**Nos. 23-35440 & 23-35450**

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO,
*Defendant-Appellant.*

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO
*Defendant,*
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives; et al.,
*Intervenors-Appellants.*

Appeal from the United States District Court
for the District of Idaho
Honorable B. Lynn Winmill
(1:22-cv-00329-BLW)

**OPENING BRIEF OF INTERVENORS-APPELLANTS
THE IDAHO LEGISLATURE**

Monte Neil Stewart
11000 Cherwell Court
Las Vegas, NV 89144
Telephone: (208) 514-6360
monteneilstewart@gmail.com

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

## CORPORATE DISCLOSURE STATEMENT

As the elected leaders of a branch of the Idaho State government, Intervenors-Appellants are not required to submit a corporate disclosure statement under Federal Rules of Appellate Procedure (FRAP) 26.1(a).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES .................................................................v

INTRODUCTION.................................................................................1

JURISDICTIONAL STATEMENT ......................................................3

ISSUES PRESENTED .........................................................................3

ADDENDUM.........................................................................................3

STANDARD OF REVIEW....................................................................4

STATEMENT OF THE CASE .............................................................4

    I.     Statutory Background .................................................................4

             A. EMTALA .........................................................................5

             B. Idaho Abortion Law .......................................................6

    II.    Procedural History...................................................................9

             A. The Complaint.................................................................9

             B. The Preliminary Injunction ................................................10

                    1. *Motions practice* ...........................................................10

                    2. *August 2022 Order*........................................................11

                    3. *Motions to Reconsider* ................................................15

                    4. *May 2023 Order* ............................................................16

C. Related State Court Litigation ............................................. 18

D. Appeal ............................................................................... 20

SUMMARY OF ARGUMENT .................................................... 20

ARGUMENT .......................................................................... 24

I.  The Preliminary Injunction Rests on Fundamental Errors of Law ....................................................................................... 24

    A. EMTALA Cannot Preempt Section 622 .............................. 24

        1. *Settled principles determine whether federal law preempts state law* .................................................. 26

        2. *EMTALA preempts state law only when it "directly conflicts" – and section 622 does not* ........................... 27

        3. *Under the Medicare Act, EMTALA cannot preempt state laws setting medical standards or regulating the practice of medicine – which is all that section 622 does* ................................................................. 31

        4. *The district court misapplied or disregarded the express preemption clauses governing EMTALA* ....... 32

    B. EMTALA Does Not Mandate Abortion ................................ 35

        1. *EMTALA's requirement of stabilizing care does not imply a duty to make abortion available* .................. 35

        2. *Construing EMTALA as an abortion mandate contradicts the statute's repeated injunction to provide medical care for unborn children* .............................. 38

iv

3. *Construing EMTALA as an abortion mandate is contrary to how Congress legislates concerning abortion* ................................................... 42

4. *The decision below is inconsistent with a related case on appeal before the Fifth Circuit* ............................. 43

5. *Construing EMTALA as an abortion mandate transgresses the major questions doctrine* ................ 45

C. The District Court Misconstrued Section 622 ..................... 54

D. Enjoining Section 622 Because of EMTALA Is Unconstitutional ............................................................... 57

1. *The preliminary injunction violates the Tenth Amendment* ............................................................ 57

2. *The Decision Below Violates the Spending Clause* .... 63

II. The Preliminary Injunction Inflicts Irreparable Harm on The Idaho Legislature ..................................................................... 66

III. The Balance of Equities and Public Interest Tip in Favor of The Idaho Legislature ..................................................................... 68

CONCLUSION .......................................................................... 72

CERTIFICATE OF COMPLIANCE ......................................... 74

STATEMENT OF RELATED CASES ...................................... 75

ADDENDUM .............................................................................. 77

v

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018)..........................................................................66

*Alabama Ass'n. of Realtors v. Dep't of Health and Human Servs.,*
    141 S. Ct. 2485 (2021)..............................................................46, 51

*American Vantage Cos. v. Table Mountain Rancheria,*
    292 F.3d 1091 (9th Cir. 2002).........................................39, 41-42

*American Acad. of Ophthalmology, Inc. v. Sullivan,*
    990 F.2d 377 (6th Cir. 1993).............................................................32

*Arizona v. United States,*
    567 U.S. 387 (2012).............................................................................57

*Baker v. Adventist Health, Inc.,*
    260 F.3d 987 (9th Cir. 2001)....................................................27, 28-29

*Bannister v. Davis,*
    140 S. Ct. 1698 (2020).........................................................................12

*Beaver v. Tarsadia Hotels,*
    816 F.3d 1170 (9th Cir. 2016).............................................................26

*Bernhardt v. Los Angeles Cty,*
    339 F.3d 920 (9th Cir. 2003) ..............................................................68

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023)................................................................45, 46

*Bond v. United States,*
    572 U.S. 844 (2014) .............................................................................57

vi

*Bradley v. School Bd. of Richmond,*
    416 U.S. 696 (1974) ......................................................................... 8-9

*Bryan v. Rectors and Visitors of Univ. of Va.,*
    95 F.3d 349 (4th Cir. 1996) ................................................................ 29

*Bryant v. Adventist Health Sys./West,*
    289 F.3d 1162 (9th Cir. 2002) ........................................................ 28-29

*BST Holdings v. OSHA,*
    17 F.4th 604 (5th Cir. 2021) ......................................................... 70-71

*Coons v. Lew,*
    762 F.3d 891 (9th Cir. 2014) ............................................................. 28

*Cipollone v. Liggett Group, Inc.,*
    505 U.S. 504 (1992) ...................................................... 25, 27, 32, 35

*CSX Trans., Inc. v. Easterwood,*
    507 U.S. 658 (1993) .......................................................................... 26

*DISH Network Corp. v. FCC,*
    653 F.3d 771 (9th Cir. 2011) ............................................................. 25

*Do Sung Uhm v. Humana, Inc.,*
    620 F.3d 1134 (9th Cir. 2010) ........................................................... 26

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ............................................. 2, 8, 23, 58, 66-67

*Doe # 1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) ........................................................... 68

*Draper v. Chiapuzio,*
    9 F.3d 1391 (9th Cir. 1993) .............................................. 12, 32, 33, 34

*Eberhardt v. Los Angeles,*
    62 F.3d 1253 (9th Cir. 1995) ............................................................. 28

vii

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015)......................................................25, 69

*Golden v. Washington*,
138 S. Ct. 448 (2017)...........................................................................67

*Gonzales v. Oregon*,
546 U.S. 243 (2006).....................................................................49, 53

*Gregory v. Ashcroft*,
501 U.S. 452 (1991).....................................................................58, 59

*Hardy v. New York City Health Hosp. Corp.*,
164 F.3d 789 (2d Cir. 1999) .......................................................29, 44

*Harry v. Marchant*,
291 F.3d 767 (11th Cir. 2002)............................................................29

*Keams v. Tempe Tech. Inst., Inc.*,
39 F.3d 222 (9th Cir. 1994).................................................................27

*Maryland v. King*,
567 U.S. 1301 (2012) ..........................................................................66

*Mayes v. Biden*,
67 F.4th 921 (9th Cir. 2023) ...............................................................52

*Mazurek v. Armstrong*,
520 U.S. 968, 972 (1996) ...............................................................24-25

*McCall v. PacifiCare of Cal., Inc.*,
21 P.3d 1189 (Cal. 2001)....................................................................31

*Medtronic v. Lohr*,
518 U.S. 470 (1996)............................................................................27

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)..............................................................18

viii

*Murphy v. National Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) ........................................................60-61, 62

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977).......................................................................66

*New York v. United States,*
    505 U.S. 144 (1992)........................................................................60

*NFIB v. OSHA,*
    142 S. Ct. 661 (2022)......................................................................46

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ..................................................................63, 65

*Nken v. Holder,*
    556 U.S. 418 (2009).......................................................................68

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ......................................................................63, 66

*Pennsylvania Medical Soc'y v. Marconis,*
    942 F.2d 842 (3d Cir. 1991) ...........................................................31

*In re Pharmaceutical Indus. Average Wholesale Price Litig.,*
    582 F.3d 156 (1st Cir. 2009) ..........................................................31

*Planned Parenthood Great Nw. v. State,*
    __ P.3d __, 2022 WL 3335696, (Idaho Aug. 12, 2022) ........7, 18-19, 56

*Planned Parenthood Great Nw. v. State,*
    522 P.3d 1132 (Idaho 2023) ..........................17, 19, 23, 55, 56, 71, 72

*Poretti v. Dzurenda,*
    11 F.4th 1037 (9th Cir. 2021) ........................................................69

*Raich v. Gonzales,*
    500 F.3d 850 (9th Cir. 2007) .........................................................59

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ............................................................... 39

*Roe v. Wade*,
410 U.S. 113 (1973) ................................................................. 6

*Root v. New Liberty Hosp. Dist.*,
209 F.3d 1068 (8th Cir. 2000) .............................................. 30

*Spector v. Norwegian Cruise Line Limited*,
545 U.S. 119 (2005) ............................................................... 46

*Southwest Voter Registration Educ. Project v. Shelley*,
344 F.3d 914 (9th Cir. 2003) ................................................... 4

*Tafflin v. Levitt*,
493 U.S. 455 (1990) ............................................................... 26

*Texas v. Becerra*,
623 F. Supp. 3d 696 (N.D. Tex. 2022) ................................ 43, 44-45, 47

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ...................................... 4, 61-62

*United States v. Kuchinski*,
469 F.3d 853 (9th Cir. 2006) .................................................. 4

*United States v. Paulk*,
569 F.3d 1094 (9th Cir. 2009) ................................................ 4

*United States Forest Serv. v. Cowpasture River Pres. Ass'n*,
140 S. Ct. 1837 (2020) ...................................... 45, 50, 59-60

*Utility Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014) ............................................ 45, 47, 50

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ......................... 45-46, 50, 51, 52, 53

x

*Washington v. Trump,*
   847 F.3d 1151 (9th Cir. 2017) ............................................................ 67

*Whitman v. American Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001) .......................................................................... 22

*Winter v. National Resource Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................. 24, 66, 67

## Constitutional Provisions

U.S. CONST. art. I § 8 ............................................................................ 63

U.S. CONST. art. VI ............................................................................... 26

U.S. CONST. amend. X .......................................................................... 57

## Statutes and Rules

CAL. GOV'T CODE § 7284.6(a)(4) ........................................................ 61

42 C.F.R. § 489.24 .......................................................................... 5-6, 40

Exec. Order No. 14,076, 87 Fed. Reg. 42053 (Jul. 8, 2022) .............. 43, 48

H.B. 374, 67th Leg., 1st Sess. (Idaho 2023) ....................................... 8, 55

H.R. 8296, 117th Cong. (2022) ............................................................ 51

IDAHO CODE § 18-604(1) ............................................................. 7, 15, 55

IDAHO CODE § 18-622 .................................................................. *passim*

IDAHO CODE § 18-622(1) ................................................................ 7, 35

IDAHO CODE § 18-622(1)(a) ................................................................. 8

IDAHO CODE § 18-622(2) ........................................ 8, 14, 23, 55-56, 62, 71

IDAHO CODE § 18-622(2)(a) ........................................................ 7

IDAHO CODE § 18-622(2)(b) ................................................... 7, 56

IDAHO CODE § 18-622(3) ................................................. 13, 14, 62

IDAHO CODE § 18-622(3)(a) ...................................................... 13

IDAHO CODE § 18-622(4) ............................................... 7, 55, 71

IDAHO CODE § 18-622(5) ............................................... 8, 55, 71

IDAHO CODE § 18-8804 ............................................................ 6

IDAHO CODE § 18-8805(4) ........................................................ 6

IDAHO CODE § 18-8807(1) ..................................................... 6-7

8 Pub. L. 117-103 ................................................................... 42

S. 4132, 117th Cong. (2022) ................................................... 51

8 U.S.C. § 1101 ...................................................................... 61

28 U.S.C. § 503 ...................................................................... 52

28 U.S.C. § 1292 ...................................................................... 3

28 U.S.C. § 1331 ...................................................................... 3

42 U.S.C. § 300a-6 ................................................................. 42

42 U.S.C. § 300a-7(b)(1) ........................................................ 42

42 U.S.C. § 300z-10(a) ........................................................... 42

42 U.S.C. § 1395 ............................................... 1, 21, 26, 31, 34, 35

42 U.S.C. § 1395dd ...................................................................... *passim*

42 U.S.C. § 1395dd(a) .......................................................... 5, 38

42 U.S.C. § 1395dd(b) ............................................. 36, 37, 38, 53

42 U.S.C. § 1395dd(b)(1) ...................................................... 5, 51

42 U.S.C. § 1395dd(b)(1)(A) ...................................................... 36

42 U.S.C. § 1395dd(c) ............................................................... 38

42 U.S.C. § 1395dd(c)(1) ............................................................ 5

42 U.S.C. § 1395dd(c)(1)(A)(ii) ................................... 1, 21, 38

42 U.S.C. § 1395dd(c)(2)(A) ......................................... 1, 21, 38

42 U.S.C. § 1395dd(d)(1)(A) ....................................................... 6

42 U.S.C. § 1395dd(d)(1)(B) ....................................................... 6

42 U.S.C. § 1395dd(d)(2)(A) ..................................................... 30

42 U.S.C. § 1395dd(e)(1) ............................................ 5, 6, 33-34, 38

42 U.S.C. § 1395dd(e)(1)(A) ..................................... 15, 36, 41

42 U.S.C. § 1395dd(e)(1)(A)(i) ........................... 1, 15, 21, 37, 38

42 U.S.C. § 1395dd(e)(1)(B) ................................ 36, 38, 39-40

42 U.S.C. § 1395dd(e)(1)(B)(i) ................................................. 40

42 U.S.C. § 1395dd(e)(1)(B)(ii) ....................... 1, 15, 21, 38, 40

42 U.S.C. § 1395dd(e)(3)(A) ...................................................... 37

42 U.S.C. § 1395dd(e)(3)(B) ........................................................ 37

42 U.S.C. § 1395dd(f) ................................. 1, 12, 14, 21, 26, 27, 30, 33, 35

42 U.S.C. § 2996f(b)(8) ............................................................. 42

42 U.S.C. § 18023(b)(4) ......................................................... 42-43

**Other Authorities**

CMS Center for Clinical Standards and Quality, QSO-22-22-Hospitals ("Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss") (July 1, 2022) ............ 48

CMS Center for Clinical Standards and Quality, QSO-21-22-Hospitals ("Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss") (Sep. 17, 2021) ........... 48

Letter from Secretary Becerra to Health Care Providers (July 11, 2022) .................................................................................. 64

## INTRODUCTION

This appeal will decide whether the United States can transform an obscure federal statute into a nationwide abortion mandate—when Congress plainly intended to foreclose that result. At issue is a preliminary injunction prohibiting the State of Idaho from enforcing Idaho Code § 18-622[1] (section 622) on the sole ground that it conflicts with the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, by outlawing abortions under circumstances when the government says that EMTALA requires it.

But the injunction has no foundation because the federal-state conflict it purportedly stands on does not exist. Two non-preemption clauses, 42 U.S.C. §§ 1395dd(f) and 1395, prevent EMTALA from overriding state laws like section 622 that circumscribe the availability of particular medical procedures like abortion. EMTALA says nothing about abortion. But it does repeatedly express a hospital's duty to care for both a pregnant woman and her unborn child. *See* 42 U.S.C. §§ 1395dd(e)(1)(A)(i), 1395dd(e)(1)(B)(ii), 1395dd(c)(1)(A)(ii),

---

[1] Unless otherwise indicated, all references to section 622 are to the amended version in effect as of July 1, 2023.

1395dd(c)(2)(A). EMTALA nowhere pits the health or safety of one against the other.

Embracing the United States' novel reading of EMTALA leads to grave results. The preliminary injunction rests on the exercise of significant executive power without clear congressional authority, contrary to the major questions doctrine. What's more, the injunction violates the Tenth Amendment by expanding federal power at the expense of state authority to regulate abortion, confirmed in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), and by transgressing the anticommandeering doctrine. Likewise, the injunction validates a reading of EMTALA contrary to the Spending Clause. The United States has tried to coerce the State of Idaho into complying with the EMTALA mandate by threatening to deprive the State of all Medicare funding, even though federal aid for emergency medical care under EMTALA is a minor part of the Medicare program. And the government presses this demand even though the supposed mandate is retroactive. Since the decision below is incorrect as a matter of law, it should be reversed and the preliminary injunction vacated.

3

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292 because the appeal is from a district court order refusing to dissolve a preliminary injunction. The appeal is timely because a notice of appeal was filed on July 3, 2023, within 60 days after the district court's order denying the Legislature's motion for reconsideration, and the United States is a party. *See* FRAP 4(a)(1)(B)(i).

## ISSUES PRESENTED

1. Does the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, preempt Idaho Code § 18-622 (section 622)?

2. If EMTALA does not require Medicare-funded hospitals to perform abortions, did the district court err as a matter of law by issuing a preliminary injunction prohibiting the enforcement of section 622?

## ADDENDUM

An addendum containing pertinent statutes is included herein at the close of this brief. 9th Cir. R. 28-2.7.

4

## STANDARD OF REVIEW

Although the district court's grant of a preliminary injunction is reviewed for abuse of discretion, *see United States v. California*, 921 F.3d 865, 877–78 (9th Cir. 2019), "[t]he district court's interpretation of the underlying legal principles … is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc)). Questions of law are reviewed de novo. *See United States v. Paulk*, 569 F.3d 1094, 1095 (9th Cir. 2009); *United States v. Kuchinski*, 469 F.3d 853, 857 (9th Cir. 2006).

## STATEMENT OF THE CASE

### I. Statutory Background

This appeal involves a preliminary injunction blocking the enforcement of section 622, which makes abortion a crime unless authorized by statute, because it supposedly conflicts with EMTALA. But the conflict is false. EMTALA is governed by two non-preemption clauses demonstrating that Congress did not intend to override state laws like section 622. Even if not, statutory text disclaims that EMTALA requires access to abortion.

5

## A.    EMTALA

EMTALA obligates Medicare-funded hospitals to provide medical treatment for emergency medical conditions, regardless of a patient's ability to pay. *See* 42 U.S.C. § 1395dd. EMTALA obligates a Medicare-participating hospital to (1) perform "an appropriate medical screening examination" to see whether the patient has an emergency medical condition, *id.* § 1395dd(a); (2) conduct a further medical exam along with "such treatment as may be required to stabilize the medical condition" or send the patient "to another medical facility," *id.* § 1395dd(b)(1); and (3) transfer a patient with an emergency medical condition that has not been stabilized only as provided and where "appropriate," *id.* § 1395dd(c)(1).

Central to these duties is EMTALA's definition of "emergency medical condition":

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part; or (B) with respect to a pregnant woman who is having contractions—(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman *or the unborn child*.

6

42 U.S.C. § 1395dd(e)(1) (emphasis added); *accord* 42 C.F.R. § 489.24.

This definition highlights Congress's solicitude toward a pregnant woman *and* her unborn child. EMTALA requires emergency medical care for both of them. The statute obligates hospitals to consider the health of either when determining whether "immediate medical attention" is needed and whether a transfer might jeopardize "the health or safety" of either. 42 U.S.C. § 1395dd(e)(1).

Noncompliance carries severe consequences. A hospital or physician "that negligently violates" EMTALA "is subject to a civil money penalty of" up to $50,000 per violation. *Id.* § 1395dd(d)(1)(A), (B). One whose violations are "gross and flagrant or is repeated" may be excluded "from participation in [Medicare] and State health care programs." *Id.* § 1395dd(d)(1)(B).

## B. Idaho Abortion Law

In 2020, Idaho adopted three statutes regulating abortion. One prohibits abortions after a fetal heartbeat has been detected. IDAHO CODE § 18-8804. This statute was intended as a stopgap measure until *Roe v. Wade*, 410 U.S. 113 (1973) was overruled. *See* IDAHO CODE § 18-8805(4). Another statute creates a cause of action against persons who perform an

7

abortion contrary to Idaho law. *Id.* § 18-8807(1). The third statute is section 622, the subject of this appeal. *See id.* § 18-622(1).

Section 622 makes it a crime to perform an abortion unless authorized by statute. *See id.* That proscription restores long-held Idaho policy. *See Planned Parenthood Great Nw. v. State*, __ P.3d __, 2022 WL 3335696, at *6 (Idaho Aug. 12, 2022) (describing how Idaho law regarded abortion as a crime, with exceptions, from territorial days until *Roe*).

Idaho law defines *abortion* as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." IDAHO CODE § 18-604(1). Section 622 prohibits physicians from performing an abortion unless an exception applies to save the mother's life or (during the first trimester) to terminate a pregnancy resulting from rape or incest. *Id.* §§ 622(2)(a), (b). These exceptions apply when a physician acts out of "good faith medical judgment and based on the facts known to the physician at the time." *Id.* Also, a doctor faces no liability when treating a pregnant mother accidentally results in the death of an unborn child. *Id.* § 622(4).

8

Section 622 exempts a woman who obtains an abortion from liability altogether. *Id.* § 622(5).

The original version of section 622 provided that it would come into effect 30 days after "[t]he issuance of the judgement in any decision of the United States supreme court that restores to the states their authority to prohibit abortion." *Id.* § 622(1)(a) (repealed). *Dobbs*, 142 S. Ct. at 2228, triggered this effective date. There, the Supreme Court overruled *Roe* and held that "[t]he Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion." *Id.* at 2284. The *Dobbs* judgment issued on July 26, 2022, making section 622 presumptively effective on August 25. *See* Docket Statement, *Dobbs v. Jackson Women's Health Org.*, No. 19-1392, at https://www.supremecourt.gov/search.aspx? filename=/docket/docketfiles/html/public/19-1392.html.

Section 622 was amended during the 2023 legislative session. *See* H.B. 374, 67th Leg., 1st Sess. (Idaho 2023) (eff. July 1, 2023). It received a new title, the "Defense of Life Act," and the provision triggering the effective date was repealed. *Id.* Affirmative defenses allowing a physician to avoid prosecution were replaced by straightforward exceptions. *See* IDAHO CODE § 622(2). Those amendments are pertinent on appeal since

9

this Court will "apply the law in effect at the time it renders its decision." *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (1974).

## II.     Procedural History

### A.     The Complaint

Shortly before section 622 became effective, the United States filed a complaint challenging its validity. 4-LEG-ER-570. The timing created needless urgency, as the district court pointed out. The government "chose to delay filing this case and its motion for preliminary injunction for over six weeks after the Supreme Court issued the *Dobbs* decision." Mem. Decision and Order, 4-LEG-ER-533.

The complaint alleges that section 622 violates the Supremacy Clause of the federal Constitution by conflicting with EMTALA. 4-LEG-ER-572. On the government's telling, EMTALA requires Medicare-participating hospitals to perform an abortion whenever a pregnant woman suffers from an "emergency medical condition" demanding it. 4-LEG-ER-571. Section 622 conflicts with that requirement because it punishes doctors delivering medical care supposedly required by EMTALA. *See* 4-LEG-ER-572. Section 622 thereby violates the Supremacy Clause and is preempted. *See id.*

Preemption follows, the government says, because "medical care that a state may characterize as an 'abortion' is necessary emergency stabilizing care that hospitals are required to provide under EMTALA." 4-LEG-ER-571. Hence section 622 is preempted because EMTALA mandates abortions that section 622 prohibits. 4-LEG-ER-572.

The United States sought a declaratory judgment stating that section 622 is preempted and that "Idaho may not initiate a prosecution against, seek to impose any form of liability on, or attempt to revoke the professional license of any medical provider based on the provider's performance of an abortion that is authorized under EMTALA." 4-LEG-ER-585. The government also demanded a preliminary and permanent injunction against section 622. *Id.*

## B. The Preliminary Injunction

### 1. *Motions practice*

Less than a week after the complaint, the Legislature sought to intervene as of right. *See* Idaho Legislature's Motion to Intervene, 4-LEG-ER-564. The district court denied intervention as of right but granted permissive intervention. 4-LEG-ER-515. A later order denied the

11

Legislature's renewed motion to intervene, 2-LEG-ER-118, and that order is also on appeal. 2-LEG-ER-81(Case No. 23-35153).

The United States sought a preliminary injunction against section 622. *See* Mot. for Prelim. Inj., 4-LEG-ER-562. Specifically, the government said that it was likely to succeed on the merits because EMTALA requires physicians to perform abortions as emergency care under circumstances that section 622 prohibits. United States' Mem. ISO Mot. for Prelim. Inj., 4-LEG-ER-548–557. The government added that section 622 would "result in irreparable harm to the public" and to the government's "sovereign interests [in enforcing EMTALA]." 4-LEG-ER-557. It claimed that the balance of equities favored an injunction since the government's "sovereign interest" was critical, 4-LEG-ER-559, while "the State of Idaho will suffer no cognizable harm" because section 622 "is not currently in effect, has never been in effect, and therefore enjoining it … would simply preserve the status quo." 4-LEG-ER-560.

### 2. August 2022 Order

The day before section 622 was due to become effective, the district court issued a preliminary injunction preventing its enforcement. Mem.

Decision and Order of Aug. 24, 1-LEG-ER-14.[2]

The principle of federal supremacy drove that result. In particular, the district court ruled that the United States would "likely succeed on the merits" because "state law must yield to federal law when it's impossible to comply with both," and section 622 "conflicts with" EMTALA. 1-LEG-ER-16. Chiefly, the court relied on a clause preempting state law "to the extent that the [state law] directly conflicts." 42 U.S.C. § 1395dd(f). The court cited circuit precedent construing the phrase "directly conflicts" in terms of impossibility and obstacle preemption. *See* 1-LEG-ER-32 (citing *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993)). So the court considered each form of preemption.

Section 622 fails impossibility preemption, the court said, because "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care" and "Idaho statutory law makes that treatment a crime." *Id*. Nor do section 622's former provisions, offering an affirmative "defense to prosecution" for a physician who performs an

---

[2] The notice of appeal identified only the May Order denying the motion for reconsideration under FRCP 59(e), but an appeal from such an order "merges with the prior determination." *Bannister v. Davis*, 140 S. Ct. 1698, 1703 (2020). As such, this brief will address both the August and May orders concerning the preliminary injunction.

13

abortion for reasons authorized by statute, Idaho Code § 18-622(3) (repealed), "cure the impossibility." 1-LEG-ER-33. The "straightforward example" of a medical condition for which section 622 does not allow an abortion is "an ectopic pregnancy." 1-LEG-ER-20. During a hearing on the injunction, "the State conceded that the procedure necessary to terminate an ectopic pregnancy is a criminal act." 1-LEG-ER-21. This, even though "[i]t is undisputed that an ectopic pregnancy in a fallopian tube is an emergency medical condition that places the patient's life in jeopardy," 1-LEG-ER-20, and section 622 expressly authorizes an abortion "to prevent the death of the pregnant woman." IDAHO CODE § 18-622(3)(a) (unamended version). Other serious complications of pregnancy include preeclampsia, the possibility of sepsis, a blood clot, or a placental abruption. *See* 1-LEG-ER-21–22. The court credited the government's contention that since section 622 does not authorize an abortion for these conditions, when EMTALA requires treatment, it is "impossible for physicians to comply with both statutes." 1-LEG-ER-35.

Section 622 fails obstacle preemption, the district court wrote, because "Idaho's criminal abortion law will undoubtedly deter physicians from providing abortions in some emergency situations." 1-LEG-ER-39.

14

EMTALA serves the purpose of "establish[ing] a bare minimum of emergency care that would be available to all people in Medicare-funded hospitals." 1-LEG-ER-38. Section 622 allegedly poses an obstacle to that purpose by "deter[ring] physicians from providing abortions in some emergency situations." 1-LEG-ER-39. In fact, the court complained that "the structure of Idaho's criminal abortion law—specifically that it provides for an affirmative defense rather than an exception—compounds the deterrent effect and increases the obstacle it poses to achieving the goals of EMTALA." 1-LEG-ER-39–40.

On these grounds, the district court concluded that section 622 "directly conflicts" with EMTALA, 42 U.S.C. § 1395dd(f), and is therefore preempted. 1-LEG-ER-32, 38. The court denied that *Dobbs* had any bearing. "*Dobbs* did not overrule the Supremacy Clause. Thus, even when it comes to regulating abortion, state law must yield to federal law." 1-LEG-ER-51.

The August Order thus "restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by [EMTALA]."

15

1-LEG-ER-51. Specifically, Idaho officials may not enforce section 622 against the following:

> [A]ny medical provider or hospital based on their performance of conduct that (1) is defined as an "abortion" under Idaho Code § 18-604(1), but that is necessary to avoid (i) "placing the health of" a pregnant patient "in serious jeopardy"; (ii) a "serious impairment to bodily functions" of the pregnant patient; or (iii) a "serious dysfunction of any bodily organ or part" of the pregnant patient, pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)–(iii).

1-LEG-ER-52.

This rendition of EMTALA omits relevant language guaranteeing emergency medical care for unborn children. *See* 42 U.S.C. §§ 1395dd(e)(1)(A)(i), 1395dd(e)(1)(B)(ii).

### 3. *Motions to Reconsider*

Two weeks later, the Legislature filed a Motion for Reconsideration. 2-LEG-ER-270; *see also* 2-LEG-ER-247. It explained that the district court overlooked how the hearing showed that the federal government's interpretation wars with EMTALA's text. 2-LEG-ER-253. EMTALA obligates a physician to protect both "the health of the woman *or her unborn child.*" *Id.* (quoting 42 U.S.C. § 1395dd(e)(1)(A) (emphasis added)). The Legislature pointed out the bitter irony of construing that statutory command to mean that EMTALA requires physicians to

perform abortions—a medical treatment, to state the obvious, which is fatal to an "unborn child." 2-LEG-ER-253–254. The Legislature also argued that precedents rejected this reading of EMTALA and repudiated "the government's attempt to use EMTALA as a wedge to leverage federal control over state abortion laws." 2-LEG-ER-256. As the Legislature explained, the court had been misled by the United States' overbroad reading of EMTALA when issuing an insupportable preliminary injunction. 2-LEG-ER-258. And the Legislature argued that those errors raise serious objections under the major questions doctrine, the Supremacy Clause, Article III, the Spending Clause, and the Tenth Amendment. *See* 2-LEG-ER-260.

### 4. *May 2023 Order*

Nine months after the preliminary injunction issued, the district court denied the Legislature's motion for reconsideration. *See* Memorandum Decision and Order of May 4, 1-LEG-ER-2 (May Order). Reaffirming its August Order, the court found "no reason to reconsider its decision … and the injunction stands." 1-LEG-ER-12. The court brushed aside arguments presented during the initial round of briefing, finding that the

17

Legislature and AGO "failed to carry their heavy burden on reconsideration." 1-LEG-ER-6.

The district court minimized an Idaho Supreme Court decision holding that section 622 is valid under the state constitution, *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132 (Idaho 2023). 2-LEG-ER-132.[3] Despite that result, the district court concluded that the Idaho decision "confirms each of the fundamental principles that underpinned this Court's decision." 1-LEG-ER-8. Although the Idaho court confirmed that section 622 does not apply to ectopic or nonviable pregnancies and that section 622's defenses take into account the subjective judgement of the individual physician who performed the abortion, these clarifications did not "fundamentally alter" the district court's analysis on preemption. *Id*. In the district court's opinion, what matters is that "EMTALA requires physicians to offer medical care that state law criminalizes." 1-LEG-ER-9. The May Order does not acknowledge amendments to section 622 that replace its affirmative defenses with exceptions. Nor does the decision below mention the Legislature's constitutional objections to the

---

[3] The Legislature and the Idaho Office of the Attorney General (AGO) filed supplemental briefing to address the implications of the Idaho Supreme Court decision. *See* 2-LEG-ER-84; 2-LEG-ER-103.

18

preliminary injunction. Accordingly, the court denied the Legislature's and AGO's motions for reconsideration, 2-LEG-ER-270, and left the preliminary injunction in place. 1-LEG-ER-12.

Other than denying the Legislature's and AGO's motions for reconsideration, the district court has taken no other steps to resolve the case. *Cf. Melendres v. Arpaio*, 695 F.3d 990, 1003 (9th Cir. 2012) (applauding a district court for "proceed[ing] to trial and otherwise mov[ing] towards a final judgment in the case without waiting for our interlocutory review").

## C.    Related State Court Litigation

While this case unfolded, parallel litigation took place before the Idaho Supreme Court. Planned Parenthood of the Great Northwest challenged all three Idaho abortion statutes as contrary to the Idaho Constitution. That state litigation holds important implications for the decision below.

Like the United States here, Planned Parenthood sought a preliminary injunction to prevent the operation of the Idaho abortion statutes, but the Idaho Supreme Court declined. *See Planned Parenthood Great N.W. v. State*, 2022 WL 3335696. That court held that the challenge

to section 622 lacked a "*substantial* likelihood of success on the merits" because Planned Parenthood was essentially "asking this Court to … declare a right to abortion under the Idaho Constitution when—on its face—there is none." *Id.* at *6.

Nor did Planned Parenthood fare any better on the merits. The Idaho Supreme Court held that it "cannot read a fundamental right to abortion into the text of the Idaho Constitution." *Planned Parenthood*, 522 P.3d at 1148. The court explained that "there simply is no support for a conclusion that a right to abortion was 'deeply rooted' at the time the [Idaho Constitution] was adopted." *Id.* All three Idaho statutes were sustained under the Idaho Constitution. *Id.* at 1147. Significant for this case, the court determined that "ectopic and non-viable pregnancies" are outside the scope of section 622. *Id.* at 1202. "Thus, treating an ectopic [or other non-viable pregnancy], by removing the fetus is plainly not within the definition of 'abortion' as criminally prohibited by [section 622]." *Id.* at 1203.

**D.    Appeal**

A timely notice of appeal followed on July 3, 2023, ECF No. 138, 4-LEG-ER-587. This brief is filed within the deadline prescribed under the recent scheduling order. *See* Order of July 20, 2023, Dkt. No. 7.

## SUMMARY OF ARGUMENT

This appeal concerns a preliminary injunction founded on a non-existent conflict between federal and state law. The district court accepted the federal government's novel claim that EMTALA requires Medicare-funded hospitals to perform abortions as emergency care and that section 622 is preempted insofar as it conflicts with that requirement. 1-LEG-ER-32–47; 1-LEG-ER-9–12. For that reason, the district court issued a preliminary injunction barring the enforcement of section 622 insofar as it conflicts with EMTALA. *See* 1-LEG-ER-51–52.

That decision is incorrect and should be reversed. EMTALA is not a nationwide abortion mandate, section 622 does not prevent medical care for pregnant women in distress, and the federal-state conflict accepted by the district court as justification for enjoining section 622 is riddled with multiple defects.

Consider the federal side of the government's purported conflict. Two non-preemption clauses governing EMTALA preclude it from preempting a state law like section 622.

*First*, EMTALA says that it preempts only when state law "directly conflicts." 42 U.S.C. § 1395dd(f). That language excludes preemption based on an implied duty not in EMTALA's text. Since EMTALA does not expressly require hospitals to perform abortions as emergency care, Idaho's section 622 poses no conflict with it. *Second*, EMTALA is governed by a non-preemption provision in the Medicare Act, *id.* § 1395, of which EMTALA is a part. That provision—binding on EMTALA— denies federal authority to preempt state standards of medical care like Idaho's restrictions on abortion.

Even without these obstacles to preemption, the decision below is faulty. EMTALA repeatedly directs a hospital to deliver medical care to a pregnant woman *and* her unborn child. *See* 42 U.S.C. §§ 1395dd(e)(1)(A)(i), 1395dd(e)(1)(B)(ii), 1395dd(c)(1)(A)(ii), 1395dd(c)(2)(A). Although EMTALA does not describe particular forms of medical treatment, it unambiguously requires Medicare-funded hospitals to care for unborn children.

Construing EMTALA as a national abortion mandate also runs headlong into the major questions doctrine. Few issues are more politically consequential than deciding whether and when an abortion should be legal. EMTALA says nothing about abortion but repeatedly directs hospitals and physicians to deliver medical treatment to a pregnant woman and her unborn child. Yet the United States claims that this obscure statute guaranteeing emergency medical care for patients at Medicare-funded hospitals contains a *sub silentio* requirement to perform abortions. It is hard to imagine a tinier mousehole or a larger elephant than what the United States contrives here. *See Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes"). And it makes no difference that the United States as a whole rather than an individual agency asserts that power. Allowing the Executive Branch to assert significant executive power without clear congressional authority undermines the major questions doctrine's dual rationale of the separation of powers and sensible statutory construction.

The state side of the government's supposed conflict is no less mistaken. Section 622 does not bar doctors from treating a pregnant

woman's emergency medical condition. Section 622 authorizes a doctor to perform an abortion when, in the doctor's subjective medical judgment, it is necessary to save a woman's life or when (during the first trimester) a pregnancy results from rape or incest. IDAHO CODE § 18-622(2). Because the exception for medical necessity turns on subjective professional judgment, the doctor faces no threat of prosecution for good-faith measures intended to save a woman's life. *See id.* Beyond all this, Idaho law does not regard medical treatment for conditions like preeclampsia or ectopic pregnancy or other non-viable pregnancies as an abortion at all. *See Planned Parenthood*, 522 P.3d at 1202-03.

Beyond these errors of statutory construction, the preliminary injunction harbors unacknowledged constitutional defects. The preliminary injunction deprives the State of Idaho of the sovereign power to regulate abortion, which the Supreme Court recognized in *Dobbs*, 142 S. Ct. at 2228. Accepting the government's reading of EMTALA would eliminate state authority over abortion based on nothing more than the Executive Branch's interpretive creativity. What is more, the preliminary injunction violates the Tenth Amendment's anticommandeering principle by purporting to regulate Idaho state officials rather than the

24

hospitals to which EMTALA is addressed. Also, the district court's construction of EMTALA offends the Spending Clause. Congress's power to attach conditions to federal grants does not include the power to terminate grants for other programs to secure compliance with a federal directive or to impose such a condition retroactively. The lower court's reading of EMTALA transgresses both these limitations.

Finally, the other injunction factors strongly favor reversal. The Idaho Legislature continues to suffer irreparable harm every day that section 622 is enjoined, and the balance of equities tips in favor of vacating the injunction.

## ARGUMENT

## I. THE PRELIMINARY INJUNCTION RESTS ON FUNDAMENTAL ERRORS OF LAW.

### A. EMTALA Cannot Preempt Section 622.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Supreme Court precedent likewise establishes that since the United

States requested the preliminary injunction, it bears the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1996). Likelihood of success on the merits "is the most important" factor. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Unless the government satisfies that element, a court "need not consider the remaining" factors. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776–77 (9th Cir. 2011). The United States has failed to carry its heavy burden because the preliminary injunction issued by the district court rests on fundamental errors of law. It should not stand.

The sole basis for enjoining Idaho law is the district court's determination that "there will always be a conflict between EMTALA and Idaho Code § 18-622" because "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care." 1-LEG-ER-31, 32. But the district court lost sight of a vital principle. "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992). That principle should decide this case. EMTALA is governed by two non-preemption clauses

that should have prevented the outcome below. Since EMTALA does not preempt section 622, the decision below is incorrect.

      1.   *Settled principles determine whether federal law preempts state law.*

"[U]nder our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Congress may, in the exercise of its enumerated powers, displace state law. *See Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1148 (9th Cir. 2010). When that occurs the Supremacy Clause prescribes a choice-of-law rule, that federal law "shall be the supreme Law of the Land." U.S. CONST. art. VI. Preemption falls into recognized categories: field, conflict, and express. *See Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016) (citation omitted).

EMTALA is governed by two express preemption clauses, 42 U.S.C. §§ 1395dd(f) and 1395. These clauses mark the boundaries of EMTALA's preemptive scope. When a statute contains an express preemption clause, courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Precisely limning

how far a federal statute affects state law is critical. The task is to "identify the domain expressly pre-empted by that language." *Medtronic v. Lohr*, 518 U.S. 470, 484 (1996) (cleaned up). And it is evident that "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S. at 517. That is why "express provisions for preemption of some state laws imply that Congress intentionally did not preempt state law generally, or in respects other than those it addressed." *Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994).

The question, then, is whether the express preemption clauses governing EMTALA support "the pre-emptive reach" justifying the preliminary injunction. *Cipollone*, 505 U.S. at 517. They do not.

> 2.   *EMTALA preempts state law only when a state law "directly conflicts"—and section 622 does not.*

EMTALA contains an express "non-preemption provision." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001). It says, "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Non-

preemption is the baseline: EMTALA generally "do[es] *not* preempt any State or local law requirement." *Id.* (emphasis added). Preemption occurs only where state law "*directly* conflicts with a requirement of this section," *Id.* (emphasis added). The adverb matters. A purported conflict between EMTALA and state law must be *direct. Cf. Coons v. Lew*, 762 F.3d 891, 902 (9th Cir. 2014) (voiding an Arizona statute for directly conflicting with the Affordable Care Act).

Circuit precedent affirms that EMTALA does not dictate particular standards of medical care. *Eberhardt v. Los Angeles*, 62 F.3d 1253 (9th Cir. 1995), rejected an EMTALA claim against a physician for not "conduct[ing] a psychiatric evaluation or a mental status evaluation" for a man later killed by the police following a violent psychiatric episode. *Id.* at 1255. "EMTALA clearly declines to impose on hospitals a national standard of care in screening patients." *Id.* at 1258. The Court explained that "Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay." *Id.*

Other decisions by this Court are no less insistent that EMTALA does not prescribe standards of medical care beyond the statute's overt

requirements. *See Baker*, 260 F.3d at 993 ("The statute is not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice."); *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1166 (9th Cir. 2002) ("EMTALA, however, was not enacted to establish a federal medical malpractice cause of action nor to establish a national standard of care.").

Other circuits agree that EMTALA does not preempt state standards of medical care. *Hardy v. New York City Health Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999) (reading EMTALA's non-preemption clause as evidence "that one of Congress's objectives was that EMTALA would peacefully coexist with applicable state 'requirements'"); *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996) ("[T]he legal adequacy of that [stabilizing] care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt."); *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) ("EMTALA was not intended to establish guidelines for patient care, to replace available state remedies, or to provide a federal remedy for medical negligence.") (citations omitted).

30

EMTALA preempts state law only when it contradicts with the statute's express requirements. *Root v. New Liberty Hospital District*, 209 F.3d 1068 (8th Cir. 2000), illustrates. There, the Eighth Circuit held that EMTALA preempted a Missouri statute immunizing state political subdivisions like hospital districts from tort suits. Because that law directly conflicts with EMTALA's provision allowing for a personal damage suit, 42 U.S.C. § 1395dd(d)(2)(A), the court readily concluded that "Missouri's sovereign immunity statute must yield." *Id.* at 1070. *Root* shows why the decision below is mistaken. The district court's ruling that EMTALA preempts Idaho law rests on the premise that EMTALA contains an implied duty of hospitals to perform abortions as emergency care. 1-LEG-ER-14. But *Root* preempted Missouri's sovereign immunity statute only because EMTALA expressly authorizes what Missouri law prohibited. *See id.* at 1069. Since EMTALA has no express requirement requiring abortion, it does not preempt section 622. *See* 42 U.S.C. § 1395dd(f).

> 3.  *Under the Medicare Act, EMTALA cannot preempt state laws setting medical standards or regulating the practice of medicine—which is all that section 622 does.*

EMTALA's preemptive reach is further shortened by a separate non-preemption clause in the Medicare Act. It provides that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided … or to exercise any supervision or control over the administration or operation of any such institution, agency, or person." 42 U.S.C. § 1395. This clause establishes that "the practice of medicine is, in general, a subject of state regulation." *Pennsylvania Med. Soc'y v. Marconis*, 942 F.2d 842, 846 n.4 (3d Cir. 1991); *accord In re Pharm. Indus. Average Wholesale Price Lit.*, 582 F.3d 156, 175 (1st Cir. 2009) (construing section 1395 to mean that the Medicare Act "reserves a regulatory role to the states" and "demonstrates Congress's intent to minimize federal intrusion into the area."). Courts have interpreted section 1395 as a bar to preempting state consumer protection laws, *see id.*, and state standards of medical care, *see McCall v. PacifiCare of Cal., Inc.*, 21 P.3d 1189, 1197 (Cal. 2001) (the Medicare Act does not displace state tort law).

Because EMTALA is bound by section 1395 it cannot be construed as "a mechanism to supervise or control the practice of medicine." *American Acad. of Ophthalmology, Inc. v. Sullivan*, 998 F.2d 377, 387 (6th Cir. 1993).

> 4. *The district court misapplied or disregarded the express preemption clauses governing EMTALA.*

The district court lost sight of EMTALA's limited "pre-emptive reach." *Cipollone*, 505 U.S. at 517.

It was wrong to conclude that a state law "directly conflicts" with EMTALA based on impossibility and obstacle preemption. *See* 1-LEG-ER-32 (citing *Draper*, 9 F.3d at 1393). In the court's opinion, it is physically impossible to obey both EMTALA and section 622 because "federal law requires the provision of care and state law criminalizes that very care." *Id.* Section 622 poses obstacle preemption too, on the court's view that "Idaho's criminal abortion statute … will undoubtedly deter physicians from providing abortions in some emergency situations. That, in turn, would obviously frustrate Congress's intent to ensure adequate emergency care for all patients who turn up in Medicare-funded hospitals." 1-LEG-ER-39.

33

The May Order reiterated this line of argument, with minor qualifications. Although the Idaho Supreme Court sustained section 622 as constitutional, the district court concluded that section 622 embodies a subjective standard for physicians invoking the statute's affirmative defenses and held that section 622 has no bearing on the medical treatment of ectopic or nonviable pregnancies. 1-LEG-ER-8. The court below ruled that these important clarifications of Idaho law "do not fundamentally alter this Court's preemption analysis." *Id*.

But the May Order (like the August Order before it) neglects the teaching that "a court should construe [EMTALA's] preemptive effect as narrowly as possible." *Draper*, 9 F.3d at 1393. It was an error of law to conclude that section 622 "directly conflict[s]" with EMTALA based on an implied duty to perform abortions on which EMTALA is silent. 42 U.S.C. § 1395dd(f). EMTALA's language alone leaves an Idaho physician entirely free to comply with both that statute and section 622. Nothing in section 622 prevents a doctor from performing an emergency screening examination or treating emergency medical conditions experienced by a pregnant woman. And section 622 poses no obstacle to EMTALA's purposes. EMTALA reflects the policy choice to mandate emergency

medical care for both a pregnant woman and her unborn child—and section 622 is fully aligned with those aims. *See* 42 U.S.C. § 1395dd(e)(1) (defining *emergency medical condition* in part as a threat to "the health of the woman or her unborn child").

*Draper* is not to the contrary. There, the Court held that EMTALA's two-year statute of limitations did not preempt an Oregon law imposing a one-year notice-of-claim requirement. 9 F.3d at 1393–94. While interpreting EMTALA's non-preemption clause in terms of impossibility and obstacle preemption, the Court stressed that it would "construe [EMTALA's] preemptive effect as narrowly as possible." *Id.* at 1393. That approach is consistent with the need to "respect legislative provisions that explicitly address preemption." *Id.* By contrast, the district court considered whether EMTALA preempts section 622 without respecting *Draper*'s cautious approach to EMTALA's baseline of non-preemption. *See* 1-LEG-ER-32.

Strikingly, neither of the district court's orders mentions the Medicare Act's non-preemption clause, 42 U.S.C. § 1395. That clause forecloses EMTALA as a basis for preempting section 622, which embodies both a state standard of medical care (proscribing abortion

under particular circumstances) and a regulation of the medical profession (prescribing the suspension or loss of a medical license for violating the statute.) *See* IDAHO CODE § 18-622(1). As such, section 622 is the kind of state law that Congress intended to operate free from federal "supervision or control." 42 U.S.C. § 1395.

The district court misapplied EMTALA's non-preemption clause by ruling that an implied duty to perform abortions "directly conflicts" with the statute, 42 U.S.C. § 1395dd(f) and by not considering the non-preemption clause under the Medicare Act, *id.* § 1395. Consequently, the preliminary injunction exaggerates EMTALA's "pre-emptive reach." *Cipollone*, 505 U.S. at 517. We urge the Court to reverse the decision below for that reason alone. Such an outcome would provide complete relief to the Legislature while allowing the Court to avoid other issues.

### B. EMTALA Does Not Mandate Abortion.

#### 1. *EMTALA's requirement of stabilizing care does not imply a duty to make abortion available.*

Reversal is no less warranted if the Court decides to address whether EMTALA can be fairly interpreted as a requirement for Idaho physicians to perform abortions regardless of state law. The district court's central ruling is that "EMTALA obligates the treating physician

to provide stabilizing treatment, including abortion care," 1-LEG-ER-32. That conclusion flouts statutory text and context alike.

Any duty under EMTALA to perform abortions arises by implication. The statute nowhere uses the word *abortion* or anything like it. The federal-state conflict at the foundation of the preliminary injunction rests on an implication drawn from EMTALA's spare language requiring a hospital to provide "stabilizing treatment" when a screening exam concludes that a patient has an emergency medical condition. 42 U.S.C. § 1395dd(b) (heading); *accord id.* § 1395dd(b)(1)(A) (requiring "such treatment as may be required to stabilize the [emergency] medical condition").

EMTALA's text refutes the government's mandate-by-implication. The statute does not specify what medical treatment satisfies the duty to provide "stabilizing treatment." *Id.* at § 1395dd(b). The statutory heading from which that phrase is taken actually says, "Necessary stabilizing treatment for emergency medical conditions and labor." *Id.* The words "and labor" suggest the need for medical care to treat a pregnant woman in labor, just as the definition of "emergency medical condition" expressly provides. *Id.* § 1395dd(e)(1)(A), (B). Delving more deeply into EMTALA,

37

the definition of *stabilized* undermines the idea of abortion as mandated medical care. For all patients, EMTALA requires such care to mean that "no material deterioration of the [emergency medical] condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility …." *Id.* at § 1395dd(e)(3)(B). But the corresponding definition of *emergency medical condition* requires emergency care whenever a pregnant woman has a medical condition that places "the health of the woman *or her unborn child* in serious jeopardy." *Id.* § 1395dd(e)(1)(A)(i) (emphasis added). Since abortion places the unborn child in "serious jeopardy"—fatal jeopardy, in fact—that medical procedure is outside the meaning of "stabilizing treatment" under EMTALA. *Id.* § 1395dd(b). Augmenting that point, EMTALA's only approved form of stabilizing treatment for a pregnant woman with contractions is delivering her child. *Id.* § 1395dd(e)(3)(A). For the government's claim to work, one must accept that a statute expressly requiring emergency care for unborn children and endorsing the delivery of a child as a means of stabilizing a pregnant woman with contractions also implies the duty to perform abortions. That implication simply makes no sense.

> 2. *Construing EMTALA as an abortion mandate contradicts the statute's repeated injunction to provide medical care for unborn children.*

Construing "stabilizing treatment," *id.* § 1395dd(b), to mean that hospitals not only may—but must—perform abortions despite contrary state law defies provisions expressing Congress's commitment to unborn children. Congress left no doubt that federally funded hospitals must provide medical treatment for an unborn child. EMTALA contains four provisions requiring emergency care for both a pregnant woman and her unborn child. *See* 42 U.S.C. §§ 1395dd(e)(1)(A)(i); 1395dd(e)(1)(B)(ii); 1395dd(c)(1)(A)(ii); and 1395dd(c)(2)(A).

The August Order (and by reaffirmance, the May Order) excises EMTALA's references to the protection of unborn children from the preemption analysis. That untoward result follows from disregarding and misstating portions of EMTALA's definition of "emergency medical condition." *Id.* § 1395dd(e)(1). Since that definition is the fulcrum on which the statute's screening, stabilizing, and transfer duties depend, getting the definition wrong is fundamental. *See id.* §§ 1395dd(a)–(c).

The August Order casts aside half of that definition as it concerns "a pregnant woman who is having contractions." *Id.* § 1395dd(e)(1)(B).

39

The only proffered explanation is that it regarded subsection (B) as "not relevant to the issues before the Court." 1-LEG-ER-17 n.1.

That footnote is extraordinary. The United States has challenged the validity of section 622 on the theory that EMTALA commands Medicare-participating hospitals to perform abortions to stabilize pregnant women with emergency medical conditions. *See* 4-LEG-ER-579. EMTALA's description of when "a pregnant woman who is having contractions" experiences an emergency medical condition is plainly relevant. 42 U.S.C. § 1395dd(e)(1)(B). Turning a blind eye to subsection (B) flouts the "well-established principle of statutory construction that legislative enactments should not be construed to render their provisions mere surplusage." *Am. Vantage Cos. v. Table Mountain Rancheria*, 292 F.3d 1091, 1098 (9th Cir. 2002) (cleaned up); *accord Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.") (citation omitted). Surplusage is exactly what subsection (B) becomes in the decision below.

Reading subsection (B) confirms its relevance. It provides that a pregnant woman with contractions has an emergency medical condition, within the meaning of the statute, if a physician determines "(i) that there

is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child." 42 U.S.C. § 1395dd(e)(1)(B). Transferring a woman in that condition to another facility is forbidden unless there is time enough for "a safe transfer … *before* delivery." *Id.* § 1395dd(e)(1)(B)(i) (emphasis added). This limitation avoids the prospect of delivering a child during an ambulance ride or in a related circumstance away from the safety and comfort of a hospital. Then there is a general prohibition on any transfer that "may pose a threat to the health or safety of the woman *or the unborn child.*" *Id.* § 1395dd(e)(1)(B)(ii) (emphasis added). Even the prospect of such a threat renders a transfer illegal. The hospital is obliged to consider not only the unborn child's life, but his or her "health or safety." *Id.*; *accord* 42 C.F.R. § 489.24 (same).

The district court's determination to brush aside subsection (B), 1-LEG-ER-17 n.1 clashes with the opening sentences of the August order. "Pregnant women in Idaho routinely arrive at emergency rooms experiencing severe complications. The patient might be spiking a fever, experiencing uterine cramping and chills, *contractions*, shortness of

breath, or significant vaginal bleeding." 1-LEG-ER-14 (emphasis added).

If these conditions are a concern—and they should be—then subsection

(B) is not only relevant but potentially conclusive.

Having set aside subsection (B), the August Order strikes out EMTALA's remaining reference to the medical treatment of an unborn child. Subsection (A) of the statute's definition of "emergency medical condition" provides that such a condition exists when the absence of "immediate medical attention" probably will result in "placing the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A) (emphasis added). Yet the court unaccountably removes the phrase "or her unborn child" from its injunction. *See* 1-LEG-ER-52 (prohibiting the enforcement of section 622 insofar as an abortion is "necessary to avoid (i) 'placing the health of' a pregnant patient 'in serious jeopardy'").

Through these two basic errors—dismissing subsection (B) as irrelevant and removing the phrase "or unborn child" from subsection (A)—the district court effectively rewrites EMTALA. Not only does the court's interpretive carpentry violate the canon against rendering

42

statutory text "mere surplusage." *Am. Vantage Cos.*, 292 F.3d at 1098.

That approach transforms EMTALA from a humane measure guaranteeing emergency medical care for a pregnant woman and her unborn child into a measure protecting the mother alone.

> 3. *Construing EMTALA as an abortion mandate is contrary to how Congress legislates concerning abortion.*

From the larger context of congressional lawmaking, the decision below is at odds with Congress's established pattern of speaking plainly when it legislates regarding abortion. *See, e.g.*, 42 U.S.C. § 300a-6 (barring the use of federal funds "in programs where abortion is a method of family planning"); *id.* § 300z-10(a) (specifying that "grants may be made only to projects or programs which do not advocate, promote, or encourage abortion"); *id.* § 2996f(b)(8) (prohibiting the federal funding for the Legal Services Corporation for use in "any proceeding or litigation which seeks to procure a nontherapeutic abortion"). Federal laws protecting the conscience rights of healthcare workers and institutions likewise use the word *abortion*. *See, e.g.*, Church Amendments, *id.* § 300a-7(b)(1) (forbidding public officials to require an "individual to perform or assist in the performance of any sterilization procedure or abortion" if it "would be contrary to his religious beliefs or moral convictions"); the

Weldon Amendment, 8 Pub. L. 117-103, div. H, title V General Provisions, § 507(d)(1) (withholding federal appropriations from any unit of federal or state government if it "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions"); Affordable Care Act, 42 U.S.C. § 18023(b)(4) ("No qualified health plan offered through an Exchange may discriminate against any individual health care provider or health care facility because of its unwillingness to provide, pay for, provide coverage of, or refer for abortions.").

> 4. *The decision below is inconsistent with a related case on appeal before the Fifth Circuit.*

The district court's construction of EMTALA has already been rejected by another federal court. *Texas v. Becerra*, 623 F. Supp. 3d 696, 739 (N.D. Tex. 2022), granted an injunction for the State of Texas preventing HHS and CMS from enforcing the same EMTALA-as-abortion-mandate theory pressed here. That theory appeared in an HHS Guidance document issued after an executive order directed federal agencies to "protect and expand access to abortion." Exec. Order No. 14,076, 87 Fed. Reg. 42053 (Jul. 8, 2022).

44

Four reasons led the Texas court to rule that the State likely would succeed on the merits. (1) In the court's view, the "HHS Guidance likely exceeds its statutory authority and is not a permissible construction of EMTALA." *Becerra*, 623 F. Supp. 3d at 724. (2) EMTALA "creates obligations to stabilize *both* a pregnant woman and her unborn child." *Id.* at 725 (emphasis added). Even though this dual obligation can be in tension, as when a pregnant woman experiences a medical emergency, EMTALA's text does not address that potential conflict and the United States exceeded its statutory authority by imposing a national policy that proffers abortion as the only acceptable treatment. *Id.* at 726. (3) Given the express preemption clauses in EMTALA and the Medicare Act, the court found that Congress intended for "EMTALA [to] peacefully coexist with applicable state requirements." *Id.* at 727 (quoting *Hardy*, 164 F.3d at 795). (4) Lastly, the district court stressed that the HHS Guidance was unprecedented—that "EMTALA has never been construed to preempt state abortion laws." *Id.* at 735. This offered more evidence that the HHS's reading of EMTALA cannot be sustained. *Id.*

Therefore, the Texas district court issued a preliminary injunction, which it later converted to a permanent injunction barring CMS and

HHS from enforcing the guidance document. *See Texas v. Becerra*, No. 5-22-cv-00185, ECF No. 109 (N.D. Tex. Jan. 13, 2023). That ruling is on appeal before the Fifth Circuit.

> 5. *Construing EMTALA as an abortion mandate transgresses the major questions doctrine.*

The United States' whole case turns on the assertion that EMTALA requires Medicare-participating hospitals to perform abortions as emergency medical care. *See* 4-LEG-ER-585. Reading EMTALA that way collides with the major questions doctrine. It presumes that Congress will "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). When that occurs, "something more than a merely plausible textual basis" is necessary, *W. Va. v. EPA*, 142 S. Ct. 2587, 2609 (2022): only "clear congressional authorization" will do. *Util. Air*, 573 U.S. at 324. Indeed, "exceedingly clear language" is necessary if Congress "wishes to significantly alter the balance between federal and state power." *U.S Forest Serv. v. Cowpasture River Preserv. Assn.*, 140 S. Ct. 1837, 1850 (2020). Requiring "a clear statement," *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023), of congressional authority to justify the consequential exercise of executive power rests on "both separation of

powers principles and a practical understanding of legislative intent." *W. Va.*, 142 S. Ct. at 2609. Like other clear-statement rules, the major questions doctrine "ensure[s] Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005).

Only months ago, *Biden*, 143 S. Ct. at 2355, applied the major questions doctrine to invalidate the Department of Education's student-loan-forgiveness program. *Id.* at 2375. *Biden* marks the fourth case since 2021 where the Supreme Court has relied on the major questions doctrine in significant challenges to federal law. *See W. Va.*, 142 S. Ct. at 2616 (invalidating an EPA rule because "[a] decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body"); *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) (setting aside an OSHA standard requiring large employers to ensure that their employees were vaccinated against COVID-19); *Ala. Assoc. of Realtors v. Dep't of Health and Hum. Servs.*, 141 S. Ct. 2485 (2021) (voiding a nationwide eviction moratorium imposed by the Centers for Disease Control).

47

Familiar "telltale sign[s]" show that this is a classic major questions doctrine case. *Biden*, 143 S. Ct. at 2382 (Barrett, J., concurring).

*First*, the United States "claims to discover in a long-extant statute an unheralded power" to control national abortion policy. *Util. Air*, 573 U.S. at 324. Accepting the government's interpretation of EMTALA "would bring about an enormous and transformative expansion in [the Executive Branch's] regulatory authority without clear congressional authorization." *Id.* Construing EMTALA, a narrow measure for ensuring access to emergency medical care, as an unyielding requirement to provide abortions regardless of contrary state law is nothing short of "transformative." *Id.* By the government's logic, controversial medical treatments of all kinds can be inferred from the wonderfully versatile phrase "necessary stabilizing treatment." 4-LEG-ER-574 (quoting 42 U.S.C. § 1395dd). But the idea that Congress hid a federal abortion mandate in a remote corner of the Medicare Act is wholly implausible.

*Second*, the government's reading of EMTALA is unprecedented. The Northern District of Texas held so in *Becerra*. 623 F. Supp. 3d at 735 ("EMTALA has never been construed to preempt state abortion laws").

Although proving a negative is notoriously difficult, evidence of that novelty appears by comparing two CMS guidance documents. Three days after President Biden directed federal agencies to heighten federal protections for abortion access, Exec. Order No. 14,076, 87 Fed. Reg. 42053 (Jul. 8, 2022), CMS issued a memorandum purporting to remind hospitals of their duties under EMTALA. Among them is this:

> ***If a physician believes that a pregnant patient*** *presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician* ***must*** *provide that treatment. When a state law prohibits abortion and does not include an exception for the life of the pregnant person — or draws the exception more narrowly than EMTALA's emergency medical condition definition —* ***that state law is preempted***.

CMS Center for Clinical Standards and Quality, QSO-22-22-Hospitals ("Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss"), at 1 (July 11, 2022) (emphasis in original). This paragraph, which captures the Executive Branch's legal theory in this case, does not appear in the previous CMS guidance memo on EMTALA issued in 2021. *See* CMS Center for Clinical Standards and Quality, QSO-21-22-Hospitals ("Reinforcement of EM-TALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss") (Sep. 17, 2021). Its novelty is another

strike against the claim that EMTALA requires Idaho hospitals to perform abortions.

*Third*, the Attorney General, who brought this suit, lacks the expertise to determine whether abortion is the appropriate form of medical treatment for certain emergency medical conditions. *Gonzales v. Oregon*, 546 U.S. 243 (2006), is instructive. There, the Attorney General defended an interpretive rule restricting the use of controlled substances for physician-assisted suicide. The Court concluded that "the authority claimed by [him] is both beyond his expertise and incongruous with the statutory purposes and design." *Id.* at 267. Significantly for this case, the purported "implicit delegation" of such authority was "not sustainable." *Id.* An "oblique form" of statutory authority is flatly insufficient when the assertion of executive power concerns a matter of "earnest and profound debate across the country." *Id.* (quotation omitted). Exactly the same can be said of the United States' claim that EMTALA confers an "implicit delegation" of authority to compel physicians to perform abortions prohibited by state law based on the statute's "oblique" language. *Id.*

*Fifth*, the political implications of the federal government's supposed authority here are far-reaching. The United States' complaint

claims that EMTALA requires physicians at Idaho hospitals to perform abortion procedures as "stabilizing treatment" for a pregnant woman. 4-LEG-ER-576. That claim is a matter of "vast … political significance," *Util. Air*, 573 U.S. at 324 (quotation omitted). National controversy will erupt if the Executive Branch is allowed to exercise "highly consequential power [over abortion] beyond what Congress could reasonably be understood to have granted," *W. Va.*, 142 S. Ct. at 2609, and to "significantly alter the balance between federal and state power," without "exceedingly clear language" from Congress. *Cowpasture River*, 140 S. Ct. at 1849-50. The power to regulate abortion would then rest with the Justice Department rather than with members of Congress or elected officials in every state.

Together, these signs of executive overreach mean that the United States must identify "more than a merely plausible textual basis" to justify the assault on Idaho law. *W. Va.*, 142 S. Ct. at 2609. The government's burden is to identify "'clear congressional authorization' for the power it claims." *Id.* (quoting *Util. Air*, 573 U.S. at 324).

51

Clear authorization is exactly what the United States lacks. The only statutory text remotely supporting its claim is EMTALA's requirement to deliver "such treatment as may be required to stabilize the medical condition" of a patient with an emergency medical condition. 42 U.S.C. § 1395dd(b)(1). This generic duty to provide emergency care is the "wafer-thin reed" on which the United States leans to seize "sweeping power" over abortion. *Ala. Assoc.*, 141 S. Ct. at 2489.

Contriving an abortion mandate from EMTALA disregards Supreme Court precedents under the major questions doctrine. Like the CDC's eviction moratorium, the Executive Branch's weaponization of EMTALA asserts "a breathtaking amount of authority." *Id*. And like the EPA's electricity generation rule, the United States has interpreted EMTALA as a national abortion mandate that "Congress had conspicuously and repeatedly declined to enact itself," *W. Va.*, 142 S. Ct. at 2610. *See* Women's Health Protection Act of 2023, H.R. 8296, 117th Cong. §§ 4(a)(1), 5(a)(1) (2022) (proposed legislation prescribing a federal right to "abortion services" that would "supersede" contrary state law); S. 4132, 117th Cong. §§ 3(a)(1), 4(a)(1) (2022) (same). It is impossible to square

these results with controlling precedents insisting on congressional clarity in other matters of national significance. Forcing unwilling states like Idaho to accept federal policy on abortion is a "decision of such magnitude and consequence" that it belongs (if at all) to Congress—not to the interpretive creativity of the Justice Department. *W. Va.*, 142 S. Ct. at 2616.

*Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), poses no obstacle to applying the major questions doctrine. True, *Mayes* held that the doctrine does not apply to actions of the President under the Procurement Act. *See id.* at 933. Here, the complaint is founded on EMTALA, which does not delegate discretionary authority to the President. *See* 4-LEG-ER-572. Also unlike *Mayes*, political accountability is a live issue since the suit is brought by the United States under the direction of the Attorney General, an appointed official—not an elected one. *See* 28 U.S.C. § 503. Applied here, the major questions doctrine would not interfere with the President's duty to see that the laws are faithfully executed. The leeway owed to a President carrying out that duty under an express grant of congressional authority, *see Mayes*, 67 F.4th at 933, is misplaced when considering the lawfulness of asserted executive authority without a presidential overlay.

53

Excusing the United States from the major questions doctrine merely because the lawsuit is brought by the Department of Justice rather than by an individual agency would flout Supreme Court precedent. *See, e.g.*, *Gonzales*, 546 U.S. at 267–68 (Attorney General lacked authority from "oblique" statutory provision to criminalize assisted suicide). Besides, declining to hold the United States to account under the major questions doctrine also would frustrate the doctrine's twin rationales of "separation of powers principles and a practical understanding of legislative intent." *W. Va.*, 142 S. Ct. at 2609.

Indeed, the potential consequences of sanctioning the United States' newly discovered power under EMTALA are staggering. The government's essential claim is that EMTALA's duty of stabilizing treatment is a blank page that the Executive Branch may fill with its preferred medical policy. By that logic, the United States could impose a federal mandate to perform sterilization procedures, gender-transitioning procedures, or virtually any kind of medical procedure—so long as the purported mandate can be dressed up as "necessary stabilizing treatment." 42 U.S.C. § 1395dd(b). Such an approach would displace Congress's role as the Nation's lawmaker, in a quintessential

violation of the major questions doctrine. Considering that possibility, any quibble about the differences between the United States' lawsuit here and an individual agency action should be set aside.

### C. The District Court Misconstrued Section 622.

Errors of law also skewed the district court's analysis of section 622. By its account, "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care. But regardless of the pregnant patient's condition, Idaho statutory law makes that treatment a crime." 1-LEG-ER-32. In fact, the lower court characterized section 622 as an impediment to decent medical care for a pregnant woman in distress. *See* 1-LEG-ER-49–50 (describing "the pregnant patient, laying on a gurney in an emergency room facing the terrifying prospect of a pregnancy complication that may claim her life" but where "her doctors feel hobbled by an Idaho law that does not allow them to provide the medical care necessary to save her health and life"). That depiction of section 622 is false and misleading.

False because section 622 does not make it a crime to deliver needed medical treatment to a pregnant woman.

*First*, the statute wholly exempts a woman who obtains an abortion. IDAHO CODE § 18-622(5).

*Second*, not all medical procedures to terminate a pregnancy qualify as an abortion under Idaho law. By statute, *abortion* is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id.* § 18-604(1). The Idaho Supreme Court has definitively held that section 622 does not cover ectopic or other non-viable pregnancies. *See Planned Parenthood*, 522 P.3d at 1202–03. A doctor faces no liability if giving a pregnant mother needed medical treatment accidentally results in the death of an unborn child. *See* IDAHO CODE §§ 18-622(4) (statutory exemption); *id.* § 18-604(1) (defining *abortion* as using some means "to intentionally terminate" a pregnancy).

*Third*, recent amendments clarify that section 622 contains straightforward exceptions rather than affirmative defenses. *See* H.B. 374, 67th Leg., 1st Sess. (Idaho 2023). Section 622 now provides that an abortion to save a woman's life or (during the first trimester) to address a pregnancy from rape or incest "shall not be considered criminal

abortions." IDAHO CODE §§ 18-622(2); 18-622(2)(b). Nor is a physician vulnerable to prosecution because he performed an abortion believing that a woman's life was at risk. A mistake of fact is no basis for prosecution. These statutory exceptions protect a physician who acts "in his good faith medical judgment and based on the facts known to the physician at the time." *Id.* §§ 18-622(2)(a)(i), (ii). Given that safe harbor, section 622 should no longer "deter physicians from providing abortions in some emergency situations." 1-LEG-ER-39; *accord* 1-LEG-ER-7. Yet the May Order neglects to acknowledge these important amendments.

The district court's depiction of section 622 is misleading as well. Far from posing an irrational obstacle to decent medical care, section 622 simply restores Idaho law to its pre-*Roe* condition. *See Planned Parenthood*, 2022 WL 3335696, at *6 (Abortion was a crime under Idaho law from territorial days until *Roe*). With exceptions for a mother's life or pregnancies resulting from rape or incest, section 622 fairly reflects Idaho's "history and traditions" under which a nontherapeutic "abortion was viewed as an immoral act and treated as a crime." *Planned Parenthood*, 522 P.3d at 1148.

In sum, the federal-state conflict for which the district court issued a preliminary injunction is false at both ends. Reading EMTALA as an abortion mandate defeats Congress's evident intent to secure emergency medical care for both a pregnant woman and her unborn child, and Idaho's section 622 is not the draconian measure depicted by the lower court. Because there is no conflict between EMTALA and section 622, the preliminary injunction has no foundation. It should be vacated and the decision below reversed.

**D.    Enjoining Section 622 Because of EMTALA Is Unconstitutional.**

*1.    The preliminary injunction violates the Tenth Amendment.*

Under the federal Constitution, "both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). This system of dual sovereignty means that "the National Government possesses only limited powers [and] the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854 (2014). That essential principle of federalism is enshrined in the Tenth Amendment, which promises that "powers not delegated to the United States" by the Constitution are "reserved to the States respectively, or the people." U.S.

CONST. amend. X. The decision below clashes with the Tenth Amendment in two respects.

*First*, enjoining section 622 unlawfully deprives the State of Idaho of its reserved power to regulate abortion. The Supreme Court has held that the Constitution reserves that power to the states.

> We therefore hold that the Constitution does not confer a right to abortion. *Roe* and *Casey* must be overruled, and the authority to regulate abortion must be returned to the people and their elected representatives.

*Dobbs*, 142 S. Ct. at 2279.

Implications of deep constitutional importance flow from that holding. *Dobbs* contemplates that abortion will be regulated in a way that "will be more sensitive to the diverse needs of a heterogenous society," that "increases opportunity for citizen involvement in democratic process," that "allows for more innovation and experimentation in government," and that "makes government more responsive by putting the States in competition for a mobile citizenry." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (citation omitted). All these virtues of a federal system guarded by the Tenth Amendment naturally follow from *Dobbs's* determination that states hold the power to regulate abortion.

59

The decision below thwarts the exercise of that sovereign power. By enjoining Idaho's section 622 based on an implied duty under EMTALA, the district court has prevented Idaho from governing itself as *Dobbs* assured all states that they were free to do. Nor is the district court's explanation convincing. Its decision rests on the Supremacy Clause, which the court described as a rule that "state law must yield to federal law when it's impossible to comply with both." 1-LEG-ER-16. The court added that "*Dobbs* did not overrule the Supremacy Clause…. [E]ven when it comes to regulating abortion, state law must yield to conflicting federal law." 1-LEG-ER-51. The court below misconceived the limits of the Supremacy Clause. True, "if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment." *Raich v. Gonzales (Raich II)*, 500 F.3d 850, 867 (9th Cir. 2007). But "[t]his is an extraordinary power in a federalist system … that we must assume Congress does not exercise lightly." *Gregory*, 501 U.S. at 460. That is why courts insist on "exceedingly clear language" if federal law is to "alter the balance between federal and state power," *Cowpasture River*, 140 S. Ct.

at 1849-50. EMTALA is "exceedingly clear," *id.*—but in the opposite direction. Yet the district court missed the federalism implications of reading EMTALA as an abortion mandate.

*Second*, the preliminary injunction offends the anticommandeering doctrine, which acknowledges that "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). This means that "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York v. United States*, 505 U.S. 144, 166 (1992). In *Murphy*, the Supreme Court invalidated a federal statute prohibiting states from authorizing sports gambling. *Murphy* explained that for a federal statute to preempt state law, it must satisfy two conditions: (1) "represent the exercise of a power conferred on Congress by the Constitution"; (2) the "provision at issue must be best read as one that regulates private actors." 138 S. Ct. at 1479. The sports gambling provision failed that test. In the Court's view, "there is simply no way to understand the provision prohibiting state authorization as anything other than a direct

command to the States. And that is exactly what the anticommandeering rule does not allow." *Id.* at 1481.

Circuit precedent is no less forceful in applying the anticommandeering doctrine. In *United States v. California*, 921 F.3d 865 (9th Cir. 2019), the United States challenged California laws "expressly designed to protect [state] residents from federal immigration enforcement." *Id.* at 872. There too, the federal government invoked the Supremacy Clause "and moved to enjoin [the laws'] enforcement." *Id.* at 873. The district court denied the injunction and this Court affirmed. The United States claimed that the Immigration and Nationalization Act, 8 U.S.C. § 1101 *et. seq.*, preempted California law because it directs state law enforcement agencies not to transfer a person to federal immigration authorities "unless authorized by a judicial warrant or judicial probable cause determination." *California*, 921 F.3d at 886 (quoting Cal. Gov't Code § 7284.6(a)(4)). Critically, this Court discerned that "the specter of the anticommandeering rule distinguishes the case before us from the preemption cases on which the United States relies." *Id.* at 888. That rule, the Court explained, "permits a state's refusal to adopt preferred federal policies." *Id.* at 889. Preemption does not apply because federal

immigration law "does not require any particular action on the part of California or its political subdivisions." *Id.* at 889. Without a clear statutory mandate, "the federal government was free to *expect* as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment." *Id.* at 891 (emphasis in original).

So too, here. The August Order "restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by [EMTALA] ...." 1-LEG-ER-51. Tellingly, this order is directed at State officials rather than at "regulat[ing] private actors" like hospitals. *Murphy*, 138 S. Ct. at 1479. And as in *California*, what's really at stake is whether Idaho may "refus[e] to adopt preferred federal policies" on which Congress has elected not to adopt an express mandate. 921 F.3d at 889. Under the anticommandeering doctrine, the answer is yes— Idaho may make that choice.

For both these reasons, the preliminary injunction should be set aside as contrary to the Tenth Amendment.

2.     *The Decision Below Violates the Spending Clause.*

The decision below also violates the Constitution's Spending Clause. *See* U.S. CONST. art. I, § 8. There are "limits on Congress's power … to secure state compliance with federal objectives." *NFIB v. Sebelius*, 567 U.S. 519, 576 (2012). One, when "conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes." *Id.* at 580. Two, retroactive conditions are forbidden. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). Both principles apply here.

*First*, the United States threatens to withhold all Medicare funding unless Idaho complies with the government's abortion mandate under EMTALA. The complaint asserts the government's "interest in protecting the integrity of the funding it provides under Medicare and ensuring that hospitals who are receiving Medicare funding will not refuse to provide stabilizing treatment to patients experiencing medical emergencies." 4-LEG-ER-582. Idaho receives massive funding under Medicare, as the United States concedes. "From 2019 to 2020, HHS paid approximately ***74 million dollars*** for emergency department care in Idaho hospitals

enrolled in Medicare. *Id.* (emphasis added). Funding for emergency facilities is only a small part of the "approximately ***$3.4 billion*** in federal Medicare funds during fiscal years 2018-2020." 4-LEG-ER-546 (emphasis added). The United States then stresses that *all* Medicare funding—not limited to emergency facilities—is "conditioned on compliance with EMTALA." *Id.*

The complaint accuses section 622 of denying the United States "the benefit of its bargain … by affirmatively prohibiting Idaho hospitals from complying with certain obligations under EMTALA." 4-LEG-ER-582. By prohibiting abortion unless authorized by law, section 622 allegedly "undermines the overall Medicare program and the funds that the United States provides in connection with that program …." 4-LEG-ER-582–83. The threat is obvious. Idaho hospitals must perform abortions whenever the United States says that EMTALA requires it, or risk the loss of billions in Medicare funding. Any doubt that the threat is intended should be put to rest given the directive issued by HHS Secretary Becerra. He instructed Medicare-participating hospitals that violating the EMTALA abortion mandate "may be subject to termination of its Medicare provider agreement." Letter from Secretary Becerra to

65

Health Care Providers, July 11, 2022, at 2, *available at*

https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-

to-health-care-providers.pdf.

Threatening to withhold all Medicare-related funding from Idaho

hospitals unless they adhere to a baseless construction of EMTALA

exceeds the Government's authority under the Spending Clause.

Consider a similar dispute under the Affordable Care Act. States

challenging the statute complained that "Congress [was] coercing

[them] to adopt the changes it wants by threatening to withhold all of a

State's Medicaid grants, unless the State accepts the new expanded

funding and complies with the conditions that come with it." *NFIB*, 567

U.S. at 575. That provision of the ACA amounted to "economic

dragooning that leaves the States with no real option but to acquiesce

in the Medicaid expansion." *Id.* at 582 (footnote omitted). Likewise here.

The United States threatens the State of Idaho with the devastating loss

of all Medicare funding (of which EMTALA-related funding is a small

part) unless Idaho hospitals comply with the government's lawless

exercise of power under EMTALA. Leveraging compliance in this way is

not a policy nudge—but "a gun to the head." *Id* at 581.

*Second*, the federal government's demand for compliance with a contested interpretation of EMTALA is retroactive. It comes long after Idaho agreed to the conditions of participating in Medicare. Imposing its abortion mandate on Idaho hospitals retroactively is another reason to conclude that the government is violating the Spending Clause. *Pennhurst*, 451 U.S. at 25.

## II. THE PRELIMINARY INJUNCTION INFLICTS IRREPAR-ABLE HARM ON THE IDAHO LEGISLATURE.

The Idaho Legislature will "suffer irreparable harm" unless the injunction is vacated. *Winter*, 555 U.S. at 20. Supreme Court precedent teaches that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (citing *Md. v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)); *accord New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). That principle is especially true when a federal court blocks a state law adopted through democratic processes on a matter of public controversy.

Here, the Idaho Legislature enacted section 622 in anticipation of a Supreme Court decision by the U.S. Supreme Court abandoning *Roe*. *Dobbs*, 142 S. Ct. 2228, is that decision. It held that "[t]he Constitution

does not prohibit the citizens of each State from regulating or prohibiting abortion," and, accordingly, "return[ed] that authority to the people and their elected representatives." *Id.* at 2284. The injunction blocks that return of sovereign authority and thwarts Idaho's exercise of democratic self-government.

Maintaining the preliminary injunction against 622 is anything but harmless even if it did issue a year ago. Federal injunctions are the exception, not the norm. *See Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right."). Every day that passes with an injunction in place inflicts irreparable harm on the Legislature.

Conversely, the United States will not suffer irreparable harm from vacating the preliminary injunction. Any harm from waiting to persuade an appellate panel that section 622 poses a genuine conflict with EMTALA before enjoining the law is hardly "irreparable" since the government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam), *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017). Otherwise, any lawsuit by the United States challenging

a state law would unavoidably impose an irreparable injury on the state in the course of testing the law's validity. That cannot be so. The *Winter* standard strives to *avoid* irreparable injury—not inflict it. It is the harm from interfering with state law that counts as irreparable injury, not the operation of a state law the federal government opposes.[4]

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIP IN FAVOR OF THE IDAHO LEGISLATURE.

The last two *Winter* factors—balancing the equities and the public interest—merge when the United States is a party. *See Nken*, 556 U.S. at 435.

The district court thought it a "key consideration" to account for "what impact an injunction would have on non-parties and the public at large." 1-LEG-ER-49 (citing *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003)). The public at large would be best served, the court said, by vindicating the Supremacy Clause. *See id.* In addition, the court discerned that "allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho." *Id.* And hospital

---

[4] The government cannot cite third-party harm as the source of injury to itself when *Nken v. Holder*, 556 U.S. 418 (2009), asks "whether *the applicant* will be irreparably injured." *Id.* at 426 (emphasis added); *accord Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020).

capacity in neighboring states "would be pressured as patients may choose to cross state lines to get the emergency care they are entitled to receive under federal law." 1-LEG-ER-50–51. Compared to these interests, the August Order said that "the State of Idaho will not suffer any real harm if the Court issues the modest preliminary injunction the United States is requesting." 1-LEG-ER-51. Hence, the court concluded that "the public interest lies in favor of enjoining the challenged Idaho law to the extent it conflicts with EMTALA." *Id.*

Respectfully, the lower court analysis is flawed. Where the court focused on how the preliminary injunction affects "non-parties and the public at large," 1-LEG-ER-49, the likelihood of success on the merits "is the most important" factor in evaluating an injunction. *Garcia*, 786 F.3d at 740. Also, what matters under the "balance of equities" prong are "the burdens or hardships to [the plaintiff] compared with the burden on [the State of Idaho and the Legislature] if an injunction is ordered." *Poretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Properly focused on that inquiry, the balance tips in the Legislature's favor. For the Legislature, the preliminary injunction interposes federal judicial power on an issue of profound importance to Idaho. Elected state officials acted in good faith

by adopting section 622 in harmony with Supreme Court precedent. Enjoining Idaho law is an affront to the State that only searching judicial scrutiny can justify. By contrast, the United States can identify no hardship of its own if an injunction does not prevent the operation of section 622 before it has been conclusively declared invalid on the merits. A federal injunction blocking an Idaho law on a matter of great public importance imposes a greater hardship on the State of Idaho than the burden the United States would bear by postponing injunctive relief until its unprecedented claim of federal power has prevailed following trial and appellate review.

Public interest likewise weighs against the preliminary injunction. Enjoining section 622 based on an untested and erroneous interpretation of EMTALA introduces uncertainty and confusion for Idaho law enforcement authorities and for healthcare professionals trying to treat pregnant women in a medical crisis. The preliminary injunction likewise disserves the public interest by suggesting that Idaho hospitals will lose Medicare funding for complying with state law. And at the level of fundamental principle, "[t]he public interest is also served by maintaining our constitutional structure," which the preliminary

injunction disrupts by exaggerating the authority of the Executive Branch at the expense of Congress and the State of Idaho. *BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

Nor—and this point deserves emphasis—does vacating the preliminary injunction pose a threat to the healthcare needed by pregnant women in Idaho. Section 622 expressly authorizes such care through the exemptions and exceptions we have described. *See* IDAHO CODE §§ 18-622(2), (4), (5). There is no reasonable prospect, for instance, that a woman suffering from preeclampsia or the side-effects of an ectopic pregnancy will be denied life-saving medical care because of section 622. Preeclampsia is a dangerous condition that poses a genuine threat to a woman's life, and section 622 expressly authorizes an abortion where a physician judges it in good faith to be necessary. *See id.* § 18-622(2). An ectopic pregnancy can be equally life-threatening and even when not, its removal is not an abortion under Idaho law. *See Planned Parenthood*, 522 P.3d at 1203. Since EMTALA does not dictate any particular form of medical treatment—including abortion—an Idaho doctor complies with EMTALA by giving a pregnant woman with an emergency medical condition the same care provided to any similarly situated patient,

regardless of the patient's ability to pay. That may include medical treatments other than abortion to resolve a pregnant woman's emergency medical condition.

On the other side of the balance sheet, the United States has no legitimate interest in compelling Idaho's compliance with an implied mandate contrary to EMTALA's text and context. Certainly, there is no public interest in substituting the United State' conception of abortion policy for Idaho's. Reasonable minds differ about when the law should allow a woman to terminate her pregnancy. But Idaho's elected officials have lawfully exercised their authority to adopt laws restoring the State's historic commitment to protecting unborn life. *Id.* at 1148 (describing Idaho's "history and traditions" under which "abortion was viewed as an immoral act and treated as a crime"). And nothing in EMTALA precludes that choice.

## CONCLUSION

The Court should reverse the decision below and vacate the district court's orders granting preliminary injunctive relief.

Respectfully submitted,

*/s/ Daniel W. Bower*
Daniel W. Bower

73

Monte Neil Stewart
11000 Cherwell Court
Las Vegas, NV 89144
Telephone: (208) 514-6360
monteneilstewart@gmail.com

MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors - Appellants*

August 7, 2023

74

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO 9TH CIRCUIT RULE 32-1
## FOR CASE NOS. 23-35440 & 23-35450

I hereby certify that this brief complies with the word limits permitted by Ninth Circuit Rule 32-1. The brief is 13,657 words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

Dated: August 7, 2023          */s/ Daniel W. Bower*
                               Daniel W. Bower

                               *Counsel for Intervenors - Appellants*

## STATEMENT OF RELATED CASES

The Idaho Legislature is aware of a related case pending in this Court, pursuant to Ninth Circuit Rule 28-2.6: *United States of America v. State of Idaho*, Case No. 23-35153 (appealing the district court's denial of the Idaho Legislature's motion to intervene as of right).

Respectfully submitted,

*/s/ Daniel W. Bower*
Daniel W. Bower
Monte N. Stewart
MORRIS BOWER & HAWS
12550 W. Explorer Drive
Suite 100
Boise, ID 83713
208-345-3333

dbower@morrisbowerhaws.com

*Counsel for Intervenors - Appellants*

August 7, 2023

# ADDENDUM

## TABLE OF CONTENTS

EMTALA—42 U.S.C. § 1395dd ................................................................ 79

IDAHO CODE § 18-622 ......................................................................... 88

42 U.S.C. § 1395dd

# § 1395dd. Examination and treatment for emergency medical conditions and women in labor

**(a) Medical screening requirement.**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this title [42 USCS §§ 1395 et seq.]) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor.**

**(1) In general**.

If any individual (whether or not eligible for benefits under this title [42 USCS §§ 1395 et seq.]) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

> **(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> **(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

**(2) Refusal to consent to treatment**.

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and

benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3) Refusal to consent to transfer**.

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

**(c) Restricting transfers until individual stabilized.**

**(1) Rule**.

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless—

**(A)**

**(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 1861(r)(1) [42 USCS § 1395x(r)(1)]) has signed a certification that[1] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the

---

[1] So in original. Probably should be followed by a comma.

unborn child from effecting the transfer, or

**(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1861(r)(1) [42 USCS § 1395x(r)(1)]), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

**(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

**(2) Appropriate transfer**.

An appropriate transfer to a medical facility is a transfer—

**(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

**(B)** in which the receiving facility—

**(i)** has available space and qualified personnel for the treatment of the individual, and

**(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility with all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency

medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

**(d) Enforcement.**

**(1) Civil monetary penalties**.

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1128A [42 USCS § 1320a-7a] (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1128A(a) [42 USCS § 1320a-7a(a)].

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who—

**(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

**(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this title [42 USCS §§ 1395 et seq.] and State health care programs. The provisions of section 1128A [42 USCS § 1320a-7a] (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1128A(a) [42 USCS § 1320a-7a(a)].

**(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1866(a)(1)(I) [42 USCS § 1395cc(a)(1)(I)]) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

**(2) Civil enforcement.**

**(A) Personal harm**.

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

84

**(B) Financial loss to other medical facility**.

Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(C) Limitations on actions**.

No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**.

In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this title [42 USCS §§ 1395 et seq.], the Secretary shall request the appropriate quality improvement organization (with a contract under part B of title XI [42 USCS §§ 1320c et seq.]) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this title [42 USCS §§ 1395 et seq.] for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B [42 USCS §§ 1320c et seq.].

**(4) Notice upon closing an investigation**.

The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

**(e) Definitions.**

In this section:

**(1)** The term "emergency medical condition" means—

    **(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

        **(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

        **(ii)** serious impairment to bodily functions, or

        **(iii)** serious dysfunction of any bodily organ or part; or

    **(B)** with respect to a pregnant woman who is having contractions—

        **(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

        **(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1866 [42 USCS § 1395cc].

**(3)**

    **(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the

Case: 23-35440, 08/07/2023, ID: 12769714, DktEntry: 10, Page 100 of 103

86

condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

**(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1861(mm)(1) [42 USCS § 1395x(mm)(1)]) and a rural emergency hospital (as defined in section 1861(kkk)(2) [42 USCS § 1395x(kkk)(2)]).

**(f) Preemption.**

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

**(g) Nondiscrimination.**

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

87

**(h) No delay in examination or treatment.**

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

**(i) Whistleblower protections.**

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

Idaho Code § 18-622.

## § 622. Defense of life act.

**(1)** Except as provided in subsection (2) of this section, every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

**(2)** The following shall not be considered criminal abortions for purposes of subsection (1) of this section:

> **(a)** The abortion was performed or attempted by a physician as defined in this chapter and:
>
> > **(i)** The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and
> >
> > **(ii)** The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or
>
> **(b)** The abortion was performed or attempted by a physician as defined in this chapter during the first trimester of pregnancy and:

89

  **(i)** If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws; or

  **(ii)** If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported to a law enforcement agency or child protective services that she is the victim of an act of rape or incest and a copy of such report has been provided to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws.

**(3)** If a report concerning an act of rape or incest is made to a law enforcement agency or child protective services pursuant to subsection (2)(b) of this section, then the person who made the report shall, upon request, be entitled to receive a copy of such report within seventy-two (72) hours of the report being made, provided that the report may be redacted as necessary to avoid interference with an investigation.

**(4)** Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

**(5)** Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.