Nos. 23-35440, 23-35450

IN THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellee,*

*v.*

STATE OF IDAHO
*Defendant-Appellant,*

*v.*

MIKE MOYLE, ET AL.,
*Movants-Appellants*

On Appeal from the United States District Court
For the District of Idaho
No. 1:22-cv-329
Hon. B. Lynn Winmill

**BRIEF OF INDIANA AND 18 OTHER STATES AS *AMICI
CURIAE* IN SUPPORT OF APPELLANT STATE OF IDAHO**

Office of the Attorney General
302 W. Washington Street, IGCS 5th Floor
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov
*Counsel of Record

THEODORE E. ROKITA
  Attorney General of Indiana
THOMAS M. FISHER*
  Solicitor General
JAMES A. BARTA
  Deputy Solicitor General
MELINDA R. HOLMES
  Deputy Attorney General
*Counsel for* Amici *States*
*Additional counsel listed with signature block*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTEREST OF THE *AMICI* STATES ...................................................... 1

SUMMARY OF THE ARGUMENT ........................................................... 2

ARGUMENT ............................................................................................... 4

I.   The United States Lacks a Cause of Action to Sue States Under the Supremacy Clause, Particularly to Enforce Conditions of Grants to Non-State Entities ................................................................................... 4

II.  EMTALA's Narrow Exemption from its Anti-Preemption Clause Does Not Apply to Generally Applicable State Laws Governing Medical Services ................................................................................................... 10

III. The Spending Power Does Not Give Congress the Authority to Pay Hospitals to Exempt Themselves from Generally Applicable State Laws Policing Medical Services ................................................................ 13

    A. The Supremacy Clause applies to federal law, not conditions on federal grants ..................................................................................... 13

    B. Treating Medicare conditions as laws having preemptive effect risks violating the Tenth Amendment and the Republican Form of Government Clause ................................................................................ 17

CONCLUSION ............................................................................................ 22

ADDITIONAL COUNSEL ........................................................................ 23

CERTIFICATE OF COMPLIANCE ......................................................... 24

CERTIFICATE OF SERVICE ................................................................... 25

# TABLE OF AUTHORITIES

### CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ................................................................... 15

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................. 5, 7

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ............................................................ *passim*

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*,
   33 F.4th 1107 (9th Cir. 2022) ............................................... 10, 11

*Barnes v. Gorman*,
   536 U.S. 181 (2002) ................................................................ 8, 14

*Cipollone v. Liggett Grp., Inc.*,
   505 U.S. 504 (1992) ..................................................................... 11

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   142 S. Ct. 1562 (2022) ............................................................ 8, 14

*Deanco Healthcare, LLC v. Becerra*,
   365 F. Supp. 3d 1029 (C.D. Cal. 2019) ....................................... 11

*Democratic Party of Wis. v. Vos*,
   966 F.3d 581 (7th Cir. 2020) ................................................. 21, 22

*Dobbs v. Jackson Women's Health Organization*,
   142 S. Ct. 2228 (2022) ..................................................... 1, 11, 20

*Draper v. Chiapuzio*,
   9 F.3d 1391 (9th Cir. 1993) ........................................................ 10

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) ....................................................................... 8

*Health and Hosp. Corp. v. Talevski*,
   143 S. Ct. 1444 (2023) ................................................................ 17

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020) .......................................................................................5

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)...........................................................................................10

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
  469 U.S. 256 (1985)...................................................................................13, 16

*Linder v. United States*,
  268 U.S. 5 (1925).............................................................................................19

*Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
  474 U.S. 494 (1986)...........................................................................................7

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)...................................................................................15, 18

*New York v. United States*,
  505 U.S. 144 (1992)..........................................................................................21

*Newport v. Fact Concerts, Inc.*,
  453 U.S. 247 (1981)............................................................................................8

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981).........................................................................................8, 14

*South Dakota v. Dole*,
  483 U.S. 203 (1987)..........................................................................................15

*In re T.D. Bank, N.A.*,
  150 F. Supp. 3d 593 (D.S.C. 2015) .................................................................13

*Texas v. Becerra*,
  623 F. Supp. 3d 696 (N.D. Tex. 2022) ...................................................3, 11, 12

*United States v. Butler*,
  297 U.S. 1 (1936)........................................................................................3, 19, 20

*United States v. California*,
  655 F.2d 914 (9th Cir. 1980) .............................................................................4

*United States v. Doremus*,
249 U.S. 86 (1919) ..........................................................................19

*Wallace v. Kato*,
549 U.S. 384 (2007 .............................................................................7

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) ..............................................................................8

*Ex Parte Young*,
209 U.S. 123 (1908) .............................................................................6

*Ziglar v. Abbasi*,
137 S. Ct. 1843 (2017) .........................................................................5

**STATUTES**

42 U.S.C. § 1395a-7(b)(5) ...................................................................7

42 U.S.C. § 1395cc(b)(2) ....................................................................7

42 U.S.C. § 1395dd.....................................................................*passim*

Idaho Code § 18-622(3)(a) ............................................................2, 12

**OTHER AUTHORITIES**

Charles G. Addison, *A Treatise on the Law of Contracts* (11th ed.
1911) ....................................................................................................9

David Engdahl, *The Contract Thesis of the Federal Spending Power*,
52 S.D. L. Rev. 496 (2007).................................................................14

David Engdahl, *The Spending Power*, 44 Duke L.J. 1 (1994)..............9

Federal Rule of Appellate Procedure 29(a)(2)......................................1

*Overview of the State - Idaho – 2023*, HRSA Maternal & Child
Health, https://mchb.tvisdata.hrsa.gov/Narratives/Overview/
da820095-c0e3-4708-a1a7-abb733cde3af..........................................12

Philip Hamburger, *Purchasing Submission: Conditions, Power, and
Freedom* ...........................................................................13, 15, 16, 21

The Federalist No. 33 (J. Cooke ed. 1961) ...............................................................17

U.S. Const. Article IV, § 4 .......................................................................................21

U.S. Const. Article VI................................................................................................13

1 William W. Story, *A Treatise on the Law of Contracts* § 552
    (Boston, Little, Brown & Co., 5th ed. 1874) ....................................................8, 9

## INTEREST OF *AMICI* STATES

The States of Indiana, Alabama, Arkansas, Florida, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming respectfully submit this brief as *amici curiae* in support of the Defendant.[1]

In the wake of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), many States, like Idaho, prohibit abortion at all stages of pregnancy, with exceptions for the saving the life of the mother or preventing severe and irreversible harm to the mother. The *Amici* States have an interest in the rejection of the United States' untenable position that EMTALA preempts the law at issue here.

Furthermore, the United States has taken the remarkable position that it may seek a federal court injunction against a State any time it thinks a state law violates the conditions of a federal grant issued to a non-state entity. Such power would permit the Executive Branch to challenge all manner of state police-power regulations and fundamentally transform the relationships among citizens, their States, and the United States.

*Amici* States fully support the arguments of Idaho explaining why its law does not preclude use of abortion to stabilize a mother consistent with EMTALA. *Amici* submit this brief to expound on related arguments and explain why the Court should

---

[1] *Amici* States file this brief under Federal Rule of Appellate Procedure 29(a)(2).

reject the position of the United States at even more fundamental levels—because the United States cannot sue States to enforce grant conditions applicable to hospitals, because EMTALA's grant conditions are not "laws" with preemptive effect under the Supremacy Clause, and because concluding otherwise would call EMTALA into question under both the Tenth Amendment and the Republican Form of Government Clause.

## SUMMARY OF ARGUMENT

Idaho criminalizes abortion but provides an affirmative defense where "[t]he physician determined . . . that the abortion was necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(3)(a)(ii). The district court enjoined the abortion law under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, which requires hospitals participating in Medicare to provide stabilizing care to all patients who arrive at an emergency department suffering from an emergency medical condition. The United States hypothesized below that with "some pregnancy-related emergency medical conditions," such as ectopic pregnancy or severe preeclampsia, "a physician could determine that the necessary stabilizing treatment is care that could be deemed an 'abortion' under Idaho law." 3-ER-375. The district court agreed, holding that compliance with both the Idaho statute and EMTALA is impossible, and that even if compliance with both were possible, the

Idaho statute creates an obstacle to the execution of Congress' objectives under EMTALA. 1-ER-31–47.

The existence of any conflict between EMTALA and Idaho's abortion law is highly suspect, and EMTALA's allegedly preemptive effect was denied in a similar case. *See Texas v. Becerra*, 623 F. Supp. 3d 696, 727–30 (N.D. Tex. 2022). But this case also raises larger questions over whether the United States can sue a State directly under the Supremacy Clause and whether Congress can preempt a State's use of its police power by way of conditions on federal grants. The position of the United States is not merely that Congress can sometimes preempt state law using the spending power, but that the federal government can, in effect, pay hospitals to violate state law with impunity. The Supreme Court has expressly stated, however, that the federal government may not establish a financial relationship directly with a regulated entity that both bypasses state officials and negates state police-power authority. *See United States v. Butler*, 297 U.S. 1, 77–78 (1936).

Indeed, such authority would radically restructure the relationships among the federal government, States, and citizens. With several other major federal grant programs, such as Medicaid, the State plays an intermediary role whereby it assents to grant conditions and modulates its governance of citizens accordingly. But here the United States offers the novel argument that the federal government may bypass the

State entirely and establish a relationship directly with a citizen that, at the citizen's election, effectively immunizes the citizen from state police power authority.

A proper understanding of grant conditions and the federal spending power, not to mention the basic dual-sovereign structure of American constitutional government, does not permit such an arrangement. Rather, federal grant recipients continue to be governed by the state police power, which informs whether citizens can qualify for federal grants under specified grant conditions. In other words, the proper question in this case is not whether the Idaho abortion law is preempted by federal law, but whether the Idaho law prevents its hospitals from qualifying for federal Medicare grants. The answer to that question is surely no (for reasons well explained by Idaho), but framing the question properly is critical to understanding and preserving the proper relationships among the federal government, States, and citizens.

## ARGUMENT

### I. The United States Lacks a Cause of Action To Sue States Under the Supremacy Clause, Particularly To Enforce Conditions of Grants to Non-State Entities

As a suit against a State under the Supremacy Clause to enforce conditions of federal grants to non-state entities, this case is, fundamentally, a non-starter.

To sue a State, "the federal government," "like any other plaintiff," "must first have a cause of action." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). But no constitutional or statutory provision expressly authorizes the United

States to seek an injunction when state law prevents a private party from accepting a federal grant. And that authority cannot be inferred. As the Supreme Court has emphasized in recent years, gone is the "*ancien regime*" in which courts "assumed it to be a proper judicial function" to imply causes of action. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017); *see, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020); *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). Now, the "watchword is caution." *Hernandez*, 140 S. Ct. at 742. If Congress "does not itself so provide, a private cause of action will not be created through judicial mandate." *Ziglar*, 137 S. Ct. at 1856.

That is true even where federal and state law conflict. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015). *Armstrong* concerned an action by providers of residential habilitation services challenging Idaho's failure to amend existing Medicaid reimbursement rates. *Id.* at 323–24. The challengers argued that Idaho's rates were inconsistent with section (30)(A) of the Medicaid Act. *Id.* The Court held that the providers' lawsuit was barred because the Supremacy Clause does not create an "implied right of action." *Id.* at 327. It explained that the Supremacy Clause "creates a rule of decision," but not "any federal rights" or "a cause of action." *Id.* at 324–25. In other words, "[i]t instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325.

While the *Armstrong* Court recognized "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted," an injunction "is a judge-made remedy" emanating from the Court's decision in *Ex Parte Young*, 209 U.S. 123 (1908). "[W]e have never held or even suggested that . . . it rests upon an implied right of action contained in the Supremacy Clause." *Armstrong*, 575 U.S. at 327.

Under *Armstrong*, a claim that federal law preempts state regulation is the basis upon which injunctive relief can be awarded, it is not itself a cause of action. *See id. Armstrong* thus directly forecloses a right of action directly under the Supremacy Clause—a holding that applies as much to the federal government as to a private entity. *Contra* ECF No. 95 at 13–14. And because *this* case purports to be a Supremacy Clause case, *see* 3-ER-372; 3-ER-383, a direct right of action is lacking.

Furthermore, EMTALA itself already provides a comprehensive enforcement scheme, which forecloses any implication of a cause of action for the United States. *Armstrong*, 575 U.S. at 328 (rejecting cause of action in equity). Under EMTALA, the federal government can seek civil monetary penalties against hospitals and physicians who "negligently violate[]" EMTALA's stabilizing requirements. 42 U.S.C. § 1395dd(d)(1). In addition, patients "who suffer[] personal harm as a direct result of a participating hospital's violation" has a cause of action "against the participating

6

hospital" to obtain relief for the harm caused to them. *Id.* § 1395dd(d)(2). And the Secretary of HHS can exclude hospitals and physicians who violate EMTALA from participating in other federal programs. *Id.* § 1395cc(b)(2); *id.* § 1395a-7(b)(5). "[T]he 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Armstrong*, 575 U.S. at 328 (quoting *Sandoval*, 532 U.S. at 290). Here, that means exclusion of some implied right for the United States to "enforce" EMTALA against states.

Indeed, the United States seeks much broader relief than EMTALA author-izes—"invalid[ation]" of state law and an "injunction . . . prohibiting enforcement" of state law, 3-ER-384—against the State of Idaho, which is *not* a party to grant agreements with Idaho hospitals. The contractual nature of EMTALA and Medicare, and Idaho's status as a non-party to Medicare/EMTALA grant agreements, further undermines the existence of a cause of action here.

With all legislation, Congress legislates on the background of common-law principles, including contract law, and courts continue to apply the common law unless Congress has clearly displaced it. *See Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."); *see, e.g.*, *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (looking to "common-law tort principles" to determine running of

statute of limitations for a Section 1983 action); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (explaining that in the Section 1983 context, the Supreme Court has long recognized that "members of the 42d Congress were familiar with common-law principles" and "likely intended these common-law principles to obtain, absent specific provisions to the contrary" (quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258 (1981)).

A federal grant authorized and conditioned by a statute enacted under the spending power is "a *contract*: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Accordingly, contract principles inform the operation, limits, enforcement, and remedies for those agreements. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022) (explaining that general contract principles "limit[] 'the scope of available remedies' in actions brought to enforce Spending Clause statutes" (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998))).

Under the common law, nonparties to a contract neither can sue to enforce, nor be compelled to comply with, that contract's terms. The common law has long held that "no stranger to the consideration can take advantage of a contract, though made for his benefit." 1 William W. Story, *A Treatise on the Law of Contracts* § 552 (Boston, Little, Brown & Co., 5th ed. 1874). Because mutual agreement is required

8

to bind the parties to a contract, *id.* § 490, "only a person who is a party to a contract can incur liability under it," Charles G. Addison, *A Treatise on the Law of Contracts* 313 (11th ed. 1911). Accordingly, a third party is not bound by a contract's terms; only those in "privity" of contract are so bound. *See* Story, *supra*, § 573.

These principles apply to agreements to participate in federal programs under Congress's spending power. This case is, in effect, a lawsuit by one party to a contract against a stranger to the contract to enforce the contract's terms. Here, the hospital itself, not the State, opts to participate in the program and enters into the spending agreement directly with the federal government. Because the State is not a party, it cannot be bound by the terms of the agreement—including provisions requiring its laws to be overridden by federal law. *See* David Engdahl, *The Spending Power*, 44 Duke L.J. 1, 104 (1994) ("[T]hird-party rights . . . are 'secured' (if at all) not by any 'law,' but only by the contract between the recipient and the United States.").

The upshot is that, in addition to Supremacy Clause doctrine articulated by *Armstrong*, common-law contract principles foreclose a right of action by the United States to bring this suit, *i.e.*, to enforce its grant conditions against a State as a non-party.

9

## II. EMTALA's Narrow Exemption from Its Anti-Preemption Clause Does Not Apply to Generally Applicable State Laws Governing Medical Services

Preemption "comes in three forms: express preemption, field preemption, and implied preemption." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1113–14 (9th Cir. 2022). The court held that the Idaho abortion law is expressly preempted by EMTALA's preemption clause. 1-ER-31–32. But EMTALA's preemption clause provides that state laws are only preempted "to the extent that the requirement *directly* conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added). The Ninth Circuit has construed "directly conflicts" language to refer to impossibility preemption and obstacle preemption. *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993). But obstacle preemption, where state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), is a type of implied preemption, which was not the fundamental argument advanced by the United States below.

Critically, the plain text of EMTALA creates a presumption against preemption of State law: "[t]he provisions of this section *do not preempt* any State or local law requirement, *except* to the extent that the requirement *directly conflicts* with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added). Such text disclaims any broad concern with whether state law somehow imposes an "obstacle" to

10

congressional objectives. Idaho need not show that its law is not an obstacle to Congress's purpose because "[t]he text of the statute is unambiguous that EMTALA would preempt state law only if the state requirement directly conflicted with the requirements of EMTALA." *Deanco Healthcare, LLC v. Becerra*, 365 F. Supp. 3d 1029, 1037 (C.D. Cal. 2019); *see Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.").

The Idaho abortion law does not directly conflict with EMTALA because compliance with both is possible. *See Bonta*, 33 F.4th at 1114. EMTALA imposes equal obligations to protect the health of the mother and the health of the unborn child. *See* 42 U.S.C. § 1395dd(e)(1)(A) (defining an "emergency medical condition" with respect to a pregnant woman as one jeopardizing "the health of the woman or her unborn child"). As the district court noted in *Texas v. Becerra*, which asked whether EMTALA preempted Texas's abortion law, EMTALA is silent as to what a physician must do when there is a conflict between the health of the mother and the health of the unborn child. 623 F. Supp. 3d 696, 726–27 (N.D. Tex. 2022) (citing § 1395dd(e)(1)(A)).

It is thus up to the States to decide how to balance these obligations, *see Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (holding States may regulate abortion for "legitimate interests" including "preservation of prenatal life"

and "maternal health and safety"), and "there is no direct conflict between EMTALA and state laws that attempt to address this circumstance," *Becerra,* 623 F. Supp. 3d at 727. Idaho filled the void left by EMTALA by permitting abortion where necessary to stabilize a patient, *see* Idaho Code § 18-622(3)(a)(i), and nothing about this provision makes it impossible for Idaho hospitals to screen, stabilize, and transfer patients in compliance with EMTALA, s*ee* 42 U.S.C. § 1395dd(a)–(c). To the contrary, Idaho's abortion law instructs physicians how to balance their obligations to the mother and the unborn child where EMTALA fails to do so. Thus, there is no direct conflict between Idaho's abortion law and EMTALA.

But regardless, a hospital may comply with both state and federal law simply by turning down federal money. Some hospitals in Idaho are not Medicare providers. *See* 3-ER-366 (noting "[t]here are 52 Medicare-participating hospitals in Idaho"); *III.B. Overview of the State - Idaho – 2023*, HRSA Maternal & Child Health, https://mchb.tvisdata.hrsa.gov/Narratives/Overview/da820095-c0e3-4708-a1a7-abb733cde3af (listing a total of 53 hospitals in Idaho). Such hospitals do not violate federal law even if they refuse a service that the Department of Justice deems required by EMTALA. Rejecting or being ineligible for a federal grant given the police-power requirements of state law does not amount to "violating" federal law.

Direct conflict, moreover, does not include the incidental implications of generally applicable exercises of the state police power. If a state legislature enacted a

statute ordering that hospitals receiving federal grants need not stabilize patients, or must hand over a percentage of their federal grants to the State, that might qualify as a "direct conflict." *See Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260–68 (1985) (declaring preemption of state law that channeled grants received by local governments in conflict with a federal statute). But Idaho's abortion law is a generally applicable law that does not target federal grants or a general requirement that hospitals stabilize patients. "Where the state and federal law are not in irreconcilable conflict, and the degree of interference imposed by state law is merely incidental, preemption does not apply." *In re T.D. Bank, N.A.*, 150 F. Supp. 3d 593, 607 (D.S.C. 2015). Because any conflict between the Idaho abortion law and EMTALA is merely incidental, the Idaho law cannot be preempted.

## III. The Spending Power Does Not Give Congress the Authority To Pay Hospitals To Exempt Themselves from Generally Applicable State Laws Policing Medical Services

### A. The Supremacy Clause applies to federal law, not conditions on federal grants

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme law of the land." U.S. Const. art. VI. But conditions on federal grants are not "law" for Supremacy Clause purposes. Historically, "regulation was traditionally a matter of public congressional enactment" and Congress was "reluctan[t] . . . to use conditions as a means of national domestic regulation." Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 91 n.* (2021). Attaching

conditions to federal grants affords a way to incent desired behavior without commanding it. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent," *i.e.*, the consent of the individual accepting a federal grant, as opposed to the consent of the people writ large. *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562, 1570 (2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981)).

The distinction is critical to a proper understanding of the spending power and its limits. In sum, "the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). In other words, "Congress' *legislative* powers *cannot be avoided* by simply opting out," but "Congress' power to spend money is *not* a *legislative* power." David Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 498 (2007). That limitation protects critical state interests. Thus, "unlike statutory provisions that are grounded in Congress' *legislative* powers, spending terms and conditions are obligatory and enforceable only if voluntarily accepted." *Id.* at 500. The "knowing acceptance" standard preserves the vertical balance of power between States and the federal government, "ensuring that Spending Clause legislation does not undermine the status of

14

the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

For this reason, the Court has set limits on the conditions that Congress may impose on federal funding. For instance, Congress may impose "conditions that define the limits of the government spending program" but not "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). And while Congress may financially induce States to accept policy changes, it may not impose conditions "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 580 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).

Critically, a grantee need not accept a federal contract in the first instance, and if it does, the remedy for violation of its terms is a matter between the grantee and the United States. So, "when a federal statute does not directly require adherence to its provisions, but instead proposes them as terms of a contractual promise, it is not giving them the obligation of law." Hamburger, *supra*, 132. Because "conditions do not purport to bind . . . in the manner of law," "[n]o federal condition, by whatever means adopted, should be understood to defeat the obligation of contrary state law."

*Id.* at 131. Otherwise, "[i]n shifting legislative power to . . . private decisions, conditions displace public representative self-government . . . with private barter." *Id.* at 92.

The United States cited below only a single preemption case involving a federal grant, *see* 3-ER-315, where the Court invalidated a state statute restricting how localities could spend federal grants authorized by Congress for "any" purpose. *See Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260–68 (1985). But the Court did not squarely address whether grant conditions are properly understood to constitute "law" under the Supremacy Clause. And that case at most can be understood to preclude States from interfering with the relationship between an eligible federal grant recipient and the grantor—*i.e.*, not as a case precluding the State from enacting generally applicable police-power statutes that may preclude grant eligibility.

"[R]ead[ing] the Supremacy Clause in the context of the Constitution as a whole," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015), the Supremacy Clause does not require States to give way in their traditional areas of regulation simply because an entity within its borders desires to accept federal grant money. "Hamilton wrote that the Supremacy Clause 'only declares a truth, which flows immediately and necessarily from the institution of a Federal Government.'"

*Id.* at 325 (quoting The Federalist No. 33, p. 207 (J. Cooke ed. 1961)). Such a description "would have been grossly inapt if the Clause were understood to give affected parties a constitutional . . . right to enforce federal laws against the States," *id.*—or, indeed, unilaterally subject the States' laws to preemption. The historical record does not support such a broad understanding of the Clause.[2]

Treating grant conditions as "law" that trumps a generally applicable state exercise of the police power substitutes private barter for representative government. It threatens a fundamental alteration of the relationships among citizens, their States, and the federal government, whereby the federal government may induce citizens to violate state law with impunity. The Supreme Court has never countenanced such a capacious understanding of congressional power, and this Court should head it off by rejecting the federal government's preemption claim at its most fundamental level—that no "law" of the United States is even implicated.

### B. Treating Medicare conditions as laws having preemptive effect risks violating the Tenth Amendment and the Republican Form of Government Clause

By urging the district court to treat EMTALA's conditions on Medicare participation as "law" capable of preempting state abortion prohibitions, the United

---

[2] This can be contrasted with the statutory cause-of-action context, where, owing to the history of the Civil Rights Act of 1871, persons may vindicate rights secured by the "laws" of the United States, including some conditions on federal spending. *See Health and Hosp. Corp. v. Talevski*, 143 S. Ct. 1444, 1452–53 (2023).

States has embraced a model of general federal governance the Supreme Court has long rejected. In light of the Tenth Amendment, Congress cannot use the spending power to "undermine the status of the states as independent sovereigns in our federal system," *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 577, but that is exactly what the United States has proposed here.

Congress derives its spending power from the General Welfare Clause and the Appropriations Clause, which, as the Supreme Court has recognized in multiple cases, contain substantive limitations, lest they become a tool for unlimited Congressional government. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 576–78. Critically, Congress may not use its spending power to coerce States. *Id.* at 578. Coercion can arise in multiple ways. First, as in *NFIB*, Congress may coerce States by using federal spending programs to lure States into dependence and then radically changing the terms of the program. State hospitals that participate as Medicare providers subject to the conditions of EMTALA find themselves in such a position. They have become dependent on the Medicare program to provide services desired by state elected leaders, and then are threatened with deprivation if they refuse to violate generally applicable state law governing abortion. That is exactly the sort of "gun to the head" that the Court deemed unconstitutional in *NFIB*. *Id.* at 581.

But the Court has recognized another species of coercion that also runs afoul of the Tenth Amendment. That occurs where Congress uses its taxing-and-spending

power to enter the arena of general police power and override contrary state laws. So, for example, in *Linder v. United States*, 268 U.S. 5 (1925), the Court rejected use of the power to tax for the general welfare to regulate the practice of medicine. It said that "[o]bviously, direct control of medical practice in the states is beyond the power of the federal government," which meant that "[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure." *Id.* at 18; *see also United States v. Doremus*, 249 U.S. 86, 93 (1919) (invalidating a federal regulation of physicians predicated on the taxing power because it invaded the police power of States and observing, "[o]f course Congress may not in the exercise of federal power exert authority wholly reserved to the states"). Here, as in those cases, the United States contends that Congress may derive a use of the General Welfare Clause to invade the regulation of medicine. Here, as in those cases, that argument should be rejected.

The Court applied *Linder* to a federal grant program under the Agricultural Adjustment Act in *United States v. Butler*, 297 U.S. 1 (1936), where it invalidated a plan to transfer payments from producing farmers to non-producing farmers. In the Court's view, "the act invades the reserved rights of the states. It is a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated

19

to the federal government." *Id.* at 68. And the grants were a critical part of that invasion: "The tax, the appropriation of the funds raised, and the direction for their disbursement, are but parts of the plan. They are but means to an unconstitutional end." *Id.* Critically for this case, any choice of the citizen to participate was irrelevant, because even so "[a]t best, it is a scheme for purchasing with federal funds submission to federal regulation of a subject reserved to the states." *Id.* at 72.

That is precisely what the United States advocates here—a purchase of citizen submission to federal regulation—with the added problem that such submission would (at least according to the federal government's theory) directly subvert state law on a matter reserved to the States. For there can be little doubt that, following *Dobbs v. Jackson Women's Health Organization*, regulation of abortion constitutes a core state police power. 142 S. Ct. 2228, 2284 (2022) ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion."). And the Court in *Butler* was crystal-clear that using the spending power to undermine core state police powers at the election of the citizen is unconstitutional: "An appropriation to be expended by the United States under contracts calling for violation of a state law clearly would offend the Constitution." 297 U.S. at 73. The Court has thus rejected the position advanced here by the United States.

Furthermore, because the United States is attempting to use EMTALA to suspend state police power regulations without the State's consent, it undermines state

sovereignty in a way that implicates the Republican Form of Government Clause. *See* U.S. Const. art. IV, § 4. While the federal government may "induce the states to adopt policies that the Federal Government itself could not impose," it cannot induce citizens (corporate or otherwise) to violate state law. A "republican form of government" is one where the people are governed by legislatively enacted laws, not one where a different sovereign tempts some citizens to exempt themselves from state laws. Manifestly, "the purchase of submission is not what traditionally was understood as a republican form of government." Hamburger, *supra*, at 147. That observation is particularly apt where the submission is not undertaken by the State itself, but by a citizen being paid by the federal government to violate state law.

While the Supreme Court has never directly enforced the Guarantee Clause against the United States, it has observed that "perhaps not all claims under the Guarantee Clause present non-justiciable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992). Where Congress (or the Executive Branch) "actively interfere[s] in the states' republican self-governance," courts do not face unanswerable questions about how the United States itself should "guarantee" republican government. Hamburger, *supra*, at 147.

With the sort of active interference attempted by the United States in this case, courts can observe and declare violations using administrable standards, which averts the political question doctrine. *See Democratic Party of Wis. v. Vos*, 966 F.3d

581, 589 (7th Cir. 2020) ("We do not interpret *Rucho* or any other decision by the Supreme Court as having categorically foreclosed all Guarantee Clause claims as nonjusticiable, even though no such claim has yet survived Supreme Court review."). This Court should avoid the need to address such difficult questions by rejecting the use of conditions on grants to non-state actors as "laws" enforceable under the Supremacy Clause. Otherwise, it should conclude that a scheme whereby the United States pays hospitals to violate state abortion laws constitutes a paradigmatic violation of the Republican Form of Government Clause.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

Respectfully submitted,

*/s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Attorney General
302 W. Washington Street
Indianapolis, IN 46204
(317) 924-3005
Tom.Fisher@atg.in.gov
*Counsel of Record

THEODORE E. ROKITA
   Attorney General of Indiana
THOMAS M. FISHER*
   Solicitor General
JAMES A. BARTA
   Deputy Solicitor General
MELINDA R. HOLMES
   Deputy Attorney General

*Counsel for* Amici *States*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

BRENNA BIRD
Attorney General
State of Iowa

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

ANGELA COLMENERO
Provisional Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming

23

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 5,145 words. The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).


Dated: August 14, 2023

*/s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

## CERTIFICATE OF SERVICE

I certify that on August 14, 2023, I caused service of the foregoing brief to be made by electronic filing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all parties with an email address of record, who have appeared and consent to electronic service in this action.

Dated: August 14, 2023

*/s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General