**Nos. 23-35440, 23-35450**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF IDAHO,

Defendant-Appellant,

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK
WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH
IDAHO LEGISLATURE, Proposed Intervenor-Defendants,

Movants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Idaho

———————————

## RESPONSE OF THE UNITED STATES
## TO MOTION FOR A STAY PENDING APPEAL

———————————

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

PAUL R. RODRÍGUEZ
*Deputy General Counsel*

DAVID HOSKINS
*Supervisory Litigation Attorney*

JESSICA BOWMAN
MELISSA HART
*Attorneys*

*U.S. Department of Health
and Human Services*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JOSHUA D. HURWIT
*United States Attorney*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER
NICHOLAS S. CROWN
*Attorneys, Appellate Staff
Civil Division, Room 7325
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-305-1754*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................1

STATEMENT .....................................................................................................2

      A.    Legal Background. ................................................................2

      B.    Procedural Background....................................................4

ARGUMENT ......................................................................................................6

I.    The Legislature Is Not Likely to Succeed on the Merits. ......................6

      A.    EMTALA requires hospitals to offer abortion care when qualified physicians deem it necessary. .............................6

      B.    EMTALA preempts Idaho law insofar as it would prohibit stabilizing treatment...........................................8

      C.    The Legislature's arguments lack merit. ......................10

II.    The Legislature Fails to Show Irreparable Harm and the Equities Decisively Support Denying the Stay. ...................................... 19

CONCLUSION ................................................................................ 23

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

**INTRODUCTION**

The Idaho Legislature seeks to stay a preliminary injunction that issued over a year ago. The Court should deny this extraordinary request.

This case involves one of the country's most restrictive abortion laws: an Idaho statute so sweeping that the State's Supreme Court calls it a "Total Abortion Ban." *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1147 (Idaho 2023). Idaho makes it a felony to terminate a patient's pregnancy unless doing so would be "necessary" to prevent the patient's "death." Idaho Code § 18-622(2). It therefore criminalizes care required to stabilize pregnancy-related medical emergencies—*e.g.*, premature pre-term rupture of membranes (PPROM) or pre-eclampsia—which, if left untreated, can lead to catastrophic outcomes that stop short of death, including sepsis, uncontrollable bleeding, and organ failure. Idaho's statute prohibits such medically necessary care even though, in certain emergencies, federal law requires it. *See* Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd.

In August 2022, the United States brought this suit and sought a preliminary injunction. Invoking the Supremacy Clause and EMTALA's express preemption provision, § 1395dd(f), the district court granted tailored relief targeting situations when applying Idaho's ban in federally funded hospitals would "directly conflict[] with a requirement of" EMTALA.

The Legislature cannot show a likelihood of success on the merits. The court's statutory analysis is bolstered by the factual record, which the stay motion ignores. The

1

motion also fails on the equities. The Legislature delayed a year before filing it and suffers no irreparable harm. The injunction issued before Idaho's law became effective and imposes no tangible injury on the Legislature (indeed, the State—the named defendant—has not sought a stay). And Idaho has no prerogative to jeopardize the lives and health of individuals experiencing emergency medical conditions, or to force physicians in federally funded hospitals to withhold necessary treatment.

## STATEMENT

### A.  Legal Background.

**1.**  Congress enacted EMTALA in 1986, based on "a growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." H.R. Rep. No. 99-241, pt. 3, at 5 (1985). Its "overarching purpose" is to "ensure that patients, particularly the indigent and underinsured, receive adequate emergency medical care." *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) (alterations and quotation marks omitted). EMTALA applies to every hospital that has an emergency department and participates in Medicare. 42 U.S.C. § 1395dd(e)(2); *id.* § 1395cc(a)(1)(I)(i).

Under EMTALA, covered hospitals must offer individuals "[n]ecessary stabilizing treatment" when they present with an "emergency medical condition." *Id.* § 1395dd(b)(1)(A). A hospital may "transfer" an "individual to another medical facility," subject to various requirements. *Id.* § 1395dd(b)(1)(B), (c).

An "emergency medical condition" exists when an individual's "health" is in "serious jeopardy" or the individual risks "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A). "'[T]o stabilize'" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A).

EMTALA preempts "any State or local law requirement" that "directly conflicts with a requirement of this section." *Id.* § 1395dd(f). A direct conflict occurs when (1) it is "physically impossible" to comply with both state law and EMTALA, or (2) "the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1394 (9th Cir. 1993) (per curiam).

**2.** Idaho Code § 18-622 is a statute that the State Supreme Court has called a "Total Abortion Ban" and recognized as narrower than another Idaho law that more closely aligns with EMTALA. *Planned Parenthood*, 522 P.3d at 1195-97, 1203-04, 1207. Idaho allows only those abortions "necessary to prevent … death," Idaho Code § 18-622(2)(a), or to treat "an ectopic or molar pregnancy," *id.* § 18-604(1). Otherwise, it is a felony punishable by two-to-five years' imprisonment—and by suspension or revocation of a professional license—to "perform[]," "attempt[] to perform," or "assist[] in performing or attempting to perform" treatment that involves pregnancy termination,

3

even if that treatment is necessary to prevent irreversible harm to the patient. *Id.* § 18-622(1).[1]

### B. Procedural Background.

The United States filed suit, challenging § 18-622's constitutionality. 4-LEG-ER-570.[2] The government sought preliminary relief before § 18-622 could take effect and purport to prohibit emergency healthcare that EMTALA requires—*i.e.*, stabilizing treatments that physicians deem necessary.

On August 24, 2022, the district court preliminarily enjoined § 18-622's application insofar as it directly conflicts with EMTALA. 1-LEG-ER-14–52. The court concluded that both impossibility- and obstacle-preemption applied because Idaho law criminalizes and deters stabilizing treatments. 1-LEG-ER-32–47. For example, potentially devastating medical conditions exist (such as PPROM, pre-eclampsia, and placental abruption) that meet EMTALA's criteria and for which an abortion would prevent a *risk* of death—even if a provider cannot determine that pregnancy termination is *necessary* to prevent death. 1-LEG-ER-20–22. Similarly, such conditions could lead to non-

---

[1] Section 18-622(2)(b) permits abortion "during the first trimester of pregnancy" if the patient first furnishes a law-enforcement report that the pregnancy is the result of an "act of rape or incest." And before recent amendments, the statute's "necessary to prevent … death" provision was an affirmative defense. Idaho Code § 18-622(3)(a)(ii), (b)(i) (as originally enacted).

[2] Although the Complaint named one defendant—the State of Idaho—the Legislature permissively intervened. Both the State and Legislature appealed the preliminary injunction. The Legislature denoted its record excerpts as "LEG-ER"; the State denoted its excerpts as "ER."

lethal but irreversible harms to the pregnant individual, including "severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, hypoxic brain injury," or strokes. 1-LEG-ER-15; *see* 3-ER-188–217, 319–358. Yet, when a provider concludes that abortion is necessary stabilizing treatment required under EMTALA in those circumstances, Idaho Code § 18-622 criminalizes that care because it is not "necessary" to prevent "death."

**2.** Rather than immediately appeal or request a stay, the Legislature sought reconsideration. 2-LEG-ER-270. After that motion became ripe, the Legislature asked the district court to "stay" its decision-making and instead permit supplemental briefing. 2-LEG-ER-209. The court granted the Legislature's request. 2-LEG-ER-129.

On May 4, 2023, the court denied reconsideration. 1-LEG-ER-2. The Legislature again declined to immediately appeal or seek a stay. Instead, it appealed on the last permissible day. 4-LEG-ER-587 (7/3/23 notice). That same date—nearly 11 months after the injunction had issued—the Legislature moved the district court for a stay pending appeal. 2-LEG-ER-76. The Legislature did not explain its delay, nor did it request an expedited decision or an order by a date certain. The district court has not yet ruled.

In this Court, the Legislature consented to consolidating its appeal with the State's—and received a one-week extension for its merits brief. No. 23-35450, Dkts. 6-1, 7. The Legislature filed that brief on August 7. It did not seek a stay in this Court until August 22, fewer than three weeks before the United States' merits brief is due.

5

## ARGUMENT

"A stay is not a matter of right" but "an exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quotation marks omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion" under four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426, 433-34 (quotation marks omitted). The "first two factors" are "the most critical," *id.* at 434, yet all weigh strongly against the Legislature.

## I.    The Legislature Is Not Likely to Succeed on the Merits.

The district court correctly identified a direct conflict. Federal law requires hospitals to offer stabilizing treatment, while state law criminalizes that same care.

### A.    EMTALA requires hospitals to offer abortion care when qualified physicians deem it necessary.

**1.**    Medicare-participating hospitals must offer "stabilizing treatment" to all individuals who present to emergency departments with an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). Barring an appropriate transfer, hospitals "must provide," "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* A hospital "meet[s]" this requirement if it "offers the individual" examination and

6

treatment and "informs the individual … of the risks and benefits," yet the individual refuses treatment. *Id.* § 1395dd(b)(2).

EMTALA defines the stabilization requirement broadly. It does not exempt any form of care: "'[T]o stabilize'" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during" transfer. 42 U.S.C. § 1395dd(e)(3)(A). That expansive definition is "not given a fixed or intrinsic meaning," but instead "is purely contextual or situational" and requires a "physician, faced with an emergency, to make a fast on-the-spot risk analysis." *Cherukuri v. Shalala*, 175 F.3d 446, 449-50 (6th Cir. 1999); *see In re Baby K*, 16 F.3d 590, 595-96 (4th Cir. 1994). EMTALA requires *any* form of stabilizing treatment, *if* the relevant professional determines such care is necessary.

**2.** EMTALA's protections apply equally to pregnant individuals. *See* 42 U.S.C. § 1395dd(b). Congress expressly provided that a "pregnant woman" could be among the "individual[s]" experiencing an "emergency medical condition." *Id.* § 1395dd(e)(1)(A)(i), (B).

Abortion care constitutes potential stabilizing treatment. Various conditions can arise (or become exacerbated) during pregnancy and qualify as "emergency medical conditions" under EMTALA. Examples include PPROM, pre-eclampsia, and eclampsia. 3-ER-188–217, 319–358 (physician declarations). For some conditions, a physician could conclude that the requisite stabilizing treatment is pregnancy termination. *Id.*; 1-

7

LEG-ER-15, 20–22. If so, EMTALA requires that such treatment be offered and provided upon informed consent. 42 U.S.C. § 1395dd(b)(1)(A), (2).

Courts routinely recognize that abortion may constitute stabilizing treatment in medical emergencies. *E.g.*, *New York v. HHS*, 414 F. Supp. 3d 475, 537-39 (S.D.N.Y. 2019); *Morin v. Eastern Me. Med. Ctr.*, 780 F. Supp. 2d 84, 93-96 (D. Me. 2010); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712-18 (E.D. Mich. 2009); *California v. United States*, No. C-05-00328-JSW, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008).

Practitioners have likewise understood that EMTALA's requirements can encompass abortion care—*if* the medical provider determines that pregnancy termination is the necessary stabilizing treatment for a specific emergency medical condition. 3-ER-323–336, 339–346, 349–352, 355–358.

## B. EMTALA preempts Idaho law insofar as it would prohibit stabilizing treatment.

1. EMTALA expressly preempts contrary state laws: "The provisions of this section do not preempt any State or local law requirement, *except to* the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added).

Preemption occurs when (1) it is "physically impossible" to comply with both state law and EMTALA, or (2) "the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper*, 9 F.3d at 1394; *see id.* at 1393. A state law permitting (or requiring) physicians to refuse stabilizing

treatment poses a direct conflict. *See Baby K*, 16 F.3d at 597. Courts have similarly found preemption when state laws presented obstacles to EMTALA's civil-liability provisions. *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000); *Burditt v. HHS*, 934 F.2d 1362, 1373-74 (5th Cir. 1991).

**2.** Idaho's law directly conflicts with EMTALA. It is impossible to comply with both: Under § 18-622, it is a felony to "perform[]," "attempt[] to perform," or "assist[] in performing or attempting to perform an abortion" unless "necessary to prevent" the patient's "death." But emergency medical conditions (*e.g.*, PPROM, pre-eclampsia, and placental abruption) meet EMTALA's criteria by posing a *risk* of death even when a provider cannot determine that abortion is *necessary* to prevent death. In addition, non-lethal emergency medical conditions arise in Idaho that, in a physician's judgment, still require pregnancy termination as stabilizing treatment to prevent injuries like strokes, "limb amputation," "kidney failure," or "hypoxic brain injury." 1-LEG-ER-15; *see* 3-ER-182–183, 191–192, 195–201, 204–210, 213–217, 319–358. Accordingly, providers cannot comply with both state and federal law. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (finding preemption because "individuals could be prosecuted for conduct that Congress specifically sought to protect").

Section 18-622 also flouts obstacle-preemption principles. It criminalizes stabilizing treatments and requires suspension (or revocation) of the provider's license. These threats have "a deterrent effect," 1-LEG-ER-40, and obstruct Congress's "purpose" of "ensur[ing] that patients, particularly the indigent and underinsured, receive

adequate emergency medical care," *Arrington*, 237 F.3d at 1073-74 (quotation marks omitted); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("fear" of "expos[ure] … to unpredictable civil liability" sufficient for implied preemption); *see Baby K*, 16 F.3d at 597. The Legislature, moreover, does not dispute the factual record supporting the court's conclusions. 3-ER-345 ("[T]he threat of criminal prosecution has already deterred doctors from providing medically necessary, life-saving care."); *see also* 3-ER-200–201, 209–211, 351–352, 357–358.

## C.    The Legislature's arguments lack merit.

The Legislature raises various objections. Many are forfeited; each is unavailing.

1.    The Legislature contends (Mot. 6-7) that EMTALA's preemption provision is a "non-preemption" clause. But the case it cites, *Baker v. Adventist Health, Inc.*, 260 F.3d 987 (9th Cir. 2001), confirmed that § 1395dd(f) is "a non-preemption provision" only for *additional* "state remedies," such as "a state law claim for medical malpractice." *Id.* at 993. Section 1395dd(f) preserves state laws requiring care beyond EMTALA's requirements, but preempts laws that directly conflict with EMTALA's minimum guarantees. Indeed, the Legislature conceded in its merits brief (at 30) that preemption applies when EMTALA and state law "contradict[]."

2.    The Legislature argues (Mot. 7-9) that EMTALA excludes pregnancy termination because it does not single out such care. *But see* 4-LEG-ER-504 (discussing conditions "requir[ing] an emergency medical procedure under EMTALA, with that procedure ending the life of the preborn child"). But there is no "such thing as a 'canon

10

of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020). It would be impossible (and unnecessary) for EMTALA to list every conceivable emergency medical condition and all corresponding stabilizing treatments. By not naming abortion—just as it omits mention of all sorts of stabilizing treatments—EMTALA treats pregnancy termination the same.

EMTALA mentions a specific stabilizing treatment in only one circumstance: when a pregnant individual is "having contractions." 42 U.S.C. § 1395dd(e)(1)(B); *see id.* § 1395dd(e)(3)(A) ("'[T]o stabilize' means, … with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta)."). By singling out "contractions," EMTALA ensures that labor constitutes an "emergency medical condition," regardless of subparagraph (e)(1)(A)'s standards. For all other emergency medical conditions, EMTALA leaves it to relevant physicians to determine what "medical treatment of the condition" is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual." *Id.* § 1395dd(e)(3)(A).

When Congress creates special rules governing abortion—or excludes abortion from otherwise-applicable rules—it does so explicitly. *See* 4-LEG-ER-552 (collecting examples). EMTALA's history and context reinforce the point: The same legislation through which Congress considered EMTALA included another proposed program that, unlike EMTALA, *did* expressly carve out abortion. *Compare* Consolidated Omnibus

11

Reconciliation Act of 1985, H.R. 3128, 99th Cong. § 124 (1985) (language that became EMTALA), *with id.* § 302(b)(2)(B) (excluding abortion from different program); *see also* 42 U.S.C. § 18023(d) (indicating that EMTALA may require emergency abortions).

**3.** The Legislature asserts (Mot. 9-11) that EMTALA's references to an "unborn child" exclude abortion from the broad definition of stabilizing treatment. That argument is forfeited and incorrect.

**a.** The Legislature did not raise this argument in the preliminary-injunction briefing and thus forfeited it. *See School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007).

Regardless, this new assertion overlooks the statutory text. EMTALA's screening, stabilization, and transfer obligations in subsections (a), (b), and (c) create duties only to an "individual," not an "unborn child." A hospital's screening duty arises when an "individual" "comes to the emergency department" and a request for examination or treatment "is made on the individual's behalf." 42 U.S.C. § 1395dd(a). A hospital's obligation to offer stabilizing treatment arises if it determines that "the individual has an emergency medical condition." *Id.* § 1395dd(b)(1). The "individual" must be informed of risks and benefits and can give "informed consent to refuse such examination and treatment." *Id.* § 1395dd(b)(2). And EMTALA restricts transfer "until [the] individual [is] stabilized." *Id.* § 1395dd(c). By expressly creating a duty only to individuals, EMTALA did not extend those duties to the "unborn."

12

**b.** EMTALA's four references to an "unborn child" do not alter this conclusion. Three references apply only when the individual is in labor, 42 U.S.C. § 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(B)(ii), and are irrelevant to EMTALA's requirements when the individual is *not* in labor. The statute sensibly considers risks to an "unborn child" in determining whether a hospital may permissibly transfer an individual in labor. But this says nothing about whether EMTALA establishes discrete obligations regarding an "unborn child" in other circumstances, nor does it suggest that Congress intended to mandate further gestation of a fetus at the expense of the individual's health when emergency complications arise. The Legislature's argument also proves too much, because it would mean EMTALA does not even encompass abortions necessary to save the individual's life. *See* 3-ER-253–254 (State's declarant admitting abortion as proper treatment of PPROM).

The injunction is likewise consistent with EMTALA's final reference to an "unborn child" in § 1395dd(e)(1)(A)(i). Subparagraph (e)(1)(A)(i) expands the circumstances when a pregnant individual can be considered to have an emergency medical condition necessitating stabilizing treatment: It includes conditions that might threaten the health of the unborn child, but not the pregnant individual. Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (1989); H.R. Rep. No. 101-386, at 838 (1989) (Conf. Rep.). But the text is clear. What must be stabilized is the "medical condition," *id.* § 1395dd(b)(1)(A), which belongs to the "individual," *id.* § 1395dd(b)(1), (c), (e)(1)(A)(i).

13

EMTALA's informed-consent framework supports this reading. Hospitals must inform the individual of the risks and benefits of the stabilizing treatment the provider concludes is necessary. 42 U.S.C. § 1395dd(b)(2). Then, "the individual (or a person acting on the individual's behalf)" decides whether to proceed. *Id.* EMTALA thus contemplates that the pregnant individual will determine whether to continue a dangerous pregnancy.

4.      Departing from EMTALA, the Legislature invokes (Mot. 7) a general provision of the Medicare Act providing that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. The Legislature failed to preserve this argument, *see School Dist.*, 5 F.3d at 1263; *Burlington*, 509 F.3d at 1093 n.3, which also misunderstands § 1395 and its interaction with EMTALA.

Nothing in § 1395 nullifies EMTALA's preemption provision or this Court's decision in *Draper*, 9 F.3d at 1393-94. The Supreme Court recently rejected a similar "reading of section 1395," which "would mean that nearly every condition of participation" in Medicare "is unlawful." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (per curiam). EMTALA's conditions, moreover, were enacted by Congress, not imposed by a "Federal officer or employee." 42 U.S.C. § 1395.

Nor does § 1395 give States prerogative to deny women stabilizing treatment. Through § 1395's "admonition that regulation should not 'supervise or control' medical

14

practice or hospital operations," Congress "endorsed medical self-governance" for providers. *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 101 (5th Cir. 1992).

Far from exercising supervision or control over medical practice, the injunction *preserves* physicians' ability to identify necessary stabilizing treatment—just as EMTALA leaves that determination to the relevant professionals' judgment. 42 U.S.C. § 1395dd(e)(3)(A); *see Cherukuri*, 175 F.3d at 449-50. Even if there were any tension between § 1395 and EMTALA's stabilization requirement, EMTALA—the subsequent and more "specific" statute—would control. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

The Legislature's single citation, *Eberhardt v. City of Los Angeles*, 62 F.3d 1253 (9th Cir. 1995), does not suggest otherwise. *Eberhardt* pertained to EMTALA's screening requirement, it did not discuss § 1395's meaning, and it did not address the extent to which EMTALA's stabilization requirement preempts state law.

**5.**     The Legislature cites (Mot. 11-13) the major questions doctrine, but that doctrine applies only to "*agency* decisions of vast economic and political significance." *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir. 2023) (quotation marks omitted). Here, there is "no relevant agency action," *id.*, because the United States is enforcing a "policy decision[]" made by "Congress … itself," *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quotation marks omitted).

Nor would any agency action, even if it existed here, constitute a "transformative expansion" of regulatory authority. *Mayes*, 67 F.4th at 934-36 (quotation marks omitted).

"[H]ealthcare facilities that wish to participate in Medicare … have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare." *Biden*, 142 S. Ct. at 652. And the notion that stabilizing treatment may include abortion is not "unprecedented." *Contra* Mot. 12. Courts, Congress, and practitioners have long understood the point—including before the decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See supra* pp. 7-8.

Even if there were anything unexpected about the district court's interpretation, that would provide no basis to disregard EMTALA. The Legislature relies on "extra-textual consideration[s]," which the Supreme Court has repeatedly rejected. *Bostock*, 140 S. Ct. at 1749. A statute can be "'very broad' and 'very clear,'" *Marinello v. United States*, 138 S. Ct. 1101, 1116 (2018) (Thomas, J., dissenting), and EMTALA is both.

**6.** The Legislature's effort (Mot. 14-16) to diminish the direct statutory conflicts here lacks merit. The Legislature conceded this argument, admitting to "conceptual textual conflicts" between EMTALA and § 18-622. 2-ER-118:24.

Section 18-622's narrow carveout from criminal liability—permitting abortions only when "necessary" to prevent the pregnant individual's "death"—does not resolve the conflict. EMTALA requires stabilizing treatment for any "emergency medical condition," which extends beyond treatments necessary to prevent death. 42 U.S.C. § 1395dd(e)(1)(A) (including "health … in serious jeopardy," "serious impairment to bodily functions," and "serious dysfunction of any bodily organ or part"); *accord* 1-LEG-ER-15, 20–22; 3-ER-191–192, 195–201, 204–210, 213–217, 319–358.

16

The recent amendments to Idaho law are inapposite. They removed an affirmative-defense structure and excluded some (not all) nonviable pregnancies from the definition of "abortion." But those amendments retained the standard that abortions must be *necessary* to prevent death, which is far narrower than EMTALA's stabilization requirements. 42 U.S.C. § 1395dd(e)(1)(A); *see* 1-LEG-ER-10 (Order listing examples); 3-ER-188–217, 319–358 (physician declarations); *Planned Parenthood*, 522 P.3d at 1196, 1207 (recognizing § 18-622's standard is narrower than another Idaho law that is "*substantially similar*" to EMTALA).

Regardless, § 18-622 stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Draper*, 9 F.3d at 1394, because it deters EMTALA-covered care, 1-LEG-ER-38–47.

**7.** The Legislature's remaining constitutional arguments (Mot. 16-18) are unavailing.

**a. Spending Clause.** "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds," *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1568 (2022), including through EMTALA, 42 U.S.C. § 1395cc(a)(1)(I)(i). The only time the Supreme Court has found improper "coercion" in a spending program was in the Medicaid context—which involves funds provided directly to States—when the Court concluded that States were forced to adopt new spending programs or lose federal funding (worth "over 10 percent of a State's overall budget") for existing programs. *See NFIB v. Sebelius*, 567 U.S. 519, 580-

85 (2012) (Roberts, C.J.) (plurality opinion). Here, however, the Legislature admits that "providers' participation in Medicare is voluntary." *Compare* 3-ER-373 (Complaint ¶15), *with* Dkt. 15-2 (Answer ¶15). And the government seeks to enforce a decades-old condition on Medicare funding, which has long been understood to include abortion in certain circumstances, *supra* pp. 7-8, and which Congress plainly has authority to enact, *see Biden*, 142 S. Ct. at 650.

b.    **Tenth Amendment.** "[T]here can be no violation of the Tenth Amendment" here because "Congress act[ed] under one of its enumerated powers," *United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000), through the Spending Clause. This case is a paradigm of preemption: EMTALA's stabilizing-treatment requirement "imposes restrictions or confers rights on private actors," Idaho's ban on such treatment "imposes restrictions that conflict with the federal law," and "therefore the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018). As noted, the Legislature concedes in its merits brief (at 30) that preemption applies when EMTALA and state law "contradict[]."

History likewise refutes the Legislature's reliance (Mot. 16) on Idaho's "sovereign authority." At EMTALA's enactment in 1986, no State could properly ban abortion pre-viability, or post-viability "where it [wa]s necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (plurality opinion) (quotation marks omitted) (re-affirming holdings of *Roe v. Wade*, 410 U.S. 113 (1973)); *see City of Akron v. Akron Ctr.*

*for Reprod. Health, Inc.*, 462 U.S. 416, 428-31 (1983); *Thornburgh v. American Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 759 (1986). EMTALA did not preserve authority that no State possessed when Congress enacted the statute.

The Supreme Court's decision in *Dobbs* does not alter this analysis. *Dobbs* "returned" "the authority to regulate abortion … to the people and their elected representatives," 142 S. Ct. at 2279, which includes "their representatives in the democratic process in … Congress," *id.* at 2309 (Kavanaugh, J., concurring). Congress placed this question—what treatment is necessary to stabilize emergency medical conditions experienced by pregnant individuals—in physicians' hands, to be determined according to their medical judgment and with the security of an express preemption clause.

## II.  The Legislature Fails to Show Irreparable Harm and the Equities Decisively Support Denying the Stay.

**A.**     The Legislature fails to demonstrate that it is likely to suffer irreparable injury before the preliminary-injunction appeal is resolved. *See Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). This independently forecloses relief. *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam) (stay "may not issue" absent showing of irreparable harm).

**1.**     The Legislature claims (Mot. 3-4) irreparable harm because the injunction prevents the State from enforcing state law. As the movant, however, the Legislature must establish irreparable harm to *itself*, not to others. *Doe*, 957 F.3d at 1060. Enforcing Idaho law is the duty of Idaho's executive branch, not its Legislature. Idaho Const. art.

II, § 1; *id.* art. IV, § 5.[3] Here, Idaho's executive branch—representing the State as defendant-appellant—has not sought a stay. The State's decision not to invoke an enforcement-related harm undermines the Legislature's request that the Court exercise equitable discretion to grant interim relief on this ground.

Nor does the Legislature demonstrate irreparable harm by citing its authority to "regulate abortion." Mot. 4. Whether the Legislature may constitutionally prohibit abortion care—even when it constitutes stabilizing treatment under EMTALA—"is at the core of this dispute, to be resolved at the merits stage of this case." *Doe*, 957 F.3d at 1059. "[T]he harm of such a perceived institutional injury is not irreparable, because the [Legislature] may yet pursue and vindicate its interests in the full course of this litigation." *Id.* (quotation marks omitted). The Legislature offers no evidence that it suffers any concrete harms in the interim. Indeed, it continues to enact laws after the injunction issued.

**2.** Delay is also a relevant factor "in evaluating" a claim of "irreparable harm absent interim relief." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

---

[3] The Legislature's citations (Mot. 3) do not support its novel argument that a *legislature* can establish irreparable harm and obtain a stay on this basis. Each case involved irreparable-harm claims by *executive* branch officials. *See Abbott v. Perez*, 138 S. Ct. 2305 (2018) (Governor); *Maryland v. King*, 567 U.S. 1301 (2012) (State represented by Attorney General); *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) (Attorney General); *District 4 Lodge of the Int'l Ass'n of Machinists v. Raimondo*, 18 F.4th 38 (1st Cir. 2021) (Secretary of Commerce); *Thompson v. DeWine*, 976 F.3d 610 (6th Cir. 2020) (per curiam) (Governor).

The Legislature's delay is substantial and unexplained. The district court granted the preliminary injunction on August 24, 2022. 1-ER-52. For the next 11 months, the Legislature declined to immediately appeal, sought to delay its own reconsideration motion and, once the court denied reconsideration, waited the full 60-day period before noticing its appeal and seeking a stay. *Supra* p. 5. On appeal, the Legislature consented to an extended briefing schedule and did not move for a stay in this Court until August 22—almost a year since the injunction issued. *Id.* This "long delay" "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

A stay, moreover, is meant "simply [to] suspend[] judicial alteration of the status quo." *Nken*, 556 U.S. at 429 (quotation marks omitted). The injunction itself preserves the status quo because it issued before § 18-622's effective date.

**B.** Even if the abstract principles that the Legislature invokes constituted irreparable harm, they would not outweigh the severe harms that a stay would cause. The balance of equities and public interest, which "merge" here, *Nken*, 556 U.S. at 435, independently counsel against the stay request.

**1.** "[A]llowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho." 1-LEG-ER-49. A stay permitting the law to take full effect during this appeal would increase the risk that pregnant patients needing emergency care would face serious complications, irreversible injuries (such as strokes, amputations, and organ failure), or death. *See supra* pp. 4-5, 9. The district court found

21

that numerous pregnancy-related conditions could require emergency abortion care, and that these conditions have occurred and will "inevitabl[y]" occur again within Idaho. 1-LEG-ER-50; *see* 3-ER-182–183, 188–217, 319–358. Yet the "emergency care mandated by EMTALA" in such cases would be "forbidden by Idaho's criminal abortion law." 1-LEG-ER-50.

The Legislature insists (Mot. 19-20) that state law does not criminalize abortions necessary to treat ectopic pregnancies, or pre-eclampsia "that poses a genuine threat to a woman's life." But emergency medical conditions affecting pregnant patients extend beyond those two scenarios. *E.g.*, 3-ER-326–331 (heart failure, PPROM, placental abruption). Even absent an immediate risk of death, it serves the public interest to ensure access to necessary stabilizing treatment when pregnant individuals' health is in "serious jeopardy," or when they are at risk of "serious impairment to bodily functions" or "serious dysfunction of any bodily organ." 42 U.S.C. § 1395dd(e)(1)(A).

Staying the injunction, moreover, would strain "the capacity of hospitals in neighboring states that do not prohibit physicians from providing EMTALA-mandated care," which "would be pressured as patients may choose to cross state lines to get the emergency care" that Idaho prohibits. 1-LEG-ER-50–51 (citing amici States' brief).

**2.** The public interest would also be harmed by a stay permitting a preempted state law to take effect. *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) ("[P]reventing a violation of the Supremacy Clause serves the public interest.").

A stay would likewise interfere with the United States' sovereign interest in proper administration of federal law and Medicare. *E.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."). The government agreed to provide Medicare funds to hospitals in Idaho, so long as those hospitals comply with EMTALA. 42 U.S.C. § 1395cc(a)(1)(I). But § 18-622 threatens "harm to the administration and integrity of Medicare," *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003), because federal funding would no longer guarantee access to necessary treatments when EMTALA requires them, 3-ER-363–364. This harm is substantial: the government provided over $3 billion in Medicare funding to hospitals in Idaho over fiscal years 2018-2020, with approximately $74 million attributable to emergency departments. 3-ER-367–368.

**3.** The Legislature's remaining points (Mot. 18-21) about federalism, separation of powers, and the "profound importance" of the issues repackage merits arguments. As discussed above (at 6-19), the Legislature cannot show a likelihood of success on the merits.

## CONCLUSION

The motion should be denied.

Respectfully submitted,

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

PAUL R. RODRÍGUEZ
*Deputy General Counsel*

DAVID HOSKINS
*Supervisory Litigation Attorney*

JESSICA BOWMAN
MELISSA HART
   *Attorneys*

   *U.S. Department of Health
   and Human Services*

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney
   General*

JOSHUA D. HURWIT
   *United States Attorney*

MICHAEL S. RAAB
MCKAYE L. NEUMEISTER

  *s/ Nicholas S. Crown*

NICHOLAS S. CROWN
   *Attorneys, Appellate Staff
   Civil Division, Room 7325
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 305-1754
   nicholas.s.crown@usdoj.gov*

September 2023

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellee states that it knows of one case related to the above-captioned consolidated appeals: Case No. 23-35153. That appeal arises from the district court's partial grant of intervention issued during the proceedings below.

*s/ Nicholas S. Crown*
Nicholas S. Crown

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Ninth Circuit Rules 27-1 and 32-3 because it contains 5,577 words. This brief also complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 27 because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Nicholas S. Crown*
Nicholas S. Crown

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

*s/ Nicholas S. Crown*

Nicholas S. Crown

**ADDENDUM**

# TABLE OF CONTENTS

EMTALA, 42 U.S.C. § 1395dd ........................................................................A1

Idaho Code § 18-604 (effective July 1, 2023)....................................................A7

Idaho Code § 18-604 (effective July 1, 2021)....................................................A9

Idaho Code § 18-622 (effective July 1, 2023)................................................. A10

Idaho Code § 18-622 (enacted in 2020, effective August 25, 2022)........................... A12

**42 U.S.C. § 1395dd**

**§ 1395dd. Examination and treatment for emergency medical conditions and women in labor**

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

**(2) Refusal to consent to treatment**

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3) Refusal to consent to transfer**

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on

the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

## (c) Restricting transfers until individual stabilized

### (1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless--

**(A)(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that[4] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

**(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

**(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

### (2) Appropriate transfer

An appropriate transfer to a medical facility is a transfer--

**(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

---

[4] So in original. Probably should be followed by a comma.

**(B)** in which the receiving facility--

**(i)** has available space and qualified personnel for the treatment of the individual, and

**(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

## (d) Enforcement

### (1) Civil money penalties

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a-7a(a) of this title.

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who--

**(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

**(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a-7a of this title (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a-7a(a) of this title.

**(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

**(2) Civil enforcement**

**(A) Personal harm**

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(B) Financial loss to other medical facility**

Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(C) Limitations on actions**

No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**

In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate quality improvement organization (with a contract under part B of subchapter XI) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B.

**(4) Notice upon closing an investigation**

The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

**(e) Definitions**

In this section:

**(1)** The term "emergency medical condition" means--

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part; or

**(B)** with respect to a pregnant woman who is having contractions--

**(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

**(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1395cc of this title.

**(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

> **(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1395x(mm)(1) of this title) and a rural emergency hospital (as defined in section 1395x(kkk)(2) of this title).

## (f) Preemption

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

## (g) Nondiscrimination

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

## (h) No delay in examination or treatment

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

A6

**(i) Whistleblower protections**

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

## Idaho Code § 18-604 (effective July 1, 2023)

### § 18-604. Definitions

As used in this chapter:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean:

    (a) The use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization, or the implantation of a fertilized ovum within the uterus;

    (b) The removal of a dead unborn child;

    (c) The removal of an ectopic or molar pregnancy; or

    (d) The treatment of a woman who is no longer pregnant.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be

knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

(a) A description of any proposed treatment or procedure;

(b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

(c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

A8

**Idaho Code § 18-604 (effective July 1, 2021)**

**§ 18-604. Definitions**

As used in this act:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean the use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization or the implantation of a fertilized ovum within the uterus.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

    (a) A description of any proposed treatment or procedure;

    (b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

    (c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.


### Idaho Code § 18-622 (effective July 1, 2023)

### § 18-622. Defense of life act

(1) Except as provided in subsection (2) of this section, every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(2)  The following shall not be considered criminal abortions for purposes of subsection (1) of this section:

(a)  The abortion was performed or attempted by a physician as defined in this chapter and:

(i)  The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(ii)  The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

(b)  The abortion was performed or attempted by a physician as defined in this chapter during the first trimester of pregnancy and:

(i)  If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws; or

(ii)  If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported to a law enforcement agency or child protective services that she is the victim of an act of rape or incest and a copy of such report has been provided to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws.

(3)  If a report concerning an act of rape or incest is made to a law enforcement agency or child protective services pursuant to subsection (2)(b) of this section, then the person who made the report shall, upon request, be entitled to receive a copy of such report within seventy-two (72) hours of the report being made, provided that the report may be redacted as necessary to avoid interference with an investigation.

(4)  Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

A11

(5) Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.

## Idaho Code § 18-622 (enacted in 2020, effective August 25, 2022)

### § 18-622. Criminal abortion

(1) Notwithstanding any other provision of law, this section shall become effective thirty (30) days following the occurrence of either of the following circumstances:

(a) The issuance of the judgment in any decision of the United States supreme court that restores to the states their authority to prohibit abortion[1]; or

(b) Adoption of an amendment to the United States constitution that restores to the states their authority to prohibit abortion.

(2) Every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(3) It shall be an affirmative defense to prosecution under subsection (2) of this section and to any disciplinary action by an applicable licensing authority, which must be proven by a preponderance of the evidence, that:

(a)(i) The abortion was performed or attempted by a physician as defined in this chapter;

(ii) The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(iii) The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

(b)(i) The abortion was performed or attempted by a physician as defined in this chapter;

(ii) If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported the act of rape or incest to a law enforcement agency and provided a copy of such report to the physician who is to perform the abortion;

(iii) If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported the act of rape or incest to a law enforcement agency or child protective services and a copy of such report has been provided to the physician who is to perform the abortion; and

(iv) The physician who performed the abortion complied with the requirements of paragraph (a)(iii) of this subsection regarding the method of abortion.

(4) Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

(5) Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.

A13