Nos. 23-35440 & 23-35450

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.
THE STATE OF IDAHO,
*Defendant-Appellant*.

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.
THE STATE OF IDAHO
*Defendant*,
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives; et al.,
*Intervenors-Appellants*.

Appeal from the United States District Court
for the District of Idaho
Honorable B. Lynn Winmill
(1:22-cv-00329-BLW)

## INTERVENORS-APPELLANTS' REPLY IN SUPPORT OF MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

# ARGUMENT

## I. NO PROCEDURAL BARRIER PREVENTS THE COURT FROM CONSIDERING THE LEGISLATURE'S LEGAL ARGUMENTS.

### A. The Idaho Legislature Did Not "Forfeit" Legal Arguments that the District Court Excluded.

The United States opposes a stay. But since the Legislature's motion satisfies *Nken v. Holder*, 556 U.S. 418 (2009), a stay should issue.

The government alleges that the Idaho Legislature "forfeited" its argument that EMTALA's references to the medical care of an "unborn child" "exclude abortion from the broad definition of stabilizing treatment" by not raising the argument in the Legislature's opposition to the preliminary injunction. Resp. at 12.[1] Not so.

Neither decision cited in the Response supports forfeiture. *School District No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993), involves a failure to file documents with a motion as reason to deny reconsideration. *Burlington Northern & Santa Fe Railway Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007), rejected an argument initially raised in a reply. The alleged procedural bar is a fiction.

Worse, the forfeiture argument would punish the Legislature for an omission compelled by the district court's restrictions on the Legislature as a permissive in-

---

[1] The Response does not comply with word-length limits. Where FRAP 27(d)(2)(A) allows "5,200 words," the Certificate of Compliance attests to "5,577 words."

tervenor. Exhibit 6 at 1.[2] Yet the Response says nothing about how the court limited the Legislature to factual arguments when opposing the preliminary injunction. That the United States cites a non-existent procedural bar and fails to acknowledge the Legislature's constraints is egregious.

### B. The Idaho Legislature Did Not Concede that EMTALA Conflicts with Section 622.

The United States writes that the Legislature "conceded" the conflict between EMTALA and Idaho law during a hearing on the preliminary injunction. Resp. at 16 (citing 2-ER-118). Hardly.

Former counsel for the Legislature said, "I'm not disputing, Your Honor, the conceptual textual conflicts[.]" Exhibit 7 at 2-ER-118. But courts review an alleged concession for a "slip of the tongue." *In re Adamson Apparel, Inc. v. Simon*, 785 F.3d 1285, 1294 (9th Cir. 2015). Context matters.

At the time of the hearing, the district court had granted the Legislature permissive intervention "limited to allowing it to present evidence and argument aimed at 'showing the holes' in the factual foundation of the United States' motion." Exhibit 6 at 18. So the Legislature's counsel did not engage legal issues like conflicts between federal and state law. *See, e.g.*, Exhibit 7 at 2-ER-112–13.

---

[2] The Legislature has appealed its claim to intervene as of right. No. 23-35153.

The Legislature clarified its position in a brief opposing the preliminary injunction. There, the Legislature offered "a thorough-going analysis" showing that "EMTALA does not preempt the 622 Statute." Exhibit 8 at 13. But counsel did not present that argument, in compliance with the court's directions. *Id.*

Even if it were a concession, counsel's stray remark cannot affect this Court's "independent power to identify and apply the proper construction of governing law." *Aleman v. Glickman*, 217 F.3d 1191, 1196 n.3 (9th Cir. 2000) (citation omitted).

## C. The Legislature's Request for a Stay Is Timely.

Both in the procedural background and in its discussion of irreparable injury, the United States accuses the Legislature of unreasonably delaying its request for a stay. *See* Resp. at 5, 20–21. It isn't so. The Legislature acted in a timely and reasonable way. It moved for reconsideration 14 days after the preliminary injunction and for a stay pending appeal on "[t]hat same date" as its timely notice of appeal. Resp. at 5. That the preliminary injunction has stood undisturbed for a year is due to the district court's eight-month delay in deciding motions for reconsideration—not to any delay by the Legislature.

## II. THE IDAHO LEGISLATURE HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. EMTALA Does Not Preempt Section 622.

#### 1. An implied duty to perform abortions does not preempt state law because it does not "directly" conflict.

The United States rehashes the district court's flawed preemption analysis. *See* Resp. at 8–10. But the government still misunderstands EMTALA's non-preemption clause. 42 U.S.C. § 1395dd(f). Since the United States infers a duty to perform abortions from EMTALA's obligation to provide "stabilizing treatment," that implied duty cannot pose the kind of direct conflict that triggers EMTALA's preemption clause. *Id.* § 1395dd(b)(1)(A). EMTALA preempts state laws that interfere with the federal statute's express requirements, but not otherwise.

Nor has the Legislature ever "conceded" that EMTALA preempts section 622. Resp. at 10, 18. Its opening brief says, "EMTALA preempts state law only when it contradicts with the statute's express requirements." Exhibit 9 at 30.

The United States then insists that "[w]hen Congress creates special rules governing abortion—or excludes abortion from otherwise-applicable rules—it does so explicitly." Resp. at 11. But this gets matters backwards. Executive power must be proven, not presumed. Like any federal agency, USDOJ and HHS "literally [have] no power to act, let alone pre-empt the validly enacted legislation of a sovereign

4

State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Com'n v. FCC*, 476 U.S. 355, 374 (1986).

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), does not save the government's argument. Unlike the sweeping Civil Rights Act, EMTALA is a "limited 'anti-dumping' statute." *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). EMTALA's overlapping non-preemption clauses mean that its "preemptive effect" should be construed "as narrowly as possible." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993). This is incontrovertible.

> 2. *The Medicare Act bars EMTALA from preempting state standards of medical care like section 622.*

The United States charges the Legislature with "fail[ing] to preserve this argument" about the Medicare Act, Resp. at 14, but does not bother to explain why. To be clear, the Legislature raised the argument in its motion for reconsideration, opening brief, and motion for a stay. *See* Exhibit 10 at 8–9; Exhibit 9 at 31–32; Mot. at 7.

The Medicare Act's express non-preemption clause does not "depart[ ] from EMTALA." Resp. at 14. That clause *controls* EMTALA.

*Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam), is inapposite. The abortion mandate asserted here has not been "long insisted upon" by the United States. *Id.* at 654. And *Biden* nowhere hints at generally lowering section 1395's barrier on the federal takeover of medical practice.

5

The government says that the abortion mandate it advocates was "enacted by Congress" rather than being "imposed by a 'Federal officer or employee.'" Resp. at 14 (quoting 42 U.S.C. § 1395). Again, not so. That mandate reflects a statutory interpretation adopted by USDOJ and HHS—not the words enacted by Congress.

The United States further argues that the preliminary injunction "*preserves* physicians' ability to identify necessary stabilizing treatment." Resp. at 15. But section 1395 proscribes federal "supervision or control over the practice of medicine," regardless of whether it promotes physician autonomy. 42 U.S.C. § 1395. The point is to preserve state autonomy over the practice of medicine within a state's borders.

Straining to avoid section 1395, the government contends that "any tension" between it and EMTALA should be resolved in favor of EMTALA as the more recent and specific statute. *See* Resp. at 15. But repeal-by-implication is disfavored. "[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984) (citation omitted).

### B.    EMTALA Does Not Require Abortion as Stabilizing Care.

It is undisputed that EMTALA requires a hospital to provide "stabilizing treatment" to a patient with what the statute calls an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). But the parties disagree whether "stabilizing treatment" implies a duty to perform abortions. The United States insists so because the statute

6

"does not exempt any form of care." Resp. at 7. On that view, "EMTALA requires *any* form of stabilizing treatment *if* the relevant professional determines such care is necessary." *Id.* (emphasis in original). The government infers that "[a]bortion care constitutes potential stabilizing treatment." *Id.*

Space precludes a full rebuttal. Suffice it to say that (1) EMTALA says nothing about abortion; (2) the statute requires medical care for "an unborn child," *see, e.g.*, 42 U.S.C. § 1395dd(e)(1)(A)(i); and (3) delivery is the only form of stabilizing treatment expressly approved for a pregnant woman with contractions, *id.* § 1395dd(e)(3)(A). These features make EMTALA-as-abortion-mandate implausible.

The United States denies that EMTALA entails "duties to the 'unborn.'" Resp. at 12. Yet the statute says otherwise. *See* 42 U.S.C. §§ 1395dd(c)(1)(A)(ii) (barring a patient transfer that poses "increased risks" to "the unborn child"); 1395dd(c)(2)(A) (allowing a patient transfer that "minimizes the risks" to "the health of the unborn child"); 1395dd(e)(1)(A)(i) ("emergency medical condition" puts "the health of the [pregnant] woman or her unborn child in serious jeopardy"); 1395dd(e)(1)(B)(ii) ("emergency medical condition" includes a patient transfer that "pose[s] a threat to the health or safety of the woman [in labor] or the unborn child").

The Response's claim, Resp. at 8, that "[c]ourts routinely recognize" EMTALA as an abortion mandate has threadbare support, and none of the cited rulings involves a medical condition that section 622 covers. *See New York v. U.S. Dep't of*

7

*Health and Human Services*, 414 F. Supp. 3d 475, 539 (S.D.N.Y. 2019) (citing ectopic pregnancy as an emergency condition covered by EMTALA); *id.* at 555 (HHS declines to say how EMTALA applies to emergency abortions under a conscience rule); *Morin v. Eastern Me. Med. Ctr.*, 780 F. Supp. 2d 84, 93–96 (D. Me. 2010) (addressing whether EMTALA requires a hospital to deliver a dead fetus); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712–18 (E.D. Mich. 2009) (declining to resolve whether EMTALA requires delivery of a nonviable fetus); *California v. United States*, No. C-05-00328-JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) (dismissing a case under California law for lack of standing).

### C. The Major Questions Doctrine Precludes the United States' Construction of EMTALA as a Fount of Executive Power.

The United States resists the major questions doctrine for reasons that don't add up. The notion that "there is 'no relevant agency action' because the United States is enforcing 'a policy decision[ ]' made by 'Congress … itself'" begs the question whether EMTALA embodies a congressional decision to mandate abortion. Resp. at 15 (quotations omitted). One cannot avoid the doctrine for lack of "a 'transformative expansion' of regulatory authority." *Id.* (quotation omitted). Inaugurating an abortion mandate is plenty transformative. Regardless, the doctrine applies when clear congressional authority fails to underwrite "agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)

(citations omitted). Obviously, a federal abortion mandate holds "vast … political significance." *Id.*

As the motion rightly said, "This is a quintessential major questions doctrine case." Mot. at 11. All the elements are here—a newfound source of executive power with "vast … political significance" but without "clear congressional authorization." *Util. Air*, 573 U.S. at 324. That alone should doom the government's case.

### D. The Government's Reading of EMTALA Raises Serious Constitutional Questions.

The United States breezes by the Legislature's constitutional objections in less than two pages. *See* Resp. at 16–18.

Spending Clause issues remain. The USDOJ and HHS may not coerce unwilling Idaho hospitals into complying with the government's novel construction of EMTALA by threatening to withhold multi-billion-dollar Medicare grants when EMTALA-related funding is comparatively small. As in *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012), that threat leaves hospitals—and the states where they operate— "no real option but to acquiesce." Neither *NFIB*'s factual setting nor a hospital's voluntary participation as a general matter determines whether the government's threat is coercive. *See* Resp. at 17. And Congress's authority to adopt statutory conditions on Medicare disbursement differs from the United States' more limited authority to force acceptance of its statutory construction. *See id.* at 18.

Tenth Amendment problems are no less evident. Far from being a "paradigm of preemption," this case is a paradigm of executive overreach. Resp. at 18. The United States whizzes by express provisions curtailing EMTALA's preemptive reach. *See* 42 U.S.C. §§ 1395dd(f), 1395. Contra the government, Resp. at 18, the Legislature has never conceded that EMTALA preempts Idaho law. *See* Exhibit 9. at 30. And the holding in *Dobbs* is unmistakable: "The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion." 142 S. Ct. at 2284. The Supreme Court's opinion does not endorse congressional power over abortion, and the Response confuses the United States' policy preferences with EMTALA's text. *See* Resp. at 19.

## III. IRREPARABLE INJURY AND THE REMAINING *NKEN* FACTORS SUPPORT A STAY PENDING APPEAL.

### A. The Preliminary Injunction, by Itself, Irreparably Harms the Idaho Legislature.

The United States says that the Legislature has not suffered irreparable injury because "[e]nforcing Idaho law is the duty of Idaho's executive branch." Resp. at 19. That response is a non sequitur. The ruling principle is that "a State suffers 'on-going irreparable harm' whenever it is 'enjoined by a court from effectuating statutes enacted by representatives of its people.'" Mot. at 3 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). The injury lies in preventing a State from "effectuating" its laws. *Id.* Proof of other harm is unnecessary.

Applying *King* to the elected officials it covers is hardly "novel." Resp. at 20 n.3. Because irreparable harm is caused by judicial interference with "statutes enacted by representatives of [a State's] people," *King*, 567 U.S. at 1303, any duly authorized body or official of State government may assert it. That executive branch officials have invoked *King* makes no difference.

The Idaho Attorney General's decision not to request a stay has no bearing on the Legislature's motion.

To undermine the Legislature's showing of irreparable injury, the United States falsely charges the Legislature with "substantial and unexplained" delay. Resp. at 21. Those criticisms misrepresent the record: the Legislature has acted timely and reasonably. That the preliminary injunction has endured for a year is due to the district court's delays—not to any foot dragging by the Legislature.

## B.     The Public Interest and Balance of the Equities Support a Stay.

The United States invokes "severe harms that a stay would cause." Resp. at 21. Echoing the district court, the government claims a stay would "increase the risk that pregnant patients needing emergency care would face serious complications, irreversible injuries … or death." *Id.* This exaggerates Idaho law. The United States does not contest that section 622 authorizes pregnancy termination to treat women with ectopic pregnancy, preeclampsia, and threats to their life. *Id.* Still, the government says, "it serves the public interest to ensure access to necessary stabilizing

11

treatment" in the interest of "pregnant individuals' health." *Id.* at 22. Invoking its sovereign authority, the government also claims that the public interest is "harmed by a stay permitting a preempted state law to take effect." *Id.*

Both contentions "repackage merits arguments." *Id.* at 23. In fact, they beg leading questions in the case—whether EMTALA requires access to abortion at all and whether, if so, EMTALA preempts Idaho law. No is our answer.

## CONCLUSION

For these reasons, the Legislature respectfully requests a stay of the district court orders dated August 24, 2022 and May 4, 2023, pending final disposition of the appeal before this Court and proceedings before the Supreme Court of the United States.

Respectfully submitted,

*/s/ Daniel W. Bower*
Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

September 8, 2023

12

**CERTIFICATE OF COMPLIANCE PURSUANT TO
CIRCUIT RULE 32-1 FOR CASE NOS. 23-35440 & 23-35450**

I hereby certify that this brief complies with the word limits permitted by

FRAP 27(d)(2)(C). The motion is 2,584 words, excluding the cover and documents

exempted by FRAP 27(a)(2)(B). The brief's type size and typeface comply with

FRAP 32(a)(5) and (6).

Dated: September 8, 2023            */s/ Daniel W. Bower*
                                    Daniel W. Bower

                                    *Counsel for Intervenors - Appellants*

# EXHIBIT 6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:22-cv-00329-BLW |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| THE STATE OF IDAHO, | |
| Defendant. | |

## INTRODUCTION

Before the Court is a motion to intervene filed by the Idaho Legislature (Dkt. 15). For the reasons expressed below, the Court will grant the motion in part and deny it in part. The Court will deny the motion to the extent the Legislature seeks to intervene as of right. But the Court will grant permissive intervention on a limited basis to allow the Legislature to present argument and evidence (including witnesses) in opposition to the United States' pending Motion for Preliminary Injunction. As explained further below, the Legislature's participation will be limited to presenting evidence and arguments the Legislature has said will show "the holes in the 'factual' foundation" of the United States' motion. *See Legislature's Reply Br., Dkt. 25, at 6.* Thus, the Legislature will be allowed to participate in the preliminary-injunction proceedings only – and in that limited

fashion. Otherwise, if during the course of this litigation the facts develop such that it becomes clear the State and Legislature's interests diverge, and the State can no longer adequately represent the Legislature's interests, the Court will entertain a renewed motion to intervene.

## BACKGROUND

In 2020, the Idaho Legislature passed a law making it a felony for anyone to perform or attempt to perform or assist with an abortion. Idaho Code § 18-622(2). This law allows for affirmative defenses to prosecution where the abortion is necessary to prevent the death of a pregnant woman, or the pregnancy resulted from rape or incest that was reported to law enforcement. *Id.* § 18- 622(3) (the "Total Abortion Ban.") Idaho Governor Brad Little signed the bill, but the Total Abortion Ban did not become law when signed. Rather, recognizing the constitutional impediments presented by *Roe v. Wade*, 410 U.S. 113 (1973), the bill contained a provision – commonly referred to as a "trigger" – stating that the prohibition would take effect 30 days following "[t]he issuance of the judgment in any decision of the United States supreme court that restores to the states their authority to prohibit abortion . . . ." Idaho Code § 18-622(1)(a).

On June 24, 2022, the United States Supreme Court handed down *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (June 24, 2022), overruling *Roe* and holding that the "Constitution does not prohibit the citizens of

each State from regulating or prohibiting abortion." 142 S. Ct. at 2284. The

Supreme Court's decision in *Dobbs* triggered the Total Abortion Ban, which is

now set to go into effect on August 25, 2022.

Governor Little has consistently offered his full-throated support for *Roe's*

overruling and for Idaho's Total Abortion Ban. In July 2021, he joined ten other

governors submitting an *amicus* brief in *Dobbs*, arguing that *Roe* should be

overturned and regulation of abortion should be returned to the states. (Idaho

Attorney General Lawrence Wasden also joined more than 20 other attorneys

general in a similar *amicus* brief.) And on the same day the Supreme Court issued

*Dobbs*, Governor Little issued a press release lauding the decision and commenting

that Idaho's Total Abortion Ban would take effect later this summer:

> I join many in Idaho and across the country today in welcoming the
> high court's long awaited decision upholding state sovereignty and
> protecting preborn lives. The decision provides clarity around landmark
> cases at the center of passionate debate in our country for nearly five
> decades. This is now clear – the 'right' to an abortion was a judicial
> creation. Abortion is not a right expressed in the U.S. Constitution, and
> abortion will be entrusted to the states and their people to regulate.
>
> Idaho has been at the forefront of enacting new laws to protect preborn
> babies. The pro-life bill I signed into law in 2020 will go into effect
> later this summer.
>
> Today's decision is the culmination of pro-life efforts to defend the
> defenseless – preborn babies who deserve protection. It also is
> affirmation of states' rights, a fundamental aspect of our American

**MEMORANDUM DECISION AND ORDER - 3**

government.[1]

Waiting six weeks from the issuance of *Dobbs*, and with only three weeks until the Total Abortion Ban is due to take effect, the United States of America filed this case against the State of Idaho on August 2, 2022. The United States challenges the constitutionality of the Total Abortion Ban on the grounds that it violates the Supremacy Clause and is preempted to the extent it is contrary to the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. The United States seeks to enjoin the statute's taking effect on August 25, 2022.

The tight timeline between the United States' filing its complaint and the law's effective date necessitated the parties agree to an expedited brief schedule. The schedule proposed by the parties, and which the Court adopted, provided for the United States to file its preliminary injunction motion on August 8, the State to file its response on August 16, and the United States to file its reply on August 19 by noon Mountain Daylight Time. *Order*, Dkt. 13. The Court has scheduled the hearing on the motion for August 22, 2022.

Shortly before the United States filed its Motion for Preliminary Injunction, on the evening of August 8, the Legislature moved to intervene as an intervenor-

---

[1] *Gov. Little Comments on SOCUTS Overrule of Roe v. Wade*, dated June 24, 2022, https://gov.idaho.gov/pressrelease/gov-little-comments-on-scotus-overrule-of-roe-v-wade/ (last visited Aug. 13, 2022).

**MEMORANDUM DECISION AND ORDER - 4**

defendant pursuant to Federal Rule 24(a) or Rule 24(b). The Legislature seeks to intervene because, it argues, Idaho law and Rule 24 allow it to intervene as of right in any actions challenging the constitutionality of a state law, and the State will not adequately represent all of the Legislature's interests in this litigation. If denied the opportunity to intervene, it further requests permission to file an *amicus curiae* brief and participate in the August 22 hearing.

The United States does not oppose the Legislature's participation in this case as an *amicus curiae*, and it further states that it does not oppose the State's ceding some of its oral argument time to the Legislature if the State chooses to do so. But the United States opposes the Legislature's intervention on the basis that the Legislature has failed to identify any divergence between its interests and the interests of the State in this case and has failed to provide any justification that its intervention would aid the Court's decision in this case. The United States further argues that the Legislature's intervention would prejudice the United States under the expedited briefing schedule unless the Court were to take steps to mitigate the prejudice.

## LEGAL STANDARD

The Federal Rules of Civil Procedure permit a party to intervene as of right under Rule 24(a) and permissively under Rule 24(b). *Cooper v. Newsom*, 13 F.4th 857, 864 (9th Cir. 2021). An applicant for intervention as of right must satisfy four

criteria under Rule 24(a)(2): "(1) the application for intervention must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit." *Animal Legal Def. Fund v. Otter*, 300 F.R.D. 461, 464 (D. Idaho 2014) (citing *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001)); *see also Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020) (citing Fed. R. Civ. P. 24(a)(2)).

"In evaluating whether these requirements are met, courts are guided primarily by practical and equitable considerations." *Callahan v. Brookdale Senior Living Cmty., Inc*., --- F.4th ---, 2022 WL 3016027, at *5 (9th Cir. June 29, 2022) (internal quotation marks and citation omitted). Although courts construe Rule 24(a) broadly in favor of proposed intervenors, *id.*, an applicant seeking intervention bears the burden of proving that these requirements are met. *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). Failure to satisfy any one of the requirements is fatal to the application." *Perry v. Prop. 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir. 2009).

By contrast, permissive intervention under rule 24(b) requires only that the

proposed intervener "have a question of law or fact in common" with the

underlying action, that the request be timely made, and that the court have an

independent basis for jurisdiction over the proposed intervener's claims.

Fed. R. Civ. P. 24(b). When ruling on a motion for permissive intervention under

Rule 24(b), a district court "must consider whether the intervention will unduly

delay or prejudice the adjudication of the original parties' rights." *Dep't of Fair*

*Emp. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 741 (9th Cir. 2011) (quoting

Fed. R. Civ. P. 24(b)). "Even if an applicant satisfies those threshold requirements,

the district court has discretion to deny permissive intervention." *Cooper*, 13 F.4th

at 868.

## ANALYSIS

When an applicant moves to intervene in a pending lawsuit under Federal

Rule of Civil Procedure 24(a)(2), a federal court has no authority to grant the

motion if an existing party to the case adequately represents the movant's interests.

Fed. R. Civ. P. 24(a)(2). Here, the Legislature has failed to meet its burden of

showing that the State will not adequately represent its interests in the litigation.

The Legislature's failure to satisfy this requirement is fatal to its application for

intervention as of right. *Perry*, 587 F.3d at 950.

As already noted, however, the Court will allow the Legislature to intervene

on a limited basis, as explained in further detail below.

**MEMORANDUM DECISION AND ORDER - 7**

1.  **Intervention as a Matter of Right**

A movant seeking intervention typically bears a "minimal" burden of

showing inadequacy of representation by an existing party, and such burden is

satisfied if the applicant can demonstrate that representation of its interests may be

inadequate. *Berger v. N. Carolina State Conf. of the NAACP*, 142 S. Ct. 2191,

2205 (2022) (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10

(1972)). In *Berger*, the Supreme Court addressed a request by two leaders of North

Carolina's state legislature to intervene in a federal lawsuit challenging a voter-

identification law and explained what it takes to meet this "minimal" burden.

There, the NAACP sued Executive Branch officials sympathetic to its position—

namely, the Governor, who had vetoed the law after its passage and continued to

actively oppose it, and members of the State Board of Elections (collectively, the

"Board"), who were appointed and potentially removable by the Governor. *Id.* at

2198. The state's attorney general assumed responsibility for defending the

Governor and the Board. *Id.* Like the Governor, the attorney general had opposed

an earlier voter-ID law and participated in a legal challenge against it. *Id.* Further,

the North Carolina attorney general's office had a history of opposing laws enacted

by the legislature and declining to fully defend those laws in federal litigation. *Id.*

at 2197.

After the NAACP sued these officials in *Berger,* two legislative leaders

**MEMORANDUM DECISION AND ORDER - 8**

moved to intervene on behalf of the state legislature, arguing, inter alia, that "without their participation, important state interests would not be adequately represented in light of the Governor's opposition to [the bill], the Board's allegiance to the Governor, and the attorney general's opposition to earlier voter-ID efforts." *Id.* They also claimed the Board had offered only a "tepid" defense of the law in a parallel state-court proceeding. *Id.* at 2198-99. The district court denied their motion without prejudice and again denied their renewed motion. *Id.* at 2199.

As the litigation proceeded without the legislative leaders, the NAACP moved to enjoin the Board from enforcing the voter-ID law in the upcoming litigation; by this time, the Governor had been dismissed from the suit, and only the Board members, represented by the attorney general, remained as defendants. *Id.* The legislative leaders, unsatisfied with the vigor of the Board's response to the request for injunctive release, sought to lodge an *amicus* brief, five expert reports, and several other declarations. *Id.* "At the end of the day, however, the District Court refused to consider the amicus brief and accompanying materials, struck them from the record, and granted a preliminary injunction barring enforcement of [the voter-ID law]." *Id.*

The legislative leaders appealed the ruling denying intervention. The Board also appealed the ruling granting the preliminary injunction but did not seek a stay

**MEMORANDUM DECISION AND ORDER - 9**

of the injunction because of "disruptive effect such relief would have had on election administration." *Id.* (internal quotation marks omitted). The law was therefore not enforced during the state's March 2020 primary election. *Id.* at 2200. Meanwhile, the Governor had filed an *amicus* brief in the appeal in favor of the injunction, arguing that the district court "had not gone far enough." *Id.* But the Fourth Circuit ultimately side with the legislative leaders with respect to the injunction, who had also filed an *amicus* brief opposing it, finding the district court had abused its discretion in issuing the injunction. The Fourth Circuit, however, affirmed the district court's denial of intervention in an *en banc* decision. The Supreme Court granted certiorari.

The Supreme Court reversed the Fourth Circuit's *en banc* decision, holding North Carolina's legislative leaders were entitled to intervene in the litigation. In so holding and "[c]asting aspersions on no one," the Court observed, "this litigation illustrates how divided state governments sometimes warrant participation by multiple state officials in federal court. *Id.* at 2205. It explained how the legislative leaders requesting to intervene sought to give voice to a perspective different from that of the Board – which remained beholden to a Governor that had vetoed the law at issue and who had filed his own briefs in the litigation, "calling the law 'unconstitutional' and arguing that it 'should never go into effect,'" and which at all times had been represented by an attorney general

**MEMORANDUM DECISION AND ORDER - 10**

who publicly opposed an earlier version of the law. Critically, the Board had also conceded in the parallel state-court proceedings "that its 'primary objective' wasn't defending [the law], but obtaining guidance regarding which law it would need to enforce in an upcoming election ([the current law being challenged] or preexisting law)." *Id.* at 2199. Thus, the Board, more concerned about the state's interest in "stability and certainty," had aimed its focus in the litigation on obtaining guidance for the administration of upcoming elections – instead of focusing wholeheartedly on defending the law from the constitutional challenge. *Id.*

By contrast, the legislative leaders remained unburdened "by misgivings about the law's wisdom" and, if allowed to intervene, had pledged to focus solely on "defending the law vigorously on the merits, without an eye to crosscutting administrative concerns" – concerns that had plagued the Board's defense throughout the litigation. *Id.* This "unalloyed interest in vindicating the law from constitutional challenge," *id.* at 2196, the Supreme Court reasoned, set the legislative leader's interests apart from the interests of the Board, who were more concerned with election administration than defending the law. *Id.* at 2205. Because the legislative leaders had shown that they sought to vindicate valuable state interests distinct from the Board's interests – and had further shown that the Board's preoccupation with administrative concerns and its allegiance to a Governor, who opposed the law, prevented it from adequately representing those

**Memorandum Decision and Order - 11**

distinct interests – the Supreme Court held that the legislative leaders had a right to intervene in the litigation. *Id.*

In this case, unlike in *Berger*, the Legislature has failed to show that it brings a distinct state interest to bear on this litigation that the State cannot adequately represent – even given the Legislature's minimal burden. As just discussed, in *Berger*, the legislative leaders provided evidence that the existing state defendants' "primary objective" in the litigation differed from their own *and* that existing state defendant's preoccupation with these other interests, together with their misgivings about the wisdom of the law, prevented them from providing a full-throated defense of the law on the merits. But no such concerns exist here. The Idaho Legislature can point to no evidence that the State, represented by the Attorney General, has expressed any misgivings about the Total Abortion Ban, or that the State is concerned with interests distinct from the Legislature's that would prevent it from focusing solely on "defending the law vigorously on the merits," without an eye to other concerns. Nor has the Attorney General ever publicly opposed the Total Abortion Ban or a similar law, and nothing otherwise indicates that he would decline to defend it. To the contrary, all signs lead to the conclusion that not only does the State assert "an unalloyed interest" in vindicating the law from constitutional challenge, indicating it will offer the most robust defense of the law, but also that the State and Legislature's interests are fully aligned in this litigation.

**MEMORANDUM DECISION AND ORDER - 12**

Despite this reality, the Legislature claims that it has a "*unique interest, the interest that is really at stake here*—its unique power and authority and duty to answer the hard questions posed by abortion," such as "What is the moral value of a preborn child?," or "In what situations are the mother's interests more weighty than the moral value and interests of the preborn child?" *Legislature's Reply Br.*, Dkt. 25, at 8 (emphasis in original). The Legislature maintains only it can answer these questions, and not the executive branch. *Id.* But the United States has not sued any executive branch officials; instead, it has sued the State, and the Legislature utterly fails to explain how it is uniquely positioned – separate and apart from the State – to answer these questions. The Legislature's criticism of the Executive Branch in this case is particularly puzzling given Governor Little's statements unequivocally supporting the *Dobbs* decision and the Total Abortion Ban. Likewise, as noted, all indications suggest that the Attorney General remains fully on board in defending the law.

In fact, to this point, the Legislature has presented no credible argument that it itself is distinct from the "the State," either formally or functionally for purposes this litigation, and therefore a "new" party entitled to intervene under Rule 24(a). Again, this case is distinguishable from *Berger* in that the United States has not sued particular officers of the State but rather the State itself. As the United States argues, "[b]y virtue of being part of the State of Idaho itself, the Idaho Legislature

is *already* a party, and the Legislature articulates no reason why this Court should grant intervention when the State is *already* a party. *United States Resp.* at 6, Dkt. 23 (citing *Berger*, 142 S. Ct. at 2203) (rejecting the argument that "the legislative leaders are already effectively 'existing' parties to this suit" because the plaintiff "has not sued the State"). And, critically, as the United States also points out, because the State itself is the defendant, the practical concerns animating *Berger* do not exist here: there is no risk United States has "select[ed] as their defendants those individual officials [it] consider[s] most sympathetic to [its] cause or most inclined to settle favorably and quickly." *Id.* at 2201. Indeed, even if the United States tried, it is difficult to see what state official it could have picked who it may have considered more sympathetic to its cause or who would have been more inclined to settle this case favorably and quickly. In this case, the State appears fully united thus far.

In sum, the Court finds the circumstances of this case readily distinguishable from *Berger* and further finds that the Legislature has failed to show it seeks "to give voice to a different perspective" than the State's, or that the State will not adequately represent the Legislature's interests. Even as it is, *Berger* will make litigation in federal court involving states far more burdensome. As Justice Sotomayer noted in her dissent, "[i]t is difficult to overstate the burden the Court's holding [in *Berger*] will foist on district courts." *Id.* at 2211. But to ignore

MEMORANDUM DECISION AND ORDER - 14

distinctions between this case and *Berger* – and to allow a legislature the right to intervene in every federal case whenever it says it should be allowed to do so *and* without requiring the legislature to meet even its minimal burden of showing it possesses a distinct interest or that its interests are inadequately represented – would allow a state to turn into a nine-headed Hydra whenever it so chooses. This Court does not read *Berger* as intending or permitting such a result in a case such as this one – where not a speck of evidence exists that the State and the Legislature's interests diverge in any real and practical sense. This Court therefore finds that the Legislature has shown no right to intervene in this case – at least at this stage in the litigation.

As explained below, however, the Court will allow the Legislature to permissively intervene for the limited purpose of opposing the United States' motion for preliminary injunction, including an opportunity to present witnesses at the August 22 hearing if it so chooses.

## 2. Permissive Intervention

"A district court may grant permissive intervention under Rule 24(b)(1)(B) where the applicant shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *Perry*, 587 F.3d at 955 (internal quotation marks and citation omitted). "Where a putative intervenor has met these

requirements, the court may also consider other factors in the exercise of its discretion. *Id.* "These relevant factors include the nature and extent of the intervenors' interest, their standing to raise relevant legal issues, the legal position they seek to advance, and its probable relation to the merits of the case." *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326, 1329 (9th Cir. 1977). The Court may also consider "whether the intervenors' interests are adequately represented by other parties" and "whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Id.*

"When making this discretionary determination, a district court 'must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Lucent,* 642 F.3d at 741(quoting Fed. R. Civ. P. 24(b)(3)). "The district court's discretion under Rule 24(b), to grant or deny an application for permissive intervention includes discretion to limit intervention to particular issues." *Id.* (quoting *Van Hoomissen v. Xerox Corp.*, 497 F.2d 180, 181 (9th Cir.1974) (internal quotation marks and ellipses omitted).

Here, the Court finds that the Legislature's motion is timely and that its Proposed Answer reflects defenses that present common issues of fact and law. As the Legislature has met the threshold requirements for permissive intervention, the Court may consider other factors in its discretion, including whether the

MEMORANDUM DECISION AND ORDER - 16

Legislature "will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Spangler*, 552 F.2d at 1329.

In its reply brief, the Legislature says it would call witnesses at the preliminary injunction hearing to present evidence of whether "Relevant Abortions"[2] are "occurring in Idaho's Medicare-funded emergency rooms," but the State may not. *Legislature's Reply* at 5, Dkt. 25. While the Court – in light of the evidence it currently has before it – would not consider the State's decision not to call witnesses at the preliminary injunction hearing on this narrow factual question a reason to justify the Legislature's intervention as of right, it nonetheless finds that that justifies the Legislature's permissive intervention *on this sole issue*. *Lucent*, 642 F.3d at 741 (limiting intervention to discrete issues).

The Legislature may therefore permissively intervene, but it will be limited at this juncture to presenting argument and evidence in opposition to the United States' motion for preliminary injunction. More specifically, the Legislature's participation in the preliminary-injunction proceedings will be limited to allowing

---

[2] The Legislature defines "Relevant Abortions" as "those emergency-room abortions that fall (i) inside the prohibition of abortion found in Idaho Code § 18-622 ("the 622 Statute") and (ii) outside the overlap between the 622 Statute's medical-emergency exception and EMTALA's medical-emergency mandate but still inside EMTALA's mandate." *Legislature's Reply* at 2, Dkt. 25.

MEMORANDUM DECISION AND ORDER - 17

it to show "the holes in the 'factual' foundation" of the motion on the issue of

"Relevant Abortions," as the Legislature has specifically laid out in its reply.

*Legislature's Reply*, 6-7, Dkt. 25 (describing the Legislature's "present litigation

plan"). The Court, of course, will allow the Legislature to modify its proposed plan

in responding to the preliminary injunction motion on this particular issue as the

Legislature sees fit. But the larger point is that, substantively, the Legislature's

participation will be limited to allowing it to present evidence and argument aimed

at "showing the holes" in the factual foundation of the United States' motion.

Lastly, the Court cannot ignore the issue of whether the Legislature's

permissive intervention "will unduly delay or prejudice the adjudication of the

original parties' rights." The United States argues that granting the Legislature will

prejudice it because it negotiated the briefing schedule with the State under the

assumption they would be the only parties in the case – and the "briefing schedule

is extraordinarily expedited in light of the impending effective date of the

challenged law." *United States' Resp.*, Dkt. 23, at 8. The United States claims that

the Legislature's intervention at this juncture would be unfair because "the United

States would need to respond to two opposition briefs of up to 20 pages each (plus

an unknown number of factual submissions), but would, under the briefing

schedule, have only two and a half days (and ten pages) to do so." *Id.*

First, the Court notes that any prejudice to the United States stemming from

**MEMORANDUM DECISION AND ORDER - 18**

the briefing schedule is largely of the United States' own making. It chose to delay filing this case and its motion for preliminary injunction for over six weeks after the Supreme Court issued the *Dobbs* decision. Nonetheless, the Court acknowledges that the Legislature's intervention may cause some prejudice to the United States. To mitigate that prejudice, the Court has limited the Legislature by subject matter, as already explained.

Further, in terms of briefing deadlines, the Court will adopt this schedule:

(1) The Legislature must file its brief on **August 16, 2022** – which is the same day the State's brief is due. If the Legislature intends to present affidavits, any such affidavits shall likewise be due on **August 16, 2022**.

(2) The United States must file its optional combined reply brief – addressing both the State's and the Legislature's briefing – by the existing reply deadline of **12:00 p.m. Mountain Time on August 19, 2022**.

As for page limitations, the State will be permitted 20 pages, and the Legislature 15. The United States will be allowed 20 pages for its combined reply brief.

Finally, in an effort to ensure that the preliminary-injunction proceedings are efficient and streamlined, the Court will not allow the State and the Legislature to pursue duplicative strategies during the preliminary-injunction proceedings. More

**MEMORANDUM DECISION AND ORDER - 19**

specifically, during an informal conference, the State indicated it views the United

States' motion as presenting purely legal questions. The Legislature, on the other

hand, says it is "prepared to present evidence countering the Government's

position on the material issues of fact." *Legislature Reply Br.* Dkt. 25, at 5.

Accordingly, to the extent that the Legislature intends to present factual evidence

(or challenge the United States' factual submissions) – including by calling

witnesses – the Court will not allow the State to duplicate those efforts.

## ORDER

**IT IS ORDERED that** the Idaho Legislature's Motion to Intervene (Dkt.

15) is **GRANTED in part and DENIED in part**, as explained above.

DATED: August 13, 2022

_____

B. Lynn Winmill
U.S. District Court Judge

# Exhibit 7

No. 23-35440, 23-35450

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STATE OF IDAHO,

*Defendant-Appellant,*

*v.*

MIKE MOYLE, ET AL.

*Movants-Appellants.*

---

On Appeal from the United States District Court
for the District of Idaho

No. 1:22-cv-00329-BLW
The Honorable B. Lynn Winmill

---

## STATE OF IDAHO'S EXCERPTS OF
## RECORD Volume 2 of 3

---

RAÚL R. LABRADOR
  *Attorney General*

Idaho Office of the Attorney General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
josh.turner@ag.idaho.gov
brian.church@ag.idaho.gov

THEODORE J. WOLD
  *Solicitor General*
JOSHUA N. TURNER
  *Deputy Solicitor General*

LINCOLN DAVIS WILSON
Chief, Civil Litigation and
Constitutional Defense
BRIAN V. CHURCH
  *Deputy Attorney General*

1                **UNITED STATES DISTRICT COURT**

2                   **DISTRICT OF IDAHO**

3

4 UNITED STATES OF AMERICA,    )  CASE NO. 1:22-cv-00329-BLW
                        )

5       Plaintiff,       )  **MOTION HEARING**
                        )

6          vs.         )
                        )

7 THE STATE OF IDAHO,      )
                        )

8       Defendant,      )
                        )

9 and                 )
                        )

10 SCOTT BEDKE, in his official  )
capacity as Speaker of the    )
House of Representatives of    )

11 the State of Idaho; CHUCK     )
WINDER, in his capacity as     )

12 President Pro Tempore of the  )
Idaho State Senate; and the    )

13 SIXTY-SIXTH IDAHO LEGISLATURE, )
                        )

14       Intervenor-Defendants.  )
_____ )

15

16

17           **TRANSCRIPT OF PROCEEDINGS**
     **BEFORE THE HONORABLE B. LYNN WINMILL**

18       **MONDAY, AUGUST 22, 2022; 9:02 A.M.**
              **BOISE, IDAHO**

19

20

21

22 Proceedings recorded by mechanical stenography, transcript
produced by computer.

23 _____

24        **TAMARA I. HOHENLEITNER, CSR 619, CRR**
      FEDERAL OFFICIAL COURT REPORTER

25     550 WEST FORT STREET, BOISE, IDAHO  83724

2

A P P E A R A N C E S

**FOR THE UNITED STATES OF AMERICA**
    Brian D. Netter, Deputy Assistant Attorney General
    U.S. DEPARTMENT OF JUSTICE
    CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
    1100 L Street, N.W.
    Washington, D.C. 20005

**FOR DEFENDANT STATE OF IDAHO**
    Brian V. Church, Deputy Attorney General
    Clay R. Smith, Special Deputy Attorney General
    LAWRENCE G. WASDEN ATTORNEY GENERAL
    CIVIL LITIGATION DIVISION
    954 W. Jefferson Street, 2nd Floor
    P.O. Box 83720
    Boise, ID 83720-0010

    Joan E. Callahan, Special Deputy Attorney General
    NAYLOR & HALES, P.C.
    950 W. Bannock Street, Suite 610
    Boise, ID 83702

**FOR INTERVENOR-DEFENDANTS**
    Daniel W. Bower
    MORRIS BOWER & HAWS PLLC
    1305 12th Avenue Road
    Nampa, Idaho 83686

    Monte Neil Stewart
    Attorney at Law
    11000 Cherwell Court
    Las Vegas, Nevada 89144

1                        I N D E X

2                   AUGUST 22, 2022

3

   **Proceeding**                                    **Page**
4

   Argument by Mr. Netter............................ 10
5  Argument by Mr. Church........................... 23
   Argument by Mr. Stewart.......................... 54
6  Argument by Mr. Netter........................... 67
   Court takes under advisement..................... 74

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

August 22, 2022

THE CLERK:  The Court will now hear Civil Case 22-329,
*United States of America vs. The State of Idaho*, regarding
plaintiff's motion for a preliminary injunction.

THE COURT:  Good morning, Counsel.

Before we take up this matter, I did want -- we did
provide a call-in number.  I don't know if anyone has taken
advantage of that, but it's something that we have only been
able to do during the pandemic.  But I did need to remind anyone
who is listening in that it is against federal law to try to
record court proceedings even from a remote location.

Of course, that would apply to anyone here in the
courtroom as well, but we're usually not as concerned about that
happening as we would if someone were simply listening in by a
telephone connection.

As we begin, I have given counsel 45 minutes per side.
I'm going to make some initial observations intended just to
point out where I have some concerns so that you can target your
argument appropriately.

I do want to point out at the outset my appreciation
for the considerable energy and skill demonstrated by the briefs
and declarations which the parties have submitted.  It's been
immensely helpful, created a lot of work.  The amicus briefing
was also excellent and provided, I think, a real broad

1    understanding as to the various points in this.

2         Now, before I actually get to offering those initial

3    observations, I hope it is clear to everyone here, this is not a

4    case about the wisdom of *Dobbs* or the wisdom of *Roe v. Wade*.

5    That really is completely secondary to this decision.  *Dobbs* is

6    the law of the land, and that will not be questioned here.  The

7    only question is resolving a conflict or apparent conflict

8    between federal and state law under the supremacy clause of the

9    United States Constitution.

10        Now, let me address some of the concerns.  I think I

11   have two or three concerns for the State and one concern for the

12   Government, but I'm offering them here because you both may want

13   to comment on them.

14        It struck me that the State, both in their

15   brief -- both in their briefing and in their declarations,

16   attempted to state their arguments in language other than what

17   was actually included in Idaho's abortion statute.

18        Routinely you argued, both in briefing and in

19   declarations, that the statute provides an affirmative defense

20   to a doctor who may be prosecuted under its provisions if the

21   doctor has a good faith belief that the abortion was necessary

22   because the medical condition was life-threatening.  That's the

23   word that was kind of pretty consistently used throughout the

24   briefing and declarations.

25        The United States, in its reply brief, makes a

6

1      compelling argument that this is a rewriting of the statute

2      since the statute only permits the affirmative defense if the

3      abortion was, quote, "necessary to prevent death," close quote.

4              So the question is:  Does the statute provide for an

5      affirmative defense if the medical condition would be, without

6      an abortion, life-threatening, or is the abortion truly

7      necessary to prevent death, or are they the same thing?

8              But relying on Black's Law Dictionary and Idaho

9      Supreme Court cases, the U.S. makes a strong argument that

10     "necessary" means indispensable or absolutely needed.

11             And I guess I have to share that I have the same

12     concern that the statute would only provide the doctor with an

13     affirmative defense if he or she believed in good faith that the

14     patient would, in fact, die unless the abortion is performed.

15     And that is quite different from simply being life-threatening,

16     which suggests only a possibility of death.

17             So that's one issue I really want the State to hit

18     head on.  And I would note you didn't have a chance to respond

19     to it because it came up in the reply brief.  But then it only

20     came up in the reply brief because it was a kind of reframing of

21     the issue by the State in its response brief.

22             The second question is somewhat related, and it's

23     simply this:  That even if the "necessary to prevent death"

24     language can be read as meaning life-threatening, that deals

25     only with situations where the patient's death is either going

1   to happen or is at least a probability.

2          But there are situations which I think have been

3   pointed out primarily in the amicus and the United States'

4   submissions where a doctor may well believe that in the hospital

5   setting, they can prevent or substantially reduce the chance of

6   the patient's death, but that there is still a substantial

7   likelihood that the patient will be left with serious medical

8   injuries if an abortion is not performed.  They may be left

9   infertile or have temporary or permanent major organ failure or

10  have a stroke, leaving the patient with long-term serious

11  disability.

12          As I would note, the submissions from the

13  United States suggest that is more than just a hypothetical

14  concern.

15          My concern is that in that setting, where the death of

16  the patient is not likely but it is still going to have very

17  serious medical consequences for the patient, there would seem

18  to be just an absolute conflict between EMTALA and the Idaho

19  abortion statute.

20          So on that front, it strikes me at least initially

21  that the impossibility preemption applies.  And I need to have

22  the State hit that head on, why that is not truly a conflict

23  between the statutes.

24          Okay.  For the Government, here is the concern I would

25  like to make sure you address:  In this case, it appears that we

8

1    have express preemption because of the language of EMTALA.  And

2    since the touchstone of preemption is Congressional intent, then

3    is it not true that the Idaho abortion statute is only preempted

4    if it directly conflicts with EMTALA?  That's the language in

5    EMTALA itself.  There must be a direct conflict, or there is no

6    preemption.

7         So does that make the implied preemption principle,

8    such as impossibility and obstacle preemption, not relevant?

9    And then how does that bear upon this case?

10        So those are the three concerns I thought I would

11   throw -- I know I'll have questions as we get into this more

12   deeply, but I wanted counsel to be aware of at least those three

13   concerns.

14        I guess just one last observation that is more general

15   in nature.  You know, I have been a judge for a lot of years.  I

16   have sat and observed the application of our criminal laws, and

17   I think it's pretty obvious that our legislature and Congress

18   think that passing criminal laws will change behavior.  And from

19   my time on the bench, I have seen that change in behavior

20   applies not just in the core of the criminal statute but around

21   the edges.

22        Simply put, we assume that rational people will not

23   just literally comply with the criminal statute but will avoid

24   conduct which might even be viewed as violating the statute

25   simply because of the impact of being charged even if you're

1     able to obtain an acquittal.

2          Intentionally or otherwise, the abortion statute, if

3     that premise is correct, will cause doctors to steer clear of

4     conduct that could be seen as violating the Idaho abortion

5     statute.  It would be a rare situation where a doctor is going

6     to be willing or anxious to push the limits and go right up to

7     the edge of what is allowed under the Idaho abortion statute.

8     In essence, they will seek a safe harbor in which they have no

9     chance of prosecution.

10          Does that almost not create obstacle preemption if the

11    doctors are risk averse?  I mean, I think it's in the very

12    nature of their profession.

13          So I want, again, counsel to be aware that I just had

14    that general concern that really is a reflection of what I have

15    observed as a judge in handling a lot of criminal cases and kind

16    of having a sense of what Congress and the legislature intend

17    when they pass criminal laws trying to not only criminalize

18    behavior but change behavior both directly within the statute

19    and on its edges.

20          So, with that, let's go ahead and begin.

21          Mr. Netter, I think you'll start.  I understand you're

22    going to reserve 20 minutes for rebuttal.  And we have a clock,

23    which is more for your aid.  I actually use it pretty strictly

24    in some cases to keep attorneys on time.  I don't think that

25    will be too much of an issue because we have given you a lot of

1    time to argue, but it will give you some idea of where you are

2    with the time allotted.

3              So, Mr. Netter.

4              MR. NETTER:  Thank you, Your Honor.

5              Good morning, Your Honor.  May it please the Court.

6    Brian Netter, U.S. Department of Justice, for the United States.

7              Each of us will, at some point in our lives, encounter

8    a medical emergency for ourselves, for a friend, for a loved

9    one.  We hope that when that point of medical crisis arrives,

10   the person in need is able to get to a hospital where a doctor

11   or a nurse who has trained their entire professional life for

12   that moment, trained for years, will know the right treatment to

13   administer.

14             And although perhaps it should go unsaid, we hope that

15   in that moment, the doctor or the nurse will be able to

16   administer the treatment, will not be precluded, will not be

17   forced to hesitate out of fear that the doctor or nurse, him or

18   herself, will face criminal sanctions.

19             As the Court has acknowledged, this case arises under

20   a federal law called EMTALA, the Emergency Medical Treatment and

21   Labor Act.  Under EMTALA, when a patient arrives at a

22   participating hospital with an emergency medical condition, the

23   physician is required to offer what's called a stabilizing

24   treatment.  Any state law that conflicts directly with that

25   requirement is preempted.

1          So let me address right here at the outset the Court's

2     question about what preemption means in the context of EMTALA,

3     because that is governed by binding Ninth Circuit precedent, a

4     case called *Draper vs. Chiapuzio* that was decided by the

5     Ninth Circuit in 1993.

6          In that case, the Ninth Circuit said, while construing

7     EMTALA, the key phrase is "directly conflicts."  A state statute

8     directly conflicts with federal law in either of two cases:

9     First, if compliance with both federal and state regulations is

10    a physical impossibility or, second, if the state law is, quote,

11    "an obstacle to the accomplishment and execution of the full

12    purposes and objectives of Congress."

13         So we believe that answers the question and that both

14    physical impossibility and obstacle preemption are within the

15    scope of the statutory preemption provision of EMTALA.

16         THE COURT:  Yeah.  I read that decision, and I can't

17    disagree with it because it is -- well, I guess I can disagree

18    with it.  I have to follow it because it's the Ninth Circuit

19    precedent.  But it struck me as a little odd because there does

20    seem to be express preemption; and, as such, we look directly at

21    the language of the statute.  And the statute says there is only

22    a conflict or preemption if there is direct conflict.

23         But you're right.  I mean, that is the case that I

24    think governs that, but, you know, I'm going to -- I will wait

25    to hear what the legislature and the State of Idaho has to say,

1    but I did wonder at the time when I read the decision that they

2    seemed to be going a little further than they needed to; and

3    where there is express language about preemption, that would

4    seem to govern the issue.

5           But you hit the exact case.  I mean, that was exactly

6    the response I thought you would make, but I wanted to hear you

7    make that argument.

8           Go ahead.

9           MR. NETTER:  Well, let me just add one additional

10   point on that, Your Honor, which is that the legislative history

11   of EMTALA indicates that the purpose behind the preemption

12   provision was to ensure that states would be able to enforce

13   stricter laws that required even greater provision of emergency

14   care.

15          So it's sensible in that circumstance for the

16   preemption provision to be interpreted to prevent a state from

17   erecting obstacles to the full purposes and objectives of

18   Congress.

19          So we're here today, of course, because sometimes a

20   patient who arrives at a participating hospital with an

21   emergency medical condition is pregnant.  And sometimes the

22   stabilizing treatment that is necessary to save the life or

23   protect the health of that patient is an abortion.

24          And yet, Idaho has a law set to go into effect this

25   week which the state supreme court has described as a total

1    abortion ban that is poised to subject doctors and nurses who

2    participate in any abortion to the felony criminal process.

3         Now, as the briefing in this case has demonstrated,

4    there are some issues on which the State, the legislature, and

5    the United States agree.  Principally, everybody seems to agree

6    that there is some preemption; and to the extent that EMTALA

7    governs, the State of Idaho doesn't have the authority to

8    override that.

9         Additionally, the State and the intervenors appear to

10   agree that EMTALA does require abortions as a stabilizing

11   treatment under some circumstances.

12        The primary dispute between the parties is whether

13   there is an actual dispute: what the scope of the Idaho law is,

14   and how that compares to the protections afforded by EMTALA.

15        With respect to that, there are both legal and factual

16   angles.  Primarily, of course, the interpretation of EMTALA and

17   the interpretation of Idaho law, that's a question of law for

18   this Court to determine.

19        Now, there are some additional factual questions as to

20   what actual medical conditions can arise that fit within the gap

21   between Idaho law and EMTALA.

22        As has been identified in the briefs and in the

23   accompanying declarations, there are a number of conditions that

24   affect pregnant individuals that would fall within this gap,

25   potentially including ectopic pregnancy, preterm/prelabor

1    rupture of membranes, placental abruption, preeclampsia with

2    severe features, sepsis, cardiovascular disease, and the list

3    goes on.

4         I would like to discuss a bit the facts and the

5    powerful declarations that were submitted by obstetricians and

6    gynecologists within the state of Ohio *[sic]* who are set to be

7    subject to this law in the coming days.

8         But first we should start with the law.  Because the

9    way that 18-622 was crafted here is very telling, because the

10    Idaho Code part governing abortion contains a definition.  It

11    has a definition for medical emergency.  And the legislature

12    told us in its motion to intervene, Docket 15-1, that the

13    definition of medical emergency in the Idaho Code, which was

14    used by the legislature in the 2021 Heartbeat Law, was designed

15    to track EMTALA, and that 18-622, the Total Abortion Ban, was

16    intended to be narrower.  When the legislature told us that, we

17    should believe it.

18         It's a standard canon of statutory interpretation that

19    when Congress or when a state legislature uses different

20    language to cover different concepts, a different outcome is

21    intended.  That was certainly the case here.

22         There was an article published in the *Idaho Capitol

23    Sun* on Friday that transcribed some of the colloquy in the

24    committee hearing of the legislation that resulted in 18-622.

25    And I found that to be rather telling.

1    During the hearing of the House State Affairs

2    Committee, Representative Brooke Green asked the sponsor of the

3    legislation, Representative Todd Lakey, why there was no

4    exception for the health of the pregnant individual.

5    What he said is:  "If you're talking about the health

6    of the mother, that's a nuanced decision that could be something

7    much less than life, where if the decision was based solely on a

8    question of some type of health, then you're talking about

9    taking the life of the unborn child," he said.

10    After Representative Green asked if that meant that

11    the health of the woman was irrelevant, Representative Lakey

12    said, "I would say it weighs less, yes, than the life of the

13    child."

14    So I think this indicates, Your Honor, that the

15    different framing, the different phrasing "necessary to prevent

16    the life" *[sic]* as opposed to the much broader categories that

17    appear in EMTALA and that appeared even in other abortion

18    restrictions adopted by this legislature, that that's

19    significant.

20    There is a reason why different language was adopted

21    here, and that reason requires the injunctive relief that has

22    been requested by the United States.

23    Of course, the text of 18-622 confirms that to be

24    true.  The language "necessary to prevent the death" is not

25    couched in probabilistic terms.  Necessary is absolute; it means

1 indispensable.  The State confirmed as much in its submission to

2 the Idaho Supreme Court just 32 days ago in *Planned Parenthood*

3 *Great Northwest vs. State*.

4   In response to an argument that this language was

5 vague, the State said that the affirmative defense is available

6 only if the procedure is, quote, "essential to stop the death of

7 a pregnant woman."

8   THE COURT:  This was from the oral argument before the

9 Idaho Supreme Court?

10   MR. NETTER:  That was in the briefing --

11   THE COURT:  The briefing.

12   MR. NETTER:  -- that led to the oral argument.  Yes,

13 Your Honor.

14   It's no wonder, under that standard, that physicians

15 are fearful of practicing under a regime in which federal law

16 and the Hippocratic oath require the provision of care, but

17 Idaho law says that providing the care potentially makes you a

18 felon.

19   So now much of the briefing, as a factual matter, has

20 hinged on the question of what the legislature calls relevant

21 abortions and whether they exist.  The reality, which I think

22 each of us has experienced over the course of our lives, is that

23 pregnancies sometimes have complications.  And that's true in

24 Idaho just as it's true everywhere else.

25   The legislature submitted what it called some official

1  data, trying to suggest that emergency abortions are exceedingly

2  rare in Idaho and that there have been only a handful over the

3  period covered by the data, the past 10 to 12 years.  So I

4  wanted quickly to point out why that assessment of the data is

5  manifestly incorrect.

6  　　　　The legislature looked at official data that covered

7  only pregnant individuals who were less than 18 who were also

8  unable to obtain the consent of their parents or guardians or

9  pregnant individuals who were seeking an abortion more than

10  20 weeks after fertilization, which is at a gestational age of

11  22 weeks or later.

12  　　　　There is additional data that we have submitted in our

13  papers -- this is at Docket 86-6 at 10, which is ECF page 11 --

14  that indicates that abortions that take place after 22 weeks'

15  gestational age account for something like 0.1 percent of the

16  abortions in Idaho.

17  　　　　So the suggestion that there aren't emergency

18  abortions in this state is unfortunately incorrect, and the

19  declarations that we have submitted demonstrate that to be the

20  case.

21  　　　　And these are not only procedures that take place at

22  the moment where the doctor knows that if the procedure does not

23  happen, the patient will die.  Medical needs occur on a spectrum

24  where there are times when a disease will progress, where there

25  could be organ damage, where there could be serious implications

1    for a patient's health and where waiting for additional

2    treatment is going to cause even greater complications.  And

3    then there may be a later time when it is actually the case that

4    an abortion is truly necessary to save an individual's life, but

5    the costs that are borne during that interim period are serious

6    and reflect some of the delta between EMTALA and Idaho law.

7        I would refer the Court in particular to the

8    supplemental declaration of Dr. Emily Corrigan, who is an

9    obstetrician/gynecologist at Saint Alphonsus here in Boise.  And

10   that's at Docket 86-3, and her initial declaration was at

11   Docket 17-6.

12       She identified three patients on which she was aware

13   of actual emergency abortions that had been necessary, Jane

14   Does 1, 2, and 3.

15       Jane Doe 1 experienced preterm/prelabor rupture of

16   membranes, and Dr. Corrigan said in her supplemental declaration

17   that, in some circumstances, it could become serious enough to

18   result in death, but it might just require limb amputations or a

19   hysterectomy.

20       Jane Doe No. 2 was suffering from a placental

21   abruption, where the placenta prematurely detaches from the

22   uterine wall.  That condition, she testified, might just cause

23   kidney failure or a brain injury.

24       Jane Doe 3 had a condition called water on the lungs

25   that might just cause a lung injury rather than death.

1          Considering all this, Dr. Corrigan explained that she

2      told her hospital that OB/GYN physicians in Idaho are, quote,

3      "bracing for the impact of this law as if it is a large meteor

4      headed toward Idaho."

5          Now, it nearly goes without saying in the text of

6      EMTALA, the circumstances in which stabilizing treatment must be

7      offered are considerably broader.  EMTALA is phrased in

8      probabilistic terms:  When the absence of treatment is

9      reasonably expected to result in placing the health of a patient

10     in serious jeopardy, in serious impairment to bodily functions,

11     in serious dysfunction of any bodily organ or part.

12         The conditions described by Dr. Corrigan plainly

13     describe there being abortions that are necessary under EMTALA,

14     that are required as a matter of federal law that Idaho law

15     would set -- is poised to criminalize.

16         There is also, of course, a fairly common complication

17     of pregnancy, ectopic pregnancy, that is discussed in the

18     briefing.

19         Dr. Amelia Huntsberger in Sandpoint, Idaho, at Docket

20     86-4, explains that not every patient with an ectopic pregnancy

21     will die without treatment, which I take to mean that there are

22     circumstances in which it may be possible, theoretically, to

23     wait for a fallopian tube to rupture and for the fetal heartbeat

24     to stop before trying to clean up the internal bleeding and

25     organ damage.

1          Now, the legislature has argued that ectopic

2   pregnancy -- that treatment of an ectopic pregnancy is not

3   within the scope of the law.  The State, notably, has not taken

4   that position.

5          And the legislature has not grappled with the

6   statutory text in the slightest in trying to explain to this

7   Court or to physicians why the treatment of an ectopic pregnancy

8   would not constitute criminal abortion under Idaho law.

9          As the Court indicated, with respect to obstacle

10  preemption, there are questions here about the chilling effect.

11  And one thing I haven't discussed yet is the very peculiar

12  manner in which the supposed exception of this law is

13  structured:  That ordinarily if a state were to want to

14  criminalize abortion except in certain circumstances, it would

15  be the burden of the prosecutor to establish that those

16  circumstances were not met, and the prosecutor would have to

17  make that proof beyond a reasonable doubt.

18          Here, however, the presumption is flipped.  Here, a

19  prima facie criminal violation is established any time an

20  abortion is performed within the state of Idaho.  Full stop.

21  The only way for a physician to avoid becoming a felon and going

22  to jail for up to five years is by proving up the affirmative

23  defense and convincing the jury, on the physician's burden or on

24  the nurse's burden, by a preponderance of evidence that this

25  narrow affirmative defense has been satisfied.

1          It hardly seems necessary to point out that doctors
2     would avoid the risks of a criminal trial if at all possible.
3     But, again, we have declarations to demonstrate that that's the
4     case.
5          Dr. Kylie Cooper, an OB/GYN and maternal-fetal
6     medicine specialist at St. Luke's here in Boise, said in her
7     supplemental declaration, Docket 86-5, that as a physician who
8     is practicing in Idaho and through her personal interactions
9     with healthcare providers around the state, as well as through
10    her positions with ACOG, the American College of Obstetricians
11    and Gynecologists, the Idaho Perinatal Project Advisory Board,
12    and the Idaho Coalition for Safe Reproductive Healthcare,
13    providers' fear -- provider fear and unease is real and
14    widespread.
15         The State and the legislature don't have any response
16    to this.  Indeed, the Attorney General's Office doesn't seem to
17    argue on this point at all.  They don't dispute the chilling
18    effect.
19         The legislature insists that prosecutors would
20    exercise their discretion prudently.  As a matter of law, that
21    simply doesn't matter.  The Ninth Circuit held in *United States
22    vs. City of Arcata* that in that case, the City's promise of
23    self-restraint does not affect our consideration of the
24    ordinance's validity.
25         That's the case here.  And I think that it is

1    transparently the case that submitting a declaration from one

2    county prosecutor in a state that has 43 elected county

3    prosecutors provides no comfort to the physicians and the

4    nurses -- excuse me -- of this state.

5         Because, as Dr. Huntsberger pointed out in her

6    declaration, the very nature of discretion is that different

7    people are going to exercise it differently.

8         And even if it were the case that all 43 county

9    prosecutors could attest to the fact that they didn't intend to

10   prosecute under these circumstances, Idaho law has a provision

11   under which a member of a grand jury can identify the commission

12   of an offense and that fellow jurors must thereafter investigate

13   the same.  That's Idaho Code 19-1108.

14        Likewise, there is a citizen complaint provision

15   whereunder any individual within the state of Idaho can go to a

16   magistrate with a criminal complaint.  Under those

17   circumstances, the magistrate doesn't appear to have discretion.

18   If the elements of the crime are satisfied, then the magistrate

19   has to endorse the complaint.

20        And even if these procedures were not sufficiently

21   troubling, there is the fact of the statute of limitations.

22   There is a five-year statute of limitations on felonies in

23   Idaho, which means even if today's prosecutors decided that they

24   were not inclined to prosecute these offenses, nothing would

25   prevent a future prosecutor, perhaps one elected after today's

1     date, from taking up abortions that happened during the interim.

2          So, Your Honor, the United States filed this action

3     because federal law contains a requirement.  The requirement is

4     for emergency care to be offered under certain circumstances,

5     that federal law preempts contrary state laws.  And the

6     preemption effect is particularly powerful here, where lives,

7     livelihood, and health are surely on the line.

8          The State's legal interpretation of its statute

9     doesn't measure up and isn't consistent with the interpretations

10    that the State offered to its own supreme court only a month

11    ago.  And the factual circumstances demonstrate that the need

12    for judicial intervention is dire.

13         So I'll be happy to respond to any additional

14    questions the Court has or to respond after the State and

15    legislature have an opportunity to speak.

16         THE COURT:  I may have more questions after.  But

17    you're going to reserve the balance of your time?

18              MR. NETTER:  I will, Your Honor.  Thank you.

19         THE COURT:  Very good.  Thank you, Mr. Netter.

20         Mr. Church.

21         MR. CHURCH:  Thank you very much, Your Honor.

22         THE COURT:  While you're getting up there, I would

23    like you to respond to Mr. Netter's -- well, to the issue of

24    whether or not an ectopic pregnancy is a pregnancy.

25              Just looking at the plain language of the statute, I

1     know there has been an argument that it's not -- or at least

2     it's not an abortion to end an ectopic pregnancy, but the

3     "abortion" is defined as "terminating any clinically diagnosable

4     pregnancy," and "pregnancy" is defined as "having a developing

5     fetus in the body and commences with fertilization."

6          Isn't even an ectopic pregnancy a developing fetus

7     after fertilization?  And why is that not kind of dispositive on

8     that issue?

9          I'm only asking that question now because that was

10    kind of the last point that Mr. Netter made, and it was on my

11    mind.  Go ahead.

12         MR. CHURCH:  Good morning again, Your Honor.  May it

13    please the Court.  Deputy Attorney General Brian Church on

14    behalf of the State of Idaho.

15         Let me begin by tackling the question you just asked,

16    Your Honor.  And as the State, I am bound by what the

17    legislature has wrote with respect to what a definition is of an

18    abortion under Idaho Code 18-604(1).

19         Your Honor, it is our understanding that with respect

20    to an ectopic pregnancy, that that would be defined as a

21    pregnancy under law and that it would be direct with respect to

22    your question.

23         Now, in this case, Your Honor --

24         THE COURT:  Just so we're clear, then, that

25    necessarily follows that if you end that pregnancy through an

1      abortion, through a termination of the developing fetus in the

2      fallopian tube, that that would be an abortion?

3              MR. CHURCH:  Yes, Your Honor, again, based upon Idaho

4      Code 18-604(1).

5              THE COURT:  And sub 11, which I think is the

6      definition of pregnancy.

7              MR. CHURCH:  That would be correct, Your Honor.  And

8      with respect to sub 1, which defines abortion, the State is

9      bound by the definition --

10             THE COURT:  Okay.

11             MR. CHURCH:  -- that has been provided, Your Honor.

12             THE COURT:  Thank you for your candor.  Go ahead.

13             MR. CHURCH:  I appreciate that.  Thank you very much,

14      Your Honor.

15             In this case, Your Honor, the United States asked this

16      Court to enjoin Idaho from enforcing Idaho Code Section 18-622

17      against any provider in every instance where 18-622 and the

18      Treatment Act may apply.  This Court should deny the preliminary

19      injunction for four reasons.

20             First, the United States has not shown that every

21      abortion performed as a stabilizing treatment would conflict

22      with 18-622 and so has not met its burden for a facial

23      challenge.

24             Second --

25             THE COURT:  All right.  Well, let me -- you're going

1    to challenge my memory here.  Go ahead and make the four points,

2    but I'm going to have questions about all of them, because the

3    whole issue of as applied or facial challenge, I don't

4    understand the United States to be arguing that the entire

5    statute is invalid, only that it's invalid when applied in an

6    emergency room setting where there are EMTALA obligations.

7         How does that become -- well, I will ask you, when you

8    finish your list -- so be prepared -- why that makes it a facial

9    application.  And then the follow-up question is:  Why does it

10   matter?

11        Go ahead.  And you have to understand, I'm going to

12   have a lot of questions here.  And I will try to ask them in a

13   way that does not disrupt the flow of your argument, but I can't

14   promise that.  So go ahead.

15        MR. CHURCH:  Your Honor, I appreciate the

16   interruption.  And I appreciate the opportunity, on behalf of

17   the State, to answer the Court's questions.

18        As Your Honor has indicated, I would like to finish

19   the four points, and I will directly respond to your question

20   about the facial challenge.

21        The second reason, Your Honor, that this Court should

22   deny the injunctive relief is that the Treatment Act with its

23   savings provision, which is 1395dd(f), does not preempt Idaho

24   from imposing criminal consequences for a violation of 18-622,

25   as the savings provision allows each state law requirement to

1     stand unless it directly conflicts with the requirement in the

2     Treatment Act.

3          THE COURT:  Yeah.  That was my discussion with

4     Mr. Netter.  And that's, I think, an issue he has to address.

5     So you will need to be prepared to address the Ninth Circuit's

6     take on that language, which I'm not sure I understand but I

7     have to follow.

8          So go ahead.

9          MR. CHURCH:  I appreciate that, Your Honor.

10         The third reason why the Court should deny injunctive

11    relief in this case is that there is no direct conflict with a

12    Treatment Act requirement because Idaho chose to make an

13    exception to criminal liability and affirmative defense which

14    has the doctor assert a subjective good-faith medical judgment

15    as his or her defense.

16         THE COURT:  And I will ask you, once you have

17    completed -- that it's not an exception; it is an affirmative

18    defense.

19         Do you agree with that?

20         MR. CHURCH:  Well, Your Honor, it is an affirmative

21    defense, but it's also an exception to criminal liability.  And

22    it's just the way in which the burden shifts, Your Honor.

23         As even Mr. Netter pointed out, under a typical

24    exception, which, like the fetal heartbeat, for instance, would

25    have, it would be the burden of a prosecutor.

1          THE COURT:  To prove beyond a reasonable doubt that

2     the exception does not apply?

3          MR. CHURCH:  That would be correct, Your Honor.

4          But, as we'll point out in just a moment, I'm not sure

5     that there is any material difference between an affirmative

6     defense which has the physician maintaining the burden and the

7     prosecutor maintaining a burden; each that proves an exception

8     to criminal liability, at least for preemption purposes,

9     Your Honor, and at least with respect to a direct conflict with

10    a Treatment Act requirement, which is what the savings provision

11    requires.

12          THE COURT:  Okay.

13          MR. CHURCH:  The fourth reason, Your Honor, why the

14    State of Idaho would ask this Court deny injunctive relief is

15    that even though the United States' declarants made clear that

16    they could determine when an abortion was necessary to preserve

17    the life of a pregnant woman, the United States has not shown

18    that doctors in all instances would be chilled by an alleged

19    conflict between 18-622 and the Treatment Act such that the

20    entire purpose of the Treatment Act would be nullified.

21          Your Honor, I understand you wanted me to first

22    address the question about the facial challenge, and I would

23    like to go ahead and go there now.

24          THE COURT:  Yes.

25          MR. CHURCH:  So, Your Honor, my understanding of the

1    United States' requested relief in this case is for a

2    preliminary injunction.  I'm going to go to their filing of

3    their proposed order, which is at Docket 17-2.

4         The proposed order in this case, as I understand,

5    seeks an injunction of the State not only as with respect to the

6    United States itself but that would enjoin the State from

7    applying Idaho Code 18-622 to any abortion performed by any

8    physician or hospital within the state of Idaho.

9         And that would be the second full paragraph of the --

10   or the second further-ordered paragraph that is in that -- in

11   that docket.

12        And the reason why I point that out, Your Honor, is

13   because, as I understand the relief that's requested in this

14   case, it is relief that is beyond just the United States itself;

15   it's relief that goes to additional parties.

16        THE COURT:  Well, Counsel, I wanted to -- well, I

17   checked the transcript to see if I heard you correctly.  You are

18   saying that the State is requesting that 18-622 have no

19   application in any emergency room in the state of Idaho?  Are

20   you saying that's the requested relief?

21        MR. CHURCH:  No, Your Honor.

22        THE COURT:  Okay.  I misunderstood.  Would you restate

23   that so I'm sure, so that we are clearly communicating here.

24        MR. CHURCH:  Sure.  I want to be clear on that, Your

25   Honor.  Thank you.

```
 1              THE COURT:  Well, let me take a stab at the way I
 2     understand the relief requested, which is that 18-622 would have
 3     no application in any emergency room which has been provided
 4     with Medicare funding and where EMTALA would require that an
 5     abortion be performed.  That's my understanding of what the
 6     United States is asking.
 7              MR. CHURCH:  Let me add one caveat to that,
 8     Your Honor.
 9              I think, in addition to that, one of the things that's
10     being requested or as part of that request, Your Honor, is that
11     the State of Idaho not be allowed to either take criminal action
12     against or licensing action against any physician or hospital as
13     a result of an alleged conflict between 18-622 and the Treatment
14     Act.
15              So, Your Honor, the scope of relief is going beyond
16     just the United States here.  It would also apply in
17     circumstances to persons who are not even parties to this
18     proceeding, namely, physicians and potentially hospitals as
19     well.
20              THE COURT:  Are you arguing this as a standing issue?
21              MR. CHURCH:  No, I'm not arguing this as a standing
22     issue, Your Honor.  I'm arguing this as part of why this is a
23     facial challenge.
24              Because some of the case law -- the *John Doe* case that
25     we cited, for instance -- I think helps make this point that
```

1    some of the relief here is going beyond just a particular

2    abortion that maybe the United States would be raising to the

3    State of Idaho.

4           Recall, Your Honor, that this pre-enforcement

5    challenge is going at every single time an abortion may be

6    provided as stabilizing treatment under the Treatment Act, and

7    the United States is attempting to block the enforcement of

8    18-622 in every single instance.

9           And for that reason, Your Honor, we believe that this

10   is a facial attack that the United States bears the burden under

11   the *Salerno* test of showing that there are zero instances where

12   18-622 can be applied with the Treatment Act.

13          And, Your Honor, we believe clearly -- and as the

14   original declarations seem to indicate -- the doctors in this

15   case are able to determine what is necessary to preserve the

16   life of a woman or necessary to prevent the death of a pregnant

17   woman, which is what 18-622 authorizes.

18          So we are not seeing a direct conflict in those

19   instances, Your Honor.  As such, that would defeat the facial

20   challenge in this case, because there are certainly instances

21   where Idaho Code 18-622 can be applied where there is an

22   abortion provided as stabilizing treatment under the Treatment

23   Act.

24          As such, because it's a facial challenge, that is the

25   key point, Your Honor, is that they haven't met their burden of

1    showing that there is zero instances where those two acts can be

2    applied together.

3         Now, Your Honor did ask about our position on

4    life-threatening versus necessary to prevent the death or

5    necessary to preserve the life of a woman.  And I do want to

6    address that, Your Honor.

7         And I guess one point is -- that I would note is that

8    our understanding of what the language means with respect to

9    Idaho Code 18-622 is that it's consistent with, I think, the

10   general purpose of the Hyde Amendment, the current Hyde

11   Amendment that governs the federal trust funds that are provided

12   for Medicare purposes.

13        And this is from Public Law 117-103.  It's one of the

14   laws cited by the United States.  And I am specifically reading

15   from 136 Statutes at Large 496.  And this is Section 507.

16        It explains that the limitations established in the

17   preceding section, which as I understand it generally prohibit

18   the funds -- federal funds from going to abortion, do not apply

19   to an abortion, one, if the pregnancy is the result of an act of

20   rape or incest -- which is covered as part of 18-622,

21   Your Honor -- or, second, in the case where a woman suffers from

22   a physical disorder, physical injury, or physical illness,

23   including a life-endangering physical condition caused by or

24   arising from the pregnancy itself that would, as certified by a

25   physician, place the woman in danger of death unless an abortion

1    is performed.

2              THE COURT:  I'm not sure I completely understand why

3    that statute is relevant when we have -- that's a federal

4    statute.  And is it directly applicable to the EMTALA

5    obligations?

6              MR. CHURCH:  Well, it's not directly applicable, Your

7    Honor, but it's also -- it's consistent with -- we are offering

8    it solely to show that our interpretation is consistent with

9    the --

10             THE COURT:  Well, you're saying that the Idaho

11   legislature, when they said that the abortion was necessary to

12   avoid the death of the patient, that they were really thinking

13   what Congress said when they are dealing with it in a totally

14   different context.  I'm not sure I understand how that flows.

15             MR. CHURCH:  Well, let me make two points with respect

16   to that, Your Honor.  I think the first point, you said

17   "necessary to avoid the death of the woman."  That's not the

18   language of the statute.

19             THE COURT:  Well, I was paraphrasing.  But the word

20   "necessary" is there, and that's the operative term.

21             MR. CHURCH:  That is correct; the word "necessary" is

22   there.  And it's necessary to prevent the death of the pregnant

23   woman.

24             I offered the example of the current Hyde Amendment

25   simply to show that our interpretation of Idaho Code 18-622

1    appears to be consistent with what the Hyde Amendment provides

2    as a matter of federal law.

3            It's not to shed light on exactly what 18-622's terms

4    mean.  That would be a question of law, as Mr. Netter pointed

5    out, for this Court or, really, the Idaho Supreme Court to

6    determine.

7            And, Your Honor, with respect to that, you know,

8    that's also why we could have an as-applied challenge as part of

9    a prosecution.  If there truly is a prosecution, Your Honor, of

10   a physician, that physician could argue that the abortion was,

11   in his or her good-faith medical judgment -- which is a

12   subjective standard -- that the abortion was necessary to

13   prevent the death of a woman.

14           That is a subjective standard, and the Court would be

15   well -- in a criminal prosecution would be well capable of

16   handling determining whether the -- whether the physician has

17   made that showing and made -- made clear that the affirmative

18   defense would apply.

19           THE COURT:  Let me ask -- and this came up from

20   Mr. Netter's suggestion that, within the last few weeks, your

21   office has appeared before the Idaho Supreme Court and argued,

22   to avoid a suggestion of ambiguity, that the statute clearly

23   requires that the procedure of abortion was essential to prevent

24   the death of a pregnant woman.

25           Essential is different than a risk.

1          Again, I don't know if you argued that or not or if
2     someone else in your office did, but I'm sure your office wants
3     to be consistent.
4          Could you kind of just explain why that should not be
5     troublesome to the Court.
6          MR. CHURCH:  Sure.  That should not be troublesome to
7     the Court for a couple reasons.
8          And first, let me point -- I agree with Your Honor
9     that there is nowhere in the statute Idaho Code 18-622 that the
10    term "risk" is used with respect to -- that the abortion is
11    necessary to prevent a risk of death of the pregnant woman.
12    Instead, it's abortion is necessary to prevent the pregnant
13    death of a woman.
14         Your Honor, I believe in that case, Mr. Netter is
15    citing to language that is also citing from Black's Law
16    Dictionary.  I don't see any meaningful difference in the
17    position that the State is taking here today with respect to its
18    understanding of 18-622 and the position that it has taken
19    before the Idaho Supreme Court.
20         You're right, Your Honor, it's a different attorney
21    with that case.  But I understand --
22         THE COURT:  You're not throwing someone under the bus,
23    are you?
24         MR. CHURCH:  I am not throwing someone under the bus,
25    Your Honor, because our position, I believe, is consistent

1    between the two cases.  And even then, Your Honor, you know,

2    this is a question of law for this Court if it decides it must

3    interpret Idaho Code 18-622.

4         Again, the important facet from the State's

5    perspective in this case, Your Honor, is that the United States

6    has not shown in all instances that there is a direct conflict

7    between Idaho Code 18-622 and the Treatment Act.  Because there

8    are certainly cases where the abortion was necessary to prevent

9    the death of the pregnant woman, as some of the declarations

10   from the United States' declarants in their original submission

11   made clear.

12        Now, one -- the second point I had, Your Honor, that I

13   did want to move on to and address was in the United States'

14   response brief, they appeared to make an argument that the State

15   of Idaho was categorically preempted from exercising either

16   civil regulatory or civil sanctioning or criminal sanctioning

17   authority with respect to any stabilizing or any type of

18   treatment that would be offered as a stabilizing treatment.  And

19   that's page 19 of their reply brief that I'm looking at.

20        I would note that if their argument is that there's a

21   categorical rule prohibiting some criminal prohibition of

22   manners of treatment, such as abortion, first, that that would

23   be inconsistent with the savings provision in 1395dd(f).  Recall

24   that 1395dd(f) allows every state law requirement to stand

25   unless that state law requirement directly conflicts with a

1     requirement in EMTALA or the Treatment Act.

2           Now, with respect to that, Your Honor, my note would

3     be that the case law has established that state malpractice

4     actions, for instance, have been authorized against physicians

5     or providers.  Moreover, even the act itself provides for civil

6     regulatory penalty --

7           THE COURT:  Why would a malpractice action create a

8     conflict with EMTALA?

9           MR. CHURCH:  And that's my point.  It does not create

10    a conflict.

11          THE COURT:  Here, their argument is that there is a

12    conflict.  So why is that apropos to what we're discussing here?

13          MR. CHURCH:  Well, it's apropos because we are

14    contending that there is no conflict in allowing the State to

15    even have a criminal prohibition in the first place.

16          My understanding is that the United States has raised

17    a categorical argument.

18          THE COURT:  Well, there is no conflict if the criminal

19    prohibition provides an exception that would fall and satisfy

20    the three categories of EMTALA where medical care is necessary

21    even if it includes an abortion.

22          That's the whole point of this, is whether there is no

23    exception for injury short of death.  And it's stated as an

24    affirmative defense in which the burden is on the doctor to

25    prove by a preponderance of the evidence the existence of the

1    condition -- the circumstance rather than the burden being upon

2    the State to prove beyond a reasonable doubt that it does not

3    exist.

4            And I can tell you, having presided over hundreds of

5    criminal trials, that is a huge difference.  So...

6            MR. CHURCH:  Well, and I appreciate what Your Honor

7    has recognized.  And I am just responding to one argument that

8    was made in the United States brief.

9            But you're right.  The United States also contends, as

10   we understand it, that 18-622 -- and this is at pages 7 to 8 of

11   their brief -- that 18-622 is problematic because it places an

12   affirmative defense on the physician and places the burden on

13   the physician to prove that affirmative defense.

14           Now, I did want to make one note is that, as part of

15   their briefing, the United States cites to the Fetal Heartbeat

16   Act as an example of a law that allows exceptions.  And my

17   understanding of the United States' brief is that, under their

18   envisioning, the Fetal Heartbeat Act itself is not in direct

19   conflict with EMTALA or the Treatment Act simply because it has

20   an exception within it.

21           Now, one additional aside I should note for Your Honor

22   is that the Fetal Heartbeat Act, as of Friday, August 19, did go

23   live and is effective.  And it does currently govern physicians

24   within the state.  And so physicians within the state are bound

25   by 18-8804 and 18-8805 -- excuse me, Your Honor -- with respect

1     to the criminal prohibitions that are within 18-8805.

2             As the Court well knows, though, under 18-622 --

3             THE COURT:  Are you suggesting that the fetal

4     heartbeat law has superseded the criminal abortion statute?

5             MR. CHURCH:  No, Your Honor, but let me clarify that.

6             So under 18-8805 and I believe it's sub 4, 18-8805 was

7     presumed to go in effect first and has now gone into effect

8     first.  When 18-622 became enforceable, at least the criminal

9     provisions of 18-622 became enforceable, that statute, 18-8805,

10    provided that the criminal prohibitions if 18-622 were

11    enforceable would supersede 18-8805's, or the Fetal Heartbeat

12    Act's, criminal prohibitions.

13            Again, right now, as we stand today, Your Honor, the

14    Fetal Heartbeat Act is effective and it is active within the

15    state of Idaho.

16            THE COURT:  But not in criminal prosecutions?

17            MR. CHURCH:  It is effective with respect to criminal

18    prosecutions, Your Honor.

19            THE COURT:  I thought you just said that the 18-622

20    said that any contrary provision has to give way to its

21    provisions.  Did I --

22            MR. CHURCH:  When 18-622 is enforceable, Your Honor.

23    18-622 is not effective yet and is not enforceable yet.

24            THE COURT:  Well, as of Thursday, then it will.  Is

25    that what you're saying?

1          MR. CHURCH:  As of Thursday, assuming the Court does

2     not enjoin it, it certainly will be enforceable, Your Honor.

3          THE COURT:  Well, I certainly won't enjoin anything

4     more than what the United States has asked, which is enjoin

5     enforcement in the context where EMTALA would require medical

6     treatment.

7          MR. CHURCH:  Correct, Your Honor.  And again, if

8     18-622 is not enforceable in those circumstances, then, by the

9     terms of 18-8805(4), my understanding is that those criminal

10    provisions would be enforceable, the Fetal Heartbeat Act

11    provisions would be enforceable if 18-622 is not enforceable.

12          But the one thing I think Your Honor -- and Your Honor

13    has hit upon it as well -- is that the difference in this case

14    that's alleged is that there is a difference between Idaho's

15    chosen mechanism of allowing an affirmative defense and allowing

16    a doctor to show good-faith proof that it was a good-faith

17    medical judgment based on the facts known to the physician at

18    or -- at the time that the doctor makes the decision, that the

19    abortion was necessary to prevent the death of a pregnant woman.

20          Now, under -- in a typical exception case where the

21    prosecutor would bear the burden -- and my understanding with

22    respect to 18-8805 and 18-8804 is that it is based upon an

23    objective standard of whether the -- there was an emergency

24    medical condition, for instance, under those statutes and that

25    it uses an objective standard.

1         Now, what I don't understand, Your Honor -- and I

2 think this is the point of disagreement between the State and

3 the federal government -- is this: The United States appears to

4 take no issue or have no issue with 18-8804 and 18-8805, the

5 Fetal Heartbeat Act -- which provide for an exception process

6 but still provide for criminal prosecution -- but takes issue

7 and shows -- and says that there is a direct conflict when Idaho

8 has chosen in 18-622 to impose an affirmative defense structure.

9         There is no good basis, in our -- in the State's view,

10 to view the difference in the burden of proof or the subjective

11 versus objective standard as being in direct conflict with the

12 Treatment Act.

13         Now, the one case that the United States cites in its

14 reply brief is *Arrington*. And I've had a chance to look at

15 *Arrington*. I understand *Arrington* to be the Ninth Circuit

16 reviewing an agency's -- I believe Health and Human Services'

17 review of a hospital's ambulance diversion policy. It doesn't

18 say anything about criminal liability or that the State is going

19 to be preempted from having a criminal liability that is

20 escapable through an affirmative defense.

21         There is simply no requirement, Your Honor, in the

22 Treatment Act that, in our view, would be a direct conflict here

23 with respect to a requirement of the Treatment Act and a

24 requirement in 18-622.

25         Now, Your Honor had asked about the direct conflict

1    and what that means with respect to the Treatment Act.  And,

2    Your Honor, we're bound for these proceedings by the

3    Ninth Circuit's decision in *Draper*, which, as Mr. Netter

4    indicated, determined that the direct conflict means that there

5    would either be -- that it would be physically impossible to

6    comply with both Idaho Code 18-622 in this case and with the

7    Treatment Act, or it would apply in those situations when the

8    entire Act's purpose would be, as we pointed out in our

9    briefing, effectively nullified, is the language from the

10   Ninth Circuit that's used.

11          And in this case, Your Honor, we certainly don't

12   believe that the standard that the State of Idaho has placed

13   upon physicians to prove an affirmative defense is one that

14   stands as a -- as essentially a nullification of the entire

15   purposes of the anti-dumping Treatment Act.

16          Now, the last thing I wanted to just touch upon,

17   Your Honor, was with respect to the chilling argument.  And

18   contrary to Mr. Netter's representation, we certainly did

19   challenge the assertion that there would be chilling in this

20   case.  Let me make a couple points with respect to the chilling.

21          First, we understood the declarants in their original

22   declarations to make perfectly clear that they could determine

23   when an abortion was necessary to save the life of a mother.

24          THE COURT:  Well, the declarations that you submitted

25   didn't use that terminology.  Typically, they indicated that

1    these were life-threatening and did not, I don't think,

2    directly -- or did they?  If they did and you can point that

3    out, I'll stand corrected.

4          But that was one of the concerns I had, is that the

5    medical declarations from healthcare providers that you

6    submitted consistently referred to these as being clearly

7    life-threatening and, therefore, falling within the affirmative

8    defense.

9          MR. CHURCH:  So just as one example, Your Honor, we

10    only submitted one declaration from a healthcare provider on

11    behalf of the State.  This was at 66-1, declaration --

12          THE COURT:  Perhaps it was submitted by the

13    intervenor --

14          MR. CHURCH:  The legislature.

15          THE COURT:  But I'll let Mr. Stewart respond to that.

16          MR. CHURCH:  I do want to make one clarification,

17    though, Your Honor.

18          We did point out that -- this would be from the

19    declaration of Kraig White, paragraph 4, and this is at page 4

20    as well.  He, for instance, says:  "It would be my good faith

21    medical opinion that termination of the pregnancy was necessary

22    to save the life of the pregnant woman."

23          So I believe that's consistent with --

24          THE COURT:  Okay.  That's correct.  That absolutely is

25    the language at issue here.

1    MR. CHURCH:  But we also understood, and my point,

2    Your Honor, was that the United States -- the federal

3    government's declarants certainly knew and made statements that

4    they were able to determine that a medical abortion was

5    necessary to save the life of the mother, which is the call that

6    18-622 imposes upon physicians.

7        Now, with respect to the chilling argument, our

8    understanding of the chilling argument is that physicians -- the

9    United States asserts that physicians would feel chilled simply

10   because there is an apparent conflict or an alleged conflict --

11   excuse me -- between 18-622 and the Treatment Act.

12       But we must remember that 18-622 applies in all

13   contexts, not just in the Treatment Act context, but any facet

14   of a physician's practice, you know, including practices outside

15   of the Treatment Act.

16       And so making that decision that is placed upon

17   physicians to determine whether an abortion is necessary to

18   preserve the life of the pregnant woman is a call that they are

19   going to have to make not just at the emergency room but also in

20   their normal practice to the extent they believe an abortion is

21   necessary in their good faith medical belief and judgment to

22   preserve the life of the pregnant mother.

23       We would also note, at least for the chilling

24   purposes, Your Honor, that there is just no direct conflict with

25   any particular requirement of the Treatment Act.

1          THE COURT:  Well, let me ask a question about that.

2     And you are about out of the time that you have agreed was a

3     portion of time.  I'm going to actually have a question or two

4     to follow up, so I think I will just turn your clock off while I

5     ask those questions.

6          MR. CHURCH:  I appreciate that, Your Honor.

7          THE COURT:  You might not appreciate it when I'm done,

8     but we'll see.  I hope your answers will be enlightening because

9     I've got a question that I think points out, at least in my

10    mind, the challenge in how we apply this.

11         How do we get around the fact that the affirmative

12    defense only deals with conducting an abortion necessary to

13    prevent the death of the patient when the EMTALA talks about

14    having injury to organs adversely affecting -- you know, serious

15    impact upon health?  I can't, off the top of my tongue, give you

16    those three elements.

17         But isn't there just a total impossibility preemption

18    because there is just complete conflict because there is no

19    exception for anything short of an abortion necessary to prevent

20    the death of the patient when EMTALA clearly says you have to be

21    concerned about their health as well?

22         MR. CHURCH:  Well, let me make two points in response

23    to that, Your Honor.

24         First, I do want to look at the statutory text of the

25    Treatment Act just to make sure we are on the same page as far

1        as the terms.

2              And Your Honor cited, I believe, first, the definition

3        of "emergency medical condition," which, as we have all agreed,

4        as provided by the text of the statute to mean "a medical

5        condition manifesting itself by acute symptoms of sufficient

6        severity, including severe pain, such that the absence of

7        immediate medical attention could reasonably be expected to

8        result in placing the health of the individual or, with respect

9        to a pregnant woman, the health of the woman or her unborn child

10       in serious jeopardy, serious impairment to bodily functions, or

11       serious dysfunction of any bodily organ or part."  Or there is

12       another provision that applies with respect to a pregnant woman

13       who is having contractions.

14             THE COURT:  Yeah, right.  So those were the three.

15       That's exactly the three conditions under EMTALA that I can

16       never rattle off, but you did a nice job of doing that.

17             MR. CHURCH:  But I want to offer one more point,

18       Your Honor, with respect to that.

19             When a patient is -- when a person goes to the

20       emergency room, has a screening, and that screening determines

21       that there is an emergency medical condition -- which is what we

22       have been just discussing -- that is then the springboard or it

23       starts the process that's required by 49 U.S.C. 1395dd(b)(1) --

24       well, correction -- well, I'm sorry, Your Honor.  I apologize.

25       It's within sub (b) sub (1) that the -- once there is an

1    emergency medical condition that has been found, it is then up

2    to the hospital, "within the staff and facilities available at

3    the hospital, for such further medical examination and such

4    treatment as may be required to stabilize the medical

5    condition."

6         And the reason why I bring that up, Your Honor, is I

7    want to make sure we're clear on the definition of stabilizing

8    treatment, because stabilizing treatment under provision (e)

9    sub -- it's going to be (e) sub (3) is treatment that is

10   "necessary to assure, within reasonable medical probability,

11   that no material deterioration of the condition is likely to

12   result from or occur during the transfer of the individual from

13   a facility."

14        So I want to make sure, Your Honor, that, you know,

15   stabilizing treatment is not necessarily a cure of an emergency

16   medical condition, Your Honor. It is simply treatment that's

17   necessary to assure that there is no material deterioration

18   within a reasonable medical probability of whatever condition is

19   there.

20        Now, Your Honor asked about what happens where an

21   abortion is -- a provider determines that abortion is necessary

22   not to prevent the death of a woman, but it would be necessary

23   as some form of stabilizing treatment.

24        THE COURT: Well, not -- it would be necessary to

25   protect her health, to protect her organs, to protect, you know,

```
1     those three standards that EMTALA imposes.  That's where my
2     concern is.
3              In fact, let me -- I'm going to ask -- I've asked
4     Ms. Smith to stop the clock for a minute here.  I don't want to
5     take up Mr. Stewart's time.  I'm hopeful he appreciates that.
6              But here, you know, I've tried to think in my mind
7     what kind of portrays where the conflict is.  And I thought
8     about, you know, maybe it's being someone who wishes they had
9     been a law school professor, and so I came up with a
10    hypothetical that law professors like to use to try to make
11    points.  And I'll throw that at you, and you can tell me how you
12    would respond.
13             Let's say you're an attorney with a client who is an
14    ER doctor.  She calls somewhat in a frantic state because she
15    has got a patient that she is now treating in a very difficult
16    situation; let's say it's preeclampsia.  They have tried to
17    control it medically and have been unable to, and the accepted
18    medical practice at that point is an abortion.
19             Basically, her blood pressure is completely out of
20    control; and in her experience, if the abortion is not
21    performed, there is at least a 50/50 likelihood that she will
22    die.
23             She also indicates that she is completely risk averse
24    and is not willing to take any chance that she will be
25    prosecuted even though that she might be able to succeed on an
```

1      affirmative defense.

2           So, as her attorney, do you advise her that she can

3      perform the abortion under the statute without any risk of

4      prosecution?

5           MR. CHURCH:  Well, Your Honor, I appreciate the

6      question.

7           And so with respect to that, just to make sure we're

8      clear, that this would be a situation covered by the Treatment

9      Act to begin with.

10          THE COURT:  Yes.  I should have predicated.  Yes,

11     absolutely.

12          MR. CHURCH:  So with respect to that, Your Honor, and

13     the current version of Idaho Code 18-622, I, as the lawyer,

14     would advise that -- I would ask questions:  Is this necessary

15     to prevent the death of a pregnant woman?

16          THE COURT:  Well, she said it's at least 50 percent.

17     It's a 50/50 proposition.

18          MR. CHURCH:  Well, Your Honor, but I would -- as the

19     lawyer, I would point back to the fact that 18-622 contains no

20     risk or no 50/50 risk requirement or no requirement that the

21     death be imminent or some other temporal requirement.  It simply

22     applies where the abortion is necessary to save the life of the

23     pregnant mother.

24          THE COURT:  And she says:  I can't answer that; I can

25     just tell you it's 50/50.

```
1          MR. CHURCH:  Well, then that physician, well, one,
2     could also consider consulting not only with me but with other
3     physicians, or --
4          THE COURT:  She has got a patient that is in critical
5     medical condition; she has to make a decision immediately as to
6     what to do.
7          MR. CHURCH:  Well, Your Honor, you know, as the
8     attorney for the hospital, you can only advise on what the law
9     is.  And the law says, under 18-622, that she needs to determine
10    in her good faith medical judgment whether the abortion is
11    necessary to preserve the life of the pregnant mother.
12         THE COURT:  And if she gets it wrong, she is
13    prosecuted, charged, arrested, and has a chance to argue and
14    prove to the jury that her judgment was right; the 50/50 is
15    enough to say that it was necessary to prevent her death?  Is
16    that --
17         MR. CHURCH:  I do want to quibble with one last aspect
18    of your point there, Your Honor.
19         Remember, under 18-622, the affirmative defense that
20    is offered is based on the physician's subjective good faith
21    medical judgment.  If the physician can testify and show that it
22    was within her good faith medical judgment to perform the
23    abortion and that the abortion was necessary to save the life of
24    the pregnant woman, then that falls within the affirmative
25    defense of Idaho Code 18-622.
```

1      THE COURT:  And what if she says, you know, they think

2      they can control it, but there still is a 5 percent chance that

3      she will die.  Does that change your advice to the doctor?

4      MR. CHURCH:  No, Your Honor.  Because, again, there is

5      no -- not at least from the State's perspective, there is no

6      probability or risk that is part of 18-622.  18-622 just

7      requires that the physician make that determination of whether

8      it's necessary to preserve the life of the pregnant woman.

9      THE COURT:  All right.  Well, then the same

10      hypothetical, but she indicates that if the abortion is not

11      performed, the patient will not die, but there is a 90 percent

12      chance she will suffer a stroke, have permanent damage to her

13      vital organs, such as her heart, her liver, or her kidneys.

14      What's your answer then?

15      MR. CHURCH:  Well, Your Honor, it's the same answer in

16      that you would have -- under Idaho law, the affirmative defense

17      arises under 18-622 when the abortion is necessary to prevent

18      the death of the pregnant woman.

19      THE COURT:  So you would tell her she cannot perform

20      that abortion, or she would be facing criminal liability?

21      MR. CHURCH:  Your Honor, I would just be advising as

22      to what the statute says, Your Honor.

23      But I would note for purposes of this case,

24      Your Honor, that because this is a facial challenge, there are

25      still circumstances where, you know, 18-622 and the Treatment

```
1     Act can be applied.  And that's a reason why we should deny the
2     United States' requested preliminary injunction relief in this
3     case.
4               THE COURT:  Okay.  So basically, as an attorney, you'd
5     simply tell the doctor, your client:  This is what the statute
6     says, and I can't tell you whether you will be prosecuted or
7     not, but the risk is that this is what the statute provides?
8               And I assume you would agree that in the last part of
9     my hypothetical where there is no risk of death, but there is a
10    substantial risk of serious impact upon her health -- organs
11    failing, permanent damage to those organs, maybe a stroke --
12    that in that situation, the statute would not apply and would
13    not provide an affirmative defense.
14              MR. CHURCH:  Your Honor, I'm only bound by what 18-622
15    provides.
16              THE COURT:  Okay.  Well, that's why I'm asking.  Do
17    you agree that 18-622 would not provide an affirmative defense
18    in that situation?
19              MR. CHURCH:  If the -- if the physician cannot testify
20    in her good faith medical belief that she believed the abortion
21    was necessary to preserve or prevent the death of the pregnant
22    woman, then the affirmative defense would be inapplicable in
23    that case, Your Honor.
24              THE COURT:  All right.  And she would be subject to
25    criminal prosecution and face a minimum two years in prison?
```

2-ER-105

1          MR. CHURCH:  Subject to what I have just said, yes,

2     Your Honor.

3          THE COURT:  Okay.  All right.  Thank you.

4          Anything else?  I will let you make a few parting

5     shots before we hear from Mr. Stewart, if there is anything else

6     you want to add.

7          Counsel, I know the hypothetical -- I remember from

8     law school that we sometimes think that professors are being

9     unfair, but usually they are doing it to try to point out kind

10    of where the cutting edge is.

11         And that's the reason I did that, is to try to see how

12    a real-life attorney dealing with a real-life doctor dealing

13    with a real-life pregnant patient, how they are to confront the

14    statute in an emergency room setting.  And that's why I asked

15    the questions that way.

16         You gave a very lawyerly response, which is:  This is

17    what the statute provides and wouldn't provide guidance beyond

18    that.

19         But is that troublesome in terms of EMTALA compliance?

20         MR. CHURCH:  I don't think so, Your Honor.  Because,

21    again, I'm not certain that there is a direct conflict here that

22    is presented.

23         THE COURT:  Even in the context where it's not

24    life-threatening?

25         MR. CHURCH:  Well, even if there could be a conflict,

1    Your Honor, again, in the State's position, this is a facial

2    challenge.

3              THE COURT:  All right.

4              MR. CHURCH:  And we would have to show -- the

5    United States would have to show that in all instances, 18-622

6    conflicts with the Treatment Act.

7              Our position is they clearly haven't shown that,

8    Your Honor.  And for these reasons, we would ask that you deny

9    preliminary injunctive relief requested by the United States.

10             THE COURT:  Well, thank you.

11             MR. CHURCH:  Thank you, Your Honor.

12             THE COURT:  Thank you, Mr. Church.

13             Mr. Stewart.

14             MR. STEWART:  Your Honor, Monte Stewart along with

15   Daniel Bower representing the Idaho legislature.

16             Here is my answer to your hypothetical:  That doctor

17   calls me from the emergency room or, more accurately, from an

18   extension of the emergency room, which would be up in labor and

19   delivery, which is where these emergencies really do play out.

20             And, yes, EMTALA does apply in labor and delivery;

21   it's not limited physically to the emergency room.

22             That doctor calls me and gives me the 50/50

23   hypothetical.  I tell her:  You go right ahead, and you use your

24   best medical judgment, and you can do so without fear of

25   prosecution.

1          Now, I can do that and put my legal malpractice

2     insurance policy on the line and do so without the slightest

3     heartburn or without ever second-guessing myself.

4          Because in the real world, in the real world -- and

5     I'm speaking to you as someone who has prosecuted cases in state

6     court and as someone who, as an employee of the United States

7     Department of Justice, as the United States Attorney for the

8     District of Nevada, has prosecuted cases and knows how

9     prosecutors think:  In the real world, there will not be a

10    prosecution.  And Grant Loebs certainly backs me up.

11         Now, you then try to -- you then moved to make the

12    hypothetical more challenging where you eliminated the risk of

13    death.  And you, I think, were trying to use some language from

14    EMTALA itself, from the definition of "emergency medical

15    condition" -- "serious impairment to bodily functions, or

16    serious dysfunction of any bodily organ or part."

17         Now, subpart (2) and subpart (3) -- I think I can

18    help.  And this is going to help through the remainder of the

19    time you give me.  May -- with the leave of the Court, may

20    Mr. Bower pass out a packet to Court and counsel, law clerks, if

21    that's okay, with just a few documents in it?

22         THE COURT:  What is it you want the Court to look at?

23         MR. STEWART:  The first document is actually the

24    Government's proposed preliminary injunction order.  The second

25    one is the page from EMTALA that I am referring to.  And the

1    third document is an exercise I went through regarding the

2    proper scope of any injunction if you decided to go in that

3    direction.

4            And, of course, the legislature believes the only

5    proper order is motion denied, but I think it's helpful in this

6    factual context to address that.

7            THE COURT:  Why don't you put that on the evidence

8    presenter.

9            MR. STEWART:  What's that?

10           THE COURT:  If you could just put that on the evidence

11   presenter, it might be easier.  We could possibly even -- I

12   don't know if we can bring it on for those in the audience,

13   but...

14           MR. STEWART:  Can you see this or just the audience?

15           THE COURT:  I'm supposed to be able to see it.

16           Well, all right.  Yeah, I can now.  It's up on my

17   screen.  I don't know if we are able to show it to the --

18           MR. STEWART:  Given my age, I'm low-tech.  That's why

19   I brought paper copies for everyone.

20           THE COURT:  I am not low-tech, and I prefer -- okay.

21   I think we have got it.  Go ahead.

22           MR. STEWART:  Okay.  Well, if you'll see here, subpart

23   (2) and subpart (3) are the ones I just read to you.  And that's

24   what I heard you saying --

25           THE COURT:  That's not precisely --

1          MR. STEWART:  -- in that second hypothetical.  Is that
2     correct?
3          THE COURT:  Well, I was not trying to capture it
4     precisely, but that was the point.
5          MR. STEWART:  But the general idea, yes.
6          I would give the same answer with the same absence of
7     any heartburn.
8          THE COURT:  So you are saying there is no risk of
9     prosecution --
10          MR. STEWART:  Because there is another affirmative
11     defense in the real world.  And that is assuming -- and I'm not
12     conceding anything -- you have limited me to talk about the
13     actual conflict which is the fact-intense issue here.  In
14     talking only about that, I am honoring your directive to me.
15          THE COURT:  Okay.  Well, I think what you're saying is
16     that prosecutors will not actually prosecute under these
17     circumstances.
18          MR. STEWART:  Right, because there is an affirmative
19     defense under the Government's own position --
20          THE COURT:  Just a moment.  Just a moment,
21     Mr. Stewart.
22          But there is not an affirmative defense as to the
23     three categories that we listed here, because the statute
24     doesn't provide an affirmative defense where it is just
25     health-threatening as opposed to necessary to prevent the death

1     of the mother.

2          MR. STEWART:  Yes.  622 doesn't provide it, but EMTALA

3     does.

4          THE COURT:  But that's the point, is EMTALA is in

5     conflict with -- or at least the Government is arguing that

6     EMTALA is in conflict with a federal statute which criminalizes

7     providing an abortion as a medical treatment if it is not

8     necessary to preserve the mother's life.

9          MR. STEWART:  Exactly right.

10          Your Honor, let me step back and tell you that there

11     is a gulf between Mr. Netter and Mr. Stewart.  Mr. Netter's

12     approach is highly conceptual, highly textual, highly abstract.

13     Mr. Stewart's approach is real life, real world, and practical.

14          THE COURT:  Well, isn't real world -- I noted that

15     Mr. Netter referred to the comment made during the debates that

16     led to the adoption of the Idaho abortion statute in which an

17     effort was made to apparently include some protection for the

18     situation where the pregnant patient's health is at risk.

19          And the response was:  Well, in that situation, the

20     right of the fetus should be primary.

21          Are you saying there are no prosecutors out of 44

22     counties in the state of Idaho that might not take that same

23     position?

24          MR. STEWART:  Let me take the easiest case first.

25          Idaho is capable of many things, but it is not capable

1     of producing now or in the future a prosecuting attorney stupid

2     enough to prosecute an ectopic pregnancy case.  The first thing

3     the doctor --

4          THE COURT:  I didn't ask about an ectopic

5     specifically.

6          Just generally, given the attitude or the expression

7     of legislative intent which Mr. Netter referenced during his

8     oral argument, are you saying there is no prosecutor, in the 44

9     counties in the state of Idaho, who would take the position that

10    where it is only necessary to protect the health of the

11    mother -- I keep using the word "mother" -- health of the

12    pregnant patient, that should give way to the rights of the

13    unborn fetus?

14         MR. STEWART:  The answer to that, Your Honor, is that

15    this legislation is designed to balance this state's

16    determination of the moral value of the preborn child on one

17    hand and the often weighty, weighty and even heart-wrenching

18    interests of the mother -- I won't hesitate to use the

19    word -- on the other hand.  And this is where, in the exercise

20    of its constitutional right, the State of Idaho has drawn the

21    line.

22         What I'm trying to get across here, Your Honor --

23    because you're being asked to issue an injunction that carves

24    back against Idaho's judgment and to do so on the basis of one

25    federal statute, EMTALA.  And we have talked about the conflict.

1    It is a fact-intensive conflict.  I would like to point out

2    something extremely important, the single-most important thing I

3    can say to you right now in the time given me.

4         If you will look at the EMTALA language that's up on

5    the screen, you will see there is a subpart (1):  "Placing the

6    health of the individual, or with respect to a pregnant woman,

7    the health of the woman or her unborn child in serious

8    jeopardy."

9         There is congressional language expressing a

10   congressional intent to protect and preserve the mother and the

11   child equally -- not one above the other, equally.

12        Why I have that in yellow and why this is the most

13   important thing I can tell you is because of the language the

14   Department of Justice wants you to use in any preliminary

15   injunction order.

16        They have used -- and this is the first document in

17   the packet.  They have used -- after distorting the language of

18   subpart (1), they have used the subpart (1) language in the

19   proposed order.  They even preserve the subpart (1) numeral, but

20   they don't quote it truthfully and fully and honestly, "placing

21   the health of a pregnant patient in serious jeopardy."

22        In other words, Your Honor, please, they have taken

23   congressional language, the purpose -- the clear meaning of

24   which, the clear purpose and intent of which is to protect the

25   unborn child from serious injury, serious jeopardy, serious

1    health problem.  And they are writing that language after they

2    have taken out any reference which they never gave you anywhere

3    in their papers -- any reference to the "unborn child."  They

4    are using that language --

5         THE COURT:  Just a moment, Mr. Stewart.  Just a

6    moment.

7         The conflict here is between a state statute

8    permitting an abortion -- excuse me -- criminalizing an abortion

9    even where the abortion would be necessary to preserve the

10   health and ensure no injury to -- permanent injury to organs,

11   et cetera.  How or why should the requested relief in any way

12   reflect a concern for the health of the unborn fetus?  Because

13   we're talking about an abortion where the choice has been made

14   where there is no balancing at that point.

15        MR. STEWART:  Because your authority extends to the

16   boundary of the conflict and no further.  You can enjoin 622 to

17   the extent of a conflict; perhaps only conceptual, hypothetical,

18   abstract conflict, because we have shown there is no actual one.

19   But that's the limit of your authority to enjoin enforcement and

20   operation of 622.

21        So what is the boundary of that conflict?  It's

22   discernment by 622 on one hand but certainly by EMTALA on the

23   other hand.  You can't say that 622, with its intent to protect

24   the life of the child, conflicts with subpart (1), which is

25   Congress's intent to protect the child.

1        You don't have the "unborn child" reference in subpart

2    (2) and subpart (3).  And that's why it would be entirely wrong

3    to use subpart (1) language in any preliminary injunction order,

4    because you're going outside the scope of what Congress

5    intended.

6        Why is the Government trying to shoehorn in this

7    subpart (1) language?  Well, I submit, in all due respect, that

8    it's to keep the administration's political promise to push back

9    against *Dobbs* and to restore, to the extent possible, under the

10   powers of the executive branch.

11       I would ask leave of the Court to submit a redline --

12   it's actually blue on this document --

13       THE COURT:  Counsel, your time is almost up.

14       MR. STEWART:  I understand that.  This is the most

15   important thing I can do.

16       THE COURT:  All right.  I'm just letting you know.  So

17   go ahead.

18       MR. STEWART:  Yes.  Thank you.

19       -- to submit a proposed what we call a fallback

20   order -- we are not consenting or agreeing or conceding

21   anything -- but that carefully, carefully defines what it is

22   that is being enjoined and carefully limits the injunction to

23   its only proper basis, which is the actual conflict based on

24   EMTALA.

25       And that's part of that packet that I requested leave

1    to submit.  We can submit it after the hearing is over if you

2    prefer.

3         THE COURT:  Well, the concern during oral argument is

4    the Government needs a chance to respond.  So I don't know -- is

5    there a reason why it couldn't have been submitted in advance?

6         MR. STEWART:  Well, it's only because we only very

7    recently realized what the Government was doing with this

8    subpart (1).

9         THE COURT:  Well, I don't think there is any secret

10   here --

11        MR. STEWART:  Misuse of subpart (1) --

12        THE COURT:  Just a moment, Mr. Stewart.

13        There is no secret about it.  You put up the

14   complaint, or at least the proposed order.  I don't think there

15   is too much surprise about that.

16        What is it you want the Court to consider?

17        MR. STEWART:  A blue-line of the Government's proposal

18   order which --

19        THE COURT:  Well, you're --

20        MR. STEWART:  -- puts in the proper limitations that

21   it does not contain.

22        THE COURT:  You're over time now, but let me just ask

23   it this way:  So are you saying that because of the language in

24   EMTALA at subparagraph (1) that you cite, that this indicates

25   that Congress has indicated that no abortion can be performed

1    because that would, by definition, be inimical to the life and

2    health of the fetus?

3         MR. STEWART:  What I'm saying to the very best of my

4    ability, Your Honor, is that that language, subpart (1)

5    language, cannot be used to increase the risk of jeopardy to the

6    health of the unborn child because its purpose is to do the

7    opposite.

8         THE COURT:  So, really, you are saying that if we have

9    a situation where an abortion is necessary to preserve the

10   health of the mother, then, in that situation, EMTALA would

11   still preclude that abortion because it does not take into

12   account the life of the unborn fetus?

13        MR. STEWART:  What I'm saying -- yes.  Well, let me

14   say it this way:  Subpart (2) and subpart (3) set a standard.

15        By the way, the Fetal Heartbeat Act echos sub (2) and

16   sub (3).  That's why the Government didn't challenge it, even

17   though it is now in effect and has criminal provisions equally

18   onerous.

19        THE COURT:  But it doesn't -- as I suggested with

20   Mr. Church, it does not supersede 622.  622 is still and will be

21   in effect come Thursday.

22        MR. STEWART:  No, it will not be in effect if you

23   enjoin its operation.

24        THE COURT:  No, no, no.  Without an injunction.  I

25   mean, I thought that was obvious from my question.

```
 1              MR. STEWART:  Right, right, right.  But, of course,
 2     what I'm saying is --
 3              THE COURT:  No, no.  My question is:  It will still be
 4     in effect; the fetal heartbeat law will not supersede or in any
 5     way affect the Section 622 coming into effect on Thursday?
 6              MR. STEWART:  That's correct.  The superseding
 7     language is actually in the Fetal Heartbeat Act itself, which
 8     was enacted later, a year later than the --
 9              THE COURT:  No.  You answered my question.
10              MR. STEWART:  Yes.
11              THE COURT:  You're well over your time.  If you want
12     to submit it, I'll look at -- I'll give you a minute to very
13     quickly summarize the argument you are going to make with this,
14     and then I'll --
15              Mr. Netter, if you, after looking at it, feel the need
16     to respond, I may give you a chance to submit a very short,
17     maybe one- or two-page response since you have not seen this in
18     advance.  Or if you think you can look at it quickly and
19     incorporate that into your argument, you can do that as well.
20              MR. NETTER:  Thank you, Your Honor.
21              THE COURT:  Mr. Stewart, just a minute to wrap up
22     before I turn the time back to Mr. Netter.
23              MR. STEWART:  In the real world, there is no conflict.
24     I'm not disputing, Your Honor, the conceptual textual conflicts,
25     but what matters is what happens in the real world.
```

1              And I believe the factual demonstration is very strong

2      that there is no actual conflict between the operation of 622

3      and the operation, within its intended and proper scope, of

4      the -- of the EMTALA language, especially because -- and this is

5      my last sentence -- my doctors whom I respect greatly tell me

6      that they have never encountered a case falling within subpart

7      (2) and subpart (3) where the health of the mother -- excuse

8      me -- the life of the mother was not in danger and threatened

9      and likely to occur.

10             The Government has not given you one concrete example

11     of that --

12             THE COURT:  Did you read Dr. Corrigan's --

13             MR. STEWART:  Yes.

14             -- other than -- other than ectopic pregnancies.

15             And you have known our position for weeks.  The

16     legislature had no intent, because as our doctors told us -- one

17     of the first things they told us:  What?  No.  An ectopic

18     pregnancy is not an abortion.  Why?  Because it will never

19     result in a live birth, and it will always put --

20             THE COURT:  Excuse me, Counsel.  Counsel, just a

21     moment.  That's not the definition of "pregnancy," nor is it the

22     definition of "abortion" under the statute.

23             MR. STEWART:  Well, again -- again, the conceptual as

24     opposed to the real world and the practical.  My clients are

25     real-world, practical folks.

1          THE COURT:  All right.  Thank you.

2          Mr. Netter.

3          MR. NETTER:  Your Honor, let me start with a quick

4     administrative note.

5          THE COURT:  Yes.

6          MR. NETTER:  To make it easier for the Court to locate

7     the representation by the State in the Idaho Supreme Court

8     proceedings as to what the affirmative defense means, I want to

9     provide a more specific citation because the filings are a bit

10    difficult to navigate.

11         It's in Case No. 49817.  It is a document entitled

12    "Respondents' Response to Order Setting Hearing," and it's at

13    page 14.

14         THE COURT:  I would note I understood Mr. Church is

15    not in any way running away from that statement.  I think he was

16    pretty clear that the language necessary to prevent the death of

17    the pregnant patient means what it says and says what it means.

18         And I appreciate his candor that -- I don't think he

19    ran away from that, and I think he apparently took roughly the

20    same position that his colleague in the Attorney General's

21    Office took before the Idaho Supreme Court.  But I appreciate

22    that, and I will look at that.

23         Go ahead.

24         MR. NETTER:  I don't disagree, Your Honor.  I also

25    understood Mr. Church to be attempting to faithfully interpret

1    the statutory text.

2         My only point of departure would be that Mr. Church

3    said that he was not troubled in the circumstance that the 50/50

4    hypothetical with the prospect that there could be a criminal

5    violation or criminal prosecution; whereas with reference to

6    EMTALA, I see that as deeply problematic and, from a moral

7    standpoint, extremely objectionable.

8         Now, the State's primary arguments here seem to rest

9    on the *Salerno* issues as to whether or not, as a technical

10   matter, the challenge presented by the United States is a facial

11   challenge.

12        To be clear, this is not a facial challenge that has

13   been filed by the United States.  A facial challenge would be if

14   we had said:  Here is one defect we have identified; and as a

15   result, the entire statute falls.

16        Our challenge is tailored to the circumstances in

17   which EMTALA applies.  So every time EMTALA mandates care, Idaho

18   law must yield.

19        Now, I thought I understood Mr. Church to be saying

20   also that perhaps it's okay, that maybe this can be litigated

21   later, or perhaps there is, like, an affirmative defense that

22   can be raised in criminal proceedings stemming from EMTALA.  And

23   that last point might have been from Mr. Stewart.

24        So I want to be clear on this:  That the injury to the

25   United States takes place sooner.  That the issue here is, as

1    the physicians have told us in their declarations, there will be

2    hesitancy to comply with federal law.

3            The federal interest here is in ensuring that the

4    benefit of the bargain -- the federal law -- in ensuring that

5    the emergency care that is prescribed by EMTALA is actually

6    delivered.

7            And if there are circumstances in which a doctor

8    hesitates, in which a doctor has to call the lawyers and get a

9    legal opinion because it seems like Idaho law might be violated

10   or has to speak with Mr. Stewart about his sense of whether,

11   despite the statutory text the prosecutor is going to bring the

12   charges, this is all in conflict with EMTALA and federal law,

13   which requires the care to be offered at the point where it's

14   necessary.

15           Now, Mr. Stewart said in this context that Idaho has

16   drawn its line.  And I want to be clear that our position is

17   that Idaho doesn't get to draw a line that conflicts with

18   EMTALA.

19           Federal law has prescribed a standard to the extent of

20   any direct conflict -- which, in this context, means

21   impossibility or obstacle preemption -- federal law governs.

22   And Idaho doesn't have the prerogative, under the supremacy

23   clause of the U.S. Constitution, to draw its own distinct line.

24           So Mr. Stewart just brought up the statutory language

25   about "unborn child."  And I'll say first that I don't believe

1    that this issue is properly before the Court.  It was not raised

2    in the papers.  Indeed, both the State and the legislature

3    indicated that they agreed that there were circumstances under

4    which EMTALA would require abortions as a stabilizing treatment.

5         I understood Mr. Stewart's argument to be, because of

6    this "unborn child" language in the statute that, in fact, the

7    opposite is true.  And that position has surely been forfeited.

8         In any event, that interpretation of the statute, the

9    interpretation of the statute that I think Mr. Stewart was

10   intimating at, is just not correct.

11        The "unborn child" language did not appear in EMTALA

12   as it was originally adopted.  It was incorporated through an

13   amendment that was adopted in 1989.  There is nothing in the

14   text or in the statutory history that suggests that Congress was

15   trying to prohibit emergency abortions in some extremely

16   roundabout fashion.

17        Instead, it appears that it occurred to somebody that

18   there could be an emergency condition pertaining only to a

19   fetus; and that if a pregnant individual appeared at a hospital

20   and she was herself healthy but had a fetal condition, that the

21   hospital should be providing treatment under the same

22   circumstances.

23        Now, none of this suggests that emergency abortions

24   have somehow become unlawful or unnecessary under EMTALA.

25   Indeed, it is meaningful that the requirement under EMTALA is

1      not for the doctor to actually perform a particular treatment

2      but for the hospital to offer the treatment and to discuss the

3      pros and cons, the risks and the benefits of the treatment.  And

4      if after that discussion of the risks and benefits, the patient

5      refuses to provide informed consent for the procedure, then

6      that's the patient's prerogative.

7              And we have seen in some of the declarations that it

8      does sometimes happen; that when doctors make recommendations

9      about medical care, patients think otherwise.

10             There are some other indications, too, post the 1989

11     amendment, that suggest that Mr. Stewart's potential

12     interpretation of the "unborn child" language doesn't work.

13             We noted in our opening brief that Congressman Weldon,

14     the author of the Weldon Amendment -- which is designed to

15     protect from discrimination institutions that decline to provide

16     abortions -- in the legislative history of the Weldon Amendment

17     in 2005, Representative Weldon was asked:  Why doesn't your

18     amendment mean that when women are experiencing life-threatening

19     conditions, that they will be effectively dying on the operating

20     table?

21             And his response, coming from the perspective of

22     somebody who was trying to empower institutions that decline to

23     provide abortions, was that EMTALA would govern in those

24     circumstances and that nothing in his amendment would preclude

25     the provision of that lifesaving care under federal law.

1          Likewise, through the Affordable Care Act in 2010,

2     42 U.S.C. 18023, Congress provided circumstances under which a

3     state can exclude abortions from the health plans that are

4     offered on the marketplace in the state.  And in so doing,

5     Congress explicitly recognized that nothing in the Affordable

6     Care Act was designed to overcome the provisions of EMTALA in

7     that context.

8          Mr. Church also brought up the heartbeat law.  He

9     suggested that we had endorsed the exception to the heartbeat

10    law.  And I just want to make clear that we haven't done so.

11         The fact that we haven't expressly challenged the

12    exception in the heartbeat law doesn't mean that we have blessed

13    that particular formulation, particularly in light of the fact

14    that, under our reading of 18-8804 and -8805, that law is

15    effectively to expire later this week.

16         I was having a hard time understanding if Mr. Church

17    was suggesting that the heartbeat law could survive to the

18    extent this Court were to enjoin the Total Abortion Ban.

19         We certainly don't read 18-8804 and 18-8805 to provide

20    that avenue.  It says if the Total Abortion Ban becomes

21    enforceable -- which it would even if it's enjoined to the

22    extent that it's in conflict with federal law -- that the

23    heartbeat law would no longer be in effect.

24         Your Honor, I want to go back to the point that

25    Mr. Stewart made suggesting that the statutory text doesn't

1    matter here, effectively, because he knows what prosecutors

2    think.

3            I have no way to gauge whether or not he truly

4    understands how the prosecutors in each county of this state

5    think or how the voters are going to think about prosecutors

6    they are going to elect in the future or how members of a grand

7    jury might think before taking a complaint to a magistrate.

8            But the question here is how doctors are going to

9    evaluate the statute.  And we submitted in the declarations

10    explanations from the doctors about the horrifying situation

11    that they anticipate will result from the full implementation of

12    the Total Abortion Ban.

13            The other point about Mr. Stewart's representation and

14    the practicalities matter is the Court should take this as an

15    enormous concession.  If the legislature, and potentially the

16    State, are taking the position that the text of the statute

17    isn't real, then that means the text of the statute isn't

18    lawful.

19            And the role of a court of law in that context is to

20    enjoin the impermissible operation of a law which will cause

21    drastic effects and dramatic consequences for pregnant

22    individuals in the state of Idaho and for physicians and for

23    medical providers.

24            So unless the Court has further questions --

25            THE COURT:  No.

1    MR. NETTER:  -- we would ask the Court to enter the

2    preliminary relief requested in our motion.

3    THE COURT:  Thank you, Mr. Netter.

4    Counsel, I intend to issue a written decision in this

5    matter.  My best guess is we won't have it done until Wednesday,

6    possibly tomorrow, but our plan is no later than Wednesday since

7    the law takes effect on Thursday.

8    I will offer just one or two observations.  I am

9    having a hard time seeing how this is an as-applied challenge

10   where there is clearly a very narrow and, as I think, frankly,

11   Mr. Stewart has argued, a very rare, in his view, perhaps

12   nonexistent threat, but it's certainly in very limited

13   circumstances where the abortion statute would be precluded.

14   I hope I made clear:  It seems to me it's clearly an

15   as-applied challenge, and I have a hard time seeing how this

16   could be a facial challenge.

17   Another thought that I think I do want to observe.

18   Mr. Stewart has made a great deal that we should focus on the

19   real-world events and not on the text, the conceptual language

20   of the statute.

21   The concern is, of course, that real-world events are

22   very hard to predict.  The text of the statute is very easy to

23   read and understand.  And I think the case law is absolutely

24   clear that it is the text that matters and that we

25   don't -- judges are not issued some kind of a crystal ball when

1    they're appointed to the bench that allows them to see what the

2    facts are, but we are generally trained in interpreting the

3    case, the statutory language.

4         And I think this case kind of underscores why the case

5    law is clear that we do need to look at the text in determining

6    whether there is a conflict between federal law and state law.

7         Simply put, doctors in emergency rooms and labor and

8    delivery rooms around this state are going to be forced to

9    navigate their way through this conflict between the abortion

10   statute and EMTALA.  I think it is not much comfort to a doctor

11   in that there is a sitting prosecutor who they think will not

12   enforce it, but no one knows for sure.

13        And importantly, the text matters in terms of

14   impacting the decisions made by those doctors when they confront

15   a life-or-death situation involving a pregnancy that has gone

16   horribly wrong.

17        So I think in terms of determining preemption, we have

18   to look at the statute.  And I have a very hard time seeing how

19   we can compare the abortion statute as we think it may be

20   applied to what EMTALA requires when we certainly can't rule out

21   the possibility that it will, indeed, be enforced.

22        Indeed, the legislature would not have adopted the law

23   unless they intended that it would be enforced according to the

24   exact terms that they set forth.  I don't think our legislature

25   ever intends a law thinking that it will not be enforced

1     according to its terms.

2          And that's why I think the law is clear that that's

3     what we look at; we look at the statutory language.  We don't

4     guess about what a prosecutor will or won't do.  And I think

5     I'll just leave it at that.

6          So there are some other concerns I've got.  I've tried

7     to point those out at the outset in my questioning.  We will

8     issue a written decision.  I think, without any doubt, it will

9     be filed no later than Wednesday so we have a clear guidance one

10    way or the other before the statute takes effect.

11          Is there anything else, Counsel?

12          MR. NETTER:  No, Your Honor.

13          MR. STEWART:  No, Your Honor.

14          MR. CHURCH:  Nothing from the State, Your Honor.

15          THE COURT:  Then we'll be in recess.

16    (Proceedings concluded at 10:50 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                         REPORTER'S CERTIFICATE

 2

 3

 4          I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that

 5     the foregoing is a correct transcript of proceedings in the

 6     above-entitled matter.

 7

 8

 9

10

11

12

13

14     /s/  Tamara I. Hohenleitner              08/24/2022
       _____        _____
15     TAMARA I. HOHENLEITNER, CSR, RPR, CRR     Date

16

17

18

19

20

21

22

23

24

25
```

# Exhibit 8

Daniel W. Bower, ISB #7204
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, Idaho 83686
Telephone: (208) 345-3333
Facsimile: (208) 345-4461
dbower@morrisbowerhaws.com

Monte Neil Stewart, ISB #8129
11000 Cherwell Court
Las Vegas, Nevada 89144
monteneilstewart@gmail.com

*Attorneys for Intervenor-Defendants*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | Case No. 1:22-cv-00329-BLW |
| Plaintiff, | |
| v. | **IDAHO LEGISLATURE'S BRIEF IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR PRELIMINARY INJUNCTION** |
| THE STATE OF IDAHO, | |
| Defendant, | |
| and | |
| SCOTT BEDKE, in his official capacity as Speaker of the House of Representatives of the State of Idaho; CHUCK WINDER, in his capacity as President Pro Tempore of the Idaho State Senate; and the SIXTY-SIXTH IDAHO LEGISLATURE, | |
| Intervenor-Defendants. | |

The Speaker of the Idaho House of Representatives Scott Bedke, Idaho Senate President Pro Tempore Chuck Winder, and the Sixty-Sixth Idaho Legislature (collectively the "Legislature") respectfully submit this brief in opposition to the Government's Motion for Preliminary Injunction (Dkt. 17).

<u>RESPONSIVE DISCUSSION</u>

## I. Introduction

The preeminent issue here is one of fact, whether in the real world EMTALA[1] actually conflicts with the 622 Statute.[2] In other words, does EMTALA ever require Idaho medical professionals to perform a medical procedure prohibited by the 622 Statute? Section II below addresses that factual question and makes clear that the answer is "no." That factual question, of course, presupposes that each of EMTALA and the 622 Statute is being given a correct reading and accorded its proper and actual scope. Section III below addresses that subject.

The Complaint (Dkt. 1)—as well as the United States Attorney General's press conference accompanying its filing—presented to the American public a picture of wide and deep conflict and therefore a civil action of wide scope and consequence, one that would enable the performance of hundreds and hundreds of abortions otherwise prohibited by the 622 Statute.[3] False picture. As the volume of a large stock-water trough is to the volume of a thimble, so is the scope of the Complaint's false picture to the scope of what is really at stake here. And worse, the thimble is

---

[1] 42 U.S.C. § 1395dd.
[2] Idaho Code § 18-622.
[3] Opponents of the 622 Statute, like Planned Parenthood, like to refer to it as the "Total Abortion Ban," a phrase that this Court itself used in its Order ruling on the Legislature's Motion to Intervene. Dkt. 27 at P. 2. A respect for accuracy (and an aversion to Orwellian labels) will lead to rejection of that phrase, especially by this Court. The 622 Statute clearly does not ban all abortions and clearly does not criminalize emergency medical procedures undertaken to preserve the life of the mother even though the death of the preborn child is thereby made certain.

empty; the Government has not shown and cannot show *any* real-world cases where medical procedures supposedly required by EMTALA will not take place unless this Court grants the Government its requested injunctive relief.

The Government uses five mechanisms to present this case as being of much wider scope and consequence than it really is. One, it deems treatment of ectopic "pregnancies" to be abortions within the scope of the 622 Statute. This was a clumsy and unseemly blunder on the Government's part (although the motivation for it is clear). As the Legislature's Reply re Intervention, Dkt. 25 at P. 2 said: "Ectopic 'pregnancies' fall *outside* the 622 Statute's prohibition. That is the Legislature's clear understanding and intent, one shared by the executive branch." (Emphasis in original.) That Reply went on to show that the Government almost certainly knew that it was working a deception. *Id*. at 2-3. And, as Dr. Reynolds says in her declaration: "Termination of an ectopic pregnancy is not an abortion and no competent physician would deem it to be such. It is therefore not prohibited by the 622 Statute. Any effort to redefine abortion to include treatment of ectopic pregnancies is medically baseless and, in my judgment, inexcusable." *See* Declaration of Tammy Reynolds, M.D. ("Reynolds Declaration") at ¶ 12. Section II. A. below exposes this first misleading mechanism for what it is.

Two, directly through the testimony of the three Idaho doctor-declarants used by the Government (and indirectly through the testimony of its Pennsylvania doctor-declarant), the Government attempts to show that a not insubstantial number of pregnancy-related medical emergencies in Idaho require, under EMTALA, emergency medical treatment that will result in loss of the preborn child's life but that the 622 Statute prohibits. This attempt fails. The declarations of Drs. French and Reynolds establish quite clearly that the Government's presentation is premised on the warping of both medical realities and the proper scope and understanding of EMTALA and

the 622 Statute. Indeed, the French and Reynolds declarations establish quite conclusively that the Government has failed to present any credible evidence of any pregnancy-related medical emergencies in Idaho requiring, under EMTALA, emergency medical treatment that will result in loss of the preborn child's life but that the 622 Statute prohibits. Section II. B. below exposes the fatal defects in the Government's second misleading mechanism.

Three, the Government predicts, as if such were a present reality, the rather absurd idea that this State's prosecuting attorneys will in effect zealously second-guess the judgment of the medical professionals providing emergency medical treatment to pregnant women and thereby bring prosecutions against those involved whenever the treatment is related to the death of the preborn child—and do so as a matter of course, if not automatically. The declaration of Prosecuting Attorney Bryan Taylor debunks that absurd and misleading notion. Section II. C. below fully exposes this third misleading mechanism for what it is.

Four, the Government speaks of there being only two affirmative defenses to a prosecution making a *prima facie* showing of a violation of the 622 Statute in the context of emergency medical treatments—good-faith medical judgment that the treatment was necessary to prevent the death of the pregnant woman and reported rape or incest. But of course, there is a third defense—that the 622 Statute is unconstitutional under the Supremacy Clause and preemption doctrines to the extent it operates to prohibit or interfere with EMTALA's mandate. That is the Government's claim here, and its filings suggest the Government's strong belief that its claim is a slam dunk. If it is that, the Government's "factual" presentations about "fears of prosecution" and "chilling effects on medical judgments" must be adjudged misleading at best. No further elaboration is required to show this fourth misleading mechanism for what it is.

The Government's fifth misleading mechanism brings us back to what we said before, that attention to the key factual question presupposes that each EMTALA and the 622 Statute is being given a correct reading and accorded its proper and actual scope. The Government tries to subvert that presupposition. It constantly and without warrant tries to expand EMTALA's supposed scope, to minimize and distort the 622 Statute's language limiting its own scope, and thereby to expand the scope of the 622 Statute's prohibition. All this for the purpose of fabricating a conflict that does not exist but without which the Government has no case, let alone grounds for the exercise of this Court's extraordinary equitable powers. As noted, Section III below corrects this fifth misleading mechanism.

These are the Government's five mechanisms used to paint its false picture about a supposed actual "conflict" and hence about the scope and consequence of its case against Idaho.

What is really at stake amounts to the content of a thimble. The Government must say (and has tried to show but has failed to do so) that the thimble is full. We say and have shown with not just admissible but credible evidence that the thimble is empty. The thimble is empty if all it contains is the *concept* of Relevant Abortions; it has some real content to the extent, but only to the extent, that Relevant Abortions occur in Idaho. And the law is clear that this Court can issue an injunction against the 622 Statute's operation in that very small realm (and only in that very small realm) *only* if the thimble has something in it.

For clarity, we state here what we mean by the phrase Relevant Abortions, with this definition being a refined and improved version compared to our prior efforts. The phrase Relevant Abortions means that class of emergency medical conditions (i) where medically appropriate treatment of the mother will result in the death of the preborn child, (ii) where EMTALA requires

that treatment, but (iii) where the 622 Statute prohibits it because it is not necessary to save the life of the mother.

## II. The Thimble Is Empty.

### A. Treatment of an ectopic pregnancy is not an abortion.

It is hard to overstate how greatly the Government, in its effort to manufacture a conflict, relies on its erroneous characterization of the medical treatment of ectopic pregnancies as abortion and therefore within the scope of the 622 Statute's prohibition. That this characterization is erroneous is certain. We so demonstrated in our Reply in Support of the Legislature's Motion to Intervene.[4] Dr. Reynolds's testimony, quoted above, so demonstrates. And Dr. French's testimony is quite thorough in exposing the falsity of this mischaracterization.

Dr. French testifies: "I have reviewed the declaration of Dr. Lee A. Fleisher, and he uses the example of an ectopic pregnancy as a life-threatening scenario whereby an abortion is necessary to save the life of the mother. I agree that a life-saving procedure is necessary, but the life-saving surgery is *not* considered an abortion. Idaho law does not prohibit any life-saving surgery, even if it results in the death of the unborn child." *See* Declaration of Richard Scott French, M.D. ("French Declaration") at ¶ 17 (emphasis added). He goes on to explain in detail why he "would question the competence of an obstetrician who said they were going to perform an abortion on a patient bleeding out from a ruptured ectopic pregnancy." *Id*. at ¶ 18. He makes that explanation in ¶¶ 18–20, all of which leads to this conclusion at ¶ 21:

The life threat of an ectopic pregnancy is covered in 18-622(4) that specifies the health of the woman is of primary importance:

---

[4] Dkt. 25 at 2-3.

Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

The only credible evidence before this Court is that the 622 Statute does not cover medical treatments for ectopic pregnancy. That being so, there is no conflict between it and EMTALA.

### B. The Government has failed to show the presence of Relevant Abortions in Idaho.

The grand objective of the four doctor declarations filed by the Government (Drs. Cooper, Corrigan, Seyb, and Fleisher) is to make it appear that Relevant Abortions are not uncommon in Idaho. But the declarations of Drs. French and Reynolds put the needle to that balloon.

Dr. Reynolds testifies at ¶ 7:

In this context, I note that none of the Jane Doe cases described in the declarations filed in this civil action by Idaho doctors Cooper, Corrigan, and Seyb constitutes a Relevant Abortion. That is so because, based on the plain language of those descriptions, each case involved an emergency medical procedure to save the life of the mother. In other words, in my opinion, each case involved a lawful medical procedure under the 622 Statute. Indeed, in my judgment and based on my experience, each case presented a situation where no informed, competent professional would second-guess the legality of the procedure.

Dr. French goes into great detail in his analysis of each of Jane Doe cases set forth in the declarations of the Government's three Idaho doctors and also into Dr. Fleisher's hypotheticals. *See* French Declaration at ¶¶ 17–29 (rebutting Dr. Fleisher's hypotheticals); *id*. at ¶¶ 30–55 (explaining and correcting the Jane Doe accounts of the three Idaho doctors). On that strong basis, he is able to provide this clear and powerful conclusion:

I have reviewed the declarations submitted by Dr. Lee A. Fleisher, Dr. Emily Corrigan, Dr. Kylie Cooper, Dr. Stacy T. Seyb and the cases they present. In my opinion, the examples of pregnancy-related medical emergencies in these declarations are presented in a way that creates a false conflict/false dichotomy between the life and health of the mother and the life and health of the unborn child and appear to assume that under Idaho Code § 18-622, physicians will give the health and welfare of the mother less consideration than the health and welfare of the unborn child. In my experience, in the emergency situations presented in these examples and anticipated by EMTALA, the subordination of the mother's life and

health in favor of the unborn child by a physician has not and will not occur. Further, these same physicians would never interpret Idaho Code 18-622 to mean that the mother's health and welfare are secondary to the baby. Every physician understands the Hippocratic Oath of "do no harm", and physicians certainly understand that the baby's health is dependent upon the mother's health. This is why in the tragic and rare circumstances whereby the mother dies, then a post-mortem C-section is promptly performed. Since there is no chance to save the mother, then the focus turns to the baby's health.

*Id.* at ¶ 9.

What we said before merits repeating: The declarations of Drs. French and Reynolds establish quite conclusively that the Government has failed to present any credible evidence of any pregnancy-related medical emergencies in Idaho requiring, under EMTALA, emergency medical treatment that will result in loss of the preborn child's life but that the 622 Statute prohibits. No Relevant Abortions, therefore no conflict between EMTALA and the 622 Statute.

Dr. Reynolds's declaration in particular teaches of the rarity of emergency medical procedures undertaken to save the life of the mother and resulting in the death of the preborn child. Reynolds Declaration at ¶¶ 3, 6. The official data fully support her declaration. The Idaho Department of Health and Welfare collects data from treating physicians on abortions where (i) the patient is under 18, (ii) the postfertilization age of the preborn child is undetermined, and (iii) the postfertilization age is over 20 weeks. That data, going back to 2007 for # 1 and 2013 for # 2 and # 3, gives these numbers for emergency medical procedures undertaken to save the life of the mother and resulting in the death of the preborn child: for # 1, one procedure since 2007; for # 2, zero since 2013; and for # 3, four since 2013. See Declaration of Pam Harder (with Exhibits A and B).

Yet more credible evidence that the thimble is empty.

**C. As it will be applied by Idaho's prosecuting attorneys, the 622 Statute poses no threat of interference with any EMTALA-required medical procedure or of causing any "fears" or "chills" in any competent medical professional.**

As with the treatment of ectopic pregnancies, it is hard to overstate the extent to which the Government relies on its third misleading mechanism. That mechanism is to misread (minimize) the language in the 622 Statute that limits its own scope and to misread (maximize) the scope of its prohibition—and then to *assume* that this State's prosecuting attorneys will zealously second-guess the judgment of the medical professionals providing emergency medical treatment to pregnant women and thereby bring prosecutions against those involved whenever the treatment is related to the death of the preborn child—and do so as a matter of course, if not automatically. False picture and one painted without any factual support.

We believe that the only admissible, credible evidence before this Court relevant to this third mechanism will be to this effect: When some serious medical condition exists that requires an emergency medical procedure under EMTALA, with that procedure ending the life of the pre-born child, this State's prosecuting attorneys, in the standard and ordinary exercise of their prosecutorial discretion, will not second-guess the judgments and decisions of the involved medical professionals. Indeed, they will not even seriously consider prosecuting under the 622 Statute. There is one caveat to these facts but one that helps the Government not at all: if a prosecuting attorney were to receive clear and convincing evidence that the procedure was done in bad faith, that is, as a fabricated emergency medical condition and a sham designed to evade the 622 Statute, then they will seriously consider prosecution.

We base this summary of the evidence on conversations with multiple Prosecuting Attorneys in Idaho. We believe in good faith that we will be filing a declaration from one of them by our Wednesday, August 17, 2022, noon filing deadline. We also believe in good faith that, if

this Court allows live testimony, through the use of our subpoena power this Court will hear testimony fully consistent with our summary above and none materially contrary to it.

On this basis, we respectfully submit that, yet again, the Government's picture of a conflict between EMTALA and the 622 Statute is fabricated and false, without any foundation in fact.

### III. The Correct Factual and Legal Understanding of the Scope of Both EMTALA and the 622 Statute Defeats the Government's Efforts to Warp and Distort Their Scope.

#### A. A correct factual understanding of the scope of the two statutes, founded on the realities of emergency medicine, reveals the thimble to be empty.

Dr. Reynolds's declaration at ¶ 8 teaches that "part of a treating Ob-Gyn physician's duty of care is possession of accurate knowledge of the language and real-world application of the jurisdiction's laws regulating abortion." Dr. French's declaration demonstrates an Idaho physician's fulfillment of that duty. Dr. French provides careful analysis of the actual language of the 622 Statute, including its language limiting its own scope, and—and this is important—how in the real world of emergency medicine that language applies. This analysis appears throughout his declaration.

We have already quoted above the French Declaration at ¶ 9 where he demonstrates the error of the Government's doctors' false assumption that under the 622 Statute "physicians will give the health and welfare of the mother less consideration than the health and welfare of the unborn child." This assumption is false exactly because "in the emergency situations presented in these examples [real and hypothetical given by the Government's doctors] and anticipated by EMTALA, the subordination of the mother's life and health in favor of the unborn child by a physician has not and will not occur." *Id*. In turn, this is so exactly because "these same physicians would never interpret Idaho Code 18-622 to mean that the mother's health and welfare are secondary to the baby." *Id*.

Continuing to apply the 622 Statute in the context of real-world emergency medicine, Dr. French testifies regarding the Government doctors' real and hypothetical cases and "similar procedures in the same or similar circumstances":

> The Idaho law as written in no way precludes this life-saving procedure or other similar procedures in the same or similar circumstances. As stated in Section 18-622(4):

> Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

*Id*. at ¶ 15. *See also id*. at ¶ 21.

Turning to EMTALA, Dr. French testifies that "EMTALA is designed and intended simply to facilitate the transfer of patients to facilities that have the capacity to treat them – it is not a statute that mandates any particular type of treatment, but rather "stabilizing treatment" until the patient can be transferred." *Id*. at 10. This is important because, relative to many of the real and hypothetical cases presented by the Government's doctors, those doctors are assuming "that every hospital has the capability to take care of high-risk pregnancy cases." *Id*. Obviously, that is not true "in a rural state such as Idaho." *Id*. And here is a further error in the "scenarios presented in [the Government doctors'] declarations"—those scenarios "imply that in extreme emergency situations, the physician may be confused as to whether his or her first duty is to abort babies or save the life of the mother before transferring her to an appropriate hospital." In the real world, that confusion simply does not happen; the emergency medical providers "the most appropriate action to save the mother's life [which] is to send [her] to the closest hospital with the appropriate resources and personnel for the care of a critically ill pregnant woman." *Id*.

In ¶ 23, Dr. French goes on to explain how specific provisions of EMTALA apply when "the patient is too unstable to transport and the transferring hospital is unable to provide the proper

medications or treatments necessary to 'stabilize' the patient." One provision limits the hospital's EMTALA obligation to provide such screening and treatment as may be within the resources of "'the staff and facilities available at the hospital.' (42 U.S.C. § 1395dd(b)(1)(a).)" *Id.* The second provision provides that EMTALA does not prohibit the transfer of an unstable patient upon a particular medical judgment: when, "based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer." This language is from 42 U.S.C. § 1395dd(c)(1)(A)(ii). *Id.* These EMTALA provisions, which Idaho emergency medical providers apply routinely, show the unworldly, unrealistic nature of one of Dr. Fleisher's key hypothetical examples. *Id.* at ¶ 22.

All this careful analysis of the correct meaning and application of EMTALA and the 622 Statute in the real world sustains Dr. French's key conclusion that "in the emergency situations presented [by the Government's doctors] . . . and anticipated by EMTALA, the subordination of the mother's life and health in favor of the unborn child by a physician *has not and will not occur.*" *Id.* at ¶ 9 (emphasis added). "Further, these same physicians would *never* interpret Idaho Code 18-622 to mean that the mother's health and welfare are secondary to the baby." *Id.* (emphasis added).

The true picture presented by Dr. French is a much-needed antidote to the Government's misleading picture of a state law of draconian reach wreaking havoc in the world of emergency medicine (the 622 Statute) and of a federal law that has as its purpose and effect—surprise—rolling back *Dobbs*' restoration to the States of their Tenth Amendment right, power, and authority to regulate abortion, including the making of all the hard moral decisions that right, power, and

authority require. Attention to Dr. French's analysis leads to the confident conclusion that, instead of havoc, there is harmony. Certainly, there is no conflict between EMTALA and the 622 Statute.

So, yes, as a matter of fact, the thimble is empty.

**B. A correct legal understanding of the scope of the two statutes, especially EMTALA, also reveals the thimble to be empty.**

We have in hand a thorough-going analysis of the law governing any invocation and application of EMTALA. That analysis demonstrates that the Government's invocation and application of EMTALA here are accurately seen as wrong and abusive. Because of this Court's currently in-place order limiting the Legislature to fact issues and precluding it from making legal arguments, we cannot present that analysis in this brief and can only hope that the Attorney General's Office adequately mirrors what we have in hand (which we have shared with it).

Our legal analysis demonstrates that:

1. EMTALA does not preempt the 622 Statute expressly.

2. EMTALA does not impliedly preempt the 622 Statute.

3. The Government's interpretation of EMTALA conflicts with serious constitutional doctrines.

   a. As read by the Government, EMTALA poses serious separation-of-powers conflicts because of the statute's deprivation of state authority affirmed by the United States Supreme Court in *Dobbs.*

   b. As read by the Government, EMTALA poses serious concerns that it violates the Major Questions Doctrine.

   c. As read by the Government, EMTALA poses serious concerns that it violates the limits of the Spending Clause.

In the event this legal analysis is not adequately presented to the Court in defense of the 622 Statute, we will promptly accept this Court's prior invitation to seek a modification of the existing limits on the scope of the Legislature's intervention so as to be able to present the legal analysis to this Court.

Dated this 16th day of August, 2022.

MORRIS BOWER & HAWS PLLC

By:  /s/ Daniel W. Bower
      Daniel W. Bower


 /s/ Monte Neil Stewart
Monte Neil Stewart

*Attorneys for Proposed Intervenors-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2022, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Brian David Netter
DOJ-Civ
Civil Division
950 Pennsylvania Avenue NW
Washington, DC 20530
Email: brian.netter@usdoj.gov

*Attorneys for Plaintiff*

Julie Straus Harris
DOJ-Civ
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Email: julie.strausharris@usdoj.gov

*Attorneys for Plaintiff*

Anna Lynn Deffebach
DOJ-Civ
Civil Division- Federal Programs Branch
1100 L ST NW
Ste Lst 12104
Washington, DC 20005
Email: anna.l.deffebach@usdoj.gov

*Attorneys for Plaintiff*

Emily Nestler
DOJ-Civ
1100 L Street
Washington, DC 20005
Email: emily.b.nestler@usdoj.gov

*Attorneys for Plaintiff*

Daniel Schwei
DOJ-Civ
Federal Programs Branch
1100 L St NW, Ste 11532
Washington, DC 20530
Email: daniel.s.schwei@usdoj.gov

*Attorneys for Plaintiff*

Lisa Newman
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Email: lisa.n.newman@usdoj.gov

*Attorneys for Plaintiff*

Christopher A. Eiswerth
DOJ-Civ
Federal Programs Branch
1100 L Street, NW
Ste 12310
Washington, DC 20005
Email: christopher.a.eiswerth@usdoj.gov

*Attorneys for Plaintiff*

Brian V Church
Dayton Patrick Reed
Ingrid C Batey
Megan Ann Larrondo
Steven Lamar Olsen
Office of the Attorney General
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83702-0010
Email: brian.church@ag.idaho.gov
        dayton.reed@ag.idaho.gov
        ingrid.batey@ag.idaho.gov
        megan.larrondo@ag.idaho.gov
        steven.olsen@ag.idaho.gov

*Attorneys for Defendant*

Wendy J. Olson
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702-7705
Email: wendy.olson@stoel.com


*Attorneys for Amici Curiae The American
Hospital Association and The Association
of American Medical Colleges*

Jacob M. Roth *(pro hac vice)*
Charlotte H. Taylor *(pro hac vice)*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Email: ctaylor@jonesday.com
        yroth@jonesday.com

Amanda K. Rice *(pro hac vice)*
JONES DAY
150 West Jefferson, Suite 2100
Detroit, MI 48226-4438
Email: arice@jonesday.com

*Attorneys for Amici Curiae The American Hospital
Association and The Association of American
Medical Colleges*

Shannon Rose Selden *(pro hac vice)*
Leah Martin *(pro hac vice)*
Adam Aukland-Peck *(pro hac vice)*
DEBEVOISE &PLIMPTON LLP
919 Third Ave.
New York, NY 10022
Email: srselden@debevoise.com
      lmartin@debevoise.com
      aauklandpeck@debevoise.com

Jeffrey B. Dubner *(PHV forthcoming)*
Skye L. Perryman *(PHV forthcoming)*
John T. Lewis *(PHV forthcoming)*
Maher Mahmood *(PHV forthcoming)*
DEMOCRACY FORWARD FOUNDATION
655 15th St. NW, Ste 800
Washington, D.C. 20005
Email: jdubner@democracyforward.org
      sperryman@democracyforward.org
      jlewis@democracyforward.org
      mmahmood@democracyforward.org

*Attorneys for Amici*

*Attorneys for Amici*

   */s/ Daniel W. Bower*
   Daniel W. Bower

# Exhibit 9

**Nos. 23-35440 & 23-35450**

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO,
*Defendant-Appellant.*

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO
*Defendant,*
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives; et al.,
*Intervenors-Appellants.*

Appeal from the United States District Court
for the District of Idaho
Honorable B. Lynn Winmill
(1:22-cv-00329-BLW)

**OPENING BRIEF OF INTERVENORS-APPELLANTS
THE IDAHO LEGISLATURE**

Monte Neil Stewart
11000 Cherwell Court
Las Vegas, NV 89144
Telephone: (208) 514-6360
monteneilstewart@gmail.com

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

# CORPORATE DISCLOSURE STATEMENT

As the elected leaders of a branch of the Idaho State government,

Intervenors-Appellants are not required to submit a corporate disclosure

statement under Federal Rules of Appellate Procedure (FRAP) 26.1(a).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ....................................................... v

INTRODUCTION ................................................................ 1

JURISDICTIONAL STATEMENT .................................................. 3

ISSUES PRESENTED ........................................................... 3

ADDENDUM ................................................................... 3

STANDARD OF REVIEW ........................................................ 4

STATEMENT OF THE CASE ..................................................... 4

    I.    Statutory Background ................................................ 4

           A. EMTALA ........................................................ 5

           B. Idaho Abortion Law ........................................... 6

    II.   Procedural History.................................................. 9

           A. The Complaint................................................... 9

           B. The Preliminary Injunction .................................... 10

                 1. *Motions practice* ........................................ 10

                 2. *August 2022 Order* ...................................... 11

                 3. *Motions to Reconsider* .................................. 15

                 4. *May 2023 Order* ......................................... 16

iii

C. Related State Court Litigation ............................................. 18

D. Appeal ................................................................................. 20

SUMMARY OF ARGUMENT .................................................... 20

ARGUMENT .............................................................................. 24

I.   The Preliminary Injunction Rests on Fundamental Errors of Law ...................................................................................... 24

A. EMTALA Cannot Preempt Section 622 .............................. 24

1. *Settled principles determine whether federal law preempts state law* .................................................... 26

2. *EMTALA preempts state law only when it "directly conflicts" – and section 622 does not* ............................... 27

3. *Under the Medicare Act, EMTALA cannot preempt state laws setting medical standards or regulating the practice of medicine – which is all that section 622 does* ................................................................................ 31

4. *The district court misapplied or disregarded the express preemption clauses governing EMTALA* ....... 32

B. EMTALA Does Not Mandate Abortion ................................ 35

1. *EMTALA's requirement of stabilizing care does not imply a duty to make abortion available* ................... 35

2. *Construing EMTALA as an abortion mandate contradicts the statute's repeated injunction to provide medical care for unborn children* .............................. 38

3. *Construing EMTALA as an abortion mandate is contrary to how Congress legislates concerning abortion* ..................................................................... 42

4. *The decision below is inconsistent with a related case on appeal before the Fifth Circuit* ............................. 43

5. *Construing EMTALA as an abortion mandate transgresses the major questions doctrine* ................ 45

C. The District Court Misconstrued Section 622 ...................... 54

D. Enjoining Section 622 Because of EMTALA Is Unconstitutional ................................................................. 57

1. *The preliminary injunction violates the Tenth Amendment* ............................................................... 57

2. *The Decision Below Violates the Spending Clause* .... 63

II. The Preliminary Injunction Inflicts Irreparable Harm on The Idaho Legislature ..................................................................... 66

III. The Balance of Equities and Public Interest Tip in Favor of The Idaho Legislature ................................................................. 68

CONCLUSION ...................................................................... 72

CERTIFICATE OF COMPLIANCE ........................................ 74

STATEMENT OF RELATED CASES ..................................... 75

ADDENDUM ......................................................................... 77

v

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018)..........................................................................66

*Alabama Ass'n. of Realtors v. Dep't of Health and Human Servs.,*
    141 S. Ct. 2485 (2021).................................................................. 46, 51

*American Vantage Cos. v. Table Mountain Rancheria,*
    292 F.3d 1091 (9th Cir. 2002)................................................ 39, 41-42

*American Acad. of Ophthalmology, Inc. v. Sullivan,*
    990 F.2d 377 (6th Cir. 1993).............................................................32

*Arizona v. United States,*
    567 U.S. 387 (2012)............................................................................57

*Baker v. Adventist Health, Inc.,*
    260 F.3d 987 (9th Cir. 2001)................................................. 27, 28-29

*Bannister v. Davis,*
    140 S. Ct. 1698 (2020)......................................................................12

*Beaver v. Tarsadia Hotels,*
    816 F.3d 1170 (9th Cir. 2016)..........................................................26

*Bernhardt v. Los Angeles Cty,*
    339 F.3d 920 (9th Cir. 2003) ...........................................................68

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023)............................................................... 45, 46

*Bond v. United States,*
    572 U.S. 844 (2014) ..........................................................................57

vi

*Bradley v. School Bd. of Richmond,*
    416 U.S. 696 (1974) .......................................................................... 8-9

*Bryan v. Rectors and Visitors of Univ. of Va.,*
    95 F.3d 349 (4th Cir. 1996) .............................................................. 29

*Bryant v. Adventist Health Sys./West,*
    289 F.3d 1162 (9th Cir. 2002) ..................................................... 28-29

*BST Holdings v. OSHA,*
    17 F.4th 604 (5th Cir. 2021) ....................................................... 70-71

*Coons v. Lew,*
    762 F.3d 891 (9th Cir. 2014) ............................................................ 28

*Cipollone v. Liggett Group, Inc.,*
    505 U.S. 504 (1992) ..................................................... 25, 27, 32, 35

*CSX Trans., Inc. v. Easterwood,*
    507 U.S. 658 (1993) .......................................................................... 26

*DISH Network Corp. v. FCC,*
    653 F.3d 771 (9th Cir. 2011) ............................................................ 25

*Do Sung Uhm v. Humana, Inc.,*
    620 F.3d 1134 (9th Cir. 2010) .......................................................... 26

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ............................................. 2, 8, 23, 58, 66-67

*Doe # 1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) .......................................................... 68

*Draper v. Chiapuzio,*
    9 F.3d 1391 (9th Cir. 1993) .............................................. 12, 32, 33, 34

*Eberhardt v. Los Angeles,*
    62 F.3d 1253 (9th Cir. 1995) ............................................................ 28

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ..................................................... 25, 69

*Golden v. Washington*,
   138 S. Ct. 448 (2017) ........................................................................ 67

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) .................................................................... 49, 53

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) .................................................................... 58, 59

*Hardy v. New York City Health Hosp. Corp.*,
   164 F.3d 789 (2d Cir. 1999) ....................................................... 29, 44

*Harry v. Marchant*,
   291 F.3d 767 (11th Cir. 2002) ........................................................ 29

*Keams v. Tempe Tech. Inst., Inc.*,
   39 F.3d 222 (9th Cir. 1994) ............................................................ 27

*Maryland v. King*,
   567 U.S. 1301 (2012) ...................................................................... 66

*Mayes v. Biden*,
   67 F.4th 921 (9th Cir. 2023) .......................................................... 52

*Mazurek v. Armstrong*,
   520 U.S. 968, 972 (1996) ........................................................... 24-25

*McCall v. PacifiCare of Cal., Inc.*,
   21 P.3d 1189 (Cal. 2001) ................................................................ 31

*Medtronic v. Lohr*,
   518 U.S. 470 (1996) ........................................................................ 27

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .......................................................... 18

*Murphy v. National Collegiate Athletic Ass'n,*
  138 S. Ct. 1461 (2018) ........................................................ 60-61, 62

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) ...................................................................... 66

*New York v. United States,*
  505 U.S. 144 (1992) ......................................................................... 60

*NFIB v. OSHA,*
  142 S. Ct. 661 (2022) ...................................................................... 46

*NFIB v. Sebelius,*
  567 U.S. 519 (2012) ................................................................... 63, 65

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................ 68

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) ..................................................................... 63, 66

*Pennsylvania Medical Soc'y v. Marconis,*
  942 F.2d 842 (3d Cir. 1991) ........................................................ 31

*In re Pharmaceutical Indus. Average Wholesale Price Litig.,*
  582 F.3d 156 (1st Cir. 2009) ...................................................... 31

*Planned Parenthood Great Nw. v. State,*
  __ P.3d __, 2022 WL 3335696, (Idaho Aug. 12, 2022) ........ 7, 18-19, 56

*Planned Parenthood Great Nw. v. State,*
  522 P.3d 1132 (Idaho 2023) ...........................17, 19, 23, 55, 56, 71, 72

*Poretti v. Dzurenda,*
  11 F.4th 1037 (9th Cir. 2021) ..................................................... 69

*Raich v. Gonzales,*
  500 F.3d 850 (9th Cir. 2007) ...................................................... 59

ix

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ............................................................... 39

*Roe v. Wade*,
410 U.S. 113 (1973) ................................................................. 6

*Root v. New Liberty Hosp. Dist.*,
209 F.3d 1068 (8th Cir. 2000) ........................................... 30

*Spector v. Norwegian Cruise Line Limited*,
545 U.S. 119 (2005) ............................................................. 46

*Southwest Voter Registration Educ. Project v. Shelley*,
344 F.3d 914 (9th Cir. 2003) ................................................ 4

*Tafflin v. Levitt*,
493 U.S. 455 (1990) ............................................................. 26

*Texas v. Becerra*,
623 F. Supp. 3d 696 (N.D. Tex. 2022) ................................ 43, 44-45, 47

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .................................... 4, 61-62

*United States v. Kuchinski*,
469 F.3d 853 (9th Cir. 2006) ................................................ 4

*United States v. Paulk*,
569 F.3d 1094 (9th Cir. 2009) .............................................. 4

*United States Forest Serv. v. Cowpasture River Pres. Ass'n*,
140 S. Ct. 1837 (2020) ...................................... 45, 50, 59-60

*Utility Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014) ............................................. 45, 47, 50

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ...................... 45-46, 50, 51, 52, 53

x

*Washington v. Trump,*
   847 F.3d 1151 (9th Cir. 2017) ........................................................ 67

*Whitman v. American Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001) ...................................................................... 22

*Winter v. National Resource Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................ 24, 66, 67

**Constitutional Provisions**

U.S. CONST. art. I § 8 ......................................................................... 63

U.S. CONST. art. VI ............................................................................ 26

U.S. CONST. amend. X ........................................................................ 57

**Statutes and Rules**

CAL. GOV'T CODE § 7284.6(a)(4) .......................................................... 61

42 C.F.R. § 489.24 ........................................................................ 5-6, 40

Exec. Order No. 14,076, 87 Fed. Reg. 42053 (Jul. 8, 2022) .............. 43, 48

H.B. 374, 67th Leg., 1st Sess. (Idaho 2023) ....................................... 8, 55

H.R. 8296, 117th Cong. (2022) ............................................................ 51

IDAHO CODE § 18-604(1) .............................................................. 7, 15, 55

IDAHO CODE § 18-622 ................................................................... *passim*

IDAHO CODE § 18-622(1) ................................................................ 7, 35

IDAHO CODE § 18-622(1)(a) ................................................................. 8

IDAHO CODE § 18-622(2) ........................................ 8, 14, 23, 55-56, 62, 71

IDAHO CODE § 18-622(2)(a) ........................................................ 7

IDAHO CODE § 18-622(2)(b) ................................................... 7, 56

IDAHO CODE § 18-622(3) ................................................. 13, 14, 62

IDAHO CODE § 18-622(3)(a) ..................................................... 13

IDAHO CODE § 18-622(4) ............................................... 7, 55, 71

IDAHO CODE § 18-622(5) ............................................... 8, 55, 71

IDAHO CODE § 18-8804 ............................................................ 6

IDAHO CODE § 18-8805(4) ......................................................... 6

IDAHO CODE § 18-8807(1) ...................................................... 6-7

8 Pub. L. 117-103 ................................................................. 42

S. 4132, 117th Cong. (2022) .................................................. 51

8 U.S.C. § 1101 .................................................................. 61

28 U.S.C. § 503 .................................................................. 52

28 U.S.C. § 1292 ................................................................... 3

28 U.S.C. § 1331 .................................................................. 3

42 U.S.C. § 300a-6 .............................................................. 42

42 U.S.C. § 300a-7(b)(1) ....................................................... 42

42 U.S.C. § 300z-10(a) .......................................................... 42

42 U.S.C. § 1395 ...................................... 1, 21, 26, 31, 34, 35

42 U.S.C. § 1395dd .......................................................................... *passim*

42 U.S.C. § 1395dd(a) ................................................................. 5, 38

42 U.S.C. § 1395dd(b) ................................................. 36, 37, 38, 53

42 U.S.C. § 1395dd(b)(1) ............................................................ 5, 51

42 U.S.C. § 1395dd(b)(1)(A) ........................................................... 36

42 U.S.C. § 1395dd(c) ....................................................................... 38

42 U.S.C. § 1395dd(c)(1) .................................................................... 5

42 U.S.C. § 1395dd(c)(1)(A)(ii) ................................................ 1, 21, 38

42 U.S.C. § 1395dd(c)(2)(A) ...................................................... 1, 21, 38

42 U.S.C. § 1395dd(d)(1)(A) .............................................................. 6

42 U.S.C. § 1395dd(d)(1)(B) .............................................................. 6

42 U.S.C. § 1395dd(d)(2)(A) ............................................................ 30

42 U.S.C. § 1395dd(e)(1) ................................................. 5, 6, 33-34, 38

42 U.S.C. § 1395dd(e)(1)(A) ..................................................... 15, 36, 41

42 U.S.C. § 1395dd(e)(1)(A)(i) ........................................ 1, 15, 21, 37, 38

42 U.S.C. § 1395dd(e)(1)(B) ...................................................... 36, 38, 39-40

42 U.S.C. § 1395dd(e)(1)(B)(i) ......................................................... 40

42 U.S.C. § 1395dd(e)(1)(B)(ii) ........................................ 1, 15, 21, 38, 40

42 U.S.C. § 1395dd(e)(3)(A) ............................................................... 37

42 U.S.C. § 1395dd(e)(3)(B) ..................................................... 37

42 U.S.C. § 1395dd(f) ................................. 1, 12, 14, 21, 26, 27, 30, 33, 35

42 U.S.C. § 2996f(b)(8) .......................................................... 42

42 U.S.C. § 18023(b)(4) ....................................................... 42-43

## Other Authorities

CMS Center for Clinical Standards and Quality, QSO-22-22-Hospitals ("Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss") (July 1, 2022) ............ 48

CMS Center for Clinical Standards and Quality, QSO-21-22-Hospitals ("Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss") (Sep. 17, 2021) ........... 48

Letter from Secretary Becerra to Health Care Providers (July 11, 2022) ............................................................................... 64

**INTRODUCTION**

This appeal will decide whether the United States can transform an obscure federal statute into a nationwide abortion mandate—when Congress plainly intended to foreclose that result. At issue is a preliminary injunction prohibiting the State of Idaho from enforcing Idaho Code § 18-622[1] (section 622) on the sole ground that it conflicts with the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, by outlawing abortions under circumstances when the government says that EMTALA requires it.

But the injunction has no foundation because the federal-state conflict it purportedly stands on does not exist. Two non-preemption clauses, 42 U.S.C. §§ 1395dd(f) and 1395, prevent EMTALA from overriding state laws like section 622 that circumscribe the availability of particular medical procedures like abortion. EMTALA says nothing about abortion. But it does repeatedly express a hospital's duty to care for both a pregnant woman and her unborn child. *See* 42 U.S.C. §§ 1395dd(e)(1)(A)(i), 1395dd(e)(1)(B)(ii), 1395dd(c)(1)(A)(ii),

---

[1] Unless otherwise indicated, all references to section 622 are to the amended version in effect as of July 1, 2023.

1395dd(c)(2)(A). EMTALA nowhere pits the health or safety of one against the other.

Embracing the United States' novel reading of EMTALA leads to grave results. The preliminary injunction rests on the exercise of significant executive power without clear congressional authority, contrary to the major questions doctrine. What's more, the injunction violates the Tenth Amendment by expanding federal power at the expense of state authority to regulate abortion, confirmed in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), and by transgressing the anticommandeering doctrine. Likewise, the injunction validates a reading of EMTALA contrary to the Spending Clause. The United States has tried to coerce the State of Idaho into complying with the EMTALA mandate by threatening to deprive the State of all Medicare funding, even though federal aid for emergency medical care under EMTALA is a minor part of the Medicare program. And the government presses this demand even though the supposed mandate is retroactive. Since the decision below is incorrect as a matter of law, it should be reversed and the preliminary injunction vacated.

# JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292 because the appeal is from a district court order refusing to dissolve a preliminary injunction. The appeal is timely because a notice of appeal was filed on July 3, 2023, within 60 days after the district court's order denying the Legislature's motion for reconsideration, and the United States is a party. *See* FRAP 4(a)(1)(B)(i).

# ISSUES PRESENTED

1. Does the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, preempt Idaho Code § 18-622 (section 622)?

2. If EMTALA does not require Medicare-funded hospitals to perform abortions, did the district court err as a matter of law by issuing a preliminary injunction prohibiting the enforcement of section 622?

# ADDENDUM

An addendum containing pertinent statutes is included herein at the close of this brief. 9th Cir. R. 28-2.7.

4

## STANDARD OF REVIEW

Although the district court's grant of a preliminary injunction is reviewed for abuse of discretion, *see United States v. California*, 921 F.3d 865, 877–78 (9th Cir. 2019), "[t]he district court's interpretation of the underlying legal principles … is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc)). Questions of law are reviewed de novo. *See United States v. Paulk*, 569 F.3d 1094, 1095 (9th Cir. 2009); *United States v. Kuchinski*, 469 F.3d 853, 857 (9th Cir. 2006).

## STATEMENT OF THE CASE

### I. Statutory Background

This appeal involves a preliminary injunction blocking the enforcement of section 622, which makes abortion a crime unless authorized by statute, because it supposedly conflicts with EMTALA. But the conflict is false. EMTALA is governed by two non-preemption clauses demonstrating that Congress did not intend to override state laws like section 622. Even if not, statutory text disclaims that EMTALA requires access to abortion.

## A.   EMTALA

EMTALA obligates Medicare-funded hospitals to provide medical treatment for emergency medical conditions, regardless of a patient's ability to pay. *See* 42 U.S.C. § 1395dd. EMTALA obligates a Medicare-participating hospital to (1) perform "an appropriate medical screening examination" to see whether the patient has an emergency medical condition, *id.* § 1395dd(a); (2) conduct a further medical exam along with "such treatment as may be required to stabilize the medical condition" or send the patient "to another medical facility," *id.* § 1395dd(b)(1); and (3) transfer a patient with an emergency medical condition that has not been stabilized only as provided and where "appropriate," *id.* § 1395dd(c)(1).

Central to these duties is EMTALA's definition of "emergency medical condition":

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part; or (B) with respect to a pregnant woman who is having contractions—(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman *or the unborn child*.

42 U.S.C. § 1395dd(e)(1) (emphasis added); *accord* 42 C.F.R. § 489.24.

This definition highlights Congress's solicitude toward a pregnant woman *and* her unborn child. EMTALA requires emergency medical care for both of them. The statute obligates hospitals to consider the health of either when determining whether "immediate medical attention" is needed and whether a transfer might jeopardize "the health or safety" of either. 42 U.S.C. § 1395dd(e)(1).

Noncompliance carries severe consequences. A hospital or physician "that negligently violates" EMTALA "is subject to a civil money penalty of" up to $50,000 per violation. *Id.* § 1395dd(d)(1)(A), (B). One whose violations are "gross and flagrant or is repeated" may be excluded "from participation in [Medicare] and State health care programs." *Id.* § 1395dd(d)(1)(B).

### B.    Idaho Abortion Law

In 2020, Idaho adopted three statutes regulating abortion. One prohibits abortions after a fetal heartbeat has been detected. IDAHO CODE § 18-8804. This statute was intended as a stopgap measure until *Roe v. Wade*, 410 U.S. 113 (1973) was overruled. *See* IDAHO CODE § 18-8805(4). Another statute creates a cause of action against persons who perform an

abortion contrary to Idaho law. *Id.* § 18-8807(1). The third statute is section 622, the subject of this appeal. *See id.* § 18-622(1).

Section 622 makes it a crime to perform an abortion unless authorized by statute. *See id.* That proscription restores long-held Idaho policy. *See Planned Parenthood Great Nw. v. State*, __ P.3d __, 2022 WL 3335696, at *6 (Idaho Aug. 12, 2022) (describing how Idaho law regarded abortion as a crime, with exceptions, from territorial days until *Roe*).

Idaho law defines *abortion* as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." IDAHO CODE § 18-604(1). Section 622 prohibits physicians from performing an abortion unless an exception applies to save the mother's life or (during the first trimester) to terminate a pregnancy resulting from rape or incest. *Id.* §§ 622(2)(a), (b). These exceptions apply when a physician acts out of "good faith medical judgment and based on the facts known to the physician at the time." *Id.* Also, a doctor faces no liability when treating a pregnant mother accidentally results in the death of an unborn child. *Id.* § 622(4).

Section 622 exempts a woman who obtains an abortion from liability altogether. *Id.* § 622(5).

The original version of section 622 provided that it would come into effect 30 days after "[t]he issuance of the judgement in any decision of the United States supreme court that restores to the states their authority to prohibit abortion." *Id.* § 622(1)(a) (repealed). *Dobbs*, 142 S. Ct. at 2228, triggered this effective date. There, the Supreme Court overruled *Roe* and held that "[t]he Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion." *Id.* at 2284. The *Dobbs* judgment issued on July 26, 2022, making section 622 presumptively effective on August 25. *See* Docket Statement, *Dobbs v. Jackson Women's Health Org.*, No. 19-1392, at https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/19-1392.html.

Section 622 was amended during the 2023 legislative session. *See* H.B. 374, 67th Leg., 1st Sess. (Idaho 2023) (eff. July 1, 2023). It received a new title, the "Defense of Life Act," and the provision triggering the effective date was repealed. *Id.* Affirmative defenses allowing a physician to avoid prosecution were replaced by straightforward exceptions. *See* IDAHO CODE § 622(2). Those amendments are pertinent on appeal since

9

this Court will "apply the law in effect at the time it renders its decision." *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (1974).

## II.  Procedural History

### A.  The Complaint

Shortly before section 622 became effective, the United States filed a complaint challenging its validity. 4-LEG-ER-570. The timing created needless urgency, as the district court pointed out. The government "chose to delay filing this case and its motion for preliminary injunction for over six weeks after the Supreme Court issued the *Dobbs* decision." Mem. Decision and Order, 4-LEG-ER-533.

The complaint alleges that section 622 violates the Supremacy Clause of the federal Constitution by conflicting with EMTALA. 4-LEG-ER-572. On the government's telling, EMTALA requires Medicare-participating hospitals to perform an abortion whenever a pregnant woman suffers from an "emergency medical condition" demanding it. 4-LEG-ER-571. Section 622 conflicts with that requirement because it punishes doctors delivering medical care supposedly required by EMTALA. *See* 4-LEG-ER-572. Section 622 thereby violates the Supremacy Clause and is preempted. *See id.*

Preemption follows, the government says, because "medical care that a state may characterize as an 'abortion' is necessary emergency stabilizing care that hospitals are required to provide under EMTALA." 4-LEG-ER-571. Hence section 622 is preempted because EMTALA mandates abortions that section 622 prohibits. 4-LEG-ER-572.

The United States sought a declaratory judgment stating that section 622 is preempted and that "Idaho may not initiate a prosecution against, seek to impose any form of liability on, or attempt to revoke the professional license of any medical provider based on the provider's performance of an abortion that is authorized under EMTALA." 4-LEG-ER-585. The government also demanded a preliminary and permanent injunction against section 622. *Id.*

## B.  The Preliminary Injunction

### 1.  *Motions practice*

Less than a week after the complaint, the Legislature sought to intervene as of right. *See* Idaho Legislature's Motion to Intervene, 4-LEG-ER-564. The district court denied intervention as of right but granted permissive intervention. 4-LEG-ER-515. A later order denied the

Legislature's renewed motion to intervene, 2-LEG-ER-118, and that order is also on appeal. 2-LEG-ER-81(Case No. 23-35153).

The United States sought a preliminary injunction against section 622. *See* Mot. for Prelim. Inj., 4-LEG-ER-562. Specifically, the government said that it was likely to succeed on the merits because EMTALA requires physicians to perform abortions as emergency care under circumstances that section 622 prohibits. United States' Mem. ISO Mot. for Prelim. Inj., 4-LEG-ER-548–557. The government added that section 622 would "result in irreparable harm to the public" and to the government's "sovereign interests [in enforcing EMTALA]." 4-LEG-ER-557. It claimed that the balance of equities favored an injunction since the government's "sovereign interest" was critical, 4-LEG-ER-559, while "the State of Idaho will suffer no cognizable harm" because section 622 "is not currently in effect, has never been in effect, and therefore enjoining it … would simply preserve the status quo." 4-LEG-ER-560.

### 2. *August 2022 Order*

The day before section 622 was due to become effective, the district court issued a preliminary injunction preventing its enforcement. Mem.

Decision and Order of Aug. 24, 1-LEG-ER-14.[2]

The principle of federal supremacy drove that result. In particular, the district court ruled that the United States would "likely succeed on the merits" because "state law must yield to federal law when it's impossible to comply with both," and section 622 "conflicts with" EMTALA. 1-LEG-ER-16. Chiefly, the court relied on a clause preempting state law "to the extent that the [state law] directly conflicts." 42 U.S.C. § 1395dd(f). The court cited circuit precedent construing the phrase "directly conflicts" in terms of impossibility and obstacle preemption. *See* 1-LEG-ER-32 (citing *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993)). So the court considered each form of preemption.

Section 622 fails impossibility preemption, the court said, because "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care" and "Idaho statutory law makes that treatment a crime." *Id*. Nor do section 622's former provisions, offering an affirmative "defense to prosecution" for a physician who performs an

---

[2] The notice of appeal identified only the May Order denying the motion for reconsideration under FRCP 59(e), but an appeal from such an order "merges with the prior determination." *Bannister v. Davis*, 140 S. Ct. 1698, 1703 (2020). As such, this brief will address both the August and May orders concerning the preliminary injunction.

13

abortion for reasons authorized by statute, Idaho Code § 18-622(3) (repealed), "cure the impossibility." 1-LEG-ER-33. The "straightforward example" of a medical condition for which section 622 does not allow an abortion is "an ectopic pregnancy." 1-LEG-ER-20. During a hearing on the injunction, "the State conceded that the procedure necessary to terminate an ectopic pregnancy is a criminal act." 1-LEG-ER-21. This, even though "[i]t is undisputed that an ectopic pregnancy in a fallopian tube is an emergency medical condition that places the patient's life in jeopardy," 1-LEG-ER-20, and section 622 expressly authorizes an abortion "to prevent the death of the pregnant woman." IDAHO CODE § 18-622(3)(a) (unamended version). Other serious complications of pregnancy include preeclampsia, the possibility of sepsis, a blood clot, or a placental abruption. *See* 1-LEG-ER-21–22. The court credited the government's contention that since section 622 does not authorize an abortion for these conditions, when EMTALA requires treatment, it is "impossible for physicians to comply with both statutes." 1-LEG-ER-35.

Section 622 fails obstacle preemption, the district court wrote, because "Idaho's criminal abortion law will undoubtedly deter physicians from providing abortions in some emergency situations." 1-LEG-ER-39.

EMTALA serves the purpose of "establish[ing] a bare minimum of emergency care that would be available to all people in Medicare-funded hospitals." 1-LEG-ER-38. Section 622 allegedly poses an obstacle to that purpose by "deter[ring] physicians from providing abortions in some emergency situations." 1-LEG-ER-39. In fact, the court complained that "the structure of Idaho's criminal abortion law—specifically that it provides for an affirmative defense rather than an exception—compounds the deterrent effect and increases the obstacle it poses to achieving the goals of EMTALA." 1-LEG-ER-39–40.

On these grounds, the district court concluded that section 622 "directly conflicts" with EMTALA, 42 U.S.C. § 1395dd(f), and is therefore preempted. 1-LEG-ER-32, 38. The court denied that *Dobbs* had any bearing. "*Dobbs* did not overrule the Supremacy Clause. Thus, even when it comes to regulating abortion, state law must yield to federal law." 1-LEG-ER-51.

The August Order thus "restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by [EMTALA]."

1-LEG-ER-51. Specifically, Idaho officials may not enforce section 622

against the following:

> [A]ny medical provider or hospital based on their performance of
> conduct that (1) is defined as an "abortion" under Idaho Code § 18-
> 604(1), but that is necessary to avoid (i) "placing the health of" a
> pregnant patient "in serious jeopardy"; (ii) a "serious impairment to
> bodily functions" of the pregnant patient; or (iii) a "serious dysfunc-
> tion of any bodily organ or part" of the pregnant patient, pursuant
> to 42 U.S.C. § 1395dd(e)(1)(A)(i)–(iii).

1-LEG-ER-52.

 This rendition of EMTALA omits relevant language guaranteeing

emergency medical care for unborn children. *See* 42 U.S.C. §§

1395dd(e)(1)(A)(i), 1395dd(e)(1)(B)(ii).

### 3. *Motions to Reconsider*

Two weeks later, the Legislature filed a Motion for Reconsideration.

2-LEG-ER-270; *see also* 2-LEG-ER-247. It explained that the district

court overlooked how the hearing showed that the federal government's

interpretation wars with EMTALA's text. 2-LEG-ER-253. EMTALA

obligates a physician to protect both "the health of the woman *or her*

*unborn child.*" *Id.* (quoting 42 U.S.C. § 1395dd(e)(1)(A) (emphasis

added)). The Legislature pointed out the bitter irony of construing that

statutory command to mean that EMTALA requires physicians to

perform abortions—a medical treatment, to state the obvious, which is fatal to an "unborn child." 2-LEG-ER-253–254. The Legislature also argued that precedents rejected this reading of EMTALA and repudiated "the government's attempt to use EMTALA as a wedge to leverage federal control over state abortion laws." 2-LEG-ER-256. As the Legislature explained, the court had been misled by the United States' overbroad reading of EMTALA when issuing an insupportable preliminary injunction. 2-LEG-ER-258. And the Legislature argued that those errors raise serious objections under the major questions doctrine, the Supremacy Clause, Article III, the Spending Clause, and the Tenth Amendment. *See* 2-LEG-ER-260.

### 4. May 2023 Order

Nine months after the preliminary injunction issued, the district court denied the Legislature's motion for reconsideration. *See* Memorandum Decision and Order of May 4, 1-LEG-ER-2 (May Order). Reaffirming its August Order, the court found "no reason to reconsider its decision … and the injunction stands." 1-LEG-ER-12. The court brushed aside arguments presented during the initial round of briefing, finding that the

Legislature and AGO "failed to carry their heavy burden on reconsideration." 1-LEG-ER-6.

The district court minimized an Idaho Supreme Court decision holding that section 622 is valid under the state constitution, *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132 (Idaho 2023). 2-LEG-ER-132.[3] Despite that result, the district court concluded that the Idaho decision "confirms each of the fundamental principles that underpinned this Court's decision." 1-LEG-ER-8. Although the Idaho court confirmed that section 622 does not apply to ectopic or nonviable pregnancies and that section 622's defenses take into account the subjective judgement of the individual physician who performed the abortion, these clarifications did not "fundamentally alter" the district court's analysis on preemption. *Id.* In the district court's opinion, what matters is that "EMTALA requires physicians to offer medical care that state law criminalizes." 1-LEG-ER-9. The May Order does not acknowledge amendments to section 622 that replace its affirmative defenses with exceptions. Nor does the decision below mention the Legislature's constitutional objections to the

---

[3] The Legislature and the Idaho Office of the Attorney General (AGO) filed supplemental briefing to address the implications of the Idaho Supreme Court decision. *See* 2-LEG-ER-84; 2-LEG-ER-103.

preliminary injunction. Accordingly, the court denied the Legislature's and AGO's motions for reconsideration, 2-LEG-ER-270, and left the preliminary injunction in place. 1-LEG-ER-12.

Other than denying the Legislature's and AGO's motions for reconsideration, the district court has taken no other steps to resolve the case. *Cf. Melendres v. Arpaio*, 695 F.3d 990, 1003 (9th Cir. 2012) (applauding a district court for "proceed[ing] to trial and otherwise mov[ing] towards a final judgment in the case without waiting for our interlocutory review").

## C.    Related State Court Litigation

While this case unfolded, parallel litigation took place before the Idaho Supreme Court. Planned Parenthood of the Great Northwest challenged all three Idaho abortion statutes as contrary to the Idaho Constitution. That state litigation holds important implications for the decision below.

Like the United States here, Planned Parenthood sought a preliminary injunction to prevent the operation of the Idaho abortion statutes, but the Idaho Supreme Court declined. *See Planned Parenthood Great N.W. v. State*, 2022 WL 3335696. That court held that the challenge

to section 622 lacked a "*substantial* likelihood of success on the merits" because Planned Parenthood was essentially "asking this Court to … declare a right to abortion under the Idaho Constitution when—on its face—there is none." *Id.* at *6.

Nor did Planned Parenthood fare any better on the merits. The Idaho Supreme Court held that it "cannot read a fundamental right to abortion into the text of the Idaho Constitution." *Planned Parenthood*, 522 P.3d at 1148. The court explained that "there simply is no support for a conclusion that a right to abortion was 'deeply rooted' at the time the [Idaho Constitution] was adopted." *Id.* All three Idaho statutes were sustained under the Idaho Constitution. *Id.* at 1147. Significant for this case, the court determined that "ectopic and non-viable pregnancies" are outside the scope of section 622. *Id.* at 1202. "Thus, treating an ectopic [or other non-viable pregnancy], by removing the fetus is plainly not within the definition of 'abortion' as criminally prohibited by [section 622]." *Id.* at 1203.

20

## D.   Appeal

A timely notice of appeal followed on July 3, 2023, ECF No. 138, 4-LEG-ER-587. This brief is filed within the deadline prescribed under the recent scheduling order. *See* Order of July 20, 2023, Dkt. No. 7.

## SUMMARY OF ARGUMENT

This appeal concerns a preliminary injunction founded on a non-existent conflict between federal and state law. The district court accepted the federal government's novel claim that EMTALA requires Medicare-funded hospitals to perform abortions as emergency care and that section 622 is preempted insofar as it conflicts with that requirement. 1-LEG-ER-32–47; 1-LEG-ER-9–12. For that reason, the district court issued a preliminary injunction barring the enforcement of section 622 insofar as it conflicts with EMTALA. *See* 1-LEG-ER-51–52.

That decision is incorrect and should be reversed. EMTALA is not a nationwide abortion mandate, section 622 does not prevent medical care for pregnant women in distress, and the federal-state conflict accepted by the district court as justification for enjoining section 622 is riddled with multiple defects.

21

Consider the federal side of the government's purported conflict. Two non-preemption clauses governing EMTALA preclude it from preempting a state law like section 622.

*First*, EMTALA says that it preempts only when state law "directly conflicts." 42 U.S.C. § 1395dd(f). That language excludes preemption based on an implied duty not in EMTALA's text. Since EMTALA does not expressly require hospitals to perform abortions as emergency care, Idaho's section 622 poses no conflict with it. *Second*, EMTALA is governed by a non-preemption provision in the Medicare Act, *id.* § 1395, of which EMTALA is a part. That provision—binding on EMTALA— denies federal authority to preempt state standards of medical care like Idaho's restrictions on abortion.

Even without these obstacles to preemption, the decision below is faulty. EMTALA repeatedly directs a hospital to deliver medical care to a pregnant woman *and* her unborn child. *See* 42 U.S.C. §§ 1395dd(e)(1)(A)(i), 1395dd(e)(1)(B)(ii), 1395dd(c)(1)(A)(ii), 1395dd(c)(2)(A). Although EMTALA does not describe particular forms of medical treatment, it unambiguously requires Medicare-funded hospitals to care for unborn children.

22

Construing EMTALA as a national abortion mandate also runs headlong into the major questions doctrine. Few issues are more politically consequential than deciding whether and when an abortion should be legal. EMTALA says nothing about abortion but repeatedly directs hospitals and physicians to deliver medical treatment to a pregnant woman and her unborn child. Yet the United States claims that this obscure statute guaranteeing emergency medical care for patients at Medicare-funded hospitals contains a *sub silentio* requirement to perform abortions. It is hard to imagine a tinier mousehole or a larger elephant than what the United States contrives here. *See Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes"). And it makes no difference that the United States as a whole rather than an individual agency asserts that power. Allowing the Executive Branch to assert significant executive power without clear congressional authority undermines the major questions doctrine's dual rationale of the separation of powers and sensible statutory construction.

The state side of the government's supposed conflict is no less mistaken. Section 622 does not bar doctors from treating a pregnant

woman's emergency medical condition. Section 622 authorizes a doctor to perform an abortion when, in the doctor's subjective medical judgment, it is necessary to save a woman's life or when (during the first trimester) a pregnancy results from rape or incest. IDAHO CODE § 18-622(2). Because the exception for medical necessity turns on subjective professional judgment, the doctor faces no threat of prosecution for good-faith measures intended to save a woman's life. *See id*. Beyond all this, Idaho law does not regard medical treatment for conditions like preeclampsia or ectopic pregnancy or other non-viable pregnancies as an abortion at all. *See Planned Parenthood*, 522 P.3d at 1202-03.

Beyond these errors of statutory construction, the preliminary injunction harbors unacknowledged constitutional defects. The preliminary injunction deprives the State of Idaho of the sovereign power to regulate abortion, which the Supreme Court recognized in *Dobbs*, 142 S. Ct. at 2228. Accepting the government's reading of EMTALA would eliminate state authority over abortion based on nothing more than the Executive Branch's interpretive creativity. What is more, the preliminary injunction violates the Tenth Amendment's anticommandeering principle by purporting to regulate Idaho state officials rather than the

24

hospitals to which EMTALA is addressed. Also, the district court's construction of EMTALA offends the Spending Clause. Congress's power to attach conditions to federal grants does not include the power to terminate grants for other programs to secure compliance with a federal directive or to impose such a condition retroactively. The lower court's reading of EMTALA transgresses both these limitations.

Finally, the other injunction factors strongly favor reversal. The Idaho Legislature continues to suffer irreparable harm every day that section 622 is enjoined, and the balance of equities tips in favor of vacating the injunction.

## ARGUMENT

## I. THE PRELIMINARY INJUNCTION RESTS ON FUNDAMENTAL ERRORS OF LAW.

### A. EMTALA Cannot Preempt Section 622.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Supreme Court precedent likewise establishes that since the United

States requested the preliminary injunction, it bears the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1996). Likelihood of success on the merits "is the most important" factor. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Unless the government satisfies that element, a court "need not consider the remaining" factors. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776–77 (9th Cir. 2011). The United States has failed to carry its heavy burden because the preliminary injunction issued by the district court rests on fundamental errors of law. It should not stand.

The sole basis for enjoining Idaho law is the district court's determination that "there will always be a conflict between EMTALA and Idaho Code § 18-622" because "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care." 1-LEG-ER-31, 32. But the district court lost sight of a vital principle. "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992). That principle should decide this case. EMTALA is governed by two non-preemption clauses

that should have prevented the outcome below. Since EMTALA does not preempt section 622, the decision below is incorrect.

>  1.  *Settled principles determine whether federal law preempts state law.*

"[U]nder our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Congress may, in the exercise of its enumerated powers, displace state law. *See Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1148 (9th Cir. 2010). When that occurs the Supremacy Clause prescribes a choice-of-law rule, that federal law "shall be the supreme Law of the Land." U.S. CONST. art. VI. Preemption falls into recognized categories: field, conflict, and express. *See Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016) (citation omitted).

EMTALA is governed by two express preemption clauses, 42 U.S.C. §§ 1395dd(f) and 1395. These clauses mark the boundaries of EMTALA's preemptive scope. When a statute contains an express preemption clause, courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Precisely limning

how far a federal statute affects state law is critical. The task is to "identify the domain expressly pre-empted by that language." *Medtronic v. Lohr*, 518 U.S. 470, 484 (1996) (cleaned up). And it is evident that "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S. at 517. That is why "express provisions for preemption of some state laws imply that Congress intentionally did not preempt state law generally, or in respects other than those it addressed." *Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994).

The question, then, is whether the express preemption clauses governing EMTALA support "the pre-emptive reach" justifying the preliminary injunction. *Cipollone*, 505 U.S. at 517. They do not.

> ### 2. *EMTALA preempts state law only when a state law "directly conflicts"—and section 622 does not.*

EMTALA contains an express "non-preemption provision." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001). It says, "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Non-

preemption is the baseline: EMTALA generally "do[es] *not* preempt any State or local law requirement." *Id.* (emphasis added). Preemption occurs only where state law "*directly* conflicts with a requirement of this section," *Id.* (emphasis added). The adverb matters. A purported conflict between EMTALA and state law must be *direct. Cf. Coons v. Lew*, 762 F.3d 891, 902 (9th Cir. 2014) (voiding an Arizona statute for directly conflicting with the Affordable Care Act).

Circuit precedent affirms that EMTALA does not dictate particular standards of medical care. *Eberhardt v. Los Angeles*, 62 F.3d 1253 (9th Cir. 1995), rejected an EMTALA claim against a physician for not "conduct[ing] a psychiatric evaluation or a mental status evaluation" for a man later killed by the police following a violent psychiatric episode. *Id.* at 1255. "EMTALA clearly declines to impose on hospitals a national standard of care in screening patients." *Id.* at 1258. The Court explained that "Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay." *Id.*

Other decisions by this Court are no less insistent that EMTALA does not prescribe standards of medical care beyond the statute's overt

requirements. *See Baker*, 260 F.3d at 993 ("The statute is not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice."); *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1166 (9th Cir. 2002) ("EMTALA, however, was not enacted to establish a federal medical malpractice cause of action nor to establish a national standard of care.").

Other circuits agree that EMTALA does not preempt state standards of medical care. *Hardy v. New York City Health Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999) (reading EMTALA's non-preemption clause as evidence "that one of Congress's objectives was that EMTALA would peacefully coexist with applicable state 'requirements'"); *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996) ("[T]the legal adequacy of that [stabilizing] care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt."); *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) ("EMTALA was not intended to establish guidelines for patient care, to replace available state remedies, or to provide a federal remedy for medical negligence.") (citations omitted).

EMTALA preempts state law only when it contradicts with the statute's express requirements. *Root v. New Liberty Hospital District*, 209 F.3d 1068 (8th Cir. 2000), illustrates. There, the Eighth Circuit held that EMTALA preempted a Missouri statute immunizing state political subdivisions like hospital districts from tort suits. Because that law directly conflicts with EMTALA's provision allowing for a personal damage suit, 42 U.S.C. § 1395dd(d)(2)(A), the court readily concluded that "Missouri's sovereign immunity statute must yield." *Id.* at 1070. *Root* shows why the decision below is mistaken. The district court's ruling that EMTALA preempts Idaho law rests on the premise that EMTALA contains an implied duty of hospitals to perform abortions as emergency care. 1-LEG-ER-14. But *Root* preempted Missouri's sovereign immunity statute only because EMTALA expressly authorizes what Missouri law prohibited. *See id.* at 1069. Since EMTALA has no express requirement requiring abortion, it does not preempt section 622. *See* 42 U.S.C. § 1395dd(f).

31

###### 3. Under the Medicare Act, EMTALA cannot preempt state laws setting medical standards or regulating the practice of medicine—which is all that section 622 does.

EMTALA's preemptive reach is further shortened by a separate non-preemption clause in the Medicare Act. It provides that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided … or to exercise any supervision or control over the administration or operation of any such institution, agency, or person." 42 U.S.C. § 1395. This clause establishes that "the practice of medicine is, in general, a subject of state regulation." *Pennsylvania Med. Soc'y v. Marconis*, 942 F.2d 842, 846 n.4 (3d Cir. 1991); *accord In re Pharm. Indus. Average Wholesale Price Lit.*, 582 F.3d 156, 175 (1st Cir. 2009) (construing section 1395 to mean that the Medicare Act "reserves a regulatory role to the states" and "demonstrates Congress's intent to minimize federal intrusion into the area."). Courts have interpreted section 1395 as a bar to preempting state consumer protection laws, *see id.*, and state standards of medical care, *see McCall v. PacifiCare of Cal., Inc.*, 21 P.3d 1189, 1197 (Cal. 2001) (the Medicare Act does not displace state tort law).

32

Because EMTALA is bound by section 1395 it cannot be construed as "a mechanism to supervise or control the practice of medicine." *American Acad. of Ophthalmology, Inc. v. Sullivan*, 998 F.2d 377, 387 (6th Cir. 1993).

> **4.** *The district court misapplied or disregarded the express preemption clauses governing EMTALA.*

The district court lost sight of EMTALA's limited "pre-emptive reach." *Cipollone*, 505 U.S. at 517.

It was wrong to conclude that a state law "directly conflicts" with EMTALA based on impossibility and obstacle preemption. *See* 1-LEG-ER-32 (citing *Draper*, 9 F.3d at 1393). In the court's opinion, it is physically impossible to obey both EMTALA and section 622 because "federal law requires the provision of care and state law criminalizes that very care." *Id.* Section 622 poses obstacle preemption too, on the court's view that "Idaho's criminal abortion statute … will undoubtedly deter physicians from providing abortions in some emergency situations. That, in turn, would obviously frustrate Congress's intent to ensure adequate emergency care for all patients who turn up in Medicare-funded hospitals." 1-LEG-ER-39.

The May Order reiterated this line of argument, with minor qualifications. Although the Idaho Supreme Court sustained section 622 as constitutional, the district court concluded that section 622 embodies a subjective standard for physicians invoking the statute's affirmative defenses and held that section 622 has no bearing on the medical treatment of ectopic or nonviable pregnancies. 1-LEG-ER-8. The court below ruled that these important clarifications of Idaho law "do not fundamentally alter this Court's preemption analysis." *Id*.

But the May Order (like the August Order before it) neglects the teaching that "a court should construe [EMTALA's] preemptive effect as narrowly as possible." *Draper*, 9 F.3d at 1393. It was an error of law to conclude that section 622 "directly conflict[s]" with EMTALA based on an implied duty to perform abortions on which EMTALA is silent. 42 U.S.C. § 1395dd(f). EMTALA's language alone leaves an Idaho physician entirely free to comply with both that statute and section 622. Nothing in section 622 prevents a doctor from performing an emergency screening examination or treating emergency medical conditions experienced by a pregnant woman. And section 622 poses no obstacle to EMTALA's purposes. EMTALA reflects the policy choice to mandate emergency

34

medical care for both a pregnant woman and her unborn child—and
section 622 is fully aligned with those aims. *See* 42 U.S.C. § 1395dd(e)(1)
(defining *emergency medical condition* in part as a threat to "the health
of the woman or her unborn child").

*Draper* is not to the contrary. There, the Court held that EMTALA's
two-year statute of limitations did not preempt an Oregon law imposing
a one-year notice-of-claim requirement. 9 F.3d at 1393–94. While
interpreting EMTALA's non-preemption clause in terms of impossibility
and obstacle preemption, the Court stressed that it would "construe
[EMTALA's] preemptive effect as narrowly as possible." *Id.* at 1393. That
approach is consistent with the need to "respect legislative provisions
that explicitly address preemption." *Id.* By contrast, the district court
considered whether EMTALA preempts section 622 without respecting
*Draper*'s cautious approach to EMTALA's baseline of non-preemption.
*See* 1-LEG-ER-32.

Strikingly, neither of the district court's orders mentions the
Medicare Act's non-preemption clause, 42 U.S.C. § 1395. That clause
forecloses EMTALA as a basis for preempting section 622, which
embodies both a state standard of medical care (proscribing abortion

under particular circumstances) and a regulation of the medical profession (prescribing the suspension or loss of a medical license for violating the statute.) *See* IDAHO CODE § 18-622(1). As such, section 622 is the kind of state law that Congress intended to operate free from federal "supervision or control." 42 U.S.C. § 1395.

The district court misapplied EMTALA's non-preemption clause by ruling that an implied duty to perform abortions "directly conflicts" with the statute, 42 U.S.C. § 1395dd(f) and by not considering the non-preemption clause under the Medicare Act, *id.* § 1395. Consequently, the preliminary injunction exaggerates EMTALA's "pre-emptive reach." *Cipollone*, 505 U.S. at 517. We urge the Court to reverse the decision below for that reason alone. Such an outcome would provide complete relief to the Legislature while allowing the Court to avoid other issues.

## B. EMTALA Does Not Mandate Abortion.

### 1. *EMTALA's requirement of stabilizing care does not imply a duty to make abortion available.*

Reversal is no less warranted if the Court decides to address whether EMTALA can be fairly interpreted as a requirement for Idaho physicians to perform abortions regardless of state law. The district court's central ruling is that "EMTALA obligates the treating physician

to provide stabilizing treatment, including abortion care," 1-LEG-ER-32. That conclusion flouts statutory text and context alike.

Any duty under EMTALA to perform abortions arises by implication. The statute nowhere uses the word *abortion* or anything like it. The federal-state conflict at the foundation of the preliminary injunction rests on an implication drawn from EMTALA's spare language requiring a hospital to provide "stabilizing treatment" when a screening exam concludes that a patient has an emergency medical condition. 42 U.S.C. § 1395dd(b) (heading); *accord id.* § 1395dd(b)(1)(A) (requiring "such treatment as may be required to stabilize the [emergency] medical condition").

EMTALA's text refutes the government's mandate-by-implication. The statute does not specify what medical treatment satisfies the duty to provide "stabilizing treatment." *Id.* at § 1395dd(b). The statutory heading from which that phrase is taken actually says, "Necessary stabilizing treatment for emergency medical conditions and labor." *Id.* The words "and labor" suggest the need for medical care to treat a pregnant woman in labor, just as the definition of "emergency medical condition" expressly provides. *Id.* § 1395dd(e)(1)(A), (B). Delving more deeply into EMTALA,

the definition of *stabilized* undermines the idea of abortion as mandated medical care. For all patients, EMTALA requires such care to mean that "no material deterioration of the [emergency medical] condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility ...." *Id.* at § 1395dd(e)(3)(B). But the corresponding definition of *emergency medical condition* requires emergency care whenever a pregnant woman has a medical condition that places "the health of the woman *or her unborn child* in serious jeopardy." *Id.* § 1395dd(e)(1)(A)(i) (emphasis added). Since abortion places the unborn child in "serious jeopardy"—fatal jeopardy, in fact—that medical procedure is outside the meaning of "stabilizing treatment" under EMTALA. *Id.* § 1395dd(b). Augmenting that point, EMTALA's only approved form of stabilizing treatment for a pregnant woman with contractions is delivering her child. *Id.* § 1395dd(e)(3)(A). For the government's claim to work, one must accept that a statute expressly requiring emergency care for unborn children and endorsing the delivery of a child as a means of stabilizing a pregnant woman with contractions also implies the duty to perform abortions. That implication simply makes no sense.

38

2.    *Construing EMTALA as an abortion mandate contradicts the statute's repeated injunction to provide medical care for unborn children.*

Construing "stabilizing treatment," *id.* § 1395dd(b), to mean that hospitals not only may—but must—perform abortions despite contrary state law defies provisions expressing Congress's commitment to unborn children. Congress left no doubt that federally funded hospitals must provide medical treatment for an unborn child. EMTALA contains four provisions requiring emergency care for both a pregnant woman and her unborn child. *See* 42 U.S.C. §§ 1395dd(e)(1)(A)(i); 1395dd(e)(1)(B)(ii); 1395dd(c)(1)(A)(ii); and 1395dd(c)(2)(A).

The August Order (and by reaffirmance, the May Order) excises EMTALA's references to the protection of unborn children from the preemption analysis. That untoward result follows from disregarding and misstating portions of EMTALA's definition of "emergency medical condition." *Id.* § 1395dd(e)(1). Since that definition is the fulcrum on which the statute's screening, stabilizing, and transfer duties depend, getting the definition wrong is fundamental. *See id.* §§ 1395dd(a)–(c).

The August Order casts aside half of that definition as it concerns "a pregnant woman who is having contractions." *Id.* § 1395dd(e)(1)(B).

The only proffered explanation is that it regarded subsection (B) as "not relevant to the issues before the Court." 1-LEG-ER-17 n.1.

That footnote is extraordinary. The United States has challenged the validity of section 622 on the theory that EMTALA commands Medicare-participating hospitals to perform abortions to stabilize pregnant women with emergency medical conditions. *See* 4-LEG-ER-579. EMTALA's description of when "a pregnant woman who is having contractions" experiences an emergency medical condition is plainly relevant. 42 U.S.C. § 1395dd(e)(1)(B). Turning a blind eye to subsection (B) flouts the "well-established principle of statutory construction that legislative enactments should not be construed to render their provisions mere surplusage." *Am. Vantage Cos. v. Table Mountain Rancheria*, 292 F.3d 1091, 1098 (9th Cir. 2002) (cleaned up); *accord Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.") (citation omitted). Surplusage is exactly what subsection (B) becomes in the decision below.

Reading subsection (B) confirms its relevance. It provides that a pregnant woman with contractions has an emergency medical condition, within the meaning of the statute, if a physician determines "(i) that there

is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child." 42 U.S.C. § 1395dd(e)(1)(B). Transferring a woman in that condition to another facility is forbidden unless there is time enough for "a safe transfer … *before* delivery." *Id.* § 1395dd(e)(1)(B)(i) (emphasis added). This limitation avoids the prospect of delivering a child during an ambulance ride or in a related circumstance away from the safety and comfort of a hospital. Then there is a general prohibition on any transfer that "may pose a threat to the health or safety of the woman *or the unborn child.*" *Id.* § 1395dd(e)(1)(B)(ii) (emphasis added). Even the prospect of such a threat renders a transfer illegal. The hospital is obliged to consider not only the unborn child's life, but his or her "health or safety." *Id.*; *accord* 42 C.F.R. § 489.24 (same).

The district court's determination to brush aside subsection (B), 1-LEG-ER-17 n.1 clashes with the opening sentences of the August order. "Pregnant women in Idaho routinely arrive at emergency rooms experiencing severe complications. The patient might be spiking a fever, experiencing uterine cramping and chills, *contractions*, shortness of

breath, or significant vaginal bleeding." 1-LEG-ER-14 (emphasis added). If these conditions are a concern—and they should be—then subsection (B) is not only relevant but potentially conclusive.

Having set aside subsection (B), the August Order strikes out EMTALA's remaining reference to the medical treatment of an unborn child. Subsection (A) of the statute's definition of "emergency medical condition" provides that such a condition exists when the absence of "immediate medical attention" probably will result in "placing the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A) (emphasis added). Yet the court unaccountably removes the phrase "or her unborn child" from its injunction. *See* 1-LEG-ER-52 (prohibiting the enforcement of section 622 insofar as an abortion is "necessary to avoid (i) 'placing the health of' a pregnant patient 'in serious jeopardy'").

Through these two basic errors—dismissing subsection (B) as irrelevant and removing the phrase "or unborn child" from subsection (A)—the district court effectively rewrites EMTALA. Not only does the court's interpretive carpentry violate the canon against rendering

42

statutory text "mere surplusage." *Am. Vantage Cos.*, 292 F.3d at 1098. That approach transforms EMTALA from a humane measure guaranteeing emergency medical care for a pregnant woman and her unborn child into a measure protecting the mother alone.

> 3.  *Construing EMTALA as an abortion mandate is contrary to how Congress legislates concerning abortion.*

From the larger context of congressional lawmaking, the decision below is at odds with Congress's established pattern of speaking plainly when it legislates regarding abortion. *See, e.g.*, 42 U.S.C. § 300a-6 (barring the use of federal funds "in programs where abortion is a method of family planning"); *id.* § 300z-10(a) (specifying that "grants may be made only to projects or programs which do not advocate, promote, or encourage abortion"); *id.* § 2996f(b)(8) (prohibiting the federal funding for the Legal Services Corporation for use in "any proceeding or litigation which seeks to procure a nontherapeutic abortion"). Federal laws protecting the conscience rights of healthcare workers and institutions likewise use the word *abortion. See, e.g.*, Church Amendments, *id.* § 300a-7(b)(1) (forbidding public officials to require an "individual to perform or assist in the performance of any sterilization procedure or abortion" if it "would be contrary to his religious beliefs or moral convictions"); the

Weldon Amendment, 8 Pub. L. 117-103, div. H, title V General Provisions, § 507(d)(1) (withholding federal appropriations from any unit of federal or state government if it "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions"); Affordable Care Act, 42 U.S.C. § 18023(b)(4) ("No qualified health plan offered through an Exchange may discriminate against any individual health care provider or health care facility because of its unwillingness to provide, pay for, provide coverage of, or refer for abortions.").

### 4. *The decision below is inconsistent with a related case on appeal before the Fifth Circuit.*

The district court's construction of EMTALA has already been rejected by another federal court. *Texas v. Becerra*, 623 F. Supp. 3d 696, 739 (N.D. Tex. 2022), granted an injunction for the State of Texas preventing HHS and CMS from enforcing the same EMTALA-as-abortion-mandate theory pressed here. That theory appeared in an HHS Guidance document issued after an executive order directed federal agencies to "protect and expand access to abortion." Exec. Order No. 14,076, 87 Fed. Reg. 42053 (Jul. 8, 2022).

44

Four reasons led the Texas court to rule that the State likely would succeed on the merits. (1) In the court's view, the "HHS Guidance likely exceeds its statutory authority and is not a permissible construction of EMTALA." *Becerra*, 623 F. Supp. 3d at 724. (2) EMTALA "creates obligations to stabilize *both* a pregnant woman and her unborn child." *Id.* at 725 (emphasis added). Even though this dual obligation can be in tension, as when a pregnant woman experiences a medical emergency, EMTALA's text does not address that potential conflict and the United States exceeded its statutory authority by imposing a national policy that proffers abortion as the only acceptable treatment. *Id.* at 726. (3) Given the express preemption clauses in EMTALA and the Medicare Act, the court found that Congress intended for "EMTALA [to] peacefully coexist with applicable state requirements." *Id.* at 727 (quoting *Hardy*, 164 F.3d at 795). (4) Lastly, the district court stressed that the HHS Guidance was unprecedented—that "EMTALA has never been construed to preempt state abortion laws." *Id.* at 735. This offered more evidence that the HHS's reading of EMTALA cannot be sustained. *Id.*

Therefore, the Texas district court issued a preliminary injunction, which it later converted to a permanent injunction barring CMS and

HHS from enforcing the guidance document. *See Texas v. Becerra*, No. 5-22-cv-00185, ECF No. 109 (N.D. Tex. Jan. 13, 2023). That ruling is on appeal before the Fifth Circuit.

> ### 5. Construing *EMTALA* as an abortion mandate transgresses the major questions doctrine.

The United States' whole case turns on the assertion that EMTALA requires Medicare-participating hospitals to perform abortions as emergency medical care. *See* 4-LEG-ER-585. Reading EMTALA that way collides with the major questions doctrine. It presumes that Congress will "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). When that occurs, "something more than a merely plausible textual basis" is necessary, *W. Va. v. EPA*, 142 S. Ct. 2587, 2609 (2022): only "clear congressional authorization" will do. *Util. Air*, 573 U.S. at 324. Indeed, "exceedingly clear language" is necessary if Congress "wishes to significantly alter the balance between federal and state power." *U.S Forest Serv. v. Cowpasture River Preserv. Assn.*, 140 S. Ct. 1837, 1850 (2020). Requiring "a clear statement," *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023), of congressional authority to justify the consequential exercise of executive power rests on "both separation of

powers principles and a practical understanding of legislative intent." *W. Va.*, 142 S. Ct. at 2609. Like other clear-statement rules, the major questions doctrine "ensure[s] Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005).

Only months ago, *Biden*, 143 S. Ct. at 2355, applied the major questions doctrine to invalidate the Department of Education's student-loan-forgiveness program. *Id.* at 2375. *Biden* marks the fourth case since 2021 where the Supreme Court has relied on the major questions doctrine in significant challenges to federal law. *See W. Va.*, 142 S. Ct. at 2616 (invalidating an EPA rule because "[a] decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body"); *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) (setting aside an OSHA standard requiring large employers to ensure that their employees were vaccinated against COVID-19); *Ala. Assoc. of Realtors v. Dep't of Health and Hum. Servs.*, 141 S. Ct. 2485 (2021) (voiding a nationwide eviction moratorium imposed by the Centers for Disease Control).

47

Familiar "telltale sign[s]" show that this is a classic major questions doctrine case. *Biden*, 143 S. Ct. at 2382 (Barrett, J., concurring).

*First*, the United States "claims to discover in a long-extant statute an unheralded power" to control national abortion policy. *Util. Air*, 573 U.S. at 324. Accepting the government's interpretation of EMTALA "would bring about an enormous and transformative expansion in [the Executive Branch's] regulatory authority without clear congressional authorization." *Id.* Construing EMTALA, a narrow measure for ensuring access to emergency medical care, as an unyielding requirement to provide abortions regardless of contrary state law is nothing short of "transformative." *Id.* By the government's logic, controversial medical treatments of all kinds can be inferred from the wonderfully versatile phrase "necessary stabilizing treatment." 4-LEG-ER-574 (quoting 42 U.S.C. § 1395dd). But the idea that Congress hid a federal abortion mandate in a remote corner of the Medicare Act is wholly implausible.

*Second*, the government's reading of EMTALA is unprecedented. The Northern District of Texas held so in *Becerra*. 623 F. Supp. 3d at 735 ("EMTALA has never been construed to preempt state abortion laws").

Although proving a negative is notoriously difficult, evidence of that novelty appears by comparing two CMS guidance documents. Three days after President Biden directed federal agencies to heighten federal protections for abortion access, Exec. Order No. 14,076, 87 Fed. Reg. 42053 (Jul. 8, 2022), CMS issued a memorandum purporting to remind hospitals of their duties under EMTALA. Among them is this:

> ***If a physician believes that a pregnant patient*** *presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician **must** provide that treatment. When a state law prohibits abortion and does not include an exception for the life of the pregnant person — or draws the exception more narrowly than EMTALA's emergency medical condition definition — **that state law is preempted**.*

CMS Center for Clinical Standards and Quality, QSO-22-22-Hospitals ("Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss"), at 1 (July 11, 2022) (emphasis in original). This paragraph, which captures the Executive Branch's legal theory in this case, does not appear in the previous CMS guidance memo on EMTALA issued in 2021. *See* CMS Center for Clinical Standards and Quality, QSO-21-22-Hospitals ("Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss") (Sep. 17, 2021). Its novelty is another

strike against the claim that EMTALA requires Idaho hospitals to perform abortions.

*Third*, the Attorney General, who brought this suit, lacks the expertise to determine whether abortion is the appropriate form of medical treatment for certain emergency medical conditions. *Gonzales v. Oregon*, 546 U.S. 243 (2006), is instructive. There, the Attorney General defended an interpretive rule restricting the use of controlled substances for physician-assisted suicide. The Court concluded that "the authority claimed by [him] is both beyond his expertise and incongruous with the statutory purposes and design." *Id.* at 267. Significantly for this case, the purported "implicit delegation" of such authority was "not sustainable." *Id.* An "oblique form" of statutory authority is flatly insufficient when the assertion of executive power concerns a matter of "earnest and profound debate across the country." *Id.* (quotation omitted). Exactly the same can be said of the United States' claim that EMTALA confers an "implicit delegation" of authority to compel physicians to perform abortions prohibited by state law based on the statute's "oblique" language. *Id.*

*Fifth*, the political implications of the federal government's supposed authority here are far-reaching. The United States' complaint

claims that EMTALA requires physicians at Idaho hospitals to perform abortion procedures as "stabilizing treatment" for a pregnant woman. 4-LEG-ER-576. That claim is a matter of "vast … political significance," *Util. Air*, 573 U.S. at 324 (quotation omitted). National controversy will erupt if the Executive Branch is allowed to exercise "highly consequential power [over abortion] beyond what Congress could reasonably be understood to have granted," *W. Va.*, 142 S. Ct. at 2609, and to "significantly alter the balance between federal and state power," without "exceedingly clear language" from Congress. *Cowpasture River*, 140 S. Ct. at 1849-50. The power to regulate abortion would then rest with the Justice Department rather than with members of Congress or elected officials in every state.

Together, these signs of executive overreach mean that the United States must identify "more than a merely plausible textual basis" to justify the assault on Idaho law. *W. Va.*, 142 S. Ct. at 2609. The government's burden is to identify "'clear congressional authorization' for the power it claims." *Id.* (quoting *Util. Air*, 573 U.S. at 324).

51

Clear authorization is exactly what the United States lacks. The only statutory text remotely supporting its claim is EMTALA's requirement to deliver "such treatment as may be required to stabilize the medical condition" of a patient with an emergency medical condition. 42 U.S.C. § 1395dd(b)(1). This generic duty to provide emergency care is the "wafer-thin reed" on which the United States leans to seize "sweeping power" over abortion. *Ala. Assoc.*, 141 S. Ct. at 2489.

Contriving an abortion mandate from EMTALA disregards Supreme Court precedents under the major questions doctrine. Like the CDC's eviction moratorium, the Executive Branch's weaponization of EMTALA asserts "a breathtaking amount of authority." *Id*. And like the EPA's electricity generation rule, the United States has interpreted EMTALA as a national abortion mandate that "Congress had conspicuously and repeatedly declined to enact itself," *W. Va.*, 142 S. Ct. at 2610. *See* Women's Health Protection Act of 2023, H.R. 8296, 117th Cong. §§ 4(a)(1), 5(a)(1) (2022) (proposed legislation prescribing a federal right to "abortion services" that would "supersede" contrary state law); S. 4132, 117th Cong. §§ 3(a)(1), 4(a)(1) (2022) (same). It is impossible to square

these results with controlling precedents insisting on congressional clarity in other matters of national significance. Forcing unwilling states like Idaho to accept federal policy on abortion is a "decision of such magnitude and consequence" that it belongs (if at all) to Congress—not to the interpretive creativity of the Justice Department. *W. Va.*, 142 S. Ct. at 2616.

*Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), poses no obstacle to applying the major questions doctrine. True, *Mayes* held that the doctrine does not apply to actions of the President under the Procurement Act. *See id.* at 933. Here, the complaint is founded on EMTALA, which does not delegate discretionary authority to the President. *See* 4-LEG-ER-572. Also unlike *Mayes*, political accountability is a live issue since the suit is brought by the United States under the direction of the Attorney General, an appointed official—not an elected one. *See* 28 U.S.C. § 503. Applied here, the major questions doctrine would not interfere with the President's duty to see that the laws are faithfully executed. The leeway owed to a President carrying out that duty under an express grant of congressional authority, *see Mayes*, 67 F.4th at 933, is misplaced when considering the lawfulness of asserted executive authority without a presidential overlay.

53

Excusing the United States from the major questions doctrine merely because the lawsuit is brought by the Department of Justice rather than by an individual agency would flout Supreme Court precedent. *See, e.g.*, *Gonzales*, 546 U.S. at 267–68 (Attorney General lacked authority from "oblique" statutory provision to criminalize assisted suicide). Besides, declining to hold the United States to account under the major questions doctrine also would frustrate the doctrine's twin rationales of "separation of powers principles and a practical understanding of legislative intent." *W. Va.*, 142 S. Ct. at 2609.

Indeed, the potential consequences of sanctioning the United States' newly discovered power under EMTALA are staggering. The government's essential claim is that EMTALA's duty of stabilizing treatment is a blank page that the Executive Branch may fill with its preferred medical policy. By that logic, the United States could impose a federal mandate to perform sterilization procedures, gender-transitioning procedures, or virtually any kind of medical procedure—so long as the purported mandate can be dressed up as "necessary stabilizing treatment." 42 U.S.C. § 1395dd(b). Such an approach would displace Congress's role as the Nation's lawmaker, in a quintessential

54

violation of the major questions doctrine. Considering that possibility, any quibble about the differences between the United States' lawsuit here and an individual agency action should be set aside.

### C.    The District Court Misconstrued Section 622.

Errors of law also skewed the district court's analysis of section 622. By its account, "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care. But regardless of the pregnant patient's condition, Idaho statutory law makes that treatment a crime." 1-LEG-ER-32. In fact, the lower court characterized section 622 as an impediment to decent medical care for a pregnant woman in distress. *See* 1-LEG-ER-49–50 (describing "the pregnant patient, laying on a gurney in an emergency room facing the terrifying prospect of a pregnancy complication that may claim her life" but where "her doctors feel hobbled by an Idaho law that does not allow them to provide the medical care necessary to save her health and life"). That depiction of section 622 is false and misleading.

False because section 622 does not make it a crime to deliver needed medical treatment to a pregnant woman.

55

*First*, the statute wholly exempts a woman who obtains an abortion. IDAHO CODE § 18-622(5).

*Second*, not all medical procedures to terminate a pregnancy qualify as an abortion under Idaho law. By statute, *abortion* is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id.* § 18-604(1). The Idaho Supreme Court has definitively held that section 622 does not cover ectopic or other non-viable pregnancies. *See Planned Parenthood*, 522 P.3d at 1202–03. A doctor faces no liability if giving a pregnant mother needed medical treatment accidentally results in the death of an unborn child. *See* IDAHO CODE §§ 18-622(4) (statutory exemption); *id.* § 18-604(1) (defining *abortion* as using some means "to intentionally terminate" a pregnancy).

*Third*, recent amendments clarify that section 622 contains straightforward exceptions rather than affirmative defenses. *See* H.B. 374, 67th Leg., 1st Sess. (Idaho 2023). Section 622 now provides that an abortion to save a woman's life or (during the first trimester) to address a pregnancy from rape or incest "shall not be considered criminal

abortions." IDAHO CODE §§ 18-622(2); 18-622(2)(b). Nor is a physician vulnerable to prosecution because he performed an abortion believing that a woman's life was at risk. A mistake of fact is no basis for prosecution. These statutory exceptions protect a physician who acts "in his good faith medical judgment and based on the facts known to the physician at the time." *Id.* §§ 18-622(2)(a)(i), (ii). Given that safe harbor, section 622 should no longer "deter physicians from providing abortions in some emergency situations." 1-LEG-ER-39; *accord* 1-LEG-ER-7. Yet the May Order neglects to acknowledge these important amendments.

The district court's depiction of section 622 is misleading as well. Far from posing an irrational obstacle to decent medical care, section 622 simply restores Idaho law to its pre-*Roe* condition. *See Planned Parenthood*, 2022 WL 3335696, at *6 (Abortion was a crime under Idaho law from territorial days until *Roe*). With exceptions for a mother's life or pregnancies resulting from rape or incest, section 622 fairly reflects Idaho's "history and traditions" under which a nontherapeutic "abortion was viewed as an immoral act and treated as a crime." *Planned Parenthood*, 522 P.3d at 1148.

57

In sum, the federal-state conflict for which the district court issued a preliminary injunction is false at both ends. Reading EMTALA as an abortion mandate defeats Congress's evident intent to secure emergency medical care for both a pregnant woman and her unborn child, and Idaho's section 622 is not the draconian measure depicted by the lower court. Because there is no conflict between EMTALA and section 622, the preliminary injunction has no foundation. It should be vacated and the decision below reversed.

## D. Enjoining Section 622 Because of EMTALA Is Unconstitutional.

### 1. *The preliminary injunction violates the Tenth Amendment.*

Under the federal Constitution, "both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). This system of dual sovereignty means that "the National Government possesses only limited powers [and] the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854 (2014). That essential principle of federalism is enshrined in the Tenth Amendment, which promises that "powers not delegated to the United States" by the Constitution are "reserved to the States respectively, or the people." U.S.

58

CONST. amend. X. The decision below clashes with the Tenth Amendment in two respects.

*First*, enjoining section 622 unlawfully deprives the State of Idaho of its reserved power to regulate abortion. The Supreme Court has held that the Constitution reserves that power to the states.

> We therefore hold that the Constitution does not confer a right to abortion. *Roe* and *Casey* must be overruled, and the authority to regulate abortion must be returned to the people and their elected representatives.

*Dobbs*, 142 S. Ct. at 2279.

Implications of deep constitutional importance flow from that holding. *Dobbs* contemplates that abortion will be regulated in a way that "will be more sensitive to the diverse needs of a heterogenous society," that "increases opportunity for citizen involvement in democratic process," that "allows for more innovation and experimentation in government," and that "makes government more responsive by putting the States in competition for a mobile citizenry." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (citation omitted). All these virtues of a federal system guarded by the Tenth Amendment naturally follow from *Dobbs's* determination that states hold the power to regulate abortion.

The decision below thwarts the exercise of that sovereign power. By enjoining Idaho's section 622 based on an implied duty under EMTALA, the district court has prevented Idaho from governing itself as *Dobbs* assured all states that they were free to do. Nor is the district court's explanation convincing. Its decision rests on the Supremacy Clause, which the court described as a rule that "state law must yield to federal law when it's impossible to comply with both." 1-LEG-ER-16. The court added that "*Dobbs* did not overrule the Supremacy Clause.... [E]ven when it comes to regulating abortion, state law must yield to conflicting federal law." 1-LEG-ER-51. The court below misconceived the limits of the Supremacy Clause. True, "if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment." *Raich v. Gonzales (Raich II)*, 500 F.3d 850, 867 (9th Cir. 2007). But "[t]his is an extraordinary power in a federalist system … that we must assume Congress does not exercise lightly." *Gregory*, 501 U.S. at 460. That is why courts insist on "exceedingly clear language" if federal law is to "alter the balance between federal and state power," *Cowpasture River*, 140 S. Ct.

at 1849-50. EMTALA is "exceedingly clear," *id.*—but in the opposite direction. Yet the district court missed the federalism implications of reading EMTALA as an abortion mandate.

*Second*, the preliminary injunction offends the anticommandeering doctrine, which acknowledges that "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). This means that "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York v. United States*, 505 U.S. 144, 166 (1992). In *Murphy*, the Supreme Court invalidated a federal statute prohibiting states from authorizing sports gambling. *Murphy* explained that for a federal statute to preempt state law, it must satisfy two conditions: (1) "represent the exercise of a power conferred on Congress by the Constitution"; (2) the "provision at issue must be best read as one that regulates private actors." 138 S. Ct. at 1479. The sports gambling provision failed that test. In the Court's view, "there is simply no way to understand the provision prohibiting state authorization as anything other than a direct

command to the States. And that is exactly what the anticommandeering rule does not allow." *Id.* at 1481.

Circuit precedent is no less forceful in applying the anticommandeering doctrine. In *United States v. California*, 921 F.3d 865 (9th Cir. 2019), the United States challenged California laws "expressly designed to protect [state] residents from federal immigration enforcement." *Id.* at 872. There too, the federal government invoked the Supremacy Clause "and moved to enjoin [the laws'] enforcement." *Id.* at 873. The district court denied the injunction and this Court affirmed. The United States claimed that the Immigration and Nationalization Act, 8 U.S.C. § 1101 *et. seq.*, preempted California law because it directs state law enforcement agencies not to transfer a person to federal immigration authorities "unless authorized by a judicial warrant or judicial probable cause determination." *California*, 921 F.3d at 886 (quoting Cal. Gov't Code § 7284.6(a)(4)). Critically, this Court discerned that "the specter of the anticommandeering rule distinguishes the case before us from the preemption cases on which the United States relies." *Id.* at 888. That rule, the Court explained, "permits a state's refusal to adopt preferred federal policies." *Id.* at 889. Preemption does not apply because federal

immigration law "does not require any particular action on the part of California or its political subdivisions." *Id.* at 889. Without a clear statutory mandate, "the federal government was free to *expect* as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment." *Id.* at 891 (emphasis in original).

So too, here. The August Order "restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by [EMTALA] …." 1-LEG-ER-51. Tellingly, this order is directed at State officials rather than at "regulat[ing] private actors" like hospitals. *Murphy*, 138 S. Ct. at 1479. And as in *California*, what's really at stake is whether Idaho may "refus[e] to adopt preferred federal policies" on which Congress has elected not to adopt an express mandate. 921 F.3d at 889. Under the anticommandeering doctrine, the answer is yes—Idaho may make that choice.

For both these reasons, the preliminary injunction should be set aside as contrary to the Tenth Amendment.

63

## 2. *The Decision Below Violates the Spending Clause.*

The decision below also violates the Constitution's Spending Clause. *See* U.S. CONST. art. I, § 8. There are "limits on Congress's power … to secure state compliance with federal objectives." *NFIB v. Sebelius*, 567 U.S. 519, 576 (2012). One, when "conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes." *Id.* at 580. Two, retroactive conditions are forbidden. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). Both principles apply here.

*First*, the United States threatens to withhold all Medicare funding unless Idaho complies with the government's abortion mandate under EMTALA. The complaint asserts the government's "interest in protecting the integrity of the funding it provides under Medicare and ensuring that hospitals who are receiving Medicare funding will not refuse to provide stabilizing treatment to patients experiencing medical emergencies." 4-LEG-ER-582. Idaho receives massive funding under Medicare, as the United States concedes. "From 2019 to 2020, HHS paid approximately *74 million dollars* for emergency department care in Idaho hospitals

enrolled in Medicare. *Id.* (emphasis added). Funding for emergency facilities is only a small part of the "approximately ***$3.4 billion*** in federal Medicare funds during fiscal years 2018-2020." 4-LEG-ER-546 (emphasis added). The United States then stresses that *all* Medicare funding—not limited to emergency facilities—is "conditioned on compliance with EMTALA." *Id.*

The complaint accuses section 622 of denying the United States "the benefit of its bargain … by affirmatively prohibiting Idaho hospitals from complying with certain obligations under EMTALA." 4-LEG-ER-582. By prohibiting abortion unless authorized by law, section 622 allegedly "undermines the overall Medicare program and the funds that the United States provides in connection with that program …." 4-LEG-ER-582–83. The threat is obvious. Idaho hospitals must perform abortions whenever the United States says that EMTALA requires it, or risk the loss of billions in Medicare funding. Any doubt that the threat is intended should be put to rest given the directive issued by HHS Secretary Becerra. He instructed Medicare-participating hospitals that violating the EMTALA abortion mandate "may be subject to termination of its Medicare provider agreement." Letter from Secretary Becerra to

Health Care Providers, July 11, 2022, at 2, *available at* https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf.

Threatening to withhold all Medicare-related funding from Idaho hospitals unless they adhere to a baseless construction of EMTALA exceeds the Government's authority under the Spending Clause. Consider a similar dispute under the Affordable Care Act. States challenging the statute complained that "Congress [was] coercing [them] to adopt the changes it wants by threatening to withhold all of a State's Medicaid grants, unless the State accepts the new expanded funding and complies with the conditions that come with it." *NFIB*, 567 U.S. at 575. That provision of the ACA amounted to "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 582 (footnote omitted). Likewise here. The United States threatens the State of Idaho with the devastating loss of all Medicare funding (of which EMTALA-related funding is a small part) unless Idaho hospitals comply with the government's lawless exercise of power under EMTALA. Leveraging compliance in this way is not a policy nudge—but "a gun to the head." *Id* at 581.

*Second*, the federal government's demand for compliance with a contested interpretation of EMTALA is retroactive. It comes long after Idaho agreed to the conditions of participating in Medicare. Imposing its abortion mandate on Idaho hospitals retroactively is another reason to conclude that the government is violating the Spending Clause. *Pennhurst*, 451 U.S. at 25.

## II. THE PRELIMINARY INJUNCTION INFLICTS IRREPARABLE HARM ON THE IDAHO LEGISLATURE.

The Idaho Legislature will "suffer irreparable harm" unless the injunction is vacated. *Winter*, 555 U.S. at 20. Supreme Court precedent teaches that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (citing *Md. v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)); *accord New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). That principle is especially true when a federal court blocks a state law adopted through democratic processes on a matter of public controversy.

Here, the Idaho Legislature enacted section 622 in anticipation of a Supreme Court decision by the U.S. Supreme Court abandoning *Roe*. *Dobbs*, 142 S. Ct. 2228, is that decision. It held that "[t]he Constitution

does not prohibit the citizens of each State from regulating or prohibiting abortion," and, accordingly, "return[ed] that authority to the people and their elected representatives." *Id.* at 2284. The injunction blocks that return of sovereign authority and thwarts Idaho's exercise of democratic self-government.

Maintaining the preliminary injunction against 622 is anything but harmless even if it did issue a year ago. Federal injunctions are the exception, not the norm. *See Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right."). Every day that passes with an injunction in place inflicts irreparable harm on the Legislature.

Conversely, the United States will not suffer irreparable harm from vacating the preliminary injunction. Any harm from waiting to persuade an appellate panel that section 622 poses a genuine conflict with EMTALA before enjoining the law is hardly "irreparable" since the government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam), *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017). Otherwise, any lawsuit by the United States challenging

a state law would unavoidably impose an irreparable injury on the state in the course of testing the law's validity. That cannot be so. The *Winter* standard strives to *avoid* irreparable injury—not inflict it. It is the harm from interfering with state law that counts as irreparable injury, not the operation of a state law the federal government opposes.[4]

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIP IN FAVOR OF THE IDAHO LEGISLATURE.

The last two *Winter* factors—balancing the equities and the public interest—merge when the United States is a party. *See Nken*, 556 U.S. at 435.

The district court thought it a "key consideration" to account for "what impact an injunction would have on non-parties and the public at large." 1-LEG-ER-49 (citing *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003)). The public at large would be best served, the court said, by vindicating the Supremacy Clause. *See id.* In addition, the court discerned that "allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho." *Id.* And hospital

---

[4] The government cannot cite third-party harm as the source of injury to itself when *Nken v. Holder*, 556 U.S. 418 (2009), asks "whether *the applicant* will be irreparably injured." *Id.* at 426 (emphasis added); *accord Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020).

capacity in neighboring states "would be pressured as patients may choose to cross state lines to get the emergency care they are entitled to receive under federal law." 1-LEG-ER-50–51. Compared to these interests, the August Order said that "the State of Idaho will not suffer any real harm if the Court issues the modest preliminary injunction the United States is requesting." 1-LEG-ER-51. Hence, the court concluded that "the public interest lies in favor of enjoining the challenged Idaho law to the extent it conflicts with EMTALA." *Id.*

Respectfully, the lower court analysis is flawed. Where the court focused on how the preliminary injunction affects "non-parties and the public at large," 1-LEG-ER-49, the likelihood of success on the merits "is the most important" factor in evaluating an injunction. *Garcia*, 786 F.3d at 740. Also, what matters under the "balance of equities" prong are "the burdens or hardships to [the plaintiff] compared with the burden on [the State of Idaho and the Legislature] if an injunction is ordered." *Poretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Properly focused on that inquiry, the balance tips in the Legislature's favor. For the Legislature, the preliminary injunction interposes federal judicial power on an issue of profound importance to Idaho. Elected state officials acted in good faith

by adopting section 622 in harmony with Supreme Court precedent. Enjoining Idaho law is an affront to the State that only searching judicial scrutiny can justify. By contrast, the United States can identify no hardship of its own if an injunction does not prevent the operation of section 622 before it has been conclusively declared invalid on the merits. A federal injunction blocking an Idaho law on a matter of great public importance imposes a greater hardship on the State of Idaho than the burden the United States would bear by postponing injunctive relief until its unprecedented claim of federal power has prevailed following trial and appellate review.

Public interest likewise weighs against the preliminary injunction. Enjoining section 622 based on an untested and erroneous interpretation of EMTALA introduces uncertainty and confusion for Idaho law enforcement authorities and for healthcare professionals trying to treat pregnant women in a medical crisis. The preliminary injunction likewise disserves the public interest by suggesting that Idaho hospitals will lose Medicare funding for complying with state law. And at the level of fundamental principle, "[t]he public interest is also served by maintaining our constitutional structure," which the preliminary

injunction disrupts by exaggerating the authority of the Executive Branch at the expense of Congress and the State of Idaho. *BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

Nor—and this point deserves emphasis—does vacating the preliminary injunction pose a threat to the healthcare needed by pregnant women in Idaho. Section 622 expressly authorizes such care through the exemptions and exceptions we have described. *See* IDAHO CODE §§ 18-622(2), (4), (5). There is no reasonable prospect, for instance, that a woman suffering from preeclampsia or the side-effects of an ectopic pregnancy will be denied life-saving medical care because of section 622. Preeclampsia is a dangerous condition that poses a genuine threat to a woman's life, and section 622 expressly authorizes an abortion where a physician judges it in good faith to be necessary. *See id.* § 18-622(2). An ectopic pregnancy can be equally life-threatening and even when not, its removal is not an abortion under Idaho law. *See Planned Parenthood*, 522 P.3d at 1203. Since EMTALA does not dictate any particular form of medical treatment—including abortion—an Idaho doctor complies with EMTALA by giving a pregnant woman with an emergency medical condition the same care provided to any similarly situated patient,

regardless of the patient's ability to pay. That may include medical treatments other than abortion to resolve a pregnant woman's emergency medical condition.

On the other side of the balance sheet, the United States has no legitimate interest in compelling Idaho's compliance with an implied mandate contrary to EMTALA's text and context. Certainly, there is no public interest in substituting the United State' conception of abortion policy for Idaho's. Reasonable minds differ about when the law should allow a woman to terminate her pregnancy. But Idaho's elected officials have lawfully exercised their authority to adopt laws restoring the State's historic commitment to protecting unborn life. *Id.* at 1148 (describing Idaho's "history and traditions" under which "abortion was viewed as an immoral act and treated as a crime"). And nothing in EMTALA precludes that choice.

## CONCLUSION

The Court should reverse the decision below and vacate the district court's orders granting preliminary injunctive relief.

Respectfully submitted,

*/s/ Daniel W. Bower*
Daniel W. Bower

Monte Neil Stewart
11000 Cherwell Court
Las Vegas, NV 89144
Telephone: (208) 514-6360
monteneilstewart@gmail.com

MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors - Appellants*

August 7, 2023

74

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO 9TH CIRCUIT RULE 32-1**
**FOR CASE NOS. 23-35440 & 23-35450**

I hereby certify that this brief complies with the word limits
permitted by Ninth Circuit Rule 32-1. The brief is 13,657 words,
excluding the items exempted by FRAP 32(f). The brief's type size and
typeface comply with FRAP 32(a)(5) and (6).

Dated: August 7, 2023        */s/ Daniel W. Bower*
                              Daniel W. Bower

                              *Counsel for Intervenors - Appellants*

75

## STATEMENT OF RELATED CASES

The Idaho Legislature is aware of a related case pending in this Court, pursuant to Ninth Circuit Rule 28-2.6: *United States of America v. State of Idaho*, Case No. 23-35153 (appealing the district court's denial of the Idaho Legislature's motion to intervene as of right).

Respectfully submitted,

*/s/ Daniel W. Bower*
Daniel W. Bower
Monte N. Stewart
MORRIS BOWER & HAWS
12550 W. Explorer Drive
Suite 100
Boise, ID 83713
208-345-3333

dbower@morrisbowerhaws.com

*Counsel for Intervenors - Appellants*

August 7, 2023

# Exhibit 10

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

THE UNITED STATES OF AMERICA,

     Plaintiff,

v.

THE STATE OF IDAHO,

     Defendant,

and

SCOTT BEDKE, in his official capacity as Speaker of the House of Representatives of the State of Idaho; CHUCK WINDER, in his capacity as President Pro Tempore of the Idaho State Senate; and the SIXTY-SIXTH IDAHO LEGISLATURE,

     Intervenor-Defendants.

Case No. 1:22-cv-00329-BLW

---

## IDAHO LEGISLATURE'S BRIEF IN SUPPORT OF MOTION FOR RECONSIDERATION OF ORDER GRANTING PRELIMINARY INJUNCTION

---

Monte Neil Stewart, ISB No. 8129
11000 Cherwell Court
Las Vegas, Nevada 89144
Telephone: (208)514-6360
monteneilstewart@gmail.com

Daniel W. Bower, ISB No. 7204
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, Idaho 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Attorneys for Intervenor-Defendants*

<u>TABLE OF CONTENTS</u>

I.      This motion is procedurally proper and satisfies the standard of review ......1

II.     The Idaho Order clearly erred by ignoring Congress's language
        defining the scope of EMTALA and instead using the
        Administration's materially different and misleading language ...................2

III.    Serious legal and constitutional errors render the preliminary
        injunction clearly erroneous...........................................................................8

        A.      The Decision Contains Clear Errors of Law Under
                State and Federal Statutes ...................................................................8

        B.      Granting a Preliminary Injunction for the United States
                Commits Clear Errors of Constitutional Law ....................................9

                1.  As read by the Government, EMTALA violates
                    the major questions doctrine .......................................................10

                2.  The Supremacy Clause does not give the United States
                    an implied right of action ............................................................11

                3.  The Preliminary Injunction Exceeds the Court's Powers
                    as an Inferior Court Under Article III .........................................12

                4.  The Court's Decision sanctions an interpretation of
                    EMTALA that exceeds Congress's authority under
                    the Spending Clause .....................................................................13

                5.  The Preliminary Injunction Trenches on Idaho's
                    Reserved Power Under the Tenth Amendment...........................15

CONCLUSION...................................................................................................16

CERTIFICATE OF SERVICE ...........................................................................17

i

<u>TABLE OF CASES AND AUTHORITIES</u>

**Cases:**

*Alabama Assoc. of Realtors v. Dep't of Health and Human Servs.*,
    141 S. Ct. 2485 (2021) .........................................................................................10, 11

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015).............................................................................................11, 12

*Borden v. United States*,
    141 S. Ct. 1817 (2021) ..............................................................................................7

*Dobbs v. Jackson Women's Health Organization*,
    142 S. Ct. 2228 (2022)..............................................3, 4, 11, 12, 13, 15, 16

*Favia v. Indiana Univ. of Pennsylvania*,
    7 F.3d 332 (3d Cir. 1993)..........................................................................................1

*Harrington v. City of Chicago*,
    433 F.3d 542 (7th Cir. 2006) ....................................................................................8

*Hayes v. Oregon*,
    No. 1:20-CV-01332-CL, 2022 WL 488069 (D. Or. Feb. 17, 2022)...........................1

*Jean v. Nelson*,
    472 U.S. 846 (1985)................................................................................................12

*Katie A., ex rel. Ludin v. Los Angeles Cnty.*,
    481 F.3d 1150, 1152 (9th Cir. 2007) ........................................................................1

*Marbury v. Madison*,
    5 U.S. 137 (1803)...................................................................................................16

*NFIB v. OSHA*,
    142 S. Ct. 661 (2022).....................................................................................10, 13, 15

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981)............................................................................................13, 15

*Planned Parenthood of Southeastern Penn. v. Casey,*
    505 U.S. 833 (1992) ................................................................................4, 6

*Pyramid Lake Paiute Tribe of Indians v. Hodel,*
    882 F.2d 364 (9th Cir. 1989) ................................................................1, 2

*Roe v. Wade,*
    410 U.S. 113 (1973) ................................................................................4, 6

*Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.,*
    5 F.3d 1255 (9th Cir. 1993) ........................................................................1

*Texas v. Becerra,*
    No. 5:22-CV-185-H, 2022 WL 3639525 (N.D. Tex. Aug. 23, 2022) ..............4, 5, 6, 7

*Utility Air Regulatory Group v. EPA,*
    573 U.S. 302 (2014) ............................................................................10, 11

*W. Va. v. EPA,*
    142 S. Ct. 2587 (2022) ...............................................................................10

*Wholesaler Equity Dev. Corp. v. Bargreen,*
    No. C20-1095RSM, 2021 WL 5648099 (W.D. Wash. Dec. 1, 2021) ...........1

*Wholesaler Equity Dev. Corp. v. Bargreen,*
    No. 21-36010, 2021 WL 7443767 (9th Cir. Dec. 17, 2021) .......................1

**Statutes:**

28 U.S.C. § 1292(a)(1) ......................................................................................1

42 U.S.C. § 1395 .............................................................................................9

42 U.S.C. § 1395dd(b) ...................................................................................11

42 U.S.C. § 1395dd(c)(2)(A) .......................................................................3, 7

42 U.S.C. § 1395dd(e)(1)(A) ...........................................................................2

42 U.S.C. §§ 1395dd(e)(1)(A)(i)-(iii) ..........................................................15

I.C. § 18-622 ......................................................................3, 6, 7, 8, 9, 13, 14, 15, 16

I.C. §§ 18-622(2), (3) ........................................................................................15

Idaho Code § 18-622(3) ......................................................................................8

Fed. R. Civ. P. 59(e) ........................................................................................1, 2

**Other Authorities:**

Affordable Care Act ........................................................................................14

Exec. Order
    14076, 87 Fed. Reg. 42053, 42053 (July 13, 2022) ....................................4

Social Security Act XVIII ..................................................................................9

U.S. Const. art. I, § 8 .................................................................................12, 13

Spending Clause .................................................................................13, 14, 15

Supremacy Clause ..........................................................................2, 7, 11, 12

www.hhs.gov ......................................................................................................4

## I.   This motion is procedurally proper and satisfies the standard of review.

This motion is procedurally proper.

> When a district court enters an order granting preliminary injunctive relief, parties who take exception to its terms must either file a motion for reconsideration in the district court within ten days under Rule 59(e) [now 28 days], bring an interlocutory appeal from that order under 28 U.S.C.A. § 1292(a)(1), or wait until the preliminary injunction becomes final and then appeal.

*Favia v. Indiana Univ. of Pennsylvania*, 7 F.3d 332, 337–38 (3d Cir. 1993). Motions for reconsideration of orders regarding preliminary injunctions are standard practice in the Ninth Circuit,[1] *see, e.g., Katie A., ex rel. Ludin v. Los Angeles Cnty.*, 481 F.3d 1150, 1152 (9th Cir. 2007) ("We have jurisdiction to review the district court's order granting the preliminary injunction and the court's denial of the motion for reconsideration under 28 U.S.C. § 1292(a)(1)."). A motion under Rule 59(e) is timely if "filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). This motion is timely since it follows less than 28 days after the August 24, 2022 entry of the Idaho Order.

This motion satisfies the standard of review. Ninth Circuit precedent holds that "[r]econsideration is appropriate if the district court . . . committed clear error or the initial decision was manifestly unjust . . . ." *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). "[A] trial court has discretion to reconsider its prior, non-final decisions. '[T]he major grounds that justify reconsideration involve . . . the need to correct a clear error or prevent manifest injustice.'" *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369

---

[1] Here are some examples from just the past ten months: *Hayes v. Oregon*, No. 1:20-CV-01332-CL, 2022 WL 488069, at *1 (D. Or. Feb. 17, 2022) (reviewing a motion to reconsider denial of a preliminary injunction, stated that a "district court is permitted to reconsider and amend a previous order pursuant to Federal Rule of Civil Procedure 59(e)."); *Wholesaler Equity Dev. Corp. v. Bargreen*, No. C20-1095RSM, 2021 WL 5648099 (W.D. Wash. Dec. 1, 2021), appeal dismissed, No. 21-36010, 2021 WL 7443767 (9th Cir. Dec. 17, 2021) (same).

n.5 (9th Cir. 1989).[2] The following sections demonstrate that reconsideration and alteration of the Idaho Order are necessary to correct a clear error and prevent manifest injustice.

## II. The Idaho Order clearly erred by ignoring Congress's language defining the scope of EMTALA and instead using the Administration's materially different and misleading language.

In the August 22 hearing, Mr. Stewart spoke of Idaho having drawn its line regulating abortion. Transcript of August 22, 2022 Hearing ("Transcript") at 59. Mr. Netter in response said that the United States had established a different "standard," a different line, protecting abortions in the context of emergency medical conditions. *Id*. at 69. His point was that where Idaho's line went beyond the United States' line, there was a conflict creating a Supremacy Clause issue that must be resolved in favor of the United States by issuing an injunction prohibiting State action in the area of conflict defined by the two lines. *Id*.

Mr. Netter, however, misspoke. The United States has not drawn a line, it has drawn two lines. Congress drew one line, and the current administration ("Administration"), through its Department of Justice ("DOJ") and its Department of Health and Human Services ("DHHS"), has (since and in response to June 24) drawn a different line. A materially different line.

Congress's line and the Administration's newly minted line diverge at subpart (i) of EMTALA's definition of "emergency medical condition." 42 U.S.C. § 1395dd(e)(1)(A) says in relevant part:

> (1) The term "emergency medical condition" means—(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child)* in serious jeopardy . . . ."

42 U.S.C. § 1395dd(e)(1)(A) (emphasis added).

2

As this language reveals, Congress drew its line to protect *both* the mother *and* the unborn child in an emergency medical situation. By contrast, the Administration draws its line to eliminate all protection for the unborn child in such situations. It did so by a simple expedient—it silently erased "or her unborn child" from all DOJ filings here (including in its Proposed Order, Dkt. 17-2, which this Court used word-for-word in the Idaho Order at 38-39) and from all DHHS Guidance and other communications.

In the August 22 hearing, this was the Legislature's thrice-iterated "most important point." Transcript at 60, 62. The Government's Proposed Order, with its inclusion of the altered subpart (i) language, was seeking to enjoin State action where there was *no* conflict between federal law and state law. This matters because this Court's "authority extends to the boundary of the conflict and no further. You can enjoin 622 to the extent of a conflict …. But that's the limit of your authority to enjoin enforcement and operation of 622." *Id*. at 61. Moreover, and distressingly, the DOJ was erasing Congressional language expressly written to protect the health of preborn children in order to expand the injunction's scope and, thereby, greatly increase the risk of death for such children. That purpose squarely contradicts EMTALA's clear language and Congress's evident intent that "the health of . . . the unborn child" not be put "in serious jeopardy." 42 U.S.C. § 1395dd(c)(2)(A).

Mr. Stewart went on to note correctly that this alteration, this erasure, of Congressional language was done in an effort to fulfill at least in part the Administration's "political promise to push back against *Dobbs*." *Id*. at 62. That political promise was made so publicly and so soon after *Dobbs* that everyone in the courtroom knew what Mr. Stewart was referring to.[3] Soon after *Dobbs*

---

[3] Describing the Supreme Court's decision in *Dobbs* as the cause of a nationwide "health crisis," President Biden responded with an executive order directing HHS to "consider[ ] updates to

overruled the *Roe/Casey* abortion regime and returned to the respective States and their people their constitutional authority to regulate abortion, the Administration publicly announced that the federal executive branch, across all its departments, would use whatever means it could grasp in an effort both to thwart the *Dobbs* decision and to attempt to resurrect to the greatest extent possible the nationwide *Roe/Casey* abortion regime. That was the political promise, with this civil action being one effort to fulfill it—or, more accurately, to create the appearance of fulfilling it. [4]

During the August 22 hearing, the Legislature's counsel sought to share not just the uncensored EMTALA language but also a "blue-line" of the Government's Proposed Order that limited its scope to the scope of the real conflict (defined by Congressional language), rather than the scope of the manufactured conflict (defined by the altered subpart (i) language). Transcript at 62-63. The Court declined to look at the "blue-line," suggesting it could be filed post-hearing. *Id*. at 65. The Legislature did file it following the hearing, later that same day. Dkt. 93.

Then on August 23, the United States District Court for the Northern District of Texas issued its Decision and Order making the same thrice-iterated "most important" point. *Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 3639525 (N.D. Tex. Aug. 23, 2022) ("Texas Decision"). This Court had the Texas Decision in hand on August 24, Dkt. 94-1, although the later-filed Idaho Order makes no reference to it.

---

current guidance on obligations specific to emergency conditions and stabilizing care under [EMTALA]." Exec. Order 14076, 87 Fed. Reg. 42053, 42053 (July 13, 2022). HHS promptly obliged. A few days later, it issued "clarifying guidance" under EMTALA, along with Secretary Becerra's statement that the statute "preempts state law restricting access to abortion in emergency situations." https://www.hhs.gov/about/news/2022/ 07/11/following-president-bidens-executive-order-protect-access-reproductive-health-care-hhs-announces-guidance-clarify-that-emergency-medical-care-includes-abortion-services.html. This case is nothing more or less than Administration policy operationalized as high-stakes litigation against the State of Idaho.

[4] We say "create the appearance" because, according to our research, at its broadest the Government's case affects a category of abortions that, under the *Roe/Casey* regime, accounted for less than 2% of all Idaho abortions.

Regarding the Legislature's "most important" point, the Texas Decision first detailed the context and making of the political promise and the scope of efforts to fulfill it, including the DHHS Guidance, *id.* at 6–9, and this Idaho civil action, *id.* at 37. (All Texas Decision page references are to the version filed in this civil action as Document 94-1.)

That Decision then addresses the uncensored language of subpart (i), which created "EMTALA's equal obligations to the pregnant woman and her unborn child" but also "create[d] a potential conflict in duties that [EMTALA] does not resolve," *id*. at 42, specifically, what do doctors do "where emergency medical conditions threaten the health of both the pregnant woman and the unborn child"? *Id*. at 43.

After thorough analysis of the relevant statutory and case law bearing on "the obligations of doctors in cases of conflict between the health of a pregnant woman and her unborn child," the Texas court concluded that "there is no direct conflict between EMTALA and state laws that attempt to address that circumstance." *Id.* at 44. There is no "impossibility" preemption, *id.* at 45–46, and no "obstacle" preemption, *id.* at 46–49. Because EMTALA simply "does not resolve how stabilizing treatments must be provided when a doctor's duties to a pregnant woman and her unborn child possibly conflict," *id.* at 49, "EMTALA leaves [that resolution] to the states." *Id.*

The Texas Decision utterly rejects the government's attempt to use EMTALA as a wedge to leverage federal control over state abortion laws. That Decision repudiates the government's theory of preemption: since "EMTALA leaves unresolved the conflict between emergency medical conditions that threaten the health of both the pregnant woman and the unborn child—and therefore . . . does not preempt state law filling that void—it becomes clear the Guidance [and the identically worded Proposed Order] goes beyond the language of" EMTALA. *Id*. This is because the Administration's "erasure" scheme requires (DHHS's Guidance) or allows (DOJ's Proposed

5

Order) "physicians to perform abortions when they believe that an abortion would resolve a pregnant woman's emergency medical condition irrespective of the unborn child's health and contrary state law." *Id*. Thus, the Administration's scheme of omitting statutory language specifically requiring medical care to protect a preborn child "stands contrary to" EMTALA. *Id*. at 50.

The Texas Decision concludes with well-deserved criticism of the Administration's "erasure" scheme—its "conspicuous omission of the reference to the health of the 'unborn child.'" *Id*. Rightly, the Decision found the Administration's distortion of plain statutory language indefensible—especially as a political maneuver to repurpose EMTALA as a kind of *Roe/Casey* Restoration Act. *Id*. at 49–52. Because EMTALA "expresses explicit concern for the unborn child," *id*. at 52, "[t]his concern is critical to understanding how the statute [EMTALA] approaches abortion—if at all." *Id*.

> In such a case, the Court [along with, by this point, every other good-faith reader] finds it difficult to square a statute that instructs physicians to provide care for both the pregnant woman and the unborn child with [preliminary injunction language] excluding the health of the unborn child as a consideration when providing care for a mother. If there ever were a time to include the full definition of an emergency medical condition, the abortion context would be it.

By adopting wholesale the Government's Proposed Order with its altered subpart (i) language, the Idaho Order at 38-39 stepped beyond the bounds of EMTALA and thereby stepped beyond the bounds of any real conflict between federal law (Congress's law, not the Administration's clumsy counterfeit) and Idaho's 622 Statute. That in turn means that the Idaho Order at 38-39 steps beyond this Court's lawful authority. *See* Transcript at 61 (a district court's "authority extends to the boundary of the conflict and no further"). The United States Supreme Court has made the same point, forcefully:

> Simply put, where enforcement of a law would conflict with the Constitution, a court has authority under the Supremacy Clause to enjoin enforcement, but a court *cannot*, consistent with separation of powers, enjoin enforcement of a statute where enforcement would be lawful.

*Borden v. United States*, 141 S. Ct. 1817, 1836 (2021) (emphasis added).

This binding law means that a preliminary injunction should not affect the enforcement of the 622 Statute except insofar as EMTALA requires it. Therein lies the rub. By crediting the Government's misinterpretation of EMTALA—built on a deliberate omission of language requiring the protection of a pregnant woman's unborn child—this Court's preliminary injunction purports to enjoin the 622 Statute where the language of EMTALA does not apply.

We, therefore, urge the Court to amend pages 38 and 39 of the Idaho Order in keeping with the "blue-line" submitted by the Legislature. That "blue-line" document takes out the Government's altered subpart (i) language, while leaving in the subpart (ii) and subpart (iii) language. Idaho's 622 Statute on its face (although not in application) is different from the Texas statute addressed in the Texas Decision relative to those two subparts.

Modifying the preliminary injunction in this way is literally a life-and-death matter. Some of Idaho's preborn children may well die as a consequence of the Idaho Order as now written—children whose lives Idaho's 622 Statute protects properly and constitutionally. If the 622 Statute is to be enjoined at all, the Idaho Order should conform with the actual language of EMTALA—not a version partially erased to serve the Administration's political purposes. Remember that EMTALA clearly requires that the health of the unborn child not be put "in serious jeopardy," 42 U.S.C. § 1395dd(c)(2)(A), let alone in that ultimate jeopardy created by the Administration's "erasure" scheme.

**III.  Serious legal and constitutional errors render the preliminary injunction clearly erroneous.**

A motion for reconsideration should be granted when the judgment rests on a clear error of law. *See Harrington v. City of Chicago*, 433 F.3d 542 (7th Cir. 2006) (altering or amending a judgment is permitted when there has been a manifest error of law). Here, the decision granting a preliminary injunction to the United States relies on a misstatement of Idaho law and an omission of federal law. Even more critically, the decision does not address multiple legal and constitutional errors that the State and Legislature brought to the Court's attention. For those reasons, the preliminary injunction should be vacated.

   *A.  The Decision Contains Clear Errors of Law Under State and Federal Statutes.*

The Court's analysis relies on a misstatement of Idaho law. When explaining why the affirmative defenses in Idaho Code § 18-622 did not "cure" the impossibility of complying with both Idaho law and EMTALA, the district court criticized those defenses. Decision at *8. "The affirmative defense admits that the physician committed a crime but asserts that the crime was justified and is therefore legally blameless. And it can only be raised after the physician has already faced indictment, arrest, pretrial detention, and trial for every abortion they perform." *Id.* (citation omitted). Not so. Idaho has not adopted the draconian scheme that the Court has described. Section 622 plainly says that the life of the mother, rape, and incest are "affirmative defense[s] *to prosecution*." Idaho Code § 18-622(3) (emphasis added). No physician faces the gantlet of criminal prosecution, so long as he or she performs an abortion under the circumstances provided for by statute. Because the Court's analysis of the central issue of preemption turns on an incorrect rendition of section 622, the preliminary injunction stands on a clear error of law.

The decision likewise goes awry by neglecting to address a federal statute that expressly limits EMTALA's preemptive force, even though the decision squarely relies on preemption as

the reason for enjoining the 622 Statute. *See* Decision at *18–26 (discussing impossibility and obstacle preemption). That provision says that "[n]othing in *this subchapter* shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided … or to exercise any supervision or control over the administration or operation of any such institution, agency, or person." 42 U.S.C. § 1395 (emphasis added). This directive *not* to preempt state law is controlling because EMTALA falls within subchapter XVIII of the Social Security Act. Since the Court's analysis did not address section 1395, or its effect on the government's preemption claims, that too is a clear error of law that calls for the preliminary injunction to be vacated.

> ### B. Granting a Preliminary Injunction for the United States Commits Clear Errors of Constitutional Law.

Mistakes of statutory interpretation are surely enough to warrant reconsideration. But it is the multiple constitutional errors raised by the case brought by the United States that make reconsideration especially urgent. Although the State and the Legislature presented serious constitutional objections to the Government's case, the Court declined to address them. The State argued that the government's interpretation of EMTALA renders the statute "invalid as coercive spending clause legislation." *United States v. State of Idaho*, No. 1:22-cv-00329-BLW, 2022 WL 3692618, at *6 (D. Idaho Aug. 24, 2022) (Decision). But that objection was brushed aside as "not sufficiently developed," to which the Court added the inapplicable rule that "courts should [not] anticipate a question of constitutional law in advance of the necessity of deciding it." *Id.* (quotation omitted). For its part, the Legislature submitted substantial constitutional objections in a memorandum attached to its Motion for Leave to File Legal Arguments, but the Court denied the Motion and declined to address those objections. Docket Entry Order, Doc. 75. These rulings

effectively denied the State and the Legislature any hearing on their constitutional objections to the complaint. We respectfully ask the Court to consider those objections now.

1. *As read by the government, EMTALA violates the major questions doctrine.*

Under the major questions doctrine courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014). When this rule applies, "something more than a merely plausible textual basis for the agency action is necessary." *Id.* at 2609. Requiring an unusually clear delegation of congressional authority over a matter of national significance reflects the nondelegation doctrine, which preserves the separation of powers by ensuring that "any new laws governing the lives of Americans are subject to the robust democratic processes the Constitution demands." *NFIB v. OSHA*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring). In this way, the major question doctrine resolves the problem of "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *W. Va. v. EPA*, 142 S. Ct. 2587, 2609 (2022). Three times in the past year alone, the Supreme Court has invoked the major questions doctrine as sufficient reason to declare certain Administration initiatives unconstitutional. *Id.* at 2616 (invalidating an EPA rule because "[a] decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body"); *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) (setting aside an OSHA standard requiring large employers to ensure that their employees were vaccinated against COVID-19); *Alabama Assoc. of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485 (2021) (voiding a nationwide eviction moratorium imposed by the Centers for Disease Control).

The Idaho Order sanctions a violation of the major questions doctrine by deferring to an executive branch interpretation of EMTALA that inaugurates unprecedented authority over a matter of grave political importance, without express congressional approval. The United States

asserts that federal law precludes Idaho from regulating abortion insofar as it qualifies (in the government's view) as needed "stabilizing treatment" for a pregnant woman at a federally funded emergency center. Decision at *2. But exerting federal control over state abortion law is indisputably a matter of "vast … political significance." *Utility Air Regulatory Group*, 573 U.S. at 324. It takes "more than a merely plausible textual basis" to justify a federal assault on the constitutional authority that Idaho possesses under *Dobbs*. *Id.* at 2609. The United States must show that Congress has spoken with unusual clarity in requiring emergency rooms to perform abortion procedures even when unnecessary to save a mother's life. And that the United States has failed to do. EMTALA's glancing reference to "[n]ecessary stabilizing treatment" hardly speaks with the requisite clarity to the issue of abortion procedures, given the prospect of upending Idaho law on a question of enormous public significance. 42 U.S.C. § 1395dd(b). Like the CDC's eviction moratorium, the government's weaponization of EMTALA grants the government "a breathtaking amount of authority," *Ala. Assoc. of Realtors*, 141 S. Ct. at 2489, by imposing a nationwide abortion mandate through an unreasonable interpretation of a narrow statute.

### 2. The Supremacy Clause does not give the United States an implied right of action.

As described more fully in an amicus brief filed by 17 states, the Supremacy Clause does not contain the implied right of action on which this case rests. In another case against the State of Idaho, the U.S. Supreme Court held that providers of residential habilitation services could not bring a suit under the Supremacy Clause challenging the disparity between Idaho's Medicaid reimbursement rates and the supposed requirements of the Medicaid Act. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015). Such a suit was barred, the Court explained, because the Supremacy Clause "creates a rule of decision," but not "any federal rights" or "a cause of action." *Id.* at 324–25. Rather, the Clause "instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what

circumstances they may do so." *Id.* at 325. *Armstrong* thus directly forecloses the United States from bringing a lawsuit against the State of Idaho directly under the Supremacy Clause.

Its decision highlights this Court's view that "the Supremacy Clause says state law must yield to federal law when it's impossible to comply with both. *And that's all this case is about.*" Decision at *1 (emphasis added). But the Court does not grapple with how *Armstrong* precludes this case. The United States is not "an individual" seeking an injunction to prevent a state regulation from overriding federal immunity. *Id.* at *6 (quoting *Armstrong*, 575 U.S. at 326). Nor does it matter that the United States is "challenging the validity" of Idaho law. *Id. Armstrong* stands for the broad principle that the Supremacy Clause nowhere "give[s] affected parties a constitutional (and hence congressionally unalterable) right to enforce federal laws against the States." 575 U.S. at 325. On that point, the United States stands in no better position than a private party. Since *Armstrong* bars exactly the kind of claim brought by the Government here, the preliminary injunction rests on another clear error of law.

### 3. The Preliminary Injunction Exceeds the Court's Powers as an Inferior Court Under Article III.

By issuing its preliminary injunction, the Court has exceeded its power as an inferior tribunal. Article III vests "the judicial power of the United States" in "one supreme Court." U.S. Const. art. III, § 1. The resulting judicial hierarchy makes U.S. Supreme Court precedents binding on this Court. *Jean v. Nelson*, 472 U.S. 846 (1985) ("this Court's judgments are precedents binding on the lower courts"). Only weeks ago, the U.S. Supreme Court issued a historic decision overruling 50 years of its own precedents holding that abortion is a federal constitutional right. *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2284 (2022). *Dobbs* specifically held that eliminating a federal right to abortion would result in the return of regulatory authority concerning abortion "to the people and their elected representatives." *Id.* Despite *Dobbs*, the Idaho

12

Order blocks the State of Idaho from exercising that authority by enjoining the 622 Statute. Since this Court's order does not explain how a statutory interpretation can impede the transfer of constitutional authority pronounced in *Dobbs*, that decision is in error.

> 4. *The Court's Decision sanctions an interpretation of EMTALA that exceeds Congress's authority under the Spending Clause.*

The State fairly briefed the Court on its concern that the Government's interpretation of EMTALA violates the Spending Clause. That is the Clause granting Congress the power "to pay the Debts and provide for the … general Welfare of the United States." U.S. Const. art. I, § 8. To guard against allowing that power to obliterate the fundamental distinction between federal and state powers, the Constitution places "limits on Congress's power … to secure state compliance with federal objectives." *NFIB v. Sebelius*, 567 U.S. 519, 576 (2012). For instance, when "conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes." *Id.* at 580. Federal strings may attach to federal dollars, but "the States must have a genuine choice whether to accept the offer." *Id.* at 588. Also, retroactive conditions on federal funding are disallowed. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981) ("Though Congress' power to legislate under the spending power is broad, it does not include surprising the States with post-acceptance or 'retroactive' conditions."). Both limits are transgressed here.

*First*, the United States threatens to withhold all Medicare funding unless Idaho complies with the Government's novel abortion mandate under EMTALA. That threat is evident from an insistence that "a *hospital* participating in Medicare must comply with EMTALA as a condition of receiving federal funds" and that "*hospitals* enter into written agreements with the [HHS] Secretary confirming they will comply with EMTALA." Mem. in Supp. of Mot. for a Prelim. Inj., *United States v. State of Idaho*, No. 1:22-cv-329-BLW, at 5 (S.D. Idaho Aug. 8, 2022) ("Mem.")

13

(emphasis added). The United States insists that EMTALA imposes duties for "all patients, not just for Medicare beneficiaries." *Id.* at 19. This expansive reading of EMTALA leads to a sweeping outcome. Because Idaho Code § 18-622 governs all abortions performed in the state, the Government says, state law will "disrupt the [Medicare] program and deprive the United States of the benefit of its bargain by prohibiting Idaho hospitals from performing EMTALA-mandated services, notwithstanding that hospitals' receipt of Medicare funds is conditioned on them doing so." *Id.* On the Government's view, EMTALA requires Idaho hospitals to perform abortion procedures whenever the Government says so, and noncompliance may result in the loss of all Medicare funds.

Those funds are considerable. By the Government's own estimate, between 2018–20, Idaho's hospitals received $3.4 billion in Medicare funds and the state's 39 emergency centers received $74 million in federal funding—all of which was "conditioned on compliance with EMTALA." *Id.* at 6. Framed in these terms, the threatened loss of federal funding is not limited to support for abortion-related emergency care or abortion-related emergency care for Medicare beneficiaries. As the Government would have it, compliance with EMTALA embraces all Medicare-funded emergency centers and all patients—not only Medicare recipients. *Id.* at 6. Its memorandum lays out the case for denying Idaho hospitals funding under the Medicare program, solely because of its dispute with perceived noncompliance as to a single medical procedure governed by Idaho law and available at only 39 of 52 Medicare-certified hospitals. *Id*.

Threatening to withhold all Medicare-related funding for hospitals in Idaho unless emergency centers comply with an expansive interpretation of EMTALA exceeds the Government's authority under the Spending Clause. Consider a parallel threat in the original Affordable Care Act. There, states complained that "Congress [was] coercing the States to adopt

14

the changes it wants by threatening to withhold all of a State's Medicaid grants, unless the State accepts the new expanded funding and complies with the conditions that come with it." *NFIB*, 567 U.S. at 575. Agreeing with that objection, the Court held that this provision of ACA amounted to "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 582 (footnote omitted). Likewise here. The Government's threat to withhold all federal funding to any emergency center found to violate EMTALA is not a policy nudge—but "a gun to the head." *NFIB*, 567 U.S. at 581.

*Second*, the United States has sprung this abortion mandate under EMTALA on Idaho long after it agreed to other conditions of participating in Medicare. Trying to impose its abortion mandate on Idaho hospitals retroactively is an independent reason for concluding that the Government is exceeding its powers under the Spending Clause. *Pennhurst*, 451 U.S. at 25.

## 5. The Preliminary Injunction Trenches on Idaho's Reserved Power Under the Tenth Amendment.

The preliminary injunction violates the State of Idaho's reserved power to regulate abortion. *Dobbs* held that that authority now belongs "to the people and their elected representatives." 142 S. Ct. at 2284. There can be no reasonable dispute that Idaho possesses the authority to regulate abortion as a matter of federal constitutional law. But the preliminary injunction will thwart the return of authority prescribed by *Dobbs*. Specifically, the injunction prevents Idaho from carrying out sections 622(2) and (3), to the extent that those provisions collide with provisions under EMTALA that protect a pregnant woman's health from "serious jeopardy," pose a "serious impairment to [her] bodily functions," or threaten to cause a "serious dysfunction of any bodily organ or part." Decision at *15 (quoting 42 U.S.C. §§ 1395dd(e)(1)(A)(i)-(iii)). This order overrides the political, practical, and moral judgment of Idaho lawmakers to protect both mother *and* child by permitting abortion when necessary to save the mother's life and to allow

abortion to terminate a pregnancy resulting from rape or incest, but not otherwise. Idaho Code § 18-622.

Even if the United States could point to unambiguous statutory authority for its attempted blockade of Idaho law, EMTALA is a garden-variety statute that must give way to the Constitution insofar as they conflict. *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (the constitution controls any legislative act repugnant to it."). Under that principle, the Supreme Court's final judgment in *Dobbs* must prevail over conflicting federal statutes. While EMTALA remains valid to the extent that it prescribes certain forms of medical care by institutions participating in Medicare and Medicaid, it cannot be read as the Idaho Order says. The people of Idaho enjoy constitutional authority to govern themselves with respect to abortion, and no federal statute, however overread by an Administration committed to countering *Dobbs*, can lawfully diminish that authority.

## CONCLUSION

For all these reasons, the Court should either modify its August 24 Order to reflect the blue-line document submitted by the Legislature or vacate that Order in its entirety.

Dated this 7th day of September, 2022.

*/s/ Daniel W. Bower*
Daniel W. Bower
MORRIS BOWER & HAWS, PLLC


*/s/ Monte Neil Stewart*
Monte Neil Stewart

*Attorneys for Intervenor-Respondents*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of September, 2022, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

BRIAN DAVID NETTER
DOJ-Civ
Civil Division
brian.netter@usdoj.gov

DANIEL SCHWEI
DOJ-Civ
Federal Programs Branch
daniel.s.schwei@usdoj.gov

JULIE STRAUS HARRIS
DOJ-Civ Civil Division,
Federal Programs Branch
julie.strausharris@usdoj.gov

LISA NEWMAN
DOJ-Civ Civil Division,
Federal Programs Branch
lisa.n.newman@usdoj.gov

ANNA LYNN DEFFEBACH
DOJ-Civ
Civil Division,
Federal Programs Branch
anna.l.deffebach@usdoj.gov

CHRISTOPHER A. EISWERTH
DOJ-Civ
Federal Programs Branch
christopher.a.eiswerth@usdoj.gov

EMILY NESTLER DOJ-Civ
emily.b.nestler@usdoj.gov

*Attorneys for Plaintiff United States of America*

Brian V Church
Dayton Patrick Reed
Ingrid C Batey
Megan Ann Larrondo
Steven Lamar Olsen
Office of the Attorney General
brian.church@ag.idaho.gov
dayton.reed@ag.idaho.gov
ingrid.batey@ag.idaho.gov
megan.larrondo@ag.idaho.gov
steven.olsen@ag.idaho.gov

JOAN E. CALLAHAN, ISB #9241
NAYLOR & HALES, P.C.
Special Deputy Attorney General
joan@naylorhales.com

*Attorneys for Defendant*

JAY ALAN SEKULOW
sekulow@aclj.org
JORDAN A. SEKULOW
jordansekulow@aclj.org
STUART J. ROTH
Stuartroth1@gmail.com
OLIVIA F. SUMMERS
osummers@aclj.org
LAURA B. HERNANDEZ
lhernandez@aclj.org

*Attorneys for Amicus Curiae*
*American Center for Law & Justice*

LAURA ETLINGER
New York State Office
of the Attorney General
laura.Etlinger@ag.ny.gov

*Attorney for Amici States*
*California, New York, Colorado, Connecticut,*
*Delaware, Hawaii, Illinois, Maine, Maryland,*
*Massachusetts, Michigan, Minnesota,*
*Nevada, New Jersey, New Mexico, North*
*Carolina, Oregon, Pennsylvania, Rhode*
*Island, Washington, and Washington, D.C.*

WENDY OLSON
Stoel Rives LLP
wendy.olson@stoel.com

JACOB M. ROTH
AMANDA K. RICE
Jones Day
jroth@jonesday.com
arice@jonesday.com

*Attorneys for Amici Curiae*
*The American Hospital Association and the*
*Association of American Medical Colleges*

SHANNON ROSE SELDEN
Debevoise & Plimpton LLP
srselden@debevoise.com

ADAM B. AUKLAND-PECK
Debevoise & Plimpton LLP
Aaukland-peck@debevoise.com

LEAH S. MARTIN
Debevoise & Plimpton LLP
lmartin@debevoise.com

*Attorneys for Amici Curiae American College*
*of Emergency Physicians, Idaho Chapter of*
*the American College of Emergency*
*Physicians, American college of Obstetricians*
*and Gynecologists, Society for Maternal-Fetal*
*Medicine, National Medical Association,*
*National Hispanic Medical Association,*
*American Academy of Pediatrics, American*
*Academy of Family Physicians, American*
*Public Health Association, and American*
*Medical Association*

I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participant via email:

CHARLOTTE H. TAYLOR
Jones Day
ctaylor@jonesday.com

*/s/ Daniel W. Bower*

Daniel W. Bower