Nos. 23-35440, 23-35450

───────────────────────

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

───────────────────────

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF IDAHO,

Defendant-Appellant,

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-Defendants,

Movants-Appellants.

───────────────────────

On Appeal from the United States District Court
for the District of Idaho

───────────────────────

## CONSOLIDATED BRIEF FOR THE UNITED STATES

───────────────────────

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

PAUL R. RODRÍGUEZ
*Deputy General Counsel*

DAVID HOSKINS
*Supervisory Litigation Attorney*

JESSICA BOWMAN
MELISSA HART
*Attorneys*

*U.S. Department of Health
and Human Services*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JOSHUA D. HURWIT
*United States Attorney*

MICHAEL S. RAAB
MCKAYE L. NEUMEISTER
NICHOLAS S. CROWN
*Attorneys, Appellate Staff
Civil Division, Room 7325
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUE ............................................................ 3

PERTINENT STATUTES ................................................................... 3

STATEMENT OF THE CASE ............................................................ 3

    A.    The Emergency Medical Treatment and Labor Act (EMTALA). ............ 3

    B.    Idaho Code § 18-622........................................................................ 6

    C.    Procedural Background. ................................................................... 7

SUMMARY OF ARGUMENT ......................................................... 12

STANDARD OF REVIEW................................................................ 15

ARGUMENT ..................................................................................... 15

I.    The District Court Correctly Concluded That The United States Is Likely To Succeed On The Merits. .......................................................... 15

    A.    EMTALA preempts Idaho Code § 18-622 insofar as they directly conflict. .......................................................................................... 15

        1.    EMTALA requires hospitals to offer abortion care when treating physicians deem it necessary "stabilizing treatment" for an individual's "emergency medical condition." ....................................................................... 15

        2.    Idaho Code § 18-622 prohibits stabilizing treatment that providers deem necessary under EMTALA. ................................ 21

    B.    The State and Legislature's objections are forfeited and unavailing. ...... 25

II.    The Equities Decisively Support The Preliminary Injunction. ........................... 49

III.     The District Court Properly Tailored The Preliminary Injunction. ................... 57

CONCLUSION ............................................................................................................. 60

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*American Med. Ass'n v. Weinberger,*
  522 F.2d 921 (7th Cir. 1975) ................................................................. 42

*Arc of California v. Douglas,*
  757 F.3d 975 (9th Cir. 2014) ................................................................. 51

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................................................. 46

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ............................................................................. 46

*Arrington v. Wong,*
  237 F.3d 1066 (9th Cir. 2001) .............................. 4, 9, 20, 24, 29, 38

*Baby K, In re,*
  16 F.3d 590 (4th Cir. 1994) .................... 16, 21, 24, 29, 30, 37, 42, 45

*Baker v. Adventist Health, Inc.,*
  260 F.3d 987 (9th Cir. 2001) ......................................................... 26, 39

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) ...................................................... 41, 45, 48

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ................................................... 18, 19, 48-49

*Brooker v. Desert Hosp. Corp.,*
  947 F.2d 412 (9th Cir. 1991) ......................................................... 29, 40

*Bryan v. Rectors & Visitors of the Univ. of Va.,*
  95 F.3d 349 (4th Cir. 1996) ................................................................. 31

*Bryant v. Adventist Health System/West,*
  289 F.3d 1162 (9th Cir. 2002) ....................................................... 42, 43

iii

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)..................................................................................... 24

*Burditt v. HHS*,
934 F.2d 1362 (5th Cir. 1991)................................................................22, 45

*Burlington N. & Santa Fe Ry. Co. v. Vaughn*,
509 F.3d 1085 (9th Cir. 2007)..........................................................36, 40, 43

*California v. United States*,
No. C-05-328-JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008)............... 20

*Campbell v. Universal City Dev. Partners, Ltd.*,
72 F.4th 1245 (11th Cir. 2023) ................................................................... 38

*Camreta v. Greene*,
563 U.S. 692 (2011)..................................................................................... 48

*Cherukuri v. Shalala*,
175 F.3d 446 (6th Cir. 1999) ................................................ 16, 18, 31, 42

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992)..................................................................................... 25

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*,
462 U.S. 416 (1983)..................................................................................... 47

*City of Pocatello v. Peterson*,
473 P.2d 644 (Idaho 1970)........................................................................... 27

*Cummings v. Premier Rehab Keller, PLLC*,
142 S. Ct. 1562 (2022) ............................................................................41, 44

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019)....................................................................... 51

*Davis v. Michigan Dep't of Treasury*,
489 U. S. 803 (1989) ................................................................................... 31

*Dobbs v. Jackson Women's Health Organization*,
142 S. Ct. 2228 (2022) ................................................................................ 47

*Downhour v. Somani,*
   85 F.3d 261 (6th Cir. 1996) ........................................................ 42

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) .................................................... 52

*Draper v. Chiapuzio,*
   9 F.3d 1391 (9th Cir. 1993) .................................. 6, 8, 21, 25, 29, 45

*Earth Island Inst. v. Carlton,*
   626 F.3d 462 (9th Cir. 2010) ...................................................... 54

*Eberhardt v. City of Los Angeles,*
   62 F.3d 1253 (9th Cir. 1995) ...................................................... 30

*Edmo v. Corizon, Inc.,*
   935 F.3d 757 (9th Cir. 2019) ...................................................... 58

*Environmental Prot. Info. Ctr. v. Carlson,*
   968 F.3d 985 (9th Cir. 2020) ...................................................... 54

*Florida v. HHS,*
   19 F.4th 1271 (11th Cir. 2021) ................................................... 54

*Gallardo ex rel. Vargas v. Del Puerto Hosp.,*
   98 F.3d 1202 (9th Cir. 1996) ........................................................ 4

*Geo Grp., Inc. v. Newsom,*
   50 F.4th 745 (9th Cir. 2022) ...................................................... 50

*Hardy v. New York City Health & Hosps. Corp.,*
   164 F.3d 789 (2d Cir. 1999) .............................................. 21, 30, 45

*Harris v. McRae,*
   448 U.S. 297 (1980) ................................................................... 43

*Harry v. Marchant,*
   291 F.3d 767 (11th Cir. 2002) ................................................... 30

*Hecox v. Little,* --- F.4th ---,
   No. 20-35813, 2023 WL 5283127 (9th Cir. Aug. 17, 2023) ............. 57, 58, 59, 60

v

*Home Depot U.S.A., Inc. v. Jackson,*
139 S. Ct. 1743 (2019) ................................................................. 31

*Jackson v. East Bay Hosp.,*
246 F.3d 1248 (9th Cir. 2001) ............................................... 30, 43

*John Doe No. 1 v. Reed,*
561 U.S. 186 (2010) ..................................................................... 59

*Lamb-Weston, Inc. v. McCain Foods, Ltd.,*
941 F.2d 970 (9th Cir. 1991) ...................................................... 58

*Marinello v. United States,*
138 S. Ct. 1101 (2018) ................................................................ 49

*Marshall ex rel. Marshall v. East Carroll Parish Hosp. Serv. Dist.,*
134 F.3d 319 (5th Cir. 1998) ...................................................... 30

*Martindale v. Indiana Univ. Health Bloomington, Inc.,*
39 F.4th 416 (7th Cir. 2022) ....................................................... 30

*Mayes v. Biden,*
67 F.4th 921 (9th Cir. 2023) ................................................. 47, 48

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) ...................................................... 54

*Morin v. Eastern Me. Med. Ctr.,*
780 F. Supp. 2d 84 (D. Me. 2010) .............................................. 20

*Murphy v. National Collegiate Athletic Ass'n,*
138 S. Ct. 1461 (2018) ................................................................ 46

*National Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ..................................................................... 44

*New York v. HHS,*
414 F. Supp. 3d 475 (S.D.N.Y. 2019) ........................................ 20

*Olson v. California,*
62 F.4th 1206 (9th Cir. 2023) ..................................................... 15

vi

*Pharmaceutical Indus. Average Wholesale Price Litig., In re,*
582 F.3d 156 (1st Cir. 2009) ................................................................ 42

*Planned Parenthood Great Nw. v. State,*
522 P.3d 1132 (Idaho 2023).............................. 1, 2, 6, 10, 23, 24, 27, 29, 51

*Planned Parenthood of Se. Pa. v. Casey,*
505 U.S. 833 (1992)................................................................................ 46

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
566 U.S. 639 (2012)................................................................................ 41

*Ritten v. Lapeer Reg'l Med. Ctr.,*
611 F. Supp. 2d 696 (E.D. Mich. 2009) ............................................ 20

*Roberts v. Galen of Va., Inc.,*
525 U.S. 249 (1999)................................................................................ 39

*Roe v. Wade,*
410 U.S. 113 (1973)................................................................................ 47

*Roman v. Wolf,*
977 F.3d 935 (9th Cir. 2020)................................................................ 15

*Root v. New Liberty Hosp. Dist.,*
209 F.3d 1068 (8th Cir. 2000)........................................................ 22, 45

*School Dist. No. 1J, Multnomah Cty. v. ACandS, Inc.,*
5 F.3d 1255 (9th Cir. 1993)........................................................31, 40, 43

*State v. Yager,*
85 P.3d 656 (Idaho 2004)...................................................................... 28

*Summers v. Baptist Med. Ctr. Arkadelphia,*
91 F.3d 1132 (8th Cir. 1996)................................................................ 43

*Texas v. Becerra,*
623 F. Supp. 3d 696 (N.D. Tex. 2022) .............................................. 48

*Thornburgh v. American Coll. of Obstetricians & Gynecologists,*
476 U.S. 747 (1986)................................................................................ 47

*United States v. Adams*,
   40 F.4th 1162 (10th Cir. 2022) ....................................................... 32

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ...................................................... 49

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011), *rev'd in part on other grounds*,
   567 U.S. 387 (2012) ..........................................................49, 52, 53

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ................................... 49, 52, 53, 54

*United States v. City of Arcata*,
   629 F.3d 986 (9th Cir. 2010) ......................................................... 46

*United States v. Harris Methodist Fort Worth*,
   970 F.2d 94 (5th Cir. 1992) ........................................................... 41

*United States v. Jones*,
   231 F.3d 508 (9th Cir. 2000) ......................................................... 45

*United States v. Mackby*,
   339 F.3d 1013 (9th Cir. 2003) ....................................................... 50

*United States v. University Hosp., State Univ. of N.Y. at Stony Brook*,
   729 F.2d 144 (2d Cir. 1984) .......................................................... 42

*United States v. Washington*,
   142 S. Ct. 1976 (2022) ................................................................... 46

*United States v. Wells*,
   519 U.S. 482 (1997) ....................................................................... 46

*Utility Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014) .................................................................47, 48

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ....................................................... 23

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
   529 U.S. 765 (2000)................................................................................................ 49

*Washington v. Trump,*
   847 F.3d 1151 (9th Cir. 2017)..........................................................................51, 52

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ....................................................................................... 47

*Zango, Inc. v. Kaspersky Lab, Inc.,*
   568 F.3d 1169 (9th Cir. 2009).............................................................................. 46

**Statutes:**
Emergency Medical Treatment and Labor Act (EMTALA):

   42 U.S.C. § 1395dd ...................................................................................1, 3, 12
   42 U.S.C. § 1395dd(a) ......................................................................................4, 32
   42 U.S.C. § 1395dd(b) ...................................................................................15, 16
   42 U.S.C. § 1395dd(b)(1) .....................................................................5, 16, 32, 34
   42 U.S.C. § 1395dd(b)(1)(A) ..........................................................17, 22, 34, 36
   42 U.S.C. § 1395dd(b)(1)(B) .................................................................................30
   42 U.S.C. § 1395dd(b)(2) .......................................................5, 16, 17, 22, 23, 32, 36
   42 U.S.C. § 1395dd(c) ...............................................................................30, 32, 34
   42 U.S.C. § 1395dd(c)(1)(A)(ii) .........................................................................5, 33
   42 U.S.C. § 1395dd(c)(2)(A) .............................................................................5, 33
   42 U.S.C. § 1395dd(c)(2)(B) ................................................................................. 5
   42 U.S.C. § 1395dd(d)......................................................................................... 4
   42 U.S.C. § 1395dd(e) ......................................................................................... 32
   42 U.S.C. § 1395dd(e)(1) ..................................................................................... 4
   42 U.S.C. § 1395dd(e)(1)(A) ...............................................................8-9, 22, 27, 28
   42 U.S.C. § 1395dd(e)(1)(A) (1988) ................................................................. 34
   42 U.S.C. § 1395dd(e)(1)(A)(i) .........................................................16, 32, 33, 34, 38
   42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii) ................................................................... 6
   42 U.S.C. § 1395dd(e)(1)(A)(ii)-(iii) ................................................................. 35
   42 U.S.C. § 1395dd(e)(1)(B) .........................................................................16, 18
   42 U.S.C. § 1395dd(e)(1)(B)(ii) .......................................................................... 33
   42 U.S.C. § 1395dd(e)(2) ..................................................................................... 4
   42 U.S.C. § 1395dd(e)(2)(C) (1988) ................................................................. 34
   42 U.S.C. § 1395dd(e)(3)(A).........................................................5, 16, 18, 39, 41
   42 U.S.C. § 1395dd(f) .......................................2, 6, 21, 26, 31, 37, 41, 46

Public Health Cigarette Smoking Act of 1969,
   Pub. L. No. 91-222, 84 Stat. 87 ................................................................ 25

Pub. L. No. 99-272, § 9121(b), 100 Stat. 82, 166 (1986) ............................ 34

Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (1989) ...................... 34

Pub. L. No. 117-103, div. H, tit. V, §§ 506-507, 136 Stat. 49, 496 (2022) ................... 43

1 U.S.C. § 8(a) .............................................................................................. 32

1 U.S.C. § 8(b) .............................................................................................. 32

10 U.S.C. § 1093 ........................................................................................... 19

20 U.S.C. § 1688 ........................................................................................... 19

22 U.S.C. § 5453(b) ...................................................................................... 19

22 U.S.C. § 7704(c)(4) .................................................................................. 19

25 U.S.C. § 1676 ........................................................................................... 19

28 U.S.C. § 1292(a)(1) .................................................................................... 3

28 U.S.C. § 1331 ............................................................................................. 3

28 U.S.C. § 1345 ............................................................................................. 3

42 U.S.C. § 238n ........................................................................................... 19

42 U.S.C. § 280h-5(a)(3)(C) ......................................................................... 19

42 U.S.C. § 300a-6 ........................................................................................ 19

42 U.S.C. § 300a-7 ........................................................................................ 19

42 U.S.C. § 300a-8 ........................................................................................ 19

42 U.S.C. § 300z-10 ...................................................................................... 19

42 U.S.C. § 1395 *et seq.* ................................................................. 3

42 U.S.C. § 1395 ............................................................................ 40

42 U.S.C. § 1395cc ........................................................................... 3

42 U.S.C. § 1395cc(a)(1)(I)(i) ................................................ 3, 41, 44, 50

42 U.S.C. § 1397ee(c)(7) ................................................................. 19

42 U.S.C. § 2996f(b)(8) ................................................................... 19

42 U.S.C. § 12584a(a)(9) ................................................................. 19

42 U.S.C. § 18023(d) .................................................................. 20, 44

Idaho Code § 18-604(1)-(2) ............................................................. 27

Idaho Code § 18-604(1)(a)-(d) .......................................................... 11

Idaho Code § 18-604(1)(c) ................................................................ 6

Idaho Code § 18-604(9) .................................................................. 28

Idaho Code § 18-622 ............................. 1, 2, 9, 10, 11, 12, 13, 14, 15, 22, 49

Idaho Code § 18-622(1) ......................................................... 7, 23, 24

Idaho Code § 18-622(2)(a) ...................................................... 26, 27, 55

Idaho Code § 18-622(2)(a)(i) ............................................ 6, 11, 23, 28, 36

Idaho Code § 18-622(2)(b) ................................................................ 6

Idaho Code § 18-622(3)(a)(ii) ............................................................ 7

Idaho Code § 18-8801(5) ................................................................. 23

**Regulations:**

42 C.F.R. § 489.24(a)(1)(i) ................................................................ 4

42 C.F.R. § 489.24(a)(1)(ii) ............................................................... 5

42 C.F.R. § 489.24(d)(2)(i) ........................................................... 5, 30

**Legislative Materials:**

151 Cong. Rec. H177 (daily ed. Jan. 25, 2005) ................................. 44

Consolidated Omnibus Reconciliation Act of 1985,
    H.R. 3128, 99th Cong. (1985) .................................................... 19

H.B. 374, § 1, 67th Leg., 1st Reg. Sess. (Idaho 2023),
    https://perma.cc/ZTZ7-HHWK ............................................ 11, 57

H.R. Rep. No. 99-241, pt. 1 (1985) ............................................. 6, 26

H.R. Rep. No. 99-241, pt. 3 (1985) ...................................4, 6, 26, 38

H.R. Rep. No. 99-453 (1985) ....................................................... 19

H.R. Rep. No. 101-386 (1989) ..................................................... 34

**Other Authorities:**

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are
    Pregnant or Are Experiencing Pregnancy Loss* (Sept. 17, 2021),
    https://perma.cc/65CQ-YLUQ ................................................. 21

*Life-Threatening*, Black's Law Dictionary (11th ed. 2019) ................. 55

**INTRODUCTION**

In some instances, pregnant individuals arrive at Medicare-participating emergency departments needing immediate treatment. They may present with emergency medical conditions, including infections, pre-eclampsia, or premature pre-term rupture of membranes (PPROM). Such conditions can lead to devastating harms like sepsis requiring limb amputation, uncontrollable bleeding requiring hysterectomy, kidney failure requiring lifelong dialysis, or even death—unless they are stabilized. And sometimes, a treating physician will determine that pregnancy termination (*i.e.*, abortion care) is the necessary stabilizing treatment.

When that happens, federal law requires the hospital to offer the treatment and provide it upon the patient's consent. The Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, guarantees individuals "necessary stabilizing treatment" for their "emergency medical conditions." This guarantee covers not only threats to a patient's life, but also to her health, organs, and major bodily functions.

But Idaho's abortion law, Idaho Code § 18-622, virtually ensures that such harms will occur. Idaho enacted a statute so sweeping that the Idaho Supreme Court calls it a "Total Abortion Ban." *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1147 (Idaho 2023). Under § 18-622, it is a felony for a healthcare professional to terminate a pregnancy unless doing so would be "necessary" to prevent the patient's "death." As the Idaho Supreme Court has recognized, that standard is narrower than the language Congress employed in EMTALA, which protects patients not only from imminent death

but also from serious threats to their health. *Id.* at 1158, 1195-97, 1203-04, 1207. Idaho's law therefore criminalizes care required by federal law to stabilize pregnancy-related medical emergencies that could irreversibly injure the individual.

The Supremacy Clause and EMTALA's express preemption provision preclude that result. Thus, before Idaho's law became effective, the United States brought this suit and moved for a preliminary injunction to block the State from enforcing § 18-622 against emergency healthcare that EMTALA requires—*i.e.*, stabilizing treatments that physicians deem necessary. The district court granted a tailored preliminary injunction that applies when enforcing Idaho's law in Medicare-participating hospitals would "directly conflict[] with a requirement of" EMTALA. 42 U.S.C. § 1395dd(f).

Appellants—the State of Idaho and the Idaho Legislature—fail to show legal or factual error. EMTALA protects pregnant patients no less than non-pregnant patients, and it guarantees stabilizing treatment for emergency medical conditions that pose severe threats to their health. Because Idaho Code § 18-622 criminalizes that same care unless it is "necessary" to prevent "death," it directly conflicts with EMTALA. Bolstering the district court's statutory analysis is a substantial factual record, which appellants do not meaningfully address.

The severe risk of irreparable harm and the equities also support the preliminary injunction. Idaho's statute will jeopardize the lives and health of individuals experiencing emergency medical conditions, and will prohibit physicians in Medicare-participating hospitals from providing treatment necessary to prevent such harms.

Finally, the injunction is appropriately tailored. The State's contrary contention is premised on a misreading of the district court's order. The injunction quotes EMTALA itself and targets the precise situations when Idaho's law would directly conflict with federal law—and thus injure the United States's sovereign interests.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1345. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in granting a preliminary injunction.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. The Emergency Medical Treatment and Labor Act (EMTALA).

Medicare is a federally funded program administered by the Secretary of Health and Human Services. Medicare pays healthcare providers or insurers for services under certain circumstances. *See* 42 U.S.C. § 1395 *et seq.* Participation in Medicare is voluntary, and each provider agrees to certain conditions to receive funding. *See id.* § 1395cc.

One of those conditions is compliance with EMTALA. *See* 42 U.S.C. § 1395dd; *id.* § 1395cc(a)(1)(I)(i). Congress enacted EMTALA in 1986, based on "a growing

3

concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." H.R. Rep. No. 99-241, pt. 3, at 5 (1985). "The 'overarching purpose of EMTALA is to ensure that patients, particularly the indigent and underinsured, receive adequate emergency medical care.'" *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) (alterations omitted) (quoting *Gallardo ex rel. Vargas v. Del Puerto Hosp.*, 98 F.3d 1202, 1205 (9th Cir. 1996)). EMTALA applies to hospitals that have an emergency department and participate in Medicare, 42 U.S.C. § 1395dd(e)(2), and provides for civil enforcement, *id.* § 1395dd(d).

Under EMTALA, when an individual presents to a Medicare-participating emergency department and requests examination or treatment, the hospital must provide an appropriate medical-screening examination "to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a); *see* 42 C.F.R. § 489.24(a)(1)(i). The term "emergency medical condition" means:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>> (ii) serious impairment to bodily functions, or
>> (iii) serious dysfunction of any bodily organ or part; or
> (B) with respect to a pregnant woman who is having contractions—
>> (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
>> (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1).

4

If the provider determines that an individual has an emergency medical condition, "the hospital must provide either—(A) … for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with" certain requirements. 42 U.S.C. § 1395dd(b)(1); *see* 42 C.F.R. § 489.24(a)(1)(ii).[1] A hospital "meet[s]" this requirement if it "offers the individual" examination and treatment and "informs the individual (or a person acting on the individual's behalf) of the risks and benefits," yet "the individual (or a person acting on the individual's behalf) refuses" treatment. 42 U.S.C. § 1395dd(b)(2). The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i).

EMTALA defines "'to stabilize'" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). As relevant here, then, EMTALA requires that hospitals offer stabilizing treatment when "the health" of the individual is "in serious jeopardy," or when a condition could result in a "serious

---

[1] A hospital may "transfer" the individual only if the transfer meets certain requirements, *e.g.*, that the medical benefits of transferring outweigh the risks, 42 U.S.C. § 1395dd(c)(1)(A)(ii), and that the transfer is "appropriate" when the transferring hospital receives confirmation that the receiving facility has agreed to the transfer and has the space and qualified personnel to treat the individual, *id.* § 1395dd(c)(2)(A), (B).

impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A)(i)-(iii).

EMTALA contains an express preemption provision, preserving state laws "except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). A direct conflict occurs when (1) it is "physically impossible" to comply with both state law and EMTALA, or (2) "the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1394 (9th Cir. 1993) (per curiam). This provision does "not preempt stricter state laws," *i.e.*, state laws requiring emergency care in addition to EMTALA's requirements. H.R. Rep. No. 99-241, pt. 1, at 4 (1985); H.R. Rep. No. 99-241, pt. 3, at 5 (expressing desire to add "federal sanctions" as a supplement to state-law duties "to provide necessary emergency care").

### B.    Idaho Code § 18-622.

The Idaho Supreme Court has called § 18-622 a "Total Abortion Ban." *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1147 (Idaho 2023). Unless the patient furnishes a police report that her pregnancy (still within the first trimester) resulted from "an act of rape or incest," Idaho Code § 18-622(2)(b), Idaho allows only those abortions "necessary to prevent the death of the pregnant woman," *id.* § 18-622(2)(a)(i), or to "remov[e] … an ectopic or molar pregnancy," *id.* § 18-604(1)(c).[2] Otherwise, it is a

---

[2] Before recent amendments, the necessary-to-prevent-death provision was an affirmative defense. Idaho Code § 18-622(3)(a)(ii) (as originally enacted); *see infra* p.11.

felony punishable by two-to-five years' imprisonment—and by suspension or revocation of the healthcare professional's "license"—to "perform[]," "attempt[] to perform," or "assist[] in performing or attempting to perform" treatment that involves pregnancy termination, *id.* § 18-622(1). The statute applies even if withholding treatment poses a *risk* of causing death, or would cause the patient irreversible but non-lethal harm.

### C.     Procedural Background.

**1.**     In August 2022, the United States filed this equitable suit, challenging § 18-622 as preempted to the extent it directly conflicts with EMTALA. 4-LEG-ER-570.[3] The government sought preliminary relief before § 18-622 took effect to block the State from enforcing the statute against emergency healthcare that EMTALA requires—that is, stabilizing treatments that physicians deem necessary.

In its preliminary-injunction motion, the United States argued that § 18-622 directly conflicts with EMTALA for several independent reasons. *See* 3-ER-290–316. The government explained that: (1) EMTALA requires offering treatment for a broader set of medical conditions beyond those allowed under § 18-622, including when there is an uncertain "risk" that the patient could die, or when treatment would prevent non-lethal harms; (2) Section 18-622's criminal and license sanctions will deter the provision of

---

[3] Although the Complaint named one defendant—the State of Idaho—the Legislature permissively intervened. (In a separate appeal, No. 23-35153, the Legislature seeks interlocutory review of decisions partially granting intervention.) In this consolidated appeal, the Legislature denoted its record excerpts as "LEG-ER"; the State denoted its excerpts as "ER."

stabilizing treatments, and (3) the (since-amended) affirmative-defense structure of § 18-622 posed an obstacle to EMTALA.

The United States submitted declarations from numerous physicians, including emergency-department providers in Idaho. Those physicians explained how various conditions can arise (or become exacerbated) during pregnancy and may constitute "emergency medical conditions" under EMTALA. *See, e.g.*, 3-ER-182–183, 188–217, 319–358. In some cases, physicians conclude that the requisite stabilizing treatment is pregnancy termination, even if it is not "necessary" to prevent death (*e.g.*, because there is an uncertain *risk* of death or the condition would cause serious harms short of death). *See id.*

**2.** On August 24, 2022, the district court granted a preliminary injunction. Applying both impossibility- and obstacle-preemption principles, *see Draper*, 9 F.3d at 1393-94, the court concluded that the United States had likely shown that § 18-622 is preempted to the extent it directly conflicts with EMTALA, 1-ER-014–052.

First, the court determined that because EMTALA "requires the provision of care and [§ 18-622] criminalizes that very care, it is impossible to comply with both laws." 1-ER-032. The court observed that EMTALA is "broader than" Idaho's necessary-to-prevent-death standard "on two levels": (a) EMTALA's stabilization requirement applies "to prevent injuries that are more wide-ranging than death," and (b) EMTALA requires stabilizing treatment "when harm is probable, when the patient could 'reasonably be expected' to suffer injury," 1-ER-034 (quoting 42 U.S.C.

8

§ 1395dd(e)(1)(A)), whereas Idaho Code § 18-622 allows only "abortions that the treating physician determines are *necessary* to prevent the patient's death," 1-ER-033. The order detailed several conditions that could require abortion care as the stabilizing treatment to avoid a risk of death, or to avoid devastating consequences short of causing death. It identified, for example:

- pre-eclampsia resulting in "the onset of seizures";

- an "infection after the amniotic sac surrounding the fetus has ruptured," leading to "sepsis requiring limb amputation" or organ failure; and

- "placental abruption" leading to "catastrophic or uncontrollable bleeding" that could "requir[e] hysterectomy" or result in "kidney failure requiring life-long dialysis."

1-ER-015, 021–024; *see also* 1-ER-010–012.

Second, the court concluded that obstacle preemption independently applied because, "even if it were theoretically possible to simultaneously comply with both laws," Idaho's ban would frustrate EMTALA's "clear purpose … to establish a bare minimum of emergency care that would be available to all people in Medicare-funded hospitals." 1-ER-037–038. Idaho's law deters stabilizing abortion care, the court observed, because its necessary-to-prevent-death standard is challenging to apply in emergency situations and threatens criminal consequences for on-the-spot judgments about the likelihood that a patient would die absent treatment. 1-ER-040–044. The court also explained that Idaho Code § 18-622 would obstruct Congress's purpose in ensuring "adequate emergency medical care," *Arrington*, 237 F.3d at 1074 (quotation marks omitted), by causing

a delay in medically necessary care and worse outcomes for patients, 1-ER-045–046. The court likewise determined that enforcing § 18-622 would make it more difficult to recruit and retain qualified physicians in Idaho. 1-ER-047; *see* 1-ER-022–024, 036–037.

Having found both impossibility and obstacle preemption, the court granted targeted relief. It "restrain[ed] and enjoin[ed] the State of Idaho, including all of its officers, employees, and agents, from enforcing" Idaho Code § 18-622 "as applied to medical care required by [EMTALA], 42 U.S.C. § 1395dd." 1-ER-051. The court detailed the injunction's scope by quoting EMTALA itself. "Specifically," the order stated,

> the State of Idaho, including all of its officers, employees, and agents, are prohibited from initiating any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on, any medical provider or hospital based on their performance of conduct that (1) is defined as an "abortion" under Idaho Code § 18-604(1), but that is necessary to avoid (i) "placing the health of" a pregnant patient "in serious jeopardy"; (ii) a "serious impairment to bodily functions" of the pregnant patient; or (iii) a "serious dysfunction of any bodily organ or part" of the pregnant patient, pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii).

1-ER-051–052.

**3.** Instead of immediately appealing, the State and Legislature moved for reconsideration, which the district court denied. 1-ER-002–013. The court noted that the State and Legislature were either "rehashing arguments previously presented or" raising new "arguments that they could have raised earlier." 1-ER-006.

The court also explained that appellants' reliance on *Planned Parenthood*, 522 P.3d 1132, which issued after the preliminary injunction, "confirmed—rather than

eliminated—the conflict between EMTALA and the Total Abortion Ban." 1-ER-009. As interpreted by the Idaho Supreme Court, § 18-622's necessary-to-prevent-death exception to the abortion ban covers "a narrower scope of conduct than [what] EMTALA covers," because EMTALA requires stabilizing treatment (including abortion care) "when a patient faces serious health risks that may stop short of death." 1-ER-009–010.

4.  Idaho amended Idaho Code § 18-622, effective July 1, 2023. It now excludes "removal of a dead unborn child," "removal of an ectopic or molar pregnancy," and "treatment of a woman who is no longer pregnant" from the statutory definition of abortion. *See* H.B. 374, § 1, 67th Leg., 1st Reg. Sess. (Idaho 2023), https://perma.cc/ZTZ7-HHWK (amending Idaho Code § 18-604(1)(a)-(d)). The amendments also removed § 18-622's affirmative-defense structure, converting those defenses into exceptions to liability. *Id.* § 2. But the standard remains unchanged: The only relevant exception to Idaho's abortion ban applies to abortions "necessary to prevent … death." Idaho Code § 18-622(2)(a)(i).

5.  Both the State and Legislature appealed. *See* Nos. 23-35440, 23-35450. This Court consolidated the parallel appeals and directed the United States to file a consolidated response brief. *See* Order, No. 23-35440, Dkt. No. 9.

On July 3, 2023—nearly 11 months after the injunction had issued—the Legislature moved the district court for a stay pending appeal. 2-LEG-ER-76. In this appeal, the Legislature filed its merits brief on August 7. No. 23-35440, Dkt. Nos. 9-10. On

August 22, the Legislature sought a stay pending appeal in this Court. No. 23-35450, Dkt. No. 29. The United States has opposed both motions, which remain pending.

## SUMMARY OF ARGUMENT

This Court should affirm the preliminary injunction.

**I.** On the merits, the district court correctly identified a direct conflict between federal and state law.

Under EMTALA, 42 U.S.C. § 1395dd, individuals presenting to a covered emergency department—and experiencing an emergency threatening their health—must be offered treatment necessary to stabilize the emergency medical condition. EMTALA frames this stabilization requirement in broad terms. It does not exempt any form of care, and it applies even when the medical condition would not necessarily cause death: EMTALA requires stabilizing treatment whenever the patient faces serious risks to their health, organs, and bodily functions. The stabilization requirement applies equally to pregnant individuals. And the statutory text (and the virtually undisputed factual record) confirm that physicians can (and sometimes do) determine that the necessary stabilizing treatment for certain emergencies involves terminating a pregnancy. Thus, if the patient consents, the hospital must provide that treatment.

Idaho Code § 18-622, however, makes that same care a felony. Under state law, a healthcare professional would face five years' imprisonment—and license suspension or revocation—for performing an abortion unless that treatment were "necessary to prevent … death." Idaho thus criminalizes medically necessary emergency care when a

12

healthcare professional is unable to conclude that an abortion is *necessary* to prevent the pregnant individual's death, but still determines that such medical care is necessary to prevent a *risk* of death—or to prevent catastrophic but non-lethal harm. Accordingly, physicians in Medicare-participating hospitals would risk their liberty and livelihoods by providing stabilizing treatment they deem necessary to prevent serious harms like seizures, strokes, or organ failure.

The Supremacy Clause and EMTALA's express preemption clause preclude that result. Applying settled impossibility- and obstacle-preemption principles, the district court properly enjoined application of Idaho's law insofar as it directly conflicts with EMTALA's requirements.

The State and Legislature raise several objections on appeal, but many of their arguments are forfeited, and each is unavailing. For example, appellants misunderstand the governing preemption principles, focus on inapposite features of Idaho's law, venture unpreserved (and incorrect) arguments about EMTALA's text, and rely on irrelevant statutes and constitutional provisions.

II.    The district court properly exercised its discretion in determining that the equities and public interest favored a preliminary injunction.

The United States showed that it would suffer irreparable harm if Idaho Code § 18-622 were enforced when it directly conflicts with EMTALA. A direct conflict would violate the Supremacy Clause and interfere with the United States's sovereign interest in proper administration of federal law, including Medicare.

13

The district court also correctly concluded that the public interest and balance of the equities support preliminary relief. Relying on factual findings that appellants do not address, the court found that permitting enforcement of § 18-622 against EMTALA-required care would increase the risk that pregnant patients would face serious medical complications, irreversible injuries (such as limb amputation, hypoxic brain injury, and organ failure), or even death. By contrast, appellants suffer no irreparable harm because, among other things, the injunction maintains the status quo: Section 18-622 has never applied to EMTALA-required care.

The State and Legislature's objections are unavailing. Appellants either repackage their merits arguments or improperly seek to have this Court re-weigh the harms and equities.

**III.** The preliminary injunction is appropriately tailored. It targets the precise situations when enforcing Idaho Code § 18-622 would directly conflict with EMTALA's stabilization requirements in Medicare-participating emergency departments.

The State argues that the injunction is overbroad, but that contention is premised on a misreading of court's order. Equally unpersuasive is the State's argument that the government obtained "facial relief" without satisfying the burden for a facial challenge. The United States raised an as-applied challenge to Idaho's law, and the injunction does not extend beyond the specific circumstances when § 18-622's operation would conflict with EMTALA's operation—and would thus violate the Supremacy Clause and injure the United States's sovereign interest in proper administration of federal law.

14

Regardless, the district court separately held that, even construed as a facial challenge, this lawsuit is likely to succeed. The State declined to challenge that alternative holding.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Olson v. California*, 62 F.4th 1206, 1218 (9th Cir. 2023) (quoting *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020)).

## ARGUMENT

### I. The District Court Correctly Concluded That The United States Is Likely To Succeed On The Merits.

#### A. EMTALA preempts Idaho Code § 18-622 insofar as they directly conflict.

EMTALA and Idaho Code § 18-622 directly conflict. Federal law requires covered hospitals to provide stabilizing treatments that providers deem necessary, while state law criminalizes that care. The injunction rests on a straightforward textual analysis and a compelling factual record.

##### 1. EMTALA requires hospitals to offer abortion care when treating physicians deem it necessary "stabilizing treatment" for an individual's "emergency medical condition."

a. Medicare-participating hospitals must offer "stabilizing treatment" to all individuals who present to emergency departments with an "emergency medical condition." 42 U.S.C. § 1395dd(b). For such individuals and upon informed consent, hospitals "must provide," "within the staff and facilities available at the hospital, for such

further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* § 1395dd(b)(1), (2).

The stabilization requirement does not exempt any form of care. EMTALA broadly defines "'to stabilize'" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during" transfer. 42 U.S.C. § 1395dd(e)(3)(A). That expansive definition is "not given a fixed or intrinsic meaning," but instead "is purely contextual or situational" and requires a "physician, faced with an emergency, to make a fast on-the-spot risk analysis." *Cherukuri v. Shalala*, 175 F.3d 446, 449-50 (6th Cir. 1999); *see also In re Baby K*, 16 F.3d 590, 595-96 (4th Cir. 1994). EMTALA thus contemplates *any* form of stabilizing treatment, if the relevant medical professionals determine that such care is necessary.

**b.** EMTALA's protections apply to pregnant individuals. Congress expressly contemplated that a "pregnant woman" would be among the "individual[s]" experiencing an "emergency medical condition." 42 U.S.C. § 1395dd(e)(1)(A)(i), (B). When a pregnant individual "comes to a hospital and the hospital determines that the individual has an emergency medical condition," absent appropriate transfer, "the hospital must provide … such treatment as may be required to stabilize the medical condition." *Id.* § 1395dd(b).

EMTALA's stabilization requirement encompasses emergency abortion care. Many conditions can arise during (or be exacerbated by) pregnancy that may constitute

"emergency medical conditions." Examples include PPROM, pre-eclampsia, and ec-
lampsia. *See, e.g.*, 1-ER-011–012, 021–023 (factual findings); 3-ER-182–183, 188–217,
319–368 (physician declarations). If left untreated, those conditions could present
"grave risks" to the pregnant individual's health, including "severe sepsis requiring limb
amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure
requiring lifelong dialysis, or hypoxic brain injury." 1-ER-010 (quotation marks omit-
ted); *accord, e.g.*, 1-ER-011–012, 015, 020–024; 3-ER-191–192, 195–201, 204–210, 319–
358. In those circumstances, a physician could conclude in their professional judgment
that the requisite stabilizing treatment is abortion care. *See, e.g.*, 1-ER-022. EMTALA
would then require that such treatment be offered and provided upon informed con-
sent. 42 U.S.C. § 1395dd(b)(1)(A), (2).

 Both appellants conceded in the proceedings below that stabilizing treatment
under EMTALA can involve pregnancy termination. The State recognized "circum-
stances when stabilizing treatment necessitated by EMTALA includes an abortion." 3-
ER-236–237. Likewise, the Legislature did not dispute that "some serious medical con-
dition exists that requires an emergency medical procedure under EMTALA, with that
procedure ending the life of the preborn child," and instead questioned whether state
prosecutors would "exercise … their prosecutorial discretion" in those cases. 4-LEG-
ER-504.

 On appeal, the State acknowledges (Br. 24) that "EMTALA does not dictate
specific treatment requirements," but does not follow that concession to its logical

conclusion. By not expressly naming abortion as treatment that could meet EMTALA's definition of "stabilize"—just as EMTALA omits mention of all sorts of stabilizing treatments—the statute treats pregnancy termination the same as all other potential treatments for emergency medical conditions. *See, e.g., Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."). It would be impossible (and unnecessary) for the statute to list every conceivable emergency medical condition and its corresponding stabilizing treatment. Rather, EMTALA requires whatever treatment a provider concludes is medically necessary to stabilize whatever emergency condition is present.

In fact, EMTALA mentions a specific form of stabilizing treatment in only one circumstance: when a pregnant woman is in labor and "having contractions." 42 U.S.C. § 1395dd(e)(1)(B); *see id.* § 1395dd(e)(3)(A) ("The term 'to stabilize' means, … with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta)."). By singling out "contractions," EMTALA expands the definition of "emergency medical condition" to include labor, which otherwise might not meet subparagraph (e)(1)(A)'s standards. For all other emergency medical conditions, EMTALA leaves it to the physician to determine what "medical treatment of the condition" is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual." *Id.* § 1395dd(e)(3)(A); *see Cherukuri*, 175 F.3d at 449-50 (explaining that the definition of "stabilized" is "purely contextual or situational").

18

**c.** Congress knows how to create special rules governing abortion or excluding abortion care from otherwise-applicable rules. *See, e.g.*, 10 U.S.C. § 1093; 20 U.S.C. § 1688; 22 U.S.C. §§ 5453(b), 7704(c)(4); 25 U.S.C. § 1676; 42 U.S.C. §§ 238n, 280h-5(a)(3)(C), 300a-6, 300a-7, 300a-8, 300z-10, 1397ee(c)(7), 2996f(b)(8), 12584a(a)(9). Yet Congress notably did not do so for EMTALA. The Legislature recognizes (Br. 42-43) this tradition, but draws the wrong inference in arguing that EMTALA's expansive text silently excludes certain treatments. There is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." *Bostock* 140 S. Ct. at 1747. Congress's choice "not to include any exceptions" instead means that "courts apply the broad rule." *Id.*

EMTALA's history and context reinforce the point. The same legislation through which Congress considered EMTALA included a separate program that, unlike EMTALA, *did* expressly prohibit abortion. *Compare* Consolidated Omnibus Reconciliation Act of 1985, H.R. 3128, 99th Cong. § 124 (1985) (language that became EMTALA), *with id.* § 302(b)(2)(B) (excluding abortion from a different program's authorized activities). But Congress did not include such language in EMTALA itself (and did not enact the other program either). H.R. Rep. No. 99-453, at 601 (1985) (Conf. Rep.). The omission of abortion care in EMTALA shows that Congress did not intend to exclude such stabilizing treatment.

The Affordable Care Act suggests the same conclusion. In a section allowing States to prohibit abortion coverage in certain health plans, the ACA states that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1867 of the Social Security Act (popularly known as 'EMTALA.')." 42 U.S.C. § 18023(d).

    **d.**    Courts have long understood that abortion care can constitute stabilizing treatment. *See, e.g.*, *New York v. HHS*, 414 F. Supp. 3d 475, 537-39 (S.D.N.Y. 2019); *Morin v. Eastern Me. Med. Ctr.*, 780 F. Supp. 2d 84, 93-96 (D. Me. 2010); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712-18 (E.D. Mich. 2009); *California v. United States*, No. C-05-328-JSW, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008). This commonsense conclusion follows both from the statute's broad text, *supra* pp. 15-19, and from EMTALA's "purpose" of "ensur[ing] that patients, particularly the indigent and underinsured, receive adequate emergency medical care," *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) (quotation marks omitted).

Practitioners likewise understand that EMTALA's stabilization requirements encompass abortion care in certain circumstances: namely, *if* the medical provider determines that such care is the requisite stabilizing treatment for a specific emergency medical condition. *See, e.g.*, 3-ER-323–336, 339–346, 349–352, 355–358.

Federal agencies share that view. For example, in September 2021, the Centers for Medicare and Medicaid Services (CMS) issued guidance that "[e]mergency medical conditions involving pregnant patients may include, but are not limited to: ectopic

pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features." CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* 4 (Sept. 17, 2021), https://perma.cc/65CQ-YLUQ. The guidance reminded that "[s]tabilizing treatment could include medical and/or surgical interventions," including "dilation and curettage (D&C)." *Id.*

### 2. Idaho Code § 18-622 prohibits stabilizing treatment that providers deem necessary under EMTALA.

**a.** EMTALA expressly preempts contrary state laws. It provides that "[t]he provisions of this section do not preempt any State or local law requirement, *except* to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added).

This preemption provision applies when (1) it is "physically impossible" for a hospital or physician to comply with both state law and EMTALA, or (2) "the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1394 (9th Cir. 1993) (per curiam); *see Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999).

A direct conflict occurs when state law permits (or, as here, requires) medical professionals to refuse requisite stabilizing treatment. *See Baby K*, 16 F.3d at 597 (holding that state law permitting physicians to refuse to provide care directly conflicted with EMTALA's stabilization requirement). Courts have likewise found that EMTALA

preempts state laws that stood as obstacles to EMTALA's civil liability provisions. *See Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000) (state law preempted insofar as it shielded hospitals from EMTALA liability); *Burditt v. HHS*, 934 F.2d 1362, 1373-74 (5th Cir. 1991) (recognizing "no reason for conditioning the applicability of EMTALA's civil penalty provision on the vagaries of the several state laws").

**b.** The district court correctly identified a direct conflict between EMTALA and Idaho Code § 18-622.

**i.** It is impossible for medical providers to comply with both statutes. Providers may (and sometimes do) determine, in the exercise of medical judgment required by EMTALA, that an abortion is the necessary stabilizing treatment for an individual's emergency medical condition. *See, e.g., supra* pp. 8-9, 16-17, 20-21; 1-ER-033–037. In those cases, federal law states that the hospital "must provide" that medically necessary treatment with the patient's consent. 42 U.S.C. § 1395dd(b)(1)(A), (2).

EMTALA's requirements apply even when treatment is not necessary to prevent the patient's death. An "emergency medical condition" under EMTALA is any "medical condition" that in "the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual … in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). Thus, even for conditions that might (or are certain to) stop short of causing death, EMTALA requires the hospital to offer abortion care if the relevant physician has deemed it the requisite stabilizing treatment.

But Idaho criminalizes that same care. Under § 18-622, it is a felony for medical providers to "perform[]," "attempt[] to perform," or "assist[] in performing or attempting to perform an abortion" unless it is deemed "necessary … to prevent death." Idaho Code § 18-622(1), (2)(a)(i). For example, if an emergency-room physician in Idaho determines that an abortion is the treatment necessary to prevent a *risk* of the pregnant individual's death, or to prevent catastrophic bleeding or non-lethal organ failure, *see* 1-ER-021–024, and provides that care with the individual's consent, 42 U.S.C. § 1395dd(b)(2), then the physician has committed a state felony. Because providers "could be prosecuted for conduct that Congress specifically sought to protect," it is impossible to comply with both state and federal law. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013).

As the district court recognized, the Idaho Supreme Court has confirmed that § 18-622's necessary-to-prevent-death standard directly conflicts with EMTALA's stabilization requirement. 1-ER-009–012. In *Planned Parenthood Great Northwest v. State*, 522 P.3d 1132 (Idaho 2023), the Idaho Supreme Court noted that § 18-622 does not include "the broader 'medical emergency' exception" to liability that is present in another state statute. *Id.* at 1196.[4] That omission underscores that § 18-622 is narrower than

---

[4] That "medical emergency" exception would cover any "condition that, in reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." Idaho Code § 18-8801(5). Section 18-622, the law the United

*Continued on next page.*

EMTALA, because the medical-emergency exception would have "appl[ied] in nearly identical circumstances in which EMTALA might preclude the Total Abortion Ban from being enforced." *Id.* at 1158; *see id.* at 1207 (observing that "EMTALA uses language *substantially similar* to" the medical-emergency exception absent from § 18-622).

**ii.** Section 18-622 also presents a direct conflict under obstacle-preemption principles. Besides criminalizing stabilizing treatments, state law demands that the provider's license be "suspended" for at least six months "upon a first offense," and "permanently revoked upon a subsequent offense." Idaho Code § 18-622(1). As the district court observed, these threats have "a deterrent effect," 1-ER-040, and thus obstruct Congress's "overarching purpose" of "ensur[ing] that patients, particularly the indigent and underinsured, receive adequate emergency medical care." *Arrington*, 237 F.3d at 1073-74 (quotation marks omitted).

That amply establishes obstacle preemption. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (finding "fear" of "expos[ure] … to unpredictable civil liability" sufficient for implied preemption); *Baby K*, 16 F.3d at 597 ("[T]o the extent [state law] exempts physicians from providing care they consider medically or ethically inappropriate, it directly conflicts with the provisions of EMTALA that require stabilizing treatment to be provided."). Indeed, appellants do not dispute the factual record

---

States has challenged, "supersede[s]" the statute containing the "medical emergency" exception. *Planned Parenthood*, 522 P.3d at 1161.

supporting the district court's conclusions. *See, e.g.*, 3-ER-345 ("[I]n my experience …
the threat of criminal prosecution has already deterred doctors from providing medi-
cally necessary, life-saving care."); 3-ER-209–211 ("The Idaho Law will have serious
negative effects on medical care in Idaho." (some capitalizations omitted)).

### B. The State and Legislature's objections are forfeited and unavailing.

The State and Legislature level various challenges to the injunction. Many are
forfeited, and each lacks merit.

**1. Preemption Standards.** The State (at 18-19, 27) and Legislature (at 27-
35) incorrectly maintain that the district court misconstrued EMTALA's preemption
provision.

The State asserts (Br. 18-19) that the district court failed to "cite" or apply
preemption principles set forth in *Draper*, 9 F.3d at 1393. That is inaccurate. The court
both cited *Draper* and meticulously measured the facts against applicable standards of
impossibility and obstacle preemption. *E.g.*, 1-ER-031–047. The State's invocation of
*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), underlines the point: There, a federal
statute had preemptive effect because it explicitly forbade any state-law "requirement"
not "in conformity with" the federal law. *Id.* at 515, 524 (quoting Public Health Cigarette
Smoking Act of 1969, Pub. L. No. 91-222, 84 Stat. 87). That is materially indistinguish-
able from EMTALA's language "preempt[ing] any State or local law requirement[] …

25

to the extent that the requirement directly conflicts with a requirement of" EMTALA. 42 U.S.C. § 1395dd(f).

Equally unpersuasive are the Legislature's assertions that 42 U.S.C. § 1395dd(f) is a "non-preemption provision." Leg.Br. 27 (quotation marks omitted). For support, the Legislature cites a case that confirmed that § 1395dd(f) is "a non-preemption provision" only for *additional* "state remedies," such as "a state law claim for medical malpractice." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001). Although § 1395dd(f) preserves state laws requiring emergency care beyond EMTALA's requirements, it still preempts state laws that directly conflict with EMTALA's minimum guarantees. *See id.*; *see also, e.g.*, H.R. Rep. No. 99-241, pt. 1, at 4 (explaining that EMTALA does "not preempt stricter state laws," *i.e.*, state laws requiring emergency care in addition to EMTALA's obligations); H.R. Rep. No. 99-241, pt. 3, at 5 (expressing desire to add "federal sanctions" as a supplement to state-law duties "to provide necessary emergency care").

**2. Conflict Between EMTALA and Idaho Code § 18-622.** The State and Legislature attempt to diminish the direct conflict between federal and state law, insisting that "there is no gap." State.Br. 24-25; *see* Leg.Br. 23, 33, 54-57. But appellants conceded this argument in the proceedings below by acknowledging "conceptual textual conflicts" between EMTALA and Idaho law. 2-ER-118:24.

**a.** Idaho's slim exception permitting abortions only when "necessary" to prevent the patient's "death," Idaho Code § 18-622(2)(a), does not eliminate the direct

conflict. EMTALA requires stabilizing treatment for any detected "emergency medical condition," which extends beyond treatments *necessary* to prevent death. 42 U.S.C. § 1395dd(e)(1)(A) (including "health … in serious jeopardy," "serious impairment to bodily functions," and "serious dysfunction of any bodily organ or part"); *accord Planned Parenthood*, 522 P.3d at 1158, 1195-97, 1203-04, 1207 (contrasting § 18-622's exception and omission of a "'medical emergency' exception" with EMTALA's stabilization requirements); *City of Pocatello v. Peterson*, 473 P.2d 644, 648 (Idaho 1970) (recognizing that "'[n]ecessary' means 'indispensable'"). The physicians' declarations and court's factual findings—which neither appellant engages with here—also reveal devastating (but not necessarily lethal) emergency medical conditions that, if left untreated, would present "grave risks" to the pregnant individual's health. 1-ER-010. Examples include "severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, or hypoxic brain injury." 1-ER-010 (quotation marks omitted); *accord, e.g.*, 1-ER-011–012, 015, 020–024; 3-ER-191–192, 195–201, 204–210, 319–358.

The State's (at 14, 24-25) and Legislature's (at 8-9, 55-56) references to recent amendments to Idaho law underscore the errors in their analysis. Those amendments removed the ban's affirmative-defense structure and excluded certain—but not all—nonviable pregnancies from the definition of "criminal abortion." Idaho Code § 18-622(2)(a); *id.* § 18-604(1)-(2). Those amendments, however, retained the standard that an abortion must be "necessary" to prevent "death," which is narrower than

EMTALA's stabilization requirements. *See* 42 U.S.C. § 1395dd(e)(1)(A); *supra* pp. 22-24. As the district court recognized, EMTALA is "broader than" Idaho's necessary-to-prevent-death standard "on two levels." 1-ER-034. First, EMTALA's stabilization requirements apply "to prevent injuries that are more wide-ranging than death." 1-ER-034. Second, EMTALA "calls for stabilizing treatment" when "the patient could 'reasonably be expected' to suffer injury." 1-ER-034 (quoting 42 U.S.C. § 1395dd(e)(1)(A)); *see also* 1-ER-010–012.

If anything, the amendments to Idaho law spotlight the direct conflict with EMTALA. Idaho could have amended § 18-622 to include a "medical emergency" exception, like the one discussed in the Idaho Supreme Court's *Planned Parenthood* decision, to permit abortion care when withholding treatment would pose a *risk* of death or severe non-lethal harms to the pregnant individual. *See supra* pp. 23-24; *see also* Idaho Code § 18-604(9) (similarly defining "Medical emergency"). Rather than include such an exception or incorporate the state-law definition of "medical emergency," § 18-622's exception employs stricter language: "necessary to prevent … death." Idaho Code § 18-622(2)(a)(i). That demonstrates that Idaho intended the exception to criminal liability to apply in narrower circumstances. *See, e.g.*, *State v. Yager*, 85 P.3d 656, 666 (Idaho 2004) ("Where a statute with respect to one subject contains a certain provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed."). This is particularly so because Idaho amended other portions of § 18-622 *after* the State Supreme Court had highlighted the differences

28

between EMTALA and the "Total Abortion Ban." *See Planned Parenthood*, 522 P.3d at 1158, 1207.

     **b.**    Regardless, Idaho law still stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Draper*, 9 F.3d at 1394, because § 18-622 still deters EMTALA-covered care, *see, e.g.*, 1-ER-038–047; *Arrington*, 237 F.3d at 1073-74; *supra* pp. 24-25.

     In challenging the court's obstacle-preemption conclusion, the State suggests that EMTALA is limited to "patient dumping or refusing to treat patients who are unable to pay." State.Br. 29; *see* Leg.Br. 28-29. But no such limitation can be found in the statute. To the contrary, appellants' view "directly conflicts with the plain language of EMTALA" because it would permit covered hospitals to provide "treatment that would allow [an individual's] condition to materially deteriorate, so long as the care she was provided was consistent with the care provided to other individuals." *Baby K*, 16 F.3d at 595-96. That interpretation is incompatible with the "statutorily defined … duty of a hospital to provide stabilizing treatment." *Id.* at 595. For support, moreover, the State cites a case reaffirming that EMTALA "applies to any and all patients, not just to patients with insufficient resources." *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 414-15 (9th Cir. 1991); *see also Arrington*, 237 F.3d at 1073-74 (noting EMTALA's "overarching purpose" of "ensur[ing] that patients, particularly the indigent and underinsured, receive *adequate* emergency medical care" (emphasis added) (quotation marks omitted)).

The other authorities that the State and Legislature cite are inapt. Most pertain to EMTALA's screening or transfer requirements and do not address the extent to which the statutory *stabilization* requirement—the one at issue here—preempts state law. *See Martindale v. Indiana Univ. Health Bloomington, Inc.*, 39 F.4th 416, 423 (7th Cir. 2022); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258-59, 1259 n.3 (9th Cir. 1995); *Marshall ex rel. Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998).

Likewise inapposite are *Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002) (en banc), and *Jackson v. East Bay Hospital*, 246 F.3d 1248 (9th Cir. 2001). In *Harry*, the patient was "admitted" to the hospital, 291 F.3d. at 770 n.8, which in appropriate circumstances "satisfie[s]" a hospital's responsibilities under the stabilization requirement, 42 C.F.R. § 489.24(d)(2)(i); *see* 42 U.S.C. § 1395dd(b)(1)(B), (c); *supra* p. 5 & n.1. And *Jackson* was a screening case in which there was no genuine dispute that the hospital "stabilized the only emergency condition it detected." 246 F.3d at 1257. Neither decision undermines the district court's preemption finding or suggests that a state can criminalize stabilizing treatment. *Cf. Baby K*, 16 F.3d at 597 (holding that state law permitting physicians to refuse to provide care directly conflicted with EMTALA's stabilization requirement).

Appellants' remaining citations are consonant with the district court's reasoning. Those decisions adopted the same impossibility- and obstacle-preemption principles that the district court applied here, *Hardy*, 164 F.3d at 795; agreed that EMTALA's

stabilization requirement "establishes an 'objective' standard of 'reasonableness' based on the situation at hand," *Cherukuri*, 175 F.3d at 449-51; and reiterated that the "stabilization requirement was intended to regulate the hospital's care" in the "narrow context" of "emergency treatment," as opposed to "longer-term full treatment," *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996). None of these cases subverts the straightforward conclusion that EMTALA "preempt[s]" a "State or local law requirement" in Idaho that "directly conflicts" with EMTALA's stabilization "requirement." 42 U.S.C. § 1395dd(f).

**3.** **"Unborn Child" Provisions.** The State (at 22-25, 32) and Legislature (at 33, 38-42) also contend that EMTALA's references to an "unborn child" exclude abortion care from the broad definition of stabilizing treatment. That argument is both forfeited and incorrect.

**a.** Neither appellant raised this argument in the preliminary-injunction briefing. *See School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). Instead, they acknowledged that there could be "circumstances when stabilizing treatment necessitated by EMTALA includes an abortion." 3-ER-236–237; *see* 4-LEG-ER-504 (similar).

Appellants' assertion also disregards the "fundamental canon of statutory construction that the words of a statute must be read in their context." *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U. S. 803, 809 (1989)). EMTALA's screening, stabilization, and transfer obligations

in subsections (a), (b), and (c) create a duty only to an "individual," not an "unborn child." A hospital's screening duty arises when an "individual" "comes to the emergency department" and a request for examination or treatment "is made on the individual's behalf." 42 U.S.C. § 1395dd(a). A hospital's obligation to offer stabilizing treatment arises if it determines that "the individual has an emergency medical condition." *Id.* § 1395dd(b)(1). The "individual" must be informed of risks and benefits and can give "informed consent to refuse such examination and treatment." *Id.* § 1395dd(b)(2). And EMTALA restricts transfer "until [the] individual [is] stabilized." *Id.* § 1395dd(c) (formatting omitted).

The "individual" to whom a hospital owes obligations under EMTALA does not include a fetus. EMTALA does not purport to specially define the term "individual," *see* 42 U.S.C. § 1395dd(e) (definitional section), but that term is defined for purposes of federal law in the Dictionary Act. That statute defines "individual" to "include every infant member of the species homo sapiens who is *born alive* at any stage of development." 1 U.S.C. § 8(a) (emphasis added); *see id.* § 8(b) (defining "born alive"); *see also United States v. Adams*, 40 F.4th 1162, 1170 (10th Cir. 2022) (collecting cases interpreting § 8 to exclude fetuses).

By focusing the duty to stabilize on "individuals," EMTALA did not extend an independent duty to the "unborn." Rather, in acknowledging that an "individual" could be pregnant, EMTALA carefully distinguishes between "the individual" (denoting the "pregnant woman") and "her unborn child." 42 U.S.C. § 1395dd(e)(1)(A)(i). At bottom,

when emergency medical conditions arise during a pregnancy, the individual to whom EMTALA creates obligations—and grants the ability to refuse consent—is the pregnant woman.

      **b.**    EMTALA's four references to an "unborn child" do not alter this conclusion.

      **i.**    Three of those references consider possible harm to an "unborn child" only when the pregnant individual is in labor. 42 U.S.C. § 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(B)(ii). Those provisions are irrelevant to EMTALA's requirements when a pregnant individual is *not* in labor. The statute sensibly requires hospitals to consider risks to the health of an "unborn child" in determining whether the hospital may permissibly transfer an individual in labor before delivery. But this says nothing about whether the statute establishes discrete obligations regarding an "unborn child" in other circumstances, nor does it suggest that Congress intended to mandate the further gestation of a fetus at the expense of the mother's health when emergency complications arise.

      **ii.**    The State and Legislature likewise misapprehend EMTALA's final reference to an "unborn child" in § 1395dd(e)(1)(A)(i). Clause (e)(1)(A)(i) expands the circumstances when a pregnant individual can be considered to have an "emergency medical condition." It includes conditions that might threaten the health of "the unborn child," but not necessarily that of the pregnant individual. 42 U.S.C. § 1395dd(e)(1)(A)(i) (defining "emergency medical condition" to include conditions that could result in "placing the health of the individual (or, with respect to a pregnant woman, the health

33

of the woman or her unborn child) in serious jeopardy"). But this addition did not alter EMTALA's framework: what must be stabilized is the "medical condition," *id.* § 1395dd(b)(1)(A), which belongs to the "individual," *id.* § 1395dd(b)(1), (c), (e)(1)(A)(i).

Statutory history further demonstrates that, in referencing an "unborn child," Congress did not intend to exclude pregnancy termination as a form of stabilizing treatment. As originally enacted, EMTALA's definition of "emergency medical condition" did not consider the health of a pregnant individual's fetus. Pub. L. No. 99-272, § 9121(b), 100 Stat. 82, 166 (1986) (codified at 42 U.S.C. § 1395dd(e)(1)(A) (1988)) ("placing the patient's health in serious jeopardy"). At the time, any risks to the "unborn child" were relevant only to determining whether a patient was in "active labor." *Id.* (codified at 42 U.S.C. § 1395dd(e)(2)(C) (1988)). Thus, if a pregnant individual came to an emergency room without being in labor and had a medical condition that jeopardized the health of her fetus—but not (yet) her own health—the hospital was arguably under no obligation to offer her stabilizing treatment.

Congress amended the definition of "emergency medical condition" three years later to its current form. Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (1989). The change "[p]rovid[ed] that 'emergency medical condition' *also applies* to a condition that places in serious jeopardy the health of the woman *or* her unborn child." H.R. Rep. No. 101-386, at 838 (1989) (Conf. Rep.) (emphases added). As amended, EMTALA requires hospitals to offer the pregnant woman stabilizing treatment for that condition.

But under subsections (a), (b), and (c), a hospital's affirmative duties under EMTALA still run to the pregnant individual.

**iii.** EMTALA's references to an "unborn child" reflect that when Congress required hospitals to consider the health of an "unborn child" in carrying out EMTALA's obligations, it said so explicitly. The remaining definitions of "emergency medical condition" do not mention an "unborn child." *See* 42 U.S.C. § 1395dd(e)(1)(A)(ii)-(iii). Rather, the scope of possible emergency medical conditions necessitating stabilizing treatment includes "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part" belonging to the individual. *Id.* In these respects, the "individual" pregnant woman receives greater protection than the "unborn child."

Appellants' argument also proves too much. Under appellants' theory, EMTALA's references to an "unborn child" would mean abortion would never constitute stabilizing treatment, even when necessary to save the individual's life. Yet, in arguing that federal and state law do not conflict, the State and Legislature assert that both statutes contemplate abortion care when necessary to prevent death. *E.g.*, State.Br. 20, 25; Leg.Br. 56-57, 71-72. Appellants' position also conflicts with the State's submitted evidence: One of the State's declarants explained that, when an individual has "a condition … such that it is not safe to transfer the patient until stabilizing treatment is given," "termination of the pregnancy" could be appropriate because it would be "necessary to save the life of the pregnant woman." 3-ER-253–254 (addressing stabilizing treatment for PPROM); *see generally* 3-ER-249–260 (providing additional examples).

35

Those sworn statements make little sense under appellants' view of the "unborn child" provisions.

**iv.** The Legislature disregards these textual cues in contending that pregnancy termination cannot constitute "stabilizing treatment" because it "places the unborn child in 'serious jeopardy.'" Leg.Br. 37; *cf.* Br. 24, 32. That argument is incorrect for the same reasons discussed above. The Legislature's assertion also overlooks EMTALA's informed-consent framework. EMTALA requires hospitals to inform the individual of the risks and benefits of the stabilizing treatment that the provider has concluded is necessary. 42 U.S.C. § 1395dd(b)(2). Then, "the individual (or a person acting on the individual's behalf)" must decide whether to consent or refuse. *Id.* EMTALA thus contemplates that it is the pregnant individual who must weigh the risks to herself and to her fetus and decide whether to continue a dangerous pregnancy.

**4. Treatment "Available at the Hospital."** The State also asserts (at 20-21) that stabilizing treatment cannot encompass abortion because such care is not "available at the hospital," 42 U.S.C. § 1395dd(b)(1)(A), given that Idaho has criminalized it.

That argument fails in every respect. It is forfeited because the State did not raise it in the proceedings below. *See Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007). It is incompatible with the State's assertion that abortion care *is* available when "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a)(i). It is irreconcilable with the State's concession that "[t]he range

36

of emergency room services subject to EMTALA is immense, and … may even include abortions." 3-ER-239. And it is inconsistent with the Legislature's recognition that a "serious medical condition" could "require[] an emergency medical procedure under EMTALA, with that procedure ending the life of the preborn child." 4-LEG-ER-504. The State's argument also contradicts the factual record: Both the federal government and the State submitted physician declarations confirming that abortion care is within their medical expertise or their hospitals' capabilities (and appropriate treatment in certain circumstances). *E.g.*, 3-ER-247–260, 338–340, 348–351, 354–357. The State cites no case adopting its contrary argument, and ignores the Fourth Circuit's decision in *Baby K*, which rejected it. 16 F.3d at 597.

The State ventures into the irrelevant by asserting (at 21) that the United States's position would "require[]" hospitals "to staff its emergency departments with doctors willing to perform abortions." For purposes of this case, the point is "far more modest." 1-ER-016. Under the Supremacy Clause, Idaho may not prosecute (or disturb the licenses of) any medical provider "based on their performance of conduct" that, in the provider's judgment, was necessary stabilizing treatment under EMTALA. 1-ER-052; *see Baby K*, 16 F.3d at 597.

The State's view, moreover, is exactly backwards. EMTALA "preempt[s] any State or local law requirement" that "directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). But the State's theory would write § 1395dd(f) out of the statute: Under the State's framing, EMTALA would never preempt a state law that

forbids a particular stabilizing treatment, because any banned treatment would simply be "[un]available" under § 1395(b)(1)(A). It is nonsensical to interpret a federal law with an express preemption provision—enacted because state law at the time failed to ensure the provision of necessary emergency care, *see Arrington*, 237 F.3d at 1073-74; H.R. Rep. No. 99-241, pt. 3, at 5—as allowing state laws that prohibit the provision of necessary emergency care. *See, e.g.*, *Campbell v. Universal City Dev. Partners, Ltd.*, 72 F.4th 1245, 1257-58 (11th Cir. 2023) (holding that state law cannot define what disability-discriminatory requirements are "necessary" under the Americans with Disabilities Act, given the statute's preemption provision and consequences of interpreting the federal law to yield to state law).

The State's reading would also lead to absurd consequences. It would mean that Idaho could restrict life-saving treatment for non-medical reasons, contrary to the canons of medical ethics, and still benefit from Medicare funding for its hospitals. And despite EMTALA's broad framework and express preemptive effect, emergency-department physicians would be forbidden to provide the care that, in their professional judgment, would be necessary to stabilize an emergency medical condition. For example, the State's view would permit it to demand that hospitals refuse curative treatment, and instead offer only palliative care, for any emergency condition resulting from an individual's own unlawful activities—*e.g.*, injuries caused by trespassing, a drug overdose, underage drinking, or reckless driving. Even if the medical condition placed an individual's health "in serious jeopardy," 42 U.S.C. § 1395dd(e)(1)(A)(i), an emergency-

department physician in a Medicare-participating hospital would be forbidden to offer the treatment that she judged necessary to prevent "material deterioration of the condition," *id.* § 1395dd(e)(3)(A), because that treatment would not be "available" under state law, State.Br. 21 (quotation marks omitted).

None of the State's citations supports this result. In fact, *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249 (1999) (per curiam), undermines the State's theory. *Roberts* rejected a hospital's argument that § 1395dd(b) included a subjective "appropriateness" standard, which would have required the plaintiff "alleging a violation of" EMTALA's stabilization requirement to "prove that the hospital acted with an improper motive in failing to stabilize her." *Id.* at 250. The State misunderstands (Br. 22) the Supreme Court's observation that § 1395dd(b) "does not require an 'appropriate' stabilization." 525 U.S. at 253. The Court was rejecting a narrow construction and emphasizing the stabilization requirement's breadth. *Id.*

This Court's decision in *Baker v. Adventist Health, Inc.*, 260 F.3d 987 (9th Cir. 2001), lends no support to the State either. *Baker* involved EMTALA's screening requirement, not the stabilization requirement relevant here. *Id.* at 994-95; *cf. Roberts*, 525 U.S. at 250-53 (noting that the requirements are distinct). And the treatment at issue was not "available" at the hospital because no providers were qualified to perform it. *Baker*, 260 F.3d at 994-95. That is the converse of the predicament presented here: Idaho imposes criminal liability even when a physician has identified a necessary stabilizing treatment that she is fully trained and willing to provide.

39

Similarly misplaced is the State's reliance on *Brooker v. Desert Hospital Corp.*, 947 F.2d 412 (9th Cir. 1991). That case had nothing to do with a restriction on a physician's exercise of medical judgment or a criminal ban on emergency healthcare. The plaintiff, in fact, *received* the care that her physicians had deemed stabilizing treatment. *Id.* at 415. This Court, moreover, reiterated the unremarkable point that stabilizing treatments need not "alleviate completely [the] emergency condition." *Id.*

**5.    42 U.S.C. § 1395.**   Lacking support in EMTALA itself, the State (at 22-23, 26-27) and Legislature (at 31-35) invoke a general provision of the Medicare Act, 42 U.S.C. § 1395, and argue that the government's theory would impose a national standard of care. Appellants forfeited this argument,[5] which also misunderstands § 1395 and its interaction with EMTALA.

Section 1395 states that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." This provision does not apply by its own terms because EMTALA's funding condition was enacted by Congress, not imposed by a "Federal officer or employee." 42 U.S.C. § 1395. Section 1395, moreover, does not narrow EMTALA's preemption clause—which

---

[5] The Legislature claims (at 34) it is "striking[]" that the preliminary injunction did not address § 1395, but neither the State nor the Legislature raised that provision until they moved for reconsideration. Thus, the argument was not properly before the district court at the reconsideration phase, *see School Dist.*, 5 F.3d at 1263, and it is forfeited here, *see Burlington*, 509 F.3d at 1093 n.3.

covers all "directly conflict[ing]" state laws. *Id.* § 1395dd(f). And even if there were any tension between EMTALA's stabilization requirement and the general provision in § 1395, EMTALA—the subsequent and more "specific" statute—would control. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Section 1395 also does not eliminate Congress's "broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds," *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1568 (2022), including through EMTALA, 42 U.S.C. § 1395cc(a)(1)(I)(i). The Supreme Court recently rejected a "reading of section 1395" like appellants' interpretation, which "would mean that nearly every condition of participation the Secretary has long insisted upon is unlawful." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (per curiam).

Nor does § 1395 give states authority to deny women stabilizing treatment under EMTALA. Through § 1395's "admonition that regulation should not 'supervise or control' medical practice or hospital operations," Congress "endorsed medical self-governance" for providers. *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 101 (5th Cir. 1992). That is entirely consistent with EMTALA's requirement that hospitals offer stabilizing medical treatment when practitioners deem it necessary.

Far from imposing a national standard or exercising supervision or control over the practice of medicine, the injunction *preserves* physicians' ability to identify necessary stabilizing treatment—just as EMTALA leaves that determination to the relevant professionals' judgment. 42 U.S.C. § 1395dd(e)(3)(A). The meaning of "stabilized" is

41

"purely contextual or situational" and "depends on the risks associated with" a particular case and "requires the transferring physician, faced with an emergency, to make a fast on-the-spot risk analysis." *Cherukuri*, 175 F.3d at 449-50; *accord Baby K*, 16 F.3d at 595-96. By contrast, state laws that bar the provision of abortion care when it constitutes the necessary stabilizing treatment under EMTALA interfere with doctors' ability to exercise their medical judgment and respond to emergency situations, with potentially disastrous consequences for pregnant individuals. 1-ER-010–012, 015, 020–024; *see supra* pp. 8-10, 16-17, 26-28.

The cases on which the State and Legislature rely do not suggest otherwise. Many have nothing to do with EMTALA at all. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009) (Medicare Part B); *Downhour v. Somani*, 85 F.3d 261 (6th Cir. 1996) (same); *United States v. University Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144 (2d Cir. 1984) (Rehabilitation Act of 1973); *American Med. Ass'n v. Weinberger*, 522 F.2d 921 (7th Cir. 1975) (Medicare and Medicaid regulations concerning reimbursement for admitted patients).

Even the decisions that do address EMTALA do not support appellants. In *Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002), for example, this Court concluded that a covered hospital should not "be liable under EMTALA if its staff negligently fails to detect an emergency medical condition." *Id.* at 1166. But the Court did not suggest that a state could criminalize stabilizing treatments, or that a hospital could disregard its obligation to stabilize an emergency medical condition that it *did*

42

diagnose. Rather, *Bryant* emphasized that whenever a physician "detects" any "emergency medical conditions," it is "the hospital's duty to stabilize" them. *Id.* (quoting *Jackson*, 246 F.3d at 1254) (citing *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132 (8th Cir. 1996) (en banc)).

      **6.**   **Appropriations Provisions.** The State (at 24 n.5) and Legislature (at 42-43) make passing references to appropriations riders known as the Hyde and Weldon Amendments. Here again, appellants forfeited reliance on those amendments because they did not address them in the preliminary-injunction briefing. *See Burlington*, 509 F.3d at 1093 n.3; *School Dist.*, 5 F.3d at 1263. In any event, those provisions do not apply on their own terms, as they restrict direct federal funding for certain (but not all) abortion care or prohibit the recipients of funding from discriminating against healthcare entities and individuals on the ground that they perform or refuse to perform abortions. *See* Pub. L. No. 117-103, div. H, tit. V, §§ 506-507, 136 Stat. 49, 496 (2022); *Harris v. McRae*, 448 U.S. 297, 302-03 (1980).

      Far from supporting appellants, the Hyde and Weldon Amendments reinforce the district court's conclusion that stabilizing treatment under EMTALA can encompass abortion. For example, when presented with questions whether the amendments would cause "women [to] die because they will not have access to an abortion needed to save the life of the mother," the sponsoring legislator invoked EMTALA to allay those concerns:

> Hyde-Weldon does nothing of the sort. It ensures that in situations where a mother's life is in danger a health care provider must act to protect the mother's life. In fact, Congress passed [EMTALA] forbidding critical-care health facilities to abandon patients in medical emergencies, and requires them to provide treatment to stabilize the medical condition of such patients—particularly pregnant women.

151 Cong. Rec. H177 (daily ed. Jan. 25, 2005) (Statement of Rep. Weldon); *see also id.* (noting that the amendments pertain only to so-called "elective abortions"); 42 U.S.C. § 18023(d) (indicating that EMTALA can require emergency abortions). The Hyde and Weldon Amendments also demonstrate that Congress knows how to create special rules for abortion when it wishes to do so. *See supra* pp. 19-20.

**7. Spending Clause.** Departing from statutory text altogether, appellants assert (State.Br. 32; Leg.Br. 63-66) that the district court's decision violates the Spending Clause. That too is incorrect.

EMTALA reflects Congress's "broad power under the Spending Clause" to "set the terms on which it disburses federal funds." *See Cummings*, 142 S. Ct. at 1568; 42 U.S.C. § 1395cc(a)(1)(I)(i) (establishing compliance with EMTALA as a condition of Medicare payment). The only time the Supreme Court has found improper "coercion" in a spending program was in the Medicaid context—which, unlike Medicare, involves funds provided directly to states—when the Court concluded that states were forced to adopt new spending programs or lose federal funding (worth "over 10 percent of a State's overall budget") for existing programs. *See National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580-85 (2012) (Roberts, C.J.) (plurality opinion). Here, however,

appellants admitted that "[m]edical providers' participation in Medicare is voluntary." *Compare* 3-ER-373 (Complaint ¶ 15), *with* SER-6 (State's Answer), *and* SER-17 (Legislature's Answer). And the United States seeks to enforce an established condition on federal Medicare funding, which has long been understood to include abortion care in certain circumstances, *see supra* pp. 19-21, and which Congress plainly has authority to enact, *see Biden*, 142 S. Ct. at 650.

**8. Tenth Amendment.** For similar reasons, the Tenth Amendment, "principles of federalism," and Idaho's "'historic police powers,'" *see* State.Br. 18-19, 25-29; Leg.Br. 57-62, are inapposite.

As an initial matter, the Legislature concedes (at 30) that the Supremacy Clause applies in the EMTALA context—a point courts consistently recognize. *See, e.g.*, *Draper*, 9 F.3d at 1393; *Root*, 209 F.3d at 1070; *Hardy*, 164 F.3d at 795; *Baby K*, 16 F.3d at 597; *Burditt*, 934 F.2d at 1373-74. Moreover, "there can be no violation of the Tenth Amendment" here because "Congress act[ed] under one of its enumerated powers" when it enacted EMTALA. *See United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000). This case fits the classic model of preemption: EMTALA's stabilization requirement "imposes restrictions or confers rights on private actors," Idaho's ban on such care "imposes restrictions that conflict with the federal law," and "therefore the federal law takes

45

precedence and the state law is preempted." *See Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018).[6]

Appellants' attempt to invoke Idaho's historic "police powers" also lacks merit. It disregards EMTALA's express preemption clause. 42 U.S.C. § 1395dd(f). And it overlooks EMTALA's historical context. In requiring stabilizing treatment and including an express preemption provision, Congress was legislating against a backdrop that limited a state's authority to ban abortion. *Cf. United States v. Wells*, 519 U.S. 482, 495 (1997) (noting presumption that "Congress expects its statutes to be read in conformity with th[e Supreme] Court's precedents"). At EMTALA's enactment in 1986, the Supreme Court had recognized that no state could properly ban abortion pre-viability, or post-viability "where it [wa]s necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (plurality opinion) (quotation marks omitted) (reaffirming holdings of

---

[6] These points resolve the "questions" that certain *amici* raise (but appellants forfeited) concerning the federal government's ability to bring suit and the Supremacy Clause's applicability to Spending Clause legislation. *See, e.g., Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("An amicus curiae generally cannot raise new arguments on appeal, and arguments not raised by a party in an opening brief are waived." (citation omitted)); *cf.* Br. of Indiana; Br. of American Center for Law & Justice. The United States advances an equitable cause of action consistent with centuries of precedent. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (referring to suits in equity "to enjoin unconstitutional actions by state and federal officers," a practice "reflect[ing] a long history of judicial review of illegal executive action, tracing back to England"); *see also, e.g., United States v. Washington*, 142 S. Ct. 1976 (2022); *Arizona v. United States*, 567 U.S. 387, 393-94 (2012); *United States v. City of Arcata*, 629 F.3d 986, 989-90 (9th Cir. 2010). And as explained, courts have long held that EMTALA has preemptive effect. *See supra* p. 45.

*Roe v. Wade*, 410 U.S. 113 (1973)); *see City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 428-31 (1983); *Thornburgh v. American Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 759 (1986). EMTALA did not preserve police powers that no state possessed when Congress enacted the statute.

The decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), does not alter this analysis. The Supreme Court "returned" "the authority to regulate abortion … to the people and their elected representatives," *id.* at 2279, which includes "their representatives in the democratic process in … Congress," *id.* at 2309 (Kavanaugh, J., concurring). Those elected representatives in Congress had already placed this question—what treatment is necessary to stabilize emergency medical conditions experienced by pregnant women—in the hands of physicians, to be determined according to their professional judgment and with the security of an express preemption clause.

**9.    Major Questions Doctrine.**   Finally, the Legislature invokes (at 45-54) the major questions doctrine, but that doctrine applies only to "*agency* decisions of vast 'economic and political significance.'" *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir. 2023) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). It is irrelevant here because there is "no relevant agency action." *Id.* Instead, the United States is enforcing "policy decisions" made by "Congress … itself." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quotation marks omitted).

Nor would any agency action, even if it existed here, constitute a "transformative expansion" of regulatory authority as required to implicate the major questions doctrine. *Mayes*, 67 F.4th at 934-36 (quoting *Utility Air*, 573 U.S. at 324). To the contrary, "healthcare facilities that wish to participate in Medicare and Medicaid have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare." *Biden*, 142 S. Ct. at 652. And the notion that abortion may constitute stabilizing treatment is not "unprecedented." *Contra* Leg.Br. 44. As explained above (pp. 19-21), courts, Congress, practitioners, and agencies have long understood that EMTALA can encompass emergency abortion treatments—including before the Supreme Court's decision in *Dobbs*.[7]

Even if there were anything unexpected about the district court's interpretation, that would provide no basis to disregard EMTALA. The Legislature relies on "extratextual consideration[s]," which the Supreme Court has repeatedly rejected. *See Bostock*,

---

[7] Nor does *Texas v. Becerra*, 623 F. Supp. 3d 696 (N.D. Tex. 2022), support reversal here. That decision—which the federal government has appealed, *see* No. 23-10246 (5th Cir.)—involves different claims, different governmental actions, and different state laws. And it "is not binding precedent." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (quotation marks omitted). In any event, the *Texas* decision is incorrect. Among other things, it (1) mistook state law, rather than federal law, to govern when emergency stabilizing treatment is available—contrary to EMTALA's text, structure, and purpose, *see supra* pp. 15-22, 25-31, 36-43; (2) it overlooked the guarantees Congress provided for the "individual" (*i.e.*, the "pregnant woman"), including the individual's role in deciding which stabilizing treatments to accept, *see supra* pp. 31-36; and (3) it ignored several statutory and historical cues that Congress intended EMTALA to require hospitals to offer emergency abortion care if the treating physician determines that it is necessary stabilizing treatment, *see supra* pp. 15-21, 31-47.

140 S. Ct. at 1749. A statute can be "'very broad' and 'very clear.'" *Marinello v. United States*, 138 S. Ct. 1101, 1116 (2018) (Thomas, J., dissenting). EMTALA is both.

## II. The Equities Decisively Support The Preliminary Injunction.

The district court properly exercised its discretion in determining that the remaining factors supported a preliminary injunction. The State and Legislature's arguments to the contrary—which largely repeat their position on the merits or ask the Court to re-weigh harms and equities—are unavailing.

**A.1.** The United States would suffer irreparable harm if Idaho Code § 18-622 went into full effect because permitting the law to operate when it directly conflicts with EMTALA would violate the Supremacy Clause. *See United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (concluding that the United States demonstrated irreparable harm in preemption case based on infringement of Supremacy Clause), *rev'd in part on other grounds*, 567 U.S. 387 (2012); *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) (explaining that such a conclusion is "consistent" with circuit precedent). The district court correctly concluded that the United States satisfied this factor. 1-ER-048.

Section 18-622 would cause the United States irreparable harm by interfering with the federal government's sovereign interest in proper administration of federal law and Medicare. *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *cf. Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). The United States agreed to provide

49

Medicare funds to hospitals in Idaho, so long as those hospitals comply with EMTALA. 42 U.S.C. § 1395cc(a)(1)(I)(i). But Idaho Code § 18-622 threatens "harm to the administration and integrity of Medicare," *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003), because federal funding would no longer guarantee access to necessary treatments when EMTALA requires them, 3-ER-363–364. This harm implicates substantial funding: the United States provided over $3 billion in Medicare funding to hospitals in Idaho over fiscal years 2018 to 2020, with approximately $74 million attributable to emergency departments. 3-ER-367–368. The preliminary injunction prevents such "significant[] frustrat[ion]" of federal law. 1-ER-048.

**2.** None of appellants' arguments undermines the district court's analysis. The State asserts (Br. 33) that the federal government would not suffer irreparable harm because "there is no right to abortion" in EMTALA. This objection merely reiterates the State's unsuccessful merits arguments. *See, e.g.*, *supra* pp. 29-49. The State further asserts (Br. 34) that a "lesser standard for showing irreparable harm from constitutional injuries" does not apply here, because "the question the United States raised is whether 42 U.S.C. § 1395dd(f) preempts Idaho Code § 18-622." But the district court did not apply a lesser standard. *See* 1-ER-048. Regardless, the United States has made clear that the Supremacy Clause underlies its claims. *See* 3-ER-383 ("Claim for Relief" for "Preemption Under the Supremacy Clause and EMTALA" (emphasis and some capitalizations omitted)); 3-ER-384 (alleging that § 18-622 "violates the Supremacy Clause"); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751, 762-63 (9th Cir. 2022) (en banc)

50

(concluding that state law that was obstacle preempted by federal statute "violates the Supremacy Clause").

The State also contends (Br. 33-34) that, although the United States challenged § 18-622 before it became effective, the government "delayed pursuing preemption" by failing to challenge a 1973-version of Idaho's abortion law, which allegedly "implies a lack of … irreparable injury." The State forfeited this objection by failing to raise it below. And an alleged "delay," even if it existed, would not be "particularly probative in the context of ongoing, worsening injuries." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (quoting *Arc of California v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014)). But there was no delay: That the United States did not challenge a different abortion law during the period when Idaho had much more limited ability to ban abortion, *see supra* pp. 46-47, does not suggest a lack of irreparable harm now. The "Total Abortion Ban" at issue was poised to go into effect on August 25, 2022, *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1158 (2023), and the United States sought a preliminary injunction over two weeks before the significantly worse injuries threatened by the new ban became reality, 3-ER-296. Nothing about this timeline undermines the district court's finding of irreparable harm.

Finally, the Legislature claims that the harms to the United States are not irreparable because the government can "vindicate its interests" through this litigation without the need for preliminary relief. Leg.Br. 67-68 (quoting *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam)). The case that the Legislature relies on for this

proposition, however, underscores the propriety of leaving the injunction in place. In *Washington*, this Court concluded that the interests of a movant seeking a stay pending appeal did not warrant disturbing the district court's grant of preliminary relief. 847 F.3d at 1156, 1168 (addressing movant's claim of "institutional injury by erosion of the separation of powers" and denying stay of temporary restraining order). Appellants' interests here can similarly be "pursue[d] and vindicate[d] … in the full course of this litigation" while preliminary relief remains in place. *Id.* at 1168. Moreover, unlike *Washington*, the government's injury here involves a Supremacy-Clause violation. The Legislature offers no response to this Court's precedents showing that such violations do cause irreparable harm to the United States. *See Arizona*, 641 F.3d at 366; *California*, 921 F.3d at 893.

**B.** The district court properly determined that the public interest and balance of the equities—which "merge" when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)—favored granting the preliminary injunction.

**1.** The court found that "allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho." 1-ER-049. The record soundly supports that conclusion. The operation of § 18-622 would increase the risk that pregnant patients needing emergency care would face serious medical complications, irreversible injuries (such as strokes, limb amputation, and organ failure), or even death. *See* 3-ER-335–336; 3-ER-339, 342, 343, 344–345; 3-ER-349–352; 3-ER-356–357.

52

Numerous pregnancy-related conditions could require emergency abortion care and, as the court found, these conditions have occurred and will inevitably occur again within Idaho. *See* 1-ER-050; 3-ER-182–183, 188–217, 319–368. And for many of these conditions, the "emergency care mandated by EMTALA" would be "forbidden by Idaho's criminal abortion law." 1-ER-050.

Moreover, permitting Idaho's law to take effect when it directly conflicts with EMTALA would strain "the capacity of hospitals in neighboring states that do not prohibit physicians from providing EMTALA-mandated care," which "would be pressured as patients may choose to cross state lines to get the emergency care" that Idaho prohibits. 1-ER-050 (citing amici states' brief). Enjoining a preempted state law while this litigation proceeds further "serves the public interest" by "preventing a violation of the Supremacy Clause." *See California*, 921 F.3d at 893; *Arizona*, 641 F.3d at 366.

Regarding the "other side of the equitable balance sheet," the district court correctly determined that appellants "will not suffer any real harm" from this "modest preliminary injunction." 1-ER-051. The injunction maintains the status quo by preventing § 18-622 from operating "to the extent it conflicts with EMTALA," 1-ER-051, until after the court has determined its legality under federal law.

**2.** Appellants' objections to the district court's weighing of the equities and public interest are largely premised on their merits arguments. *See* State.Br. 34-35; Leg.Br. 70-72. For the same reasons appellants will not succeed on the merits, *supra* pp. 15-49, they do not demonstrate any error in the court's analysis of the equities.

53

Appellants allege harm to the State from being unable to enforce a duly enacted law under Idaho's post-*Dobbs* authority to regulate abortion. *See* State.Br. 34-35; Leg.Br. 66-67. As the district court recognized, however, "*Dobbs* did not overrule the Supremacy Clause," and "even when it comes to regulating abortion, state law must yield to conflicting federal law." 1-ER-051; *see Florida v. HHS*, 19 F.4th 1271, 1291-92 (11th Cir. 2021) (declining to find irreparable injury to state's "authority to enforce its own law" where federal law preempted conflicting state law).

At bottom, appellants ask this Court to afford more weight to this consideration, re-balance the equities and public interest, and reach a different result. *See* State.Br. 35 ("[T]he balance of equities and public interest lie in allowing Idaho to lawmake for themselves."); Leg.Br. 69-70 (invoking the "profound importance" of the issue to Idaho and contending that the injunction "imposes a greater hardship on the State of Idaho than the burden the United States would bear by postponing injunctive relief"). But "[t]he assignment of weight to particular harms is a matter for district courts to decide." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010). This Court's review, by contrast, is "limited and deferential." *California*, 921 F.3d at 877 (quotation marks omitted). "[A]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Environmental Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989-90 (9th Cir. 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012)). Appellants' request for the Court to rebalance the equities lacks merit.

The Legislature suggests (at 69) that the district court applied the wrong standard through an improper focus on certain factors. That is incorrect. The court recognized that "whether the United States is likely to succeed on the merits" was "the most important" factor, 1-ER-031, and analyzed the issue at length, 1-ER-031–047. And the court correctly observed that "whether the balance of equities tips in the United States' favor and whether an injunction is in the public interest" "merge" here, 1-ER-049, and thus considered the public interest, effects on third parties, and the State of Idaho's "side of the equitable balance sheet," 1-ER-049–051.

The Legislature also contends that "the healthcare needed by pregnant women in Idaho" is not threatened absent an injunction, because § 18-622 would permit "life-saving medical care" for ectopic pregnancies and "life-threatening" pre-eclampsia. Leg.Br. 71. But the Legislature's reference to "life-threatening" care departs from the statutory text it enacted—which requires that care be "*necessary* to prevent … death." Idaho Code § 18-622(2)(a) (emphasis added). As the district court noted in rejecting this same argument, the term "life-threatening" would not suffice under Idaho's necessary-to-prevent-death standard because the term "suggests only the *possibility* of death." 1-ER-034 (citing *Life-Threatening*, Black's Law Dictionary (11th ed. 2019)). And as explained above (pp. 8-9, 22-24), emergency medical conditions affecting pregnant patients extend beyond the two scenarios on which the Legislature relies. *E.g.*, 3-ER-326–331 (discussing heart failure, PPROM, placental abruption); *see also* 1-ER-010–012. Indeed, the court relied on its factual findings and the government's declarations in

concluding "that allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho," because § 18-622 would "not allow [physicians] to provide the medical care necessary to preserve [a pregnant patient's] *health* and life." 1-ER-049–50 (emphasis added). The Legislature has not challenged these findings on appeal.

Finally, the State claims that some of the concerns motivating the district court's equities analysis deserve less weight after the Idaho Supreme Court's *Planned Parenthood* decision and the amendments to § 18-622, which either clarified or removed the statute's affirmative-defense structure. State.Br. 34-35. But the existence of an affirmative defense does not affect the district court's conclusion, because Idaho retained the relevant standard—"necessary to prevent … death"—which is narrower than EMTALA's stabilization requirements. *See supra* pp. 8-11, 21-24, 26-31.

The district court expressly referenced the affirmative-defense structure in only a single sentence of its equities analysis. 1-ER-050. The rest of its discussion—and the critical conclusion that giving § 18-622 its full effect "would threaten severe, irreparable harm to pregnant patients in Idaho," 1-ER-049—are unaffected. Moreover, the court analyzed the *Planned Parenthood* decision in addressing appellants' reconsideration motions, and found "no reason to reconsider its decision granting the United States' motion for a preliminary injunction." 1-ER-012. As the district court observed, *Planned Parenthood* simply "confirmed—rather than eliminated—the conflict between EMTALA and the Total Abortion Ban." 1-ER-009.

56

Although the amendments to § 18-622 were approved in April 2023, appellants did not attempt to bring them to the district court's attention before the court issued its reconsideration order a month later. *Compare* H.B. 374, § 1, 67th Leg., 1st Reg. Sess. (Idaho 2023), https://perma.cc/ZTZ7-HHWK (approved April 4, 2023), *with* 1-ER-013 (reconsideration order dated May 4, 2023). The State cannot claim that the court abused its discretion by not addressing developments that the State declined to raise for its consideration.

## III. The District Court Properly Tailored The Preliminary Injunction.

**A.** The district court determined that "it should preserve the status quo while the parties litigate this matter" and "grant the United States' motion" for a preliminary injunction. 1-ER-016. The court thus enjoined the State of Idaho "from enforcing Idaho Code § 18-622 to the extent that statute conflicts with EMTALA-mandated care." 1-ER-016; *see* 1-ER-051 ("The Court hereby restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622[] as applied to medical care required by … 42 U.S.C. § 1395dd.").

This relief targets the extent of the state law's conflict with EMTALA. *See* 1-ER-037 ("The state law must therefore yield to federal law to the extent of that conflict."); 1-ER-051 (enjoining § 18-622 "to the extent it conflicts with EMTALA"). The court appropriately tailored the scope of the preliminary injunction "to remedy the specific harm alleged." *Hecox v. Little*, --- F.4th ---, No. 20-35813, 2023 WL 5283127, at *21 (9th

57

Cir. Aug. 17, 2023) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).

**B.** The State asserts that the injunction is "overbroad" on two bases. State.Br. 35-38. Neither argument warrants altering the injunction.

**1.** The State first contests (Br. 36-37) the injunction's prohibition on enforcing § 18-622 against conduct that constitutes an abortion under Idaho law "but that is necessary to avoid (i) 'placing the health of' a pregnant patient 'in serious jeopardy'; (ii) a 'serious impairment to bodily functions' of the pregnant patient; or (iii) a 'serious dysfunction of any bodily organ or part' of the pregnant patient." 1-ER-52. The State claims that EMTALA's definition of stabilizing treatment—which covers treatment "necessary-to-assure-no-material-deterioration" of an emergency medical condition—is "much narrower than" the treatment covered by the injunction. State.Br. 36-37.

This argument fails on its own terms. The State misconstrues the injunction by focusing on one sentence in isolation, rather than reading it in context. *Contra Edmo v. Corizon, Inc.*, 935 F.3d 757, 800 (9th Cir. 2019) (interpreting sentence in injunction order "in context" of rest of order and opinion in rejecting claim of overbreadth); *Hecox*, 2023 WL 5283127, at *21 & nn.20–21 (similar). The injunction's first sentence makes clear that the scope of relief targets enforcement of § 18-622 "as applied to medical care required by [EMTALA], 42 U.S.C. § 1395dd." 1-ER-51. This express limitation is

58

consistent with the court's accompanying opinion.[8] The injunction cannot reasonably be read to exceed abortion care that constitutes stabilizing treatment under EMTALA. For its part, the Legislature does not purport to share the State's interpretation.

2.      Finally, the State asserts (Br. 37-38), that the injunction is "overbroad because it grants facial relief" without satisfying the "burden for a facial challenge."

As the district court explained, however, "the United States has mounted a textbook, as-applied challenge focusing only on a particular application of the statute in a particular context": where § 18-622 conflicts with EMTALA and purports to prohibit "EMTALA-mandated care." 1-ER-030–031. The preliminary injunction applies only to the extent of the claim that EMTALA preempts § 18-622 and implicates the United States's sovereign interests under the Supremacy Clause. The "plaintiff['s] claim and the relief that would follow" do not "reach beyond the particular circumstances of the[] plaintiff[]." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).

Even if the claim could be viewed as reaching beyond this "particular case," the government would only need to satisfy the standard "for a facial challenge *to the extent of that reach*." *Reed*, 561 U.S. at 194 (emphasis added); *see Hecox*, 2023 WL 5283127, at

---

[8] *See, e.g.*, 1-ER-051 ("enjoining the challenged Idaho law to the extent it conflicts with EMTALA"); 1-ER-031 (considering whether § 18-622 "must include a carve-out for EMTALA-mandated care"); 1-ER-030 (reciting the "limited form o[f] relief" sought); 1-ER-016 ("[T]he State of Idaho will be enjoined from enforcing Idaho Code § 18-622 to the extent that statute conflicts with EMTALA-mandated care."); 2-ER-093 (hearing transcript) ("I certainly won't enjoin anything more than … enforcement in the context where EMTALA would require medical treatment.").

*21 (characterizing *Reed* as "holding that a challenge to a category of applications of a statute may be characterized as an as-applied challenge"). This Court has thus recognized that, where appropriate, a district court may "issu[e] a preliminary injunction against the entire category of applications of" a statute for which it determines that a challenge was likely to succeed on the merits. *Hecox*, 2023 WL 5283127, at *21 & n.22.

Here, the district court concluded in the alternative that, even construed as a facial challenge "focusing … on the subset of abortions EMTALA requires," the United States's lawsuit is "likely to succeed on the merits" because within "that subset there will always be a conflict between EMTALA and Idaho Code § 18-622." 1-ER-031. The State failed to challenge that conclusion on appeal and thus forfeited any argument that the application of a facial-challenge standard to the category of abortions at issue requires narrowing the preliminary injunction.

## CONCLUSION

For the foregoing reasons, the order granting a preliminary injunction should be affirmed.

60

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JOSHUA D. HURWIT
*United States Attorney*

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

PAUL R. RODRÍGUEZ
*Deputy General Counsel*

DAVID HOSKINS
*Supervisory Litigation Attorney*

JESSICA BOWMAN
MELISSA HART
*Attorneys*

*U.S. Department of Health
and Human Services*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER

*s/ Nicholas S. Crown*

NICHOLAS S. CROWN
*Attorneys, Appellate Staff
Civil Division, Room 7325
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-1754
nicholas.s.crown@usdoj.gov*

September 2023

61

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellee states that it knows of one case related to the above-captioned consolidated appeals: Case No. 23-35153. That appeal arises from the district court's partial grant of intervention issued during the proceedings below.

*s/ Nicholas S. Crown*
Nicholas S. Crown

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35440, 23-35450

I am the attorney or self-represented party.

**This brief contains** | 14,891 | **words, including** | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.

　☒ a party or parties are filing a single brief in response to multiple briefs.

　☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Nicholas S. Crown | **Date** | 9/8/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | Rev. 12/01/22

**ADDENDUM**

# TABLE OF CONTENTS

EMTALA, 42 U.S.C. § 1395dd ........................................................................... A1

Born-Alive Infants Protection Act, 1 U.S.C. § 8 .......................................... A7

Idaho Code § 18-604 (effective July 1, 2023) ................................................. A8

Idaho Code § 18-604 (effective July 1, 2021) ............................................... A10

Idaho Code § 18-622 (effective July 1, 2023) ............................................... A11

Idaho Code § 18-622 (enacted in 2020, effective August 25, 2022) .......................... A13

**42 U.S.C. § 1395dd**

**§ 1395dd. Examination and treatment for emergency medical conditions and women in labor**

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

**(2) Refusal to consent to treatment**

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3) Refusal to consent to transfer**

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on

the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

## (c) Restricting transfers until individual stabilized

### (1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless--

**(A)(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that[9] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

**(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

**(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

### (2) Appropriate transfer

An appropriate transfer to a medical facility is a transfer--

**(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

---

[9] So in original. Probably should be followed by a comma.

A2

**(B)** in which the receiving facility--

**(i)** has available space and qualified personnel for the treatment of the individual, and

**(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

## (d) Enforcement

### (1) Civil money penalties

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a-7a(a) of this title.

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who--

**(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

A3

**(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a-7a of this title (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a-7a(a) of this title.

**(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

**(2) Civil enforcement**

**(A) Personal harm**

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(B) Financial loss to other medical facility**

Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(C) Limitations on actions**

No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**

In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate quality improvement organization (with a contract under part B of subchapter XI) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B.

**(4) Notice upon closing an investigation**

The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

**(e) Definitions**

In this section:

**(1)** The term "emergency medical condition" means--

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part; or

**(B)** with respect to a pregnant woman who is having contractions--

**(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

A5

**(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1395cc of this title.

**(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

> **(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1395x(mm)(1) of this title) and a rural emergency hospital (as defined in section 1395x(kkk)(2) of this title).

## (f) Preemption

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

## (g) Nondiscrimination

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

## (h) No delay in examination or treatment

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and

treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

**(i) Whistleblower protections**

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

## 1 U.S.C. § 8

### § 8. "Person", "human being", "child", and "individual" as including born-alive infant

**(a)** In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the words "person", "human being", "child", and "individual", shall include every infant member of the species homo sapiens who is born alive at any stage of development.

**(b)** As used in this section, the term "born alive", with respect to a member of the species homo sapiens, means the complete expulsion or extraction from his or her mother of that member, at any stage of development, who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, regardless of whether the umbilical cord has been cut, and regardless of whether the expulsion or extraction occurs as a result of natural or induced labor, cesarean section, or induced abortion.

**(c)** Nothing in this section shall be construed to affirm, deny, expand, or contract any legal status or legal right applicable to any member of the species homo sapiens at any point prior to being "born alive" as defined in this section.

**Idaho Code § 18-604 (effective July 1, 2023)**

**§ 18-604. Definitions**

As used in this chapter:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean:

    (a) The use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization, or the implantation of a fertilized ovum within the uterus;

    (b) The removal of a dead unborn child;

    (c) The removal of an ectopic or molar pregnancy; or

    (d) The treatment of a woman who is no longer pregnant.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

    (a) A description of any proposed treatment or procedure;

    (b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

A8

    (c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

**Idaho Code § 18-604 (effective July 1, 2021)**

**§ 18-604. Definitions**

As used in this act:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean the use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization or the implantation of a fertilized ovum within the uterus.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

  (a) A description of any proposed treatment or procedure;

  (b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

  (c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

A10

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

## Idaho Code § 18-622 (effective July 1, 2023)

### § 18-622. Defense of life act

(1) Except as provided in subsection (2) of this section, every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(2) The following shall not be considered criminal abortions for purposes of subsection (1) of this section:

(a)  The abortion was performed or attempted by a physician as defined in this chapter and:

(i)  The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(ii)  The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

(b)  The abortion was performed or attempted by a physician as defined in this chapter during the first trimester of pregnancy and:

(i)  If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws; or

(ii)  If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported to a law enforcement agency or child protective services that she is the victim of an act of rape or incest and a copy of such report has been provided to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws.

(3)  If a report concerning an act of rape or incest is made to a law enforcement agency or child protective services pursuant to subsection (2)(b) of this section, then the person who made the report shall, upon request, be entitled to receive a copy of such report within seventy-two (72) hours of the report being made, provided that the report may be redacted as necessary to avoid interference with an investigation.

(4)  Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

A12

(5)  Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.

## Idaho Code § 18-622 (enacted in 2020, effective August 25, 2022)

### § 18-622. Criminal abortion

(1) Notwithstanding any other provision of law, this section shall become effective thirty (30) days following the occurrence of either of the following circumstances:

(a) The issuance of the judgment in any decision of the United States supreme court that restores to the states their authority to prohibit abortion[1]; or

(b) Adoption of an amendment to the United States constitution that restores to the states their authority to prohibit abortion.

(2) Every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(3) It shall be an affirmative defense to prosecution under subsection (2) of this section and to any disciplinary action by an applicable licensing authority, which must be proven by a preponderance of the evidence, that:

(a)(i) The abortion was performed or attempted by a physician as defined in this chapter;

(ii) The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(iii) The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

A13

(b)(i) The abortion was performed or attempted by a physician as defined in this chapter;

(ii) If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported the act of rape or incest to a law enforcement agency and provided a copy of such report to the physician who is to perform the abortion;

(iii) If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported the act of rape or incest to a law enforcement agency or child protective services and a copy of such report has been provided to the physician who is to perform the abortion; and

(iv) The physician who performed the abortion complied with the requirements of paragraph (a)(iii) of this subsection regarding the method of abortion.

(4) Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

(5) Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.

A14