Nos. 23-35440, 23-35450

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

STATE OF IDAHO,

*Defendant-Appellant*,

v.

MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF REPRESENTATIVES, ET AL.,

*Intervenors-Defendants-Appellants*.

**On Appeal from the United States District Court
for the District of Idaho**

**BRIEF FOR THE STATES OF CALIFORNIA, NEW YORK, ARIZONA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, WISCONSIN, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT IN SUPPORT OF APPELLEE**

Letitia James
 *Attorney General*
 *State of New York*
Barbara D. Underwood
 *Solicitor General*
Ester Murdukhayeva
 *Deputy Solicitor General*
Galen Sherwin
 *Special Counsel for Reproductive Justice*
Sarah Coco
 *Assistant Solicitor General*

Rob Bonta
 *Attorney General State of California*
Renu R. George
 *Senior Assistant Attorney General*
Karli Eisenberg
 *Supervising Attorney General*
Hayley Penan
 *Deputy Attorney General*
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-7785

# TABLE OF CONTENTS

**Page i**

Introduction and Interests of Amici Curiae ................................................... 1

Argument................................................................................................. 3

    I.    EMTALA Has Long Been Interpreted to Require the Treatment of Pregnancy-Related Conditions That Need Emergency Abortion Care .............................................................................. 3

    II.    For Decades, States Have Understood That Abortion Care Is Part of Emergency Care ........................................................... 12

    III.    Failure to Provide Emergency Abortion Care When Required Causes Serious Harms to Patients and Providers in Idaho and Amici States .......................................................................... 15

        A.    Prohibiting Physicians from Providing Emergency Abortions Egregiously Harms Pregnant Patients ......... 15

        B.    Prohibiting Physicians from Providing Emergency Abortion Care in Idaho Harms Amici States ............... 24

Conclusion ........................................................................................... 32

# TABLE OF AUTHORITIES

**Page ii**

CASES

*Bryan v. Rectors & Visitors of the Univ. of Va.*
95 F.3d 349 (4th Cir. 1996) ...................................................................9

*Burditt v. U.S. Dep't Health & Hum. Servs.*
934 F.2d 1362 (5th Cir. 1991) .........................................................6, 10

*Cleland v. Bronson Health Care Grp., Inc.*
917 F.2d 266 (6th Cir. 1990) ...................................................................9

*Dobbs v. Jackson Women's Health Organization*
No. 19-1392, 597 U.S. (2022) ......................................................*passim*

*In re Baby "K"*
16 F.3d 590 (4th Cir. 1994) ...................................................................9

*June Med. Servs. LLC v. Kliebert*
250 F. Supp. 3d 27 (M.D. La. 2017)......................................................8, 9

*Los Angeles v. Lyons*
461 U.S. 95 (1983)...................................................................................15

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*
571 F.3d 873 (9th Cir. 2009) ...............................................................15

*McDougal v. Lafourche Hosp. Serv. Dist. No. 3*
No. 92-cv-2006, 1993 U.S. Dist. LEXIS 7381 (E.D. La. May 24,
1993) ..........................................................................................................8

*Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*
524 F.3d 54 (1st Cir. 2008)...................................................................8

*Morin v. Eastern Me. Med. Ctr.*
779 F. Supp. 2d 166 (D. Me. 2011)......................................................8

*New York v. U.S. Dep't Health & Hum. Servs.*
414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...............................................8, 9

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*
  951 F. Supp. 2d 891 (W.D. Tex. 2013) ....................................9

*Planned Parenthood of Wis., Inc. v. Van Hollen*
  738 F.3d 786 (7th Cir. 2013) ....................................8

*Ritten v. Lapeer Reg'l Med. Ctr.*
  611 F. Supp. 2d 696 (E.D. Mich. 2009) ....................................8

*Roberts v. Galen of Va., Inc.*
  525 U.S. 249 (1999) ....................................10

*United States v. Idaho*
  623 F. Supp. 3d 1096 (D. Idaho 2022) ....................................10, 11

*United States v. Idaho*
  No. 1:22-cv-00329-BLW, 2023 WL 3284977 (D. Idaho May 4,
  2023) ....................................*passim*

*Zurawski v. Texas*
  No. D-1-GN-23-000968 (Tex. Dist. Ct. filed Mar. 6, 2023). ....................................19

**STATUTES**

42 U.S.C.
  § 1395dd ....................................*passim*
  § 1395dd(a) ....................................3
  § 1395dd(b)(2) ....................................3, 12
  § 1395dd(b)-(c) ....................................5
  § 1395dd(e)(1)(A) ....................................4, 5, 11
  § 1395dd(e)(1)(B) ....................................4
  § 1395dd(e)(3)(A) ....................................4
  § 1395dd(e)(3)(B) ....................................4

Idaho Code
  § 18-622 ....................................22

**REGULATIONS**

42 C.F.R. § 489.24(d)(2)(i) ....................................4

# TABLE OF AUTHORITIES
## (continued)

Page

Regulation for the Enforcement of Federal Health Care Provider
Conscience Protection Laws, 76 Fed. Reg. 9,968 (Feb. 23, 2011) ..................... 6

**OTHER AUTHORITIES**

Andrea MacDonald et al., *The Challenge of Emergency Abortion
Care Following the Dobbs Ruling*, 328 JAMA 1691 (Nov. 1, 2022) .......... 17, 18

Angela Palermo, *Keeping doomed fetuses alive: How doctors say
Idaho's abortion law disrupts care,* Id. Statesman (Aug. 27, 2022),
https://www.idahostatesman.com/living/health-
fitness/article264970909.html ..................................................................... 21, 22

Angie Leventis Lourgos, *Abortions in Illinois for Out of State Patients
Have Skyrocketed*, Chi. Trib. (Aug. 4, 2022),
https://www.chicagotribune.com/news/breaking/ct-illinois-
abortion-increase-post-roe-20220802-
eottdwcfnjfjxdvbfgd4kwefwu-story.html ........................................................ 27

Aria Bendix, *How Life-Threatening Must a Pregnancy Be to End It
Legally?*, NBC News (June 30, 2022),
https://www.nbcnews.com/health/health-news/abortion-ban-
exceptions-life-threatening-pregnancy-rcna36026 ............................................ 18

Brianna Keefe-Oates et al., *Use of Abortion Services in Massachusetts
After the Dobbs Decision Among In-State vs Out-of-State
Residents*, JAMA Network Open, e2332400 (Sept. 6, 2023) ............................ 29

Caitlin Myers et al., Abortion Access Dashboard,
https://experience.arcgis.com/experience/6e360741bfd84db79d5db
774a1147815 ..................................................................................................... 27

Cindy Carcamo, *A California desert town has long been an abortion
refuge for Arizona and Mexico. Now it's overwhelmed*, L.A. Times
(July 20, 2022), https://www.latimes.com/california/story/2022-07-
20/planned-parenthood-clinic-in-this-conservative-desert-town-is-
now-a-refuge-for-arizonans-seeking-abortions ........................................... 28, 29

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

Claire Morley et al., *Emergency department crowding: A systematic review of causes, consequences and solutions*, 13 PLOS ONE e0203316 (2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0203316 ..................................................................................................29

Commonwealth Fund, *The U.S. Maternal Health Divide: The Limited Maternal Health Services and Worse Outcomes of States Proposing New Abortion Restrictions*, https://www.commonwealthfund.org/publications/issue-briefs/2022/dec/us-maternal-health-divide-limited-services-worse-outcomes ....................................................................................23, 31

Eric Nadel & Janet Talbot-Stern, *Obstetric and Gynecologic Emergencies*, 15 Emergency Med. Clinics of N. Am. 389 (1997)......................5

*Fact Check – Termination of Pregnancy Can Be Necessary to Save a Woman's Life, Experts Say*, Reuters (Dec. 27, 2021), https://www.reuters.com/article/factcheck-abortion-false/fact-check-termination-of-pregnancy-can-be-necessary-to-save-a-womans-life-experts-say-idUSL1N2TC0VD ....................................................16

*Facts Are Important: Abortion Is Healthcare*, Am. Coll. Obstetricians & Gynecologists (ACOG) (2022), https://www.acog.org/advocacy/facts-are-important/abortion-is-healthcare ................................................................................13

*Facts Are Important: Understanding Ectopic Pregnancy*, ACOG (2022), https://www.acog.org/advocacy/facts-are-important/understanding-ectopic-pregnancy#:~:text=An%20ectopic%20pregnancy%20occurs%20when,%2C%20ovary%2C%20and%20cesarean%20scar ....................................16

Frances Stead Sellers & Fenit Nirappil, *Confusion Post-Roe Spurs Delays, Denials for Some Lifesaving Pregnancy Care*, Wash. Post (July 16, 2022), https://www.washingtonpost.com/health/2022/07/16/abortion-miscarriage-ectopic-pregnancy-care/ ......................................................19

# TABLE OF AUTHORITIES
## (continued)

**Page**

Gabor Kelen et al., *Emergency Department Crowding: The Canary in the Health Care System*, NEJM Catalyst (Sept. 28, 2021), https://catalyst.nejm.org/doi/full/10.1056/CAT.21.0217 ...................................30

Geoffrey Chamberlain & Philip Steer, *ABC of Labour Care: Obstetric Emergencies,* 318 BMJ 1342 (1999), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1115721/.................................5

Hannah Metzger, *Colorado Democrats advance ban of 'deceptive' ads, 'abortion reversal' for crisis pregnancy centers*, Colo. Politics (Mar. 30, 2023), https://www.coloradopolitics.com/legislature/democrats-target-abortion-reversal-crisis-pregnancy-centers-colorado/article_e5c4fa2e-cf1d-11ed-bff6-ef208a330dd2.html .......................28

HHS & Dep't of Justice, *Health Care Fraud and Abuse Control Program Annual Report for Fiscal Year 2019* (2020), https://oig.hhs.gov/publications/docs/hcfac/FY2019-hcfac.pdf...........................6

HHS, Off. Inspector Gen., *Semi-Annual Report to Congress: April 1 - September 30, 2015* (2015), https://oig.hhs.gov/reports-and-publications/archives/semiannual/2015/sar-fall15.pdf........................................6

HHS, Off. Inspector Gen., *Semi-Annual Report to Congress: April 1, 2007 - September 30, 2007* (2007), https://oig.hhs.gov/publications/docs/semiannual/2007/Semiannual Final2007.pdf..................................................................................6

HHS, Off. Inspector Gen., *Semi-Annual Report to Congress: October 1, 1999 - March 30, 2000* (2000), https://oig.hhs.gov/publications/docs/semiannual/2000/00ssemi.pdf..................7

Ian Millhiser, *No one knows when it is legal to perform medically necessary abortions in Texas*, Vox (Mar. 12, 2023), https://www.vox.com/politics/2023/3/12/23631278/supreme-court-abortion-texas-medically-necessary-sepsis-zurawski.........................................24

# TABLE OF AUTHORITIES
## (continued)

**Page**

J. David Goodman & Azeen Ghorayshi, *Women Face Risks as Doctors Struggle With Medical Exceptions on Abortion*, N.Y. Times (July 20, 2022), https://www.nytimes.com/2022/07/20/us/abortion-save-mothers-life.html .................................................................................19

Jessica Hill, *Las Vegas sees big spike in out-of-state abortion seekers*, Las Vegas Rev.-J. (updated June 27, 2023), https://www.reviewjournal.com/news/politics-and-government/nevada/las-vegas-sees-big-spike-in-out-of-state-abortion-seekers-2800219/...................................................29

Joseph Zibulewsky, *The Emergency Medical Treatment and Active Labor Act (EMTALA): What It Is and What It Means for Physicians,* 14 Baylor Univ. Med. Ctr. Proc. 339 (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1305897/ ...............................3

Kandra Kent, *Oregon sees uptick in abortion travel, most out-of-staters come from Idaho*, KPTV (Nov. 8, 2022), https://www.kptv.com/2022/11/08/oregon-sees-uptick-abortion-tourism-most-out-of-staters-come-idaho// .........................................26

Karma Dickerson, *More out-of-state patients begin arriving in California for reproductive health services*, Fox 40 News (Sept. 20, 2022), https://fox40.com/news/fox40-focus/out-of-state-patients-reproductive-health-abortion-california/................................29

Laura Kusisto, *Doctors Struggle with Navigating Abortion Bans in Medical Emergencies*, Wall Street J. (Oct. 13, 2022), https://www.wsj.com/articles/doctors-struggle-with-navigating-abortion-bans-in-medical-emergencies-11665684225?mod=politics_lead_pos9 .......................................24, 30

Lauren Gallup & Rachel Sun, *Number of Idaho abortion patients traveling to Washington up 56% after Roe overturned*, OPB (July 10, 2023), https://www.opb.org/article/2023/07/10/idaho-abortion-patients-traveling-to-washington-increases-56-percent-after-roe-overturned/............................................................28

# TABLE OF AUTHORITIES
## (continued)

**Page**

Lisa Baumann, *Idaho abortion law one reason hospital won't deliver babies*, AP News (Mar. 23, 2023), https://apnews.com/article/hospital-baby-delivery-idaho-abortion-ban-040fb50e0e069967efcb3fcd72a56677 ..................................................20, 23

Lisa Wolf et al., *Triage Decisions Involving Pregnancy-Capable Patients: Educational Deficits and Emergency Nurses' Perceptions of Risk*, 52 J. Continuing Educ. Nursing 21 (2021) ..............................................5

March of Dimes, *Nowhere to Go: Maternity Care Deserts Across the U.S., 2022 Report* (2022), https://www.marchofdimes.org/sites/default/files/2022-10/2022_Maternity_Care_Report.pdf..................................................23

Margot Sanger-Katz et al., *Interstate Abortion Travel Is Already Straining Parts of the System,* N.Y. Times (July 23, 2022), https://www.nytimes.com/2022/07/23/upshot/abortion-interstate-travel-appointments.html .....................................................................24

Marielle Kirstein et al*., 100 Days Post-Roe: At Least 66 Clinics Across 15 US States Have Stopped Offering Abortion Care*, Guttmacher Inst., (Oct. 6, 2022), https://www.guttmacher.org/2022/10/100-days-post-roe-least-66-clinics-across-15-us-states-have-stopped-offering-abortion-care ......................27

Marisa Kendall, *Demand has quadrupled at some California abortion clinics since Roe fell*, Mercury News (Jan. 1, 2023), https://www.mercurynews.com/2023/01/01/demand-has-tripled-quadrupled-at-california-abortion-clinics-since-roe-fell/ ...................................28

Mary Kekatos, *Idaho woman shares 19-day miscarriage on TikTok, says state's abortion laws prevented her from getting care*, ABC News (Jan. 21, 2023), https://abcnews.go.com/Health/idaho-woman-shares-19-day-miscarriage-tiktok-states/story?id=96363578 ....................................................................20

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Maternity Care Desert: Data from Idaho*, March of Dimes (Oct. 2022), https://www.marchofdimes.org/peristats/data?reg=99&top=23&stop=641&lev=1&slev=4&obj=9&sreg=16 ...........................................22

Matt Bloom & Bente Berkland, *Wait Times at Colorado Clinics Hit Two Weeks as Out-of-State Patients Strain System*, KSUT (July 28, 2022), https://www.ksut.org/health-science/2022-07-28/wait-times-at-colorado-abortion-clinics-hit-2-weeks-as-out-of-state-patients-strain-system ...........................................27

Matthew Foley et al., *Financial Impact of Emergency Department Crowding*, 12 W. J. Emergency Med. 192 (May 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3099606/...............................29

Megan Burbank, *Who is traveling to Washington for abortion care?*, Crosscut (Nov. 14, 2022), https://crosscut.com/equity/2022/11/who-traveling-washington-abortion-care ...........................................26

Mem. from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp., CMS, to State Survey Agency Dirs. (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf...........................................7, 11

Mem. from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp., CMS, to State Survey Agency Dirs. (Sept. 17, 2021), https://www.cms.gov/files/document/qso-21-22-hospital.pdf...........................................6

Mikaela Smith et al., *Abortion Travel Within the United States: An Observational Study of Cross-State Movement to Obtain Abortion Care in 2017*, 10 The Lancet – Reg'l Health: Americas art. 100214 (Mar. 3, 2022), https://www.sciencedirect.com/science/article/pii/S2667193X2200031X?via%3Dihub...........................................25

# TABLE OF AUTHORITIES
## (continued)

**Page**

Nathan Richards, *Judicial Resolution of EMTALA Screening Claims at Summary Judgment*, 87 N.Y.U. L. Rev. 591 (May 2012), https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-87-2-Richards.pdf ..........................3

Nicole Rideout, *One year since the overturn of Roe, OB/GYNs report devastating impacts from lack of abortion access*, OSHU News (June 24, 2023), https://news.ohsu.edu/2023/06/24/one-year-since-the-overturn-of-roe-obgyns-report-devastating-impacts-from-lack-of-abortion-access ..................................26

Oriana González & Nicole Cobler, *Influx of Out-of-State Patients Causes Abortion Delays*, Axios (Sept. 12, 2022), https://www.axios.com/local/austin/2022/09/12/texans-out-of-state-patients-abortions-delays ...................................24, 28

Oriana González, *Report: Abortion bans led to life-threatening health complications*, Axios (May 16, 2023), https://www.axios.com/2023/05/16/abortion-bans-life-threatening-complications-death ..........................20, 21

*Planned Parenthood centers in SoCal report dramatic increase in abortion patients from out of state*, ABC 7 News (July 6, 2022), https://abc7.com/planned-parenthood-abortion-orange-county-san-bernardino/12023682/ ...........................29

*Press Release* 3/17/2023, *Discontinuation of Labor & Deliver Services at Bonner General Hospital*, Bonner General Health, https://bonnergeneral.org/wp-content/uploads/2023/03/Bonner-General-Health-Press-Release-Closure-of-LD-3.17.2023.pdf ..........................23

Priya Pandey, *A Year After Dobbs: People with Low Incomes and Communities of Color Disproportionately Harmed*, Ctr. L. & Soc. Pol'y (June 23, 2023), https://www.clasp.org/blog/a-year-after-dobbs-people-with-low-incomes-and-communities-of-color-disproportionately-harmed/ ..........................31

# TABLE OF AUTHORITIES
## (continued)

**Page**

Randi Kaye & Stephen Samaniego, *Idaho's murky abortion law is driving doctors out of the state*, CNN (May 13, 2023), https://www.cnn.com/2023/05/13/us/idaho-abortion-doctors-drain/index.html ............................................................................................21, 22

Samantha Artiga et al., *What are the Implications of the Overturning of Roe v. Wade for Racial Disparities?*, KFF (Jul. 5, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/what-are-the-implications-of-the-overturning-of-roe-v-wade-for-racial-disparities ............................................................................31

Sarah Friedmann, *What a Medical Emergency for an Abortion Actually Means, According to OB/GYNs*, Bustle (June 6, 2019), https://www.bustle.com/p/what-a-medical-emergency-for-abortion-actually-means-according-to-obgyns-17929296 .................................16

Sarahn Wheeler & Allison Bryant, *Racial and Ethnic Disparities in Health and Health Care*, 44 Obstet Gynecol Clin. N. Am. 1 (Mar. 2017). .........................................................................................31

Sarai Rodriguez, *Emergency Department (ED) Overcrowding Leads to Worse Health Outcomes*, Patient Engagement HIT (Nov. 14, 2022), https://patientengagementhit.com/news/emergency-department-ed-overcrowding-leads-to-worse-health-outcomes........................31

Society of Fam. Plan., *#WeCount Report, April 2022 to March 2023* (Jun. 15, 2023), https://societyfp.org/wp-content/uploads/2023/06/WeCountReport_6.12.23.pdf..............................26, 27

Stephen Bohan, *Americans Deserve Better Than 'Destination Hallway' in Emergency Departments and Hospital Wards*, STAT News (Aug. 1, 2022), https://www.statnews.com/2022/08/01/americans-deserve-better-than-destination-hallway-emergency-department/ .............................................30

*Subspecialties of OB-GYN*, ACOG (2023) https://www.acog.org/career-support/medical-students/medical-student-toolkit/subspecialties-of-ob-gyn .............................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page**

Tina Reed, *Defining "Life-Threatening" Can Be Tricky in Abortion Law Exceptions*, Axios (June 28, 2022), https://www.axios.com/2022/06/28/abortion-ban-exceptions-women-medical-emergencies ...............................................................17

Wash. State Dep't of Health, *Hospital Reproductive Health Services for Ferry County Memorial Hospital* (Aug. 29, 2019), https://doh.wa.gov/sites/default/files/hospital-policies/FerryCountyRHSF.pdf .........................................................14

Wash. State Dep't of Health, *Hospital Reproductive Health Services for Lourdes Hospital* (Sept. 3, 2019), https://doh.wa.gov/sites/default/files/hospital-policies/LourdesRHSF.pdf ...............................................................14

Wash. State Dep't of Health, *Hospital Reproductive Health Services for Virginia Mason Memorial Hospital* (Aug. 30, 2019), https://doh.wa.gov/sites/default/files/legacy/Documents/2300/HospPolicies/VirginiaMasonMemorialRHSF.pdf .......................................14

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

Amici States of California, New York, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Wisconsin, and the District of Columbia submit this brief in support of appellee the United States of America. The district court properly granted the federal government's request for preliminary injunction against enforcement of Idaho's near total ban on abortion to the extent it conflicts with the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd.

Amici have a substantial interest in this case. Amici own and operate hospital systems subject to EMTALA, employ healthcare personnel, and license and regulate the many healthcare providers operating within their jurisdictions. Amici thus have a strong interest in clear guidance regarding obligations arising under EMTALA.

Amici also have a strong interest in protecting the rights of their residents who need emergency medical care while present as students, workers, or visitors in Idaho and other States that may attempt to prohibit emergency abortion care contrary to EMTALA's requirements. In addition, if patients in Idaho are denied necessary emergency abortion care, they may travel to Amici States (including, but

not limited to, Oregon and Washington) to receive needed emergency care. These States would thus experience additional pressures on their already overwhelmed hospital systems.

EMTALA, enacted in 1986, has long been a crucial tool in ensuring that everyone who comes to a hospital emergency department receives an appropriate medical screening to determine whether they have an emergency medical condition and assuring that patients are not transferred or discharged until they receive medical treatment to stabilize any such condition. Amici submit this brief to highlight that EMTALA has long been interpreted to cover emergency medical conditions involving or affecting pregnancy for which necessary stabilizing treatment may include abortion care. That straightforward interpretation of EMTALA derives from the statute's text and ensures that individuals with pregnancy-related emergency medical conditions receive care needed to prevent death or serious impairment.

Amici's experience as healthcare providers confirms that emergency abortion care is necessary to avoid serious harmful outcomes in numerous situations, including patients with an ectopic pregnancy, severe preeclampsia, pregnancy loss complications, and other medical conditions for which immediate medical attention is needed. Amici have long understood that abortion care is part of emergency care and their experience establishes that failing to provide

stabilizing abortion care when needed to address emergency medical conditions will cause serious patient and provider harms in Idaho and other States. These harms provide a strong basis for the injunctive relief granted by the district court.

## ARGUMENT

### I. EMTALA HAS LONG BEEN INTERPRETED TO REQUIRE THE TREATMENT OF PREGNANCY-RELATED CONDITIONS THAT NEED EMERGENCY ABORTION CARE

EMTALA applies to any hospital that operates an emergency department and participates in Medicare—criteria met by virtually every hospital in the country.[1] Under EMTALA, if "any individual" presents at a hospital's emergency department for examination or treatment, the hospital must provide an appropriate medical screening to determine whether an emergency medical condition exists. 42 U.S.C. § 1395dd(a). If the screening indicates the patient has an emergency medical condition, the hospital cannot transfer or discharge the patient until it provides "treatment as may be required to stabilize the medical condition," unless the transfer is specifically authorized by the statute. *Id.* § 1395dd(b)-(c). The hospital may also admit the patient as an inpatient in good faith to stabilize the

---

[1] *See* Joseph Zibulewsky, *The Emergency Medical Treatment and Active Labor Act (EMTALA): What It Is and What It Means for Physicians,* 14 Baylor Univ. Med. Ctr. Proc. 339, 340 (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1305897/; Nathan Richards, *Judicial Resolution of EMTALA Screening Claims at Summary Judgment*, 87 N.Y.U. L. Rev. 591, 601 & n.52 (May 2012), https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-87-2-Richards.pdf.

emergency medical condition. 42 C.F.R. § 489.24(d)(2)(i). An "emergency medical condition" is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in" (i) placing the health of the individual in serious jeopardy, or with respect to a pregnant individual, the health of the individual or the fetus, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. 42 U.S.C. § 1395dd(e)(1)(A). Stabilizing the emergency medical condition involves providing "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual." *Id.* § 1395dd(e)(3)(A). An emergency medical condition also exists with respect to a pregnant individual who is in active labor and having contractions, when there is inadequate time for a safe transfer before delivery or such transfer may pose a threat to the health or safety of the pregnant person or the fetus. *Id.* § 1395dd(e)(1)(B). Stabilizing the patient in this circumstance may include delivery. *Id.* § 1395dd(e)(3)(B). Nothing in EMTALA excludes any conditions or categories of medical care from the statute's requirements.

There are many pregnancy-related emergency medical conditions that do not involve active labor, including ectopic pregnancy, traumatic placental abruption

(separation), hemorrhages, pre-labor rupture of membranes, placenta previa, amniotic fluid embolism, and emergent hypertensive disorders including preeclampsia with severe features.[2] These conditions all trigger EMTALA's obligation to provide stabilizing care since in the absence of immediate treatment, all of them would reasonably be expected to result in serious jeopardy to the individual's health, serious impairment to bodily functions, or serious dysfunction of a bodily organ. *See id.* § 1395dd(e)(1)(A). Absent several exceptions not relevant here, EMTALA mandates that the individual with such a condition cannot be transferred or discharged until the hospital provides stabilizing treatment. *See id.* § 1395dd(b)-(c).

For decades, the federal government and courts throughout the country have interpreted EMTALA to require treatment for emergency conditions relating to pregnancy and have concluded that such treatment may include emergency abortion care. More than a decade ago, in the context of federal conscience refusal laws that might otherwise allow a physician to refuse to perform an abortion, the

---

[2] *See* Geoffrey Chamberlain & Philip Steer, *ABC of Labour Care: Obstetric Emergencies,* 318 BMJ 1342, 1342-45 (1999), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1115721/; Eric Nadel & Janet Talbot-Stern, *Obstetric and Gynecologic Emergencies*, 15 Emergency Med. Clinics of N. Am. 389, 389-97 (1997); Lisa Wolf et al., *Triage Decisions Involving Pregnancy-Capable Patients: Educational Deficits and Emergency Nurses' Perceptions of Risk*, 52 J. Continuing Educ. Nursing 21, 21-29 (2021).

U.S. Department of Health and Human Services (HHS) acknowledged that EMTALA may require abortion care in appropriate circumstances in a rule implementing such laws.[3] Likewise, in September 2021, Centers for Medicare and Medicaid Services (CMS) issued guidance on EMTALA restating that emergency medical conditions include pregnancy-related conditions and describing required stabilizing treatment as including abortion care when medically indicated.[4] HHS's Office of Inspector General has also brought enforcement actions against hospitals for EMTALA violations involving pregnancy-related emergency medical conditions. *See Burditt v. U.S. Dep't Health & Hum. Servs.*, 934 F.2d 1362, 1367-76 (5th Cir. 1991) (affirming enforcement action against hospital where pregnant individual presented with severe hypertension).[5]

---

[3] *See Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws*, 76 Fed. Reg. 9,968, 9,973 (Feb. 23, 2011).

[4] *See* Mem. from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp., CMS, to State Survey Agency Dirs. (Sept. 17, 2021), https://www.cms.gov/files/document/qso-21-22-hospital.pdf.

[5] *See also* HHS & Dep't of Justice, *Health Care Fraud and Abuse Control Program Annual Report for Fiscal Year 2019*, at 45 (2020), https://oig.hhs.gov/publications/docs/hcfac/FY2019-hcfac.pdf (describing enforcement action involving pregnant individual with preeclampsia); HHS, Off. Inspector Gen., *Semi-Annual Report to Congress: April 1 – September 30, 2015*, at 37 (2015), https://oig.hhs.gov/reports-and-publications/archives/semiannual/2015/sar-fall15.pdf (same, pregnant individual with abdominal and lower back pain symptoms); HHS, Off. Inspector Gen., *Semi-Annual Report to Congress: April 1, 2007 – September 30, 2007*, at 26 (2007), https://oig.hhs.gov/publications/docs/semiannual/2007/SemiannualFinal2007.pdf

Most recently, in July 2022, CMS issued guidance reiterating EMTALA's obligations regarding patients who are pregnant or experiencing pregnancy loss.[6] The CMS guidance restates EMTALA's requirement that determinations regarding whether an individual has an emergency medical condition and, if so, what stabilizing treatment is needed before transfer or discharge, are medical determinations for which the treating physician is responsible. The guidance also notes that numerous pregnancy-related conditions may constitute emergency medical conditions under EMTALA, including emergent hypertensive disorders like preeclampsia with severe features, ectopic pregnancy, or pregnancy loss complications. And the guidance reminds hospitals and physicians that if the treating physician determines that abortion is the appropriate stabilizing medical treatment for an emergency medical condition, EMTALA requires that a physician provide that treatment if the hospital has the capacity for such treatment.

Consistent with the federal government's interpretation of EMTALA, courts throughout the country have repeatedly found pregnancy-related emergency

---

(same, symptoms of vaginal bleeding, cramps, and decreased fetal movement); HHS, Off. Inspector Gen., *Semi-Annual Report to Congress: October 1, 1999 – March 30, 2000*, at 32-33 (2000), https://oig.hhs.gov/publications/docs/semiannual/2000/00ssemi.pdf (same, symptom of sharp abdominal pain).

[6] *See* Mem. from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp., CMS, to State Survey Agency Dirs. (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf.

conditions fall within the scope of EMTALA. *See, e.g.*, *Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 55-62 (1st Cir. 2008) (ectopic pregnancy); *Morin v. Eastern Me. Med. Ctr.*, 779 F. Supp. 2d 166, 168-69, 185 (D. Me. 2011) (16-week-pregnant patient having contractions without fetal cardiac activity); *McDougal v. Lafourche Hosp. Serv. Dist. No. 3*, No. 92-cv-2006, 1993 U.S. Dist. LEXIS 7381, at *1 (E.D. La. May 24, 1993) (pregnant patient with vaginal bleeding).

Courts have also consistently interpreted EMTALA as requiring abortion services when needed to stabilize an emergency medical condition. *See Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712-18 (E.D. Mich. 2009) (applying EMTALA's anti-retaliation provision to doctor who refused to transfer patient in unstable condition who may have needed abortion); *see also New York v. U.S. Dep't Health & Hum. Servs.*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019) (holding that federal rule allowing physicians to refuse to perform or assist with abortion was not in accordance with law as it would "create[], via regulation, a conscience exception to EMTALA's mandate"). Numerous courts have held that patients of physicians who perform abortions must be admitted to the emergency department under EMTALA regardless of whether the treating physician has admitting privileges at the hospital. *See, e.g.*, *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 787-88 (7th Cir. 2013); *June Med. Servs. LLC v. Kliebert*,

250 F. Supp. 3d 27, 64 (M.D. La. 2017), *rev'd on other grounds sub nom.*, *June Med. Servs. LLC v. Gee*, 905 F.3d 787 (5th Cir. 2018), *rev'd sub nom.*, *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103 (2020); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 899-900 (W.D. Tex. 2013), *rev'd on other grounds*, 748 F.3d 583 (5th Cir. 2014). Under the reasoning of these decisions, if a patient presents at the emergency department with an incomplete abortion, EMTALA requires that the patient receive stabilizing emergency abortion care. *See June Med. Servs.*, 250 F. Supp. 3d at 62, 64.

Finally, courts have long interpreted EMTALA as protecting patients from "being turned away from emergency rooms for non-medical reasons." *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). Thus, "courts have declined to read exceptions into EMTALA's mandate," including exceptions allowing transfers based on a physician's religious, moral, or ethical refusal to provide specified stabilizing treatment. *New York*, 414 F. Supp. 3d at 537 (collecting cases); *see In re Baby "K"*, 16 F.3d 590, 597 (4th Cir. 1994); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 272 (6th Cir. 1990) (observing that EMTALA's plain text prohibits a hospital from refusing treatment based on "political or cultural opposition"). Consequently, liability for failure to provide stabilizing treatment is not dependent on the physician's or hospital's motive.

*Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999); *see Burditt*, 934 F.2d at 1373 (same, failure to effect proper transfer).

Appellants' argument that EMTALA does not require emergency abortion care (Br. of Appellant State of Idaho at 19-25; Br. of Intervenors-Appellants Idaho Legislature at 30, 33-34) ignores this longstanding interpretation. *See supra* at 3-10. As the district court correctly concluded, EMTALA requires providers who have the capacity to do so to offer emergency abortion care when an abortion is necessary to avoid placing an individual's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ. *See United States v. Idaho*, 623 F. Supp. 3d 1096, 1109-10 (D. Idaho 2022); *United States v. Idaho*, No. 1:22-cv-00329-BLW, 2023 WL 3284977, at *4 (D. Idaho May 4, 2023) (denying motion for reconsideration). For example, as the district court observed, a pregnant patient may arrive at the emergency department with symptoms indicating severe preeclampsia. Severe preeclampsia may qualify as an emergency medical condition requiring abortion as a stabilizing treatment under EMTALA if a physician concludes that it could reasonably be expected to result in

serious impairment to the patient's bodily functions. *See Idaho*, 623 F.3d at 1104-05.[7]

Appellants are likewise incorrect that the longstanding interpretation of EMTALA as requiring abortion services when needed to stabilize an emergency medical condition ignores language in EMTALA imposing duties with respect to the health of both a pregnant individual and the fetus. *See* Br. of Appellant State of Idaho at 23-24; Br. of Intervenor-Appellant Idaho Legislature at 35-42. Appellants reason that the abortion itself could precipitate an emergency medical condition because it places the health of the fetus in jeopardy. But a fetus does not have a condition requiring "immediate medical attention" when a stabilizing abortion is offered under EMTALA; instead, the abortion is proposed as the appropriate stabilization for a pregnant person's emergency medical condition. *See* 42 U.S.C. § 1395dd(e)(1)(A). Under such circumstances, the hospital has a duty under EMTALA to provide stabilizing treatment to the pregnant individual.

In rare circumstances where both the pregnant individual and fetus simultaneously have emergency medical conditions, the text of EMTALA resolves any potential conflict in the physician's duties by leaving to the pregnant patient

---

[7] *See also* Complaint (Aug. 2, 2022) at 2, 7 (ECF No. 1), United States v. Idaho, No. 1:22-cv-329 (Aug. 2, 2022); Mem. from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp., *supra* note 6.

the choice whether to pursue stabilizing abortion care or continue gestation: the pregnant individual can grant or refuse consent for either treatment. *See* 42 U.S.C. § 1395dd(b)(2) (hospital's duty to provide stabilizing treatment is met where it offers the treatment, explains the risks and benefits, and the individual refuses to consent). EMTALA by its plain terms thus treats abortion the same as any other stabilizing medical treatment.

## II.  FOR DECADES, STATES HAVE UNDERSTOOD THAT ABORTION CARE IS PART OF EMERGENCY CARE

Hospitals in nearly all Amici States regularly provide abortion care to stabilize many emergency medical conditions, including severe pregnancy complications, pregnancy loss complications, pre-labor rupture of membranes, ectopic pregnancy, emergent hypertensive disorders including preeclampsia with severe features, and incomplete abortion. Often, pregnant patients face unforeseeable emergency medical conditions and need abortion care to protect their lives and prevent severe and disabling injury to their health, regardless of whether they wanted and intended the pregnancy. As the American College of Obstetricians and Gynecologists has explained, pregnancy complications "may be so severe that abortion is the only measure to preserve a woman's health or save

her life."[8] In Amici's experience, emergent conditions and conditions likely to become emergent can require abortion care to avoid serious harm.

Accordingly, abortion care has regularly been provided by hospitals in almost all Amici States to stabilize emergency medical conditions. In New York, for example, from 2019 through 2021, 16,216 abortions were performed for patients presenting at the emergency department, with 2,969 abortions performed within the emergency department, 5,244 abortions performed during an inpatient stay after presenting to the emergency department, and 8,003 abortions performed by ambulatory surgery.[9] In Massachusetts, from 2019 through 2022, 1,866 MassHealth patients received abortion services in hospital emergency departments.

Provider accounts likewise demonstrate that abortion is a regular and critical part of emergency healthcare. A physician at Oregon's public academic health center, Oregon Health & Science University, described often receiving transfers that require urgent or emergent pregnancy termination, including pregnant patients with hemorrhages due to placenta previa and placental abruption, peri-viable

---

[8] *Facts Are Important: Abortion Is Healthcare*, Am. Coll. Obstetricians & Gynecologists (ACOG) (2022), https://www.acog.org/advocacy/facts-are-important/abortion-is-healthcare.

[9] The data for 2020-2021 is not yet finalized and may be underinclusive. For the 2019-2021 data, medication abortion was the predominant method for procedures within the emergency department (2,596 of the 2,969 procedures), but made up only a small percentage of abortions performed in inpatient (277 of 5,244) and ambulatory surgery (69 of 8,003) settings.

premature rupture of membranes with sepsis, peri-viable severe decompensating preeclampsia, acute leukemia, ectopic pregnancies, and hemorrhaging pregnancy loss, among other conditions. The Illinois Department of Public Health's Office of Women's Health and Family Services similarly reported instances of patients needing emergency surgery to end their pregnancy. Providers at one New Jersey hospital have also reported the regular use of abortion in emergency settings to treat pregnancy loss where the uterus is infected or at risk of infection, ectopic pregnancies, severe preeclampsia, and molar pregnancy (nonviable abnormally fertilized egg that can act like a malignancy and is at high risk of metastasizing), for which no other treatment is available. And in Washington, hospitals regularly provide abortions to stabilize many emergency medical conditions. Indeed, some Washington hospitals that do not regularly provide abortion care in non-emergency settings explicitly permit abortion when it is the appropriate treatment of an emergency condition and therefore required under EMTALA.[10]

---

[10] *See, e.g.*, Wash. State Dep't Health, *Hospital Reproductive Health Services for Ferry County Memorial Hospital*, at 1-2 (Aug. 29, 2019), https://doh.wa.gov/sites/default/files/hospital-policies/FerryCountyRHSF.pdf; Wash. State Dep't Health, *Hospital Reproductive Health Services for Lourdes Hospital*, at 1 (Sept. 3, 2019), https://doh.wa.gov/sites/default/files/hospital-policies/LourdesRHSF.pdf; Wash. State Dep't Health, *Hospital Reproductive Health Services for Virginia Mason Memorial Hospital*, at 1-2 (Aug. 30, 2019), https://doh.wa.gov/sites/default/files/legacy/Documents/2300/HospPolicies/VirginiaMasonMemorialRHSF.pdf.

III. **FAILURE TO PROVIDE EMERGENCY ABORTION CARE WHEN REQUIRED CAUSES SERIOUS HARMS TO PATIENTS AND PROVIDERS IN IDAHO AND AMICI STATES**

The district court's order enjoining enforcement of Idaho's abortion ban when it conflicts with EMTALA protects patients in Idaho and elsewhere, and should be affirmed. The district court did not abuse its discretion in enjoining Idaho's abortion ban to the extent it conflicts with EMTALA, particularly given the equities and public interest considerations. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 876 (9th Cir. 2009); *Los Angeles v. Lyons*, 461 U.S. 95, 136 (1983) ("Courts of equity have much greater latitude in granting injunctive relief 'in furtherance of the public interest than . . . when only private interests are involved.'"). As Amici's experience demonstrates, the relief ordered by the district court helps safeguard the health of patients in Idaho, avoids further pressuring the already overwhelmed capacity of hospitals in neighboring states, and protects the public health.

A. **Prohibiting Physicians from Providing Emergency Abortions Egregiously Harms Pregnant Patients**

Pregnancy- and pregnancy loss-related complications can be emergency medical conditions requiring urgent stabilizing treatment that can include abortion; in such case any failure or delay in providing necessary abortion care puts the

pregnant patient's life or health at risk.[11] As one example, a physician explained that a clear sign of uterine infection can be life threatening "because there is an extremely high risk that the infection inside of the uterus spreads very quickly into [the patient's] bloodstream and she becomes septic. If she continues the pregnancy it comes at a very high risk of death."[12] Another observed, "under certain conditions, continuing a pregnancy could significantly increase the morbidity risk for the pregnant person or even jeopardize their life. . . . [F]or people with certain cardiovascular disease conditions, like Eisenmenger's syndrome and pulmonary hypertension, carrying a pregnancy could cause as high as a 40% risk of maternal death."[13]

---

[11] *See, e.g.*, *Fact Check – Termination of Pregnancy Can Be Necessary to Save a Woman's Life, Experts Say*, Reuters (Dec. 27, 2021), https://www.reuters.com/article/factcheck-abortion-false/fact-check-termination-of-pregnancy-can-be-necessary-to-save-a-womans-life-experts-say-idUSL1N2TC0VD (discussing, e.g., that placental abruption presents a risk of hemorrhage, which if left untreated, threatens the pregnant person's life and that preeclampsia if not treated quickly can result in the pregnant person's death); *Facts Are Important: Understanding Ectopic Pregnancy*, ACOG (2022), https://www.acog.org/advocacy/facts-are-important/understanding-ectopic-pregnancy#:~:text=An%20ectopic%20pregnancy%20occurs%20when,%2C%20ovary%2C%20and%20cesarean%20scar (advising "[a]n untreated ectopic pregnancy is life threatening; withholding or delaying treatment can lead to death").

[12] *Fact Check – Termination of Pregnancy*, *supra* note 11.

[13] Sarah Friedmann, *What a Medical Emergency for an Abortion Actually Means, According to OB/GYNs*, Bustle (June 6, 2019), https://www.bustle.com/p/what-a-medical-emergency-for-abortion-actually-means-according-to-obgyns-17929296.

Confusion regarding the legality of abortion as emergency medicine harms patients. As one physician explained, "'[e]mergency' exists on a continuum," and if the law does not clearly enable physicians to determine when a patient has an emergency medical condition, it forces "a physician [to] withhold evidence-based care until a patient develops an unambiguous emergency with significantly increased morbidity and mortality, such as septic shock and multisystem organ failure."[14] Such delays produce grave risks because physicians cannot easily forecast when a pregnant patient's death or serious impairment becomes imminent during a medical emergency.[15] The risks are exacerbated by the fact that "[m]any pregnant individuals are young and healthy; thus, they are able to compensate for severe physiologic derangements and might not appear ill until very late in their course of critical illness."[16] As Lisa Harris, University of Michigan professor of reproductive health, discussed, "there are many circumstances in which it is not

---

[14] Andrea MacDonald et al., *The Challenge of Emergency Abortion Care Following the Dobbs Ruling*, 328 JAMA 1691-92 (Nov. 1, 2022).

[15] *See* Tina Reed, *Defining "Life-Threatening" Can Be Tricky in Abortion Law Exceptions*, Axios (June 28, 2022), https://www.axios.com/2022/06/28/abortion-ban-exceptions-women-medical-emergencies. For example, Utah-based obstetrician Lori Gawron explained that if a pregnant patient experiences a ruptured membrane in the second trimester, there is a greater risk of infection and "[i]f the infection progresses to sepsis, the maternal life is absolutely at risk. But we can't say how long that will take or how severe the infection will get in that individual." *Id.*

[16] MacDonald et al., *supra*, note 14.

17

clear whether a patient is close to death."[17] She explained, "It's not like a switch that goes off or on that says, 'OK, this person is bleeding a lot, but not enough to kill them,' and then all of a sudden, there is bleeding enough to kill them. . . . It's a continuum, so even how someone knows where a person is in that process is really tricky.'"[18]

However, data reflects that "withholding evidence-based care to have clear documentation of an unambiguous threat to life is dangerous"; "every hour of delayed care increases the patient's likelihood of dying by approximately 4%."[19] Thus, "the longer emergency abortions are delayed, the greater risk that lifesaving interventions might not be effective and pregnant individuals could experience morbidity and mortality."[20]

---

[17] Aria Bendix, *How Life-Threatening Must a Pregnancy Be to End It Legally?*, NBC News (June 30, 2022), https://www.nbcnews.com/health/health-news/abortion-ban-exceptions-life-threatening-pregnancy-rcna36026.

[18] *Id.* Dr. Harris also impressed that confusion about when the medical emergency becomes sufficiently life-threatening for intervention under state law likely delays intervention "to that very last minute when it's clear that a patient will die to do the procedure, and that's just not an ideal time to do any kind of intervention." *Id.*

[19] MacDonald et al., *supra* note 14.

[20] *Id.*

Regrettably, examples abound of patients suffering grave harm when they do not receive necessary emergency abortion care.[21] For example, following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, determining when an abortion is allowed under Texas law became "fraught with uncertainty and legal risk," forcing doctors to "significantly alter the care they provide to women whose pregnancy complications put them at high risk of harm."[22] As a result, Amanda Zurawski, the named plaintiff in a lawsuit challenging Texas' abortion laws, was "forced to wait until she was septic to receive abortion care, causing one of her fallopian tubes to become permanently closed."[23] The court found that ongoing enforcement of the law created an imminent risk "that physicians throughout Texas will have no choice but to bar or delay the provision of abortion care to pregnant persons in Texas."[24]

---

[21] *See* Frances Stead Sellers & Fenit Nirappil, *Confusion Post-Roe Spurs Delays, Denials for Some Lifesaving Pregnancy Care*, Wash. Post (July 16, 2022), https://www.washingtonpost.com/health/2022/07/16/abortion-miscarriage-ectopic-pregnancy-care/.

[22] J. David Goodman & Azeen Ghorayshi, *Women Face Risks as Doctors Struggle With Medical Exceptions on Abortion*, N.Y. Times (July 20, 2022), https://www.nytimes.com/2022/07/20/us/abortion-save-mothers-life.html.

[23] *Zurawski v. Texas,* No. D-1-GN-23-000968 (Tex. Dist. Ct. filed Mar. 6, 2023).

[24] *Id.* (Aug. 4, 2023 order granting temporary injunction).

Likewise, in Idaho, without the district court's injunction, doctors would be forced to delay or alter their treatment of pregnant individuals due to fears of criminalization or other legal ramifications.[25] Idaho OBGYN Dr. Emily Corrigan explained that before the injunction went into effect, the Idaho ban was "already harming women in Idaho. . . . [T]he threat of criminal prosecution has already deterred doctors from providing medically necessary, life-saving care."[26] Another

---

[25] Seyb Decl. (Aug. 8, 2022) at 4-5 (ECF No. 17-8), U.S. v. Idaho, No. 1:22-cv-329 (Aug. 2, 2022) (describing provider's strong desire to transfer a patient with serious bleeding rather than perform necessary pregnancy termination, prior to the injunction, due to fears of the legal consequences of proceeding with termination); Corrigan Decl. (Aug. 8, 2022) at 8 (ECF No. 17-6), U.S. v. Idaho, No. 1:22-cv-329 (describing scenarios where Idaho ban would interfere with providers' ability to provide the standard of care in life-threatening pregnancy complications); Cooper Decl. (ECF No. 17-7), U.S. v. Idaho, No. 1:22-cv-329 (describing provider's concern about personal risk of offering medically necessary emergency abortion care). Despite the preliminary injunction, there has been at least one report of delayed care due to fears and confusion about the implications of Idaho's abortion ban. *See* Mary Kekatos, *Idaho woman shares 19-day miscarriage on TikTok, says state's abortion laws prevented her from getting care*, ABC News (Jan. 21, 2023), https://abcnews.go.com/Health/idaho-woman-shares-19-day-miscarriage-tiktok-states/story?id=96363578.

[26] Corrigan Decl. (Aug. 8, 2022) at 8 (ECF No. 17-6), U.S. v. Idaho, No. 1:22-cv-329; *see also* Lisa Baumann, *Idaho abortion law one reason hospital won't deliver babies*, AP News (Mar. 23, 2023), https://apnews.com/article/hospital-baby-delivery-idaho-abortion-ban-040fb50e0e069967efcb3fcd72a56677 (Dr. Amelia Huntsberger, Idaho OBGYN described, "[D]elaying medical care until we can say an abortion is necessary to prevent death is dangerous. . . . Patients will suffer pain, complications, and could die if physicians comply with Idaho law as written."); Oriana González, *Report: Abortion bans led to life-threatening health complications*, Axios (May 16, 2023), https://www.axios.com/2023/05/16/abortion-bans-life-threatening-complications-

20

reproductive healthcare provider in Boise, Dr. Lauren Miller, described how the law puts doctors in an impossible position: "If I don't act fast enough to save your life, prevent you from getting septic, I could be liable for civil cases . . . malpractice. But if I act too quickly and I'm not 100% certain that the patient is going to die from the complication she's sustaining, then I could be guilty of a felony."[27] Another provider, Dr. Frank Johnson, described how providers' worries about criminalization under Idaho's abortion ban had caused delays in care because "[t]he teams are asking for input, feedback, and they're reaching out to our legal team to help make sure they're compliant with the law as it's currently written . . . [a]nd that's creating stress, anxiety and potential for delay that wasn't there previously."[28] And as Dr. Corrigan described, often "in emergency situations, many of which present in the middle of the night, physicians do not have time to consult with lawyers about whether a decision they believe is warranted by the

---

death (describing report in which doctors confidentially/anonymously shared anecdotes of pregnant patients' lives being put at risk due to state abortion restrictions, including patient(s) from Idaho).

[27] Randi Kaye & Stephen Samaniego, *Idaho's murky abortion law is driving doctors out of the state*, CNN (May 13, 2023), https://www.cnn.com/2023/05/13/us/idaho-abortion-doctors-drain/index.html.

[28] Angela Palermo, *Keeping doomed fetuses alive: How doctors say Idaho's abortion law disrupts care,* Id. Statesman (Aug. 27, 2022), https://www.idahostatesman.com/living/health-fitness/article264970909.html; Corrigan Decl. (Aug. 8, 2022) at 8 (ECF No. 17-6), U.S. v. Idaho, No. 1:22-cv-329.

standard of care and therefore in the best interest of the patient will result in a

financially ruinous investigation into their practice or in criminal liability."[29] These

delays result in "[i]ncreased risk and mortality for pregnant women."[30]

Idaho's abortion ban has also had other harmful effects on healthcare access

in Idaho: the ban has made it more difficult to recruit OBGYNs to Idaho, where

there was already an OBGYN shortage before the Idaho abortion ban[31]; the ban has

also led to reproductive healthcare providers leaving the state[32] and to the closure

---

[29] Corrigan Decl. (Aug. 8, 2022) at 8 (ECF No. 17-6), U.S. v. Idaho, No. 1:22-cv-329.

[30] Palermo, *supra* note 28; Corrigan Decl. (Aug. 8, 2022) at 8 (ECF No. 17-6), U.S. v. Idaho, No. 1:22-cv-329 ("[T]ime spent by physicians in court defending their medical decisions will keep them from their clinical duties for significant periods of time. This will add to the shortages in hospital and clinic coverage, increasing the workload of their practice partners as well as increasing wait times for patients."); *id.* at 9 ("[C]riminaliz[ing] abortion, even in many medically necessary circumstances, in a state where there is both a shortage of qualified physicians and a disproportionate number of high-risk pregnancies… puts the health of Idaho women at significant risk.").

[31] *See Maternity Care Desert: Data from Idaho*, March of Dimes (Oct. 2022), https://www.marchofdimes.org/peristats/data?reg=99&top=23&stop=641&lev=1&slev=4&obj=9&sreg=16.

[32] *See* Corrigan Decl. (Aug. 8, 2022) at 8 (ECF No. 17-6), U.S. v. Idaho, No. 1:22-cv-329 ("Idaho Code § 18-622 is also making it even more difficult to recruit Ob-Gyns to the State of Idaho" because it places providers in "a very difficult position because of a conflict between the State law and [their] ethical obligations to patients and [their] obligations under Federal law" and at least one doctor "decided to stop her part-time work at [their] hospital due to the stress of complying with" Idaho's abortion ban); *see also* Kaye & Samaniego, *supra* note 27 (describing how doctors "who care for pregnant women and perform[] abortions –

of at least one hospital's maternity ward.[33] Indeed, in explaining its decision to

close its maternity ward, that hospital pointed to Idaho's laws subjecting

physicians to the risk of "civil lawsuits and criminal prosecution, leading to jail

time or fines" merely for providing the standard of care.[34] Such outcomes will

likely worsen existing barriers to accessing prenatal care, and in turn, drive up rates

of serious pregnancy complications.[35] Vulnerable patients living in maternity care

and abortion care deserts also risk losing access to other critical reproductive

health services performed by OBGYNs, including gynecologic oncology care,

---

are fleeing the state due to new abortion restrictions," including an example of a reproductive healthcare provider, Dr. Lauren Miller, who reported that she was planning to leave Idaho due to fears that she could be "tried as a felon simply for saving someone's life").

[33] *See* Baumann, *supra* note 26.

[34] *Press Release* 3/17/2023, *Discontinuation of Labor & Deliver Services at Bonner General Hospital*, Bonner General Health, https://bonnergeneral.org/wp-content/uploads/2023/03/Bonner-General-Health-Press-Release-Closure-of-LD-3.17.2023.pdf.

[35] *See* March of Dimes, *Nowhere to Go: Maternity Care Deserts Across the U.S., 2022 Report* (2022), https://www.marchofdimes.org/sites/default/files/2022-10/2022_Maternity_Care_Report.pdf; Commonwealth Fund, *The U.S. Maternal Health Divide: The Limited Maternal Health Services and Worse Outcomes of States Proposing New Abortion Restrictions*, https://www.commonwealthfund.org/publications/issue-briefs/2022/dec/us-maternal-health-divide-limited-services-worse-outcomes.

infertility treatment, contraceptive access, and other preventative care.[36] These

harms would be further exacerbated by a ruling that permits the statute to go into

effect as to emergency abortion care.

B.    Prohibiting Physicians from Providing Emergency Abortion
      Care in Idaho Harms Amici States

Vacating the injunction would cause significant harms in Amici States.

Severe restrictions on abortion care in states restricting abortion, including Idaho,

have already placed extreme strain on healthcare systems in Amici States by

forcing patients to travel to these states when they are in need of acute care.[37]

Without the injunction, Idaho's ban will predictably result in even more pregnant

---

[36] *See Subspecialties of OB-GYN*, ACOG (2023)
https://www.acog.org/career-support/medical-students/medical-student-toolkit/subspecialties-of-ob-gyn.

[37] *See* Margot Sanger-Katz et al., *Interstate Abortion Travel Is Already Straining Parts of the System,* N.Y. Times (July 23, 2022),
https://www.nytimes.com/2022/07/23/upshot/abortion-interstate-travel-appointments.html; Oriana González & Nicole Cobler, *Influx of Out-of-State Patients Causes Abortion Delays*, Axios (Sept. 12, 2022),
https://www.axios.com/local/austin/2022/09/12/texans-out-of-state-patients-abortions-delays; Laura Kusisto, *Doctors Struggle with Navigating Abortion Bans in Medical Emergencies*, Wall Street J. (Oct. 13, 2022),
https://www.wsj.com/articles/doctors-struggle-with-navigating-abortion-bans-in-medical-emergencies-11665684225?mod=politics_lead_pos9; Ian Millhiser, *No one knows when it is legal to perform medically necessary abortions in Texas*, Vox (Mar. 12, 2023), https://www.vox.com/politics/2023/3/12/23631278/supreme-court-abortion-texas-medically-necessary-sepsis-zurawski (describing situations where women with serious conditions were forced to travel to Amici for care).

people traveling to Amici States to seek medical care, resulting in crowded waiting rooms and increasing waiting times for time-sensitive healthcare services.[38]

As a general matter, studies have repeatedly reflected that state abortion restrictions force many pregnant individuals to travel out of state for care.[39] These numbers have risen as state legislatures pass ever more restrictive laws. For instance, even before the Supreme Court's decision in *Dobbs*, in 2017, over 30% of all Idaho residents who received an abortion had to leave the state to do so.[40] Immediately following *Dobbs*, in eastern Washington, clinics reported a massive influx of patients from Idaho; one clinic reported that 78% of its patients in July

---

[38] Due to the recency of Idaho's law and the mixed status of the law in Amici States, not all have the same definitively measurable overflow at present. But all Amici share a strong interest in protecting their residents who travel to Idaho, or to other states that will be emboldened to adopt laws like Idaho's. The domino effects of lifting the injunction will surely affect Amici States in one way or another, to the extent they are not already.

[39] Mikaela Smith et al., *Abortion Travel Within the United States: An Observational Study of Cross-State Movement to Obtain Abortion Care in 2017*, 10 The Lancet – Reg'l Health: Americas art. 100214 (Mar. 3, 2022), https://www.sciencedirect.com/science/article/pii/S2667193X2200031X?via%3Dihub (in 2017, overall, 8% of women who received an abortion had to cross state lines for care—this number was vastly higher in states with significant abortion restrictions).

[40] *Id.*

2022 were from Idaho (almost double the rate from the prior year).[41] Planned Parenthood reported serving Idaho residents at clinics even further into Washington, as far as Kennewick and Walla Walla, with drive times of more than four hours from Boise.[42] In Oregon, providers report an average of 100 to 300 additional abortions performed per month post-*Dobbs*.[43] Providers at Oregon Health & Science University report that following *Dobbs,* the majority of OHSU's out-of-state patients were from Idaho and Texas.[44]

In the six months after *Dobbs*, the average number of abortions performed per month in states that ban or severely restrict abortion dropped to ten or fewer.[45] In Idaho, that number started declining following *Dobbs* after implementation of

---

[41] Megan Burbank, *Who is traveling to Washington for abortion care?*, Crosscut (Nov. 14, 2022), https://crosscut.com/equity/2022/11/who-traveling-washington-abortion-care.

[42] *Id.*

[43] Nicole Rideout, *One year since the overturn of Roe, OB/GYNs report devastating impacts from lack of abortion access*, OSHU News (June 24, 2023), https://news.ohsu.edu/2023/06/24/one-year-since-the-overturn-of-roe-obgyns-report-devastating-impacts-from-lack-of-abortion-access.

[44] *Id.* Similarly, Planned Parenthood Columbia Willamette reported most of their out-of-state abortion patients are from Idaho. Kandra Kent, *Oregon sees uptick in abortion travel, most out-of-staters come from Idaho*, KPTV (Nov. 8, 2022), https://www.kptv.com/2022/11/08/oregon-sees-uptick-abortion-tourism-most-out-of-staters-come-idaho//.

[45] Society of Fam. Plan., *#WeCount Report, April 2022 to March 2023*, at 9, 12 (Jun. 15, 2023), https://societyfp.org/wp-content/uploads/2023/06/WeCountReport_6.12.23.pdf.

Idaho's abortion ban in August 2022, and dropped to less than ten per month

beginning in September 2022 (compared to 170 per month pre-*Dobbs*, in April and

May 2022 and 150 per month in July and August 2022).[46]

As a result, pregnant individuals from Idaho and other abortion-restricting

States crossed state lines to obtain services in even greater numbers.[47] According to

one study, the average distance for Idahoans to obtain abortion increased from 40

miles to 178 miles between March 2022 and March 2023.[48] In Washington, one

year post-*Dobbs*, Planned Parenthood clinics have seen a 56% increase in Idaho

patients and a 36% increase in out-of-state abortion patients, increasing

---

[46] *Id.*

[47] *E.g.*, Angie Leventis Lourgos, *Abortions in Illinois for Out of State Patients Have Skyrocketed*, Chi. Trib. (Aug. 4, 2022), https://www.chicagotribune.com/news/breaking/ct-illinois-abortion-increase-post-roe-20220802-eottdwcfnjfjxdvbfgd4kwefwu-story.html (reporting a 700% increase in the number of out-of-state patients served in Illinois); Matt Bloom & Bente Berkland, *Wait Times at Colorado Clinics Hit Two Weeks as Out-of-State Patients Strain System*, KSUT (July 28, 2022), https://www.ksut.org/health-science/2022-07-28/wait-times-at-colorado-abortion-clinics-hit-2-weeks-as-out-of-state-patients-strain-system (100% increase in wait times than before *Dobbs*); Marielle Kirstein et al., *100 Days Post-Roe: At Least 66 Clinics Across 15 US States Have Stopped Offering Abortion Care*, Guttmacher Inst. (Oct. 6, 2022), https://www.guttmacher.org/2022/10/100-days-post-roe-least-66-clinics-across-15-us-states-have-stopped-offering-abortion-care (discussing how the "dramatic increases in caseloads mean clinic capacity and staff are stretched to their limits, resulting in longer wait times for appointments even for residents of states where abortion remains legal").

[48] Caitlin Myers et al., Abortion Access Dashboard, https://experience.arcgis.com/experience/6e360741bfd84db79d5db774a1147815.

Washington's total number of abortion patients by 18%.[49] And the Northwest Abortion Access Fund, which provides financial and travel assistance to people seeking abortions, saw a 61% increase in the abortion funding it distributed compared to the same period in the year before *Dobbs*.[50] In Colorado, in the six months following *Dobbs*, 94% of individuals seeking assistance from an abortion fund were from out of state.[51] An Illinois clinic reported patients from States other than Missouri and Illinois rose to 40% of cases, compared to 5% before *Dobbs*.[52] In California, since *Dobbs*, demand has skyrocketed at many clinics—with increases ranging from 400% to 513% to even 900% in some counties.[53] In

---

[49] Lauren Gallup & Rachel Sun, *Number of Idaho abortion patients traveling to Washington up 56% after Roe overturned*, OPB (July 10, 2023), https://www.opb.org/article/2023/07/10/idaho-abortion-patients-traveling-to-washington-increases-56-percent-after-roe-overturned/ (comparing data from January–May 2022 to data from January–May 2023).

[50] *Id.*

[51] Hannah Metzger, *Colorado Democrats advance ban of 'deceptive' ads, 'abortion reversal' for crisis pregnancy centers*, Colo. Politics (Mar. 30, 2023), https://www.coloradopolitics.com/legislature/democrats-target-abortion-reversal-crisis-pregnancy-centers-colorado/article_e5c4fa2e-cf1d-11ed-bff6-ef208a330dd2.html (In January 2023, 750 out-of-state people traveled to Colorado Planned Parenthoods for abortion care, compared to 1,500 total during all of 2021).

[52] González & Cobler, *supra* note 37.

[53] Marisa Kendall, *Demand has quadrupled at some California abortion clinics since Roe fell*, Mercury News (Jan. 1, 2023), https://www.mercurynews.com/2023/01/01/demand-has-tripled-quadrupled-at-california-abortion-clinics-since-roe-fell/; Cindy Carcamo, *A California desert town has long been an abortion refuge for Arizona and Mexico. Now it's*

Nevada, since June 2022, Las Vegas has seen a 37% increase in out-of-state

patients at Planned Parenthood health centers. More than 1,200 patients came to

Las Vegas from out of state, including Idaho.[54] And a Planned Parenthood clinic in

Massachusetts reported an estimated 37.5% increase in out-of-state patients, driven

largely by patients from outside New England.[55]

When Idaho hospitals and providers do not provide emergency abortion care

required by EMTALA, Amici's healthcare systems will inevitably feel additional

strain, with potentially severe health and economic effects.[56] For example, a

---

*overwhelmed*, L.A. Times (July 20, 2022),
https://www.latimes.com/california/story/2022-07-20/planned-parenthood-clinic-in-this-conservative-desert-town-is-now-a-refuge-for-arizonans-seeking-abortions;
Karma Dickerson, *More out-of-state patients begin arriving in California for reproductive health services*, Fox 40 News (Sept. 20, 2022),
https://fox40.com/news/fox40-focus/out-of-state-patients-reproductive-health-abortion-california/; *Planned Parenthood centers in SoCal report dramatic increase in abortion patients from out of state*, ABC 7 News (July 6, 2022),
https://abc7.com/planned-parenthood-abortion-orange-county-san-bernardino/12023682/.

[54] Jessica Hill, *Las Vegas sees big spike in out-of-state abortion seekers*, Las Vegas Rev.-J. (updated June 27, 2023),
https://www.reviewjournal.com/news/politics-and-government/nevada/las-vegas-sees-big-spike-in-out-of-state-abortion-seekers-2800219/.

[55] Brianna Keefe-Oates et al., *Use of Abortion Services in Massachusetts After the Dobbs Decision Among In-State vs Out-of-State Residents*, JAMA Network Open, e2332400 (Sept. 6, 2023).

[56] *See* Claire Morley et al., *Emergency department crowding: A systematic review of causes, consequences and solutions*, 13 PLOS ONE e0203316 (2018),
https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0203316;
Matthew Foley et al., *Financial Impact of Emergency Department Crowding*, 12

pregnant patient in Tennessee, at risk of severe preeclampsia, was forced to take a six-hour ambulance ride to North Carolina for care, but because of the delay and travel, arrived with dangerously high blood pressure and signs of kidney failure, undoubtedly requiring more Amici resources to provide this more intensive critical care.[57]

Emergency departments are already struggling with overcrowding, long wait times, and staff shortages, especially in rural and underserved areas, including those parts of Oregon and Washington that border Idaho.[58] Any additional influx of patients needing urgent care to address medical emergencies will aggravate these stresses, increasing delays, morbidity, and mortality for all people needing emergency care.[59] Indeed, emergency department overcrowding can broadly lead

---

W. J. Emergency Med. 192-97 (May 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3099606/.

[57] Kusisto, *supra* note 37.

[58] *See* Stephen Bohan, *Americans Deserve Better Than 'Destination Hallway' in Emergency Departments and Hospital Wards*, STAT News (Aug. 1, 2022), https://www.statnews.com/2022/08/01/americans-deserve-better-than-destination-hallway-emergency-department/ (discussing increasing demands for in-patient and emergency hospital services); Gabor Kelen et al., *Emergency Department Crowding: The Canary in the Health Care System*, NEJM Catalyst (Sept. 28, 2021), https://catalyst.nejm.org/doi/full/10.1056/CAT.21.0217 ("Even prior to the Covid-19 pandemic, greater than 90% of U.S. [Emergency Departments] found themselves stressed beyond the breaking point at least some of the time.").

[59] Kelen et al., *supra* note 58 (describing emergency department overcrowding as a widespread problem and source of patient harm and "[t]he

to more than a 5% increased mortality rate for patients experiencing medical emergencies.[60] These harms are generally felt most acutely by racial and ethnic minorities, who already experience disparities in healthcare access and outcomes.[61] Reversing the district court's order enjoining enforcement of Idaho's abortion ban to the extent it conflicts with EMTALA will worsen those disparities, harming Amici, their healthcare systems, and their residents.

---

impact of [emergency department] overcrowding on morbidity, mortality, medical error, staff burnout, and excessive cost is well documented").

[60] Sarai Rodriguez, *Emergency Department (ED) Overcrowding Leads to Worse Health Outcomes*, Patient Engagement HIT (Nov. 14, 2022), https://patientengagementhit.com/news/emergency-department-ed-overcrowding-leads-to-worse-health-outcomes.

[61] *See* Commonwealth Fund, *supra* note 35; Priya Pandey, *A Year After Dobbs: People with Low Incomes and Communities of Color Disproportionately Harmed*, Ctr. L. & Soc. Pol'y (June 23, 2023), https://www.clasp.org/blog/a-year-after-dobbs-people-with-low-incomes-and-communities-of-color-disproportionately-harmed/; Samantha Artiga et al., *What are the Implications of the Overturning of Roe v. Wade for Racial Disparities?*, KFF (Jul. 5, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/what-are-the-implications-of-the-overturning-of-roe-v-wade-for-racial-disparities/; Sarahn Wheeler & Allison Bryant, *Racial and Ethnic Disparities in Health and Health Care*, 44 Obstet Gynecol Clin. N. Am. 1-11 (Mar. 2017).

## CONCLUSION

The District Court's Order enjoining enforcement of Idaho's abortion ban to the extent it conflicts with EMTALA should be affirmed.

Dated: September 15, 2023

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Barbara D. Underwood
  *Solicitor General*
Ester Murdukhayeva
  *Deputy Solicitor General*
Galen Sherwin
  *Special Counsel for Reproductive
Justice*
Sarah Coco
  *Assistant Solicitor General*
N.Y. State Bar No. 5783790

Office of the Attorney General
28 Liberty St.
New York, NY 10005
(212) 416-6312
(212) 416-8962 (fax)
Sarah.Coco@ag.ny.gov

ROB BONTA
  *Attorney General*
  *State of California*
Renu R. George
  *Senior Assistant Attorney General*
Karli Eisenberg
  *Supervising Deputy Attorney
General*

 */s/ Hayley Penan*
Hayley Penan
California State Bar No. 313693
  *Deputy Attorney General*

California Department of Justice
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-7785
Hayley.penan@doj.ca.gov

*(Counsel listing continues on next page.)*

KRISTIN K. MAYES
  *Attorney General*
  *State of Arizona*
2005 N. Central Ave
Phoenix, AZ 85004

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

JOSHUA H. STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

MICHELLE A. HENRY
  *Attorney General*
  *Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333

PETER F. NERONHA
 *Attorney General*
 *State of Rhode Island*
150 South Main Street
Providence, RI 02903

ANTHONY G. BROWN
 *Attorney General*
 *State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

CHARITY R. CLARK
 *Attorney General*
 *State of Vermont*
109 State Street
Montpelier, VT 05609

ANDREA JOY CAMPBELL
 *Attorney General*
 *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

ROBERT W. FERGUSON
 *Attorney General*
 *State of Washington*
P.O. Box 40100
Olympia, WA 98504

DANA NESSEL
 *Attorney General*
 *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

JOSHUA L. KAUL
 *Attorney General*
 *State of Wisconsin*
17 W. Main Street
Madison, WI 53703

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

BRIAN L. SCHWALB
 *Attorney General*
 *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,988 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft in Times New Roman 14-point font, a proportionally spaced typeface.

Dated:  September 15, 2023          _/s/ Hayley Penan_____ _
                                   Hayley Penan

## CERTIFICATE OF SERVICE

I certify that on September 15, 2023, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that services will be accomplished by the appellate EM/EC system.

Dated: September 15, 2023  _/s/ Amber Gray_____
Amber Gray

SA2023301951
37502303.docx