**Nos. 23-35440, 23-35450**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF IDAHO,

Defendant-Appellant,

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-Defendants,

Movants-Appellants.

On Appeal from the United States District Court
for the District of Idaho

**BRIEF OF AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, AMERICAN MEDICAL ASSOCIATION, SOCIETY FOR MATERNAL-FETAL MEDICINE, ET AL., AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

SHANNON ROSE SELDEN
*COUNSEL OF RECORD*
ADAM AUKLAND-PECK
DEBEVOISE &
  PLIMPTON LLP
66 Hudson Blvd.
New York, NY 10001
Tel.: (212) 909-6000

*Counsel to Amici Curiae*

JEFFREY B. DUBNER
DEMOCRACY FORWARD
  FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090

*Counsel to Amici Curiae*

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici* state as follows:

The American Academy of Family Physicians is a non-profit professional association that has no parent and issues no stock.

The American Academy of Pediatrics is a non-profit professional association that has no parent and issues no stock.

The American College of Emergency Physicians is a non-profit professional association that has no parent and issues no stock.

The American College of Obstetricians and Gynecologists is a non-profit professional association that has no parent and issues no stock.

The American Medical Association is a non-profit professional association that has no parent and issues no stock.

The American Public Health Association is a non-profit professional association that has no parent and issues no stock.

The National Hispanic Medical Association is a non-profit professional association that has no parent and issues no stock.

The National Medical Association is a non-profit professional association that has no parent and issues no stock.

The Society for Maternal-Fetal Medicine is a non-profit professional association that has no parent and issues no stock.

## TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ....................................................... 1

PRELIMINARY STATEMENT ........................................................ 7

ARGUMENT ................................................................................. 12

I.   Providing Stabilizing Treatment for Pregnant Patients with
     Emergency Medical Conditions Sometimes Requires Abortion ............ 12

     A.  The Nature of Emergency Care ..................................... 12

     B.  Caring for Pregnant Patients Is an Essential Component of
         Emergency Medicine ..................................................... 14

II.  EMTALA Requires Physicians to Provide Stabilizing Treatment to
     Pregnant Patients—Including, Where Necessary, Termination of
     Pregnancy .................................................................................. 17

III. The Idaho Law Would Criminalize Care EMTALA Requires
     Physicians to Provide .................................................................. 21

     A.  It Is Often Impossible for Physicians to Comply
         Simultaneously with the Idaho Law and EMTALA ..................... 23

     B.  The Idaho Law Deters All Abortions—Even Those It
         Purports to "Excuse" as Life-Threatening .................................. 26

IV.  The Idaho Law Will Have Devastating Consequences for Pregnant
     Patients ..................................................................................... 29

     A.  The Idaho Law Will Have a Disproportionately Negative
         Impact on Rural and Poor Pregnant Patients in Idaho .................. 33

V.   The Idaho Law Undermines Principles of Medical Ethics ...................... 37

CONCLUSION ................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022),
No. 1:22-CV-00329-BLW, 2023 WL 3284977 (D. Idaho May
4, 2023) ............................................................................................. *passim*

**Statutes**

42 U.S.C. § 1395dd .................................................................................. *passim*

IDAHO CODE § 18-622 ............................................................................... *passim*

**Other Authorities**

*2022 National Healthcare Quality and Disparities Report*,
AGENCY FOR HEALTHCARE RSCH. AND QUALITY (Oct. 2022) .................... 36

68 Fed. Reg. 53221, 53229 (Nov. 10, 2003) (codified at 42
C.F.R. 413, 482, and 489) ............................................................................ 12

ACEP, *Definition of Emergency Medicine* (Jan. 2021) ................................ 12

ACEP, *Code of Ethics For Emergency Physicians* (Jan. 2017) ..................... 14

ACEP, *Understanding EMTALA* (2023) ........................................................ 18

ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise
Multimodal Approach for Postpartum Pain Management*
(Sept. 2021) ................................................................................................... 11

ACOG, *Code of Professional Ethics* (Dec. 2018) ......................................... 38

ACOG Committee Opinion No. 586, *Health Disparities in Rural
Women* (Feb. 2014, *reaff'd* 2021) ............................................................... 35

ACOG Committee Opinion No. 667, *Hospital-Based Triage of
Obstetric Patients* (July 2016) ............................................................. 13, 19

ACOG Committee Opinion No. 815, *Increasing Access to
Abortion* (Dec. 2020) .................................................................................. 11

iv

ACOG FAQs, *Bleeding During Pregnancy* (Aug. 2022) ...............................16

ACOG Obstetric Care Consensus No. 7, *Placenta Accreta Spectrum* (Dec. 2018, *reaff'd* 2021) ..................................... 11, 16

ACOG Obstetric Care Consensus No. 10, *Management of Stillbirth* (Mar. 2020, *reaff'd* 2021)...........................................16

ACOG Practice Bulletin No. 183, *Postpartum Hemorrhage* (Oct. 2017) ....................................................................................10

ACOG Practice Bulletin No. 190, *Gestational Diabetes Mellitus* (Feb. 2018)..................................................................................10

ACOG Practice Bulletin No. 198, *Prevention and Management of Obstetric Lacerations at Vaginal Delivery* (Sept. 2018, *reaff'd* 2022) ............................................................................11

ACOG Practice Bulletin No. 200, *Early Pregnancy Loss* (Nov. 2018, *reaff'd* 2021) ....................................... 15, 16, 21

ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes* (Mar. 2020) ...............................................................15

ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia* (June 2020) ................................................. 10, 16

Alicia Naspretto, *'My Heart Broke Into a Million Pieces': The Stories Behind the Texas Abortion Ban Lawsuit*, KXXV 25 ABC (Mar. 8, 2023).....................................................................32

AMA, *Code of Medical Ethics Opinions on Patient-Physician Relationships* § 1.1.1 (2016).......................................................38

Anjali Nambiar et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, 227 AM. J. OBSTETS. & GYNECOL. 648 (2022)..........................29

Anthony Mazzeo et al., *Delivery of Emergency Care in Rural Settings*, ACEP 1 (2017) ...........................................................35

Carolyn A. Miller et al., *Patient Experiences With Miscarriage Management in the Emergency and Ambulatory Settings*, 134 AM. J. OBSTETS. & GYNECOL. 1285 (2019) ................................................15

Ctrs. for Medicare & Medicaid Servs., *CMS Rural Health Strategy* (2018) ............................................................35

Ctrs. for Medicare & Medicaid Servs., *Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022, revised Aug. 25, 2022) ............................................................37

Donna Hoyert, *Maternal Mortality Rates in the United States, 2021*, NAT'L CTR. FOR HEALTH STAT. (Mar. 2023) ....................................19

Elizabeth Cohen & John Bonifield, *Texas Woman Almost Dies Because She Couldn't Get an Abortion*, CNN (Nov. 16, 2022)................30

Elizabeth Cohen et al., *'Heartbreaking' Stories Go Untold, Doctors Say, As Employers 'Muzzle' Them in Wake of Abortion Ruling*, CNN (Oct. 12, 2022) ........................................32

*Emergency Department and Inpatient Utilization and Cost for Pregnant Women: Variation by Expected Primary Payer and State of Residence, 2019*, AGENCY FOR HEALTHCARE RSCH. AND QUALITY (Dec. 14, 2021) ....................................................15

Emily Baumgaertner, *Doctors in abortion-ban states fear prosecution for treating patients with life-threatening pregnancies*, LA TIMES (July 29, 2022) ....................................33

Emily E. Petersen et al., *Vital Signs: Pregnancy-Related Deaths, United States, 2011–2015, and Strategies for Prevention, 13 States, 2013–2017*, 68 MORBIDITY AND MORTALITY WKLY. REP. 423 (2019) ........................................................11

*Four in 5 Pregnancy-related Deaths in the U.S. are Preventable*, CTRS. FOR DISEASE CONTROL AND PREVENTION (Sept. 19, 2022) ................................................................29

*High-Risk Pregnancy*, CLEVELAND CLINIC, (last reviewed Dec. 14, 2021) ...................................................................19

*Idaho Coalition for Safe Reproductive Health Care Letter*, POST REGISTER (Aug. 10, 2022), ........................................................22

Juanita Chinn et al., *Health Equity Among Black Women in the United States*, 30 J. WOMEN'S HEALTH 212 (2021)...................................36

Katherine Tucker et al., *Delayed Diagnosis and Management of Second Trimester Abdominal Pregnancy*, BMJ CASE REP. 1 (2017)....................................................................14

Kimberly Kilfoyle et al., *Nonurgent and Urgent Emergency Department Use During Pregnancy: An Observational Study* 216 AM. J. OF OBSTETS. & GYNECOL. 1 (2017) .........................................19

Laura Ungar & Heather Hollingsworth, *Despite Dangerous Pregnancy Complications, Abortions Denied*, ASSOCIATED PRESS (Nov. 20, 2022) .................................................32

Lyndsey S. Benson et al., *Early Pregnancy Loss in the Emergency Department, 2006–2016*, 2 J. AM. C. OF EMERGENCY PHYSICIANS OPEN e12549 (2021) ................ 15, 33, 34, 36, 37

Maria Mendez, *Texas Laws Say Treatments for Miscarriages, Ectopic Pregnancies Remain Legal but Leave Lots of Space for Confusion*, TEX. TRIBUNE (July 20, 2022) .........................................27

Michael S. Beeson et al., *2019 Model of the Clinical Practice of Emergency Medicine*, AM. BD. OF EMERGENCY MED. (2019)...................17

Nancy Ochieng & Gabrielle Clerveau , *How Many Physicians Have Opted Out of the Medicare Program?*, KFF (Sept. 11, 2023) ....................................................................18

Robert W. Neumar, *The Zerhouni Challenge: Defining the Fundamental Hypothesis of Emergency Care Research*, 49 ANNALS EMERGENCY MED. (2007)..........................................................13

Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, THE COMMONWEALTH FUND (Nov. 18, 2020) .........................11

Sheryl Stolberg, *As Abortion Laws Drive Obstetricians From Red States, Maternity Care Suffers*, N.Y. TIMES (Sept. 7, 2023) ................................................................. 28, 34

Stephanie Emma Pfeffer, *Texas Woman Nearly Loses Her Life After Doctors Can't Legally Perform an Abortion: 'Their Hands Were Tied'*, PEOPLE MAGAZINE (Oct. 18, 2022)............................32

Susanna Trost et al., *Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 US States, 2017–2019*, CTRS. FOR DISEASE CONTROL AND PREVENTION (Sept. 19, 2022)................................................... 11, 29

*Trends in the Utilization of Emergency Dep't Servs., 2009–2018*, OFFICE OF THE ASSISTANT SECRETARY FOR PLANNING AND EVALUATION, HHS (Mar. 2021). ................................36

*Where You Live Matters: Maternity Care Access in Idaho*, MARCH OF DIMES (May 2023)......................................34

Whitney Arey et al., *A Preview of the Dangerous Future of Abortion Bans—Texas Senate Bill 8*, 387 N. ENGL. J. MED. 388 (2022)..................................................27

*Zurawski v. Texas*, No. D-1-GN-23-000968, Pls.' First Am. V. Pet. for Declaratory J. and Appl. for Temporary and Permanent Inj. (May 22, 2023)......................................... 23, 31

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are leading medical and public health societies representing physicians, other clinicians, and public health professionals who serve patients in Idaho and nationwide. Among other organizations, they include the American College of Obstetricians and Gynecologists ("ACOG"), the nation's leading organization of physicians who provide health services unique to people seeking obstetric or gynecologic care; the American College of Emergency Physicians ("ACEP"), the leading advocate for emergency physicians; the American Medical Association ("AMA"), the largest professional association of physicians, residents, and medical students in the country; and the Society for Maternal-Fetal Medicine ("SMFM"), the medical professional society for maternal-fetal medicine subspecialists, who are obstetricians with additional training in high-risk pregnancies.

*Amici*, their members, and their patients are deeply affected by IDAHO CODE § 18-622 (the "Idaho Law"). Ensuring access to evidence-based health

---

[1]    Plaintiff-Appellee consents to the filing of this brief. Defendant-Appellant takes no position. Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for *amici curiae* authored this brief in whole; no party's counsel authored, in whole or in part, this brief; and no person or entity other than *amici* and their counsel contributed monetarily to preparing or submitting this brief.

1

care and promoting health care policy that improves patient health are central to *amici*'s missions. *Amici* believe that all patients are entitled to prompt, complete, and unbiased emergency health care that is medically and scientifically sound and is provided in compliance with the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA").

*Amici* submit this brief to provide for the Court the physicians' perspective on the ways in which Idaho's near-complete ban on abortion has undermined Idaho physicians' ability to provide appropriate emergency care, conflicts with obligations imposed under EMTALA, is inconsistent with longstanding principles of medical ethics, and has had a devastating impact on the health and safety of pregnant patients[2] in the state. *Amici* are:

**American Academy of Family Physicians (AAFP)**: Founded in 1947, the AAFP is one of the largest national medical organizations, representing 129,600 family physicians and medical students nationwide. AAFP seeks to improve the health of patients, families, and communities by

---

[2]  *Amici* use the term "women" and "she/her" inclusively and recognize that people who do not identify as women can also become pregnant and need emergency care.

2

advocating for the health of the public and by supporting its members in providing continuous comprehensive health care to all.

**American Academy of Pediatrics (AAP)**: AAP is a professional medical organization dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults. Its membership is comprised of primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists, including subspecialists in pediatric emergency medicine and adolescent medicine. AAP is committed to advancing high-quality medical care for pregnant adolescents.

**American College of Emergency Physicians (ACEP)**: ACEP is the nation's leading medical society representing emergency medicine. Through continuing education, research, public education, and advocacy, ACEP advances emergency care on behalf of its approximately 38,000 emergency physician members and the more than 150 million people they treat on an annual basis. Both by law and by oath, emergency physicians must care for all patients seeking emergency medical treatment. As with our nation, ACEP members represent a diverse array of personal and political beliefs, yet they are united in the belief that emergency physicians must be able to practice high-quality, objective, evidence-based medicine without legislative,

regulatory, or judicial interference in the physician-patient relationship. Denial of emergency care or delay in providing emergency services on the basis of race, religion, sexual orientation, gender identity, ethnic background, social status, type of illness, or ability to pay is unethical under the Code of Ethics as emergency physicians.

**American College of Obstetricians and Gynecologists (ACOG)**: Representing more than 90% of board-certified OB/GYNs in the United States, ACOG is the nation's premier professional membership organization for obstetrician-gynecologists dedicated to access to evidence-based, high-quality, safe, and equitable obstetric and gynecologic care. ACOG maintains the highest standards of clinical practice and continuing education of its members, promotes patient education, and increases awareness among its members and the public of the changing issues facing women's health care. ACOG is committed to ensuring access for all people to the full spectrum of evidence-based quality reproductive health care, including abortion care, and is a leader in the effort to confront the maternal mortality crisis in the United States. ACOG opposes medically unnecessary laws or restrictions that serve to delay or prevent care and the criminalization of evidence-based medicine. ACOG has previously appeared as *amicus curiae* in various courts throughout

the country, and ACOG's briefs and guidelines have been cited by numerous courts as an authoritative voice of science and medicine relating to obstetric and gynecologic health care.

**American Medical Association (AMA)**:  The AMA is the largest professional association of physicians, residents, and medical students in the United States.  Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all physicians, residents, and medical students in the United States are represented in the AMA's policy-making process.  The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes.  AMA members practice in every medical specialty and in every state.

**American Public Health Association (APHA)**:  APHA champions the health of all people and all communities; strengthens the profession of public health; shares the latest research and information; promotes best practices; and advocates for public health issues and policies grounded in scientific research.  APHA represents more than 26,000 individual members and is the only organization that combines a 150-year perspective, a broad-based

member community, and the ability to influence federal policy to improve the public's health.

**National Hispanic Medical Association (NHMA)**: National Hispanic Medical Association is a nonprofit association representing the interests of 50,000 Hispanic physicians with the mission to improve the health of Hispanics and other underserved communities.

**National Medical Association (NMA)**: Established in 1895, the National Medical Association is the oldest and largest national professional and scientific organization that represents the interests of 50,000 African American physicians and their patients. The NMA advocates for parity and justice in medicine, the elimination of disparities in health, and the promotion of health equity, including by confronting the U.S. maternal mortality crisis and improving women's health.

**Society for Maternal-Fetal Medicine (SMFM)**: Founded in 1977, SMFM is the medical professional society for maternal-fetal medicine subspecialists, who are obstetricians with additional training in high-risk pregnancies. SMFM represents more than 6,500 members who care for high-risk pregnant people and provides education, promotes research, and engages in advocacy to advance optimal and equitable perinatal outcomes for all

people who desire and experience pregnancy. SMFM and its members are dedicated to ensuring that all medically appropriate treatment options are available for individuals experiencing a high-risk pregnancy.

## **PRELIMINARY STATEMENT**

The Idaho Law endangers patients by directly interfering with federal law and medical ethics, which ensure that all patients in emergency settings receive medical treatment based on their individual health care needs. The federal EMTALA statute requires physicians, hospitals, and other medical facilities to provide stabilizing treatment to any patient presenting with an emergency medical condition that has the potential to cause serious harm to the patient or that endangers their life. Emergency treatment by definition requires physicians to act quickly, often with limited information, to treat and stabilize the patient. Timing is essential, as patients' conditions can deteriorate rapidly and with little or no warning. For nearly four decades, EMTALA has provided the foundation for the emergency care safety net, and its continuity is essential to patient care.

The Idaho Law conflicts with EMTALA and is unworkable in an emergency medicine setting. It prohibits treatment that well-established clinical guidelines for the treatment of pregnant patients in emergency

7

conditions require. This arises, for example, in the emergency department in contexts where a patient's pregnancy is presenting urgent risks to the pregnant patient's life or health but where the Idaho Law would prevent medically indicated care that includes terminating the pregnancy out of medical necessity. Indeed, the Idaho Law goes so far as to prevent the termination of a pregnancy in an emergency circumstance where the fetus will otherwise not survive and where the pregnant patient's health and potentially life are at risk without terminating the nonviable pregnancy. Withholding this care is directly contrary to EMTALA's mandate and to bedrock principles of medical ethics. If applied to emergency medical care, the Idaho Law would force physicians to disregard their patients' clinical presentations, their own medical expertise and training, and their legal obligations under EMTALA— or risk criminal prosecution. By criminalizing necessary, medically indicated care in emergency situations, the Idaho Law will have devastating consequences for patients and physicians.

The Idaho Law prevents medical professionals from providing emergency medical care, as that concept has been defined and practiced for decades. It eliminates the very core of emergency medicine—prompt provision of stabilizing and often life-saving treatment—and replaces it with

an unconscionable wait-and-see approach that will prove deadly for many patients. This is not hyperbole. On its face, the Idaho Law disregards standard medical practice and purports to force physicians to delay care until a patient's medical condition deteriorates to the point of becoming life-threatening. Delays in emergency care can be traumatic and devastating to pregnant patients, contribute to maternal morbidity, may permanently impair fertility, and can make it impossible to provide the optimal treatment for preventing a harmful, or even fatal, outcome.

By requiring physicians to delay treatment until patients' lives are in immediate and indisputable danger, the Idaho Law will put patients at tremendous and medically inappropriate risk of death and of serious, life-altering complications, and subject them (and their loved ones) to serious and needless additional emotional trauma as a result. For example, patients presenting with previable premature rupture of membranes will be at risk for health or life-threatening complications. Under the Idaho Law, these patients risk becoming septic because physicians will be compelled to wait until signs of infection are present when a patient is suffering from a premature rupture of the amniotic sac that is incompatible with continuing a pregnancy to term. Patients with uterine hemorrhage will be forced to wait until their blood loss

is deemed sufficient to elevate their status firmly into life threatening territory under the Idaho Law—at which point they will likely require far more invasive interventions with far greater side effects, risks, and recovery times. And even then—because the Idaho Law demands a level of certainty that is totally at odds with the practice of medicine—physicians risk the reputational, professional, and financial burdens of being arrested, indicted, and prosecuted for following federal law and their professional obligations. In providing emergency care, physicians must act swiftly to implement a treatment plan based on their best medical judgment—judgment that necessarily has been honed by over a decade of medical education, training, and fellowship and must follow evidence-based guidelines and ethical obligations to meet the patient's individual health care needs. By forcing physicians to delay or forego care that they have been trained and are ethically required to provide, the Idaho Law creates substantial risks for patients and physicians alike.

Even under the best of circumstances, pregnancy and childbirth impose significant physiological changes that can exacerbate underlying preexisting conditions and can severely compromise health.[3] When those risks create

---

[3] *See*, *e.g.*, ACOG Practice Bulletin No. 190, *Gestational Diabetes Mellitus* (Feb. 2018); ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia* (June 2020); ACOG Practice Bulletin No. 183,

emergency situations that jeopardize the patient's health and life, the patient is entitled to and should receive health- and life-saving medical care like anyone else in this country, and the physicians who provide that care consistent with clinical best practices and longstanding federal law should not be criminally sanctioned.[4]  In short, the Idaho Law is not just bad law, it is bad medicine, particularly in light of the nation's maternal health crisis.[5]

---

*Postpartum Hemorrhage* (Oct. 2017); ACOG Obstetric Care Consensus No. 7, *Placenta Accreta Spectrum* (Dec. 2018, *reaff'd* 2021); ACOG Practice Bulletin No. 198, *Prevention and Management of Obstetric Lacerations at Vaginal Delivery* (Sept. 2018, *reaff'd* 2022); ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management* (Sept. 2021).

[4]  *See generally* ACOG Committee Opinion No. 815, *Increasing Access to Abortion* (Dec. 2020).

[5]  *See generally* Susanna Trost et al., *Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 US States*, *2017–2019*, CTRS. FOR DISEASE CONTROL AND PREVENTION (Sept. 19, 2022), https://www.cdc.gov/reproductivehealth/maternal-mortality/docs/pdf/ Pregnancy-Related-Deaths-Data-MMRCs-2017-2019-H.pdf; Emily E. Petersen et al., *Vital Signs: Pregnancy-Related Deaths, United States, 2011–2015, and Strategies for Prevention, 13 States, 2013–2017*, 68 MORBIDITY AND MORTALITY WKLY. REP. 423 (2019); Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, THE COMMONWEALTH FUND (Nov. 18, 2020), https://www.commonwealthfund.org/publications/issue-briefs/2020/nov/maternal-mortality-maternity-care-us-compared-10-countries ("The U.S. has the highest maternal mortality rate among developed countries.").

## ARGUMENT

I. **Providing Stabilizing Treatment for Pregnant Patients with Emergency Medical Conditions Sometimes Requires Abortion**

### A. The Nature of Emergency Care

"Emergency medicine is the medical specialty dedicated to the diagnosis and treatment of unforeseen illness or injury."[6] Emergency care is not limited to treatment provided in the emergency department ("ED") but is practiced in a broad variety of settings both within the hospital and in other locations.[7] Emergency medicine includes "initial evaluation, diagnosis, treatment, coordination of care among multiple clinicians or community resources, and disposition of any patient requiring expeditious medical, surgical, or psychiatric care."[8] Emergency care may be provided to pregnant

---

[6] *Definition of Emergency Medicine*, Am. Coll. of Emergency Physicians ("ACEP"), 1 (Jan. 2021), https://www.acep.org/siteassets/new-pdfs/policy-statements/definition-of-emergency-medicine.pdf.

[7] *Id.*; *see also Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals with Emergency Medical Conditions*, 68 Fed. Reg. 53221, 53229 (Nov. 10, 2003) (codified at 42 C.F.R. 413, 482, and 489) ("CMS believes that EMTALA requires that a hospital's dedicated emergency department would not only encompass what is generally thought of as a hospital's 'emergency room,' but would also include other departments of hospitals, such as labor and delivery . . . .").

[8] ACEP, *supra* note 6, at 1.

patients in the ED or in labor and delivery units by obstetrician-gynecologists, by family physicians, or by any number of other medical specialists.[9]

It is essential to the life and health of patients that emergency care be provided based on sound medical standards. Emergency physicians identify and treat conditions when patients first present, often making the difficult determination of what care is needed and what specialists should be involved in a time-sensitive situation. Because of the complexities inherent in most health emergencies, physicians must use their medical judgment—honed through years of medical education, training, and experience—to provide evidence-based care that is consistent with clinical guidance and responsive to their patients' individualized needs.

Rapid treatment improves patient outcomes, while delays increase the risk of complications, permanent injury, or death.[10] Rapid treatment is

---

[9]  *Id.* ("Emergency medicine is not defined by location but may be practiced in a variety of settings including, but not limited to, hospital-based and freestanding emergency departments (EDs), urgent care clinics, observation medicine units, emergency medical response vehicles, at disaster sites, or via telehealth."); *see also* ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* (July 2016).

[10]  *See*, *e.g.*, Robert W. Neumar, *The Zerhouni Challenge: Defining the Fundamental Hypothesis of Emergency Care Research*, 49 ANNALS EMERGENCY MED. 696 (2007).

therefore a core ethical responsibility for physicians in emergency scenarios: "Patients often arrive at the emergency department with acute illnesses or injuries that require immediate care . . . emergency physicians have little time to gather additional data, consult with others, or deliberate about alternative treatments. Instead, there is a presumption for quick action guided by predetermined treatment protocols."[11] This includes treatment of pregnancy-related emergencies where "[e]arly diagnosis and treatment are paramount in reducing maternal morbidity and mortality."[12]

### B. Caring for Pregnant Patients Is an Essential Component of Emergency Medicine

Pregnant patients regularly seek emergency care—and that care sometimes involves abortion as the treatment. In virtually every shift (and often multiple times per shift), emergency physicians see pregnant patients presenting with abdominal pain, vaginal bleeding, or other pregnancy-related issues. [13] While not all pregnancy complications require emergency

---

[11] *Code of Ethics for Emergency Physicians*, ACEP, 4 (Jan. 2017), https://www.acep.org/siteassets/new-pdfs/policy-statements/code-of-ethics-for-emergency-physicians.pdf.

[12] Katherine Tucker et al., *Delayed Diagnosis and Management of Second Trimester Abdominal Pregnancy*, BMJ CASE REP. 1, 1 (2017).

[13] In 2019, over 3.5 million women visited EDs for reasons related to pregnancy (other than delivery), with an additional 216,981 pregnant

intervention, emergencies involving pregnant patients are frequent and dangerous. For example, some of the issues pregnant patients may present with include:

- **Pre-labor rupture of membranes**, where the amniotic sac ruptures before fetal viability, potentially leading to serious maternal infection and sepsis;[14]

- **Miscarriage** or early pregnancy loss ("EPL"), which is extremely common, occurs in approximately 10% of clinically recognized pregnancies.[15] Women seek care in the ED with miscarriage-related concerns hundreds of thousands of times each year.[16] A miscarriage may put a patient at risk of excessive blood loss and serious infection as long as the

---

women visiting for reasons not primarily related to their pregnancy. *Emergency Department and Inpatient Utilization and Cost for Pregnant Women: Variation by Expected Primary Payer and State of Residence, 2019*, AGENCY FOR HEALTHCARE RSCH. AND QUALITY, 30 (Dec. 14, 2021), https://hcup-us.ahrq.gov/reports/ataglance/HCUPanalysisHosp UtilPregnancy.pdf.

[14] ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes*, at 80 (Mar. 2020).

[15] ACOG Practice Bulletin No. 200, *Early Pregnancy Loss* (Nov. 2018, *reaff'd* 2021).

[16] Carolyn A. Miller et al., *Patient Experiences With Miscarriage Management in the Emergency and Ambulatory Settings*, 134 OBSTETS. & GYNECOL. 1285, 1285 (2019) (noting that "[p]atients with concerns about a potential miscarriage . . . present for care in [EDs] at a rate of approximately 500,000 each year in the United States"); Lyndsey S. Benson et al., *Early Pregnancy Loss in the Emergency Department, 2006–2016*, 2 J. AM. COLL. EMERGENCY PHYSICIANS OPEN e12549, 1–2 (2021) (finding that "EPL-related care accounts for over 900,000 ED visits in the United States each year").

products of conception remain in the uterus, yet also may involve a pregnancy that will not continue but in which embryonic or fetal cardiac activity is observed;[17]

- **Excessive bleeding**, which can be caused by placenta accreta spectrum and other conditions;[18]

- **Gestational hypertension and preeclampsia** (high blood pressure), which complicate 2–8% of pregnancies globally and are one of the leading causes of maternal mortality around the world. It is estimated that instances of these complications occurring within the first year of delivery cost $2.18 billion in the United States annually;[19] and

- **Placental abruption**, which is when the placenta separates from the inner wall of the uterus, causing serious and potentially uncontrollable bleeding. It is the cause of stillbirth in up to 10% of cases and can result in serious complications, like cardiac arrest or kidney failure.[20]

---

[17] ACOG Practice Bulletin No. 200, *supra* note 15.

[18] *See FAQs: Bleeding During Pregnancy*, ACOG (Aug. 2022), https://www.acog.org/womens-health/faqs/bleeding-during-pregnancy#:~:text=Common%20problems%20that%20may%20cause,also%20may%20signal%20preterm%20labor; ACOG Obstetric Care Consensus No. 7, *Placenta Accreta Spectrum* (Dec. 2018, *reaff'd* 2021).

[19] ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia* (June 2020); *see also United States v. Idaho*, 623 F. Supp. 3d 1096, 1104 (D. Idaho 2022), *reconsideration denied*, No. 1:22-CV-00329-BLW, 2023 WL 3284977 (D. Idaho May 4, 2023) (discussing situations in which high blood pressure or preeclampsia might occur).

[20] *See Idaho*, 623 F. Supp. 3d at 1104 (discussing placental abruption complications); ACOG Obstetric Care Consensus No. 10, *Management of Stillbirth* (Mar. 2020, *reaff'd* 2021).

These are just a few examples. The American Board of Emergency Medicine's Model of Clinical Practice of Emergency Medicine, the definitive source and guide to the core content found on emergency physicians' board examinations, contains an entire section devoted to "Complications of Pregnancy." [21] Nearly all listed conditions are graded as "critical" or "emergent," meaning that they "may progress in severity or result in complications with a high probability for morbidity if treatment is not begun quickly."[22]

## II. EMTALA Requires Physicians to Provide Stabilizing Treatment to Pregnant Patients—Including, Where Necessary, Termination of Pregnancy

Because of the unique nature of emergency medicine, federal law has, for more than 35 years, required nearly all physicians and hospitals to meet a minimum standard of care. [23] EMTALA defines an emergency medical condition as:

---

[21] Michael S. Beeson et al., *2019 Model of the Clinical Practice of Emergency Medicine*, AM. BD. OF EMERGENCY MED., 36 (2019), https://www.abem.org/public/docs/default-source/default-document-library/2019-em-model_website.pdf?sfvrsn=d75fcdf4_2.

[22] *Id.* at 36–37.

[23] All physicians and hospitals participating in government funded health care programs are subject to EMTALA. Only about 1% of non-pediatric

17

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.[24]

EMTALA requires that physicians provide treatment to any patient that presents with an emergency condition "until the emergency medical condition is resolved or stabilized."[25]

This mandate requires no more (and often less) than what physicians are taught to view as their ethical and professional responsibility. Faced with a medical emergency, intervening and stabilizing the patient—what EMTALA requires—is the *bare minimum* care that physicians are ethically bound to provide.

---

physicians have opted out of Medicare. *See* Nancy Ochieng & Gabrielle Clerveau, *How Many Physicians Have Opted Out of the Medicare Program?*, KFF (Sept. 11, 2023), https://www.kff.org/medicare/issue-brief/how-many-physicians-have-opted-out-of-the-medicare-program.

[24]   42 U.S.C. § 1395dd(e)(1)(A).

[25]   ACEP, *Understanding EMTALA*, https://www.acep.org/life-as-a-physician/ethics--legal/emtala/emtala-fact-sheet/ (last visited Sept. 15, 2023).

Given the risks associated with being pregnant, [26] emergency care providers regularly treat pregnant patients for the emergent medical conditions described above, as well as other trauma that may implicate the pregnancy's safety or viability, like car accidents.[27]  Hospital-based obstetric units collaborate with EDs because "labor and delivery units frequently serve as emergency units for pregnant women." [28]  Hospitals structure these collaborative treatment efforts by establishing protocols for cooperation and

---

[26] The U.S. mortality rate associated with live births was a staggering 32.9 per 100,000 live births in 2021, up from 23.8 in 2020.  Donna Hoyert, *Maternal Mortality Rates in the United States, 2021*, CTRS. FOR DISEASE CONTROL AND PREVENTION NAT'L CTR. FOR HEALTH STAT., 1 (Mar. 2023), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/ 2021/maternal-mortality-rates-2021.pdf.  Pre-existing conditions and comorbidity with other illnesses further increase the likelihood of pregnancy complications. *See*, *e.g.*, *High-Risk Pregnancy*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/22190-high-risk-pregnancy (last reviewed Dec. 14, 2021) (describing how preexisting conditions exacerbate the risks of the pregnancy).

[27] Kimberly Kilfoyle et al., *Nonurgent and Urgent Emergency Department Use During Pregnancy: An Observational Study*, 216 AM. J. OF OBSTETS. & GYNECOL. 1, 2 (2017).

[28] *See* ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients*, at 1 (July 2016).

triage between delivery units and EDs, as well as for the appropriate stabilization of pregnant patients in accordance with EMTALA.[29]

EMTALA does not specify the particular treatment that should be provided in a given situation. Instead, when a physician determines that an individual has an emergency medical condition, they must provide "*such treatment as may be required to stabilize the medical condition.*"[30] EMTALA properly defers to the medical judgment of the physician(s) responsible for treating the patient to determine how best to achieve the designated objective of stabilization. That decision-making, in turn, is informed by established clinical guidelines, developed and regularly updated according to the latest advancements in medical science.

Just as EMTALA does not specify particular treatments, it does not allow for physicians to withhold specific treatments for non-medical reasons. Rather, if a treatment is "required to stabilize the medical condition," it must be provided—full stop.[31]

---

[29]  *See id.* at 2.

[30]  42 U.S.C. § 1395dd(b)(1)(A) (emphasis added).

[31]  *Id.*

### III. The Idaho Law Would Criminalize Care EMTALA Requires Physicians to Provide

The Idaho Law unnecessarily and profoundly conflicts with a physician's ability to provide EMTALA-mandated stabilizing care. The law is staggeringly broad. It criminalizes any action that has the effect of "intentionally terminat[ing] the clinically diagnosable pregnancy of a woman[.]"[32] It forces physicians to delay or deny care, endangering patients' health and undermining patients' trust and confidence in the availability and fairness of emergency care.

In emergency medicine, what Idaho now defines as criminal abortion has long been understood as a necessary, standard, and evidence-based medical treatment. As medically defined, abortion is a medical intervention provided to individuals who need to end the medical condition of pregnancy. For example, abortion includes the administration of medication to women already experiencing a miscarriage to complete expulsion of pregnancy tissue, including an embryo or fetus.[33] Abortion includes the removal of an embryo, fetus, and in advanced cases, potentially a uterus as the result of infection arising from the preterm premature rupture of membranes. An abortion is the

---

[32] Idaho Code § 604(1).

[33] ACOG Practice Bulletin No. 200, *supra* note 15.

necessary treatment in the event of uncontrolled bleeding from, for example, placental abruption or an ongoing miscarriage, even when fetal cardiac activity may still be detectable.  Yet the Idaho Law would criminalize nearly all medical use of abortion, even in emergency situations where the embryo or fetus is nonviable, and endanger the lives, health, and mental and emotional well-being of patients and their families.[34]

As the District Court recognized, the Idaho Law therefore conflicts with EMTALA in two ways.[35]  First, when faced with certain emergency scenarios, it will be impossible for any Idaho physician to provide medical treatment that complies simultaneously with EMTALA and the Idaho abortion ban.  Second, the Idaho Law has and will deter physicians from performing abortions, even when medically-indicated and the standard of care demands it.

---

[34] *Idaho Coalition for Safe Reproductive Health Care Letter*, POST REGISTER (Aug. 10, 2022), https://www.postregister.com/idaho-coalition-for-safe-reproductive-health-care-letter/pdf_4a332f4a-5e88-50ca-8ed6-046896b19dd9.html (an open letter signed by hundreds of Idaho physicians describing the dangerous effects of the Idaho Law on emergency care for pregnant patients).

[35] *Idaho*, 623 F. Supp. 3d at 1109–12.

### A. It Is Often Impossible for Physicians to Comply Simultaneously with the Idaho Law and EMTALA

There are two related but distinct hurdles that will prevent physicians from complying with both sets of laws: severity and timing.[36] To begin with, the Idaho Law criminalizes most abortions performed in an emergency—leaving physicians with only the narrowest exception when intervention is absolutely essential to prevent a patient's imminent death.[37] In the emergency medical context, "life-threatening" situations are those where death is reasonably possible if the patient does not receive medical treatment, even if there is a chance that the patient could fortuitously survive. And EMTALA requires treatment in an even broader set of circumstances[38]—wherever it can

---

[36] *Id.* at 1109–10 (acknowledging timing and severity issues resulting in impossibility preemption).

[37] *See id.* at 1109 ("According to the dictionary, the word 'necessary' means something is 'needed' or 'essential.'") (internal citations and quotation marks omitted).

[38] *See generally Zurawski v. Texas*, No. D-1-GN-23-000968, Pls.' First Am. V. Pet. for Declaratory J. and Appl. for Temporary and Permanent Inj., ¶¶ 282–86 (May 22, 2023) (noting that this broader set of circumstances, while not comprehensive, includes "neural tube defects (including anencephaly); certain trisomies like trisomy 13 and 18 (the presence of an extra chromosome); triploidy (the presence of an extra set of chromosomes); certain gastric and cardiac defects in the fetus; and Potter syndrome (where the fetus does not properly develop kidneys), are examples of conditions where the fetus either will not survive delivery or likely will not survive more than a few hours or days after birth. Abortion is generally indicated for patients with such pregnancies, as abortion is

"reasonably be expected" that "the absence of immediate medical attention" would place the patient's health in "serious jeopardy" or cause serious bodily impairment or dysfunction.[39]  But the Idaho Law sets the threshold far higher before a physician can provide medical treatment:  the patient must be certain to die imminently if an abortion is not provided.[40]  The exception only applies where an abortion is "necessary" to prevent the death of the pregnant patient.[41]  Even if the pregnant patient is at risk of death, the Idaho Law will often require delaying stabilizing treatment past the point when EMTALA and medical ethics require intervention.

No clinical bright line defines when a patient's condition crosses the lines of this continuum.  At what point does the condition of a pregnant woman with a uterine hemorrhage deteriorate from health-threatening to life-

---

typically medically safer for the pregnant person than carrying the pregnancy to term and delivering a baby with no meaningful chance of survival.  Some fetal conditions present particularly acute risks to the pregnant person.  For example, partial molar pregnancy is a condition where the placenta transforms into an invasive cancer, thus creating an emergency for the pregnant person.  Mirror syndrome is an emergent complication of pregnancy where the pregnant person and fetus both experience severe fluid retention that can lead to both fetal and maternal demise.").

[39]  42 U.S.C. § 1395dd(e)(1)(A).

[40]  Idaho Code § 18-622(2)(a)(i); *Idaho*, 623 F. Supp. 3d at 1109–13.

[41]  Idaho Code § 18-622(2)(a)(i).

threatening?  When is it absolutely certain she will die but for medical intervention?  How many blood units does she have to lose?  One?  Two?  Five?  How fast does she have to be bleeding?  Soaking through two pads an hour?  Three?  How low does her blood pressure need to be?  90 over 60 mm HG?  80 over 50?  And at what point in time does the condition of a pregnant patient with sepsis from a uterine infection deteriorate from health-threatening, to life-threatening, to necessarily about to die?  If the standard treatment of IV fluids does not stop her blood pressure from dropping, is her condition now life-threatening?  Even if life-*threatening*, is she certain to die?  Is it when she is unconscious and any further treatment has become more complex and fraught with risk and further complications?

There is simply no practicable way to apply this test in emergency medicine—as the District Court recognized, "medicine does not work in" "absolutes."[42]  Life and health exist on a fragile and shifting continuum, and in emergent situations, physicians must and do act quickly to preserve it.  They cannot be expected, and should not be compelled, to delay stabilizing treatment until a legislatively imagined but medically nonexistent line has been crossed.

---

[42]  *Idaho*, 623 F. Supp. 3d at 1105, 1113.

B.     **The Idaho Law Deters All Abortions—Even Those It Purports to "Excuse" as Life-Threatening**

Structuring the Idaho Law's meager "life of the mother" protection as the only exception to otherwise criminal conduct will inevitably deter physicians from performing abortions, regardless of the severity of the emergency. It is a Hobson's choice: any physician considering terminating a pregnancy—even where clearly necessary to save the life of the pregnant patient—will have to consider that they may still be indicted; that they would bear the cost of retaining counsel and defending against the indictment; and that they would risk loss of their medical license, livelihood, reputation, or even conviction if a jury cannot be persuaded that they were correct in their medical judgment.[43]

The clear effect of Idaho's criminal statute will be to deter physicians from performing abortions in some emergency circumstances, which, as the District Court recognized, will "obviously frustrate Congress's intent to

---

[43]    *Idaho*, 623 F. Supp. 3d at 1109 (recognizing that "[a]n affirmative defense is an excuse, not an exception. The difference is not academic. The affirmative defense admits that the physician committed a crime but asserts that the crime was justified and is therefore legally blameless. And it can only be raised after the physician has already faced indictment, arrest, pretrial detention, and trial for every abortion they perform. . . . So even though accused healthcare workers might avoid a conviction, the statute still makes it impossible to provide an abortion without also committing a crime").

ensure adequate emergency care for all patients who turn up in Medicare-funded hospitals."[44]  Research conducted after the implementation of abortion bans in Texas and published in the *New England Journal of Medicine* describes a pervasive "climate of fear" among the medical community.[45] Interviews with clinicians found that "[Texas law] has had a chilling effect on a broad range of health care professionals, adversely affecting patient care and endangering people's lives."[46]  Because abortion bans like Idaho's fail to capture the nuances of emergency medicine, they create substantial uncertainty about exactly what conduct is legal.[47]  For example, "[s]ome clinicians believe that patients with rupture of membranes before fetal viability are eligible for a medical exemption under [Texas law], while others believe these patients cannot receive an abortion so long as there is fetal cardiac activity."[48]  This confusion may even "result[] in patients receiving

---

[44]  *Id.* at 1112.

[45]  Whitney Arey et al., *A Preview of the Dangerous Future of Abortion Bans—Texas Senate Bill 8*, 387 N. ENGL. J. MED. 388, 389 (2022).

[46]  *Id.* at 388.

[47]  *Id.* at 389; *see also* Maria Mendez, *Texas Laws Say Treatments for Miscarriages, Ectopic Pregnancies Remain Legal but Leave Lots of Space for Confusion*, TEX. TRIBUNE (July 20, 2022), https://www.texastribune.org/2022/07/20/texas-abortion-law-miscarriages-ectopic-pregnancies/.

[48]  Arey, *supra* note 45, at 389.

medically inappropriate care." [49] Physicians have described use of hysterotomy (a surgical incision in the uterus) rather than the preferred dilation and evacuation, despite increased risk of complications and detrimental impact on future pregnancies, purely "because it might not be construed as an abortion."[50]

Doctors who handle high-risk pregnancies have left Idaho as a result.[51] Dr. Kylie Cooper left Idaho after concluding, after "many agonizing months," that "the risk was too big for me and my family."[52] Dr. Lauren Miller came to a similar conclusion after feeling "anxious being on the labor unit, just not knowing if somebody else was going to second-guess my decision. That's not how you want to go to work every day."[53]

---

[49] *Id.*

[50] *Id.* at 390.

[51] Sheryl Stolberg, *As Abortion Laws Drive Obstetricians From Red States, Maternity Care Suffers*, N.Y. TIMES (Sept. 7, 2023), https://www.nytimes.com/2023/09/06/us/politics/abortion-obstetricians-maternity-care.html#:~:text=New%20York%20Times-,As%20Abortion%20Laws%20Drive%20Obstetricians%20From%20Red%20States%2C%20Maternity%20Care,has%20been%20particularly%20hard%20hit.&text=Sheryl%20Gay%20Stolberg%20interviewed%20obstetricians,medical%20clinic%20in%20McCall%2C%20Idaho.

[52] *Id.*

[53] *Id.*

## IV.    The Idaho Law Will Have Devastating Consequences for Pregnant Patients

Patients will suffer from the deterrent effects of the Idaho Law.  As one study found, approximately four in five pregnancy-related deaths nationwide are preventable;[54] any deterrent to providing life-saving care promptly will have a dire impact on the patient.  In states that aggressively restrict abortion—even those with laws relatively more permissive than the Idaho Law—physicians have been forced to rely broadly on "expectant management," otherwise known as the "wait and see" approach.  Facing a pregnant patient suffering from an emergency medical condition, physicians are forced to ignore their judgment and, directly contrary to their training and clinical guidance, withhold treatment until harm is imminent before providing the clinically indicated termination of pregnancy.  A recent study in Texas found that "expectant management of obstetrical complications in the periviable period, i.e., at the border of viability, was associated with significant maternal morbidity."[55]  "Expectant management resulted in 57%

---

[54]    *Four in 5 Pregnancy-related Deaths in the U.S. are Preventable*, CTRS. FOR DISEASE CONTROL AND PREVENTION (Sept. 19, 2022), https://www.cdc.gov/media/releases/2022/p0919-pregnancy-related-deaths.html; *see also* Trost et al., *supra* note 5.

[55]    Anjali Nambiar et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2*

of patients having a serious maternal morbidity compared with 33% who elected immediate pregnancy interruption under similar clinical circumstances reported in states without such legislation."[56]

These are not just statistics. In Texas, a woman named Amanda Eid suffered previable premature rupture of the membranes, which resulted in her water breaking at just 18 weeks.[57] Although her doctors already knew that the fetus could never survive and that Ms. Eid would inevitably develop a dangerous infection, they believed that Texas's law prohibited them from terminating the doomed pregnancy until she was "sick enough that [her] life

---

*Texas Hospitals After Legislation on Abortion*, 227 AM. J. OF OBSTETS. & GYNECOL. 648, 648 (2022).

[56] *Id.* at 649. The study also documented a significant increase in maternal morbidity among patients with preterm labor who would have been promptly offered induction abortions before the law but, due to fear regarding the law, were not offered such treatment until their physicians determined that an emergent condition posed "an immediate threat to maternal life." *Id.* at 648–49. The study followed patients with premature preterm rupture of the membranes and pregnancy tissue prolapsed into the vagina. Among these patients, 43% experienced maternal morbidity such as infection or hemorrhage; 32% required intensive care admission, dilation and curettage, or readmission; and one patient required a hysterectomy. *Id.* at 649. The study concluded that "state-mandated expectant management" is associated with "significant maternal morbidity." *Id.*

[57] Elizabeth Cohen & John Bonifield, *Texas Woman Almost Dies Because She Couldn't Get an Abortion*, CNN (Nov. 16, 2022), https://www.cnn.com/2022/11/16/health/abortion-texas-sepsis/index.html.

was at risk."[58]  Three days later, "she went downhill very, very fast[,]" her fever spiking "in a matter of maybe five minutes."[59]  By this time, her bacterial infection was severe enough that antibiotics and a blood transfusion were unable to stop it—she went into septic shock, requiring invasive treatment and leaving it unclear whether she would survive.[60]  Emergency physicians were ultimately able to save her life, but only just.[61]  Among other consequences, the infection caused uterine scarring that may leave Ms. Eid unable to have another child.[62]

This is not an isolated or extraordinary incident.  Amanda Zurawski suffered an almost identical experience to Ms. Eid.[63]  She suffered from previable premature rupture of the membranes—but because the threat to her life was not sufficiently acute, she, like Ms. Eid, was sent home for expectant

---

[58]  *Id.*

[59]  *Id.*

[60]  *Id.*

[61]  *Id.*

[62]  *Id.*

[63]  Ms. Zurawski and 12 other women with similar stories have filed a lawsuit in Texas seeking to prevent this same pattern from occurring again and again.  *Zurawski v. Texas*, No. D-1-GN-23-000968, Pls.' First Am. V. Pet. for Declaratory J. and Appl. for Temporary and Permanent Inj., ¶¶ 7–236 (May 22, 2023).

management.[64]  As a result of this delay, she became septic and nearly died from the infection, and her uterus and fallopian tubes were heavily scarred as a result of the infection, permanently impacting her fertility and making it challenging (if not impossible) for her to become pregnant in the future.[65]

Neither Ms. Eid nor Ms. Zurawski would have suffered the same trauma and permanent impairment had they received timely and medically indicated emergency treatment.  Similar delays are occurring around the country—many of them resulting in near-death misses and many leaving life-long impairments.[66]

---

[64]  *Id.* ¶¶ 11–29.

[65]  *Id.* ¶¶ 25–29.

[66]  *See*, *e.g.*, Alicia Naspretto, *'My Heart Broke Into a Million Pieces': The Stories Behind the Texas Abortion Ban Lawsuit*, KXXV 25 ABC (Mar. 8, 2023), https://www.kxxv.com/news/in-depth/my-heart-broke-into-a-million-pieces-the-stories-behind-the-texas-abortion-ban-lawsuit; Laura Ungar & Heather Hollingsworth, *Despite Dangerous Pregnancy Complications, Abortions Denied*, ASSOCIATED PRESS (Nov. 20, 2022), https://apnews.com/article/abortion-science-health-business-ap-top-news-890e813d855b57cf8e92ff799580e7e8; Stephanie Emma Pfeffer, *Texas Woman Nearly Loses Her Life After Doctors Can't Legally Perform an Abortion: 'Their Hands Were Tied'*, PEOPLE MAGAZINE (Oct. 18, 2022), https://people.com/health/texas-woman-nearly-loses-her-life-after-doctors-cannot-legally-perform-abortion/; Elizabeth Cohen et al., *'Heartbreaking' Stories Go Untold, Doctors Say, As Employers 'Muzzle' Them in Wake of Abortion Ruling*, CNN (Oct. 12, 2022),

A. **The Idaho Law Will Have a Disproportionately Negative Impact on Rural and Poor Pregnant Patients in Idaho**

The consequences of the Idaho Law will be especially devastating for underserved populations, including patients living in rural areas and pregnant patients with low incomes. As a result of structural inequities and social determinants, these populations are "more likely to face barriers in accessing routine health care services," including prenatal care.[67] Consistent with EMTALA's mandate, ED use has been "consistently increasing"; however, use by low-income populations and people of color continues to rise at the highest rates.[68] This is especially true in Idaho, where 29.5% of Idaho counties are "maternity care deserts," and the number of birthing hospitals in

---

https://www.cnn.com/2022/10/12/health/abortion-doctors-talking/index.html; Courtney Carpenter, *League City Family in 'Nightmare' Situation Under Texas Abortion Law*, ABC 13 (Sept. 29, 2022), https://abc13.com/texas-abortion-laws-heartbeat-act-senate-bill-8-pregnant-woman/12277047/; Emily Baumgaertner, *Doctors in abortion-ban states fear prosecution for treating patients with life-threatening pregnancies*, LA TIMES (July 29, 2022), https://www.latimes.com/world-nation/story/2022-07-29/fearful-of-prosecution-doctors-debate-how-to-treat-pregnant-patients.

[67] Benson, *supra* note 16, at 2.

[68] *Id.* Increasing ED use is indicative of a lack of access to other medical care, delay of preventive care, and presentation for care only when symptoms have gotten severe.

the state decreased by 12.5% from 2019 to 2020.[69]  Those effects are not hypothetical.  Idaho's laws have "had a profound chilling effect on recruitment and retention," and "smaller hospitals in Idaho have been unable to withstand the strain.  Two closed their labor and delivery units this year; one of them, Bonner General Health, a 25-bed hospital in Sandpoint in northern Idaho, cited the state's 'legal and political climate' and the departure of 'highly respected, talented physicians' as factors that contributed to its decision."[70]  In light of the socioeconomic constraints these populations already face in accessing health care services, EDs and "emergency physicians have been given a unique social role and responsibility to act as health care providers of last resort for many patients who have no other ready access to care," a role and responsibility that EMTALA contemplated explicitly.[71]

---

[69]  *Where You Live Matters: Maternity Care Access in Idaho*, MARCH OF DIMES (May 2023), https://www.marchofdimes.org/peristats/ reports/idaho/maternity-care-deserts.

[70]  Stolberg, *supra* note 51.

[71]  ACEP, *supra* note 11, at 4; *see also Idaho*, 623 F. Supp. 3d at 1111–12 (noting that Congress expressed particular concern for rural hospitals when designing EMTALA); Benson, *supra* note 16, at 7 (EDs play a "vital role" in "caring for those who are socioeconomically vulnerable").

The over half a million (or 30.8% of) Idaho residents living in rural areas are particularly endangered by this law.[72] "[R]ural Americans are more likely to be living in poverty, unhealthy, older, uninsured or underinsured, and medically underserved."[73] Rural hospitals and EDs are "the safety net" for rural Americans, including rural pregnant patients.[74] Rural women are "more likely to be poor, lack health insurance or rely substantially on Medicaid and Medicare" and "must travel longer distances to receive care."[75] Pregnant rural patients accordingly are less likely to seek prenatal care,[76] and the initiation of prenatal care in the first trimester is lower for rural pregnant women and girls compared with those in suburban areas.[77] It is therefore not

---

[72] *Urban and Rural*, U.S. CENSUS BUREAU (June 28, 2023), https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural.html.

[73] Ctrs. for Medicare & Medicaid Servs., *CMS Rural Health Strategy* at 2 (2018), https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Rural-Strategy-2018.pdf.

[74] Anthony Mazzeo et al., *Delivery of Emergency Care in Rural Settings*, ACEP 1, 1 (2017), https://www.acep.org/siteassets/sites/acep/blocks/section-blocks/rural/delivery-of-emergency-care-in-rural--settings.pdf.

[75] ACOG Committee Opinion No. 586, *Health Disparities in Rural Women*, at 2 (Feb. 2014, *reaff'd* 2021).

[76] *Id.*

[77] *Id.*

surprising that "rural women experience poorer maternal outcomes compared to their non-rural counterparts, including high pregnancy-related mortality."[78]

Women of color similarly will be disproportionately harmed by the Idaho Law. People of color and people with low incomes generally have worse access to care and higher rates of ED visits.[79] Pregnant women of color are also less likely to receive prenatal care, resulting in an increased risk for complex health issues occurring in pregnancy.[80] As a result, women of color experience higher rates of severe maternal morbidity and are more likely to die from pregnancy-related complications.[81] Women of color are also more

---

[78] Ctrs. for Medicare & Medicaid Servs., *Advancing Rural Maternal Health Equity* at 1 (2022), https://www.cms.gov/files/document/maternal-health-may-2022.pdf.

[79] *See generally 2022 National Healthcare Quality and Disparities Report*, AGENCY FOR HEALTHCARE RSCH. AND QUALITY (Oct. 2022), https://www.ahrq.gov/research/findings/nhqrdr/nhqdr22/index.html; *Trends in the Utilization of Emergency Dep't Servs., 2009-2018*, OFFICE OF THE ASSISTANT SECRETARY FOR PLANNING AND EVALUATION, HHS 1, 22 (Mar. 2021), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files //199046/ED-report-to-Congress.pdf.

[80] Benson, *supra* note 16, at 2; *see also* Juanita Chinn et al., *Health Equity Among Black Women in the United States*, 30 J. WOMEN'S HEALTH 212, 215 (2021) (explaining that "Black women are at a disadvantage regarding the protective factor of the early initiation of prenatal care").

[81] *See* AGENCY FOR HEALTHCARE RSCH. AND QUALITY, *supra* note 79, at 1; *see also* Chinn, *supra* note 80, at 215 (Black and Latina women "are at greater risk of poor pregnancy outcomes").

likely to experience EPL (or miscarriage), the standard treatment for which can include abortion, and to visit an ED for their EPL-related care.[82]

Each of these categories of women is therefore more likely to experience emergency medical conditions when pregnant and thus more likely to need the critical care that the Idaho Law obstructs. The Idaho law will, as described above and explicitly stated in the District Court's opinion, "undoubtedly deter physicians from providing abortions in some emergency situations."[83] This deterrence will serve only to exacerbate those poorer outcomes, thereby "obviously frustrat[ing] Congress's intent to ensure adequate emergency care for all patients."[84]

## V. The Idaho Law Undermines Principles of Medical Ethics

EMTALA's requirement that a physician must provide "stabilizing treatment [to] prevent material deterioration" of all patients and must "act prior to the patient's condition declining"[85] codified what was already

---

[82] Benson, *supra* note 16, at 5–7.

[83] *Idaho*, 623 F. Supp. 3d at 1112.

[84] *Id.*

[85] Ctrs. for Medicare & Medicaid Servs., *Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022, revised Aug. 25, 2022), https://www.cms.gov/medicareprovider-enrollment-and-certificationsurveycertificationgeninfopolicy-and-memos-states-

paramount in physicians' professional obligations. For example, ACEP's Code of Professional Ethics states that "[e]mergency physicians shall embrace patient welfare as their primary professional responsibility" and explains that it is unethical to deny or delay the provision of emergency care on the basis of "type of illness or injury."[86] ACOG's Code of Professional Ethics similarly states that "the welfare of the patient must form the basis of all medical judgments" and that obstetrician-gynecologists should "exercise all reasonable means to ensure that the most appropriate care is provided to the patient."[87] The AMA Code of Medical Ethics likewise places on physicians the "ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others."[88] The Idaho Law's prohibition of medically indicated emergency care without regard to circumstance violates long-established and widely accepted principles of medical ethics by: (1) substituting legislators' opinions for the necessary medical course of action as determined by a physician or health care provider and informed by clinical

---

and/reinforcement-emtala-obligations-specific-patients-who-are-pregnant-or-are-experiencing-pregnancy-0.

[86] ACEP, *supra* note 11, at 4, 11.

[87] ACOG, *Code of Professional Ethics*, at 2 (Dec. 2018).

[88] AMA, *Code of Medical Ethics Opinions on Patient-Physician Relationships* § 1.1.1 (2016).

standards of care; (2) forcing physicians to factor their own legal exposure into their calculus when treating emergent conditions; and (3) compelling physicians and health care professionals to deny necessary emergency care in violation of the age-old principles of beneficence and non-maleficence.

Laws that criminalize medical care even when EMTALA and medical ethics mandate that physicians provide it cannot be reconciled with the reality of the provision of emergency medicine or bedrock principles of medical ethics.

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth by the Government, this Court should affirm the preliminary injunction preventing this dangerous law from taking effect as to emergency medical care.

Dated:  September 19, 2023

Respectfully submitted,

*s/*    Shannon Rose Selden

**Shannon Rose Selden**
**Adam Aukland-Peck**
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard East.
New York, NY 10001
Tel.: 212-909-6000
srselden@debevoise.com
aaauklandpeck@debevoise.com

**Jeffrey B. Dubner**
DEMOCRACY FORWARD
FOUNDATION
655 15th St. NW, Ste 800
Washington, D.C. 20005
Tel.: (202) 448-9090
jdubner@democracyforward.org

*Counsel for* Amici

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** ____23-35440, 23-35450_____

I am the attorney or self-represented party.

**This brief contains** ____5,510_____ **words,** including ___0_____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
　　[ ] it is a joint brief submitted by separately represented parties.
　　[ ] a party or parties are filing a single brief in response to multiple briefs.
　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ Shannon Rose Selden_____ **Date** ___9/19/2023_____
*(use "s/[typed name]" to sign electronically-filed documents)*

1