**Nos. 23-35440 & 23-35450**

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO,
*Defendant-Appellant.*

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO
*Defendant,*
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives; et al.,
*Intervenors-Appellants.*

Appeal from the United States District Court
for the District of Idaho
Honorable B. Lynn Winmill
(1:22-cv-00329-BLW)

**REPLY BRIEF OF INTERVENORS-APPELLANTS
THE IDAHO LEGISLATURE**

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................i

TABLE OF AUTHORITIES....................................................iii

ARGUMENT ........................................................................1

I. ENJOINING IDAHO LAW INFLICTS AN IRREPARABLE INJURY ON THE IDAHO LEGISLATURE ..............................2

    A. The Preliminary Injunction Inflicts Irreparable Injury on the Legislature as a Matter of Law.............................................2

    B. The United States Suffers No Irreparable Harm if Section 622 Operates in Full ........................................................5

II. THE UNITED STATES HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ....................................................7

    A. EMTALA Does Not Authorize the United States to Preempt Idaho Abortion Law ...........................................................7

        1. *Federal statutes authorize executive power through express delegation or fair implication – not by presuming such power* ...............................................7

        2. *Express non-preemption clauses deny that EMTALA preempts section 622* ...................................................8

            a. *EMTALA's non-preemption clause* ..................8

            b. *The Medicare Act's non-preemption clause* .... 12

    B. EMTALA Does Not Mandate Abortion Access .....................16

        1. *EMTALA mandates medical care for unborn children* ...................................................................21

ii

C. Construing EMTALA as an Abortion Mandate Violates the Major Questions Doctrine ...................................................... 27

D. Serious Constitutional Questions Persist Because of Reading EMTALA as an Abortion Mandate ...................................... 29

    1. *The preliminary injunction violates the Tenth Amendment* ............................................................... 29

    2. *The preliminary injunction offends the Spending Clause* ...................................................................... 31

III.   OTHER *WINTER* FACTORS FAVOR THE LEGISLATURE ...................................................................................... 32

A. Neither the Public Interest Nor a Balance of the Equities Favor the Preliminary Injunction ......................................... 32

CONCLUSION ................................................................... 37

CERTIFICATE OF COMPLIANCE ..................................... 38

STATEMENT OF RELATED CASES ................................. 39

ADDENDUM ...................................................................... 40

iii

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
138 S. Ct. 2305 (2018)...................................................................2

*In re Adamson Apparel, Inc. v. Simon,*
785 F.3d 1285 (9th Cir. 2015)...................................................10

*Alabama Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021)................................................................27

*Aleman v. Glickman,*
217 F.3d 1191 (9th Cir. 2000).................................................10

*Am. Trucking Assoc., Inc. v. Los Angeles,*
559 F.3d 1046 (9th Cir. 2009)....................................................5

*In re Baby K,*
16 F.3d 590 (4th Cir. 1994) ...............................................18, 19

*Baker v. Adventist Health, Inc.,*
260 F.3d 987 (9th Cir. 2001)...................................................8, 9

*Biden v. Missouri,*
142 S. Ct. 647 (2022) ................................................................14

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023)................................................................27

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020)..................................................................7

*Bradley v. Sch. Bd. of Richmond,*
416 U.S. 696 (1974).....................................................................33

iv

*Bryan v. Rectors and Visitors of Univ. of Va.*,
95 F.3d 349 (4th Cir. 1996) ............................................................... 12

*Burlington N. & Santa Fe Ry. Co. v. Vaughn*,
509 F.3d 1085 (9th Cir. 2007) ......................................................... 1, 2

*California v. United States*,
2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ..................................... 20

*Cherukuri v. Shalala*,
175 F.3d 446 (6th Cir. 1999) ............................................................. 18

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) ...................................................................... 8, 16

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) .................................................. 3, 4, 28, 30, 36

*Eberhardt v. Los Angeles*,
62 F.3d 1253 (9th Cir. 1995) ............................................................. 19

*Florida v. HHS*,
19 F.4th 1271 (11th Cir. 2021) ........................................................... 4

*In re Focus Media Inc. v. Pringle*,
387 F.3d 1077 (9th Cir. 2004) ......................................................... 4-5

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ...................................................................... 27, 28

*Hardy v. New York City Health Hosp. Corp.*,
164 F.3d 789 (2d Cir. 1999) .............................................................. 12

*Harry v. Marchant*,
291 F.3d 767 (11th Cir. 2002) ....................................................... 11, 12

*Home Depot U.S.A., Inc. v. Jackson*,
139 S. Ct. 1743 (2019) ...................................................................... 22

v

*Louisiana Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986) ...................................................................... 7

*Maryland v. King,*
  567 U.S. 1301 (2012) ............................................... 3, 4, 6, 33, 34

*Mayes v. Biden,*
  67 F.4th 921 (9th Cir. 2023) .................................................... 27

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ...................................................................... 2

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
  559 U.S. 229 (2010) .................................................................... 25

*Morin v. E. Maine Med. Ctr.,*
  780 F. Supp. 2d 84 (D. Me. 2010) ........................................... 19

*Murphy v. NCAA,*
  138 S. Ct. 1461 (2018) ......................................................... 29, 30

*New York v. HHS,*
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) .................................... 19

*NFIB v. Sebelius,*
  567 U.S. 519 (2012) ............................................................. 31, 32

*Nken v. Holder,*
  556 U.S. 418 (2009) .................................................. 2, 32, 34, 35

*Planned Parenthood Great Nw. v. Idaho,*
  522 P.3d 1132 (Idaho 2023) ............................................... 9, 35

*Poretti v. Dzurenda,*
  11 F.4th 1037 (9th Cir. 2021) .................................................. 34

vi

*Ritten v. Lapeer Reg'l Med. Ctr.*,
   611 F. Supp. 2d 696 (E.D. Mich. 2009) ......................................... 19-20

*Roe v. Wade*,
   410 U.S. 113 (1973) .............................................................................. 30

*Root v. New Liberty Hosp. Dist.*,
   209 F.3d 1068 (8th Cir. 2000) ............................................................. 9

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984) ......................................................................... 13-14

*School District No. 1J, Multnomah Cnty. v. ACandS, Inc.*,
   5 F.3d 1255 (9th Cir. 1993) ................................................................. 1

*Sw. Voter Registration Educ. Project v. Shelley*,
   344 F.3d 914 (9th Cir. 2003) ............................................................... 1

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) ..................................................... 5, 6, 34

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ......................................................... 6, 33

*United States Telecom Ass'n v. FCC*,
   855 F.3d 381 (D.C. Cir. 2017) ........................................................... 28

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ............................................................. 6

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ................................................................. 27, 28

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................... 2, 3, 4, 32, 34

## Constitutional Provisions

U.S. CONST. art. I § 8 ................................................................. 31

U.S. CONST. art. VI ....................................................... 3, 5, 6, 29

U.S. CONST. amend. X ............................................... 29, 30, 31

## Statutes and Rules

IDAHO CODE § 18-622 ................................................. 3, 5, 8

IDAHO CODE § 18-622(2) .......................................... 15, 33

IDAHO CODE § 18-622(2)(a) ............................................. 25

IDAHO CODE § 18-622(4) .................................................. 33

IDAHO CODE § 18-622(5) .................................................. 33

42 U.S.C. § 1395 ................................. 4, 8, 12, 13, 14, 15

42 U.S.C. § 1395dd ......................................................... *passim*

42 U.S.C. § 1395dd(b) ............................................. 16, 17

42 U.S.C. § 1395dd(b)(2) ............................................... 18

42 U.S.C. § 1395dd(e)(1) ............................................... 22

42 U.S.C. § 1395dd(e)(1)(A)(i) ............................. 17, 22, 24

42 U.S.C. § 1395dd(e)(1)(B) ........................................ 23

42 U.S.C. § 1395dd(e)(1)(B)(ii) .................................... 24

42 U.S.C. § 1395dd(e)(3)(A) ........................................ 17

viii

42 U.S.C. § 1395dd(e)(3)(B) ........................................................ 17

42 U.S.C. § 1395dd(f) ................................................... 8, 11, 13

42 U.S.C. § 18023(c)(1) ............................................................ 20

42 U.S.C. § 18023(c)(2) ............................................................ 20

## Other Authorities

Exec. Order No. 14,076, 87 Fed. Reg. 42053 (Jul. 8, 2022) .................... 20

CMS Center for Clinical Standards and Quality, QSO-21-22-Hospitals (Sep. 17, 2021) .......................................................... 20

CMS Center for Clinical Standards and Quality, QSO-22-22-Hospitals (July 11, 2022) .................................................... 20-21

# ARGUMENT

A preliminary injunction is reviewed for abuse of discretion, Resp. at 15, but "[t]he district court's interpretation of the underlying legal principles … is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc and per curiam). Here, the preliminary injunction contains several legal errors requiring vacatur.

Before proceeding, we deny the United States' repeated claim that the Legislature forfeited its substantive arguments by omitting them from its brief opposing the preliminary injunction. *See, e.g.*, Resp. at 13, 25, 31, 36, 40, 40 n.5, 43. The government cites *School District No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255 (9th Cir. 1993), but that authority involves the failure to file documents with a motion for reconsideration—not preservation requirements (if any) concerning a preliminary injunction. *Id.* at 1263. *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007), is equally irrelevant. It involves the rule against arguments raised for the first time in a reply. *Id.* (But "[w]e have discretion to review an issue not raised by appellant,

however, when it is raised in the appellee's brief."). On no account has the Legislature forfeited any part of its defense of Idaho law.

## I. ENJOINING IDAHO LAW INFLICTS AN IRREPARABLE INJURY ON THE IDAHO LEGISLATURE.

### A. The Preliminary Injunction Inflicts Irreparable Injury on the Legislature as a Matter of Law.

The Response fails to mention the controlling legal standard for a preliminary injunction. The moving party must demonstrate a likelihood of success on the merits, irreparable harm, and a consideration of the balance of equities and the public interest—which are merged when the government is a party. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Nken v. Holder*, 556 U.S. 418, 435 (2009). The United States has not carried this burden. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Begin with irreparable injury. The Legislature cited decisions establishing that a state suffers irreparable harm when a federal injunction prevents the operation of state law. Op'g Br. at 66–67 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018), *et al.*). Demonstrating irreparable injury establishes one of the "most critical" elements of the *Winter* standard in the Legislature's favor. *Nken*, 556 U.S.at 434. The government's objections falter on review.

First, the United States claims that "appellants suffer no irreparable harm because, among other things, the injunction maintains the status quo: Section 18-622 has never applied to EMTALA-required care." Resp. at 14. But "a preliminary injunction is an extraordinary remedy"—not the baseline for a new status quo. *Winter*, 555 U.S. at 24.

Second, the Response fails to cite—much less counter—the Supreme Court precedents in the Legislature's opening brief, which establish that enjoining state law imposes an irreparable injury. Op'g Br. at 66. The ruling principle is that a State suffers "ongoing irreparable harm" whenever it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). That kind of injury directly falls on the Idaho Legislature because the preliminary injunction impedes the State from "effectuating" a duly enacted statute. *Id.* Irreparable injury exists by dint of the preliminary injunction alone.

The district court's statement that "*Dobbs* did not overrule the Supremacy Clause," Resp. at 54, is a non sequitur that cannot obliterate the irreparable harm inflicted by enjoining Idaho law. *See King*, 567 U.S. at 1303. Having said that, construing EMTALA as an abortion mandate is

4

plainly intended to thwart and limit *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

Third, The United States confuses separate prongs of the *Winter* standard by describing the Legislature's irreparable injury argument as a request "to afford more weight to this consideration, re-balance the equities and public interest, and reach a different result." Resp. at 54. Not so. Our plea is to give the Legislature's irreparable injury the independent weight it merits. *See King*, 567 U.S. at 1303.

*Florida v. HHS*, 19 F.4th 1271 (11th Cir. 2021), cannot diminish the relevance of *King*. Not only does the Supreme Court precedent control, but the Eleventh Circuit's conclusion that Florida was uninjured came after a determination that the state law was validly preempted. *Id.* at 1291–92. Here, the government's preemption claim is dubious, if only because the district court ignored the Medicare Act and misapplied EMTALA's native non-preemption clause. Op'g Br. at 32–35.

Fourth, the principle that "[t]he assignment of weight to particular harms is a matter for district courts to decide," Resp. at 54 (quotation omitted), is inapposite when a district court commits a legal error. *See In*

5

*re Focus Media Inc. v. Pringle*, 387 F.3d 1077, 1081 (9th Cir. 2004). And the district court's orders are unfortunately filled with errors.

**B.    The United States Suffers No Irreparable Harm if Section 622 Operates in Full.**

The government says vacating the preliminary injunction will harm it by "violat[ing] the Supremacy Clause" and "interfering with the federal government's sovereign interest in proper administration of federal law and Medicare" Resp. at 13, 49. These interests are identical. They are also not irreparable.

Circuit precedents, Resp. at 49, do not establish that the government suffers irreparable harm whenever an allegedly preempted state law goes into effect. *See United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012) (finding irreparable harm after concluding that the government was "likely to succeed on the merits" under the Supremacy Clause); *Am. Trucking Assoc., Inc. v. Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) (the balance of equities and the public interest prongs favored a preliminary injunction against a likely-preempted local ordinance).

6

*United States v. California*, 921 F.3d 865 (9th Cir. 2019), rebuffed "general pronouncements that a Supremacy Clause violation alone constitutes sufficient harm to warrant an injunction." *Id.* at 894. But the United States has nothing else to offer. *See* Resp. at 49.

Letting a preempted state law operate may impose irreparable harm on the United States—*but* only if its claim of preemption is valid. *See Arizona*, 641 F.3d at 366. That qualified injury differs from the Legislature's irreparable injury, which arises from the injunction as a matter of law. *See King*, 567 U.S. at 1303.

The United States quarrels that *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam), allowed a preliminary injunction to remain undisturbed. Rep. at 52. But the point of *Washington* is to deny a claimed injury as irreparable when the United States still could "pursue and vindicate its interests in the full course of this litigation." 847 F.3d. at 1168. That same logic applies here. The United States cannot show irreparable injury simply by asserting a preemption claim. Since that claim has little likelihood of success, it does not support a finding of irreparable harm.

## II. THE UNITED STATES HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS. [1]

### A. EMTALA Does Not Authorize the United States to Preempt Idaho Abortion Law.

#### 1. *Federal statutes authorize executive power through express delegation or fair implication – not by presuming such power.*

The United States says that an abortion mandate follows from the statutory text because EMTALA's "stabilization requirement does not exempt any form of care." Resp. at 16. Not so. USDOJ and HHS "literally [have] no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The "canon of donut holes" line from *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020), Resp. at 19, does not advance the government's case. Abortion is too controversial to plausibly believe that Congress authorized federal preemption of state abortion laws through winks and nudges. Actually, by demanding power unless Congress denies it, the United States heightens the major questions doctrine violation we describe.

---

[1] The evening before this filing was due, the Ninth Circuit ruled EMTALA likely does not preempt section 622 and granted a stay. *See* Dkt. 49.

> 2. *Express non-preemption clauses deny that EMTALA preempts section 622.*

Preemption is the sole legal ground for the preliminary injunction. 1-LEG-ER-31, 32. But dual express non-preemption clauses mean that EMTALA does not preempt section 622.

> a. *EMTALA's non-preemption clause.*

Express preemption clauses limit when federal law preempts state law. "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992). EMTALA is controlled by dual non-preemption clauses, 42 U.S.C. §§ 1395dd(f) and 1395. Together, they preclude EMTALA from preempting a state law like section 622, which governs the practice of medicine.

Rehearsing the district court's faulty analysis, the United States argues that "a direct conflict" between EMTALA and section 622 justifies the preliminary injunction. Resp. at 22–23. But the supposed duty to provide an abortion arises only by implication, and an implied duty cannot "directly" conflict with state law. 42 U.S.C. § 1395dd(f).

*Baker v. Adventist Health Inc.*, 260 F.3d 987 (9th Cir. 2001), undercuts the government's preemption claim. *Baker* rightly labels EMTALA's preemption clause "a non-preemption provision" and denies that EMTALA is "intended to create a national standard of care for hospitals." *Id.* at 993, 994.

EMTALA doubtlessly preempts state laws that directly conflict with its "minimum guarantees." Resp. at 26. But those guarantees are exemplified by *Root v. New Liberty Hospital District*, 209 F.3d 1068 (8th Cir. 2000)—not by the government's abortion mandate.

The Idaho Supreme Court didn't confirm a conflict between section 622 and EMTALA's stabilization requirement. Resp. at 26. The Idaho court noted that section 622 "does not include the broader 'medical emergency' exception for abortions present in" other Idaho statutes. *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1196 (Idaho 2023). The absence of that exception had no effect on section 622's validity under Idaho law. *Id.* at 1195–96.

The United States writes that the Legislature "conceded" EMTALA's preemptive force "by acknowledging 'conceptual textual conflicts' between EMTALA and Idaho law." Resp. at 26. Former counsel

for the Legislature did mention "conceptual textual conflicts" during a hearing on the preliminary injunction. 2-ER-118. But his remarks were directed at the importance of prosecutorial discretion in mitigating the effects of section 622. *Id.* That is because the Legislature was bound at the time by court-ordered limitations on permissive intervention. 4-LEG-ER-515. But a concession should not be inferred from a "slip of the tongue." *In re Adamson Apparel, Inc. v. Simon*, 785 F.3d 1285, 1294 (9th Cir. 2015). Even if the remark were a concession, it does not affect the Court's "independent power to identify and apply the proper construction of governing law." *Aleman v. Glickman*, 217 F.3d 1191, 1196 n.3 (9th Cir. 2000) (citation omitted). When opposing the preliminary injunction, the Legislature offered a written analysis showing that "EMTALA does not preempt the 622 Statute." 4-LEG-ER-508. But the court denied leave to submit it.

Nor did the Legislature "concede[ ] in the proceedings below that stabilizing treatment under EMTALA can involve pregnancy termination." Resp. at 17. Limited to factual arguments by the district court's restrictions on permissive intervention, the Legislature argued that prosecutorial discretion would mitigate the impact of section 622.

11

That's why the opposition explains that "[w]hen some serious medical condition exists that requires an emergency medical procedure under EMTALA, with that procedure ending the life of the preborn child, this State's prosecuting attorneys … will not second-guess the judgments and decisions of the involved medical professionals." 4-LEG-ER-504. Nothing in that statement endorses the United States' reading of EMTALA as an abortion mandate that preempts Idaho law.

The United States also attempts to manufacture a conflict between section 622 and EMTALA on the theory that Idaho law exposes pregnant women to health risks contrary to EMTALA. *See* Resp. at 26–29. That argument too presumes that an implied duty to provide an abortion "directly conflicts" with Idaho law. 42 U.S.C. § 1395dd(f). Because that is wrong, the precise medical conditions when section 622 permits an abortion are immaterial. EMTALA contains no abortion mandate. It no more dictates the scope of Idaho abortion law than it dictates the circumstances under which Idaho hospitals must perform a tonsillectomy or open-heart surgery. The government's contrary view departs from EMTALA's text and long-established precedents construing it.

12

*Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002) (en banc), affirms that "EMTALA was not intended to establish guidelines for patient care, to replace available state remedies, or to provide a federal remedy for medical negligence." *Id.* at 773. This construction of EMTALA actually does "undermine[ ] the district court's preemption finding." Resp. at 30.

Nor do the government's attacks on *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999) and *Bryan v. Rectors and Visitors of University of Virginia*, 95 F.3d 349, 351 (4th Cir. 1996) hold any sway. Both decisions bolster the Legislature's position—that "EMTALA does not preempt state standards of medical care." Op'g Br. at 29. Whether they apply impossibility and obstacle preemption or differentiate between stabilizing care during emergency treatment and long-term care is immaterial. *See* Resp. at 30–31.

> b.    *The Medicare Act's non-preemption clause.*

The Medicare Act further shortens EMTALA's preemptive reach. Any interpretation under "this subchapter," meaning the Medicare Act, cannot "authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided … or to exercise any supervision or

control over the administration or operation of any such institution, agency, or person." 42 U.S.C. § 1395. This prohibition applies to EMTALA, as part of the Act.

The United States resists that conclusion. By its lights, EMTALA's abortion mandate is a "funding condition … enacted by Congress, not imposed by a 'Federal officer or employee.'" Resp. at 40 (quoting 42 U.S.C. § 1395). But the preemption claim raised in the complaint derives from the government's construction of EMTALA—not from a funding condition adopted by Congress. And it defies reality to deny that the case involves a lawsuit by federal officers and employees at USDOJ and HHS aimed at "exercis[ing] … supervision or control" of Idaho abortion law. 42 U.S.C. § 1395. Indeed, simply consider the opening page of the United States' brief and the team of USDOJ and HHS lawyers who prepared it.

Also mistaken is the assertion that section 1395 "does not narrow EMTALA's preemption clause." Resp. at 40. Section 1395 proscribes federal "supervision or control over the practice of medicine," 42 U.S.C. § 1395, while EMTALA limits preemption to state laws that "directly conflict," 42 U.S.C. § 1395dd(f). Section 1395 plainly narrows the range of state laws that EMTALA can preempt.

"[A]ny tension" between section 1395 and EMTALA's stabilizing requirement, Resp. at 41, must be harmonized. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017–1018 (1984). That EMTALA is more recent and specific does not justify disregarding section 1395. *See* Resp. at 41.

*Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam), does not counsel against applying section 1395. It rejected an extreme interpretation that would have voided "nearly every condition of [Medicare and Medicaid] participation the Secretary [of HHS] has long insisted upon." *Id.* at 654. But the EMTALA mandate pressed here has not been "long insisted upon" by the United States. *Id.* And *Biden* nowhere hints at lowering section 1395's barrier on federal control of medical practice.

The Response falsely accuses the Legislature of arguing that section 1395 "give[s] states authority to deny women stabilizing treatment under EMTALA." Resp. at 41. No one doubts that women are entitled to every guarantee promised by EMTALA. Section 1395 expresses Congress's limits on preemption; it has nothing to do with discriminating against women.

15

The United States also insists that the preliminary injunction "*preserves* physicians' ability to identify necessary stabilizing treatment." *Id.* But section 1395 prohibits federal control of medical practice regardless of whether it fosters physician autonomy. 42 U.S.C. § 1395. A rule requiring deference to the judgments of individual physicians, Resp. at 41, is still a forbidden exercise of federal "supervision or control" over the practice of medicine. 42 U.S.C. § 1395.

State autonomy is in the government's crosshairs. The United States takes the position that "state laws that bar the provision of abortion care when it constitutes the necessary stabilizing treatment under EMTALA interfere with doctors' ability to exercise their medical judgment and respond to emergency situations, with potentially disastrous consequences for pregnant individuals." Resp. at 42. This misstates the law and the facts. EMTALA does not command hospitals to perform abortions contrary to state law. States do not illegitimately "interfere with … medical judgment" when they legislate concerning abortion. *Id.* State officials—including the Idaho Legislature—properly seek to protect both pregnant women and unborn children in "emergency situations." *Id.* Section 622 itself balances a commitment to unborn children with safeguards

that encourage physicians "to exercise their medical judgment" to avoid "potentially disastrous consequences for pregnant [women]," *id.* *See* IDAHO CODE § 18-622(2). No one questions that a pregnant woman in medical crisis needs sound medical treatment. The issue is who decides when that treatment can be an abortion—federal agencies acting at the President's direction or state officials elected by the people of Idaho. Unless Congress clearly authorizes federal control (and then, only if that authority is constitutional), state laws on abortion are no less valid than state-law restrictions in other controversial areas like assisted suicide.

By misapplying (or overlooking) controlling non-preemption clauses, the district court exaggerated EMTALA's "pre-emptive reach." *Cipollone*, 505 U.S. at 517. The preliminary injunction should be vacated for that reason alone.

## B. EMTALA Does Not Mandate Abortion Access.

We agree that EMTALA requires participating hospitals to provide "stabilizing treatment" for a patient with an emergency medical condition. 42 U.S.C. § 1395dd(b). But the United States is wrong to infer a duty of abortion access. Resp. at 16 ("EMTALA's stabilization requirement encompasses emergency abortion care.").

17

EMTALA's text refutes the government's mandate-by-implication. The statute does not specify what medical treatment satisfies the duty to provide "stabilizing treatment." 42 U.S.C. § 1395dd(b). EMTALA defines *stabilized* in a way that denies the idea of abortion as required medical care. For all patients, EMTALA requires such care to mean that "no material deterioration of the [emergency medical] condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility …." *Id.* at § 1395dd(e)(3)(B). But the corresponding definition of *emergency medical condition* requires emergency care whenever a pregnant woman has a medical condition that places "the health of the woman *or her unborn child*" in "serious jeopardy." *Id.* § 1395dd(e)(1)(A)(i) (emphasis added). Since abortion places the unborn child in "serious jeopardy," it cannot be an appropriate "stabilizing treatment." *Id.* § 1395dd(b). As the government admits, "EMTALA mentions a specific form of stabilizing treatment in only one circumstance," Resp. at 18—when a pregnant woman with contractions safely delivers her child. 42 U.S.C. § 1395dd(e)(3)(A).

The United States urges that excluding abortion as stabilizing care "overlooks EMTALA's informed-consent framework." Resp. at 36. But the

word "framework" overstates the statute. EMTALA deems a hospital to have satisfied its screening-exam and stabilization duties if the patient (or her representative) "refuses to consent to the examination and treatment." 42 U.S.C. § 1395dd(b)(2). Informed consent is effectively an exception to the screening-exam and stabilization requirements. It is incorrect to say that "EMTALA thus contemplates that it is the pregnant individual who must weigh the risks to herself and to her fetus and decide whether to continue a dangerous pregnancy." Resp. at 36.

*Cherukuri v. Shalala*, 175 F.3d 446 (6th Cir. 1999), offers the government no relevant support. The Sixth Circuit gave the EMTALA term "stabilized" a "purely contextual or situational" meaning that "depends on the risks associated with the [patient] transfer and requires the transferring physician, faced with an emergency, to make a fast on-the-spot risk analysis." *Id.* at 449–50. Here, the issue is not whether the word "stabilized" has a fixed meaning or whether a physician must act quickly in the face of an emergency medical condition. It is whether EMTALA's stabilization duty implies access to abortion. On that point, *Cherukuri* adds nothing.

19

*In re Baby K*, 16 F.3d 590 (4th Cir. 1994), helps the government even less. It held that a hospital violated EMTALA by not giving an anencephalic infant respiratory support when the statute "require[s] hospitals and physicians to provide stabilizing care to any individual presenting an emergency medical condition." *Id.* at 598. A decision confirming the duty to save an infant's life is a curious precedent for the government's abortion mandate. *See* Resp. at 16. The Response does not explain how *Baby K* supports the government's reading of EMTALA, *id.*, and this Court has understood *Baby K* to mean only that "the stabilization requirement is not met by simply dispensing uniform stabilizing treatment." *Eberhardt v. Los Angeles*, 62 F.3d 1253, 1259 n.3 (9th Cir. 1995). We do not dispute that.

Not surprisingly, the Response's cited district court rulings do not prop up the claim that "abortion care can constitute stabilizing treat-ment." Resp. at 20. None of those decisions holds that EMTALA requires hospitals to perform abortions despite contrary state law, and all but one involves a medical condition like ectopic and other nonviable pregnancies that section 622 does not cover. *See New York v. HHS*, 414 F. Supp. 3d

475, 539 (S.D.N.Y. 2019) (citing ectopic pregnancy as an emergency condition covered by EMTALA); *id.* at 555 (HHS declines to say how a challenged conscience rule applies under EMTALA); *Morin v. E. Maine Med. Ctr.*, 780 F. Supp. 2d 84, 93–96 (D. Me. 2010) (addressing whether EMTALA required a hospital to deliver a dead fetus); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712–18 (E.D. Mich. 2009) (declining to resolve whether EMTALA requires delivery of a nonviable fetus); *California v. United States*, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) (dismissing a case under California law for lack of standing).

The Affordable Care Act undercuts the government's case. Resp. at 20, 44. The Act expressly does *not* preempt state laws "on abortions" or affect federal laws concerning "conscience protection," "willingness or refusal to provide abortion," and "discrimination on the basis of willingness or refusal to provide … abortion." 42 U.S.C. § 18023(c)(1)–(2).

Regulatory guidance forcefully proves that this lawsuit is groundbreaking. Resp. at 20–21. A 2021 guidance document mentions "ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features." CMS Center for Clinical Standards and Quality, QSO-21-22-Hospitals, at 4 (Sep. 17,

2021). But its 2022 successor, issued three days after Executive Order No. 14,076, 87 Fed. Reg. 42053 (July 8, 2022), advised hospitals that when "abortion is the stabilizing treatment necessary to resolve that [emergency medical condition], the physician ***must*** provide that treatment." CMS Center for Clinical Standards and Quality, QSO-22-22-Hospitals, at 1 (July 11, 2022) (emphasis in original). CMS further directed that any contrary state law "***is preempted***." *Id.* (emphasis in original). That its experts agree with the government's reading of EMTALA is hardly surprising—or probative of its case. Resp. at 20.

### 1. *EMTALA mandates medical care for unborn children.*

The United States tries to explain away EMTALA's references to emergency care for unborn children, but the attempt is unavailing. EMTALA's expressed commitment to protecting the unborn is inconsistent with the government's abortion mandate.

Contrary to the Response, the Legislature has not "acknowledged that there could be 'circumstances when stabilizing treatment necessitated by EMTALA includes an abortion.'" Resp. at 31 (quoting 3-ER-236–37). The cited passage from the Legislature's brief says this: "As it will be applied by Idaho's prosecuting attorneys, the 622 Statute poses

no threat of interference with any EMTALA-required medical procedure or of causing any 'fears' or 'chills' in any competent medical professional." 4-LEG-ER-504. The heading is plainly written in the subjunctive—and it is directed at the mitigating effect of prosecutorial discretion.

We agree that "the words of a statute must be read in their context." Resp. at 31 (quoting *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (cleaned up)). But that principle bolsters the Legislature's reading of EMTALA, not the government's.

The United States disregards statutory context when contending that "[t]he 'individual' to whom a hospital owes obligations under EMTALA does not include a fetus." Resp. at 32. Although the government says that EMTALA's screening, stabilizing, and transfer duties apply only to individuals, the statutory text says otherwise. *See id.* at 31–32.

EMTALA's fulcrum is the statutory definition of "emergency medical condition." 42 U.S.C. § 1395dd(e)(1). And that definition leaves no doubt that EMTALA requires Medicare-participating hospitals to make medical decisions for the protection of unborn children. A defining attribute of an emergency medical condition is that the lack of "immediate medical attention could reasonably be expected to result in

… placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy." *Id.* § 1395dd(e)(1)(A)(i). In a part of the definition addressed to "a pregnant woman who is having contractions," EMTALA prohibits a patient transfer that "may pose a threat to the health or safety of the woman or the unborn child." *Id.* § 1395dd(e)(1)(B). Given EMTALA's references to unborn children, the Dictionary Act's definition of "individual" is beside the point. Resp. at 32.

Fighting with the text, the United States argues that "EMTALA did not extend an independent duty to the 'unborn.'" *Id.* Because EMTALA differentiates between a pregnant woman and her unborn child, the government says, "the individual to whom EMTALA creates obligations—and grants the ability to refuse consent—is the pregnant woman." *Id.* at 33. It is answer enough that the statute includes unborn children within the crucial definition of "emergency medical condition."

The United States tries another tack, arguing that all but one of the statutory references to unborn children "are irrelevant to EMTALA's requirements when a pregnant individual is *not* in labor." *Id.* But marginalizing those references makes no sense when the government's

preemption claim depends on reading EMTALA as an abortion mandate. Pregnant women in labor face life-threatening conditions too.

Taking a strange turn, the Response picks a fight with EMTALA's prohibition on transferring a pregnant woman in labor when it would "threat[en] …the health or safety of the woman or the unborn child." 42 U.S.C. § 1395dd(e)(1)(B)(ii). The government says that this prohibition does not "mandate the further gestation of a fetus at the expense of the mother's health when emergency complications arise." Resp. at 33. No one disputes that EMTALA requires a hospital to deliver medical care to a pregnant woman suffering an emergency medical condition. But the statute says nothing about the difficult questions that arise when a physician reasonably believes that an abortion is necessary to save a pregnant woman's life or health. The statute neither authorizes an abortion nor commands the woman's health or life to be sacrificed. Congress chose, instead, to adopt a statute requiring hospitals to safeguard both a pregnant woman and her unborn child.

A final ploy simply rewrites the statute. EMTALA provides that an emergency medical condition exists when the lack of medical care would "plac[e] the health of the individual (or, with respect to a pregnant

woman, the health of the woman or her unborn child) in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A)(i). An abortion puts the life of an unborn child in fatal jeopardy. Yet the government argues that the lack of an explicit reference to unborn children in other portions of the definition of emergency medical condition means that a "pregnant woman receives greater protection than the 'unborn child.'" Resp. at 35. Yet one will read EMTALA in vain for any text dividing a pregnant woman from her unborn child. The statute requires medical care for both—a fact beyond legitimate dispute.

The government's attempt to enlist legislative history, Resp. at 34, is likewise unavailing. "[R]eliance on legislative history is unnecessary in light of the statute's unambiguous language." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 236 n.3 (2010).

Nor is it relevant that accurately construing EMTALA "would mean abortion would never constitute stabilizing treatment, even when necessary to save the individual's life." Resp. at 35. The question is not whether EMTALA requires access to an abortion, but whether a woman facing a threat to her life can obtain one. In Idaho, the answer is a

resounding yes. Section 622 expressly authorizes a physician to perform an abortion to save a woman's life. IDAHO CODE § 18-622(2)(a).

Any suggestion that the Legislature has conceded that EMTALA "contemplate[s] abortion care" is false. Resp. at 35. Pages 56–57 of the Legislature's Opening Brief describe section 622's exceptions but does not discuss EMTALA in any detail. Op'g Br. at 56–57 (quoting 1-LEG-ER-39). Page 57 refutes the Response: "Reading EMTALA as an abortion mandate defeats Congress's evident intent to secure emergency medical care for both a pregnant woman and her unborn child." *Id.* at 57. Pages 71–72 do not help the government. There, the Legislature explains why vacating the preliminary injunction will not "pose a threat to the healthcare needed by pregnant women in Idaho." *Id.* at 71. And the brief stresses that "the United States has no legitimate interest in compelling Idaho's compliance with an implied mandate contrary to EMTALA's text and context." *Id.* at 72. Nowhere does the Legislature concede that EMTALA requires abortion.

EMTALA does not dictate abortion access and, even if it did, Congress limited EMTALA's preemptive reach by proscribing federal interference with state laws like section 622 governing the practice of

medicine. Hence, the United States' criticisms of section 622, including the lifesaving exception in section 622(2), are beside the point. *See* Resp. at 27–28. Idaho is free to adopt its own abortion policy without answering to the Executive Branch.

### C. Construing EMTALA as an Abortion Mandate Violates the Major Questions Doctrine.

This is a quintessential major questions doctrine case. Yet the United States says that the doctrine is "irrelevant" because there is "no relevant agency action" and because "the United States is enforcing 'policy decisions' made by 'Congress … itself.'" Resp. at 47 (quoting *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir. 2023), *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022)). Neither objection is tenable.

First, USDOJ and HHS are federal agencies subject to the major questions doctrine. *See Gonzales v. Oregon*, 546 U.S. 243, 275 (2006) (applying the doctrine to an interpretive rule issued by the Attorney General); *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (applying the doctrine to CDC's nationwide eviction moratorium).

Second, the novel construction of EMTALA pressed by the United States is not exempt from the major questions doctrine merely because it

28

is expressed in litigation rather than formal regulation. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2372–75 (2023) (applying the doctrine to the Department of Education's program cancelling student debt). The same problem of "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted" exists here, no less than when USDOJ issued a rule on assisted suicide, *Gonzales*, 546 U.S. at 275, and CDC issued an eviction moratorium. *West Virginia*, 142 S. Ct. at 2609.

Third, the United States is not "enforcing" Congress's policy decisions, but the current Administration's policy preferences. Resp. at 47. More accurately, EMTALA is the statutory window dressing invoked to thwart and limit *Dobbs*. That attempt deprives Congress of its prerogative "to make major policy decisions itself." *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc).

Besides, the Response misstates the major questions doctrine. It does not require evidence that a legal rule is "transformative"—though a national abortion mandate is surely that. Resp. at 48. The doctrine applies when federal "agencies assert[ ] highly consequential power

beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. The claim that USDOJ's interpretation of EMTALA preempts state abortion laws neatly fits that description.

Nor can the United States ignore the doctrine by depicting the EMTALA mandate as an ordinary health-and-safety condition on Medicare funding. Resp. at 48. The government's demand for Idaho hospitals to perform abortions despite Idaho law is not "unexpected," *id.*—it is unprecedented. *See* Op'g Br. at 47–48.

Like every other major questions doctrine case, the United States here has dusted off an obscure corner of the U.S. Code as putative authority to exercise authority beyond what Congress has delegated. Unless stopped, the statutory approach pioneered in this case will allow USDOJ and HHS to seize control of abortion policy in every state.

## D. Serious Constitutional Questions Persist Because of Reading EMTALA as an Abortion Mandate.

### 1. The preliminary injunction violates the Tenth Amendment.

The United States says that the Tenth Amendment is "inapposite." Resp. at 45. We disagree. Preempting Idaho abortion law dramatically expands federal power at the State's expense. Whether "the Supremacy Clause applies in the EMTALA context" has no effect on the Tenth

Amendment issues raised by the complaint. Resp. at 45. The Supremacy Clause is not "an independent grant of legislative power to Congress"—much less to federal agencies like USDOJ and HHS. *Murphy v. NCAA*, 138 S. Ct. 1461, 1479 (2018).

The constitutionality of EMTALA as written is currently not disputed. *See* Resp. at 45. That does not make the government's reading of EMTALA correct—or avoid the Tenth Amendment violation we describe.

Far from being a "classic model of preemption," this case is a model of federal overreach. *Id.* Its only reply to the Legislature's anticommandeering argument, Op'g Br. at 60, is the government's oblique reference to EMTALA's restrictions on "private actors." Resp. at 45. But the United States made anticommandeering relevant by electing to "issue direct orders" to the State of Idaho through a lawsuit aimed at invalidating state law. *Murphy*, 138 S. Ct. at 1476.

Equally beside the point is that "EMTALA did not preserve police powers that no state possessed when Congress enacted the statute." Resp. at 47. The Tenth Amendment issues raised by the United States'

preemption claim do not vanish because EMTALA was enacted during the era of *Roe v. Wade*, 410 U.S. 113 (1973).

Swimming upstream, the United States also claims that *Dobbs* "does not alter this analysis" under the Tenth Amendment. Resp. at 47. But the Court's opinion in *Dobbs* nowhere hints at congressional authority over abortion—or at an abortion regime governed by physicians acting solely "according to their professional judgment." *Id.*

In short, Tenth Amendment issues persist because the preliminary injunction illicitly distorts the Constitution's division of powers between the federal government and the states.

## 2. *The preliminary injunction offends the Spending Clause.*

The Response argues that the Spending Clause does not apply. Resp. at 44. Supposedly, "the United States seeks to enforce an established condition on federal Medicare funding, which has long been understood to include abortion care in certain circumstances … and which Congress plainly has authority to enact." *Id.* at 45. Hardly.

Congress certainly may attach conditions to federal spending, but the Spending Clause prohibits "conditions [that] take the form of threats to terminate other significant independent grants." *NFIB v. Sebelius*, 567

U.S. 519, 580 (2012). Even if *NFIB* were "[t]he only time the Supreme Court has found improper 'coercion,'" Resp. at 44, the principle is still controlling. The complaint threatens the State of Idaho with the loss of all Medicare funding—not the loss of EMTALA-related funding, a fraction of that amount—unless the State complies with a lawless mandate. *See* 4-LEG-ER-582. Holding billions in Medicare funding hostage in a dispute under EMTALA is exactly the kind of compulsion that *NFIB* condemns. 567 U.S. at 580.

That *NFIB* involved Medicaid rather than Medicare is immaterial. *See* Resp. at 44. Although Medicare directs funding to hospitals, the United States has sued the State of Idaho and issued its financially devastating threat to the State. *See* 4-LEG-ER-582. *NFIB* applies.

Nor does it matter that participation in Medicare is voluntary as a general matter. *See* Resp. at 45. Neither the State nor the hospitals in it voluntarily consented to the EMTALA mandate asserted here.

## III.   OTHER *WINTER* FACTORS FAVOR THE LEGISLATURE.

### A.   Neither the Public Interest Nor a Balance of the Equities Favor the Preliminary Injunction.

It is undisputed that the other *Winter* factors—balancing the equities and the public interest—merge when the United States is a party. *See* Resp. at 52; *Nken*, 556 U.S. at 435. But agreement ends there.

The United States recounts the district court's determination that allowing section 622 would harm "non-parties and the public at large," 1-LEG-ER-49; Resp. at 52–53. But the risks from allowing section 622 to operate are greatly exaggerated. Vacating the preliminary injunction will not "pose a threat to the healthcare needed by pregnant women in Idaho. Section 622 expressly authorizes such care through the exemptions and exceptions we have described." Op'g Br. at 71 (citing IDAHO CODE §§ 18-622(2), (4), (5)).[2] Nor is it appropriate to enjoin Idaho law out of a speculative concern with an increased drain on hospital capacity in neighboring states. *See* Resp. at 53. By that logic, no state could adopt pro-life laws without the looming threat of judicial intervention.

Although the United States invokes its interest in preserving federal supremacy, *id.*, that interest is limited by Congress' delegated authority. *See California*, 921 F.3d at 894.

---

[2] Amendments to section 622 are binding. *See Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (1974) ("a court is to apply the law in effect at the time it renders its decision.").

34

Debating what counts as the "status quo," Resp. at 53, is unfruitful. It is more useful to recall that the preliminary injunction issued only one day before section 622 was to become effective and has remained in force without a trial for more than a year. The Legislature strenuously disagrees that enjoining Idaho law has not inflicted irreparable injury on the State. *See, e.g.*, *King*, 567 U.S. at 1303.

When balancing the equities, a court considers "the burdens or hardships to [the United States] compared with the burden on [the State of Idaho and the Legislature] if an injunction is ordered." *Poretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). The Legislature faces an irreparable injury from the preliminary injunction alone, *King*, 567 U.S. at 1303, while the United States only has a possible injury if EMTALA preempts Idaho law—which it doesn't. *See Arizona*, 641 F.3d at 366.

The Response charges that the Legislature asks this Court to "re-balance the equities and public interest." Resp. at 54. Not so. Naturally, the Legislature disagrees with the lower court's assessment of those elements. But the more basic objection is that the district court elevated third-party harm while downplaying the public interest in maintaining

Congress's limits on EMTALA's preemptive reach and the resulting protection for Idaho's right of self-government.

The United States defends the district court's application of the *Winter* standard. Resp. at 55. But the government cannot dispute that the irreparable-injury prong asks "whether the applicant will be irreparably injured," *Nken*, 556 U.S. at 426, not third-party injuries, while the district court thought it a "key consideration" to consider "what impact an injunction would have on non-parties and the public at large." 1-LEG-ER-49 (citation omitted). Elevating third-party harm in this way treats the merged elements of public interest and the equities as if they can supplant irreparable injury and the likelihood of success. That result contradicts *Nken*, under which those "first two factors of the traditional standard are the most critical." 556 U.S. at 434.

In the end, the United States must rely on the district court's factfinding, based on declarations submitted within a three-week period that have never been tested at trial, to portray section 622 as a brutal threat to Idaho women. Resp. at 55–56. It isn't so. The complaint says that "ectopic pregnancy, severe preeclampsia, or a pregnancy complication threatening septic infections or hemorrhage … could be

deemed an 'abortion' under Idaho law." 4-LEG-ER-576. The Idaho Supreme Court has conclusively held that section 622 does not cover ectopic or other non-viable pregnancies and that it authorizes an abortion to save a woman's life. *See Planned Parenthood*, 522 P.3d at 1202–03. Still unsatisfied, the United States complains that "emergency medical conditions affecting pregnant patients extend beyond the[se] two scenarios ...." Resp. at 55. Perhaps. But the difficult problems that arise when a pregnant woman has an emergency medical condition belong to the people of Idaho and their elected representatives—not to federal agencies wielding a contrived mandate. *See Dobbs*, 142 S. Ct. at 2257.

## CONCLUSION

The Court should reverse the decision below and vacate the district court's orders granting preliminary injunctive relief.

Respectfully submitted,

*/s/ Daniel W. Bower*

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333

dbower@morrisbowerhaws.com

*Counsel for Intervenors - Appellants*

Dated: September 29, 2023

38

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO 9TH CIRCUIT RULE 32-1**
**FOR CASE NOS. 23-35440 & 23-35450**

I hereby certify that this brief complies with the word limits permitted by Ninth Circuit Rule 32-1. The brief is 6,879 words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

*/s/ Daniel W. Bower*
Daniel W. Bower

*Counsel for Intervenors – Appellants*

Dated: September 29, 2023

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the Idaho Legislature states that it knows of a related case pending in this Court: *United States of America v. State of Idaho*, Case No. 23-35153 (appealing the district court's denial of the Idaho Legislature's motion to intervene as of right).

Respectfully submitted,

*/s/ Daniel W. Bower*

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333

dbower@morrisbowerhaws.com

*Counsel for Intervenors - Appellants*

September 29, 2023

# ADDENDUM

## TABLE OF CONTENTS

42 U.S.C. § 1395dd (EMTALA) ............................................................. 42

42 U.S.C. § 1395 ................................................................................ 50

42 U.S.C. § 18023 .............................................................................. 51

IDAHO CODE § 18-622 ...................................................................... 56

## EMTALA - 42 U.S.C. § 1395dd

**(a) Medical screening requirement.** In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this title [42 U.S.C. §§ 1395 et seq.]) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor.**

**(1) In general**. If any individual (whether or not eligible for benefits under this title [42 U.S.C. §§ 1395 *et seq.*]) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

**(2) Refusal to consent to treatment**. A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to

43

secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3) Refusal to consent to transfer**. A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

**(c) Restricting transfers until individual stabilized.**

**(1) Rule**. If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless—

**(A)**

**(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 1861(r)(1) [42 U.S.C. § 1395x(r)(1)]) has signed a certification that[,] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

**(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1861(r)(1) [42 U.S.C. § 1395x(r)(1)]), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

**(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

**(2) Appropriate transfer**. An appropriate transfer to a medical facility is a transfer—

**(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

**(B)** in which the receiving facility—

**(i)** has available space and qualified personnel for the treatment of the individual, and

**(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility with all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

**(d) Enforcement.**

45

**(1) Civil monetary penalties**.

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1128A [42 U.S.C. § 1320a-7a] (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1128A(a) [42 U.S.C. § 1320a-7a(a)].

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who—

**(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

**(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this title [42 U.S.C. §§ 1395 *et seq.*] and State health care programs. The provisions of section 1128A [42 U.S.C. § 1320a-7a] (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1128A(a) [42 U.S.C. § 1320a-7a(a)].

**(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1866(a)(1)(I) [42 U.S.C. § 1395cc(a)(1)(I)]) and notifies the on-call physician and the on-call physician fails or refuses to appear within a

reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

**(2) Civil enforcement.**

**(A) Personal harm**. Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(B) Financial loss to other medical facility**. Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(C) Limitations on actions**. No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**. In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this title [42 U.S.C. §§ 1395 et seq.], the Secretary shall request the appropriate quality improvement organization (with a contract under part B of title XI [42 U.S.C. §§ 1320c et seq.]) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize

the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this title [42 U.S.C. §§ 1395 et seq.] for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B [42 U.S.C. §§ 1320c *et seq.*].

**(4)** Notice upon closing an investigation. The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

**(e) Definitions.** In this section:

**(1)** The term "emergency medical condition" means—

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part; or

**(B)** with respect to a pregnant woman who is having contractions—

**(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

**(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1866 [42 U.S.C. § 1395cc].

**(3)**

**(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

**(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1861(mm)(1) [42 U.S.C. § 1395x(mm)(1)]) and a rural emergency hospital (as defined in section 1861(kkk)(2) [42 U.S.C. § 1395x(kkk)(2)]).

**(f) Preemption.** The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

**(g) Nondiscrimination.** A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

**(h) No delay in examination or treatment.** A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

**(i) Whistleblower protections.** A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

## 42 U.S.C. § 1395 – Prohibition Against Any Federal Interference

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

## 42 U.S.C. § 18023 – Special rules

**(a) STATE OPT-OUT OF ABORTION COVERAGE**

**(1) IN GENERAL**

A State may elect to prohibit abortion coverage in qualified health plans offered through an Exchange in such State if such State enacts a law to provide for such prohibition.

**(2) TERMINATION OF OPT OUT**

A State may repeal a law described in paragraph (1) and provide for the offering of such services through the Exchange.

**(b) SPECIAL RULES RELATING TO COVERAGE OF ABORTION SERVICES**

**(1) VOLUNTARY CHOICE OF COVERAGE OF ABORTION SERVICES**

**(A) In general**

Notwithstanding any other provision of this title (or any amendment made by this title)—

**(i)** nothing in this title (or any amendment made by this title), shall be construed to require a qualified health plan to provide coverage of services described in subparagraph (B)(i) or (B)(ii) as part of its essential health benefits for any plan year; and

**(ii)** subject to subsection (a), the issuer of a qualified health plan shall determine whether or not the plan provides coverage of services described in subparagraph (B)(i) or (B)(ii) as part of such benefits for the plan year.

**(B) Abortion services**

**(i) Abortions for which public funding is prohibited**

The services described in this clause are abortions for which the expenditure of Federal funds appropriated for the Department of Health and Human Services is not permitted, based on the law as in effect as of the date that is 6 months before the beginning of the plan year involved.

**(ii) Abortions for which public funding is allowed**

The services described in this clause are abortions for which the expenditure of Federal funds appropriated for the Department of Health and Human Services is permitted, based on the law as in effect as of the date that is 6 months before the beginning of the plan year involved.

**(2) PROHIBITION ON THE USE OF FEDERAL FUNDS**

**(A) In general**

If a qualified health plan provides coverage of services described in paragraph (1)(B)(i), the issuer of the plan shall not use any amount attributable to any of the following for purposes of paying for such services:

**(i)** The credit under section 36B of title 26 (and the amount (if any) of the advance payment of the credit under section 18082 of this title).

**(ii)** Any cost-sharing reduction under section 18071 of this title (and the amount (if any) of the advance payment of the reduction under section 18082 of this title).

**(B) Establishment of allocation accounts**

In the case of a plan to which subparagraph (A) applies, the issuer of the plan shall—

**(i)** collect from each enrollee in the plan (without regard to the enrollee's age, sex, or family status) a separate payment for each of the following:

**(I)** an amount equal to the portion of the premium to be paid directly by the enrollee for coverage under the plan of services other than services described in paragraph (1)(B)(i) (after reduction for credits and cost-sharing reductions described in subparagraph (A)); and

**(II)** an amount equal to the actuarial value of the coverage of services described in paragraph (1)(B)(i), and

**(ii)** shall deposit all such separate payments into separate allocation accounts as provided in subparagraph (C).

In the case of an enrollee whose premium for coverage under the plan is paid through employee payroll deposit, the separate payments required under this subparagraph shall each be paid by a separate deposit.

**(C) Segregation of funds**

**(i) In general**

The issuer of a plan to which subparagraph (A) applies shall establish allocation accounts described in clause (ii) for enrollees receiving amounts described in subparagraph (A).

**(ii) Allocation accounts**

The issuer of a plan to which subparagraph (A) applies shall deposit—

**(I)** all payments described in subparagraph (B)(i)(I) into a separate account that consists solely of such payments and that is used exclusively to pay for services other than services described in paragraph (1)(B)(i); and

**(II)** all payments described in subparagraph (B)(i)(II) into a separate account that consists solely of such payments and that is used exclusively to pay for services described in paragraph (1)(B)(i).

**(D) Actuarial value**

**(i) In general**

The issuer of a qualified health plan shall estimate the basic per enrollee, per month cost, determined on an average actuarial basis, for including coverage under the qualified health plan of the services described in paragraph (1)(B)(i).

**(ii) Considerations** In making such estimate, the issuer—

**(I)** may take into account the impact on overall costs of the inclusion of such coverage, but may not take into account any cost reduction estimated to result from such services, including prenatal care, delivery, or postnatal care;

**(II)** shall estimate such costs as if such coverage were included for the entire population covered; and

**(III)** may not estimate such a cost at less than $1 per enrollee, per month.

### (E) Ensuring compliance with segregation requirements

### (i) In general

Subject to clause (ii), State health insurance commissioners shall ensure that health plans comply with the segregation requirements in this subsection through the segregation of plan funds in accordance with applicable provisions of generally accepted accounting requirements, circulars on funds management of the Office of Management and Budget, and guidance on accounting of the Government Accountability Office.

### (ii) Clarification

Nothing in clause (i) shall prohibit the right of an individual or health plan to appeal such action in courts of competent jurisdiction.

### (3) RULES RELATING TO NOTICE

### (A) Notice

A qualified health plan that provides for coverage of the services described in paragraph (1)(B)(i) shall provide a notice to enrollees, only as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage.

### (B) Rules relating to payments

The notice described in subparagraph (A), any advertising used by the issuer with respect to the plan, any information provided by the Exchange, and any other information specified by the Secretary shall provide information only with respect to the total amount of the combined payments for services described in paragraph (1)(B)(i) and other services covered by the plan.

### (4) NO DISCRIMINATION ON BASIS OF PROVISION OF ABORTION

No qualified health plan offered through an Exchange may discriminate against any individual health care provider or health care facility because of its unwillingness to provide, pay for, provide coverage of, or refer for abortions.

**(c) APPLICATION OF STATE AND FEDERAL LAWS REGARDING ABORTION**

**(1) NO PREEMPTION OF STATE LAWS REGARDING ABORTION**

Nothing in this Act shall be construed to preempt or otherwise have any effect on State laws regarding the prohibition of (or requirement of) coverage, funding, or procedural requirements on abortions, including parental notification or consent for the performance of an abortion on a minor.

**(2) NO EFFECT ON FEDERAL LAWS REGARDING ABORTION**

**(A) In general**

Nothing in this Act shall be construed to have any effect on Federal laws regarding—

**(i)** conscience protection;

**(ii)** willingness or refusal to provide abortion; and

**(iii)** discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion.

**(3) NO EFFECT ON FEDERAL CIVIL RIGHTS LAW**

Nothing in this subsection shall alter the rights and obligations of employees and employers under title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.].

**(d) APPLICATION OF EMERGENCY SERVICES LAWS**

Nothing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1395dd of this title (popularly known as "EMTALA").

## Idaho Code § 18-622 - Defense of Life Act.

**(1)** Except as provided in subsection (2) of this section, every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

**(2)** The following shall not be considered criminal abortions for purposes of subsection (1) of this section:

**(a)** The abortion was performed or attempted by a physician as defined in this chapter and:

**(i)** The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

**(ii)** The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

**(b)** The abortion was performed or attempted by a physician as defined in this chapter during the first trimester of pregnancy and:

**(i)** If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws; or

**(ii)** If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported to a law enforcement agency or child protective services that she is the victim of an act of rape or incest and a copy of such report has been provided to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws.

**(3)** If a report concerning an act of rape or incest is made to a law enforcement agency or child protective services pursuant to subsection (2)(b) of this section, then the person who made the report shall, upon request, be entitled to receive a copy of such report within seventy-two (72) hours of the report being made, provided that the report may be redacted as necessary to avoid interference with an investigation.

**(4)** Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

**(5)** Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.