**Nos. 23-35440, 23-35450**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF IDAHO,

Defendant-Appellant,

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-Defendants,

Movants-Appellants.

_____

On Appeal from the United States District Court
for the District of Idaho

_____

### EMERGENCY MOTION FOR RECONSIDERATION EN BANC
### OF PUBLISHED ORDER GRANTING STAY PENDING APPEAL
### (RELIEF REQUESTED BY OCTOBER 10, 2023)

_____

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

PAUL R. RODRÍGUEZ
*Deputy General Counsel*

DAVID HOSKINS
*Supervisory Litigation Attorney*

JESSICA BOWMAN
MELISSA HART
*Attorneys*

*U.S. Department of Health
and Human Services*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JOSHUA D. HURWIT
*United States Attorney*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER
NICHOLAS S. CROWN
*Attorneys, Appellate Staff
Civil Division, Room 7325
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-305-1754*

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned certifies that the following is the information required by Circuit Rule 27-3.

(i)     Attorneys for the parties.

Counsel for Movants-Appellants Mike Moyle et al.
Daniel W. Bower (dbower@morrisbowerhaws.com)
Morris Bower & Haws PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
(208) 345-3333

Counsel for Defendant-Appellant State of Idaho
Joshua N. Turner (josh.turner@ag.idaho.gov)
Lincoln Davis Wilson (lincoln.wilson@ag.idaho.gov)
Brian V. Church (brian.church@ag.idaho.gov)
Alan Foutz (alan.foutz@ag.idaho.gov)
Steven L. Olsen (steven.olsen@ag.idaho.gov)
Idaho Office of the Attorney General
700 W. Jefferson St., Suite 210
Boise, ID 83720
(208) 334-2400

Counsel for Plaintiff-Appellee United States of America
Michael S. Raab (michael.raab@usdoj.gov)
McKaye L. Neumeister (mckaye.l.neumeister@usdoj.gov)
Nicholas S. Crown (nicholas.s.crown@usdoj.gov)
Civil Division, U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-1754

(ii)   Facts showing the existence and nature of the emergency.

On September 28, 2023, a motions panel (Bade, Lee, VanDyke, JJ.) issued a published order granting a motion by the Idaho Legislature—a permissive intervenor in the

i

proceedings below—for a stay pending appeal of the district court's preliminary injunction, which issued over a year earlier. As set forth below, emergency *en banc* reconsideration of that published order, including an immediate administrative stay of the order, is necessary to prevent immediate irreparable harm to the public and to the United States.

The published stay order (Add.1–18) allows Idaho to begin enforcing an abortion ban—which has never previously been in effect in the Medicare-participating hospitals at issue—in circumstances where that law is preempted by a federal statute. Federal law guarantees access to abortion care when that treatment is necessary to stabilize emergency medical conditions that put an individual's "health" in "serious jeopardy," or when the individual risks "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A), (3).

Idaho's law, however, criminalizes abortion care even in those circumstances. As the district court concluded in its factual findings, unless the Idaho law remains enjoined, medical professionals in Idaho face criminal liability for providing emergency abortion care for conditions that, if not stabilized as contemplated by federal law, could result in irreversible harms, such as sepsis requiring limb amputation, uncontrollable bleeding requiring hysterectomy, or kidney failure requiring lifelong dialysis. For example, after the stay order allowing Idaho's criminal law to take effect in Medicare-participating hospitals, a pregnant individual in Idaho experiencing uncontrollable (but non-lethal) bleeding would have to undergo a hysterectomy instead of receiving medically

necessary treatment to terminate the pregnancy. The stay, moreover, harms the United States's sovereign interests in the proper administration of federal law by permitting a preempted state law to operate.

The United States seeks an immediate administrative stay of the published order and requests full relief on this motion by October 10, 2023.

(iii)  Earlier filing.

The stay order issued on September 28, 2023. The United States filed this emergency motion as soon as practicable, on September 30, 2023.

(iv)  Notice to counsel.

Counsel for Movants-Appellants and Defendant-Appellant were notified of this emergency motion by email at 1:26p.m. PT on September 29, 2023. As of this filing, counsel for Movants-Appellants and Defendant-Appellant have not responded. This motion and supporting documents will be served by email and by using the appellate CM/ECF system. Ninth Circuit Court staff were notified of the government's intent to file this motion by email and voicemail on September 29, 2023.

(v)  Submissions to the district court.

The stay order was issued by a motions panel of this Court. The requested relief is not available in the district court.

*s/ Nicholas S. Crown*
Nicholas S. Crown

# TABLE OF CONTENTS

**Page**

RULE 35 STATEMENT ................................................................... 1

INTRODUCTION ........................................................................... 2

BACKGROUND .............................................................................. 3

ARGUMENT .................................................................................. 7

I.    The Stay Order Reflects Significant Legal Errors. ................................... 7

    A.    EMTALA requires hospitals to offer abortion care when it constitutes stabilizing treatment. ................................................. 7

    B.    Idaho law is preempted because it prohibits stabilizing treatment. .......... 8

    C.    The order's impossibility-preemption analysis was fundamentally flawed. ......................................................................... 9

        1.    The order misinterpreted EMTALA. ................................. 9

        2.    The order misinterpreted Idaho's statute and precedent. ............. 13

    D.    The order's obstacle-preemption analysis was mistaken. ........................ 15

II.    The Equities Decisively Support Vacating the Stay. ........................................... 16

CONCLUSION ................................................................................ 19

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

iv

## RULE 35 STATEMENT

*En banc* review is appropriate because the stay order involves questions of exceptional importance and conflicts with Fourth Circuit precedent, *In re Baby K*, 16 F.3d 590 (4th Cir. 1994).

The Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, requires that Medicare-funded hospitals offer individuals "necessary stabilizing treatment" for their "emergency medical conditions." In some circumstances, that medically necessary treatment is pregnancy termination. EMTALA's broad text covers not only threats to a patient's life, but also to her health, organs, and major bodily functions. The Idaho law at issue, however, makes it a felony to terminate a patient's pregnancy unless it is "necessary" to prevent the patient's "death." Idaho Code § 18-622(2). Before Idaho's law took effect, the United States sought preliminary relief to block Idaho from enforcing the statute against emergency healthcare that EMTALA requires. The district court issued a preliminary injunction.

A year later, a panel of this Court published an order staying the injunction, immediately permitting Idaho's law to criminalize EMTALA-required treatments. The question presented is:

Whether the panel erred by staying the preliminary injunction, where the district court found every factor in the United States's favor—including that patients, providers, and public health would be irreparably harmed absent an injunction—and after the movants delayed almost 11 months before seeking a stay.

**INTRODUCTION**

In a published order, a motions panel of this Court stayed a year-old preliminary injunction. Overnight, the stay allowed Idaho's abortion ban—never previously in effect in Medicare-participating hospitals—to criminalize emergency healthcare that federal law requires. The Court should rehear the matter *en banc*, vacate the stay, and grant an immediate administrative stay of the panel's order.

EMTALA guarantees individuals "necessary stabilizing treatment" for their "emergency medical conditions." By its terms, EMTALA extends beyond life-saving care; it applies to threats to a patient's health, organs, and major bodily functions. Pregnant individuals may arrive at Medicare-covered hospitals with serious conditions, including infections, pre-eclampsia, or premature pre-term rupture of membranes (PPROM). Those conditions can lead to devastating harms like sepsis requiring limb amputation, uncontrollable bleeding requiring hysterectomy, or kidney failure requiring lifelong dialysis—unless they are stabilized. Sometimes, a physician will determine that pregnancy termination is the necessary stabilizing treatment, even when the physician cannot conclude that the condition is lethal.

But Idaho Code § 18-622 ensures that irreversible harms will occur, by making it a felony for healthcare professionals to terminate a pregnancy unless doing so is "necessary" to prevent the patient's "death." As the Idaho Supreme Court recognizes, that carveout is narrower than EMTALA's standard. *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1158, 1195-97, 1203-04, 1207 (Idaho 2023).

2

In August 2022, the United States sought preliminary relief before Idaho's law became effective. Invoking the Supremacy Clause and EMTALA's express preemption provision—and citing irreparable harms to the government and public absent relief—the district court enjoined enforcement of § 18-622 in Medicare-participating hospitals when doing so would directly conflict with EMTALA.

A year later, a panel of this Court stayed the preliminary injunction. In granting such extraordinary relief to the Idaho Legislature (which permissively intervened), the panel: overlooked critical features in federal and state law (including that EMTALA applies in non-lethal circumstances); ignored the factual record attesting to non-lethal conditions requiring emergency pregnancy termination; contradicted the Idaho Supreme Court's interpretation of Idaho's law; and created a conflict with Fourth Circuit precedent. The order upended the status quo (because Idaho's law was enjoined before it became effective), suddenly prohibiting physicians from providing treatment necessary to prevent devastating harms. And it did so despite the Legislature's 11-month delay in seeking a stay.

An administrative stay, *en banc* review, and vacatur of the panel order is warranted. *E.g.*, *Feldman v. Arizona Sec. of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016) (granting reconsideration *en banc*).

## BACKGROUND

A.     Congress enacted EMTALA based on "a growing concern about the provision of adequate emergency room medical services to individuals who seek care,

3

particularly as to the indigent and uninsured." H.R. Rep. No. 99-241, pt. 3, at 5 (1985). Its "overarching purpose" is "ensur[ing] that patients, particularly the indigent and underinsured, receive adequate emergency medical care." *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) (quotation marks omitted). EMTALA applies to hospitals that have an emergency department and participate in Medicare. 42 U.S.C. §§ 1395cc(a)(1)(I)(i), 1395dd(e)(2).

Covered hospitals must offer "[n]ecessary stabilizing treatment" to individuals presenting with an "emergency medical condition." *Id.* § 1395dd(b)(1)(A). Barring an appropriate transfer and upon the patient's informed consent, hospitals "must provide," "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* § 1395dd(b)(1)(A), (2).

An "emergency medical condition" exists when an individual's "health" is in "serious jeopardy" or the individual risks "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A). "'[T]o stabilize'" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A).

EMTALA preempts contrary state laws: "The provisions of this section do not preempt any State or local law requirement, *except to* the extent that the requirement

4

directly conflicts with a requirement of this section." *Id.* § 1395dd(f) (emphasis added). Preemption occurs when (1) it is "physically impossible" to comply with both state law and EMTALA, or (2) "the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1394 (9th Cir. 1993) (per curiam).

**B.** The Idaho Supreme Court calls Idaho Code § 18-622 a "Total Abortion Ban" and already interpreted its exceptions as narrower than EMTALA's standards. *Planned Parenthood*, 522 P.3d at 1195-97, 1203-04, 1207. Unless the patient furnishes (within the first trimester) a police report that her pregnancy resulted from "an act of rape or incest," Idaho Code § 18-622(2)(b), Idaho allows only those abortions "necessary to prevent the death of the pregnant woman," *id.* § 18-622(2)(a)(i), or to "remov[e] … an ectopic or molar pregnancy," *id.* § 18-604(1)(c). Otherwise, it is a felony punishable by imprisonment and license-suspension (or revocation) for healthcare professionals to "perform[]," "attempt[]," or "assist[] in performing or attempting to perform" treatment involving pregnancy termination. *Id.* § 18-622(1).

**C.** Before § 18-622's effective date, the United States sued to block the State from enforcing it against providers who offer emergency healthcare that EMTALA requires. 4-LEG-ER-570. On August 24, 2022, the district court issued a preliminarily injunction. 1-LEG-ER-14–52. The court concluded that both impossibility- and obstacle-preemption applied because Idaho law criminalizes and deters stabilizing treatments. 1-LEG-ER-32–47. Potentially devastating conditions exist (*e.g.*, PPROM, pre-

eclampsia, and placental abruption) that meet EMTALA's criteria, and for which an abortion would prevent serious injuries even when a provider cannot conclude that pregnancy termination is *necessary* to prevent death. 1-LEG-ER-20–22. And some conditions lead to irreversible but non-lethal harms. 1-LEG-ER-15 (identifying "severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, hypoxic brain injury"); *see* 3-ER-188–217, 319–358. Yet, even when providers conclude that abortion is medically necessary stabilizing treatment in those circumstances, Idaho criminalizes that care because it is not "necessary" to prevent "death."[1]

The Legislature did not seek a stay until nearly 11 months after the injunction issued. Rather, the Legislature requested reconsideration, 2-LEG-ER-270, and supplemental briefing, 2-LEG-ER-209. When the court denied reconsideration on May 4, 2023, 1-LEG-ER-2, the Legislature did not appeal until July 3. 4-LEG-ER-587. That same date, the Legislature moved for a stay in district court. 2-LEG-ER-76. In this Court, the Legislature did not seek a stay until August 22, 2023. The State never sought a stay.

---

[1] Idaho amended § 18-622, effective July 1, 2023. It now excludes "removal of an ectopic or molar pregnancy" from the definition of "abortion." H.B. 374, § 1, 67th Leg., 1st Reg. Sess. (Idaho 2023). The amendments also converted § 18-622's prior affirmative-defense structure into exceptions to liability. *Id.* § 2. But the standard at issue remains unchanged: The only relevant exception applies to abortions "necessary to prevent … death." Idaho Code § 18-622(2)(a)(i). The stay order thus erred in suggesting "moot[ness]." Add.11.

On September 28, 2023, a panel of this Court issued a published order granting a stay pending appeal. Add.1–18.

## ARGUMENT

## I. The Stay Order Reflects Significant Legal Errors.

The order's merits analysis falters at every step. It disregards EMTALA's and § 18-622's text, overlooks the factual record, and creates a circuit conflict.

### A. EMTALA requires hospitals to offer abortion care when it constitutes stabilizing treatment.

Medicare-participating hospitals must offer "stabilizing treatment" to individuals presenting with an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). "'[T]o stabilize'" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during" transfer. *Id.* § 1395dd(e)(3)(A). That definition "is purely contextual or situational." *Cherukuri v. Shalala*, 175 F.3d 446, 449 (6th Cir. 1999); *see Baby K*, 16 F.3d at 595-96. EMTALA requires *any* form of stabilizing treatment, *if* the relevant professional deems it necessary in their reasonable medical judgment.

EMTALA's protections apply to pregnant individuals. 42 U.S.C. § 1395dd(b). Congress provided that a "pregnant woman" could be among the "individual[s]" experiencing an "emergency medical condition." *Id.* § 1395dd(e)(1)(A)(i), (B). Abortion care, moreover, can constitute stabilizing treatment. Various conditions—*e.g.*, PPROM, pre-

7

eclampsia, and eclampsia—can arise or become exacerbated during pregnancy and constitute emergency medical conditions. 3-ER-188–217, 319–358. In some circumstances, a physician will conclude that the stabilizing treatment for these conditions is pregnancy termination, even if the condition is non-lethal. *Id.*; 1-LEG-ER-15, 20–22. EMTALA requires hospitals to provide such treatment upon the pregnant individual's informed consent. 42 U.S.C. § 1395dd(b)(1)(A), (2).

## B. Idaho law is preempted because it prohibits stabilizing treatment.

EMTALA expressly preempts "any State or local law requirement" that "directly conflicts with a requirement of this section." *Id.* § 1395dd(f). This standard incorporates impossibility- and obstacle-preemption principles. *Draper*, 9 F.3d at 1393-94. As the Fourth Circuit held, a state law permitting physicians to refuse stabilizing treatment poses a direct conflict. *Baby K*, 16 F.3d at 597 (finding preemption where state law "exempt[ed] physicians from providing care they consider medically or ethically inappropriate").

It is impossible to comply with Idaho Code § 18-622 and EMTALA in certain cases. Under § 18-622, abortion care is a felony unless "necessary to prevent" the patient's "death." But conditions can meet EMTALA's criteria even when providers cannot determine that abortion is *necessary* to prevent death. As the district court found, patients arrive at ERs suffering non-lethal conditions that could require pregnancy termination to prevent injuries like strokes, limb amputation, kidney failure, or hypoxic

brain injury. 1-LEG-ER-15; *see* 3-ER-182–183, 191–192, 195–201, 204–210, 213–217, 319–358. Providers therefore cannot comply with both laws in such situations. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (preemption where "individuals could be prosecuted for conduct that Congress specifically sought to protect").

Obstacle preemption also applies. Section 18-622 has "a deterrent effect," 1-LEG-ER-40, and obstructs Congress's "purpose" of "ensur[ing] that patients, particularly the indigent and underinsured, receive *adequate* emergency medical care," *Arrington*, 237 F.3d at 1073-74 (emphasis added) (quotation marks omitted); *see Baby K*, 16 F.3d at 597.

### C. The order's impossibility-preemption analysis was fundamentally flawed.

#### 1. The order misinterpreted EMTALA.

**a.** The panel incorrectly concluded that abortion cannot constitute stabilizing treatment by reasoning that EMTALA does not "mandate that certain procedures, such as abortion, be offered." Add.6. But there is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020). EMTALA does not "mandate" *any* specific procedures. It would be impossible (and unnecessary) for EMTALA to list every conceivable emergency medical condition and all corresponding stabilizing treatments. By not naming abortion, EMTALA treats it the same as every other stabilizing treatment. And far from setting

9

a "standard[] of care," *contra* Add.6–8, the injunction preserves physicians' statutory obligation to determine what treatment is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to occur." 42 U.S.C. § 1395dd(e)(3)(A); *see Cherukuri*, 175 F.3d at 449-50.

EMTALA mentions a specific stabilizing treatment in only one circumstance: when pregnant individuals are "having contractions." 42 U.S.C. § 1395dd(e)(1)(B); *id.* § 1395dd(e)(3)(A). This provision expands the definition of "emergency medical condition" to include labor, which otherwise might not meet § 1395dd(e)(1)(A)'s standards. For all other conditions, EMTALA tasks relevant physicians with determining medically necessary stabilizing treatment. *Id.* § 1395dd(e)(3)(A).

Congress knows how to create special rules governing abortion or excluding abortion from otherwise-applicable rules, 4-LEG-ER-552 (collecting examples), but it did not do so here. Indeed, the legislation through which Congress considered EMTALA included another proposed program that, unlike EMTALA, *did* expressly carve out abortion. *Compare* H.R. 3128, 99th Cong. § 124 (1985) (language that became EMTALA), *with id.* § 302(b)(2)(B) (excluding abortion from different program); 42 U.S.C. § 18023(d) (indicating EMTALA may require emergency abortions). The omission of any reference to abortion care shows that Congress did not intend EMTALA to exclude such stabilizing treatment.

Consistent with EMTALA's broad text and "purpose" of ensuring "adequate emergency medical care," *Arrington*, 237 F.3d at 1073-74, courts have understood that

10

abortion care can constitute stabilizing treatment, *see, e.g.*, *New York v. HHS*, 414 F. Supp. 3d 475, 537-39 (S.D.N.Y. 2019); California Amicus Br. 3-12. Practitioners likewise attested that EMTALA sometimes necessitates abortion care. 3-ER-323–336, 339–346, 349–352, 355–358.

    **b.**    The order erred in suggesting (Add.6–7) that EMTALA's reference to an "unborn child" in § 1395dd(e)(1)(A) excludes pregnancy termination as stabilizing treatment. EMTALA's screening, stabilization, and transfer obligations run to an "individual," not an "unborn child." A hospital's screening duty arises when an "individual" "comes to the emergency department" and an examination or treatment request "is made on the individual's behalf." 42 U.S.C. § 1395dd(a). A hospital's obligation to stabilize arises if it determines "the individual has an emergency medical condition." *Id.* § 1395dd(b)(1). The "individual" must be informed of risks and benefits and can "refuse such examination and treatment." *Id.* § 1395dd(b)(2). And EMTALA restricts transfer "until [the] individual [is] stabilized." *Id.* § 1395dd(c).

    Section 1395dd(e)(1)(A) does not alter this conclusion. It expands the circumstances when pregnant individuals can be considered to have "emergency medical conditions" by including conditions that might threaten the health of "the unborn child," but not necessarily that of the pregnant individual. *Id.* § 1395dd(e)(1)(A)(i) (defining "emergency medical condition" to include conditions that could "plac[e] the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy"). This addition does not alter EMTALA's

11

framework: what must be stabilized is the "medical condition," *id.* § 1395dd(b)(1)(A), belonging to the "individual," *id.* § 1395dd(b)(1), (c), (e)(1)(A)(i).[2]

Statutory history demonstrates that Congress did not intend this provision to exclude abortion as stabilizing treatment. Originally, EMTALA's definition of "emergency medical condition" did not consider the health of an individual's fetus. Pub. L. No. 99-272, § 9121(b), 100 Stat. 82, 166 (1986). Any risks to the "unborn child" were relevant only to determining whether a patient was in "active labor." *Id.* When individuals arrived at emergency rooms while not in labor and with a condition that jeopardized the health of a fetus—but not (yet) the individual's health—the hospital arguably had no obligation to stabilize. Congress amended EMTALA, Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (1989), providing that the term "'emergency medical condition' *also applies* to a condition that places in serious jeopardy the health of the woman *or* her unborn child," H.R. Rep. No. 101-386, at 838 (1989) (Conf. Rep.) (emphases added). But under subsections (a), (b), and (c), a hospital's duties under EMTALA still run to the pregnant individual.

EMTALA's informed-consent framework—which the stay order overlooked—supports this view by contemplating that the *individual* will determine whether to continue a dangerous pregnancy. Hospitals must inform the individual of the risks and

---

[2] EMTALA references an "unborn child" in three other provisions, 42 U.S.C. § 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(B)(ii), but the order did not rely on them. They are inapposite for the reasons discussed (and apply only when an individual is in labor).

benefits of the stabilizing treatment. 42 U.S.C. § 1395dd(b)(2). Then, "the individual (or a person acting on the individual's behalf)" decides whether to proceed. *Id.*

    **c.**    Similarly inapt is the panel's reliance on "Idaho's historic police powers" and the atextual view that EMTALA merely prevents "dumping" indigent patients. Add.8, 13-14. Both conclusions disregard EMTALA's preemption provision. EMTALA, moreover, did not preserve police powers that no State possessed when Congress enacted the statute. In requiring stabilizing treatment and expressly assigning preemptive effect, Congress was legislating against a backdrop that limited states' authority to ban abortion. And nothing in EMTALA's text confines it to patient-dumping. The Fourth Circuit rejected that interpretation because it "directly conflicts with the plain language" of EMTALA's stabilization requirement. *Baby K*, 16 F.3d at 595-96; *see Arrington*, 237 F.3d at 1073-74.

### 2. The order misinterpreted Idaho's statute and precedent.

The order's alternative conclusion—that if EMTALA encompassed abortion care, Idaho law "would not conflict," Add.9—disregarded § 18-622's text, Idaho precedent, and EMTALA's application in non-lethal contexts.

The panel emphasized that § 18-622 permits abortions when physicians deem such care "necessary to save the life of the mother," Add.10-12, but ignored that EMTALA requires stabilizing treatments beyond those *necessary* to prevent *death*. 42 U.S.C. § 1395dd(e)(1)(A) ("health … in serious jeopardy"; "serious impairment to bodily

functions"; "serious dysfunction of any bodily organ or part"). As the district court recognized, EMTALA is "broader than" Idaho's necessary-to-prevent-death standard because, *e.g.*, the stabilization requirement applies "to prevent injuries that are more wide-ranging than death." 1-LEG-ER-34. The panel did not address this textual requirement.

The order likewise ignored the factual findings and physician declarations detailing devastating conditions that, if untreated, would present "grave risks" to the pregnant individual's health, even when a physician believes those risks are not yet lethal. *E.g.*, 1-LEG-ER-10 ("'severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, or hypoxic brain injury'"); 3-ER-328 ("eclampsia can cause coma"). Without analyzing such circumstances, the order now requires physicians to let emergency conditions deteriorate before offering necessary treatment—precisely what EMTALA prevents. 42 U.S.C. § 1395dd(e)(3).

The panel's reliance on *Planned Parenthood*, 522 P.3d 1132, was misplaced. The Idaho Supreme Court explained that § 18-622 does not include "the broader 'medical emergency' exception" to liability present in another Idaho statute. *Id.* at 1196.[3] That

---

[3] That "medical emergency" exception would cover any "condition that, in reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." Idaho Code § 18-8801(5).

omission underscores that § 18-622 is narrower than EMTALA, because the medical-emergency exception would have "appl[ied] in nearly identical circumstances in which EMTALA might preclude the Total Abortion Ban from being enforced." *Id.* at 1158; *id.* at 1207 (observing "EMTALA uses language *substantially similar* to" the medical-emergency exception absent from § 18-622).

The stay order's references (Add.11–12) to recent state-law amendments likewise highlight the errors in its analysis. Those amendments removed § 18-622's affirmative-defense structure and excluded ectopic pregnancies from the definition of "criminal abortion." Idaho Code §§ 18-622(2)(a), 18-604(1)-(2). But Idaho law still requires that an abortion be "necessary" to prevent "death," which is narrower than EMTALA. Indeed, when debating this amendment, Idaho legislators confirmed that "the decision was to focus on the life of the mother versus a health exception." https://perma.cc/QC9M-LBQV (statement of Sen. Lakey).

## D. The order's obstacle-preemption analysis was mistaken.

In rejecting obstacle preemption (Add.12–14), the order compounded the errors described above by concluding that EMTALA is limited to patient-dumping and "le[aves] it to state healthcare standards to determine which course of treatment" satisfies EMTALA's stabilization requirements. Add.13. That interpretation erases EMTALA's preemption provision. And the logic of that interpretation would allow restrictions on life-saving treatment for non-medical reasons, defeating a key purpose of EMTALA. It is untenable to interpret a federal statute with an express preemption

15

provision—enacted because state law had failed to ensure "adequate" emergency care, *Arrington*, 237 F.3d at 1073-74; H.R. Rep. No. 99-241, pt. 3, at 5—as allowing state laws prohibiting necessary emergency care.

The order's hypothetical spotlights this error. The panel posited that "a medical professional may believe an organ transplant is necessary to stabilize a patient's emergency medical condition, but EMTALA would not then preempt a state's requirements governing organ transplants." Add.8. That example is inapt because physicians could still lawfully provide stabilizing treatment; the closer analogy is a law *criminalizing* organ transplants. By condoning such a law, the order conflicts with EMTALA and the Fourth Circuit's decision in *Baby K*, 16 F.3d at 595-97.

The order's citations do not support a stay. *Baker v. Adventist Health, Inc.*, 260 F.3d 987 (9th Cir. 2001), and *Eberhardt v. City of Los Angeles*, 62 F.3d 1253 (9th Cir. 1995), are inapposite because they pertained to EMTALA's screening requirement, not the stabilization requirement. The latter is broader. *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 250-53 (1999).

## II.    The Equities Decisively Support Vacating the Stay.

**A.**    The harms to the government and public interest, which "merge" here, *Nken v. Holder*, 556 U.S. 418, 435 (2009), tilt sharply against the stay.

**1.**    The stay "threaten[s] severe, irreparable harm to pregnant patients in Idaho." 1-LEG-ER-49. In allowing Idaho's law to take effect overnight, the stay increases the risk that pregnant patients needing emergency care will face irreversible

16

injuries (such as strokes, amputations, hysterectomies, and organ failure), let alone death. *Supra* pp. 8-9, 13-15; 1-LEG-ER-50; 3-ER-182–183, 188–217, 319–358. It also strains "the capacity of hospitals in neighboring states that do not prohibit physicians from providing EMTALA-mandated care." LEG-ER-50–51. Qualified OBGYNs had already begun fleeing Idaho. Stolberg, N.Y. Times (Sept. 7, 2023), https://perma.cc/5WJB-GZFA; Cooper, Idaho Cap. Sun (Feb. 10, 2023), https://perma.cc/R5QG-THSD.

The order discounted these harms by stating that "Idaho's law expressly contemplates necessary medical care for pregnant women in distress." Add.17. But it relied on an inapposite provision addressing "accidental death" or "unintentional injury to" the fetus, not emergency abortions. Idaho Code § 18-622(4). And the panel's statement that Idaho "would not prevent abortions" when "EMTALA required such treatment," Add.17, again overlooks that EMTALA applies beyond lethal contexts.

**2.** The government also suffers irreparable harm when a preempted law operates. *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019). The stay interferes with the United States' sovereign interest in proper administration of federal law, *e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012), and threatens "harm to the administration and integrity of Medicare," *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003), because federal funding no longer guarantees access to medically necessary treatments when EMTALA requires them, 3-ER-363–364; 3-ER-367–368 (observing over $3 billion in Medicare funding to Idaho hospitals over FY2018-2020).

17

**B.**     The Legislature is unlikely to suffer irreparable injury without a stay. *See Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020); *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam).

The order stated that the Legislature "may" invoke harm to the State (represented by Idaho's Attorney General) and seek to "enforc[e]" Idaho law. Add.14–15. But the State declined to seek a stay, which undermines any claimed injury on this ground. Regardless, because Idaho's ability to enforce its law is "the core of this dispute," the alleged injury "is not 'irreparable,' because the [Legislature] 'may yet pursue and vindicate its interests in the full course of this litigation.'" *Doe*, 957 F.3d at 1059.

The Legislature's 11-month delay in seeking relief, moreover, "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). The panel attributed the delay to the *Planned Parenthood* decision and the time the district court "took in ruling on Idaho's reconsideration motions." Add.15–16. But both are irrelevant because the Legislature could have requested (but chose not to seek) a stay in the interim.

The order likewise contravened the purpose of a stay by upending the status quo. *Nken*, 556 U.S. at 429 ("A stay 'simply suspend[s] judicial alteration of the status quo'"). The preliminary injunction itself preserved the status quo because it issued before § 18-622's effective date.

## CONCLUSION

This Court should vacate the stay and grant an immediate administrative stay of the panel's order.

Respectfully submitted,

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

PAUL R. RODRÍGUEZ
*Deputy General Counsel*

DAVID HOSKINS
*Supervisory Litigation Attorney*

JESSICA BOWMAN
MELISSA HART
*Attorneys*

*U.S. Department of Health and Human Services*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JOSHUA D. HURWIT
*United States Attorney*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER

 s/ Nicholas S. Crown
NICHOLAS S. CROWN
*Attorneys, Appellate Staff*
*Civil Division, Room 7325*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*nicholas.s.crown@usdoj.gov*

September 2023

19

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellee states that it knows of one case related to the above-captioned consolidated appeals: Case No. 23-35153. That appeal arises from the district court's partial grant of intervention issued during the proceedings below.

*s/ Nicholas S. Crown*
Nicholas S. Crown

## CERTIFICATE OF COMPLIANCE

This brief complies with Ninth Circuit Rule 35-4 and 40-1 because it contains 4,200 words. It was prepared in a proportionally spaced typeface using Word for Microsoft 365 in Garamond 14-point font.

*s/ Nicholas S. Crown*
Nicholas S. Crown

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2023, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I will also serve this motion by email.

*s/ Nicholas S. Crown*
Nicholas S. Crown

**ADDENDUM**

## TABLE OF CONTENTS

Published Order Granting Stay Pending Appeal (Sept. 28, 2023) ..........................Add.1

EMTALA, 42 U.S.C. § 1395dd.................................................................................Add.19

Idaho Code § 18-604 (effective July 1, 2023)..........................................................Add.25

Idaho Code § 18-604 (effective July 1, 2021)..........................................................Add.27

Idaho Code § 18-622 (effective July 1, 2023)..........................................................Add.28

Idaho Code § 18-622 (enacted in 2020, effective August 25, 2022)......................Add.30

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

SEP 28 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Nos. 23-35440 |
| Plaintiff-Appellee, | 23-35450 |
| v. | D.C. No. 1:22-cv-00329-BLW |
| STATE OF IDAHO, | ORDER |
| Defendant, | |
| v. | |
| MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-Defendants, | |
| Movants-Appellants. | |

Before: Bridget S. Bade, Kenneth K. Lee, and Lawrence VanDyke, Circuit Judges.

Order by Judge VanDyke

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court "heed[ed] the Constitution and return[ed] the issue of abortion to the people's elected representatives." 142 S. Ct. 2228, 2243 (2022). After *Dobbs*, a number of states,

including Idaho, have exercised that prerogative to enact abortion restrictions.  In response, the federal government has sued Idaho claiming that a federal law unrelated to abortion preempts the will of the people of that state, through their elected representatives, to "protect[] fetal life," as *Dobbs* described it.  *Id.* at 2261.  Because there is no preemption, the Idaho Legislature is entitled to a stay of the district court's order improperly enjoining its duly enacted statute.

## BACKGROUND

In 2020, Idaho passed section 622, which prohibits most abortions in the state.  *See* S.B. 1385, 65th Leg., 2d Reg. Sess. (Idaho 2020).  The law contained a trigger, meaning that it was only to take effect thirty days after judgment was entered "in any decision of the United States supreme court that restores to the states their authority to prohibit abortion."  2020 Idaho Sess. Laws 827.  The law makes it a crime for a healthcare provider to perform an abortion unless, among a few other exceptions, "[t]he physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman."  Idaho Code § 18-622(2)(a)(i).  Idaho law defines abortion as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child," except in a few listed circumstances.  Idaho Code § 18-604.

*Dobbs* triggered section 622, after which the federal government challenged Idaho's law, arguing that it is preempted by the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd (EMTALA). EMTALA was enacted to prevent hospitals that receive Medicare reimbursement from refusing to provide emergency care to the indigent because of their inability to pay. *Id.* As relevant to this case, it requires emergency room doctors to stabilize patients' emergency medical conditions before transferring them. The federal government moved for a preliminary injunction to stop Idaho's law from taking full effect on the trigger date following *Dobbs*. The district court granted the preliminary injunction in August 2022 and denied reconsideration in May 2023. Both the State of Idaho and the Idaho Legislature, which was allowed to intervene for purposes of the preliminary injunction, have appealed the district court's decision. The Legislature has also moved for a stay of the injunction pending appeal. Because Idaho's law is not preempted by EMTALA and the equitable factors favor a stay, we grant the Legislature's motion to stay this case pending appeal.

## DISCUSSION

We consider four factors when considering a request for a stay of a district court's injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Each of the four *Nken* factors favors issuing a stay here. The Legislature has made a strong showing that EMTALA does not preempt section 622. EMTALA does not require abortions, and even if it did in some circumstances, that requirement would not directly conflict with section 622. The federal government will not be injured by the stay of an order preliminarily enjoining enforcement of a state law that does not conflict with its own. Idaho, on the other hand, will be irreparably injured absent a stay because the preliminary injunction directly harms its sovereignty. And the balance of the equities and the public interest also favor judicial action ensuring Idaho's right to enforce its legitimately enacted laws during the pendency of the State's appeal.

## I.    The Legislature Has Made a Strong Showing That It Is Likely to Succeed on the Merits.

Under *Nken*, a stay applicant must make a "strong showing" that it is likely to succeed on the merits. 556 U.S. at 434. This threshold is met because EMTALA does not preempt section 622.

"When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue … there is no need to infer congressional intent to preempt state laws from the substantive provisions

of the legislation." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) (alterations, internal quotation marks, and citations omitted). EMTALA contains an express provision stating that "[t]he provisions of this section *do not* preempt any State or local law requirement, except to the extent that the requirement *directly* conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphases added); *see also Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) ("The statute expressly contains a non-preemption provision for state remedies." (citing § 1395dd(f))). Because this court looks to "[c]ongressional intent [as] the sole guide in determining whether federal law preempts a state statute," we must look "only to this language and construe [EMTALA's] preemptive effect as narrowly as possible." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (citations omitted).

As this court has recognized, when determining the preemptive effect of EMTALA "[t]he key phrase is 'directly conflicts.'" *Id.* Direct conflicts occur in only two instances. First, when compliance with both is a "physical impossibility." *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)); *see also McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015). And second, when the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chiapuzio*, 9 F.3d at 1393 (quoting

*Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). In this case, neither type of conflict exists.

### A. It Is Not Impossible to Comply with Both EMTALA and Section 622.

EMTALA was enacted to ensure that the poor and uninsured receive emergency medical care at hospitals receiving Medicare reimbursement. *See Arrington v. Wong*, 237 F.3d 1066, 1069 (9th Cir. 2001). It provides certain procedures that hospitals must follow but does not set standards of care or specifically mandate that certain procedures, such as abortion, be offered. But even assuming that EMTALA did require abortions in certain, limited circumstances, it would not require abortions that are punishable by section 622. So it still would not be impossible to comply with both EMTALA and section 622.

In interpreting a statute, we must "start with the statutory text." *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020). The text of EMTALA shows that it does not require hospitals to perform abortions. Instead, EMTALA requires a hospital to determine whether an emergency medical condition is reasonably expected to place "the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A) (omissions removed) (emphasis added). So an emergency medical condition includes one that "plac[es] the health of the … unborn child[] in

serious jeopardy." *Id.* Where such a condition exists, the hospital must stabilize the condition before transferring the individual to another medical facility unless certain conditions are met. *Id.* § 1395dd(b)(1). "[T]o stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A).

EMTALA therefore has dual stabilization requirements: hospitals must ensure that "no material deterioration of the condition" of a woman *or* her unborn child is likely to occur. The assumption that EMTALA implies some hierarchy when stabilization of the woman might require "a material deterioration of the condition" of the child requires us to read *in* an *implicit* duty to perform abortions from the explicit duty to stabilize, which is far beyond that required for a *direct* conflict.

The federal government nonetheless argues that because hospitals are required to stabilize patients' medical conditions, they must perform abortions because abortion could be a "form of stabilizing treatment." But EMTALA does not require the State to allow every form of treatment that *could conceivably* stabilize a medical condition solely because, as the government argues, a "relevant professional determines such care is necessary." In fact, EMTALA does not impose *any* standards of care on the practice of medicine. Nor could it within the broader

statutory scheme. *See Baker*, 260 F.3d at 993. It certainly doesn't require that a hospital provide whatever treatment an individual medical professional may desire. For example, a medical professional may believe an organ transplant is necessary to stabilize a patient's emergency medical condition, but EMTALA would not then preempt a state's requirements governing organ transplants.

Because Congress's "clear and manifest" purpose confirms that EMTALA does not impose specific methods of "stabilizing treatment," we must assume "that the historic police powers of the States [are] not to be superseded by" EMTALA. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The purpose of EMTALA is "to prevent hospitals [from] dumping indigent patients by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Arrington*, 237 F.3d at 1069 (alternations, internal quotation marks, and citation omitted). The purpose of EMTALA is not to impose specific standards of care— such as requiring the provision of abortion—but simply to "ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995). To read EMTALA to require a specific method of treatment, such as abortion, pushes the statute far beyond its original purpose, and therefore is not a ground to disrupt Idaho's historic police powers.

Even if the federal government were correct that EMTALA requires abortions as "stabilizing treatment" in limited circumstances, EMTALA still would not conflict with Idaho's law.  Section 622 includes an exception allowing abortion when a "physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion [is] necessary to prevent the death of the pregnant woman."  Idaho Code § 18-622.

The district court concluded that there is a gap between what a doctor might believe necessary to save the life of a pregnant woman and what might be reasonably expected to place the health of her or her unborn child in serious jeopardy, seriously impair their bodily functions, or cause serious dysfunction of any bodily organ or part.  Specifically, the district court invoked the supposed ambiguity in Idaho's law to construe it as creating a conflict with EMTALA.  But almost all the examples in the district court's parade-of-horribles are no longer true, given the Idaho Legislature's recent amendment to the statute and clarification from the Supreme Court of Idaho.

First, relying on declarations from certain doctors, the district court repeatedly noted that the Idaho law's ambiguity would interfere with doctors' medical judgment.  For example, it held that "against the backdrop of these uncertain, medically complex situations, [the statutory exception] is an empty promise—it does not provide any clarity."  It added that it "offers little solace to physicians attempting

to navigate their way around both EMTALA and Idaho's criminal abortion laws" and that "Idaho law criminalizes as an 'abortion' what physicians in emergency medicine have long understood" as required to save lives.

But after the district court issued its injunction, the Supreme Court of Idaho authoritatively interpreted this state law provision as providing a broad, subjective standard requiring the doctor, in his or her good faith medical judgment, to believe it necessary to terminate the pregnancy. *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1203 (Idaho 2023). Put another way, the Supreme Court of Idaho clarified that the text of the exception means what it says: if a doctor subjectively believes, in his or her good faith medical judgment, that an abortion is necessary to prevent the death of the pregnant woman, then the exception applies. *Id*. Thus, the district court's reliance on declarations from certain doctors claiming that the law would undermine their medical judgment is no longer valid.

Second, the district court also relied on some of the federal government's experts who argued that Idaho doctors could not terminate a pregnancy while complying with section 622 because they could not be *certain* that an abortion is necessary. But the Supreme Court of Idaho has made clear that "certainty" is not the standard under Idaho law. That Court also held that the standard has no imminency requirement. *Id*. at 1203–04. It explicitly held that the "necessary to save the life of the mother" standard does not require certainty, a substantial risk of

death, or any other particular probability level. *Id.* Nor is a "medical consensus on what is necessary to prevent the death of the woman … required …." *Id.* at 1204 (internal quotation marks omitted). As the Supreme Court of Idaho put it, "[t]he plain language of the [exception] leaves wide room for the physician's 'good faith medical judgment' on whether the abortion was 'necessary to prevent the death of the pregnant woman' based on those facts known to the physician at that time." *Id.* at 1203.

Third, the district court heavily relied on ectopic pregnancies—mentioning them eleven times in the opinion—as a justification for finding section 622 in direct conflict with EMTALA. But Idaho recently amended its law to clarify that "the removal of an ectopic or molar pregnancy" is *not* an abortion. *See* 2023 Idaho Sess. Laws 906 (excluding from the statute's definition of "abortion"). So that issue is now moot.

Fourth, the district court emphasized that the life of the mother exception in the statute was technically an affirmative defense, noting that an "affirmative defense is an excuse, not an exception" and that this "difference is not academic." But Idaho amended the law to make it a statutory exception, not an affirmative defense. 2023 Idaho Sess. Laws 908. So this objection, too, has been superseded by events.

Given the statutory amendments and the Supreme Court of Idaho's recent decision, any ambiguity identified by the federal government and the district court no longer exists: if a doctor believes, in his or her good faith medical judgment, that an abortion is necessary to save the life of the mother, then the exception applies. Neither the probability nor the imminency of death matters to the exception's application. *Id.* at 1203. For all the hypotheticals presented by the district court, the conduct required by EMTALA has been shown to satisfy section 622's "life of the mother" standard, so the two laws would not conflict even if EMTALA actually required abortions.

In sum, when a doctor determines an abortion is necessary to save the life of the mother, termination of a pregnancy is not punishable by section 622. Idaho Code § 18-622. Therefore, even if the federal government were right that EMTALA requires abortions in certain limited circumstances, EMTALA would not require abortions *that are punishable by section 622*. The federal government is thus wrong when it asserts that it is impossible to comply with both EMTALA and section 622.

**B. Section 622 Does Not Pose an Obstacle to the Purpose of EMTALA.**

Obstacle preemption occurs when, "under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (alterations and internal quotation marks

omitted) (quoting *Hines*, 312 U.S. at 67). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute *as a whole* and identifying its purpose and intended effects …." *Id.* (emphasis added).

As relevant here, "Congress enacted EMTALA to respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment." *Baker*, 260 F.3d at 993. EMTALA was "not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice." *Id.*; *see also Eberhardt*, 62 F.3d at 1258 ("The statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care in screening patients."). This conclusion is "[c]onsistent with the statutory language" of EMTALA, *id.*, under which the duty to stabilize is "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility …." 42 U.S.C. § 1395dd(e)(3)(A). Under the language of EMTALA, Congress left it to state healthcare standards to determine which course of treatment "may be necessary" to prevent "material deterioration …." *See id.*

It is not the purpose of EMTALA to force hospitals to treat medical conditions using certain procedures. Instead, EMTALA seeks to prevent hospitals from

neglecting poor or uninsured patients with the goal of protecting "the health of the woman" and "her unborn child."  42 U.S.C. § 1395dd(e)(1)(A).  Section 622's limitations on abortion services do not pose an obstacle to EMTALA's purpose because they do not interfere with the provision of emergency medical services to indigent patients.

## II.    The Legislature Has Shown Irreparable Harm Absent a Stay.

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (alterations in original) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).  The district court's injunction prevents Idaho from enforcing section 622 as enacted by representatives of its people, so the State easily meets its burden of showing irreparable harm.  The federal government's two arguments to the contrary do not convince us otherwise.

First, the government argues that the Legislature cannot establish irreparable harm by pointing to harm to the State of Idaho itself.  But it makes no difference to our harm analysis that the State seeks the stay through its Legislature, rather than through its Attorney General; the government's argument to the contrary relies upon a distinction without a difference.  The State itself, not merely its officials, "suffers a form of irreparable injury" when it cannot effectuate its statutes.  *Id.*  And the State

"is free to 'empower multiple officials to defend its sovereign interests in federal court.'" *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2202 (2022) (alteration omitted) (quoting *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022)). Here, Idaho law empowers the Legislature as a state entity to represent those interests. *See* Idaho Code § 67-465. The Legislature may thus invoke the State of Idaho's irreparable harm.

Second, the federal government claims that the Legislature's delay in requesting the stay is "substantial and inexplainable," and therefore prevents a showing of irreparable harm. The record is somewhat mixed on this issue, but usually "delay is but a single factor to consider in evaluating irreparable injury." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014). While "failure to seek judicial protection can imply the lack of need for speedy action," here there is no evidence that the Legislature was "sleeping on its rights." *Id*. at 990–91 (internal quotation marks and citation omitted).

It appears that the extended period of time after the district court's original injunction here is instead explained primarily by the long time that court took in ruling on Idaho's reconsideration motions, together with other circumstances outside the Legislature's control. On September 7, 2022, only two weeks after the district court granted the federal government's injunction, the Legislature moved for reconsideration. And in November 2022, it sent a letter to the court requesting a

ruling on the motion to reconsider. In January 2023, three months after the federal government responded to the reconsideration motion and two months after the Legislature requested an expedited ruling, the Supreme Court of Idaho issued a decision authoritatively interpreting section 622. Idaho requested leave to file supplemental briefing in federal court addressing the Supreme Court of Idaho's decision. The district court took another three months after the supplemental briefing was complete to decide the motion for reconsideration; the Legislature was not at fault for these delays. And the Legislature moved for a stay in the district court on the same day it timely noticed its appeal of the district court's denial of its motion for reconsideration. We cannot say that the Legislature was clearly dilatory in defending the State's rights. The record suggests that the Legislature tried to protect those rights before the district court before seeking a stay from this court.

## III. The Balance of the Equities Favors a Stay.

The third and fourth *Nken* factors—"whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies"—also favor a stay. 556 U.S. at 435.

Idaho enacted section 622 to effectuate that state's strong interest in protecting unborn life. That public interest is undermined each day section 622 remains inappropriately enjoined. Beyond that specific interest, improperly preventing Idaho from enforcing its duly enacted laws and general police power also undermines the

State's public interest in self-governance free from unwarranted federal interference. *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("The public interest is also served by maintaining our constitutional structure[.]"); *Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) (public interest is served by "respecting the Constitution's assignment of … power").

The federal government points to no injury to itself caused by Idaho's law. Instead, relying on its merits argument that Idaho's law is preempted, it cites to cases holding that "preventing a violation of the Supremacy Clause serves the public interest." But because Idaho's law is not preempted, those arguments do not help the federal government.

Beyond that inapposite concern, the federal government argues that a continued stay will result in public health benefits for pregnant women needing emergency care, and also benefit hospitals in neighboring states who would otherwise be forced to treat women denied such care in Idaho. But Idaho's law expressly contemplates necessary medical care for pregnant women in distress. *See* Idaho Code § 18-622(4). So the federal government's argument that pregnant women will be denied necessary emergency care overlooks Idaho law. And as explained above, even assuming abortions were required to "stabilize" emergency conditions presented by some pregnant women, and that EMTALA required such treatment, Idaho's law would not prevent abortions in those circumstances.

Ultimately, given our conclusion that EMTALA does not preempt Idaho's law, the federal government has no discernable interest in regulating the internal medical affairs of the State, and the public interest is best served by preserving the force and effect of a duly enacted Idaho law during the pendency of this appeal. Therefore, the balance of the equities and the public interest support a stay in this case.

## CONCLUSION

For the above reasons, the traditional stay factors favor granting the Legislature's motion. The Legislature's motion for a stay pending appeal is therefore **GRANTED**.

**42 U.S.C. § 1395dd**

**§ 1395dd. Examination and treatment for emergency medical conditions and women in labor**

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

**(2) Refusal to consent to treatment**

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3) Refusal to consent to transfer**

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on

the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

## (c) Restricting transfers until individual stabilized

### (1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless--

**(A)(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that[1] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

**(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

**(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

### (2) Appropriate transfer

An appropriate transfer to a medical facility is a transfer--

**(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

---

[1] So in original. Probably should be followed by a comma.

**(B)** in which the receiving facility--

**(i)** has available space and qualified personnel for the treatment of the individual, and

**(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

## (d) Enforcement

### (1) Civil money penalties

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a-7a(a) of this title.

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who--

**(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

> **(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a-7a of this title (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a-7a(a) of this title.

> **(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

## (2) Civil enforcement

### (A) Personal harm

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

### (B) Financial loss to other medical facility

Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

### (C) Limitations on actions

No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**

In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate quality improvement organization (with a contract under part B of subchapter XI) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B.

**(4) Notice upon closing an investigation**

The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

## (e) Definitions

In this section:

**(1)** The term "emergency medical condition" means--

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part; or

**(B)** with respect to a pregnant woman who is having contractions--

**(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

**(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1395cc of this title.

**(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

**(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1395x(mm)(1) of this title) and a rural emergency hospital (as defined in section 1395x(kkk)(2) of this title).

## (f) Preemption

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

## (g) Nondiscrimination

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

## (h) No delay in examination or treatment

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and

treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

**(i) Whistleblower protections**

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.


**Idaho Code § 18-604 (effective July 1, 2023)**

**§ 18-604. Definitions**

As used in this chapter:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean:

> (a) The use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization, or the implantation of a fertilized ovum within the uterus;

> (b) The removal of a dead unborn child;

> (c) The removal of an ectopic or molar pregnancy; or

> (d) The treatment of a woman who is no longer pregnant.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

(a) A description of any proposed treatment or procedure;

(b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

(c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

**Idaho Code § 18-604 (effective July 1, 2021)**

**§ 18-604. Definitions**

As used in this act:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean the use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization or the implantation of a fertilized ovum within the uterus.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

   (a) A description of any proposed treatment or procedure;

   (b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

   (c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

## Idaho Code § 18-622 (effective July 1, 2023)

### § 18-622. Defense of life act

(1) Except as provided in subsection (2) of this section, every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(2) The following shall not be considered criminal abortions for purposes of subsection (1) of this section:

(a)  The abortion was performed or attempted by a physician as defined in this chapter and:

(i)  The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(ii)  The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

(b)  The abortion was performed or attempted by a physician as defined in this chapter during the first trimester of pregnancy and:

(i)  If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws; or

(ii)  If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported to a law enforcement agency or child protective services that she is the victim of an act of rape or incest and a copy of such report has been provided to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws.

(3)  If a report concerning an act of rape or incest is made to a law enforcement agency or child protective services pursuant to subsection (2)(b) of this section, then the person who made the report shall, upon request, be entitled to receive a copy of such report within seventy-two (72) hours of the report being made, provided that the report may be redacted as necessary to avoid interference with an investigation.

(4)  Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

(5) Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.

## Idaho Code § 18-622 (enacted in 2020, effective August 25, 2022)

### § 18-622. Criminal abortion

(1) Notwithstanding any other provision of law, this section shall become effective thirty (30) days following the occurrence of either of the following circumstances:

(a) The issuance of the judgment in any decision of the United States supreme court that restores to the states their authority to prohibit abortion[1]; or

(b) Adoption of an amendment to the United States constitution that restores to the states their authority to prohibit abortion.

(2) Every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(3) It shall be an affirmative defense to prosecution under subsection (2) of this section and to any disciplinary action by an applicable licensing authority, which must be proven by a preponderance of the evidence, that:

(a)(i) The abortion was performed or attempted by a physician as defined in this chapter;

(ii) The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(iii) The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

(b)(i) The abortion was performed or attempted by a physician as defined in this chapter;

(ii) If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported the act of rape or incest to a law enforcement agency and provided a copy of such report to the physician who is to perform the abortion;

(iii) If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported the act of rape or incest to a law enforcement agency or child protective services and a copy of such report has been provided to the physician who is to perform the abortion; and

(iv) The physician who performed the abortion complied with the requirements of paragraph (a)(iii) of this subsection regarding the method of abortion.

(4) Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

(5) Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.