**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Nos.  23-35440 23-35450 |
| v. | D.C. No. 1:22-cv-00329-BLW |
| STATE OF IDAHO, *Defendant,* | |
| v. | ORDER |
| MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE, *Proposed Intervenor-Defendants, Movants-Appellants.* | |

Filed September 28, 2023

Before:  Bridget S. Bade, Kenneth K. Lee, and Lawrence
VanDyke, Circuit Judges.

Order by Judge VanDyke

# SUMMARY[*]

## Stay / Abortion / Preemption

The panel granted the Idaho Legislature's motion to stay, pending appeal, the district court's order preliminarily enjoining Idaho Code section 18-622, which makes it a crime for a healthcare provider to perform an abortion unless, among a few other exceptions, "the physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman."

The federal government argued that section 622 was preempted by the Emergency Medical Treatment and Labor Act (EMTALA), which was enacted to ensure that the poor and uninsured receive emergency medical care at hospitals receiving Medicare reimbursement, and requires emergency room doctors to stabilize patients' emergency medical conditions before transferring them. The district court granted the federal government's motion for a preliminary injunction.

The panel considered the factors set forth in *Nken v. Holder*, 556 U.S. 418, 434 (2009), in considering the Idaho Legislature's request for a stay of the district court's injunction, and held that each of the factors favored issuing a stay.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

First, the Legislature made a strong showing that it would succeed on the merits because EMTALA does not preempt section 622.  The panel rejected the federal government's assertion that it is impossible to comply with both EMTALA and section 622.  And even if the federal government were right that EMTALA requires abortions in limited circumstances, EMTALA would not require those abortions that are punishable by section 622 because termination of a pregnancy is not punishable under section 622 when a doctor determines that an abortion is necessary to save the life of the mother.  Nor do section 622's limitations on abortion services pose an obstacle to the purpose of EMTALA because they do not interfere with the provision of emergency medical services to indigent patients.

Second, Idaho will be irreparably injured absent a stay because the preliminary injunction directly harms Idaho's sovereignty.

Finally, the balance of the equities and the public interest support a stay to ensure Idaho's right to enforce its legitimately enacted laws during the pendency of the State's appeal.

## ORDER

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court "heed[ed] the Constitution and return[ed] the issue of abortion to the people's elected representatives." 142 S. Ct. 2228, 2243 (2022). After *Dobbs*, a number of states, including Idaho, have exercised that prerogative to enact abortion restrictions. In response, the federal government has sued Idaho claiming that a federal law unrelated to abortion preempts the will of the people of that state, through their elected representatives, to "protect[] fetal life," as *Dobbs* described it. *Id*. at 2261. Because there is no preemption, the Idaho Legislature is entitled to a stay of the district court's order improperly enjoining its duly enacted statute.

## BACKGROUND

In 2020, Idaho passed section 622, which prohibits most abortions in the state. *See* S.B. 1385, 65th Leg., 2d Reg. Sess. (Idaho 2020). The law contained a trigger, meaning that it was only to take effect thirty days after judgment was entered "in any decision of the United States supreme court that restores to the states their authority to prohibit abortion." 2020 Idaho Sess. Laws 827. The law makes it a crime for a healthcare provider to perform an abortion unless, among a few other exceptions, "[t]he physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a)(i). Idaho law defines abortion as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood,

cause the death of the unborn child," except in a few listed circumstances.  Idaho Code § 18-604.

*Dobbs* triggered section 622, after which the federal government challenged Idaho's law, arguing that it is preempted by the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd (EMTALA).  EMTALA was enacted to prevent hospitals that receive Medicare reimbursement from refusing to provide emergency care to the indigent because of their inability to pay.  *Id.*  As relevant to this case, it requires emergency room doctors to stabilize patients' emergency medical conditions before transferring them.  The federal government moved for a preliminary injunction to stop Idaho's law from taking full effect on the trigger date following *Dobbs*.  The district court granted the preliminary injunction in August 2022 and denied reconsideration in May 2023.  Both the State of Idaho and the Idaho Legislature, which was allowed to intervene for purposes of the preliminary injunction, have appealed the district court's decision.  The Legislature has also moved for a stay of the injunction pending appeal.  Because Idaho's law is not preempted by EMTALA and the equitable factors favor a stay, we grant the Legislature's motion to stay this case pending appeal.

## DISCUSSION

We consider four factors when considering a request for a stay of a district court's injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*

*v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Each of the four *Nken* factors favors issuing a stay here. The Legislature has made a strong showing that EMTALA does not preempt section 622.  EMTALA does not require abortions, and even if it did in some circumstances, that requirement would not directly conflict with section 622. The federal government will not be injured by the stay of an order preliminarily enjoining enforcement of a state law that does not conflict with its own.  Idaho, on the other hand, will be irreparably injured absent a stay because the preliminary injunction directly harms its sovereignty.  And the balance of the equities and the public interest also favor judicial action ensuring Idaho's right to enforce its legitimately enacted laws during the pendency of the State's appeal.

## I.   The Legislature Has Made a Strong Showing That It Is Likely to Succeed on the Merits.

Under *Nken*, a stay applicant must make a "strong showing" that it is likely to succeed on the merits.  556 U.S. at 434.  This threshold is met because EMTALA does not preempt section 622.

"When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue … there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation."  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) (alterations, internal quotation marks, and citations omitted).  EMTALA contains an express provision stating that "[t]he provisions of this section *do not* preempt any State or local law requirement, except to the extent that the requirement *directly* conflicts with a requirement of this section."  42

U.S.C. § 1395dd(f) (emphases added); *see also Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) ("The statute expressly contains a non-preemption provision for state remedies." (citing § 1395dd(f))). Because this court looks to "[c]ongressional intent [as] the sole guide in determining whether federal law preempts a state statute," we must look "only to this language and construe [EMTALA's] preemptive effect as narrowly as possible." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (citations omitted).

As this court has recognized, when determining the preemptive effect of EMTALA "[t]he key phrase is 'directly conflicts.'" *Id.* Direct conflicts occur in only two instances. First, when compliance with both is a "physical impossibility." *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)); *see also McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015). And second, when the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chiapuzio*, 9 F.3d at 1393 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). In this case, neither type of conflict exists.

## A. It Is Not Impossible to Comply with Both EMTALA and Section 622.

EMTALA was enacted to ensure that the poor and uninsured receive emergency medical care at hospitals receiving Medicare reimbursement. *See Arrington v. Wong*, 237 F.3d 1066, 1069 (9th Cir. 2001). It provides certain procedures that hospitals must follow but does not set standards of care or specifically mandate that certain procedures, such as abortion, be offered. But even assuming that EMTALA did require abortions in certain, limited

circumstances, it would not require abortions that are punishable by section 622. So it still would not be impossible to comply with both EMTALA and section 622.

In interpreting a statute, we must "start with the statutory text." *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020). The text of EMTALA shows that it does not require hospitals to perform abortions. Instead, EMTALA requires a hospital to determine whether an emergency medical condition is reasonably expected to place "the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A) (omissions removed) (emphasis added). So an emergency medical condition includes one that "plac[es] the health of the … unborn child[] in serious jeopardy." *Id*. Where such a condition exists, the hospital must stabilize the condition before transferring the individual to another medical facility unless certain conditions are met. *Id*. § 1395dd(b)(1). "[T]o stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id*. § 1395dd(e)(3)(A).

EMTALA therefore has dual stabilization requirements: hospitals must ensure that "no material deterioration of the condition" of a woman *or* her unborn child is likely to occur. The assumption that EMTALA implies some hierarchy when stabilization of the woman might require "a material deterioration of the condition" of the child requires us to read *in* an *implicit* duty to perform abortions from the explicit duty to stabilize, which is far beyond that required for a *direct* conflict.

The federal government nonetheless argues that because hospitals are required to stabilize patients' medical conditions, they must perform abortions because abortion could be a "form of stabilizing treatment." But EMTALA does not require the State to allow every form of treatment that *could conceivably* stabilize a medical condition solely because, as the government argues, a "relevant professional determines such care is necessary." In fact, EMTALA does not impose *any* standards of care on the practice of medicine. Nor could it within the broader statutory scheme. *See Baker*, 260 F.3d at 993. It certainly doesn't require that a hospital provide whatever treatment an individual medical professional may desire. For example, a medical professional may believe an organ transplant is necessary to stabilize a patient's emergency medical condition, but EMTALA would not then preempt a state's requirements governing organ transplants.

Because Congress's "clear and manifest" purpose confirms that EMTALA does not impose specific methods of "stabilizing treatment," we must assume "that the historic police powers of the States [are] not to be superseded by" EMTALA. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The purpose of EMTALA is "to prevent hospitals [from] dumping indigent patients by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Arrington*, 237 F.3d at 1069 (alternations, internal quotation marks, and citation omitted). The purpose of EMTALA is not to impose specific standards of care—such as requiring the provision of abortion—but simply to "ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay." *Eberhardt v. City of Los Angeles*, 62 F.3d

1253, 1258 (9th Cir. 1995). To read EMTALA to require a specific method of treatment, such as abortion, pushes the statute far beyond its original purpose, and therefore is not a ground to disrupt Idaho's historic police powers.

Even if the federal government were correct that EMTALA requires abortions as "stabilizing treatment" in limited circumstances, EMTALA still would not conflict with Idaho's law. Section 622 includes an exception allowing abortion when a "physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion [is] necessary to prevent the death of the pregnant woman." Idaho Code § 18-622.

The district court concluded that there is a gap between what a doctor might believe necessary to save the life of a pregnant woman and what might be reasonably expected to place the health of her or her unborn child in serious jeopardy, seriously impair their bodily functions, or cause serious dysfunction of any bodily organ or part. Specifically, the district court invoked the supposed ambiguity in Idaho's law to construe it as creating a conflict with EMTALA. But almost all the examples in the district court's parade-of-horribles are no longer true, given the Idaho Legislature's recent amendment to the statute and clarification from the Supreme Court of Idaho.

First, relying on declarations from certain doctors, the district court repeatedly noted that the Idaho law's ambiguity would interfere with doctors' medical judgment. For example, it held that "against the backdrop of these uncertain, medically complex situations, [the statutory exception] is an empty promise—it does not provide any clarity." It added that it "offers little solace to physicians

attempting to navigate their way around both EMTALA and Idaho's criminal abortion laws" and that "Idaho law criminalizes as an 'abortion' what physicians in emergency medicine have long understood" as required to save lives.

But after the district court issued its injunction, the Supreme Court of Idaho authoritatively interpreted this state law provision as providing a broad, subjective standard requiring the doctor, in his or her good faith medical judgment, to believe it necessary to terminate the pregnancy. *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1203 (Idaho 2023). Put another way, the Supreme Court of Idaho clarified that the text of the exception means what it says: if a doctor subjectively believes, in his or her good faith medical judgment, that an abortion is necessary to prevent the death of the pregnant woman, then the exception applies. *Id*. Thus, the district court's reliance on declarations from certain doctors claiming that the law would undermine their medical judgment is no longer valid.

Second, the district court also relied on some of the federal government's experts who argued that Idaho doctors could not terminate a pregnancy while complying with section 622 because they could not be *certain* that an abortion is necessary. But the Supreme Court of Idaho has made clear that "certainty" is not the standard under Idaho law. That Court also held that the standard has no imminency requirement. *Id.* at 1203–04. It explicitly held that the "necessary to save the life of the mother" standard does not require certainty, a substantial risk of death, or any other particular probability level. *Id.* Nor is a "medical consensus on what is necessary to prevent the death of the woman … required …." *Id.* at 1204 (internal quotation marks omitted). As the Supreme Court of Idaho put it, "[t]he plain language of the [exception] leaves wide room for the

physician's 'good faith medical judgment' on whether the abortion was 'necessary to prevent the death of the pregnant woman' based on those facts known to the physician at that time." *Id.* at 1203.

Third, the district court heavily relied on ectopic pregnancies—mentioning them eleven times in the opinion—as a justification for finding section 622 in direct conflict with EMTALA. But Idaho recently amended its law to clarify that "the removal of an ectopic or molar pregnancy" is *not* an abortion. *See* 2023 Idaho Sess. Laws 906 (excluding from the statute's definition of "abortion"). So that issue is now moot.

Fourth, the district court emphasized that the life of the mother exception in the statute was technically an affirmative defense, noting that an "affirmative defense is an excuse, not an exception" and that this "difference is not academic." But Idaho amended the law to make it a statutory exception, not an affirmative defense. 2023 Idaho Sess. Laws 908. So this objection, too, has been superseded by events.

Given the statutory amendments and the Supreme Court of Idaho's recent decision, any ambiguity identified by the federal government and the district court no longer exists: if a doctor believes, in his or her good faith medical judgment, that an abortion is necessary to save the life of the mother, then the exception applies. Neither the probability nor the imminency of death matters to the exception's application. *Id.* at 1203. For all the hypotheticals presented by the district court, the conduct required by EMTALA has been shown to satisfy section 622's "life of the mother" standard, so the two laws would not conflict even if EMTALA actually required abortions.

In sum, when a doctor determines an abortion is necessary to save the life of the mother, termination of a pregnancy is not punishable by section 622. Idaho Code § 18-622. Therefore, even if the federal government were right that EMTALA requires abortions in certain limited circumstances, EMTALA would not require abortions *that are punishable by section 622*. The federal government is thus wrong when it asserts that it is impossible to comply with both EMTALA and section 622.

## B. Section 622 Does Not Pose an Obstacle to the Purpose of EMTALA.

Obstacle preemption occurs when, "under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (alterations and internal quotation marks omitted) (quoting *Hines*, 312 U.S. at 67). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute *as a whole* and identifying its purpose and intended effects …." *Id.* (emphasis added).

As relevant here, "Congress enacted EMTALA to respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment." *Baker*, 260 F.3d at 993. EMTALA was "not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice." *Id.*; *see also Eberhardt*, 62 F.3d at 1258 ("The statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care in screening patients."). This conclusion is "[c]onsistent with the statutory language" of EMTALA, *id.*,

under which the duty to stabilize is "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility …." 42 U.S.C. § 1395dd(e)(3)(A). Under the language of EMTALA, Congress left it to state healthcare standards to determine which course of treatment "may be necessary" to prevent "material deterioration …." *See id.*

It is not the purpose of EMTALA to force hospitals to treat medical conditions using certain procedures. Instead, EMTALA seeks to prevent hospitals from neglecting poor or uninsured patients with the goal of protecting "the health of the woman" and "her unborn child." 42 U.S.C. § 1395dd(e)(1)(A). Section 622's limitations on abortion services do not pose an obstacle to EMTALA's purpose because they do not interfere with the provision of emergency medical services to indigent patients.

## II. The Legislature Has Shown Irreparable Harm Absent a Stay.

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (alterations in original) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)). The district court's injunction prevents Idaho from enforcing section 622 as enacted by representatives of its people, so the State easily meets its burden of showing irreparable harm. The federal government's two arguments to the contrary do not convince us otherwise.

First, the government argues that the Legislature cannot establish irreparable harm by pointing to harm to the State of Idaho itself.  But it makes no difference to our harm analysis that the State seeks the stay through its Legislature, rather than through its Attorney General; the government's argument to the contrary relies upon a distinction without a difference.  The State itself, not merely its officials, "suffers a form of irreparable injury" when it cannot effectuate its statutes.  *Id.*  And the State "is free to 'empower multiple officials to defend its sovereign interests in federal court.'"  *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2202 (2022) (alteration omitted) (quoting *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022)).  Here, Idaho law empowers the Legislature as a state entity to represent those interests.  *See* Idaho Code § 67-465.  The Legislature may thus invoke the State of Idaho's irreparable harm.

Second, the federal government claims that the Legislature's delay in requesting the stay is "substantial and inexplainable," and therefore prevents a showing of irreparable harm.  The record is somewhat mixed on this issue, but usually "delay is but a single factor to consider in evaluating irreparable injury."  *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014).  While "failure to seek judicial protection can imply the lack of need for speedy action," here there is no evidence that the Legislature was "sleeping on its rights."  *Id*. at 990–91 (internal quotation marks and citation omitted).

It appears that the extended period of time after the district court's original injunction here is instead explained primarily by the long time that court took in ruling on Idaho's reconsideration motions, together with other circumstances outside the Legislature's control.  On

September 7, 2022, only two weeks after the district court
granted the federal government's injunction, the Legislature
moved for reconsideration. And in November 2022, it sent
a letter to the court requesting a ruling on the motion to
reconsider. In January 2023, three months after the federal
government responded to the reconsideration motion and
two months after the Legislature requested an expedited
ruling, the Supreme Court of Idaho issued a decision
authoritatively interpreting section 622. Idaho requested
leave to file supplemental briefing in federal court
addressing the Supreme Court of Idaho's decision. The
district court took another three months after the
supplemental briefing was complete to decide the motion for
reconsideration; the Legislature was not at fault for these
delays. And the Legislature moved for a stay in the district
court on the same day it timely noticed its appeal of the
district court's denial of its motion for reconsideration. We
cannot say that the Legislature was clearly dilatory in
defending the State's rights. The record suggests that the
Legislature tried to protect those rights before the district
court before seeking a stay from this court.

### III. The Balance of the Equities Favors a Stay.

The third and fourth *Nken* factors—"whether issuance of
the stay will substantially injure the other parties interested
in the proceeding" and "where the public interest lies"—also
favor a stay. 556 U.S. at 435.

Idaho enacted section 622 to effectuate that state's strong
interest in protecting unborn life. That public interest is
undermined each day section 622 remains inappropriately
enjoined. Beyond that specific interest, improperly
preventing Idaho from enforcing its duly enacted laws and
general police power also undermines the State's public

interest in self-governance free from unwarranted federal interference. *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("The public interest is also served by maintaining our constitutional structure[.]"); *Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) (public interest is served by "respecting the Constitution's assignment of … power").

The federal government points to no injury to itself caused by Idaho's law. Instead, relying on its merits argument that Idaho's law is preempted, it cites to cases holding that "preventing a violation of the Supremacy Clause serves the public interest." But because Idaho's law is not preempted, those arguments do not help the federal government.

Beyond that inapposite concern, the federal government argues that a continued stay will result in public health benefits for pregnant women needing emergency care, and also benefit hospitals in neighboring states who would otherwise be forced to treat women denied such care in Idaho. But Idaho's law expressly contemplates necessary medical care for pregnant women in distress. *See* Idaho Code § 18-622(4). So the federal government's argument that pregnant women will be denied necessary emergency care overlooks Idaho law. And as explained above, even assuming abortions were required to "stabilize" emergency conditions presented by some pregnant women, and that EMTALA required such treatment, Idaho's law would not prevent abortions in those circumstances.

Ultimately, given our conclusion that EMTALA does not preempt Idaho's law, the federal government has no discernable interest in regulating the internal medical affairs of the State, and the public interest is best served by

preserving the force and effect of a duly enacted Idaho law during the pendency of this appeal. Therefore, the balance of the equities and the public interest support a stay in this case.

## CONCLUSION

For the above reasons, the traditional stay factors favor granting the Legislature's motion. The Legislature's motion for a stay pending appeal is therefore **GRANTED**.