**Nos. 23-35440 & 23-35450**

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO,
*Defendant-Appellant.*

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO
*Defendant,*
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives; et al.,
*Intervenors-Appellants.*

Appeal from the United States District Court
for the District of Idaho
Honorable B. Lynn Winmill
(1:22-cv-00329-BLW)

**LEGISLATURE'S RESPONSE TO EMERGENCY MOTION FOR RE-CONSIDERATION EN BANC OF PUBLISHED ORDER GRANTING STAY PENDING APPEAL (RELIEF REQUESTED BY 10/10/2023).**

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................i

ARGUMENT ..................................................... 1

I.    THE UNITED STATES FAILS THE HIGH BAR FOR *EN BANC* RECONSIDERATION ................................................ 1

    A. The Stay Order Does Not "Conflict[ ] With a Decision of the United States Supreme Court or of the Court to Which the Petition is Addressed." ........................................... 1

    B. The Motion Does Not Pose "One or More Questions of Exceptional Importance." ...................................... 2

II.    THE UNANIMOUS PANEL CORRECTLY HELD THAT THE LEGISLATURE IS LIKELY TO SUCCEED ON THE MERITS ................................................ 6

    A. The Unanimous Panel Correctly Held That the Legislature Has Made a Strong Showing on the Merits ............................ 7

        1. *The unanimous panel correctly recognized that the definition of "stabilizing treatment" does not demand abortions* .................................................. 7

        2. *The unanimous panel correctly recognized that EMTALA protects unborn life* .................................. 15

    B. The Unanimous Panel Correctly Held That the Legislature Has Made a Strong Showing on the Merits Because EMTALA Does Not Preempt Section 622 ............................ 14

        1. *There is no impossibility preemption* ........................ 14

        2. *There is no obstacle preemption* ................................ 15

III.   THE UNANIMOUS PANEL CORRECTLY HELD THAT THE REMAINING *NKEN* FACTORS FAVOR THE LEGISLATURE ............................................................................... 16

A. The Unanimous Panel Correctly Held That the Legislature is the Party to Suffer "Irreparable Injury" Absent a Stay and That Any Delay Was Caused by the District Court Not the Legislature ........................................................................... 17

B. The Unanimous Panel Correctly Held That the Stay Will Not Substantially Injure Other Parties or Harm the Public Interest ................................................................................. 18

CONCLUSION ............................................................................ 22

CERTIFICATE OF COMPLIANCE .......................................... 23

STATEMENT OF RELATED CASES ...................................... 24

ADDENDUM ............................................................................. 25

# ARGUMENT

## I. THE UNITED STATES FAILS THE HIGH BAR FOR *EN BANC* RECONSIDERATION.

"An en banc hearing or rehearing is not favored and ordinarily will not be ordered." FRAP 35(a). Granting *en banc* petitions is "rare," *Anderson v. Neven*, 974 F.3d 1191, 1120 (9th Cir. 2020) (Wardlaw, J., concurring in denial), and should be granted only when the case "is *both* of exceptional importance *and* the decision *requires correction*." *Newdow v. U.S. Congress*, 328 F.3d 466, 469 (9th Cir. 2003) (Reinhardt, J., concurring) (reversed on other grounds) (emphasis in original).

The United States continues to act on its deep dislike for how Idaho has exercised its sovereign authority to regulate abortion after *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2279 (2022) ("[T]he authority to regulate abortion must be returned to the people and their elected representatives."). But deep dislike of a state's abortion laws is insufficient to grant rehearing *en banc*.

### A. The Stay Order Does Not "Conflict[ ] With a Decision of the United States Supreme Court or of the Court to Which the Petition is Addressed."

There are two circumstances in which the FRAP and Circuit Rules approve *en banc* review.

2

The first is not at issue here. The panel decision does not "conflict[] with a decision of the United States Supreme Court or of the court to which the petition is addressed." FRAP 35(b)(1)(A). The United States does not claim otherwise. And the most relevant Supreme Court decision here (*Dobbs*) actually confirms the logic of the stay order because courts must "return the issue of abortion to the people and their elected representatives" in the several states. *Dobbs*, 142 S. Ct. at 2279.

## B. The Motion Does Not Pose "One or More Questions of Exceptional Importance."

FRAP 35 also approves *en banc* review when there are "one or more questions of exceptional importance" which are "concisely stated" for the Court's consideration. FRAP 35(b)(1)(A).

This case is certainly important. But the United States presents no "concise statement" of an important and novel legal question for this Court to review. The United States merely asks whether the panel committed unspecified "err[or] by staying the preliminary injunction" and generally pleads with the Ninth Circuit to reconsider points already raised in United States' Opposition and already rejected by the unanimous panel. Mot. at 1. This is hardly a "concise statement" of an important and concrete issue that needs reviewing.

3

The Ninth Circuit does recognize a "question of exceptional importance" when "the opinion of a panel directly conflicts with an existing opinion by another court of appeals and substantially affects a rule of national application in which there is an overriding need for national uniformity." Circuit Rule 35-1. But *In re Baby K*, 16 F.3d 590 (4th Cir. 1994) fails that standard.

*In re Baby K* arose when a hospital asked for declaratory judgement excusing it from providing breathing support to an anencephalic infant born without a cerebrum. The hospital said providing care to an infant with zero consciousness and zero prospects for long-term survival was futile. *Id.* at 593. But the Fourth Circuit said EMTALA required the hospital "to stabilize" the infant so long as the parents requested it. *Id.* at 594.

The United States claims that *In re Baby K* "directly conflicts" with the panel's decision. *See* Circuit Rule 35-1. But here there is no "direct[] conflict" on a crucial rule of "national application." *Id.*

First, *In re Baby K* concerns an infant born alive. The central question of abortion is mentioned nowhere. *See* 16 F.3d at 592–95. True, *In re*

4

*Baby K* said EMTALA overrode a state law permitting physicians to refuse treatments they considered "medically or ethically inappropriate." *Id.* at 597. But during *In re Baby K*, nobody disputed that breathing support was "stabilizing treatment" under EMTALA—everyone presumed it was. *See id.* at 592. Thus, *In re Baby K* fails to mention (much less analyze) the central dispute in this case—whether EMTALA's reference to "stabilizing treatment" can be read as an abortion mandate. *In re Baby K* hardly analyzes the meaning of "stabilizing treatment" and it certainly doesn't suggest that such treatment includes abortions. This is not a case that "directly conflicts" with the panel's decision. *See* Circuit Rule 35-1.

Second, *In re Baby K* is hardly a case that "substantially affects a rule of national application in which there is an overriding need for national uniformity." *See* Circuit Rule 35-1. *In re Baby K* was decided in 1994. Since then, Westlaw says that only three sister circuit courts (Sixth, Ninth, and Eleventh) have cited it—one time each. And none of those cases talk about abortion either. *See Roberts v. Galen of Virginia, Inc.*, 111 F.3d 405 (6th Cir. 1997) (severe truck injuries); *Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002) (respiratory and cardiac failure);

5

*Eberhardt v. Los Angeles*, 62 F.3d 1253 (9th Cir. 1995) (psychiatric patient). In each of those cases, *In re Baby K* is cited only in a single footnote. *Roberts*, 111 F.3d at 410 n.4; *Marchant*, 291 F.3d at 774 n.13; *Eberhardt*, 62 F.3d at 1259 n.3. Such brusque treatment hardly suggests a heated intercircuit dispute over a "rule of national application in which there is an overriding need for national uniformity." *See* Circuit Rule 35-1.

In summary, the United States' motion hardly contains a "concise statement" of a "question of exceptional importance" as contemplated in FRAP 35(b)(1)(B). There is no concise statement, but rather a broad plea to generally relitigate the case in its entirety. Mot. at 1 ("whether the panel erred by staying the preliminary injunction"). And the Fourth Circuit case supposedly demonstrating a conflict "of national application in which there is an overriding need for national uniformity" turns out to be silent on whether EMTALA is an abortion mandate.

The truth is, the United States doesn't really have a specific legal error for the Ninth Circuit to rehear—it just really dislikes the panel's decision and wishes that the Ninth Circuit would call a general do-over. This Court should decline to grant one.

## II.   THE UNANIMOUS PANEL CORRECTLY HELD THAT THE LEGISLATURE IS LIKELY TO SUCCEED ON THE MERITS.

After failing to supply a "concise statement" of a "question of exceptional importance," the United States gets down to its real business—asking this Court to relitigate point-by-point the analysis that the unanimous panel already rejected. But as shown below, the panel got it right. None of the points the United States wants to relitigate constitute the kind of serious panel error for which the Ninth Circuit exercises *en banc* review. *United States v. Burdeau*, 180 F.3d 1091, 1092 (9th Cir. 1999) (Tashima, J., concurring in denial of *en banc* rehearing) (a panel decision "usually constitutes the final judicial decision" and should be reviewed "only to determine whether the [panel's] legal error resulted in an erroneous judgement.").

Because the United States' motion basically asks the Ninth Circuit to rehear the entirety of its initial Response brief (Dkt. 31, ADDENDUM_042), this Court may find useful the rebuttals in the Legislature's Reply (Dkt. 32, ADDENDUM_086) which convinced the unanimous panel to issue the stay. Nevertheless, this Response echoes those points to show the unanimous panel was correct to issue the stay.

As a preliminary matter, this question is governed by the factors in *Nken v. Holder*, 556 U.S. 417 at 434. (2009) (Requiring (i) strong showing on the merits, (ii) irreparable injury, (iii) substantial injury to other parties, and (iv) public interest). The unanimous panel found that "[e]ach of the four *Nken* factors favors issuing a stay here." Order at 4. The remainder of this Part II addresses *Nken*'s first factor and showcases the Legislature's "strong showing" of being "likely to succeed on the merits." *Nken*, 556 U.S. at 434. Part III addresses the remaining *Nken* factors which also favor the Legislature.

## A. The Unanimous Panel Correctly Held That the Legislature Has Made a Strong Showing on the Merits.

The United States recycles its claims that EMTALA requires providers to perform abortions and thus preempts Idaho Code § 18-622 ("section 622"). But the unanimous panel got it right. "The text of EMTALA shows that it does not require hospitals to perform abortions." Decision at 6. Thus, "EMTALA does not preempt section 622." *Id.* at 4.

### 1. The unanimous panel correctly recognized that the definition of "stabilizing treatment" does not demand abortions.

The United States says that EMTALA's definition of "stabilizing treatment" requires "*any* form of stabilizing treatment, *if* the relevant

8

professional deems it necessary in their reasonable medical judgement." Mot. at 7 (emphasis in original). Since EMTALA applies to pregnant individuals, that supposedly means abortions are among the "*any* form of stabilizing treatment" EMTALA sometimes requires. *Id.* at 9–10. But this claim cannot survive scrutiny.

First, EMTALA nowhere mentions abortions—much less demands that providers facilitate them. This alone ought to settle the question, because EMTALA contains an express *nonpreemption* clause which says that EMTALA preempts state law only when EMTALA "directly conflicts." 42 U.S.C. § 1395dd(f).[1] Because EMTALA does not directly state that providers must facilitate abortions, any duty to do so is implied at best. Simple English says an implied duty cannot "directly conflict" with state law, and therefore EMTALA's nonpreemption clause negates any claim of preemption. *See also* Order at 4–6 (unanimous panel reaching that same conclusion).

---

[1] *Contra* the United States' repeated mischaracterization, section 1395dd(f) is not a "preemption" clause. *See, e.g.*, Mot. at 4, 8. The text itself is clearly a *nonpreemption* clause: "The provisions of this section *do not* preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added).

9

Second, the United States attempts to explain EMTALA's lack of an abortion mandate by claiming that EMTALA requires "*any* form of stabilizing treatment, *if* the relevant professional deems it necessary in their reasonable medical judgement." Mot. at 7 (emphasis added). Notably, there is no citation to statute or case law after this claim. And such a claim is absurd because states ban controversial medical procedures all the time. Order at 8 (unanimous panel reaching that same conclusion). EMTALA does not override all those laws just because a practitioner feels the controversial treatment would be "reasonable."

The United States takes issue with the panel's hypothetical on organ transplants, Mot. at 16, so here is a different one: Surely, the United States would not concede that EMTALA allows a psychiatrist to order conversion therapy in contravention of state law if a young transgender person presented at the hospital with suicidal ideation from severe gender dysphoria. *See*, *e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1063 (9th Cir. 2022) (healthcare provider challenging Washington's ban on conversion therapy). Such a result would be absurd because EMTALA simply does not contain language requiring "*any* form of stabilizing treatment" like

10

the United States claims. *See also* Order at 7–8 (unanimous panel reaching that same conclusion). And EMTALA especially does not have language allowing a healthcare provider's "reasonable medical judgement" to override state law. *See Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) (EMTALA's nonpreemption provision precludes displacement of state healthcare laws); Mot. at 4–5 (unanimous panel reaching that same conclusion).

Third, the United States also says, Mot. at 9, that there is no "canon of donut holes" where silence on specific implementation of a general rule creates a "tacit exception." *Id.* (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020)). Thus, abortions are supposedly silently included by implication in EMTALA's general requirement to provide "stabilizing treatment."

That logic may work for antibiotics and aspirin, but abortion is a topic that "sparked a national controversy that has embittered our political culture for half a century." *Dobbs*, 142 S. Ct. at 2241. Congress may very well pass legislation that implicitly affects appendectomies, but it is preposterous to make that same presumption for abortion. As the United States itself has pointed out, "Congress knows how to create special rules

11

governing abortion." Mot. at 10. The United States says EMTALA's silence on abortion "shows that Congress did not intend EMTALA to exclude" abortions. *Id.* But the exact opposite inference is just as valid—EMTALA's silence on abortion also shows that Congress did not intend to supplant state laws regulating abortion. And the second of these inferences is far more probable in light of the "national [abortion] controversy that has embittered our political culture for half a century," *Dobbs*, 142 S. Ct. at 2241, and where EMTALA's specific *nonpreemption clause* says EMTALA only preempts a state law when it "directly conflicts." 42 U.S.C. § 1395dd(f).

Fourth, the United States points to a single case for the proposition that abortion can constitute stabilizing treatment. Mot. at 11 (citing *New York v. HHS*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019). But this dispute over Idaho's law is not about whether abortions *could* be "stabilizing care" under EMTALA. It's about whether abortions *must* be provided as "stabilizing care." And on that note, *New York*, 414 F. Supp. 3d 475 contradicts the United States' position: In *New York*, HHS was "[s]pecifically confronted with comments raising concerns about emergency scenarios" involving "bringing a woman with an ectopic pregnancy to an emergency

room." *Id.* at 555. To such comments, "HHS stated only that the rule's application 'would depend on the facts and circumstances of each case.'" *Id.* HHS and the United States cannot waffle in the *New York* case about whether regulations on abortion conflict with EMTALA, and then later cite that same case as proof that EMTALA requires abortions.[2]

Fifth, the United States says legislation considered concurrently with EMTALA explicitly exempted abortion while EMTALA did not. Mot. at 10. This supposedly shows Congress would have exempted abortion explicitly had it wanted to. But again, the United States relies on inference. In this case, "reliance on legislative history is unnecessary in light of the statute's unambiguous language." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 236 n.3 (2010). EMTALA's "unambiguous language" makes clear that Congress intended no preemption of state law unless EMTALA "directly conflicts." 42 U.S.C. § 1395dd(f).

---

[2] Equally inapposite are the cases cited in the amicus brief of California et al. None of the cases cited there pitted EMTALA against a state statute regulating abortion. And many of them involve an ectopic pregnancy, a nonviable fetus, or other situations where section 622 would not prohibit the termination of the pregnancy. *See, e.g.*, *Morin v. Eastern Me. Med. Ctr.*, 780 F. Supp. 2d 84, 93–96 (D. Me. 2010) (dead fetus); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712–18 (E.D. Mich. 2009) (nonviable fetus).

13

Since nothing in EMTALA mentions abortion, EMTALA cannot "directly conflict" with section 622. Legislative history is "unnecessary in light of [EMTALA's] unambiguous language." *Milavetz*, 559 U.S. at 236 n.3.

    2. *The unanimous panel correctly recognized that EMTALA protects unborn life.*

Far from being an abortion mandate, EMTALA actually imposes an affirmative duty on hospitals to protect the health of "unborn children." And unlike the United States' highly selective and inferential approach, EMTALA clearly states its protections for unborn children in several places.

For example: Under EMTALA, a hospital's duties arise when a patient has an "emergency medical condition." 42 U.S.C. § 1395dd(e)(1). A pregnant woman suffers from an "emergency medical condition" if lack of care would put "the health of the woman *or her unborn child* in serious jeopardy." *Id*. § 1395dd(e)(1)(A) (cleaned up and emphasis added). EMTALA also says that a "pregnant woman who is having contractions" suffers an "emergency medical condition" when a physician determines that "transfer [to another facility] may pose a threat to the health or safety of the woman or the *unborn child*." *Id*. § 1395dd(e)(1)(B) (emphasis added). Further, no transfer can be made if it would "pose a threat to the

14

*health or safety* of the woman *or the unborn child.*" *Id.* § 1395dd(e)(1)(B)(ii) (emphasis added).

Aborting a child hardly promotes their "health or safety." *Id.* Repeatedly, EMTALA expresses Congress's commitment to protect *both* a pregnant woman *and* her unborn child. Thus, the United States must not only explain why EMTALA is silent on the question of abortion. It must also explain away repeated references to protecting the "health or safety of … the unborn child." *Id.* The United States tackles both tasks with admirable creativity. *See, e.g.*, Mot. at 11, 12. But in the end, the unanimous panel decision got it right. The greater weight of textual evidence points against EMTALA being an abortion mandate. Order at 12.

## B. The Unanimous Panel Correctly Held That the Legislature Has Made a Strong Showing on the Merits Because EMTALA Does Not Preempt Section 622.

### 1. There is no impossibility preemption.

Because EMTALA is not an abortion mandate, there is no impossibility preemption. Order at 6 ("It is not impossible to comply with both EMTALA and section 622."). And even if EMTALA could be read as an abortion mandate, there still is no conflict because of the Idaho law's many exceptions. Section 622 exempts any physician who in "good faith medical

judgement" and "based on facts known … at the time" believes the abortion is necessary to prevent the death of the pregnant woman. IDAHO CODE § 18-622. And far from the United States' claim that *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132 (Idaho 2023) confirms a conflict, the Idaho Supreme Court's ruling actually *eliminated* most any potential conflict. *Id.* at 1203. The Idaho Supreme Court held that (i) the exemptions protect a doctor's subjective rather than objective judgement, (ii) a doctor need not be 100% certain that a pregnant woman would die before commencing a life-saving abortion, and (iii) most of the emergency medical conditions raised by the United States are not "abortions" under state law, and thus are not prohibited under section 622. *See id.* at 1203, 1204. With these clarifications, the chance of actual conflict between EMTALA and section 622 approaches nearly zero. As the unanimous panel concluded, it is not "impossible" to comply with both statutes and thus impossibility preemption is inappropriate. Mot. at 12.

 2. *There is no obstacle preemption.*

 Nor is there obstacle preemption. The unanimous panel correctly cited the Supreme Court's teaching that obstacle preemption must be weighed against a statute's purpose "as a whole." *Crosby v. Nat'l Foreign*

16

*Trade Council*, 530 U.S. 363, 373 (2000). And Congress enacted EMTALA not as an abortion mandate, but "to respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment." *Baker*, 260 F.3d at 993 (EMTALA was "not intended to create a national standard of care for hospitals."). To claim obstacle preemption, the United States would have to show that EMTALA's purpose "as a whole" is to require hospitals to perform abortions. EMTALA does not even mention abortions, which makes the above proposition extremely unlikely.

## III. THE UNANIMOUS PANEL CORRECTLY HELD THAT THE REMAINING *NKEN* FACTORS FAVOR THE LEGISLATURE.

The unanimous panel correctly said the likelihood of success on the merits favors the Legislature. *Nken*, 556 U.S. at 434 (the first *Nken* factor). The unanimous panel also correctly held that the remaining *Nken* factors favor the Legislature because: (a) the Legislature will be irreparably injured absent a stay; (b) the stay will not substantially injure the other parties interested in the proceeding; and (c) the public interest favors the Legislature. *See* Order at 16-18.

17

**A. The Unanimous Panel Correctly Held That the Legislature is the Party to Suffer "Irreparable Injury" Absent a Stay and That Any Delay Was Caused by the District Court Not the Legislature.**

Precluding Idaho from enforcing section 622 imposes irreparable injury. The unanimous panel recognized that "any time a State is enjoined by a court from effecting statutes enacted by the representatives of its people, it suffers a form of irreparable injury." *See* Order at 14 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) and *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers). Significantly, the panel rejected the assertion that the Legislature is differently situated from the OAG. The panel's decision aligns with *Berger* and the Legislature's prior briefing. *See Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2202 (2022) (A state is "free to empower multiple officials to defend its sovereign interests in federal court.") (cleaned up).

Equally flawed is the assertion that the Legislature was dilatory in defending Idaho's rights and this precludes a showing of irreparable injury. As the panel noted, any supposed delay arose from the district court's failure to timely rule on the motions for reconsideration. Order at 15. The United States cannot avoid the fact that it was the district court,

18

not the Legislature, that dragged its feet. As plainly noted by the panel, "the Legislature was not at fault for these delays." Order at 16.

The United States is left to argue that regardless of the district court's failure to timely rule, the Legislature still "could have requested" a stay. Mot. at 18. But this is not the standard. The procedural context affirmatively proves there was no lack of urgency. Indeed, just the opposite: The Legislature requested expedited treatment and even sent correspondence to the district court requesting the same. Order at 15–16. The district court's delay hardly negates any harm to the Legislature—it exacerbated it.

## B. The Unanimous Panel Correctly Held That the Stay Will Not Substantially Injure Other Parties or Harm the Public Interest.

The panel correctly held the third and fourth *Nken* factors favor a stay. *See* Order at 18. Those factors ask "whether issuance of a stay will substantially injure the parties interested in the proceeding" and whether "the public interest" support the Legislature's motion. *See Nken*, 556 at 435.

The United States maintains that the "harms to the government and public interest" merge. Mot. at 16. First, the United States claims it

"suffers irreparable harm when a preempted law operates." Mot. at 17. But that argument entirely depends on whether EMTALA preempts section 622. Since the panel found no preemption, that argument is unpersuasive.

That leaves the United States to assert that public interest weighs towards a stay. Here, the government makes no new arguments. The United States continues to argue that public health is protected by the preliminary injunction. Mot. at 17. But the panel correctly noted that this ignores section 622's exceptions for "necessary medical care for pregnant women in distress." Order at 17. And where the "federal government has no discernable interest in regulating the internal medical affairs of the State" the United States fails to appreciate Idaho's strong interest in "self-governance free from unwarranted federal interference." *Id.* at 16-17.

The United States argues the panel erred. First, the United States argues what it has before—that the panel incorrectly interpreted section 622 and that "EMTALA applies beyond lethal contexts." Mot. at 17. But this interpretation is contrary to the preemption arguments cited above. EMTALA's purported abortion mandate could only arise by implication.

But such an implied duty cannot "directly" conflict with Idaho law. Moreover, it flies in the face of the express preemption provision found in the Medicare Act which directs that "[n]othing in this subchapter [the Medicare Act] shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. This provision governs EMTALA since it is part of the Medicare Act. Thus, EMTALA cannot confer federal "supervision or control over the practice of medicine or the manner in which medical services are provided." *Id.*; *see also Eberhardt*, 62 F.3d at 1258 (EMTALA enacted "not to improve the overall standard of medical care, but to prevent "refusing essential emergency care because of a patient's inability to pay."). The interpretation advocated by the United States plainly offends section 1395 by seizing control of "the practice of medicine" regarding abortion. 42 U.S.C. § 1395.

This is precisely why the panel said "the federal government has no discernable interest in regulating the internal medical affairs of the State, and that the public interest is best served by preserving the force

21

and effect of a duly enacted Idaho law during the pendency of this appeal." Order at 18. The panel correctly ruled that "[t]o read EMTALA to require a specific method of treatment, such as an abortion, pushes the statute far beyond its original purpose, and therefore, is not a ground to disrupt Idaho's historic police powers." Order at 8.

In sum, the panel properly concluded that the United States has no legitimate interest in compelling Idaho's compliance with an implied mandate contrary to the Medicare Act and EMTALA. And, certainly, there is no public interest in substituting the government's contrived and implied conception of abortion policy for what Idaho's elected representatives have duly enacted.

## CONCLUSION

The Court should deny this emergency motion for *en banc* review of the panel's decision to stay.

Respectfully submitted,

*/s/ Daniel W. Bower*

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333

dbower@morrisbowerhaws.com

*Counsel for Intervenors - Appellants*

Dated: October 4, 2023

**CERTIFICATE OF COMPLIANCE
PURSUANT TO 9TH CIRCUIT RULE 40-1
FOR CASE NOS. 23-35440 & 23-35450**

I hereby certify that this brief complies with the word limits permitted by Ninth Circuit Rule 40-1. The brief is 4,192 words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(4)-(6).

*/s/ Daniel W. Bower*
Daniel W. Bower

*Counsel for Intervenors – Appellants*

Dated: October 4, 2023

24

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the Idaho Legislature states that it knows of a related case pending in this Court: *United States of America v. State of Idaho*, Case No. 23-35153 (appealing the district court's denial of the Idaho Legislature's motion to intervene as of right).

Respectfully submitted,

*/s/ Daniel W. Bower*

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333

dbower@morrisbowerhaws.com

*Counsel for Intervenors - Appellants*

October 4, 2023

# ADDENDUM

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

**SEP 28 2023**

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Nos. 23-35440 |
| Plaintiff-Appellee, | 23-35450 |
| v. | D.C. No. 1:22-cv-00329-BLW |
| STATE OF IDAHO, | ORDER |
| Defendant, | |
| v. | |
| MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-Defendants, | |
| Movants-Appellants. | |

Before: Bridget S. Bade, Kenneth K. Lee, and Lawrence VanDyke, Circuit Judges.

Order by Judge VanDyke

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court "heed[ed] the Constitution and return[ed] the issue of abortion to the people's elected representatives." 142 S. Ct. 2228, 2243 (2022). After *Dobbs*, a number of states,

including Idaho, have exercised that prerogative to enact abortion restrictions. In response, the federal government has sued Idaho claiming that a federal law unrelated to abortion preempts the will of the people of that state, through their elected representatives, to "protect[] fetal life," as *Dobbs* described it. *Id.* at 2261. Because there is no preemption, the Idaho Legislature is entitled to a stay of the district court's order improperly enjoining its duly enacted statute.

## BACKGROUND

In 2020, Idaho passed section 622, which prohibits most abortions in the state. *See* S.B. 1385, 65th Leg., 2d Reg. Sess. (Idaho 2020). The law contained a trigger, meaning that it was only to take effect thirty days after judgment was entered "in any decision of the United States supreme court that restores to the states their authority to prohibit abortion." 2020 Idaho Sess. Laws 827. The law makes it a crime for a healthcare provider to perform an abortion unless, among a few other exceptions, "[t]he physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a)(i). Idaho law defines abortion as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child," except in a few listed circumstances. Idaho Code § 18-604.

*Dobbs* triggered section 622, after which the federal government challenged Idaho's law, arguing that it is preempted by the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd (EMTALA). EMTALA was enacted to prevent hospitals that receive Medicare reimbursement from refusing to provide emergency care to the indigent because of their inability to pay. *Id.* As relevant to this case, it requires emergency room doctors to stabilize patients' emergency medical conditions before transferring them. The federal government moved for a preliminary injunction to stop Idaho's law from taking full effect on the trigger date following *Dobbs*. The district court granted the preliminary injunction in August 2022 and denied reconsideration in May 2023. Both the State of Idaho and the Idaho Legislature, which was allowed to intervene for purposes of the preliminary injunction, have appealed the district court's decision. The Legislature has also moved for a stay of the injunction pending appeal. Because Idaho's law is not preempted by EMTALA and the equitable factors favor a stay, we grant the Legislature's motion to stay this case pending appeal.

## DISCUSSION

We consider four factors when considering a request for a stay of a district court's injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

3

other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Each of the four *Nken* factors favors issuing a stay here. The Legislature has made a strong showing that EMTALA does not preempt section 622. EMTALA does not require abortions, and even if it did in some circumstances, that requirement would not directly conflict with section 622. The federal government will not be injured by the stay of an order preliminarily enjoining enforcement of a state law that does not conflict with its own. Idaho, on the other hand, will be irreparably injured absent a stay because the preliminary injunction directly harms its sovereignty. And the balance of the equities and the public interest also favor judicial action ensuring Idaho's right to enforce its legitimately enacted laws during the pendency of the State's appeal.

## I. The Legislature Has Made a Strong Showing That It Is Likely to Succeed on the Merits.

Under *Nken*, a stay applicant must make a "strong showing" that it is likely to succeed on the merits. 556 U.S. at 434. This threshold is met because EMTALA does not preempt section 622.

"When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue … there is no need to infer congressional intent to preempt state laws from the substantive provisions

of the legislation." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) (alterations, internal quotation marks, and citations omitted). EMTALA contains an express provision stating that "[t]he provisions of this section *do not* preempt any State or local law requirement, except to the extent that the requirement *directly* conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphases added); *see also Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) ("The statute expressly contains a non-preemption provision for state remedies." (citing § 1395dd(f))). Because this court looks to "[c]ongressional intent [as] the sole guide in determining whether federal law preempts a state statute," we must look "only to this language and construe [EMTALA's] preemptive effect as narrowly as possible." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (citations omitted).

As this court has recognized, when determining the preemptive effect of EMTALA "[t]he key phrase is 'directly conflicts.'" *Id.* Direct conflicts occur in only two instances. First, when compliance with both is a "physical impossibility." *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)); *see also McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015). And second, when the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chiapuzio*, 9 F.3d at 1393 (quoting

*Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  In this case, neither type of conflict exists.

**A. It Is Not Impossible to Comply with Both EMTALA and Section 622.**

EMTALA was enacted to ensure that the poor and uninsured receive emergency medical care at hospitals receiving Medicare reimbursement.  *See Arrington v. Wong*, 237 F.3d 1066, 1069 (9th Cir. 2001).  It provides certain procedures that hospitals must follow but does not set standards of care or specifically mandate that certain procedures, such as abortion, be offered.  But even assuming that EMTALA did require abortions in certain, limited circumstances, it would not require abortions that are punishable by section 622.  So it still would not be impossible to comply with both EMTALA and section 622.

In interpreting a statute, we must "start with the statutory text."  *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020).  The text of EMTALA shows that it does not require hospitals to perform abortions.  Instead, EMTALA requires a hospital to determine whether an emergency medical condition is reasonably expected to place "the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part."  42 U.S.C. § 1395dd(e)(1)(A) (omissions removed) (emphasis added).  So an emergency medical condition includes one that "plac[es] the health of the … unborn child[] in

serious jeopardy." *Id*. Where such a condition exists, the hospital must stabilize the condition before transferring the individual to another medical facility unless certain conditions are met. *Id.* § 1395dd(b)(1). "[T]o stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id*. § 1395dd(e)(3)(A).

EMTALA therefore has dual stabilization requirements: hospitals must ensure that "no material deterioration of the condition" of a woman *or* her unborn child is likely to occur. The assumption that EMTALA implies some hierarchy when stabilization of the woman might require "a material deterioration of the condition" of the child requires us to read *in* an *implicit* duty to perform abortions from the explicit duty to stabilize, which is far beyond that required for a *direct* conflict.

The federal government nonetheless argues that because hospitals are required to stabilize patients' medical conditions, they must perform abortions because abortion could be a "form of stabilizing treatment." But EMTALA does not require the State to allow every form of treatment that *could conceivably* stabilize a medical condition solely because, as the government argues, a "relevant professional determines such care is necessary." In fact, EMTALA does not impose *any* standards of care on the practice of medicine. Nor could it within the broader

7

statutory scheme.  *See Baker*, 260 F.3d at 993.  It certainly doesn't require that a hospital provide whatever treatment an individual medical professional may desire. For example, a medical professional may believe an organ transplant is necessary to stabilize a patient's emergency medical condition, but EMTALA would not then preempt a state's requirements governing organ transplants.

Because Congress's "clear and manifest" purpose confirms that EMTALA does not impose specific methods of "stabilizing treatment," we must assume "that the historic police powers of the States [are] not to be superseded by" EMTALA. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  The purpose of EMTALA is "to prevent hospitals [from] dumping indigent patients by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Arrington*, 237 F.3d at 1069 (alternations, internal quotation marks, and citation omitted).  The purpose of EMTALA is not to impose specific standards of care— such as requiring the provision of abortion—but simply to "ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995).  To read EMTALA to require a specific method of treatment, such as abortion, pushes the statute far beyond its original purpose, and therefore is not a ground to disrupt Idaho's historic police powers.

Even if the federal government were correct that EMTALA requires abortions as "stabilizing treatment" in limited circumstances, EMTALA still would not conflict with Idaho's law. Section 622 includes an exception allowing abortion when a "physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion [is] necessary to prevent the death of the pregnant woman." Idaho Code § 18-622.

The district court concluded that there is a gap between what a doctor might believe necessary to save the life of a pregnant woman and what might be reasonably expected to place the health of her or her unborn child in serious jeopardy, seriously impair their bodily functions, or cause serious dysfunction of any bodily organ or part. Specifically, the district court invoked the supposed ambiguity in Idaho's law to construe it as creating a conflict with EMTALA. But almost all the examples in the district court's parade-of-horribles are no longer true, given the Idaho Legislature's recent amendment to the statute and clarification from the Supreme Court of Idaho.

First, relying on declarations from certain doctors, the district court repeatedly noted that the Idaho law's ambiguity would interfere with doctors' medical judgment. For example, it held that "against the backdrop of these uncertain, medically complex situations, [the statutory exception] is an empty promise—it does not provide any clarity." It added that it "offers little solace to physicians attempting

9

to navigate their way around both EMTALA and Idaho's criminal abortion laws" and that "Idaho law criminalizes as an 'abortion' what physicians in emergency medicine have long understood" as required to save lives.

But after the district court issued its injunction, the Supreme Court of Idaho authoritatively interpreted this state law provision as providing a broad, subjective standard requiring the doctor, in his or her good faith medical judgment, to believe it necessary to terminate the pregnancy. *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1203 (Idaho 2023). Put another way, the Supreme Court of Idaho clarified that the text of the exception means what it says: if a doctor subjectively believes, in his or her good faith medical judgment, that an abortion is necessary to prevent the death of the pregnant woman, then the exception applies. *Id*. Thus, the district court's reliance on declarations from certain doctors claiming that the law would undermine their medical judgment is no longer valid.

Second, the district court also relied on some of the federal government's experts who argued that Idaho doctors could not terminate a pregnancy while complying with section 622 because they could not be *certain* that an abortion is necessary. But the Supreme Court of Idaho has made clear that "certainty" is not the standard under Idaho law. That Court also held that the standard has no imminency requirement. *Id.* at 1203–04. It explicitly held that the "necessary to save the life of the mother" standard does not require certainty, a substantial risk of

death, or any other particular probability level. *Id.* Nor is a "medical consensus on what is necessary to prevent the death of the woman … required …." *Id.* at 1204 (internal quotation marks omitted). As the Supreme Court of Idaho put it, "[t]he plain language of the [exception] leaves wide room for the physician's 'good faith medical judgment' on whether the abortion was 'necessary to prevent the death of the pregnant woman' based on those facts known to the physician at that time." *Id.* at 1203.

Third, the district court heavily relied on ectopic pregnancies—mentioning them eleven times in the opinion—as a justification for finding section 622 in direct conflict with EMTALA. But Idaho recently amended its law to clarify that "the removal of an ectopic or molar pregnancy" is *not* an abortion. *See* 2023 Idaho Sess. Laws 906 (excluding from the statute's definition of "abortion"). So that issue is now moot.

Fourth, the district court emphasized that the life of the mother exception in the statute was technically an affirmative defense, noting that an "affirmative defense is an excuse, not an exception" and that this "difference is not academic." But Idaho amended the law to make it a statutory exception, not an affirmative defense. 2023 Idaho Sess. Laws 908. So this objection, too, has been superseded by events.

Given the statutory amendments and the Supreme Court of Idaho's recent decision, any ambiguity identified by the federal government and the district court no longer exists: if a doctor believes, in his or her good faith medical judgment, that an abortion is necessary to save the life of the mother, then the exception applies. Neither the probability nor the imminency of death matters to the exception's application. *Id.* at 1203. For all the hypotheticals presented by the district court, the conduct required by EMTALA has been shown to satisfy section 622's "life of the mother" standard, so the two laws would not conflict even if EMTALA actually required abortions.

In sum, when a doctor determines an abortion is necessary to save the life of the mother, termination of a pregnancy is not punishable by section 622. Idaho Code § 18-622. Therefore, even if the federal government were right that EMTALA requires abortions in certain limited circumstances, EMTALA would not require abortions *that are punishable by section 622*. The federal government is thus wrong when it asserts that it is impossible to comply with both EMTALA and section 622.

**B. Section 622 Does Not Pose an Obstacle to the Purpose of EMTALA.**

Obstacle preemption occurs when, "under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (alterations and internal quotation marks

omitted) (quoting *Hines*, 312 U.S. at 67). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute *as a whole* and identifying its purpose and intended effects …." *Id.* (emphasis added).

As relevant here, "Congress enacted EMTALA to respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment." *Baker*, 260 F.3d at 993. EMTALA was "not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice." *Id.*; *see also Eberhardt*, 62 F.3d at 1258 ("The statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care in screening patients."). This conclusion is "[c]onsistent with the statutory language" of EMTALA, *id.*, under which the duty to stabilize is "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility …." 42 U.S.C. § 1395dd(e)(3)(A). Under the language of EMTALA, Congress left it to state healthcare standards to determine which course of treatment "may be necessary" to prevent "material deterioration …." *See id.*

It is not the purpose of EMTALA to force hospitals to treat medical conditions using certain procedures. Instead, EMTALA seeks to prevent hospitals from

neglecting poor or uninsured patients with the goal of protecting "the health of the woman" and "her unborn child." 42 U.S.C. § 1395dd(e)(1)(A). Section 622's limitations on abortion services do not pose an obstacle to EMTALA's purpose because they do not interfere with the provision of emergency medical services to indigent patients.

## II.     The Legislature Has Shown Irreparable Harm Absent a Stay.

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (alterations in original) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)). The district court's injunction prevents Idaho from enforcing section 622 as enacted by representatives of its people, so the State easily meets its burden of showing irreparable harm. The federal government's two arguments to the contrary do not convince us otherwise.

First, the government argues that the Legislature cannot establish irreparable harm by pointing to harm to the State of Idaho itself. But it makes no difference to our harm analysis that the State seeks the stay through its Legislature, rather than through its Attorney General; the government's argument to the contrary relies upon a distinction without a difference. The State itself, not merely its officials, "suffers a form of irreparable injury" when it cannot effectuate its statutes. *Id.* And the State

"is free to 'empower multiple officials to defend its sovereign interests in federal court.'" *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2202 (2022) (alteration omitted) (quoting *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022)). Here, Idaho law empowers the Legislature as a state entity to represent those interests. *See* Idaho Code § 67-465. The Legislature may thus invoke the State of Idaho's irreparable harm.

Second, the federal government claims that the Legislature's delay in requesting the stay is "substantial and inexplainable," and therefore prevents a showing of irreparable harm. The record is somewhat mixed on this issue, but usually "delay is but a single factor to consider in evaluating irreparable injury." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014). While "failure to seek judicial protection can imply the lack of need for speedy action," here there is no evidence that the Legislature was "sleeping on its rights." *Id*. at 990–91 (internal quotation marks and citation omitted).

It appears that the extended period of time after the district court's original injunction here is instead explained primarily by the long time that court took in ruling on Idaho's reconsideration motions, together with other circumstances outside the Legislature's control. On September 7, 2022, only two weeks after the district court granted the federal government's injunction, the Legislature moved for reconsideration. And in November 2022, it sent a letter to the court requesting a

15

ruling on the motion to reconsider. In January 2023, three months after the federal government responded to the reconsideration motion and two months after the Legislature requested an expedited ruling, the Supreme Court of Idaho issued a decision authoritatively interpreting section 622. Idaho requested leave to file supplemental briefing in federal court addressing the Supreme Court of Idaho's decision. The district court took another three months after the supplemental briefing was complete to decide the motion for reconsideration; the Legislature was not at fault for these delays. And the Legislature moved for a stay in the district court on the same day it timely noticed its appeal of the district court's denial of its motion for reconsideration. We cannot say that the Legislature was clearly dilatory in defending the State's rights. The record suggests that the Legislature tried to protect those rights before the district court before seeking a stay from this court.

### III.   The Balance of the Equities Favors a Stay.

The third and fourth *Nken* factors—"whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies"—also favor a stay. 556 U.S. at 435.

Idaho enacted section 622 to effectuate that state's strong interest in protecting unborn life. That public interest is undermined each day section 622 remains inappropriately enjoined. Beyond that specific interest, improperly preventing Idaho from enforcing its duly enacted laws and general police power also undermines the

16

State's public interest in self-governance free from unwarranted federal interference. *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("The public interest is also served by maintaining our constitutional structure[.]") ; *Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) (public interest is served by "respecting the Constitution's assignment of … power").

The federal government points to no injury to itself caused by Idaho's law. Instead, relying on its merits argument that Idaho's law is preempted, it cites to cases holding that "preventing a violation of the Supremacy Clause serves the public interest." But because Idaho's law is not preempted, those arguments do not help the federal government.

Beyond that inapposite concern, the federal government argues that a continued stay will result in public health benefits for pregnant women needing emergency care, and also benefit hospitals in neighboring states who would otherwise be forced to treat women denied such care in Idaho. But Idaho's law expressly contemplates necessary medical care for pregnant women in distress. *See* Idaho Code § 18-622(4). So the federal government's argument that pregnant women will be denied necessary emergency care overlooks Idaho law. And as explained above, even assuming abortions were required to "stabilize" emergency conditions presented by some pregnant women, and that EMTALA required such treatment, Idaho's law would not prevent abortions in those circumstances.

17

Ultimately, given our conclusion that EMTALA does not preempt Idaho's law, the federal government has no discernable interest in regulating the internal medical affairs of the State, and the public interest is best served by preserving the force and effect of a duly enacted Idaho law during the pendency of this appeal. Therefore, the balance of the equities and the public interest support a stay in this case.

## CONCLUSION

For the above reasons, the traditional stay factors favor granting the Legislature's motion. The Legislature's motion for a stay pending appeal is therefore **GRANTED**.

Nos. 23-35440 & 23-35450

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO,
*Defendant-Appellant.*

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
THE STATE OF IDAHO
*Defendant,*
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives; et al.,
*Intervenors-Appellants.*

Appeal from the United States District Court
for the District of Idaho
Honorable B. Lynn Winmill
(1:22-cv-00329-BLW)

## INTERVENORS-APPELLANTS' OPPOSED MOTION TO
## STAY PRELIMINARY INJUNCTION PENDING APPEAL

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

# INTRODUCTION

At issue here is whether the United States can lawfully prevent the State of Idaho from regulating abortion by contriving a mandate contrary to federal law. Idaho Code § 18-622 (section 622) prohibits abortion unless authorized. Before it could come into force, the United States sued Idaho, claiming that section 622 is preempted by the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd (EMTALA). The district court issued a preliminary injunction and reaffirmed that order when denying motions for reconsideration. This appeal followed.

The motion seeks a stay pending appeal. Intervenors-Appellants, the Speaker of the Idaho House of Representatives Mike Moyle, Idaho Senate President Pro Tempore Chuck Winder, and the Sixty-Seventh Legislature (Legislature) respectfully move this Court for a stay of the district court's orders dated May 4, 2023 (Dkt. 135) (May Order or Exh. 1) and August 24, 2022 (Dkt. 95) (August Order or Exh. 2), until a final disposition of the pending appeal before this Court and proceedings before the Supreme Court of the United States.[1]

The Legislature satisfies the standard for issuing a stay pending appeal. Every day that the preliminary injunction prevents the operation of Idaho law inflicts

---

[1] The Legislature satisfied FRAP 8 by filing a motion for a stay with the district court. *See* Mot. to Stay Pending Appeal (Dkt. 140) (Exh. 3). That motion was fully briefed on August 4, 2023, but the district court has not acted on it. As for Circuit Rule 27-1, opposing counsel has confirmed that the United States opposes the motion.

irreparable harm on the State. The Legislature has a strong likelihood of success on the merits since the preliminary injunction rests on a conflict between federal and state law that does not exist. Congress expressly limited the preemptive reach of EMTALA, and it cannot preempt state laws like section 622. EMTALA does not impliedly require a hospital to perform abortions; rather, it expressly requires emergency medical care for *both* a pregnant woman *and* her unborn child. Giving EMTALA the gloss preferred by the government will violate the major questions doctrine, as well as the Tenth Amendment and the Spending Clause. Finally, the public interest and balance of the equities point toward a stay.

## ARGUMENT

A familiar four-part standard governs when to issue a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation omitted). Irreparable injury and the likelihood of success "are the most critical." *Id.* at 434. When those are satisfied, a court will consider "the harm to the opposing party and weighing the public interest"—factors that "merge when the Government is the opposing party." *Id.* at 435.

This Circuit uses a "sliding scale" approach, under which "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rock-*

*ies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam) (applying the sliding scale approach to a stay pending appeal). Analysis may begin with irreparable harm. *See Leiva-Perez*, 640 F.3d at 965; *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020).

## I.    THE IDAHO LEGISLATURE WILL SUFFER IRREPARABLE IN-JURY WITHOUT A STAY.

The Legislature can readily show that "a stay is necessary to avoid likely irreparable injury to the [Legislature] while the appeal is pending." *Wolf*, 952 F.3d at 1007. The Supreme Court has held that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). That holding reflects the broader principle that a State suffers "ongoing irreparable harm" whenever it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Other circuits have applied that principle when considering whether an injunction inflicts irreparable injury. *See, e.g.*, *Vote.Org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022) (quoting *King*, 567 U.S. at 1303); *District 4 Lodge of the Int'l Ass. Of Machinists v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (same); *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (same).

Last August, the district court issued a preliminary injunction blocking the operation of section 622. *See* Exh. 2, at 38–39. That interference with "a duly enacted statute" constitutes irreparable harm by itself. *King*, 567 U.S. at 1303. Every day that passes with that injunction in place obstructs the State from carrying out a duly adopted law reflecting Idaho's historic policy of disfavoring abortion. *See Planned Parenthood Great N.W. v. State*, 522 P.3d 1132, 1148 (Idaho 2023) (describing Idaho's "history and traditions" prohibiting abortion unless authorized by law).

Beyond the intrinsic harm of impeding Idaho law, the preliminary injunction prevents the exercise of Idaho's constitutional authority to regulate abortion, which the Supreme Court has directly recognized. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The preliminary injunction thwarts Idaho's exercise of democratic self-government as *Dobbs* promised states were free to do.

A stay will not cause irreparable injury to the United States. Allowing section 622 to operate as intended does not impose "irreparable" harm since the government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam), *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017).[2]

---

[2] Third-party harm does not count as irreparable injury to the government. *See Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020).

## II.  THE IDAHO LEGISLATURE HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

*Nken* requires "a strong showing" that the party requesting a stay is likely to succeed. 556 U.S. at 434. "[S]atisfaction of this factor is the irreducible minimum requirement to granting any equitable and extraordinary relief." *City and Cnty. of San Francisco v. U.S. Citizenship and Immigr. Servs.*, 944 F.3d 773, 789 (9th Cir. 2019). But "the minimum quantum of likely success necessary to justify a stay" consists of demonstrating that "serious legal questions are raised." *Leiva-Perez*, 640 F.3d at 967-68 (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)). That is certainly so here.

### A.  The Preliminary Injunction Rests on an Asserted Conflict Between Federal and Idaho Law.

The May Order appealed from here reaffirmed the preliminary injunction issued in August 2022. *See* Exh. 1, at 11. That injunction "restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by [EMTALA], 42 U.S.C. § 1395dd." Exh. 2, at 38. In the district court's view, "the Supremacy Clause says state law must yield to federal law when it's impossible to comply with both," and section 622 "conflicts with" EMTALA. *Id.* at 3. Section 622 is enjoined "to the extent that statute conflicts with EMTALA-mandated care." *Id.* That injunction and its rationale harbor multiple errors.

**B.      EMTALA Cannot Preempt Section 622.**

The preliminary injunction rests on the district court's ruling that "there will always be a conflict between EMTALA and Idaho Code § 18-622" because "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care." *Id*. at 18, 19. While acknowledging that EMTALA contains "an express preemption provision," the court concluded that section 622 fails both impossibility and obstacle preemption. *Id.* at 19 (citing *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993)). But that approach to preemption fails to account for this Court's instruction to "construe [EMTALA's] preemptive effect as narrowly as possible." *Draper*, 9 F.3d at 1393. It also disregards an express preemption provision in the Medicare Act.

EMTALA says that "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement ***directly*** conflicts with a requirement of this section." 42 U.S.C. § 1359dd(f) (emphasis added). The baseline is non-preemption. *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) (referring to EMTALA's "non-preemption provision"). EMTALA preempts only when state law "directly conflicts." 42 U.S.C. § 1359dd(f). Given the adverb "directly," an implied duty under EMTALA does not pose a *direct* conflict with state law. Yet the government's purported mandate to provide an abortion arises by implication—from EMTALA's general duty for a physician to "provide

stabilizing treatment" for a patient with an emergency medical condition." Exh. 2, at 19. Such an implied duty cannot "directly" conflict with Idaho law.

Further limiting EMTALA's preemptive force is the Medicare Act. It directs that "[n]othing in this subchapter [the Medicare Act] shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. This provision governs EMTALA since it is part of the Medicare Act. So EMTALA cannot confer federal "supervision or control over the practice of medicine or the manner in which medical services are provided." *Id.*; *see also Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995) ("Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay."). The preliminary injunction thus offends section 1395 by seizing control of "the practice of medicine" regarding abortion. 42 U.S.C. § 1395.

Because the preliminary injunction exceeds these limits on EMTALA's preemptive reach, it is void and should be vacated.

## C. EMTALA Does Not Mandate Abortion.

Even without sharp limits on EMTALA's preemptive authority, the preliminary injunction has no foundation. It rests on the conclusion that "EMTALA

obligates the treating physician to provide stabilizing treatment, including abortion care." Exh. 2, at 19. But EMTALA's text repudiates such an obligation.

EMTALA says nothing about abortion. The statute can be said to require abortions as emergency care, if at all, only by implication. Indeed, the statutory text shows that Congress intended for hospitals to provide medical care to a pregnant woman *and* her unborn child—not to force hospitals to perform abortions.

EMTALA's express duties are simple and few. A Medicare-participating hospital must (1) perform "an appropriate medical screening examination" to see whether the patient has an emergency medical condition, 42 U.S.C. § 1395dd(a); conduct a further medical exam along with "such treatment as may be required to stabilize the medical condition" or send the patient "to another medical facility," *id.* § 1395dd(b)(1); transfer a patient with an emergency medical condition that has not been stabilized only as provided and where "appropriate," *id.* § 1395dd(c)(1), (2).

These duties arise when a patient has an "emergency medical condition," as the statute defines it. *Id.* § 1395dd(e)(1). A pregnant woman suffers from an "emergency medical condition" triggering the hospital's duty of care if "the absence of immediate medical attention" could put "the health of the woman or her unborn child in serious jeopardy." *Id.* § 1395dd(e)(1)(A) (punctuation altered). That definition also details when "a pregnant woman who is having contractions" is suffering from an emergency medical condition. *Id.* § 1395dd(e)(1)(B). This occurs if a physician

determines that "(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child." *Id.* Transferring her to another facility is forbidden unless there is time enough for "a safe transfer … *before* delivery." *Id.* § 1395dd(e)(1)(B)(i) (emphasis added). Then there is a catchall prohibition on any transfer that "may pose a threat to the health or safety of the woman or the unborn child." *Id.* § 1395dd(e)(1)(B)(ii). Even the prospect of such a threat bars a transfer. The hospital is thus obliged to consider not only the unborn child's life, but his or her "health or safety." *Id.*; *accord* 42 C.F.R. § 489.24 (same).

Repeatedly, then, EMTALA expresses Congress's commitment to protect *both* a pregnant woman *and* her unborn child. At no point does the statute suggest that the mother's health should take priority over the child's life. Only the United States (and the preliminary injunction) does that.

### D.    The District Court's Orders Misconstrue EMTALA.

*First*, the decision below goes awry by discarding subsection (B) of EMTALA's definition of *emergency medical condition*, 42 U.S.C. § 1395dd(e)(1). *See* Exh. 2, at 4 n.1. Statutory provisions describing when "a pregnant woman who is having contractions" suffers an emergency medical condition are plainly relevant to the government's claim that EMTALA requires abortion. 42 U.S.C. § 1395dd(e)(1).

*Second*, the preliminary injunction unaccountably removes the phrase "or her unborn child" when describing how EMTALA and Idaho law conflict. *Id.* at § 1395dd(e)(1)(A)(i). The August order enjoins section 622 insofar as it interferes with an abortion deemed "necessary to avoid (i) 'placing the health of' a pregnant patient 'in serious jeopardy'; (ii) a 'serious impairment to bodily functions' of the pregnant patient; or (iii) a 'serious dysfunction of any bodily organ or part' of the pregnant patient, pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)–(iii)." Exh. 2, at 38–39. Omitting "or her unborn child" from the statute wrongly reduces EMTALA's text to "mere surplusage." *Am. Vantage Cos. v. Table Mountain Rancheria*, 292 F.3d 1091, 1098 (9th Cir. 2002) (cleaned up). Excising the statute's reference to unborn children in a case that tests how far Idaho law can protect them is profoundly troubling.

*Third*, the district court is likewise mistaken to say that EMTALA "calls for stabilizing treatment, which of course may include abortion care." Exh. 2, at 21. Stabilizing treatment is required only when a patient with an emergency medical condition cannot be transferred to another facility, consistent with statutory criteria. *See* 42 U.S.C. §§ 1395dd(b)(1); 1395dd(c). Even then, the definition of *stabilized* undermines the notion of requiring a hospital to perform an abortion for that purpose. After all, EMTALA's only approved form of stabilizing care is to ensure that "the [pregnant] woman has delivered (including the placenta)." *Id* § 1395(e)(3)(B).

In short, Congress's repeated command to deliver emergency medical care to both a pregnant woman and her unborn child refutes the government's contention that EMTALA requires hospitals to perform abortions.

### E. Construing EMTALA as an Abortion Mandate Violates the Major Questions Doctrine.

The district court's reading of EMTALA collides with the major questions doctrine. Under that doctrine, courts presume that Congress will "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted). In that instance, "something more than a merely plausible textual basis" is necessary, *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022): only "clear congressional authorization" will do. *Util. Air*, 573 U.S. at 324. Indeed, "exceedingly clear language" is necessary if Congress "wishes to significantly alter the balance between federal and state power." *U.S Forest Serv. v. Cowpasture River Preserv. Assn.*, 140 S. Ct. 1837, 1849–50 (2020). Requiring "a clear statement," *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023), of congressional authority to justify the consequential exercise of executive power rests on "both separation of powers principles and a practical understanding of legislative intent." *W. Va.*, 142 S. Ct. at 2609.

This is a quintessential major questions doctrine case.

*First*, the United States "claims to discover in a long-extant statute an unheralded power" to control national abortion policy. *Util. Air*, 573 U.S. at 324.

Accepting the government's gloss on EMTALA "would bring about an enormous and transformative expansion in [the Executive Branch's] regulatory authority without clear congressional authorization." *Id.* By the government's logic, all sorts of medical mandates can be inferred from the versatile phrase "necessary stabilizing treatment." 42 U.S.C. § 1395dd. But the idea that Congress hid such consequential power in a remote corner of the Medicare Act is wholly implausible.

*Second*, the government's reading of EMTALA is unprecedented. *See Texas v. Becerra*, 623 F. Supp. 3d 696, 735 (N.D. Tex. 2022). That novelty is another powerful strike against construing EMTALA as an abortion mandate.

*Third*, the government's claim that federal law requires hospitals to perform abortions even when prohibited by state law is a matter of "vast … political significance," *Util. Air*, 573 U.S. at 324 (quotation omitted). The Supreme Court's decision in *Roe v. Wade* to constitutionalize abortion "sparked a national controversy" for the past half-century. *Dobbs*, 142 S. Ct. at 2241. Controversy will inflame national politics no less if the Executive Branch is allowed to exercise "highly consequential power [over abortion] beyond what Congress could reasonably be understood to have granted," *W. Va.*, 142 S. Ct. at 2609, and to "significantly alter the balance between federal and state power," without "exceedingly clear language" from Congress. *Cowpasture River*, 140 S. Ct. at 1849–50.

These signs of executive overreach oblige the United States to identify "more than a merely plausible textual basis" to justify the assault on Idaho law. *W. Va.*, 142 S. Ct. at 2609. The government must pinpoint "'clear congressional authorization' for the power it claims." *Id.* (quoting *Util. Air*, 573 U.S. at 324). And that it cannot do. The only statutory text propping up the government's claim is broad language requiring a hospital to deliver "such treatment as may be required to stabilize the medical condition" of a patient with an emergency medical condition. 42 U.S.C. § 1395dd(b)(1)(A). This "wafer-thin reed" is all the United States has to support its claim to "sweeping power" over abortion. *Ala. Assoc. of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). Without clear congressional authority, the government's interpretation should be rejected.

*Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), poses no obstacle to applying the major questions doctrine. Even if the doctrine does not apply to actions of the President, *see id.* at 933, EMTALA is unlike the Procurement Act since it does not grant discretionary authority to the President. And unlike *Mayes*, political accountability remains a concern because the suit is brought under the direction of the Attorney General, an appointed official—not an elected one. *See* 28 U.S.C. § 503. The leeway owing to a President acting under an express grant of congressional authority, *see Mayes*, 67 F.4th at 933, is misplaced when considering the lawfulness of asserted executive authority without a presidential overlay.

**F.     The District Court Mischaracterized Section 622 as a Risk to the Life and Health of Women in Crisis.**

The federal-state conflict at the root of the preliminary injunction appears no better from the perspective of state law.

In the district court's telling, section 622 is unduly harsh. "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care. But regardless of the pregnant patient's condition, Idaho statutory law makes that treatment a crime." Exh. 2, at 19. Pressing further, the court asks the reader to imagine "the pregnant patient, laying on a gurney in an emergency room facing the terrifying prospect of a pregnancy complication that may claim her life" but where "her doctors feel hobbled by an Idaho law that does not allow them to provide the medical care necessary to save her health and life." Exh. 2, at 36–37. Framing section 622 in these emotional terms is highly misleading. Far from posing an arbitrary obstacle to decent medical care, section 622 simply restores Idaho law to its pre-*Roe* condition under which performing an elective "abortion was viewed as an immoral act and treated as a crime." *Planned Parenthood*, 522 P.3d at 1148.

To start, Idaho law does not treat all medical procedures to terminate a pregnancy as an abortion. By statute, *abortion* is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood,

cause the death of the unborn child." IDAHO CODE § 18-604(1). The Idaho Supreme Court ruled that pregnancy complications like preeclampsia, as well as ectopic pregnancy and other non-viable pregnancies are outside the scope of section 622. *See Planned Parenthood*, 522 P.3d at 1202–03. A doctor faces no liability if giving a pregnant mother needed medical treatment accidentally results in the death of an unborn child. *See* IDAHO CODE §§ 18-622(4) (statutory exemption); *id.* § 18-604(1) (defining *abortion* as using some means "to intentionally terminate" a pregnancy).

Besides defining abortion narrowly, section 622 contains straightforward exceptions authorizing abortion to save a woman's life or (during the first trimester) to terminate a pregnancy from rape or incest. IDAHO CODE §§ 18-622(2), 18-622(2)(b). A physician does not risk prosecution because he performed an abortion believing that a woman's life was at risk. Statutory exceptions protect a physician who acts "in his good faith medical judgment and based on the facts known to the physician at the time." *Id.* §§ 18-622(2)(a)(i), (ii). Given that safe harbor, section 622 should no longer "deter physicians from providing abortions in some emergency situations." Exh. 1, at 6; *accord* Exh. 2, at 26. Yet the May Order neglects to acknowledge these important amendments.

Hence, the federal-state conflict conceived by the district court is false at both ends. Reading EMTALA as an abortion mandate defeats Congress's evident intent to secure emergency medical care for both a pregnant woman and her unborn child,

and Idaho's section 622 is not the draconian measure portrayed by the lower court. Because EMTALA and section 622 do not conflict, the preliminary injunction has no basis. It should be vacated and the decision below reversed.

### G.   Construing EMTALA as an Abortion Mandate Raises Significant Constitutional Objections.

#### *1.     The preliminary injunction violates the Tenth Amendment.*

The decision below contradicts the Tenth Amendment in two ways.

Enjoining section 622 unlawfully deprives the State of Idaho of its sovereign authority to regulate abortion. *Dobbs* holds that the Constitution reserves that power to the states. *Dobbs*, 142 S. Ct. at 2279 (holding that "the authority to regulate abortion must be returned to the people and their elected representatives"). The decision below thwarts Idaho from charting its own course on abortion. Courts require "exceedingly clear language" if federal law is to "alter the balance between federal and state power," *Cowpasture River*, 140 S. Ct. at 1849-50, and EMTALA is "exceedingly clear," *id.*—but in the opposite direction. The district court evidently missed the federalism implications of reading EMTALA as an abortion mandate.

#### *2.     The decision below violates the Spending Clause.*

The construction of EMTALA adopted by the district court transgresses the Spending Clause. *See* U.S. CONST. art. I, § 8.

*First*, that Clause forbids the United States from coercing an unwilling state into complying with a regulatory command. But that is what the government does

by threatening the State of Idaho with the loss of all Medicare funding (of which EMTALA-related funding is a small part) unless Idaho hospitals obey the government's baseless reading of EMTALA. *See NFIB v. Sebelius*, 567 U.S. 519, 582 (2012) (holding that a provision of the ACA amounted to "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion"). Here, the United States says that section 622 denies it "the benefit of its bargain … by affirmatively prohibiting Idaho hospitals from complying with certain obligations under EMTALA." Complaint, Dkt. 1, at 13 (Exh. 4). The government adds that section 622 "undermines the overall Medicare program and the funds that the United States provides in connection with that program …." *Id.* at 13–14. This suggests that Idaho hospitals must perform abortions when the United States says that EMTALA requires it or risk the loss of billions in Medicare funding. The scale of that risk is eye-popping. Idaho received "approximately ***$3.4 billion*** in federal Medicare funds" between 2018-2020. USA Memo ISO Motion for Prelim. Inj., Dkt. 17-1, at 6 (emphasis added) (Exh. 5). HHS Secretary Becerra made the threat crystal clear by warning that any Medicare-funded hospitals that adheres to state law rather than to the government's conception of EMTALA risks "termination of its Medicare provider agreement." Letter from Secretary Becerra to Health Care Providers, July 11, 2022, at 2, *available at* https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf.

*Second*, the requirement pressed by the United States is retroactive. It comes long after Idaho agreed to the conditions of participating in Medicare. Imposing a novel mandate retroactively is another way that the government violates the Spending Clause. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

## III.   GRANTING A STAY SERVES THE PUBLIC INTEREST AND APTLY BALANCES THE EQUITIES.

*Nken* holds that the remaining factors—harm to the opposing party and the public interest—"merge when the Government is the opposing party." 556 U.S. at 435. These factors too weigh in favor of a stay.

The public interest is served by confining the government within its lawful bounds and "maintaining our constitutional structure" of powers divided among the three branches of the national government and between the federal government and the states. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). *See also Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) (the public interest would be served by "respecting the Constitution's assignment of the power of the purse to Congress, and by deferring to Congress's understanding of the public interest"). *Dobbs* recognizes that the State of Idaho is free to strike its own balance between safeguarding the health and safety of its women and the lives of its unborn children. That same interest is reflected in EMTALA's requirement to furnish emergency medical care for both a pregnant woman and her unborn child. *See* 42 U.S.C. §

1395dd(e)(1). And it is consistent with non-preemption provisions in EMTALA, 42 U.S.C. § 1395dd(f), and the Medicare Act. 42 U.S.C. § 1395.

The district court thought otherwise. To it, a "key consideration" is "what impact an injunction would have on non-parties and the public at large." Exh. 2, at 36 (citing *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003)). The public at large would be best served, the court said, by vindicating the Supremacy Clause. *See id.* In addition, the court discerned that "allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho." *Id.* And hospital capacity in neighboring states "would be pressured as patients may choose to cross state lines to get the emergency care they are entitled to receive under federal law." Exh. 2, at 37-38. Compared to these interests, the district court said that "the State of Idaho will not suffer any real harm if the Court issues the modest preliminary injunction the United States is requesting." Exh. 2, at 38. Accordingly, the court ruled that "the public interest lies in favor of enjoining the challenged Idaho law to the extent it conflicts with EMTALA." *Id.*

Yet section 622 expressly authorizes necessary medical care for pregnant women in distress. *See* IDAHO CODE §§ 18-622(2), (4), (5). There is no reasonable prospect that a woman suffering from preeclampsia or the side-effects of an ectopic pregnancy will be denied medical care because of section 622. Preeclampsia is a dangerous condition that poses a genuine threat to a woman's life, and section 622

expressly authorizes an abortion where a physician judges it in good faith to be necessary. *See id.* § 18-622(2). An ectopic pregnancy can also be life-threatening and even when not, its removal is not an abortion under Idaho law. *See Planned Parenthood*, 522 P.3d at 1203. Since EMTALA does not dictate any particular form of medical treatment—including abortion—an Idaho doctor complies with EMTALA by giving a pregnant woman with an emergency medical condition the same care provided to any similarly situated patient, regardless of the patient's ability to pay. That may include treatments other than abortion.

The lower court's focus on "non-parties and the public at large," Exh. 2, at 36, is mistaken when the likelihood of success on the merits "is the most important" factor in evaluating an injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Also, what matters under the "balance of equities" prong are "the burdens or hardships to [the plaintiff] compared with the burden on [the State of Idaho and the Legislature] if an injunction is ordered." *Poretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Properly focused, the balance tips in the Legislature's favor. For the Legislature, the preliminary injunction interposes federal judicial power on an issue of profound importance to Idaho. Elected state officials acted in good faith by adopting section 622 in harmony with Supreme Court precedent. Enjoining Idaho law is an affront to the State that only searching judicial review can justify.

By comparison, the United States has no legitimate interest in forcing compliance with an implied mandate contrary to EMTALA's text and context. Surely, there is no public interest in replacing Idaho's conception of abortion policy with the federal government's. Reasonable minds differ about when the law should authorize an abortion. But Idaho's elected officials have duly adopted laws restoring the State's historic commitment to protecting unborn life. *See Planned Parenthood Great N.W.*, 522 P.3d at 1148 (describing Idaho's "history and traditions" respecting the regulation of abortion). And nothing in EMTALA bars that choice.

## CONCLUSION

For these reasons, the Legislature respectfully requests a stay of the district court orders dated August 24, 2022 and May 4, 2023, pending final disposition of the appeal before this Court and proceedings before the Supreme Court of the United States.

Respectfully submitted,

*/s/ Daniel W. Bower*
Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

August 22, 2023

**CERTIFICATE OF COMPLIANCE PURSUANT TO
CIRCUIT RULE 32-1 FOR CASE NOS. 23-35440 & 23-35450**

I hereby certify that this brief complies with the word limits permitted by

FRAP 27(d)(2)(A). The motion is 4,984 words, excluding the cover and documents

exempted by FRAP 27(a)(2)(B). The brief's type size and typeface comply with

FRAP 32(a)(5) and (6).

Dated: August 22, 2023          */s/ Daniel W. Bower*
                               Daniel W. Bower

                               *Counsel for Intervenors-Appellants*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF IDAHO,

Defendant-Appellant,

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK
WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH
IDAHO LEGISLATURE, Proposed Intervenor-Defendants,

Movants-Appellants.

_____

On Appeal from the United States District Court
for the District of Idaho

_____

## RESPONSE OF THE UNITED STATES
## TO MOTION FOR A STAY PENDING APPEAL

_____

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

PAUL R. RODRÍGUEZ
*Deputy General Counsel*

DAVID HOSKINS
*Supervisory Litigation Attorney*

JESSICA BOWMAN
MELISSA HART
*Attorneys*

*U.S. Department of Health
and Human Services*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JOSHUA D. HURWIT
*United States Attorney*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER
NICHOLAS S. CROWN
*Attorneys, Appellate Staff
Civil Division, Room 7325
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT ......................................................................................................2

    A.   Legal Background. ....................................................................................2

    B.   Procedural Background.............................................................................4

ARGUMENT ......................................................................................................6

I.    The Legislature Is Not Likely to Succeed on the Merits. .......................6

    A.   EMTALA requires hospitals to offer abortion care when qualified
        physicians deem it necessary. ................................................................6

    B.   EMTALA preempts Idaho law insofar as it would prohibit
        stabilizing treatment.............................................................................8

    C.   The Legislature's arguments lack merit. ...........................................10

II.    The Legislature Fails to Show Irreparable Harm and the Equities
    Decisively Support Denying the Stay. ....................................................19

CONCLUSION ................................................................................................ 23

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# INTRODUCTION

The Idaho Legislature seeks to stay a preliminary injunction that issued over a year ago. The Court should deny this extraordinary request.

This case involves one of the country's most restrictive abortion laws: an Idaho statute so sweeping that the State's Supreme Court calls it a "Total Abortion Ban." *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1147 (Idaho 2023). Idaho makes it a felony to terminate a patient's pregnancy unless doing so would be "necessary" to prevent the patient's "death." Idaho Code § 18-622(2). It therefore criminalizes care required to stabilize pregnancy-related medical emergencies—*e.g.*, premature pre-term rupture of membranes (PPROM) or pre-eclampsia—which, if left untreated, can lead to catastrophic outcomes that stop short of death, including sepsis, uncontrollable bleeding, and organ failure. Idaho's statute prohibits such medically necessary care even though, in certain emergencies, federal law requires it. *See* Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd.

In August 2022, the United States brought this suit and sought a preliminary injunction. Invoking the Supremacy Clause and EMTALA's express preemption provision, § 1395dd(f), the district court granted tailored relief targeting situations when applying Idaho's ban in federally funded hospitals would "directly conflict[] with a requirement of" EMTALA.

The Legislature cannot show a likelihood of success on the merits. The court's statutory analysis is bolstered by the factual record, which the stay motion ignores. The

1

motion also fails on the equities. The Legislature delayed a year before filing it and suffers no irreparable harm. The injunction issued before Idaho's law became effective and imposes no tangible injury on the Legislature (indeed, the State—the named defendant—has not sought a stay). And Idaho has no prerogative to jeopardize the lives and health of individuals experiencing emergency medical conditions, or to force physicians in federally funded hospitals to withhold necessary treatment.

## STATEMENT

### A. Legal Background.

**1.** Congress enacted EMTALA in 1986, based on "a growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." H.R. Rep. No. 99-241, pt. 3, at 5 (1985). Its "overarching purpose" is to "ensure that patients, particularly the indigent and underinsured, receive adequate emergency medical care." *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) (alterations and quotation marks omitted). EMTALA applies to every hospital that has an emergency department and participates in Medicare. 42 U.S.C. § 1395dd(e)(2); *id.* § 1395cc(a)(1)(I)(i).

Under EMTALA, covered hospitals must offer individuals "[n]ecessary stabilizing treatment" when they present with an "emergency medical condition." *Id.* § 1395dd(b)(1)(A). A hospital may "transfer" an "individual to another medical facility," subject to various requirements. *Id.* § 1395dd(b)(1)(B), (c).

2

An "emergency medical condition" exists when an individual's "health" is in "serious jeopardy" or the individual risks "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A). "'[T]o stabilize'" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A).

EMTALA preempts "any State or local law requirement" that "directly conflicts with a requirement of this section." *Id.* § 1395dd(f). A direct conflict occurs when (1) it is "physically impossible" to comply with both state law and EMTALA, or (2) "the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1394 (9th Cir. 1993) (per curiam).

 **2.** Idaho Code § 18-622 is a statute that the State Supreme Court has called a "Total Abortion Ban" and recognized as narrower than another Idaho law that more closely aligns with EMTALA. *Planned Parenthood*, 522 P.3d at 1195-97, 1203-04, 1207. Idaho allows only those abortions "necessary to prevent … death," Idaho Code § 18-622(2)(a), or to treat "an ectopic or molar pregnancy," *id.* § 18-604(1). Otherwise, it is a felony punishable by two-to-five years' imprisonment—and by suspension or revocation of a professional license—to "perform[]," "attempt[] to perform," or "assist[] in performing or attempting to perform" treatment that involves pregnancy termination,

3

even if that treatment is necessary to prevent irreversible harm to the patient. *Id.* § 18-622(1).[1]

## B.    Procedural Background.

The United States filed suit, challenging § 18-622's constitutionality. 4-LEG-ER-570.[2] The government sought preliminary relief before § 18-622 could take effect and purport to prohibit emergency healthcare that EMTALA requires—*i.e.*, stabilizing treatments that physicians deem necessary.

On August 24, 2022, the district court preliminarily enjoined § 18-622's application insofar as it directly conflicts with EMTALA. 1-LEG-ER-14–52. The court concluded that both impossibility- and obstacle-preemption applied because Idaho law criminalizes and deters stabilizing treatments. 1-LEG-ER-32–47. For example, potentially devastating medical conditions exist (such as PPROM, pre-eclampsia, and placental abruption) that meet EMTALA's criteria and for which an abortion would prevent a *risk* of death—even if a provider cannot determine that pregnancy termination is *necessary* to prevent death. 1-LEG-ER-20–22. Similarly, such conditions could lead to non-

---

[1] Section 18-622(2)(b) permits abortion "during the first trimester of pregnancy" if the patient first furnishes a law-enforcement report that the pregnancy is the result of an "act of rape or incest." And before recent amendments, the statute's "necessary to prevent … death" provision was an affirmative defense. Idaho Code § 18-622(3)(a)(ii), (b)(i) (as originally enacted).

[2] Although the Complaint named one defendant—the State of Idaho—the Legislature permissively intervened. Both the State and Legislature appealed the preliminary injunction. The Legislature denoted its record excerpts as "LEG-ER"; the State denoted its excerpts as "ER."

4

lethal but irreversible harms to the pregnant individual, including "severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, hypoxic brain injury," or strokes. 1-LEG-ER-15; *see* 3-ER-188–217, 319–358. Yet, when a provider concludes that abortion is necessary stabilizing treatment required under EMTALA in those circumstances, Idaho Code § 18-622 criminalizes that care because it is not "necessary" to prevent "death."

2.     Rather than immediately appeal or request a stay, the Legislature sought reconsideration. 2-LEG-ER-270. After that motion became ripe, the Legislature asked the district court to "stay" its decision-making and instead permit supplemental briefing. 2-LEG-ER-209. The court granted the Legislature's request. 2-LEG-ER-129.

On May 4, 2023, the court denied reconsideration. 1-LEG-ER-2. The Legislature again declined to immediately appeal or seek a stay. Instead, it appealed on the last permissible day. 4-LEG-ER-587 (7/3/23 notice). That same date—nearly 11 months after the injunction had issued—the Legislature moved the district court for a stay pending appeal. 2-LEG-ER-76. The Legislature did not explain its delay, nor did it request an expedited decision or an order by a date certain. The district court has not yet ruled.

In this Court, the Legislature consented to consolidating its appeal with the State's—and received a one-week extension for its merits brief. No. 23-35450, Dkts. 6-1, 7. The Legislature filed that brief on August 7. It did not seek a stay in this Court until August 22, fewer than three weeks before the United States' merits brief is due.

5

# ARGUMENT

"A stay is not a matter of right" but "an exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quotation marks omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion" under four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426, 433-34 (quotation marks omitted). The "first two factors" are "the most critical," *id.* at 434, yet all weigh strongly against the Legislature.

## I.      The Legislature Is Not Likely to Succeed on the Merits.

The district court correctly identified a direct conflict. Federal law requires hospitals to offer stabilizing treatment, while state law criminalizes that same care.

### A.      EMTALA requires hospitals to offer abortion care when qualified physicians deem it necessary.

**1.**      Medicare-participating hospitals must offer "stabilizing treatment" to all individuals who present to emergency departments with an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). Barring an appropriate transfer, hospitals "must provide," "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* A hospital "meet[s]" this requirement if it "offers the individual" examination and

treatment and "informs the individual … of the risks and benefits," yet the individual refuses treatment. *Id.* § 1395dd(b)(2).

EMTALA defines the stabilization requirement broadly. It does not exempt any form of care: "'[T]o stabilize'" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during" transfer. 42 U.S.C. § 1395dd(e)(3)(A). That expansive definition is "not given a fixed or intrinsic meaning," but instead "is purely contextual or situational" and requires a "physician, faced with an emergency, to make a fast on-the-spot risk analysis." *Cherukuri v. Shalala*, 175 F.3d 446, 449-50 (6th Cir. 1999); *see In re Baby K*, 16 F.3d 590, 595-96 (4th Cir. 1994). EMTALA requires *any* form of stabilizing treatment, *if* the relevant professional determines such care is necessary.

**2.**     EMTALA's protections apply equally to pregnant individuals. *See* 42 U.S.C. § 1395dd(b). Congress expressly provided that a "pregnant woman" could be among the "individual[s]" experiencing an "emergency medical condition." *Id.* § 1395dd(e)(1)(A)(i), (B).

Abortion care constitutes potential stabilizing treatment. Various conditions can arise (or become exacerbated) during pregnancy and qualify as "emergency medical conditions" under EMTALA. Examples include PPROM, pre-eclampsia, and eclampsia. 3-ER-188–217, 319–358 (physician declarations). For some conditions, a physician could conclude that the requisite stabilizing treatment is pregnancy termination. *Id.*; 1-

7

LEG-ER-15, 20–22. If so, EMTALA requires that such treatment be offered and provided upon informed consent. 42 U.S.C. § 1395dd(b)(1)(A), (2).

Courts routinely recognize that abortion may constitute stabilizing treatment in medical emergencies. *E.g.*, *New York v. HHS*, 414 F. Supp. 3d 475, 537-39 (S.D.N.Y. 2019); *Morin v. Eastern Me. Med. Ctr.*, 780 F. Supp. 2d 84, 93-96 (D. Me. 2010); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712-18 (E.D. Mich. 2009); *California v. United States*, No. C-05-00328-JSW, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008).

Practitioners have likewise understood that EMTALA's requirements can encompass abortion care—*if* the medical provider determines that pregnancy termination is the necessary stabilizing treatment for a specific emergency medical condition. 3-ER-323–336, 339–346, 349–352, 355–358.

### B.  EMTALA preempts Idaho law insofar as it would prohibit stabilizing treatment.

**1.**  EMTALA expressly preempts contrary state laws: "The provisions of this section do not preempt any State or local law requirement, *except to* the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added).

Preemption occurs when (1) it is "physically impossible" to comply with both state law and EMTALA, or (2) "the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper*, 9 F.3d at 1394; *see id.* at 1393. A state law permitting (or requiring) physicians to refuse stabilizing

treatment poses a direct conflict. *See Baby K*, 16 F.3d at 597. Courts have similarly found preemption when state laws presented obstacles to EMTALA's civil-liability provisions. *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000); *Burditt v. HHS*, 934 F.2d 1362, 1373-74 (5th Cir. 1991).

**2.** Idaho's law directly conflicts with EMTALA. It is impossible to comply with both: Under § 18-622, it is a felony to "perform[]," "attempt[] to perform," or "assist[] in performing or attempting to perform an abortion" unless "necessary to prevent" the patient's "death." But emergency medical conditions (*e.g.*, PPROM, pre-eclampsia, and placental abruption) meet EMTALA's criteria by posing a *risk* of death even when a provider cannot determine that abortion is *necessary* to prevent death. In addition, non-lethal emergency medical conditions arise in Idaho that, in a physician's judgment, still require pregnancy termination as stabilizing treatment to prevent injuries like strokes, "limb amputation," "kidney failure," or "hypoxic brain injury." 1-LEG-ER-15; *see* 3-ER-182–183, 191–192, 195–201, 204–210, 213–217, 319–358. Accordingly, providers cannot comply with both state and federal law. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (finding preemption because "individuals could be prosecuted for conduct that Congress specifically sought to protect").

Section 18-622 also flouts obstacle-preemption principles. It criminalizes stabilizing treatments and requires suspension (or revocation) of the provider's license. These threats have "a deterrent effect," 1-LEG-ER-40, and obstruct Congress's "purpose" of "ensur[ing] that patients, particularly the indigent and underinsured, receive

9

adequate emergency medical care," *Arrington*, 237 F.3d at 1073-74 (quotation marks omitted); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("fear" of "expos[ure] … to unpredictable civil liability" sufficient for implied preemption); *see Baby K*, 16 F.3d at 597. The Legislature, moreover, does not dispute the factual record supporting the court's conclusions. 3-ER-345 ("[T]he threat of criminal prosecution has already deterred doctors from providing medically necessary, life-saving care."); *see also* 3-ER-200–201, 209–211, 351–352, 357–358.

### C. The Legislature's arguments lack merit.

The Legislature raises various objections. Many are forfeited; each is unavailing.

**1.** The Legislature contends (Mot. 6-7) that EMTALA's preemption provision is a "non-preemption" clause. But the case it cites, *Baker v. Adventist Health, Inc.*, 260 F.3d 987 (9th Cir. 2001), confirmed that § 1395dd(f) is "a non-preemption provision" only for *additional* "state remedies," such as "a state law claim for medical malpractice." *Id.* at 993. Section 1395dd(f) preserves state laws requiring care beyond EMTALA's requirements, but preempts laws that directly conflict with EMTALA's minimum guarantees. Indeed, the Legislature conceded in its merits brief (at 30) that preemption applies when EMTALA and state law "contradict[]."

**2.** The Legislature argues (Mot. 7-9) that EMTALA excludes pregnancy termination because it does not single out such care. *But see* 4-LEG-ER-504 (discussing conditions "requir[ing] an emergency medical procedure under EMTALA, with that procedure ending the life of the preborn child"). But there is no "such thing as a 'canon

10

of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020). It would be impossible (and unnecessary) for EMTALA to list every conceivable emergency medical condition and all corresponding stabilizing treatments. By not naming abortion—just as it omits mention of all sorts of stabilizing treatments—EMTALA treats pregnancy termination the same.

EMTALA mentions a specific stabilizing treatment in only one circumstance: when a pregnant individual is "having contractions." 42 U.S.C. § 1395dd(e)(1)(B); *see id.* § 1395dd(e)(3)(A) ("'[T]o stabilize' means, … with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta)."). By singling out "contractions," EMTALA ensures that labor constitutes an "emergency medical condition," regardless of subparagraph (e)(1)(A)'s standards. For all other emergency medical conditions, EMTALA leaves it to relevant physicians to determine what "medical treatment of the condition" is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual." *Id.* § 1395dd(e)(3)(A).

When Congress creates special rules governing abortion—or excludes abortion from otherwise-applicable rules—it does so explicitly. *See* 4-LEG-ER-552 (collecting examples). EMTALA's history and context reinforce the point: The same legislation through which Congress considered EMTALA included another proposed program that, unlike EMTALA, *did* expressly carve out abortion. *Compare* Consolidated Omnibus

11

Reconciliation Act of 1985, H.R. 3128, 99th Cong. § 124 (1985) (language that became EMTALA), *with id.* § 302(b)(2)(B) (excluding abortion from different program); *see also* 42 U.S.C. § 18023(d) (indicating that EMTALA may require emergency abortions).

**3.** The Legislature asserts (Mot. 9-11) that EMTALA's references to an "unborn child" exclude abortion from the broad definition of stabilizing treatment. That argument is forfeited and incorrect.

**a.** The Legislature did not raise this argument in the preliminary-injunction briefing and thus forfeited it. *See School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007).

Regardless, this new assertion overlooks the statutory text. EMTALA's screening, stabilization, and transfer obligations in subsections (a), (b), and (c) create duties only to an "individual," not an "unborn child." A hospital's screening duty arises when an "individual" "comes to the emergency department" and a request for examination or treatment "is made on the individual's behalf." 42 U.S.C. § 1395dd(a). A hospital's obligation to offer stabilizing treatment arises if it determines that "the individual has an emergency medical condition." *Id.* § 1395dd(b)(1). The "individual" must be informed of risks and benefits and can give "informed consent to refuse such examination and treatment." *Id.* § 1395dd(b)(2). And EMTALA restricts transfer "until [the] individual [is] stabilized." *Id.* § 1395dd(c). By expressly creating a duty only to individuals, EMTALA did not extend those duties to the "unborn."

**b.** EMTALA's four references to an "unborn child" do not alter this conclusion. Three references apply only when the individual is in labor, 42 U.S.C. § 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(B)(ii), and are irrelevant to EMTALA's requirements when the individual is *not* in labor. The statute sensibly considers risks to an "unborn child" in determining whether a hospital may permissibly transfer an individual in labor. But this says nothing about whether EMTALA establishes discrete obligations regarding an "unborn child" in other circumstances, nor does it suggest that Congress intended to mandate further gestation of a fetus at the expense of the individual's health when emergency complications arise. The Legislature's argument also proves too much, because it would mean EMTALA does not even encompass abortions necessary to save the individual's life. *See* 3-ER-253–254 (State's declarant admitting abortion as proper treatment of PPROM).

The injunction is likewise consistent with EMTALA's final reference to an "unborn child" in § 1395dd(e)(1)(A)(i). Subparagraph (e)(1)(A)(i) expands the circumstances when a pregnant individual can be considered to have an emergency medical condition necessitating stabilizing treatment: It includes conditions that might threaten the health of the unborn child, but not the pregnant individual. Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (1989); H.R. Rep. No. 101-386, at 838 (1989) (Conf. Rep.). But the text is clear. What must be stabilized is the "medical condition," *id.* § 1395dd(b)(1)(A), which belongs to the "individual," *id.* § 1395dd(b)(1), (c), (e)(1)(A)(i).

13

EMTALA's informed-consent framework supports this reading. Hospitals must inform the individual of the risks and benefits of the stabilizing treatment the provider concludes is necessary. 42 U.S.C. § 1395dd(b)(2). Then, "the individual (or a person acting on the individual's behalf)" decides whether to proceed. *Id.* EMTALA thus contemplates that the pregnant individual will determine whether to continue a dangerous pregnancy.

4.      Departing from EMTALA, the Legislature invokes (Mot. 7) a general provision of the Medicare Act providing that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. The Legislature failed to preserve this argument, *see School Dist.*, 5 F.3d at 1263; *Burlington*, 509 F.3d at 1093 n.3, which also misunderstands § 1395 and its interaction with EMTALA.

Nothing in § 1395 nullifies EMTALA's preemption provision or this Court's decision in *Draper*, 9 F.3d at 1393-94. The Supreme Court recently rejected a similar "reading of section 1395," which "would mean that nearly every condition of participation" in Medicare "is unlawful." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (per curiam). EMTALA's conditions, moreover, were enacted by Congress, not imposed by a "Federal officer or employee." 42 U.S.C. § 1395.

Nor does § 1395 give States prerogative to deny women stabilizing treatment. Through § 1395's "admonition that regulation should not 'supervise or control' medical

14

practice or hospital operations," Congress "endorsed medical self-governance" for providers. *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 101 (5th Cir. 1992).

Far from exercising supervision or control over medical practice, the injunction *preserves* physicians' ability to identify necessary stabilizing treatment—just as EMTALA leaves that determination to the relevant professionals' judgment. 42 U.S.C. § 1395dd(e)(3)(A); *see Cherukuri*, 175 F.3d at 449-50. Even if there were any tension between § 1395 and EMTALA's stabilization requirement, EMTALA—the subsequent and more "specific" statute—would control. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

The Legislature's single citation, *Eberhardt v. City of Los Angeles*, 62 F.3d 1253 (9th Cir. 1995), does not suggest otherwise. *Eberhardt* pertained to EMTALA's screening requirement, it did not discuss § 1395's meaning, and it did not address the extent to which EMTALA's stabilization requirement preempts state law.

**5.**     The Legislature cites (Mot. 11-13) the major questions doctrine, but that doctrine applies only to "*agency* decisions of vast economic and political significance." *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir. 2023) (quotation marks omitted). Here, there is "no relevant agency action," *id.*, because the United States is enforcing a "policy decision[]" made by "Congress … itself," *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quotation marks omitted).

Nor would any agency action, even if it existed here, constitute a "transformative expansion" of regulatory authority. *Mayes*, 67 F.4th at 934-36 (quotation marks omitted).

15

"[H]ealthcare facilities that wish to participate in Medicare … have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare." *Biden*, 142 S. Ct. at 652. And the notion that stabilizing treatment may include abortion is not "unprecedented." *Contra* Mot. 12. Courts, Congress, and practitioners have long understood the point—including before the decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See supra* pp. 7-8.

Even if there were anything unexpected about the district court's interpretation, that would provide no basis to disregard EMTALA. The Legislature relies on "extra-textual consideration[s]," which the Supreme Court has repeatedly rejected. *Bostock*, 140 S. Ct. at 1749. A statute can be "'very broad' and 'very clear,'" *Marinello v. United States*, 138 S. Ct. 1101, 1116 (2018) (Thomas, J., dissenting), and EMTALA is both.

**6.** The Legislature's effort (Mot. 14-16) to diminish the direct statutory conflicts here lacks merit. The Legislature conceded this argument, admitting to "conceptual textual conflicts" between EMTALA and § 18-622. 2-ER-118:24.

Section 18-622's narrow carveout from criminal liability—permitting abortions only when "necessary" to prevent the pregnant individual's "death"—does not resolve the conflict. EMTALA requires stabilizing treatment for any "emergency medical condition," which extends beyond treatments necessary to prevent death. 42 U.S.C. § 1395dd(e)(1)(A) (including "health … in serious jeopardy," "serious impairment to bodily functions," and "serious dysfunction of any bodily organ or part"); *accord* 1-LEG-ER-15, 20–22; 3-ER-191–192, 195–201, 204–210, 213–217, 319–358.

16

The recent amendments to Idaho law are inapposite. They removed an affirmative-defense structure and excluded some (not all) nonviable pregnancies from the definition of "abortion." But those amendments retained the standard that abortions must be *necessary* to prevent death, which is far narrower than EMTALA's stabilization requirements. 42 U.S.C. § 1395dd(e)(1)(A); *see* 1-LEG-ER-10 (Order listing examples); 3-ER-188–217, 319–358 (physician declarations); *Planned Parenthood*, 522 P.3d at 1196, 1207 (recognizing § 18-622's standard is narrower than another Idaho law that is "*substantially similar*" to EMTALA).

Regardless, § 18-622 stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Draper*, 9 F.3d at 1394, because it deters EMTALA-covered care, 1-LEG-ER-38–47.

**7.** The Legislature's remaining constitutional arguments (Mot. 16-18) are unavailing.

**a. Spending Clause.** "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds," *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1568 (2022), including through EMTALA, 42 U.S.C. § 1395cc(a)(1)(I)(i). The only time the Supreme Court has found improper "coercion" in a spending program was in the Medicaid context—which involves funds provided directly to States—when the Court concluded that States were forced to adopt new spending programs or lose federal funding (worth "over 10 percent of a State's overall budget") for existing programs. *See NFIB v. Sebelius*, 567 U.S. 519, 580-

17

85 (2012) (Roberts, C.J.) (plurality opinion). Here, however, the Legislature admits that "providers' participation in Medicare is voluntary." *Compare* 3-ER-373 (Complaint ¶15), *with* Dkt. 15-2 (Answer ¶15). And the government seeks to enforce a decades-old condition on Medicare funding, which has long been understood to include abortion in certain circumstances, *supra* pp. 7-8, and which Congress plainly has authority to enact, *see Biden*, 142 S. Ct. at 650.

b.    **Tenth Amendment.** "[T]here can be no violation of the Tenth Amendment" here because "Congress act[ed] under one of its enumerated powers," *United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000), through the Spending Clause. This case is a paradigm of preemption: EMTALA's stabilizing-treatment requirement "imposes restrictions or confers rights on private actors," Idaho's ban on such treatment "imposes restrictions that conflict with the federal law," and "therefore the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018). As noted, the Legislature concedes in its merits brief (at 30) that preemption applies when EMTALA and state law "contradict[]."

History likewise refutes the Legislature's reliance (Mot. 16) on Idaho's "sovereign authority." At EMTALA's enactment in 1986, no State could properly ban abortion pre-viability, or post-viability "where it [wa]s necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (plurality opinion) (quotation marks omitted) (reaffirming holdings of *Roe v. Wade*, 410 U.S. 113 (1973)); *see City of Akron v. Akron Ctr.*

18

*for Reprod. Health, Inc.*, 462 U.S. 416, 428-31 (1983); *Thornburgh v. American Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 759 (1986). EMTALA did not preserve authority that no State possessed when Congress enacted the statute.

The Supreme Court's decision in *Dobbs* does not alter this analysis. *Dobbs* "returned" "the authority to regulate abortion … to the people and their elected representatives," 142 S. Ct. at 2279, which includes "their representatives in the democratic process in … Congress," *id.* at 2309 (Kavanaugh, J., concurring). Congress placed this question—what treatment is necessary to stabilize emergency medical conditions experienced by pregnant individuals—in physicians' hands, to be determined according to their medical judgment and with the security of an express preemption clause.

## II. The Legislature Fails to Show Irreparable Harm and the Equities Decisively Support Denying the Stay.

**A.** The Legislature fails to demonstrate that it is likely to suffer irreparable injury before the preliminary-injunction appeal is resolved. *See Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). This independently forecloses relief. *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam) (stay "may not issue" absent showing of irreparable harm).

**1.** The Legislature claims (Mot. 3-4) irreparable harm because the injunction prevents the State from enforcing state law. As the movant, however, the Legislature must establish irreparable harm to *itself*, not to others. *Doe*, 957 F.3d at 1060. Enforcing Idaho law is the duty of Idaho's executive branch, not its Legislature. Idaho Const. art.

19

II, § 1; *id.* art. IV, § 5.[3] Here, Idaho's executive branch—representing the State as de-fendant-appellant—has not sought a stay. The State's decision not to invoke an en-forcement-related harm undermines the Legislature's request that the Court exercise equitable discretion to grant interim relief on this ground.

Nor does the Legislature demonstrate irreparable harm by citing its authority to "regulate abortion." Mot. 4. Whether the Legislature may constitutionally prohibit abor-tion care—even when it constitutes stabilizing treatment under EMTALA—"is at the core of this dispute, to be resolved at the merits stage of this case." *Doe*, 957 F.3d at 1059. "[T]he harm of such a perceived institutional injury is not irreparable, because the [Legislature] may yet pursue and vindicate its interests in the full course of this litiga-tion." *Id.* (quotation marks omitted). The Legislature offers no evidence that it suffers any concrete harms in the interim. Indeed, it continues to enact laws after the injunction issued.

2.    Delay is also a relevant factor "in evaluating" a claim of "irreparable harm absent interim relief." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

---

[3] The Legislature's citations (Mot. 3) do not support its novel argument that a *legislature* can establish irreparable harm and obtain a stay on this basis. Each case in-volved irreparable-harm claims by *executive* branch officials. *See Abbott v. Perez,* 138 S. Ct. 2305 (2018) (Governor); *Maryland v. King*, 567 U.S. 1301 (2012) (State represented by Attorney General); *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) (Attorney General); *District 4 Lodge of the Int'l Ass'n of Machinists v. Raimondo*, 18 F.4th 38 (1st Cir. 2021) (Sec-retary of Commerce); *Thompson v. DeWine*, 976 F.3d 610 (6th Cir. 2020) (per curiam) (Governor).

The Legislature's delay is substantial and unexplained. The district court granted the preliminary injunction on August 24, 2022. 1-ER-52. For the next 11 months, the Legislature declined to immediately appeal, sought to delay its own reconsideration motion and, once the court denied reconsideration, waited the full 60-day period before noticing its appeal and seeking a stay. *Supra* p. 5. On appeal, the Legislature consented to an extended briefing schedule and did not move for a stay in this Court until August 22—almost a year since the injunction issued. *Id.* This "long delay" "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

A stay, moreover, is meant "simply [to] suspend[] judicial alteration of the status quo." *Nken*, 556 U.S. at 429 (quotation marks omitted). The injunction itself preserves the status quo because it issued before § 18-622's effective date.

**B.** Even if the abstract principles that the Legislature invokes constituted irreparable harm, they would not outweigh the severe harms that a stay would cause. The balance of equities and public interest, which "merge" here, *Nken*, 556 U.S. at 435, independently counsel against the stay request.

**1.** "[A]llowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho." 1-LEG-ER-49. A stay permitting the law to take full effect during this appeal would increase the risk that pregnant patients needing emergency care would face serious complications, irreversible injuries (such as strokes, amputations, and organ failure), or death. *See supra* pp. 4-5, 9. The district court found

21

that numerous pregnancy-related conditions could require emergency abortion care, and that these conditions have occurred and will "inevitabl[y]" occur again within Idaho. 1-LEG-ER-50; *see* 3-ER-182–183, 188–217, 319–358. Yet the "emergency care mandated by EMTALA" in such cases would be "forbidden by Idaho's criminal abortion law." 1-LEG-ER-50.

The Legislature insists (Mot. 19-20) that state law does not criminalize abortions necessary to treat ectopic pregnancies, or pre-eclampsia "that poses a genuine threat to a woman's life." But emergency medical conditions affecting pregnant patients extend beyond those two scenarios. *E.g.*, 3-ER-326–331 (heart failure, PPROM, placental abruption). Even absent an immediate risk of death, it serves the public interest to ensure access to necessary stabilizing treatment when pregnant individuals' health is in "serious jeopardy," or when they are at risk of "serious impairment to bodily functions" or "serious dysfunction of any bodily organ." 42 U.S.C. § 1395dd(e)(1)(A).

Staying the injunction, moreover, would strain "the capacity of hospitals in neighboring states that do not prohibit physicians from providing EMTALA-mandated care," which "would be pressured as patients may choose to cross state lines to get the emergency care" that Idaho prohibits. 1-LEG-ER-50–51 (citing amici States' brief).

**2.** The public interest would also be harmed by a stay permitting a preempted state law to take effect. *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) ("[P]reventing a violation of the Supremacy Clause serves the public interest.").

22

A stay would likewise interfere with the United States' sovereign interest in proper administration of federal law and Medicare. *E.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."). The government agreed to provide Medicare funds to hospitals in Idaho, so long as those hospitals comply with EMTALA. 42 U.S.C. § 1395cc(a)(1)(I). But § 18-622 threatens "harm to the administration and integrity of Medicare," *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003), because federal funding would no longer guarantee access to necessary treatments when EMTALA requires them, 3-ER-363–364. This harm is substantial: the government provided over $3 billion in Medicare funding to hospitals in Idaho over fiscal years 2018-2020, with approximately $74 million attributable to emergency departments. 3-ER-367–368.

**3.** The Legislature's remaining points (Mot. 18-21) about federalism, separation of powers, and the "profound importance" of the issues repackage merits arguments. As discussed above (at 6-19), the Legislature cannot show a likelihood of success on the merits.

## CONCLUSION

The motion should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
    *General*

JOSHUA D. HURWIT
  *United States Attorney*

MICHAEL S. RAAB

McKAYE L. NEUMEISTER

*Of Counsel:*

SAMUEL BAGENSTOS
  *General Counsel*

PAUL R. RODRÍGUEZ
  *Deputy General Counsel*

DAVID HOSKINS
  *Supervisory Litigation Attorney*

JESSICA BOWMAN

MELISSA HART
  *Attorneys*

  *U.S. Department of Health*
    *and Human Services*

  *s/ Nicholas S. Crown*
NICHOLAS S. CROWN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *nicholas.s.crown@usdoj.gov*

September 2023

24

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellee states that it knows of one case related to the above-captioned consolidated appeals: Case No. 23-35153. That appeal arises from the district court's partial grant of intervention issued during the proceedings below.

*s/ Nicholas S. Crown*
Nicholas S. Crown

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Ninth Circuit Rules 27-1 and 32-3 because it contains 5,577 words. This brief also complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 27 because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.


*s/ Nicholas S. Crown*
Nicholas S. Crown

# CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

*s/ Nicholas S. Crown*
Nicholas S. Crown

**ADDENDUM**

# TABLE OF CONTENTS

EMTALA, 42 U.S.C. § 1395dd ..................................................................................A1

Idaho Code § 18-604 (effective July 1, 2023)......................................................A7

Idaho Code § 18-604 (effective July 1, 2021)......................................................A9

Idaho Code § 18-622 (effective July 1, 2023).................................................. A10

Idaho Code § 18-622 (enacted in 2020, effective August 25, 2022)........................... A12

**42 U.S.C. § 1395dd**

**§ 1395dd. Examination and treatment for emergency medical conditions and women in labor**

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

**(2) Refusal to consent to treatment**

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3) Refusal to consent to transfer**

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on

the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

**(c) Restricting transfers until individual stabilized**

**(1) Rule**

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless--

**(A)(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that[4] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

**(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

**(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

**(2) Appropriate transfer**

An appropriate transfer to a medical facility is a transfer--

**(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

---

[4] So in original. Probably should be followed by a comma.

A2

**(B)** in which the receiving facility--

**(i)** has available space and qualified personnel for the treatment of the individual, and

**(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

## (d) Enforcement

### (1) Civil money penalties

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a-7a(a) of this title.

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who--

**(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

A3

**(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a-7a of this title (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a-7a(a) of this title.

**(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

**(2) Civil enforcement**

**(A) Personal harm**

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(B) Financial loss to other medical facility**

Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(C) Limitations on actions**

No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**

In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate quality improvement organization (with a contract under part B of subchapter XI) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B.

**(4) Notice upon closing an investigation**

The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

**(e) Definitions**

In this section:

**(1)** The term "emergency medical condition" means--

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part; or

**(B)** with respect to a pregnant woman who is having contractions--

**(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

**(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

A5

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1395cc of this title.

**(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

> **(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1395x(mm)(1) of this title) and a rural emergency hospital (as defined in section 1395x(kkk)(2) of this title).

## (f) Preemption

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

## (g) Nondiscrimination

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

## (h) No delay in examination or treatment

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

A6

**(i) Whistleblower protections**

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

### Idaho Code § 18-604 (effective July 1, 2023)

### § 18-604. Definitions

As used in this chapter:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean:

   (a) The use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization, or the implantation of a fertilized ovum within the uterus;

   (b) The removal of a dead unborn child;

   (c) The removal of an ectopic or molar pregnancy; or

   (d) The treatment of a woman who is no longer pregnant.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be

A7

knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

(a) A description of any proposed treatment or procedure;

(b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

(c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

**Idaho Code § 18-604 (effective July 1, 2021)**

**§ 18-604. Definitions**

As used in this act:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean the use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization or the implantation of a fertilized ovum within the uterus.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

    (a) A description of any proposed treatment or procedure;

    (b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

    (c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

## Idaho Code § 18-622 (effective July 1, 2023)

### § 18-622. Defense of life act

(1) Except as provided in subsection (2) of this section, every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(2) The following shall not be considered criminal abortions for purposes of subsection (1) of this section:

(a)  The abortion was performed or attempted by a physician as defined in this chapter and:

(i)   The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(ii)  The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

(b)  The abortion was performed or attempted by a physician as defined in this chapter during the first trimester of pregnancy and:

(i)   If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws; or

(ii)  If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported to a law enforcement agency or child protective services that she is the victim of an act of rape or incest and a copy of such report has been provided to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws.

(3)  If a report concerning an act of rape or incest is made to a law enforcement agency or child protective services pursuant to subsection (2)(b) of this section, then the person who made the report shall, upon request, be entitled to receive a copy of such report within seventy-two (72) hours of the report being made, provided that the report may be redacted as necessary to avoid interference with an investigation.

(4)  Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

(5)  Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.

### Idaho Code § 18-622 (enacted in 2020, effective August 25, 2022)

### § 18-622. Criminal abortion

(1)  Notwithstanding any other provision of law, this section shall become effective thirty (30) days following the occurrence of either of the following circumstances:

(a) The issuance of the judgment in any decision of the United States supreme court that restores to the states their authority to prohibit abortion[1]; or

(b) Adoption of an amendment to the United States constitution that restores to the states their authority to prohibit abortion.

(2) Every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(3) It shall be an affirmative defense to prosecution under subsection (2) of this section and to any disciplinary action by an applicable licensing authority, which must be proven by a preponderance of the evidence, that:

(a)(i) The abortion was performed or attempted by a physician as defined in this chapter;

(ii) The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(iii) The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

A12

(b)(i) The abortion was performed or attempted by a physician as defined in this chapter;

(ii) If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported the act of rape or incest to a law enforcement agency and provided a copy of such report to the physician who is to perform the abortion;

(iii) If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported the act of rape or incest to a law enforcement agency or child protective services and a copy of such report has been provided to the physician who is to perform the abortion; and

(iv) The physician who performed the abortion complied with the requirements of paragraph (a)(iii) of this subsection regarding the method of abortion.

(4) Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

(5) Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.

A13

Nos. 23-35440 & 23-35450

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.
THE STATE OF IDAHO,
*Defendant-Appellant.*

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.
THE STATE OF IDAHO
*Defendant*,
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives; et al.,
*Intervenors-Appellants.*

Appeal from the United States District Court
for the District of Idaho
Honorable B. Lynn Winmill
(1:22-cv-00329-BLW)

**INTERVENORS-APPELLANTS' REPLY IN SUPPORT OF
MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

# ARGUMENT

## I.  NO PROCEDURAL BARRIER PREVENTS THE COURT FROM CONSIDERING THE LEGISLATURE'S LEGAL ARGUMENTS.

### A.  The Idaho Legislature Did Not "Forfeit" Legal Arguments that the District Court Excluded.

The United States opposes a stay. But since the Legislature's motion satisfies *Nken v. Holder*, 556 U.S. 418 (2009), a stay should issue.

The government alleges that the Idaho Legislature "forfeited" its argument that EMTALA's references to the medical care of an "unborn child" "exclude abortion from the broad definition of stabilizing treatment" by not raising the argument in the Legislature's opposition to the preliminary injunction. Resp. at 12.[1] Not so.

Neither decision cited in the Response supports forfeiture. *School District No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993), involves a failure to file documents with a motion as reason to deny reconsideration. *Burlington Northern & Santa Fe Railway Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007), rejected an argument initially raised in a reply. The alleged procedural bar is a fiction.

Worse, the forfeiture argument would punish the Legislature for an omission compelled by the district court's restrictions on the Legislature as a permissive in-

---

[1] The Response does not comply with word-length limits. Where FRAP 27(d)(2)(A) allows "5,200 words," the Certificate of Compliance attests to "5,577 words."

tervenor. Exhibit 6 at 1.[2] Yet the Response says nothing about how the court limited the Legislature to factual arguments when opposing the preliminary injunction. That the United States cites a non-existent procedural bar and fails to acknowledge the Legislature's constraints is egregious.

### B. The Idaho Legislature Did Not Concede that EMTALA Conflicts with Section 622.

The United States writes that the Legislature "conceded" the conflict between EMTALA and Idaho law during a hearing on the preliminary injunction. Resp. at 16 (citing 2-ER-118). Hardly.

Former counsel for the Legislature said, "I'm not disputing, Your Honor, the conceptual textual conflicts[.]" Exhibit 7 at 2-ER-118. But courts review an alleged concession for a "slip of the tongue." *In re Adamson Apparel, Inc. v. Simon*, 785 F.3d 1285, 1294 (9th Cir. 2015). Context matters.

At the time of the hearing, the district court had granted the Legislature permissive intervention "limited to allowing it to present evidence and argument aimed at 'showing the holes' in the factual foundation of the United States' motion." Exhibit 6 at 18. So the Legislature's counsel did not engage legal issues like conflicts between federal and state law. *See, e.g.*, Exhibit 7 at 2-ER-112–13.

---

[2] The Legislature has appealed its claim to intervene as of right. No. 23-35153.

The Legislature clarified its position in a brief opposing the preliminary injunction. There, the Legislature offered "a thorough-going analysis" showing that "EMTALA does not preempt the 622 Statute." Exhibit 8 at 13. But counsel did not present that argument, in compliance with the court's directions. *Id.*

Even if it were a concession, counsel's stray remark cannot affect this Court's "independent power to identify and apply the proper construction of governing law." *Aleman v. Glickman*, 217 F.3d 1191, 1196 n.3 (9th Cir. 2000) (citation omitted).

## C. The Legislature's Request for a Stay Is Timely.

Both in the procedural background and in its discussion of irreparable injury, the United States accuses the Legislature of unreasonably delaying its request for a stay. *See* Resp. at 5, 20–21. It isn't so. The Legislature acted in a timely and reasonable way. It moved for reconsideration 14 days after the preliminary injunction and for a stay pending appeal on "[t]hat same date" as its timely notice of appeal. Resp. at 5. That the preliminary injunction has stood undisturbed for a year is due to the district court's eight-month delay in deciding motions for reconsideration—not to any delay by the Legislature.

3

## II.  THE IDAHO LEGISLATURE HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.  EMTALA Does Not Preempt Section 622.

#### 1.  *An implied duty to perform abortions does not preempt state law because it does not "directly" conflict.*

The United States rehashes the district court's flawed preemption analysis. *See* Resp. at 8–10. But the government still misunderstands EMTALA's non-preemption clause. 42 U.S.C. § 1395dd(f). Since the United States infers a duty to perform abortions from EMTALA's obligation to provide "stabilizing treatment," that implied duty cannot pose the kind of direct conflict that triggers EMTALA's preemption clause. *Id.* § 1395dd(b)(1)(A). EMTALA preempts state laws that interfere with the federal statute's express requirements, but not otherwise.

Nor has the Legislature ever "conceded" that EMTALA preempts section 622. Resp. at 10, 18. Its opening brief says, "EMTALA preempts state law only when it contradicts with the statute's express requirements." Exhibit 9 at 30.

The United States then insists that "[w]hen Congress creates special rules governing abortion—or excludes abortion from otherwise-applicable rules—it does so explicitly." Resp. at 11. But this gets matters backwards. Executive power must be proven, not presumed. Like any federal agency, USDOJ and HHS "literally [have] no power to act, let alone pre-empt the validly enacted legislation of a sovereign

State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Com'n v. FCC*, 476 U.S. 355, 374 (1986).

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), does not save the government's argument. Unlike the sweeping Civil Rights Act, EMTALA is a "limited 'anti-dumping' statute." *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). EMTALA's overlapping non-preemption clauses mean that its "preemptive effect" should be construed "as narrowly as possible." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993). This is incontrovertible.

>    2.   *The Medicare Act bars EMTALA from preempting state standards of medical care like section 622.*

The United States charges the Legislature with "fail[ing] to preserve this argument" about the Medicare Act, Resp. at 14, but does not bother to explain why. To be clear, the Legislature raised the argument in its motion for reconsideration, opening brief, and motion for a stay. *See* Exhibit 10 at 8–9; Exhibit 9 at 31–32; Mot. at 7.

The Medicare Act's express non-preemption clause does not "depart[ ] from EMTALA." Resp. at 14. That clause *controls* EMTALA.

*Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam), is inapposite. The abortion mandate asserted here has not been "long insisted upon" by the United States. *Id.* at 654. And *Biden* nowhere hints at generally lowering section 1395's barrier on the federal takeover of medical practice.

5

The government says that the abortion mandate it advocates was "enacted by Congress" rather than being "imposed by a 'Federal officer or employee.'" Resp. at 14 (quoting 42 U.S.C. § 1395). Again, not so. That mandate reflects a statutory interpretation adopted by USDOJ and HHS—not the words enacted by Congress.

The United States further argues that the preliminary injunction "*preserves physicians' ability to identify necessary stabilizing treatment.*" Resp. at 15. But section 1395 proscribes federal "supervision or control over the practice of medicine," regardless of whether it promotes physician autonomy. 42 U.S.C. § 1395. The point is to preserve state autonomy over the practice of medicine within a state's borders.

Straining to avoid section 1395, the government contends that "any tension" between it and EMTALA should be resolved in favor of EMTALA as the more recent and specific statute. *See* Resp. at 15. But repeal-by-implication is disfavored. "[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984) (citation omitted).

## B.     EMTALA Does Not Require Abortion as Stabilizing Care.

It is undisputed that EMTALA requires a hospital to provide "stabilizing treatment" to a patient with what the statute calls an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). But the parties disagree whether "stabilizing treatment" implies a duty to perform abortions. The United States insists so because the statute

"does not exempt any form of care." Resp. at 7. On that view, "EMTALA requires *any* form of stabilizing treatment *if* the relevant professional determines such care is necessary." *Id.* (emphasis in original). The government infers that "[a]bortion care constitutes potential stabilizing treatment." *Id.*

Space precludes a full rebuttal. Suffice it to say that (1) EMTALA says nothing about abortion; (2) the statute requires medical care for "an unborn child," *see, e.g.*, 42 U.S.C. § 1395dd(e)(1)(A)(i); and (3) delivery is the only form of stabilizing treatment expressly approved for a pregnant woman with contractions, *id.* § 1395dd(e)(3)(A). These features make EMTALA-as-abortion-mandate implausible.

The United States denies that EMTALA entails "duties to the 'unborn.'" Resp. at 12. Yet the statute says otherwise. *See* 42 U.S.C. §§ 1395dd(c)(1)(A)(ii) (barring a patient transfer that poses "increased risks" to "the unborn child"); 1395dd(c)(2)(A) (allowing a patient transfer that "minimizes the risks" to "the health of the unborn child"); 1395dd(e)(1)(A)(i) ("emergency medical condition" puts "the health of the [pregnant] woman or her unborn child in serious jeopardy"); 1395dd(e)(1)(B)(ii) ("emergency medical condition" includes a patient transfer that "pose[s] a threat to the health or safety of the woman [in labor] or the unborn child").

The Response's claim, Resp. at 8, that "[c]ourts routinely recognize" EMTALA as an abortion mandate has threadbare support, and none of the cited rulings involves a medical condition that section 622 covers. *See New York v. U.S. Dep't of*

7

*Health and Human Services*, 414 F. Supp. 3d 475, 539 (S.D.N.Y. 2019) (citing ectopic pregnancy as an emergency condition covered by EMTALA); *id.* at 555 (HHS declines to say how EMTALA applies to emergency abortions under a conscience rule); *Morin v. Eastern Me. Med. Ctr.*, 780 F. Supp. 2d 84, 93–96 (D. Me. 2010) (addressing whether EMTALA requires a hospital to deliver a dead fetus); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712–18 (E.D. Mich. 2009) (declining to resolve whether EMTALA requires delivery of a nonviable fetus); *California v. United States*, No. C-05-00328-JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) (dismissing a case under California law for lack of standing).

## C. The Major Questions Doctrine Precludes the United States' Construction of EMTALA as a Fount of Executive Power.

The United States resists the major questions doctrine for reasons that don't add up. The notion that "there is 'no relevant agency action' because the United States is enforcing 'a policy decision[ ]' made by 'Congress … itself'" begs the question whether EMTALA embodies a congressional decision to mandate abortion. Resp. at 15 (quotations omitted). One cannot avoid the doctrine for lack of "a 'transformative expansion' of regulatory authority." *Id.* (quotation omitted). Inaugurating an abortion mandate is plenty transformative. Regardless, the doctrine applies when clear congressional authority fails to underwrite "agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)

(citations omitted). Obviously, a federal abortion mandate holds "vast … political significance." *Id.*

As the motion rightly said, "This is a quintessential major questions doctrine case." Mot. at 11. All the elements are here—a newfound source of executive power with "vast … political significance" but without "clear congressional authorization." *Util. Air*, 573 U.S. at 324. That alone should doom the government's case.

### D. The Government's Reading of EMTALA Raises Serious Constitutional Questions.

The United States breezes by the Legislature's constitutional objections in less than two pages. *See* Resp. at 16–18.

Spending Clause issues remain. The USDOJ and HHS may not coerce unwilling Idaho hospitals into complying with the government's novel construction of EMTALA by threatening to withhold multi-billion-dollar Medicare grants when EMTALA-related funding is comparatively small. As in *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012), that threat leaves hospitals—and the states where they operate—"no real option but to acquiesce." Neither *NFIB*'s factual setting nor a hospital's voluntary participation as a general matter determines whether the government's threat is coercive. *See* Resp. at 17. And Congress's authority to adopt statutory conditions on Medicare disbursement differs from the United States' more limited authority to force acceptance of its statutory construction. *See id.* at 18.

Tenth Amendment problems are no less evident. Far from being a "paradigm of preemption," this case is a paradigm of executive overreach. Resp. at 18. The United States whizzes by express provisions curtailing EMTALA's preemptive reach. *See* 42 U.S.C. §§ 1395dd(f), 1395. Contra the government, Resp. at 18, the Legislature has never conceded that EMTALA preempts Idaho law. *See* Exhibit 9. at 30. And the holding in *Dobbs* is unmistakable: "The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion." 142 S. Ct. at 2284. The Supreme Court's opinion does not endorse congressional power over abortion, and the Response confuses the United States' policy preferences with EMTALA's text. *See* Resp. at 19.

## III. IRREPARABLE INJURY AND THE REMAINING *NKEN* FACTORS SUPPORT A STAY PENDING APPEAL.

### A. The Preliminary Injunction, by Itself, Irreparably Harms the Idaho Legislature.

The United States says that the Legislature has not suffered irreparable injury because "[e]nforcing Idaho law is the duty of Idaho's executive branch." Resp. at 19. That response is a non sequitur. The ruling principle is that "a State suffers 'on-going irreparable harm' whenever it is 'enjoined by a court from effectuating statutes enacted by representatives of its people.'" Mot. at 3 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). The injury lies in preventing a State from "effectuating" its laws. *Id.* Proof of other harm is unnecessary.

10

Applying *King* to the elected officials it covers is hardly "novel." Resp. at 20 n.3. Because irreparable harm is caused by judicial interference with "statutes enacted by representatives of [a State's] people," *King*, 567 U.S. at 1303, any duly authorized body or official of State government may assert it. That executive branch officials have invoked *King* makes no difference.

The Idaho Attorney General's decision not to request a stay has no bearing on the Legislature's motion.

To undermine the Legislature's showing of irreparable injury, the United States falsely charges the Legislature with "substantial and unexplained" delay. Resp. at 21. Those criticisms misrepresent the record: the Legislature has acted timely and reasonably. That the preliminary injunction has endured for a year is due to the district court's delays—not to any foot dragging by the Legislature.

**B.      The Public Interest and Balance of the Equities Support a Stay.**

The United States invokes "severe harms that a stay would cause." Resp. at 21. Echoing the district court, the government claims a stay would "increase the risk that pregnant patients needing emergency care would face serious complications, irreversible injuries … or death." *Id.* This exaggerates Idaho law. The United States does not contest that section 622 authorizes pregnancy termination to treat women with ectopic pregnancy, preeclampsia, and threats to their life. *Id.* Still, the government says, "it serves the public interest to ensure access to necessary stabilizing

11

treatment" in the interest of "pregnant individuals' health." *Id.* at 22. Invoking its sovereign authority, the government also claims that the public interest is "harmed by a stay permitting a preempted state law to take effect." *Id.*

Both contentions "repackage merits arguments." *Id.* at 23. In fact, they beg leading questions in the case—whether EMTALA requires access to abortion at all and whether, if so, EMTALA preempts Idaho law. No is our answer.

## CONCLUSION

For these reasons, the Legislature respectfully requests a stay of the district court orders dated August 24, 2022 and May 4, 2023, pending final disposition of the appeal before this Court and proceedings before the Supreme Court of the United States.

Respectfully submitted,

*/s/ Daniel W. Bower*
Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

September 8, 2023

12

**CERTIFICATE OF COMPLIANCE PURSUANT TO
CIRCUIT RULE 32-1 FOR CASE NOS. 23-35440 & 23-35450**

I hereby certify that this brief complies with the word limits permitted by

FRAP 27(d)(2)(C). The motion is 2,584 words, excluding the cover and documents

exempted by FRAP 27(a)(2)(B). The brief's type size and typeface comply with

FRAP 32(a)(5) and (6).

Dated: September 8, 2023           */s/ Daniel W. Bower*
                                   Daniel W. Bower

                                   *Counsel for Intervenors - Appellants*

## 42 U.S.C. § 1395 – Prohibition Against Any Federal Interference

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

## Federal Rule of Appellate Procedure 35:
## En Banc Determination

**(a) When Hearing or Rehearing En Banc May Be Ordered**. A majority of the circuit judges who are in regular active service and who are not disqualified may order that an appeal or other proceeding be heard or reheard by the court of appeals en banc. An en banc hearing or rehearing is not favored and ordinarily will not be ordered unless:

> **(1)** en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or

> **(2)** the proceeding involves a question of exceptional importance.

**(b) Petition for Hearing or Rehearing En Banc**. A party may petition for a hearing or rehearing en banc.

> **(1)** The petition must begin with a statement that either:

>> **(A)** the panel decision conflicts with a decision of the United States Supreme Court or of the court to which the petition is addressed (with citation to the conflicting case or cases) and consideration by the full court is therefore necessary to secure and maintain uniformity of the court's decisions; or

>> **(B)** the proceeding involves one or more questions of exceptional importance, each of which must be concisely stated; for example, a petition may assert that a proceeding presents a question of exceptional importance if it involves an issue on which the panel decision conflicts with the authoritative decisions of other United States Courts of Appeals that have addressed the issue.

> **(2)** Except by the court's permission:

>> **(A)** a petition for an en banc hearing or rehearing produced using a computer must not exceed 3,900 words; and

**(B)** a handwritten or typewritten petition for an en banc hearing or rehearing must not exceed 15 pages.

**(3)** For purposes of the limits in Rule 35(b)(2), if a party files both a petition for panel rehearing and a petition for rehearing en banc, they are considered a single document even if they are filed separately, unless separate filing is required by local rule.

**(c) Time for Petition for Hearing or Rehearing En Banc**. A petition that an appeal be heard initially en banc must be filed by the date when the appellee's brief is due. A petition for a rehearing en banc must be filed within the time prescribed by Rule 40 for filing a petition for rehearing.

**(d) Number of Copies**. The number of copies to be filed must be prescribed by local rule and may be altered by order in a particular case.

**(e) Response**. No response may be filed to a petition for an en banc consideration unless the court orders a response. The length limits in Rule 35(b)(2) apply to a response.

**(f) Call for a Vote**. A vote need not be taken to determine whether the case will be heard or reheard en banc unless a judge calls for a vote.

## TABLE OF CONTENTS

Panel Order of September 28, 2023 .............................ADDENDUM_001

Legislature's Motion for Stay.......................................ADDENDUM_019

United States' Response Opposing Stay.......................ADDENDUM_042

42 U.S.C. § 1395dd (EMTALA) ..................................ADDENDUM_073

IDAHO CODE § 18-604 (2023).........................................ADDENDUM_079

IDAHO CODE § 18-622 (2023).........................................ADDENDUM_082

Legislature's Reply Supporting Stay ...........................ADDENDUM_086

42 U.S.C. § 1395 .........................................................ADDENDUM_100

FRAP 35.......................................................................ADDENDUM_101