**Nos. 23-35440, 23-35450**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF IDAHO,

Defendant-Appellant,

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-Defendants,

Movants-Appellants.

On Appeal from the United States District Court
for the District of Idaho

## REPLY IN SUPPORT OF UNITED STATES'S EMERGENCY MOTION FOR RECONSIDERATION EN BANC OF PUBLISHED ORDER GRANTING STAY PENDING APPEAL (RELIEF REQUESTED BY OCTOBER 10, 2023)

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

PAUL R. RODRÍGUEZ
*Deputy General Counsel*

DAVID HOSKINS
*Supervisory Litigation Attorney*

JESSICA BOWMAN
MELISSA HART
*Attorneys*
U.S. Department of Health and Human Services

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JOSHUA D. HURWIT
*United States Attorney*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER
NICHOLAS S. CROWN
*Attorneys, Appellate Staff*
*Civil Division, Room 7325*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*202-305-1754*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.     The Stay Order Conflicts with Fourth Circuit Precedent. ..................... 2

II.    Appellants Fail to Diminish the Direct Statutory Conflict Here. ......... 4

III.   The Equities Sharply Undermine the Stay. ............................................ 8

CONCLUSION ...................................................................................................... 9

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## INTRODUCTION

The *en banc* Court should administratively stay—and vacate—the published motions-panel order staying a year-old preliminary injunction. The order allows Idaho's "Total Abortion Ban," *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1147 (Idaho 2023), to criminalize emergency healthcare that federal law requires. The order conflicts with statutory text and Fourth Circuit precedent, creates confusion in emergency departments across Idaho (jeopardizing patients' health and access to medically necessary care), and upsets the status quo (because the preliminary injunction issued *before* Idaho's ban took effect).

The Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, provides individuals the "necessary stabilizing treatment" for "emergency medical conditions." When pregnant individuals experiencing a medical emergency present to Medicare-covered hospitals, EMTALA requires (upon informed consent) "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A). EMTALA expressly extends beyond life-saving care and includes threats to a patient's "health," "organ[s]," and "bodily functions." *Id.* § 1395dd(e)(1)(A).

Thus, when a pregnant individual is experiencing an emergency—*e.g.*, infections, pre-eclampsia, or premature pre-term rupture of membranes (PPROM)—a Medicare-covered hospital must offer medically necessary stabilizing treatment regardless of

1

whether the condition is lethal. In some cases, providers will determine in their reasonable judgment that the medically necessary treatment involves terminating the pregnancy, because doing so would be necessary to avoid serious harms like limb amputation, comas, strokes, hysterectomies, or organ failure. 1-LEG-ER-15; 3-ER-188–217, 319–358; *see generally* St.Luke's.Amicus.Br.

But the stay enables irreversible and life-altering injuries to patients to occur. Even when abortion is the medically necessary stabilizing treatment to avoid serious non-lethal harms, Idaho criminalizes that care because it is not "necessary" to prevent "death." Idaho Code § 18-622(2)(a). As the Idaho Supreme Court recognizes, Idaho's law is narrower than EMTALA. *Planned Parenthood*, 522 P.3d at 1158, 1195-97, 1203-04, 1207. And it subverts a core purpose of EMTALA: to ensure "adequate emergency room medical services." H.R. Rep. No. 99-241, pt. 3, at 5 (1985); *see Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001). Thus, it "directly conflicts with a requirement of" EMTALA and is "preempt[ed]." 42 U.S.C. § 1395dd(f).

## ARGUMENT

Appellants' responses underscore the direct statutory conflict and confirm that the *en banc* Court should grant emergency relief.

### I. The Stay Order Conflicts with Fourth Circuit Precedent.

*En banc* review is appropriate not only because the matter is "certainly important," Leg.Opp.2, and creates chaos in emergency rooms, Mot.i–ii, 1-6, 16-17, but also because the stay conflicts with *In re Baby K*, 16 F.3d 590 (4th Cir. 1994). The Fourth

2

Circuit squarely rejected the order's reasoning—and appellants' arguments. *Id.* at 595-97.

In dismissing the circuit conflict, Legislature and State misread *Baby K*. The Legislature asserts (Leg.Opp.4) that "nobody disputed" whether the care at issue was "'stabilizing treatment,'" but that *was* the dispute: A hospital "argue[d] that EMTALA cannot be construed to require it to provide respiratory support to anencephalics when its physicians deem such care inappropriate, because Virginia law permits physicians to refuse to provide such care." 16 F.3d at 597. The Fourth Circuit "disagree[d]," holding that "to the extent" state law "exempts physicians from providing" such care, "it directly conflicts with the provisions of EMTALA that require stabilizing treatment to be provided." *Id.*[1] By contrast, the stay order permits Idaho law to directly conflict with EMTALA by exempting care that meets EMTALA's definition of "stabilizing treatment." 42 U.S.C. § 1395dd(e)(3)(A) ("to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility").

The State mistakenly asserts (State.Opp.10-13) that *Baby K*—and EMTALA—are limited to patient-dumping or "unequal[]" treatment based on financial status. The Fourth Circuit rejected that atextual view as "directly conflict[ing] with the plain

---

[1] The State incorrectly suggests that *Baby K* did not rule on a "conflict between EMTALA and Virginia law." State.Opp.12.

3

language of EMTALA," because it would permit hospitals to "allow [a] condition to materially deteriorate, so long as the care [the individual] was provided was consistent with the care provided to other individuals." 16 F.3d at 595-96; *see Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 n.3 (9th Cir. 1995) ("the stabilization requirement is not met by simply dispensing uniform stabilizing treatment" (citing *Baby K*)). By embracing that interpretation, the stay order diverges on life-or-limb questions.

## II.     Appellants Fail to Diminish the Direct Statutory Conflict Here.

Declining to defend much of the order's analysis, appellants offer new theories. Each is unpersuasive, as explained below and previously (Dkts. 33, 35).

**A.**     Neither appellant disputes that the order's preemption analysis overlooked EMTALA's application in non-lethal contexts, and that the relevant exception to Idaho law applies only when pregnancy termination is "necessary" to prevent "death." Idaho Code § 18-622(2)(a)(i). The Legislature underscores the error by stating, "the chance of actual conflict between EMTALA and section 622 *approaches nearly* zero." Leg.Opp.15 (emphasis added). But the injunction, 1-LEG-ER-51–52, targeted those precise instances when there *is* a direct conflict, including the non-lethal contexts (detailed in the record but unaddressed by the panel) that meet EMTALA's definitions of "'emergency medical condition'" and "'stabilize,'" 42 U.S.C. § 1395dd(e)(1)(A), (3)(A); Mot.13-16; St.Luke's.Amicus.Br. 4-10. That alone warrants vacatur of the stay.

**B.**     In contesting preemption and EMTALA's scope, appellants do not engage with the statutory definitions of "emergency medical condition" and "stabilize."

4

Such "[t]extualist arguments that ignore the operative text cannot be taken seriously." *Sackett v. EPA*, 143 S. Ct. 1322, 1344 (2023).

Especially unavailing are appellants' suggestions that the district court's straightforward reading would require "bloodletting," "euthanasia," "lobotomies," or "conversion therapy" in Medicare-participating emergency rooms. State.Opp.4; Leg.Opp.9. Appellants offer no analysis—or medical evidence—suggesting any of their hypotheticals would constitute "medical treatment of [an emergency medical] condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). Like the stay order, appellants do not discuss the factual record showing that, in certain emergencies, pregnancy termination constitutes the only medical treatment that can prevent material deterioration and catastrophic harms to the patient. Mot.8-9.

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), does not alter the analysis. The Supreme Court "returned" "the authority to regulate abortion … to the people and their elected representatives," *id.* at 2279, which includes "their representatives in the democratic process in … Congress," *id.* at 2309 (Kavanaugh, J., concurring). Those representatives in Congress defined EMTALA's stabilizing-treatment requirement broadly and unequivocally preempted "any" state law that "directly conflicts." 42 U.S.C. § 1395dd(e)(3)(A), (f).

5

**C.** Lacking support in EMTALA, appellants cite a general provision of the Medicare Act, 42 U.S.C. § 1395, and incorrectly argue that the government's theory imposes a national standard of care.[2]

The panel did not cite § 1395, which does not apply by its terms. EMTALA's funding condition was enacted by Congress, not imposed by a "Federal officer or employee." Section 1395, moreover, does not narrow EMTALA's preemption clause—which covers all "directly conflict[ing]" state laws. *Id.* § 1395dd(f). Even if there were any tension between EMTALA and § 1395, EMTALA—the subsequent and more "specific" statute—would control. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

*Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390 (D.C. Cir. 2021), is also inapposite. It addressed an irrelevant statute that, unlike EMTALA, lacked "explicit" preemptive effect. *Id.* at 400.

**D.** Venturing further from the panel's reasoning, the State contends that stabilizing treatment cannot encompass abortion because such care is not "available at the hospital," 42 U.S.C. § 1395dd(b)(1)(A), after Idaho criminalized it.

That argument falters at every turn. The State did not timely raise it below. It is incompatible with the State's assertion that abortion *is* available when "necessary to

---

[2] Section 1395 states that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided."

prevent … death." Idaho Code § 18-622(2)(a)(i). It is irreconcilable with the State's concession that "[t]he range of emergency room services subject to EMTALA is immense, and … may even include abortions." 3-ER-239. And it is inconsistent with the Legislature's recognition that a "serious medical condition" could "require[] an emergency medical procedure under EMTALA, with that procedure ending the life of the preborn child." 4-LEG-ER-504. The physician declarations (some offered by the State) also belie this argument by attesting that abortion care is within their medical expertise or their hospitals' capabilities (and appropriate treatment in certain circumstances). 3-ER-247–260, 338–340, 348–351, 354–357. Here, too, the State's theory contradicts *Baby K*, 16 F.3d at 597.[3]

The State's view, moreover, is backwards. It would excise EMTALA's express preemption provision from the statute: Under the State's framing, EMTALA would never preempt state laws forbidding a particular stabilizing treatment, because any banned treatment would simply be "[un]available" under § 1395(b)(1)(A). That is untenable, particularly given EMTALA's purpose of ensuring "adequate" treatment.

---

[3] The State's reliance on *Martindale v. Indiana Univ. Health Bloomington, Inc.*, 39 F.4th 416 (7th Cir. 2022), is misplaced because it addressed EMTALA's transfer requirements—not stabilization or preemption. EMTALA's transfer provision likewise does not support the State. *Contra* State.Opp.6-7. The "medical benefits" of providing stabilizing treatments that Idaho physicians are trained and willing to perform will "outweigh" the risks of withholding that care and transporting the individual to receive it out-of-state. 42 U.S.C. § 1395dd(c)(1)(A)(ii). The State's reading also creates absurd consequences: It would relegate EMTALA to a patient-dumping regime and allow States to ban any stabilizing treatment for non-medical reasons, like cost-savings.

*Arrington*, 237 F.3d at 1073-74; H.R. Rep. No. 99-241, pt. 3, at 5; *see Campbell v. Universal City Dev. Partners, Ltd.*, 72 F.4th 1245, 1257-58 (11th Cir. 2023) (state law cannot define what disability-discriminatory requirements are "necessary" under the ADA, given the statute's preemption provision and consequences of interpreting federal law to yield to state law).

  **E.** The government previously refuted appellants' remaining arguments. *E.g.*, Leg.Add.053, Dkt. 35 at 25-26 (rebutting "nonpreemption"-clause argument); Leg.Add.055–057, Dkt. 35 at 31-36 (rebutting "unborn child" argument); Leg.Add.059–060, Dkt. 35 at 26-31, Mot. 14-15 (rebutting reliance on state-law amendments). None supports a stay of an injunction pre-dating § 18-622's effective date, especially a year later.

## III. The Equities Sharply Undermine the Stay.

  **A.** Appellants deny harm to the United States's sovereignty only by departing from EMTALA's text and the Fourth Circuit's preemption analysis. Appellants do not contest that the stay upends the status quo (because the injunction issued before Idaho's law took effect). *Contra Nken v. Holder*, 556 U.S. 418, 429 (2009). And they simply ignore the devastating harms—*e.g.*, comas, strokes, and organ failures—pregnant patients now face. Mot.16-17; St.Luke's.Amicus.Br.10-18.

  Instead, the State repeats (State.Opp.13-14) an argument first unveiled on appeal: that the federal government "delay[ed]" by not challenging a different Idaho law enacted in 1973. That logic does not follow. The United States sought preliminary relief

8

two weeks before § 18-622's effective date. 3-ER-296. Whether the federal government challenged a prior statute (when Idaho had much more limited ability to ban abortion) is irrelevant.

**B.** On the other side of the ledger, the State does not reconcile its assertions of irreparable harm with its failure to seek any stay.[4] Likewise, the Legislature does not explain why it waited almost a year to request a stay if, as it claims, Idaho suffered irreparable injury the moment the injunction issued. *See Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019); *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). And like the stay order, appellants do not address *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020), which held that a "perceived institutional injury is not 'irreparable'" at the stay stage when the government-party "'may yet pursue and vindicate its interests in the full course of th[e] litigation.'"

## CONCLUSION

This Court should vacate the stay and grant an immediate administrative stay of the panel's order.

---

[4] The State instead questions (State.Opp.15-16) the availability of *en banc* relief, but overlooks Circuit Rule 27-10 and General Order 6.11, which expressly refer to *en banc* review of a published order.

9

|  |  |
|---|---|
|  | Respectfully submitted, |
| *Of Counsel:* | BRIAN M. BOYNTON<br>   *Principal Deputy Assistant Attorney*<br>     *General* |
| SAMUEL BAGENSTOS<br>   *General Counsel* | JOSHUA D. HURWIT<br>   *United States Attorney* |
| PAUL R. RODRÍGUEZ<br>   *Deputy General Counsel* | MICHAEL S. RAAB<br>McKAYE L. NEUMEISTER |
| DAVID HOSKINS<br>   *Supervisory Litigation Attorney* |  s/ *Nicholas S. Crown* |
| JESSICA BOWMAN<br>MELISSA HART<br>   *Attorneys*<br>    U.S. Department of Health<br>     and Human Services | NICHOLAS S. CROWN<br>   *Attorneys, Appellate Staff*<br>   *Civil Division, Room 7325*<br>   *U.S. Department of Justice*<br>   *950 Pennsylvania Avenue NW*<br>   *Washington, DC 20530*<br>   *(202) 305-1754*<br>   *nicholas.s.crown@usdoj.gov* |

October 2023

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellee states that it knows of one case related to the above-captioned consolidated appeals: Case No. 23-35153. That appeal arises from the district court's partial grant of intervention issued during the proceedings below.

    *s/ Nicholas S. Crown*
    Nicholas S. Crown

## CERTIFICATE OF COMPLIANCE

This brief contains 2,097 words, less than half of the word-limit imposed by the *en banc* coordinator's order (Dkt. 54) directing a response to the United States's emergency motion. This brief was prepared in a proportionally spaced typeface using Word for Microsoft 365 in Garamond 14-point font.

*s/ Nicholas S. Crown*
Nicholas S. Crown

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

*s/ Nicholas S. Crown*
Nicholas S. Crown