**Nos. 23-35440, 23-35450 (consol.)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

STATE OF IDAHO,
*Defendant-Appellant,*

*and*

MIKE MOYLE, *Speaker of the Idaho House of Representatives*; CHUCK WINDER, *President Pro-Tempore of the Idaho Senate*; THE SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-Defendants,
*Movants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:22-cv-00329-BLW
Hon. B. Lynn Winmill, District Court Judge

# PROPOSED BRIEF OF *AMICUS CURIAE* ST. LUKE'S HEALTH SYSTEM IN SUPPORT OF APPELLEE

Wendy Olson
STOEL RIVES LLP
101 S. Capitol Blvd.,
Suite 1900
Boise, ID 83702
(208) 387-4291

Lindsay C. Harrison
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for [Proposed] Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

St. Luke's Health System, Ltd. is an Idaho nonprofit corporation. St. Luke's Health System, Ltd. has no parent corporation. No publicly held corporation, nor any other person or entity, owns any stock in St. Luke's Health System, Ltd.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT OF INTEREST ...........................................................................1

ARGUMENT ..................................................................................................4

I. IDAHO CODE § 18-622 IMPOSES CONFLICTING STATE AND FEDERAL OBLIGATIONS ON IDAHO'S HEALTH CARE PROVIDERS. .........................................................................................4

II. STAYING THE DISTRICT COURT'S INJUNCTION WILL CAUSE IRREPARABLE HARM TO IDAHO RESIDENTS AND HARM THE PUBLIC INTEREST IN IDAHO. ..........................................10

A. A Stay Will Irreparably Harm Patient Care and Increase Suffering. ............................................................................................11

B. A Stay Will Also Harm the Idaho Public by Deterring Physicians and Nurses From Practicing in Idaho...............................13

C. The Legislature's Amendments Do Not Avoid These Harms. ...........16

CONCLUSION ...........................................................................................17

# TABLE OF AUTHORITIES

CASES

*Arrington v. Wong*, 237 F.3d 1066 (9th Cir. 2001) ....................................................10

*Draper v. Chiapuzio*, 9 F.3d 1391 (9th Cir. 1993) .......................................................9

*Golden Gate Restaurant Ass'n v. City & County of San Francisco*,
512 F.3d 1112 (9th Cir. 2008) ..........................................................................15

*Planned Parenthood Great Northwest v. Idaho*, 522 P.3d 1132 (Idaho
2023) .............................................................................................. 12-13

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) ...............................................9, 10

*Small v. Avanti Health Systems, LLC*, 661 F.3d 1180 (9th Cir. 2011) ....................10

STATUTES

42 U.S.C. § 1395cc(a)(1)(I)(i) .............................................................................4

42 U.S.C. § 1395dd(b)(2) ......................................................................................7

42 U.S.C. § 1395dd(e)(1)(A) ..................................................................................7

42 U.S.C. § 1395dd(e)(1)(A)(i) ..............................................................................5

42 U.S.C. § 1395dd(e)(1)(A)(ii) .............................................................................5

42 U.S.C. § 1395dd(e)(1)(A)(iii) ............................................................................5

42 U.S.C. § 1395dd(e)(3).....................................................................................17

42 U.S.C. § 1395dd(e)(3)(A) ...............................................................................5, 6

42 U.S.C. § 1395dd(f)...........................................................................................9

Idaho Code § 18-204............................................................................................13

Idaho Code § 18-604(1) ........................................................................................7

Idaho Code § 18-622.....................................................................................*passim*

Idaho Code § 18-622(1) ...................................................................................7, 13

Idaho Code § 18-622(2)(a)(i) ........................................................................3

**OTHER AUTHORITIES**

Christopher L. Bennett et al., *United States 2020 Emergency Medicine Resident Workforce Analysis*, 80 Annals Emergency Med. 3 (July 1, 2022), https://bit.ly/3QM50pB ........................................................14

Christopher Cheney, *Rural Areas Experiencing Emergency Medicine Workforce Shortage*, Rural Health Info. Hub (June 29, 2022), https://bit.ly/3QqHcIm ..........................................................................14

Idaho Dep't Health & Welfare, *Bureau of Rural Health & Primary Care Brief* (Jan. 2023), https://bitly.ws/WoWZ ....................................14

Kathleen McLaughlin, *No OB-GYNs Left in Town: What Came After Idaho's Assault on Abortion*, The Guardian (Aug. 22, 2023), https://bitly.ws/WoZy ..........................................................................15

Natality on CDC WONDER Online Database, http://wonder.cdc.gov/natality-expanded-current.html (current as of Oct 4, 2023 10:16:56 AM) ...........................................................1

Christopher Rowland, *A Challenge for Antiabortion States: Doctors Reluctant to Work There*, Wash. Post (Aug. 6, 2022), https://wapo.st/3w1ujfC ..........................................................................................14

*Understanding Idaho's Doctor Shortage*, Boise State Public Radio, https://bit.ly/3doQyFO (last visited Oct. 4, 2023) ............................13

U.S. Dep't of Health & Human Servs. *Projections of Supply and Demand for Women's Health Service Providers: 2018-2030* (Mar. 2021), https://bit.ly/3PhGagh.........................................................................14

Sarah Varney, *After Idaho's Strict Abortion Ban, OB-GYNs Stage a Quick Exodus*, Salt Lake Trib. (May 2, 2023), https://bit.ly/467ocGB ...........................................................................................15

## STATEMENT OF INTEREST[1]

St. Luke's Health System, Ltd. ("St. Luke's") is the only Idaho-based, not-for-profit, community-owned and community-led health system. Its mission is to improve the health of people in the communities it serves. To fulfill that mission, St. Luke's operates hospitals, clinics, and other health facilities across Southwest and South-Central Idaho, including eight emergency departments. Nine trauma centers in Southwest and South-Central Idaho are designated Time Sensitive Emergency ("TSE") centers; St. Luke's operates six of them. St. Luke's employs 16,027 people and is the largest private employer in the State. St. Luke's physicians and nurses treat patients millions of times each year, including over one million hospital visits, 224,000 emergency department visits and 1.9 million clinic visits in 2022 alone. Many of those patients are pregnant women; just last year, St. Luke's helped welcome more than 8,735 newborns, representing 39% of live births in the state of Idaho.[2]

---

[1] No party or party's counsel authored the proposed brief in whole or in part, and no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief. No person other than St. Luke's or its counsel has made a monetary contribution to fund the preparation or submission of this brief.

[2] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Natality on CDC WONDER Online Database. Data are from the Natality Records 2016-2022, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/natality-expanded-current.html on Oct 4, 2023 10:16:56 AM.

Hospitals in Idaho participate in Medicare pursuant to agreements with the United States Department of Health and Human Services and are required to comply with the Emergency Medical Treatment and Labor Act ("EMTALA"). Because Idaho Code § 18-622 creates a direct conflict with EMTALA, it places hospitals, including St. Luke's, in the precarious position of risking the criminal liability and medical licenses of their providers simply for complying with federal law. Alternatively, complying with § 18-622 could risk violating EMTALA and the ability to participate in Medicare. As a result, physicians in Idaho, and the institutions for which they work, are faced with an irreconcilable conflict. Foreseeing the potential for such conflict, Congress expressly stated that EMTALA preempts such conflicting state law requirements.

In this brief, St. Luke's offers first-hand insight into what transpires in Idaho's emergency departments[3] and how a stay of the district court's injunction will imperil patient care. Health care providers in Idaho's emergency departments treat all kinds of health conditions experienced by pregnant patients. In some critical cases, termination of a clinically diagnoseable pregnancy is the emergency standard of care necessary to stabilize a patient. In many such cases, absent termination, the patient may experience severe consequences short of death that are

[3] Patients with emergency pregnancy-related conditions are frequently triaged and treated in a hospital's labor & delivery department, which is considered part of the "emergency department" under EMTALA.

nonetheless irreparable. These include loss of reproductive organs and fertility, loss of other organs, permanent disability, and severe pain, among other things. Idaho Code § 18-622 prohibits health care providers from doing what is needed to stabilize their patients and prevent these harms. This conflict is not hypothetical: It is very real, and the consequences of § 18-622 will be grave.

St. Luke's understands the Legislature's reasons for enacting this law and appreciates the Legislature's obligation to enact laws that reflect the needs and values of Idahoans. Although the law does not expressly state an intention to impact emergency medical care, it will have that effect. And that remains true even after the Legislature's amendments, which may permit termination of pregnancy where "necessary to prevent the [mother's] death," Idaho Code § 18-622(2)(a)(i), but do not permit termination of pregnancy when necessary to stabilize other serious and debilitating health conditions. Unfortunately, the law's unintended consequences will harm patients, medical professionals, the Idaho healthcare system, and Idaho residents more broadly. Because St. Luke's is dedicated to improving the health and well-being of Idahoans and supporting its physicians, and because § 18-622 undermines those goals, *Amicus* respectfully urges that the Court affirm the district court's preliminary injunction.

## ARGUMENT

### I. IDAHO CODE § 18-622 IMPOSES CONFLICTING STATE AND FEDERAL OBLIGATIONS ON IDAHO'S HEALTH CARE PROVIDERS.

Idaho Code § 18-622 and EMTALA conflict from the perspective of Idaho's physicians and hospital systems. To start, consider the stakes: Idaho's medical providers depend on Medicare to care for their patients. In 2021 alone, Medicare-covered services accounted for more than 30% of St. Luke's patient encounters. If Idaho's hospitals were to lose their ability to participate in Medicare, many patients who rely on them, not only those covered by Medicare, would not be able to receive the care they need. Nor are they likely to easily find care elsewhere: Idaho suffers from a hospital resource crisis in which there are often not enough hospital staff or beds, and facilities are forced to transfer patients to other facilities for care. Participation in Medicare is essential to health care operations and Idahoans.

As a condition of participating in Medicare, hospitals must agree to comply with EMTALA. *See* 42 U.S.C. § 1395cc(a)(1)(I)(i). Under EMTALA, hospitals must offer stabilizing treatment where "the health" of a patient is "in serious jeopardy," or where a condition could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A)(i)-(iii). To "stabilize" a patient, the hospital must "provide such medical treatment of the condition as may be necessary to assure, within

reasonable medical probability, that no material deterioration of the condition is likely to result" if the patient is discharged or transferred. *Id*. § 1395dd(e)(3)(A).

While the panel's stay order suggested that EMTALA does not require any particular treatment, that is not the experience of trained medical providers who comply with the law. In some cases, "stabilization" under EMTALA does require a physician to recommend termination of a patient's clinically diagnoseable pregnancy. Specifically, termination is sometimes necessary to prevent serious jeopardy to the health of a pregnant patient; in those cases, so long as the patient consents, a provider under EMTALA *must* perform that procedure. St. Luke's physicians submitted declarations[4] describing several recent examples: two patients with preeclampsia with severe features, Cooper Decl. ¶ 6; Seyb Decl. ¶¶ 9-10; two patients with HELLP syndrome, Cooper Decl. ¶¶ 8, 10; a patient with septic abortion, Seyb Decl. ¶¶ 7-8; and a patient in hypovolemic shock due to blood loss, *id*. ¶¶ 11-12. In each case, a fetal heartbeat was detected when the patient presented in the emergency department. In each case, the health of the patient was in serious jeopardy. In each case, physicians determined that termination of the clinically diagnoseable pregnancy was the standard of care "necessary to assure, within reasonable medical probability, that no material

[4] *See* Declaration of Kylie Cooper, M.D., Dkt. 17-7 (hereinafter "Cooper Decl."), Declaration of Stacy T. Seyb, M.D., Dkt. 17-8 (hereinafter "Seyb Decl."), *United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022).

deterioration of the condition is likely to result." 42 U.S.C. § 1395dd(e)(3)(A). As a result, in each case, physicians were compelled by EMTALA to recommend termination of the pregnancy (with patient consent) knowing that the termination would result in fetal death. The interpretation of EMTALA advanced in the panel's stay order stands in marked contrast to the decades of experience in Idaho's hospitals and emergency departments.[5]

These cases illustrate something critical the panel's stay order overlooked: termination of a clinically diagnoseable pregnancy is sometimes necessary to stabilize a patient's *health*. And these cases are just a few examples: pregnant patients also present with early incomplete miscarriage as well as other conditions that can occur concurrent with, or because of the pregnancy, such as cancer, pulmonary hypertension, and heart failure. In some of these cases, physicians determine that termination is necessary to stabilize the patient's health and, with the patient's informed consent, is therefore required by EMTALA.

Because EMTALA sometimes requires physicians to perform a termination that would fit the definition of an abortion under Idaho law, the criminal ban on abortions in Idaho Code § 18-622 creates a conflict between the state and federal obligations of our health care providers. Under § 18-622(1), "[e]very person who

---

[5] The notion that Congress *excluded* abortion as stabilizing treatment in EMTALA would stun the vast majority of medical providers who have provided emergency care to pregnant patients over the last several decades.

performs or attempts to perform an abortion . . . commits the crime of criminal abortion," a felony punishable by two to five years imprisonment. *Id*. The statute defines "[a]bortion" as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id*. § 18-604(1). The Legislature created an exception for terminations that are "necessary to prevent the death of the pregnant woman." *Id.* § 18-622. But there is still no exception to preserve the mother's underlying health, bodily organs, fertility, or the other irreparable harms women will experience if § 18-622 takes effect. EMTALA requires stabilizing treatment for *any* "emergency medical condition," not just those treatments intended to prevent death.[6] 42 U.S.C. § 1395dd(e)(1)(A). As both Dr. Seyb and Dr. Cooper explained, some of their patient examples may have survived without a termination but would have been at risk for severe health problems, including renal failure and clotting disorder, Seyb Decl. ¶¶ 7-8, stroke, seizure, pulmonary edema, and kidney failure, Cooper Decl. ¶¶ 6, 10. Thus, in many cases where termination is necessary to "stabilize" a patient under EMTALA because the life *or health* of the mother is in serious

[6] EMTALA does not require termination, or any other stabilizing treatment, where a patient refuses to consent to the treatment. *See* 42 U.S.C. § 1395dd(b)(2) (acknowledging that "the individual" with an emergency medical condition, after being informed "of the risks and benefits" of treatment, may "refuse[] to consent to the . . . treatment").

jeopardy, Idaho Code § 18-622 appears to prohibit it. The panel's stay order overlooked these patients entirely and thereby missed how and why EMTALA preempts § 18-622 even as amended.

If § 18-622 takes effect, health care providers in Idaho will be faced with an impossible choice. They can terminate a pregnancy where necessary to prevent serious jeopardy to a patient's health, but they may face criminal prosecution and the revocation of their licenses; their malpractice insurance is unlikely to cover them for criminal acts or the defense of a criminal prosecution, and the consequences of facing such prosecution may be ruinous. Alternatively, Idaho physicians may decline or simply hesitate to perform a termination until it may be too late, putting their patients' health in jeopardy and violating EMTALA; this could place their hospital's participation in Medicare in danger, with devastating results for *all* patients.

The example of St. Luke's is illustrative. In the entire State of Idaho, there are only 43 critical access and acute care hospitals with emergency departments or services. Eight are operated by St. Luke's. Ending participation in Medicare would threaten the health care of hundreds of thousands in Idaho, whether pregnant or not.

In 1986, Congress foresaw this dilemma and preempted laws like Idaho Code § 18-622 precisely so that health care providers would not be forced to

choose between Scylla and Charybdis. Specifically, EMTALA provides that "any State or local law requirement" is preempted "to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). "A state statute directly conflicts with federal law in either of two cases: first, if 'compliance with both federal and state regulations is a physical impossibility,' or second, if the state law is 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (citations omitted) (per curiam); *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) ("We have held that state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'" (citation omitted)).

Here, both kinds of direct conflict exist. First, compliance both with EMTALA and Idaho Code § 18-622 is impossible: one statute requires stabilizing care to be performed, even if it involves termination of a pregnancy, while the other prohibits many terminations that are necessary to stabilize a patient's health. *See PLIVA*, 564 U.S. at 618 (holding state law was preempted when "[i]t was not lawful under federal law for the Manufacturers to do what state law required of them" and "even if they had fulfilled their federal duty…, they would not have satisfied the requirements of state law"). Second, Idaho Code § 18-622 is an obstacle to EMTALA's purpose "to ensure that patients, particularly the indigent

and underinsured, receive adequate emergency medical care." *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) (quotation marks and alterations omitted).

Because of the Supremacy Clause, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA*, 564 U.S. at 617 (citation omitted). Here, the Supremacy Clause requires that Idaho Code § 18-622 give way to the conflicting obligations of EMTALA. By overlooking how § 18-622 functions on the ground in Idaho's emergency departments, the stay order erred in its preemption analysis.

## II. STAYING THE DISTRICT COURT'S INJUNCTION WILL CAUSE IRREPARABLE HARM TO IDAHO RESIDENTS AND HARM THE PUBLIC INTEREST IN IDAHO.

A showing of irreparable harm does not require proof "that irreparable harm is certain or even nearly certain[,]" only that it is "likely." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011). That standard is certainly met here. If permitted to take effect, Idaho Code § 18-622 will cause irreparable harm to the Idaho public by delaying and disrupting patient care. By its terms, the law will chill health care providers from administering care necessary to stabilize pregnant patients whose health is in jeopardy. And though pregnant patients will bear the brunt of those consequences, they will not bear them alone. Health care providers will be mired in legal debates and/or criminal proceedings, removing them from patient care and further overburdening an already overburdened system.

By deterring physicians and nurses from practicing here, § 18-622 will compound existing provider shortages, and everyone in Idaho will suffer. Finally, the Legislature's recent amendments exempting abortions that are necessary to "prevent the death" of the mother, will not avert the disastrous consequences of § 18-622.

### A. A Stay Will Irreparably Harm Patient Care and Increase Suffering.

Today in Idaho, when a pregnant patient presents with serious complications, physicians follow their training and federal law. Both presently advise that a termination should be performed where necessary to stabilize a patient whose health is in serious jeopardy. Idaho Code § 18-622 disrupts that care. By criminalizing this necessary care, § 18-622 hinders a provider's ability to do their job and protect their patients' health.

The Idaho statute is designed to prohibit health care providers from terminating pregnancies, and—notwithstanding the limited exception to preserve the life of the patient—it does not permit termination where necessary to otherwise stabilize the patient's health. In those situations, if a patient has no option but to continue their pregnancy, they will suffer—potentially gravely. The conditions that call for termination can be extremely painful. If untreated, they can cause serious health complications, including systemic bleeding, liver hemorrhage and

failure, kidney failure, stroke, seizure, pulmonary edema, and more. *See, e.g.*, Cooper Decl. ¶¶ 8, 10.

In an emergency, time matters. Even if a patient is ultimately provided the medically necessary care, Idaho Code § 18-622 will delay that care until a debate—likely had among physicians and non-physician attorneys—determines whether it is truly "necessary to prevent the death" of the patient, Idaho Code § 18-622, or whether it is "only" necessary to avert a serious but non-lethal threat to the patient's health—which is not protected by Idaho law. Because a physician administering an emergency termination in Idaho would be risking their professional license, livelihood, personal security, and freedom, it is only natural that physicians may hesitate and seek assurance, to the extent possible, before proceeding. In the meantime, their patients may suffer, and their conditions may deteriorate, perhaps materially. These delays will ultimately harm the critically ill pregnant patient along with other patients in the Emergency Department whose providers must scramble to cover additional patients as other providers debate with lawyers as to whether the indicated care is permissible under Idaho law and when it may be administered.

The Supreme Court of Idaho did not solve this problem by interpreting the law to provide a subjective standard requiring the doctor, in their good faith medical judgment, to believe it necessary to terminate the pregnancy. *See Planned*

*Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1203 (Idaho 2023). From a physician's perspective, it is not always easy to tell—even subjectively and in good faith—when a patient's life, as opposed to her health, is imperiled. Idaho physicians have long been able to provide stabilizing care without trying to decipher the line between health and death. But if § 18-622 takes effect, they will waste precious minutes trying to parse where one obligation begins and another ends. Patients will suffer accordingly.

Furthermore, Idaho law not only prohibits physicians from terminating a clinically diagnosable pregnancy but also exposes those who assist them to criminal and license-suspension risk. *See* Idaho Code § 18-204 (criminal accessory statute); *id.* § 18-622(1) (license suspension provision). As a result, there will be some cases where a physician may be comfortable proceeding but has no nurse or other staff to assist. This too will mean at best delayed care and at worst deficient or no care at all. And, again, it is the patients who will suffer irreparably.

### B. A Stay Will Also Harm the Idaho Public by Deterring Physicians and Nurses From Practicing in Idaho.

Medical providers in Idaho are already stretched thin. Idaho trails far behind other states regarding its number of physicians per capita.[7] A January 2023 report

[7] *Understanding Idaho's Doctor Shortage*, Boise State Public Radio, https://bit.ly/3doQyFO (last visited Oct. 4, 2023).

by the Idaho Department of Health and Welfare shows that 98.2% of areas in Idaho have a primary care professional shortage.[8] Idaho also has a shortage of emergency physicians.[9] And Idaho is one of the states most affected by the nationwide OB-GYN shortage.[10] This shortage is both caused and exacerbated by the lack of a single OB-GYN residency program in the State of Idaho: that gap means that every OB-GYN physician must be recruited to Idaho from out of state.

Unfortunately, Idaho Code § 18-622 will inevitably worsen these provider shortages by deterring medical professionals from practicing here. *See* Seyb Decl. ¶ 14. Indeed, one of the physician declarants confirmed this is already happening, as OB-GYNs around the country have rejected offers to work in states with restrictive abortion laws so as to avoid the risks of liability that may result from following the standard of care.[11] *See* Declaration of Dr. Emily Corrigan ¶ 32, Dkt.

---

[8] Idaho Dep't Health & Welfare, *Bureau of Rural Health & Primary Care Brief* (Jan. 2023), https://bitly.ws/WoWZ.

[9] *See* Christopher L. Bennett et al., *United States 2020 Emergency Medicine Resident Workforce Analysis*, 80 Annals Emergency Med. 3 (July 1, 2022), https://bit.ly/3QM50pB; *see also* Christopher Cheney, *Rural Areas Experiencing Emergency Medicine Workforce Shortage*, Rural Health Info. Hub (June 29, 2022), https://bit.ly/3QqHcIm.

[10] U.S. Dep't of Health & Human Servs., *Projections of Supply and Demand for Women's Health Service Providers: 2018-2030* (Mar. 2021), https://bit.ly/3PhGagh (projecting demand of OB-GYNs to exceed supply in Idaho).

[11] Christopher Rowland, *A Challenge for Antiabortion States: Doctors Reluctant to Work There*, Wash. Post (Aug. 6, 2022), https://wapo.st/3w1ujfC.

No. 17-6 (stating that "at least one of my colleagues has already decided to stop her part-time work at our hospital due to the stress of complying with this law"). Another declarant, Dr. Huntsberger, has already left Idaho due to the uncertainties surrounding § 18-622.[12]

The consequences of provider shortages are serious. Without enough physicians and nurses to provide medical care to a community, the quality of care suffers, wait times for an appointment increase, and practitioners become overworked and stressed, causing burnout and—in a vicious cycle—deterring other people from entering the medical field or practicing here, which only compounds the shortages going forward. Again, these consequences will be felt by far more than just the pregnant patients most directly affected by § 18-622. By making it materially more difficult to attract and retain OB-GYNs, family practitioners, emergency physicians, maternity nurses, and other medical providers, Idaho Code § 18-622 will harm the public interest. *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (granting stay

[12] *See, e.g.*, Sarah Varney, *After Idaho's Strict Abortion Ban, OB-GYNs Stage a Quick Exodus*, Salt Lake Trib. (May 2, 2023), https://bit.ly/467ocGB; Kathleen McLaughlin, *No OB-GYNs Left in Town: What Came After Idaho's Assault on Abortion*, The Guardian (Aug. 22, 2023), https://bitly.ws/WoZy. Maternal Fetal Medicine ("MFM") specialists, who are relied upon by OB-GYNs and family practitioners statewide—are also leaving Idaho. In the past year, St. Luke's lost two MFM specialists—Dr. Kylie Cooper and Dr. Lauren Miller—which brings the *statewide* total of MFMs down to 5.

because "the general public has an interest in the health of San Francisco residents and workers").

**C. The Legislature's Amendments Do Not Avoid These Harms.**

The Legislature's recent amendments—which, *inter alia*, set forth exemptions for abortions that physicians deem necessary to save the life of the mother—do not forestall the harms to patients, physicians, or the people of Idaho.

*First*, the "prevent the death" exception does not mitigate the law's chilling effect on medical providers who could be criminally prosecuted if they are found to have violated the law. The exception is sufficiently narrow—covering threats to life, but not to other serious (though nonfatal) health complications—that providers can take no comfort that they will escape prosecution if their patient will survive, yet suffer, absent termination.

*Second*, and relatedly, the limited exception is structured to incentivize prolonged suffering. Because it allows termination of a clinically diagnosable pregnancy only where necessary to prevent death, it encourages providers to delay medically-necessary treatment until the patient is close to death, even though the provider understands that the condition will inevitably worsen and even though the patient suffers in the meantime. Said differently, even if the health of the pregnant patient is in serious jeopardy—where she may suffer a lifetime of debilitating complications and excruciating pain if she does not receive an emergency

termination—so long as the suffering is short of death, even the amended § 18-622 provides no exception. EMTALA exists to prevent this deterioration. *See* 42 U.S.C. § 1395dd(e)(3).

*Third*, the amendments do not ameliorate the law's harmful effects in discouraging health care providers from practicing in Idaho. The exception does not change the fact that, by forcing physicians to allow their patients to suffer, § 18-622 will make Idaho an unwelcome home for OB-GYNs, family practitioners, emergency physicians, and other providers seeking to minimize patient suffering consistent with their professional assessments.

**CONCLUSION**

For the foregoing reasons, *Amicus* St. Luke's Health System, Ltd. respectfully requests that the Court affirm the District Court's preliminary injunction.

Respectfully submitted,

*/s/ Lindsay C. Harrison*

Lindsay C. Harrison
Jenner & Block LLP
1099 New York Avenue, NW
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

Wendy Olson
Stoel Rives LLP

101 S. Capitol Blvd, Suite 1900
Boise, ID 83702
(208) 387-4291
Wendy.Olson@stoel.com

*Attorneys for Amicus Curiae St. Luke's Health System, Ltd.*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed via the Court's electronic filing system on this 28th day of December 2023, to be served by operation of the electronic filing system on all ECF-registered counsel of record.

*/s/ Lindsay C. Harrison*

Lindsay C. Harrison
Jenner & Block LLP
1099 New York Ave. NW,
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Attorney for Amicus Curiae St. Luke's Health System, Ltd.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Ninth Circuit Rule 29(2) because it contains 3,920 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). It was prepared in a proportionately spaced typeface using Microsoft Office Word 365 in Times New Roman using 14-point font.

Dated: December 28, 2023

/s/ *Lindsay C. Harrison*
Lindsay C. Harrison

*Attorney for Amicus Curiae St. Luke's Health System, Ltd.*