APPEAL NOS. 23-35440, 23-35450

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF IDAHO,

*Defendant-Appellant,*

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE,

*Movants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:22-cv-00329-BLW

## REPLACEMENT OPENING BRIEF
## OF APPELLANT STATE OF IDAHO

JAMES A. CAMPBELL
JOHN J. BURSCH
ERIN M. HAWLEY
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jcampbell@ADFlegal.org
jbursch@ADFlegal.org
ehawley@ADFlegal.org
lwilson@ADFlegal.org

RAUL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
SOLICITOR GENERAL
MICHAEL A. ZARIAN
700 W Jefferson St #210
Boise, ID 83720
(208) 332-3548
alan.hurst@ag.idaho.gov
michael.zarian@ag.idaho.gov

*Counsel for Appellant State of Idaho*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................iv

Statement Regarding Oral Argument ..............................................................1

Statement of Jurisdiction ................................................................................1

Statement of the Issues ...................................................................................3

Pertinent Statutes and Regulations ................................................................3

Introduction .....................................................................................................4

Statement of the Case .....................................................................................6

I.      Idaho protects unborn children ............................................................6

II.     EMTALA protects indigent patients and unborn children. ................6

III.    EMTALA defers to state-law medical standards ................................9

IV.     The United States reinterprets EMTALA as an abortion mandate ....10

V.      The district court grants an injunction and Idaho appeals ................11

VI.     The Supreme Court grants certiorari and then dismisses it. ............13

VII.    After remand, the administration reaffirms its EMTALA guidance. ....13

Summary of Argument ..................................................................................14

Standard of Review .......................................................................................15

Argument .......................................................................................................16

I.      The federal government cannot override state law by paying private
        parties to violate it. ...........................................................................16

        A.      The administration's view of EMTALA violates the clear-notice
                requirement. ...........................................................................18

        B.      The administration's view of EMTALA violates the non-coercion
                requirement. ...........................................................................19

C. The administration's cited authorities in favor of third-party preemption fall far short of the mark. ........................................21

II. The administration lacks a cause of action. .................................23

 A. There are adequate remedies at law. ..................................23

 B. Available remedies are exclusive.......................................24

III. EMTALA does not preempt state abortion laws. ........................25

 A. Clear-statement canons foreclose the federal government's expansive reading of EMTALA. ........................................26

  1. The presumption against preemption forecloses an expansive reading of EMTALA.......................................26

  2. The limitations inherent in Spending Clause legislation foreclose an expansive reading of EMTALA. ................................27

  3. The major questions doctrine forecloses an expansive reading of EMTALA. ...............................................28

 B. EMTALA's plain text precludes reading it as an abortion mandate. ..........................................................29

  1. EMTALA imposes a duty to "the unborn child." ..........................29

  2. The United States cannot construe a duty to "the unborn child" as an abortion mandate...........................31

 C. EMTALA's structure precludes the administration's view of the statute.................................................................32

  1. EMTALA imposes a federal duty to treat, not a national standard of care. ..................................................33

  2. EMTALA's stabilization requirement looks to state law for its content. ................................................35

  3. Treating EMTALA as a national abortion mandate leads to nonsensical results...............................................37

D.    EMTALA's uncontroverted enforcement history forecloses the federal government's radical new gloss. .......................................38

IV.   At minimum, the Court should vacate or narrow the injunction based on the United States' concessions. ..................................................................41

A.    The United States has no irreparable harm from Idaho law. ...................41

B.    The concessions the administration made in the Supreme Court require narrowing the injunction. .................................................................43

1.    The administration maintained that EMTALA does not require abortions for mental-health reasons. ...................................44

2.    The administration acknowledged the conscience protections it opposed before. .........................................................45

3.    The administration conceded that EMTALA requires delivery—not abortion—after viability. ...........................................47

4.    The administration admitted that any abortion under EMTALA would be limited to acute circumstances. ....................48

Conclusion .......................................................................................................................49

Statement of Related Cases ..........................................................................................50

Certificate of Service ....................................................................................................51

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*A&M Records, Inc. v. Napster, Inc.,*
    284 F.3d 1091 (9th Cir. 2002) ...................................................................15

*Alabama Association of Realtors v. Department of Health & Human Services,*
    594 U.S. 758 (2021) ...................................................................................28

*Alliance for the Wild Rockies v. Petrick,*
    68 F.4th 475 (9th Cir. 2023) ......................................................................15

*Altria Group, Inc. v. Good,*
    555 U.S. 70 (2008) .....................................................................................26

*Arlington Central School District Board of Education v. Murphy,*
    548 U.S. 291 (2006) .............................................................................. 18, 27

*Armstrong v. Exceptional Child Center, Inc.,*
    575 U.S. 320 (2015) ............................................................. 4, 14, 23–24

*Atlas Life Insurance Company v. W. I. Southern, Inc.,*
    306 U.S. 563 (1939) ...................................................................................22

*Baker v. Adventist Health, Inc.,*
    260 F.3d 987 (9th Cir. 2001) .....................................................................35

*Barnes v. Gorman,*
    536 U.S. 181 (2002) ...................................................................................17

*Bates v. Dow Agrosciences LLC,*
    544 U.S. 431 (2005) ...................................................................................26

*Bennett v. Arkansas,*
    485 U.S. 395 (1988) ...................................................................................22

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) ...................................................................................22

*Bryant v. Adventist Health System/West,*
    289 F.3d 1162 (9th Cir. 2002) .............................................................. 8, 33

*California ex rel. Becerra v. Azar,*
    950 F.3d 1067 (9th Cir. 2020) ...................................................................15

*California v. United States,*
2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ...........................................40

*Charles C. Steward Machine Company v. Davis,*
301 U.S. 548 (1937) ...........................................................................19

*Cleland v. Bronson Health Care Group, Inc.,*
917 F.2d 266 (6th Cir. 1990) ...............................................................34

*Correa v. Hospital San Francisco,*
69 F.3d 1184 (1st Cir. 1995) ...............................................................34

*Coventry Health Care of Missouri, Inc. v. Nevils,*
581 U.S. 87 (2017) ............................................................................21

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ..........................................................................24

*Dobbs v. Jackson Women's Health Organization,*
597 U.S. 215 (2022) .........................................................................5–6

*Draper v. Chiapuzio,*
9 F.3d 1391 (9th Cir. 1993) ...............................................................27

*Eberhardt v. City of Los Angeles,*
62 F.3d 1253 (9th Cir. 1995) ..............................................................33

*English v. General Electric Company,*
496 U.S. 72 (1990) ............................................................................25

*Gatewood v. Washington Healthcare Corp.,*
933 F.2d 1037 (D.C. Cir. 1991) ...........................................................34

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ............................................................................9

*Goodman v. Sullivan,*
891 F.2d 449 (2d Cir. 1989) ...............................................................33

*Hardy v. New York City Health & Hospital Corporation,*
164 F.3d 789 (2d Cir. 1999) ...............................................................34

*Health & Hospital Corporation of Marion County v. Talevski,*
599 U.S. 166 (2023) ..........................................................................21

v

*Hedges v. Dixon County*,
 150 U.S. 182 (1893) ................................................................24

*Holcomb v. Monahan*,
 30 F.3d 116 (11th Cir. 1994) ...................................................34

*I.N.S. v. Pangilinan*,
 486 U.S. 875 (1988) ................................................................24

*Idaho v. United States*,
 144 S. Ct. 541 (2024) .............................................................12

*Jackson v. East Bay Hospital*,
 246 F.3d 1248 (9th Cir. 2001) ............................................ 6, 34

*Lawrence County v. Lead-Deadwood School District No. 40-1*,
 469 U.S. 256 (1985) ................................................................22

*Lexmark International, Inc. v. Static Control Components, Inc.*,
 572 U.S. 118 (2014) ................................................................24

*Life Technologies Corp. v. Promega Corp.*,
 580 U.S. 140 (2017) ................................................................25

*Marbury v. Madison*,
 5 U.S. (1 Cranch) 137 (1803) .................................................16

*Marshall ex rel. Marshall v. East Carroll Parish Hospital Service District*,
 134 F.3d 319 (5th Cir. 1998) .....................................................7

*Massachusetts v. Mellon*,
 262 U.S. 447 (1923) ................................................................20

*Medtronic, Inc. v. Lohr*,
 518 U.S. 470 (1996) ............................................... 9, 20, 25–26

*Morin v. Eastern Main Medical Center*,
 780 F. Supp. 2d 84 (D. Me. 2010) ...........................................40

*Moyle v. United States*,
 144 S. Ct. 2015 (2024) ....................................12–13, 27, 29–32, 37–39, 41, 43–48

*Nartey v. Franciscan Health Hospital*,
 2 F.4th 1020 (7th Cir. 2021) ...................................................34

*National Federation of Independent Business. v. Sebelius,*
 567 U.S. 519 (2012) ................................................................. 16–21

*New Hampshire v. Maine,*
 532 U.S. 742 (2001) ........................................................................ 43

*New York v. U.S. Department of Health & Human Services,*
 2022 WL 17974424 (2d Cir. Dec. 8, 2022) .................................... 40

*New York v. U.S. Department of Health & Human Services,*
 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ........................................... 40

*New York v. United States,*
 505 U.S. 144 (1992) ........................................................................ 20

*NFIB v. Department of Labor, Occupational Safety & Health Administration,*
 595 U.S. 109 (2022) ........................................................................ 28

*Nken v. Holder,*
 556 U.S. 418 (2009) ........................................................................ 16

*O'Brien v. Massachusetts Bay Transportation Authority,*
 162 F.3d 40 (1st Cir. 1998) ........................................................... 21

*Pegram v. Herdrich,*
 530 U.S. 211 (2000) ........................................................................ 43

*Pennhurst State School & Hospital v. Halderman,*
 451 U.S. 1 (1981) .............................................................. 17–18, 27

*Philpott v. Essex County Welfare Board,*
 409 U.S. 413 (1973) ........................................................................ 22

*Planned Parenthood Great Northwest v. Idaho,*
 522 P.3d 1132 (Idaho 2023) .................................................. 6, 12, 42

*Rice v. Santa Fe Elevator Corp.,*
 331 U.S. 218 (1947) .................................................................... 9, 26

*Ritten v. Lapeer Regional Medical Center,*
 611 F. Supp. 2d 696 (E.D. Mich. 2009) ....................................... 40

*Roberts v. Galen of Virginia, Inc.,*
 525 U.S. 249 (1999) .......................................................................... 8

*Ross v. Blake,*
578 U.S. 632 (2016) ...................................................25

*South Dakota v. Dole,*
483 U.S. 203 (1987) ............................................. 16, 19

*Southwest Airlines Company v. Saxon,*
596 U.S. 450 (2022) ...................................................25

*Summers v. Baptist Medical Center Arkadelphia,*
91 F.3d 1132 (8th Cir. 1996) ...................................34

*Texas v. Becerra,*
89 F.4th 529 (5th Cir. 2024) ..........................5, 33, 46

*Thompson v. Allen County,*
115 U.S. 550 (1885) ...................................................23

*Torretti v. Main Line Hospitals, Inc.,*
580 F.3d 168 (3d Cir. 2009) .....................................34

*Towery v. Brewer,*
672 F.3d 650 (9th Cir. 2012) ...................................15

*Townsend v. Swank,*
404 U.S. 282 (1971) ...................................................22

*Trader Joe's Company v. Hallatt,*
835 F.3d 960 (9th Cir. 2016) ...................................16

*Transamerica Mortgage Advisors, Inc. v. Lewis,*
444 U.S. 11 (1979) .....................................................24

*United States v. Idaho,*
83 F.4th 1130 (9th Cir. 2023) .............................12, 42

*United States v. University Hospital, State University of New York at Stony Brook,*
729 F.2d 144 (2d Cir. 1984) .....................................33

*Urban ex rel. Urban v. King,*
43 F.3d 523 (10th Cir. 1994) ...................................34

*Utility Air Regulatory Group v. E.P.A.,*
573 U.S. 302 (2014) ...................................................29

*Vickers v. Nash General Hospital, Inc.*,
    78 F.3d 139 (4th Cir. 1996) ..............................................................34

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ................................................................... 9, 26

*West Virginia v. E.P.A.*,
    597 U.S. 697 (2022) ..................................................................28–29

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ........................................................................28

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ................................................................. 26, 41

**Statutes**

1 U.S.C. § 8 ....................................................................................31

28 U.S.C. § 1254 ...............................................................................2

28 U.S.C. § 1292 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 2101 ...............................................................................2

42 U.S.C. § 1320a-7a ......................................................................23

42 U.S.C. § 1320c-3 ........................................................................36

42 U.S.C. § 1395 ................................................................... 9, 27, 33

42 U.S.C. § 1395cc ..........................................................................17

42 U.S.C. § 1395dd .............................. 7–8, 17, 22–25, 27, 29–32, 35–37, 48

42 U.S.C. § 18023 ............................................................................40

Idaho Code § 16-2423 ......................................................................37

Idaho Code § 18-604 ........................................................................42

Idaho Code § 18-622 (2020) ...............................................................6

Idaho Code § 18-622 (2023) ................................................. 6, 9, 12, 42

Idaho Code § 37-2705 ................................................................ 9, 37

Idaho Code § 39-4514 ...................................................................37

**Rules**

Fed. R. App. P. 4 ..............................................................................1

Fed. R. Civ. P. 59 .............................................................................1

**Regulations**

42 C.F.R. § 482.11 .........................................................................33

42 C.F.R. § 489.24 .........................................................................44

Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 78,072 (Dec. 19, 2008) ..................................39

Protecting Access to Reproductive Healthcare Services, Exec. Order No. 14076, 87 Fed. Reg. 42053 (July 8, 2022)...........................................................10

Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23,170 (May 21, 2019)........................................................39

**Other Authorities**

Centers for Medicare & Medicaid Services, State Operations Manual, App. V ...8–9, 35

CMS, *Hospital Surveys with 2567 Statement of Deficiencies - 2023Q4* (last modified Feb. 13, 2024)..................................................................................38

CMS, *Memorandum re Clarification on Release of 60-Day Quality Improvement Organization Reports* (Mar. 27, 2024) ...............................................36

CMS, *Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022) ....................................10–11

CMS, *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (Sept. 17, 2021, revised Oct. 3, 2022) ........................40

H.B. 1385, 65th Leg., 2d Reg. Sess., 2020 Idaho Sess. Laws 827 .....................................6

H.R. Rep. No. 241, 99th Cong., 1st Sess., Part I, at 27 (1985)........................................7

J. Brumbaugh et al., *Neonatal Survival After Prolonged Preterm Premature Rupture of Membranes Before 24 Weeks of Gestation*, 124 Obstetrics & Gynecology 992 (2014) ........................................................................................................................42

PPROM Foundation, *PPROM Facts*, (June 21, 2024) ........................................................42

Press Release, U.S. Dep't of Health & Hum. Servs., *Biden-Harris Administration Reaffirms Commitment to EMTALA Enforcement* (July 2, 2024) ..................13, 44–46

Press Release, U.S. Dep't of Health & Hum. Servs., *HHS Secretary Xavier Becerra Statement on EMTALA Enforcement* (May 1, 2023) ..................................................23

Robin Kundis Craig, *When Daubert Gets Erie: Medical Certainty and Medical Expert Testimony in Federal Court*, 77 Denv. U.L. Rev. 69 (1999) ........................................36

## STATEMENT REGARDING ORAL ARGUMENT

This case involves important questions of federal power and preemption, and the Court will benefit from the elucidation of these issues at oral argument. The Court has already indicated that en banc oral argument will take place during the week of December 9, 2024, in Pasadena, California.

## STATEMENT OF JURISDICTION

The United States filed suit against the State of Idaho on August 2, 2022, asserting preemption under the United States Constitution and seeking a preliminary injunction. 3-StateER-369–85. The district court had jurisdiction under 28 U.S.C. § 1331. On August 24, 2022, the district court granted the United States a preliminary injunction. 1-StateER-51. Such an order is immediately appealable to this Court. 28 U.S.C. § 1292(a)(1).

On September 21, 2022, the State of Idaho moved to reconsider the preliminary injunction. 3-StateER-146–78. The motion was timely filed within 28 days of the preliminary injunction order. Fed. R. Civ. P. 59(e). On May 4, 2023, the district court denied the motion. 1-StateER-002–13.

On June 28, 2023, the State of Idaho filed a timely notice of appeal, *see* Fed. R. App. P. 4(a)(4)(A)(iv), which was docketed as Case No. 23-35440. On July 20, 2023, this appeal was consolidated with the Idaho legislature's appeal in *United States v. Moyle*, Case No. 23-35450, and a stay of the injunction pending appeal was sought. A panel of this Court issued a published opinion granting a stay of the injunction pending appeal on September 28, 2023. The United States moved for emergency

reconsideration en banc on September 30, 2023, which this Court granted in an unreasoned order on October 10, 2023. The en banc Court denied the motion to stay pending appeal on November 13, 2023.

On November 20, 2023, Idaho and the legislature filed emergency applications for a stay with the Supreme Court, invoking 28 U.S.C. §§ 1254 (1) and 2101 (f). On January 5, 2024, the Supreme Court granted the applications, stayed the district court's injunction, and granted certiorari before judgment. The Supreme Court's jurisdiction rested on 28 U.S.C. §§ 1254 (1) and 2101 (e).

On June 27, 2024, the Supreme Court dismissed the writ of certiorari as improvidently granted, vacated the stay entered January 5, 2024, and remanded to this Court for further proceedings en banc. This Court directed the parties to submit supplemental briefs.

## STATEMENT OF THE ISSUES

1.      Whether Congress can preempt state law and regulate the practice of medicine in the states by using its spending power to enter into contracts with private hospitals.

2.      Whether Congress has expressed an "intent to foreclose" equitable suits like the federal government's by providing a detailed enforcement scheme under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd.

3.      Whether EMTALA, which requires Medicare-funded emergency rooms to treat all patients in need of emergency medical treatment, preempts Idaho's Defense of Life Act, Idaho Code § 18-622, which generally prohibits abortion except in cases of rape or incest or to save the mother's life.

4.      Whether the district court's preliminary injunction is overbroad because it departs from EMTALA's text and does not incorporate the administration's concessions.

## PERTINENT STATUTES AND REGULATIONS

An addendum containing all pertinent statutes was attached to the State of Idaho's Opening Brief, filed August 7, 2023, as Docket Entry No. 12-1 in Case No. 23-35440. 9th Cir. R. 28-2.7.

## INTRODUCTION

The United States sued the State of Idaho, claiming its agreement with private hospitals somehow preempts the state's democratically enacted law. According to the administration, the federal Emergency Medical Treatment and Active Labor Act—known as EMTALA—requires Idaho hospitals that accept Medicare payments to offer abortions, even abortions that are prohibited by Idaho's Defense of Life Act. The district court enjoined the Defense of Life Act in part. For three reasons, this Court should reverse and vacate the injunction.

First, the Spending Clause does not authorize Congress to preempt state law simply by paying private parties to violate it. Spending Clause legislation is based on consent—states that accept Congress's money accept the strings attached—and the administration does not claim Idaho ever consented to EMTALA's conditions. Instead, it argues that by sending money to hospitals, Congress can regulate medical practice nationwide and exclude the states that have traditionally performed that role. This stunning expansion of Congress's spending power has never been endorsed by any court, and this Court should not be the first.

Second, the administration lacks an equitable cause of action. Federal courts cannot grant equitable relief when Congress expressed an "intent to foreclose" it. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015). And Congress has done that here by providing a statutory enforcement mechanism in EMTALA.

Third, the administration's newfound interpretation of EMTALA violates the text, structure, purpose, and history of the statute. "EMTALA does not mandate any specific type of medical treatment, let alone abortion." *Texas v. Becerra*, 89 F.4th 529,

4

542 (5th Cir. 2024), *petition for cert. filed*, No. 23-1026 (U.S. Apr. 1, 2024). Quite the opposite, EMTALA requires hospitals to prevent harm to an "unborn child" by stabilizing any threatening condition. That admonition belies any requirement that hospitals must provide abortions contrary to state law. Further, EMTALA does not preempt state standards of care, but incorporates them. Before this lawsuit, the federal government had never construed the statute otherwise, and certainly not to mandate abortion.

At a minimum, this Court should vacate or narrow the district court's injunction. For one, the injunction cannot stand because the administration has not shown any circumstance where Idaho law prohibits an abortion that EMTALA allegedly requires. For another, the administration clarified EMTALA's limited scope before the Supreme Court: the Solicitor General represented that the stabilizing care required by EMTALA applies only to "acute" physical emergencies and not "mental health conditions." The administration also conceded that doctors and hospitals are protected if they object to providing abortions on conscience grounds.

In *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 232 (2022), the Supreme Court "return[ed] the issue of abortion to the people's elected representatives." To honor that principle and our federalist system of government, the en banc Court should reverse and vacate the district court's preliminary injunction.

5

## STATEMENT OF THE CASE

### I.    Idaho protects unborn children.

In 2020, Idaho enacted a statute now known as the Defense of Life Act, which prohibits most abortions with exceptions for rape or incest and to protect the life of the mother. Idaho Code § 18-622. That Act became effective after *Dobbs* restored to the states the authority to regulate abortion. 597 U.S. at 292; H.B. 1385, 65th Leg., 2d Reg. Sess., 2020 Idaho Sess. Laws 827. As originally enacted, the Act created an affirmative defense for a physician performing an abortion where the "abortion was necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(3)(a)(i)–(iii) (2020).

After the district court entered its preliminary injunction here, the Idaho Supreme Court upheld the Defense of Life Act against a state-law challenge. *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1203 (Idaho 2023). The Idaho Supreme Court clarified that removing an ectopic pregnancy is not an abortion under the Act, that the Act does not require "certainty" or imminency of a threat to the mother's life, and that the Act allows physicians to rely on their good-faith medical judgment on that question. *Id.* at 1202–03. The Idaho legislature then amended the Act to codify the Idaho Supreme Court's clarification on ectopic pregnancies and to recharacterize the Act's "life-saving" language as an exception to the Act's abortion prohibition rather than an affirmative defense. Idaho Code § 18-622 (2023).

### II.    EMTALA protects indigent patients and unborn children.

Congress enacted and President Reagan signed EMTALA into law nearly 40 years ago as part of the Medicare Act. The law addressed a specific concern: "that

hospitals were dumping patients who were unable to pay for care, either by refusing to provide emergency treatment to these patients, or by transferring the patients to other hospitals before the patients' conditions stabilized." *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001) (citing H.R. Rep. No. 241, 99th Cong., 1st Sess., Part I, at 27 (1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 605). The Act is "commonly known as the 'Patient Anti-Dumping Act.'" *Id.*; *Marshall ex rel. Marshall v. E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) (emergency rooms were "refusing to treat patients who are unable to pay").

Consistent with that purpose, EMTALA imposes three duties on hospitals that accept Medicare. These duties apply when an "individual" presents in the emergency room. Following statutory amendments in 1989, each of those duties also embraces a duty to what EMTALA calls "the unborn child."

**Screening.** First, hospitals must conduct "an appropriate medical screening examination within the capability of the hospital's emergency department … to determine whether" the individual has an "emergency medical condition." 42 U.S.C. § 1395dd(a). EMTALA defines "emergency medical condition" in a manner that protects unborn life. It is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.]"

42 U.S.C. § 1395dd(e)(1)(A) (emphasis added).

**Stabilization.** If the hospital determines the individual has an "emergency medical condition," it must "stabilize" that condition. To "stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). EMTALA restricts a hospital's treatment obligation to what is "within the staff and facilities *available at the hospital*." 42 U.S.C. § 1395dd(b)(1)(A) (emphasis added). CMS has defined "available" as limited both by the hospital's physical space and "specialized services," as well as the "*scope of [its staff's] professional licenses*." Centers for Medicare & Medicaid Services (CMS), State Operations Manual, App. V, at 48, https://perma.cc/L499-GU4C (State Operations Manual) (emphasis added).

**Transfer.** As an alternative to stabilization of an emergency medical condition, a hospital may "transfer … the individual to another medical facility. 42 U.S.C. § 1395dd(b)(1). Transfers under EMTALA must also ensure that expected benefits outweigh the risks to "the individual and, in the case of labor, *to the unborn child*." 42 U.S.C. § 1395dd(c)(1)(A)(ii), (c)(2)(A) (emphasis added). Transfers are not "appropriate" unless they "minimize[ ] the risks to the individual's health and, in the case of a woman in labor, the health *of the unborn child*." *Id.* § (c)(2)(A) (emphasis added).

For its entire history, courts have correctly read EMTALA consistent with its anti-dumping purpose. *Bryant v. Adventist Health System/W.*, 289 F.3d 1162, 1166 (9th

Cir. 2002). And because EMTALA requires only the care "available" at the hospital, 42 U.S.C. § 1395dd(b)(1), "there is no question" the statute "does not [always] require an 'appropriate' stabilization." *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999) (per curiam).

In sum, as CMS has long maintained, the text of EMTALA leaves the question of specific treatments for stabilizing care to state law and what is permitted by state medical licenses. State Operations Manual, App. V at 48.

## III. EMTALA defers to state-law medical standards.

States license and regulate medical providers "under their police powers" for "the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (citation omitted). That is just as true for abortion, Idaho Code § 18-622, as it is for opioid and other pharmaceutical prescriptions, Idaho Code § 37-2705.

States also retain the authority to protect the integrity and ethics of the medical profession. *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). That reserved power is inherent in "the structure and limitations of federalism." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). EMTALA operates against that backdrop of state regulation. Indeed, any preemption analysis starts with the "assumption that the historic police powers of the States"—including their power to impose medical standards of care—do not yield to federal law apart from "the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). And the Medicare Act's savings clause clarifies that EMTALA does not override state regulation of medicine: "[n]othing in this subchapter"—including EMTALA—"shall

be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395.

## IV. The United States reinterprets EMTALA as an abortion mandate.

In the immediate aftermath of *Dobbs*, President Biden issued an executive order directing multiple agencies—including HHS, the Department of Justice, the Secretary of Homeland Security, and the Federal Trade Commission—to undertake a government-wide effort to use federal law to "promote" abortion. Protecting Access to Reproductive Healthcare Services, Exec. Order No. 14076, 87 Fed. Reg. 42053, 42053–54 (July 8, 2022). The President's directive called on his administration to "consider[ ] updates to current guidance on obligations specific to emergency conditions and stabilizing care under" EMTALA. 87 Fed. Reg. at 42054.

Three days after the executive order, the administration discovered a new national abortion mandate in EMTALA, where it had evidently lain dormant for 36 years. HHS issued novel "guidance" to "remind" hospitals receiving Medicare funds of a position it had never before taken: that EMTALA requires emergency room doctors to perform or complete abortions, including "incomplete" chemical-induced abortions, regardless of state laws that would bar them. CMS, *Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* 1, 6 (July 11, 2022).

The memorandum insists that if "a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by

10

EMTALA, and … abortion is the stabilizing treatment necessary to resolve that condition, the physician *must* provide that treatment." *Id.* at 1. Never before had guidance on EMTALA required hospitals or physicians to provide any particular procedure, much less an abortion. The memorandum also insisted that "[a]ny state actions against a physician who provides an abortion in order to stabilize an emergency medical condition [as defined by that physician] in a pregnant individual presenting to the hospital would be preempted." *Id.* at 5–6. And the administration threatened that if a hospital terminates its Medicare provider agreement to avoid this reinterpretation of EMTALA, CMS may penalize the hospital. *Id.* at 4.

## V.    The district court grants an injunction and Idaho appeals.

Three weeks after the new CMS guidance was issued, the United States sued Idaho. *United States v. State of Idaho*, No. 1:22-cv-00329-BLW, 3-StateER-369–85. It sought declaratory relief that Idaho Code § 18-622 "violates the Supremacy Clause and is preempted to the extent it is contrary to EMTALA." 3-State-ER-383. The federal government also asked for an injunction. 3-StateER-288–316. The Idaho legislature was awarded intervention. 3-StateER-286–87.

The district court granted a preliminary injunction. 1-StateER-014–52. It held that the Defense of Life Act was preempted by EMTALA for abortions necessary to avoid "(i) placing the health of a pregnant patient in serious jeopardy; (ii) a serious impairment to bodily functions of the pregnant patient; or (iii) a serious dysfunction of any bodily organ or part of the pregnant patient." 1-StateER-052.

The State and the legislature moved for reconsideration. While those motions were pending, the Idaho Supreme Court interpreted the Defense of Life Act. *Planned Parenthood Great Nw.*, 522 P.3d at 1202–03. Thereafter, the legislature amended the Act, clarifying that the treatment for ectopic pregnancy was not an abortion and converting the life-of-the-mother affirmative defense into a statutory exception. Idaho Code § 18-622(2)(a)(i). The district court nevertheless denied reconsideration. 1-StateER-012.

The State and the legislature appealed and requested a stay. A unanimous Ninth Circuit panel granted a stay in a published order, concluding that "EMTALA does not preempt" Idaho's Defense of Life Act. *United States v. Idaho*, 83 F.4th 1130, 1134 (9th Cir. 2023). The panel first determined that conflict preemption did not exist. EMTALA "does not set standards of care or specifically mandate that certain procedures, such as abortion, be offered." *Id.* at 1135. And Congress did not intend EMTALA to supersede "the historic police powers of the States," including the right to prohibit abortion. *Id.* at 1136 (citation omitted). The panel also held that obstacle preemption was inapplicable: the Act's "limitations on abortion services do not pose an obstacle to EMTALA's purpose because they do not interfere with the provision of emergency medical services to indigent patients." *Id.* at 1138–39.

Within days and without explanation, the en banc Court vacated the panel's stay opinion and granted en banc review. The State and the legislature then moved the Supreme Court for a stay pending appeal or in the alternative for a writ of certiorari before judgment.

## VI. The Supreme Court grants certiorari and then dismisses it.

On January 5, 2024, the Court granted the stay and the petition in both cases. *Idaho v. United States*, 144 S. Ct. 541 (2024). However, on June 27, 2024, the Supreme Court dismissed the writs of certiorari as improvidently granted and remanded to this Court. *Moyle v. United States*, 144 S. Ct. 2015 (2024). Justice Barrett concurred, noting that the United States made significant concessions regarding its position before the Supreme Court. *Id.* at 2021. For one, it "emphatically disavowed the notion that an abortion is ever required as stabilizing treatment for mental health conditions." *Id.* Moreover, "the United States clarified that federal conscience protections, for both hospitals and individual physicians, apply in the EMTALA context." *Id.* And it conceded that EMTALA requires delivery of an unborn child post-viability and stated that EMTALA would require abortion only in acute situations. *Id.* at n.*.

In dissent, Justice Alito, joined by Justices Thomas and Gorsuch, would have ruled in Idaho's favor on the merits. In their view, the federal government's "preemption theory is plainly unsound." *Id.* at 2027. And "Idaho never consented to *any* conditions imposed by EMTALA and certainly did not surrender control of the practice of medicine and the regulation of abortions within its territory." *Id.* at 2028.

## VII. After remand, the administration reaffirms its EMTALA guidance.

Two business days after the Supreme Court dismissed this case, the administration issued new guidance reaffirming its interpretation of EMTALA. *See* Press Release, U.S. Dep't of Health & Hum. Servs., *Biden-Harris Administration Reaffirms Commitment to EMTALA Enforcement* (July 2, 2024), https://perma.cc/ZEV4-ENKY (Becerra Ltr.). The administration's new guidance, which threatened

13

termination of provider agreements for non-compliance, did not mention any of the concessions the administration made before the Supreme Court. *Id.* Idaho requested that the administration agree to modify the injunction based on those concessions, but the administration declined to do so. Idaho's motion for that relief from the district court remains pending.

## SUMMARY OF ARGUMENT

In EMTALA's nearly 40-year history, no one thought it required abortion until the administration sought to recreate a federal abortion mandate after *Dobbs*. But nothing in EMTALA's text or history suggests that it preempts Idaho's Act.

This Court need not even reach that question. It is undisputed that Idaho never agreed to EMTALA's terms; it has no public hospitals that have taken Medicare funding. The federal government's theory is based entirely on agreements with *private* hospitals. In other words, the administration says that Idaho law is preempted because someone else contracted with the federal government. That theory of EMTALA obliterates both the knowing and voluntary limitations on the spending power. And it makes a mockery of our federalist system, which has never been understood to require the states to govern at Congress's direction. Indeed, no court has held that the United States can preempt state laws—and thereby regulate the practice of medicine—merely by entering into contracts with private parties. This Court should not take that dramatic step.

In addition, the administration lacked a cause of action to sue Idaho for an injunction. As the Supreme Court has recognized, federal courts cannot grant equitable relief when Congress expressed an "intent to foreclose" it. *Armstrong*, 575

U.S. at 328. Congress has done that here by creating a carefully reticulated enforcement mechanism in EMTALA. That forecloses the grant of equitable relief.

The merits of the administration's preemption claim also fail. No less than three canons of construction require the administration to show that Congress clearly included an abortion mandate in EMTALA. It did not. To the contrary, the statute protects "the unborn child" and requires that hospitals provide only those services "available" at their facilities. Reinforcing this text, the statute has never been construed to mandate a national standard of care or a particular medical treatment. Instead, it requires hospitals to treat patients equally regardless of their ability to pay.

At minimum, the Court should narrow the injunction to reflect EMTALA's text and the United States' concessions at the Supreme Court.

## STANDARD OF REVIEW

When a district court issues a preliminary injunction on "faulty legal premises," the injunction must be vacated. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 483 (9th Cir. 2023) (reversing grant of preliminary injunction). An injunction will not stand unless the district court "got the law right." *Id.* at 491. Accordingly, this Court reviews the district court's conclusions of law de novo. *Id.* It reviews the other terms of the preliminary injunction for an abuse of discretion. *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002).

A preliminary injunction is an "extraordinary remedy." *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1105 (9th Cir. 2020) (citation omitted). It "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (per curiam) (citation omitted). Here, the

United States must establish the following four factors: "(1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest." *Petrick*, 68 F.4th at 490 (citation omitted). Since the party opposing the preliminary injunction is a state government, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

This Court applies the same standard of review to the district court's decision denying the State's motion for reconsideration. *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 965–66 n.3 (9th Cir. 2016).

## ARGUMENT

### I. The federal government cannot override state law by paying private parties to violate it.

The administration argues that the Spending Clause permits third-party hospitals to bind nonconsenting States to conditions to which they never agreed and thereby preempt state law. That breathtaking view of the spending power is both unprecedented and baseless.

To be sure, "objectives not thought to be within Article I's enumerated legislative fields, may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *South Dakota v. Dole,* 483 U.S. 203, 207 (1987) (cleaned up). The spending power, in other words, allows Congress to "induce the States to adopt policies that the Federal Government itself could not impose." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012) (opinion of Roberts, C.J.).

Yet that power does not change the fundamental bargain agreed to by ratifying States: "The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176 (1803). The Supreme Court has thus repeatedly recognized "limits on Congress's power under the Spending Clause to secure state compliance with federal objectives." *Sebelius,* 567 U.S. at 576 (opinion of Roberts, C.J.).

To begin, Spending Clause legislation functions "in the nature of a contract: in return for federal funds, the recipients agree to comply with federally imposed conditions." *Barnes v. Gorman,* 536 U.S. 181, 186 (2002) (cleaned up) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "The legitimacy of Congress's exercise of the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.) (cleaned up). "Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.*

Here, there's no question that EMTALA is Spending Clause legislation. It conditions Medicare funds on a hospital's compliance with certain conditions. In particular, EMTALA requires participating hospitals—in exchange for federal monies—to provide stabilizing treatment for certain emergency medical conditions, irrespective of the patient's insurance or ability to pay. 42 U.S.C. § 1395dd. Consistent with the nature of spending power legislation, the statute's terms bind only participating hospitals, not third parties like Idaho. *Id.* §§ 1395dd(e)(2), 1395cc.

### A. The administration's view of EMTALA violates the clear-notice requirement.

The Spending Clause's clear-notice requirement ensures that a State knowingly accepts federal conditions. It mandates that—to be binding—a condition must be set out "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). In fact, the Supreme Court has long held that "[t]here can … be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17–18. Additionally, Congress may not change the terms of the bargain through a post-acceptance "surpris[e]." *Id.* at 25. Such a modification would negate the requirement that States knowingly consent to federal conditions on the front end.

Here, Idaho never knowingly agreed to be bound by EMTALA, much less the administration's novel interpretation of that law. It has no public hospitals that accept Medicare funding. That's why the United States conceded at oral argument that Idaho never accepted EMTALA's conditions. Oral Arg. Tr. at 70–71, *Moyle v. United States*, No. 23-276 (April 24, 2024) (Oral Arg. Tr.). That should end the matter. The spending power cannot preempt state law absent a "knowing[ ]" acceptance. *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.).

The administration insists that it doesn't matter that Idaho never knowingly agreed to the conditions because *someone else* did. Under that erroneous view of the Spending Clause, the administration's agreements with private hospitals bind Idaho, too. But a third-party hospital's acceptance of Spending Clause conditions can no more bind Idaho than could New York's acceptance of conditions bind Missouri.

**B.    The administration's view of EMTALA violates the non-coercion requirement.**

A state's acceptance of Spending Clause conditions must be voluntary. *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.) (cleaned up). Under the anti-coercion doctrine, courts "scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements to exert a power akin to undue influence" over the States. *Id.* at 577 (opinion of Roberts, C.J.) (cleaned up). Such legislation may not cross the "point at which pressure turns into compulsion, and ceases to be inducement." *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937). In contrast, where states exercise their "unfettered will" and accept federal conditions, they may not later raise Spending Clause concerns. *Id.* at 590.

In *South Dakota v. Dole*, for instance, the Supreme Court held that Congress had validly used the spending power to incentivize states to accept a federally imposed minimum drinking age. Because the financial incentive—less than one percent of the State's budget—was "relatively mild encouragement," 483 U.S. at 211, the decision whether to accept the federal drinking age condition "remain[ed] the prerogative of the States not merely in theory but in fact." *Id.* at 211–12. In short, South Dakota's acceptance of the condition was voluntary.

The anti-coercion doctrine dooms the administration's preemption claim here. If the government may not exert "undue influence" on a state's choice to accept federal conditions, it certainly cannot deprive states of any choice at all. Here, far from exercising its "unfettered will" to voluntarily agree to EMTALA's conditions, *Steward Mach.*, 301 U.S. at 590, Idaho never accepted those terms at all.

According to the administration, the anti-coercion principle does not apply here because a state law effectively vanishes when the federal government pays a third party to violate it. That cannot be. To take one example, suppose the federal government wanted to lower the drinking age to 18 nationwide. Under that theory, Congress could condition payments to liquor stores on their agreement to provide alcohol to anyone over 18, and states would have no say.

The administration's claim that third-party agreements override state law makes spending power limitations wholly illusory. Indeed, the administration told the Supreme Court that the spending power gives the federal government the authority to regulate the practice of medicine in every state. Oral Arg. Tr. at 98. All the federal government has to do, it says, is pay private hospitals. And it acknowledged the implications of this view: through this mechanism, the spending power would allow the government to ban abortion or prohibit gender-reassignment surgeries for minors nationwide—or alternatively, to require abortions or gender-reassignment surgeries nationwide. *Id.* at 97. So much for "the historic primacy of state regulation of matters of health and safety." *Medtronic*, 518 U.S. at 485. The government's extraordinary view of the spending power would vastly "undermine the status of the States as independent sovereigns in our federal system." *Sebelius*, 567 U.S. at 577(opinion of Roberts, C.J.).

To allow a private party to bind Idaho to federal terms "runs contrary to our system of federalism." *Id.* at 577–78 (opinion of Roberts, C.J.). Courts reasonably expect "the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal

policies as their own." *Id.* at 579 (opinion of Roberts, C.J.) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). But the "Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992).

In short, the administration's argument fails because Idaho never agreed to EMTALA's conditions and cannot possibly be bound by them. The federal government is wrong that it may purchase *state* compliance by paying *private* parties for it. To hold otherwise "would present a grave threat to the system of federalism created by our Constitution." *See Sebelius*, 567 U.S. at 675 (joint dissent of Scalia, Kennedy, Thomas, and Alito, J.J.).

## C. The administration's cited authorities in favor of third-party preemption fall far short of the mark.

The administration has previously asserted that "valid Spending Clause legislation is federal 'Law[ ]' entitled to full preemptive force under the Supremacy Clause." Br. for Resp't at 45, *Moyle v. United States*, No. 23-726 (U.S. Mar. 21, 2024) (U.S. Br.). Yet the federal courts have recognized the fundamental "awkwardness" of basing preemption on legislation enacted under the spending power. *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 43 (1st Cir. 1998). This is because the terms of such legislation are knowingly and voluntarily accepted. Thus, the "typical remedy for state noncompliance with federally imposed conditions is … to terminate funds." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023). At most, Spending Clause legislation could preempt state law only where "the State voluntarily and

knowingly accepts the terms of the 'contract.'" *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.) (cleaned up). Here, Idaho never agreed to EMTALA.

The administration has gestured towards a handful of cases it says supports its argument that private-party agreements under the spending power preempt state law. U.S. Br. at 45–46 (citing *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87 (2017), *Bennett v. Arkansas*, 485 U.S. 395 (1988) (per curiam), *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256 (1985), *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413 (1973), and *Townsend v. Swank*, 404 U.S. 282 (1971)). But none of those cases so held, as Justice Alito observed at oral argument. Oral Arg. Tr. at 71–72. These authorities merely conclude that states could not add conditions to federal programs like social security or federal employee disability insurance.

In any event, in none of the cited cases did the parties or the Supreme Court address the Spending Clause issue at all. Such rulings establish no precedent on the Spending Clause. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed the [issue], we are free to address the issue on the merits.").

The administration has also made the counterintuitive argument that EMTALA's *savings* clause supports preemption. That Congress *limited* the preemptive effect of EMTALA—providing that state law is not preempted unless it "directly conflicts" with EMTALA, 42 U.S.C. § 1395dd—in no way suggests Congress can bind *nonconsenting* states. The Constitution's structural limitations still apply, and the federal government cannot bind a state by contracting with that state's citizens.

## II. The administration lacks a cause of action.

The United States, like any plaintiff, must have a "cause of action." *Atlas Life Ins. Co. v. W. I. Southern, Inc.*, 306 U.S. 563, 570 (1939). Because the Supremacy Clause does not contain its own cause of action, the federal government resorts to equity. But Congress has expressed an "intent to foreclose" equitable suits under EMTALA by providing a detailed enforcement scheme under that statute. *Armstrong*, 575 U.S. at 328. So the administration's lawsuit fails at the starting gate.

### A. There are adequate remedies at law.

Equitable relief is unavailable when there is an "adequate remedy at law." *Thompson v. Allen Cnty.*, 115 U.S. 550, 554 (1885). And the United States has adequate remedies to enforce EMTALA.

Congress has prescribed civil monetary penalties against EMTALA-offending hospitals and physicians and the power to exclude them from future participation in Medicare programs. 42 U.S.C. § 1395dd(d)(1). To pursue these statutory remedies, the government must follow a thorough process of administrative and judicial review. 42 U.S.C. § 1320a-7a. Within six years of an alleged violation, the HHS Secretary may "initiate an [enforcement] action." 42 U.S.C. § 1320a-7a(c)(1). The Secretary must then hold a "hearing," accept evidence, 42 U.S.C. § 1320a-7a(c)(2), and "determin[e] the amount or scope of any penalty," 42 U.S.C. § 1320a-7a(d). After judicial review, the Secretary may enforce in federal court the penalty imposed and allocate recovered funds consistent with statutory scheduling. 42 U.S.C. § 1320a-7a (e)-(f).

This detailed remedial scheme ensures that the federal government will be made whole if a grant recipient violates EMTALA. CMS knows well how to use its

statutory remedies; it is pursuing two such investigations against hospitals in Missouri. Press Release, U.S. Dep't of Health & Hum. Servs., *HHS Secretary Xavier Becerra Statement on EMTALA Enforcement* (May 1, 2023), https://perma.cc/NVW2-WJJZ. These statutory remedies afford the United States adequate enforcement tools. That it has refused to employ them here does not entitle it to sue in equity.

### B. Available remedies are exclusive.

The remedies discussed above are also exclusive. "[T]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Armstrong*, 575 U.S. at 328 (cleaned up); *accord, e.g.*, *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). Here, Congress has provided some enforcement methods and denied others—including injunctions. This careful balancing of remedies in EMTALA was deliberate, and federal courts "cannot … recognize a cause of action that Congress has denied." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).

"Courts of equity can no more disregard statutory and constitutional requirements … than can courts of law." *I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988) (quoting *Hedges v. Dixon Cnty.*, 150 U.S. 182, 192 (1893) (cleaned up)). Because available remedies "implicitly preclude[ ]" injunctions, the United States cannot invoke equity to "circumvent" Congress's choice. *Armstrong*, 575 U.S. at 328. That squarely forecloses the federal government's injunction request here.

### III. EMTALA does not preempt state abortion laws.

Even if the federal government could override the laws of nonconsenting states vis-à-vis the spending power, and even if an equitable cause of action existed here, EMTALA does not preempt the Defense of Life Act. For the administration to prevail, EMTALA requires it to show a "direct[ ] conflict" with the Defense of Life Act. 42 U.S.C. § 1395dd(f). Under this standard, Idaho law is preempted only if compliance with both EMTALA and state law is "impossible," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000), or if state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (citation omitted). Neither is true here.

The federal government's preemption argument presents a question of statutory interpretation. As always, that interpretation "begins with the text," *Ross v. Blake*, 578 U.S. 632, 638 (2016), as informed by "canons of statutory interpretation." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). In addition to the text, the Court also considers the structure, purpose, and history of the statute. *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 149-50 (2017). These principles apply because preemption analysis "does not occur in a contextual vacuum" and "is informed by … presumptions about the nature of pre-emption." *Medtronic*, 518 U.S. at 484–85.

At the outset, the administration's interpretation faces three clear-statement canons that demand an unambiguous abortion requirement. But EMTALA's plain language excludes that reading, since it directs hospitals to care for "the unborn child." *See* 42 U.S.C. § 1395dd(e)(1)(A)(i). EMTALA's structure and purpose also foreclose that interpretation—the law incorporates state standards of care, and it was

enacted by a Congress and presidential administration that opposed federal subsidies of abortion. History, too, stands against the administration, which has not cited any instance in which EMTALA was ever construed to mandate abortion during the first 36 years after its enactment. The administration's aggressive new reading cannot prevail, and this Court should reverse.

### A. Clear-statement canons foreclose the federal government's expansive reading of EMTALA.

The administration's attempt to construe EMTALA as an abortion mandate with preemptive force requires it to overcome the hurdles set by three different clear-statement canons: the presumption against preemption, the Spending Clause, and the major-questions doctrine. It cannot surmount any of these barriers, much less all of them.

### 1. The presumption against preemption forecloses an expansive reading of EMTALA.

Courts presume that Congress does not preempt state regulation of medicine. The preemption analysis starts "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230; *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). This presumption "applies with particular force when Congress has legislated in a field traditionally occupied by the States," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008), such as "health and safety" regulations where states have "historic primacy." *Medtronic*, 518 U.S. at 485.

26

As the Supreme Court has held, the regulation of medicine is "a field which the States have traditionally occupied," *Wyeth*, 555 U.S. at 565 & n.3 (citation omitted), and states have a deep interest "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731. If EMTALA is "susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria*, 555 U.S. at 77 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

EMTALA reinforces these interpretive principles by baking them into its text. As part of the Medicare Act, EMTALA specifically disclaims any federal interference in the states' "control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Plus, EMTALA includes its own separate savings clause, which forbids preemption of state law absent a "direct[ ] conflict[ ]." 42 U.S.C. § 1395dd(f). These saving clauses mean EMTALA's preemptive effect must be construed "as narrowly as possible." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (per curiam). The presumption against preemption requires the administration to show that its reading of EMTALA is clearly correct, something it cannot do.

## 2. The limitations inherent in Spending Clause legislation foreclose an expansive reading of EMTALA.

EMTALA's status as Spending Clause legislation imposes yet another clear-statement hurdle. Even if the federal government could override state law by paying a private party to violate it (and, as explained above, it cannot), the administration would still have to show that EMTALA imposed the condition it advocates "unambiguously." *Pennhurst*, 451 U.S. at 17.

27

The text of EMTALA does not provide "clear notice" of its purported abortion mandate. *See Murphy*, 548 U.S. at 296. It defers to state medical-practice standards and directs covered hospitals to provide care for the "unborn child." 42 U.S.C. § 1395dd(e)(1)(A)(i). "[N]o one who has any respect for statutory language can plausibly say that the Government's interpretation is *unambiguously* correct." *Moyle*, 144 S. Ct. at 2027–28 (Alito, J., dissenting, emphasis added).

### 3. The major questions doctrine forecloses an expansive reading of EMTALA.

Finally, the major-questions doctrine thwarts an expansive interpretation of EMTALA. The major-questions doctrine is based on "both separation of powers principles and a practical understanding of legislative intent." *West Virginia v. E.P.A.*, 597 U.S. 697, 723 (2022). It is rooted in the common-sense presumptions that "Congress intends to make major policy decisions itself," *id.* (citation omitted), does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and refrains from settling important political issues using "cryptic" language, *West Virginia*, 597 U.S. at 721.

That framework applies here. Enacting an emergency-room mandate that overrides state-law standards of care—whether involving experimental medications, marijuana, or abortion—is a matter of undoubted "political significance." *Id.* And in the Supreme Court, the administration conceded that "when Congress intends to create special rules governing abortion …, it does so explicitly." Resp. in Opp. to Appl. for Stay at 33–34, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (No. 23-727) (citations omitted). That is particularly clear given the "lack of historical precedent"

for invoking EMTALA to mandate abortions, *NFIB v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119–20 (2022) (per curiam), as well as "the sheer scope" of the government's capacious reading of the statute, *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam).

Thus, under major-questions principles, the Court should give a considerable "measure of skepticism" to the administration's claim that Congress mandated abortions without even using the word. *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014). A "plausible" or "colorable textual basis" will not suffice. *West Virginia*, 597 U.S. at 722–23. Rather, the administration must (but cannot) point to "clear congressional authorization." *Id.* at 723.

## B. EMTALA's plain text precludes reading it as an abortion mandate.

### 1. EMTALA imposes a duty to "the unborn child."

Under these clear-statement canons, EMTALA's plain language forecloses the administration's reading of the statute. EMTALA does not even mention abortion, much less require it. Quite the opposite: EMTALA demands that covered hospitals care for both "the woman" *and* "her unborn child." 42 U.S.C. § 1395dd(e)(1)(A)(i). The United States' attempt to cobble together an abortion mandate from a statute that disclaims it is "plainly unsound." *Moyle*, 144 S. Ct. at 2027 (Alito, J., dissenting).

There is no getting around the statutory duty to the unborn child, which is woven throughout EMTALA's screening, stabilization, and transfer requirements.

First, in screening for whether "an emergency medical condition … exists," 42 U.S.C. § 1395dd(a), EMTALA demands that Medicare-funded hospitals evaluate

whether the condition may "plac[e] ... the health of the woman or her unborn child ... in serious jeopardy." *Id.* § 1395dd(e)(1)(A)(i). EMTALA thus expressly references the health of the unborn child and requires providers to screen for conditions that place the child in jeopardy.

Second, if the child has such a condition, the hospital must "stabilize" the condition "within the staff and facilities available at the hospital." *Id.* § 1395dd(b)(1)(A). Notably, the duty is not to stabilize the patient, but to stabilize the *condition*, which again, includes a condition that places the child's health in "jeopardy." *Id.* § 1395dd(e)(1)(A)(i). "[A]borting an 'unborn child' does not protect it from jeopardy." *Moyle*, 144 S. Ct. at 2029 (Alito, J., dissenting).

Third, if a hospital chooses instead to transfer a pregnant woman in labor to another facility, it must again consider the unborn child. EMTALA requires the hospital to certify that the expected benefits of transfer outweigh any "increased risks" to the woman "and, in the case of labor, to the unborn child." 42 U.S.C. §§ 1395dd(c)(1)(A)(ii), (e)(1)(B). So "regardless of whether a hospital chooses to treat or transfer a pregnant woman, it must strive to protect her 'unborn child' from harm." *Moyle*, 144 S. Ct. at 2029 (Alito, J., dissenting).

Other contextual clues further dispel the notion that Congress intended EMTALA to function as an abortion mandate. EMTALA was bipartisan legislation that "garnered broad support in both Houses of Congress, including the support of Members such as Representative Henry Hyde who adamantly opposed the use of federal funds to abet abortion." *Moyle*, 144 S. Ct. at 2030–31 (Alito, J., dissenting). Similarly, President Ronald Reagan, who signed EMTALA into law, "repeatedly

promised not to use federal funds to subsidize or require the provision of abortions." *Id.* (citations omitted). It is not plausible to understand EMTALA as promoting an abortion mandate that its supporters vehemently opposed.

### 2. The United States cannot construe a duty to "the unborn child" as an abortion mandate.

According to the administration, EMTALA's "unborn child" language does not matter because the statute only imposes duties to the "individual," which does not include unborn children. *See* 1 U.S.C. § 8(a); U.S. Br. at 41. This is simply incorrect: EMTALA does not focus the stabilization duty on the individual, but rather demands that covered hospitals "stabilize *the medical condition*," which it expressly defines to include a condition that places "the health of the . . . unborn child[ ] in serious jeopardy." 42 U.S.C. §§ 1395dd(b)(1)(A), (e)(1)(A)(i) (emphasis added).

Even if the administration were correct about the original meaning of "individual," Congress expressly amended EMTALA to protect unborn children. The amendments provide that, if the "individual" is pregnant or in labor, the hospital must also consider the health of "the unborn child." 42 U.S.C. §§ 1395dd(c)(1)(A)(ii), (2)(A), (e)(1)(A)(i), (B)(ii). Again, the administration does not explain how an emergency room could, for example, "minimize[ ] the risks to … the health of the unborn child" by effecting a transfer to provide an abortion. 42 U.S.C. § 1395dd(c)(2)(A).

Even further, as Justice Alito observed, "there is a simple explanation for EMTALA's repeated use of the term 'individual,' and it provides no support for the Government's interpretation." *Moyle*, 144 S. Ct. at 2030 (Alito, J., dissenting). "Most

of those references involve conduct in which *only* the pregnant woman can engage, such as going to an emergency room, receiving medical information, consenting to or refusing treatment, or filing suit." *Id.* (emphasis added). In contrast, the references to "unborn child" involve situations in which the health of the child may be implicated along *with* the mother—e.g., "when a pregnant woman is transferred, her 'unborn child' obviously goes with her," and "a woman's 'emergency medical condition,' … includes conditions that jeopardize her 'unborn child.'" *Id.* Even if the administration's interpretation were plausible, the presence of an alternate reading that also protects the child precludes a finding of preemption.

The administration also argues that because EMTALA assigns the giving of "informed consent" to the individual, it means that a pregnant woman speaks for her child and can obtain an abortion in violation of state law. 42 U.S.C. § 1395dd(b)(2)-(3). But informed consent is itself a state-law legal doctrine, and the giving of informed consent thus necessarily cannot broaden the medical procedures that state law permits. Of course, "the right to refuse medical treatment without consent does not entail the right to demand treatment that is prohibited by law." *Moyle*, 144 S. Ct. at 2030 (Alito, J., dissenting). "[A] woman's right to withhold consent to treatment related to her pregnancy does not mean that she can demand an abortion." *Id.*

## C. EMTALA's structure precludes the administration's view of the statute.

EMTALA's statutory structure makes the administration's reading even more untenable. The administration maintains that EMTALA imposes a federal standard of care that can require doctors to provide abortion in the emergency room regardless of

contrary state law. That conception flouts the basic premise of the entire Medicare Act. That Act insists, in its very first section, that the law "shall [not] be construed" to interfere with "the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. This statutory provision "underscores the 'congressional policy against the involvement of federal personnel in medical treatment decisions.'" *Texas*, 89 F.4th at 542 (quoting *United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 160 (2d Cir. 1984)).

That is why Congress prohibited the government from "direct[ing] or prohibit[ing] any [particular] kind of treatment or diagnosis" in administering Medicare, *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989) (per curiam), and it conditioned hospitals' Medicare participation on "assur[ing] that personnel are licensed or meet other applicable standards that are required by State or local laws," 42 C.F.R. § 482.11(c). EMTALA's provisions do not displace state standards; they incorporate them. And in imposing its federal duty to treat, EMTALA takes state law as it finds it. The federal government's contrary view cannot stand.

### 1. EMTALA imposes a federal duty to treat, not a national standard of care.

The courts of appeals are unanimous in holding that EMTALA's federal rule is not a national standard of care. The Fifth Circuit recently rejected the administration's attempt to construe EMTALA as an abortion mandate, concluding that "EMTALA does not impose a national standard of care." *Texas*, 89 F.4th at 543. This Court has held the same: EMTALA "was not enacted to establish … a national standard of

care." *Bryant*, 289 F.3d at 1166. Indeed, it "clearly declines" to do so. *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995).

Because EMTALA does not impose a standard of care, it does not require any specific medical procedure (other than the requirement of delivery for active labor). Instead, it demands that hospitals treat all patients on the same footing, prohibiting "disparate" treatment, *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995), by imposing a legal duty "to provide emergency care to all," *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792–93 (2d Cir. 1999). Rather than creating a "national … standard of care," *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 173–74 (3d Cir. 2009), EMTALA creates a cause of action merely "for what amounts to failure to treat" based on the treatments permitted by state law, *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991).[1]

That fits with EMTALA's purpose: preventing hospitals from "dumping patients who were unable to pay for care." *Jackson*, 246 F.3d at 1254. And that

---

[1] *Accord Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142–43 (4th Cir. 1996); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268, 272 (6th Cir. 1990) (EMTALA's terms "preclude[ ] resort to a malpractice or other objective standard of care"; hospital need merely "act[ ] in the same manner as it would have for the usual paying patient"); *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020, 1025 (7th Cir. 2021) (per curiam) ("We therefore join the chorus of circuits that have concluded the EMTALA cannot be used to challenge the quality of medical care") (collecting cases); *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996) (plaintiffs are entitled "to be treated as other similarly situated patients are treated, within the hospital's capabilities"); *Urban ex rel. Urban v. King*, 43 F.3d 523, 525 (10th Cir. 1994) (EMTALA "is neither a malpractice nor a negligence statute"); *Holcomb v. Monahan*, 30 F.3d 116, 117 & n.2 (11th Cir. 1994) (EMTALA creates no negligence or malpractice claims; indigent patients need merely be treated the same as other patients).

34

statutory purpose—which has nothing to do with abortion—defeats both impossibility preemption and purposes and objectives preemption.

### 2. EMTALA's stabilization requirement looks to state law for its content.

The state-law foundation of medical practice also permeates the stabilization requirement on which the administration relies. And it precludes its attempt to read a national standard into the stabilization provision in three ways.

*First*, EMTALA defines the scope of the stabilization requirement according to state law. It limits treatment to what is "within the staff and facilities *available* at the hospital," 42 U.S.C. § 1395dd(b)(1)(A) (emphasis added), which CMS has long understood to be restricted to what is permitted under state law.

CMS's state operations manual says the "available" limitation means a hospital "must provide stabilizing treatment *within its capability and capacity*." State Operations Manual, App. V, at 48 (emphasis added). And those capabilities are limited not just by a hospital's physical space and "specialized services," but by the "*scope of [its staff's] professional licenses*," *id.* (emphasis added), which states alone set. Thus, this Court held in *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 991 (9th Cir. 2001), that EMTALA did not require a 40-bed rural hospital to offer psychiatric treatment where it had no psychiatrists on staff. In the same manner, EMTALA does not require emergency rooms to provide treatments that are unavailable because state law forbids them. If emergency rooms need not hire psychiatrists, neither must they hire abortion providers.

*Second*, the enforcement of EMTALA's statutory stabilization requirement hinges on several terms defined by state law. The stabilization duty applies based on conditions likely to occur within a "reasonable medical probability," 42 U.S.C. § 1395dd(e)(3)(A), which is a quintessential state-law standard. *See* Robin Kundis Craig, *When Daubert Gets Erie: Medical Certainty and Medical Expert Testimony in Federal Court*, 77 Denv. U.L. Rev. 69, 70 (1999). And its remedial provisions likewise turn on whether a hospital "negligently violates" its provisions—another state-law standard— or whether relief is available "under the law of the State in which the hospital is located." 42 U.S.C. §§ 1395dd(d)(1)(A)-(B), (2)(A). EMTALA's requirements expressly contemplate and embrace a state-law foundation.

*Third,* the supplementary statutes that establish the enforcement regime for Medicare—and EMTALA—eschew a national standard in favor of local norms. CMS enforces EMTALA mainly by contracting with quality improvement organizations to conduct surveys of participating hospitals.[2] And by statute, those surveying organizations must apply "*norms of care*, diagnosis, and treatment based upon typical patterns of practice *within the geographic area served by the organization*." 42 U.S.C. § 1320c-3(a)(6) (emphasis added). If those organizations look to "national norms" at all, the statute directs them to "consider" them only "where appropriate," not as a mandate. *Id.* And if EMTALA imposes a national standard of treatment for anything—much less for so

---

[2] An EMTALA complaint triggers a state survey agency investigation, followed by regional office review, medical expert review, and, if necessary, an Office of the Inspector General investigation. *E.g.*, CMS, *Memorandum re Clarification on Release of 60-Day Quality Improvement Organization Reports* (Mar. 27, 2024), https://perma.cc/B9T9-YGF8.

controversial an issue as abortion—its directive to do so is found nowhere in its text or in anything else in the Medicare Act.

### 3. Treating EMTALA as a national abortion mandate leads to nonsensical results.

The administration's extra-textual vision of EMTALA would also impose grave downstream consequences. Under the administration's view, if a person presents with a condition that could result in "serious impairment to bodily functions," 42 U.S.C. § 1395dd(e)(1)(A)(ii), then EMTALA demands the physician prescribe any appropriate treatment, regardless of state law. The physician's judgment would thus override contrary state regulations and make that treatment "available" at the hospital, but it would do so only in the emergency room.

By making doctors a law unto themselves, the administration's view would compel an organ transplant in the ER whenever the physician believed it necessary, regardless of state laws on organ donation. It would even compel organ transplant by a nurse who believed himself capable of the procedure but wasn't duly licensed. And it would authorize doctors to prescribe medical marijuana, opioids, or even a lobotomy in violation of state law. *E.g.*, Idaho Code § 37-2705(d)(29) (THC schedule I controlled substance); *id.* § 39-4514; (prohibition on euthanasia); *id.* § 16-2423(3) (prohibition on pediatric psychosurgery and electroconvulsive treatment).

Plus, despite the United States' disclaimer, *see Moyle*, 144 S. Ct. at 2021 (Barrett, J., concurring), the logic of its position would also mean that EMTALA opens a "mental health" loophole for abortion. It would authorize emergency-room doctors to perform abortions whenever they say those abortions are necessary to avoid

37

"serious jeopardy" to the mother's mental health. 42 U.S.C. § 1395dd(e)(1)(A)(i). Indeed, the United States has insisted that mental health remains a component of the health that EMTALA requires hospitals to consider in applying its stabilization requirement. Oral Arg. Tr. at 77–78; *Moyle*, 144 S. Ct. at 2039 (Alito, J., dissenting). Perhaps that is why the United States has refused to modify the injunction to conform to its mental health disclaimer.

### D. EMTALA's uncontroverted enforcement history forecloses the federal government's radical new gloss.

If EMTALA were unambiguous in demanding that hospitals perform abortions even when prohibited by state law, one would expect that in the many decades since its enactment, it would have been enforced that way. But no such evidence or no such case exists. Not one. To the contrary, during the entire 36 years before the federal government's novel reading of the statute, the federal government never construed EMTALA as mandating abortion.

The United States' own evidence of enforcement shows this. In the Supreme Court, the government proffered spreadsheets of CMS hospital survey records. But of the 115,000 survey summaries, it identified just seven that it says support its abortion mandate. U.S. Br. at 16 n.2 (citing CMS, *Hospital Surveys with 2567 Statement of Deficiencies - 2023Q4* (last modified Feb. 13, 2024), https://perma.cc/8UCY-DK7Y). As the administration acknowledges, five of those instances involved treating ectopic pregnancies, *see id.*, which Idaho law allows. One involved a failure to stabilize a pregnant woman's pain and said nothing about the facility failing to provide an abortion. (2010-2016 file, cited as Row 20,800 in U.S. Br., Row 69,788 in current

38

spreadsheet.) In the last case, "the hospital was faulted, not for failing to perform an abortion, but for discharging a sick pregnant woman without calling for an ambulance to transport her to another hospital," *Moyle*, 144 S. Ct. at 2032 (Alito, J., dissenting)—actions that "compromise[ed] the health of the unborn baby *and* patient," (2010-2016 File, cited as Row 16,963 in U.S. Br., Row 54,373 in current spreadsheet (emphasis added)). That the only relevant enforcement example expressly identifies a hospital's obligation to the unborn child shows how baseless this newfound EMTALA theory is.

The same goes for the administration's invocation of various HHS rules that refer to EMTALA. U.S. Br. at 16–18 & n.2. HHS's 2008 Rule about conscience protections does not say that EMTALA requires abortions that violate state law; rather, it reinforces the interpretation above by acknowledging that EMTALA obligations are "limited to the capabilities of the particular hospital." Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 78,072, 78,087 (Dec. 19, 2008). Similarly, the 2019 Rule issued by HHS's civil rights office, "like the 2008 Rule," declined to "go into detail as to how its provisions may or may not interact with other statutes or in all scenarios." Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23,170, 23,183 (May 21, 2019). Even the federal government's 2021 guidance does not use the word "abortion" but merely stated that stabilizing treatment "could" include "dilation and curettage (D&C)," as it would in Idaho for a miscarriage. CMS, *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* 4 (Sept. 17,

2021, revised Oct. 3, 2022). The only rule that ever stated that EMTALA requires abortions was the post-*Dobbs* guidance at issue here.

None of the federal government's cases hold otherwise. *California v. United States* upheld a federal conscience law allowing doctors to refrain from performing abortions, despite the argument that EMTALA required them. No. 05-00328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008). *Morin v. Eastern Maine Medical Center* concerned not an abortion but whether to deliver an unborn child that was already dead. 780 F. Supp. 2d 84, 86 (D. Me. 2010). *Ritten v. Lapeer Regional Medical Center* involved a factual dispute about whether a patient "was truly in labor" and required premature delivery. 611 F. Supp. 2d 696, 715 (E.D. Mich. 2009). And *New York v. U.S. Department of Health & Human Services* was not an EMTALA case but a ruling against a Trump administration regulation enforcing federal conscience laws, a regulation the current administration rescinded after *Dobbs*. 414 F. Supp. 3d 475, 537–39 (S.D.N.Y. 2019), *appeal withdrawn by* No. 19-4254, 2022 WL 17974424 (2d Cir. Dec. 8, 2022).

Finally, lacking textual support inside EMTALA, the United States looks beyond it to the Affordable Care Act. It cites a provision of that law about abortion found in subsection (d) that says: "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including ... EMTALA." 42 U.S.C. § 18023(d) (internal quotation marks omitted). But the administration skips over subsection (c), which contains an express savings clause stating that it is not to be construed to preempt state laws about abortion. 42 U.S.C. § 18023(c)(1).

Subsection (c) manifests Congress's express purpose—the "touchstone" of preemption, *Wyeth*, 555 U.S. at 565—and shows how subsection (d) fits within the overall EMTALA framework. If state law allows abortion as a stabilizing treatment (e.g., in California), a hospital does not violate the ACA's abortion subsidy prohibitions by performing it. This provision simply "reaffirms the duty of participating hospitals to comply with EMTALA, but it does not expand what the text of EMTALA requires." *Moyle*, 144 S. Ct. at 2032 (Alito, J., dissenting).

## IV. At minimum, the Court should vacate or narrow the injunction based on the United States' concessions.

The district-court injunction cannot stand in its current form. First, the Court should vacate the injunction because case developments show that the administration faces no irreparable harm. And second, at a minimum, the Court should narrow the injunction to reflect the concessions that the federal government made in the Supreme Court that led that Court to dismiss the writ of certiorari as improvidently granted.

### A. The United States has no irreparable harm from Idaho law.

The Court may vacate the injunction because the administration has not shown any irreparable harm from Idaho law. Even if the administration were correct in its interpretation of EMTALA (and it is not), it did not establish any practical conflict between EMTALA and the Defense of Life Act—that is, any particular situation in which it says EMTALA would require an abortion that Idaho law would forbid. The United States proffered declarations from physicians who described various emergency-room situations in which, in their medical judgment, abortion was

41

appropriate. 3-StateER-319–68. But none of those situations pose a conflict with Idaho law. For instance, several declarations address termination of ectopic pregnancies, 3-StateER-205-207, 209, 325–26, 335–36, which the Defense of Life Act does not prohibit. *See* Idaho Code § 18-604(1)(c); *Idaho*, 83 F.4th at 1137. And every other circumstance those declarations describe involved life-threatening circumstances, such that Idaho law would allow an abortion because the physician determined "in his good faith medical judgment" that it was necessary to "prevent the death" of the mother. Idaho Code § 18-622(2)(a)(i); *Planned Parenthood Great Nw.*, 522 P.3d at 1203.

Even the federal government's example of pre-term, premature rupture of membranes (PPROM)—rupture of the amniotic sac before 37 weeks—shows how its view of EMTALA does not create a practical conflict with what Idaho law permits. 3-StateER-191–92. Under Idaho's Defense of Life Act, a doctor treating a patient with PPROM pre-viability will try to save the lives and preserve the health of both the mother *and* her child. Idaho Code § 18-622(2)(a)(i). By monitoring the mother's temperature and white-blood-cell count, the doctor can watch for infection and prescribe antibiotics if necessary. PPROM Foundation, *PPROM Facts*, (June 21, 2024), https://www.aapprom.org/community/ppromfacts. In 90% of cases, the mother and baby will be fine for the few weeks necessary until viability, when the baby can be delivered safely, honoring the lives of both patients. *See id.* (citing J. Brumbaugh et al., *Neonatal Survival After Prolonged Preterm Premature Rupture of Membranes Before 24 Weeks of Gestation*, 124 Obstetrics & Gynecology 992 (2014)). And in the unlikely and tragic event that the mother's condition destabilizes, Idaho law authorizes the same thing

42

the administration says is required: to end the pregnancy if necessary to save the mother's life.

This Court should vacate the injunction for lack of irreparable injury.

**B.   The concessions the administration made in the Supreme Court require narrowing the injunction.**

At the very least, the Court should narrow or modify the injunction to reflect the concessions the administration made to the Supreme Court about its position. Three justices would have left the stay in place, *see Moyle*, 144 S. Ct. at 2027 (Alito, J., dissenting), and three others concurred in the dismissal of the writ because of the administration's narrowing concessions, which they said "will not stop Idaho from enforcing its law in the vast majority of circumstances," *Id.* at 2022 (Barrett, J., concurring).

The administration's concessions consisted of positions that it "disclaimed," "emphatically disavowed," "clarified," and "emphasized." *Id.* at 2021 & n.* (Barrett, J., concurring). Those concessions should be given effect—the administration may not prevail "in one phase of a case on an argument and then rely[ ] on a contradictory argument to prevail in another phase," *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000), "changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (citation omitted).

Yet the concessions that mattered in the Supreme Court have not yet been given effect. Despite Idaho's direct request, the administration has refused to modify the injunction to incorporate these concessions and has opposed Idaho's motion in the district court to do so. Instead, just two business days after the Supreme Court's

order, the administration issued new guidance that "[r]eaffirms" its expansive interpretation of EMTALA, with no mention of its concessions. *See* Becerra Ltr. That has caused considerable confusion regarding the administration's enforcement policy, particularly since the new guidance threatens that a hospital that does not comply with its interpretation would face "termination of its Medicare provider agreement or the imposition of civil monetary penalties." *Id.*

At a minimum, then, this Court should modify the injunction to reflect those concessions by stating that it does not prohibit enforcement of Idaho's Defense of Life Act in the following situations: (1) abortions sought for mental health reasons; (2) abortions to which doctors or hospitals object as a matter of conscience; (3) abortions after 22 weeks; and (4) any abortion sought in a non-acute context.

## 1. The administration maintained that EMTALA does not require abortions for mental-health reasons.

The administration made critical concessions in the Supreme Court about mental health under EMTALA. It had maintained in this Court that "EMTALA requires whatever treatment a provider concludes is medically necessary to stabilize whatever emergency condition is present." Consolidated Br. of U.S. at 18, ECF No. 35. That broad formulation mattered because HHS's own regulations have long considered an emergency medical condition to include mental health conditions—i.e., "psychiatric disturbances." 42 C.F.R. § 489.24(b); *see also Moyle*, 144 S. Ct. at 2039 (Alito, J., dissenting). But "[a]t the merits stage" in the Supreme Court, the United States "emphatically disavowed the notion that an abortion is ever required as stabilizing treatment for mental health conditions." *Id.* at 2021 (Barrett, J., concurring)

(citation omitted). Three justices found this "an important concession," explaining that this "reading of EMTALA does not gut Idaho's Act." *Id.* As a result, they voted to lift the stay.

That matters because the injunction does not reflect this late-breaking concession. 1-ER-051–52. Nor does the administration's new guidance address this significant change—rather than stating that mental health cannot be a ground for abortion, the administration's new guidance seemingly embraces the same broad reading of "health" that it has advanced since 2022. Becerra Ltr.; *see also* Oral Arg. Tr. at 77–78; *Moyle*, 144 S. Ct. at 2039 (Alito, J., dissenting). And far from acknowledging the "dramatic narrowing" of this dispute, *Moyle*, 144 S. Ct. at 2022 (Barrett, J., concurring), the administration insists that "[f]ederal EMTALA requirements have not changed" from its 2022 guidance. Becerra Ltr. The Court should narrow the injunction to hold the administration to its important mental health concession.

## 2. The administration acknowledged the conscience protections it opposed before.

The administration also made the significant concession that federal conscience protections supersede EMTALA's requirements both for physicians and for hospitals. Previously, the administration argued in this Court that those conscience protections "do not apply on their own terms" to EMTALA and that instead those laws "reinforce[d]" that abortion was stabilizing treatment. U.S. Br. at 43. As the administration explained then, "EMTALA requires hospitals to offer abortion care when treating physicians deem it necessary." *Id.* at 15 (heading, emphasis removed). It was precisely *because* the administration's 2022 guidance on EMTALA had ignored

45

those conscience protections that two groups of pro-life physicians challenged it in another lawsuit. *See Texas*, 89 F.4th at 536 & n.5.

But once the Supreme Court granted review, the administration came to acknowledge the conscience protections for hospitals that it had previously denied. "[T]he United States clarified that federal conscience protections, for both hospitals and individual physicians, apply in the EMTALA context." *Moyle*, 144 S. Ct. at 2021 (Barrett, J., concurring). At argument, the Solicitor General assured the Court that EMTALA "does not override" the conscience protections in the Weldon Amendment, Church Amendment, and Coats-Snowe Amendment (and presumably the Hyde Amendment, too). Oral Arg. Tr. at 87–90. In fact, she acknowledged that federal conscience protections mean that EMTALA does not require abortions even if the entire medical staff of a hospital or the hospital itself objects to providing an abortion. *See id.* at 90. Three justices found this change in position to be "another critical point" that "alleviates Idaho's concern that the Government's interpretation of EMTALA would strip healthcare providers of conscience protections." *Moyle*, 144 S. Ct. at 2021 (Barrett, J., concurring).

Yet almost as soon as the Solicitor General made this concession, the administration began walking away from it. Immediately after the Court's lifting of the stay, the administration reinstituted its demand that "the provider must offer" abortion where it is needed to treat a patient "experiencing an emergency medical condition as defined by EMTALA." Becerra Ltr. The letter's *only* reference to conscience protections was to acknowledge the Fifth Circuit's rejection of its position in a footnote. *Id.*

46

All of this matters because the district court's injunction here is silent about conscience protections for doctors and hospitals. 1-ER-051–52. Left in place, that injunction will continue to endorse a view of the law that the administration in its arguments to the Supreme Court agreed was wrong. The Court should modify the injunction to implement what the parties concede is the correct view of the law.

### 3.   The administration conceded that EMTALA requires delivery—not abortion—after viability.

The administration "also clarified that if pregnancy seriously jeopardizes the woman's health postviability, EMTALA requires delivery, not abortion." *Moyle*, 144 S. Ct. at 2021 n.* (Barrett, J., concurring) (citing U.S. Br. at 10; Tr. of Oral Arg. 75). This too was a change from the administration's prior position before this Court, where it clearly articulated its view that the physician chooses "whatever treatment" the physician believes is medically necessary. Consolidated Br. of U.S. at 18. But before the Supreme Court, the administration scrapped that position in part and argued that at least after viability, abortion cannot be stabilizing treatment because EMTALA requires delivery. *Moyle*, 144 S. Ct. at 2021 n.* (Barrett, J., concurring). The injunction knows no such limits—rather, "it is very likely that the preliminary injunction will lead to more abortions, including in at least some cases where the fetus is viable." *Id.* at 2035 (Alito, J., dissenting). This concession is absent from the administration's new guidance, and this Court should modify the injunction to implement it.

4.      **The administration admitted that any abortion under EMTALA would be limited to acute circumstances.**

At oral argument, the administration also drew back on its prior position by acknowledging "that EMTALA requires abortion only in an 'emergency acute medical situation,' where a woman's health is in jeopardy if she does not receive an abortion 'then and there.'" *Moyle*, 144 S. Ct. at 2021 n.* (Barrett, J., concurring) (quoting Tr. of Oral Arg. 79–80). Three justices stated that this "narrow[ed] the scope of EMTALA's potential conflict with Idaho's Act." *Id.*

Indeed, the administration had previously advanced—and obtained an injunction from the district court endorsing—the far more expansive view expressed in its 2022 guidance: that EMTALA had a "much broader definition of when treatment is required, *i.e.*, for an emergency medical condition that *could result* in 'placing the health of the individual … in serious jeopardy.'" Reply Mem. in Supp. of Mot. for Prelim. Inj. at 17, No. 1:22-cv-329 (D. Idaho Aug. 19, 2022), ECF No. 86 (emphasis added); U.S. Consolidated Opp. to Mots. for Reconsideration at 18, No. 1:22-cv-329 (D. Idaho Oct. 12, 2022), ECF No. 106. That injunction permits abortions as stabilizing care not only where necessary to avoid material deterioration of an emergency medical condition, 42 U.S.C. § 1395dd(e)(3)(A), but also where necessary to *prevent* an emergency medical condition in the first place. 1-ER-051–52. And while EMTALA defines an emergency medical condition as one with "acute symptoms" requiring "immediate medical attention," 42 U.S.C. § 1395dd(e)(1)(A), the district court's injunction directed to avoiding emergency medical conditions contains no such limitations, 1-ER-051–52. The lower court's reading of EMTALA greatly

expands the scope of the statute, so much so that the administration did not even dispute Idaho's contention in the Supreme Court that the injunction was overbroad in this respect. Yet the administration has declined to modify the injunction. This Court should do so.

## CONCLUSION

The Court should vacate the district court's injunction or, at minimum, narrow it consistent with the administration's concessions.

Respectfully submitted,

Dated: September 13, 2024

By:/s/ Alan M. Hurst

JAMES A. CAMPBELL
JOHN J. BURSCH
ERIN M. HAWLEY
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jcampbell@ADFlegal.org
jbursch@ADFlegal.org
ehawley@ADFlegal.org
lwilson@ADFlegal.org

RAUL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
SOLICITOR GENERAL
MICHAEL A. ZARIAN
700 W Jefferson St #210
Boise, ID 83720
(208) 332-3548
alan.hurst@ag.idaho.gov
michael.zarian@ag.idaho.gov

*Counsel for Appellant the State of Idaho*

## STATEMENT OF RELATED CASES

The State of Idaho is unaware of any related cases currently pending in this Court.

/s/ Alan M. Hurst
Alan M. Hurst
Attorney for Appellant State of Idaho

September 13, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2024 I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Alan M. Hurst*
Alan M. Hurst
Attorney for Appellant State of Idaho

September 13, 2024

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35440, 23-35450

I am the attorney or self-represented party.

**This brief contains** | 12,357 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.
　☐ a party or parties are filing a single brief in response to multiple briefs.
　☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Alan M. Hurst | **Date** | September 13, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*