**CASE NOs. 23-35440 & 23-35450**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Mike Moyle, Speaker of the Idaho House of Representatives, et al.,

                  Plaintiffs-Appellants,

v.

United States,

                  Appellee.

_____

State of Idaho,

                  Plaintiffs-Appellants,

v.

United States,

                  Appellee.

_____

On Appeal from the United States District Court for the
District of Idaho
_____

**BRIEF OF *AMICUS CURIAE* MANHATTAN INSTITUTE
SUPPORTING PLAINTIFFS-APPELLANTS**
_____

Ilya Shapiro
 *Counsel of Record*
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

September 18, 2024

## CORPORATE DISCLOSURE STATEMENT

The Manhattan Institute has no parent companies, subsidiaries, or affiliates, and does not issue shares to the public.

.

| | |
|---|---|
| Dated: September 18, 2024 | s/ *Ilya Shapiro* |
| | Ilya Shapiro |

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES` ................................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................1

ARGUMENT .............................................................................................................4

   I. EMTALA Ensures Equal Treatment of Patients, not a National Standard of Care ..........................................................................................4

      A. Congress Passed EMTALA to Address "Patient Dumping" .....................4

      B. EMTALA Has Never Been Understood to Require a National Standard of Care ........................................................................................6

   II. Reading a National Standard of Care into EMTALA Would Have Grave Implications for Numerous Other State Laws ..........................................8

      A. Gender-Affirming Care ..............................................................................9

      B. Medical Aid-in-Dying Laws ....................................................................10

      C. Right-to-Try Laws ...................................................................................11

CONCLUSION ........................................................................................................12

CERTIFICATE OF COMPLIANCE ......................................................................13

CERTIFICATE OF SERVICE ................................................................................14

# TABLE OF AUTHORITIES`

**Cases**

*Arrington v. Wong*, 237 F.3d 1066 (9th Cir. 2001) ....................................................5

*Brooks v. Maryland General Hosp., Inc*., 996 F.2d 708 (4th Cir. 1993) ................. 6

*Bryant v. Adventist Health Syst./W.*, 289 F. 3d 1162 (9th Cir. 2002). ..................... 7

*Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, (6th Cir. 1990)...........7

*Del Carmen Guadalupe v. Negron Agosto,* 299 F.3d 15 (1st Cir. 2002) .................7

*Dobbs v. Jackson Women's Health,* 597 U.S. 215 (2022).........................................1

*Fraticelli-Torres v. Hosp. Hermanos,* 300 Fed. Appx. 1 (1st Cir. 2008)..................6

*Gatewood v. Wash. Healthcare Corp.,* 933 F.2d 1037 (D.C. Cir. 1991) ..................9

*Gonzales v. Oregon,* 546 U.S. 243 (2006).................................................................8

*Gregory v. Ashcroft,* 501 U.S. 452 (1991)............................................................... 11

*Hardy v. N.Y. City Health & Hosp. Corp.,* 164 F.3d 789 (2d Cir. 1999)..................7

*Harry v. Marchant,* 291 F.3d 767 (11th Cir. 2002)...................................................6

*Hines v. Adair Cnty. Pub. Hosp. Dist. Corp.,* 827 F.Supp. 426 (W.D. Ky. 1993)....4

*Hunt ex. rel. Hunt v. Lincoln Cnty. Mem'l Hosp.*, 317 F.3d 891 (8th Cir. 2003)......7

*John Muir Mem'l Hosp., Inc. v. Davis,* 726 F.2d 1443 (9th Cir. 1984) ....................4

*Marshall v. E. Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319 (5th Cir. 1998) .......7

*Moyle v. United States,* 603 U.S. ___ (2024) (per curiam) .......................................3

*Nartey v. Franciscan Health Hosp.,* 2 F.4th 1020 (7th Cir. 2021)............................7

*Newsom v. Vanderbilt Univ.,* 653 F.2d 1100 (6th Cir. 1981)....................................4

*Smith v. Crisp Reg'l Hosp., Inc.,* 985 F.3d 1306 (11th Cir. 2021)............................8

*St. Anthony Hosp. v. U.S. Dep't of Health & Hum.Servs.,*
    309 F.3d 680 (10th Cir. 2002) ..............................................................................8

*Summers v. Baptist Med. Ctr. Arkadelphia,* 91 F.3d 1132 (8th Cir. 1996)...............6

*Texas v. Becerra,* 89 F.4th 529 (5th Cir. 2024) ........................................................7

*Torreti v. Main Line Hosps., Inc.,* 580 F.3d 168 (3d Cir. 2009) ..............................7

*Vickers v. Nash Gen. Hosp., Inc.,* 78 F.3d 139 (4th Cir. 1996)..................................6

*Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457 (2001) ............................................4

*Williams v. Dimensions Health Corp.,* 952 F.3d 531 (4th Cir. 2020) .......................7

**Statutes and Regulations**

42 U.S.C. § 291 *et seq*...................................................................................................4

42 C.F.R. § 53.111 ........................................................................................................4

Emergency Treatment and Active Labor Act, 42 U.S.C. § 1395 (1986) ............. 1, 5

Hill-Burton Act, Pub. Law 79-725, 60 Stat. 1040 (July 13, 1946)....................... 4, 5

Idaho Code § 18-622......................................................................................................1

**Other Authorities**

David A. Ansell and Robert L. Schiff, *Patient Dumping*,
  257 JAMA 1500 (1987)...........................................................................................5

David E. Engdahl, *The Spending Power*, 44 Duke L.J. 2 (1994)............................ 11

*Federal Right to Try: Questions and Answers,* Right to Try National
  Movement .............................................................................................................. 12

Lindsey Dawson & Jennifer Kates*, Policy Tracker: Youth Access to Gender-
  Affirming Care and State Policy Restrictions, KFF* (Aug. 27, 2024) ..................9

Mark Seidenfeld, *The Bounds of Congress's Spending Power*,
  61 Ariz. L. Rev. 1 (2019)...................................................................................... 11

*States Where Medical Aid in Dying is Authorized*, Compassion & Choices.......... 10

U.S. Commission on Civil Rights, *Patient Dumping* (Sept. 2014) ...........................4

## INTEREST OF *AMICUS CURIAE*[1]

The Manhattan Institute for Policy Research ("MI") is a nonpartisan public policy research foundation whose mission is to develop and disseminate new ideas that foster greater economic choice and individual responsibility. To that end, MI has historically sponsored scholarship and filed briefs supporting economic freedom against government overreach.

This case interests MI because it involves a direct application of the federalism principles at the heart of our constitutional order. It involves statutory interpretation that runs counter to the text, structure, history, and even purpose of the statute. By advancing this interpretation, the federal government is using a longstanding federal law as an unprecedented vehicle for a takeover of state medical regulation.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

In 2020, Idaho passed the Defense of Life Act, banning all abortions except where necessary to protect the life of the mother. Idaho Code § 18-622. The Act went into effect two years later, after the Supreme Court's decision in *Dobbs v. Jackson Women's Health*, 597 U.S. 215 (2022). Shortly thereafter, the federal government reinterpreted the Emergency Medical Treatment and Active Labor Act

---

[1] Pursuant to Fed. R. App. P. 29, counsel states that all parties consented to the filing of this brief. Further, no party's counsel authored any part of this brief and no person other than *amicus* funded its preparation or submission.

1

(EMTALA) to require the provision of abortions in any hospital emergency room that accepts Medicare funding, even where contrary to state law. Idaho contends that this novel interpretation of EMTALA is unsupported by statutory text and stands to nullify more than 20 states' laws by preempting a regulatory field historically entrusted to the states' police powers: medical standards of care.

The district court granted a preliminary injunction, finding that EMTALA preempts the Defense of Life Act for abortions where necessary to avoid jeopardizing the health of, "serious impairment to bodily functions of," or "serious dysfunction of any bodily organ or part of" the patient. A unanimous panel of this Court granted a stay, holding that EMTALA did not preempt Idaho's law because there's no conflict between the two and the state law in no way frustrates the federal law's purpose. The panel reasoned that EMTALA doesn't establish national care standards, but simply mandates equal treatment for indigent patients. This Court then went *en banc*, vacating the panel's opinion and granting a rehearing.

On November 23, 2023, Petitioners Mike Moyle and the State of Idaho filed an application for a stay with the Supreme Court. On January 5, 2024, the Supreme Court stayed the district court's preliminary injunction, treated the application for a stay as a petition for *certiorari*, and granted *certiorari*. On June 27, 2024, the Supreme Court dismissed the writs of *certiorari* before judgment as improvidently

granted and vacated the stays entered by the Court. *Moyle v. United States*, 603 U.S. ___ (2024) (*per curiam*). Now the case is back before this Court.

The Court should take this opportunity to affirm its commitment to federalism. Medical standards of care are the historic domain of state regulation, so any federal mandate in this area must enjoy an especially strong statutory basis. That's not the case here. The federal government's novel interpretation of EMTALA has no basis in the law's text, structure, history, or purpose. EMTALA was meant to solve a particular mischief left unaddressed by previous healthcare legislation: the increasing and widespread trend of "patient dumping," wherein hospitals would deny emergency care and refer outpatients based on their ability to pay. EMTALA's purpose is revealed by the statute's text, which imposes a threefold obligation on hospitals. First, hospitals must provide an appropriate medical screening examination to any individual who comes to the ER and requests one. Second, they must provide either stabilizing treatment or transfer to another medical facility if the individual is found to have an emergency medical condition. Third, the hospital may transfer individuals with emergency medical conditions only in select circumstances.

This Court should affirm the consensus of federal appellate courts across the country: that EMTALA is an equal-treatment statute, not a standard-of-care statute. This longstanding consensus is consistent with established principles of federalism, and it is a more faithful reading of the text, structure, history, and purpose of

3

EMTALA. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). Nor does it smuggle nationalized standards of care under the beneficent language of equal treatment.

## ARGUMENT

### I. EMTALA Ensures Equal Treatment of Patients, not a National Standard of Care

#### A. Congress Passed EMTALA to Address "Patient Dumping"

EMTALA preempts only the "common law of no duty to treat," not state-specific standards of care. *Hines v. Adair Cnty. Pub. Hosp. Dist. Corp.*, 827 F. Supp. 426, 432 (W.D. Ky. 1993). *See also* U.S. Commission on Civil Rights, Patient Dumping (Sept. 2014) (explaining EMTALA's requirement and definition of stabilization and its general conformity with the medical definition of stabilization).

In 1946, Congress passed the Hill-Burton Act, which provided federal funds for hospital construction so long as states offered a "reasonable volume" of free care for indigent patients. 42 U.S.C. § 291 *et seq.* This "reasonable volume" standard would remain undefined until 1972, when "Hill-Burton regulations established quantifiable guidelines" for compliance with the provision. *John Muir Mem'l Hosp., Inc. v. Davis*, 726 F.2d 1443, 1444 (9th Cir. 1984). *See also* 42 C.F.R. § 53.111. Still, the Hill-Burton Act primarily incentivized hospital construction; it never adequately ensured protection for indigent patients. *Newsom v. Vanderbilt Univ.*, 653 F.2d 1100, 1117 n.4 (6th Cir. 1981) (observing that the legislative history of the Act

"demonstrates that Congress had no intention of requiring the hospitals to furnish a certain amount of free care.") Of all the problems the Hill-Burton Act left unsolved, one of the most urgent was the increasing trend of "patient dumping." *See* David A. Ansell, and Robert L. Schiff, *Patient Dumping*, 257 JAMA 1500 (1987) (describing the increasing rate and widespread scale of "patient dumping"). "Patient dumping" is generally defined as "the denial of . . . medical services to a patient for economic reasons and the referral of that patient elsewhere." *Id.*

To address this problem, Congress enacted the Emergency Medical Treatment and Active Labor Act of 1986, 42 U.S.C. § 1395dd. EMTALA generally ensures that hospitals provide appropriate screening for emergency medical conditions and stabilizing treatment if such a condition exists. *Arrington v. Wong*, 237 F.3d 1066, 1070 (9th Cir. 2001). A hospital's specific obligations under EMTALA are threefold. First, "any individual . . . [who] comes to the emergency department" and requests "examination or treatment for a medical condition" must be given an "appropriate medical screening examination." 42 U.S.C. § 1395dd(a). Second, upon determining that "the individual has an emergency medical condition, the hospital must provide either" stabilizing treatment or transfer to another medical facility. *Id.* at § 1395dd(b). Third, "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized," the hospital may transfer the individual only in select circumstances. *Id.* at § 1395dd(c).

5

EMTALA's text, structure, and history demonstrate Congress's intent to "impose a limited duty on hospitals with emergency rooms to provide emergency care to all individuals who come there." *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996) (quoting *Brooks v. Maryland General Hosp., Inc.*, 996 F.2d 708, 715 (4th Cir. 1993) (internal quotation marks omitted)). Indeed, the limited nature of this duty is a well-settled feature of this federal law.

### B. EMTALA Has Never Been Understood to Require a National Standard of Care

Requiring a specific stabilizing treatment such as abortion stretches EMTALA beyond this limited duty of equal treatment. Indeed, courts have long recognized that "[t]he stabilization obligation does not impose a standard of care prescribing how physicians must treat a critical patient's condition." *Fraticelli-Torres v. Hosp. Hermanos*, 300 Fed.Appx. 1, 4 (1st Cir. 2008) (citing *Harry v. Marchant*, 291 F.3d 767, 771–72 (11th Cir. 2002)). Instead, the Act merely—but still importantly—entitles patients to equal treatment. *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996).

By now mandating a federal standard of care, HHS contravenes not only the history, structure, text, and purpose of EMTALA but also disregards the longstanding reasoning of federal courts throughout the nation. Most recently, the

Fifth Circuit held that "EMTALA does not mandate any specific type of medical treatment, let alone abortion." *Texas v. Becerra*, 89 F.4th 529, 542 (5th Cir. 2024).

The Fifth Circuit is in good company; every geographical circuit court agrees that EMTALA merely mandates equal treatment, not a nationalized standard of care. *See*, e.g., *Del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15, 21 (1st Cir. 2002) (distinguishing a standard-of-care complaint from an EMTALA complaint); *Hardy v. N.Y. City Health & Hosp. Corp.*, 164 F.3d 789, 792–93 (2d Cir. 1999) (describing duty of equal care); *Torreti v. Main Line Hosps., Inc.*, 580 F.3d 168, 173 (3d Cir. 2009) (emphasizing EMTALA's focus on disparate patient treatment); *Williams v. Dimensions Health Corp.*, 952 F.3d 531, 538 (4th Cir. 2020) (stating that EMTALA does not cover standard-of-care claims); *Marshall v. E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324–25 (5th Cir. 1998) (holding that violations of EMTALA concern whether the patient was treated "equitably in comparison to" similarly situated patients); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 270 (6th Cir. 1990) (noting EMTALA's limited scope and compatibility with statelaw claims); *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020, 1025 (7th Cir. 2021) (holding that EMTALA "cannot be used to challenge the quality of 7 medical care"); *Hunt ex rel. Hunt v. Lincoln Cnty. Mem'l Hosp.*, 317 F.3d 891, 894 (8th Cir. 2003) (noting that "EMTALA focuses on uniform treatment of patients"); *Bryant v. Adventist Health Syst./W.*, 289 F.3d 1162, 1166 (9th Cir. 2002) (stating that

7

EMTALA was not enacted "to establish a national standard of care"); *St. Anthony Hosp. v. U.S. Dep't of Health & Hum. Servs.*, 309 F.3d 680, 694 (10th Cir. 2002) (noting that EMTALA is "an anti-dumping provision, not a federal medical malpractice law"); *Smith v. Crisp Reg'l Hosp., Inc.*, 985 F.3d 1306, 1308 (11th Cir. 2021) (reaffirming a prior en banc decision stating that EMTALA "was not intended to establish guidelines for patient care"); *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991) (holding that EMTALA merely "create[s] a new cause of action" for "failure to treat"). In sum, the text, structure, history, and purpose of EMTALA, along with the jurisprudence of 12 federal appellate courts, support the notion that this federal law imposes only a limited duty of equal care. There is no congressional intent to set federal standards of care. Instead, EMTALA operates against ordinary background principles of federalism and the states' traditional police powers. *Cf. Gonzales v. Oregon*, 546 U.S. 243, 246 (2006) (reaching the same conclusion as to the Controlled Substances Act).

### II. Reading a National Standard of Care into EMTALA Would Have Grave Implications for Numerous Other State Laws

In its memo published July 11, 2022, the Centers for Medicare and Medicaid Services (CMS) mandate 8 abortion as a "stabilizing procedure" wherever "necessary to resolve" an emergency condition. This language is a blatant attempt to circumvent and nullify state self-governance.

A state's ability to protect its citizens' health, safety, and welfare should not be overlooked. The federal government contends that Idaho's § 18-622 is preempted to the extent it directly conflicts with the EMTALA guidance. That's true, but there is no conflict. By manufacturing one, the federal government nationalizes a morally and politically fraught standard of care for a broad range of pregnancy-related emergencies. It is, in essence, telling physicians to perform abortions or face § 1395dd(d) liability. If CMS can nationalize a standard of care through § 1395(b)'s stabilization requirement, then EMTALA may become any future administration's preferred vehicle for nullifying state law. This has disturbing implications for any number of other medical issues. A few that readily come to mind include gender-affirming care, assisted suicide, and right-to-try cases.

### A. Gender-Affirming Care

Twenty-six states currently ban "gender-affirming care" in all circumstances.[2] However, the American Medical Association deems medical and surgical treatment for gender dysphoria medically necessary. If EMTALA becomes a legally viable vehicle for nationalizing medical practice, CMS in future could easily interpret §

---

[2] These states include Alabama, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Wyoming, and West Virginia. *See* Lindsey Dawson & Jennifer Kates, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, KFF (Aug. 27, 2024), https://tinyurl.com/29vg2wq4.

9

1395dd(b) to require gender-affirming care for any patient presenting with an "emergency medical condition" as defined by subsection (e).

### B. Medical Aid-in-Dying Laws

Ten states have laws permitting physician-assisted suicide.[3] However, a nationalized standard of care under § 1395dd(b) could plausibly preempt such state laws by construing § 1395dd(b)'s stabilization requirement to preclude treatments that result in the death of the patient. That would arguably be a faithful application of EMTALA's definition of a stabilizing treatment: "medical treatment . . . [that] may be necessary to assure . . . no material deterioration of the condition is likely to result from or occur during the transfer" of the patient. § 1395dd(e) (emphasis added).

Conversely, an executive branch with different views could require states to offer physician-assisted suicide under § 1395dd(b), since such treatment assures that no further "material deterioration" is possible and thus may technically comply with EMTALA's definition of stabilizing treatment.

---

[3] The states are California, Colorado, Hawaii, Maine, Montana, New Jersey, New Mexico, Oregon, Vermont, and Washington. *See States Where Medical Aid in Dying Is Authorized*, Compassion & Choices, http://tinyurl.com/59u5xcky (last visited Sept. 18, 2024).

**C. Right-to-Try Laws**

Under "Right to Try" laws, 41 states currently allow terminally ill patients the right to seek experimental treatments that have passed the FDA's Phase I clinical trials. *See Federal Right to Try: Questions and Answers*, Right to Try National Movement, https://tinyurl.com/26tctt56 (last visited Sept. 18, 2024). Experimental treatments include medical marijuana.

A nationalized standard of care under § 1395dd(b) could mandate the availability of such treatment, even in states that have made different risk calculations concerning these experimental treatments.

In seeking to enjoin Idaho from enforcing its own laws, the federal government offers a novel and expansive preemption theory. Under this approach, the spending power becomes an instrument of unlimited federal power, and the federal government can run roughshod over states' police power to legislate for their citizens' health, safety, and welfare. Such a power grab cannot be allowed. *See generally* Mark Seidenfeld, *The Bounds of Congress's Spending Power*, 61 Ariz. L. Rev. 1, 26 (2019); David E. Engdahl, *The Spending Power*, 44 Duke L.J. 2 (1994).

If the federal government's expansive view of preemption were to prevail here, the concepts of state autonomy and of dual sovereignty would be destroyed. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (expounding on dual sovereignty and the relation between the state and federal governments).

## CONCLUSION

By using EMTALA to mandate abortion procedures, HHS stretches this federal law beyond its natural and well-established scope. There is longstanding jurisprudential consensus that EMTALA preempts the common law's absence of a duty to treat, but no court has held that such preemption extends to state standards of care. The government's litigation posture here invites future administrations to use this newfound power to decide for the nation questions of vast political importance that are properly left to state and local authorities.

The Court should curb this executive overreach and affirm the longstanding consensus of the lower courts.

Respectfully submitted,

s/ *Ilya Shapiro*
Ilya Shapiro
   *Counsel of Record*
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

September 18, 2024

12

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-35440 & 23-35450

I am the attorney or self-represented party.

**This brief contains 2,612 words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.
[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.
[ ] complies with the length limit designated by court order dated _____.
[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Ilya Shapiro          **Date** September 18, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit for filing and transmittal of a Notice of Electronic Filing to the participants in this appeal who are registered CM/ECF users.

DATED: September 18, 2024             s/ Ilya Shapiro
                                                      Counsel for *Amicus Curiae*