**Nos. 24-35440 & 24-35450**

═══════════════════

**In the
United States Court of Appeals for the Ninth Circuit**

───────────────

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.
THE STATE OF IDAHO,
*Defendant-Appellant,*
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives, *et al.*,
*Movants-Appellants*

───────────────

**On Appeal from the
United States District Court for the District of Idaho**

───────────────

**Brief *Amicus Curiae* of America's Future, U.S. Constitutional Rights Legal Defense Fund, Judicial Action Group, Restoring Liberty Action Committee, and Conservative Legal Defense and Education Fund in Support of Appellants and Reversal**

───────────────

JOSEPH W. MILLER
  LAW OFFICE OF JOSEPH MILLER, LLC
  P.O. Box 83440
  Fairbanks, AK  99708

PHILLIP L. JAUREGUI
  JUDICIAL ACTION GROUP
  2700 Corporate Dr., Ste. 200
  Birmingham, AL  35242

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA  24506

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070


*Attorneys for Amici Curiae*
September 19, 2024
*Attorney of Record

═══════════════════

## DISCLOSURE STATEMENT

The *amici curiae* herein, America's Future, U.S. Constitutional Rights Legal Defense Fund, Judicial Action Group, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A). These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them, except for Restoring Liberty Action Committee, which is a nonprofit educational organization.

*s/Jeremiah L. Morgan*
Jeremiah L. Morgan

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.   THE HHS SECRETARY HAD NO STATUTORY AUTHORITY TO ISSUE
     THE GUIDANCE DOCUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.   The Guidance Documents . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.   EMTALA Never Required Abortions to Be Performed . . . . . . . 6

     C.   The Guidance Documents Undermine the 1989 Amendments
          to EMTALA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.  THE DISTRICT COURT INJUNCTION AGAINST IDAHO LAW
     UNDERMINES THE SUPREME COURT'S DECISION IN DOBBS . . . . . . . . 14

     A.   Dobbs Returned the Issue of Abortion to the States . . . . . . . . . 14

     B.   The Biden Administration Dedicated Itself to Undermine
          Dobbs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. THE GUIDANCE DOCUMENTS CONSTITUTE AN UNCONSTITUTIONAL
     EXERCISE OF A FEDERAL POLICE POWER . . . . . . . . . . . . . . . . . . 20

     A.   Idaho Correctly Views the Guidance Documents as a
          Usurpation of the State Police Power . . . . . . . . . . . . . . . . . 20

B.    The Founders Intended Dual Sovereignties to Preserve Liberty . . 21

C.    The Spending Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

Page

**UNITED STATES CONSTITUTION**
Amendment X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATUTES**
42 U.S.C. § 1395 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
42 U.S.C. § 1395dd  . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 10
Idaho Code § 18-604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**CASES**
*Arrington v. Wong*, 237 F.3d 1066 (9th Cir. 2001) . . . . . . . . . . . . . . . . . .  1
*Dobbs v. Jackson Women's Health Org,* 597 U.S. 215 (2022) . . . . . .  2, *passim*
*Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
*Gibbons v. Ogden*, 22 U.S. 1 (1824) . . . . . . . . . . . . . . . . . . . . . . . 21
*Gregory v. Ashcroft*, 501 U.S. 452 (1991) . . . . . . . . . . . . . . . . . . . 21
*Hutto v. Davis*, 454 U.S. 370 (1982) . . . . . . . . . . . . . . . . . . . . . . 19
*Jacobson v. Mass.*, 197 U.S. 11 (1905) . . . . . . . . . . . . . . . . . . . . . 22
*Jaffree v. Wallace*, 705 F.2d 1526 (11th Cir. 1983) . . . . . . . . . . . 19
*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) . . . . . . . . . 23, 24
*Roe v. Wade*, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . . . . . 2, 14, 15
*S.D. v. Dole*, 483 U.S. 203 (1987) . . . . . . . . . . . . . . . . . . . . . . . 23
*United States v. Lopez*, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . 22

**MISCELLANEOUS**
42 C.F.R. § 457.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Centers for Medicare & Medicaid Services, "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss" (July 11, 2022) . . . . . . . . . . . . . . . . . . . . . . . 3, 6
Executive Order No. 14076 (July 8, 2022) . . . . . . . . . . . . . . . . . . . 17
John Marshall's Defense of *McCulloch v. Maryland* (G. Gunther ed. 1969) . . 23
Letter from Xavier Becerra to Health Care Providers, Secretary of Health and Human Services (July 11, 2022) . . . . . . . . . . . . . . . . . 5, 7, 8, 11

iv

K. Moseley-Morris, "Idaho's abortion trigger ban clock starts now — ban will take effect Aug. 25," *Idaho Capital Sun* (July 26, 2022) . . . . . . . 2

L. Rose, "Biden's Radical Shift on Abortion is Out of Step with Most Americans," *Newsweek* (Feb. 8, 2021) . . . . . . . . . . . . . . . . . . . . . 17

J. Summers, M. Lim, & K. Fox, "HHS Secretary Becerra on federal abortion rights," *NPR* (June 28, 2022) . . . . . . . . . . . . . . . . . . . . . 18

The White House, "Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade" (June 24, 2022). . . . . . . . 3, 16, 17

J. Wright, "HHS secretary says 'everything is on the table' in response to medication abortion ruling," *CNN Politics* (Apr. 9, 2023) . . . . . . . . 18

v

## INTEREST OF *AMICI CURIAE*[1]

America's Future, U.S. Constitutional Rights Legal Defense Fund, Judicial Action Group, Restoring Liberty Action Committee, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal income tax under either sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. These entities, *inter alia*, participate in the public policy process, including conducting research, and informing and educating the public on the proper construction of state and federal constitutions, as well as statutes related to the rights of citizens, and questions related to human and civil rights secured by law.

## STATEMENT OF THE CASE

In 1986, "Congress enacted the Emergency Medical Treatment and Active Labor Act of 1986 (EMTALA), commonly known as the Patient Anti-Dumping Act, 42 U.S.C. § 1395dd, to prevent 'hospitals … "dumping" [indigent] patients … by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized.'" *Arrington v. Wong*, 237 F.3d

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

1066, 1069 (9th Cir. 2001). EMTALA "was passed in 1986 amid growing concern over the availability of emergency health care services to the poor and uninsured. The statute was designed principally to address the problem of 'patient dumping,' whereby hospital emergency rooms deny uninsured patients the same treatment provided paying patients, either by refusing care outright or by transferring uninsured patients to other facilities. See H.R. Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1985); *id*., pt. 3, at 5." *Gatewood v. Washington Healthcare Corp*., 933 F.2d 1037, 1039 (D.C. Cir. 1991).

Foreseeing the possibility that the U.S. Supreme Court might at some date overturn *Roe v. Wade*, 410 U.S. 113 (1973), the Idaho legislature passed in 2020 the "Defense of Life Act."[2] The act proscribes abortion except to protect the life of the mother or in certain cases of rape or incest. *Id.* The law was a "trigger law," slated to take effect 30 days after any Supreme Court decision overruling *Roe*. *Id*. In June 2022, the Supreme Court overturned *Roe* (*Dobbs v. Jackson Women's Health Org,* 597 U.S. 215 (2022)), and the Idaho act was set to take effect on August 25, 2022.

---

[2] K. Moseley-Morris, "Idaho's abortion trigger ban clock starts now — ban will take effect Aug. 25," *Idaho Capital Sun* (July 26, 2022).

Reacting with hostility against the Supreme Court's returning of the issue of abortion to the States, President Biden directed the Department of Health and Human Services ("HHS") to "take steps to ensure that … politicians cannot interfere in the decisions that should be made between a woman and her doctor."[3]  Pursuant to that directive, HHS Secretary Xavier Becerra promulgated a Guidance Document that instructed that any hospital receiving funds from the Centers for Medicare and Medicaid Services ("CMS") must provide abortions as "emergency care,"[4] by giving new meaning to EMTALA to achieve President Biden's pro-abortion directive.  Although the text of EMTALA restricted any preemption, the Guidance Document purported to preempt state law:

> If a physician believes that a pregnant patient presenting at an emergency department is experiencing an emergency medical condition … and that **abortion** is the stabilizing treatment necessary to resolve that condition, the physician **must provide** that treatment. When a state law prohibits abortion … that state law is **preempted**. [*Id.* (emphasis added)]

---

[3]  The White House, "Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade" (June 24, 2022) (hereinafter "Remarks").

[4]  Centers for Medicare & Medicaid Services, "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss" (July 11, 2022).

On August 2, 2022, the United States filed suit against Idaho in the U.S. District Court for Idaho, alleging that the state Defense of Life Act violates EMTALA and the Supremacy Clause.[5]   On August 24, 2022, the day before the state law was to take effect, the district court enjoined its operation. *United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Id. 2022).

In January 2024, the Supreme Court granted an application for stay of the injunction, treating it as a petition for a writ of certiorari before judgment, and granting review on the sole question of "[w]hether EMTALA preempts state laws that protect human life and prohibit abortions such as Idaho's Defense of Life Act." *Idaho v. United States*, 2024 U.S. LEXIS 3 * (Jan. 5, 2024).  In June 2024, after oral argument, the Supreme Court dismissed the writ of certiorari as "improvidently granted," vacated the stay of the district court's injunction, and remanded the case to this Court, which has now ordered rebriefing.[6]

---

[5]  Complaint, *United States v. Idaho*, No. 1:22-cv-00329-BLW (D. Id. Aug. 2, 2022), ECF No. 1.

[6]  Some of these *amici* filed an *amicus* brief in support of Idaho before the U.S. Supreme Court on February 27, 2024.

4

# ARGUMENT

## I.  THE HHS SECRETARY HAD NO STATUTORY AUTHORITY TO ISSUE THE GUIDANCE DOCUMENTS.

### A.  The Guidance Documents.

Just 17 days after the *Dobbs* decision, Secretary of Health and Human Services Xavier Becerra issued a Guidance Letter to American hospitals, twisting the meaning of a federal statute to undermine the effect of the Supreme Court's *Dobbs* decision.[7]

> In light of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, I am writing regarding … enforcement of the Emergency Medical Treatment and Active Labor Act (EMTALA).  As frontline health care providers, the federal EMTALA statute protects your clinical judgment and the action that you take to provide stabilizing medical treatment to your pregnant patients,[8] **regardless of the restrictions in the state where you practice**.

Under that directive, any hospital receiving funds from the CMS must provide abortions as emergency stabilizing care, as provided in a CMS summary published the same day:

---

[7]  Letter from Xavier Becerra to Health Care Providers, Secretary of Health and Human Services (July 11, 2022) (emphasis added).

[8]  Demonstrating their relentless commitment to Newspeak, pregnant women are termed "pregnant patients," presumably to ensure that pregnant men are treated equally.

5

> If a physician believes that a **pregnant patient** presenting at an emergency department is experiencing an emergency medical condition … and that **abortion is the stabilizing treatment necessary** to resolve that condition, the physician must provide that treatment. **When a state law prohibits abortion … that state law is preempted**.[9]

### B.    EMTALA Never Required Abortions to Be Performed.

In issuing the Guidance Documents, Secretary Becerra purported to exercise his authority under EMTALA — a federal law enacted in 1986 to address the problem of hospitals "patient dumping" by refusing to provide care to uninsured patients or transferring those patients to other facilities. EMTALA provides that hospitals receiving funds from CMS are required to screen patients, as follows:

> if any individual … comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for **an appropriate medical screening examination** within the capability of the hospital's emergency department. [42 U.S.C. § 1395dd(a) (emphasis added).]

EMTALA also requires stabilizing care:

---

[9] Centers for Medicare & Medicaid Services, "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss" (July 11, 2022) (emphasis added). The July 11, 2022 Letter from Secretary Becerra, *supra*, and this CMS publication are collectively referred to as the "Guidance Documents."

[i]f any individual … comes to a hospital and the hospital determines
that the individual has an **emergency medical condition**, the
hospital must provide either … within the staff and facilities
available at the hospital, for such further medical examination and
such treatment as may be required **to stabilize** the medical
condition, **or … for transfer** of the individual to another medical
facility.…  [42 U.S.C. § 1395dd(b)(1) (emphasis added).]

The district court injunction was utterly unsupported by EMTALA.  First,
EMTALA contains an express prohibition on interference with the manner in
which medical services are provided.  *See* 42 U.S.C. § 1395 (App.14).  Second,
none of the EMTALA statutory provisions even mention abortion in any context.
Third, EMTALA expressly provides that there would be no preemption except in
the case of a "direct conflict[]," which does not exist here.  42 U.S.C.
§ 1395dd(f).  Nevertheless, the Biden Administration asserts that its Guidance
Documents preempting state regulation of abortion are authorized by EMTALA.

The penalty for violation of these Guidance Documents is severe, including
monetary penalties and even more serious actions **against both hospitals and
physicians**.

If the results of a complaint investigation indicate that a hospital
violated one or more of the provisions of EMTALA, a **hospital may
be subject to termination of its Medicare provider agreement**
and/or the imposition of **civil monetary penalties**.  Civil monetary
penalties may also be imposed against **individual physicians** for
EMTALA violations.  Additionally, physicians may also be subject

to **exclusion from the Medicare and State health care programs**…. [Letter from Xavier Becerra (emphasis added).]

Appellants have demonstrated that there is no "direct conflict" between Idaho's abortion law as amended in 2023 and providing stabilizing care (Moyle Br. at 33-34). Nonetheless, the awareness that severe sanctions could be imposed by a federal government agency determined to promote abortion in defiance of state law alters the medical calculus when a pregnant woman presents at an Emergency Room. For example, if a woman is "spotting" and demanding an abortion, would the physicians be obligated to provide it as "stabilizing care" even though there is no active bleeding? If a pregnant woman has taken drugs and says she fears for the health of her unborn child, requesting an abortion, would the physician be obligated to perform it? If a woman seeks an abortion, stating that she would harm herself if she is forced to deliver her unborn child, does that require an abortion be provided as "stabilizing care"? In these and other circumstances, when do the Guidance Documents require abortions be performed as "stabilizing care"?

The Guidance Documents seem designed to set up manufactured controversies to empower judges to push its boundaries. Will pro-abortion activists come into Emergency Rooms demanding an abortion to create a

8

challenge, much as has been done by homosexual activists targeting Christian bakers, florists, and website developers to service their same-sex wedding ceremony?[10]  If a woman who was refused an abortion in such circumstances files a complaint with CMS, under orders to advance abortion rights, will it assess crushing penalties, much as has been done by Colorado and certain other states?

Under this Biden CMS system, who speaks for the unborn child who is also protected by EMTALA?  The reality is that a CMS complaint can only be filed by the mother.  Thus, the physician is incentivized to perform a requested abortion as "stabilizing care," and to disregard the interests of the unborn child despite the fact that the child is also a patient of the physician, under the 1989 Amendments to EMTALA, discussed in the next subsection, *infra*.

As Appellants point out, the hostility of the Biden Admnistration to the pro-life position is not reflective of federal law and regulations generally.  *See* Moyle Br. at 53-57.  For example, Title XXI of the Social Security Act, enacted in 1997, authorizes federal grants to states for provision of child health assistance

---

[10]  *See, e.g.,* Brief *Amicus Curiae* of Public Advocate of the United States, *et al.* in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, U.S. Supreme Court No. 16-111 (Sept. 7, 2017) on Writ of Certiorari in Support of Petitioners.

to uninsured, low-income children, known as the CHIP program.  For purposes
of that program, 42 C.F.R. § 457.10 defines "child" as follows:

> Child means an individual under the age of 19 including the period
> **from conception** to birth.

Under the current Administration, the federal government has made a sharp turn,
but it should not be assumed that all federal laws, regulations, and policies urge
abortion.

### C.    The Guidance Documents Undermine the 1989 Amendments to EMTALA.

Congress amended EMTALA in 1989 to extend the protections of that law
with respect to an "emergency medical condition" by redefining that term to
include "with respect to a pregnant woman, the health of the woman or her
**unborn child**."  42 U.S.C. § 1395dd(e)(1)(A)(i) (emphasis added).  With this
and other EMTALA amendments, Congress required medical staff to treat an
"unborn child" as a patient when making a determination about whether an
emergency medical condition exists, and if so, what treatment may be required.
The Guidance Documents not only fail to address the 1989 amendments
protecting the "unborn child," but they also actually can be seen to encourage
hospitals to violate these child-protective provisions of EMTALA.

10

First, the Guidance Documents focus exclusively on duties owed to the "pregnant patient," providing not even one word about the physician's duties under EMTALA to the "unborn child." Likewise, the more extensive CMS Memorandum of July 11, 2022, which purports to "restate existing guidance … in light of new state laws prohibiting or restricting access to abortion," contains a passing reference to "unborn child," but only with respect to transferring patients, and nothing on stabilizing care, which is the EMTALA provision with respect to which federal preemption is being claimed.

Second, when the Guidance Documents address stabilizing conditions, they actually instruct physicians to consider only the health of the mother (even though the word "mother" is not used): "**If a physician believes that a pregnant patient** presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that **abortion** is the stabilizing treatment necessary to resolve that condition, the physician **must** provide that treatment." Becerra letter, p. 1 (emphasis added). By its exclusive focus on the "pregnant patient," this instruction implicitly tells the physicians that they are not to consider the interests of the "unborn child," in violation of EMTALA.

11

Third, the Guidance Documents devalue the "unborn child," whose death is termed a "stabilizing treatment" for the mother. The EMTALA amendment's use of the term "unborn child" demonstrates that Congress viewed the physicians and hospitals as dealing with two human beings — the mother (a/k/a "pregnant patient") and the "unborn child." The term "preborn child" is defined in Idaho law as "an individual organism of the species Homo sapiens from fertilization until live birth." Idaho Code § 18-604(5). Use of cavalier "stabilizing" language might have been necessary for the Guidance Documents to shoehorn a supposed right to abortion into a statutory right of stabilizing care, but it is shocking nonetheless.[11]

Even if EMTALA had never been amended to protect expressly the life of the "unborn child," it would not offer a direct conflict with and justify preemption of Idaho state law. However, the fact that EMTALA provides such

---

[11] By repeatedly describing an abortion as mere "stabilizing treatment," the Guidance Documents seek to avoid the fact that the life of a human being is being ended. To be sure, as Idaho law provides, there are instances where it is understood that a pregnancy will lead to the death of the "unborn child," such as an ectopic pregnancy, and this inevitable outcome is being facilitated by the physician to protect the mother. Those procedures are not considered "abortions" under the Idaho law. Idaho Code § 18-604(1)(c). However, the government should still treat the baby with respect and not just as a destabilizing force to be dispensed with.

12

protection, and that the Biden Administration Guidance Documents ignore that part of the statute, demonstrates the extent to which the HHS Secretary is willing to go to legitimatize abortion from conception to the moment before birth.

The Guidance Documents cannot be considered to be an effort to give any reasonable meaning to the EMTALA law.  Rather, the Biden Administration appears to have cast about to find a vehicle through which it could promote abortion and override state pro-life laws, and landed on EMTALA.  Appellants demonstrate that the HHS Guidance Documents constitute a complete rewriting of EMTALA to include abortion without congressional authorization.  There is no direct conflict requiring preemption and no basis for finding an application of the Supremacy Clause, particularly since Congress has not imposed this requirement.  The Executive Branch cannot give new meaning to this statute to create a right to an abortion and then claim there is a direct conflict between EMTALA and Idaho law.  *See* Moyle Br. at 12-13.[12]

But even more fundamentally, upholding the district court's injunction would both defy the Supreme Court's effort to return the issue of abortion

---

[12]  Moreover, the district court's speculation about conflicts between EMTALA and the Idaho law are no longer relevant after Idaho's 2023 Amendments.  *See* Moyle Br. at 10-12.

regulation to the states (*see* section II, *infra*), as well as sanction the assertion of a federal police power under the guise of a spending condition (*see* section III, *infra*).

## II. THE DISTRICT COURT INJUNCTION AGAINST IDAHO LAW UNDERMINES THE SUPREME COURT'S DECISION IN *DOBBS*.

### A. *Dobbs* Returned the Issue of Abortion to the States.

*Dobbs v. Jackson Women's Health Org.* was highly controversial, but simple in design: it reversed the Supreme Court's earlier nationalization of the abortion issue in *Roe v. Wade*, returning the issue of abortion to the states. While most remember *Dobbs* only for overturning *Roe*'s constitutional "right to an abortion," just as important was its commitment to honor each state's authority to chart its own course addressing that controversial issue.

The *Dobbs* Court recited the nation's long history of state regulation of abortion. It explained that "[f]or the first 185 years after the adoption of the Constitution, each State was permitted to address this issue in accordance with the views of its citizens." *Dobbs* at 225. "By the time of the adoption of the Fourteenth Amendment, three-quarters of the States had made abortion a crime at any stage of pregnancy, and the remaining States would soon follow." *Id.* at 241. "This overwhelming consensus endured until the day *Roe* was decided. At

14

that time, also by the *Roe* Court's own count, a substantial majority — 30 States — still prohibited abortion at all stages except to save the life of the mother."[13] *Id.* at 249. But then, *Roe v. Wade* improperly "imposed the same highly restrictive regime on the entire Nation, and it effectively struck down the abortion laws of every single State." *Id.* at 228.

The authority of a state to regulate abortion is found in the state's police powers to protect the health, safety, and welfare of its citizens. *Dobbs* explained, "[F]or more than a century after 1868 — including 'another half-century' after women gained the constitutional right to vote in 1920 … it was firmly established that laws prohibiting abortion like the Texas law at issue in *Roe* were permissible exercises of state regulatory authority." *Id.* at 261. The Court admitted that *Roe* "usurped the power to address a question of profound moral and social importance that the Constitution unequivocally leaves for the people." *Id.* at 269.

The Supreme Court was clear as to its real constitutional mandate: "It is time to heed the Constitution and return the issue of abortion to the people's elected representatives" at the state level. *Id.* at 232. Accordingly, the Supreme

---

[13] Idaho's enjoined law is more permissive than these 1973-era statutes.

Court announced, "[o]ur decision returns the issue of abortion to those [state] legislative bodies." *Id.* at 289.

**B.     The Biden Administration Dedicated Itself to Undermine *Dobbs*.**

President Biden roundly criticized the Supreme Court's decision to return the issue of abortion to the States, expressing anger and defiance.  Biden called the Court's decision "the culmination of a deliberate effort over decades to upset the balance of our law" and "an extreme ideology and a tragic error by the Supreme Court."[14]  He accused the Court of "jeopardizing the health of millions of women."  *Id*.  He stated:  "it just stuns me," and "[i]t's cruel."  *Id*.  He accused the Court of "literally taking America back 150 years."  *Id*.  He asserted that the Court's *Dobbs* majority "shows how extreme it is….  They have made the United States an outlier among developed nations in the world."  *Id*.  Biden promised to strike back, declaring that "this decision must not be the final word."  He threatened:  "I will do all in my power to protect a woman's right in states where they will face the consequences of today's decision."  *Id*.  "My administration will use all of its appropriate lawful powers."  *Id*.

---

[14]  The White House, "Remarks" (June 24, 2022).

16

To override in part the Supreme Court's decision in *Dobbs*, President Biden stated, "I'm directing the Department of Health and Human Services to take steps to ensure that … politicians cannot interfere in the decisions that should be made between a woman and her doctor."[15] He followed up his threat with an Executive Order:

> The President has directed the Secretary of Health and Human Services (HHS) to … take steps to ensure all patients — including pregnant women and those experiencing pregnancy loss — have access to the full rights and protections for emergency medical care afforded under the law, including by considering updates to current guidance that clarify physician responsibilities and protections under the Emergency Medical Treatment and Labor Act (EMTALA).[16]

President Biden certainly did not need to twist Secretary Becerra's arm to order hospitals to perform abortions made illegal by State law. Previously, as California's attorney general: "Becerra tried to force pro-life pregnancy centers to advertise abortion services and force churches and religious orders to pay for abortions and contraceptives under their health care plans."[17] After the *Dobbs*

---

[15] White House, Remarks, *supra*.

[16] The White House, "FACT SHEET: President Biden to Sign Executive Order Protecting Access to Reproductive Health Care Services" (July 8, 2022). *See* Executive Order No. 14076 (July 8, 2022), App.24-30.

[17] L. Rose, "Biden's Radical Shift on Abortion is Out of Step with Most Americans," *Newsweek* (Feb. 8, 2021).

decision, "President Biden condemned the decision. And today his Health and Human Services secretary vowed to take steps to protect women's reproductive health. He called last week's ruling, quote, 'despicable.'"[18] More recently, Secretary Becerra responded to other pro-life rulings by promising: "'Everything is on the table. The president said that way back when the Dobbs decision came out. Every option is on the table....'"[19]

The *Dobbs* Court recognized that abortion was not a matter for the federal government, but rather a matter for state legislatures, as the: "weighing of the relative importance of the fetus and mother represent[s] a departure from the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies." *Id.* at 289 (internal quotations omitted).

The Biden Administration view is quite different — it has boldly announced its commitment to the undermining of the *Dobbs* decision. The Biden Administration does not trust the States and the People to decide whether and

---

[18] J. Summers, M. Lim, & K. Fox, "HHS Secretary Becerra on federal abortion rights," *NPR* (June 28, 2022) (video).

[19] J. Wright, "HHS secretary says 'everything is on the table' in response to medication abortion ruling," *CNN Politics* (Apr. 9, 2023).

18

how abortion should be regulated.  It has only one objective — unlimited abortion on demand up to the moment of birth in every state.

The district court did not do its job to respect and follow the Supreme Court's decision in *Dobbs*.  In sanctioning the Executive Branch usurpation of state legislative power, it acted in defiance of the Supreme Court's ruling.  Until recently, such defiance has been rare, but when engaged in by the lower federal courts, it has drawn swift correction from the Supreme Court.  In *Hutto v. Davis*, 454 U.S. 370, 374-75 (1982) (*per curiam*), the Supreme Court rebuked the circuit court, saying:  "the Court of Appeals could be viewed as having ignored … the hierarchy of the federal court system.…  [U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."[20]  This Court should not allow anarchy to spread, by reasserting the basic hierarchal nature of our judicial system.  In *Dobbs*, the Supreme Court modeled respect for the constitutional limitations on

_____

[20]  *See also Jaffree v. Wallace*, 705 F.2d 1526, 1532 (11th Cir. 1983) ("[T]he Supreme Court is the ultimate authority on the interpretation of our Constitution and laws; its interpretations may not be disregarded.").

its own power as part of the national government.  This Court should require the

Biden Administration to afford the Constitution the same respect.

## III. THE GUIDANCE DOCUMENTS CONSTITUTE AN UNCONSTITUTIONAL EXERCISE OF A FEDERAL POLICE POWER.

### A. Idaho Correctly Views the Guidance Documents as a Usurpation of the State Police Power.

The problem presented by the Guidance Documents is more fundamental

than the case of an executive department simply exceeding such authority it was

granted by Congress on a federal matter.

> The government has no power to exceed the statutory and
> constitutional limits of its federal power with this unprecedented
> lawsuit.  Idaho waited nearly 50 years to reclaim the sovereign
> authority to legislate on abortion.  The State did so after *Dobbs*
> "return[ed] the issue of abortion to the people's elected
> representatives."  597 U.S. at 232.  Within weeks, the Government
> hauled Idaho into federal court and demanded its compliance with a
> newfound HHS abortion mandate nowhere in EMTALA's text.  The
> government has no power to place state legislatures under its
> control….  Its novel preemption theory denies States and the
> American people the freedom to chart their own course.  [Moyle Br.
> at 77.]

The HHS action constitutes a deliberate intrusion into the powers of the

state.  It is at bottom an attempt by the Biden HHS to assume federal police

20

powers which the Tenth Amendment reserves to the States.  *See* Moyle Br. at
26, 77.

**B.    The Founders Intended Dual Sovereignties to Preserve Liberty.**

The Supreme Court has repeatedly explained the reason for the Founders'
division of governmental power between the federal and state sovereigns:
"Perhaps the principal benefit of the federalist system is a check on abuses of
government power.…  [A] healthy balance of power between the States and the
Federal Government will **reduce the risk of tyranny** and abuse from either
front.…"  *Gregory v. Ashcroft*, 501 U.S. 452, 458-459 (1991) (emphasis added).

From the founding days until the mid-20th century, police powers were
understood to be the domain of the States.  In 1824, the Supreme Court
recognized that the powers reserved to States included:

> [an] immense mass of legislation, which embraces every thing
> within the territory of a State, not surrendered to the general
> government: all which can be most advantageously exercised by the
> States themselves.  Inspection laws, quarantine laws, **health laws of
> every description**, as well as laws for regulating the internal
> commerce of a State, and those which respect turnpike roads,
> ferries, &c., are component parts of this mass.  [*Gibbons v. Ogden*,
> 22 U.S. 1, 203 (1824) (emphasis added).]

Later, the Supreme Court unequivocally explained that police powers are
vested in the States:

21

> The authority of the State [which] is commonly called the police power — a power which the State did not surrender when becoming a member of the Union under the Constitution.  Although this court has refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a State to enact quarantine laws and "health laws of every description...."
> [*Jacobson v. Mass.*, 197 U.S. 11, 24-25 (1905).]

In modern times, the Supreme Court has again reiterated that "[t]he Constitution … withhold[s] from Congress a plenary police power." *United States v. Lopez*, 514 U.S. 549, 566 (1995).  Accordingly, the Supreme Court has declined to "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567.  "To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated … and that there never will be a distinction between what is truly national and what is truly local." *Id.* at 567-68.  Indeed, as Justice Thomas noted in his concurrence, "[t]he Federal Government has nothing approaching a police power." *Id.* at 584-85 (Thomas, J., concurring).

Clearly, the Biden Administration rejects the Supreme Court's return of abortion law to the States.  Just as clearly, the Administration violently disagrees with the choice made by the people of Idaho through their state legislature.  In

22

asserting that HHS' Guidance Documents can preempt state police powers, it makes a mockery of this basic constitutional balance of powers. It is an action utterly without constitutional authority. Whether HHS' position on abortion or Idaho's position is a better public policy position is immaterial. "The peculiar circumstances of the moment may render a measure more or less wise, but cannot render it more or less constitutional." Chief Justice John Marshall, A Friend of the Constitution No. V, *Alexandria Gazette*, July 5, 1819, in <u>John Marshall's Defense of *McCulloch v. Maryland*</u> at 190-191 (G. Gunther ed. 1969).

### C. The Spending Power.

To be sure, Congress has the right, under the Constitution's spending power, to influence state policy with financial incentives. *See S.D. v. Dole*, 483 U.S. 203 (1987). Where Congress offers "relatively mild encouragement to the States" through the inducement of federal funds, the Supreme Court has found no constitutional infirmity. *Id.* at 211. But "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id.* As the Supreme Court has expressly held in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012),

23

where Congress threatened to make all Medicaid funding conditioned on adherence to a specific requirement, it was "much more than 'relatively mild encouragement' — it is a gun to the head." *Id.* at 581. By any standard, the HHS demand backed up by this sanction presents Idaho with an impermissible "gun to the head." It essentially threatens a death sentence to the Medicare program in Idaho unless the State capitulates and subjects its State law to the illicit "police power," not even of Congress, but of a naked HHS edict.

The Biden Administration's Guidance Documents are not just a misuse of EMTALA, but they are also an attempt to transfer the historic police powers of the states to a member of the President's Cabinet. It usurps the authority of the Idaho legislature to exercise its police powers in line with the will of its voters.

## CONCLUSION

The district court injunction should be vacated and the case dismissed.

Respectfully submitted,

  */s/ Jeremiah L. Morgan*

JOSEPH W. MILLER
  LAW OFFICES of JOSEPH MILLER, LLC
  P.O. Box 83440
  Fairbanks, AK  99708

PHILLIP L. JAUREGUI
  JUDICIAL ACTION GROUP

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
  jmorgan@lawandfreedom.com

2700 Corporate Dr., Ste. 200    *Attorney of Record
Birmingham, AL  35424    *Attorneys for Amici Curiae*
            September 19, 2024

RICK BOYER
 INTEGRITY LAW FIRM
 P.O. Box 10953
 Lynchburg, VA  24506

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-35440, 24-35450

I am the attorney or self-represented party.

**This brief contains** | 5,127 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [           ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jeremiah L. Morgan | **Date** | 9/19/24

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* America's Future, *et al.*, in Support of Appellants and Reversal, was made, this 19th day of September 2024, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

                                           */s/Jeremiah L. Morgan*

                                           Jeremiah L. Morgan
                                           Attorney for *Amici Curiae*