**23-35440, 23-35450**

_____

# United States Court of Appeals
# for the Ninth Circuit

_____

UNITED STATES OF AMERICA
*Plaintiff-Appellee*

v.

STATE OF IDAHO,
*Defendant-Appellant,*

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives;
CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE
SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-
Defendants,
*Movants-Appellants.*

_____

On Appeal from the United States District Court
for the District of Idaho

_____

## BRIEF OF LIFE LEGAL DEFENSE FOUNDATION AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELANT AND MOVANTS-APPELLANTS

CATHERINE W. SHORT
   Counsel of Record
Sheila A. Green
Life Legal Defense Foundation
PO Box 1313
Ojai, CA 93024-1313
(707) 337-6880
kshort@lldf.org

Rebecca R. Messall
Messall Law Firm, LLC
11670 Fountains Dri., Suite 200
Maple Grove, MN 55369
(612) 471-5800
rm@lawmessall.com

Counsel to *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Life Legal Defense Foundation is a non-profit corporation with no stock or parent corporations.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................. iii

INTEREST OF *AMICUS* CURIAE ............................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ................................................................................... 3

   I.    EMTALA Does Not Preempt Idaho's DOL Because
         EMTALA Preempts Only Directly Conflicting State Law
         "Requirements," Not Prohibitions. ..................................................... 3

  II.    Even if the DOL's prohibition were considered a
         "requirement", EMTALA does not preempt Idaho's Defense
         of Life Act. ..................................................................................... 7

    A.    It is not impossible to comply with both EMTALA and the
          DOL. ........................................................................................ 9

     1.    EMTALA requires that the unborn child be protected as an
           "individual" covered by the Act. ............................................... 9

     2.    EMTALA does not regulate the practice of medicine and
           therefore does not require that hospitals perform abortions
           to stabilize the health of a pregnant woman. ........................... 17

    B.    The DOL does not stand as an obstacle to the
          accomplishment and execution of the purposes and
          objectives of Congress. ............................................................ 19

 III.    Because EMTALA, which was enacted under the Spending
         Clause, does not unambiguously require abortions to protect
         the health of the mother, it does not preempt the DOL. ................. 23

 IV.    Allowing federal preemption of state police powers over
         health and safety opens a Pandora's box of unprecedented
         federal control. ............................................................................ 26

CONCLUSION ............................................................................. 27

# TABLE OF AUTHORITIES

## Cases

*Ariz. v. United States*,
 567 U.S. 387  (2012) .................................................................. 8

*Arrington v. Wong*,
 237 F.3d 1066 (9th Cir. 2001) ................................................. 21

*Banks v. Chi. Grain Trimmers*,
 390 U.S. 459 (1968) ................................................................ 14

*Buckman Co. v. Plaintiffs' Legal Comm.*,
 531 U.S. 341 (2001) ................................................................ 22

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
 373 U.S. 132 (1963) .................................................................. 8

*Gregory v. Ashcroft*,
 501 U.S. 452 (1991) ................................................................ 24

*Health & Hosp. Corp. v. Talevski*,
 599 U.S. 166 (2023) .......................................................... 24, 25

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
 471 U.S. 707 (1985) .................................................... 17, 22, 26

*Hines v. Davidowitz*,
 312 U.S. 52 (1941) ......................................................... 8, 19, 22

*In re Baby "K"*,
 16 F.3d 590 (4th Cir. 1994) ..................................................... 21

*Martinez v. Mukasey*,
 519 F.3d 532 (5th Cir. 2008) ................................................... 14

*Mass. Med. Soc'y v. Dukakis,*
 815 F.2d 790 (1st Cir. 1987) .................................................... 17

*Moyle v. United States,*

    144 S. Ct. 2015 (2024) ...................................................................... passim

*Pennhurst State Sch. & Hosp. v. Halderman*,

    451 U.S. 1 (1981) ................................................................................. 3, 23

*Planned Parenthood of Se. Penn. v. Casey*,

    505 U.S. 833 (1992) ................................................................................. 15

*Pub. Citizen v. Nuclear Reg. Comm'n*,

    901 F.2d 147 (D.C. Cir. 1990) .................................................................. 4

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,

    566 U.S. 639 (2012) ................................................................................. 16

*Salas v. United States*,

    2024 WL 3944661 *5 (9th Cir. Aug. 27, 2024)........................................ 3

*Stengel v. Medtronics*,

    704 F.3d 1224 (9th Cir. 2013)................................................................... 8

*Thornburgh v. Am. Coll. of Obstetricians & Gynecologists,*

    476 U.S. 747 (1986) ................................................................................. 15

*United States v. Lucero*,

    989 F.3d 1088 (9th Cir. 2021).................................................................. 13

*United States v. Paulson*,

    68 F.4th 528 (9th Cir. 2023).................................................................... 10

*United States v. Poff,*

    781 Fed. Appx. 593 (9th Cir. 2019) ....................................................... 11

*United States v. State of Idaho*,

    623 F. Supp. 3d 1096 (D. Idaho 2022)...................................................... 5

*United States v. Texas*,

    599 U.S. 670 (2023) ................................................................................... 4

*Wyeth v. Levine*,

   555 U.S. 555 (2009) ........................................................................ 6, 7, 17

**Statutes**

15 U.S.C. § 1334(b) ....................................................................... 6

18 U.S.C. § 3664(n) ....................................................................... 11

42 U.S.C. § 1395 .............................................................. 17, 19, 20, 24

42 U.S.C. § 1395dd(d) .................................................................... 22

42 U.S.C. § 1395dd(e)(1) (B)............................................................ 5

42 U.S.C. § 1395dd(e)(1). .............................................................. 19

42 U.S.C. § 1395dd(e)(1)(A) ........................................................ 9, 12

42 U.S.C. § 1395dd(e)(1)(A)(i)................................................. 2, 13, 16, 23

42 U.S.C. § 1395dd(e)(1)(A)(ii)....................................................... 13

42 U.S.C. § 1395dd(e)(1)(A)(iii) ..................................................... 13

42 U.S.C. § 1395dd(e)(3) ...................................................... 3, 19, 21

42 U.S.C. § 1395dd(e)(3)(A) ........................................................... 5

42 U.S.C. § 1395dd(f) .............................................................. passim

Alaska Stat. § 09.55.585 (2018) ....................................................... 15

Alaska Stat. § 11.81.900 (2018) ....................................................... 15

Fla. Stat. § 775.021(5)(e) (2018)....................................................... 15

Idaho Code § 18-502(9) (Supp. 2024) .................................................. 15

Idaho Code § 18-622 .............................................................. passim

Idaho Code § 18-622(2)(a)(i) ........................................................... 9

Idaho Code § 604(5) (Supp. 2024).................................................... 15

Kan. Stat. § 60-1901(c) (Supp. 2016) ................................................. 15

Unif. Com. Code § 2-206 .............................................................. 25

**Regulations**

*Protecting Access to Reprod. Healthcare Servs.*, Exec. Ord. No.

14076, 87 Fed. Reg. 42053 (2022) .......................................................... 25

**Constitutional Provisions**

U.S. Const. Art. 1, § 8 ................................................................................ 23

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation*

*of Legal Texts* (1st Ed. 2011) ........................................................... passim

*Bans on Best Practice Medical Care forTransgender Youth*,

Movement Advancement Project,

https://www.lgbtmap.org/equality-

maps/healthcare_youth_medical_care_bans ........................................... 26

*Black's Law Dictionary* (10th ed. 2014) ........................................................ 4

*Black's Law Dictionary* (5th ed. 1979) ...................................................... 4, 5

*Emergency Medical Treatment & Labor Act (EMTALA),* Centers for

Medicare and Medicaid Services ........................................................... 20

*FACT SHEET: Biden-Harris Administration Continues the Fight for*

*Reproductive Freedom*, The White House (March 7, 2024) .............. 2, 12

*Overview of the Emergency Medical Treatment and Active Labor Act*

*(EMTALA) and Emergency Abortion Services* 1*,* Congressional

Research Service, March 21, 2023 .......................................................... 20

*Physician-Assisted Suicide Disregards the Dignity of Human*,

Americans United for Life ..................................................................... 26

## INTEREST OF *AMICUS* CURIAE[1]

*Amicus* Life Legal Defense Foundation ("Life Legal") is a California non-profit 501(c)(3) public interest legal and educational organization that works to assist and support those who advocate in defense of life.  Its mission is to give innocent and helpless human beings of any age, particularly unborn children, a trained and committed defense against the threat of death, and to support their advocates in the nation's courtrooms.  Amicus opposes the attempt of the Biden Administration to impose a federal abortion mandate using a bi-partisan law passed to protect mothers and their unborn children.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The United States decided to pick a fight with Idaho over its valid pro-life laws, using EMTALA to score political points. The tip-off can be found in the announcement that the Biden Administration would "continue the fight for reproductive freedom" by using the federal Emergency Medical Treatment and Active Labor Act (EMTALA) (42 U.S.C. § 1395dd) to undermine state laws

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for amicus represent that no counsel for a party authored this brief in whole or in part and that no person or entity, other than amicus or their counsel, made a monetary contribution to the preparation or submission of this brief.  Counsel for all parties consented to the filing of this brief.

protecting unborn children. *FACT SHEET: Biden-Harris Administration Continues the Fight for Reproductive Freedom*, The White House (March 7, 2024). Obviously, in the tragic cases where women are faced with the threatened loss of a pregnancy, the issue is not "reproductive freedom" but what medical care is necessary. Idaho's law allows for all necessary care for pregnant women; it need not give way to a federal mandate designed for the entirely different purpose of ensuring emergency care regardless of ability to pay.

EMTALA does not preempt Idaho's Defense of Life Act (DOL) (Idaho Code § 18-622) for several reasons. First, the DOL's prohibition on abortions except when a woman's life is in danger does not directly conflict with EMTALA. EMTALA only preempts state law "requirements", not "prohibitions."[2] Since the DOL is a prohibition on abortions except to save the life of the mother, and not a "requirement," it cannot be preempted by EMTALA.

Furthermore, even if the DOL's prohibition were covered by EMTALA's preemption clause, it does not directly conflict with EMTALA. It is not impossible to comply with both acts because EMTALA recognizes the unborn child as an "individual" (§ 1395dd(e)(1)(A)(i)) and does not require abortion in order to

---

[2] **(f) Preemption**
The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section. § 1395dd(f).

stabilize a pregnant woman whose health is in danger. 42 U.S.C. § 1395dd(e)(3).

Moreover, the DOL does not stand as an obstacle to the accomplishment and

execution of the purposes and objectives of Congress because the purpose of

EMTALA is to ensure that hospitals provide emergency care to patients

irrespective of their ability to pay.

Finally, EMTALA was enacted pursuant to the Spending Clause, and it does

not unambiguously require hospitals to perform abortions when a pregnant

woman's health is in danger. The State of Idaho has not voluntarily and knowingly

accepted the federal government's newly-enunciated interpretation of EMTALA

and is therefore not bound by it. *Pennhurst State Sch. & Hosp. v. Halderman*, 451

U.S. 1, 17 (1981).

## ARGUMENT

### I.     EMTALA Does Not Preempt Idaho's DOL Because EMTALA Preempts Only Directly Conflicting State Law "Requirements," Not Prohibitions.

EMTALA's preemption provision is a "saving clause" which only applies

when a state law "requirement" conflicts with a "requirement" of the federal act. §

1395dd(f). *See* EMTALA preemption provision, n. 2. "When interpreting the

meaning of [a] statute, we look first to its plain language." *Salas v. United States*,

2024 WL 3944661 *5 (9th Cir. Aug. 27, 2024). "If the statutory language is plain,

we must enforce the statute according to its terms." *Id.* The distinction between

3

legal "requirements" and "prohibitions" is recognized in jurisprudence. *See e.g.,*
*United States v. Texas*, 599 U.S. 670, 684 (2023) ("Moreover, the Federal
Judiciary of course routinely decides justiciable cases involving statutory
**requirements or prohibitions** on the Executive.") (emphasis added). The United
States has not identified a specific Idaho state "requirement" alleged to be in direct
conflict with an EMTALA "requirement." Rather, the Government's arguments
seek to add words which the statute does not contain. The ordinary meaning of the
word "require", according to the legal dictionary in use in 1986 when EMTALA
was enacted, means "to direct, order, demand, instruct, command, claim, compel,
request, need, exact." *Black's Law Dictionary* (5th ed. 1979). *See also Black's Law
Dictionary* (10th ed. 2014) ("requirement" means "something that must be done");
*Pub. Citizen v. Nuclear Reg. Comm'n*, 901 F.2d 147, 156 (D.C. Cir. 1990) (holding
that agency's statutory duty to provide training "requirements" was not satisfied by
instead issuing "non-mandatory regulatory guidance", which was not mandatory).
In contrast to a requirement, Idaho's abortion statute creates a prohibition, meaning
"Inhibition; interdiction. Act or law prohibiting something." *Black's* (5th ed.
1979).

On the federal side, EMTALA does not contain a "requirement" that states
allow abortions to protect a pregnant woman's health in an emergency context. *See*
Sec. II.A. *infra*. The word "abortion" is not contained in EMTALA at all, let alone

4

as a "required treatment." *See Moyle v. United States,* 144 S. Ct. 2015, 2029 (2024) (*per curiam*) (Alito, J., Thomas, J., Gorsuch, J., dissenting). In particular and contrary to the United States' gloss (*Consol. Br.* at 15-21, filed Sept. 8, 2023 (CB)), because an unborn child is not expressly excluded in regard to "stabilization" requirements (42 U.S.C. § 1395dd(e)(3)(A) and (B)), EMTALA cannot be interpreted as *requiring* that a state allow hospitals to perform abortions to protect the health of the mother.  EMTALA's lack of an abortion "requirement" defeats the United States' argument for preemption because EMTALA's preemption language only applies if a state "requirement" is in "direct conflict" with an EMTALA "requirement." *See* 42 U.S.C. § 1395dd(f).

Instead, a **prohibition** on certain abortions in Idaho's DOL is the basis for the United States' argument, and the district court's holding, for preemption. *See United States v. State of Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022); *CB* 21-25. A prohibition, however, is not the necessary element for preemption, which must be a state's conflicting "requirement."

Idaho's DOL prohibiting certain abortions does not "direct, order, demand, etc." (*Black's* (5th ed. 1979)) nor is it a "requirement" of "something that must be done." *See* Black's (10th ed. 2014). Such a prohibition, thus, is not within the meaning of the text in 42 U.S.C. § 1395dd(f). Said another way, EMTALA does not preempt state or local law "prohibitions," as Congress has done in other

5

important contexts. *See e.g.,* 15 U.S.C. § 1334(b) ("No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising and promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.") (emphasis added).

A saving clause, such as the one contained in EMTALA, is an indication that Congress is taking care to preserve state law. "As it enlarged the FDA's powers to 'protect the public health' and 'assure the safety, effectiveness, and reliability of drugs,' . . . Congress took care to preserve state law. The 1962 amendments added a saving clause, indicating that a provision of state law would only be invalidated upon a 'direct and positive conflict' with the FDCA." *Wyeth v. Levine*, 555 U.S. 555, 567 (2009) (holding that a state product liability law regarding drug labeling was not preempted by the Food and Drug Administration's drug labeling requirements). Under EMTALA, preemption is only triggered when "something that must be done" under Idaho law "directly conflicts" with "something that must be done" under EMTALA. Inasmuch as Idaho's law "prohibits abortion" with some exceptions, such "prohibition" is not an affirmative "requirement" triggering EMTALA's preemption language in 42 U.S.C. § 1395dd(f).

Congress is aware of the difference between state law prohibitions versus state law requirements. Yet it chose not to fashion EMTALA into a comprehensive

6

preemption scheme. In fact, Congress expressly fashioned EMTALA as a "no preemption" statute, subject to the very narrow exception for a state "requirement" that directly conflicts with a specific "requirement" of EMTALA. Inasmuch as EMTALA contains no "requirement" for abortion, the United States has shown no "direct conflict" with a "requirement" under Idaho law. Accordingly, EMTALA's narrow preemption provision is inapplicable in this case.

## II. Even if the DOL's prohibition were considered a "requirement", EMTALA does not preempt Idaho's Defense of Life Act.

There are two "cornerstones" of preemption jurisprudence. "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Wyeth*, 555 U.S. at 565 (2009) (citation omitted). Second, in a field which the States have traditionally occupied, such as health and safety laws, we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id*. at 565.

EMTALA contains a narrow preemption provision, in effect a saving clause, which states, "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). There is a direct conflict in either of two circumstances. In one circumstance, it must be impossible to comply with both the federal and the state law. *See, e.g., Fla. Lime & Avocado Growers,*

7

*Inc. v. Paul,* 373 U.S. 132, 143 (1963) (noting that physical impossibility would exist if a federal law forbade the picking and marketing of any avocado testing more than 7% oil and a state law excluded from the state any avocado measuring less than 8% oil)). Alternatively, the state law must stand as an obstacle to the accomplishment and execution of the purposes and objectives of Congress. *See e.g., Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (holding that a state law requiring alien registration was preempted by the Federal Alien Registration Act of 1940); *Ariz. v. United States*, 567 U.S. 387, 399-400 (2012) (holding that federal immigration law preempted state immigration laws because the former is rooted in the Constitution and is not an area of traditional police power. In *Stengel v. Medtronics*, 704 F.3d 1224 (9th Cir. 2013), the Ninth Circuit found that a state-law duty of care for a negligence claim was not conflict preempted by the Medical Device Amendments to the Food, Drug, and Cosmetic Act. The court noted that "[c]onflict preemption exists when a state requirement actually conflicts with a federal requirement, making impossible compliance with both requirements, . . . or when a state requirement 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. at 1230-31 (citations omitted). The court concluded that there was no conflict preemption because the state-law duty paralleled the federal-law duty. *Id*. at 1230 – 1233.

8

Because it is not impossible to comply with both EMTALA and the DOL, and the DOL does not stand as an obstacle to the purposes and objectives of Congress, there is no direct conflict between the two laws, and EMTALA does not preempt the DOL.

**A. It is not impossible to comply with both EMTALA and the DOL.**

**1. EMTALA requires that the unborn child be protected as an "individual" covered by the Act.**

The Government's view is that EMTALA requires Medicare-funded hospitals to perform abortions when the health of a pregnant woman is in serious jeopardy. (CB) 15 – 25. Therefore, the Government holds, this requirement directly conflicts with the DOL, which only allows abortions when, in the good faith medical judgment of the doctor, the abortion was necessary to prevent the death of the pregnant woman. Idaho Code § 18-622(2)(a)(i). Abortions that are necessary to protect the health of the woman, but not necessarily save her life, fall in the "gap" between the two laws. *Moyle v. United States*, 144 S.Ct. 2015, 2017 (2024) (Kagan, J., concurring).

This argument fails for two reasons.  First, EMTALA does not require a doctor to perform an abortion. In fact, it specifically requires that the health of the unborn child be safeguarded as well as that of the mother. Section (e)(1)(A) of the act states:

The term "emergency medical condition" means-

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-
(i) placing the health of the *individual* (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy,
**(ii)** serious impairment to bodily functions, or
**(iii)** serious dysfunction of any bodily organ or part.

(Emphases added).

The Government argues that an unborn child is not an "individual" within the meaning of EMTALA (CB 31-34), but this argument is directly refuted by the text itself, which includes the unborn child in an explanatory parenthetical describing which individuals may be facing an "emergency medical condition." *Id*. The Government violates the very canon of statutory construction that it cites, namely that the words of a statute must be read in their context. All of the sections that the Government cites in support of its argument that an unborn child is not an individual within the meaning of EMTALA (subsections (a), (b), and (c)) refer back to the definition of "emergency medical condition" which clearly includes an unborn child as an "individual." According to the Presumption of Consistent Usage Canon, "A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 170 (1st Ed. 2011); *United States v. Paulson*, 68 F.4th 528, 555 (9th Cir. 2023) (holding that, under the Presumption of Consistent Usage Canon, 26 U.S. C. § 6324(a)(2)

10

imposes personal liability for unpaid estate taxes on the different types of "beneficiaries" listed in all the statutes referenced, and was not limited to beneficiaries named in only one of the statutes referenced). Subsection (i) is the only place in EMTALA that elaborates on the meaning of the term "individual", and that subsection states that the term includes both an unborn child and her mother. That understanding should then prevail throughout the Act, unless a "material variation" is made. Since the Act nowhere excludes an unborn child as an "individual", it is to be presumed that an unborn child is an "individual" within the meaning of the Act.

Because of its refusal to recognize that an unborn child is an "individual," the Government's position completely ignores EMTALA's requirement that the health of the unborn child be protected as well as that of the mother. This one-sided view is a violation of the Surplusage Canon, which states, "If possible, every word and every provision is to be given effect. . . . *None should be ignored*. None should needlessly be given an interpretation that causes it to duplicate another provision *or to have no consequence*." Scalia, *supra*, at 174; *United States v. Poff,* 781 Fed. Appx. 593*,* 594-95 (9th Cir. 2019) (applying the surplusage canon in holding that inclusion of the words "inheritance, settlement, or other judgment" in 18 U.S.C. § 3664(n) precludes including payments that are paid periodically, rather

than as a lump sum). By completely ignoring the health and life of the unborn child, the Government's analysis ignores the requirements of EMTALA.

Contrary to the Government's position (CB 35), nothing in EMTALA suggests that the life of the child is subservient to the health of the mother. This position is simply the Government's attempt to read its own policy agenda into EMTALA. *Moyle*, 144 S.Ct. at 2027 (Alito, J., dissenting). The Government's position that EMTALA imposes an abortion requirement upon states is a violation of "the false notion that the quest in statutory interpretation is to do justice." Scalia, *supra,* at 347. In this Administration's view, laws such as the DOL are unjust violations of the right to "reproductive freedom." *FACT SHEET*.[3] Indeed, the absence of any such explicit hierarchy in § (e)(1)(A) demonstrates that the health of the mother and the child are of equal importance under this law. Therefore, it cannot be the case that EMTALA must require that the life of the child be forfeited for the health of the mother. Such an interpretation violates the clear requirement of EMTALA that the health of the child be protected. *Id*.

---

[3] "The Administration is committed to ensuring that women who are experiencing pregnancy loss and other pregnancy-related emergencies have access to the full rights and protections for emergency medical care afforded under the Emergency Medical Treatment and Labor Act (EMTALA)—including abortion care when that is the stabilizing treatment required." https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/07/fact-sheet-biden-harris-administration-continues-the-fight-for-reproductive-freedom/.

Also erroneous is the Government's view that the exclusion of unborn children from §§ 1395dd(e)(1)(A)(ii)-(iii) proves that the pregnant woman receives greater protection than the unborn child. Those sections do not mention pregnant women either nor do they include the term "individual", so the Government's conclusion is groundless and is simply based on its own self-serving assumptions. In fact, the text mandates the opposite conclusion. The Whole-Text canon requires "the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Scalia, *supra*, at 167; *United States v. Lucero*, 989 F.3d 1088, 1099 (9th Cir. 2021) (applying the whole text canon and holding that the defendant, who discharged pollutants into dry land, could not be convicted of violating the Clean Water Act because it required that the pollutants be discharged from a "point source" which was defined as a "discernible, confined, and discrete conveyance" such as a pipe, a ditch or tunnel). Since subsections (ii) and (iii) do not mention the term "individual" or any person in particular, then logically the use of the term "individual" from subsection (i) would control those subsections. Indeed, were the Government's view correct, a hospital would be under no obligation to treat an unborn child experiencing the conditions mentioned in subsections (ii) and (iii) ("serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part"), while under § (e)(1)(A)(i), the hospital clearly would have a duty to give the unborn child

13

stabilizing treatment if her health were in "serious jeopardy." The Government's position that subsections (ii) and (iii) do not protect unborn children is therefore illogical and absurd and violates "the well-established maxim that statutes should be construed to avoid an absurd result." *Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008).

To avoid absurdity, the word "individual" should be interpreted in accord with another maxim, *i.e.,* that words used in a statute are given their ordinary meaning in the absence of persuasive reasons to the contrary. Scalia, *supra*, at 69; *Banks v. Chi. Grain Trimmers*, 390 U.S. 459, 465 (1968) (holding that, according to its ordinary meaning, a "determination of fact" could not be limited to issues relating to disability). The ordinary connotation of the word "individual" refers to a human being, commonly known as a "member of the species *homo sapiens*." Many years ago, this basic fact was recognized:

> However one answers the metaphysical or theological question
> whether a fetus is a 'human being' ... one must at least
> recognize, first, that the fetus is an entity that bears in its cells
> all the genetic information that characterizes a member of the
> species *homo sapiens* and distinguishes an individual member
> of that species from all others, and second, there is no

14

nonarbitrary line separating a fetus from a child or, indeed, an

adult human being."

*Thornburgh v. Am. Coll. of Obstetricians & Gynecologists,* 476 U.S. 747, 792

(1986) (White, J., dissenting), *overruled, Planned Parenthood of Se. Penn. v.*

*Casey*, 505 U.S. 833 (1992), *overruled, Dobbs v. Jackson Women's Health Org.*,

142 S. Ct. 2228 (2022); *see also, e.g.,* Alaska Stat. § 09.55.585 (2018) & §

11.81.900 (2018) (defining "unborn child" as a member of the species homo

sapiens, at any stage of development, who is carried in the womb); Fla. Stat. §

775.021(5)(e) (2018) (defining "unborn child" as "a member of the species homo

sapiens at any state of development, who is carried in the womb"); Kan. Stat. § 60-

1901(c) (Supp. 2016) (defining "unborn child" as "a living individual organism of

the species homo sapiens, *in utero*, at any stage of gestation from fertilization to

birth.").

Undefined in EMTALA, the word "individual" broadly describes born and

unborn members of "the species homo sapiens," consistent with both federal and

Idaho statutes. Idaho's definitions of a child in the womb are contained in Idaho

Code Ann. §§ 18-502(9) and 604(5) (Supp. 2024) ("individual organism of the

species homo sapiens").

The Government uses the Dictionary Act's definition of "individual" to

buttress its claim that the term only encompasses members of the species homo

15

sapiens who are born alive at any stage of development and therefore excludes

unborn children. CB 32; 1 U.S.C. § 8(a). What the Government fails to mention is

that Sec.8(c) of the Act specifically protects the rights of unborn children.

"Nothing in this section shall be construed to affirm, deny, expand, or contract any

legal status or legal right applicable to any member of the species homo sapiens at

any point prior to being "born alive" as defined in this section." EMTALA's

inclusion of unborn children as individuals that deserve emergency treatment and

protection would therefore supersede the Dictionary Act's definition of

"individual" because the General/Specific Canon holds that "If there is a conflict

between a general provision and a specific provision, the specific provision

prevails." Scalia, *supra*, at 183; *RadLAX Gateway Hotel, LLC v. Amalgamated

Bank*, 566 U.S. 639, 645-646 (2012) (holding that the specific language of a

federal provision regarding selling collateral free of liens prevailed over a broadly

worded provision that said nothing about such a sale). EMTALA specifically

includes unborn children as "individuals" in § (e)(1)(A)(i), and that provision

prevails over the definition of "individual" in the Dictionary Act, particularly in

light of § 8(c).

### 2. EMTALA does not regulate the practice of medicine and therefore does not require that hospitals perform abortions to stabilize the health of a pregnant woman.

Title 42 U.S.C. § 1395 of the Medicare Act expressly disavows any interpretation of the provisions of the Act, including EMTALA, from exercising control over the practice of medicine. "Nothing in this title [42 U.S.C. §§ 1395 et seq.] shall be construed to authorize any Federal officer or employee to exercise any supervision or control over *the practice of medicine or the manner in which medical services are provided." Id*; *Mass. Med. Soc'y v. Dukakis,* 815 F.2d 790, 791 (1st Cir. 1987) ("The first section of the Medicare Act explicitly states the contrary intent to minimize federal intrusion in the area. . . . The field of medical fee regulation seems by tradition to be one of state concern."). The Government's view that an abortion *must* be performed when a woman's health is in serious jeopardy intrudes upon the state's historic right to regulate the practice of medicine. *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern). The assumption against preemption in fields traditionally occupied by the states is in agreement with § 1395. *Wyeth*, 555 U.S. at 565.

Requiring that an abortion be performed whenever a woman has a serious health condition intrudes upon the practice of medicine and substitutes the federal

government's judgment for that of the doctor. A doctor may decide, in her good faith medical judgment, to delay the performance of an abortion, stabilizing both child and mother, in an attempt to preserve the life of the child. The Government's reading of EMTALA would prevent the doctor from exercising independent judgment as to the best way to serve the needs of both mother *and* unborn child, which EMTALA requires.

Of course, nowhere does EMTALA specifically require that an abortion be performed. The Government's assertion that the DOL prohibits stabilizing treatment that doctors deem necessary under EMTALA assumes that the two statutes conflict and therefore begs the question of whether EMTALA preempts the DOL. CB 21-25. Doctors are under an obligation to obey state law just as much as they are under an obligation to comply with federal law. Because there are other kinds of stabilizing treatments that a doctor can provide, it is not impossible to comply with both. Furthermore, since Idaho has stated that it would allow abortion for the medical conditions that the Government was concerned about (premature rupture of membranes, placental abruption, pre-eclampsia and eclampsia) (*Moyle*, 144 S.Ct. 2021 (Barrett, J., concurring)), there is even less reason to find that it is impossible for a doctor to comply with both statutes. Therefore, EMTALA cannot be interpreted to require that any particular medical procedure be performed even

in a situation where a pregnant woman's health is in serious jeopardy.[4]  Per § 1395 of the Medicare Act, this is an area that is outside the scope of the Medicare Act, which includes EMTALA. The practice of medicine is governed by state law, not by the federal Government.

Simply put, EMTALA does not require that an abortion be performed to protect a woman's health, nor can it intrude upon the state's right to regulate the practice of medicine. Instead, EMTALA requires that the health of the unborn child be protected as well as that of the mother. Therefore, it is possible for a doctor to comply with both EMTALA and the DOL because the former does not and cannot require a state to allow abortions, to protect the health of the mother without consideration for her unborn child.

### B. The DOL does not stand as an obstacle to the accomplishment and execution of the purposes and objectives of Congress.

A state law that stands as an obstacle to the accomplishment and execution of the purposes and objectives of Congress would be preempted because it would stand in direct conflict with the federal law. *Hines,* 312 U.S. at 67. The purpose of EMTALA was to "compel[] Medicare-participating hospitals to provide

---

[4] EMTALA does require delivery of the child and the placenta to stabilize a pregnant woman who is having contractions (§ 1395dd(e)(3)), but this has no application to a pregnant woman who is not in labor under § 1395dd(e)(1).

emergency care to any individual, *irrespective of an individual's ability to pay.*" *Overview of the Emergency Medical Treatment and Active Labor Act (EMTALA) and Emergency Abortion Services* 1, Congressional Research Service, March 21, 2023 (emphasis added).[5] Failure to do so exposes the hospitals to "potential enforcement action." *Id*. *See also Emergency Medical Treatment & Labor Act (EMTALA),* Centers for Medicare and Medicaid Services.[6] While the *Overview* notes the ongoing litigation over preemption of state abortion laws by EMTALA, it concludes by stating, "Congress may also chose (sic) to address how the Act intersects with state law in the context of emergency abortion services. Such legislation could clarify EMTALA's preemptive reach and the precise circumstances under which hospitals must provide these services." *Id.* Put simply, Congress has yet to adopt the Government's preemption argument.

The purpose of EMTALA, therefore, is simply to prohibit hospitals from denying critical medical care to those who may be unable to pay or who may struggle to pay. Given that the Medicare Act expressly disavows any attempt "to exercise any supervision or control over *the practice of medicine or the manner in which medical services are provided* (42 U.S.C. § 1395) (emphasis added), it is

---

[5] https://crsreports.congress.gov/product/pdf/IF/IF12355.
[6] https://www.cms.gov/medicare/regulations-guidance/legislation/emergency-medical-treatment-labor-act. ("In 1986, Congress enacted the Emergency Medical Treatment & Labor Act (EMTALA) to ensure public access to emergency services *regardless of ability to pay*.") (emphasis added).

clear that Congress has not expressed a purpose that would require hospitals to perform an abortion on a pregnant woman not in labor who was experiencing a health emergency. The fact that EMTALA does specify that delivery of the baby and placenta are stabilizing treatment when a woman is in labor (§ 1395dd(e)(3)) underscores that the Act's silence on the issue of abortion means it is not mandated. This conclusion is especially justified in light of the fact that the statutory language requires that a hospital receiving Medicare funds protect the health of the unborn child, as well as that of the mother. *See* Sec. II.A.1, *supra.* Given Congress's explicit provision for the care of the unborn child as well as the mother, its failure to address abortion as a possible stabilizing treatment is further support for the position that Congress never intended to preempt state laws in this area.

The cases the Government cites in an attempt to brush aside the relevance of § 1395 to EMTALA's reach involve situations in which the hospital failed to provide any care at all. *Arrington v. Wong*, 237 F.3d 1066 (9th Cir. 2001) (Under EMTALA, hospital was not entitled to divert a patient to a more distant hospital when the first hospital was not overloaded and unable to accept more patients.); *In re Baby "K"*, 16 F.3d 590, 597 (4th Cir. 1994) (EMTALA required doctors to provide stabilizing treatment to anencephalic infant, rather than "supportive" care in the form of nutrition, hydration and warmth). The third case *Buckman Co. v.*

21

*Plaintiffs' Legal Comm*., 531 U.S. 341 (2001) does not involve EMTALA or §
1395.

EMTALA has a mechanism for enforcement, and it does not involve the
federal government's right to engage in overreach regarding its powers of
preemption. Rather, "Federal enforcement of EMTALA is a complaint-driven
process that typically begins after the Centers for Medicare and Medicaid Services
(CMS) receives information about a potential violation. Following receipt of a
complaint, CMS may authorize an investigation to determine whether a violation
occurred." *Overview* 2. Violating hospitals are subject to civil penalties. §
1395dd(d). The existence of this remedy also undercuts the Government's attempt
to force its will upon the states.

Congress has not expressed the intent that EMTALA should require
hospitals that receive Medicare funding to perform abortions to protect the health
of women. The Act purposefully requires that hospitals provide emergency health
care regardless of ability to pay. The appropriate range of care provided is left up
to the states in their historic exercise of police powers (*Hillsborough*). Therefore,
the DOL does not stand as an obstacle to the accomplishment and execution of the
purposes and objectives of Congress (*Hines*) and does not conflict with EMTALA.

22

**III.    Because EMTALA, which was enacted under the Spending Clause, does not unambiguously require abortions to protect the health of the mother, it does not preempt the DOL.**

EMTALA, as a part of the Medicare Act, was enacted under the Spending Clause (U.S. Const. Art. 1, § 8), which imposes specific conditions before a piece of spending legislation can preempt state law.

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus *rests on whether the State voluntarily and knowingly accepts the terms of the "contract*." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (holding that the Developmentally Disabled Assistance and Bill of Rights Act encouraged state programs to better serve the mentally disabled, but did not impose binding obligations on the states) (emphasis added).

Furthermore, if Congress intends to impose a condition on the grant of federal money, it must do so unambiguously because a state cannot accept conditions that it is unaware of. *Id.*

EMTALA does not "unambiguously" require that abortions be performed to protect the health of the mother, since it requires hospitals to protect the health of an unborn child (§ 1395dd(e)(1)(A)(i)), never once mentions abortion as a type of stabilizing treatment, and nowhere indicates that the health or life of the child is subservient to the health of the mother. See Sec. II, *supra*.

In addition, because mandating abortion as a type of stabilizing treatment involves impinging upon the state's traditional role in regulating the practice of

23

medicine (*Hillsborough*), Congress must make its intention to preempt state law "clear and manifest." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (cleaned up). Since the Medicare Act expressly disavows any intent to control the practice of medicine (§ 1395), and requiring abortions as a specific treatment would be doing just that, Congress has not made its intention to override state law "clear and manifest." Therefore, it is far from "unambiguous" that the EMTALA "contract" requires the performance of abortions to safeguard the health of the mother.

Furthermore, there is no evidence that Idaho "voluntarily and knowingly" agreed to be bound by the interpretation of EMTALA that the Government is currently advocating. *Moyle*, 144 S.Ct. at 2033 (Alito, J., dissenting). EMTALA is an agreement between the federal government and the private hospitals that currently receive Medicare funds, not between the federal government and the State. Since no State hospitals with emergency rooms in Idaho accept Medicare funds (*Id.* at 2033 n. 14; Replacement Brief of Idaho at 18), Idaho is not a party to the EMTALA "contract" and has not accepted its terms. *Moyle*, 144 S.Ct. at 2033 (Alito, J., dissenting). Therefore, it cannot be bound by the Government's new-found interpretation of EMTALA. *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 212 (2023) (Thomas, J., dissenting) ("[E]ven those who held the broadest conception of the spending power recognized that it was only a power to spend, not a power to impose binding requirements with the force of federal law.")

24

Not only is this critical to understanding the limits of Congress' power under the Spending Clause, but it is also basic to the law of contracts that an offer must be accepted in order to bind a party. Unif. Com. Code § 2-206 Offer and Acceptance in Formation of Contract. The Government's position that EMTALA requires that abortions be performed to protect the health of the mother is relatively recent and is being asserted as a means of countervailing the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org*., 597 U.S. 215 (2022). *Protecting Access to Reprod. Healthcare Servs.*, Exec. Ord. No. 14076, 87 Fed. Reg. 42053 (2022). One could justifiably view Idaho's adoption of the DOL as a statement that it did *not* accept the EMTALA "contract" that the Government is proffering. Moreover, if private hospitals choose to receive Medicare funds, this does not alleviate them from the duty to comply with state law, much less bind the state. *Talevski*, 599 U.S. at 201 (2023) (Thomas, J., dissenting) ("The stated conditions simply have no effect and do not arguably secure any rights ("by law" or otherwise) unless and until they are freely accepted by the State."). Because EMTALA does not unambiguously require that abortions be performed as a stabilizing treatment to protect the health of the mother, and Idaho, as a non-party to EMTALA, did not accept the Government's current interpretation of the Act, Idaho cannot have "voluntarily and knowingly" accepted the terms. Therefore, Idaho is not bound by EMTALA, and EMTALA does not preempt the DOL, which

was lawfully enacted pursuant to the state's historic police power over health and safety. *Hillsborough*, 471 U.S. at 719

## IV. Allowing federal preemption of state police powers over health and safety opens a Pandora's box of unprecedented federal control.

There are many hot button issues in the area of health care that could be federalized should the court determine that receipt of Medicare funding can be premised on the performance of those procedures. *See Moyle*, 144 S.Ct. at 2034 (Alito, J., dissenting). Late term abortions, assisted suicide, euthanasia, and gender transition surgery are just some of those important issues that have historically been left up to the states to decide. For example, assisted suicide is currently legal in eleven states; in 40 other states, it is specifically prohibited. *Physician-Assisted Suicide Disregards the Dignity of Human*, Americans United for Life.[7] Gender transition surgery on minors is banned in twenty-six states, but explicitly protected in other states. *Bans on Best Practice Medical Care for Transgender Youth*, Movement Advancement Project, https://www.lgbtmap.org/equality-maps/healthcare_youth_medical_care_bans (last visited September 16, 2024).

If the Government's view of the Spending Clause were adopted, then Congress, using the Medicare Act, could run roughshod over the democratic processes in the states on these and other polarizing issues. For this reason, the rule

---

[7] https://aul.org/physician-assisted-suicide/ (last visited September 16, 2024)

of law and canons of construction must be carefully followed regarding legislation enacted pursuant to the Spending Clause and the assumption against preemption in cases involving police powers should be respected.

## CONCLUSION

Since Congress has not clearly evidenced the intent to require hospitals to perform abortions, this court should find that EMTALA does not preempt the DOL and should vacate the district court's injunction.

Respectfully submitted,

CATHERINE W. SHORT
    Counsel of Record
Sheila A. Green
Life Legal Defense Foundation
PO Box 1313
Ojai, CA 93024-1313
(707) 337-6880
kshort@lldf.org

Rebecca R. Messall
Messall Law Firm, LLC
11670 Fountains Dr., Ste. 200
Maple Grove, MN 55369
(612) 471-5800
rm@lawmessall.com

Counsel to *Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**:     **23-35440, 23-35450**

I am the attorney or self-represented party.

**This brief contains 6,187 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[    ] complies with the length limit designated by court order dated
_____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/Catherine Short_____   **Date** September 20, 2024

29