Nos. 23-35440, 23-35450

# United States Court of Appeals for the Ninth Circuit

_____

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

*v.*

STATE OF IDAHO,
DEFENDANT-APPELLANT,

&

MIKE MOYLE, ET AL.,
MOVANTS-APPELLANTS,

_____

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
IDAHO, NO. 22-CV-329, HON. B. LYNN WINMILL, PRESIDING*

_____

**BRIEF OF PROLIFE CENTER AT THE UNIVERSITY OF ST. THOMAS
AS *AMICUS CURIAE* SUPPORTING APPELLANTS AND REVERSAL**

_____

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay St. #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

*Counsel for* Amicus Curiae

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the Prolife Center at the University of St. Thomas is a non-profit corporation that does not have a parent corporation and is not publicly held.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ...................................................................i

Table of Authorities ................................................................................. iii

Interest of *Amicus Curiae* ........................................................................1

Introduction ...............................................................................................2

Argument....................................................................................................3

    I.  Any preemptive effect of Spending Clause legislation is limited by state consent. ................................................................................................3

    II.  Acceptance of EMTALA by private recipients cannot preempt state law....15

Conclusion ...............................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C.O.R.N. v. Edwards,* 81 F.3d 1387 (5th Cir. 1996) ..............................7

*Barnes v. Gorman* 536 U.S. 181 (2002) .................................................4

*Brecht v. Abrahamson,* 507 U.S. 619 (1993)........................................14

*Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162 (9th Cir. 2002)......................18

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) ....................... 9, 17

*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1867) ............................13

*Dalton v. Little Rock Fam. Planning Servs.*, 516 U.S. 474 (1996) ..........8

*Eng. v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ...........................................6

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ..........................................6

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ...........................................16

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ..............................................6

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023)....... 12, 13

*Hodges v. Thompson*, 311 F.3d 316 (4th Cir. 2002).................................7

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982).................................11

*Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625 (2012) .....................6

*Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256 (1985)..............................................................13

*Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319 (CA5 1998).............18

*Moyle v. United States*, 144 S. Ct. 2015 (2024)......................................1

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)....................... 5, 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ..................... 4, 5, 9, 19

*New York v. United States*, 505 U.S. 144 (1992).....................................5

*NIFLA v. Becerra*, 585 U.S. 755 (2018).................................................16

*O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40 (1st Cir. 1998) ...........7

*Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1 (1981).........................4, 9

*Reynolds v. United States*, 98 U.S. 145 (1878)......................................................19

*South Dakota v. Dole*, 483 U.S. 203 (1987) ..........................................................3

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ........................................................................................13

*Texas v. Becerra*, 89 F.4th 529 (5th Cir. 2024) ...................................................18

*United States v. Butler*, 297 U.S. 1 (1936) ...........................................................14

*Wyeth v. Levine*, 555 U.S. 555 (2009) ....................................................................6

## STATUTES

42 U.S.C. § 1395 ...................................................................................................16

42 U.S.C. § 1395cc ...............................................................................................17

42 U.S.C. § 1395dd............................................................................... 15, 16, 17, 18

42 U.S.C. § 1983 ............................................................................................ 12, 13

42 U.S.C. § 300a-7................................................................................................17

42 U.S.C. § 300a-8................................................................................................18

Pub. L. No. 117-328, 136 Stat. 4459 (2022)..........................................................17

## OTHER AUTHORITIES

5 R. Lord, *Williston on Contracts* (4th ed.) ...........................................................11

Brief for Appellants, *Lawrence County*, 1984 WL 565953 (June 11, 1984) ..........14

Brief for Appellee, *Lawrence County*, 1984 WL 565955 (Aug. 11, 1984).............14

Brief for the United States as *Amicus Curiae* Supporting Appellants, *Lawrence
   County*, 1984 WL 565957 (June 7, 1984)......................................................14

Brief for United States in *United States v. Butler*, O.T. 1935, No. 401 .................12

D. Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev.
   496 (2007).....................................................................................................13

P. Hamburger, *Purchasing Submission* (2021)........................................................9

The Federalist No. 39 (C. Rossiter ed. 1961) ..........................................................5

iv

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 1 .................................................................. 3, 15

U.S. Const. art. I, § 10.............................................................................6

U.S. Const. art. IV, cl. 2 ..........................................................................6

U.S. Const. amend. X……………………………………………………….6

## INTEREST OF *AMICUS CURIAE*

The Prolife Center at the University of St. Thomas is an academic center focused on effective legal protection for human life. A significant part of the Center's work consists of assisting government officials in drafting, passing, and defending laws to protect human life. Current uncertainty regarding the legal framework applicable to health exceptions to abortion statutes and regulations makes the work of helping officials draft laws far more difficult. Thus, *amicus* has a significant interest in this case. Its brief in the prior Supreme Court proceeding was cited by Justice Barrett's concurring opinion as explaining the "consequential argument" "about whether Congress, in reliance on the Spending Clause, can obligate recipients of federal funds to violate state criminal law." *Moyle v. United States*, 144 S. Ct. 2015, 2022 (2024) (Barrett, J., concurring, joined by Roberts, C.J., and Kavanaugh, J.). All parties consented to this brief.[1]

---

[1] No party's counsel authored, and no one other than *amicus* and its counsel contributed money for, this brief.

## INTRODUCTION

Spending Clause legislation like the Emergency Medical Treatment and Active Labor Act of 1986 cannot preempt state law unless it contains clear conditions on state law that the State accepts. Under Supreme Court precedent, Congress's power to regulate the States through Spending Clause legislation is narrow. When Congress offers States funds with conditions attached, that offer may not be coercive, and the conditions must be clear. If a State does not accept the offer, the federal conditions never come into play. And just as one State's acceptance of a Spending Clause offer could not subject another State to the conditions, a private recipient's acceptance could not subject a State to the conditions. In other words, a side deal between the federal government and a private recipient does not preempt state law, at least when the State has not accepted the relevant funds or their conditions. If a private recipient cannot fulfill the federal conditions consistent with state law, it can choose to either decline the funds or accept the consequences of violating state law.

Any other theory would upend Spending Clause limitations, allowing private parties to become laws unto themselves and depriving state law of force and effect even though the State never agreed to any conditions or took funds. It would, in essence, let the federal government direct private parties to disregard state law. Though a State could agree to subordinate its own law to the federal government's in the context of a Spending Clause agreement, the State cannot lose its general

2

police power simply because another recipient makes an agreement with the federal government.

Applying this understanding to EMTALA is straightforward. EMTALA does not create a right to abortion—or any other procedure that state law prohibits or a hospital does not provide. EMTALA's conditions on private recipients cannot overcome state law directives, even if—unlike here—those directives were contradictory. The recipients remain subject to background principles of law, including relevant state law. That state law is not preempted.

Because Spending Clause legislation like EMTALA cannot overcome state law absent state consent, the Court should reverse.

## ARGUMENT

### I. Any preemptive effect of Spending Clause legislation is limited by state consent.

The Supremacy Clause does not grant Congress a line-item veto power over state law via the Spending Clause. The Spending Clause gives Congress the power "to pay the Debts and provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds" in a way that "is not limited by the direct grants of legislative power found in the Constitution." *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (cleaned up). But "[t]he spending power is of course not unlimited." *Id.* at 207. The Supreme Court has "recognized limits on Congress's power under

3

the Spending Clause to secure state compliance with federal objectives." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012) (opinion of Roberts, C.J.).

The Supreme Court has characterized Spending Clause legislation as "much in the nature of a contract: in return for federal funds, the recipients agree to comply with federally imposed conditions." *Barnes v. Gorman* 536 U.S. 181, 186 (2002) (cleaned up) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981)). "Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress' power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* (cleaned up). So "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* (cleaned up).

This principle is especially important when the recipients of federal funds are States. In that circumstance, as with other recipients, "[t]he legitimacy of Congress's exercise of the spending power" "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.) (cleaned up). But "[r]especting this limitation" is especially "critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.* "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162

4

(1992). "Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer." *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.); *see id.* at 675 (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.) (explaining that extending the Spending Clause's "formidable power" "would present a grave threat to the system of federalism created by our Constitution").

"That insight has led th[e Supreme] Court to strike down federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes." *Id.* at 577 (opinion of Roberts, C.J.). The Supreme Court's recognition of the anticommandeering doctrine reflects "the expression of a fundamental structural decision incorporated into the Constitution"—namely, that the Constitution "limited but did not abolish the sovereign powers of the States, which retain[] a residuary and inviolable sovereignty." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (cleaned up) (citing The Federalist No. 39, p. 245 (C. Rossiter ed. 1961)). The same principle has also led the Supreme Court "to scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements to exert a power akin to undue influence" over the States. *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.).

In short, Spending Clause legislation creates a partnership between the federal and consenting state governments. Adherence to the conditions of Spending Clause

5

legislation is not mandatory absent the receipt of funds and clear, non-coercive conditions.

Turn now to preemption. Federal law is supreme over state law. U.S. Const. art. IV, cl. 2; *see Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625 (2012). But the States have general police power to legislate unless prohibited by the Constitution, including the Supremacy Clause. *See Gregory v. Ashcroft*, 501 U.S. 452, 457–58 (1991); U.S. Const. amend. X; *id.* art. I, § 10. So only if federal law requires preemption of state law—either expressly or because the laws are in contradiction—must state law yield. *See Kurns*, 565 U.S. at 631. Otherwise, state law cannot be superseded. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

As a general matter, absent a clear condition accepted by the State barring the application of state law, Spending Clause legislation cannot be preemptive. First, federal preemption cannot be based on Congress's desire to "occupy the field" because Spending Clause legislation is voluntary, leaving the door open for States to opt out of the federal program. *See Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).

Second, Spending Clause legislation generally cannot contradict state law because the federal law is voluntary. By violating the Spending Clause legislation, the State will (at worst) not satisfy the conditions for federal funds. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002).

6

Third, even if Spending Clause legislation purports to have an express preemption clause, it could only operate against States that accepted the funding and its conditions.

For these reasons, several Courts of Appeals have carefully separated Spending Clause legislation from preemption. As the Fourth Circuit has explained:

> Congress may use its Spending Power to influence a State's legislative choices by providing *incentives* for States to adopt certain policies, but may not compel or coerce a State, or go so far as to commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program. [B]ut Congress, under the *Commerce Clause*, may offer the States a choice of regulation under federal control or *preemption* under federal regulation.

*Hodges v. Thompson*, 311 F.3d 316, 320 (4th Cir. 2002) (cleaned up, emphases added); *see also A.C.O.R.N. v. Edwards,* 81 F.3d 1387, 1393 n.13 (5th Cir. 1996) ("[U]nder its spending power, Congress may attach to the receipt of federal funds conditions that have the effect of influencing state legislative choices. Further, where Congress may regulate pursuant to its Commerce Clause power, it also has the power to offer States a choice of legislating according to Congressional instruction or having state law preempted by federal regulation." (citation omitted)); *cf. O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 43 (1st Cir. 1998). ("[I]f this were a situation in which the federal sovereign had invoked the spending power to justify the preemption over the laws of a state that had eschewed federal funds, we could not dismiss

lightly the state court's intuition about the awkwardness of asserting preemption solely on the basis of Congress' exercise of that power.").

Giving the federal government authority to line-item veto state laws through Spending Clause legislation would contradict our federal system. Spending Clause legislation differs in its potential preemptive scope from ordinary legislation because its authority depends on voluntarily acceptance by a recipient. Because Spending Clause legislation is like a contract between the federal government and consenting recipients, that legislation could not have any force or effect on *nonconsenting* recipients. The same is true when the recipients are States: New Jersey's acceptance of a Spending Clause "contract" could not bind Montana to the same contract that it did *not* agree to.

The Supreme Court has reached the same conclusion even as to programs within a State, where some may accept funds and others may not. In *Dalton v. Little Rock Family Planning Services*, the lower court had completely enjoined a state constitutional provision on preemption grounds because of a purported conflict with a Medicaid condition. 516 U.S. 474, 475–76 (1996). The Court rejected this broad injunction, emphasizing that the state provision could have valid "application to state programs that receive no federal funding." *Id.* at 476. In other words, that some state programs accepted Medicaid funds did not mean that the Medicaid condition preempted state law about other state programs. *Accord, e.g.*, *CSX Transp., Inc. v.*

*Easterwood*, 507 U.S. 658, 672–73 (1993) (rejecting preemption based on federal funding condition because funds had not gone to the specific project, making the condition "inapplicab[le]").

Even more obviously, a private recipient's Spending Clause "contract" with the federal government could not have any force or effect on the recipient's home state law, at least if that State did not agree too. Again, the legitimacy of the federal Spending Clause authority "rests on whether the State voluntarily and knowingly accepts the terms of the contract." *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.) (internal quotation marks omitted). Thus, Congress cannot use Spending Clause legislation to instruct States that do *not* accept the conditions for federal funds. And Spending Clause legislation may not coerce States into accepting its conditions. Even as to *consenting* States, Congress cannot surprise "participating States with post-acceptance or 'retroactive' conditions." *Id*. at 584 (citing *Pennhurst*, 451 U.S. at 25). Otherwise, the federal government could gain consent to specified conditions only to withdraw "preexisting funding unless the states complied with the new condition." P. Hamburger, *Purchasing Submission* 203 (2021).

Private parties cannot grant Congress more preemption power than the Constitution allows. Specifically, private parties cannot force the preemption of state law by accepting federal funds from Spending Clause legislation then claiming an exemption from state law. Under those circumstances, no valid agreement exists

9

between the federal government and the State. The State did not voluntarily accept any conditions, including those that would subordinate its own laws. Instead, the only agreement that would exist is between the federal government and a private party seeking to skirt state laws. Letting the federal government excuse private parties from state law cannot be a permissible Spending Clause result.

Holding otherwise would upend the repeated limits that the Supreme Court has emphasized on the authority of Spending Clause legislation over state law. It would deprive States of their lawful authority even though they did not agree to any conditions. Instead, a State's power would depend on the federal government's ability to pay off any private recipient located in the State to disregard state law. Worse than coercing the States into agreement, this theory would make state agreement irrelevant, freeing the federal government from having to come to permissible terms with the States. And because of the federal government's ability to entice private recipients with endless funds, it would essentially give Congress "the power to issue direct orders to the governments of the States." *Murphy*, 584 U.S. at 471.

An outlandish example illustrates the point. Say the federal government enacted Spending Clause legislation that promised $1,000 to any person who robs a grocery store. John robs Kroger and gets $1,000 from Uncle Sam. Can the State where the robbery took place prosecute John? Of course it can. Spending Clause legislation could not confer any *right* on John to engage in robbery that would

overcome state law. At most, it can confer a right for John to receive $1,000 from the federal government if he robs the store. But John still violated state law and cannot use the Supremacy Clause to preempt prosecution. That is because the State never agreed to subordinate its robbery law as a condition of receiving federal funds. And the United States would not be entitled to a declaration of preemption and an injunction against the State's law prohibiting robbery.

If the State's preexisting laws mean that John cannot sign up for $1,000, federal law has nothing to say about that result. Returning to the contract analogy, an agreement between John and the federal government to do something illegal under background principles of state law is still an illegal contract. Illegal contracts are presumptively unenforceable. 5 R. Lord, *Williston on Contracts* § 12:1 (4th ed.); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982). That one party is the federal government changes nothing about the underlying illegality. The United States could, at most, buy off state law via an agreement with the State, not an illegal agreement with John. If the United States has not made an agreement with the State, and has no regulatory authority to preempt state law, then John's satisfaction of the illegal contract subjects him to state law penalties. He cannot claim refuge in his own illegal agreement.

The federal government itself shared this understanding in an early case in which it defended "the Agricultural Adjustment Act, which offered subsidies to

11

farmers not to sell crops": "Because [the Act] went 'no further than offering benefits to those who comply with certain conditions,' States 'remained as free after the passage of this Act as before to pass laws rendering it impossible for any of their inhabitants to comply with such conditions.'" *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 221 (2023) (Thomas, J., dissenting) (cleaned up) (quoting Brief for United States in *United States v. Butler*, O.T. 1935, No. 401, p. 268). The federal government's opposite view today would make "spending conditions" like this "unconstitutional." *Id.* at 229 n.16.

A potential objection might be that the Supreme Court has generally understood federal conditions accepted by States to be "laws" enforceable under 42 U.S.C. § 1983. *See generally Talevski*, 599 U.S. 166 (majority opinion). So, the argument might go, a private recipient who accepts the condition has created a "law" as to itself that preempts state law. But that cannot be correct.

First, § 1983 precedents are necessarily limited to conditions *accepted by States* because the statute requires action under color of state law. 42 U.S.C. § 1983. That a plaintiff could enforce federal conditions against consenting States as "laws" says nothing about whether federal conditions could be used as a sword to cut down state law in nonconsenting States. Here, the private recipient might have a "law" in the sense that it can enforce the agreement against the federal government, but it

does not have a "law" in the sense that it has a free pass to disregard state law that provides the background rules for the agreement.

Whatever disagreement might exist about Spending Clause legislation and § 1983, there is no question that Congress's "stated conditions simply have no effect and do not arguably secure any rights . . . unless and until they are freely accepted by the State." *Talevski*, 599 U.S. at 201 (Thomas, J., dissenting); *see* D. Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 500 (2007).

More broadly, unblinking identification of federal conditions as preemptive "law" would end-run the Spending Clause limitations set by the Supreme Court. "What cannot be done directly cannot be done indirectly," for "[t]he Constitution deals with substance, not shadows." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)).

To the extent that the United States here relies on *Lawrence County v. Lead-Deadwood School District No. 40-1* to support its position, that decision did not confront these issues. 469 U.S. 256 (1985). There, the Supreme Court held that a State could not add limitations to a county's expenditure of federal funds. *Id.* at 270. Put aside the Court's "tortured" statutory reading informed mainly by "bits and pieces of the testimony of [congressional] witnesses" and irrelevant "statements in

Committee Reports." *Id.* at 271, 273 (Rehnquist, J., dissenting, joined by Stevens, J.). The core flaw with relying on *Lawrence County* is that the parties (and the United States) did not address these Spending Clause issues.[2] *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed the [issue], we are free to address the issue on the merits."). And *Lawrence County* provides no persuasive explanation of how the United States' new theory coheres with Spending Clause limitations.

In short, if Congress wishes to impose limitations on state law tied to the grant of federal funds, it must do so unambiguously and in a way that lets States voluntarily—without undue coercion—choose to accept those funds and their attendant conditions. If a State does not accept those conditions, its law cannot be limited simply because a private recipient located within the State chooses to enter a Spending Clause agreement with the federal government. Letting Congress rely on the Spending Clause to impose laws on nonconsenting States would make that Clause "the instrument for total subversion of the governmental powers reserved to the individual states." *United States v. Butler*, 297 U.S. 1, 75 (1936).

---

[2] *See* Brief for the United States as *Amicus Curiae* Supporting Appellants, 1984 WL 565957 (June 7, 1984); Brief for Appellants, 1984 WL 565953 (June 11, 1984); Brief for Appellee, 1984 WL 565955 (Aug. 11, 1984).

## II.    Acceptance of EMTALA by private recipients cannot preempt state law.

Applying this understanding to EMTALA is straightforward. As Spending Clause legislation, EMTALA establishes voluntary conditions for the receipt of federal funds. *See* U.S. Const. art. I, § 8, cl. 1. A private recipient's acceptance of the funds and their attendant conditions does not affect state law, unless the relevant State has consented to limitations on its own law—and in a way that goes clearly beyond the confines of its own agreement for federal funds. The United States has not alleged that Idaho consented to limitations on its law at all. So the federal government cannot line-item veto Idaho law by making side deals with private hospitals in Idaho.

The United States has mainly relied on EMTALA's anti-preemption clause: "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd. This provision does not change the analysis. First, a statutory provision cannot overcome the Constitution's limitations on Congress's Spending Clause authority. So even if this clause purported to do what the United States says—inserting a get-out-of-state-law-free clause into each private hospital's agreement with the federal government—that would violate the Constitution for the reasons discussed above.

Even on its own terms, EMTALA's anti-preemption provision does not do the work that the United States claims. The provision speaks only to a "direct[] conflict" with "a requirement of this section." 42 U.S.C. § 1395dd. But private entities need not accept the government's deal. Neither must States, of course. So if the reality is that private entities *cannot* accept the deal consistent with their preexisting state law obligations, they simply cannot accept the deal. Federal law neither requires them to take Medicare funds nor gives them a right to receive those funds that overcomes their preexisting legal duties.

Even on the United States' understanding of "requirement" as simply one of the conditions of acceptance, EMTALA and the Medicare Act establish that federal officials lack the power to determine the appropriateness of state laws regulating specific medical treatments. EMTALA imposes conditions only on Medicare-participating hospitals, not States *writ large*. And federal officers are prohibited from "exercis[ing] any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Traditionally, States have had the most "significant role to play in regulating the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007); *see NIFLA v. Becerra*, 585 U.S. 755, 769 (2018) (noting "the traditional purview of state regulation of professional conduct" (cleaned up)).

"Certainly there is no explicit indication in" EMTALA "that the terms of the Federal Government's bargain . . . require modification of this regime of separate spheres of responsibility." *CSX*, 507 U.S. at 668. EMTALA asks participating hospitals to provide treatment for emergency medical conditions, regardless of a patient's ability to pay. *See* 42 U.S.C. § 1395dd. The statute lists three general requirements. First, the hospital must perform a screening examination to "determine whether or not an emergency medical condition exists." *Id.* § 1395dd(a). Then, if the hospital determines that a patient has an emergency medical condition, the hospital must either provide "[n]ecessary stabilizing treatment[s]" or a "transfer of the individual to another medical facility." *Id.* § 1395dd(b). Finally, if the hospital chooses to transfer the patient, it may do so only as provided and where "appropriate." *Id.* § 1395dd(c)(1). EMTALA is aimed not at States but at the policies and procedures of participating *hospitals*. The statute only binds hospitals that wish to participate in the program and does not bar Idaho's abortion law. *See id.* §§ 1395dd(e)(2), 1395cc.

That is especially true because another of Medicare's "requirements" is the prohibition on federal funding for abortions except in cases of rape, incest, or when the life of the mother is endangered—the same exceptions in Idaho law. *E.g.*, Pub. L. No. 117-328, §§ 506–07, 612-13, 136 Stat. 4459, 4908 (2022). Related "requirements" prohibit discriminating against physicians and entities that do not provide abortions. *E.g.*, *id.* § 209, 136 Stat. at 4880; *see also, e.g.*, 42 U.S.C. §§ 300a-7, 300a-

17

8. Once again, there is no "direct conflict" between Medicare's requirements and Idaho law, much less one of which Idaho was on notice and agreed to supersession of its own law.

As a side note, even if Idaho had accepted the terms of EMTALA, the United States should not be permitted to pull the rug from under the State by requiring that a new condition be met. The purpose of EMTALA was to provide emergency services to the uninsured. Congress did not enact EMTALA to create a national standard of care. *See Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998); *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1166 (9th Cir. 2002). In fact, EMTALA never specifies stabilizing treatments in general, except for one: "delivery of the unborn child and the placenta." 42 U.S.C. § 1395dd(e)(3)(A); *see also Texas v. Becerra*, 89 F.4th 529, 542 (5th Cir. 2024) ("The inclusion of one stabilizing treatment indicates the others are not mandated").

Now, in an about-face, the United States announces that EMTALA requires hospitals to provide voluntary abortions of an unborn child. Again, Spending Clause legislation must be unambiguous. The United States cannot hold a contracting party hostage by first gaining their consent only to later withdraw funding unless the party complies with a new condition.

Of course, this is academic, since there is nothing in the record suggesting that Idaho accepted EMTALA to begin with. Nor is there any provision in EMTALA

18

that puts Idaho on notice that if some private hospitals in Idaho accept funds, all can disregard state and local laws. And even if there *were* (say, even if one reads the anti-preemption provision that way), Idaho would still have to accept that condition before it became federal law capable of preemption under the Supremacy Clause.

Valid Spending Clause legislation is like a contract between the federal and state governments. But a contract exists only when States like Idaho voluntarily and knowingly accept its terms. Allowing a private hospital to bind Idaho to federal terms "runs contrary to our system of federalism," *Sebelius*, 567 U.S. at 577–78 (opinion of Roberts, C.J.), and would "permit every citizen to become a law unto himself," *Reynolds v. United States*, 98 U.S. 145, 167 (1878).

## CONCLUSION

For these reasons, the Court should reverse.

Respectfully submitted,

*s/ Christopher Mills*
CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay St. #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

*Counsel for* Amicus Curiae

SEPTEMBER 20, 2024

19

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-35440, 23-35450

I am the attorney or self-represented party.

**This brief contains** | 4,409 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Christopher Mills | **Date** | 9/20/24

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*