APPEAL NOS. 23-35440, 23-35450

IN THE

# United States Court of Appeals For the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF IDAHO,

*Defendant-Appellant,*

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives, *et al.,*

*Movants-Appellants.*

On Appeal from the United States District Court for the District of Idaho
Hon. B.Lynn Winmill, No. 1:22-cv-329-BLW

**BRIEF OF *AMICI CURIAE* MINNESOTA FAMILY COUNCIL,
KANSAS FAMILY VOICE, AND 18 OTHER
FAMILY POLICY ORGANIZATIONS IN SUPPORT OF APPELLANTS**

Renee K. Carlson
TRUE NORTH LEGAL
525 Park St., Suite 460
St. Paul, MN 55103
rcarlson@truenorthle-
galmn.com

Brittany M. Jones
KANSAS FAMILY FOUNDATION
8918 W. 21st St., N., Ste. 268
Wichita, KA 67205
bjones@kansasfamilyvoice.com

Nicholas J. Nelson
CROSSCASTLE PLLC
14525 Highway 7, Suite 345
Minnetonka, MN 55345
612-429-8100
nicholas.nelson@
  crosscastle.com

*Counsel for amici curiae*

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* make the following disclosure.  No *amicus* has any parent corporation, and no publicly held corporation owns 10% or more of the stock of any *amicus*.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

IDENTITY AND INTEREST OF *AMICI CURIAE* .............................................. 1

SUMMARY OF ARGUMENT ................................................................... 2

ARGUMENT ............................................................................... 4

I.  EMTALA Prevents Emergency Rooms From Turning Away Any
    Category Of Patients. ................................................................ 4

II. The Government Now Advocates That EMTALA Has Federalized The
    Field Of Emergency Medical Practice. ................................................. 8

III. The Government's Revolutionary Contention Breaks Sharply With Four
     Decades Of Unanimous EMTALA Jurisprudence. ........................................ 14

CONCLUSION ............................................................................ 18

CERTIFICATE OF COMPLIANCE ............................................................ 19

# TABLE OF AUTHORITIES

## Cases

*Baber v. Hospital Corp. of America*, 977 F.2d 872 (4th Cir. 1992) ............ 9, 16, 17

*Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002) .... 16, 17

*Burwell v. Hobby Lobby, Inc.*, 573 U.S. 682 (2014) ................................................14

*Eberhardt v. City of Los Angeles*, 62 F.3d 1253 (9th Cir. 1995) ...........................16

*Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (D.C. Cir. 1991) ......18

*Harry v. Marchant,* 291 F.3d 767 (11th Cir. 2002)................................................9

*Jackson v. East Bay Hospital*, 246 F.3d 1248 (9th Cir. 2001)................................9

*Marshall ex rel. Marshall v. East Carroll Parish Hospital Service District*, 134 F.3d 319 (5th Cir. 1998) ...............................................................................17

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .......................................................15

*Nartey v. Franciscan Health Hospital*, 2 F.4th 1020 (7th Cir. 2021)....................17

*Ruloph v. LAMMICO*, 50 F.4th 695 (8th Cir. 2022) .............................................9

*Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132 (8th Cir. 1996) .16

*Texas v. Becerra*, 89 F.4th 529 (5th Cir. 2024) ......................................................17

*United States v. Idaho*, 83 F.4th 1130 (9th Cir. 2023) .................................... 12, 18

## Statutes

24 Del. C. § 1791.....................................................................................................13

745 Ill. Code 70/6 ...................................................................................................13

Ala. Stat. § 22-21B-3–B-4........................................................................................13

Alaska Stat. § 18.16.010 ..........................................................................................13

Ariz. Stat. § 36-2154.................................................................................................13

Ark. Stat. § 20-16-304 .............................................................................................13

Cal. Health & Saf. Code § 123420...........................................................................13

Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-509, 100 stat. 82, 164 et seq. (Apr. 7, 1986).............................................................4

Emergency Medical Treatment and Labor Act, 42 U.S.C. 1395dd ........ *passim*

Kent. Stat. § 311.800 ...............................................................................................13

Fla. Stat. § 381.0051.................................................................................................13

Ga. Code § 16-12-142 16-12-142.............................................................................13

Hawaii Stat. § 453-16...............................................................................................13

Idaho Code § 18-611.................................................................................................13

Ind. Code Ann. § 16-34-1-3–6 .................................................................13

Iowa Code § 146.1–.2 ..............................................................................13

Kan. Stat. § 65-443 ...................................................................................13

La. Rev. Stat § 40:1061.2..........................................................................13

Maine Rev. Stat. Title 22 § 1592 ...............................................................13

Mass. Stat. ch. 112, § 12I .........................................................................13

Md. Health-General Code Ann. § 20-214 ...............................................13

Mich. Code § 333.20181 ...........................................................................13

Minn. Stat. § 145.42 ..................................................................................13

Miss. Code § 41-107-5 ...............................................................................13

Mo. Stat. § 188.105 ...................................................................................13

Mont. Stat. § 50-20-111 ............................................................................13

N.C. Gen. Stat. § 90-21.81C .....................................................................13

N.D. Cent. Code, § 23-16-14 ...................................................................13

N.J. Stat. § 2A:65A-1–3 ...........................................................................13

Neb. Stat. § 28-337–339 ...........................................................................13

Nev.  Rev. Stat. § 632.475 .........................................................................13

NY Code Civ R § 79-i ...............................................................................13

Ohio Code 4731.91 ...................................................................................13

Okl. St. 63 § 1-728c...................................................................................13

Ore. Stat. § 435.225 ...................................................................................13

Pa. Con. Stat. 18 § 3213 ............................................................................13

R.I. Gen. Laws § 23-17-11 ........................................................................13

S.C. Code Ann. § 44-41-40–50...................................................................13

S.D. Codified Laws § 34-23A-12................................................................13

Tenn. Code. § 39-15-204 ...........................................................................13

Tex. Occ. Code § 103.001 et. seq .............................................................13

Utah Code § 76-7-306 ..............................................................................13

Va. Code § 18.2-75 ....................................................................................13

W. Va. Code § 16-2F-7 .............................................................................13

Wis. Stat. § 253.09 ....................................................................................13

Wyo. Stat. § 35-6-129–130.........................................................................13

**Other Authorities**

131 Cong. Rec. E5520-02 (Dec. 10, 1985). ............................................................5

131 Cong. Rec. S13,892 (daily ed. Oct. 23, 1985) .................................................6

131 Cong. Rec. S13,892 (daily ed. Oct. 23, 1985). ..............................................5

H.R. Rep. 99-241(I) ...............................................................................................4, 5

H.R. Rep. 99-241(III) ..............................................................................................5

## IDENTITY AND INTEREST OF *AMICI CURIAE*[*]

*Amici* are the Minnesota Family Council, Kansas Family Voice, Alabama Policy Institute, Center for Arizona Policy, California Family Council, Center for Christian Virtue, Christian Civic League of Maine, Family Policy Alliance, The Family Leader, The Family Foundation (Kentucky), Indiana Family Institute, Nebraska Family Alliance, New York Families Foundation, North Carolina Family Policy Council, North Dakota Family Alliance, Maryland Family Institute, Massachusetts Family Institute, South Dakota Family Voice, Texas Values, and Wyoming Family Alliance.

*Amici* are nonprofit state policy organizations that educate about, promote, and defend policies that encourage and strengthen the family, with a focus on respecting the sanctity of human life from conception to natural death, limiting government intrusion into families' daily lives, promoting religious freedom, and ensuring families thrive in Minnesota, Kansas, and their respective states. Each of these organizations has played a key role in amplifying policies that protect life and religious freedom both at the state and federal levels, working with stakeholders throughout their states to promote a culture that values and protects life. We believe that protecting life and the freedom of each person to live according to the dictates of their conscience is foundational to America's legal system.

---

[*] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part. No party, and no person other than *amici*, their members, and their counsel, contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

The Emergency Medical Treatment and Labor Act (EMTALA) requires hospital emergency rooms that participate in Medicare to provide medical "treatment" as "required to stabilize the medical condition" of any patient. 42 U.S.C. 1395dd(b). EMTALA's purpose and function are well known: from the time it was introduced in Congress through its nearly 40 years of enforcement by federal agencies and the courts, EMTALA has been universally acknowledged as intended to prevent "patient dumping," where an emergency room turns away patients who are poor, uninsured, or otherwise disfavored, and sends them to seek treatment somewhere else. The statute's own provisions reflect this, defining the care it requires with reference to making a patient fit for transfer to another facility.

But now, nearly four decades after EMTALA's enactment, the Government is claiming that the statute did drastically more than this. According to the Government, EMTALA does not just require participating hospitals to provide all patients with emergency medical care, as defined by the medical profession and State law. Instead, says the Government, EMTALA's requirement to provide stabilizing "treatment" has almost completely federalized the definition and regulation of the practice of emergency medicine. No longer can States or the medical profession decide whether a given kind of procedure is inappropriate for doctors because it is too dangerous, or too new and untested, or too ethically fraught, or because its benefits are too unclear. Nor can they even decide what circumstances do or do not warrant

2

any given kind of procedure. On the government's view, in emergency rooms, all these questions must be answered under federal law—because EMTALA's bare requirement that emergency rooms provide "treatment" preempts any attempt by States or the medical profession to exercise their historic powers to define and regulate the practice of medicine.

The Government's position bears no resemblance to how EMTALA has been understood and applied since before its enactment. EMTALA requires that a hospital make emergency treatment available to anyone who visits. It prohibits emergency rooms from denying such treatment to anyone because of his or her inability to pay, or for any other reason. But nothing in the text or structure of EMTALA purports to address what set of procedures or treatments *qualify* as emergency medical care—nor has EMTALA ever been understood to do that. That question, like so many in our system of federalism and individual liberty, is left to the States and to the medical profession itself. For nearly four decades, Members of Congress, administrative agencies, and courts have universally acknowledged that EMTALA does not purport to define what emergency medical treatment *is*—it simply requires that treatment, as defined by States and the medical profession, to be made available to everyone who visits a participating hospital.

# ARGUMENT

## I. EMTALA Prevents Emergency Rooms From Turning Away Any Category Of Patients.

Congress enacted EMTALA to address what it regarded as an acute, specific problem: many emergency rooms were refusing to provide any treatment for categories of patients who they regarded as undesirable. The Senators and Representatives who introduced and sponsored EMTALA, and the Congressional committees that considered it, understood and described EMTALA primarily—and indeed, almost exclusively—as a prohibition on this sort of "patient dumping" by Medicare-participating hospitals.

EMTALA became law in 1986. It was not a stand-alone piece of legislation, but was enacted as part of the Consolidated Omnibus Budget Reconciliation Act of 1985. See Pub. L. 99-509, 100 stat. 82, 164 et seq. (Apr. 7, 1986). Explaining the inclusion of EMTALA in the omnibus bill, the House of Representatives Committee on Ways and Means stated that it was "greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance," either because "treatment was simply not provided" or because "patients in an unstable condition have been transferred improperly, sometimes without the consent of the receiving hospital." H.R. Rep. 99-241(I) at 27. The Committee acknowledged "pressures for greater hospital efficiency," but emphasized that these "are not to be construed as license to ignore traditional community responsibilities and

loosen historic standards" of care. *Id.* Accordingly, the Committee stated that the function of the amendment was to require Medicare-participating hospitals to "provide further examination and treatment within their competence" for all patients with emergency medical conditions. *Id.*

The House Judiciary Committee agreed. In proposing revisions to the EMTALA enforcement provisions, it noted "growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." H.R. Rep. 99-241(III) at 4. Representative Stark expanded on these concerns in the Congressional Record, expressing alarm that "[n]o money or insurance card in the wallet will often get an emergency patient dumped at the door with a map to the county hospital," and that this was "a growing problem with tragic results." 131 Cong. Rec. E5520-02, at 1 (Dec. 10, 1985). Representative Stark stated that it was "indefensible" that "if these patients had been middle class with health insurance they never would have faced the horrors that they encountered." Id.

In the Senate, the provisions that became EMTALA were added to the omnibus act through an amendment sponsored principally by Senators Durenberger, Kennedy, Dole, and Proxmire. 131 Cong. Rec. S13,892 (daily ed. Oct. 23, 1985). In introducing the amendment, Senator Durenberger explained that "[t]he amendment addresses an issue which has gained much public attention over the last year:" specifically, "the practice of rejecting indigent patients in life threatening situations for economic reasons alone." *Id.*

5

Decrying this practice as "unconscionable," Senator Durenberger stated that "this amendment would require hospitals serving Medicare patients to provide emergency services to individuals … regardless of their ability to pay." *Id.*

EMTALA's other Senate sponsors spoke very similarly. Senator Kennedy expressed concern about reports that patients "have been denied services" at emergency rooms "because they lacked health insurance or funds to pay cash at the door," sometimes because of "racial discrimination." *Id.* at 34. Noting that "[t]his practice is often called patient dumping," Senator Kennedy stated that he was sponsoring EMTALA because "[w]e cannot allow a health care system as advanced as ours to provide emergency care only to those who can pay." *Id.* at 34-35. Senator Dole agreed that "[w]e must put an end to certain unsafe practices, often referred to as 'patient dumping,' whereby a hospital, for purely financial reasons, refuses to initially treat or stabilize an individual." *Id.* at 35. So did Senator Proxmire, who stated that he was "delighted to join as a cosponsor of this antidumping amendment" because "there can be no excuse for a hospital with emergency room facilities to routinely refuse to provide emergency care and send an ambulance on to the local public hospital." *Id.* at 36.

EMTALA's text and structure reflect its focus on preventing emergency rooms from turning away or transferring patients without giving them any care. EMTALA does not purport to define any universal standard of emergency care that must be provided to every patient. Instead, it requires

only such care as is necessary to make it safe to transfer a given patient. When an emergency-room patient requests "examination or treatment," EMTALA first requires that "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department … to determine whether or not an emergency medical condition exists." 42 U.S.C. 1395dd(a) (parenthetical omitted). If there is indeed an emergency, then EMTALA requires that the emergency room ordinarily "must provide," "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* 1395dd(b). EMTALA specifies that "to stabilize," for these purposes, "means … to assure, with reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual." *Id.* 1395dd(e)(3)(A) (emphasis added). Finally, the most detailed substantive provision of EMTALA describes at length the conditions under which an emergency-room patient may or may not be transferred to another hospital. *Id.* 1395dd(c). EMTALA specifically defines the terms "emergency medical condition," "to stabilize," "stabilized," and "transfer." *See id.* 1395dd(e). Although the statute requires "medical examination" and "treatment" (or "medical treatment") in the specified circumstances, *see id.* 1395dd(b)(1)(A), (e)(3)(A), it contains no definitions of those terms.

After EMTALA's enactment, the courts have widely recognized its anti-patient-dumping orientation. This Court, in fact, has explained that

EMTALA has become "commonly known as the 'Patient Anti–Dumping Act,' [enacted] in response to the growing concern about the provision of adequate medical services to individuals, particularly the indigent and the uninsured, who seek care from hospital emergency rooms." *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001); *see also Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992) ("Congress enacted EMTALA to address its concern with preventing patient dumping."), *Ruloph v. LAMMICO*, 50 F.4th 695, 700 (8th Cir. 2022) ("EMTALA's aim is to discourage bad-faith hospitals from dumping patients.") As the Eleventh Circuit put it, "Congress enacted EMTALA in response to widely publicized reports of emergency care providers transferring indigent patients from one hospital to the next while the patients' emergency medical conditions worsened. EMTALA was designed specifically to address this important societal concern …." *Harry v. Marchant,* 291 F.3d 767, 770 (11th Cir. 2002).

## II. The Government Now Advocates That EMTALA Has Federalized The Field Of Emergency Medical Practice.

This case involves the federal Government's attempt to interpret EMTALA to mandate that emergency rooms perform abortions even when they are prohibited by state law. In order to do so, the Government is forced to adopt an extremely broad interpretation of the statute. Under the Government's interpretation, the principal effect of EMTALA is not simply to prevent emergency rooms from refusing to treat patients, but instead to create a comprehensive federal standard for *what kinds* of treatment must be offered

8

in emergency rooms—a standard that overrides the States' traditional power to regulate the practice of medicine, and likely also the medical profession's own views about what care is warranted in what circumstances.

Idaho law prohibits most abortions. In this lawsuit, the Government claims that EMTALA preempts this prohibition in emergency rooms in participating hospitals, and requires abortions that Idaho law does not allow. The government's argument is that the "treatment" or "medical treatment" that EMTALA requires for emergency-room patients must include abortions—whether or not they are legal under state law.

EMTALA includes no particularized references to abortion, either specifically or by implication. It merely requires "treatment" for emergency-room patients, without defining that term. Thus, the Government cannot and does not argue that EMTALA creates any federal mandate that is limited to abortions. Instead, in its previous briefing in this Court, the Government repeatedly argued that EMTALA "does not exempt any form of care" (Dkt. 35 at 12, 16.), and that "EMTALA thus contemplates *any* form of stabilizing treatment." (*Id.* at 16.)

It would be difficult to overstate the breadth of that legal theory. On the Government's account, the single word "treatment" in EMTALA creates a comprehensive federal regime, dictating whether any and every medical procedure must be performed in participating emergency rooms, and dictating also the circumstances under which each procedure must be performed. The States' traditional authority to regulate the practice of medicine does not

matter. Nor, indeed, does the medical profession's traditional authority to set standards of practice. According to the Government, if a procedure qualifies as "treatment" under EMTALA, then it must be provided in emergency rooms, no matter what state law or the medical profession's standards might say.

This likely would turn a long list of medical treatments (or putative medical treatments) into litigation footballs, giving any patient or presidential administration the ability to sue States or hospitals arguing that federal law requires them (with no state regulation) in participating emergency rooms. The parade of potential hot-button controversies is practically endless. Would assisted suicide or euthanasia be required emergency-room "treatment" for patients who felt their suffering could not be alleviated any other way? What about dispensing narcotics that are illegal under state law, or in quantities or using methods that are prohibited by state law or medical ethics? Would federal law mandate emergency "treatments" using genetically-modified or cloned organisms, in violation of state law or medical ethics? What about organ transplants in circumstances or using procedures that state law or the medical profession does not allow? Would emergency rooms be obliged to provide novel, risky, disputed, or experimental procedures regardless of state or professional standards? Or could opposing sides in the culture wars try to mandate "conversion therapy" or "gender-affirming care" as emergency treatment? If the Government literally means that EMTALA requires "*any* form of stabilizing treatment"—as it apparently must,

in order to cover abortions prohibited under state law—the far-reaching consequences would inevitably include these and many other extraordinarily difficult and delicate questions.

The problem is not only about whether States or the federal government get to make policy decisions about such difficult medical questions. It also is about the logistical nightmare of having an undefined federalized standard of "treatment" displace detailed state regulatory schemes on literal life-and-death matters. Consider the example of organ transplants, identified by this Court's stay panel. 83 F.4th 1130, 1136. An emergency-room doctor may decide that an organ transplant is necessary to stabilize a patient.  Since patients do die in hospitals (and emergency rooms) with some frequency, it may happen that organs are available there at the time a doctor makes that determination. But state law and medical ethics often regulate the organ transplant process in detail—from what the donor and his or her family must do to consent to donation, to what the medical team must do to ensure that the donor has died before donation may occur, to how it must be determined who will receive an organ that becomes available and how the organ must be preserved in the meantime. If EMTALA preempts the requirements of state law and the medical profession whenever they stand in the way of an abortion in an emergency room, would it also preempt any or all of these organ-transplant rules whenever they would prevent an emergency-room transplant? And to the extent it does, what (if any) replacement standards would govern?

On the Government's view, either federal agencies or the courts, or both, would have to decide controversial questions like these—and probably many other similar ones as well—by making an unguided decision about whether such procedures qualify as "treatment" under EMTALA's open-ended standard.

And the practical problems would not end there. On the Government's view, whenever those agencies or courts determined that a such procedure *is* "treatment" under EMTALA, a strange and confusing dual-track system of medical practice would arise. On one side of a hospital wall, performing a procedure prohibited by state law could cause a doctor to lose his or her license, to incur malpractice liability, or even to face jail time. But on the other side of the same hospital wall, in the emergency room, *not* performing exactly the same procedure could result in civil liability under EMTALA and likely loss of employment.

Even more alarming, the Government has failed to consistently acknowledge whether its novel interpretation of EMTALA would recognize the conscience rights of medical providers. The Government has suggested that if a procedure qualifies as "treatment" under ETMALA, it is required in emergency rooms, with no exceptions for practitioners who object on moral, ethical, or religious grounds. That is starkly contrary to the current state of the law. Forty-four states protect the conscience rights of providers to refuse

to participate in abortion.† The Supreme Court has said that even demanding that someone *promote* abortion—much less actually *perform* abortions as this new interpretation of EMTALA may require—"implicates a difficult and important question of religion and moral philosophy." *Burwell v. Hobby Lobby, Inc.*, 573 U.S. 682, 724 (2014). In *Hobby Lobby* the Court refused to allow a federal agency to instruct a private entity about the correctness of its beliefs. Allowing the federal government to reinterpret EMTALA in the way it purports to do would unwind these important protections that are inherent in the fabric of our nation.

It does not help matters much for the Government to say that "treatment" is required only if it both (i) satisfies EMTALA's open-ended standard and (ii) is deemed necessary either by "the relevant medical professionals" (as the Government told the stay panel of this Court, *see* Dkt. 35 at 16) or

---

† Ala. Stat. § 22-21B-3–B-4; Alaska Stat. § 18.16.010; Ariz. Stat. § 36-2154; Ark. Stat. § 20-16-304; Cal. Health & Saf. Code § 123420; 24 Del. C. § 1791; Fla. Stat. § 381.0051; Ga. Code § 16-12-142 16-12-142; Hawaii Stat. § 453-16; Idaho Code § 18-611; 745 Ill. Code 70/6; Ind. Code Ann. § 16-34-1-3–6; Iowa Code § 146.1–.2; Kan. Stat. § 65-443; Kent. Stat. § 311.800; La. Rev. Stat § 40:1061.2; Maine Rev. Stat. Title 22 § 1592; Md. Health-General Code Ann. § 20-214; Mass. Stat. ch. 112, § 12I; Mich. Code § 333.20181; Minn. Stat. § 145.42; Miss. Code § 41-107-5;  Mo. Stat. § 188.105; Mont. Stat. § 50-20-111; Neb. Stat. § 28-337–339; Nev.  Rev. Stat. § 632.475, N.J. Stat. § 2A:65A-1–3; NY Code Civ R § 79-i; N.C. Gen. Stat. § 90-21.81C; N.D. Cent. Code, § 23-16-14; Ohio Code 4731.91; Okl. St. 63 § 1-728c; Ore. Stat. § 435.225; Pa. Con. Stat. 18 § 3213; R.I. Gen. Laws § 23-17-11; S.C. Code Ann. § 44-41-40–50; S.D. Codified Laws § 34-23A-12; Tenn. Code. § 39-15-204; Tex. Occ. Code § 103.001 et. seq.; Utah Code § 76-7-306; Va. Code § 18.2-75; W. Va. Code § 16-2F-7; Wis. Stat. § 253.09; Wyo. Stat. § 35-6-129–130.

undefined "evidence based clinical standards" (as the Government told the Supreme Court, Br. for Respondent, *Moyle v. United States*, Nos. 23-726 and 23-727, at 36 (U.S.).) On remand, perhaps the Government will articulate yet another standard. In any event, the first standard has no discernible boundaries of any kind: EMTALA would preempt any state or professional rules governing medical care, so long as what "the relevant medical professionals" did qualified as "treatment" under EMTALA's undefined standard. And the second standard is little better: it would leave open-ended "evidence based clinical standards" to be interpreted not through the prisms of State law and professional regulation, as has historically been done, but under a heretofore-unknown EMTALA regime with no established rules and no settled principles. Neither prospect has any appeal, or makes any sense.

## III. The Government's Revolutionary Contention Breaks Sharply With Four Decades Of Unanimous EMTALA Jurisprudence.

This contention by the Government—that EMTALA amounts to a federal takeover of emergency medicine standards—conflicts badly with nearly four decades of unanimous federal caselaw. Consistent with general principles articulated by the Supreme Court, *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 471 (1996), the federal courts have consistently interpreted EMTALA as respecting and preserving the States' historic power to regulate the practice of medicine.

14

Immediately after EMTALA was enacted and continuing until recently, a flood of plaintiffs argued that it established a federal standard for emergency care. Such claims have been roundly rejected by the courts, including multiple times by this Court. Here is just a sampling of their conclusions:

- "EMTALA was not enacted to establish a federal medical malpractice cause of action nor to establish a national standard of care." *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1166 (9th Cir. 2002) (cleaned up).

- "The statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care in screening patients." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995).

- "So far as we can tell, every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms;" instead "the general rule that EMTALA is not a federal malpractice statute and it does not set a national emergency health care standard." *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996) (cleaned up).)

- "Had Congress intended to require hospitals to provide a screening examination which comported with generally accepted medical standards, it could have clearly specified a national standard." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879–80 (4th Cir. 1992);

- "We agree with the other courts which have interpreted EMTALA that the statute was not intended to be used as a federal malpractice statute."

15

*Marshall ex rel. Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998).

- "EMTALA is not a malpractice statute covering treatment after an emergency patient is screened and admitted. We therefore join the chorus of circuits that have concluded the EMTALA cannot be used to challenge the quality of medical care." *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020, 1025 (7th Cir. 2021).

- "EMTALA does not specify stabilizing treatments in general, except one: delivery of the unborn child and the placenta. 42 U.S.C. § 1395dd(e)(3)(A). The inclusion of one stabilizing treatment indicates the others are not mandated." *Texas v. Becerra*, 89 F.4th 529, 542 (5th Cir. 2024).

On the other side of the coin, the courts have repeatedly and expressly recognized that EMTALA *preserves* States' ability to regulate the practice of emergency medicine, especially (but not only) through malpractice actions. As this Court put it, "[a]n individual who receives substandard medical care may pursue medical malpractice remedies under state law." *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1166 (9th Cir. 2002). "Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992). "Though there may arise some areas of overlap between federal and local causes of action, most questions related to the adequacy of a hospital's standard screening and

16

diagnostic procedures must remain the exclusive province of local negligence law." *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991).

To be sure, EMTALA does do more than simply prohibit discrimination against indigent or uninsured patients. An emergency room that turned away *all* its patients, or a randomly-chosen half of its patients, would still be violating EMTALA. That is because the statute does require that hospitals provide emergency care, as defined by the medical profession and state law, to everyone who visits. But in EMTALA's relatively long history of interpretation and application, there is nothing apparent to suggest that EMTALA specifies what emergency care *is*, or displaces the States' and the medical profession's historic powers to do so.

The stay panel reached exactly this correct conclusion. As it stated,

> EMTALA does not require the State to allow every form of treatment that *could conceivably* stabilize a medical condition solely because, as the government argues, 'a relevant professional determines such care is necessary.' In fact, EMTALA does not impose *any* standards of care to the practice of medicine…. For example, a medical professional may believe an organ transplant is necessary to stabilize a patient's emergency medical condition, but EMTALA would not then preempt a state's requirements governing organ transplants.

83 F.4th 1130, 1136. Thus, the panel held that "[t]o read EMTALA to require a specific method of treatment, such as abortion, pushes the statute far

beyond its original purposes, and thereof is not a ground to disrupt Idaho's historic police powers." *Id.* (cleaned up).

That conclusion was fully in accord with the text, the structure, and the courts' continuous interpretation of EMTALA. The full Court should adopt it.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

*s/Nicholas J. Nelson*
Nicholas J. Nelson
CROSSCASTLE PLLC
14525 Highway 7, Suite 345
Minnetonka, MN 55345
612-429-8100
nicholas.nelson@crosscastle.com

Renee K. Carlson
TRUE NORTH LEGAL
525 Park St., Suite 460
St. Paul, MN 55103
rcarlson@truenorthlegalmn.com

Brittany M. Jones
KANSAS FAMILY FOUNDATION
8918 W. 21st St., N., Ste. 268
Wichita, KA 67205
bjones@kansasfamilyvoice.com

18

# CERTIFICATE OF COMPLIANCE
# WITH TYPE-VOLUME LIMIT

I am the attorney. This brief contains 4,221 words, including 0 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 23(f). The briefs type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this is an **amicus** brief and complies with the word limit of Fed. R. App. P. 23(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

*s/Nicholas J. Nelson*
Nicholas J. Nelson
September 20, 2024