Nos. 23-35440, 23-35450

IN THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellee,*

*v.*

STATE OF IDAHO
*Defendant-Appellant,*

*v.*

MIKE MOYLE, ET AL.,
*Movants-Appellants*

On Appeal from the United States District Court
For the District of Idaho
No. 1:22-cv-329
Hon. B. Lynn Winmill

**BRIEF OF INDIANA AND 19 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF APPELLANT STATE OF IDAHO**

Office of the Attorney General
302 W. Washington Street
IGCS 5th Floor
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

THEODORE E. ROKITA
  Attorney General of Indiana
JAMES A. BARTA
  Solicitor General
JENNA M. LORENCE
  Deputy Solicitor General

*Counsel for* Amici *States*
*Additional counsel listed with signature block*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF *AMICI* STATES ............................................................. 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ........................................................................................ 5

I. Through Its Novel—and Breathtakingly Broad—View of EMTALA, the United States Seeks To Invert State and Federal Roles ................................. 5

II. EMTALA Does Not Preempt Generally Applicable State Laws Regulating Medicine ................................................................................ 9

    A. EMTALA does not establish national standards of care .................... 10

    B. EMTALA does not mandate abortions ............................................ 12

    C. EMTALA does not preempt Idaho laws protecting unborn children ................................................................................................ 13

III. Construing EMTALA to Preempt Idaho Law Raises Serious Constitutional Difficulties ............................................................................ 16

    A. The Supremacy Clause applies to federal law, not grant conditions ............................................................................................ 16

    B. Using grant conditions to displace state laws would upend the federal structure ................................................................................ 20

    C. Allowing citizens to opt out of state laws contravenes our form of government ...................................................................................... 23

IV. The United States Lacks a Cause of Action ............................................ 24

CONCLUSION .................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*Alden v. Maine*,
   527 U.S. 706 (1999)..........................................................................21

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)..........................................................................25

*Arizona v. United States*,
   567 U.S. 387 (2012)..........................................................................26

*Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*,
   548 U.S. 291 (2006)..........................................................................16

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015)...............................................................18, 19, 25

*Atlas Life Ins. Co. v. W. I. Southern, Inc.*,
   306 U.S. 563 (1939)..........................................................................26

*Baber v. Hosp. Corp. of Am.*,
   977 F.2d 872 (4th Cir. 1992) .............................................................11

*Boise Artesian Hot & Cold Water Co. v. Boise City*,
   213 U.S. 276 (1909)..........................................................................26

*Bond v. United States*,
   564 U.S. 211 (2011)..........................................................................21

*Bryan v. Rectors & Visitors of Univ. of Va.*,
   95 F.3d 349 (4th Cir. 1996) ....................................................9, 10, 11

*Cipollone v. Liggett Grp., Inc.*,
   505 U.S. 504 (1992)..........................................................................14

*Correa v. Hosp. S.F.*,
   69 F.3d 1184 (1st Cir. 1995)........................................................9, 10

*Coventry Health Care of Mo., Inc. v. Nevils*,
   581 U.S. 87 (2017)......................................................................19, 20

ii

## CASES [CONT'D]

*Coyle v. Smith*,
 221 U.S. 559 (1911)............................................................18

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
 596 U.S. 212 (2022)..........................................................17

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*,
 520 U.S. 806 (1997)............................................................5

*Democratic Party of Wis. v. Vos*,
 966 F.3d 581 (7th Cir. 2020) ............................................24

*Dobbs v. Jackson Women's Health Org.*,
 597 U.S. 215 (2022)...................................................*passim*

*Eberhardt v. City of L.A.*,
 62 F.3d 1253 (9th Cir. 1995) ............................................11

*Epic Sys. Corp. v. Lewis*,
 584 U.S. 497 (2018)..........................................................13

*FDA v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000)..........................................................12

*Fullilove v. Klutznick*,
 448 U.S. 448 (1980)..........................................................20

*Gonzaga Univ. v. Doe*,
 536 U.S. 273 (2002)....................................................17, 25

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
 527 U.S. 308 (1999)..........................................................26

*Harry v. Marchant*,
 291 F.3d 767 (11th Cir. 2002) ..........................................11

*Health & Hosp. Corp. v. Talevski*,
 599 U.S. 166 (2023)..............................................16, 17, 25

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
 471 U.S. 707 (1985)......................................................5, 14

## CASES [CONT'D]

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
469 U.S. 256 (1985)........................................................................15, 19

*Linder v. United States*,
268 U.S. 5 (1925)............................................................................21, 22

*Marshall v. E. Carroll Parish Hosp. Serv. Dist.*,
134 F.3d 319 (5th Cir. 1998) ...............................................................11

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)...............................................................................13

*Moyle v. United States*,
144 S. Ct. 2015 (2024)................................................................*passim*

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012).....................................................16, 21, 23

*New York v. United States*,
505 U.S. 144 (1992)....................................................5, 21, 24

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)..........................................................14, 16, 17

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)...............................................................................13

*Pollard v. Hagan*,
44 U.S. 212 (1845).................................................................................18

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)...............................................................................13

*In re T.D. Bank, N.A.*,
150 F. Supp. 3d 593 (D.S.C. 2015) .....................................................15

*Texas v. Becerra*,
89 F.4th 529 (5th Cir. 2024) ..............................................6, 7, 9, 13

*Townsend v. Swank*,
404 U.S. 282 (1971)......................................................................17, 20

iv

CASES [CONT'D]

*United States v. Butler*,
297 U.S. 1 (1936) ........................................................................22, 23

*United States v. California*,
655 F.2d 914 (9th Cir. 1980) .......................................................24, 25

*United States v. Doremus*,
249 U.S. 86 (1919) .......................................................................21, 22

*United States v. Lopez*,
514 U.S. 549 (1995) ..................................................................5, 20, 21

*United States v. Washington*,
596 U.S. 832 (2022) ............................................................................26

*West Virginia v. EPA*,
597 U.S. 697 (2022) ............................................................................12

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ............................................................................12

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ..............................................................................26

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ......................................................................25, 26

CONSTITUTIONAL PROVISIONS

U.S. Const. art. IV, § 4 ...............................................................................23

U.S. Const. art. VI ......................................................................................16

Ark. Const. amend. 98, § 3 ...........................................................................7

STATUTES & RULES

42 U.S.C. § 1395 .........................................................................................12

42 U.S.C. § 1395a-7(b)(5) ...........................................................................25

42 U.S.C. § 1395cc(b)(2) .............................................................................25

## STATUTES & RULES [CONT'D]

42 U.S.C. § 1395dd .................................................................... 1

42 U.S.C. § 1395dd(a) ............................................................. 10

42 U.S.C. § 1395dd(b)(1) ........................................................ 10

42 U.S.C. § 1395dd(b)(1)(A)–(B) ........................................... 10

42 U.S.C. § 1395dd(d)(1) ........................................................ 25

42 U.S.C. § 1395dd(e)(1)(A)(i) ............................................... 12

42 U.S.C. § 1395dd(e)(1)(A)(i)–(iii) ....................................... 10

42 U.S.C. § 1395dd(e)(1)(B) ................................................... 12

42 U.S.C. § 1395dd(e)(3)(A) ................................................... 11

42 U.S.C. § 1395dd(e)(3)(B) ................................................... 11

42 U.S.C. § 1395dd(f) .............................................................. 14

Idaho Code § 18-604(1) ............................................................ 6

Idaho Code § 18-622(2)(a)(i)–(ii) ........................................... 15

Idaho Code § 18-622(4) ........................................................... 14

Ind. Code § 35-48-4-11 ............................................................. 7

Kan. Stat. Ann. § 21-5705(d)(2) ............................................... 7

35 Pa. Stat. § 10231.401 et seq. ................................................ 7

Fed. R. App. P. 29(a)(2) ............................................................ 1

## OTHER AUTHORITIES

David Engdahl, *The Contract Thesis of the Federal Spending Power*,
    52 S.D. L. Rev. 496 (2007) ................................................ 18

The Federalist No. 33 (Alexander Hamilton) (J. Cooke ed., 1961) ........................ 18

**OTHER AUTHORITIES [CONT'D]**

*III.B. Overview of the State - Idaho - 2023*, HRSA Maternal & Child
    Health, https://mchb..hrsa.gov/Narratives/Overview/da820095-
    c0e34708--a1a7-abb733af ...................................................................................15

Philip Hamburger, *Purchasing Submission: Conditions, Power, and
    Freedom* (2021) ...................................................................................17, 23, 24

Statement of President Monroe, 39 Annals of Cong. 1842 (1822) .........................18

## INTEREST OF *AMICI* STATES

The States of Indiana, Alabama, Alaska, Arkansas, Florida, Iowa, Kansas, Louisiana, Mississippi, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming, respectfully submit this brief as *amici curiae* in support of the Appellants.[1]

In *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022), the Supreme Court "return[ed] the issue of abortion to the people's elected representatives." In many States, including Idaho, the people's elected representatives have voted to protect prenatal life by prohibiting most abortions, exercising States' traditional authority to regulate public health and welfare within their borders. In this case, however, the United States attempted an end run around *Dobbs* by obtaining a federal injunction that prevents hospitals receiving Medicaid and Medicare funds from complying with Idaho's abortion regulations.

More remarkable still, the United States is attempting to prevent private compliance with Idaho law through legislation, the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, enacted under the Spending Clause. Its position means that the federal government can pay "private parties" to disregard state laws in traditional areas of state concern, *Moyle v. United States*, 144 S. Ct.

---

[1] *Amici* States file this brief under Federal Rule of Appellate Procedure 29(a)(2) and in accordance with this Court's Order of August 5, 2024. Dkt. 116.

2015, 2020 (2024) (Barrett, J., concurring)—an implication that the United States never disclaimed at oral argument before the U.S. Supreme Court.

If accepted, the United States' position would permit the Executive Branch to seek decrees overriding all manner of state laws and fundamentally transform the relationships among citizens, their States, and the United States. *Amici* States have a profound interest in preserving the federalist structure, their power to regulate for the welfare of their citizens, and state laws adopted by citizens' elected representatives to protect unborn children from intentional destruction.

## SUMMARY OF ARGUMENT

Idaho, like many States, prohibits most abortions to protect unborn children. As the Supreme Court held in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the power to enact laws like Idaho's regulating medicine, health, and safety resides with the States. No provision of the Constitution creates a federal police power. As the United States reads EMTALA, however, it may direct hospitals to disregard generally applicable state medical regulations. And under its reading, private hospitals and emergency room physicians may ignore state medical regulations when they (or the federal government) think it necessary. Nothing in the government's argument limits its sweeping assertion of authority to the abortion context.

EMTALA cannot be read to preempt state laws regulating medicine, including abortion restrictions. The statute requires hospitals accepting Medicaid and Medicare funds to stabilize patients with emergency medical conditions. But EMTALA does not purport to establish national standards as to what care is, or is not, medically necessary or appropriate. It simply prevents hospitals from refusing to stabilize patients using otherwise lawful medical procedures. Construing EMTALA's stabilization requirement as requiring hospitals to provide abortions in violation of state law is particularly implausible. By its terms, the stabilization requirement's protections extend to *both* "pregnant wom[e]n" *and* their "unborn child[ren]." There is no "direct" conflict between EMTALA and Idaho law that supports a preemption finding.

Adopting the federal government's capacious view of preemption would raise significant constitutional difficulties. EMTALA is Spending Clause legislation. Although Congress may seek to entice States and regulated entities to change their behavior through the Spending Clause, the Supreme Court has stressed that this power cannot be wielded to destroy the federal-state balance. But that is how the United States seeks to employ Spending Clause legislation here. In the United States' view, the federal government can pay private hospitals to violate Idaho's abortion laws with impunity—and then sue the State of Idaho to enjoin those laws as a matter of federal supremacy. Or put another way, the United States believes that the federal

3

government can establish a financial relationship directly with a citizen that, at the citizen's election, immunizes the citizen from state police power.

A proper understanding of grant conditions and the federal spending power—not to mention the basic dual-sovereign structure of American constitutional government—does not permit such an arrangement. Whatever the status of federal conditions for other purposes, voluntarily accepted conditions cannot be considered "law" capable of preempting state law under the Supremacy Clause, especially where the federal government and private recipients negotiate terms without a State's involvement. Federal grant recipients remain bound by state law.

The proper question in this case thus is not whether Idaho medical regulations are preempted by federal law, but whether Idaho's regulations prevent private hospitals from qualifying for federal Medicare grants. The answer to that question is "no" under EMTALA's express terms, but framing the question properly is critical for the constitutional balance. Construing EMTALA to excuse private hospitals and doctors from complying with state medical regulations would radically restructure the relationships among the federal government, States, and citizens. It would allow the federal government to displace state law by paying private parties, replacing lawmaking by elected state officials with a system of private barter.

The extent to which the United States has overstepped its role is underscored by its failure to satisfy the one of the most basic requirements for bringing suit—

identifying a cause of action. No statute gives the federal government a cause of action to seek injunctive relief against States to prevent enforcement of state laws that allegedly disqualify hospitals from accepting federal funds. And equity cannot be used to evade EMTALA's comprehensive remedial scheme. This Court should reject the federal government's attempt to displace valid state medical regulations.

## ARGUMENT

### I. Through Its Novel—and Breathtakingly Broad—View of EMTALA, the United States Seeks To Invert State and Federal Roles

The Constitution prescribes a "healthy balance of power between the States and the Federal Government." *New York v. United States*, 505 U.S. 144, 181 (1992) (quotation omitted). In our federalist system, the "regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985); *see De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997). The federal government lacks a "plenary police power." *United States v. Lopez*, 514 U.S. 549, 566 (1995). The power to regulate health, safety, and medicine resides with the States.

Not long ago in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the Supreme Court confirmed that States' traditional power to regulate medicine extends to protecting prenatal life. It "returned" authority to regulate abortion "to the people and their elected representatives," empowering "States [to] regulate abortion for legitimate reasons." *Id.* at 292, 300. The Court stressed that state

regulations to protect prenatal life would be subject to "the same standard of review as other health and safety measures." *Id.* at 237. Idaho's prohibition of intentionally causing "the death of [an] unborn child" thus represents a traditional exercise of state police power over matters firmly committed to the States. Idaho Code § 18-604(1). No enumerated power authorizes the federal government to countermand state laws protecting prenatal life.

Through a novel construction of EMTALA—a Reagan-era law on the books for nearly four decades—the United States seeks to invert traditional state and federal roles for vast numbers of hospitals. The United States argues that compliance with EMTALA means that "termination" of pregnancy—including by abortion—"is required to stabilize a pregnant woman whose emergency medical condition threatens serious harm to her health," even if those abortions are prohibited by state law. U.S. Br. 9, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (Nos. 23-726, 23-727). Critically, however, the United States identifies no principle that would limit its argument to abortion. Indeed, when the United States was previously before this Court, it argued that "EMTALA frames [its] stabilization requirement in broad terms. It does not exempt *any form of care.*" Dkt. 35 at 12 (emphasis added).

The implications are staggering. Under the United States' view, EMTALA "mandates *whatever* a medical provider concludes is medically necessary to stabilize *whatever* condition is present"—state laws be damned. *Texas v. Becerra*, 89 F.4th

6

529, 541 (5th Cir. 2024). Doctors may now claim that EMTALA immunizes them from state regulation and discipline whenever they engage in conduct that they or the federal government deem "necessary" for patient stability.

The inescapable implication is that federal—not state—law governs physician conduct and medical practice in countless emergency rooms nationwide. For example, some States allow physicians to prescribe medical marijuana. S*ee, e.g.*, Ark. Const. amend. 98, § 3; 35 Pa. Stat. § 10231.401 *et seq.* Others, like Indiana, ban marijuana possession for any reason. *See, e.g.*, Ind. Code § 35-48-4-11; Kan. Stat. Ann. § 21-5705(d)(2). If the United States is correct, however, physicians in all 50 States must prescribe marijuana whenever they deem it "necessary" to stabilize patients. And what of other state restrictions? Those restrictions, too, must fall away under the United States' theory. "Congress could apparently pay doctors to perform . . . third-trimester elective abortions or eugenic abortions. It could condition Medicare funds on hospitals' offering assisted suicide even in the vast majority of States that ban the practice." *Moyle v. United States*, 144 S. Ct. 2015, 2034 (2024) (Alito, J., dissenting). Under the United States' view, hospitals may overcome any state regulation on medical care simply by accepting federal funds—including "authoriz[ing] the practice of medicine by any doctor who accepts Medicare payments even if he or she does not meet the State's licensing requirements." *Id.*

7

When this case was before the Supreme Court, several of the Justices pressed the United States, seeking some limiting principle to its argument. Could the federal government, for instance, condition receipt of funds on compliance with "medical ethics rules provided for by the federal government, a medical malpractice regime, and a medical licensing regime such that effectively all state medical malpractice laws, all state medical licensing laws would be preempted?" Oral Arg. Tr. 80:24–81:6, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (Nos. 23-726, 23-727). The United States thinks "that very likely Congress could make those kinds of judgments." *Id.* at 81:21–23. The only concession the United States made was that if the federal government "entirely t[ook] over a state function" then "maybe that would be subject to a different principle"—but only "maybe." *Id.* at 83:8–10.

The impetus for the federal government's claim to a new, expansive authority is clear: It disagrees with the Supreme Court's decision to return "the issue of abortion" to the States. *Dobbs*, 597 U.S. at 232, 300. Rather than allow elected state officials who "evaluate [competing] interests differently" to protect prenatal life, *id.* at 256, the United States seeks to reimpose a federal abortion right. And in pursuit of that goal, it is ready to accept any amount of collateral damage to traditional state authority—up to the point of saying it may displace any state regulation by offering some federal funds.

8

Perhaps some might agree with the United States' current policy. But it is important to remember that the United States' position on federalism cuts both ways: the United States' position also means that Congress could use Spending Clause conditions to ban medical providers who accept Medicaid or Medicare patients from providing abortions in States that have a "state constitutional amendment requiring abortion to be available." Oral Arg. Tr. 96:24–97:12. And what's to stop Congress from seeking to meddle with state affairs only in the abortion context? Perhaps another Congress would enact Spending Clause legislation that pays private gun shops to ignore otherwise constitutional state restrictions on firearm sales. Policy preferences should not affect what one thinks of the United States' grab for power.

## II. EMTALA Does Not Preempt Generally Applicable State Laws Regulating Medicine

EMTALA's plain language cannot be read to displace generally applicable state laws governing health, safety, and medicine. EMTALA "simply . . . impose[s] on hospitals the legal duty to provide . . . emergency care," regardless of the patient's insurance status. *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996); *see Texas*, 89 F.4th at 539; *Correa v. Hosp. S.F.*, 69 F.3d 1184, 1189 (1st Cir. 1995) ("Congress [was] concerned about reports that hospital[s] . . . are refusing to accept or treat patients with emergency conditions if the patient does not have

medical insurance." (quotation omitted)). It leaves to States the job of deciding whether abortion constitutes appropriate medical practice.

## A. EMTALA does not establish national standards of care

To begin, it is helpful to understand what EMTALA requires of hospitals participating in Medicaid and Medicare. If a person comes to the emergency room and requests "examination or treatment for a medical condition," the hospital must provide a medical screening. 42 U.S.C. § 1395dd(a). The hospital then must evaluate whether the patient has an "emergency medical condition," § 1395dd(b)(1), defined as a condition "manifesting itself by acute symptoms of sufficient severity" that "the absence of immediate medical attention could reasonably be expected to result in" "placing the health of the individual . . . in serious jeopardy" or "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part," § 1395dd(e)(1)(A)(i)–(iii). If a patient's condition qualifies, then the hospital must provide "such treatment as may be required to stabilize the medical condition" or "for transfer" to another facility that can provide treatment. § 1395dd(b)(1)(A)–(B). This "stabilization or transfer" requirement achieves Congress's principal goal in EMTALA of providing emergency care to the uninsured and preventing patient dumping. *See Bryan*, 95 F.3d at 351.

What EMTALA does not do is establish national standards as to what constitutes appropriate stabilizing treatment for every serious medical condition. EMTALA explains that "to stabilize" a patient means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). EMTALA, however, does not purport to define what constitutes "necessary" or appropriate "medical treatment" for the wide range of conditions that physicians may see. The only specific intervention it requires is the "deliver[y]" of "the placenta" with a baby. *Id.*; *see* § 1395dd(e)(3)(B). Regulation of all other interventions is left to the States. In fact, EMTALA disclaims "any supervision or control over the practice of medicine or the manner in which medical services are provided." § 1395.

As courts have recognized for decades, "[t]he statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care." *Eberhardt v. City of L.A.*, 62 F.3d 1253, 1258 (9th Cir. 1995). "EMTALA was not intended to establish guidelines for patient care." *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002); *see Marshall v. E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998); *Bryan*, 95 F.3d at 351. It is "no substitute" for state laws, such as "medical malpractice" laws, that regulate the medical profession. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992). It would be surprising indeed

if EMTALA's targeted direction to stabilize patients permitted doctors to ignore any and all state laws that offend their sense of necessity. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

### B.    EMTALA does not mandate abortions

It is implausible to construe EMTALA as requiring hospitals and physicians to perform abortions prohibited by state law. EMTALA nowhere mentions the topic of abortion, as one would expect if Congress were legislating on one of the most contentious issues in American politics. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000). As even the United States concedes, "when Congress intends to create special rules governing abortion," "it does so explicitly." U.S. Br. 40. Here, however, Congress nowhere created an abortion-specific exception to the general rule that state law governs the conduct and "practice of medicine." 42 U.S.C. § 1395.

To the contrary, Congress directed hospitals to care for both pregnant women and their unborn children. EMTALA defines an "emergency medical condition" to include one that "could reasonably be expected to result" in "placing the health of the individual (or, with respect to a pregnant woman, *the health of the woman or her unborn child*) in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A)(i) (emphasis added); *see* § 1395dd(e)(1)(B). EMTALA thus places obligations on hospitals to

consider both the health of a "pregnant woman" and "her unborn child." But performing an abortion necessarily places the "health of . . . [an] unborn child . . . in serious jeopardy"—indeed, it results in the child's destruction. To read EMTALA as mandating abortions would "put the statute 'at war with itself.'" *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 434 (2023).

The United States would have this Court focus on hospitals' obligations to pregnant women only. But that EMTALA imposes obligations on hospitals to pregnant women does not allow hospitals to ignore the health of unborn children. Hospitals cannot "pick and choose" between their dual obligations. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018). They must stabilize both women and unborn children. *See Texas*, 89 F.4th at 542, 544.

## C. EMTALA does not preempt Idaho laws protecting unborn children

As a result, EMTALA does not preempt generally applicable state abortion regulations (or any other generally applicable state medical regulations). In considering preemption claims, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "That approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Id.* Thus, it is not enough for the

United States to posit a possible conflict between federal and state law here. The United States "must . . . present a showing . . . of a conflict . . . strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation." *Hillsborough*, 471 U.S. at 716; *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (requiring Spending Clause conditions to be "unambiguous[]").

The United States comes nowhere close. EMTALA expressly states that "[t]he provisions of this section *do not preempt* any State or local law requirement, *except* to the extent that the requirement *directly conflicts* with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added); *see Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted."). The preemption issue thus reduces to whether Idaho law "directly conflicts" with EMTALA. But there is no conflict for the reasons above.

Idaho law makes particularly clear that it poses no barrier to providing stabilizing medical treatments consistent with EMTALA. Idaho law not only allows doctors to provide any number of interventions apart from abortion to address a pregnant woman's condition. Idaho law also expressly allows doctors to administer medical treatment that might cause "the accidental death of, or unintentional injury to, the unborn child." Idaho Code § 18-622(4). And it allows Idaho doctors to perform an

14

abortion if "necessary to prevent the death of the pregnant woman" while giving "the best opportunity for the unborn child to survive." § 18-622(2)(a)(i)–(ii). So like EMTALA itself, Idaho law embraces the dual requirements of caring for both a pregnant woman and her unborn child.

The alleged conflict is not "direct[]" either. For the conflict to be "direct," Idaho law would have to countermand EMTALA's stabilization requirement—for example, by ordering hospitals to deny all care to pregnant women or requiring those hospitals to hand over a percentage of their federal grants to the State. *Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260–68 (1985) (declaring a state law preempted that channeled away grants received by local governments in conflict with a federal statute). But all Idaho has done is enact a generally applicable law on abortion. Any conflict is "merely incidental" and hence "preemption does not apply." *In re T.D. Bank, N.A.*, 150 F. Supp. 3d 593, 607 (D.S.C. 2015).

The United States' preemption argument and request for an injunction against enforcement of Idaho law, moreover, only make sense if every hospital in Idaho must accept federal funds. But hospitals may comply with both federal and state law simply by turning down federal money. Not all Idaho hospitals are Medicare providers. *See* D. Ct. Dkt. 17-9 ¶ 8 (noting "[t]here are 52 Medicare-participating hospitals in Idaho"); *III.B. Overview of the State – Idaho – 2023*, HRSA Maternal & Child Health, https://mchb.tvisdata.hrsa.gov/Narratives/Overview/da820095-c0e3-4708-

a1a7-abb733cde3af (listing a total of 53 hospitals in Idaho). Nonparticipating hospitals do not violate federal law even if they refuse a service that the Department of Justice deems required by EMTALA. Rejecting or being ineligible for further federal grants does not amount to "violating" federal law.

## III. Construing EMTALA to Preempt Idaho Law Raises Serious Constitutional Difficulties

Construing EMTALA to excuse private hospitals from complying with Idaho's prohibitions on abortion would raise serious constitutional difficulties. EMTALA is Spending Clause legislation. Any conditions it imposes on States depends on States accepting them knowingly. *See Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006); *Pennhurst*, 451 U.S. at 17. Here, Idaho "never consented to *any* conditions imposed by EMTALA." *Moyle*, 144 S. Ct. at 2028 (Alito, J., dissenting). But under the United States' theory, Congress may cut out the States by paying private parties to ignore state law. That theory—which has no readily discernable limits—threatens to "undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

### A. The Supremacy Clause applies to federal law, not grant conditions

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI. Although Spending Clause legislation may itself be "law" for some purposes, *see Health & Hosp. Corp. v.*

*Talevski*, 599 U.S. 166, 178 (2023), a grant condition established by Spending Clause legislation is not "law" for purposes of the Supremacy Clause where the condition is part of an arrangement between the federal government and a private party, *see Moyle*, 144 S. Ct. at 2033 (Alito, J., dissenting) ("States cannot be bound by terms that they never accepted."); Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 132 (2021).

Conditions imposed by Spending Clause legislation are not self-executing. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent," *i.e.*, the consent of the individual accepting a federal grant, as opposed to the consent of the people writ large. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (quoting *Pennhurst*, 451 U.S. at 16–17). Consequently, a grantee need not accept a federal condition in the first instance, and if it does, the "typical remedy" is "action by the Federal Government to terminate funds." *Talevski*, 599 U.S. at 183 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002)); *see Townsend v. Swank*, 404 U.S. 282, 292 (1971) (Burger, C.J., concurring) ("The appropriate inquiry in any case should be simply whether the [grantee] has indeed adhered to the provisions and is accordingly entitled to utilize federal funds in support of its program.").

It would be odd to treat spending conditions as "law" for purposes of the Supremacy Clause because "Congress' legislative powers cannot be avoided by simply

opting out." David Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 498 (2007); *see Coyle v. Smith*, 221 U.S. 559, 572 (1911) ("[A]ll constitutional laws are binding on the people . . . whether they consent to be bound by them or not." (quoting *Pollard v. Hagan*, 44 U.S. 212, 224 (1845)). Congress's spending power "has no incidental power, nor does it draw after it any consequences of that kind." Statement of President Monroe, 39 Annals of Cong. 1842 (1822). If a law requires "legislative sanction or support, the State authority must be relied on." *Id.* Because spending "conditions do not purport to bind . . . in the manner of law," "[n]o federal condition, by whatever means adopted, should be understood to defeat the obligation of contrary state law." Hamburger, *supra*, at 131.

"[R]ead[ing] the Supremacy Clause in the context of the Constitution as a whole," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015), it does not require States to give way in their traditional areas of regulation simply because private entities have accepted federal grant money. "Hamilton wrote that the Supremacy Clause 'only declares a truth which flows immediately and necessarily from the institution of a Federal Government.'" *Id.* at 325 (quoting The Federalist No. 33, at 207 (Alexander Hamilton) (J. Cooke ed., 1961)). But the "truth" that federal law is supreme over state law is "expressly confine[d]" "to laws made pursuant to the Constitution." The Federalist No. 33, *supra*, at 207. Such a description "would

18

have been grossly inapt if the Clause were understood to give affected parties a con-stitutional . . . right," *Armstrong*, 575 U.S. at 325, to subject the States' laws to preemption unilaterally, *see Moyle*, 144 S. Ct. at 2033–34 (Alito, J., dissenting). If the Supremacy Clause now allows the federal government to write citizens blank checks to violate state law, then it has far surpassed its purpose of stating "a truth."

The United States has cited in passing a few preemption cases that it claims support its argument. U.S. Br. 46, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (Nos. 23-726, 23-727); *see* Oral Arg. Tr. 67:15–19. But none "hold[] that a federal law enacted under the Spending Clause preempts a state criminal law or public health regulation." *Moyle*, 144 S. Ct. at 2034 (Alito, J., dissenting); *see* Oral Arg. Tr. 67:8–14. Nor do any address whether the federal government "can preempt the laws of non-consenting States." *Moyle*, 144 S. Ct. at 2034 (Alito, J., dissenting).

One case applied to a federal grant where the Supreme Court invalidated a state statute restricting how localities could spend federal grants authorized by Con-gress for "any" purpose. *See Lawrence Cnty.*, 469 U.S. at 260–68. But the Supreme Court did not squarely address whether grant conditions are properly understood to constitute "law" under the Supremacy Clause. And *Lawrence County* at most can be understood to preclude States from interfering with how federal money is spent, not as a case precluding a State from enacting generally applicable police-power statutes that may preclude grant eligibility. *See Coventry Health Care of Mo., Inc. v. Nevils*,

581 U.S. 87, 95–99 (2017) (addressing the types of contracts that can be subrogated under state law, which says nothing about whether criminal laws may be preempted). The United States' other cases address conditions that the State agreed to because it was the recipient of the funds. *See Townsend*, 404 U.S. at 292 (1971) (Burger, C.J., concurring). And others "simply upheld the Federal Government's ability to prevent the use of federal money for purposes other than those intended by Congress." *Moyle*, 144 S. Ct. at 2034 (Alito, J., dissenting); *id.* at n.16 (citing cases). None speak to the situation here where private parties—rather than States themselves—are federal grant recipients seeking immunity from state law.

### B. Using grant conditions to displace state laws would upend the federal structure

Treating grant conditions as "law" capable of displacing generally applicable state exercises of the police power threatens a fundamental alteration of the relationships among citizens, their States, and the federal government. Instead of using federal funding to "induce governments and private parties to cooperate voluntarily with federal policy," *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) (citation omitted), the federal government's position would allow it to pay private citizens to violate state law. This Court should not now countenance such a capacious understanding of congressional power.

The Constitution does not grant the federal government a "plenary police power." *Lopez*, 514 U.S. at 566. Nor has it ever been "understood to confer upon

Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992). Rather, our Constitution "rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 564 U.S. 211, 220–21 (2011) (quoting *Alden v. Maine*, 527 U.S. 706, 758 (1999)). The Supreme Court thus has been "careful[] to avoid creating a general federal authority akin to the police power." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 536. It has repeatedly rejected attempts by the federal government to erode the distinction "between what is truly national and what is truly local"—including in the tax and spending context. *Lopez*, 514 U.S. at 567–68; *see Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 676 (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.) (collecting cases).

For example, in *Linder v. United States*, 268 U.S. 5 (1925), the Supreme Court rejected use of the power to tax for the general welfare to regulate the practice of medicine. It stated that "[o]bviously, direct control of medical practice in the states is beyond the power of the federal government," which meant that "[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure." *Id.* at 18; *see United States v. Doremus*, 249 U.S. 86, 93 (1919) (invalidating a federal regulation of physicians predicated on the taxing power because it invaded

the police power of States and observing that "[o]f course Congress may not in the exercise of federal power exert authority wholly reserved to the states").

Similarly, in *United States v. Butler*, 297 U.S. 1 (1936), the Court invalidated a federal grant program under the Agricultural Adjustment Act that involved transfer payments from producing farmers to non-producing farmers. The statute, the Court explained, "invade[d] the reserved rights of the states. It is a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government." *Id.* at 68. And the grants were a critical part of that invasion: "The tax, the appropriation of the funds raised, and the direction for their disbursement, are but parts of the plan. They are but means to an unconstitutional end." *Id.* Critically for this case, any choice of the citizen to participate was irrelevant, because even so "[a]t best, it is a scheme for purchasing with federal funds submission to federal regulation of a subject reserved to the states." *Id.* at 72.

That is precisely what the United States advocates here—a purchase of citizen submission to federal regulation—with the added problem that such submission would (at least according to the federal government's theory) directly subvert state law on a matter reserved to the States. For after *Dobbs*, there can be no doubt that state police power encompasses abortion regulation. *See* 597 U.S. at 302 ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting

22

abortion.").  And the Court in *Butler* was clear that using the spending power to undermine core state police powers at the election of the citizen is unconstitutional: "An appropriation to be expended by the United States under contracts calling for violation of a state law clearly would offend the Constitution." 297 U.S. at 73. That same observation applies here. The Court should not permit a new use of the Spending Clause that allows the federal government to "set policy in the most sensitive areas of traditional state concern, areas which otherwise would lie outside its reach." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 675–76 (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.).

### C.  Allowing citizens to opt out of state laws contravenes our form of government

The United States' attempt to use private bargaining under EMTALA to suspend state-police-power regulations without the State's consent also implicates the Constitution's guarantee of a republican form of government. *See* U.S. Const. art. IV, § 4. A republican form of government is one where the people are governed by legislatively enacted laws, not one where a different sovereign tempts citizens to exempt themselves from state laws. *See* Hamburger, *supra*, at 147. Manifestly, "the purchase of submission is not what traditionally was understood as a republican form of government." *Id.* That observation is particularly apt where submission is not undertaken by the State itself, but by a citizen being paid by the federal government to violate state law.

Although the Supreme Court has never directly enforced the Guarantee Clause against the United States, the Supreme Court has observed that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." *New York*, 505 U.S. at 185; *see Democratic Party of Wis. v. Vos*, 966 F.3d 581, 589 (7th Cir. 2020) ("We do not interpret *Rucho* or any other decision by the Supreme Court as having categorically foreclosed all Guarantee Clause claims as nonjusticiable, even though no such claim has yet survived Supreme Court review."). One type of claim that the Supreme Court has not foreclosed is a claim arising from Congress (or the Executive Branch) "actively interfer[ing] in the states' republican self-governance." Hamburger, *supra*, at 147. That is the case here. The United States' attempt to pay hospitals to violate valid state laws enacted by elected state officials constitutes a paradigmatic violation of the Guarantee Clause.

## IV. The United States Lacks a Cause of Action

The novelty of the United States' position—that it can give private parties money to violate state law and then sue States to interrupt enforcement of the violated provisions—is underscored by its inability to identify a cause of action. To sue a State, "the federal government," "like any other plaintiff," "must first have a cause of action." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). But no statute provides the United States a cause of action here.

Previously, the United States attempted to justify its suit by invoking "equitable" practice. U.S. Br. in Opp. to Stay at 38 n.10, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (Nos. 23-726, 23-727); Oral Arg. Tr. 84:3–87:21. But the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327; *see Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017) (if Congress "does not itself so provide, a private cause of action will not be created through judicial mandate"). Those limitations include the principle that the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Armstrong*, 575 U.S. at 328 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). That rule applies here.

EMTALA provides a comprehensive scheme of enforcement. EMTALA authorizes the federal government to seek civil monetary penalties against *hospitals and physicians* who "negligently violate[]" its stabilizing requirements. 42 U.S.C. § 1395dd(d)(1). And consistent with Congress's "typical" choice of "remedy" for violations of Spending Clause conditions, EMTALA authorizes the federal government to exclude hospitals and physicians who violate EMTALA from participating in other federal programs. *Talevski*, 599 U.S. at 183 (quoting *Gonzaga Univ.*, 536 U.S. at 280); *see* 42 U.S.C. §§ 1395a-7(b)(5), 1395cc(b)(2). EMTALA, however, does not authorize the federal government to seek injunctive relief against States for their regulatory choices—a tactic that would engender serious federalism concerns.

The novelty of this suit cuts against the United States' position too. As the Supreme Court has explained, "[t]he equitable powers of federal courts are limited by historical practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (citing *Atlas Life Ins. Co. v. W. I. Southern, Inc*., 306 U.S. 563, 568 (1939)). Federal courts have "no authority" to create causes of action or "remedies previously unknown to equity jurisprudence." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999). Rather, a suit at equity must fall "within some clear ground of equity jurisdiction." *Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276, 285 (1909).

At no stage of litigation, however, has the United States identified a single precedent authorizing it to seek injunctive relief against States over generally applicable statutes that allegedly conflict with Spending Clause conditions on grants to private parties. Both *United States v. Washington*, 596 U.S. 832 (2022), and *Arizona v. United States*, 567 U.S. 387 (2012), arose out of disputes about state statutes that allegedly conflicted with the federal government's own operations. The radical expansion of federal enforcement authority that the federal government seeks here must come from Congress, "not be created through judicial mandate." *Ziglar*, 582 U.S. at 133.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

/s/ James A. Barta
JAMES A. BARTA
Solicitor General

JENNA M. LORENCE
Deputy Solicitor General

*Counsel for* Amici *States*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-35440, 23-35450

I am the attorney or self-represented party.

**This brief contains 6,233 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ James A. Barta          **Date** September 20, 2024

## CERTIFICATE OF SERVICE

I certify that on September 20, 2024, I caused service of the foregoing brief to be made by electronic filing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all parties with an email address of record, who have appeared and consent to electronic service in this action.

Dated: September 20, 2024

*/s/ James A. Barta*
James A. Barta
Solicitor General