**Nos. 23-35440, 23-35450**

# United States Court of Appeals for the Ninth Circuit

UNITED STATES,

*Plaintiffs-Appellees,*

v.

MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF REPRESENTATIVES, ET AL.,

*Defendants-Appellants,*

On Appeal from the United States District Court for the District of Idaho, Southern Division
No. 1:22-cv-00329, Hon. B. Lynn Winmill

**BRIEF FOR *AMICUS CURIAE* CHARLOTTE LOZIER INSTITUTE IN SUPPORT OF APPELLANTS AND REVERSAL**

Gene C. Schaerr
 *Counsel of Record*
Cristina Martinez Squiers
Justin A. Miller
Miranda Cherkas Sherrill
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for* Amicus Curiae

SEPTEMBER 20, 2024

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, *amicus curiae* Charlotte Lozier Institute states that it is not publicly traded and has no parent corporations. No publicly traded corporation owns 10% or more of *amicus*. The legal name of *amicus* Charlotte Lozier Institute is the Susan B. Anthony List Inc. Education Fund, a 501(c)(3) charitable nonprofit that is separate from the Susan B. Anthony List Inc., a 501(c)(4) social-welfare entity.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel of Record for* Amicus Curiae
*Charlotte Lozier Institute*

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................ i

TABLE OF AUTHORITIES .................................................. iii

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ................. 1

ARGUMENT ....................................................... 4

    I.    The United States Disregards EMTALA's Plain Text Requiring Physicians to Protect the Life of Unborn Children. ........................................... 4

        A.    EMTALA's repeated references to the "unborn child" reflect a statutory command to recognize both the pregnant woman and her unborn child as patients protected by the statute. .................... 5

        B.    The United States' contrary interpretation is not only novel, but atextual and incoherent. ......................... 7

    II.    The United States' Interpretation of EMTALA Effectively Mandates Abortions That Are Not Necessary Emergency Care ......................................... 11

    III.    The United States' Position, as well as the Positions of Leading Medical Organizations, Promote the Expansion of Abortion Availability Above All Else .................... 21

CONCLUSION .................................................. 28

CERTIFICATE OF SERVICE ................................... 29

CERTIFICATE OF COMPLIANCE ............................. 30

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*All. for Hippocratic Med. v. FDA,*
  __ F.4th __, 2024 WL 4196546 (5th Cir. Sept. 16, 2024) ..................... 23

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992) ................................................................. 4

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ................................................................. 1

*Moyle v. United States,*
  144 S. Ct. 2015 (2024) .............................................. 7, 8, 11, 17, 21, 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ................................................................. 4

*Planned Parenthood Great Nw. v. Idaho,*
  522 P.3d 1132 (Idaho 2023) .................................................... 11, 21

*Texas v. Becerra,*
  623 F. Supp. 3d 696 (N.D. Tex. 2022) ....................................... 22

*W. Va. Uranium, Inc. v. Warren,*
  587 U.S. 761 (2019) ................................................................. 4

**Statutes**

42 U.S.C. § 1395dd .......................................... 2, 3, 5, 6, 8, 9, 23

Idaho Code § 18-604 ................................................................. 11

Idaho Code § 18-622 ....................................................... 1, 10, 19, 21

**Rules**

9th Circuit Rule 29-2 ................................................................. 1

Fed. R. App. P. 29 ................................................................... 1

**Other Authorities**

AAPLOG,
  *Practice Guideline No. 10, Concluding Pregnancy*
  *Ethically* (2022) .................................................................. 13

iii

ACOG,
    *Committee Opinion No. 831, Medically Indicated
    Late-Preterm and Early-Term Deliveries*,
    138 Obs. & Gyn. e35 (2021) ..................................................................... 12

ACOG,
    *Practice Bulletin No. 135, Second-Trimester Abortion*,
    121 Obs. & Gyn. 1394, 1394 (2013) ....................................................... 26

ACOG,
    *Practice Bulletin No. 203, Chronic Hypertension in Pregnancy*,
    133 Obs. & Gyn. e26 (2019) .............................................................. 12, 18

ACOG,
    *Practice Bulletin No. 212, Pregnancy and Heart Disease*,
    133 Obs. & Gyn. e320 (2019) .................................................................. 12

ACOG,
    *Practice Bulletin No. 217, Prelabor Rupture of Membranes*,
    135 Obs. & Gyn. e80 (2020) ............................................................... 12, 17

ACOG,
    *Practice Bulletin No. 222, Gestational Hypertension and
    Preeclampsia*, 135 Obs. & Gyn. e237 (2020) ................................... 12, 18

ACOG,
    *Practice Bulletin No. 225, Medication Abortion Up to 70 Days
    of Gestation*, 136 Obs. & Gyn. e31 (2020, *reaff'd 2023*) ....................... 26

Am. Med. Ass'n,
    *AMA Announces New Adopted Policies Related to
    Reproductive Health Care* (Nov. 16, 2022) .......................................... 27

Kathi Aultman et al.,
    *Deaths and Severe Adverse Events After the Use of
    Mifepristone as an Abortifacient from September 2000
    to February 2019*, 36 Issues L. & Med. 3 (2021) ................................. 15

Heather J. Baldwin et al.,
    *Antecedents of Abnormally Invasive Placenta in
    Primiparous Women*, 131 Obs. & Gyn. 227 (2018) ............................... 17

iv

Fritz Baumgartner & Gabriel Flores,
 *Contemporary Medical Students' Perceptions of the*
 *Hippocratic Oath*, 85 Linacre Q. 63, 70 (2018) .................................... 25

Helene M. Cole,
 *Legal Interventions During Pregnancy: Court-Ordered*
 *Medical Treatments and Legal Penalties for Potentially*
 *Harmful Behavior by Pregnant Women*,
 264 J. Am. Med. Ass'n 2663 (1990) ........................................................ 7

Tessa Cox et al.,
 *Fact Sheet: Are Pro-Life State Laws Preventing*
 *Pregnant Women from Receiving Emergency Care?*,
 Charlotte Lozier Inst. (Sept. 13, 2024) ................................................ 20

George Delgado et al.,
 *A Case Series Detailing the Successful Reversal*
 *of the Effects of Mifepristone Using Progesterone*,
 33 Issues L. & Med. 21 (2018)....................................................... 14, 15

Sheila Desai et al.,
 *Estimating Abortion Provision and Abortion Referrals*
 *Among United States Obstetricians-Gynecologists in*
 *Private Practice*, 97 Contraception 297 (2018) ................................... 13

Christina Francis,
 *Georgia's Abortion Law Was Not Responsible for*
 *Young Mom's Death*, Atl. J.-Const. (Sept. 18, 2024).......................... 15

Margaret M. Gary & Donna J. Harrison,
 *Analysis of Severe Adverse Events Related to the Use*
 *of Mifepristone as an Abortifacient*,
 40 Annals Pharmacotherapy 191 (2006) ............................................. 15

Mary Harned & Ingrid Skop,
 *"Misleading Statements About Life of the Mother"*
 *Exceptions in Pro-Life Laws Require Correction*,
 39 Issues L. & Med. 76 (2024)............................................................. 20

Hippocrates,
 The Oath (Francis Adams trans. 1849) (400 B.C.).............................. 25

Shelly Kaller et al.,
  *Pharmacists' Knowledge, Perspectives, and Experiences
  with Mifepristone Dispensing for Medication Abortion*,
  61 J. Am. Pharmacists Ass'n 785 (2021) ............................................. 26

Yukiko Motojima et al.,
  *Management and Outcomes of Periviable Neonates
  Born at 22 Weeks of Gestation: A Single-Center
  Experience in Japan*, 43 J. Perinatology 1385 (2023) ........................ 13

Michael J. New,
  *Media Mislead on Tragic Death of Amber Thurman*,
  Nat'l Rev. (Sept. 19, 2024, 9:31 AM) ...................................................... 16

Heidi Schmidt & Malik Jackson,
  *University of Kansas Health Investigated for not Providing
  Emergency Abortion*, Fox4KC News (May 2, 2023) ............................. 25

Debra B. Stulberg et al.,
  *Abortion Provision Among Practicing
  Obstetrician-Gynecologists*, 118 Obstetrics & Gyn. 609 (2011) ........... 13

Tr. Oral Arg.,
  *Moyle v. United States*,
  144 S. Ct. 2015 (2024)
  (Nos. 23-726, 23-727) ............................ 12, 13, 14, 16, 17, 19, 20, 23, 24

U.S. Nat'l Libr. of Med.,
  *NCT03320057, Medication Abortion Via Pharmacy Dispensing*,
  ClinicalTrials.gov ................................................................................. 26

U.S.' Opp'n to Stay Appeal,
  *Moyle v. United States*, 144 S. Ct. 2015 (2024)
  (Nos. 23-726, 23-727), 2023 WL 8437165 & 2023 WL 8437176 .......... 10

U.S.' Resp. Br.,
  *Moyle v. United States*, 144 S. Ct. 2015 (2024)
  (Nos. 23-726, 23-727), 2024 WL 1298046 ........................ 8, 9, 17, 22, 24

Qiongjie Zhou et al.,
  *Risk Factors for Preterm Premature Rupture of
  Membranes in Chinese Women from Urban Cities*,
  127 Int'l J. Gyn. & Obs. 254 (2014) ...................................................... 17

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*[1]

Two years ago, the Supreme Court "return[ed] the issue of abortion to the people's elected representatives." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022). Now the federal government seeks to thwart the democratic process, twisting the Emergency Medical Treatment and Labor Act (EMTALA), a statute designed to preserve life, into a federal abortion mandate—and in a way that overrides Idaho's Defense of Life Act, another statute designed to preserve life. The Court should reject the federal government's argument that EMTALA preempts the Defense of Life Act because the plain text of the laws does not conflict. Indeed, the federal government's novel interpretation of the decades-old statute on the heels of *Dobbs* demonstrates its prioritization of abortion "access" above physician judgment, federalism, and the separation of powers.

---

[1] *Amicus curiae* is authorized to file this brief by Fed. R. App. P. 29(a)(2) and Circuit Rule 29-2(a) because all parties have consented to its filing. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief; and no person other than *amicus* or its counsel contributed money that was intended to fund the preparation or submission of the brief. Fed. R. App. P. 29(a)(4)(E).

For two specific reasons, the argument of the United States is wrong. First, in contriving a conflict between EMTALA and the Idaho law, the United States disregards EMTALA's plain text requiring physicians to protect the lives of unborn children. EMTALA mandates that subject hospitals treat individuals seeking emergency care. And when a potential emergency medical condition involves a "pregnant woman," EMTALA requires consideration of whether the condition places the "health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A)(i). This language, employed here and elsewhere in EMTALA, reflects Congress's commitment to the centuries-old two-patient paradigm: that ethically minded physicians must act in the interest of both the mother and her unborn child. A law's plain text cannot simultaneously protect the health of an unborn child while also mandating the destruction of that unborn child's life.

In short, the Idaho law, like EMTALA, reflects a two-patient paradigm. Thus, nothing in Idaho's law conflicts with a proper reading of EMTALA.

Second, the United States' erroneous interpretation of EMTALA would effectively require physicians to perform abortions that are not necessary to protect a mother's life. Science shows that abortion is rarely medically necessary to stabilize a pregnant woman, and an abortion will (obviously) never stabilize an unborn child. Indeed, most life-threatening complications in pregnancy occur *after* fetal viability, when the unborn child can be successfully separated from her mother in a manner that protects both of their lives. Under such circumstances, EMTALA cannot be read to require an abortion, but instead requires that the unborn child be stabilized, just as any other patient would be. *Id.* § 1395dd(e)(1)(A)(1). And in early pregnancy, many complications can be treated with medication, expectant management, and close monitoring rather than abortion.

These issues—and the proper interpretation of EMTALA generally—are of enormous importance to *amicus curiae* Charlotte Lozier Institute (CLI), a nonprofit research and education organization committed to bringing modern science to bear in life-related policy and legal decision-making. CLI believes that laws governing abortion should be informed by the most current medical and scientific knowledge on

human development and not by attempts to promote a political or ideological agenda.

Unfortunately, that is what appears to be driving the United States' position in this case. This Court should vacate the district court's erroneous injunction and reject the government's attempt to increase the number of abortions by misinterpreting both federal and state law.

## ARGUMENT

## I. The United States Disregards EMTALA's Plain Text Requiring Physicians to Protect the Life of Unborn Children.

As the Supreme Court has recognized "time and again," "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). And thus, "the best evidence of Congress's intent is the statutory text." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). "So any evidence of pre-emptive purpose, whether express or implied, must therefore be sought in the text and structure of the statute at issue." *W. Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (cleaned up). The United States' reading of EMTALA violates these basic principles by disregarding the plain text that expressly protects the lives of unborn children.

A.   **EMTALA's repeated references to the "unborn child" reflect a statutory command to recognize both the pregnant woman and her unborn child as patients protected by the statute.**

Starting with the statute's text, EMTALA requires hospitals to determine whether someone presenting at the hospital has an "emergency medical condition." 42 U.S.C. § 1395dd(a). Congress amended EMTALA in 1989 to explicitly clarify that its protections extend to unborn children. Accordingly, for thirty-five years EMTALA has defined "emergency medical condition" to apply to both a pregnant woman and her unborn child. The definition includes, among other things, medical conditions (1) from which "the absence of immediate medical attention could reasonably be expected" to place "the health of the individual" or, "with respect to a pregnant woman, the health of the woman *or her unborn child*" in "serious jeopardy," *id.* § 1395dd(e)(1)(A) (emphasis added), and (2) where transferring a pregnant woman experiencing contractions would threaten her "or the unborn child," *id.* § 1395dd(e)(1)(B). In fact, before a transfer to another facility may occur, a physician must certify that the transfer would benefit both the woman and her unborn child. *Id.* § 1395dd(c)(1)(A)(ii), (c)(2)(A).

5

If a patient has such a condition, hospitals must either (a) provide "further medical examination and such treatment as may be required to stabilize the medical condition" of the woman and her unborn child, or (b) "transfer" them "to another medical facility" that can provide the care that the woman and her unborn child need. *Id.* § 1395dd(b)(1), (c)(1).

EMTALA defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility," or for a pregnant woman who is experiencing contractions, "to deliver (including the placenta)." *Id.* § 1395dd(e)(3)(A). This definition is made "with respect to" those conditions that "plac[e] the health of … the woman *or her unborn child* … in serious jeopardy." *Id.* § 1395dd(e)(1)(A)(i), (3)(A) (emphasis added). Once again, the provision applies to both the pregnant woman and her unborn child.

The text of the statute thus demonstrates Congress's commitment to what bioethicists and physicians call a "two-patient paradigm." Under that view, "a physician's ethical duty toward the pregnant woman clearly requires the physician to act in the interest of the fetus as well as the

woman."[2] And by defining "emergency medical conditions" to include conditions threatening the health of the unborn child, EMTALA ensures that it never departs from that paradigm. Thus, at all relevant points, physicians and hospitals subject to EMTALA's requirements are required to follow the two-patient paradigm to protect both the mother and her unborn child.

## B. The United States' contrary interpretation is not only novel, but atextual and incoherent.

Despite the fact that EMTALA has explicitly protected unborn children since the 1989 amendments, the Department of Health and Human Services decided in 2022, right after the Supreme Court's *Dobbs* decision, to issue new "guidance" that told physicians they must provide abortions. Specifically, the U.S. Department of Health and Human Services (HHS) said that if physicians "believe that abortion is the stabilizing treatment necessary to resolve a pregnant woman's emergency medical condition, they must provide that treatment." *Moyle v. United States*, 144 S. Ct. 2015, 2019 (2024) (Barrett, J., concurring)

---

[2] Helene M. Cole, *Legal Interventions During Pregnancy: Court-Ordered Medical Treatments and Legal Penalties for Potentially Harmful Behavior by Pregnant Women*, 264 J. Am. Med. Ass'n 2663, 2664 (1990).

(cleaned up). HHS further stated that "[a]ny contrary state law" is "preempted." *Id.* This newfound guidance is misguided for several reasons.

First, the United States argues, despite EMTALA's clear text protecting unborn children, for a one-patient paradigm where the unborn child's health is only a consideration in relation to the mother's health. For example, the United States has argued that EMTALA's repeated mentions of the unborn child in the statute's 1989 amendments did not alter EMTALA's basic operation that what must be stabilized is the "medical condition" of the "individual"—meaning only mothers and infants born alive. U.S.' Resp. Br. at 41–43, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (Nos. 23-726, 23-727), 2024 WL 1298046 ("S.Ct. Resp. Br."). But three of these mentions require considering the unborn child's health when transferring a laboring mother. 42 U.S.C. § 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(B)(ii). And the fourth mention expands the definition of "emergency medical condition" to include medical conditions that "plac[e] the health of … the woman *or her unborn child* … in serious jeopardy." *Id.* § 1395dd(e)(1)(A)(i) (emphasis added). Thus, the 1989 amendments *did* alter (or clarify) EMTALA's basic

operation by explicitly protecting unborn children and requiring their independent protection apart from the mother.

Moreover, this independent protection includes all three provisions of EMTALA—the mother and unborn child are both patients subject to the requirements for stabilization, treatment, and potential transfer. When a pregnant woman presents at an EMTALA-regulated entity, EMTALA requires the entity to check for an "emergency medical condition," by expressly evaluating both the "woman" and "her unborn child." 42 U.S.C. § 1395dd(a), (e)(1).

Yet when it comes to stabilization, the United States argues that even when only the health of the fetus, but not the mother, is in jeopardy, Congress meant to solely require hospitals to provide "her," *i.e.*, the mother, "stabilizing treatment." S.Ct. Resp. Br. at 22, 42. The United States cannot explain, however, how stabilizing the mother would benefit her or the fetus under those circumstances. And the reason is clear: In this case, the unborn child, not the mother, is the one who requires and is entitled to stabilizing treatment.

The United States, however, conceded that EMTALA "sensibly requires hospitals to consider risks to the health" of unborn children

9

when determining whether to transfer a laboring mother. U.S.' Opp'n to Stay Appeal at 31, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (Nos. 23-726, 23-727), 2023 WL 8437165 & 2023 WL 8437176. But according to the government, those protections and physicians' consideration of the health of the unborn child end as soon as the mother's health is also in peril. *Id.* at 33. The United States' attempt to diminish the unborn child's life as secondary—one that must be protected only if her mother's health is not threatened but loses all value if her mother's health is in jeopardy—runs afoul of EMTALA's clear protection of unborn life. Congress expected hospitals and physicians to preserve both lives wherever possible.

In sum, a proper reading of EMTALA shows that the federal law and the Idaho law complement, rather than contradict, each other. Like EMTALA, Idaho law ensures that any maternal-fetal separations are performed with "good faith medical judgment" in the manner that "provide[s] the best opportunity for the unborn child to survive"—while also preserving the life of the mother. Idaho Code § 18-622(2)(a)(ii). Thus, the goal under Idaho law, like the goal under EMTALA, always requires reasonable attempts to preserve the lives of both patients. And the

government's arguments otherwise are based on a novel and erroneous reading of the law.

## II. The United States' Interpretation of EMTALA Effectively Mandates Abortions That Are Not Necessary Emergency Care.

The United States argues that EMTALA requires abortion for numerous conditions, including preterm premature rupture of membranes (PPROM), placental abruption, preeclampsia, and eclampsia. *See Moyle*, 144 S. Ct. at 2021 (Barrett, J., concurring). But, as explained next, that argument does not comport with medical science.

### A. Abortion is rarely medically necessary to stabilize a pregnant woman.

As a preliminary matter, it is highly uncommon for abortion to be a necessary medical treatment to stabilize a pregnant woman, and—critical in any EMTALA analysis—an abortion will *never* stabilize the unborn child on whom it is performed.[3] To be sure, there may be situations where EMTALA's dual obligations to the mother and her unborn child cannot maintain the lives of both and preservation of the

---

[3] Situations like the removal of an ectopic, molar, or other non-viable pregnancy, while medically necessary, are not abortions. Idaho Code § 18-604(1); *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1202–23 (Idaho 2023).

mother will result in the death of her child. But the United States was wrong to argue in the Supreme Court that for "this dual stabilization idea, … in many of these cases, the pregnancy is lost." Tr. Oral Arg. at 114, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (Nos. 23-726, 23-727) (statement of Elizabeth Prelogar) ("*Moyle* S.Ct. Arg."). The fact is that such tragic situations are rare.

In early pregnancy, complications are often treated with expectant management, where the woman and her unborn child are treated, stabilized, and closely monitored to allow the pregnancy to advance to a gestational age where the child can survive.[4] Consistent with EMTALA's two-patient paradigm, a doctor, in her own reasonable medical judgment, makes decisions along with the pregnant woman about how best to treat both the mother and child.[5]

---

[4] Am. Coll. Obs. & Gyns. (ACOG), *Committee Opinion No. 831, Medically Indicated Late-Preterm and Early-Term Deliveries*, 138 Obs. & Gyn. e35 (2021); ACOG, *Practice Bulletin No. 222, Gestational Hypertension and Preeclampsia*, 135 Obs. & Gyn. e237 (2020); ACOG, *Practice Bulletin No. 217, Prelabor Rupture of Membranes*, 135 Obs. & Gyn. e80 (2020); ACOG, *Practice Bulletin No. 212, Pregnancy and Heart Disease*, 133 Obs. & Gyn. e320 (2019); ACOG, *Practice Bulletin No. 203, Chronic Hypertension in Pregnancy*, 133 Obs. & Gyn. e26 (2019).

[5] Indeed, the majority of OB-GYNs follow a two-patient paradigm irrespective of EMTALA. The reality is that only 7–14% of obstetricians

Further, most life-threatening complications in pregnancy occur *after* fetal viability (typically around 22 weeks' gestation), when an unborn child can survive separate from her mother.[6] At that stage of pregnancy, if a medically indicated maternal-fetal separation is required, an abortion, which takes the intentional step of causing fetal demise, would be unnecessary because separation can often be done in such a way that the neonate can continue to live.[7] The United States agrees, as it conceded at oral argument in the Supreme Court that "[t]here can be complications that happen after viability, but there, the standard of care is to deliver the baby if you need the pregnancy to end because it's causing these severe health consequences for the mom." *Moyle* S.Ct. Arg. at 75. Accordingly, in such circumstances, far from *requiring* an abortion,

---

will perform an elective abortion when requested by a patient. Sheila Desai et al., *Estimating Abortion Provision and Abortion Referrals Among United States Obstetricians-Gynecologists in Private Practice*, 97 Contraception 297, 301 (2018); Debra B. Stulberg et al., *Abortion Provision Among Practicing Obstetrician-Gynecologists*, 118 Obstetrics & Gyn. 609, 612 (2011).

[6] *See, e.g.*, Yukiko Motojima et al., *Management and Outcomes of Periviable Neonates Born at 22 Weeks of Gestation: A Single-Center Experience in Japan*, 43 J. Perinatology 1385, 1385, 1387 (2023) (24 of 29 infants born at 22 weeks' gestation at one clinic survived).

[7] *See generally* Am. Ass'n Pro-Life Obs. & Gyns. (AAPLOG), *Practice Guideline No. 10, Concluding Pregnancy Ethically* (2022).

EMTALA's text requires the unborn child to be stabilized—whether by birth through standard obstetric interventions such as labor induction or cesarean section.

### B. Even in extreme situations, life-affirming care is often available.

In the Supreme Court, the United States focused on extreme conditions where "the fetus can't survive regardless," or "there is no possible way to ... stabilize the unborn child" and "it's inevitable that the pregnancy is going to be lost." *Moyle* S.Ct. Arg. at 76, 107. Although many of these conditions could be resolved by abortion, alternative stabilizing and life-affirming treatments are also often available without risking the mother's health.

For instance, approximately 10–15% of women who consume mifepristone to induce a medication abortion will continue to have a still-living fetus.[8] They may present to an emergency room for care.[9] The

---

[8] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21, 22–23 (2018), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020687Orig1s026lbl.pdf.

[9] While many of these women may not require emergency care, the tragic reality is that they may not have anywhere else to turn other than the emergency room. These women may have received abortion pills out of

United States' argument implies that the emergency provider would need to complete the abortion in that circumstance, but that action would not be required if the woman is clinically stable. A medical provider could instead offer progesterone support and continued expectant management.[10] This course of treatment, not abortion, is what EMTALA requires, as the law commands stabilizing treatment for the unborn child as well as the mother.[11]

---

state, through the mail from the internet or telemedicine providers, or by abortion providers who are unwilling or unable to manage their complications. In fact, the FDA's complication data records that less than 40% of surgeries required for failed chemical abortions were performed by abortion providers. Kathi Aultman et al., *Deaths and Severe Adverse Events After the Use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 36 Issues L. & Med. 3, 4 (2021); *see also* Margaret M. Gary & Donna J. Harrison, *Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient*, 40 Annals Pharmacotherapy 191 (2006).

[10] Delgado et al., s*upra* note 8, at 22–23.

[11] A tragic death in Georgia highlights the dangers of consuming these drugs, as two members of *amicus curiae* recently explained. The mother's "heartbreaking death was certainly preventable, but, contrary to what many are claiming, the state's abortion law did not stand in the way of saving her life." Christina Francis, *Georgia's Abortion Law Was Not Responsible for Young Mom's Death*, Atl. J.-Const. (Sept. 18, 2024), https://tinyurl.com/yt9uk2s9. The mother "obtained chemical-abortion pills in North Carolina. After returning home to Georgia, she experienced a rare complication. She had not yet expelled all of the fetal tissue. She checked into [a] [h]ospital to receive a dilation-and-curettage ...

Likewise, for women presenting with preterm premature rupture of membranes (PPROM), which occurs in 2–3% of pregnancies in the United States, abortion is far from the only option. The United States was simply wrong to argue in the Supreme Court that for "a woman who has PPROM at 17 weeks, there is no medical way to sustain the pregnancy to give the fetus a chance." *Moyle* S.Ct. Arg. at 114–15. On the contrary, the American College of Obstetricians and Gynecologists (ACOG) advises that "[w]omen presenting with [P]PROM before neonatal viability should be counseled regarding the risks and benefits of expectant management versus immediate delivery" and provided with "a realistic appraisal of neonatal outcomes. … [T]ermination of pregnancy by induction of labor or dilation and evacuation[] and expectant

---

procedure to remove the fetal remains. There were delays in her treatment, her condition deteriorated, and she tragically died." Michael J. New, *Media Mislead on Tragic Death of Amber Thurman*, Nat'l Rev. (Sept. 19, 2024, 9:31 AM), https://tinyurl.com/3hwec93u. "Georgia's pro-life heartbeat act was not responsible for [her] death. That is because the law allows physicians to intervene in cases of medical emergencies or if the preborn child has no detectable heartbeat. Both of these clearly applied in [her] case. Furthermore, a D&C to remove the remains of an unborn child that has died is not an abortion and is not criminalized in Georgia. In this case, [the mother's] death was caused by chemical-abortion pills." *Id.*

management should be offered."[12] Thus, even ACOG recognizes that watchful waiting—not abortion—can stabilize this health emergency. Moreover, there is evidence that performing a surgical abortion for this condition may cause more harm to the uterus and higher risk of PPROM in the future.[13]

Additionally, if the physician and patient desire intervention at the time of diagnosis, ACOG recommends—and all state laws allow—immediate delivery by induced labor or cesarean section. And that means delivery without intentional destruction of the unborn child, which would obviously occur with a dilation and evacuation abortion. Indeed, the United States conceded that "if pregnancy seriously jeopardizes the woman's health postviability, EMTALA requires delivery, not abortion." *Moyle*, 144 S. Ct. at 2021 n.* (Barrett, J., concurring) (citing S.Ct. Resp. Br. at 10; *Moyle* S.Ct. Arg. at 75). Delivering a child, even previability,

---

[12] ACOG, *Practice Bulletin No. 217*, *supra* note 4, at e88.

[13] *See, e.g.,* Heather J. Baldwin et al., *Antecedents of Abnormally Invasive Placenta in Primiparous Women*, 131 Obs. & Gyn. 227 (2018); Qiongjie Zhou et al., *Risk Factors for Preterm Premature Rupture of Membranes in Chinese Women from Urban Cities*, 127 Int'l J. Gyn. & Obs. 254 (2014).

preserves the possibility that the child might live; an abortion guarantees the child's death.

The same is true with preeclampsia. In the event of a life-threatening hypertensive emergency, ACOG explains that "delivery is recommended when gestational hypertension or preeclampsia with severe features … is diagnosed at or beyond 34 0/7 weeks of gestation" and recognizes that, "before 34 0/7 weeks of gestation," "expectant management of preeclampsia with severe features" may be advised "based on strict selection criteria of those appropriate candidates and is best accomplished in a setting with resources appropriate for maternal and neonatal care."[14] As dangerous as preeclampsia is, even ACOG makes clear that expectant management or delivery[15]—both options that

---

[14] ACOG, *Practice Bulletin No. 222*, *supra* note 4, at e245; *see also* ACOG, *Practice Bulletin No. 203*, *supra* note 4, at e42.

[15] ACOG distinguishes between preeclampsia with severe features, which requires delivery, and preeclampsia without severe features, which can be managed expectantly to a certain gestational age. ACOG, *Practice Bulletin No. 222*, *supra* note 4, at e245 ("[E]xpectant management is not advised when neonatal survival is not anticipated."). The phrase "survival is not anticipated" indicates preeclampsia with severe features before the unborn child can survive delivery due to gestational age, as well as an unborn child with a life-limiting fetal condition, such as anencephaly. Determining whether survival is

18

allow the unborn child to be born alive rather than aborted—are accepted treatments.

Another example that even the United States concedes does not require abortion under any circumstance is the stabilization of a mother with mental health challenges, even during a mental health emergency. Although "[t]here can be grave mental health emergencies, … EMTALA could never require pregnancy termination as the stabilizing care … because that wouldn't do anything to address the underlying brain chemistry issue that's causing … the mental health emergency in the first place." *Moyle* S.Ct. Arg. at 76–77. In fact, "it would be incredibly unethical to terminate her pregnancy" because she "might not be in a position to give any informed consent." *Id.* at 77. Simply put, abortion "is not the accepted standard of practice to treat any mental health emergency." *Id.* at 78.

Although not an exhaustive list of the possible complications that a woman may experience during pregnancy, the complications discussed above, and the life-affirming treatments that can protect both the mother

---

anticipated requires the physician's good faith medical judgment. Idaho Code § 18-622(2)(a)(ii).

and her unborn child, illustrate that the United States' insistence that every hospital covered by EMTALA offer abortion when women suffer serious pregnancy complications is incorrect.[16]

And in no event do any of these treatments involve what the United States caricatured as "waiting for women to wait and deteriorate" and withholding treatment until the doctor "think[s] she's close to death." *Moyle* S.Ct. Arg. at 103, 115. Neither the law at issue here nor any other abortion restriction to *amicus curiae*'s knowledge has such an imminency requirement.[17] And the Supreme Court of Idaho has clarified that the exception to the Idaho abortion restriction is not limited to a risk of

---

[16] And in fact, many physicians would recognize that determining whether abortion is, in fact, medically necessary during emergency treatment varies greatly from case to case, and certainly when a woman wants the unborn child to live.

[17] Mary Harned & Ingrid Skop, *"Misleading Statements About Life of the Mother" Exceptions in Pro-Life Laws Require Correction*, 39 Issues L. & Med. 76, 77–78 (2024), (noting that claims of imminency requirement are made without citation to any law); Tessa Cox et al., *Fact Sheet: Are Pro-Life State Laws Preventing Pregnant Women from Receiving Emergency Care?*, Charlotte Lozier Inst. (Sept. 13, 2024), https://lozierinstitute.org/fact-sheet-are-pro-life-state-laws-preventing-pregnant-women-from-receiving-emergency-care/ (noting that the Idaho Supreme Court stated that the state abortion law "does not require *objective* certainty, or a particular level of immediacy, before the abortion can be 'necessary' to save the woman's life.")

imminent death. *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1203 (Idaho 2023). Instead, the Idaho law requires physicians to exercise their "good faith judgment," in line with the duty of all physicians to exercise reasonable medical judgment, when approaching complex situations with the health of both patients in mind. EMTALA requires the same. Idaho Code § 18-622(2)(a)(ii).

Thus, the United States has failed to identify when an abortion is medically necessary to stabilize a patient facing serious injury under EMTALA. An argument that "under federal law, a hospital *must* provide an emergency abortion," *Moyle*, 144 S. Ct. at 2024 (Jackson, J., concurring in part and dissenting in part), must answer why EMTALA requires an abortion when other legitimate treatment options exist or are recommended.

## III. The United States' Position, as well as the Positions of Leading Medical Organizations, Promote the Expansion of Abortion Availability Above All Else.

It is unclear what exactly the United States believes EMTALA requires, as its position has changed throughout this litigation. What is clear, however, is that the federal government and leading medical

21

organizations seek to expand abortion by redefining and misinterpreting federal law.

Though the United States asserts that EMTALA requires abortion "only when ... required to stabilize an emergency medical condition," S.Ct. Resp. Br. at 10, the breadth of this statement is unclear. The government has already narrowed its position, now stating that abortion is not required to stabilize mental-health conditions and that serious conditions that develop postviability require delivery, not abortion. *See Moyle*, 144 S. Ct. at 2021 (Barrett, J., concurring).

While the United States has narrowed its position in this case (for now), it took a broader position in the related HHS guidance recently stayed in the Fifth Circuit. There, the federal government said that a medical emergency is merely a situation that "*could place* the health of a person (including pregnant patients) in serious jeopardy." *Texas v. Becerra*, 623 F. Supp. 3d 696, 731 (N.D. Tex. 2022), *aff'd,* 89 F.4th 529 (5th Cir. 2024), *petition for cert. docketed,* No. 23-1076 (U.S. Apr. 3, 2024) (emphasis added). This position is (once again) much broader than EMTALA's text, which narrowly defines medical emergency as a situation that "*could reasonably be expected* to" place the health of a

mother or her unborn child in serious jeopardy. 42 U.S.C. § 1395dd(e)(1)(A)(i) (emphasis added). Whatever its current stance, the United States intends to broaden the scope of what constitutes emergency care in favor of greater abortion access.

Further, this expansion of abortion comes at the expense of physician judgment and conscience objections. Even if a physician decides with her patient that another stabilizing treatment besides abortion would be the best course, the physician does so at great personal risk. Although the United States conceded that "EMTALA does not override … conscience protections" regarding abortion, the United States maintains that hospitals must consider conscience exemptions in "ensuring appropriate staffing for emergency care." *Moyle* S.Ct. Arg. at 88–89; *see also All. for Hippocratic Med. v. FDA*, __ F.4th __, 2024 WL 4196546, at *2 & n.1 (5th Cir. Sept. 16, 2024) (Ho, J., concurring) (pointing out that in both that case and *Moyle*, "[t]here's a simple reason [to be] uncomfortable trusting federal conscience laws to protect doctors: The Government has taken precisely the opposite position on federal conscience laws in other cases and in other courts[.]").

Thus, if a hospital did not have a doctor willing to provide abortions, "leaving itself in a position where it can never provide care, then [the United States] would terminate the Medicare funding agreement." *Moyle* S.Ct. Arg. at 92. The result of this policy could easily result in hospitals excluding conscientious doctors from emergency room staffing or pressuring them to ignore what their consciences require to avoid a federal enforcement action or investigation. Faced with the possibility of six-figure fines and the loss of federal funding, S.Ct. Resp. Br. at 5, many Idaho physicians may feel compelled to provide abortions even if their consciences forbid it or, in their good faith judgment, it is not the best course of treatment.

This fear of federal enforcement is not theoretical. In this very case, the Department of Justice sued Idaho, asserting that EMTALA requires the state's hospitals to provide abortion whenever the mother's health—but not her life—is at risk. And the federal government has already investigated and cited another hospital for allegedly denying an emergency abortion even though "[t]he care provided to the patient was reviewed by the hospital and found to be in accordance with hospital policy," "met the standard of care based upon the facts known at the time,

and complied with all applicable law."[18] Both this lawsuit and the investigation demonstrate that the United States intends to use its broad interpretation of EMTALA to ensure the expansion of abortion in emergency rooms nationwide.

The leading medical organizations have shown a similar desire to twist or outright ignore federal law to expand abortion. ACOG argued to a panel of this Court that, when physicians decide an abortion is "medically necessary," the Idaho Defense of Life Act compels them "to deny necessary emergency care in violation of the age-old principles of beneficence and non-maleficence." Br. of ACOG et al. as *Amici Curiae* Supporting Pl.-Appellee & Affirmance at 48, Dkt. No. 46.[19] But as discussed above, abortion is rarely medically necessary. ACOG's

---

[18] Heidi Schmidt & Malik Jackson, *University of Kansas Health Investigated for not Providing Emergency Abortion*, Fox4KC News (May 2, 2023), http://tinyurl.com/ywps943j.

[19] This statement is rooted in the Hippocratic Oath but fails to mention that the original Hippocratic Oath specifically pledged not to provide medicine or herbs to induce an abortion. Fritz Baumgartner & Gabriel Flores, *Contemporary Medical Students' Perceptions of the Hippocratic Oath*, 85 Linacre Q. 63, 70 (2018) ("I will give no deadly medicine to anyone if asked, nor suggest any such counsel; and in like manner I will not give to a woman a pessary to produce abortion." (quoting Hippocrates, The Oath (Francis Adams trans. 1849) (400 B.C.)).

argument, as stated earlier, ignores the two-patient paradigm and that the principles of beneficence and non-maleficence also apply to the unborn child—in medical practice as well as the text of EMTALA.[20]

The response of medical organizations to recent abortion restrictions further highlights how abortion is being prioritized over legal requirements. Leading medical organizations, such as ACOG and the American Medical Association (AMA), explicitly support abortion as essential healthcare. And they view any restrictions on abortion as

---

[20] While ACOG provides clinical practice guidelines for members that are developed through a peer-review process that generally ensures that the recommendations are based on science, ACOG has not abided by that scientific standard in its guidance about abortion. ACOG's publications on abortion are crafted by prominent abortion advocates, such as Mitchell Creinin (consultant for Danco, the manufacturer of the abortion drug, mifepristone) and Daniel Grossman (Director of ANSIRH, a vocal abortion advocacy organization), who collaborated on ACOG, *Practice Bulletin No. 225, Medication Abortion Up to 70 Days of Gestation*, 136 Obs. & Gyn. e31 (2020, *reaff'd* 2023), and (in Grossman's case) who cowrote ACOG, *Practice Bulletin No. 135, Second-Trimester Abortion*, 121 Obs. & Gyn. 1394, 1394 (2013). *See* Shelly Kaller et al., *Pharmacists' Knowledge, Perspectives, and Experiences with Mifepristone Dispensing for Medication Abortion*, 61 J. Am. Pharmacists Ass'n 785 (2021) (including disclosures for Grossman and Creinin). Dr. Grossman is also the Principal Investigator of the clinical trials to test pharmacy dispensation of mifepristone for abortion. U.S. Nat'l Libr. of Med., *NCT03320057, Medication Abortion Via Pharmacy Dispensing*, ClinicalTrials.gov, https://classic.clinicaltrials.gov/ct2/show/NCT033 20057 (accessed Sept. 19, 2024).

"reckless government interference in the practice of medicine that is dangerous to the health of our patients."[21] The AMA president has further stated: "Under extraordinary circumstances, the ethical guidelines of the profession support physician conduct that sides with their patient's safety and health, acknowledging that this may conflict with legal constraints that limit access to abortion or reproductive care."[22] In other words, abortion trumps the law.

By interpreting EMTALA in an erroneous way that blatantly contradicts the Idaho Act's protections for both mothers and their unborn children and that mandates, or, at a minimum, strongly suggests that abortions are needed in non-emergency situations, the federal government has now reiterated the message that the provision of abortion-related care must come before all else, including the plain text of laws, physicians' ethical obligations under the two-patient paradigm, physicians' individual medical judgments, and states' ability to regulate abortion after *Dobbs*. Applying EMTALA's plain text, this Court's panel

---

[21] Am. Med. Ass'n, *AMA Announces New Adopted Policies Related to Reproductive Health Care* (Nov. 16, 2022), https://tinyurl.com/4w7cbzzp.
[22] *Id.*

was correct to reject that message, and the *en banc* court should do the same.

## CONCLUSION

EMTALA, like the Idaho law at issue, protects both mothers and their unborn children. Yet the United States now promotes, and even requires, the destruction of the unborn child even when it is unnecessary to preserve the life of the mother. Because the United States' interpretation of EMTALA is deeply flawed and will—in many instances—require physicians to participate in non-emergency abortions, the district court's preliminary injunction should be vacated.

September 20, 2024

Respectfully submitted,

*/s/ Gene C. Schaerr*
Gene C. Schaerr
  *Counsel of Record*
Cristina Martinez Squiers
Justin A. Miller
Miranda Cherkas Sherrill
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136

*Counsel for* Amicus Curiae
*Charlotte Lozier Institute*

28

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. App. P. 25(d), I hereby certify that on September 20, 2024, I filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system; service on counsel for all parties was accomplished by electronic mail or by service through the Court's electronic filing system.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

## CERTIFICATE OF COMPLIANCE

The foregoing brief contains 5,716 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in 14-point Century Schoolbook font.

September 20, 2024                    */s/ Gene C. Schaerr*
                                      Gene C. Schaerr