# Nos. 23-35440, 23-35450

## In the United States Court of Appeals for the Ninth Circuit

————————

**United States of America**,
*Plaintiff-Appellee,*

*v.*

**State of Idaho**,
*Defendant-Appellant,*

*v.*

**Mike Moyle**, in his official capacity as
Speaker of the Idaho House of Representatives, et al.,
*Movants-Appellants*,

————————

On Appeal from the United States District Court
for the District of Idaho
Hon. B. Lynn Winmill, No. 1:22-cv-00329-BLW

————————

**BRIEF OF *AMICUS CURIAE* NATIONAL RIGHT TO LIFE COMMITTEE IN SUPPORT OF APPELLANTS AND REVERSAL**

James Bopp, Jr.
  *Counsel of Record*
Taylor C. Shetina
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, IN 47807
(812) 232-2434 Telephone
(812) 235-3685 Facsimile
jboppjr@aol.com
tshetina@bopplaw.com
*Attorneys for Amicus Curiae*

September 20, 2024

## CORPORATE DISCLOSURE STATEMENT

National Right to Life Committee has no parent corporation and no publicly held corporation owns 10% or more of its stock. Fed. R. App. P. ("**FRAP**") 26.1.

# TABLE OF CONTENTS

Corporate Disclosure Statement .................................................. ii

Table of Contents .................................................................... iii

Table of Authorities .................................................................. v

Identity and Interest of Amicus ................................................ 1

Summary of Argument ............................................................. 3

Argument.................................................................................. 5

    I. EMTALA establishes a baseline for emergency treatment, not a national medical standard of care. ................................................. 5

        A. HHS overreach distorts EMTALA's limited scope.................... 5

            1. EMTALA's original purpose aligns with narrow statutory requirements. ..................................................... 5

            2. HHS expansion threatens core principles of Federalism... 6

            3. Medical negligence in emergency departments falls under state jurisdiction, not EMTALA. ........................................ 8

        B. States play vital roles in establishing and enforcing medical care standards. ...................................................................... 12

            1. Landmark precedents affirm unwavering state authority in healthcare. .................................................................... 13

            2. State-tailored approaches outperform one-size-fits-all Federal standards. ........................................................... 14

C.  States hold constitutional authority to regulate medical
    standards. ................................................................ 15

    1.  Historical precedent affirms state authority over medical
        regulation.  ...................................................... 15

    2.  The scope of state authority in medical regulation. ......... 17

D.  Critical state oversight safeguards patient care in abortion
    services. ................................................................. 18

    1.  Essential physician qualifications specified by state
        authority. ........................................................ 19

    2.  Comprehensive training standards are mandated through
        state regulation. ................................................ 20

II. Executive branch fails to apply consistent Federalism standard in
    public health policy. ................................................... 23

A.  Opioid crisis and abortion access reveal stark federal-state
    health policy tensions.  ............................................... 23

B.  Federal overreach on abortion contrasts sharply with state
    deference on opioid response. ........................................ 26

C.  Executive branch respects state autonomy on opioids, while
    undermining federalism on abortion. ................................. 31

Conclusion ...................................................................... 36

Certificate of Service ........................................................... 37

Certificate of Compliance ...................................................... 38

# TABLE OF AUTHORITIES

**Cases**

*Bryant v. Adventist Health System/West,*

289 F.3d 1162 (9th Cir. 2002) ........................................................... 10

*Chiles v. Salazar,*

2024 U.S. App. LEXIS 23181 (10th Cir. Sep. 12, 2024) ................... 17

*Crowder v. Kitagawa,*

81 F.3d 1480 (9th Cir. 1996) ............................................................. 21

*Cruzan v. Dir., Mo. Dep't of Health,*
497 U.S. 261 (1990) ........................................................................... 18

*Dent v. West Virginia,*
129 U.S. 114 (1889) .................................................................... 13, 16

*Dobbs v. Jackson Women's Health Organization,*
142 S. Ct. 2228 (2022) ...................................................................... 35

*Douglas v. Noble,*
261 U.S. 165 (1923) ........................................................................... 15

*Eberhardt v. City of Los Angeles,*
62 F.3d 1253 (9th Cir. 1995) ............................................................. 10

*Florida v. Thomas,*
532 U.S. 774 (2001) ........................................................................... 16

*Gonzales v. Carhart,*
550 U.S. 124 (2007) ........................................................................... 13

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ........................................................................... 13

*Graves* v. *Minnesota*,
272 U.S. 425 (1926) .............................................................. 16

*Harris* v. *McRae*,
448 U.S. 297 (1980) .............................................................. 11

*Hillsborough Cty. v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985) ................................................................ 8

*Jackson v. East Bay Hosp.*,
246 F.3d 1248 (9th Cir. 2001) ........................................... 10

*L.W. v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ..................................... 17, 18

*Lambert v. Yellowley*,
272 U.S. 581 (1926) .............................................................. 17

*Maher* v. *Roe*,
432 U.S. 464 (1977) .............................................................. 11

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ..................................................... 18, 19

*Snipes v. DeTella*,
95 F.3d 586 (7th Cir. 1996) ............................................... 12

*Summers v. Baptist Med. Ctr. Arkadelphia*,
91 F.3d 1132 (8th Cir. 1996) ............................................. 11

*Vacco v. Quill*,
521 U.S. 793 (1997) .............................................................. 18

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ..................................................... 17, 19

*Watson v. Maryland*,
   218 U.S. 173 (1910) ................................................ 16, 17

*Williamson v. Lee Optical of Okla., Inc.*,
   348 U.S. 483 (1955) ..................................................... 16

*Woodfield v. Bd. of Prof'l Discipline of the Idaho State Bd. of Med.*,
   127 Idaho 738 (Ct. App. 1995) .......................................... 22

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ................................................ 18, 19

*Youngberg v. Romeo*,
   457 U.S. 307 (1982) ..................................................... 11

**Statutes**
42 U.S.C. §1395dd ............................................... 5-7, 9, 10

H.B. 3908, 2023 Leg., 88th Sess. (Tex. 2023) ........................ 29

H.R. Rep. No. 99-241 (1985) ............................................. 5

Idaho Code §18-608a .................................................. 20

Idaho Code §18-622 ..................................................... 8

Idaho Code §54-1814(7) .............................................. 22

Pub. L. 99-272, §9121(b), 100 Stat. 164-167 (1986) ................. 5

Pub. L. No. 91-513, 84 Stat. 1236 ..................................... 25

Pub. L. No. 99-570, 100 Stat. 2307 .................................... 25

S.C. Code Regs. 61-12 ................................................. 20

**Regulations**
42 C.F.R. § 493 ........................................................ 13

vii

45 C.F.R. § 160.203 .................................................................. 13

68 Fed. Reg. 53,222 (Sept. 9, 2003) .......................................... 7

CDC, *Opioids: Understanding the Opioid Overdose Epidemic* (April 5, 2024), https://www.cdc.gov/overdose-prevention/about/understanding -the-opioid-overdose-epidemic............................................. 24

CMS, *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss,* (QSO-21-22-Hospitals-UPDATED JULY 2022), July 11, 2022.... 8, 12

The White House Exec. Office of the President Office of National Drug Control Policy, "2024 National Drug Control Strategy," (May 6, 2024), https://www.whitehouse.gov/wp-content/uploads/2024/05/2024 -National-Drug-Control-Strategy.pdf ........................................ 32-34

U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., *The Emergency Medical Treatment and Labor Act: The Enforcement Process* (Jan. 2001) ........................................................... 10

**Other Authorities**

Catherine Gutierrez, et al., *State Regulation Of Freestanding Emergency Departments Varies Widely, Affecting Location, Growth, And Services Provided*, Health Affairs 35 (2016).............................. 14

Centers for Medicare & Medicaid Services, *Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022) .................................... 8

Code of Ethics for Emergency Physicians, *Annals of Emergency Medicine*, Volume 70, Issue 1 (July 1, 2017) .................................... 22

Congressional Research Service, *Abortion Training for Medical Students and Residents* (Sept. 7, 2022), https://crsreports.congress.gov/product/pdf/IN/IN12002 ................ 21

Corey Davis, *Legality of Drug Checking Equipment in the United States*, NETWORK FOR PUB. HEALTH L. (August 2024), https://www.networkforphl.org/wp-content/uploads/2024/08/2024-50-State-DCE-Fact-Sheet.pdf. ................................................................. 27

Drug Paraphernalia: Hearing Before the House of Representatives Select Committee on Narcotics Abuse and Control, 96th Cong., 1st Sess., (Statement of Irvin Nathan, Deputy Assistant Attorney General, U.S. Department of Justice) (1979) .................................... 25

Guttmacher Institute, *See An Overview of Abortion Laws* (Nov. 23, 2022), https://www.guttmacher.org/state-policy/explore/state-policies-later-abortions ................................................................... 20

Legislative Analysis & Public Policy Association, *Drug Checking Equipment, Needles/Syringes, and Drug Paraphernalia: Summary of State Laws* (Jan. 19, 2024), https://legislativeanalysis.org/wp-content/uploads/2024/03/FTS-and-Paraphernalia-Laws-January-2024-updated.pdf ....................... 24, 25

Legislative Analysis & Public Policy Association, *Model Expanded Access to Emergency Opioid Antagonists Act* (2021), https://legislativeanalysis.org/model-expanded-access-to-emergency-opioid-antagonists-act/ ................................................................... 32

Legislative Analysis & Public Policy Association, *Model Fentanyl Test Strip and Other Drug Checking Equipment Act* (2023), https://legislativeanalysis.org/wp-content/uploads/2023/04/Model-Fentanyl-Test-Strip-and-Other-Drug-Checking-Equipment-Act-FINAL.pdf.................................................................................................. 32

Legislative Analysis & Public Policy Association, *Model Syringe Services Program Act* (2021), https://legislativeanalysis.org/model-syringe-services-program-act/ 32

Leiona J. Noah, *Article: U.S. Drug Reform: A Cultural Shift*, 35 St. Thomas L. Rev. 55 ............................................................................. 26

Maya Manian, *Articles: The Ripple Effects of Dobbs on Health Care Beyond Wanted Abortion*, 76 SMU L. Rev. 77 (March 21, 2023) ..... 21

N.Y. Times, Allison McCann et al., *Tracking the States Where Abortion is Now Banned* (Sept. 17, 2024), https://www.nytimes.com/interactive/2024/us/abortion-laws-roe-v-wade.html ............................................................................. 29

Nadia Sawicki, *Character, Competence, and the Principles of Medical Discipline*, 13 J. Health Care L. & Pol'y 285 (2010) ........................ 15

Nat'l Conf. of State Legislatures, *Certificate of Need State Laws* (Feb. 26, 2024), https://www.ncsl.org/health/certificate-of-need-state-laws 15

National Right to Life Committee, *State Legislation* (August 12, 2024), https://nrlc.org/statelegislation/ ........................................................ 29

Nat'l Conference of State Legislatures, *State Abortion Laws: Protections and Restrictions* (Jan. 29, 2024), https://www.ncsl.org/health/state-abortion-laws-protections-and-restrictions............................................................................................. 19

Office of Inspector Gen., *The Emergency Medical Treatment and Labor Act: The Enforcement Process* (2001) ................................................. 10

Press Release, Office of the Texas Governor, Governor Abbott Signs Pivotal Measures To Combat Fentanyl Crisis (June 14, 2023), https://gov.texas.gov/news/post/combat. ........................................... 28

Randy Beck, *Article: Prioritizing Abortion Access Over Abortion Safety in Pennsylvania*, 8 U. St. Thomas J.L. & Pub. Pol'y 33 (2013) ........ 18

The Fuller Project, Erica Hensley et al., *How Major Abortion Laws Compare, State by State* (May 1, 2024), https://fullerproject.org/story/how-major-abortion-laws-compare-state-by-state-map/ ..................................................................................... 29

## IDENTITY AND INTEREST OF AMICUS[1]

Founded in 1968, the National Right to Life Committee, Inc.

("**NRLC**") is the nation's oldest and largest pro-life organization. NRLC

is the federation of 50 state right-to-life affiliates and more than 3,000

local chapters. Through education and legislation, NRLC is working to

restore legal protection to the most defenseless members of our society

who are threatened by abortion, infanticide, assisted suicide, and

euthanasia. NRLC and its related entities also have a long history of

working to protect maternal health.

NRLC's *general* interest in this case is rooted in its unwavering

dedication to preserving and promoting a culture of life across the

United States. This commitment necessarily involves safeguarding the

constitutional balance between federal and state authority in matters of

public health and medical regulation. As an organization deeply

involved in pro-life legislative efforts across the country, NRLC has a

profound interest in ensuring that states retain their historical and

---

[1] No party counsel authored this brief in whole or part, and no party, party counsel, or other person (other than amicus, its members, or its counsel) contributed money intended to fund preparing or submitting this brief. FRAP 29(a)(4)(E). All parties consented to filing this brief. FRAP 29(a)(2).

1

constitutional authority to regulate medical practices, particularly abortion, in accordance with the pro-life values of their citizens.

NRLC's *specific* interest here is in challenging the Department of Health and Human Services' ("**HHS**") expansive interpretation of the Emergency Medical Treatment and Labor Act ("**EMTALA**"), which threatens to mandate the performance of abortions in violation of state laws protecting unborn life. NRLC is gravely concerned that this federal overreach, if left unchecked, could have far-reaching consequences beyond abortion regulation, potentially eroding state authority to enact and enforce pro-life legislation across a wide spectrum of issues.

Furthermore, given NRLC's extensive work in advocating for the protection of both unborn children and their mothers, the organization has a particular interest in ensuring that medical standards of care remain under state jurisdiction. NRLC firmly believes that states are best positioned to craft and enforce regulations that safeguard both unborn life and maternal health, taking into account local medical resources, community values, and the need to protect the most vulnerable members of society.

## SUMMARY OF ARGUMENT

This case fundamentally challenges the notion that an executive agency can unilaterally redefine the scope of federal law to suit its policy preferences, potentially undermining the constitutional balance between state and federal authority in healthcare regulation.

At issue is not merely the interpretation of EMTALA, but the preservation of state sovereignty in regulating medical practice against capricious federal overreach. The regulation of medical standards of care has historically been within state jurisdiction, a principle this Court has consistently upheld for over a century. States' authority to regulate medical practice, including abortion services, stems from their fundamental police powers, a cornerstone of our federal system that cannot be casually displaced by executive order.

EMTALA's original intent was narrow and specific: to ensure emergency care access for vulnerable populations, not to establish a sweeping federal mandate for specific medical procedures. HHS' recent reinterpretation of EMTALA represents a stark departure from this intent, attempting to contrive a federal abortion mandate that contradicts both the statute's original purpose and its express language.

3

This is not a mere policy adjustment, but an alarming instance of an executive agency attempting to rewrite law through administrative guidance.

This executive overreach threatens to upend the careful balance struck by Congress, which explicitly limited EMTALA's preemptive effect. States have long played a crucial role in regulating abortion services, from establishing facility requirements to setting training standards for providers. This state-level oversight is not just a legal formality, it's a critical safeguard ensuring that medical procedures align with community standards and values.

The federal government's inconsistent approach to state authority in public health policy further underscores the arbitrary nature of this overreach. In addressing the opioid crisis, the federal government has adopted a collaborative stance, respecting state autonomy. Yet, in abortion policy post-*Dobbs*, the administration has aggressively sought to override state authority through novel, expansive interpretations of existing law. This stark disparity suggests that the respect for state authority is being selectively applied based on the political priorities of the current administration, rather than on consistent constitutional

principles.

## ARGUMENT

## I.
## EMTALA establishes a baseline for emergency treatment, not a national medical standard of care.

## A. HHS overreach distorts EMTALA's limited scope.

### 1. EMTALA's original purpose aligns with narrow statutory requirements.

EMTALA was enacted by Congress in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**") of 1985. *See* Pub. L. 99-272, §9121(b), 100 Stat. 164-167 (codified as amended 42 U.S.C. 1395dd). Its primary purpose was to address the growing concern over "patient dumping," where hospitals would transfer uninsured or indigent patients without stabilizing their emergency medical conditions.

The legislative history unequivocally demonstrates Congress's narrow intent. As the House Report stated, Congress was "concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." H.R. Rep. No. 99-241, Pt. 1,

at 27 (1985). This clear statement underscores that EMTALA was never intended to establish a national standard of medical practice or supplant state authority in healthcare regulation.

EMTALA's statutory language reflects this limited purpose, requiring Medicare-participating hospitals with emergency departments to provide appropriate medical screening to any individual seeking examination or treatment, regardless of their ability to pay, 42 U.S.C. 1395dd(a), and to provide stabilizing treatment within the hospital's capabilities if an emergency medical condition is identified. 42 U.S.C. 1395dd(b). These requirements establish a baseline for emergency treatment access, not a comprehensive federal standard of care.

## 2. HHS expansion threatens core principles of Federalism.

HHS has attempted to expand EMTALA's scope far beyond its original intent and statutory language. On July 11, 2022, the Centers for Medicare & Medicaid Services ("**CMS**") issued guidance purporting to discover a federal abortion mandate within EMTALA's stabilization requirement. This interpretation not only contradicts EMTALA's plain language but also conflicts with HHS's own 2003 guidance, which

explicitly stated that "EMTALA does not purport to establish a medical malpractice cause of action nor establish a national standard of care." 68 Fed. Reg. 53,222, 53,222 (Sept. 9, 2003) (codified at 42 C.F.R. 489.24).

Moreover, HHS's broad preemption interpretation directly contradicts EMTALA's express statutory language on preemption: "[t]he provisions of this section do not preempt any state or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. 1395dd(f). This unambiguous text signals Congress's intent to allow state laws to reinforce and supplement EMTALA's federal emergency care requirements, not to establish sweeping federal preemption of state healthcare regulation.

By attempting to impose a federal standard of care through novel interpretations of EMTALA, HHS has exceeded its statutory authority and encroached upon the traditional domain of state regulation of medical practice. This overreach threatens the delicate balance of federalism in healthcare regulation. As courts have consistently held, the regulation of health and safety matters, including the practice of

medicine, "is primarily, and historically, a matter of local concern." *See Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719, 105 S. Ct. 2371, 2378 (1985).

### 3. Medical negligence in emergency departments falls under state jurisdiction, not EMTALA.

HHS issued guidance erroneously interpreting EMTALA as requiring physicians to provide specific stabilizing treatments regardless of medical judgment or standards of care. *See* CMS, *Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022).[2] The government employed the aforementioned guidance as a foundational basis to assert that Idaho's Defense of Life Act, Idaho Code § 18-622, contravenes federal legislation by precluding the provision of abortions when deemed "necessary" for stabilizing treatment pursuant to EMTALA.

Pursuant to EMTALA, all Medicare-participating hospitals offering

---

[2] The HHS guidance reads:
"If a physician believes that a pregnant woman presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician *must* provide that treatment."
*Id.*

emergency services must adhere to exacting federal requirements. First, the hospital must provide any individual who arrives at the emergency department requesting examination or treatment an appropriate medical screening to identify whether an emergency medical condition exists. *See* 42 U.S.C. 1395dd(a). The statute specifically defines emergency medical condition as one manifesting itself through acute symptoms of sufficient severity that absence of immediate medical attention could reasonably result in serious medical risk. Secondly, if the medical screening reveals an emergency medical condition, the hospital must further offer stabilizing treatment within its capacities. *See* 42 U.S.C. 1395dd(e)(3)(A). Should the hospital lack adequate capability to fully stabilize the patient, it maintains the duty to implement an appropriate transfer to another facility equipped to offer essential curative care. *See* 42 U.S.C. 1395dd(c)(1)(B) (requiring the transfer to be "appropriate"). EMTALA confers these protections universally to all patients presenting at emergency departments, not merely Medicare beneficiaries. Hospitals face civil monetary penalties of up to $50,000 per violation. *See* 42 U.S.C. 1395dd(d)(1)(A)-(B). Each responsible physician can face a penalty of not more than $50,000 for

each individual violation. 42 U.S.C. 1395dd(d)(1)(B). In addition to monetary penalties, severe violations can lead to termination of the hospital or provider's Medicare Provider Agreement. *See* US Department of Health & Human Services: Office of Inspector General, The Emergency Medical Treatment and Labor Act: The Enforcement Process (Jan. 2001), 6.

EMTALA does *not* provide a cause of action for negligent emergency screening, diagnosis, or treatment. This Court has found that EMTALA was not promulgated with the intent of establishing a federal medical malpractice cause of action, nor a national standard of care. *See Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1168 (9th Cir. 2002); *see also Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001) ("We hold that a hospital satisfies EMTALA's 'appropriate medical screening' requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not 'designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'" (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257 (9th Cir.

1995))).[3] As evidenced in these cases and EMTALA's plain language, the statute sets a floor for non-discriminatory emergency access, not a federal malpractice standard. Negligent emergency care claims have always resided under state jurisdiction.

A state is under no constitutional duty to provide substantive services for those within its border. *See Youngberg v. Romeo, 457 U.S. 307, 317, 102 S. Ct. 2452, 2459 (1982)*; *Harris v. McRae*, 448 U.S. 297, 318, 100 S. Ct. 2671, 2689 (1980) (upholding the Hyde Amendment, which restricted the use of federal funds for abortions); *Maher v. Roe*, 432 U.S. 464, 469, 97 S. Ct. 2376, 2380 (1977) (finding no constitutional requirement for states to fund non-therapeutic abortions)). By claiming that EMTALA effectively levies Medicare-participating facilities to treat any emergency conditions, HHS ignores these limiting principles. This stretches EMTALA far beyond its statutory intent and into unprecedented territory.

---

[3] Moreover, the Eighth Circuit has emphasized that even non-uniform screening is governed by state malpractice law rather than EMTALA, as nearly any instance of negligent emergency department screening or diagnosis could be characterized as non-uniform treatment, such that findings of negligence pertain to state medical malpractice law and not EMTALA. *See Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136–38 (8th Cir. 1996).

Exacerbating this problem, HHS also falsely proclaims that it can dictate specific elements of emergency care requiring "abortion" as "stabilizing treatment," "irrespective of any state laws or mandates that apply to specific procedures." *See* HHS, CMS, Guidance Document QSO-22-22-Hospitals (July 11, 2022). In effect, HHS has claimed for itself, the ability not just to invent duties, but to define the particular clinical standards by which those obligations must be discharged. This usurpation finds no support in statute or precedent. EMTALA cannot override the fundamental notion that "the Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

## B. States play vital roles in establishing and enforcing medical care standards.

The regulation of medical practice, including the establishment and enforcement of standards of care, has long been recognized as a fundamental aspect of states' police powers. Courts have consistently upheld the primacy of state authority in this domain, recognizing that states are best positioned to address the unique healthcare needs and priorities of their populations. "The law need not give abortion doctors

12

unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community." *Gonzales v. Carhart*, 550 U.S. 124, 163, 127 S. Ct. 1610, 1636 (2007). The recent attempts by HHS, to expand EMTALA's scope, threaten to undermine this well-established framework of state regulation.

### 1. Landmark precedents affirm unwavering state authority in healthcare.

For over a century, courts have affirmed the states' authority to regulate medical practice. *See, e.g.*, *Dent v. West Virginia*, 129 U.S. 114, 32 L. Ed. 623, 9 S. Ct. 231 (1889) (upholding a requirement of licensing before a person can practice medicine); *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (preventing federal interference with Oregon's medical standards, emphasizing "structure and limitations of federalism."

The complementary function of federal and state healthcare laws further underscores the critical role of states in establishing standards of care. For instance, the Clinical Laboratory Improvement Amendments of 1988 ("**CLIA**") allow states to set more stringent standards for laboratory testing. *See* 42 C.F.R. 493. Similarly, the Health Insurance Portability and Accountability Act ("**HIPAA**") explicitly permits states to enact stronger privacy protections. *See* 45

C.F.R. 160.203(b). These federal frameworks demonstrate a long-standing recognition of states' expertise in tailoring healthcare regulations to local needs.

### 2. State-tailored approaches outperform one-size-fits-all Federal standards.

States' ability to craft emergency department regulations that address local needs is crucial for ensuring effective healthcare delivery. For example, Texas allows flexible models for freestanding emergency departments ("**FSEDs**") to promote healthcare industry growth, while California prohibits FSEDs to control costs. *See* Catherine Gutierrez, et al., State Regulation Of Freestanding Emergency Departments Varies Widely, Affecting Location, Growth, And Services Provided, *Health Affairs* 35, 1857 (2016). This variability allows states to optimize consumer protections for their specific contexts, a nuance approach that a one-size-fits-all federal standard could never achieve.

Moreover, states have implemented additional oversight mechanisms that exceed EMTALA's requirements. Twenty-four states require newly established FSEDs to obtain certificates of need, while 21 others mandate state licenses demonstrating compliance with operational, staffing, and capability standards beyond EMTALA's

14

baseline. *See* Certificate of Need State Laws, Nat'l Conf. of State

Legislatures (Feb. 26, 2024),

https://www.ncsl.org/health/certificate-of-need-state-laws. These

state-level initiatives demonstrate the critical role of local governance in

ensuring high-quality emergency care.

## C. States hold constitutional authority to regulate medical standards.

The regulation of medical practice, including the establishment and

enforcement of standards of care, has long been recognized as a

fundamental aspect of states' police powers.

### 1. Historical precedent affirms state authority over medical regulation.

The Tenth Amendment reserves powers not expressly delegated to

the federal government under the Constitution to the state

governments.  U.S. Const. amend. X.  Regulating health, safety, and

welfare through professional licensure is a longstanding component of

states' police powers under this framework of federalism.[4] *See Douglas*

---

[4] *See* Nadia Sawicki, *Character, Competence, and the Principles of Medical Discipline*, 13 J. Health Care L. & Pol'y 285, 289-94 (2010) (tracing state authority to establish medical licensing boards through its history and practice).

*v. Noble*, 261 U.S. 165, 170, 43 S. Ct. 303, 305 (1923) (upholding state's power to license dentists); *Graves v. Minnesota*, 272 U.S. 425, 429, 47 S. Ct. 122, 123 (1926) (upholding state's regulation of licensed dentists and physicians); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 491, 75 S. Ct. 461, 466 (1955) (upholding state law regulating opticians as legitimate use of state's police power). Professional integrity, competency examinations, disciplinary procedures, and scopes of practice have remained squarely within state medical boards' authority throughout case law.

As noted in *Dent v. West Virginia*, states have exercised their power to "secure. . . against the consequences of ignorance and incapacity as well as of deception and fraud" by medical professionals. 129 U.S. 114, 122, 9 S. Ct. 231, 233 (1889). This principle was reaffirmed in *Watson v. Maryland*, when a statute regulating the practice of medicine was held constitutional after attacks against provisions granting exemptions and exceptions to its operation.218 U.S. 173, 176 (1910).

The tenth circuit, just this month, recognized that "the medical profession is obviously one of those vocations where the power of the state may be exerted to see that only properly qualified persons shall

undertake its responsible and difficult duties." *Chiles v. Salazar*, Nos. 22-1445, 23-1002, 2024 U.S. App. LEXIS 23181, at *46 (10th Cir. Sep. 12, 2024) (quoting *Watson*, 218 U.S. at 176) (cleaned up). Indeed, "[t]here is no right to practice medicine which is not subordinate to the police power." *Lambert v. Yellowley*, 272 U.S. 581, 587, 47 S. Ct. 210, 211 (1926).

## 2. The scope of state authority in medical regulation.

The breadth of state authority in regulating medical practice is expansive. As the Sixth Circuit observed, "[t]his country does not have a 'deeply rooted' tradition of preventing governments from regulating the medical profession in general or certain treatments in particular. . . ." *L.W. v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023). The court further noted that "[s]tate and federal governments have long played a critical role in regulating health and welfare, . . . [and] have an abiding interest 'in protecting the integrity and ethics of the medical profession . . . .'" *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731, 117 S. Ct. 2258, 2273, 117 S. Ct. 2302, 2273 (1997)).

This authority extends to the regulation of specific medical treatments and practices. As the Sixth Circuit stated, "[s]o long as a

federal statute does not stand in the way and so long as an enumerated constitutional guarantee does not apply, the States may regulate or ban medical technologies they deem unsafe." *L.W. v. Skrmetti*, 83 F.4th 460, 474 (6th Cir. 2023). This principle has been applied consistently across various medical contexts, including vaccine labeling, assisted suicide, medical device regulation, and life support decisions. *See Wyeth v. Levine*, 555 U.S. 555, 574-75, 129 S. Ct. 1187, 1200 (2009); *Vacco v. Quill*, 521 U.S. 793, 807-08, 117 S. Ct. 2293, 2302; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 281, 110 S. Ct. 2841, 2852 (1990).

## D. Critical state oversight safeguards patient care in abortion services.

States have long played a crucial role in regulating abortion services, a practice that is firmly rooted in their constitutional authority to protect public health and safety. This regulatory power extends to establishing legal requirements for facilities and practitioners, ensuring patient safety, and standardizing the quality of care in this medically and ethically complex field. *See* Randy Beck, *Article: Prioritizing Abortion Access Over Abortion Safety in Pennsylvania*, 8 U. St. Thomas

18

J.L. & Pub. Pol'y 33, 40-41 (2013). While federal legislation and judicial precedent may provide an overarching framework for abortion rights, the implementation and oversight of clinical standards have traditionally fallen under state jurisdiction.

As courts have consistently recognized, health regulations fall squarely within "the historic police powers of the States." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). This includes the regulation of medical treatments and procedures, which is "a field which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009). The states' deep interest "in protecting the integrity and ethics of the medical profession" is particularly relevant in the context of abortion services. *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)).

### 1. Essential physician qualifications specified by state authority.

States have enacted a diverse range of laws regarding which medical providers may perform abortion services. The majority of states mandate that surgical abortions be performed by licensed physicians, reflecting a careful balancing of safety concerns and access to care.[5] For

---

[5] *See* Nat'l Conference of State Legislatures, State Abortion Laws: Protections and Restrictions (Jan. 29, 2024), https://www.ncsl.org/health/state-abortion-laws-protections-and-restrict

instance, Idaho law requires that surgical abortions be performed by a licensed physician in a hospital or licensed abortion facility. Idaho Code §18-608a. These requirements embody state judgments about the level of expertise necessary to ensure patient safety in these procedures.

The variations in state laws demonstrate the importance of allowing states to tailor their regulations to local needs and capabilities. Some states have implemented more stringent requirements, such as mandating the presence of two physicians for abortions after 22 weeks gestation.[6] South Carolina requires additional training and board certification requirements for physicians performing abortions after 14 weeks gestation. *See* S.C. Code Regs. 61-12, Part III. This regulation reflects the state's judgment that later abortions require heightened provider qualifications to minimize patient risk.

## 2. Comprehensive training standards are mandated through state regulation.

States have a recognized duty, grounded in their police powers, to

---

ions

[6] *See* Guttmacher Institute, See An Overview of Abortion Laws (Nov. 23, 2022),
https://www.guttmacher.org/state-policy/explore/state-policies-later-abortions

safeguard public health by regulating the medical profession to ensure clinical competency. Courts generally do not "second-guess the public health and safety decisions of state legislatures acting within their traditional police powers." *Crowder v. Kitagawa*, 81 F.3d 1480,1485 (9th Cir. 1996). This is particularly crucial in the context of abortion services, where inadequate training can pose significant risks to patient safety. The current federal framework for abortion education in medical training is insufficient to ensure comprehensive competency. See Maya Manian, Articles: The Ripple Effects of Dobbs on Health Care Beyond Wanted Abortion, 76 SMU L. Rev. 77, (March 21, 2023) (highlighting how abortion bans may negatively impact medical education and prenatal care by limiting ob-gyn training opportunities, particularly in states likely to ban abortion post-Dobbs, and noting potential disproportionate effects on underrepresented groups in medicine and underserved populations). Federal law only requires basic abortion education in OB/GYN residencies, allowing other programs to omit such training entirely.[7]

---

[7] Congressional Research Service, Abortion Training for Medical Students and Residents (September 7, 2022), https://crsreports.congress.gov/product/pdf/IN/IN12002

In response to this lax federal oversight, states like South Carolina have implemented more stringent requirements, such as demanding advanced credentials for physicians performing later-term abortions. These state-level interventions are crucial for mitigating safety risks and ensuring provider competency in complex procedures.[8] EMTALA's broad interpretation, however, threatens to override these state efforts to ensure adequate training and competency. By potentially compelling hospitals to perform emergency abortions regardless of state-mandated qualifications, EMTALA could force barely-trained physicians to perform complex procedures, posing grave risks to patient safety.[9]

---

[8] *See, e.g.*, Idaho Code §54-1814(7) provides that a licensed physician is subject to discipline by the Board if the physician provides health care "which fails to meet the standard of health care provided by other qualified physicians in the same community or similar communities, taking into account his training, experience and the degree of expertise to which he holds himself out to the public." *See also Woodfield v. Bd. of Prof'l Discipline of the Idaho State Bd. of Med.*, 127 Idaho 738, 742, 905 P.2d 1047, 1051 (Ct. App. 1995).

[9] *See* Code of Ethics for Emergency Physicians, 70 Annals of Emergency Medicine 1, E7-E15 (July 1, 2017) ("In order to protect patients from avoidable harm, physicians who lack appropriate training and experience in emergency medicine should not misrepresent themselves as emergency physicians and should not practice without supervision in the emergency department or prehospital setting.").

## II.
## Executive branch fails to apply consistent Federalism standard in public health policy.

The United States' federal system is currently facing a critical test in the realm of public health policy, exemplified by the stark contrast between the federal government's approaches to the opioid crisis and abortion access. This disparity not only undermines the principles of federalism but also threatens the long-established authority of states to determine medical standards of care. The federal government's inconsistent application of federalist principles across these two public health issues reveals a troubling pattern of selective deference to state authority based on policy preferences rather than constitutional principles. This approach not only jeopardizes the integrity of our federal system, but also risks undermining the ability of states to effectively regulate medical practices in response to local needs and values.

### A. Opioid crisis and abortion access reveal stark federal-state health policy tensions.

The opioid epidemic and the abortion debate represent two of the

most pressing public health and social issues facing the United States in recent years. Both have profound impacts on communities across the nation, and both have traditionally fallen under state purview for regulation and policy-making. However, the federal government's approach to these issues could not be more different, revealing a troubling inconsistency in its respect for state autonomy and federalism. The opioid crisis, like the abortion debate, affects every state in the nation.[10] It has required a multifaceted response involving federal, state, and local policymakers to implement various programs aimed at helping people who use drugs ("**PWUD**"). Two key emerging policies in this fight are the increased distribution of drug checking equipment ("**DCE**") and the expansion of syringe services programs ("**SSPs**").[11]

However, the implementation of these harm reduction strategies

---

[10]  *See* Opioids: Understanding the Opioid Overdose Epidemic, CDC (last updated April 5, 2024), https://www.cdc.gov/overdose-prevention/about/understanding-the-opioid-overdose-epidemic

[11]  *See* Legislative Analysis & Public Policy Association ("**LAPPA**"), Drug Checking Equipment, Needles/Syringes, and Drug Paraphernalia: Summary of State Laws (Jan 19, 2024), at 3, https://legislativeanalysis.org/wp-content/uploads/2024/03/FTS-and-Paraphernalia-Laws-January-2024-updated.pdf

faces a significant hurdle, one created by the federal government itself. In the mid-1970s, in response to a perceived loophole in the federal Comprehensive Drug Abuse Prevention and Control Act ("**CSA**"), states began enacting drug paraphernalia laws.[12] These laws, based on a model act drafted by the Drug Enforcement Administration ("**DEA**") in 1979, broadly defined drug paraphernalia to include items used for "testing, [or] analyzing" controlled substances.[13] This definition encompassed the very tools now recognized as crucial for harm reduction, such as fentanyl test strips and clean syringes.

For over 30 years, these laws remained largely unchanged, creating a legal landscape that criminalized the possession and distribution of harm reduction tools.[14] Even today, where these laws haven't been amended, they continue to chill the use and distribution of these potentially life-saving items. The federal government's current stance

---

[12] *Id.*; Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236, amended by Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 2307 (codified as amended at 21 U.S.C.§§801-971 (2006)).

[13] Drug Paraphernalia: Hearing Before the House of Representatives Select Committee on Narcotics Abuse and Control, 96th Cong., 1st Sess., 95 (Statement of Irvin Nathan, Deputy Assistant Attorney General, U.S. Department of Justice) (1979).

[14] LAPPA Summary of State Laws, at 6.

on harm reduction represents a complete reversal of its previous rhetoric.[15] It now encourages states to amend these restrictive laws and adopt more progressive harm reduction policies. This approach, providing guidance and resources while allowing states to make their own policy decisions, stands in stark contrast to the administration's handling of abortion policy post-*Dobbs*.

## B. Federal overreach on abortion contrasts sharply with state deference on opioid response.

Following the *Dobbs* decision and the ongoing opioid crisis have prompted a wide array of state-level responses, reflecting the diverse political and cultural landscapes across the nation. These varying approaches highlight the complexities of implementing public health policies in a federal system where states retain significant autonomy.

In the realm of DCE legalization, the nation has seen a dramatic

---

[15] *See* Leiona J. Noah, Article: U.S. Drug Reform: A Cultural Shift, 35 St. Thomas L. Rev. 55, 60-62 (discussing the evolution of addiction treatment approaches, from moralistic views to the disease model, and highlighting the commodification of drug rehabilitation services, including examples of exploitative practices in sober homes and the emerging trend of psychedelic drugs as potential treatments for mental health disorders).

shift in state policies between August 2021 and August 2024.[16] During

this period, 37 states enacted laws permitting the possession,

distribution, or both of DCE.[17] The specifics of these laws vary

considerably.[18] Thirty states legalized possession of all DCE.[19] Eleven

states specifically legalized fentanyl testing equipment.[20] Two states

legalized both fentanyl and xylazine testing equipment.[21] Three states

permitted equipment for testing all synthetic opioids.[22]

---

[16] *See* Corey Davis, Legality of Drug Checking Equipment in the United States, NETWORK FOR PUB. HEALTH L. (August 2024), at 2, https://www.networkforphl.org/wp-content/uploads/2024/08/2024-50-State-DCE-Fact-Sheet.pdf.

[17] *Id.*

[18] Distribution policies also saw significant changes, with 26 states clearly permitting the free provision of all DCE to adults, and nine additional states allowing distribution of fentanyl testing devices specifically. Some states, like California and Kansas, permitted distribution of equipment for checking specific substances.

[19] *Id.* at 2 n. 16. Alaska, California, Colorado, Connecticut, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, Utah, Vermont, Virginia, Washington, Washington DC, West Virginia, and Wyoming.

[20] *Id.* at 2 n. 17. Alabama, Arizona, Arkansas, Florida, Hawaii, Idaho, Louisiana, Mississippi, Ohio, Oklahoma, South Dakota.

[21] *Id.* at 2 n. 18. Delaware and Wisconsin.

[22] *Id.* at 2. Georgia, Kentucky, and Tennessee. Kansas uniquely allowed testing equipment for fentanyl, fentanyl analogs, ketamine, and

However, not all states have embraced this same harm reduction approach. Indiana, Iowa, North Dakota, Puerto Rico, and Texas have maintained strict prohibitions on DCE, subjecting all types to potential criminal penalties under drug paraphernalia laws.[23] These states have prioritized other methods of addressing the drug crisis, such as prevention, treatment, and enforcement. For example, Texas has implemented a comprehensive approach to combat the epidemic. In June 2023, Governor Greg Abbott signed four pivotal laws aimed at addressing various aspects of the crisis.[24] These laws represent a significant shift in the state's strategy, combining stricter legal consequences, improved reporting mechanisms, enhanced public education, and harm reduction measures. The new legislation allows for the prosecution of fentanyl-related deaths as murder and mandates that death certificates accurately reflect fentanyl poisoning as the cause of death when applicable.[25] To increase public awareness, especially

---

gamma-hydroxybutyric acid.

[23] *Id.*

[24] *See* Press Release, Office of the Texas Governor, Governor Abbott Signs Pivotal Measures To Combat Fentanyl Crisis (June 14, 2023), https://gov.texas.gov/news/post/combat.

[25] *Id.*

among young Texans, the state has designated October as Fentanyl Poisoning Awareness Month and requires public schools to provide fentanyl abuse prevention education to students in grades 6-12.[26] These multifaceted measures aim to curb the alarming rise in fentanyl-related fatalities and reflect the state's commitment to addressing the opioid crisis through a combination of legal, educational, and harm reduction strategies.

The abortion landscape shows an equally diverse range of state responses (as of September 13, 2024). [27] Fourteen states have banned abortion, with a majority including exceptions. While eight states have implemented gestational limits ranging from six to eighteen weeks. Twenty states and Washington D.C. have enacted laws protecting abortion access and shielding providers and patients from out-of-state

---

[26] H.B. 3908, 2023 Leg., 88th Sess. (Tex. 2023).

[27] For surveys of the laws discussed in this paragraph, *see* N.Y. Times, Allison McCann et al., Tracking the States Where Abortion is Now Banned (Sept. 17, 2024), https://www.nytimes.com/interactive/2024/us/abortion-laws-roe-v-wade.html; The Fuller Project, Erica Hensley et al., How Major Abortion Laws Compare, State by State (May 1, 2024), https://fullerproject.org/story/how-major-abortion-laws-compare-state-by-state-map/; National Right to Life Committee, State Legislation (August 12, 2024), https://nrlc.org/statelegislation/.

laws. Eight states have recognized or enshrined abortion rights in their state constitutions. Four states are facing ongoing legal challenges to their abortion bans or restrictions. Ten states will have voters decide on abortion-related constitutional amendments in November 2024. Seven states have had significant court rulings affecting their abortion laws since the *Dobbs* decision. Three states have not made significant changes to their abortion laws since *Dobbs*. Notable developments include California, Michigan, and Ohio voters enshrining abortion protections in their state constitutions, while Florida's Supreme Court ruled that the state Constitution's privacy protections do not extend to abortion.

Both of these policy areas have put the federal agenda at odds with certain state policies. This alignment extends to the point where both policies have resulted in state crimes being available to charge for the very thing the federal government endorses. In the opioid crisis, states like Indiana and Texas continue to criminalize DCE possession and distribution, despite federal support for harm reduction strategies. Similarly, in the abortion debate, states like Idaho have chosen to draft laws that may criminally penalize those who go against their near-total

bans, in direct opposition to federal attempts to protect abortion access.
These divergent approaches exemplify how states are using their police
power to address public health policy issues in ways that sometimes
directly contradict federal recommendations. Both scenarios
demonstrate states' willingness to chart their own course on contentious
issues, even when it means standing in opposition to federal policy
preferences.

## C. Executive branch respects state autonomy on opioids, while undermining federalism on abortion.

The executive branch's approach to addressing the opioid crisis,
particularly regarding fentanyl test strips ("**FTS**") and harm reduction
strategies, stands in stark contrast to its handling of abortion policy
post-Dobbs. While the administration has taken an aggressive, coercive
stance on abortion, its approach to opioid harm reduction has been
markedly collaborative and respectful of state autonomy.

In addressing the opioid epidemic, the administration has prioritized
partnership with states, offering resources and guidance, "to encourage
authorization of, and/or expand implementation of, existing legal
programs and to sustain funding for those currently in use to improve

access to overdose prevention, infectious disease prevention, and other health care services for PWUD and people with Substance Use Disorder ("**SUD** ")."[28] This strategy recognizes the complex nature of the crisis and the need for tailored solutions that respect state authority. The Office of National Drug Control Policy's ("**ONDCP**") collaboration with the LAPPA to develop model state laws exemplifies this approach.[29] By creating templates for laws on naloxone access, syringe services programs, and drug checking equipment, the administration provided valuable resources without imposing federal mandates.[30] This stands in sharp contrast to the administration's attempts to override state

---

[28] *See*, e.g., The White House Exec. Office of the President Office of National Drug Control Policy, "2024 National Drug Control Strategy," (May 6, 2024) at 19, https://www.whitehouse.gov/wp-content/uploads/2024/05/2024-National-Drug-Control-Strategy.pdf.

[29] *Id.* at 21.

[30] LAPPA, Model Expanded Access to Emergency Opioid Antagonists Act (2021), https://legislativeanalysis.org/model-expanded-access-to-emergency-opioid-antagonists-act/ ; Legislative Analysis and Public Policy Association, LAPPA, Model Syringe Services Program Act (2021), https://legislativeanalysis.org/model-syringe-services-program-act/; LAPPA, Legislative Analysis and Public Policy Association, Model Fentanyl Test Strip and Other Drug Checking Equipment Act (2023), https://legislativeanalysis.org/wp-content/uploads/2023/04/Model-Fentanyl-Test-Strip-and-Other-Drug-Checking-Equipment-Act-FINAL.pdf .

abortion laws through novel interpretations of EMTALA. The administration's encouragement of state action on harm reduction has been notable for its non-coercive nature. While actively promoting the decriminalization of FTS and expansion of syringe services programs, the federal government has respected state autonomy in deciding whether to adopt these measures. This approach has yielded results, with over 20 states proposing bills aligned with the ONDCP's model law for syringe services programs, and more than 70 bills incorporating elements of the model law on drug checking equipment.[31]

Flexible funding mechanisms, such as the State Opioid Response ("**SOR**") grants, have allowed states to implement harm reduction strategies according to their own priorities and legal frameworks.[32] This approach respects state discretion, unlike the administration's attempts to use federal funding as leverage to impose its interpretation of abortion requirements under EMTALA. The provision of technical assistance, peer learning forums, and policy academies further demonstrates the administration's commitment to supporting states in

---

[31] *See* 2024 National Drug Control Strategy, at 24.

[32] *Id.* at 21.

their opioid response efforts without overriding local decision-making.[33]
This collaborative approach stands in sharp contrast to the
confrontational stance taken in the lawsuit against Idaho's abortion
law.

Crucially, the administration has consistently emphasized its
respect for existing state laws regarding harm reduction tools. Federal
agencies have promoted FTS and other strategies as important public
health tools while acknowledging that implementation must occur "in
states where they are authorized by law."[34] This nuance approach
recognizes the legitimate role of states in regulating public health and
safety within their borders, a principle seemingly disregarded in the
administration's abortion policy. The administration's recognition of
incremental progress in harm reduction policy further highlights its
respect for state-level processes. By acknowledging that states may take
intermediate steps towards full legalization of tools like FTS, the
federal government has shown patience with the democratic process, a

---

[33] *Id.* "SAMHSA . . . is providing TA to states on implementation of
these naloxone saturation plans, including an all-state virtual Learning
Community . . . and a Policy Academy."

[34] *Id.* at 19, 24.

stark contrast to its attempts to rapidly impose a federal abortion mandate through regulatory reinterpretation.

This collaborative, federalism-respecting approach to the opioid crisis has allowed for a more tailored, state-by-state response that leverages local knowledge and respects diverse policy preferences. The success of this strategy in encouraging evidence-based harm reduction practices without resorting to federal coercion serves as a pointed rebuke to the administration's heavy-handed tactics on abortion policy. The contrast between these two approaches could not be clearer. On one hand, we see a federal government working in partnership with states to address a public health crisis, providing resources and encouragement while respecting state authority. On the other, we witness an administration willing to twist long-standing laws, threaten funding, and sue states in an attempt to impose its will on a contentious issue that the Supreme Court explicitly returned to state control.[35] This disparity reveals a troubling inconsistency in the administration's respect for federalism and state sovereignty, apparently dependent on its policy preferences rather than constitutional principles.

---

[35] *See Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

# CONCLUSION

The federal government's attempt to reinterpret EMTALA as a mandate for abortion services represents a dangerous overreach that threatens the foundational principles of our federal system and contradicts over a century of settled law recognizing states' primacy in regulating medical practice. This Court should reverse and vacate the preliminary injunction.

Respectfully submitted,
s/ James Bopp, Jr.
James Bopp, Jr.
  *Counsel of Record*
Taylor C. Shetina
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, IN 47807
(812) 232-2434 Telephone
(812) 235-3685 Facsimile
jboppjr@aol.com
tshetina@bopplaw.com

Dated: September 20, 2024      *Attorneys for Amicus Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that, on September 20, 2024, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

Dated: September 20, 2024       s/ James Bopp, Jr.
                                           James Bopp, Jr.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35440, 23-35450

I am the attorney or self-represented party.

**This brief contains** | 6,454 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ James Bopp, Jr. | **Date** | September 20, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*