# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF IDAHO,

Defendant-Appellant,

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE, Proposed Intervenor-Defendants,

Movants-Appellants.

On Appeal from the United States District Court
for the District of Idaho

## CONSOLIDATED BRIEF FOR THE UNITED STATES

*Of Counsel:*

SAMUEL BAGENSTOS
  *General Counsel*

JOEL McELVAIN
  *Acting Deputy General Counsel*

DAVID L. HOSKINS
  *Acting Deputy Associate Counsel*
  *for Litigation*

JESSICA BOWMAN
MELISSA HART
CATHERINE HESS
  *Attorneys*

  U.S. Department of Health
  and Human Services

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

JOSHUA D. HURWIT
  *United States Attorney*

CATHERINE M.A. CARROLL
  *Deputy Assistant Attorney General*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER
CYNTHIA A. BARMORE
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7231*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-305-1754*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ...........................................................................................................1

STATEMENT OF JURISDICTION ...............................................................................2

STATEMENT OF THE ISSUE ......................................................................................2

PERTINENT STATUTES .............................................................................................2

STATEMENT OF THE CASE .......................................................................................2

      A.     The Emergency Medical Treatment and Labor Act (EMTALA). ............2

      B.     Idaho Code § 18-622. .......................................................................................4

      C.     Procedural Background.....................................................................................5

SUMMARY OF ARGUMENT.......................................................................................8

STANDARD OF REVIEW .......................................................................................... 13

ARGUMENT ................................................................................................................ 13

I.     The District Court Correctly Held That The United States Is Likely To
     Succeed On The Merits. ....................................................................................... 13

      A.     EMTALA requires hospitals to offer pregnancy termination when
             that care is required to stabilize an emergency medical condition. ..........14

           1.     Statutory text, context, and history make clear that the
                  stabilizing care required by EMTALA can include
                  termination of a pregnancy.............................................................14

           2.     EMTALA does not merely prohibit discrimination against
                  indigent patients. ...........................................................................26

           3.     State law does not constrain EMTALA's stabilization
                  requirement. ...................................................................................30

B.    EMTALA preempts Idaho Code § 18-622 to the extent that EMTALA requires stabilizing treatment that Section 18-622 prohibits. ..........................................................................................37

1.    The record demonstrates that Section 18-622 directly conflicts with EMTALA. ....................................................37

2.    The United States has a cause of action to enforce EMTALA. ........................................................................43

3.    Appellants' constitutional arguments are forfeited and without merit........................................................................46

II.    The Equities Decisively Support The Preliminary Injunction............................. 57

III.    The District Court Properly Tailored The Preliminary Injunction..................... 58

CONCLUSION ............................................................................................................. 64

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**            **Page(s)**

*Arizona v. United States,*
     567 U.S. 387 (2012) .................................................................. 44, 51

*Armstrong v. Exceptional Child Ctr., Inc.,*
     575 U.S. 320 (2015) ........................................ 43, 44, 46, 51

*Arrington v. Wong,*
     237 F.3d 1066 (9th Cir. 2001) .................................................. 3, 42

*Baby K, In re,*
     16 F.3d 590 (4th Cir. 1994) ...................................................... 27, 31

*Baker v. Adventist Health, Inc.,*
     260 F.3d 987 (9th Cir. 2001) .................................................... 34

*Bennett v. Arkansas,*
     485 U.S. 395 (1988)................................................................ 53

*Biden v. Missouri,*
     595 U.S. 87 (2022)........................................................ 2, 28, 49

*Bostock v. Clayton County,*
     590 U.S. 644 (2020) ............................................................... 21

*Bryan v. Rectors & Visitors of the Univ. of Va.,*
     95 F.3d 349 (4th Cir. 1996) ..................................................... 30

*Buckman Co. v. Plaintiffs' Legal Comm.,*
     531 U.S. 341 (2001) ............................................................... 42

*California v. United States,*
     No. 05-328, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) .......................................... 20

*Carleson v. Remillard,*
     406 U.S. 598 (1972) ............................................................... 52

*Charles C. Steward Mach. Co. v. Davis,*
     301 U.S. 548 (1937) ............................................................... 55

*Cherukuri v. Shalala,*
     175 F.3d 446 (6th Cir. 1999) ..................................................... 30

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,*
 321 F.3d 878 (9th Cir. 2003) ................................... 47

*Correa v. Hospital S.F.,*
 69 F.3d 1184 (1st Cir. 1995) ................................... 29

*Coventry Health Care of Mo., Inc. v. Nevils,*
 581 U.S. 87 (2017) ................................... 53

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
 596 U.S. 212 (2022) ................................... 47, 53

*Dean v. United States,*
 556 U.S. 568 (2009) ................................... 31

*Dobbs v. Jackson Women's Health Org.,*
 597 U.S. 215 (2022) ................................... 16, 50, 51

*Drakes Bay Oyster Co. v. Jewell,*
 747 F.3d 1073 (9th Cir. 2014) ................................... 57

*Draper v. Chiapuzio,*
 9 F.3d 1391 (9th Cir. 1993) ................................... 4, 41

*Eberhardt v. City of Los Angeles,*
 62 F.3d 1253 (9th Cir. 1995) ................................... 29

*FDA v. Alliance for Hippocratic Med.,*
 602 U.S. 367 (2024) ................................... 63

*FDA v. Brown & Williamson Tobacco Corp.,*
 529 U.S. 120 (2000) ................................... 25

*Florida v. Mellon,*
 273 U.S. 12 (1927) ................................... 55

*Garcia v. San Antonio Metro. Transit Auth.,*
 469 U.S. 528 (1985) ................................... 55, 56

*Gatewood v. Washington Healthcare Corp.,*
 933 F.2d 1037 (D.C. Cir. 1991) ................................... 29

*Gonzales v. Oregon,*
 546 U.S. 243 (2006) ................................... 50

*Grocery Outlet Inc. v. Albertson's Inc.*,
    497 F.3d 949 (9th Cir. 2007) ........................................................................ 20

*Hardy v. New York City Health & Hosps. Corp.*,
    164 F.3d 789 (2d Cir. 1999) ................................................ 29, 30, 34, 35

*Hecox v. Little*,
    104 F.4th 1061 (9th Cir. 2024) ................................................................ 59

*King v. Smith*,
    392 U.S. 309 (1968) .................................................................................... 52

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ................................................................... 59

*Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*,
    469 U.S. 256 (1985) .................................................................................... 53

*Mayes v. Biden*,
    67 F.4th 921 (9th Cir.), *vacated as moot*,
    89 F.4th 1186 (9th Cir. 2023) .................................................................. 25

*Mayweathers v. Newland*,
    314 F.3d 1062 (9th Cir. 2002) ................................................................. 48

*Moses v. Providence Hosp. & Med. Ctrs., Inc.*,
    561 F.3d 573 (6th Cir. 2009) ................................................................... 27

*Moyle v. United States*:
    144 S. Ct. 540 (2024) ................................................................................... 8
    144 S. Ct. 2015 (2024) ..................................... 8, 38, 39, 40, 47, 58, 59, 60

*Murphy v. National Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018) .................................................................................... 55

*New York v. HHS*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................... 20

*New York v. United States*,
    505 U.S. 144 (1992) ................................. 47-48, 48, 48-49, 51, 55

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) .................................................................................... 55

*Oklahoma v. U.S. Civil Serv. Comm'n*,
    330 U.S. 127 (1947) .................................................................................... 55

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015) ................................................................ 41

*Planned Parenthood Ariz. Inc. v. Betlach*,
    727 F.3d 960 (9th Cir. 2013) .............................................. 30, 32

*Planned Parenthood Great Nw. v. State*,
    522 P.3d 1132 (Idaho 2023) ............................ 5, 7, 8, 37, 38

*Power v. Arlington Hosp. Ass'n*,
    42 F.3d 851 (4th Cir. 1994) ...................................................... 30

*R.J. Reynolds Tobacco Co. v. County of Los Angeles*,
    29 F.4th 542 (9th Cir. 2022) .................................................... 34

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ................................................................ 28

*Ritten v. Lapeer Reg'l Med. Ctr.*,
    611 F. Supp. 2d 696 (E.D. Mich. 2009) ................................ 20

*Roberts v. Galen of Virginia, Inc.*,
    525 U.S. 249 (1999)................................................. 10, 26, 27

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) .................................................. 13

*Ross v. Blake*,
    578 U.S. 632 (2016) ................................................................ 31

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) .................................................................. 46

*Sossamon v. Texas*,
    563 U.S. 277 (2011) ................................................................ 55

*South Dakota v. Dole*,
    483 U.S. 203 (1987) .......................................................... 48, 55

*Southland Corp. v. Keating*,
    465 U.S. 1 (1984) .................................................................... 34

*Summers v. Baptist Med. Ctr. Arkadelphia*,
    91 F.3d 1132 (8th Cir. 1996) .................................................. 27

*Texas v. Becerra,*
    89 F.4th 529 (5th Cir. 2024) ....................................................... 19, 63

*Thomas v. Christ Hosp. & Med. Ctr.,*
    328 F.3d 890 (7th Cir. 2003) ....................................................... 27

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994) ....................................................................... 49

*Torretti v. Main Line Hosps., Inc.,*
    580 F.3d 168, *amended,*
    586 F.3d 1011 (3d Cir. 2009) ....................................................... 29

*Townsend v. Swank,*
    404 U.S. 282 (1971) ....................................................................... 52

*United States v. Bird,*
    124 F.3d 667 (5th Cir. 1997) ....................................................... 56

*United States v. Butler,*
    297 U.S. 1 (1936) ..................................................... 47, 52, 53, 54

*United States v. City of Arcata,*
    629 F.3d 986 (9th Cir. 2010) ....................................................... 44

*United States v. Idaho*:
    82 F.4th 1296 (9th Cir. 2023) ..................................................... 8
    83 F.4th 1130 (9th Cir. 2023) ..................................................... 8

*United States v. Missouri,*
    114 F.4th 980 (8th Cir. 2024) ..................................................... 44

*United States v. United Mine Workers of Am.,*
    330 U.S. 258 (1947) ....................................................................... 45

*United States v. Washington,*
    596 U.S. 832 (2022) ....................................................................... 44

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,*
    444 U.S. 11 (1979) ......................................................................... 46

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ..................................................... 42

*Virginia Office for Prot. & Advocacy v. Stewart,*
    563 U.S. 247 (2011) ................................................................. 45, 46

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ............................................................ 25, 26

**U.S. Constitution:**

Art. I, § 8, cl. 1 ................................................................ 47

Art. VI, cl. 2 .................................................................... 52

**Statutes:**

Emergency Medical Treatment and Labor Act (EMTALA):
  42 U.S.C. § 1395dd ...................................................... 1, 2, 16
  42 U.S.C. § 1395dd(a) ................................................ 23, 26, 27
  42 U.S.C. § 1395dd(b)(1) ............ 1, 3, 9, 10, 14, 23, 29, 41
  42 U.S.C. § 1395dd(b)(1)(A) ........................................ 26, 31
  42 U.S.C. § 1395dd(b)(2) .............................................. 3, 23
  42 U.S.C. § 1395dd(c)(1) ................................................... 23
  42 U.S.C. § 1395dd(c)(1)(A)(ii) ......................................... 24
  42 U.S.C. § 1395dd(c)(2)(A) ............................................. 24
  42 U.S.C. § 1395dd(d) ........................................................ 36
  42 U.S.C. § 1395dd(d)(1) ............................................... 4, 36
  42 U.S.C. § 1395dd(d)(1)(A)-(B) ....................................... 45
  42 U.S.C. § 1395dd(d)(2) ............................................... 4, 45
  42 U.S.C. § 1395dd(d)(2)(A) ............................................. 33
  42 U.S.C. § 1395dd(d)(2)(A)-(B) ....................................... 44
  42 U.S.C. § 1395dd(d)(2)(B) ............................................. 33
  42 U.S.C. § 1395dd(d)(3) .................................................. 44
  42 U.S.C. § 1395dd(e)(1)(A) ...................................... 3-4, 15, 37
  42 U.S.C. § 1395dd(e)(1)(A) (1988) ................................... 24
  42 U.S.C. § 1395dd(e)(1)(A)(i) ............................ 10, 15, 23, 24
  42 U.S.C. § 1395dd(e)(1)(B) ......................................... 15, 21
  42 U.S.C. § 1395dd(e)(1)(B)(ii) ......................................... 24
  42 U.S.C. § 1395dd(e)(3) ................................... 9, 10, 25, 39
  42 U.S.C. § 1395dd(e)(3)(A) ........ 4, 14, 21, 26, 30, 31, 35
  42 U.S.C. § 1395dd(e)(4) ................................................ 4, 14
  42 U.S.C. § 1395dd(f) ...................................... 1, 4, 33, 34, 41, 45

Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248-2249 (1989) ........................... 24

1 U.S.C. § 8(a) ............................................................... 23

7 U.S.C. § 2156 ............................................................................................ 34

10 U.S.C. § 1093 .......................................................................................... 22

15 U.S.C. § 1225 .......................................................................................... 34

16 U.S.C. § 3507 .......................................................................................... 34

16 U.S.C. § 544*l*(e)(5) ................................................................................. 34

18 U.S.C. § 1347 .......................................................................................... 51

18 U.S.C. § 1347(a)(1) .................................................................................. 56

18 U.S.C. § 1531 .......................................................................................... 51

20 U.S.C. § 1688 .......................................................................................... 22

22 U.S.C. § 5453(b) ...................................................................................... 22

22 U.S.C. § 7704(e)(4) .................................................................................. 22

25 U.S.C. § 1676(a) ...................................................................................... 22

28 U.S.C. § 1292(a)(1) .................................................................................... 2

28 U.S.C. § 1331 ............................................................................................. 2

28 U.S.C. § 1345 ............................................................................................. 2

28 U.S.C. § 1346(b)(1) .................................................................................. 36

42 U.S.C. § 238n ........................................................................................... 22

42 U.S.C. § 280h-5(a)(3)(C) ......................................................................... 22

42 U.S.C. § 300a-6 ....................................................................................... 22

42 U.S.C. § 300a-7 ....................................................................................... 22

42 U.S.C. § 300a-7(c) ................................................................................... 49

42 U.S.C. § 300a-8 ....................................................................................... 22

42 U.S.C. § 300z-10(a) ................................................................................. 22

42 U.S.C. § 1320c-3(a)(6)(A) .............................................................. 33

42 U.S.C. § 1320d-7(a) ...................................................................... 56

42 U.S.C. § 1395 *et seq.* .................................................................... 2

42 U.S.C. § 1395 ................................................................................ 28

42 U.S.C. § 1395cc(a)(1)(I)(i) .......................................................... 2, 48

42 U.S.C. § 1395cc(b) ........................................................................ 4

42 U.S.C. § 1397ee(c)(7)(A) .............................................................. 22

42 U.S.C. § 12584a(a)(9) ................................................................... 22

42 U.S.C. § 2996f(b)(8) ..................................................................... 22

42 U.S.C. § 18023(a) ......................................................................... 17

42 U.S.C. § 18023(b) ......................................................................... 17

42 U.S.C. § 18023(d) ......................................................................... 18

43 U.S.C. § 1600g ............................................................................. 34

49 U.S.C. § 41713(b)(1) ..................................................................... 56

Idaho Code § 18-604(1) ..................................................................... 5

Idaho Code § 18-604(1)(a)-(d) ........................................................... 5

Idaho Code § 18-604(1)(c) .................................................................. 5

Idaho Code § 18-604(11) .................................................................... 5

Idaho Code § 18-622 ........................................................... 9, 13, 58, 58-59

Idaho Code § 18-622(1) ...................................................................... 5

Idaho Code § 18-622(2)(a) .................................................................. 37

Idaho Code § 18-622(2)(a)(i) ..................................................... 4, 11, 32

Idaho Code § 18-622(2)(b) .................................................................. 5

Idaho Code § 18-622(3)(a)(ii) .............................................................. 5

**Legislative Materials:**

131 Cong. Rec. 28,569 (1985) .................................................. 3, 28

Consolidated Omnibus Reconciliation Act of 1985,
    H.R. 3128, 99th Cong.:
       § 124 ...........................................................................22
       § 302(b)(2)(B) ...........................................................22

H.B. 374, 67th Leg., 1st Reg. Sess. § 1 (Idaho 2023) ...................5

H.R. Rep. No. 99-241, pt. 1 (1985).......................................... 4, 34

H.R. Rep. No. 99-241, pt. 3 (1985)..............................................4

H.R. Rep. No. 99-453 (1985) (Conf. Rep.).................................22

H.R. Rep. No. 101-386 (1989) (Conf. Rep.) ..............................24

Idaho Senate State Affairs Comm., *Minutes* (Mar. 30, 2023),
    https://perma.cc/QC9M-LBQV .................................................38

**Other Authorities:**

John Cannan, *A Legislative History of the Affordable Care Act:*
    *How Legislative Procedure Shapes Legislative History*,
    105 L. Libr. J. 131 (2013) .................................................. 17-18

CMS, *Emergency Medical Treatment and Labor Act (EMTALA) and*
    *the Born-Alive Infant Protection Act* (June 27, 2019),
    https://perma.cc/AL4B-T9CX ...................................................35

CMS, *Hospital Surveys with 2567 Statement of Deficiencies – 2024Q2*,
    https://www.cms.gov/medicare/health-safety-standards/
    guidance-for-laws-regulations/hospitals/hospitals ................ 15, 18

CMS, *Quality Improvement Organization Manual* ch. 9 (Rev. 24,
    Issued Feb. 12, 2016), https://perma.cc/WV4G-W6EV ...........35

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* (Sept. 17, 2021), https://perma.cc/V4Y9-VDHG ......................................................................18

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* (July 11, 2022), https://perma.cc/GT5D-Q9FN ......................................................................19

CMS, *State Operations Manual* app. V (Rev. 191, July 19, 2019), https://perma.cc/23A7-KYGQ ...................................................... 31, 35

73 Fed. Reg. 78,072 (Dec. 19, 2008) .......................................... 18, 20

84 Fed. Reg. 23,170 (May 21, 2019) .......................................... 18, 20

Kelcie Moseley-Morris, *Most Americans Want Health Exceptions in Abortion Bans*, Idaho Capital Sun (Nov. 7, 2023), https://perma.cc/MDR8-GE6X ......................................................................40

Kelcie Moseley-Morris, *U.S. Supreme Court Agrees to Hear Idaho Case on Emergency Room Abortions*, Idaho Capital Sun (Jan. 5, 2024), https://perma.cc/W6F2-CQ8U ......................................................................40

Press Release, HHS, *Biden-Harris Administration Reaffirms Commitment to EMTALA Enforcement* (July 2, 2024), https://perma.cc/ZEV4-ENKY ..............................................62

**INTRODUCTION**

This case concerns whether a state can prevent pregnant women from receiving the essential emergency medical treatment that federal law guarantees to all Americans. Under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, a hospital that has an emergency department and participates in Medicare must offer stabilizing treatment to any patient with an emergency medical condition that seriously threatens her life or health. *Id.* § 1395dd(b)(1). When a pregnant woman is in good health, EMTALA has no application. But pregnant women can suffer dangerous conditions that require immediate medical attention to prevent death or serious injury, including organ failure or loss of fertility. And in some tragic cases, the required stabilizing care—the only treatment that can save the woman's life or prevent serious harm to her health—involves terminating the pregnancy.

Under those narrow but critically important circumstances, a straightforward application of EMTALA's text requires hospitals to offer that essential medical care. The Department of Health and Human Services (HHS) has maintained and enforced that interpretation consistently across four administrations. The courts, the medical community, and Congress have long shared the same understanding. And when a state prohibits pregnancy termination in the emergency circumstances where EMTALA requires it, EMTALA's plain text resolves that conflict: State law is preempted "to the extent"—and only to the extent—it "directly conflicts with a requirement" of EMTALA. 42 U.S.C. § 1395dd(f). Idaho's prohibition on abortion poses such a

conflict. Idaho's law is enforceable in nearly all its applications. But in the narrow circumstances where Idaho prohibits the essential emergency care that EMTALA requires, it "directly conflicts" with EMTALA and is preempted.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1345. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in granting a preliminary injunction.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    The Emergency Medical Treatment and Labor Act (EMTALA).

Medicare is a federally subsidized health-insurance program for the elderly and certain individuals with disabilities. *See* 42 U.S.C. § 1395 *et seq.* Participation is voluntary, but hospitals that choose to participate must comply with certain conditions. *See Biden v. Missouri*, 595 U.S. 87, 90 (2022) (per curiam). Among other conditions, hospitals with emergency departments must abide by EMTALA. 42 U.S.C. § 1395dd; *id.* § 1395cc(a)(1)(I)(i).

EMTALA was enacted in 1986 to address concerns that hospitals were engaged in "patient dumping" by discharging or transferring critically ill patients who lacked insurance rather than providing "the care they need." 131 Cong. Rec. 28,569 (1985) (statement of Sen. Kennedy). "The overarching purpose of EMTALA is to ensure that patients, particularly the indigent and underinsured, receive adequate emergency medical care." *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001). Congress determined that Medicare should not "do business" with a hospital that "turns its back on an emergency medical situation." 131 Cong. Rec. 28,568 (statement of Sen. Durenberger).

EMTALA guarantees emergency care by establishing a national minimum requirement for hospitals funded by Medicare. EMTALA provides that when "any individual … comes to a [participating] hospital" with an "emergency medical condition," the hospital must offer such treatment "as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1). The "individual" must be informed of risks and benefits and can give "informed consent to refuse such examination and treatment." *Id.* § 1395dd(b)(2).

An individual has an "emergency medical condition" if "the absence of immediate medical attention could reasonably be expected to result in": (i) "placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy"; (ii) "serious impairment to bodily functions"; or (iii) "serious dysfunction of any bodily organ or part." 42 U.S.C.

3

§ 1395dd(e)(1)(A). "[T]o stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A). "[T]ransfer" is defined to include discharge. *Id.* § 1395dd(e)(4).

Hospitals that violate EMTALA are subject to suits by injured patients, 42 U.S.C. § 1395dd(d)(2); civil penalties, *id.* § 1395dd(d)(1); and, potentially, loss of Medicare funding, *id.* § 1395cc(b). EMTALA also includes an express preemption provision specifying that the statute "do[es] not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement" of EMTALA. *Id.* § 1395dd(f). A direct conflict occurs when (1) it is "physically impossible" to comply with both state law and EMTALA or (2) "the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1394 (9th Cir. 1993) (per curiam) (addressing preemption under EMTALA). This provision does "not preempt stricter state laws," *i.e.*, state laws requiring emergency care in addition to EMTALA's requirements. H.R. Rep. No. 99-241, pt. 1, at 4 (1985); *id.* pt. 3, at 5.

### B. Idaho Code § 18-622.

This case concerns Idaho Code § 18-622. That law bans nearly all pregnancy terminations. In its current form, the law includes exceptions only for "abortion[s] … necessary to prevent the death of the pregnant woman," Idaho Code § 18-622(2)(a)(i);

to terminate "an ectopic or molar pregnancy," *id.* § 18-604(1)(c); or to terminate certain pregnancies resulting from rape or incest, *id.* § 18-622(2)(b).[1]  Otherwise, Section 18-622 makes it a felony punishable by two to five years' imprisonment to "perform[]," "attempt[] to perform," or "assist[] in performing or attempting to perform" an "abortion."  *Id.* §§ 18-622(1), 18-604(1), (11).  Providers also can lose their medical licenses.  *Id.* § 18-622(1).  "Abortion" is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child," *id.* § 18-604(1), excluding "removal of a dead unborn child" and "treatment of a woman who is no longer pregnant," H.B. 374, 67th Leg., 1st Reg. Sess. § 1 (Idaho 2023) (amending Idaho Code § 18-604(1)(a)-(d)).

### C.  Procedural Background.

**1.**  The United States filed this suit against Idaho to enjoin the State from enforcing Section 18-622 in the narrow but critical circumstances when Idaho law prohibits medical care that EMTALA requires.  4-LEG-ER-570.[2]  On August 24,

---

[1] As originally enacted, Section 18-622 framed the necessary-to-prevent-death exception as an affirmative defense and did not explicitly exclude ectopic pregnancies. Idaho Code § 18-622(3)(a)(ii) (as originally enacted).  After entry of the preliminary injunction here, the Idaho Supreme Court construed the law to exclude ectopic pregnancies, *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1203 (Idaho 2023), and Idaho amended the law to its current form.

[2] Although the Complaint named one defendant—the State of Idaho—the Legislature permissibly intervened in the preliminary-injunction proceedings.  In this consolidated appeal, the Legislature denoted its record excerpts as "LEG-ER"; the State denoted its excerpts as "ER."

2022, the district court granted a preliminary injunction and enjoined enforcement of Section 18-622 "as applied to medical care required by [EMTALA]." 1-ER-014–052.

The district court held that the United States was likely to succeed on the merits of its preemption claim. The court concluded that, in some circumstances, "it is impossible to comply with both statutes." 1-ER-032. "[W]hen pregnant women come to a Medicare-funded hospital with an emergency medical condition" that seriously threatens their health, EMTALA obligates the hospital to provide stabilizing treatment, which sometimes includes "abortion care." 1-ER-032. But Section 18-622 would allow pregnancy termination only when "*necessary* to prevent the patient's death." 1-ER-033. The court explained that EMTALA's requirement to provide care is "broader" than Section 18-622's necessary-to-prevent-death exception on "two levels": EMTALA requires care (i) "to prevent injuries that are more wide-ranging than death," and (ii) "when the patient could 'reasonably be expected' to suffer injury." 1-ER-034.

Relying on declarations of medical experts, the district court found that pregnancy termination can be the EMTALA-required stabilizing treatment for several emergency conditions in circumstances where that treatment would be a felony under Idaho law. Those conditions include:

- rupture of the amniotic sac ("preterm premature rupture of the membranes" (PPROM)), which can result in infection, sepsis, or organ failure;

- "placental abruption," which can result in "uncontrollable bleeding" or "organ disfunction";

- "uncontrollable uterine hemorrhage," which can "requir[e] hysterectomy" or result in "kidney failure requiring lifelong dialysis"; and

- "preeclampsia," which can result in the "onset of seizures" or "hypoxic brain injury."

1-ER-014–015, 021–022. The court held that EMTALA preempts Section 18-622 in circumstances where EMTALA "requires the provision of care and state law criminalizes that very care." 1-ER-032.

The district court also concluded that Section 18-622 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 1-ER-038. "[E]ven if it were theoretically possible to simultaneously comply with both laws," the court held, Section 18-622 would frustrate EMTALA's guarantee of "a bare minimum of emergency care." 1-ER-037–038. The court explained that Section 18-622 would deter EMTALA-required stabilizing care because it often would require a "medically impossible" determination in emergency circumstances that pregnancy termination is "*necessary* to prevent the patient's death." 1-ER-033, 042.

**2.** The State and Legislature moved for reconsideration. They relied in part on *Planned Parenthood Great Northwest v. State*, 522 P.3d 1132 (Idaho 2023), a case decided after the preliminary injunction issued in which the Idaho Supreme Court held that Section 18-622 does not violate the state constitution. *Id.* at 1147-49, 1152-53. The district court denied the motions for reconsideration, concluding that the

motions "rehash[ed] arguments previously presented" or raised new "arguments that they could have raised earlier." 1-ER-006. The court also explained that *Planned Parenthood Great Northwest v. State* "confirmed—rather than eliminated—the conflict" between EMTALA and state law. 1-ER-009. As interpreted by the Idaho Supreme Court, Section 18-622's necessary-to-prevent-death exception covers "a narrower scope of conduct than [what] EMTALA covers," because EMTALA requires stabilizing treatment "when a patient faces serious health risks that may stop short of death." 1-ER-009–010.

**3.** The State and Legislature filed this consolidated appeal. While a panel of this Court initially stayed the district court's injunction pending appeal, *United States v. Idaho*, 83 F.4th 1130 (9th Cir. 2023), the en banc Court vacated that stay, *United States v. Idaho*, 82 F.4th 1296 (9th Cir. 2023), and set the case for argument, Order, (Nov. 13, 2023). Before argument could take place, however, the Supreme Court stayed the preliminary injunction and granted certiorari before judgment. *Moyle v. United States*, 144 S. Ct. 540 (2024). The Supreme Court ultimately dismissed the writ as improvidently granted, vacated its stay, and thereby reinstated the preliminary injunction without modification. *Moyle v. United States*, 144 S. Ct. 2015 (2024) (per curiam).

## SUMMARY OF ARGUMENT

EMTALA's promise is limited but profound: No one who comes to an emergency department in need of emergency medical care should be denied the treatment

8

required to stabilize her condition. For some pregnant women suffering tragic emergency complications, the only care that can prevent grave harm is termination of the pregnancy. In those circumstances, EMTALA requires participating hospitals to offer such care—yet Idaho forbids it. EMTALA preempts state laws like Idaho Code § 18-622 to the extent they prohibit the essential medical care required by federal law. This Court should affirm the district court's preliminary injunction on this basis.

**I.** The district court correctly held that the United States demonstrated a likelihood of success on the merits.

**A.** This case concerns the meaning of the stabilization requirement at the heart of EMTALA. Congress directed covered hospitals to offer the treatment required "to stabilize" an "emergency medical condition"—that is, "to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result" from a discharge or transfer. 42 U.S.C. § 1395dd(b)(1), (e)(3). By its terms, that directive requires covered hospitals to provide treatment that satisfies the statutory standard. When a pregnant woman presents with an emergency medical condition, there are circumstances where the only care that will stabilize the condition and thus satisfy EMTALA is termination of the pregnancy. In those narrow circumstances, EMTALA requires hospitals to offer that stabilizing care. That interpretation is firmly rooted in the statutory text, context, and history.

Appellants now suggest that the stabilizing care required by EMTALA can never include termination of a pregnancy, but that position is inconsistent with their

arguments below. In any event, such a limit has no basis in statutory text, context, or history. EMTALA treats pregnancy termination the same as any other stabilizing care: It must be provided if, and only if, it is required to assure that no material deterioration of the individual's condition is likely to occur. 42 U.S.C. § 1395dd(e)(3). In 1989, Congress amended EMTALA to make clear that it applies when a pregnant woman's medical condition seriously threatens the health of her "unborn child" even if her own health is not at risk. *Id.* § 1395dd(e)(1)(A)(i). But all of EMTALA's duties run to the "individual" seeking care—that is, the pregnant woman. And nothing in the 1989 amendment altered a hospital's obligation to offer stabilizing care when pregnancy termination is required to save the woman's life or prevent serious harm to her health.

Appellants also misconstrue EMTALA as merely prohibiting discrimination against the uninsured rather than requiring any specific treatment. That flatly contradicts the statutory text. EMTALA imposes a substantive federal standard requiring covered hospitals to offer "any individual" with an emergency medical condition "such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1). In *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249 (1999) (per curiam), the Supreme Court emphatically rejected a similar attempt to transform EMTALA into a nondiscrimination rule. Appellants' interpretation fundamentally departs from the way EMTALA has been understood and enforced for decades—not just in the context of pregnancy termination but in all of its applications.

10

Finally, Appellants err in construing EMTALA to allow state limits on necessary medical treatments. That interpretation likewise has no textual basis. And it would invert EMTALA's express preemption provision, which makes clear that when state law conflicts with EMTALA, state law must give way—not the other way around.

**B.** Idaho law directly conflicts with, and is therefore preempted by, EMTALA. As relevant here, Section 18-622 prohibits abortion unless "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a)(i). That prohibition directly conflicts with EMTALA in those cases when terminating a pregnancy is the only treatment that would stabilize a pregnant woman whose emergency medical condition threatens serious harm to her health but would not (absent further deterioration) cause her death. As the record demonstrates, that gap has devastating real-world consequences. Many pregnancy complications do not pose a serious threat to the woman's life when she arrives at the emergency room—but delaying care until necessary to prevent her death could allow her condition to deteriorate, placing her at risk of acute and long-term complications. In such circumstances, where EMTALA requires pregnancy termination to treat a medical emergency, Idaho law is preempted.

Appellants assert that the United States lacks a cause of action, but the United States has a longstanding equitable cause of action to seek to enjoin the implementation of federally preempted laws. Appellants also raise novel constitutional theories that were not presented to the district court. These objections have not been

adequately preserved for purposes of this appeal. More than two years ago, the district court exercised its discretion to grant a preliminary injunction after considering and rejecting the arguments Appellants had presented there. The proper avenue for Appellants to raise these new arguments is through summary-judgment briefing. In any event, EMTALA is fully consistent with the Spending Clause and the Tenth Amendment.

II.    The district court properly exercised its discretion in determining that the equities and public interest favor a preliminary injunction.

The United States showed that it would suffer irreparable harm if Section 18-622 were enforced when it directly conflicts with EMTALA. Such enforcement would violate the Supremacy Clause and interfere with the United States's sovereign interest in the proper administration of federal law, including Medicare. The district court also correctly concluded that the public interest and balance of the equities support preliminary relief. Relying on expert declarations, the court found that permitting enforcement of Section 18-622 against EMTALA-required care would increase the risk that pregnant patients would face serious medical complications, irreversible injuries (such as limb amputation, hypoxic brain injury, and organ failure), or even death. By contrast, Appellants suffer no irreparable harm from maintaining the status quo.

III.    The preliminary injunction is appropriately tailored. It targets the precise situations when enforcing Section 18-622 would directly conflict with EMTALA's

stabilization requirement. The State argues that the injunction is overbroad, but that contention misconstrues the district court's order.

## STANDARD OF REVIEW

This Court reviews a district court's "legal conclusions de novo," "its factual findings for clear error," and its "decision to grant or deny a preliminary injunction for abuse of discretion." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (per curiam).

## ARGUMENT

**I.    The District Court Correctly Held That The United States Is Likely To Succeed On The Merits.**

EMTALA requires hospitals to offer pregnancy termination when that care is required to stabilize an emergency medical condition that seriously threatens a pregnant woman's life or health. Idaho Code § 18-622 directly conflicts with EMTALA— and is thus preempted—where it prohibits abortion care in those limited but critically important circumstances. The district court properly exercised its discretion to preliminarily enjoin Section 18-622 to the extent of this conflict.

**A.** **EMTALA requires hospitals to offer pregnancy termination when that care is required to stabilize an emergency medical condition.**

    **1.** **Statutory text, context, and history make clear that the stabilizing care required by EMTALA can include termination of a pregnancy.**

**a.** This case concerns the meaning of EMTALA's stabilization requirement. The text states: When an individual presents to a covered hospital with an "emergency medical condition," the hospital "must provide," within its available staff and facilities, "such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1). The plain meaning of this language makes clear that a hospital violates EMTALA if an individual presents with an emergency medical condition and the hospital fails to offer the necessary stabilizing treatment.

EMTALA does not specify the particular forms of treatment necessary to address particular emergencies, nor does it contain any exceptions for specific forms of necessary medical treatment, whether pregnancy termination or otherwise. Congress also did not merely require "some" treatment or "the same" treatment offered to other patients. Instead, Congress defined what it means "to stabilize" a patient: "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur" during a transfer or discharge. 42 U.S.C. § 1395dd(e)(3)(A); *see id.* § 1395dd(e)(4). In many situations, there is only one form of treatment that would suffice to stabilize a particular condition because only one treatment is

consistent with accepted clinical standards. When that is the case, EMTALA demands that specific treatment be offered.[3]

EMTALA also applies without exception to all types of emergency medical conditions, including pregnancy-related conditions. Congress defined "emergency medical condition" to include "a medical condition manifesting itself by acute symptoms of sufficient severity" that "the absence of immediate medical attention could reasonably be expected" to result in "serious jeopardy" to the individual's "health," "serious impairment to bodily functions," or "serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). Far from excluding pregnancy-related conditions from this definition, Congress expressly contemplated that a "pregnant woman" could be among the "individual[s]" experiencing an "emergency medical condition." *Id.* § 1395dd(e)(1)(A)(i), (B).

---

[3] For example, although EMTALA does not mention epinephrine, for a patient with anaphylaxis, EMTALA requires epinephrine because that is the only treatment that will stabilize the condition. The same is true for many other conditions that require a specific stabilizing treatment: hemorrhagic shock requires blood transfusion; cardiac arrest requires defibrillation; bacterial infections and meningitis require antibiotics; blood clots require anticoagulants; hyperkalemia with kidney failure requires dialysis; diabetic ketoacidosis requires insulin; opioid overdose requires naloxone; infected obstructing kidney stones require percutaneous nephrostomy; severely collapsed lung requires a chest tube; and severe respiratory failure requires mechanical ventilation. *See* Ctrs. for Medicare & Medicaid Servs. (CMS), *Hospital Surveys with 2567 Statement of Deficiencies – 2024Q2*, https://www.cms.gov/medicare/health-safety-standards/guidance-for-laws-regulations/hospitals/hospitals (*CMS Hospital Surveys*) (documenting EMTALA violations).

For some pregnant women, pregnancy termination is the treatment necessary "to stabilize" their "emergency medical condition." 42 U.S.C. § 1395dd; 3-ER-355 (Dr. Seyb Declaration) ("[T]here are situations where pregnancy termination is the only medical intervention that can preserve [the] patient's health or save their life."); *see also, e.g.*, 3-ER-204–205, 324–325, 339–340, 349 (physician declarations). Pregnant women can experience preterm premature rupture of membranes, placental abruption, pre-eclampsia, eclampsia, spontaneous miscarriage with detectable fetal heart rate, and intrauterine infection. 1-ER-011–012, 014–015; 3-ER-182–183, 188–217, 319–368 (physician declarations). In some cases, these conditions mean the patient likely will die unless her pregnancy is terminated. In others, she faces the risk of serious harms such as loss of fertility; hysterectomy; sepsis; clotting disorder; heart attack; coma; stroke; cardiovascular, immune, or platelet dysfunction; and renal, liver, or other organ failure. 3-ER-197–200, 214–215, 329–331, 334, 356 (physician declarations); SER-17 (American College of Obstetricians and Gynecologists Practice Bulletin); 1-ER-010–012, 015, 022–024 (district court opinions). When the only treatment that will save a pregnant woman's life or prevent grave harm to her health is termination of her pregnancy, EMTALA requires covered hospitals to offer that treatment.

Experience in Idaho before Section 18-622 took effect illustrates these risks and the treatment EMTALA has always required. Although many hospitals "were not offering 'elective terminations' of pregnancies" even before *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), those hospitals did not hesitate to "treat[]

16

patients whose health condition requires abortion as stabilizing care."  3-ER-204, 209.

For example:

- A woman presented to an Idaho emergency department at 15 weeks gesta-tion with severe pre-eclampsia, putting her at risk of acute and long-term complications, including seizures and stroke.  3-ER-349–350.  Her condi-tion was stabilized by terminating the pregnancy, which is "[t]he definitive medical treatment for pre-viable preeclampsia with severe features" because the fetus is not expected to survive and continuing the pregnancy threatens the patient's "future fertility and long-term health."  3-ER-214.

- A woman presented to an Idaho emergency department at 19 weeks gesta-tion with preterm premature rupture of membranes—that is, her amniotic sac had broken.  3-ER-340.  Had she not received medical care to terminate her pregnancy, she would have been at risk of "catastrophic injuries such as septic emboli necessitating limb amputations or uncontrollable uterine hem-orrhage ultimately requiring hysterectomy."  3-ER-197.

- A woman presented to an Idaho emergency department at 19 weeks gesta-tion with placental abruption:  her placenta had separated from the wall of the uterus.  3-ER-342–343.  Her condition was stabilized with an emergent dilation and evacuation, terminating the pregnancy.  3-ER-343.  Absent that care, she would have been at risk of kidney failure and hypoxic brain injury.  3-ER-197–198.

*See also* 3-ER-344–345, 350–351, 356–357.

Since EMTALA's enactment, Congress has reaffirmed that, in some circum-stances, the required stabilizing care is termination of the pregnancy.  In the promi-nent and carefully negotiated section of the Affordable Care Act (ACA) addressing the ACA's effect on laws dealing with abortion, Congress provided that the ACA does not require insurance plans to cover abortion and prohibited the use of federal subsi-dies for certain abortions.  42 U.S.C. § 18023(a), (b); *see* John Cannan, *A Legislative His-tory of the Affordable Care Act: How Legislative Procedure Shapes Legislative History*, 105 L.

Libr. J. 131, 157, 167-68 (2013).  But Congress also emphasized that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1395dd of this title (popularly known as 'EMTALA')."  42 U.S.C. § 18023(d).  Congress's inclusion of that disclaimer in a section of the statute focused exclusively on abortion reaffirms that pregnancy termination can constitute required stabilizing care under EMTALA.  *See* American Hospital Association (AHA) Amicus Br. 18-28.

Entities that enforce and comply with EMTALA have consistently understood the statute to require pregnancy termination in appropriate emergency circumstances.  Through enforcement actions and public guidance, HHS consistently has adopted that interpretation.[4]  For example, in 2008, HHS issued a final rule expressing its understanding that hospitals must offer "abortions that are necessary to stabilize the mother, as that term has been interpreted in the context of EMTALA."  73 Fed. Reg. 78,072, 78,087 (Dec. 19, 2008); *see also* 84 Fed. Reg. 23,170, 23,183 (May 21, 2019) (similar); CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* 4 (Sept. 17, 2021), https://perma.cc/V4Y9-VDHG

---

[4] *CMS Hospital Surveys* (2010-2016 file) Row 54,373 (2012 violation for discharging pregnant patient who required pregnancy termination as stabilizing treatment); *id.* (2010-2016 file) Row 69,788 (similar violation in 2011); *id.* (2010-2016 file) Rows 10,112, 23,102, 82,096 (violations for failure to provide stabilizing treatment, including pregnancy termination, to women experiencing complications from ectopic pregnancy in 2012, 2013, and 2015); *id.* (2017-2024 file) Rows 27,382, 48,470 (similar violations in 2018 and 2021).  Pre-2010 data is not readily available.

(similar); CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* 2 (July 11, 2022), https://perma.cc/GT5D-Q9FN.[5] Thus, contrary to Appellants' characterization, HHS's understanding of EMTALA is far from "novel." State.Br.10; Leg.Br.13. HHS has articulated and enforced that understanding across at least four presidential administrations.

The medical community likewise has long understood EMTALA this way. The largest hospital system in Idaho has emphasized that Appellants' interpretation—that pregnancy termination is never required under EMTALA—"would stun the vast majority of medical providers." Brief of St. Luke's Health System as Amicus Curiae in Support of Respondent at 8 n.6, *Moyle*, Nos. 23-726, 23-727 (Mar. 14, 2024), 2024 WL 1190875, at *8 n.6; *see also* AHA Amicus Br. 35. The physician declarations in the record similarly recognize that pregnancy termination in some circumstances is "required under EMTALA." 3-ER-215; *see, e.g.*, 3-ER-206, 210; 4-LEG-ER-407 (Legislature's

---

[5] The 2022 guidance has been enjoined within Texas and as to members of two organizational plaintiffs in separate litigation. *Texas v. Becerra*, 89 F.4th 529, 533 (5th Cir. 2024). The government petitioned for certiorari in that case, asking the Supreme Court to hold the petition for disposition in accordance with its decision in this case. Cert. Pet'n 6, *Becerra v. Texas*, No. 23-1076 (S. Ct. Apt. 1, 2023). After the Court dismissed the writ in this case, the government asked that the Court grant, vacate, and remand the *Texas* case. Among other things, the government explained that the plaintiffs there had newly represented that there was no conflict between Texas law and HHS's understanding of EMTALA, because Texas law allows providers to terminate a pregnancy when such care is necessary to prevent serious harm to a pregnant woman's health. *See* Cert. Reply 2, 6-7, *Becerra v. Texas*, No. 23-1076 (S. Ct. Sept. 4, 2024). The Court denied the petition. *See* Order, *Texas v. Becerra*, __ S. Ct. __, No. 23-1076 (Oct. 7, 2024).

physician declarant agreeing that "emergency situations presented in" government's declarations were "anticipated by EMTALA"). Public comments on HHS's conscience rulemakings reflect the same understanding. *See* 73 Fed. Reg. at 78,087; 84 Fed. Reg. at 23,183. It is thus no surprise that every court to consider the issue before *Dobbs* recognized that EMTALA can require that pregnancy termination be offered. *See, e.g.*, *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 709-18 (E.D. Mich. 2009); *New York v. HHS*, 414 F. Supp. 3d 475, 537-39 (S.D.N.Y. 2019); *California v. United States*, No. 05-328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008).

**b.** Appellants err by suggesting that EMTALA can never require pregnancy termination. In the district court, Appellants agreed that EMTALA requires abortion in certain circumstances (such as for uninsured patients facing medical emergencies, where the hospital provides abortion to insured patients and state law permits abortion). *See* 3-ER-236–237 (acknowledging the existence of "circumstances when stabilizing treatment necessitated by EMTALA includes an abortion"); 4-LEG-ER-504 (agreeing that "some serious medical condition exists that requires an emergency medical procedure under EMTALA, with that procedure ending the life of the preborn child"). Appellants now claim the opposite. They can raise those new arguments at summary judgment, but the district court did not err in adjudicating the preliminary-injunction motion based on the arguments Appellants raised at that stage. *See, e.g.*, *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (per curiam)

(refusing to consider challenge to preliminary injunction where party made an inconsistent argument "in its briefing in the district court").

Regardless, Appellants provide no basis to write an exception for pregnancy termination into EMTALA. Appellants argue that because EMTALA does not expressly reference pregnancy termination, it cannot require such care. *See* State.Br.28-29; Leg.Br.76-77. But there is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020). EMTALA mandates a general care objective: stabilization. Congress did not identify the particular treatments necessary to achieve that objective for the wide range of emergency medical conditions that EMTALA covers. It would be impossible (and unnecessary) for the statute to list every conceivable emergency medical condition and its corresponding stabilizing treatment. A hospital that failed to provide a chest tube for a severely collapsed lung or defibrillation for cardiac arrest, for example, could not defend itself by asserting that EMTALA does not mention those specific treatments. *See supra* p. 15 n.3.

Appellants also note (State.Br.34; Leg.Br.39) that EMTALA mentions a specific form of stabilizing treatment in only one circumstance: when a pregnant woman is in labor and "having contractions." 42 U.S.C. § 1395dd(e)(1)(B), (3)(A). But EMTALA singles out that scenario to expand the definition of "emergency medical condition" to include labor, which otherwise might not satisfy the statutory definition. In

identifying "deliver[y]" as "stabiliz[ation]" in that one instance, Congress did not override EMTALA's general stabilization obligation for pregnant women not in labor—or exclude any other necessary stabilizing treatment.

Statutory context reinforces that conclusion. When Congress intends to create special rules governing abortion or excluding abortion care from otherwise-applicable rules, it does so explicitly. *See, e.g.*, 10 U.S.C. § 1093; 20 U.S.C. § 1688; 22 U.S.C. §§ 5453(b), 7704(e)(4); 25 U.S.C. § 1676(a); 42 U.S.C. §§ 238n, 280h-5(a)(3)(C), 300a-6, 300a-7, 300a-8, 300z-10(a), 1397ee(c)(7)(A), 2996f(b)(8), 12584a(a)(9). EMTALA contains no such carve-out. Moreover, the same legislation that led to EMTALA's enactment included a separate program that, unlike EMTALA, did expressly prohibit abortion. *Compare* Consolidated Omnibus Reconciliation Act of 1985, H.R. 3128, 99th Cong. § 124 (language that became EMTALA), *with id.* § 302(b)(2)(B) (excluding abortion from a different program's authorized activities). Congress included no such language in EMTALA (and did not enact the other program either). H.R. Rep. No. 99-453, at 601 (1985) (Conf. Rep.).

Separately, it is irrelevant that other federal law restricts federal funding for certain abortion care or targets discrimination or coercion in the abortion context. None of the cited provisions references—let alone purports to limit—EMTALA's stabilization obligation. To the extent federal funds cannot be used to pay for certain care required under EMTALA, that is no reason to except that care from EMTALA's stabilization mandate. Much of the care EMTALA requires is not subsidized by federal

funds—private insurance covers the cost of EMTALA-required treatment for many patients. And insofar as some provisions of federal law are "neutral on abortion" (Leg.Br.53), Appellants identify no statutory provision demonstrating that Congress's "neutral[ity]" extends to medically required pregnancy termination under EMTALA. Indeed, Section 18023(d) of the ACA indicates otherwise. *See supra* pp. 17-18.

EMTALA's references to the "unborn child" do not cabin EMTALA's stabilization requirement either. All of EMTALA's duties—screening, stabilization, and transfer—run to the "individual" seeking care. Subsection (a) provides that a hospital's screening obligation arises when an "individual" "comes to the emergency department" and a request for examination or treatment "is made on the individual's behalf." 42 U.S.C. § 1395dd(a). Subsection (b) provides that a hospital's stabilization obligation arises if it determines that "the individual has an emergency medical condition." *Id.* § 1395dd(b)(1). The "individual" must be informed of risks and benefits and can give "informed consent to refuse such examination and treatment." *Id.* § 1395dd(b)(2). And subsection (c) restricts transfer until the "individual" is stabilized. *Id.* § 1395dd(c)(1).

When a pregnant woman presents with an emergency medical condition, she is the "individual" to whom those obligations run. The provision of EMTALA addressing pregnant patients distinguishes between "the individual" (denoting the "pregnant woman") and "her unborn child." 42 U.S.C. § 1395dd(e)(1)(A)(i); *see* 1 U.S.C. § 8(a) (defining "individual" to "include every infant member of the species homo sapiens

who is born alive at any stage of development," but not a fetus). Accordingly, when the treatment required to stabilize a pregnant woman's emergency medical condition is terminating the pregnancy, EMTALA requires the hospital to offer that treatment and allow her—the "individual"—to make an informed decision about whether to proceed.

None of EMTALA's four references to an "unborn child" alters this core obligation. Three simply direct hospitals to also consider risks to an "unborn child" in determining whether a woman in labor may be permissibly transferred before delivery. 42 U.S.C. § 1395dd(c)(1)(A)(ii), (2)(A), (e)(1)(B)(ii). The fourth, in Section 1395dd(e)(1)(A)(i), refers to an "unborn child" in the definition of "emergency medical condition." As originally enacted, EMTALA did not specify whether a hospital owed any obligation to treat a medical condition that jeopardized the health of a fetus but not the pregnant woman. *See id.* § 1395dd(e)(1)(A) (1988). In 1989, Congress addressed that situation by expanding the definition of "emergency medical condition" as experienced by pregnant women to include conditions that threaten the health of a pregnant woman's "unborn child." Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248-2249 (1989); 42 U.S.C. § 1395dd(e)(1)(A)(i); *see* H.R. Rep. No. 101-386, at 838 (1989) (Conf. Rep.). That salutary expansion of EMTALA did not alter the statute's existing requirements to stabilize pregnant women with emergency health conditions.

Practical realities underscore why the statute does not impose the "dual stabilization requirement" that Appellants claim. Leg.Br.45; State.Br.29-30. In many of the

24

tragic emergencies where EMTALA requires pregnancy termination, the pregnancy complication itself means the fetus would not have survived even absent immediate pregnancy termination. *See, e.g.*, 3-ER-214. EMTALA cannot possibly impose a "dual stabilization requirement" extending to both the pregnant woman and the fetus when there is no treatment that could "assure, within reasonable medical probability, that no material deterioration" of the fetus's condition is likely to occur. 42 U.S.C. § 1395dd(e)(3).

Finally, Appellants invoke the major-questions doctrine to argue that EM-TALA cannot require pregnancy termination. That doctrine is wholly inapplicable here. It applies when an "agency" asserts an "[e]xtraordinary grant[] of regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). It is rooted in a presumption that Congress would speak clearly if it meant to "delegate a decision" of vast "economic and political significance to an agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). But this is not an agency-delegation case. *See Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir.) (rejecting application of major-questions doctrine where "no relevant agency action" was challenged), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). Here, Congress required hospitals to provide emergency treatment without exception for necessary abortion care. This suit simply seeks to enforce "policy decisions" made by "Congress … itself." *West Virginia*, 597 U.S. at 723. Regardless, this case bears none of the hallmarks of the handful of "extraordinary cases" where the Supreme Court has invoked the major-questions doctrine. *Id.* EMTALA's

stabilization requirement is clear and direct, not framed in "vague," "cryptic," "ancillary," or "modest" terms. *Id.* at 721, 723, 724. Nor is there anything "'transformative,'" Leg.Br.60, about interpreting the stabilization requirement to mean what it says, consistent with how it has long been understood.

### 2. EMTALA does not merely prohibit discrimination against indigent patients.

Appellants further err in contending that EMTALA requires nothing of hospitals beyond "treat[ing] all patients on the same footing" and does not entitle patients to any particular care. State.Br.34; Leg.Br.38-39. That interpretation flatly contradicts the statutory text. Congress directed hospitals to provide essential care to "any individual" with an emergency medical condition, not just those who are indigent or lacking insurance. 42 U.S.C. § 1395dd(a). Congress did not define the required care in comparative terms; instead, it mandated "such treatment as may be required to stabilize the [individual's] medical condition." *Id.* § 1395dd(b)(1)(A). And Congress left no doubt that "to stabilize" is a substantive federal standard, defining that term to mean "such medical treatment … as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition" is likely to occur. *Id.* § 1395dd(e)(3)(A).

The Supreme Court has rejected a similar attempt to transform EMTALA's stabilization requirement into a nondiscrimination rule. In *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249 (1999) (per curiam), the court of appeals had held that a hospital violates

EMTALA only if its "inappropriate stabilization resulted from an improper motive such as one involving the indigency, race, or sex of the patient." *Id.* at 252. The Supreme Court unanimously and emphatically rejected that approach, "[f]inding no support for such a requirement in the text of the statute." *Id.* at 250. Numerous courts of appeals have likewise recognized that Appellants' construction would "directly conflict[] with the plain language of EMTALA" by permitting covered hospitals to provide "treatment that would allow [an individual's] condition to materially deteriorate, so long as the care she was provided was consistent with the care provided to other individuals." *In re Baby K (Baby K)*, 16 F.3d 590, 595-96 (4th Cir. 1994). Instead, "once an individual has been diagnosed as presenting an emergency medical condition," EMTALA requires the hospital to "provide that treatment necessary to prevent the material deterioration of the individual's condition." *Id.* at 594; *see, e.g., Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 582 (6th Cir. 2009); *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 893-96 (7th Cir. 2003).[6]

---

[6] Some courts of appeals have stated that EMTALA's screening provision requires only uniform treatment among the indigent and insured. *See, e.g., Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996). Even assuming those decisions are correct, the screening provision is textually distinct from the stabilization requirement which imposes an obligation to provide medical care to achieve a defined statutory objective. *See* 42 U.S.C. § 1395dd(a). And in *Roberts*, the Supreme Court recognized that EMTALA's screening and stabilization obligations need not be construed in tandem—and squarely rejected the view that the stabilization obligation requires only equal treatment. 525 U.S. at 252-53.

Rather than grapple with EMTALA's text, Appellants invoke a separate provision of the original 1965 Medicare Act specifying that nothing in the Medicare Act "shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine." 42 U.S.C. § 1395. But EMTALA does not "interfere with 'the practice of medicine.'" State.Br.33; Leg.Br.31. Rather, EMTALA preserves the ability of hospitals to follow evidence-based clinical standards in determining what EMTALA's stabilization obligation requires in a particular case. *See infra* pp. 30-31, 35-36. Indeed, the Supreme Court recently rejected a similar "reading of section 1395" that "would mean that nearly every condition of participation the Secretary has long insisted upon is unlawful." *Biden v. Missouri*, 595 U.S. 87, 97 (2022) (per curiam). Moreover, EMTALA's stabilization requirement was enacted by Congress, not imposed by a "Federal officer or employee." And if there were some tension between the two provisions, EMTALA would control because it is later-enacted and far more "specific." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Appellants also invoke legislative history suggesting that Congress, in enacting EMTALA, sought to end the practice of patient-dumping. State.Br.7, 34; Leg.Br.27-28. But that specific concern reflected Congress's commitment to a broader principle: that "every patient who has a bonafide emergency" should receive stabilizing care. 131 Cong. Rec. 28,569 (statement of Sen. Kennedy); *see, e.g.*, *id.* (statement of Sen. Dole). Numerous courts have rejected similar attempts to narrow

EMTALA's scope through legislative history as inconsistent with the statutory text. *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1040 (D.C. Cir. 1991) (although EMTALA's "legislative history reflects an unmistakable concern with the treatment of uninsured patients, the Act itself draws no distinction between persons with and without insurance"); *Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 792-93 (2d Cir. 1999); *Correa v. Hospital S.F.*, 69 F.3d 1184, 1194 (1st Cir. 1995); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 n.3 (9th Cir. 1995). In any event, this case illustrates how enforcing EMTALA's guarantees for all patients addresses patient-dumping by ensuring that women will not need to be airlifted across state lines to access required stabilizing treatment.

Finally, Appellants' reliance on malpractice case law is misplaced. *E.g.*, Leg.Br.38, 41; State.Br.33-34. Those decisions do not construe EMTALA as prohibiting only discrimination against the uninsured. They simply recognize that liability under EMTALA "is determined independently" of liability under state malpractice or negligence law. *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 173-74, *amended*, 586 F.3d 1011 (3d Cir. 2009). A state-law malpractice action asks whether any aspect of the provider's treatment breached a duty of care under state law. By contrast, EMTALA asks whether a provider satisfied a specific statutory obligation to "stabilize" an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). For example, a doctor might satisfy EMTALA by providing an appendectomy to a patient with appendicitis while nevertheless violating state malpractice law by negligently failing to diagnose the

patient's cancer during the appendectomy. EMTALA thus is "not a substitute for state law malpractice actions," *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994), and does not "guarantee proper diagnosis" or "provide a federal remedy for misdiagnosis or medical negligence," *Hardy*, 164 F.3d at 792. EMTALA does, however, establish a baseline duty to provide "stabilizing treatment for a patient who arrives with an emergency condition," *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996), by asking whether a hospital "provid[ed] an adequate first response to a medical crisis," *Cherukuri v. Shalala*, 175 F.3d 446, 451 (6th Cir. 1999).

### 3. State law does not constrain EMTALA's stabilization requirement.

Appellants further err in arguing that state law can prohibit treatment required under EMTALA. As discussed, *supra* p. 14, EMTALA defines the required treatment as that which is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely." 42 U.S.C. § 1395dd(e)(3)(A). The ordinary meaning of these words requires hospitals to provide necessary stabilizing treatment, as determined by evidence-based clinical standards. The statute defines the stabilization requirement by reference to the medical realities that make certain treatment "necessary" to prevent "material deterioration" of an emergency medical condition. *Id.*; *cf. Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 969 (9th Cir. 2013). Were there any doubt, Congress removed it by providing that necessity is to be

measured by "reasonable medical probability." 42 U.S.C. § 1395dd(e)(3)(A). It would be inconsistent with that standard to import state legal restrictions on medically necessary care. *See Baby K*, 16 F.3d at 597 (preempting state-law limit on necessary care).

Indeed, Appellants' interpretation has no basis in the statutory text. Their state-law limitation would rewrite EMTALA's operative text to require "'such treatment as may be required to stabilize the medical condition' … *among those treatments that are authorized under both state and federal law*." Emergency Application for a Stay Pending Appeal at 17, *Idaho v. United States*, No. 23-727 (U.S. Nov. 20, 2023). Of course, Congress did not include the italicized words, and courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009).

Appellants argue (State.Br.35) that EMTALA incorporates state-law limits by requiring only treatment that is "within the staff and facilities available at the hospital," 42 U.S.C. § 1395dd(b)(1)(A). But that phrase refers to physical and personnel constraints, not legal constraints that prohibit medically necessary treatment. "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016). Thus, EMTALA requires necessary treatment that hospitals are "capable" of providing based on the "staff" and "facilities" they have, as HHS has long advised. *See* CMS, *State Operations Manual* app. V, at 48 (Rev. 191, July 19, 2019), https://perma.cc/23A7-KYGQ (referring to "physical space, equipment, supplies,

and specialized services," as well as "personnel"). Appellants do not dispute that emergency pregnancy termination is within the physical and personnel constraints of hospitals in Idaho generally. Nor could they, given that Idaho previously allowed this care and Idaho presently permits providers to terminate a pregnancy when "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a)(i); *e.g.*, 3-ER-247–260, 338–340, 348–351, 354–357 (physician declarations that abortion care is within their medical expertise or hospital capability).

This Court has rejected similar efforts by a state to limit federal availability standards for medical care by reference to state law. In *Betlach*, this Court held that an Arizona law withholding Medicaid funds from healthcare providers that provided certain abortion care violated Medicaid's free-choice-of-provider requirement. 727 F.3d at 964, 968-75. Arizona claimed the authority to limit patients' choice of Medicaid provider, construing a limitation that providers be "qualified" as empowering states to "determine for any reason that a provider is not qualified." *Id.* at 968-70. The Court rejected that argument, explaining that the Medicaid Act "indexes the relevant 'qualifications'" not to federal- or state-imposed criteria "but to factors external to the Medicaid program" like "the provider's competency and professional standing" and that the Medicaid Act did not "indicate[] that each state is free to define" the term "qualified" "however it sees fit." *Id.* at 969-70. Moreover, the Court explained that allowing states to freely set qualifications would render the free-choice-of-provider requirement "self-eviscerating" and equivalent to no requirement at all. *Id.* at 970-71.

32

Appellants' reading similarly would allow states to render resources unavailable for any reason, causing EMTALA's meaning to vary from state to state and eviscerating Congress's promise of essential emergency care to all Americans.

Statutory context confirms that the stabilizing treatment that EMTALA requires is not limited by state law. When Congress intended to incorporate state law in EMTALA, it did so expressly. *See* 42 U.S.C. § 1395dd(d)(2)(A), (B) (authorizing damages available "under the law of the State in which the hospital is located"). Moreover, Congress elsewhere created rules for quality-improvement organizations (QIOs), which work with HHS to investigate EMTALA violations, requiring QIOs to "apply professionally developed norms of care, diagnosis, and treatment based upon typical patterns of practice within the geographic area served by the organization …, taking into consideration national norms where appropriate." *Id.* § 1320c-3(a)(6)(A). The statute defines "[s]uch norms" to refer to services, providers, and the provision of care, and focuses solely on the provision of evidence-based medical care to achieve the statutory objective: stabilization. *Id.* ("consistent with professionally recognized and accepted patterns of care"; "medically appropriate").

EMTALA's express preemption provision further indicates that varying state laws cannot constrain the care EMTALA requires. That provision anticipates that state law might directly conflict with federal requirements and provides that, in such cases, EMTALA controls. 42 U.S.C. § 1395dd(f). There is thus no basis to apply a "presumption against preemption," State.Br.26, because Congress said it intended

EMTALA to have preemptive effect. *See R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022). Appellants emphasize that EMTALA does not preempt state law unless the law "directly" conflicts with EMTALA's requirements, but that limitation simply ensures that EMTALA does "not preempt stricter"—*i.e.*, more protective—"state laws." H.R. Rep. No. 99-241, pt. 1, at 4; *see, e.g.*, *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) (Section 1395dd(f) preserves additional "state remedies"). Moreover, contrary to the Legislature's suggestion (at 30-31), there is nothing uniquely "narrow" about an express preemption provision that refers to "direct" conflicts; that construction is common, reflecting the ordinary rule that federal law preempts "direct[ly]" conflicting state law. *See, e.g.*, 7 U.S.C. § 2156; 15 U.S.C. § 1225; 16 U.S.C. §§ 3507, 544*l*(e)(5); 43 U.S.C. § 1600g; *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). Finally, the Legislature asserts (at 39) that "direct conflicts" with EMTALA "tend[] to be about … EMTALA's private right of action," but the statutory text preempts "any" directly conflicting state-law requirement and includes no language limiting its application that way. 42 U.S.C. § 1395dd(f).

Statutory history points in the same direction. "EMTALA was enacted to fill a lacuna in traditional state tort law by imposing on hospitals a legal duty (that the common law did not recognize) to provide emergency care to all." *Hardy*, 164 F.3d at 792-93. In requiring hospitals to offer stabilizing treatment to any individual who presents with an emergency medical condition, EMTALA supplanted the common-law

rule that still governed in many states, under which hospitals generally could not be liable for failure to treat. *Id.* It would have made no sense for Congress to allow state law to set the boundaries of EMTALA's stabilization requirement when the very purpose of that requirement was to displace the state-law regime with a federal standard requiring medically necessary stabilizing care.

HHS also has consistently advised that compliance with EMTALA's stabilization requirement depends on providing the care that is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely," 42 U.S.C. § 1395dd(e)(3)(A)—not state law. *See, e.g.*, CMS, *Quality Improvement Organization Manual* ch. 9, at 43 (Rev. 24, Issued Feb. 12, 2016), https://perma.cc/WV4G-W6EV (explaining that EMTALA compliance depends on "[a]ccepted standards of medical practice," "[e]vidence-based clinical standards," and "[s]ound clinical judgment"); CMS, *Emergency Medical Treatment and Labor Act (EMTALA) and the Born-Alive Infant Protection Act* (June 27, 2019), https://perma.cc/AL4B-T9CX ("physician reviewers" assessing EMTALA compliance "evaluate the care, or lack of care, provided in accordance with national standards of practice"); *State Operations Manual*, *supra*, app. V, at 50 (EMTALA's stabilization requirement is satisfied when "the treating physician … in the emergency department/hospital has determined, within reasonable clinical confidence, that the emergency medical condition has been resolved"); *id.* at 61 (instructing that "a woman in

labor may be transferred only if" the transfer satisfies EMTALA; "[a] hospital cannot cite State law or practice as the basis for transfer").

Finally, the State (at 36) highlights EMTALA's references to "negligen[ce]," 42 U.S.C. § 1395dd(d), as evidence that EMTALA incorporates state law into the stabilization requirement by generally "embrac[ing]" a "state-law foundation." But nothing in the statute suggests that EMTALA's negligence element depends on state law. EMTALA's enforcement provision makes clear that if a hospital or physician "negligently violates a requirement of" EMTALA, HHS's Office of Inspector General may impose certain penalties. 42 U.S.C. § 1395dd(d)(1). That does not change what it means to violate EMTALA, which is established by the underlying statutory requirements. In assessing whether such a violation was done "negligently," HHS does not apply different concepts of negligence based on the hospital's geographic location. And when Congress intends for federal law to incorporate state-law negligence standards, it says so expressly. *See, e.g.*, 28 U.S.C. § 1346(b)(1) (applying the "law of the place" under the Federal Tort Claims Act). Similarly, Appellants note that hospitals generally must comply with state licensing requirements to participate in Medicare. Leg.Br.44; State.Br.33. But they usually can do so fully consistent with EMTALA. In the rare circumstances where there is a direct conflict in emergency situations, this general requirement cannot override EMTALA's specific requirements. In any event, state law unquestionably has relevance and force in many contexts. That fact does not negate EMTALA's express preemption provision where federal and state law

36

directly conflict, nor does the relevance of state law to other questions change the meaning of the stabilization requirement that is at issue in this case.

**B.    EMTALA preempts Idaho Code § 18-622 to the extent that EMTALA requires stabilizing treatment that Section 18-622 prohibits.**

**1.    The record demonstrates that Section 18-622 directly conflicts with EMTALA.**

**a.**    As the district court recognized, Section 18-622 prohibits care in some circumstances where EMTALA requires it.  Section 18-622 permits pregnancy termination only in cases of molar or ectopic pregnancy, or when "necessary to prevent the death of the pregnant woman."  Idaho Code § 18-622(2)(a).  The Idaho Supreme Court has construed the necessary-to-prevent-death exception as "subjective," "focusing on the particular physician's judgment" rather than "requir[ing] *objective* certainty." *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1203 (Idaho 2023).  But a physician still must determine that pregnancy termination is "necessary" to prevent "death."  *Id.*  In contrast, EMTALA requires stabilizing treatment when a patient is at risk of serious harm to her health, including serious impairment to bodily functions or dysfunction of a bodily organ.  42 U.S.C. § 1395dd(e)(1)(A).  EMTALA also requires stabilizing treatment when the requisite harm "could reasonably be expected to result" absent immediate medical attention.  *Id.*

Appellants suggest that Section 18-622's necessary-to-prevent-death exception permits any care required under EMTALA, but that reading distorts Section 18-622's

plain text. Leg.Br.47-51; State.Br.41-43. While earlier Idaho abortion laws included a

"'medical emergency' exception" that was "substantially similar" to "EMTALA,"

*Planned Parenthood Great Nw.*, 522 P.3d at 1207, Section 18-622 superseded those laws

and omitted that language, reflecting a deliberate "decision" to "focus on the life of

the mother versus a health exception," Idaho Senate State Affairs Comm., *Minutes* 3

(Mar. 30, 2023), https://perma.cc/QC9M-LBQV (statement of Sen. Lakey). EM-

TALA, by contrast, requires care for women facing serious threats to their health,

bodily functions, or organ function.

　　As the government's experts explained, many of the most common pregnancy

complications do not initially threaten the pregnant woman's life when she arrives at

the emergency department. For example, before symptoms of infection are present, a

woman suffering from preterm premature rupture of membranes is likely not at risk

of death "at the point of diagnosis." 3-ER-191–192 (Dr. Fleisher Declaration). Yet

"immediate treatment through termination of pregnancy may be necessary because

delaying treatment would allow the condition to progress, thereby threatening other

bodily organs and functions." 3-ER-192.[7] Similarly, "[t]he definitive medical

---

[7] The State takes issue with this example, arguing that in cases of PPROM, physicians generally can "monitor[]" the pregnant woman for a "few weeks" then deliver the baby. State.Br.42. But the possibility of monitoring does not cure the conflict between federal and state law. Even if she is being monitored, the woman could face serious threats to her health but not necessarily death. *See Moyle v. United States*, 144 S. Ct. 2015, 2037-38 (2024) (Alito, J., dissenting) ("[G]uidance provided by prominent medical institutions is sufficient to show how Idaho law and EMTALA, as interpreted

*Continued on next page.*

treatment for pre-viable preeclampsia with severe features is termination of pregnancy"—not just "continued observation"—because the condition "places a patient at risk for both acute and long-term complications." 3-ER-214 (Dr. Cooper Declaration). But "[t]he medical rationale … is not always to prevent death; in the majority of cases it is to avoid further deterioration, physical harm, and threat to future fertility and long-term health." 3-ER-214. Idaho law does not allow women facing that condition to receive treatment until their conditions deteriorate so much that pregnancy termination is necessary to save their lives. EMTALA, in contrast, requires stabilizing treatment to avoid "material deterioration of the condition." 42 U.S.C. § 1395dd(e)(3).

Appellants are thus wrong to suggest that "[t]here is no evidence that medical emergencies require abortions in circumstances that Idaho prohibits." Leg.Br.47; State.Br.41-42. The Legislature invokes (at 50) testimony from its own witnesses that they would "treat every condition as life-threatening without hesitation," but their disagreement with the government's experts is insufficient to overturn the district court's findings. As the Legislature emphasizes (at 35, 50), Idaho law turns on a physician's subjective views regarding whether pregnancy termination is necessary to prevent the patient's death. Testimony from the government's experts establishes that physicians are not able to make that subjective judgment with respect to all conditions that might

_____

by the Government, may conflict in such cases" of PPROM); *id.* at 2025 (Jackson, J., concurring in part and dissenting in part) (similar).

require pregnancy termination as stabilizing treatment under EMTALA. *See* 3-ER-191–192; 3-ER-197–198; 3-ER-214–215.

Even brief experience has confirmed that Section 18-622 prevents women from receiving the stabilizing medical treatment that EMTALA requires. For example, while the panel's stay was in effect, a woman had to be flown from Idaho to Utah for treatment "after her water broke about five months early," creating an urgent risk of infection, "sepsis," and "organ failure"—conditions that Idaho doctors, facing potential felony prosecution, could not say met Section 18-622's necessary-to-prevent-death threshold. Kelcie Moseley-Morris, *Most Americans Want Health Exceptions in Abortion Bans*, Idaho Capital Sun (Nov. 7, 2023), https://perma.cc/MDR8-GE6X. And after the Supreme Court stayed the preliminary injunction, Idaho doctors reported that they would have to "transfer more patients out of state for abortion care" rather than wait for the situation to become "life-threatening." Kelcie Moseley-Morris, *U.S. Supreme Court Agrees to Hear Idaho Case on Emergency Room Abortions*, Idaho Capital Sun (Jan. 5, 2024), https://perma.cc/W6F2-CQ8U. Indeed, "[t]o ensure appropriate medical care, the State's largest provider of emergency services had to airlift pregnant women out of Idaho roughly every other week," as of April 2024, "compared to once in all of the prior year (when the injunction was in effect)." *Moyle v. United States*, 144 S. Ct. 2015, 2017 (2024) (Kagan, J., concurring); *see* St. Luke's Health System Amicus Br. 14, 25 (explaining that five of those women presented with

PPROM, and one presented with severe pre-eclampsia). Such transfers "put patients at risk due to significant delays in care." St. Luke's Amicus Br. 15.

**b.** The district court correctly held that EMTALA preempts Section 18-622 where EMTALA requires care that Section 18-622 prohibits. EMTALA expressly preempts state laws that "directly conflict[]" with its requirements. 42 U.S.C. § 1395dd(f). Here, Section 18-622 directly conflicts with EMTALA because in certain cases "compliance with both state and federal law is impossible" and "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015); *see Draper v. Chiapuzio*, 9 F.3d 1391, 1394 (9th Cir. 1993) (per curiam).

Most obviously, Section 18-622 directly conflicts with EMTALA because, in some circumstances, it is impossible to comply with both laws. As the district court found, pregnant women sometimes arrive at emergency rooms suffering from dangerous conditions that do not yet threaten their lives, but where termination of the pregnancy is the only care that can prevent grave harms to their health. *See supra* pp. 38-39. A doctor also might determine in some cases that a woman can "reasonably be expected" to die or suffer serious harm without pregnancy termination, without being able to conclude that such care is "necessary" to avert her death. In such circumstances, EMTALA directs that the hospital "must provide" that treatment if the patient chooses to receive it, 42 U.S.C. § 1395dd(b)(1)—but Section 18-622 makes that treatment a felony.

41

In other circumstances, Section 18-622 directly conflicts with EMTALA because state law poses an obstacle to accomplishing EMTALA's goals. Section 18-622 imposes severe sanctions for violations, including a mandatory minimum of two years' imprisonment and license suspension. Those sanctions have a "deterrent effect," 1-ER-039, leading doctors to withhold even "medically necessary, life-saving care" that EMTALA requires and Section 18-622 theoretically permits. 3-ER-345; *see* AHA Amicus Br. 6-18. Section 18-622 thereby obstructs Congress's purpose of ensuring that all individuals "receive adequate emergency medical care." *Arrington v. Wong*, 237 F.3d 1066, 1074 (9th Cir. 2001); *see, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("fear" of "expos[ure] … to unpredictable civil liability" sufficient for implied preemption); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (where "individuals could be prosecuted for conduct that Congress specifically sought to protect," the statute "clearly poses an obstacle to the accomplishment of the 'full purposes and objectives of Congress'").

Outside of narrow but critical circumstances, EMTALA does not preclude enforcement of Idaho law. EMTALA preempts state law only to the extent that the state law directly conflicts with EMTALA's requirements. As discussed, EMTALA preempts Section 18-622 only in cases where pregnancy termination is the required stabilizing treatment for an emergency medical condition. Contrary to the State's assertion (at 37), EMTALA does not create a "'mental health' loophole for abortion"; the State neither identifies a single case where an emergency-room physician

terminated a pregnancy to stabilize a mental-health condition, nor cites any clinical

standard identifying termination as necessary stabilizing care in such circumstances.

*See* St. Luke's Amicus Br. 26-27. The appropriate stabilizing care for someone who

presents to the emergency department with an emergency mental-health condition is

psychiatric care—not pregnancy termination. *See infra* pp. 61-62.

Notably, the situations where EMTALA and Section 18-622 conflict are rare

and generally occur before viability. Once a fetus is viable and can be delivered safely,

there is no conflict between EMTALA and Idaho law—the provider can comply with

both EMTALA and Idaho law by delivering the child, which explains why the

preemption issue apparently never arose under pre-*Dobbs* laws that prohibited abor-

tions only after viability. *See* State.Br.26, 38-39 (citing 36-year history of EMTALA

pre-*Dobbs*).

### 2. The United States has a cause of action to enforce EMTALA.

Appellants also argue that the United States lacks a cause of action to enforce

EMTALA. State.Br.23-24; Leg.Br.61-63. That contention lacks merit. The United

States may sue in equity to enjoin federally preempted laws like Section 18-622. The

United States advances an equitable cause of action consistent with centuries of prece-

dent permitting suits to enjoin unconstitutional actions by state actors. *See Armstrong*

*v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Under this longstanding eq-

uitable tradition, it is well established that the United States can sue to enjoin

enforcement of state law pursuant to the Supremacy Clause. *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 837 (2022); *Arizona v. United States*, 567 U.S. 387, 393-94 (2012); *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024); *United States v. City of Arcata*, 629 F.3d 986, 989-90 (9th Cir. 2010).

Congress's express authorization of other remedies in EMTALA does not implicitly preclude equitable suits by the United States. As the Supreme Court explained in *Armstrong*, "equitable relief … is traditionally available to enforce federal law," unless Congress has "displace[d]" it by demonstrating an "intent to foreclose equitable relief." 575 U.S. at 328-29. There is no indication here that Congress intended to foreclose the United States's ability to seek equitable relief. EMTALA generally treats equitable relief as an appropriate remedy. *See* 42 U.S.C. § 1395dd(d)(2)(A)-(B) (expressly authorizing private plaintiffs to seek "equitable relief"). EMTALA also recognizes the important role that the federal government plays in ensuring compliance. *See, e.g.*, *id.* § 1395dd(d)(3) (HHS may "impos[e] sanctions" or "terminat[e] a hospital's participation" in Medicare). Equitable enforcement by the United States against states serves similar interests by promoting "uniformity" through application of the federal government's "expertise" in EMTALA's requirements and ensuring that providers are not deterred from providing the treatment EMTALA requires. *See Armstrong*, 575 U.S. at 328. The preemption questions presented by such equitable suits are in no way "judicially unadministrable." *See id.*

Moreover, the statute's express remedies are limited to hospitals and physicians. *See* 42 U.S.C. § 1395dd(d)(1)(A)-(B) (civil monetary penalties and exclusion from Medicare); *id.* § 1395dd(d)(2) (private civil actions against participating hospitals). It is implausible that, by authorizing these remedies against hospitals, Congress intended to displace traditional remedies against states: "The fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds … does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under *Ex parte Young*." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 n.3 (2011); *see also United States v. United Mine Workers of Am.*, 330 U.S. 258, 272 (1947) ("There is an old and well-known rule that statutes which in general terms divest preexisting rights or privileges will not be applied to the sovereign without express words to that effect."). Appellants' contrary position would mean that Congress intended to foreclose all remedies against states. But rather than insulate the states from EMTALA's requirements, Congress expressly preempted state laws that directly conflict with EMTALA. 42 U.S.C. § 1395dd(f). Appellants offer no reason why Congress would want to permit relief only against providers, when state laws prohibiting compliance are at least as disruptive to statutory objectives and relief against providers alone would not prevent a state from enforcing the federally preempted state law. *Contra* State.Br.23 (asserting that statutory remedies are "adequate").

The cases Appellants invoke are readily distinguishable. Appellants rely heavily on *Armstrong*, but there, the Supreme Court simply held that Congress's decision to provide a "sole remedy" against a particular party can indicate intent to displace other remedies against that same party. 575 U.S. at 328; *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) (holding that "action against a state officer" was precluded because "Congress has prescribed a detailed remedial scheme for the enforcement against a State"); *Virginia Office for Prot. & Advocacy*, 563 U.S. at 256 n.3 (explaining that the federal statute at issue in *Seminole Tribe* "created an alternative remedial scheme that would be undermined by permitting *Ex parte Young* suits"); *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19-20 (1979) (no private right of action for damages where statute gave federal government express means of criminal, civil, and administrative enforcement). Here, Congress has not provided any express remedies against states, much less displaced the United States's traditional authority to seek equitable relief against states.

### 3. Appellants' constitutional arguments are forfeited and without merit.

**a.** In opposing the government's preliminary-injunction motion (and in earlier briefing before this Court), Appellants did not develop the constitutional arguments they now press. The district court acted well within its discretion in refusing to allow Idaho to "challenge the constitutionality of a 35-year-old federal statute in a passing footnote." 1-ER-027. This Court should decline to consider Appellants'

constitutional arguments until the district court has had the opportunity to address them at summary judgment. That is the course contemplated by several Justices who concurred in the Supreme Court's order dismissing the writ of certiorari as improvidently granted: They noted that, because of Appellants' failure to raise their Spending Clause argument below, "the District Court did not address this issue." *Moyle*, 144 S. Ct. at 2022 (Barrett, J., concurring). And they emphasized that "the lower courts"—not just this Court—"should address the Spending Clause issue in the first instance." *Id.*; *see, e.g.*, *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (refusing to consider challenge to preliminary injunction where defendant did not raise issue in district court). In any event, to the extent the Court addresses Appellants' new constitutional arguments, they fail.

**b.** EMTALA is valid Spending Clause legislation. Congress has "broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). The Spending Clause authorizes Congress to "provide for the … general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, thereby conferring a "separate and distinct" "substantive power" that is "as broad as the power to tax." *United States v. Butler*, 297 U.S. 1, 65-66 (1936). The Supreme Court has recognized only four limits on the spending power, requiring expenditures to be for the "general Welfare" and conditions to be "unambiguous," "reasonably related to the purpose of the expenditure," and consistent with "any independent constitutional prohibition." *New York v.*

*United States*, 505 U.S. 144, 171-72 (1992); *South Dakota v. Dole*, 483 U.S. 203, 207-08

(1987).  All four limits are satisfied here:

*First*, Congress provided for the "general Welfare" of the United States when it

created the Medicare program.  Appellants do not contend otherwise.

*Second*, Congress made compliance with EMTALA an "unambiguous" condi-

tion for hospitals that choose to participate in Medicare.  By clearly stating that hospi-

tals must comply with EMTALA to receive Medicare funds, 42 U.S.C.

§ 1395cc(a)(1)(I)(i), Congress made "the existence of the condition … explicitly obvi-

ous."  *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) ("Congress is

not required to list every factual instance in which [a recipient of federal funds] will

fail to comply with a condition.").  No more is required, but regardless, for all the rea-

sons discussed above, EMTALA's requirements are clear and providers have long un-

derstood them.  *See supra* pp. 14-26.

*Third*, requiring compliance with EMTALA is "reasonably related" to Medi-

care's purpose to improve access to healthcare.  *See New York*, 505 U.S. at 172.  The

Legislature suggests (at 72 & n.8) that EMTALA is insufficiently related to Medicare

because EMTALA "has nothing to do with Medicare eligibility or Medicare dollars."

But EMTALA does affect Medicare dollars; by requiring hospitals to provide neces-

sary stabilizing treatment, EMTALA protects some patients from becoming perma-

nently disabled and therefore prematurely becoming Medicare beneficiaries.  Medicare

and EMTALA also both serve the goal of improving access to healthcare.  *See New*

*York*, 505 U.S. at 172 (finding reasonable relationship where "the conditions and the payments" address the same general problem).  EMTALA does so by setting minimum requirements for the provision of emergency healthcare.  And Medicare does so in many ways, including by providing insurance to specific populations and funding programs that benefit Medicare and non-Medicare patients alike.  *See, e.g., Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 509 (1994).  Numerous Medicare conditions also serve this goal by establishing standards and requirements that apply to all patients.  "[H]ealthcare facilities that wish to participate in Medicare and Medicaid have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare."  *Missouri*, 595 U.S. at 94; *see also, e.g.*, 42 U.S.C. § 300a-7(c) (requiring certain hospitals to adhere to federal conscience protections).

Moreover, EMTALA improves access to healthcare for both Medicare beneficiaries and other people.  Medicare beneficiaries might need emergency healthcare in a range of situations covered by EMTALA, including not only emergency pregnancy termination (which might be needed by Medicare beneficiaries who are disabled or have end-stage renal disease) but also treatment for heart attack, stroke, and other life-threatening conditions (which might be needed by any Medicare beneficiary).  Additionally, by requiring hospitals to provide stabilizing treatment to everyone who needs it, EMTALA prevents the treatment delays that would occur were hospitals to screen patients for insurance coverage before providing necessary medical treatment.  And by preventing patient-dumping, EMTALA improves capacity at hospitals that

otherwise would treat a disproportionately large share of indigent patients, thereby improving those hospitals' ability to adequately serve their Medicare patients.

*Finally*, EMTALA does not violate any independent constitutional prohibition. Contrary to the Legislature's arguments (at 74-78), EMTALA does not violate the Tenth Amendment. Medical practice simply is not an area of exclusive state control. "[T]here is no question that the Federal Government can set uniform national standards" on matters of "health and safety," including "medical practice." *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006). Those standards reflect the broad federal interest in promoting safe and effective healthcare for all Americans, which EMTALA serves by requiring hospitals to provide stabilizing treatment in emergency situations. EMTALA also serves important federal interests in interstate comity and interstate commerce by generally prohibiting patient-dumping across state lines. This case illustrates those interests in the abortion context: When Idaho's restrictions went into effect, women in Idaho had to be airlifted to other states to receive the emergency abortion care they needed. EMTALA enables women to access emergency abortion care without crossing state lines, regardless of the state where they live, thereby improving outcomes for patients and alleviating burdens on healthcare providers in other states.

Contrary to Appellants' suggestion, the Supreme Court in *Dobbs* did not hold that abortion policy is subject to exclusive state control. In *Dobbs*, the Court "returned" "the authority to regulate abortion … to the people and their elected representatives." 597 U.S. at 292. But the people's elected representatives include their

representatives in "Congress." *Id.* at 345 (Kavanaugh, J., concurring). And those representatives enacted EMTALA, which requires hospitals to offer pregnancy termination in emergency circumstances. If Congress wishes to revisit EMTALA or any other federal abortion law in light of states' greater authority to regulate abortion after *Dobbs*, it is free to do so. Nothing in *Dobbs* provides any reason to conclude that abortion is a matter of exclusive state control.

Appellants also emphasize that Idaho's preempted statute is a criminal law, but criminal law is not an area of exclusive state control either. Numerous federal laws address criminal conduct. *See, e.g.*, 18 U.S.C. § 1531 (criminalizing partial-birth abortion); *id.* § 1347 (criminalizing healthcare fraud). Federal law also routinely precludes enforcement of state criminal law. *See, e.g.*, *Arizona*, 567 U.S. 387 (state criminal law related to immigration preempted). Where a state criminal law proscribes conduct that federal law permits, the state law "interfere[s] with the careful balance struck by Congress" and is preempted. *Id.* at 406. And here, where that conduct is not merely permitted by federal law but required, the interference with federal objectives is obvious. A "court may not convict a criminal defendant of violating a state law that federal law prohibits." *Armstrong*, 575 U.S. at 326.

Furthermore, as discussed below, EMTALA is a valid exercise of Congress's authority under the Commerce Clause in addition to the Spending Clause. *See infra* pp. 55-56. There can be no Tenth Amendment violation where, as here, Congress acted under the Commerce power. *See New York*, 505 U.S. at 156.

**c.**     Because EMTALA is valid federal law, it carries the same force under the Supremacy Clause as any other valid federal law.  The Supreme Court has consistently applied the Supremacy Clause to reach that conclusion with respect to other Spending Clause legislation.  *See, e.g.*, *King v. Smith*, 392 U.S. 309, 333 n.34 (1968) ("There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid."); *Butler*, 297 U.S. at 74 (similar, for state laws that conflict with conditions attached to federal spending agreements with private parties); *Carleson v. Remillard*, 406 U.S. 598, 600-01 (1972); *Townsend v. Swank*, 404 U.S. 282, 285-86 (1971).  Those decisions reflect the categorical language of the Supremacy Clause, which provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," "shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2. The Supremacy Clause makes no exception for laws enacted pursuant to Congress's "substantive" and "distinct" authority under the Spending Clause.  *Butler*, 297 U.S. at 65-66, 74.

Appellants principally contend that they did not voluntarily consent to comply with EMTALA.  But even taking that assertion at face value, states do not have a veto power when, as here, Congress provides conditional federal funding to entities other than the state.  *See Butler*, 297 U.S. at 74.  The Supreme Court made this clear in *Butler*,

which considered a federal program that directed money to private farmers on the condition that the farmers take certain actions. The Court explained that where "[t]he United States can make the contract" with a state's citizens because "the federal power to tax and to appropriate reaches the subject-matter of the contract," "its exertion cannot be displaced by state action." *Id.* "To say otherwise is to deny the supremacy of the laws of the United States; to make them subordinate to those of a state." *Id.*[8]

Consistent with *Butler*, the Court has repeatedly applied ordinary preemption principles to spending legislation that directs federal funding to entities other than states. *See, e.g.*, *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-99 (2017); *Bennett v. Arkansas*, 485 U.S. 395, 396 (1988) (per curiam); *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269-70 (1985). Every case Appellants cite, in contrast, refers to a state's consent because the state is the recipient of the federal funds. *See, e.g.*, *Cummings*, 596 U.S. at 219 (explaining that Spending Clause legislation "operates based on consent" by "*the [recipients]*" (alteration in original) (emphasis added)). They do not create a new rule outside of that context that "would reverse the cardinal principle embodied in the Constitution and substitute one which declares

---

[8] The Court ultimately invalidated the agricultural program at issue in *Butler* on Tenth Amendment grounds only because the Court, at the time, viewed the program as improperly regulating an area of exclusive state control. 297 U.S. at 68, 74-75. There is no such problem here for the reasons just discussed.

that Congress may only effectively legislate as to matters within federal competence when the states do not dissent." *Butler*, 297 U.S. at 74.

Appellants similarly err by invoking anti-coercion principles. Appellants suggest that Medicare conditions cannot preempt state law because participation in Medicare is not truly voluntary, given the size of the Medicare program, but states may not rewrite federal funding conditions simply because they consider a federal program to be important. Otherwise, any state could object to any requirement in any large federal program on the same ground. That limitless view would upend Congress's authority under the Spending Clause to set the conditions of federal expenditures and would render invalid all of the myriad conditions Congress attached to Medicare. Appellants' reliance on a contract analogy underscores the point: A contract is not invalid simply because one side offers the other side a compelling deal. Appellants themselves acknowledged in district court that hospitals voluntarily participate in Medicare, subject to compliance with EMTALA. *Compare* 3-ER-373 (Complaint ¶ 15) ("Medical providers' participation in Medicare is voluntary."), *with* SER-6 (State's Answer), *and* SER-36 (Legislature's Answer).

Appellants now claim otherwise by relying on cases that arose in a fundamentally different context. In those cases, the Supreme Court held that a federal spending condition was improperly coercive because the spending program was structured in a way that created a separate constitutional problem. In particular, when a federal spending condition requires states to affirmatively regulate in a certain way, Tenth

Amendment limits on commandeering can raise concerns about coercion. *See, e.g.,* *New York*, 505 U.S. at 162, 167; *NFIB v. Sebelius*, 567 U.S. 519, 578 (2012); *Dole*, 483 U.S. at 211; *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 587-90 (1937); *Florida v. Mellon*, 273 U.S. 12 (1927); *Oklahoma v. U.S. Civil Serv. Comm'n*, 330 U.S. 127, 144 (1947); *see also Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018). No such structural concerns are present here: EMTALA does not direct states to regulate in a particular way or, indeed, to take any affirmative regulatory steps at all.[9] Nor do Appellants' general concerns about federal overreach justify imposing a new substantive limit on Congress's Article I powers. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550-51 (1985).

    **d.** In any event, regardless of the scope of Congress's Spending Clause power, EMTALA and Medicare both rest on a second Article I power: the Commerce Clause. There is nothing unusual about federal laws that rest on both powers. *See, e.g.*, *Sossamon v. Texas*, 563 U.S. 277 (2011) (RLUIPA). The Medicare program regulates a complex national healthcare market in which individuals, providers, hospital systems, medical schools, insurers, and other actors are engaged in "existing commercial activity." *See NFIB*, 567 U.S. at 552. Congress routinely regulates that

---

[9] While the district court's injunction precludes Idaho from enforcing criminal prohibitions that directly conflict with EMTALA, that is a consequence of the Supremacy Clause, which applies to all valid federal laws. And it does not require Idaho to take any affirmative action for which a state's voluntary consent otherwise might be necessary.

commercial activity under the Commerce Clause, including to preempt contrary state law. *See, e.g.,* 42 U.S.C. § 1320d-7(a) (HIPAA); 49 U.S.C. § 41713(b)(1) (Airline Deregulation Act of 1978 addressing, *e.g.,* air ambulance services); 18 U.S.C. § 1347(a)(1) (making it a crime to "defraud any health care benefit program"); *United States v. Bird*, 124 F.3d 667, 677-78 (5th Cir. 1997) (upholding the Freedom of Access to Clinic Entrances Act under the Commerce Clause). EMTALA likewise permissibly regulates commercial activity by creating a minimum federal standard for the provision of emergency healthcare services—services that are then billed and often paid for, whether by the federal government, national insurers, private parties, or other sources of funding.

Moreover, "[i]t long has been settled that Congress' authority under the Commerce Clause extends to intrastate economic activities that affect interstate commerce." *Garcia*, 469 U.S. at 537. EMTALA does just that. The terms under which hospitals provide emergency healthcare, which is an economic activity, affect interstate commerce by affecting the provision of healthcare in other states. For instance, by prohibiting patient-dumping, EMTALA prevents hospitals from denying emergency healthcare to patients who then must travel, including across state lines, to receive the healthcare they need. *See supra* pp. 40-41. That travel affects the healthcare systems of neighboring states that take in patients needing treatment, as the district court found. 1-ER-050. Congress's authority under the Commerce Clause to enact EMTALA resolves any doubt that EMTALA is supreme federal law.

56

## II.    The Equities Decisively Support The Preliminary Injunction.

The district court properly exercised its discretion in determining that the remaining factors support a preliminary injunction.

**A.**    The United States would suffer irreparable harm if Section 18-622 went into full effect because permitting the law to operate when it directly conflicts with EMTALA would violate the Supremacy Clause and interfere with the federal government's sovereign interest in the proper administration of federal law and Medicare. The district court correctly concluded that the United States satisfies this factor. 1-ER-048. The court also properly determined that the public interest and balance of the equities—which "merge" when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)—favor granting the preliminary injunction. Specifically, the court found that "allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho," 1-ER-049, and the record soundly supports that conclusion. Moreover, permitting Idaho's law to take effect when it directly conflicts with EMTALA would strain "the capacity of hospitals in neighboring states that do not prohibit physicians from providing EMTALA-mandated care," which "would be pressured as patients may choose to cross state lines to get the emergency care" that Idaho prohibits. 1-ER-050. Regarding the "other side of the equitable balance sheet," the court correctly determined that appellants "will not suffer any real harm" from this "modest preliminary injunction." 1-ER-051. The injunction maintains the status quo by preventing Section 18-622 from operating "to

the extent it conflicts with EMTALA," 1-ER-051, until after the court determines its legality under federal law.

**B.**     Appellants have largely abandoned their objections to these conclusions. The State continues to raise one argument with respect to the United States's irreparable harm—namely, that there is no "practical conflict" because there is no "particular situation" in which "EMTALA would require an abortion that Idaho law would forbid." State.Br.41.  As explained above, however, that is incorrect.  *See supra* pp. 37-41. During the period in which Section 18-622 was in effect, real women had to be airlifted out of Idaho to secure the emergency healthcare they needed.  *See* St. Luke's Amicus Br. 13-15.  "Those transfers" of "medically fragile women to other States to receive abortions" "measure the difference between the life-threatening conditions Idaho will allow hospitals to treat and the health-threatening conditions it will not." *Moyle*, 144 S. Ct. at 2017 (Kagan, J., concurring).  On this record, the district court properly exercised its discretion to conclude that allowing Section 18-622 to take effect in full would "threaten severe, irreparable harm to pregnant patients in Idaho." 1-ER-049.

## III.    The District Court Properly Tailored The Preliminary Injunction.

The district court issued a preliminary injunction to prevent Idaho "from enforcing Idaho Code § 18-622 to the extent that statute conflicts with EMTALA-mandated care."  1-ER-016; 1-ER-051 ("The Court hereby restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho

Code § 18-622[] as applied to medical care required by … 42 U.S.C. § 1395dd."). That remedy "preserve[s] the status quo" during this litigation, 1-ER-016, and is appropriately tailored "to remedy the specific harm alleged." *Hecox v. Little*, 104 F.4th 1061, 1089 (9th Cir. 2024) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)). Appellants ask this Court to modify the injunction, but that request is premature. *See* Leg.Br.35-36; State.Br.43-49. The State's motion to modify the injunction remains pending in the district court. Dkt. No. 166. The district court should be permitted to determine in the first instance whether to modify its injunction following remand.

In any event, Appellants' requests to modify the injunction are without merit. First, they argue that modification is warranted in light of statements made by the United States to the Supreme Court, but the United States's position has been consistent throughout this litigation. Moreover, the Supreme Court declined to order that relief. After considering Appellants' arguments and the United States's representations, the Supreme Court reinstated the district court's preliminary injunction without modification. *See Moyle*, 144 S. Ct. at 2015. In separate opinions concurring in the vacatur of the stay, six Justices expressly confirmed that the August 2022 preliminary injunction would be reinstated and would continue to govern during further proceedings. *See id.* at 2018 (Kagan, J., concurring) ("Today's ruling thus puts the case back where it belongs, and with the preliminary injunction in place."); *id.* at 2022-23 (Barrett, J., concurring) ("I also agree that we should vacate the stay," leaving "the

59

preliminary injunction in place."); *id.* at 2023 (Jackson, J., concurring in part and dissenting in part) ("I concur in the Court's *per curiam* decision to lift its stay, which should not have been entered in the first place."). The Supreme Court could have modified the stay or directed changes on remand if modification were necessary based on Appellants' arguments or statements the United States made. But it did not do so, and Appellants provide no compelling reason for this Court to reach a different conclusion.

Appellants also contend that the preliminary injunction is overbroad because, in their view, the injunction limits the enforcement of Section 18-622 beyond "acute circumstances." State.Br.48. But there is no reason to modify the injunction to make plain what is already clear: The preliminary injunction is limited to healthcare that EMTALA requires. Appellants highlight language that they read to permit "abortions … where necessary to *prevent* an emergency medical condition in the first place," State.Br.48; Leg.Br.35-36, but the injunction does not reach so broadly.[10] The first sentence makes clear that the scope of relief targets enforcement of Section 18-622

---

[10] Although the State attempts (at 48) to tie this argument to a statement made by the United States to the Supreme Court, it is clear from the statutory text that EMTALA applies only in emergency medical situations. The United States explained over a year ago, in response to this same overbreadth argument, that the State's interpretation of the injunction as applying to circumstances beyond the statutory text is incorrect. Consolidated Brief for the United States 58-59 (Sept. 8, 2023).

"as applied to medical care required by [EMTALA], 42 U.S.C. § 1395dd." 1-ER-051.

This express limitation is consistent with the court's accompanying opinion.[11]

Relatedly, the State contends that the injunction must be "narrow[ed]" to reflect that "EMTALA does not require abortions for mental-health reasons." State.Br.44-45. But, as the Solicitor General explained at oral argument in the Supreme Court, although an "emergency medical condition" for a pregnant patient "can include grave mental health emergencies," stabilizing treatment under EMTALA for such a condition "could never lead to pregnancy termination because that is not the accepted standard of practice to treat any mental health emergency." Transcript of Oral Argument at 77-78, *Idaho*, No. 23-727 (Apr. 24, 2024); *see* Brief for the Respondent at 26 n.5, *Moyle*, Nos. 23-726, 23-727 (Mar. 21, 2024) ("Idaho neither identifies a single case where an emergency-room physician terminated a pregnancy to stabilize a mental-health condition, nor cites any clinical standard identifying termination as necessary stabilizing care in such circumstances."). Contrary to the State's insistence (at 45), that statement is not a "significant change" in the government's position; the State has not identified any instance where the United States took a contrary position.

---

[11] *See, e.g.*, 1-ER-051 ("enjoining the challenged Idaho law to the extent it conflicts with EMTALA"); 1-ER-031 (considering whether Section 18-622 "must include a carve-out for EMTALA-mandated care"); 1-ER-030 (reciting the "limited form o[f] relief" sought); 1-ER-016 ("[T]he State of Idaho will be enjoined from enforcing Idaho Code § 18-622 to the extent that statute conflicts with EMTALA-mandated care."); 2-ER-093 (hearing transcript) ("I certainly won't enjoin anything more than … enforcement in the context where EMTALA would require medical treatment.").

Nor can the State credibly claim (at 44) "confusion" about this issue based on a letter from HHS that merely communicates that the preliminary injunction was reinstated. *See* Press Release, HHS, *Biden-Harris Administration Reaffirms Commitment to EMTALA Enforcement* (July 2, 2024), https://perma.cc/ZEV4-ENKY.

Similarly, the State briefly contends (at 47) that the injunction should be modified to reflect that "EMTALA requires delivery—not abortion—after viability." But again, the preliminary injunction only bars Idaho from enforcing Section 18-622 against a provider for providing care that is required under EMTALA. The injunction cannot plausibly be interpreted to allow pregnancy termination when the proper stabilizing treatment under EMTALA, per accepted clinical standards, would be to safely deliver the baby.

Finally, the State asks this Court to modify the injunction to account for the application of federal conscience protections. But nothing in the injunction purports to displace those protections. It enjoins Idaho from imposing criminal liability on those who have actually provided emergency medical care as required by EMTALA. Neither Section 18-622 nor the injunction has anything to do with providers who choose not to provide care consistent with federal conscience protections.

Moreover, even if federal conscience protections were somehow relevant to the injunction, there would be no need to modify the injunction to make those protections clear. The government has repeatedly stated in briefing across multiple cases that federal conscience protections apply to care provided pursuant to EMTALA. *See*

62

Brief for the Fed. Petitioners at 23 n.3, *FDA v. Alliance For Hippocratic Med.*, Nos. 23-235, 23-236 (U.S. Jan. 23, 2024); Reply Brief for Appellants at 25, *Texas*, 89 F.4th 529 (No. 23-10246) (Aug. 4, 2023), 2023 WL 5097005, at *25. And the Supreme Court has endorsed that position. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 389 (2024) ("EMTALA does not require doctors to perform abortions or provide abortion-related medical treatment over their conscience objections"). The text of the preliminary injunction is fully consistent with the applicability of federal conscience protections under EMTALA.

# CONCLUSION

This Court should affirm the district court's order granting a preliminary injunction.

Respectfully submitted,

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*

JOEL McELVAIN
*Acting Deputy General Counsel*

DAVID L. HOSKINS
*Acting Deputy Associate Counsel
for Litigation*

JESSICA BOWMAN
MELISSA HART
CATHERINE HESS
*Attorneys*

*U.S. Department of Health
and Human Services*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JOSHUA D. HURWIT
*United States Attorney*

CATHERINE M.A. CARROLL
*Deputy Assistant Attorney General*

MICHAEL S. RAAB

*s/ McKaye L. Neumeister*

McKAYE L. NEUMEISTER
CYNTHIA A. BARMORE
*Attorneys, Appellate Staff
Civil Division, Room 7231
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-1754
McKaye.L.Neumeister@usdoj.gov*

October 2024

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellee states that it knows of one case related to the above-captioned consolidated appeals: Case No. 23-35153. That appeal arose from the district court's partial grant of intervention issued during the proceedings below. The appeal was dismissed for lack of jurisdiction and is no longer pending in this Court. *United States v. Idaho*, No. 23-35153, 2024 WL 1504346 (9th Cir. Apr. 8, 2024).

*s/ McKaye L. Neumeister*
McKaye L. Neumeister

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-35440, 23-35450

I am the attorney or self-represented party.

**This brief contains** 15,389 **words,** including ☐ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⦿ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☑ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated ☐.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ McKaye L. Neumeister **Date** 10/15/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

**ADDENDUM**

# TABLE OF CONTENTS

EMTALA, 42 U.S.C. § 1395dd ........................................................................A1

Born-Alive Infants Protection Act, 1 U.S.C. § 8 ...................................A7

Idaho Code § 18-604 (effective July 1, 2023)....................................A8

Idaho Code § 18-622 (effective July 1, 2023)................................. A10

## § 1395dd. Examination and treatment for emergency medical conditions and women in labor

### (a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

### (b) Necessary stabilizing treatment for emergency medical conditions and labor

#### (1) In general

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

#### (2) Refusal to consent to treatment

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

#### (3) Refusal to consent to transfer

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on

the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

## (c) Restricting transfers until individual stabilized

### (1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless--

**(A)(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that[12] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

**(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

**(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

### (2) Appropriate transfer

An appropriate transfer to a medical facility is a transfer--

**(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

---

[12] So in original. Probably should be followed by a comma.

**(B)** in which the receiving facility--

**(i)** has available space and qualified personnel for the treatment of the individual, and

**(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

## (d) Enforcement

### (1) Civil money penalties

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a-7a(a) of this title.

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who--

**(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

> **(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a-7a of this title (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a-7a(a) of this title.

> **(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

## (2) Civil enforcement

### (A) Personal harm

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

### (B) Financial loss to other medical facility

Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

### (C) Limitations on actions

No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**

In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate quality improvement organization (with a contract under part B of subchapter XI) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B.

**(4) Notice upon closing an investigation**

The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

## (e) Definitions

In this section:

**(1)** The term "emergency medical condition" means--

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part; or

**(B)** with respect to a pregnant woman who is having contractions--

**(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

**(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1395cc of this title.

**(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

**(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1395x(mm)(1) of this title) and a rural emergency hospital (as defined in section 1395x(kkk)(2) of this title).

## (f) Preemption

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

## (g) Nondiscrimination

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

## (h) No delay in examination or treatment

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and

treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

**(i) Whistleblower protections**

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

## 1 U.S.C. § 8

### § 8. "Person", "human being", "child", and "individual" as including born-alive infant

**(a)** In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the words "person", "human being", "child", and "individual", shall include every infant member of the species homo sapiens who is born alive at any stage of development.

**(b)** As used in this section, the term "born alive", with respect to a member of the species homo sapiens, means the complete expulsion or extraction from his or her mother of that member, at any stage of development, who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, regardless of whether the umbilical cord has been cut, and regardless of whether the expulsion or extraction occurs as a result of natural or induced labor, cesarean section, or induced abortion.

**(c)** Nothing in this section shall be construed to affirm, deny, expand, or contract any legal status or legal right applicable to any member of the species homo sapiens at any point prior to being "born alive" as defined in this section.

**Idaho Code § 18-604 (effective July 1, 2023)**

**§ 18-604. Definitions**

As used in this chapter:

(1) "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean:

    (a) The use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization, or the implantation of a fertilized ovum within the uterus;

    (b) The removal of a dead unborn child;

    (c) The removal of an ectopic or molar pregnancy; or

    (d) The treatment of a woman who is no longer pregnant.

(2) "Department" means the Idaho department of health and welfare.

(3) "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

(4) "Emancipated" means any minor who has been married or is in active military service.

(5) "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

(6) "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

(7) "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

(8) "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

    (a) A description of any proposed treatment or procedure;

    (b) Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

     (c) The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

(9) "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Minor" means a woman under eighteen (18) years of age.

(11) "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

(12) "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

(13) "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

(14) "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

(15) Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

**Idaho Code § 18-622 (effective July 1, 2023)**

**§ 18-622. Defense of life act**

(1) Except as provided in subsection (2) of this section, every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

(2) The following shall not be considered criminal abortions for purposes of subsection (1) of this section:

(a) The abortion was performed or attempted by a physician as defined in this chapter and:

(i) The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

(ii) The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself; or

(b) The abortion was performed or attempted by a physician as defined in this chapter during the first trimester of pregnancy and:

(i) If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws; or

(ii) If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported to

a law enforcement agency or child protective services that she is the victim of an act of rape or incest and a copy of such report has been provided to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws.

(3)  If a report concerning an act of rape or incest is made to a law enforcement agency or child protective services pursuant to subsection (2)(b) of this section, then the person who made the report shall, upon request, be entitled to receive a copy of such report within seventy-two (72) hours of the report being made, provided that the report may be redacted as necessary to avoid interference with an investigation.

(4)  Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

(5)  Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.