# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STATE OF IDAHO,

*Defendant-Appellant,*

*v.*

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE,

*Movants-Appellants*

On Appeal from the United States District Court
for the District of Idaho (No. 1:22-cv-00329-BLW) · *Honorable B. Lynn Winmill*

## BRIEF OF AMERICAN CIVIL LIBERTIES UNION, ACLU FOUNDATION, AND ACLU OF IDAHO AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE

KATHLEEN R. HARTNETT
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
(415) 693-2000

PATRICK J. HAYDEN
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

*Counsel for the ACLU Foundation*

ALEXA KOLBI-MOLINAS
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

*Counsel for the ACLU and ACLU Foundation*

*Additional Counsel Listed On Inside Cover*

ANGELINE X. CHEN
COOLEY LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004
(202) 842-7800

ALEXANDER ROBLEDO
COOLEY LLP
500 Boylston Street
Boston, MA 02116
(617) 937-2300

*Counsel for the ACLU Foundation*

PAUL CARLOS SOUTHWICK
EMILY MYREI CROSTON
AMERICAN CIVIL LIBERTIES UNION OF
IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750

*Counsel for the ACLU of Idaho*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici curiae* state that they do not have a parent corporation and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................2

ARGUMENT ........................................................................................5

I.   EMTALA Requires Stabilizing Treatment or Transfer for "*Any Individual*" With an Emergency Medical Condition, Without Exception. .....................................................................................5

II.  EMTALA Has Been Consistently Understood to Require Abortion Care Where Necessary to Stabilize an Emergency Condition. ............................................................................8

III. EMTALA Contains No Abortion Exception. ................................12

    A.   The References to the "Unborn Child" Did Not Alter EMTALA's Obligation to Provide Emergency Abortions, Where Necessary. ...............................................12

    B.   EMTALA Contains No Implicit Abortion Exception Either. ...................................................................18

    C.   EMTALA Prohibits State-Created Exceptions to its Stabilization Requirement. ..................................................21

IV.  Federal Health Care Refusal Laws Provide No Basis for Modifying the Preliminary Injunction. ..................................25

CONCLUSION ...................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrego Abrego v. The Dow Chem. Co.*,
    443 F.3d 676 (9th Cir. 2006) .......................................... 16

*Arrington v. Wong*,
    237 F.3d 1066 (9th Cir. 2001) ........................................ 24

*Matter of Baby K*,
    16 F.3d 590 (4th Cir. 1994), *cert. denied*, 513 U.S. 825
    (1994) .......................................................... 8, 11, 22, 23

*Baker v. Adventist Health, Inc.*,
    260 F.3d 987 (9th Cir. 2001) .......................................... 24

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ................................................ 24

*Bostock v. Clayton Cnty*,
    590 U.S. 644 (2020) .................................................. 7, 19

*Bryant v. Adventist Health Sys./West*,
    289 F.3d 1162 (9th Cir. 2002) ....................................... 5, 19

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979) ................................................... 16

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .................................................... 28

*Deanco Healthcare, LLC v. Becerra*,
    806 F. App'x 581 (9th Cir. 2020) ..................................... 22

*Desire, LLC v. Manna Textiles, Inc.*,
    986 F.3d 1253 (9th Cir. 2021) .......................................... 5

*Eberhardt v. City of Los Angeles*,
    62 F.3d 1253 (9th Cir. 1995) ........................................... 8

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000) .......................................................... 5

*Honeycutt v. United States*,
581 U.S. 443 (2017) ........................................................ 22

*Hunt ex rel. Hunt v. Lincoln Cnty. Mem'l Hosp.*,
317 F.3d 891 (8th Cir. 2003) ........................................ 19

*James v. Sunrise Hosp.*,
86 F.3d 885 (9th Cir. 1996) ............................................ 7

*Kungys v. United States*,
485 U.S. 759 (1988) .......................................................... 9

*Landgraf v. USI Film Prods.*,
511 U.S. 244, 251 (1994) ............................................... 21

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........................................................ 21

*Moyle v. United States*,
144 S. Ct. 2015 ........................................................ 14, 26

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
693 F.3d 1084 (9th Cir. 2012) ...................................... 22

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
810 F.3d 631 (9th Cir. 2015) .................................... 28, 29

*Pasquantino v. United States*,
544 U.S. 349 (2005) .......................................................... 5

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........................................................ 25

*Roe v. Wade*,
410 U.S. 113 ................................................................... 16

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Salazar v. Buono,*
    559 U.S. 700 (2010).............................................................27

*St. Anthony Hosp. v. U.S. Dep't of Health & Hum. Servs.,*
    309 F.3d 680 (10th Cir. 2002).............................................19

*Thomas v. Anchorage Equal Rts. Comm'n,*
    220 F.3d 1134 (9th Cir. 2000)............................................26

*United States v. Barraza-Lopez,*
    659 F.3d 1216 (9th Cir. 2011)...............................................9

*United States v. Korotkiy,*
    __ F.4th ___, 2024 WL 4456818 (9th Cir. Oct. 10, 2024) ....... 14, 16, 24

*W. Va. Univ. Hosps., Inc. v. Casey,*
    499 U.S. 83 (1991)..............................................................21

**Statutes**

42 U.S.C.
    § 238n.............................................................................10
    § 238n(a)(1) ....................................................................10
    §§ 300a-7(c), (d) .............................................................10
    § 1395dd ..........................................................................2
    § 1395dd(b)(1) .............................................................2, 20
    § 1395dd(b)(1)(A)..........................................................6, 23
    § 1395dd(b)(1)(B)..............................................................23
    §§ 1395dd(b) ......................................................................6
    § 1395dd(e)(1)(A).............................................................15
    § 1395dd(e)(3)(A)..........................................................6, 21
    § 1395dd(f).................................................................2, 6, 22
    § 18023(c).........................................................................9
    § 18023(d).........................................................................9

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328,
    § 506, 136 Stat. 4459.........................................................10

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, §§ 6211(c), (h), 103 Stat. 2246, 2248 (codified at 42 U.S.C. §§ 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(B)(ii)) .......................... 13

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6211(h), 103 Stat. 2248 (codified at 42 U.S.C. § 1395dd(e)(1)(A)(i)) .................................................................. 14

**Other Authorities**

42 C.F.R. § 489.24(d)(1) ............................................................ 24

73 Fed. Reg. 78,072 (Dec. 19, 2008) ....................................... 10

84 Fed. Reg. 23,170 (May 21, 2019) ................................... 10, 11

Defs.' Consolidated Reply in Support of Defs.' Mot. to Dismiss, *New York v. HHS*, No. 1:19-cv-04676 (S.D.N.Y. filed Aug. 14, 2019), ECF No. 148, 2019 WL 7425364 ...................... 11

Defs.' Consolidated Mem. of Law in Support of Defs.' Mot. to Dismiss, New *York v. HHS*, No. 1:19-cv-04676 (S.D.N.Y. filed Sep. 19, 2019), ECF No. 224, 2019 WL 8165747 .................................................... 11

Sarah Zhang, "*That's Something You Won't Recover From as a Doctor*," Atlantic, Oct. 2024, https://www.theatlantic.com/magazine/archive/2024/10/abortion-ban-idaho-ob-gyn-maternity-care/679567/ ............................ 27

Transcript of Oral Argument, *Moyle v. United States*, 2024 WL 1767599 (U.S. 2024) (No. 23-276), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-726_6jf7.pdf ........................................................ 18

# STATEMENT OF INTEREST[1]

The American Civil Liberties Union is a nationwide, non-profit, non-partisan organization dedicated to the principles of liberty and equality embodied in the constitution and the nation's civil rights laws, including the right of all individuals to access emergency care, as guaranteed under the Emergency Medical Treatment and Labor Act ("EMTALA"). The ACLU Foundation is a nationwide, non-profit, non-partisan, tax-exempt organization, one of whose primary activities is litigation in furtherance of the principles of liberty and equality embodied in the constitution and our nation's civil rights laws, including EMTALA. The ACLU of Idaho is a statewide affiliate of the national ACLU. Over the past twenty-five years, the ACLU has been involved in multiple challenges seeking to vindicate the rights guaranteed by EMTALA, including to emergency abortion care.

---

[1] No party or party's counsel authored this brief in whole or in part, and no one other than *amici* and their counsel have made a monetary contribution to this brief's preparation and submission. All parties consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT[2]

Nearly forty years ago, Congress enacted EMTALA, 42 U.S.C. § 1395dd, in response to the widespread problem of hospitals refusing to provide emergency medical treatment—either at all, or by inappropriately "dumping" individuals from one hospital to another, while their conditions worsened. For this nationwide problem, Congress created a nationwide solution: a federal law requiring all Medicare-participating hospitals with emergency departments to provide "*any individual*" experiencing an emergency medical condition, *id.* § 1395dd(b)(1), with "[n]ecessary stabilizing treatment for emergency medical conditions and labor," *id.* § 1395dd(b), and expressly preempting any state law that "directly conflicts" with this requirement, *id.* § 1395dd(f).

As such, for almost four decades, EMTALA has—in text and in practice—imposed a statutory obligation on covered entities to provide necessary stabilizing care or an appropriate transfer without exception. Accordingly, in those narrow but critical situations where abortion is a

---

[2] Unless otherwise indicated, all emphases are added and internal citations and quotations omitted.

necessary stabilizing treatment, EMTALA's plain text requires covered hospitals to provide it, just as it requires any other necessary stabilizing treatment, and preempts any state law to the contrary.

Appellants' attempts to evade the plain text are unavailing and would rewrite history. First and foremost, EMTALA's references to the "unborn child" do not exempt, let alone prohibit, covered hospitals from providing emergency abortions. Replacement Opening Br. of Appellant State of Idaho ("State Br.") 5, 25, 29-32; Br. of Appellants Mike Moyle *et al.* ("Leg. Br.") 44-46. There is no reasonable construction of that language—which was added to clarify hospitals' transfer obligations during childbirth and to expand, not restrict, pregnant people's access to care—that strips EMTALA of any requirement to provide emergency abortions and defers the question to the states, as the Legislature suggests. Leg. Br. 45. And, contrary to the radical argument now pressed by the Attorney General, it did not *sub silentio* transform EMTALA into a nationwide abortion ban. State Br. 29, 31.

Second, EMTALA contains no implicit abortion carve-outs either. For example, EMTALA does not expressly delineate abortion as a required stabilizing treatment because the statute does not delineate *any*

specific treatment that may be required to stabilize individuals facing an emergency. And the fact that Medicare does not cover all emergency abortions is irrelevant, as EMTALA explicitly states its protections apply regardless of whether Medicare reimbursement is available.

Third, EMTALA does not allow state law-created exceptions to the stabilization requirement. *See* State Br. 29-30; Leg. Br. 35-40. To hold otherwise would transform a federal law that *mandates* stabilizing treatment for any individual who needs it into one that sanctions *withholding* it whenever a state chooses to do so. EMTALA's obligations simply cannot be narrowed or nullified by state laws that would bar stabilizing treatment.

Finally, this Court must reject the Attorney General's bizarre and meritless request to modify the preliminary injunction to authorize prosecutions of "abortions to which doctors or hospitals object as a matter of conscience." State Br. 44. Idaho's abortion ban punishes those who provide emergency abortion care, not those who refuse to do so. What the Attorney General really seeks is an advisory ruling on the interaction between EMTALA and other federal laws not at issue here, which this Court lacks the jurisdiction to entertain.

**ARGUMENT**

"As in all statutory interpretation," this Court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1265 (9th Cir. 2021); *accord Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254 (2000). Here, EMTALA's broad language obligates hospitals to provide necessary stabilizing treatment or an appropriate transfer to *any* individual, without exception, and its express preemption clause overrides any state law to the contrary. "[N]o canon of statutory construction permits [the Court] to read the statute more narrowly." *Pasquantino v. United States*, 544 U.S. 349, 372 (2005).

## I. EMTALA Requires Stabilizing Treatment or Transfer for "*Any* Individual" With an Emergency Medical Condition, Without Exception.

EMTALA "fill[s] a lacuna in traditional state tort law by imposing on hospitals a legal duty (that the common law did not recognize) to provide emergency care *to all*." *Bryant v. Adventist Health Sys. / West*, 289 F.3d 1162, 1169 (9th Cir. 2002). EMTALA's text imposes an unambiguous requirement on covered hospitals: they "must" provide "any individual" experiencing an emergency medical condition *either* **(1)** such medical

treatment "as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur" upon discharge, **or (2)** an appropriate transfer. 42 U.S.C. §§ 1395dd(b), (e)(3)(A). EMTALA makes no exception for any specific conditions or stabilizing treatments or procedures. Even where a hospital lacks the "staff and facilities available" to stabilize a particular condition, it is not relieved of its statutory obligation. *Id.* § 1395dd(b)(1)(A). Rather, EMTALA requires the hospital to directly transfer that individual "through qualified personnel and transportation equipment" to an appropriate facility that can provide the needed treatment. *Id.* §§ 1395dd(b)(1)(B), (c)(2)(A), (c)(2)(D). In short, nothing in EMTALA's text permits covered hospitals to deny necessary treatment or an appropriate transfer.

That EMTALA "contains no procedure-specific language" is irrelevant. Leg. Br. 34; *see also* State Br. 29. EMTALA does not attempt the impossible task of identifying *any* of the particular procedures that "may be necessary," 42 U.S.C. § 1395dd(e)(3)(A), to stabilize an emergency condition. For example, EMTALA does not mention, *e.g.*, administering epinephrine, setting a broken bone, or suturing an open

wound. But no one would seriously argue that failure to provide any of these treatments, where "necessary," *id.*, would comport with EMTALA simply because Congress did not explicitly list them. Br. for the United States ("U.S. Br.") 15 n.3. Thus where, as here, it is indisputable that abortion may be a necessary stabilizing treatment in tragic cases of pregnancy loss, *see, e.g.*, U.S. Br. 14-21; Br. of Amicus Am. Hosp. Ass'n *et al.* ("AHA Br.") 3, 15-16; Br. of Amicus Curiae St. Luke's Health Sys. ("St. Luke's Br.") 7-10, 13-15, there is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception," *Bostock v. Clayton Cnty,* 590 U.S. 644, 669 (2020).

Moreover, courts have long rejected efforts to "retreat beyond" EMTALA's text to narrow or limit its scope. *Id.* at 666. For example, contrary to Appellants' arguments, *see* State Br. 8-9, 25-26; Leg. Br. 27-28, 35-40, this Court has long recognized that the purported *motivation* for EMTALA cannot alter or override the plain terms of the stabilization requirement. *See, e.g.*, *James v. Sunrise Hosp.*, 86 F.3d 885, 887 (9th Cir. 1996) ("Although the immediate concern of Congress was to ensure that hospitals do not refuse essential emergency care because of a patient's

inability to pay, the language of the Act does not condition its operation on that motive."). And likewise contrary to Appellants' arguments, State Br. 34, Leg. Br. 37-39, this Court has long rejected any argument that EMTALA's stabilization requirement is "met by simply dispensing uniform stabilizing treatment." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 n.3 (9th Cir. 1995); *see also Matter of Baby K*, 16 F.3d 590, 595-96 (4th Cir. 1994), *cert. denied*, 513 U.S. 825 (1994) (rejecting argument that stabilization requirement requires "only . . . uniform treatment" because such a construction "conflicts with the plain language of EMTALA"). Instead, EMTALA's plain text demands any necessary stabilizing treatment in the context of emergencies—including abortion—and Appellants' attempts to engraft an abortion exception to that text lacks merit.

## II. EMTALA Has Been Consistently Understood to Require Abortion Care Where Necessary to Stabilize an Emergency Condition.

Congress, the executive branch, and the courts have all consistently recognized what the text makes plain: Hospitals must provide abortion where necessary to stabilize an emergency medical condition.

To start, Congress spoke directly to this issue in a section of the

Affordable Care Act creating certain rules and limitations concerning abortion coverage. There, Congress expressly provided that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1867 of the Social Security Act (popularly known as 'EMTALA')." 42 U.S.C. § 18023(d). This savings clause, located in a section exclusively addressing abortion, would be meaningless if abortion were not a stabilizing treatment under EMTALA. *See United States v. Barraza-Lopez*, 659 F.3d 1216, 1220 (9th Cir. 2011) ("It is a well-established principle of statutory construction that 'legislative enactments should not be construed to render their provisions mere surplusage.'"); *accord Kungys v. United States*, 485 U.S. 759, 778 (1988).[3]

Prior administrations, including those of Presidents George W. Bush and Trump, have also understood that EMTALA requires abortions when necessary to stabilize an emergency. For example, in 2008, HHS

---

[3] Contrary to what the Attorney General argues, State Br. 39, the only state laws this section *preserves* from preemption by the Affordable Care Act are those state laws "regarding the prohibition of (or requirement of) coverage, funding, or procedural requirements on abortions, including parental notification or consent for the performance of an abortion on a minor." 42 U.S.C. § 18023(c). A near-total criminal ban on abortions is not a "procedural requirement."

promulgated a regulation purporting to interpret and enforce three federal statutes, known as the Church[4], Coats[5], and Weldon Amendments[6] that, *inter alia*, allow certain recipients of federal funds to refuse to provide abortion services under certain circumstances.[7] HHS asserted it "d[id] not anticipate any actual conflict between EMTALA and this regulation," not because EMTALA lacked any requirement to provide emergency abortion care, but rather because a conflict would only arise "where a hospital, as opposed to an individual, has an objection to performing abortions that are necessary to stabilize the mother," and HHS was "unaware of any hospital that has such a policy." 73 Fed. Reg. 78,072, 78,087-88 (Dec. 19, 2008) ("Bush Rule").

HHS promulgated a similar rule in 2019, acknowledging that "[EMTALA] would not be displaced by the rule, and requires provision of treatment in certain emergency situations and facilities." 84 Fed. Reg.

---

[4] 42 U.S.C. §§ 300a-7(c), (d).

[5] 42 U.S.C. § 238n.

[6] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 506, 136 Stat. 4459, 4908.

[7] *Amici* refer to these provisions collectively as the federal healthcare refusal laws because it accurately reflects the statutory text. *See, e.g.*, 42 U.S.C. § 238n(a)(1) (prohibiting discrimination "on the basis that" a covered entity "refuses" to undergo abortion training).

23,170, 23,224 (May 21, 2019) ("Trump Rule"). Once again, as HHS

clarified in related litigation, its position was not that EMTALA imposes

no duty to provide stabilizing abortions; rather, covered entities could

"continue to abide by EMTALA's requirements" and "ensure that

emergency care is available to all patients" by "double staffing" whenever

a staff member has a religious or moral objection to providing emergency

abortion care.[8] According to HHS, such "staffing arrangements

effectively eliminates any risk personnel will be unavailable to meet

EMTALA's requirements."[9] Namely, the requirement to provide

emergency abortions.[10]

Finally, federal courts have similarly recognized that EMTALA

---

[8] Defs.' Consolidated Reply in Support of Defs.' Mot. to Dismiss at 17-18, *New York v. HHS*, No. 1:19-cv-04676 (S.D.N.Y. filed Sep. 19, 2019), ECF No. 224, 2019 WL 8165747.

[9] Defs.' Consolidated Mem. of Law in Support of Defs.' Mot. to Dismiss at 48, *New York v. HHS*, No. 1:19-cv-04676 (S.D.N.Y. filed Aug. 14, 2019), ECF No. 148, 2019 WL 7425364.

[10] Appellants cannot meaningfully contend with this history. The Attorney General can only muster that the Bush and Trump Rules did not "say that EMTALA requires abortions *that violate state law*," State Br. 39, thereby conceding it mandates abortions in other contexts. But HHS would have had no cause to address conflicting state abortion bans, both given the express preemption clause, *see also Matter of Baby K*, 16 F.3d at 596–98, and that it was unconstitutional to ban abortion at the time, *see infra* p. 16.

requires emergency abortions. For example, contrary to what the Attorney General suggests, *see* State Br. 40, the district court in *California v. United States* expressly recognized that "required medical treatment" under EMTALA includes "abortion related services," No. 05-328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008). And, given that litigation around the Trump Rule discussed *supra* directly concerned, *inter alia*, whether Congress intended for the federal healthcare refusal statutes to create an abortion exception to EMTALA, the Attorney General's claim that *New York v. U.S. Department of Health & Human Services*, is "not an EMTALA case" is disingenuous. State Br. 40; *see also* U.S. Br. 20 (citing cases).

## III. EMTALA Contains No Abortion Exception.

### A. The References to the "Unborn Child" Did Not Alter EMTALA's Obligation to Provide Emergency Abortions Where Necessary.

Notwithstanding the plain text and decades of history and practice to the contrary, Appellants argue primarily that EMTALA *cannot* require emergency abortions because the statute's references to the "unborn child" preclude any such requirement. Whereas the Legislature claims this language creates a "dual" obligation to the pregnant person and their

embryo or fetus that effectively leaves the question to the states, Leg. Br. 44-46, the Attorney General goes one step further and asserts that these references impose a "statutory duty" to protect an embryo or fetus from "jeopardy" that would effectively *prohibit* Medicare-funded hospitals nationwide from providing abortions altogether, State Br. 29, 31. Neither argument finds support in the text or any canon of statutory interpretation.

EMTALA's four references to the "unborn child" were added in 1989, and all but one appear in provisions that deal exclusively with *hospital transfers during childbirth*. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, §§ 6211(c), (h), 103 Stat. 2246, 2248 (codified at 42 U.S.C. §§ 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(B)(ii)). Statutory provisions addressing hospitals transfers *while a woman is already in labor* are plainly inapplicable to emergency abortions in cases of pregnancy loss. These provisions ensure that transfers properly account for risks to the fetus during childbirth; it cannot follow that in doing so, Congress *sub silentio* excluded pregnant women from the protections contained in EMTALA's stabilization requirement (an entirely different provision) when abortion is necessary to stabilize an

unrelated emergency medical condition. *See generally United States v. Korotkiy*, ___ F.4th ___, 2024 WL 4456818, at *8 (9th Cir. Oct. 10, 2024) ("[C]ontext, common sense, and usage matter: after all, the meaning of a word depends on the circumstances in which it is used.") (cleaned up).

EMTALA's only other reference to the "unborn child" appears in the definition of "emergency medical condition" and is similarly designed to *expand* coverage, not restrict it. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6211(h), 103 Stat. 2248 (codified at 42 U.S.C. § 1395dd(e)(1)(A)(i)). Here, Congress clarified that definition to *include* where a pregnant woman seeks "immediate medical attention" for "her unborn child," even if the pregnant woman herself does not have an emergency medical condition. *Id.* Once again, Congress's decision to ensure that a pregnant woman can seek stabilizing treatment for conditions threatening her life or health *or* that of "her unborn child" in no way precludes or displaces pregnant women from obtaining an abortion where that is the treatment necessary to stabilize their own emergency medical condition. *See also Moyle v. United States*, 144 S. Ct. 2015, 2019 n* (2024) (Kagan, J., concurring) ("The amendment would likely have sparked far more opposition if it somehow tacitly withdrew

EMTALA's requirement that hospitals treat women who need an abortion to prevent death or serious harm.").

In effect, Appellants' arguments strip the term "unborn child" wholly out of context and *sub silentio* transform a statute designed to protect pregnant people into one that could force doctors to watch helplessly as their patients' conditions deteriorate or airlift them out of state, as would be the case in Idaho but for the injunction. St. Luke's Amicus Br. 13-16. For example, the Legislature argues that in referencing the "unborn child," "EMTALA leaves it to the state legislatures to choose how to strike th[e] balance" between permitting or proscribing abortion in some or all cases. Leg. Br. 45. But there simply is no textual basis for concluding that by *clarifying* hospitals' obligations when transferring a pregnant person who is giving birth, and *expanding* when a pregnant person can seek care "immediate medical attention" at any Medicare-participating hospital in the country, 42 U.S.C. § 1395dd(e)(1)(A), that Congress was actually giving states the option to deprive pregnant people of necessary, even life-saving, emergency care.

*See Korotkiy*, 2024 WL 4456818, at *8.[11] Moreover, Congress could not have delegated this "balance" to the states in 1989, when the references to "unborn child" were added to EMTALA, because, at the time, it was unconstitutional under *Roe v. Wade* for states to prohibit life- or health-saving abortions. 410 U.S. 113, 164-65 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *see also Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) ("[W]e presume that Congress is aware of the legal context in which it is legislating."); *accord Cannon v. Univ. of Chicago*, 441 U.S. 677, 699 (1979).

The Attorney General's position, while also totally untethered to the statutory text, is even more radical: the Attorney General argues that the mere addition of the words "unborn child" to EMTALA created a statutory *duty* to the embryo or fetus that seemingly takes priority over any duty to the pregnant person. According to the Attorney General,

---

[11] That Idaho currently exempts certain procedures from its definition of abortion, State Br. 6; Leg. Br. 9-12, is beside the point. Their contention is still that the Legislature may define such care as "abortion," and thereby exempt it from EMTALA. That necessarily includes life-saving abortions, notwithstanding that, for now, Idaho does not explicitly criminalize them.

"[t]here is *no* getting around the statutory duty to the unborn child," and therefore EMTALA "*requires* hospitals to prevent harm to an 'unborn child,'" State Br. 5, 29. But when a person is experiencing emergency complications from pre-viability pregnancy loss, abortion does not "stabilize" the embryo or fetus. *See also* U.S. Br. 25.[12] Thus, if the Attorney General were correct, emergency abortions would be categorically unlawful in any Medicare-participating hospital with an emergency department—including in Idaho—even though there may be no other way to stabilize the pregnant woman at all. *See* U.S. Br. 24-25. In other words, EMTALA would be, despite common sense and all evidence to the contrary, a federal abortion *ban*—prohibiting hospitals throughout the country from providing abortions, even in emergencies and even in jurisdictions where abortion is not just lawful, but legally protected. Talk about "'hid[ing] elephants in mouseholes.'" State Br. 28.

Of course, to read the term "unborn child" divorced from any context

---

[12] What makes abortion a stabilizing treatment under EMTALA are those situations when complications arise necessitating the immediate removal of the pregnancy to stabilize the woman *at a point when* the embryo or fetus cannot survive. *See also* U.S. Br. 16-17, 24-25. This is why post-viability abortions are not required under EMTALA: After viability, the stabilizing treatment in such cases of pregnancy complications—delivering the pregnancy—is no longer an abortion.

or plain meaning to convert EMTALA into a national abortion ban is obviously wrong, and the Attorney General's attempts to soften the edges of this argument only underscore that fact. *See* Tr. of Oral Arg. at 43 ("[W]e're not saying, your honor, that EMTALA prohibits abortions.") (Turner), *Moyle v. United States,* 2024 WL 1767599 (2024) (No. 23-276), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-726_6jf7.pdf. Indeed, the Attorney General's view that some life-saving abortions may be permitted under Idaho law, State Br. 42, simply cannot be squared with what he views as EMTALA's "duty" to the "unborn child." *Id.* at 5, 7, 29, 30, 31. If, per the Attorney General's reasoning, the addition of "or her unborn child" to that provision necessarily imposed a statutory duty to the embryo or fetus that excludes all pregnant women who need stabilizing abortions from EMTALA, then that would also exclude abortions for ectopic pregnancies or other life-saving abortions. The Attorney General cannot have it both ways, but the fact that he tries to is telling.

### B. EMTALA Contains No Implicit Abortion Exception Either.

Appellants' other statutory arguments are on no stronger ground. First, as noted above, if the fact that EMTALA did not expressly mention

a specific stabilizing treatment, *i.e.*, abortion, meant that covered hospitals had no obligation to provide it, the statute itself would be a nullity. *See, e.g.*, State Br. 29; Leg. Br. 4, 34. Where, as here, "Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock*, 590 U.S. at 669.

The argument that this is tantamount to setting "a national standard of care" is a red herring. Leg. Br. 41; *see also* State Br. 33-35. Everyone agrees EMTALA is not a federal malpractice statute, *see generally Bryant*, 289 F.3d at 1168-69, and courts have long correctly distinguished between cases where a covered entity failed to provide necessary stabilizing treatment ("failure to treat"), which are covered by EMTALA, and cases involving an inadvertent or negligent failure to detect or provide the correct treatment, which are not.[13] This case clearly falls into the former category, not the latter. If anything, it is Appellants

---

[13] *Compare, e.g.*, *St. Anthony Hosp. v. U.S. Dep't of Health & Hum. Servs.*, 309 F.3d 680, 690, 695-96 (10th Cir. 2002) (affirming finding of EMTALA violation where hospital refused to provide individual with emergency medical condition necessary stabilizing vascular surgery), *with Hunt ex rel. Hunt v. Lincoln Cnty. Mem'l Hosp.*, 317 F.3d 891, 894 (8th Cir. 2003) (rejecting claim that plaintiff received "incorrect treatment" because EMTALA does not require "correct or non-negligent treatment in all circumstances," and treatment that plaintiff received "was appropriate for EMTALA purposes.").

who—by seeking to dictate what stabilizing treatments are appropriate, as well as *when*—would transform EMTALA into something it is not: a statute "setting nationwide rules about *how* exactly patients must be stabilized." Leg. Br. 38.

Second, that Medicare covers some, but not all, emergency abortions, Leg. Br. 55-56; is a deliberate feature, not a bug, of the statutory scheme: EMTALA explicitly mandates stabilizing treatments where federal funds will not pay for those treatments. *See* 42 U.S.C. § 1395dd(b)(1) (mandating stabilizing treatment to any individual "whether or not eligible for benefits under [Medicare]"). What treatments must be provided and what treatments must be paid for are simply different questions, which can be answered differently.

Finally, there is also no "duty to interpret Congress's statutes as a harmonious whole," Leg. Br. 57, that compels a different conclusion. The fact that Congress elects to approach abortion differently in different statutes does not give this Court license to rewrite Congress's legislation in search of its idea of "harmon[y]." *Id*. To the contrary, "[i]t is not our function to . . . treat alike subjects that different Congresses have chosen to treat differently." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101

(1991), *superseded by statute, Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994).

## C. EMTALA Prohibits State-Created Exceptions to its Stabilization Requirement.

EMTALA's text also refutes Appellants' arguments that EMTALA's stabilization requirement "incorporates state standards of care" establishing which stabilizing treatments may be provided. State Br. 25; *see also* Leg. Br. 38-43. As explained above, *supra* Section I, EMTALA's stabilization requirement is unequivocal: it requires the provision of "such treatment of the medical condition as may be necessary," 42 U.S.C. § 1395dd(e)(3)(A), full stop. Yet, Appellants would turn "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" on its head, "creating [] utterly irrational loophole[s]." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 386 (1992). Instead of a law that mandates necessary stabilizing care be provided to all individuals, EMTALA would become one that sanctions *withholding* care whenever a state chooses to bar it, or even prohibits it outright. And, instead of preempting directly conflicting state laws, its requirements could be narrowed or nullified by state law. However, this Court "cannot construe a statute in a way that negates its plain text."

*Honeycutt v. United States*, 581 U.S. 443, 454 n.2 (2017).

To start, the preemption clause contains no exception for state healthcare laws, only those laws that do not "directly conflict[]," 42 U.S.C. § 1395dd(f), and this Court "ordinarily resist[s] reading words or elements into a statute that do not appear on its face," *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1095 (9th Cir. 2012); *cf. Deanco Healthcare, LLC v. Becerra*, 806 F. App'x 581, 584 (9th Cir. 2020) (holding no preemption where "the charity care requirement does not stand as an obstacle to any aspect of the EMTALA.").

Indeed, the Legislature's claim that "[n]ever until this case has EMTALA been read to require hospitals to provide 'such treatment' even if that treatment violates state law," Leg. Br. 40 (italics omitted), is incorrect. In *Baby K*, for example, the Fourth Circuit considered whether a hospital could stop providing respiratory care to an anencephalic infant, on the ground that Virginia law allowed doctors to deny "medical treatment" they deemed "medically or ethically inappropriate," 16 F.3d at 592, 597, and squarely held that EMTALA preempted the relevant

state law, *id.* at 597.[14]

Nor is the phrase "within the staff and facilities available," 42 U.S.C. § 1395dd(b)(1)(A), some sort of Trojan horse for state law to override EMTALA's stabilization mandate. *See* State Br. 35; Leg. Br. 38-39; *see also Matter of Baby K*, 16 F.3d at 597 (rejecting argument that state law governing certain treatments may render "staff and facilities" unavailable and exempt from stabilization requirement). The statute is clear that this language does not create an exception to EMTALA, but triggers a different obligation—appropriate transfer, 42 U.S.C. § 1395dd(b)(1)(B), which notably is distinct from an outright discharge, *id.* at (e)(4). And it is within the context of the broader statutory obligation—stabilization *or* appropriate transfer—that this Court has long understood the phrase "staff and facilities available" to refer to exactly what it sounds like: a hospital's technical capacity to provide the

---

[14] Clearly, *Baby K* did not lead to the widespread preemption of other state laws, *e.g.*, bans on against lobotomizing children, physician-assisted death, and medical marijuana, as the Attorney General predicts. State Br. 28. Of course, there is no credible argument that any of these could ever meet EMTALA's narrow statutory definition of stabilizing treatment anyway.

requisite stabilizing treatment, *i.e.*, whether it has sufficiently trained staff, equipment, or other necessary resources. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) ("To strip a word from its context is to strip that word of its meaning."); *accord Korotkiy*, __ F.4th ___, 2024 WL 4456818, at *8.

For example, in *Baker v. Adventist Health, Inc.*, this Court rejected the argument that psychiatric services were within the "capability" of a California hospital where it "d[id] not offer psychiatric treatment and ha[d] no psychiatrists, psychologists, or any other mental health professionals on staff," 260 F.3d 987, 991 (9th Cir. 2001), and the physician on duty had merely "t[aken] psychiatry courses during medical school" and "been exposed to psychiatric patients as an emergency room physician," *id.* at 994; *see also Arrington v. Wong*, 237 F.3d 1066, 1073 (9th Cir. 2001); 42 C.F.R. § 489.24(d)(1) (requiring stabilizing treatment "*[w]ithin the capabilities of* the staff and facilities available at the hospital").[15] Here, the record in this case is clear that covered hospitals

_____

[15] Appellants' only real response to the plain text—that by referencing "the scope of [a hospital staff's] professional licenses" the CMS Operations Manual somehow expands that statutory text to mean anything other than those treatments a particular provider is trained to safely provide—is grasping at straws. State Br. 8, 35-36; *see* Leg. Br. 37.

in Idaho are staffed and fully capable of providing such care and will continue to do so as long as their hands are not tied by Idaho's ban. Idaho Leg. Excerpts of Record, 3-LEG-ER-292-96; *see also generally* St. Luke's Amicus Br.; AHA Amicus Br.

Finally, that a separate section of the Medicare Act, 42 U.S.C. § 1395, states that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided" does not change EMTALA's plain meaning. *See* State Br. 27; Leg. Br. 24, 31-32. EMTALA's stabilization requirement was imposed by Congress, not by a "Federal officer or employee," and was obviously intended to regulate the practice of medicine to some extent by creating a federal cause of action for a failure to provide such *medical* treatment. And, even if there were some ambiguity, EMTALA, as the later, more specific, statute, must govern. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

## IV. Federal Health Care Refusal Laws Provide No Basis for Modifying the Preliminary Injunction.

This Court must reject the Attorney General's meritless request to "modify the injunction" to state "that it does not prohibit enforcement of

[the ban]" to "abortions to which doctors or hospitals object as a matter of conscience." State Br. 44, *see also id.* at 45-46.[16] This is nothing more than an invitation to issue an advisory opinion on a legal question that is not properly before this Court, and even if it were, could not be appropriately addressed through modifying this preliminary injunction. *See Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution.").

According to the Attorney General, the injunction is improperly "silent about conscience protections for doctors and hospitals." State Br. 47. There is nothing improper about that at all. *See Moyle,* 144 S. Ct. at 2015 (per curiam) (six justices voting to reinstate the preliminary injunction without modification). To start, the Attorney General has not identified a single hospital in Idaho (or its staff) that seeks to withhold

---

[16] As the United States has ably explained, U.S. Br. 18-19, 41-43, 62-63, the other proposed grounds for modifying the injunction are equally meritless.

emergency abortion care in tragic cases of pregnancy loss. Nor has any such hospital sought to intervene or otherwise seek protection from this Court or the district court. If anything, there is evidence to the contrary, as a recent article highlighted how one Catholic hospital in Idaho was forced to stop providing emergency abortions because of the current abortion ban, and it was the preliminary injunction in this case that *restored* that hospital's ability to provide that care again. *See* Sarah Zhang, "*That's Something You Won't Recover From as a Doctor*," Atlantic, Oct. 2024, *available at* https://www.theatlantic.com/magazine/archive/2024/10/abortion-ban-idaho-ob-gyn-maternity-care/679567/.

Moreover, "[a] court must find prospective relief that fits the remedy to the wrong or injury that has been established." *Salazar v. Buono*, 559 U.S. 700, 718 (2010). The same is true of a court's authority to modify an injunction, which must be evaluated "in light of the objectives of the [original] injunction." *Id.* at 720. Here, the original injunction sought by the United States prevents Idaho from "initiating any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on any medical provider or hospital based on their performance of"

emergency abortions required under EMTALA. *See* State of Idaho's Excerpts of Record, 1-ER-51-52. Those who *do not provide emergency abortions*, whatever the reason, face no risk of prosecution under Idaho's abortion ban. Thus, "there is no adequate basis" for this Court to modify the existing injunction to authorize what the Attorney General essentially admits are hypothetical prosecutions, just as there would have been no basis to grant an injunction against such prosecutions in the first place. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983).

Of course, expanded authority for hypothetical prosecutions is not really the issue. What the Attorney General really wants is this Court to rewrite the preliminary injunction to "endorse" its view that certain provisions of the federal healthcare refusal laws exempt hospitals or their staff from their obligations under EMTALA. State Br. 47. But this case concerns EMTALA's preemptive effect over Idaho's criminal abortion ban and, as such, the preliminary injunction runs to Idaho, not the federal government, and is limited to Idaho's enforcement of that ban where it conflicts with EMTALA. The interaction between EMTALA and other *federal* statutes, and the extent to which those laws may limit the ability of the federal government to enforce EMTALA, *irrespective of state law*,

is outside the scope of this injunction, if not this case itself. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("A court's equitable power lies only over the merits of the case or controversy before it."). Accordingly, this Court must decline the Attorney General's request to modify the injunction.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

Dated: October 22, 2024

Respectfully submitted,

*/s/ Alexa Kolbi-Molinas*

KATHLEEN R. HARTNETT
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111

PATRICK J. HAYDEN
COOLEY LLP
55 Hudson Yards
New York, NY 10001

ANGELINE X. CHEN
COOLEY LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004

ALEXANDER ROBLEDO
COOLEY LLP
500 Boylston Street
Boston, MA 02116

*Counsel for the ACLU Foundation*

ALEXA KOLBI-MOLINAS
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004

*Counsel for the ACLU and ACLU Foundation*

PAUL CARLOS SOUTHWICK
EMILY MYREI CROSTON
AMERICAN CIVIL LIBERTIES UNION
OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701

*Counsel for the ACLU of Idaho*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 23-35450, 23-35440

I am the attorney or self-represented party.

**This brief contains 5,722 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[XX] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　[ ] it is a joint brief submitted by separately represented parties.

　　[ ] a party or parties are filing a single brief in response to multiple briefs.

　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Alexa Kolbi-Molinas*　　　**Date** October 22, 2024