**Nos. 23-35440, 23-35450**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

STATE OF IDAHO,
Defendant-Appellant,

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives, et al.,
Proposed Intervenor-Defendants,
Movants-Appellants.

On Appeal from the United States District Court
for the District of Idaho
Hon. B. Lynn Winmill, No. 1:22-cv-00329-BLW

**BRIEF OF NATIONAL WOMEN'S LAW CENTER, IN OUR OWN VOICE: NATIONAL BLACK WOMEN'S REPRODUCTIVE JUSTICE AGENDA, INDIGENOUS WOMEN RISING, NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM, NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE JUSTICE, AND 64 ADDITIONAL ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Christine E. Webber
*Counsel of Record*
Sabrina S. Merold
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave., NW, Ste. 500
Washington, DC 20005
Tel: (202) 408-4600
cwebber@cohenmilstein.com

*(Additional counsel listed on next page)*

Michelle Banker
Dorianne Mason
Gretchen Borchelt
Donya Khadem
**National Women's Law Center**
1350 I St. NW, Ste. 700
Washington, DC 20005
Tel: (202) 588-5180
mbanker@nwlc.org

Alison S. Deich
Aniko R. Schwarcz
Harini Srinivasan
Nina C. Jaffe-Geffner
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave., NW, Ste. 500
Washington, DC 20005
Tel: (202) 408-4600
adeich@cohenmilstein.com

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

The Amici Curiae, National Women's Law Center, In Our Own Voice: National Black Women's Reproductive Justice Agenda, Indigenous Women Rising, National Asian Pacific American Women's Forum, National Latina Institute for Reproductive Justice, and 64 additional organizations (listed in the Appendix) are non-profit entities and have no parent corporations. No publicly held corporation owns any stock in any of the Amici Curiae.

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE.................................................................1

SUMMARY OF THE ARGUMENT .........................................................2

ARGUMENT .............................................................................................3

  I.   EMTALA PROTECTS ACCESS TO ALL EMERGENCY MEDICAL
      TREATMENT, INCLUDING EMERGENCY ABORTION CARE. .............3

    A.  EMTALA Has Always Required Hospitals to Offer Emergency Abortion
       Care .................................................................................................5

    B.  The Court Should Reject Appellants' Attempt to Rewrite EMTALA. ........8

      1. EMTALA's Reference to "Unborn Child[ren] " Does Not Eliminate the
         Right to Stabilizing Abortion Care……………………………………...8

      2. "Stabilizing Treatment" Is Not Limited to Treatment Permitted by State
         Law……………..………………………………………………………..10

  II.   CARVING PROTECTIONS FOR PREGNANT PATIENTS OUT OF
       EMTALA WILL DEEPEN THIS COUNTRY'S PROFOUND
       MATERNAL HEALTH CRISIS.................................................................12

    A.  Black, Indigenous, Latinx, AAPI, Immigrant, and Rural Communities Face
       Significant Barriers to Primary and Pregnancy-Related Healthcare,
       Increasing Their Risk of Pregnancy Emergencies......................................13

    B.  The United States is Battling a Maternal Health Crisis that
       Disproportionately Harms People in Communities Facing Systemic
       Oppression and Disinvestment...................................................................18

    C.  Nullifying EMTALA's Mandate to Protect Pregnant Patients Will Further
       Harm At-Risk Communities. ......................................................................21

      1. Stripping EMTALA's Protections Will Worsen Outcomes for Pregnant
         Patients with EMCs……………………………………….…………..22

      2. Stripping Pregnant Patients of EMTALA's Protections Will Drive
         Healthcare Professionals Out of Abortion Ban States, Worsening Care
         for All Pregnant Patients…………………………….……………...28

CONCLUSION..........................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)............................................................................4

*Brooker v. Desert Hosp. Corp.*,
    947 F.2d 412 (9th Cir. 1991) ...........................................................8

*California v. United States*,
    No. C 05-00328 JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008)..................8

*Dobbs v. Jackson Women's Health Organization*,
    597 U.S. 215 (2022)............................................................................3

*Lopez v. Contra Costa Reg'l Med. Ctr.*,
    No. C 12-03726 LB, 2013 WL 1402596 (N.D. Cal. Apr. 5, 2013).....................5

*Morin v. E. Maine Med. Ctr.*,
    779 F. Supp. 2d 166 (D. Me. 2011)...................................................10

*New York v. United States Department of Health & Human Services*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...............................................7

*Roberts v. Galen of Virginia, Inc.*,
    525 U.S. 249 (1999)........................................................................5, 11

*Rubin v. Islamic Republic of Iran*,
    583 U.S. 202 (2018)..........................................................................10

*Russello v. United States*,
    464 U.S. 16 (1983)............................................................................11

*Vazquez-Rivera v. Hosp. Episcopal San Lucas, Inc.*,
    620 F. Supp. 2d 264 (D.P.R. 2009) ...................................................5

**Statutes**

42 U.S.C. § 1395dd...............................................................................5

42 U.S.C. § 1395dd(a) ........................................................................3, 11

42 U.S.C. § 1395dd(b) ............................................................2, 4, 6, 11

42 U.S.C. § 1395dd(b)(1) ............................................................5, 10

42 U.S.C. §§ 1395dd(b)(1)-(2) ...........................................................10

42 U.S.C. § 1395dd(c) .........................................................................6

42 U.S.C. § 1395dd(d)(2)(A) .............................................................11

42 U.S.C. § 1395dd(e)(1)(A) .......................................................4, 9, 23

42 U.S.C. § 1395dd(e)(1)(A)(i) .........................................................4, 5

42 U.S.C. § 1395dd(e)(1)(B) ..........................................................5, 23

42 U.S.C. § 1395dd(e)(3)(A) ...............................................................6

42 U.S.C. § 1395dd(f) ........................................................................11

42 U.S.C. § 18023(d) ...........................................................................7

Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, §
    9121(b), 100 Stat. 166 (1985) ...................................................9

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, §
    6211(h), 103 Stat. 2248 (1989) .................................................9

## Other Authorities

*Administrative Compl.*, U.S. Dep't of Health & Hum. Servs. Ctrs. For
    Medicare & Medicaid Servs. Headquarters (Nov. 8, 2022),
    https://bit.ly/4ctlXkx .............................................................25

*Air Ambulance: Available Data Show Privately-Insured Patients Are
    at Financial Risk*, GAO-19-292 16–17 (Mar. 2019),
    https://bit.ly/4hac6Cy ............................................................22

Amanda Jean Stevenson et al., *The Maternal Mortality Consequences
    of Losing Abortion Access*, University of Colorado Boulder at 3
    (June 29, 2022), https://bit.ly/3VAhLcQ .................................21

Amanda Seitz, *Dozens of Pregnant Women, Some Bleeding or in Labor, are Turned Away from ERs Despite Federal Law*, Assoc. Press (Aug. 14, 2024), https://bit.ly/3BQSW4u ..................................................23

Amy N. Addante et al., *The Association Between State-level Abortion Restrictions and Maternal Mortality in the United States, 1995-2017*, 104 Contraception 496 (2021), https://bit.ly/4aeDHPe ...........................20

Andreea A. Creanga et al., *Racial and Ethnic Disparities in Severe Maternal Morbidity: A Multistate Analysis, 2008-2010*, 210 Am. J. Obstet. Gynecol. 435.E1 (2014), https://bit.ly/3xic1dj .....................................20

Anuli Njoku, *Listen to the Whispers before They Become Screams: Addressing Black Maternal Morbidity and Mortality in the United States*, 11 Healthcare (Basel) 438 (2023), https://bit.ly/3TShwbQ ..................16

*A Post* Roe *Idaho*, Idaho Physician Well-Being Action Collaborative & Idaho Coal. For Safe Healthcare at 3–5 (Feb. 2024), https://bit.ly/4hflO6t .......................................................................28, 29

Caitlin L. McMurtry et al., *Discrimination in the United States: Experiences of Asian Americans*, 54 Health Serv. Res. 1419 (2019), https://bit.ly/3VB5KUi ...........................................................16

Caroline Medina et al., *Protecting and Advancing Health Care for Transgender Adult Communities*, Ctr. for Am. Progress at 16 (Aug. 2021), https://ampr.gs/3PATZti ..........................................................16

Cole Sullivan, *Doctor Leaves Tennessee for Colorado Over Abortion Ban*, 9 News (Apr. 7, 2023, 5:00 AM), https://bit.ly/ 3xaV0BW .....................28

Daniel Grossman et al., *Care Post-*Roe*: Documenting Cases of Poor-Quality Care Since the* Dobbs *Decision*, Advancing New Standards in Reprod. Health, May 2023, at 8, https://bit.ly/ 49gFrWx ...............................................9, 23, 24

Darcy Banco et al., *Sex and Race Differences in the Evaluation and Treatment of Young Adults Presenting to the Emergency Department With Chest Pain*, 11 J. of the Am. Heart Ass'n 2, 5-6, 8 (2022), https://bit.ly/3vvkZnb ..........................................................15

Elizabeth Rivelli, *How Much Does It Cost To Have A Baby? 2024 Averages*, Forbes (Jan. 3, 2024, 5:56 AM), https://bit.ly/3xaLMWq.................14

Elizabeth Tobin-Tyler et al., *A Year After* Dobbs: *Diminishing Access to Obstetric-Gynecologic and Maternal-Fetal Care*, Health Affairs (Aug. 3, 2023), https://bit.ly/43wvNOq.......................................................28

Emily E. Petersen et al., *Racial/Ethnic Disparities in Pregnancy-Related Deaths—United States, 2007-2016*, 68 MMWR Morbidity & Mortal Weekly Rep. 762 (2019), https://bit.ly/3xcco9z................................18

*Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law*, 73 Fed. Reg. 78,072 (Dec. 19, 2008)........................7

Eran Bornstein et al., *Racial Disparity in Pregnancy Risks and Complications in the US: Temporal Changes during 2007-2018*, 9 J. Clin. Med. 1414 (2020), https://bit.ly/3A4YDeu...........................................20

Erika Edwards, et al., *A Dramatic Rise in Pregnant Women Dying in Texas after Abortion Ban*, NBC News (Sept. 21, 2024, 5:49 PM), https://nbcnews.to/48ftB0a ...........................................................21

Eugene Declercq and Laurie C. Zephyrin, *Maternal Mortality in the United States: A Primer*, The Commonwealth Fund (Dec. 16, 2020), https://bit.ly/495tpiU .............................................................18

Eugene Declercq et al., *The U.S. Maternal Health Divide: The Limited Maternal Health Services and Worse Outcomes of States Proposing New Abortion Restrictions*, The Commonwealth Fund (Dec. 14, 2022), https://bit.ly/4a343U2 ............................................21

Eunice Kennedy Shriver, *What is Prenatal Care and Why is it Important?*, Nat'l Inst. of Child Health & Hum. Dev. (Jan. 31, 2017), https://bit.ly/43uQ5YJ ...........................................................14

Glenn Goodwin et al., *A National Analysis of ED Presentations for Early Pregnancy and Complications: Implications for Post-Roe America*, 70 Am. J. of Emergency Med. 90 (2023), https://bit.ly/3TTfCYt .............................................................2

Heather Hatfield, *What It Costs to Have a Baby*, WebMD (Mar. 4, 2013), https://wb.md/3vqNUss ................................................................ 14

Jennifer Tolbert et al., *Key Facts about the Uninsured Population*, KFF (Dec. 18, 2023), https://bit.ly/49fnjwi ............................................ 15

Jewel Mullen, *How Our Organ Transplant System Fails People of Color*, Ass'n of Am. Med. Colleges (Nov. 29, 2022), https://bit.ly/43xjS2N ............................................................................ 16

Julie Rovner, *Abortion Bans Drive Off Doctors and Close Clinics, Putting Other Health Care at Risk*, OBP (May 23, 2023 9:28 AM), https://bit.ly/3IYBKtT ............................................................................ 29

Kate Kennedy-Moulton et al., *Maternal and Infant Health Inequality: New Evidence from Linked Administrative Data* 5 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30693, 2023), https://bit.ly/3ISnJOv ............................................................................. 19

Katharine A. Harrington et al., *Rural-Urban Disparities in Adverse Maternal Outcomes in the United States, 2016-2019*, 113 Am. J. Pub. Health 224 (2023), https://bit.ly/49d5oGL .................................... 19

Katherine Gallagher Robbins et al., *State Abortion Bans Harm More than 15 Million Women of Color*, Nat'l P'ship for Women & Families (June 2023), https://bit.ly/3ITRAWK ...................................... 21

Katherine Gallagher Robbins et al., *State Abortion Bans Threaten 6.7 Million Latinas*, Nat'l P'ship for Women & Families (Oct. 2023), https://bit.ly/3VtiA79 .............................................................................. 16

Katy B. Kozhimannil et al., *Severe Maternal Morbidity and Mortality Among Indigenous Women in the United States*, 135 Obstet. Gynecol. 294 (2020), https://bit.ly/3TMKwBz .................................... 19

Katy B. Kozhimannil, *Indigenous Maternal Health—A Crisis Demanding Attention*, 1 JAMA Health Forum (2020), https://bit.ly/3PABqFA ............................................................................. 20

Kavitha Surana, *Abortion Bans Have Delayed Emergency Medical Care. In Georgia, Experts Say This Mother's Death Was Preventable*, ProPublica (Sept. 16, 2024), https://bit.ly/3A2Jpqs ...................... 27

Kendal Orgera et al., *Training Location Preferences of U.S. Medical School Graduates Post* Dobbs v. Jackson Women's Health, Ass'n of Am. Med. Colleges Rsch. & Action Inst. (Apr. 13, 2023), https://bit.ly/3Tvv7o4 ........................................................................29

Kimberly Chernoby and Brian Acunto, *Pregnancy Complications After* Dobbs*: The Role of EMTALA*, 25 W. J. Emerg Med. 79 (2024), https://bit.ly/3INZfWN ..............................................................6

Latoya Hill et al., *Health Coverage by Race and Ethnicity, 2010-2022*, KFF (Jan. 11, 2024), https://bit.ly/4aqgY2a ....................................15

Laura G. Fleszar et al., *Trends in State-Level Maternal Mortality by Racial and Ethnic Group in the United States*, 330 JAMA 52 (2023), https://bit.ly/43xMBoa ..........................................................18

Mary G. Findling et al., *Discrimination in the United States: Experiences of Latinos*, 54 Health Serv. Res. 1409 (2019), https://bit.ly/3TPNd5r ..............................................................16

Mary G. Findling et al., *Discrimination in the United States: Experiences of Native Americans*, 54 Health Serv. Res. 1431 (2019), https://bit.ly/4cyREc0 ..............................................................16

Maryam Siddiqui et al., *Increased Perinatal Morbidity and Mortality Among Asian American and Pacific Islander Women in the United States*, 124 Anesth. & Analg. 879 (2017), https://bit.ly/3ITRP4e....................18

Megan E. Deichen Hansen et al., *Racial Inequities in Emergency Department Wait Times for Pregnancy-related Concerns*, 18 Women's Health (2022), https://bit.ly/3TQlem0 ..............................19

*NWLC Files EMTALA and Sex Discrimination Complaints on Behalf of Mylissa Farmer*, Nat'l Women's Law Ctr. (Nov. 8, 2022), https://bit.ly/3PABRQe..........................................................25

Peiyin Hung et al., *Access to Obstetric Services in Rural Counties Still Declining, with 9 Percent Losing Services*, 2004-14, 36 Health Affairs 1663 (2017), https://bit.ly/3Tu6t7f........................................17

Peiyin Hung et al., *Spatial Access to Hospital-based Obstetric Units in Minorized Racial/Ethnic Areas*, Rural & Minority Health Rsch. Ctr. at 7 (Aug. 2022), https://bit.ly/3TpACVa ................................17

*Protecting Statutory Conscience Rights in Health Care*, 84 Fed. Reg. 23,170 (May 21, 2019) ........................................................................7

Rachel Rabkin Peachman, Dobbs *Decision Threatens Full Breadth of Ob-Gyn Training*, 328 JAMA 1668 (2022), https://bit.ly/3Ty4bUH................29

Roni Caryn Rabin, *How Unconscious Bias in Health Care Puts Pregnant Black Women at Higher Risk*, New York Times (Dec. 12, 2023), https://nyti.ms/3TpAfde ..........................................................16

Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, The Commonwealth Fund (Nov. 18, 2020), https://bit.ly/4co1vRY ........................18

Ruqaiijah Yearby et al., *Structural Racism in Historical and Modern US Health Care Policy*, 41 Health Affairs 187, 188 (2022), https://bit.ly/4cuHUja .........................................................................13

S. Michelle Ogunwole et al., *Interconception Care for Primary Care Providers: Consensus Recommendations on Preconception and Postpartum Management of Reproductive-Age Patients With Medical Comorbidities*, 5 Mayo Clin. Proc. Innov. Qual Outcomes 872, 872-73 (2021), https://bit.ly/3xa2mWx ......................................................14

Saloni Malik et al., *Emergency Department Use in the Perinatal Period: An Opportunity for Early Intervention*, 70 Nat'l Libr. of Med. 835 (2017), https://bit.ly/48ghRdF ..............................................2

Shefali Luthra, '*We're not going to win that fight': Bans on Abortion and Gender-Affirming Care Are Driving Doctors from Texas*, The 19th (June 21, 2023, 10:33 AM), https://bit.ly/4csSuar ....................................28

Stephania Taladrid, *Did An Abortion Ban Cost A Young Texas Woman Her Life?*, The New Yorker (Jan. 8, 2024), https://bit.ly/3TRoLkg ............26, 27

Stephanie J. Lambert et al., *Impact of the* Dobbs *Decision on Medical Education and Training in Abortion Care*, 33 Women's Health Issues 337 (2023), https://bit.ly/4atIlZm ..........................................29

ix

x

*Support for Maternal Health Policies Will Not Solve the Crisis in Abortion Access*, Nat'l Women's Law Ctr. (Apr. 2023), https://bit.ly/4co27XM ...................................................................... 24

*Two Years After* Dobbs*: WA Health Care System Impacted as Providers Meet Idaho's Growing Reproductive Care Needs*, Off. of Sen. Maria Cantwell at 3 (June 2024), https://bit.ly/48hNJyS ...................... 30

Yhenneko J. Taylor et al*., Insurance Differences in Preventive Care Use and Adverse Birth Outcomes Among Pregnant Women in a Medicaid Nonexpansion State: A Retrospective Cohort Study*, 29 J. Women's Health 29, 29-30 (2020), https://bit.ly/ 4cHa9vc ............................... 14

## INTEREST OF AMICI CURIAE[1]

The National Women's Law Center is a nonprofit legal advocacy organization dedicated to the advancement and protection of legal rights and opportunities for women,[2] girls, and all who face sex discrimination. Because access to healthcare, including—and especially—emergency obstetric care, is of tremendous significance to health equity and the health and wellbeing of all who can become pregnant, the Center has an interest in countering arguments made by Appellants and their amici, which would imperil federal protections for pregnant patients, especially in communities facing systemic oppression and divestment. This brief is also submitted on behalf of In Our Own Voice: National Black Women's Reproductive Justice Agenda, Indigenous Women Rising, National Asian Pacific American Women's Forum, and National Latina Institute for Reproductive Justice, as well as 64 additional organizations listed in the Appendix. Like the Center, these organizations are committed to equitable healthcare access.

---

[1] This brief is filed with the consent of all parties. No party's counsel authored the brief in whole or in part or contributed money intended to fund preparing or submitting the brief. No person, other than amici curiae, their members, or their counsel, contributed money intended to fund preparing or submitting the brief.

[2] While this brief sometimes refers to a woman's right to emergency obstetric care, including abortion, *amici* recognize that individuals who do not identify as women, including transgender men and non-binary persons, may become pregnant and are equally entitled to stabilizing emergency treatment.

1

## SUMMARY OF THE ARGUMENT

The Emergency Medical Treatment and Labor Act (EMTALA) is a life raft for people who have systematically been denied medical care. Recognizing the cruelty of denying medical treatment to patients in crisis, Congress created EMTALA to ensure that Medicare-funded hospitals would, at the very least, provide "necessary stabilizing treatment" for "any" patient with an "emergency medical condition," regardless of the patient's ability to pay. 42 U.S.C. § 1395dd(b). In 1989, Congress amended the statute to clarify and extend protections for pregnant people. EMTALA's plain text now requires that emergency departments stabilize pregnant patients who are in labor, have emergency conditions unrelated to labor, or need emergency treatment to prevent pregnancy loss. Because at least one-third of pregnancies involve emergency room visits,[3] and up to 15% create life-threatening conditions during the first trimester,[4] EMTALA's safeguards are critical for everyone in the United States who can become pregnant. The importance of EMTALA has only increased as this country reckons with a worsening maternal

---

[3] Saloni Malik et al., *Emergency Department Use in the Perinatal Period: An Opportunity for Early Intervention*, 70 Nat'l Libr. of Med. 835 (2017), https://bit.ly/48ghRdF.

[4] Glenn Goodwin et al., *A National Analysis of ED Presentations for Early Pregnancy and Complications: Implications for Post-Roe America*, 70 Am. J. of Emergency Med. 90 (2023), https://bit.ly/3TTfCYt.

health crisis, including a maternal mortality rate ten times that of other high-income countries, which disproportionately impacts Black and Indigenous women.

In the wake of *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), Appellants raise the novel theory that Idaho has the power to carve protections for pregnant people out of federal law. Accepting this reading of EMTALA—which distorts the statutory text beyond reason and recognition—would deepen the maternal health crisis, particularly for Black, Indigenous, immigrant, rural, and low-income communities. It would decimate treatment options for pregnancy-related emergencies and accelerate the exodus of healthcare providers from areas already considered pregnancy-care deserts, making even routine pregnancy care harder to find. *Amici* urge the Court to reject Appellants' atextual reading of EMTALA and affirm the District Court's decision below.

## ARGUMENT

### I. EMTALA PROTECTS ACCESS TO ALL EMERGENCY MEDICAL TREATMENT, INCLUDING EMERGENCY ABORTION CARE.

EMTALA's plain text ensures meaningful access to emergency healthcare for everyone, including pregnant people. The statute requires that Medicare-participating hospitals: (1) perform an "appropriate medical screening examination" on "any individual" who comes to the "emergency department" (Screening Requirement), 42 U.S.C. § 1395dd(a); and (2) provide "necessary stabilizing treatment" to any "individual" with an "emergency medical condition" (Stabilization

3

Requirement)*, id.* § 1395dd(b). An "emergency medical condition" (EMC) is any condition that, in "the absence of immediate medical attention could reasonably be expected to result in": "(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A).

For some pregnant patients with EMCs, including prolonged miscarriages, the "necessary stabilizing treatment" is terminating the pregnancy in a medical setting, where healthcare providers can guard against the risks of infection, hemorrhage, and stroke (among others). Under these circumstances, EMTALA is clear: The hospital must offer to end the pregnancy.

Appellants' novel arguments to the contrary cannot be squared with the law's "plain terms." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020). EMTALA's reference to "unborn child[ren]" creates protections for pregnant patients who need emergency treatment to avoid pregnancy loss; it does not strip protections from patients who need life- and health-saving abortion care. 42 U.S.C. § 1395dd(e)(1)(A)(i). Nor does EMTALA limit "stabilizing treatment" to treatment allowed by state law.

4

### A. EMTALA Has Always Required Hospitals to Offer Emergency Abortion Care.

Protecting pregnant patients is a core function of EMTALA. "Labor" is the only medical condition named in the title and text of the law, 42 U.S.C. § 1395dd, and the statute expressly protects "a pregnant woman who is having contractions" if her "health or safety" is at risk. *Id.* §§ (b)(1), (e)(1)(B). The statute also specifies that a "pregnant woman"—like any other "individual"—is entitled to stabilizing treatment if she has *any* medical condition that places her health in "serious jeopardy," regardless of whether she is in labor. *Id.* §§ (b)(1), (e)(1)(A)(i).[5]

For both pregnant and non-pregnant patients, EMTALA's Stabilization Requirement is straightforward and unqualified. *See Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 253 (1999). If "*any* individual" is diagnosed with an EMC, the hospital "must provide . . . within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition," (or, under limited circumstances, for a medically beneficial transfer to another healthcare facility). 42 U.S.C. § 1395dd(b)(1) (emphasis added).

---

[5] *See, e.g.*, *Lopez v. Contra Costa Reg'l Med. Ctr.*, No. C 12-03726 LB, 2013 WL 1402596, at *1 (N.D. Cal. Apr. 5, 2013) (severe preeclampsia involving hemolysis, elevated liver function, and low platelets was an EMC); *Vazquez-Rivera v. Hosp. Episcopal San Lucas, Inc.*, 620 F. Supp. 2d 264, 270 (D.P.R. 2009) (pregnant patient's "vaginal bleeding[ ] and severe abdominal pain" was an EMC (citation omitted)).

To "stabilize" a pregnant patient in labor, the hospital must help the patient "deliver." *Id.* § 1395dd(e)(3)(A). And to "stabilize" a patient with an EMC other than (or in addition to) labor, the hospital must provide the care necessary to "assure, within reasonable medical probability, that no material deterioration of the condition is likely*." Id.* Thus, the Stabilization Requirement ensures that when anyone comes to a Medicare-funded hospital with a serious medical emergency, the hospital will provide the bare minimum care necessary to guard against catastrophic outcomes.

For some pregnant patients with EMCs, the necessary stabilizing treatment is abortion care. For example, if a patient experiences a preterm premature rupture of amniotic membranes (PPROM) before the fetus is capable of surviving outside the uterus, pregnancy loss is often inevitable, but waiting for the patient to miscarry without medical support could risk sepsis, hemorrhage, severe and lasting organ damage, and loss of fertility.[6] Terminating the pregnancy promptly may be necessary to "assure, within reasonable medical probability, that no material deterioration" is "likely." 42 U.S.C. § 1395dd(e)(3)(A). Under such circumstances, EMTALA requires that the hospital offer emergency abortion care (or, if permitted by 42 U.S.C. § 1395dd(c), a transfer to a facility that will provide the care). *Id.* §1395dd(b). This

---

[6] Kimberly Chernoby and Brian Acunto, *Pregnancy Complications After* Dobbs*: The Role of EMTALA*, 25 W. J. Emerg Med. 79 (2024), https://bit.ly/3INZfWN.

interpretation of the statute has been affirmed by Congress[7] and by the U.S. Department of Health and Human Services (HHS), the agency charged with administering EMTALA.[8]

Federal courts have likewise recognized that EMTALA requires stabilizing abortion care. For example, in *New York v. United States Department of Health & Human Services*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019), the court held that HHS rules regarding medical providers' religious refusals of care must include adequate protections for the stabilizing abortion care EMTALA requires. Similarly, in a 2008 challenge to the Weldon Amendment (which concerns refusals of abortion care), the court recognized that "required medical treatment" under EMTALA includes

---

[7] Section 1303 of the Affordable Care Act (ACA), which lists "special rules" relating to abortion, states that nothing in the ACA "shall be construed to *relieve any health care provider from providing emergency services as required by* State or Federal law, *including . . . 'EMTALA'[]*." 42 U.S.C. § 18023(d) (emphasis added). In other words, the ACA recognizes—and provides no exception to—EMTALA's "require[ment]" that hospitals provide stabilizing abortion care.

[8] HHS has twice recognized that EMTALA requires abortion care in regulatory preambles. In a 2008 regulatory preamble, HHS suggested that a hospital would run afoul of EMTALA if the "hospital, as opposed to an individual, ha[d] an objection to performing abortions that are necessary to stabilize the mother." *Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law*, 73 Fed. Reg. 78,072, 78,087 (Dec. 19, 2008). HHS reiterated this view in 2019. *Protecting Statutory Conscience Rights in Health Care*, 84 Fed. Reg. 23,170, 23,183 (May 21, 2019) (2019 Refusal Rule) ("With respect to EMTALA, the Department generally agrees with its explanation in the preamble to the 2008 Rule.")

"abortion-related services." *California v. United States*, No. C 05-00328 JSW, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008).

Thus, the United States is not proposing a "novel" interpretation of EMTALA. Br. for State of Idaho (Idaho Br.) 18, ECF No. 133; Br. for Moyle, et. al. (Moyle Br.) 2, ECF No. 131. It is simply reaffirming a decades-long consensus across Congress, regulators, and courts that EMTALA protects "any and all patients" facing serious medical emergencies, including patients who need abortion care. *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir. 1991).

## B. The Court Should Reject Appellants' Attempt to Rewrite EMTALA.

Contrary to Appellants' suggestion, Idaho does not have the power to carve protections for pregnant people out of EMTALA.

### 1. EMTALA's Reference to "Unborn Child[ren]" Does Not Eliminate the Right to Stabilizing Abortion Care.

Appellants incorrectly insist that a 1989 amendment to EMTALA—which requires Medicare-funded hospitals to offer stabilizing treatment to a "pregnant woman" if her health or that of her "unborn child" is in jeopardy—*sub silentio* removed protections for patients who need stabilizing abortion care. Idaho Br. 7; Moyle Br. 5-8. This argument is unmoored from both the text of the statute and medical reality.

As originally enacted, EMTALA required hospitals to provide "necessary stabilizing treatment" for "emergency medical conditions" or "active labor." Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, § 9121(b), 100 Stat. 166 (1985). In 1989, Congress amended EMTALA to clarify that it protects pregnant patients with medical emergencies unrelated to labor and to *extend* protections to patients at risk of pregnancy loss. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6211(h), 103 Stat. 2248 (1989) (1989 Amendment). The amendment accomplished these dual goals by broadening the definition of an EMC to include any condition that, in the "absence of immediate medical attention could reasonably be expected to result in" placing a pregnant woman's or her fetus's health in "serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A).

Appellants argue that the 1989 Amendment's clear expansion of protection for pregnant patients instead allows Medicare-funded hospitals to deny pregnant patients—and pregnant patients alone—life- and health-saving treatment. Not so.

In many cases where a patient has an EMC requiring emergency abortion care—rather than delivery of a fetus capable of surviving outside the uterus—pregnancy loss is inevitable.[9] It is unthinkable that Congress amended EMTALA to

---

[9] Daniel Grossman et al., *Care Post-*Roe*: Documenting Cases of Poor-Quality Care Since the* Dobbs *Decision*, Advancing New Standards in Reprod. Health, May 2023, at 8, https://bit.ly/ 49gFrWx.

deny life- and health-saving medical treatment to a pregnant patient to "stabilize" a fetus with no chance of survival. *Cf. Morin v. E. Maine Med. Ctr.*, 779 F. Supp. 2d 166, 185 (D. Me. 2011) (rejecting the "disquieting notion" that EMTALA does not protect pregnant people who cannot "deliver a live infant" (citation omitted)).

In the rare case where there is a decision to be made between stabilizing a pregnant patient and preserving a viable pregnancy, EMTALA gives that decision to the pregnant patient. If a pregnant "individual" has an EMC, and it is not possible to provide stabilizing treatment that preserves the pregnancy, EMTALA leaves only one way for the hospital to satisfy its stabilization obligations: The hospital must "offer[] the individual" a stabilizing abortion, and get the individual's "written informed consent" to accept or refuse it. 42 U.S.C. §§ 1395dd(b)(1)-(2).

### 2. "Stabilizing Treatment" Is Not Limited to Treatment Permitted by State Law.

Idaho argues that the Stabilization Requirement only requires hospitals to provide care "within the staff and facilities available at the hospital," and treatments that are illegal under state law are not "available." Idaho Br. 15, 35 (quoting 42 U.S.C. § 1395dd(b)(1)). But that assertion reads the phrase "staff and facilities" out of the statute. *See, e.g.*, *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (a "statute should be construed" so that "no part will be inoperative or superfluous") (internal quotation marks omitted). EMTALA plainly states that, if a hospital cannot stabilize a patient because it lacks the necessary "*staff and facilities*," the hospital

10

may "transfer" the patient (consistent with EMTALA's transfer requirements)." 42 U.S.C. § 1395dd(b)(1) (emphasis added). But if the sole obstacle to providing stabilizing treatment is state law, EMTALA is clear: Federal law preempts the state restriction. 42 U.S.C. § 1395dd(f).

Idaho's argument also ignores the careful and contrasting language in EMTALA's provisions. Unlike the Screening Requirement, which calls for an "appropriate medical screening," 42 U.S.C. § 1395dd(a), the Stabilization Requirement is unqualified: Hospitals must provide "necessary stabilizing treatment." *Id.* § 1395dd(b); *see Roberts*, 525 U.S. at 253 ("[T]here is no question that the text of § 1395dd(b) does not require an 'appropriate' stabilization."). Contrary to the Supreme Court's clear instructions in *Roberts*, Appellants place a limiting gloss on the Stabilization Requirement by insisting—without textual grounding—that EMTALA only requires state-approved stabilizing care.

Appellants' reading of the Stabilization Requirement is also wrong because when EMTALA means to incorporate state law, it says so expressly. EMTALA's civil damages provision allows individuals injured by EMTALA violations to obtain "those damages available for personal injury under the law of the State in which the hospital is located." 42 U.S.C. § 1395dd(d)(2)(A). The Stabilization Requirement, however, is not cabined by state law. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but

11

omits it in another section of the same Act, it is generally presumed that Congress acts intentionally . . ." (brackets and internal quotation marks omitted)).

The Court should reject Appellants' atextual reading of EMTALA, which would perversely single out pregnant patients for disfavorable and potentially deadly treatment.

## II. CARVING PROTECTIONS FOR PREGNANT PATIENTS OUT OF EMTALA WILL DEEPEN THIS COUNTRY'S PROFOUND MATERNAL HEALTH CRISIS.

Access to healthcare in the United States has long hinged on patients' sex, race, ethnicity, income, immigration status, and zip code—a reality that undergirds EMTALA's mandate that *all* patients receive stabilizing emergency care. EMTALA's protections are particularly important for pregnant patients from communities facing systemic oppression and disinvestment, who often cannot access the preventive care necessary to avert life-threatening pregnancy complications.

Appellants' challenge to EMTALA comes at a time when abortion bans are amplifying an ongoing and inequitable crisis in maternity care. Rates of severe and fatal pregnancy complications in the United States are staggering, with Indigenous and Black patients most at risk of pregnancy-related illness and death. The proliferation of abortion bans throughout the country is compounding the crisis, preventing pregnant patients from receiving life- and health-saving medical care and

driving obstetric providers out of areas where pregnancy care is already dangerously difficult to access. The consequences of gutting EMTALA now are predictable and devastating: More pregnant people will suffer and die.

### A. Black, Indigenous, Latinx, AAPI, Immigrant, and Rural Communities Face Significant Barriers to Primary and Pregnancy-Related Healthcare, Increasing Their Risk of Pregnancy Emergencies.

Pregnant people in the United States navigate a healthcare system rooted in laws that deliberately and systematically denied equal healthcare access to people of color,[10] who comprise over half of people residing in this Circuit.[11] The legacy of those racist laws is a network of mutually reinforcing barriers to healthcare for millions of people, particularly in Black, Indigenous, Latinx, Asian American and Pacific Islander (AAPI), immigrant, and rural communities. Several barriers make routine primary and pregnancy-related care dangerously difficult to access, including: (1) lack of health insurance; (2) discrimination and language barriers; and (3) maternity care deserts. When people cannot access primary care prior to

---

[10] For example, the Federal 1946 Hospital Survey and Construction Act permitted racially segregated healthcare facilities. Over the next twenty years, state governments levied policies that disproportionately excluded racial and ethnic minority populations from Medicare and Medicaid. Ruqaiijah Yearby et al., *Structural Racism in Historical and Modern US Health Care Policy*, 41 Health Affairs 187, 188 (2022), https://bit.ly/4cuHUja.

[11] *Examining the Demographic Compositions of U.S. Circuit and District Courts*, Ctr. For Amer. Progress at 25 (Feb. 2020), https://ampr.gs/4dS96aY.

pregnancy, they are more likely to develop underlying conditions that make pregnancy more dangerous, such as chronic hypertension, heart disease, and diabetes.[12] These risks are compounded when patients cannot access adequate prenatal care.[13] Such barriers to routine healthcare make emergency complications all too common.

*Lack of Health Insurance*. Without insurance, patients often struggle to afford care for chronic health conditions that make pregnancy more dangerous.[14] Similarly, because prenatal care requires frequent[15] and expensive[16] medical appointments, a lack of health insurance can place that care out of reach. Yet insurance coverage in the United States remains deeply inequitable. Black, Indigenous, and Latinx

---

[12] S. Michelle Ogunwole et al., *Interconception Care for Primary Care Providers: Consensus Recommendations on Preconception and Postpartum Management of Reproductive-Age Patients With Medical Comorbidities*, 5 Mayo Clin. Proc. Innov. Qual Outcomes 872, 872-73 (2021), https://bit.ly/3xa2mWx.

[13] Eunice Kennedy Shriver, *What is Prenatal Care and Why is it Important?*, Nat'l Inst. of Child Health & Hum. Dev. (Jan. 31, 2017), https://bit.ly/43uQ5YJ.

[14] Yhenneko J. Taylor et al*., Insurance Differences in Preventive Care Use and Adverse Birth Outcomes Among Pregnant Women in a Medicaid Nonexpansion State: A Retrospective Cohort Study*, 29 J. Women's Health 29, 29-30 (2020), https://bit.ly/ 4cHa9vc.

[15] Typical prenatal care involves between 10 and 15 obstetrician visits. Elizabeth Rivelli, *How Much Does It Cost To Have A Baby? 2024 Averages*, Forbes (Jan. 3, 2024, 5:56 AM), https://bit.ly/3xaLMWq. For a pregnancy with complications, the number would likely be higher.

[16] For uninsured patients, prenatal care costs on average approximately $2,000. Heather Hatfield, *What It Costs to Have a Baby*, WebMD (Mar. 4, 2013), https://wb.md/3vqNUss.

14

populations are significantly more likely to be uninsured than white people,[17] as are AAPI populations.[18] Moreover, roughly one-third of immigrants in the United States lack insurance,[19] while just 9.5% of naturalized citizens and 7.7% of United States-born citizens are uninsured.[20] These insurance barriers limit access to the primary and prenatal care necessary to avert pregnancy-related EMCs.

*Discrimination and Language Barriers.* Even when patients can reach medical providers, discrimination, bias, and lack of language services may compromise their treatment. Research shows that Black patients are forced to wait longer to receive emergency[21] and non-emergency medical treatment than their white peers,[22] are offered inferior treatments, and are more frequently met with

---

[17] Latoya Hill et al., *Health Coverage by Race and Ethnicity, 2010-2022*, KFF (Jan. 11, 2024), https://bit.ly/4aqgY2a.

[18] *Expanding Access to Healthcare,* Asian & Pacific Islander Am. Health Forum, https://bit.ly/489TaQl (last reviewed Oct. 11, 2024).

[19] Jennifer Tolbert et al., *Key Facts about the Uninsured Population*, KFF (Dec. 18, 2023), https://bit.ly/49fnjwi.

[20] *Id.*

[21] One study shows Black women wait significantly longer than both white men and white women to be seen by a provider when they arrive at a hospital emergency department with chest pain. Darcy Banco et al., *Sex and Race Differences in the Evaluation and Treatment of Young Adults Presenting to the Emergency Department With Chest Pain*, 11 J. of the Am. Heart Ass'n 2, 5-6, 8 (2022), https://bit.ly/3vvkZnb.

[22] For instance, Black patients requiring an organ transplant wait on average one year longer than white patients, though Black people are four times more likely than white people to develop kidney failure and experience the highest rates of heart failure.

skepticism when they report their symptoms to healthcare providers.[23] Other patients of color and LGBTQ+ patients also face discrimination in medical settings.[24] And for patients with limited English proficiency, providers often lack adequate translation services.[25]

*Maternity Care Deserts*. Over one-third of counties in the United States are "maternity care deserts," meaning that they have *no* obstetric providers, hospital-

---

Jewel Mullen, *How Our Organ Transplant System Fails People of Color*, Ass'n of Am. Med. Colleges (Nov. 29, 2022), https://bit.ly/43xjS2N.

[23] One study analyzing taped conversations between patients and physicians reveals that doctors are more likely to express skepticism about the symptoms Black patients report. Another study of patient records shows that "doctors signal disbelief in the records of Black patients, appearing to question the credibility of their complaints by placing quotation marks around certain words." Roni Caryn Rabin, *How Unconscious Bias in Health Care Puts Pregnant Black Women at Higher Risk*, New York Times (Dec. 12, 2023), https://nyti.ms/3TpAfde; Anuli Njoku, *Listen to the Whispers before They Become Screams: Addressing Black Maternal Morbidity and Mortality in the United States*, 11 Healthcare (Basel) 438 (2023), https://bit.ly/3TShwbQ.

[24] *See, e.g.*, Mary G. Findling et al., *Discrimination in the United States: Experiences of Native Americans*, 54 Health Serv. Res. 1431 (2019), https://bit.ly/4cyREc0; Mary G. Findling et al., *Discrimination in the United States: Experiences of Latinos*, 54 Health Serv. Res. 1409 (2019), https://bit.ly/3TPNd5r; Caitlin L. McMurtry et al., *Discrimination in the United States: Experiences of Asian Americans*, 54 Health Serv. Res. 1419 (2019), https://bit.ly/3VB5KUi; Caroline Medina et al., *Protecting and Advancing Health Care for Transgender Adult Communities*, Ctr. for Am. Progress at 16 (Aug. 2021), https://ampr.gs/3PATZti.

[25] *See* Katherine Gallagher Robbins et al., *State Abortion Bans Threaten 6.7 Million Latinas*, Nat'l P'ship for Women & Families (Oct. 2023), https://bit.ly/3VtiA79.

16

based obstetric care, or birth centers.[26] Indigenous and Black pregnant patients—especially in rural areas—are disproportionately affected.[27] Over 80% of people in rural Indigenous communities lack close access to a hospital-based obstetric unit.[28] And counties with a higher percentage of Black women of reproductive age have higher odds of lacking hospital obstetric services and are more likely to lose obstetric services over time.[29] Consequently, one in four Indigenous babies, and one in six Black babies, are born in areas with limited or no access to pregnancy-related care.[30]

Woven together, these and other barriers to healthcare make pregnancies in certain communities particularly dangerous. Without EMTALA's protections, these communities would face greater risks of severe illness and pregnancy-related death.

---

[26] *Nowhere To Go: Maternity Care Deserts Across the U.S.*, March of Dimes at 5 (2024), https://bit.ly/3YeuRvJ.

[27] *Id.* at 11–12 .

[28] Peiyin Hung et al., *Spatial Access to Hospital-based Obstetric Units in Minorized Racial/Ethnic Areas*, Rural & Minority Health Rsch. Ctr. at 7 (Aug. 2022), https://bit.ly/3TpACVa.

[29] Peiyin Hung et al., *Access to Obstetric Services in Rural Counties Still Declining, with 9 Percent Losing Services*, 2004-14, 36 Health Affairs 1663 (2017), https://bit.ly/3Tu6t7f.

[30] *Nowhere To Go*, *supra* note 26 at 6.

**B. The United States is Battling a Maternal Health Crisis that Disproportionately Harms People in Communities Facing Systemic Oppression and Disinvestment.**

Rates of pregnancy-related death and disability in the United States are staggering, particularly for non-white women.

*Maternal Mortality*. The risk of pregnancy-related death in the United States is up to *ten times higher* than in other high-income countries.[31] More alarmingly, over the last twenty years, maternal mortality rates in this country have climbed, while falling elsewhere.[32]

Black and Indigenous communities bear the brunt of this crisis. Black women are roughly three times more likely than white women to die from pregnancy, and Indigenous women are more than twice as likely.[33] Worse still, pregnancy-related

---

[31] Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, The Commonwealth Fund (Nov. 18, 2020), https://bit.ly/4co1vRY.

[32] Eugene Declercq and Laurie C. Zephyrin, *Maternal Mortality in the United States: A Primer*, The Commonwealth Fund (Dec. 16, 2020), https://bit.ly/495tpiU.

[33] Emily E. Petersen et al., *Racial/Ethnic Disparities in Pregnancy-Related Deaths— United States, 2007-2016*, 68 MMWR Morbidity & Mortal Weekly Rep. 762 (2019), https://bit.ly/3xcco9z; *see also* Laura G. Fleszar et al., *Trends in State-Level Maternal Mortality by Racial and Ethnic Group in the United States*, 330 JAMA 52 (2023), https://bit.ly/43xMBoa. Recent data also shows an increase in maternal mortality for Latinx individuals and high rates of maternal mortality during hospitalization for delivery among AAPI women. Maryam Siddiqui et al., *Increased Perinatal Morbidity and Mortality Among Asian American and Pacific Islander Women in the United States*, 124 Anesth. & Analg. 879 (2017), https://bit.ly/3ITRP4e.

mortality rates for Black and Indigenous women over twenty-nine years old are *four to five* times that of their white counterparts.[34] These racial disparities persist *across* the socioeconomic spectrum: greater education and wealth do not protect Black people from pregnancy-related death.[35] The risks are heightened for Black and Indigenous people in rural areas.[36]

*Maternal Morbidity.* Severe pregnancy complications are also at crisis levels.[37] For every maternal death in the United States, there are at least seventy to eighty cases of severe maternal illness (maternal morbidity),[38] and that number is steadily increasing.[39] Again, communities of color are hit hardest. Black and Indigenous women experience severe maternal morbidity—sometimes called "near

---

[34] Petersen, *supra* note 33.

[35] Kate Kennedy-Moulton et al., *Maternal and Infant Health Inequality: New Evidence from Linked Administrative Data* 5 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30693, 2023), https://bit.ly/3ISnJOv.

[36] Katharine A. Harrington et al., *Rural-Urban Disparities in Adverse Maternal Outcomes in the United States, 2016-2019*, 113 Am. J. Pub. Health 224 (2023), https://bit.ly/49d5oGL; *see also* Katy B. Kozhimannil et al., *Severe Maternal Morbidity and Mortality Among Indigenous Women in the United States*, 135 Obstet. Gynecol. 294 (2020), https://bit.ly/3TMKwBz.

[37] Megan E. Deichen Hansen et al., *Racial Inequities in Emergency Department Wait Times for Pregnancy-related Concerns*, 18 Women's Health (2022), https://bit.ly/3TQlem0.

[38] Declercq and Zephyrin, *supra* note 32.

[39] *Severe Maternal Morbidity*, Ctrs. for Disease Control & Prevention (last reviewed July 3, 2023), https://bit.ly/40aACxp.

misses"—roughly twice as often as white women.[40] Black women are more likely to suffer from hypertension, preterm labor, hemorrhage, and infection during or related to pregnancy,[41] and Latinas are at greater risk for gestational diabetes, peripartum infection, and postpartum hemorrhage.[42] Geography exacerbates these problems. Indigenous women in rural areas have a "substantially elevated risk" of serious complications during childbirth, compared to white women and those living in urban areas.[43] The prevalence of pregnancy risk factors and complications, such as hypertensive disorders and diabetes, have only increased over time.[44]

*Abortion Restrictions Are Fueling the Crisis.* Even before *Dobbs*, states that restricted abortion had higher maternal mortality rates than states that did not.[45] In 2020, maternal death rates were 62% higher in "abortion-restriction" states than in

---

[40] Latina and AAPI women also suffer higher rates of severe morbidity than their white counterparts. Andreea A. Creanga et al., *Racial and Ethnic Disparities in Severe Maternal Morbidity: A Multistate Analysis, 2008-2010*, 210 Am. J. Obstet. Gynecol. 435.E1 (2014), https://bit.ly/3xic1dj.

[41] *See, e.g.*, Eran Bornstein et al., *Racial Disparity in Pregnancy Risks and Complications in the US: Temporal Changes during 2007-2018*, 9 J. Clin. Med. 1414 (2020), https://bit.ly/3A4YDeu (collecting studies).

[42] *Id.* (collecting studies).

[43] Katy B. Kozhimannil, *Indigenous Maternal Health—A Crisis Demanding Attention*, 1 JAMA Health Forum (2020), https://bit.ly/3PABqFA.

[44] Bornstein, *supra* note 41.

[45] Amy N. Addante et al., *The Association Between State-level Abortion Restrictions and Maternal Mortality in the United States, 1995-2017*, 104 Contraception 496 (2021), https://bit.ly/4aeDHPe.

"abortion-access" states, and between 2018 and 2020, the maternal mortality rate increased nearly twice as fast in states with abortion restrictions.[46] In Texas, after SB8—the law that effectively banned abortion in the state prior to *Dobbs*—took effect, maternal mortality increased by 56%, compared to an 11% rise nationwide.[47] Post *Dobbs*, researchers estimate that total abortion bans could cause a nearly 25% increase in maternal mortality overall, and a nearly 40% increase among Black people.[48] Like other structural barriers to medical care, state abortion bans take a particularly heavy toll on Black and Indigenous women, who are the most likely to live in states that ban or will likely ban abortion.[49]

### C. Nullifying EMTALA's Mandate to Protect Pregnant Patients Will Further Harm At-Risk Communities.

As state abortion bans proliferate, EMTALA serves as a crucial bulwark against some of the worst consequences of the maternal health crisis. If patients with emergency pregnancy complications can get to a Medicare-funded hospital,

---

[46] Eugene Declercq et al., *The U.S. Maternal Health Divide: The Limited Maternal Health Services and Worse Outcomes of States Proposing New Abortion Restrictions*, The Commonwealth Fund (Dec. 14, 2022), https://bit.ly/4a343U2.

[47] Erika Edwards, et al., *A Dramatic Rise in Pregnant Women Dying in Texas after Abortion Ban*, NBC News (Sept. 21, 2024, 5:49 PM), https://nbcnews.to/48ftB0a.

[48] Amanda Jean Stevenson et al., *The Maternal Mortality Consequences of Losing Abortion Access*, University of Colorado Boulder at 3 (June 29, 2022), https://bit.ly/3VAhLcQ.

[49] Katherine Gallagher Robbins et al., *State Abortion Bans Harm More than 15 Million Women of Color*, Nat'l P'ship for Women & Families (June 2023), https://bit.ly/3ITRAWK.

EMTALA requires that they receive stabilizing care. If the Court reverses the District Court's decision, these patients will suffer and die at higher rates. Patients from communities pushed to the margins, who disproportionately visit hospital emergency departments, will experience the worst outcomes.

A holding that EMTALA does not preempt abortion bans like Idaho's would also exacerbate maternity care deserts, making even routine obstetric care harder to find. Following *Dobbs*, providers are moving away from states with abortion restrictions.[50] If the Court adopts Appellants' novel and dangerous interpretation of EMTALA, providers may leave at a faster clip.

### 1. Stripping EMTALA's Protections Will Worsen Outcomes for Pregnant Patients with EMCs.

Without EMTALA's protections, patients who need emergency abortion care that is impermissible under state law would have to: (1) travel out of state for treatment—which may not be medically or financially possible;[51] or (2) accept substandard treatment (or no treatment) from an in-state hospital. Stories from

---

[50] *See infra* Part II.C.2.

[51] Even insured patients may pay out-of-pocket if they are forced to travel to another state. For example, in 2017, 69% of air ambulances among patients with private insurance were out-of-network, and the median cost totaled $36,400. Gov't Accountability Off., *Air Ambulance: Available Data Show Privately-Insured Patients Are at Financial Risk*, GAO-19-292 16–17 (Mar. 2019), https://bit.ly/4hac6Cy.

hospitals that have violated EMTALA illustrate the horrific consequences of placing pregnant people in this bind.

Since *Dobbs*, there have been at least one-hundred public cases in which women with serious pregnancy complications were denied abortion care or had treatment delayed due to a state abortion ban; the true number is likely significantly higher.[52] Providers in ban states report that patients experiencing emergency pregnancy complications like ectopic pregnancy or PPROM are being denied care due to clinicians' fear of prosecution.[53] For example, one patient sought treatment for a dilated cervix, through which her amniotic sac was protruding, when she was nineteen to twenty weeks pregnant. She was sent home. The following day, she came to the emergency department in severe pain and advanced labor. While EMTALA requires stabilizing treatment for pain, 42 U.S.C. § 1395dd(e)(1)(A), and stabilizing care during labor, *id.* § 1395dd(e)(1)(B), the hospital's anesthesiologists believed that providing even an epidural could be considered a crime under the state's ban.[54] As one of the patient's physicians described,

> I overheard the primary provider say to a nurse that so much as offering a helping hand to a patient getting onto the gurney while in the throes

---

[52] Amanda Seitz, *Dozens of Pregnant Women, Some Bleeding or in Labor, are Turned Away from ERs Despite Federal Law*, Assoc. Press (Aug. 14, 2024), https://bit.ly/3BQSW4u.

[53] *See* Grossman, *supra* note 9, at 1, 7, 10.

[54] *Id.* at 8.

of a miscarriage could be construed as 'aiding and abetting an abortion.' Best not to so much as touch the patient who is miscarrying . . .[55]

Denials of emergency abortion care can have severe and immediate consequences, including hemorrhage, infection, and, in the gravest cases, death. Patients denied emergency abortions are susceptible to long-term health traumas, such as loss of fertility, chronic pelvic pain, heart attack, and stroke.[56] Families are also burdened financially by denials of emergency abortions. When local hospitals turn pregnant patients away, those patients must bear the financial brunt of traveling to obtain emergency treatment, or else forgo care. Either option can have devastating consequences for patients and their families. Pregnant patients with low incomes often rely on every dollar to cover basic living needs, making the cost of traveling out of state insurmountable.[57] But without emergency abortion care, patients may die or develop lasting disabilities. Two stories illustrate this plight.

---

[55] *Id.*

[56] *Id.* at 17.

[57] Furthermore, patients who develop long-term medical complications from denials of emergency abortion care must stretch their wages to cover ongoing medical treatment or else forgo treatment—a position Black and brown women are more likely to face. *Support for Maternal Health Policies Will Not Solve the Crisis in Abortion Access*, Nat'l Women's Law Ctr. (Apr. 2023), https://bit.ly/4co27XM.

Mylissa Farmer was denied the emergency abortion care she needed, first by her local hospital in Missouri, and then by a hospital in Kansas.[58] Doctors at both hospitals determined she had previable PPROM, that she had lost all amniotic fluid, and that her fetus could not survive.[59] She was told that continuing her pregnancy would put her at risk of serious infection, hemorrhaging, the loss of her uterus, and even death.[60] Still, both hospitals refused to end the pregnancy, in violation of EMTALA.[61] With her health deteriorating rapidly, Mylissa and her now-husband drove hours to an Illinois abortion clinic *while she was in labor*.[62] The medical and financial consequences of crisscrossing state lines to obtain lifesaving abortion care linger to this day. Mylissa was docked pay for missing work and had to raise funds to pay for the Illinois care that her insurance refused to cover.[63] Her husband also lost his job because he was forced to miss work to help her travel.[64] The

---

[58] *Administrative Compl.*, U.S. Dep't of Health & Hum. Servs. Ctrs. For Medicare & Medicaid Servs. Headquarters at 12-13, 16 (Nov. 8, 2022), https://bit.ly/4ctlXkx.

[59] *Id.* at 11–12, 15.

[60] *Id.* at 11, 16.

[61] *Id.* at 12-13, 16; *NWLC Files EMTALA and Sex Discrimination Complaints on Behalf of Mylissa Farmer*, Nat'l Women's Law Ctr. (Nov. 8, 2022), https://bit.ly/3PABRQe (linking to statements of deficiency issued by HHS against both hospitals for violating EMTALA).

[62] Administrative *Compl.*, Dep't of Health & Hum. Servs. Ctrs. For Medicare & Medicaid Servs. at 18.

[63] *Id.* at 19.

[64] *Id.*

psychological and physical manifestations of the trauma Ms. Farmer suffered prevented her from working for many months, and without wages, Ms. Farmer lost the home she owned.[65]

While Mylissa ultimately obtained the care she needed, other patients—like a young Texan woman named Yeniifer (Yeni) Alvarez—have died after hospitals failed to offer stabilizing abortion care. Experts agree that Yeni's death likely could have been prevented with an abortion, but hospital records show that, despite multiple emergency room visits (including one where she was struggling to breathe), healthcare providers never offered to end her pregnancy.[66] Yeni lived in an immigrant community in Luling, Texas, where 65% of residents lack health insurance—Yeni included.[67] She had hypertension and diabetes during her pregnancy, and developed pulmonary edema at the height of the COVID-19 pandemic.[68] Because she was uninsured, she was unable to afford necessary care and medications.[69] As her condition deteriorated, she went to the emergency room

---

[65] Compl. at 12, *Farmer v. Univ. of Kan. Health Sys., et al.*, No. 2:24-CV-02335 (D. Kan. July 30, 2024), ECF No. 1.

[66] Stephania Taladrid, *Did An Abortion Ban Cost A Young Texas Woman Her Life?*, The New Yorker (Jan. 8, 2024), https://bit.ly/3TRoLkg.

[67] *Id.*

[68] *Id.*

[69] *Id.*

multiple times, but doctors did not offer abortion care.[70] As Yeni's family mourn her preventable death, her loss has led to serious financial and familial hardship because Yeni contributed to the mortgage payments and was a frequent caregiver for her family.[71]

Recent reporting reveals yet another pregnant woman who died a preventable death after a hospital delayed necessary care *following* an abortion.[72] Amber Nicole Thurman went to a local hospital because her body had not expelled all fetal tissue, a rare complication of medication abortion. Due to fear of criminal prosecution under Georgia's six-week abortion ban, Ms. Thurman's doctors waited 20 hours to perform a routine procedure to remove the tissue, even after Ms. Thurman suffered "acute severe sepsis." Ms. Thurman suffered in pain as doctors watched her infection spread, her blood pressure sink, and her organs fail. Ms. Thurman was the sole caretaker to her six-year-old son.[73]

---

[70] *Id.*

[71] *Id.*

[72] Kavitha Surana, *Abortion Bans Have Delayed Emergency Medical Care. In Georgia, Experts Say This Mother's Death Was Preventable*, ProPublica (Sept. 16, 2024), https://bit.ly/3A2Jpqs.

[73] *Id.*

Unless this Court upholds the District Court's injunction and clarifies that EMTALA protects access to all emergency medical treatment, including abortion care, stories like Mylissa's, Yeni's, and Amber's will become even more common.

### 2. Stripping Pregnant Patients of EMTALA's Protections Will Drive Healthcare Professionals Out of Abortion Ban States, Worsening Care for All Pregnant Patients.

A decision concluding that EMTALA no longer protects patients experiencing emergency pregnancy complications in this Circuit would diminish access to *all* obstetric and gynecological care. Healthcare professionals' fear of criminal prosecution under state bans, among other severe consequences, is driving obstetricians out of already underserved areas in ban states.[74] Beyond immediate attrition, there is also mounting concern that the future pipeline of OBGYN, maternal-fetal medicine physicians, and emergency room doctors will dry up,[75] as

---

[74] *See* Br. of St. Luke's Health Sys. as Amicus Curiae at 17-22, ECF No. 192; *A Post Roe Idaho*, Idaho Physician Well-Being Action Collaborative & Idaho Coal. For Safe Healthcare at 3–5 (Feb. 2024), https://bit.ly/4hflO6t. *See also* Shefali Luthra, '*We're not going to win that fight': Bans on Abortion and Gender-Affirming Care Are Driving Doctors from Texas*, The 19th (June 21, 2023, 10:33 AM), https://bit.ly/4csSuar; Cole Sullivan, *Doctor Leaves Tennessee for Colorado Over Abortion Ban*, 9 News (Apr. 7, 2023, 5:00 AM), https://bit.ly/ 3xaV0BW.

[75] Elizabeth Tobin-Tyler et al., *A Year After Dobbs: Diminishing Access to Obstetric-Gynecologic and Maternal-Fetal Care*, Health Affairs (Aug. 3, 2023), https://bit.ly/43wvNOq.

fewer medical students seek to practice in abortion ban states,[76] and abortion restrictions limit OBGYN training[77] and reduce non-OBGYN physicians' capacity to respond to obstetric emergencies.[78] Physician "exodus"[79] from ban states is leading to the closure of hospital obstetrics programs, including in Idaho and in rural areas.[80] Given that Black and Indigenous pregnant patients are already most likely to suffer the harms of maternity care deserts in rural areas, *supra* Part II.A, these closures will further devastate patients from those communities.

Providers in neighboring states are also overwhelmed by an influx of patients seeking the emergency abortion care prohibited in their state, leading to poorer patient outcomes. For example, the surge of patients from Idaho into Washington has strained hospitals and caused staffing shortages, impacting both out-of-state and

---

[76] *See, e.g.*, Kendal Orgera et al., *Training Location Preferences of U.S. Medical School Graduates Post* Dobbs v. Jackson Women's Health, Ass'n of Am. Med. Colleges Rsch. & Action Inst. (Apr. 13, 2023), https://bit.ly/3Tvv7o4.

[77] Rachel Rabkin Peachman, Dobbs *Decision Threatens Full Breadth of Ob-Gyn Training*, 328 JAMA 1668 (2022), https://bit.ly/3Ty4bUH.

[78] Stephanie J. Lambert et al., *Impact of the* Dobbs *Decision on Medical Education and Training in Abortion Care*, 33 Women's Health Issues 337 (2023), https://bit.ly/4atIlZm.

[79] Julie Rovner, *Abortion Bans Drive Off Doctors and Close Clinics, Putting Other Health Care at Risk*, OBP (May 23, 2023 9:28 AM), https://bit.ly/3IYBKtT.

[80] *Id.*; *see also A Post* Roe *Idaho*, *supra* note 74 at 3–5.

in-state patients.[81] One Washington hospital has struggled to accommodate scheduled labor inductions because they lack sufficient staff or beds.[82]

If this Court vacates the District Court's injunction, medical professionals would have one less layer of protection in treating pregnant patients with EMCs as they make emergency care decisions. As a result, doctors capable of providing a range of OBGYN care—from urgent care to life-saving cancer screenings—will continue fleeing. With fewer providers, *all* pregnant people, especially Black and Indigenous people, will suffer lifechanging harms, and many will die preventable deaths. These are precisely the outcomes EMTALA was enacted to prevent.

## CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

---

[81] *Two Years After* Dobbs*: WA Health Care System Impacted as Providers Meet Idaho's Growing Reproductive Care Needs*, Off. of Sen. Maria Cantwell at 3 (June 2024), https://bit.ly/48hNJyS.

[82] *Id.* at 4.

Dated: October 22, 2024               Respectfully submitted,

*/s/ Christine E. Webber*

| | |
|---|---|
| Michelle Banker | Christine E. Webber |
| Dorianne Mason | *Counsel of Record* |
| Gretchen Borchelt | Sabrina S. Merold |
| Donya Khadem | Alison S. Deich |
| **National Women's Law** | Aniko R. Schwarcz |
| **Center** | Harini Srinivasan |
| 1350 I St. NW, Ste. 700 | Nina C. Jaffe-Geffner |
| Washington, DC 20005 | **Cohen Milstein Sellers & Toll PLLC** |
| Tel: (202) 588-5180 | 1100 New York Ave., NW, Ste. 500 |
| mbanker@nwlc.org | Washington, DC 20005 |
| | Tel: (202) 408-4600 |
| | cwebber@cohenmilstein.com |
| | smerold@cohenmilstein.com |

*Counsel for Amici Curiae*

31

**APPENDIX**

App. 1

# APPENDIX

Abortion Care Network

AccessMatters

American Atheists

American Federation of State, County & Municipal Employees, AFL-CIO (AFSCME)

Americans United for Separation of Church and State

Asian & Pacific Islander American Health Forum

Birth In Color

Black Women for Wellness

Black Women for Wellness Action Project

Catholics for Choice

Center for Inquiry, Inc.

Community Catalyst

DC Abortion Fund

Disability Policy Consortium

Equality California

Feminist Women's Health Center

FL National Organization for Women

Florida Interfaith Coalition for Reproductive Health and Justice

Freedom From Religion Foundation

Gender Justice

App. 2

Greater Orlando National Organization for
Women

Hadassah, The Women's Zionist
Organization of America

Ibis Reproductive Health

Idaho Coalition Against Sexual and
Domestic Violence

Indigenous Idaho Alliance

Indivisible

Jacobs Institute of Women's Health

Jane's Due Process

Justice and Joy National Collaborative
(formerly National Crittenton)

Lawyers for Good Government

Legal Action Center

Legal Momentum: The Women's Legal
Defense and Education Fund

Lift Louisiana

Montanans for Choice

National Abortion Federation

National Asian Pacific American
Bar Association (NAPABA)

National Association of Commissions
for Women

National Council of Jewish Women

National Education Association

National Family Planning & Reproductive
Health Association

App. 3

National Partnership for Women & Families

National Women's Political Caucus

New Jersey Women Lawyers Association

People For the American Way

People Power United

Planned Parenthood Federation of America

Power to Decide

Pro-Choice North Carolina

Progress Florida Education Institute

Rapid Benefits Group Fund

Reproaction

Reproductive Equity Now Foundation

Reproductive Freedom for All

Reproductive Health Access Project

Service Employees International Union

SIECUS: Sex Ed for Social Change

Southwest Women's Law Center

State Innovation Exchange (SiX)

The Jane Network

The National Association of Nurse
Practitioners in Women's Health (NPWH)

Trust Women Foundation

UCSF Bixby Center for Global
Reproductive Health

Women Lawyers On Guard Inc.

Women With a Vision

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** Nos. 23-35440, 23-35450

I am the attorney or self-represented party.

**This brief contains** 6,902 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Christine E. Webber **Date** 10/22/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2024, I electronically filed the foregoing with the Clerk of Court of the United States Court of Appeals for the Ninth Circuit using the Appellate Case Management System ("ACMS"). I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: October 22, 2024

/s/ *Christine E. Webber*

Christine E. Webber