IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

**UNITED STATES OF AMERICA**

*Plaintiff-Appellee,*

v.

**THE STATE OF IDAHO,**

*Defendant-Appellant,*

v.

**MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF
REPRESENTATIVES, ET AL.,**

*Defendants-Appellants,*

_____

On Appeal from the U.S. District Court
for the District of Idaho, Southern Division
No. 1:22cv-00329 (Hon. B. Lynn Winmill)

---

**BRIEF OF PHYSICIANS FOR HUMAN RIGHTS AS AMICUS CURIAE IN
SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

---

Payal Shah
Physicians for Human Rights
520 Eighth Avenue, Suite 2300
NYC, New York 1018
9646) 564-3720
pshah@phr.org

Gerson H. Smoger
*Counsel of Record*
Smoger and Associates
4228 Hallmark Dr.
Dallas, TX 75229
(972) 243-5297
smogerlaw@gmail.com

Counsel for Amicus Curiae
Physicians for Human Rights

October 22, 2024

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Physicians for Human Rights certifies that it is a non-profit organization. It has no parent corporation or publicly owned corporation that owns 10 percent or more of its stock.

Respectfully submitted on October 22, 2024.

/s/ Gerson H. Smoger

GERSON H. SMOGER
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF CONTENTS............................................................................... ii

TABLE OF AUTHORITIES ........................................................................iv

IDENTITY AND INTEREST OF AMICUS CURIAE...........................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .........................................................................................6

    I.   THE IDAHO ACT AND EMTALA CONTAIN MARKEDLY DIFFERENT REQUIREMENTS FOR EMERGENCY ROOM CARE .............................................................................6

    II.  RESTRICTING TREATMENT UNTIL A PREGNANT PATIENT'S LIFE IS AT RISK HAS HARMFUL CONSEQUENCES .........................................................................10

    A.  The Idaho Act is Inhibiting the Proper Treatment of Very Severe Pregnancy Complications – Treatment Formerly Required by EMTALA .........................................................................13

        1.  Pre-eclampsia or HELLP Syndrome…...……………………14

        2.  Preterm Premature Rupture of Membranes (PPROM)…………15

        3.  Infection and Sepsis…………………………………………17

        4.  Conditions Not Directly Caused By Pregnancy, But Where Termination May be a Necessary Part of an E.R. Physician's Treatment…………………………………………………18

    B.  The Consequences of the Limitation on Care…………………19

        1.  Waiting Until Patients Become Sicker……………………19

        2.  Transferring Patients Out of State Due to Idaho's Abortion Ban Causes Unnecessary Delays of Care and Increased Patient Morbidity …………………………………………………21

      3.  Forced Continuation of Life-Threatening Pregnancy with a Fetal Condition Incompatible with Life……………………………...23

III.  WHAT IDAHO EMERGENCY PHYSICIANS FACE UNDER THE IDAHO ACT: CONFLICTING REQUIREMENTS AND A DIFFICULT FUTURE …………………………………………………………………………….25

A.  Conflict Between the Idaho Act, EMTALA, and the Standard of Care …………………………………………………………………...25

B.  Dual Loyalty: Conflict Between Idaho Law and a Physician's Ethical Obligations………………………………………………………27

C.  Conflict Caused by Harsh Criminal and Civil Penalties………………..29

D.  Conflict Caused by the Potential for Civil Malpractice Suits………….30

E.  Likely Long-Term Effect if EMTALA is Found Not to Preempt the Idaho Act……………………………………………………………………...32

CONCLUSION ................................................................................................34

CERTIFICATE OF COMPLIANCE .........................................................36

CERTIFICATE OF SERVICE .................................................................37

iii

# TABLE OF AUTHORITIES

**Cases**

*Roe v. Wade*, 410 U.S. 113 (1973)……………………….……………………...1

*Moyle v. United States, 144 S. Ct. 2015 (2024)* …………………………...... 8, 9

*Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619 (2022)…… …….1, 5, 31

**Statutes**

Idaho Code § 18-622…………………………………………  ……………2, 3, 5-6

Idaho Code § 18-604……………………………………………………………..5, 6


**Other Authorities**

American College of Obstetricians and Gynecologists, *Code of Professional Ethics*, ACOG, (December 2018), at 2, https://www.acog.org/-/media/project/acog/acogorg/files/pdfs/acog-policies/code-of-professional-ethics-of-the-american-college-of-obstetricians-and-gynecologists.pdf............26

American College of Emergency Physicians, *Code of Ethics for Emergency Physicians*, ACEP, (October 2023), at 6, https://www.acep.org/siteassets/new-pdfs/policy-statements/code-of-ethics-for-emergency-physicians.pdf .............26

Anjali Nambiar, et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less With Complications in 2 Texas Hospitals After Legislation on Abortion*, 78, Obstetrical & Gynecological Survey 194 (April 2023), https://journals.lww.com/obgynsurvey/abstract/2023/04000/maternal_morbidity_and_fetal_outcomes_among.4.aspx ...............................................32

Ariel Sklar, et al., *Maternal Morbidity After Preterm Premature Rupture of Membranes at <24 Weeks' Gestation*, A. M. J. Obstetrics & Gynecology, (April 2022), https://pubmed.ncbi.nlm.nih.gov/34736914/ .....................................................32

Brittni Frederiksen, et. al., *A National Survey of OBGYNs' Experiences After Dobbs*, KFF Health News, (June 21, 2023), https://www.kff.org/womens-health-policy/report/a-national-survey-of-obgyns-experiences-after-dobbs/.....32

Charlie McCann, *Abortion Bans in America are Corroding Some Doctors' Souls*, Economist, (October 6, 2023), https://www.economist.com/1843/2023/10/06/abortion-bans-in-america-are-corroding-some-doctors-souls. …………………………………………….....27

*Criminalized Care: How Louisiana's Abortion Bans Endanger Patients and Clinicians*, PHR, (March 19, 2024), https://phr.org/wp-content/uploads/2024/03/PHR-Report-Criminalized-Care-March-2024.pdf.…12

Daniel Grossman, et al., *Care Post-Roe: Documenting Cases of Poor- Quality Care Since the Dobbs Decision,* UCSF, (May 2023), https://sites.utexas.edu/txpep/files/2023/05/ANSIRH-Care-Post-Roe-Report-Embargoed-until-15-May-23.pdf. ………………………………………..…31

Danielle Campoamor, *Idaho Hospital Closes its Maternity Ward, Citing the State's 'Political Climate'*, TODAY, (March 22, 2023), https://www.today.com/parents/pregnancy/idahos-bonner-general-hospital-closes-maternity-ward-rcna75776. …………………………………………….....33

*Delayed and Denied: How Florida's 6 Week Abortion Ban Criminalizes Medical Care,* PHR, (2024), https://phr.org/our-work/resources/delayed-and-denied-floridas-six-week-abortion-ban/.........................................................................12

Donna L. Hoyert, *Maternal Mortality Rates in the United States, 2021*, CDC, (March 16, 2023), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2021/maternal-mortality-rates-2021.htm. …………………………..30

Dov Fox, *The Abortion Double Bind*, 113, American J. of Public Health, 1068, (October 1, 2023), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2023.307369?role=tab .........................................................................................................29

Erika L. Sabbath, et al., *U.S. Obstetrician-Gynecologists' Perceived Impacts of Post–Dobbs v Jackson State Abortion Bans*, JAMA, (January 17, 2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2814017.........29

Harris Meyer, *Malpractice Lawsuits Over Denied Abortion Care May Be on the Horizon*, KFF Health News, (June 23, 2023), https://kffhealthnews.org/news/article/malpractice-lawsuits-denied-abortion-care/...................................................................................................29

*HELLP Syndrome Overview*, Yale Medicine, (2024), https://www.yalemedicine.org/conditions/hellp-syndrome. …………...3, 13-14

How post-Roe laws are obstructing clinical care, UCSF, May 16, 2023, https://www.ansirh.org/research/research/how-post-roe-laws-are-obstructing-clinical-care. ……………………………………………………………...32

*Human Rights Crisis: Abortion in the United States after Dobbs*, Physicians for Human Rights, (April18, 2023), https://phr.org/wp-content/uploads/2023/04/4.13.23_UN_SR_briefingPaper_FINAL.pdf. ……...25

*In Clinicians' Own Words: How Abortion Bans Impeded Emergency Medical Treatment for Pregnant Patients in Idaho,* PHR, (March 18, 2024), https://phr.org/wp-content/uploads/2024/03/PHR-Brief-EMTALA-Idaho-2024.pdf. ……………………………………………………………...8

Int'l Dual Loyalty Working Grp., *Dual Loyalty & Human Rights In Health Professional Practice*, PHR, (2002), at 16, https://phr.org/wp-content/uploads/2003/03/dualloyalties-2002-report.pdf. ……………………..25

Jacob P. Olejarczyk, Michael Young, *Patient Rights and Ethics*, (November 28, 2022), https://www.ncbi.nlm.nih.gov/books/NBK538279/#:~:text=In%20healthcare%2C%20justice%20refers%20explicitly,be%20treated%20fairly%20and%20equitably.Julianne McShane, *Pregnant With No OB-GYNs Around: In Idaho, Maternity Care Became a Casualty of its Abortion Ban*, NBC News, (September 30, 2023), https://www.nbcnews.com/health/womens-health/pregnant-women-struggle-find-care-idaho-abortion-ban-rcna117872. …………………………..26

Katherine Ellison, Nina Martin, *Severe Complications for Women During Childbirth Are Skyrocketing — and Could Often Be Prevented*, PRO PUBLICA, (December 22, 2017), https://www.propublica.org/article/severe-complications-for-women-during-childbirth-are-skyrocketing-and-could-often-be-prevented. …………………………………………………………………31

Kelly Gooch, Marissa Plescia, *States Ranked by Active Physicians Per Capita*, Becker's Hospital Review, (March 9, 2022), https://www.beckershospitalreview.com/workforce/this-state-has-the-most-physicians-per-capita.html. ……………………………………………………34

*Letter to Health Care Providers*, DHHS, (July 11, 2022), https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf. …………………………………………………………………7

Mary Murphy, *Protection for Abortion Doctors Proposed*, THE CHRONICLE, (January 31, 2024), https://www.chronline.com/stories/protection-for-abortion-doctors-proposed,333726. ……………………………………………………...…18

*No One Could Say: Accessing Emergency Obstetrics Information as a Prospective Prenatal Patient in Post-Roe Oklahoma*, PHR, (April 2023), https://phr.org/wp-content/uploads/2023/04/Oklahoma-Abortion-Ban-Report-2023.pdf. ………..30

Payal Shah, Akila Radhakrishnan, *It's Time to Call Abortion Bans What They Are —Torture and Cruelty*, THE NATION, (June 9, 2023), https://www.thenation.com/article/society/abortion-bans-torture-cruelty/.……22

Randi Kaye, Stephen Samaniego, *Idaho's Murky Abortion Law is Driving Doctors Out of the State*, CNN, (May 13, 2023), https://www.cnn.com/2023/05/13/us/idaho-abortion-doctors-drain/index.html.. …………………………………………………………..30-34

Selena Simmons-Duffin, *In Oklahoma, a Woman Was Told to Wait Until She's 'Crashing' for Abortion Care*, NPR, (April 25, 2023), https://www.npr.org/sections/health- shots/2023/04/25/1171851775/oklahoma-woman-abortion-ban-study-shows-confusion-at-hospitals. ………………...…20

Sharon Zhang, *Idaho Hospital Will Stop Delivering Babies as Providers Flee After Abortion Bans*, TRUTHOUT, (March 21, 2023), https://truthout.org/articles/idaho-hospital-will-stop-delivering-babies-as-providers-flee-after-abortion-bans/....................................................................33

Staci Carr, *Discontinuation of Labor and Delivery Services*, Valor Health, (2023), https://www.valorhealth.org/discontinuation-of-labor-delivery-services/.......33

Stacy Weiner, *The Fallout of Dobbs on the Field of OBGYN*, AAMC, (August 23, 2023), https://www.aamc.org/news/fallout-dobbs-field-ob-gyn.........................28

*The State of Reproductive Health in the United States: The End of Roe and the Perilous Road Ahead for Women in the Dobbs Era*, Gender Equity Policy Institute, at 6, (January 19, 2023), https://thegepi.org/wp-content/uploads/2023/06/GEPI-State-of-Repro-Health-Report-US.pdf..............30

*Where You Live Matters: Maternity Care Deserts and the Crisis of Access and Equity in Texas*, March Of Dimes, (2023), https://www.marchofdimes.org/peristats/assets/s3/reports/mcd/Maternity-Care-Report-Texas.pdf.................................................................................32

Whitney Arey, et al., *A Preview of the Dangerous Future of Abortion Bans — Texas Senate Bill 8*, 387, New. Eng. J. Med., (June 22, 2022), https://www.nejm.org/doi/full/10.1056/NEJMp2207423...................................19

Whitney Arey, et. al., *Abortion Access and Medically Complex Pregnancies Before and After Texas Senate Bill 8*, 141, Obstetrics & Gynecology, 995 (May 2023), https://journals.lww.com/greenjournal/fulltext/2023/05000/abortion_access_and_medically_complex_pregnancies.20.aspx. ........................19

**IDENTITY AND INTEREST OF AMICUS CURIAE**

For more than 35 years, Physicians for Human Rights ("PHR") has used science and medicine to document and call attention to severe human rights violations around the world. PHR, which has shared in the Nobel Peace Prize, utilizes its expertise to investigate and speak out against attacks on health care workers and health care, prevent torture, document mass atrocities, and ensure accountability for human rights violations.

Through PHR's longstanding efforts to address human rights violations, PHR has developed an extensive network of partnerships with clinicians throughout the United States, including within the state of Idaho. PHR's clinician partners are deeply committed to ensuring respect for human rights for their patients and have expertise in conducting forensic medical examinations and researching the impacts of national and state policies on patient health and rights.

Since the U.S. Supreme Court reversed *Roe v. Wade,* 410 U.S. 113 (1973) ["*Roe*"] in *Dobbs v. Jackson Women's Health Organization*, 597 U.S., (2022) ["*Dobbs"*], PHR has been conducting rigorous and ongoing research to better understand the impacts of state-level abortion bans on health care providers and hospitals, particularly in states with restrictive abortion legislation, including Idaho. It is PHR's belief that the combination of our medical expertise, extensive

clinician network, and rigorous research uniquely positions us to present guidance to this Court and submit this amicus brief to share the results of our research.

PHR's research, conducted during the months after the Supreme Court lifted the District Court's injunction on Idaho Code §18-622 ("The Idaho Act") on January 24, 2024, and before the Supreme Court reinstated the injunction on June 27 ("the injunction hiatus"), supports the conclusion that there is a clear conflict between physician compliance with "The Idaho Act" and 42 U.S.C. §1395 ("EMTALA") as to what is required to treat pregnant patients in emergency rooms. Absent EMTALA, pregnant patients face dangerous health risks when treated in emergency rooms. Therefore, PHR presents this brief to explain why affirming the District Court and upholding its injunction is critical to ensuring that E.R. physicians can treat patients in a way that is consistent with medical standards of care and adheres to professional ethical principles, as well as the requirements of EMTALA, all for the ultimate benefit of their patients and the citizens of Idaho.

# SUMMARY OF ARGUMENT[1]

Idaho Code §18-622 ("The Idaho Act") and 42 U.S.C. §1395 ("EMTALA") are demonstrably in conflict. EMTALA requires stabilizing treatment, including pregnancy termination, where clinically indicated to preserve the health of the pregnant patient. Under the Idaho Act, the pregnant patient's health is an insufficient consideration. Instead, the Idaho Act only permits the termination of pregnancy to prevent the pregnant patient's death, even though a pregnant patient may suffer severe pregnancy-induced health conditions, such as preeclampsia, Preterm Premature Rupture of Membranes (PPROM), Hemolysis, Elevated Liver enzyme levels, and Low Platelet levels (HELLP syndrome), placental abruption, uncontrollable uterine hemorrhage, and infection.  These would all warrant immediate treatment under EMTALA to avoid the deterioration of the patient's condition.  The adverse impact of this conflict on the health of pregnant patients was highlighted by Supreme Court Justice Ketanji Brown Jackson by citing the contents of PHR's amicus brief multiple times.

---

[1] Pursuant to Rule 37.6, amicus curiae affirms that no counsel for any party authored this brief in whole or in part and no person or entity, other than amicus, its members, or its counsel has made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

Emergency room physicians face an impossible choice of either following the Idaho Act, but jeopardizing their patients' health, or acting in accordance with basic medical standards of care and professional ethics. The difficulties of this choice are only exacerbated by the harsh civil, criminal, and professional penalties clinicians may face for violating the Idaho Act, while they are placed in a "double bind" where they may face a medical malpractice suit if they follow the law by delaying treatment or not treating at all.

Research conducted by PHR reveals that enforcement of the Idaho Act during "the injunction hiatus" led to delays in necessary medical care and resulted in the material deterioration of pregnant patients' health. Patients in desperate and urgent need of health care were forced to undertake long-distance and dangerous journeys outside Idaho for treatment that further jeopardized their health, which is contrary to the core purpose of EMTALA. These delays and denials of care harmed pregnant patients and risked causing maternal death. Pregnant patients diagnosed with fatal fetal impairments have been forced to continue their pregnancies and denied the care necessary to prevent the deterioration of their condition, adversely impacting their physical and mental health.

If the injunction is reversed and the Idaho Act is permitted to be enforced again, the devastating results for the citizens of Idaho will not only immediately resume, but likely escalate with time. In Idaho and nationally, maternal mortality and

morbidity are increasing to record levels and will continue to increase. A growing

number of areas of Idaho are already "maternity care deserts," increasing the risk

of poor pregnancy outcomes and the use of emergency rooms for pregnancy care.

At the same time, evidence documented during the enforcement of Idaho's law

confirms that the safety net of E.R. care will disappear absent adherence to the

requirements of EMTALA.


## ARGUMENT

## I.   THE IDAHO ACT AND EMTALA CONTAIN MARKEDLY
##      DIFFERENT REQUIREMENTS FOR EMERGENCY ROOM CARE

The Idaho Act restricting the care that can be provided by health care

professionals, including E.R.[2] personnel, became effective after the *Dobbs* decision

gave states the authority to regulate abortion. The Idaho Act limits permissible

abortions to: 1) those "necessary to prevent the death of the pregnant woman,"

§18-622(2)(a)(i); 2) those necessary to terminate "an ectopic or molar pregnancy,"

§18-604(1)(c); and 3) those that terminate pregnancies resulting from rape or incest

if reported to police in the first trimester, §18-622(2)(b)(ii). Beyond these three

---

[2] For purposes of the issues before this court, this brief is limited to emergency
rooms and E.R. personnel, although the problems affect physicians beyond
emergency rooms.

limited exceptions, Idaho makes performing or assisting in performing an abortion a felony punishable by two to five years imprisonment, as well as by suspension or revocation of a health care provider's professional license. The law broadly defines "abortion" as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id.* §18-604(1).

There is, therefore, no exception allowing clinicians to act to preserve a pregnant patient's health, including preventing harm to bodily organs or fertility, unless it can be reasonably determined that an abortion is necessary to prevent death. Idaho Code §18-622(2)(a)(i) does not permit the termination of a pregnancy even when necessary to stabilize serious and debilitating health conditions suffered by pregnant patients seeking emergency services.

At the same time, as a condition of participating in Medicare, Congress has required these same E.R. personnel and hospitals to comply with the provisions of EMTALA. See 42 U.S.C. §1395cc(a)(1)(I)(i). Under EMTALA, there is a requirement that emergency personnel "stabilize" a patient in the E.R., which means E.R. physicians must "provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result" if the patient is discharged or

transferred. U.S.C. §1395dd(e)(3)(A). Thus, EMTALA requires E.R. physicians and hospitals to offer "stabilizing treatment"[3] where: 1) "the health" of a patient is "in serious jeopardy"; 2) a condition could result in a "serious impairment to bodily functions"; or 3) a condition could result in a "serious dysfunction of any bodily organ or part." 42 U.S.C. §1395dd(e)(1)(A)(i)-(iii). As such, EMTALA extends beyond lethal harms.[4] Stabilizing treatment can include medical and/or surgical interventions, such as the removal of one or both fallopian tubes, anti-hypertensive therapy, antibiotics, or abortion.

Conflict between the Idaho Act and EMTALA arises when a pregnant patient presents with an emergency medical condition that is not imminently life-threatening but where the only care that will stabilize the condition is the termination of the pregnancy. EMTALA requires E.R. personnel to undertake medically necessary interventions pursuant to the appropriate standard of care. The Idaho Act forbids it. Of course, if care is delayed long enough, pregnancy termination may eventually become necessary to prevent the death of pregnant patients as their condition deteriorates. However, waiting until that point would

---

[3] Letter to Health Care Providers, DHHS, (July 11, 2022), https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf.

[4] In these circumstances, EMTALA directs that the hospital "must provide" that treatment if the patient chooses to receive it. 42 U.S.C. 1395dd(b)(1).

violate EMTALA, which would have already required stabilizing treatment to avoid "material deterioration of the condition," 42 U.S.C. 1395dd(e)(3), and not wait for the delay to have devastating consequences.

Before January 2024, the Idaho Act was enjoined by the District Court, revived when the Supreme Court issued a stay on the lower court injunction until on June 27, 2024, when the Supreme Court reinstated the injunction and dismissed the writ of certiorari before judgment as improvidently granted. During "the injunction hiatus" PHR conducted a study to investigate the effect of the Idaho Act on pregnant patients in the E.R.  (*See* PHR Report: "In Clinicians' Own Words: How Abortion Bans Impeded Emergency Medical Treatment for Pregnant Patients in Idaho," March 2024,[5] ("Idaho Report."))

Citing the evidence presented in PHR's brief, Supreme Court Justice Jackson recognized that "Physicians for Human Rights … have looked at Idaho's law and says it prevents a lot of things in circumstances in which the federal government would require them." *Moyle v. United States, 144 S. Ct. 2015 (2024); Tr. of Oral Arg. at 62, Moyle v. United States, No. 23-726 (S. Ct. Apr. 24, 2024)*   Later, in her written opinion, Justice Jackson again cited PHR's amicus brief:

---

[5] "In Clinicians' Own Words: How Abortion Bans Impede Emergency Medical Treatment For Pregnant Patients In Idaho," PHR, March 2024, https://phr.org/wp-content/uploads/2024/03/PHR-Brief-EMTALA-Idaho-2024.pdf.

Idaho cannot credibly maintain that its law always permits abortions in cases of PPROM or pre-eclampsia such that its mandate never conflicts with federal law. The same medical condition can present with different risks in different patients. See, e.g., Brief for Physicians for Reproductive Health as Amicus Curiae 10-11; Brief for Physicians for Human Rights as Amicus Curiae 11-19. And, often, a doctor simply does not know what the risks are or whether a patient might face death.

*Moyle v. United States,* 144 S. Ct. 2015, 2025 (2024) (J. Jackson, concurring in part and dissenting in part)

## II.  RESTRICTING TREATMENT UNTIL A PREGNANT PATIENT'S LIFE IS AT RISK HAS HARMFUL CONSEQUENCES

The theoretical and legal arguments put forward by Petitioner ignore how emergency rooms work in practice as well as the human consequences of the lack of timely medical action.

When patients go to the E.R., the initial challenge for the E.R. staff is to determine if someone is very sick and needs complex or immediate medical care. In a fast-paced environment, often teeming with patients, it can be hard to tell immediately if someone is very sick and in need of urgent treatment or not that sick at all. At the same time, hesitation in treatment can itself be a significant risk.

An important aspect of this initial evaluation is determining whether a patient is pregnant. Indeed, many patients first learn about their pregnancy at the E.R., often because they are experiencing early pregnancy complications, such as bleeding or

pelvic pain. It is essential to determine pregnancy, because many medications and treatments may harm pregnant patients and their fetuses or even be abortifacients.

If a pregnancy is confirmed, the E.R. physician has to quickly perform a differential diagnosis to determine whether the patient is suffering a pregnancy complication that, if left unaddressed, will result in harm. An entire line of clinical investigation must be conducted. What is the conception date or last menstrual period? What might the due date be? Is this a healthy pregnancy? Are there any underlying conditions that complicate the diagnosis? Properly diagnosing the pregnant patient requires taking a good history, reviewing records if available, conducting a comprehensive physical exam, and, if believed to be warranted, ordering ultrasound, CT, MRI, blood tests, or other diagnostic tests.

Treating conditions in these pregnant patients can take many shapes. Pregnancy could be the direct or indirect cause of the condition that prompted the patient to seek medical care. But for virtually every condition in the E.R., managing the patient's condition can require medications or other treatments that may put a pregnancy at risk. The question that must quickly be assessed is: what does the medical standard of care call for and is termination of the pregnancy a necessary treatment modality that must be considered?

Emergency room physicians are trained to diagnose and manage a variety of severe conditions and illnesses related to pregnancy. However, the Idaho Act

fundamentally upends standard clinical practice by introducing non-evidence-based legal restrictions that force clinicians to make arbitrary determinations between "lifesaving" and "health-saving" and that call on clinicians to abandon patients who are suffering but not about to die. If the standard of care to treat the pregnant patient requires the termination of the pregnancy, which is a treatment offered by most emergency rooms, Idaho law does not give treating physicians the authority to follow the guidelines of their medical training unless necessary to prevent the death of the pregnant patient. When consulted, E.R. physicians and obstetrician-gynecologists have no option but to continue the pregnancy until the patient's health deteriorates enough to be fatally endangered, despite the fact that their pregnant patient may presently be at risk of serious health complications, including, but not limited to, systemic bleeding, overwhelming infection (sepsis), loss of reproductive organs and fertility, permanent disability, severe pain, liver hemorrhage and failure, kidney failure, stroke and other brain damage from hypotension, seizure, and severe pulmonary problems.

During "the injunction hiatus," the Idaho Act required an additional step for physicians in emergency departments, often already working feverishly to stabilize patients. They had to immediately determine if the termination of pregnancy was necessary to prevent death rather than to preserve the health of the patient. By contrast, before and after "the injunction hiatus" Idaho physicians have been able

to provide all necessary stabilizing care without trying to decipher the uncertain line between adverse health and death. But, if this Court lifts the injunction, E.R. doctors will again be forced to spend precious minutes trying to parse whether death is imminent before acting in the best interests of the health of their pregnant patients.

### A. The Idaho Act Inhibits the Proper Treatment of Very Severe Pregnancy Complications – Treatment Required by EMTALA

Physicians whom PHR spoke with during "the injunction hiatus" consistently shared that their capacity to deal with serious pregnancy conditions was significantly hampered and that the medical treatment they were able to provide in these cases was substandard. (*See* Idaho Report p 2; see also, PHR Report: "Criminalized Care: How Louisiana's Abortion Bans Endanger Patients and Clinicians," March 2024,[6] ("Louisiana Report" pp.4-6); PHR Report: "Delayed and Denied: How Florida's Six Week Abortion Ban Criminalizes Medical Care," September 2024 ("Florida Report").[7]

---

[6] "*Criminalized Care: How Louisiana's Abortion Bans Endanger Patients and Clinicians*," PHR, (March 19, 2024), https://phr.org/wp-content/uploads/2024/03/PHR-Report-Criminalized-Care-March-2024.pdf.

[7] The abortion ban in Idaho is substantially similar to laws enacted in Oklahoma and Texas. Like Idaho, these laws include complete bans on abortions with limited exceptions for threats to the life of the pregnant person. If an abortion is performed and is not within the limited exceptions, clinicians face criminal and civil penalties.

### 1) Pre-eclampsia or HELLP Syndrome

Preeclampsia is a condition of pregnancy diagnosed by dangerously high blood pressure and includes protein in the urine. Some experts consider HELLP syndrome a severe form of pre-eclampsia. These conditions can cause severe health complications, including hemorrhage or excessive bleeding, the onset of seizures, and hypoxic brain injury. Although treatment may include intravenous anti-hypertensive medications and blood transfusions, the ultimate treatment for both HELLP and pre-eclampsia is prompt delivery to remove the fetus and the placenta, or, if the fetus is previable, abortion. HELLP syndrome has been found to have up to a 24 percent maternal mortality rate.[8]

During "the injunction hiatus," clinicians reported patients being unable to access termination for these conditions while experiencing significant deterioration of their health due to the denial of definitive treatment. One Oregon obstetrician-gynecologist had a patient from Idaho with a twin pregnancy at 18 weeks'

---

Other states have bans, such as Louisiana and Florida, which do include limited health exceptions but suffer from a lack of clarity, meaning that denials of abortion as stabilizing treatment still occurs even where EMTALA should have protected a pregnant patient's need for a pregnancy termination. As such, the negative outcomes observed in studies and reports from other states are worth noting, as these can be expected to occur in Idaho.

[8] *"HELLP Syndrome Overview*," Yale Medicine, (2024), https://www.yalemedicine.org/conditions/hellp-syndrome.

gestation who had gone to an Idaho E.R. The patient, who had already had a renal transplant, was diagnosed with HELLP syndrome. She was bounced between different hospitals in Idaho without being provided with the medically appropriate treatment - an abortion. With signs of hemolysis, uncontrolled bleeding, and worsening renal function, the patient was transferred to Oregon after significant delay. By the time she got there, she had severe anemia from bleeding, severe acute renal failure, dangerously low platelets, altered mental status secondary to magnesium toxicity as the amounts of magnesium she was given to delay delivery were too much for her body to process, and both of her fetuses had died in utero. Despite the fact that she had asked doctors in Idaho to terminate her pregnancy after her first fetus died, her doctors felt that they could not terminate her pregnancy under Idaho law before finally transferring her to Oregon for termination (Idaho p.4).

## 2) Preterm Premature Rupture of Membranes (PPROM)

PPROM occurs when the amniotic membrane surrounding the fetus ruptures before 37 weeks of gestation. A pregnant patient suffering from PPROM is likely not at risk of death "at the point of diagnosis" in the E.R. Yet, "immediate treatment through termination of pregnancy may be necessary because delaying treatment would allow the condition to progress, thereby threatening other bodily

organs and functions."[9] A major risk of PPROM is the development of a serious infection of the placental tissues called chorioamnionitis. While antibiotics are given to treat this condition, the definitive treatment is immediate delivery or, if previable, abortion.

Physicians in Idaho have noted that PPROM was one of the major health care challenges under the Idaho Act, because the standard of care treatment options would have been protected by EMTALA. As one clinician stated, "With the EMTALA injunction lifted, we're back to that gray area. Do we wait for them to get chorioamnionitis? How sick does a mom have to be before we can declare it life-threatening and offer her the national standard of care?" (Idaho Report p.6)

One Utah clinician recounted receiving a patient from Idaho with PPROM who was sent home in Idaho for expectant management despite the risk of infection. Unsurprisingly, she developed sepsis and returned to the hospital where she was again denied the required care she needed – evacuation of the uterus and IV antibiotics. She was then transferred to Utah while experiencing a medical emergency. (Idaho Report pp. 5-6)

Under Louisiana's similar ban, a clinician described PPROM patients receiving more invasive procedures than would have been previously provided to meet the

---

[9] Declaration of Lee A. Fleisher, M.D. at J.A.594-595.

standard of care in response to their medical emergencies; before the ban, the standard of care would have only required the termination of the pregnancy. For example, clinicians were more frequently performing hysterotomies instead of less invasive dilations and evacuations (D & Es). According to one emergency medicine physician, the obstetrician-gynecologist consulted on the case performed a C-section on a patient with PPROM at 20 weeks gestation just to preserve the appearance of not doing an abortion, even though this was not a pregnancy that could result in a live birth. As a result, the patient underwent a far more invasive surgery than the recommended standard of care, likely will not be able to deliver again vaginally at most hospitals and is at greater risk of complications (Louisiana Report p. 23).

### 3) Infection and Sepsis

Serious infection is a persistent risk faced in the E.R., including infection after the amniotic sac surrounding the fetus has ruptured, which, absent abortion care, could lead to "sepsis" - a serious condition in which the infection-fighting processes turn on the body, causing death if not treated expeditiously.

Nearly every clinician interviewee who treated patients in or from Idaho relayed an account in which they and/or their colleagues delayed abortion care until complications worsened to the point where the patient's life was irrefutably at risk due to infection. As one Idaho clinician stated: "[I]t has caused delays in care. And

often while we're waiting and trying to figure out what we're allowed to do in the interim, patients, they'll become infected, and it becomes more clear that we need to deliver them. But it saddens me that we're waiting for pregnant women to become infected before we intervene." (Idaho Report p.8).

### 4) Conditions Not Directly Caused by Pregnancy, But Where Termination May Be a Necessary Part of an Emergency Room Physician's Treatment

The Idaho ban, as well as the bans in states with similar laws, have increased the use of medical procedures and treatments that do not meet the standard of care due to fear of impacting pregnancies - heightening the risk to patients that could have been avoided if clinicians had been able to provide abortion care. Emergency room doctors treat pregnant patients suffering from uterine aneurysms, pelvic infections, heart conditions, abscesses, gastrointestinal infections or pathology, brain damage, severe trauma, and other issues that require critical care. Some patients may need treatment immediately, which may include termination of the pregnancy.

Dr Jennifer Chin, a physician in Washington State, treated a patient from Idaho who was suffering from pulmonary hypertension. She noted the reluctance of

Idaho clinicians to provide necessary medical care, concluding that her Idaho patient would have died if she had not received abortion care in Washington.[10]

In Louisiana, a maternal-fetal medicine specialist described a situation where a patient with a severe cardiac condition was forced to remain pregnant and try multiple medications to mitigate the added stress of pregnancy on her heart before clinicians advised her of options for abortion care: "At what point can you act? How many cardiac meds have to fail? Okay, you failed ten cardiac meds, so now we can talk about it?" (Louisiana Report p.23)

## B. The Consequences of the Limitation on Care

### 1) Waiting Until Patients Become Sicker

Idaho "[p]hysicians stated that attempting to adhere to the criteria of state abortion restrictions is resulting in delays of care. To avoid the risk of criminal penalties under the bans, nearly every physician relayed an account in which they and/or their colleagues delayed abortion care until complications worsened to the point where the patient's life was irrefutably at risk." (Idaho Report p.8)

---

[10] Mary Murphy, "Protection for Abortion Doctors Proposed," The Chronicle, (January 31, 2024), https://www.chronline.com/stories/protection-for-abortion-doctors-proposed,333726.

This dangerous delay is being reported throughout the country where strict bans are in place. A Texas physician shared the following experience about trying to perform a medically indicated abortion after the Texas ban was enacted:

> "For the patients that we do have, who maybe come in as inevitable [abortions], we sit and we wait until they get infected or have some other reason that will allow us to intervene. So, it definitely, like knowing that the inevitable conclusion to this story will be a pregnancy loss, it's hard that you have to then wait for them to then develop a complication like infection in order to do anything."[11]

In the words of a Texas maternal-fetal medicine specialist, "people have to be on death's door to qualify" for medical exceptions to Texas's abortion bans.[12]

Similar devastating consequences of abortion bans are occurring in Oklahoma and Florida. When Jaci Statton, an Oklahoma woman, sought

---

[11] Whitney Arey, et. al., "*Abortion Access and Medically Complex Pregnancies Before and After Texas Senate Bill 8*, 141," Obstetrics & Gynecology, 995 (May 2023),https://journals.lww.com/greenjournal/fulltext/2023/05000/abortion_access_and_medically_complex_pregnancies.20.aspx.

[12] Whitney Arey, et al., "*A Preview of the Dangerous Future of Abortion Bans - Texas Senate Bill 8, 387*," New. Eng. J. Med., (June 22, 2022), https://www.nejm.org/doi/full/10.1056/NEJMp2207423.

treatment, the hospital staff shockingly recommended that Ms. Statton "sit in the parking lot" until something else happened, because they could not help her unless she was "crashing in front of [them] or [her] blood pressure [went] so high that [she was] fixing to have a heart attack."[13] In Florida, a clinician treating a patient with severe kidney disease reported: "We had to bring it to the head people of the hospital and be like, 'What are we allowed to do?' And they were like, 'She is not sick enough yet.' And we had to wait for her to get sicker before we were even allowed to offer her termination. I think it took over two weeks …" (Florida Report p. 12).

    **2)    Transferring Patients Out of State Due to Idaho's Abortion Ban Caused Unnecessary Delays of Care and Increased Patient Morbidity**

Physicians in states surrounding Idaho described patients from Idaho arriving in unstable medical conditions and needing additional treatments due to delay, thereby increasing longer-term health risks: "We had a previable preeclampsia patient transferred to us…If she had her care wherever she was coming from, she

---

[13]   Selena Simmons-Duffin, "*In Oklahoma, a Woman Was Told to Wait Until She's 'Crashing' for Abortion Care*," NPR, (April 25, 2023), https://www.npr.org/sections/health- shots/2023/04/25/1171851775/oklahoma-woman-abortion-ban-study-shows-confusion-at-hospitals.

wouldn't have needed to be persistently on IV antihypertensive[s]. She didn't have to have that prolonged risk of stroke." (Idaho Report p.11)

Other clinicians treating patients from Idaho highlighted risks from travel delays, including isolation from support systems during long hospital stays resulting from delays in treatment, lack of access to the patient's prior medical records, and increased costs to the patient: "You're just adding trauma to trauma." (Idaho Report p.11).

Patients report experiencing this compounded trauma when left with no option but to travel to access abortion. A Texas patient, who was diagnosed with a rupture of membranes before fetal viability, was "angry and sad" to learn that she had to travel outside of Texas for abortion care. The patient reported that her clinician told her, "If you labor on the plane, leave the placenta inside of you. You're going to have to deal with a 19-week fetus outside of your body until you land."[14]

But not everyone has the funds and ability to travel for an abortion. All too often, people of lower income or from historically marginalized groups are simply unable to travel due to cost or heightened risks of criminalization. (Louisiana Report p. 23)

---

[14] Arey et al., *supra* note 15 at 389.

A heartbreaking example of someone who could not afford to travel to another state is Mayron Hollis, a resident of Tennessee. Hollis learned that her pregnancy was "endangering her life," prompting her to seek an abortion, the appropriate medical treatment for her condition. Nonetheless, after being denied treatment in her home state and unable to travel elsewhere, "Hollis was forced to endure a dangerous pregnancy and birth, where she ultimately suffered severe hemorrhaging and lost her uterus, destroying her ability to give birth to any more children."[15]

### 3) Forced Continuation of Life-Threatening Pregnancy with a Fetal Condition Incompatible with Life

One Idaho specialist expressed her frustration at not being able to perform abortions when pregnancies were forced to continue even though the pregnancy could not result in a live birth: "Some of their fetuses had lethal chromosome abnormalities, like a triploid situation. So those are situations where not only is the patient's life and health and future fertility at risk, but the fetus is also nonviable because it has a lethal chromosome disorder. And so, yeah, I mean, the only way to treat that is going to be no longer continuing the pregnancy and abortion." Yet, despite having a fatal fetal diagnosis with a heightened risk of maternal morbidity and postpartum hemorrhage, this patient was ultimately denied care in Idaho and

---

[15] Payal Shah, Akila Radhakrishnan, *"It's Time to Call Abortion Bans What They Are —Torture and Cruelty*," The Nation, (June 9, 2023), https://www.thenation.com/article/society/abortion-bans-torture-cruelty/.

counseled to seek care in Utah. Once there, her insurance did not cover her care. (Idaho Report p.8)

As a maternal-fetal medicine specialist in Texas described her experience counseling patients: "You really can barely imagine what it's like for a woman or a couple to be faced with a devastating diagnosis for the fetus that they've just learned about maybe days or weeks before. They have grappled with this terrible, heartbreaking decision. And then they're told by the doctor, 'Well, good luck to you. Jump on Google and see where you can find a place to get your termination.'"[16]

## III.  WHAT IDAHO EMERGENCY PHYSICIANS FACE UNDER THE IDAHO ACT: CONFLICTING REQUIREMENTS AND A DIFFICULT FUTURE

### A.  Conflict Between the Idaho Act, EMTALA, and the Standard of Care

Describing EMTALA, an Idaho clinician stated:

"You're going to have somebody who's hemorrhaging, someone with potentially early onset preeclampsia, or somebody who has sepsis or an

---

[16]    Arey, et al., *supra* note 15.[17] "Human Rights Crisis: Abortion in the United States after Dobbs," PHR, (April 18, 2023), https://phr.org/wp-content/uploads/2023/04/4.13.23_UN_SR_briefingPaper_FINAL.pdf.; PHR, et al., *supra* note 14.

infection in their uterus. And I think EMTALA covers not just emergency, your life is at risk, but it covers threat to bodily organs, long term function, things like that." (Idaho Report p. 7).

Another Idaho physician stated:

"We know, as physicians and health care providers, we don't wait until somebody's in kidney failure. We want to do the things to prevent them from ever getting there and to fix things, if we can, or treat it appropriately. It's not how medicine is practiced to wait till somebody's having the worst case scenario situation. And so that's the main issue with these bans, is that they're so strict that they're in conflict with our EMTALA obligations." (Idaho Report p. 7)

Absent the Idaho Act, E.R. physicians have been able to make good-faith determinations about whether abortion care is necessary based both upon an individualized assessment of a pregnant patient's medical needs and their medical knowledge and experience. Under EMTALA, the treating physician could conclude that the requisite stabilizing treatment for patients experiencing certain conditions required pregnancy termination - that is, termination was the only care that would assure, within reasonable medical probability, that no material deterioration of the patient's condition was likely to result. If so, EMTALA

required that such treatment be offered and provided upon informed consent. 42 U.S.C. 1395dd(b)(1)(A), (2).

During "the injunction hiatus," E.R. physicians were unable to determine whether their good faith assessment of medical need was sufficient to legally provide medically necessary care. Instead of making decisions based on experience and their advanced medical training, particularly when faced with the sudden onset of symptoms, experienced physicians "report that the restrictive legal landscape means that they are generally unsure if and when medically necessary, and even lifesaving, abortions are legal."[17]

## B. Dual Loyalty: Conflict Between Idaho Law and a Physician's Ethical Obligations

Idaho's medical exceptions present physicians with the impossible choice of "dual loyalty"[18] - that is, a situation where physicians are unable to fully comply with both the law and their ethical obligations as medical practitioners. In many situations, an E.R. physician is ethically obligated to perform an abortion in line

---

[17] "Human Rights Crisis: Abortion in the United States after Dobbs," PHR, (April 18, 2023), https://phr.org/wp-content/uploads/2023/04/4.13.23_UN_SR_briefingPaper_FINAL.pdf.; PHR, et al., *supra* note 14.

[18] "Dual Loyalty & Human Rights in Health Professional Practice," International Dual Loyalty Working Group, PHR, (2002), at 16, https://phr.org/wp-content/uploads/2003/03/dualloyalties-2002-report.pdf.

with medical necessity, and yet it is entirely unclear whether Idaho's law permits it. Idaho, on the other hand, mandates that the physician's first obligation is to comply with its statutes. At times, it is impossible to comply with both.

As a result, the Idaho abortion ban can prevent E.R. physicians from complying with two fundamental recognized principles for the provision of quality medical care: (i) beneficence, or the duty to provide beneficial care to their patients; and (ii) nonmaleficence, or "do no harm," seeking to ensure that a patient will be no worse off physically, emotionally, or otherwise after treatment than before.[19] As stated by the American College of Emergency Physicians, physicians assume a fundamental duty to serve the best interests of their patients, and the welfare of their patients should form the basis of any physician's medical judgment.[20] But,

---

[19] Jacob P. Olejarczyk, Michael Young, "Patient Rights and Ethics," (November 28, 2022), https://www.ncbi.nlm.nih.gov/books/NBK538279/#:~:text=In%20healthcare%2C%20justice%20refers%20explicitly,be%20treated%20fairly%20and%20equitably.

[20] "*Code of Ethics for Emergency Physicians*," American College of Emergency Physicians, (October 2023), at 6, https://www.acep.org/siteassets/new-pdfs/policy-statements/code-of-ethics-for-emergency-physicians.pdf.;, "*Code of Professional Ethics*," American College of Obstetricians and Gynecologists, (December 2018), at 2, https://www.acog.org/-/media/project/acog/acogorg/files/pdfs/acog-policies/code-of-professional-ethics-of-the-american-college-of-obstetricians-and-gynecologists.pdf.

under abortion bans like Idaho's, a specialist commented, "It's almost like we're just rolling the dice on someone's life."[21]

### C. Conflict Caused by Harsh Criminal and Civil Penalties

The Idaho Act carries a criminal penalty of two to five years imprisonment. In addition, Idaho E.R. physicians face the risk of losing their medical licenses and the ability to practice medicine, as well as reputational harm, steep fines, and other professional penalties. Ultimately, these fines and penalties mean physicians can lose the ability to support themselves - often after a decade or more of education.

Each time that an Idaho physician terminates a pregnancy believing it to be necessary to prevent serious jeopardy to a patient's health, they are exposed to criminal investigation and prosecution and the revocation of their license. Because a physician administering an emergency termination in Idaho would be risking their professional license, livelihood, personal security, and freedom, it is natural that they will hesitate even while their patients may suffer, and their patients' conditions may deteriorate.

---

[21] Charlie McCann, "Abortion Bans in America are Corroding Some Doctors' Souls," Economist, (October 6, 2023), https://www.economist.com/1843/2023/10/06/abortion-bans-in-america-are-corroding-some-doctors-souls.

As one clinician who left Idaho due to the abortion ban stated, "I think we all live in fear of an attorney general or the prosecutors who are just looking to charge someone with this. And I think there's just that constant threat …. You worry all the time. Like, when are they going to try to come after me for this … . And for me, having a family, being a mother, a wife, you know, in addition to being a physician, and this is my career, it was just way too much for me to bear." (Idaho Report p.16). This was echoed by Dr. Kylie Cooper, a maternal-fetal medicine specialist in Idaho, who remarked: "My husband and I would talk about this every day. It was consuming us. What if I lost my license? What would happen to our kids if I went to jail? What about my guilt if I didn't help a sick patient to my fullest ability?"[22]

Dr Amelia Huntsberger, who like Kylie Cooper was one of several doctors that submitted a declaration in support of the Government's case against Idaho, said she was forced to leave Idaho: "I'm in the [operating room] dry heaving. I'm not dry heaving because of this surgery. I know how to do this surgery. I trained for this

---

[22] Stacy Weiner, "The Fallout of Dobbs on the Field of OBGYN, AAMC," (August 23, 2023), https://www.aamc.org/news/fallout-dobbs-field-ob-gyn.

surgery …. I did not train for, I am not ready for thinking about, 'Is this the case that's gonna make me a felon?'"[23]

### D.   Conflict Caused by the Potential for Civil Malpractice Suits

The medical exceptions to the Idaho Act also subject physicians to potential legal injuries beyond those provided for by statute. This situation, recognized as the "Abortion Double Bind," refers to when abortion bans trap clinicians between the risk of criminal penalty for ending a pregnancy that is not perilous enough to qualify for the state's medical exceptions and the risk of malpractice liability for not ending a dangerous pregnancy,[24] resulting in injuries or death to the pregnant patient that is argued to have been preventable. As a result, physicians are faced with two draconian options; either leave their patients to suffer harm and risk civil liability or perform an abortion and risk criminal and civil prosecution.[25]

---

[23] Erika L. Sabbath, et al., "U.S. Obstetrician-Gynecologists' Perceived Impacts of Post–Dobbs v Jackson State Abortion Bans," JAMA, (January 17, 2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2814017.

[24] Dov Fox, *The Abortion Double Bind*, *113*," American J. of Public Health, 1068, (October 1, 2023), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2023.307369?role=tab.; Harris Meyer, "Malpractice Lawsuits Over Denied Abortion Care May Be on the Horizon," KFF Health News, (June 23, 2023), https://kffhealthnews.org/news/article/malpractice-lawsuits-denied-abortion-care/., note that H.B. 3058 has passed.

[25] PHR, et al., *supra* note 14 at 6.

Dr. Lauren Miller, head of the Idaho Coalition for Safe Reproductive Health, said of the murkiness of the Idaho abortion laws, "We have a death exception and that is it without any other guidelines .... If I don't act fast enough to save your life, prevent you from getting septic, I could be liable for civil cases … malpractice. But if I act too quickly and I'm not 100 percent certain that the patient is going to die from the complication she's sustaining, then I could be guilty of a felony."[26]

### E. Likely Long-Term Effect if EMTALA is Found Not to Preempt the Idaho Act

The Idaho Act and similar laws have exacerbated maternal mortality and morbidity. The United States already has the highest maternal mortality rate of all high-income countries, and the U.S. maternal death rate has climbed from 20.1 deaths per 100,000 live births in 2019 to 23.8 in 2020, to 32.9 in 2021.[27]

---

[26] Randi Kaye, Stephen Samaniego, "*Idaho's Murky Abortion Law is Driving Doctors Out of the State*," CNN, (May 13, 2023), https://www.cnn.com/2023/05/13/us/idaho-abortion-doctors-drain/index.html.

[27] "*No One Could Say: Accessing Emergency Obstetrics Information as a Prospective Prenatal Patient in Post-Roe Oklahoma*," PHR, (April 2023), https://phr.org/wp-content/uploads/2023/04/Oklahoma-Abortion-Ban-Report-2023.pdf; "*The State of Reproductive Health in the United States: The End of Roe and the Perilous Road Ahead for Women in the Dobbs Era*," Gender Equity Policy Institute, at 6, (January 19, 2023), https://thegepi.org/wp-content/uploads/2023/06/GEPI-State-of-Repro-Health-Report-US.pdf.; Donna L. Hoyert, "*Maternal Mortality Rates in the United States, 2021*," CDC, (March 16,

Additionally, for every person in the United States who dies as a consequence of pregnancy or childbirth, up to 70 suffer hemorrhages, organ failure or other significant complications, amounting to more than one percent of all births.[28]

Across the United States, there have been numerous cases of pregnant patients who have suffered preventable harm or trauma, including nearly dying or in fact dying, because physicians have either delayed providing abortion care or outright denied it.[29] A national study conducted in the wake of *Dobbs* found that "health care providers have seen increased morbidity, exacerbated pregnancy complications, an inability to provide time-sensitive care, and increased delays in obtaining care for patients in states with abortion bans."[30]

2023), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2021/maternal-mortality-rates-2021.htm.

[28]. Katherine Ellison, Nina Martin, "Severe Complications for Women During Childbirth Are Skyrocketing - and Could Often Be Prevented," Pro Publica, (December 22, 2017), https://www.propublica.org/article/severe-complications-for-women-during-childbirth-are-skyrocketing-and-could-often-be-prevented.

[28]. Katherine Ellison, Nina Martin, "Severe Complications for Women During Childbirth Are Skyrocketing - and Could Often Be Prevented," Pro Publica, (December 22, 2017), https://www.propublica.org/article/severe-complications-for-women-during-childbirth-are-skyrocketing-and-could-often-be-prevented.

[29] . Daniel Grossman, et al., "*Care Post-Roe: Documenting Cases of Poor- Quality Care Since the Dobbs Decision,*" UCSF, (May 2023), https://sites.utexas.edu/txpep/files/2023/05/ANSIRH-Care-Post-Roe-Report-Embargoed-until-15-May-23.pdf.

Findings from a different study established that changes in practice "were associated with a doubling of severe morbidity for patients presenting with pre-labor rupture of membranes and other complications before 22 weeks gestation."[31]

Research affirms that states that restrict abortion also have fewer doctors providing care to pregnant people, creating "maternity care deserts." Thirteen of Idaho's 44 counties are now maternity care deserts.[32] In the first 15 months of the ban, 50 obstetrician-gynecologists practicing obstetrics, about one-fifth of the total, left the state. Further, 55 percent of the state's high-risk OB-GYNs have left the

[30] "How post-Roe laws are obstructing clinical care," UCSF, May 16, 2023, https://www.ansirh.org/research/research/how-post-roe-laws-are-obstructing-clinical-care; Brittni Frederiksen, et. al., "*A National Survey of OBGYNs' Experiences After Dobbs*," KFF Health News, (June 21, 2023), https://www.kff.org/womens-health-policy/report/a-national-survey-of-obgyns-experiences-after-dobbs/.

[31] Anjali Nambiar, et al., "*Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less With Complications in 2 Texas Hospitals After Legislation on Abortion*, 78," Obstetrical & Gynecological Survey 194 (April 2023), https://journals.lww.com/obgynsurvey/abstract/2023/04000/maternal_morbidity_and_fetal_outcomes_among.4.aspx.

[32] "Where You Live Matters: Maternity Care Deserts and the Crisis of Access and Equity in Texas," March of Dimes, (2023), https://www.marchofdimes.org/peristats/assets/s3/reports/mcd/Maternity-Care-Report-Texas.pdf.

state, leaving less than five in the entire state to treat patients.[33] Citing Idaho's

"legal and political climate,"[34] all four obstetrician-gynecologists that practiced at

Bonner General Hospital left Idaho in 2023 for states where abortion is legal.[35]

Valor Health, another Idaho hospital, discontinued labor and delivery services

because of staff shortages in March 2023 and stopped providing that care in June

2023.[36]

---

[33] Idaho Physician Well-Being Action Collaborative, "*A Post Roe Idaho*," (February 2024), https://www.idahocsh.org/idaho-physician-wellbeing-action-collaborative

[34] Danielle Campoamor, "*Idaho Hospital Closes its Maternity Ward, Citing the State's 'Political Climate'*," TODAY, (March 22, 2023), https://www.today.com/parents/pregnancy/idahos-bonner-general-hospital-closes-maternity-ward-rcna75776; Sharon Zhang, *Idaho Hospital Will Stop Delivering Babies as Providers Flee After Abortion Bans*, Truthout, (March 21, 2023), https://truthout.org/articles/idaho-hospital-will-stop-delivering-babies-as-providers-flee-after-abortion-bans/.

[35]. Julianne McShane, "*Pregnant With No OB-GYNs Around: In Idaho, Maternity Care Became a Casualty of its Abortion Ban*," NBC News, (September 30, 2023), https://www.nbcnews.com/health/womens-health/pregnant-women-struggle-find-care-idaho-abortion-ban-rcna117872.

[36] Staci Carr, "*Discontinuation of Labor and Delivery Services*," Valor Health, (2023), https://www.valorhealth.org/discontinuation-of-labor-delivery-services/.

Idaho already has the fewest number of active physicians per capita of any state.[37] As Jim Souza, the chief physician executive at St. Luke's Medical Center in Boise, said, "We're at the beginning of the collapse of an entire system of care."[38]

## IV. CONCLUSION

The devastating harm to pregnant patients, physicians, and the health system in Idaho in the few months of "the injunction hiatus" clearly illustrates the dangerous conflict between EMTALA and the Idaho Act.

The judgment of the District Court should be affirmed. Its injunction should be continued.

Respectfully submitted,

Gerson H. Smoger
  *Counsel of Record*
SMOGER AND ASSOCIATES
4228 Hallmark Drive
Dallas, TX 75229
(510) 531-4529
gerson@texasinjurylaw.com

---

[37] Kelly Gooch, Marissa Plescia, "*States Ranked by Active Physicians Per Capita*," Becker's Hospital Review, (March 9, 2022), https://www.beckershospitalreview.com/workforce/this-state-has-the-most-physicians-per-capita.html.

[38] Randi Kaye**,** *supr*a

Payal Shah
PHYSICIANS FOR HUMAN RIGHTS
520 Eighth Avenue, Suite 2300
New York, NY 10018
(646) 564-3720
pshah@phr.org

Counsel for Amicus Curiae
Physicians for Human Rights

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated        .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                 *Rev. 12/01/22*