**No. 23-35450 (w/ No. 23-35440)**

_____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

STATE OF IDAHO,
*Defendant-Appellant,*

v.

MIKE MOYLE,
Speaker of the Idaho House of Representatives, et al.,
Proposed Intervenor-Defendants,
*Movants-Appellants,*

_____

On Appeal from the United States District Court for the District of Idaho
Hon. B. Lynn Winmill, No. 1:22-cv-00329-BLW

_____

## REPLY BRIEF OF APPELLANTS
## MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF REPRESENTATIVES,
## CHUCK WINDER, PRESIDENT PRO TEMPORE OF THE IDAHO SENATE
## & THE SIXTY-SEVENTH IDAHO LEGISLATURE

_____

Daniel W. Bower
HILTY, BOWER,
HAWS & SEABLE PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
(208) 345-3333
dbower@hbhslaw.com

Taylor A.R. Meehan
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Supervised by principals of the firm
licensed to practice in Virginia*

# TABLE OF CONTENTS

Table of Authorities ............................................................................... ii

Reply............................................................................................................1

Argument....................................................................................................2

   I.  EMTALA Does Not Preempt Idaho's Defense of Life Act .....................2

      A.  The government's preemption theory is premised on
           rewriting EMTALA ................................................................3

          1.  EMTALA sets rules for transferring patients,
              not longer-term care.........................................................3

          2.  EMTALA's stabilize-to-transfer rule runs to the "condition,"
              including an unborn child's condition.........................................8

          3.  There is no EMTALA requirement to violate state laws
              regarding allowable medical treatment .....................................11

      B.  The government's preemption theory peddles a specious
           view of Idaho law ................................................................17

      C.  Idaho draws the same lines as Congress, and HHS cannot
           override either...................................................................22

      D.  The government has not shown it has a cause of action ..............25

 II. The Government's Preemption Theory Violates the Spending
     Clause and Intrudes on Idaho's Reserved Powers................................27

      A.  The government errs by assuming Spending Clause
           legislation preempts just like other legislation .............................30

      B.  Requiring abortions is not regulating commerce .........................36

Conclusion.................................................................................................39

Certificate of Compliance ......................................................................41

Certificate of Service ..............................................................................41

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ...................................26

*Arizona v. United States,*
  567 U.S. 387 (2012) ...................................26

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ...................................25

*Bennett v. Arkansas,*
  485 U.S. 395 (1988) ...................................33

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ...................................25

*Brooker v. Desert Hosp. Corp.,*
  947 F.2d 412 (9th Cir. 1991) ...................................4, 6

*Bryan v. Rectors & Visitors of the Univ. of Va.,*
  95 F.3d 349 (4th Cir. 1996) ...................................4, 13, 14

*Bryant v. Adventist Health Sys./W.,*
  289 F.3d 1162 (9th Cir. 2002) ...................................4, 5, 6, 8

*Carleson v. Remillard,*
  406 U.S. 598 (1972) ...................................33, 34

*Charles C. Steward Mach. Co. v. Davis,*
  301 U.S. 548 (1937) ...................................32

*City of St. Louis v. Praprotnik,*
  485 U.S. 112 (1988) ...................................29

*Cohens v. Virginia,*
  19 U.S. (6 Wheat.) 264 (1821) ...................................39

*Coventry Health Care of Mo., Inc. v. Nevils,*
  581 U.S. 87 (2017) ...................................32

*De Veau v. Braisted,*
363 U.S. 144 (1960) ..........................................................23

*Draper v. Chiapuzio,*
9 F.3d 1391 (9th Cir. 1993) ...............................2, 12, 13

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) ...................................................11, 23

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ...................................................38, 39

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ...................................................38, 39

*Hardy v. N.Y.C. Health & Hosps. Corp.,*
164 F.3d 789 (2d Cir. 1999) ..........................................14

*Harry v. Marchant,*
291 F.3d 767 (11th Cir. 2002) .............................4, 14, 21

*In re Baby "K,"*
16 F.3d 590 (4th Cir. 1994) ........................................9, 16

*In re Safeguard Self-Storage Tr.,*
2 F.3d 967 (9th Cir. 1993) .............................................37

*King v. Smith,*
392 U.S. 309 (1968) .......................................................33

*Kozlowski v. Rush,*
828 P.2d 854 (Idaho 1992) ..............................................7

*Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1,*
469 U.S. 256 (1985) .......................................................33

*Linder v. United States,*
268 U.S. 5 (1925) ...........................................................31

*Matal v. Tam,*
582 U.S. 218 (2017) .......................................................28

*Moses v. Providence Hosp. & Med. Ctrs., Inc.*,
 561 F.3d 573 (6th Cir. 2009) ............................................................16

*Moyle v. United States*,
 144 S. Ct. 2015 (2024) ........................................................................3

*Murphy v. NCAA*,
 584 U.S. 453 (2018) ....................................................................28, 39

*New York v. United States*,
 505 U.S. 144 (1992) ..............................................................32, 38, 39

*NFIB v. Sebelius*,
 567 U.S. 519 (2012) ...........................................29, 31, 32, 36, 37

*Oklahoma v. U.S. Civ. Serv. Comm'n*,
 330 U.S. 127 (1947) ..........................................................................32

*Pennhurst State Sch. & Hosp. v. Halderman*,
 451 U.S. 1 (1981) ....................................................................34, 35, 37

*Planned Parenthood Ariz. Inc. v. Betlach*,
 727 F.3d 960 (9th Cir. 2013) ....................................................15, 16

*Planned Parenthood Great Nw. v. Idaho*,
 522 P.3d 1132 (Idaho 2023) .................................2, 18, 19, 21, 22

*R.A.V. v. City of St. Paul*,
 505 U.S. 377 (1992) ....................................................................18, 21

*Rice v. Norman Williams Co.*,
 458 U.S. 654 (1982) ............................................................................2

*Roberts v. Galen of Va., Inc.*,
 525 U.S. 249 (1999) ..........................................................................16

*Ruan v. United States*,
 597 U.S. 450 (2022) ..........................................................................20

*Sossamon v. Texas*,
 563 U.S. 277 (2011) ..........................................................................36

*South Dakota v. Dole,*
483 U.S. 203 (1987) ...................................................35

*Texas v. Becerra,*
89 F.4th 529 (5th Cir. 2024) ...........................................9

*Thomas v. Christ Hosp. & Med. Ctr.,*
328 F.3d 890 (7th Cir. 2003) ..........................................16

*Townsend v. Swank,*
404 U.S. 282 (1971) ...............................................33, 34

*United States v. Bird,*
124 F.3d 667 (5th Cir. 1997) .........................................37

*United States v. Butler,*
297 U.S. 1 (1936) .................................................31, 32

*United States v. City of Arcata,*
629 F.3d 986 (9th Cir. 2010) .........................................27

*United States v. Idaho,*
83 F.4th 1130 (9th Cir. 2023) .........................................9

*United States v. Koyomejian,*
970 F.2d 536 (9th Cir. 1992) .....................................28, 29

*United States v. Missouri,*
114 F.4th 980 (8th Cir. 2024) ........................................26

*United States v. United Mine Workers of Am.,*
330 U.S. 258 (1947) ..................................................27

*United States v. Washington,*
596 U.S. 832 (2022) ..................................................26

*Va. Off. for Prot. & Advoc. v. Stewart,*
563 U.S. 247 (2011) ..................................................27

*Whittaker Corp. v. Execuair Corp.,*
953 F.2d 510 (9th Cir. 1992) .........................................29

*Woodfield v. Bd. of Pro. Discipline of the Idaho State Bd. of Med.*,
 905 P.2d 1047 (Idaho Ct. App. 1995) ....................................................7

*Yamada v. Nobel Biocare Holding AG*,
 825 F.3d 536 (9th Cir. 2016) ...........................................................29

**Federal Statutes**

10 U.S.C. §1093 ...........................................................................22

18 U.S.C. §248(d)(4) .....................................................................38

22 U.S.C. §2151b(f) ......................................................................22

42 U.S.C. §1395 ......................................................................12, 25

42 U.S.C. §1395cc(a)(1)(I)(i) ..........................................................37

42 U.S.C. §1395cc(b)(2)(A) .............................................................26

42 U.S.C. §1395dd(d)(1) ................................................................26

42 U.S.C. §1395dd(d)(3) ................................................................26

42 U.S.C. §1395dd(e)(1)(A) .............................................................3, 8

42 U.S.C. §1395dd(e)(1)(A)(i) ..........................................................9, 11

42 U.S.C. §1395dd(e)(3) ................................................................6, 11

42 U.S.C. §1395dd(e)(3)(A) .........................................................4, 5, 9, 13

42 U.S.C. §1395dd(f) ...............................................................5, 8, 13

42 U.S.C. §18023(b)(2) .................................................................24

42 U.S.C. §18023(c)(1) .................................................................24

42 U.S.C. §18023(c)(2) .................................................................24

42 U.S.C. §18023(d) ....................................................................23

Pub. L. 102-585, 106 Stat. 4947 ......................................................22

Pub. L. 118-47, §506, 138 Stat. 703 (2024).......................................22, 23

Pub. L. 118-47, §507, 138 Stat. 703 (2024).......................................22, 23

Pub. L. 118-47, §613, 138 Stat. 568 (2024)..........................................22

Pub. L. 118-47, §614, 138 Stat. 568 (2024)............................................22

Pub. L. 118-47, §810, 138 Stat. 591 (2024)............................................22

**State Statutes**

Idaho Code §18-604(1) ...............................................15, 18, 21

Idaho Code §18-604(11) ...................................................18

Idaho Code §18-622(2) ....................................................18

Idaho Code §18-622(4) ..............................................18, 21

**Regulatory Authorities**

68 Fed. Reg. 53,222 (Sept. 9, 2003) .......................................25

CMS, *Hospital Surveys with 2567 Statement
of Deficiencies – through 2024 Q3*,
https://go.cms.gov/4hxTcFS...........................................15

CMS, *Quality Improvement Organization Manual*,
Ch. 9 (Rev. 24, Issued Feb. 12, 2016),
https://perma.cc/EYL8-MNHY .....................................4, 6

Exec. Order No. 13535,
75 Fed. Reg. 15,599 (Mar. 24, 2010)...............................24

# REPLY

Two patients with the same rare blood type are in the emergency room. One patient needs an emergency blood transfusion. The other is comatose. Applying the government's version of EMTALA, federal officials can require a physician to take blood from the comatose patient even if it is a crime under state law. Complying with EMTALA, so goes the argument, sometimes means breaking state law.

That version of EMTALA is not the statute Congress enacted. Nor is it consistent with the Constitution Americans ratified. Taking the government's contrary view to its logical endpoint, new spending conditions could require Medicare providers to perform post-viability abortions or abortion-pill reversal, sex reassignment surgeries or conversion therapy, euthanasia, or whatever else States prohibit. And those States would have no say.

Taking EMTALA for what it actually says, there is no direct conflict with Idaho's Defense of Life Act. Nothing in EMTALA requires physicians to violate state law. And nothing in Idaho law—whether in EMTALA-covered circumstances or beyond—denies medical care to pregnant women.

The notion that Idaho requires "delaying care" or "prolonged suffering" is specious. *Contra* U.S.Br.11, 38-39; St. Luke's Br.23; Am. Hosp. Ass'n Br.16. The truth is Idaho law does not require "a particular level of immediacy" before life-threatening medical conditions can be treated, nor "objective certainty" that such tragedy would take a woman's life. *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1203 (Idaho 2023) (emphasis omitted). The target of Idaho law is induced abortion, not necessary medical treatment. When pregnancy complications arise, state law "leaves wide room for the physician's 'good faith medical judgment,'" allowing the physician "the room he needs to make his best medical judgment … for the benefit, not the disadvantage, of the pregnant woman." *Id.* at 1203-04.

## ARGUMENT

## I.    EMTALA Does Not Preempt Idaho's Defense of Life Act.

For EMTALA to preempt state law, there must be an actual conflict, not a contrived one. *See Draper v. Chiapuzio*, 9 F.3d 1391, 1393-94 (9th Cir. 1993) (per curiam); *see also Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982) ("a hypothetical or potential conflict is insufficient"). The government

has not met that burden.[1] Pregnant women in Idaho are entitled to "essential emergency medical treatment," *contra* U.S.Br.1, in EMTALA-covered circumstances and beyond.

## A. The government's preemption theory is premised on rewriting EMTALA.

The government misunderstands EMTALA in the following three ways, which in turn causes it to construe EMTALA's preemptive reach too broadly. Reading EMTALA for what it actually says, there is no direct conflict with Idaho law.

### 1. EMTALA sets rules for transferring patients, not longer-term care.

The government's preemption analysis forgets that EMTALA covers emergency conditions with "acute symptoms" requiring "immediate medical attention." 42 U.S.C. §1395dd(e)(1)(A). And when EMTALA says those

---

[1] Contrary to the government's suggestion, U.S.Br.20, the Legislature has consistently maintained that EMTALA contains no requirement to violate state law and that necessary medical treatment is not "abortion," 4-LEG-ER-498-99; *e.g.*, 4-LEG-ER-410. For its part, the government initially said EMTALA "contemplates *any* form of stabilizing treatment" that "medical professionals determine … is necessary," U.S.Br.16 (Sept. 8, 2023), before disclaiming that interpretation and its sweeping implications, *Moyle v. United States*, 144 S. Ct. 2015, 2021 & n.* (2024) (Barrett, J., concurring).

conditions must be stabilized, its "[t]erms relating to 'stabilization' … DO NOT REFLECT the common usage in the medical profession." CMS, *Quality Improvement Organization Manual*, Ch. 9, at 91 (Rev. 24, Issued Feb. 12, 2016), https://perma.cc/EYL8-MNHY (*QIO Manual*).

EMATLA's duty to "stabilize" is triggered only if the hospital intends to transfer a patient. *See Harry v. Marchant*, 291 F.3d 767, 775 (11th Cir. 2002). It requires providing sufficient treatment so that "no material deterioration of the condition is likely to *result from or occur during the transfer*." §1395dd(e)(3)(A) (emphasis added). Stabilization is thus "defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system." *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1167 (9th Cir. 2002) (quoting *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996)). The stabilizing treatment EMTALA anticipates is not what's necessary to "alleviate" her emergency condition. *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir. 1991). It is what's necessary to keep the condition stable "during the transfer." §1395dd(e)(3)(A). That requirement applies in the "immediate aftermath" of

an emergency and "ends when an individual is admitted for inpatient care," at which point "state tort law provides a remedy for negligent care." *Bryant*, 289 F.3d at 1167-69; *see* Leg.Br.37-38.

The government's preemption analysis does not grapple with that narrower "requirement" and whether it "directly conflicts" with Idaho law. §1395dd(f). The government rewrites EMTALA, saying it "requires pregnancy termination to treat a medical emergency"—full stop. U.S.Br.11; *see* U.S.Br.13-14 (similar). The government's brief never contemplates the second half of EMTALA's "stabilize" definition specific to "the transfer." §1395dd(e)(3)(A); *see* U.S.Br.30, 35, 39 (omitting "result from or occur during the transfer" when quoting EMTALA); U.S.Br.26 (asking whether deterioration "is likely to occur" without reference to "transfer" language); U.S.Br.37 (similar).

That rewriting infects the government's whole preemption analysis. Take the rule the government advances: that Idaho law "directly conflicts with EMTALA in those cases when terminating a pregnancy is the only treatment that would *stabilize a pregnant woman* whose emergency medical

condition threatens serious harm to her health but would not (absent further deterioration) cause her death." U.S.Br.11 (emphasis added). That rule substitutes the statute's definition of "stabilize" with the term's "common usage." *Contra QIO Manual* 91. EMTALA asks whether a "condition" will be stable during a "transfer," §1395dd(e)(3), not what ultimately will be required to "stabilize a pregnant woman," *contra* U.S.Br.11. A patient might remain in "critical condition," but she is still "stabilized" under EMTALA. *Brooker*, 947 F.2d at 415. While hospitals of course have a broader obligation to "save a pregnant woman's life or prevent grave harm," U.S.Br.16, that obligation arises under state tort law, not EMTALA. *See Bryant*, 289 F.3d at 1168-69.

For another example, the government takes aim at the "possibility of monitoring" and following a careful course of expectant management for some cases of preterm PROM or preeclampsia, with the goal of getting an unborn child to a gestational age for a preterm delivery. U.S.Br.38-39 & n.7; *see* Charlotte Lozier Br.12 & n.4, 18-19 & n.15 (discussing expectant management and ACOG guidance regarding the same); AAPLOG Br.13-14, 19-20

(same); ACOG Br.23 (acknowledging "expectant management … can sometimes be used"); 4-LEG-ER-414 (identifying first-line "stabilizing treatments," *e.g.*, "IV fluids," blood "transfusion," "blood pressure support," "antibiotics"). "Even if she is being monitored," the government contends, "the woman could face serious threats to her health but not necessarily death." U.S.Br.38 n.7. *But see, e.g.*, Charlotte Lozier Br.17 (discussing how "surgical abortion for [PPROM] may cause more harm to the uterus and higher risk of [future] PPROM"). That concern again implicates state-law requirements, not EMTALA. How an Idaho physician exercises his medical judgment to treat a patient will be highly relevant under state law; should he neglect his state-law duty of care, he faces malpractice liability. *See, e.g.*, 4-LEG-ER-438-39 (failure to treat PPROM as life-threatening is "medical malpractice"); *Kozlowski v. Rush*, 828 P.2d 854 (Idaho 1992); *Woodfield v. Bd. of Pro. Discipline of the Idaho State Bd. of Med.*, 905 P.2d 1047 (Idaho Ct. App. 1995) (affirming in part extensive disciplinary findings against OB/GYN). EMTALA, on the other hand, asks something else: how did the physician act in the "immediate aftermath" of the woman presenting to the emergency

room. *Bryant*, 289 F.3d at 1167. Did the hospital turn the patient away? If so, the EMTALA violation "is discharging a woman who should have been admitted for observation and management," AAPLOG Br.19-20, not the course of treatment afterwards, *Bryant*, 289 F.3d at 1167-69.

Failing to understand the actual EMTALA "requirement" at issue, the government fails to identify any direct conflict. *Contra* §1395dd(f). Nothing in Idaho law requires turning away patients, which would be contrary to EMTALA's stabilization provision. As the Legislature's physician-witnesses explained, pregnant women in Idaho will be treated for every "acute" scenario needing "immediate" treatment under EMTALA, §1395dd(e)(1)(A), and beyond. *See generally* 4-LEG-ER-406-26, 436-41.

### 2. EMTALA's stabilize-to-transfer rule runs to the "condition," including an unborn child's condition.

The government says "EMTALA's duties run to the 'individual' seeking care—that is, the pregnant woman." U.S.Br.10; *see* U.S.Br.23 ("duties … run to the 'individual' seeking care"). From there, the government argues that an unborn child is not such an "individual." U.S.Br.23-24. And EMTALA's references to her "unborn child" thus "do not cabin EMTALA's

stabilization requirement." U.S.Br.23; *see* Am. Hosp. Ass'n Br.19 ("the term 'unborn child' must give way"). The government again rewrites the statute.

EMTALA's stabilization provisions run to the "condition," not the "individual":

> The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment *of the condition* … .

§1395dd(e)(3)(A) (emphasis added).[2] And that "condition" is one that threatens *either* "a pregnant woman" *or* "her unborn child." §1395dd(e)(1)(A)(i). EMTALA thus reflects a "dual stabilization" requirement. *United States v. Idaho*, 83 F.4th 1130, 1136, *vacated*, 82 F.4th 1296 (9th Cir. 2023) (en banc); *see Texas v. Becerra*, 89 F.4th 529, 544-45 (5th Cir. 2024), *cert. denied*, 2024 WL 4426546 (U.S. Oct. 7, 2024). EMTALA recognizes that "[d]octors who treat pregnant women have two patients: the mother and the pre-born child." AAPLOG Br.13; *see* Charlotte Lozier Br.6-7, 12 (discussing "two-patient

---

[2] *In re Baby "K,"* 16 F.3d 590 (4th Cir. 1994), illustrates this text at work. *Baby K* turned on the hospital's refusal to treat the infant's acute condition of respiratory distress, distinguishing it from the infant's anencephaly. *Id.* at 596-98.

paradigm"). It cannot logically follow that EMTALA contains a "substantive federal standard," U.S.Br.26—sufficient to preempt state law despite §1395dd(f)'s high bar—to end that unborn child's life.

To be sure, there are circumstances where an unborn child cannot be saved pre-viability, just as severely injured or ill or elderly patients sometimes cannot be saved. That does not negate EMTALA's dual-stabilization obligation for pregnant women and unborn children. For instance, placental abruption is an acute emergency for both mother and child. 4-LEG-ER-414, 417-18. Pre-viability, an unborn child "can't survive" without that "source of blood and oxygen." 4-LEG-ER-417-18. But post-viability, physicians will perform an "immediate C-section" to save the unborn child, even though surgery necessarily poses health risks to the pregnant woman. 4-LEG-ER-414; *see also* 4-LEG-ER-440. The government now embraces those life-saving measures for the unborn child post-viability. U.S.Br.43. ("the provider can comply with both EMTALA and Idaho law by delivering the child").

Importantly, nothing in EMTALA distinguishes between those pre-viability and post-viability scenarios when defining emergency medical

conditions affecting an "unborn child." *See* §1395dd(e)(1)(A)(i). It necessarily follows for pre-viability unborn children too, nothing in EMTALA preempts state laws aiming to maximize health outcomes for both mother and child. It would "too easily find[] irreconcilable conflicts in [Congress's] work," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018), to interpret EMTALA to simultaneously require life-saving medical treatment for an unborn child, §1395dd(e)(1)(A)(i), (e)(3), but also empower HHS officials to require life-ending abortions when both mother and child could survive.

### 3. There is no EMTALA requirement to violate state laws regarding allowable medical treatment.

**a.** The government contends that when a particular treatment is the "only" stabilizing treatment, States cannot prohibit it. U.S.Br.11. That argument proves too much. Consider again an emergency blood transfusion where the blood bank has run dry; surely the government would not say a hospital must obtain blood from a minor in the waiting room or a comatose patient even if that is the "only" stabilizing treatment for another patient's condition. *See* Leg.Br.42-43.

The government responds that §1395dd(f) "anticipates that state law might directly conflict with federal requirements." U.S.Br.33. The government argues EMTALA should have "expressly" incorporated state law in its stabilization provisions but instead used terms like "reasonable medical probability." U.S.Br.31-33; *see* Am. Hosp. Ass'n Br.32-33 (similar). These arguments draw exactly the wrong inference given §1395dd(f). *See Draper*, 9 F.3d at 1393 (construing "preemptive effect as narrowly as possible").

EMTALA's default rule is that it does *not* preempt state law. Leg.Br.28-32. And the Medicare Act more broadly says federal officials will not "exercise any supervision or control over the practice of medicine or the manner in which medical services are provided," §1395, thereby leaving decisions about allowable medical treatment to States. To overcome §1395dd(f), and to insist on an implied partial repeal of §1395, *see* U.S.Br.28, the government must identify an express EMTALA requirement to provide medical treatment States prohibit or a provision empowering HHS to command such a thing. There is no such provision nor any such power. Leg.Br.24-25, 34.

Explained above, EMTALA's stabilization provisions are about ensuring hospitals "get patients into the system," not overriding state healthcare laws. *Bryan*, 95 F.3d at 351; *see* 4-LEG-ER-408. EMTALA stops a Medicare-participating hospital from sending a patient to another hospital without first assuring her emergency condition will not worsen during that transfer. §1395dd(e)(3)(A). As for exactly *what* treatment is allowable, EMTALA operates alongside state law unless EMTALA expressly says otherwise. §1395dd(f); *see Draper*, 9 F.3d at 1393; Leg.Br.34, 41-44.

The government's hypotheticals fail to answer the preemption question. To be sure, EMTALA need not list "specific treatments" to show that a hospital's failure to "provide a chest tube" or "defibrillation" violates EMTALA. U.S.Br.21. But the preemption question is different: Do EMTALA's general references to "treatment" operate alongside or against state law? Section 1395dd(f)'s default rule is that "treatment" operates alongside state law until Congress expressly says otherwise.

On EMTALA's history, the government misunderstands EMTALA's novation. The government contends it makes "no sense" for "state law to set

the boundaries of EMTALA's stabilization requirement when the very purpose of that requirement was to displace the state-law regime." U.S.Br.35. The government is half-right: EMTALA displaced the common-law rule not requiring emergency treatment for all. Leg.Br.33 & n.2. EMTALA quite literally changed "the boundaries," U.S.Br.35, of the duty of emergency care by extending that duty to Medicare-participating hospitals' front doors. But EMTALA's "federal standard," *id.*, does not go beyond that. Nothing in EMTALA purports to displace state laws about allowable medical treatment once patients are welcomed into the hospital's emergency department as EMTALA requires. EMTALA "was meant to supplement," not supplant, those existing state laws. *Harry*, 291 F.3d at 773; *see Bryan*, 95 F.3d at 351; *see also Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999) ("EMTALA would peacefully coexist with applicable state 'requirements.'").

**b.** None of the government's cited examples of EMTALA violations suggests hospitals must violate state law to comply with EMTALA. The government's first example was *not* about the hospital's failure to provide "pregnancy termination as stabilizing treatment," let alone a hospital's

unwillingness to violate state law. *Contra* U.S.Br.18 n.4; HHS Officials Br.22. The Catholic hospital would not abort a 17 to 23-week unborn child. *See* CMS, *Hospital Surveys with 2567 Statement of Deficiencies – through 2024 Q3*, https://go.cms.gov/4hxTcFS (row 78,028). The EMTALA violation was how the hospital *discharged* the patient, not its unwillingness to perform an abortion. *Id.* HHS found the hospital's failure to "transfer[] via ambulance" compromised "the health of the *unborn baby* and the patient." *Id.* (emphasis added). Similarly, the government's second example was about discharging the patient without further investigating her fever and elevated white blood cell count. *Id.* (row 100,458). And the remaining cited examples involved "ectopic pregnancy," as the government acknowledges, not abortions, *see* Idaho Code §18-604(1).

**c.** As for the government's cited caselaw, U.S.Br.32, the government relies on *Planned Parenthood Arizona Inc. v. Betlach*, 727 F.3d 960, 962 (9th Cir. 2013), involving Arizona's exclusion of abortion providers from Medicaid even when performing non-abortion family planning services. That was contrary to the Medicaid Act's "free-choice-of-provider requirement,"

prohibiting Medicaid plans from restricting choices among qualified providers. *Id.* at 968-69. *Betlach* never contemplated what the government urges here: using Medicare as a sword to require participating hospitals to perform abortions for mostly non-Medicare patients, including abortions violating state law. *See* Leg.Br.66-67.

Nor do any other cited cases contemplate whether EMTALA's reference to "treatment" includes treatments prohibited by state law. In *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 250 (1999) (per curiam), the Supreme Court rejected an unspoken "improper motive" element in EMTALA. To the extent *Roberts* is relevant here, it counsels *rejecting* an unspoken requirement to provide unlawful medical treatments. As the government acknowledges, hospitals must comply with state law to participate in Medicare. U.S.Br.36; *see* Leg.Br.44. It makes little sense to dismiss that desire for law-abiding hospitals when they are treating patients. As for *In re Baby "K,"* 16 F.3d 590 (4th Cir. 1994), *Moses v. Providence Hospital & Medical Centers, Inc.*, 561 F.3d 573 (6th Cir. 2009), and *Thomas v. Christ Hospital & Medical Center*, 328 F.3d 890 (7th Cir. 2003), those cases address, respectively, how EMTALA applies to

terminally ill patients, admitted patients, and psychiatric patients. None considers whether EMTALA's reference to "treatment" requires doctors to ignore state laws regulating allowable medical treatments.

**B. The government's preemption theory peddles a specious view of Idaho law.**

Nothing in Idaho's Defense of Life Act precludes physicians from complying with EMTALA or providing necessary medical treatment more broadly. And still, the government and *amici* conflate criminal abortions with necessary medical treatment. They say Idaho law requires "delaying care," U.S.Br.11, "prolonged suffering," St. Luke's Br.23, "certainty" of death, ACOG Br.21, and "armchair quarterback[ing]," Am. Hosp. Ass'n Br.6. Citing nothing, the government declares Idaho "does not allow women facing [pre-viability preeclampsia] to receive treatment until their conditions deteriorate so much that pregnancy termination is necessary to save their lives." U.S.Br.39; *see also, e.g.*, St. Luke's Br.23 ("delay" until "close to death"); Am. Hosp. Ass'n Br.16 (similar); ACOG Br.21-22 (similar). These repeated misstatements toe the line for a party's duty of candor.

Nearly two years ago, the Idaho Supreme Court rejected the same assertions about delayed care for medical emergencies. *Planned Parenthood*, 522 P.3d at 1203-04. The law covers induced abortions, not "[m]edical treatment," even if such treatment unintentionally or intentionally leads to the death of an unborn child. Idaho Code §18-622(2), (4); *see also* §18-604(1), (11) (excluding miscarriage, molar pregnancies, ectopic pregnancies, and non-developing pregnancies from law's scope). The exception in Idaho law for life-saving measures "is clearly a subjective standard, focusing on the particular physician's judgment." *Planned Parenthood*, 522 P.3d at 1203. It "does not require *objective certainty, or a particular level of immediacy*, before the abortion can be 'necessary' to save the woman's life." *Id.* (emphasis added). It "leaves wide room" for the physician's "medical judgment" to decide when termination of the pregnancy is warranted. *Id.* That interpretation of Idaho law is binding here. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 (1992).

These brazen misstatements of Idaho law have resulted in real-world harm. *Amicus* St. Luke's Hospital says it transferred patients with

preeclampsia and PPROM. St. Luke's Br.13-15.[3] The "terrible choice" St. Luke's describes for those patients is a false statement of Idaho law by Idaho's largest medical provider. St. Luke's apparently advised physicians that they would have to "wait" while patients "suffer and deteriorate until death is imminent" and to provide "delayed care." St. Luke's Br.13-17. And it seemingly suggested to patients that conditions would go "untreated" while systemic bleeding, liver and kidney failure, stroke, or seizure set in. St. Luke's Br.14-15. The government repeats that flagrant misrepresentation of Idaho law. *See* U.S.Br.11, 39; *see also* U.S.Br.37 (omitting *Planned Parenthood*'s rejection of an "immediacy" requirement).

These misstatements cannot be reconciled with *Planned Parenthood* or the record. Idaho's exception does *not* require death to be "imminent" or "certain[]." *Planned Parenthood*, 522 P.3d at 1203; *see also* 4-LEG-ER-438-39

---

[3] St. Luke's discussion of airlifted patients is attorney argument without reviewable evidence. St. Luke's (at 13-14) says six patients were airlifted but then describes seven. It says (at 15) that airlifting caused "significant delays in care" but then says patients were "stable enough" to transfer under EMTALA. There are no particulars about any patient's condition or whether transfer was required for more specialized medical assistance. *E.g.*, 4-LEG-ER-408, 412-13.

(stating it would be "malpractice" to misunderstand the parameters of Idaho law and not to treat PPROM as life-threatening). Measures taken for PPROM, placental abruption, preeclampsia, or other pregnancy emergencies "are not considered 'abortions' in either common or medical parlance." AAPLOG Br.2; *see* 4-LEG-ER-410 ("I can find no literature, and the physician declarations do not cite any studies, where abortion is the first line treatment for any medical emergency."). Idaho women can obtain necessary medical treatment for every single pregnancy condition identified by the government and *amici*. Leg.Br.49-52 & n.4.

The government responds by turning Idaho's subjective standard on its head, saying its witnesses' "subjective views" that Idaho would not permit pregnancy termination for "all conditions" are dispositive. U.S.Br.39-40. Similarly, *amici* describe a perceived "chilling effect" causing physicians not to treat patients. *E.g.*, Am. Hosp. Ass'n Br.6-7; St. Luke's Br.13.[4] They forget

---

[4] *Amicus* American Hospital Association (at 7, 13-14) relies on the discussion of chilling effects in *Ruan v. United States*, 597 U.S. 450 (2022), but omits that *Ruan* addressed that risk by requiring proof that physicians "knowingly or intentionally" dispensed drugs in an unauthorized manner. *Id.* at 459, 468. That scienter requirement is little different than *Planned*

that EMTALA does not foreclose personal-injury suits, malpractice suits, or other legal action for negligent or wanton care. *See Harry*, 291 F.3d at 773 ("EMTALA was not intended to establish guidelines for patient care, to replace available state remedies, or to provide a federal remedy for medical negligence." (collecting cases)). The government and *amici* misunderstand the relevance of Idaho's subjective standard to the preemption question.

This Court first must take Idaho law as it finds it. *See R.A.V.*, 505 U.S. at 381. Idaho allows for necessary medical treatment without delay. *Planned Parenthood*, 522 P.3d at 1203-04; Idaho Code §18-604(1); §18-622(2), (4). Only then, with those parameters of Idaho law settled, do physicians' subjective views become relevant. And on this record, both sides' physician-witnesses agree that the cited pregnancy conditions are "life-threatening" if untreated. Leg.Br.49-51; *e.g.*, 4-LEG-ER-416, 419, 421; 3-ER-253 ("life-threatening"); 3-ER-340 ("life-threatening intra-amniotic infection"); 3-ER-351 ("life-threatening emergency"); 3-ER-357 ("life-threatening" hypovolemic shock due to

_____

*Parenthood*'s subjective standard "leav[ing] wide room for the physician's 'good faith medical judgment.'" 522 P.3d at 1203.

blood loss); ACOG Br.16 ("high probability for morbidity"). That subjective view that conditions are "life-threatening" controls, allowing care "for the benefit, not the disadvantage, of the pregnant woman," *Planned Parenthood*, 522 P.3d at 1203-04, and there is no direct conflict under even the most capacious view of EMTALA.

### C. Idaho draws the same lines as Congress, and HHS cannot override either.

**1.** The government has no response to the Legislature's argument that Idaho's exceptions mirror Congress's decision to allow abortion-related funding only in cases of rape, incest, or where there is "danger of death" due to a "physical condition." Pub. L. 118-47, §§613-614, 810, 506-507, 138 Stat. 568, 591, 703 (2024); *see* Leg.Br.55-56. Like Idaho, Congress draws the line at pregnancy conditions endangering a mother's "life" across government programs. *E.g.*, 10 U.S.C. §1093; 22 U.S.C. §2151b(f); Pub. L. 102-585, 106 Stat. 4947 (38 U.S.C. §1710 note); Pub. L. 118-47, §§613-614, 810, 506-507, 138 Stat. 568, 591, 703. That Congress has struck the same balance as Idaho "is surely evidence that Congress does not view such a restriction" under state law "as

incompatible" with federal law. *De Veau v. Braisted*, 363 U.S. 144, 156 (1960) (plurality op.).

Nor does the government explain the conundrum that its contrary interpretation creates: If EMTALA requires abortions that Idaho prohibits, as the government contends, then EMTALA also requires abortions that Congress won't fund. Leg.Br.53-57. That makes no sense for Spending Clause legislation. And it fails to read federal law "as a harmonious whole." *Epic Sys.*, 584 U.S. at 502. To the extent Congress ever thought about "medically required pregnancy termination under EMTALA," U.S.Br.23, there is no reason to interpret EMTALA to require abortions beyond the "danger of death" scenarios that Congress will fund. Pub. L. 118-47, §§506-507, 138 Stat. 703.

**2.** Nor did the Affordable Care Act silently override Congress's longstanding deference to the States on abortion policy. *Contra* U.S.Br.17-18; Am. Hosp. Ass'n Br.21-24. The government contends 42 U.S.C. §18023(d), referring to "emergency services as required by … 'EMTALA,'" means "pregnancy termination" is "required stabilizing care under EMTALA" because preceding subsections refer to abortion. U.S.Br.18. But those preceding

subsections reflect Congress's neutrality on abortion—barring federal funds for abortion, §18023(b)(2), disclaiming preemption of state abortion laws, §18023(c)(1), and reaffirming federal conscience protections, §18023(c)(2). President Obama's contemporaneous executive order confirmed that the ACA "maintains current Hyde Amendment restrictions," Exec. Order No. 13535, 75 Fed. Reg. 15,599, 15,599 (Mar. 24, 2010), prohibiting abortion funding except in "danger of death" scenarios, *supra* I.C.1. There is no basis for reading either EMTALA or §18023(d)'s reference to EMTALA to silently override that longstanding policy, leaving room for the States to make legislative judgments.

**3.** Nor can HHS officials override state laws regarding abortion. But that is the nub of the government's preemption theory: HHS can decide, despite EMTALA's silence, that EMTALA requires abortions contrary to state law. The government's assertion that "this is not an agency-delegation case" implicating the major questions doctrine, U.S.Br.25, is irreconcilable with its reliance on HHS guidance as its source of authority requiring Idaho hospitals to perform abortions contrary to Idaho law, U.S.Br.35-36. Congress did

not give federal officials any such power to dictate the course of medical treatment under EMTALA. *See* §1395. To say otherwise offends the major questions doctrine. Leg.Br.58-61. If Congress were to depart from longstanding congressional policy, including that embodied in the Hyde Amendment, any "reasonable interpreter would expect [Congress] to make the big-time policy calls itself" in EMTALA. *Biden v. Nebraska*, 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring). As for what treatments might be offered in emergency rooms more broadly, HHS said itself before *Dobbs* that "EMTALA does not … establish a national standard of care." 68 Fed. Reg. 53,222, 53,244 (Sept. 9, 2003). The same remains true after *Dobbs*.

### D. The government has not shown it has a cause of action.

The government insists that it can sue Idaho, otherwise it could seek relief only "against providers alone" while States keep "enforcing the federally preempted state law." U.S.Br.45. These arguments lose sight of the statutory scheme and the constitutional basis for it.

As it was in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 328 (2015), Congress codified "the sole remedy" for failure to comply with

EMTALA in the Medicare Act, subjecting participating hospitals to civil penalties and exclusion from Medicare. §§1395cc(b)(2)(A), 1395dd(d)(1). EMTALA violations are reviewed after-the-fact, not *ex ante*, with the help of quality improvement organizations that "assess whether the individual involved had an emergency medical condition which had not been stabilized." §1395dd(d)(3). That "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), especially this *ex ante* suit against a State that has never accepted any abortion condition.

None of the government's cited cases purports to enforce a spending condition against a non-consenting State. In *United States v. Washington*, 596 U.S. 832, 835 (2022), the government sued to challenge state law directly regulating and discriminating against federal employees working at a federal facility. In *Arizona v. United States*, 567 U.S. 387, 395 (2012), the government sued over state law infringing the government's "well settled" power to decide immigration policy as "one national sovereign, not the 50 separate States." In *United States v. Missouri*, 114 F.4th 980, 983-84 (8th Cir. 2024), the

government sued over state law purporting to declare federal gun laws unconstitutional. In *United States v. City of Arcata*, 629 F.3d 986, 988 (9th Cir. 2010), the government sued over state law purporting to prohibit federal military recruiters from recruiting for the U.S. military. In *United States v. United Mine Workers of America*, 330 U.S. 258, 262-66 (1947), the government sued after the United Mine Workers unilaterally terminated a labor agreement with the Secretary of the Interior. And finally, in *Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 250-51 (2011), a Virginia state agency, not the federal government, sued after Virginia accepted federal funds and agreed to comply with funding conditions. None is analogous to the government's suit against Idaho here. *See* Indiana Br.24-26. To allow the government's novel suit to proceed only exacerbates the constitutional flaw in the government's preemption theory. *Infra* II.A.

## II. The Government's Preemption Theory Violates the Spending Clause and Intrudes on Idaho's Reserved Powers.

The government asks this Court to ignore the unconstitutional implications of its preemption theory until after "summary judgment." U.S.Br.46-47. But resolving those constitutional questions becomes "unavoidable" if

the Court finds a direct conflict between EMTALA and Idaho law. *Matal v. Tam*, 582 U.S. 218, 230-31 (2017). There either is or isn't a constitutional basis for the preliminary injunction.

Contrary to the government's suggestion, the parties raised constitutional questions in the district court, and there is no basis for further delaying their resolution simply because the district court declined to consider them. *See United States v. Koyomejian*, 970 F.2d 536, 541 (9th Cir. 1992) (addressing "purely legal" constitutional question not decided by the district court). For starters, the sole cause of action in the government's complaint was "Preemption under the Supremacy Clause and EMTALA." 4-LEG-ER-584. Entertaining that claim required identifying a constitutional hook beyond the Supremacy Clause. "[T]o preempt state law," EMTALA "must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018). The Legislature then raised Spending Clause and other constitutional concerns in a brief proffered to the district court before the preliminary injunction issued. 4-LEG-ER-452-59. The district court "considered" the

Legislature's motion to formally file those constitutional arguments but denied it, including because it would exceed the "15-page limit" for briefing. 4-LEG-ER-394. After the preliminary injunction, the Legislature sought reconsideration and detailed "[c]lear [e]rrors of [c]onstitutional [l]aw," including how the preliminary injunction transgressed constitutional "limits on Congress's power … to secure state compliance with federal objectives." 2-LEG-ER-260-67 (quoting *NFIB v. Sebelius*, 567 U.S. 519, 576 (2012)); *see also, e.g.*, *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) ("By filing a motion for reconsideration," appellant "gave the district court a clear opportunity to review the validity of its order."); *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543-44 (9th Cir. 2016) (finding issue sufficiently raised). The district court declined again to consider those arguments, instead concluding that "the State and the Legislature may appeal." 1-LEG-ER-12. The parties and *amici* have now fully briefed the constitutional issues, and there is no reason for ignoring them. *See Koyomejian*, 970 F.2d at 541; *cf. City of St. Louis v. Praprotnik*, 485 U.S. 112, 120-21 (1988) (observing "[i]t

should not be surprising" if district court arguments were "less detailed" than appellate arguments).

### A. The government errs by assuming Spending Clause legislation preempts just like other legislation.

The government contends EMTALA's spending condition "carries the same force under the Supremacy Clause as any other valid federal law" and States have no "veto power" when Congress funds "entities other than the state." U.S.Br.52. The Constitution confers no such "line-item veto" for state laws. St. Thomas Br.3; *see* Indiana Br.16-24. Voluntary spending conditions do not preempt state criminal laws unless and until the State itself consents to set aside its laws. Just as the government could not pay private actors to rob grocery stores, St. Thomas Br.10-11, the government cannot pay hospitals to violate state abortion restrictions, Leg.Br.64-74.

**1.** As the government acknowledged before the Supreme Court, this attempt to preempt state criminal laws with a voluntary spending condition is unprecedented. Official Tr. of Oral Arg. 68:4-71:8, *Moyle v. United States*, 144 S. Ct. 2015 (2024). And "sometimes the most telling indication of a severe

constitutional problem is the lack of historical precedent for Congress's action." *NFIB*, 567 U.S. at 549 (cleaned up).

None of the government's cited cases supports any such spending power. Relying principally on *United States v. Butler*, 297 U.S. 1 (1936), the government contends it can fund hospitals directly, and state law must give way to its chosen funding conditions. U.S.Br.52-53. But the government in *Butler* did *not* contend it could "regulate agricultural production" only to "promote the general welfare," and the Court in *Butler* held that the federal program was "a matter beyond the powers delegated to the federal government," with or without voluntary consent. 297 U.S. at 64, 68, 74-75; *see also Linder v. United States*, 268 U.S. 5, 18 (1925) ("Obviously, direct control of medical practice in the states is beyond the power of the federal government. Incidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure."). *Butler* thus had no occasion to consider whether the government, for example, could pay cotton farmers to violate state criminal laws. But after *Butler*, the Court articulated basic rules that the

federal government cannot "force a … law" upon States without their consent. *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 595 (1937). States have the option of "not yielding." *Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 143-44 (1947). And "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992). So while Congress can offer "financial inducement" to States, it cannot change state policy by "compulsion." *NFIB*, 567 U.S. at 580. The government's contrary theory—that the federal government can declare state law stops at a Medicare-participating hospital's front door—converts the Spending Clause into an "instrument for total subversion of the governmental powers reserved to the individual states." *Butler*, 297 U.S. at 75.

The government's other cited cases concern federal funding itself, not conditions of funding. *See* Leg.Br.69-70. In *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 90-91 (2017), for example, state law prohibited the government from seeking "to return healthcare costs earlier paid out by the [federal government's insurance] carrier." Similarly in *Bennett v. Arkansas*,

485 U.S. 395, 396 (1988) (per curiam), the State attempted to attach federal Social Security funds. And in *Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256, 257-58 (1985), the State attempted to control the way in which federal funds were distributed. Those funding cases cannot answer the question here: whether the government can preempt with a *condition* of funding, so far afield from Medicare dollars that the Hyde Amendment prohibits paying for the abortions the government says EMTALA requires and Idaho prohibits. Leg.Br.55-56.

The government's remaining cases concern spending conditions that States themselves accepted. Those cases stand for the unremarkable proposition that States cannot take federal funds and then not abide by voluntarily accepted funding conditions. In *King v. Smith*, 392 U.S. 309 (1968), *Townsend v. Swank*, 404 U.S. 282 (1971), and *Carleson v. Remillard*, 406 U.S. 598 (1972), States could not re-define who was a "parent" eligible to receive federal funds through the Aid to Families With Dependent Children program when States voluntarily accepted "federal terms and conditions" to distribute those funds "to all eligible individuals." *King*, 392 U.S. at 311, 333 & n.34; *see*

*Carleson*, 406 U.S. at 600-01. But as Chief Justice Burger cautioned in *Townsend*, that program was "in no way mandatory upon the States under the Supremacy Clause." 404 U.S. at 292 (Burger, C.J., concurring in judgment). So too here—the government's purported abortion condition cannot be "mandatory" when Idaho never knowingly or voluntarily accepted it. Leg.Br.68-69.

**2.** The government's remaining arguments about its spending power are at too high a level of generality. For example, the government contends that "Congress made compliance with EMTALA an 'unambiguous' condition" of Medicare funding. U.S.Br.48. But the question is not whether EMTALA compliance is unambiguous; it is whether the supposed requirement to offer treatment contrary to state law, unspoken in EMTALA, is unambiguous. For example, in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), the Court did not ask whether Congress unambiguously required States' compliance generally with the Developmentally Disabled Assistance and Bill of Rights Act, but instead whether Congress unambiguously required States to specifically provide "least restrictive" living arrangements

under that Act. *Id.* at 18. Here too, there is "no knowing acceptance" if a recipient "is unaware of the conditions or is unable to ascertain what is expected of it" under EMTALA. *Id.* at 17.

For another example, the government contends that "compliance with EMTALA is 'reasonably related' to Medicare's purpose to improve access to healthcare." U.S.Br.48. But that does not grapple with the supposed abortion condition, which is so "unrelated 'to the federal interest'" underlying Medicare, *South Dakota v. Dole*, 483 U.S. 203, 207 (1987), that Congress would prohibit funding some of those abortions. Leg.Br.55-56.

**3.** Finally, the government argues that EMTALA is not unconstitutionally coercive because it "does not direct states to regulate in a particular way" or "take any affirmative regulatory steps." U.S.Br.55. But that ignores the implications of the government's spending argument. If the government is right that EMTALA requires medical treatment prohibited by state law, then either hospitals cannot agree to funding *ex ante*, or hospitals will lose funding *ex post* if ever a circumstance arises when hospitals won't violate state law. *See* Leg.Br.73-74 (discussing threat to withdraw all Medicare

funding); *see also* St. Thomas Br.10-11 (discussing how illegal contracts are presumptively unenforceable). Either way, Idaho must step in to cover $3.4 billion in lost Medicare funding and to care for nearly 400,000 Idaho Medicare enrollees without Medicare providers—all because Idaho expects its hospitals to comply with state law. Leg.Br.73. That "gun to the head" is little different than the unconstitutionally coercive Medicaid condition in *NFIB*. 567 U.S. at 581. The federal government cannot "pressur[e] the States to accept policy changes," *id.* at 580, whether in the form of expanded Medicaid coverage or abortion laws.

## B.    Requiring abortions is not regulating commerce.

For the first time, the government contends that the Commerce Clause empowers Congress to require abortions under EMTALA. U.S.Br.55-56. Citing *Sossamon v. Texas*, 563 U.S. 277 (2011), the government argues that EMTALA can be both spending and commerce legislation. U.S.Br.55. But *Sossamon* noted, "No party contend[ed] that the Commerce Clause permitted Congress to address [RLUIPA's] alleged burden on religious exercise at issue." 563 U.S. at 282 n.1. And here, the notion that EMTALA regulates

36

"commerce" is belied by EMTALA's application only to hospitals taking Medicare funds. §1395cc(a)(1)(I)(i). EMTALA is spending legislation, not commerce, lest something that "looks like a duck, walks like a duck, and quacks like a duck, is in fact" not "a duck" but a goose. *In re Safeguard Self-Storage Tr.*, 2 F.3d 967, 970 (9th Cir. 1993). It is simply part of the Medicare "contract," where "in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17.

Quoting *NFIB*, the government says Medicare "regulates a complex national healthcare market" where "providers" and others are "engaged in 'existing commercial activity.'" U.S.Br.55. But *NFIB rejected* that leap in logic. *See* 567 U.S. at 548-55. Just as Congress could not justify the individual mandate by its effect on the healthcare market, and just as Congress could not "address the diet problem by ordering everyone to buy vegetables," *id.* at 554, it cannot require abortions based on a purported effect on the existing healthcare market, *contra* U.S.Br.55-56.

Citing *United States v. Bird*, 124 F.3d 667 (5th Cir. 1997), the government suggests Congress can preempt "contrary state [abortion] law" *via* the

Commerce Clause, just as Congress prohibited obstructing entrances to abortion clinics with the FACE Act. U.S.Br.56. But the FACE Act does not compel performing abortions. Its savings clause says the Act should not be construed "to interfere with the enforcement of State or local laws regulating the performance of abortions or other reproductive health services." 18 U.S.C. §248(d)(4). Neither *Bird* nor any other cited case contemplates a *commerce* power to require performing abortions contrary to state law. *Contra id.* While "Congress has substantial power … to encourage the States to provide" abortions if that's what Congress wants, "the Constitution does not confer upon Congress the ability simply to compel the States to do so." *New York*, 505 U.S. at 149.

*

If there is no federal power to use EMTALA to override state law, then the preliminary injunction intrudes on the State's reserved powers under the Tenth Amendment. *See Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). For the federal government to set "national standards" for medicine, *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006), Congress must do so "clearly and

unequivocally," *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 443 (1821), not with an "obscure grant of authority," *Gonzales*, 546 U.S. at 274-75, and not unconstitutionally, *see New York*, 505 U.S. at 149. It inverts our federalist system to construe EMTALA to preempt validly enacted state abortion laws. And while the government insists that the injunction is not overly broad, that forgets that any injunction without any constitutional basis offends our "system of dual sovereignty." *Gregory*, 501 U.S. at 457. "The Constitution limited but did not abolish the sovereign powers of the States, which retain[] 'a residuary and inviolable sovereignty.'" *Murphy*, 584 U.S. at 470.

## CONCLUSION

The Court should reverse and vacate the preliminary injunction.

Dated this 5th day
of November, 2024

Daniel W. Bower
HILTY, BOWER,
 HAWS & SEABLE PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
(208) 345-3333
dbower@hbhslaw.com

Respectfully submitted,

/s/ Taylor A.R. Meehan

Taylor A.R. Meehan
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Supervised by principals of the firm
 licensed to practice in Virginia

Counsel for Idaho Legislative Appellants

**CERTIFICATE OF COMPLIANCE**

In compliance with Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32-1, I certify that according to the word count feature of the word processing program used to prepare this brief, this brief contains 6,938 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure Rule 32(f) and Circuit Rule 32-1, and complies with the typeface requirements and length limits of Federal Rule of Appellate Procedure Rule 32(a) and Circuit Rule 32-1.

Dated: November 5, 2024 _/s/ Taylor A.R. Meehan_

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing brief on November 5, 2024, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

_/s/ Taylor A.R. Meehan_