# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF IDAHO,

*Defendant-Appellant,*

v.

MIKE MOYLE, Speaker of the Idaho House of Representatives; CHUCK WINDER, President Pro Tempore of the Idaho Senate; THE SIXTY-SEVENTH IDAHO LEGISLATURE,

*Movants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:22-cv-00329-BLW

## REPLY BRIEF OF APPELLANT STATE OF IDAHO

JAMES A. CAMPBELL
JOHN J. BURSCH
ERIN M. HAWLEY
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jcampbell@ADFlegal.org
jbursch@ADFlegal.org
ehawley@ADFlegal.org
lwilson@ADFlegal.org

RAUL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
SOLICITOR GENERAL
700 W Jefferson St #210
Boise, ID 83720
(208) 332-3548
alan.hurst@ag.idaho.gov

*Counsel for Appellant State of Idaho*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ii

Introduction ........................................................................................................1

Reply Argument ...................................................................................................2

I.    The federal government cannot preempt state law by paying private parties to violate it. ......................................................................................2

II.    The United States lacks a cause of action to enforce EMTALA. ..........................6

III.    EMTALA does not preempt the Idaho Defense of Life Act. ............................9

      A.    The United States' interpretation cannot survive the clear-statement canons that apply here. ..................................................9

      B.    EMTALA imposes a duty to "the unborn child" that the United States fails to give effect. ................................................................11

      C.    EMTALA does not displace state regulation of medical practice. ...........14

      D.    The United States misconstrues EMTALA's purpose. ...........................16

IV.    At minimum, the district court's injunction needs to be vacated or tailored based on subsequent developments. ......................................................18

      A.    The United States has no irreparable harm. ....................................18

          1.    The administration's "airlift" claims are unsupported. .................18

          2.    The United States suffers no irreparable harm from the enforcement of an Idaho law that does not conflict with EMTALA. ........................................................................20

      B.    The United States offers no good reason to refrain from modifying the injunction to reflect its concessions. ..........................................22

Conclusion ........................................................................................................24

Certificate of Service ...........................................................................................25

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Arlington Central School District Board of Education v. Murphy,*
    548 U.S. 291 (2006) ....................................................................10

*Armstrong v. Exceptional Child Center, Inc.,*
    575 U.S. 320 (2015) ................................................................ 6, 8

*Atlas Life Insurance Company v. W. I. Southern, Inc.,*
    306 U.S. 563 (1939) ......................................................................6

*Burditt v. HHS,*
    934 F.2d 1362 (5th Cir. 1991) ...................................................17

*Carleson v. Remillard,*
    406 U.S. 598 (1972) ......................................................................3

*Flemming v. Matteson,*
    26 F.4th 1136 (9th Cir. 2022)......................................................4

*Gatewood v. Washington Healthcare Corp.,*
    933 F.2d 1037 (D.C. Cir. 1991) .................................................17

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ......................................................................4

*Hardy v. New York City Health & Hospital Corp.,*
    164 F.3d 789 (2d Cir. 1999) ......................................................16

*In re Baby K,*
    16 F.3d 590 (4th Cir. 1994) .......................................................17

*King v. Smith,*
    392 U.S. 309 (1968) ......................................................................3

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) .....................................................20

*Moses v. Providence Hospital & Medical Centers, Inc.,*
    561 F.3d 573 (6th Cir. 2009) .....................................................17

*Moyle v. United States,*
    144 S. Ct. 2015 (2024) ................................................ 11, 18, 21, 23

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) .................................................................2, 3, 4, 5, 6

*Planned Parenthood Arizona Inc. v. Betlach*,
    727 F.3d 960 (9th Cir. 2013) ...................................................16

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ...................................................10

*Roberts v. Galen of Virginia, Inc.*,
    525 U.S. 249 (1999) ...................................................17

*Silvers v. Sony Pictures Entertainment, Inc.*,
    402 F.3d 881 (9th Cir. 2005) ...................................................7

*Southwest Airlines Company v. Saxon*,
    596 U.S. 450 (2022) ...................................................9

*Texas v. Becerra*,
    2024 WL 4426546 (U.S. Oct. 7, 2024) ...................................................11

*Texas v. Becerra*,
    89 F.4th 529 (5th Cir. 2024) ...................................................11, 14

*Thomas v. Christ Hospital & Medical Center*,
    328 F.3d 890 (7th Cir. 2003) ...................................................17

*Thompson v. Allen County*,
    115 U.S. 550 (1885) ...................................................6

*Townsend v. Swank*,
    404 U.S. 282 (1971) ...................................................3

*United States v. Butler*,
    297 U.S. 1 (1936) ...................................................3

*United States v. Idaho*,
    82 F.4th 1296 (9th Cir. 2023) ...................................................21

*United States v. Idaho*,
    83 F.4th 1130 (9th Cir. 2023) ...................................................21, 22

*Virginia Office for Protection & Advocacy v. Stewart*,
    563 U.S. 247 (2011) ...................................................8

*West Virginia v. E.P.A.*,
    597 U.S. 697 (2022) ................................................................................................11

*Wickard v. Filburn*,
    317 U.S. 111 (1942) ................................................................................................6

**Statutes**

42 U.S.C. § 1320c-3 ........................................................................................................14

42 U.S.C. § 1395 ...................................................................................................... 10, 12

42 U.S.C. § 1395dd ........................................ 6, 7, 9, 10, 11, 12, 14, 15, 22, 24

42 U.S.C. § 18023 ...........................................................................................................15

**Other Authorities**

Centers for Medicare & Medicaid Services, State Operations Manual, App. V ............14

*See 'I think it could potentially ignite a collapse of our health care system': Abortion in Idaho*,
    KTVB (June 20, 2024) ................................................................................................19

**Rules**

Fed. R. Civ. P. 65 ............................................................................................................23

Fed. R. Evid. 201 ............................................................................................................20

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ..............................................................................................5

**INTRODUCTION**

When a pregnant woman comes to an emergency room, she and her unborn child should never be denied stabilizing treatment available under state standards of care. Yet the United States insists EMTALA mandates the opposite: that it requires emergency rooms to provide care that is *not* available under state standards and which results in the death of unborn children whom both EMTALA and state law protect. The government's position conflicts with EMTALA's text and purpose, and it diverges sharply from the statute's nearly four-decade enforcement history.

But this Court need not parse EMTALA's provisions to reverse the injunction. As Idaho has argued from this lawsuit's inception, the Spending Clause forbids the United States from paying private hospitals to violate state law. And the United States cannot invoke an equitable cause of action that Congress has foreclosed.

The United States also cannot show irreparable harm. In a recent organizational deposition, a corporate representative of Idaho's largest healthcare system could not establish—as the government has claimed—that women needed to be airlifted out of Idaho for abortions (as opposed to other care). Quite the opposite: news reports suggest that at least one airlifted mom gave birth to healthy twins. The irreparable harms are on Idaho's side. This Court should reverse and vacate the injunction.

At minimum, the Court should narrow the injunction. In the Supreme Court, the United States conceded that (1) doctors and hospitals are protected if they object to providing abortions on conscience grounds, and (2) the stabilizing care required by EMTALA applies only to "acute" physical emergencies and not mental health conditions. Because the injunction does not reflect these limits, it must be modified.

# REPLY ARGUMENT

## I. The federal government cannot preempt state law by paying private parties to violate it.

The United States accepts "at face value" that Idaho has no public hospitals with emergency rooms that participate in Medicare. U.S.Br.52. Instead, the federal government doubles down on the breathtaking assertion that it may bind nonconsenting states to conditions to which they never agreed by entering into agreements with private parties. The government does not even dispute that its view of the spending power would allow Congress to preempt state law nationwide—for example, by mandating, or forbidding, access to gender transition surgeries for minors simply by paying private hospitals to violate state law. That cannot be right.

The United States acknowledges (at 47) that Congress's spending authority is limited by providing "unambiguous" notice of its conditions. It says it has complied with these limitations because *hospitals* were on clear notice of what was required. Not so. For decades, no hospital had clear notice of what the government now says EMTALA requires. Idaho.Br.27–41.

More to the point, a third party cannot bind a state to an agreement to which it did not agree. The United States is not trying to preempt an internal *hospital* regulation but a democratically enacted *state law*. A private hospital's agreement to violate state law can no more bind Idaho than could New York's acceptance of a funding condition bind Texas. The "legitimacy of Congress's exercise of the spending power … rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J.) (cleaned

up). The United States' contract with a private hospital cannot bind a nonconsenting state.

The United States argues that, if a federal law is validly enacted under the Spending Clause, it governs not only those who take the money, but those who don't. Unsurprisingly, none of its cases so hold. *United States v. Butler* simply stated in dicta that a state may not declare a federal "contract void and thus prevent those under the state's jurisdiction from complying with its terms"—*not* that the federal contract binds those who have not assented to it. 297 U.S. 1, 74 (1936). And the government's other cases concerned limits on state-law interference with the conditions of "money allotments to the States"—not, as here, a payment to a private party that the government says preempts state law. *E.g.*, *King v. Smith*, 392 U.S. 309, 333 n.34 (1968); *Carleson v. Remillard*, 406 U.S. 598, 600-01 (1972); *Townsend v. Swank*, 404 U.S. 282, 285-86 (1971).

The United States' view of the spending power also violates the anti-coercion doctrine. A state's acceptance of Spending Clause conditions must be voluntary, which means the government can't exert "undue influence" over a state. *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.) (cleaned up). This anti-coercion principle ensures that states can exercise their "unfettered will" when accepting federal conditions. *Id.* at 579 (opinion of Roberts, C.J.). But here, the government insists that Idaho's will is irrelevant—that it need not even accept federal conditions to be bound by them. It's not an exaggeration to say that such a view of the spending power "would present a grave threat to the system of federalism created by our Constitution." *Id.* at 675 (joint dissent of Scalia, Kennedy, Thomas, and Alito, J.J.).

Lacking any adequate merits response, the United States says that Idaho forfeited its Spending Clause argument. U.S.Br.46. Not so. In its first expedited preliminary injunction brief, submitted just two weeks after this case was filed, Idaho argued that the administration was "not likely to succeed on the merits" due to "serious concerns" that its novel interpretation of EMTALA's stabilization requirement was "invalid as coercive spending clause legislation." Resp. to U.S.' Mot. for Prelim. Inj. at 19 n.10, No. 1:22-cv-329 (D. Idaho Aug. 16, 2022), ECF No. 66 (citing *Sebelius*, 567 U.S. at 575-87). Idaho raised the argument again at greater length in its motion for reconsideration, which is also subject to this appeal. 3-ER-174–175. The arguments were then re-asserted in initial merits briefing in this Court, Legislature Opening Br. at 63, No. 23-35450 (9th Cir. Aug. 7, 2023), ECF No. 8; Idaho Opening Br. at 32, No. 23-35450 (9th Cir. Aug. 7, 2023), ECF No. 10-1, and in party and amicus briefing in the Supreme Court. *E.g.*, Amici Br. of Indiana, et al., *Idaho v. United States*, No. 23A470 (U.S. Nov. 27, 2023); Br. of Legislature at 48, *Moyle v. United States*, No. 23-726 (U.S. Feb. 20, 2024); Amicus Br. of Prolife Ctr. at Univ. of St. Thomas, No. 23-726 (U.S. Feb. 27, 2024). Plus, because the issue is "purely one of law," this Court is free to consider it regardless. *Flemming v. Matteson*, 26 F.4th 1136, 1144 (9th Cir. 2022).

The United States also raises a new argument: that EMTALA has preemptive force as a valid exercise of Congress's power to regulate interstate commerce and "'set uniform national standards' on matters of 'health and safety,' including 'medical practice.'" U.S.Br.50 (quoting *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006)). The government hasn't suggested this before because the argument is without merit. EMTALA

doesn't set a uniform national standard—it sets a standard that *applies only to hospitals that take federal funds*, because it is Spending Clause legislation. If a public hospital with an emergency room does not take Medicare funds, it is not subject to EMTALA.

Nor is the commerce power unbounded as the government suggests. Instead, the Supreme Court has cautioned that the Commerce Clause "must be read carefully to avoid creating a general federal authority akin to the police power." *Sebelius*, 567 U.S. at 536 (opinion of the Court). The Constitution grants Congress only the power to "*regulate* Commerce." U.S. Const. art. I, § 8, cl. 3 (emphasis added). This power "presupposes the existence of commercial activity to be regulated." *Sebelius*, 567 U.S. at 550 (opinion of Roberts, C.J.).

By its terms, EMTALA "does not regulate existing commercial activity." *Id.* at 552. Rather, it requires participating hospitals to treat people who lack the ability to pay—i.e., those patients the hospitals were *not* treating but dumping before EMTALA's enactment. The government insists (at 56) that EMTALA "permissibly regulates commercial activity by creating a minimum federal standard for the provision of emergency healthcare services—services that are then billed and often paid for, whether by the federal government, national insurers, private parties, or other sources of funding." But if hospitals were already providing the services that EMTALA requires, there would have been no need for EMTALA in the first place. The United States is requiring hospitals with emergency rooms who take Medicare dollars to do something those hospitals were not doing.

This case is even more attenuated from commerce than the mandate to purchase insurance in *Sebelius*. There, Congress required individuals to purchase insurance and enter the stream of commerce. Here, under the government's new theory, Congress would not only be requiring participating hospitals to enter the stream of commerce, but to do so *for free*. Because EMTALA requires treatment without payment, the provision of these services does not reduce the demand for a commodity, a la *Wickard v. Filburn*, 317 U.S. 111 (1942). The government can no more manufacture commerce by requiring medical treatment than it can by requiring individuals to purchase insurance. "The Framers gave Congress the power to *regulate* commerce, not to *compel* it." *Sebelius*, 567 U.S. at 555 (opinion of Roberts, C.J.).

The only monetary transaction implicated by EMTALA is not commerce at all, but the conditional grant of federal funds to hospitals that participate in Medicare. 42 U.S.C. § 1395dd. And that transaction, of course, concerns Congress's spending power, not its power to regulate commerce. The government cannot shoehorn the former into the latter.

## II.     The United States lacks a cause of action to enforce EMTALA.

The United States does not contest that, like any plaintiff, it must have a "cause of action" and that the Supremacy Clause does not supply one. *Atlas Life Ins. Co. v. W. I. Southern, Inc.*, 306 U.S. 563, 570 (1939). So the question is whether Congress has expressed an "intent to foreclose" equitable suits under EMTALA by providing a detailed enforcement scheme, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 328 (2015), including an "adequate remedy at law," *Thompson v. Allen Cnty.*, 115 U.S. 550, 554 (1885). The answer is yes. Idaho.Br.23–24.

The United States' principal response is that "EMTALA generally treats equitable relief as an appropriate remedy." U.S.Br.44. But the EMTALA provision on which the United States relies—42 U.S.C. § 1395dd(d)(2)(A)-(B)—grants that relief only to private plaintiffs, not the United States, and even then, only against "participating hospitals," not against non-participating states. As this Court has recognized en banc, "Congress' explicit listing of who *may* sue … should be understood as an *exclusion of others* from suing." *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc). So rather than supporting the United States' position, this EMTALA provision underscores Idaho's point: Congress intended to foreclose (a) equitable relief *for* the United States, and (b) equitable relief *against* anyone other than "participating hospitals."

The United States' first backup argument is that EMTALA "recognizes the important role that the federal government plays in ensuring compliance." U.S.Br.44. But again, the EMTALA provision to which the United States points—42 U.S.C. § 1395dd(d)(3)—proves Idaho's point. This provision grants the United States (a) only non-equitable remedies (b) against hospitals that take federal Medicare dollars. *Id.* (HHS may "impos[e] sanctions" or "terminat[e] a hospital's participation" in Medicare). Again, if Congress desired to give the United States equitable remedies against states like Idaho—which has no public hospitals with emergency departments that take federal Medicare dollars—it could have easily done that. This Court should not reinterpret EMTALA as though Congress did.

The United States says its equitable enforcement of EMTALA against states serves "similar interests" to private-party equitable enforcement against hospitals that

accept Medicare funds. U.S.Br.44. That's a non sequitur. Holding a private hospital to the terms of its contract with the federal government is not remotely like nullifying the law of a state that has *not* consented to EMTALA. Courts should not transform the equitable remedy that Congress expressly gave private parties against participating hospitals into a remedy that Congress declined to give the United States in any circumstance.

The United States' next argument is another point in Idaho's favor: "the statute's express remedies are limited" to actions against "hospitals and physicians," not states. U.S.Br.45. This feature shows that Congress did not intend to create express remedies against states that have no Medicare-funded public hospitals with emergency rooms. This is further evidence of congressional "intent to foreclose" equitable suits against states. *Armstrong*, 575 U.S. at 328.

The United States also cites *Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247 (2011), and says it is "implausible that, by authorizing these [express] remedies against hospitals, Congress intended to displace traditional remedies against states." U.S.Br.45. The Court there said that the federal government's ability to "exercise oversight of a federal spending program … does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under *Ex parte Young*." 563 U.S. at 256 n.3 (cleaned up). That observation makes sense when the federal government is seeking to hold state officials to the benefit of the United States' bargain *with that state*. But it's not the situation here, where the United States is seeking equitable relief against a state that did not enter into the bargain. No statute or case supports that.

The United States' final argument is that there is an incongruity between Idaho's (supposed) position—"that Congress intended to foreclose all remedies against states"—when "Congress expressly preempted state laws that directly conflict with EMTALA." U.S.Br.45 (citing 42 U.S.C. § 1395dd(f)). Leaving aside that Idaho's Defense of Life Act does not directly conflict with EMTALA, the United States misconstrues Idaho's argument. Idaho takes no position on the United States' ability to sue states or their public hospitals if those hospitals accept Medicare dollars. But the United States cannot obtain an injunction against a state that has no public hospitals with emergency departments and that has not accepted the Medicare bargain. That lack of consent dooms the United States' case.

### III. EMTALA does not preempt the Idaho Defense of Life Act.

The United States frames the merits question as a dispute over whether "[t]he district court properly exercised its discretion." U.S.Br.13. But the interplay between EMTALA and the Idaho Defense of Life Act is a purely legal question of statutory interpretation that the United States concedes this Court reviews de novo. *Id.* And it's one the district court got wrong.

#### A. The United States' interpretation cannot survive the clear-statement canons that apply here.

The government's response brief barely acknowledges the "canons of statutory interpretation" that govern its claim of federal preemption here. *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). But it cannot escape those clear-statement rules.

*First*, the administration cannot overcome the default "assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The administration's response is to recharacterize EMTALA's *savings* clause as an express preemption clause. U.S.Br.4, 33–34. But the savings clause explains that EMTALA "*do[es] not preempt* any State or local law requirement, *except to the extent* that the requirement *directly conflicts* with" an EMTALA requirement. 42 U.S.C. § 1395dd(f) (emphasis added). And it reaffirms the statutory presumption against preemption that frames the entire Medicare Act: "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine." 42 U.S.C. § 1395.

*Second*, the United States fares no better under the canon requiring Spending Clause conditions to be set out "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The government's only response is that "Congress made compliance with EMTALA an 'unambiguous' condition for hospitals that choose to participate in Medicare." U.S.Br.48. Yet the issue is not whether EMTALA governs participating hospitals (it does), but what EMTALA means. And the government does not attempt to show that a statute that directs hospitals to care for unborn children unambiguously mandates ending their lives.

*Third*, the administration tries to dodge the major questions doctrine by limiting it to questions of agency action. U.S.Br.25. This is doubly flawed. To begin, it ignores that the foundation of the major questions doctrine is the common-sense interpretive principle that "Congress intends to make major policy decisions itself." *West Virginia*

*v. E.P.A.*, 597 U.S. 697, 723 (2022) (cleaned up). In addition, this case *does* implicate a question of agency action—whether the administration's 2022 action through HHS is based on power conferred by Congress. The Fifth Circuit has held that it is not, and the Supreme Court recently denied review. *Texas v. Becerra*, 89 F.4th 529, 533 (5th Cir. 2024), *cert. denied*, 2024 WL 4426546 (U.S. Oct. 7, 2024).

## B.   EMTALA imposes a duty to "the unborn child" that the United States fails to give effect.

As Idaho explained in its opening brief, EMTALA does not even mention abortion, much less require it. Instead, EMTALA demands that covered hospitals care for both "the woman" *and* "her unborn child." 42 U.S.C. § 1395dd(e)(1)(A)(i). Given this statutory language, it is "plainly unsound" for the United States to insist that EMTALA was an abortion mandate all along. *Moyle v. United States*, 144 S. Ct. 2015, 2027 (2024) (Alito, J., dissenting).

The United States first says that Appellants argued in the district court that EMTALA requires abortion in certain circumstances but "now claim the opposite." U.S.Br.20. Not so. Idaho agrees that EMTALA might require a doctor to terminate a pregnancy in cases where Idaho law does not prohibit it—for example, in the case of an ectopic pregnancy. Idaho.Br.6. Idaho's argument is not new.

So the United States pivots and says that "Appellants provide no basis to write an exception for pregnancy termination into EMTALA." U.S.Br.21. That's backward. Given that EMTALA (a) does not mention abortion, (b) requires protection of the "unborn child," and (c) generally defers to a state's regulation of the practice of medicine, Idaho.Br.25–41, the burden is on the United States to show how EMTALA can

possibly be read to *require* abortion that violates state law. The United States does not identify any clear statement that would show an abortion mandate in this context; instead, it points only to EMTALA's generic directive to stabilize. Against a Medicare Act backdrop that insists "[n]othing in this subchapter"—including EMTALA— "shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided," 42 U.S.C. § 1395, that's not enough.

Turning to EMTALA's protection of an "unborn child," the United States tries to limit that protection to "only one circumstance: when a pregnant woman is in labor and 'having contractions.'" U.S.Br.21 (citing 42 U.S.C. § 1395dd(e)(1)(B), (3)(A)). But that ignores subsection (e)(1)(A), which broadly defines an "emergency medical condition" that requires stabilization to include those that place "the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy." (emphasis added). In other words, the "unborn child" is a second patient that must be stabilized if the health of the mother *or* the unborn child is jeopardized. There is no limitation to labor.

Having ignored the most pertinent statutory language, the United States then invokes the drafting convention that "[w]hen Congress intends to create special rules governing abortion," it "does so explicitly." U.S.Br.22. Yet the United States identifies no provision—much less an explicit one—that compels abortion in violation of state law.

Next, the United States tries to confine the hospital's stabilization obligation as running to a single "individual": the mother. U.S.Br.23–24. That's not what the statute says or even implies—again, subsection (e)(1)(A) demands that hospitals stabilize conditions that place the health of the unborn child in jeopardy. Say that a pregnant mother presented at a covered hospital with severe preeclampsia, a serious pregnancy disorder that involves high blood pressure and other symptoms that can threaten the health of the mother *and* her baby. Severe preeclampsia can be treated with hospitalization, antihypertensive drugs and magnesium sulfate (for the mother), and corticosteroids (for the baby) until the baby can be safely delivered. Under the United States' version of EMTALA, if the mother instead elected to abort her child, the hospital would not have to provide the stabilizing treatment but instead would have to perform the abortion. That can't be what Congress intended. In one breath, the United States describes EMTALA's expansion to protect an unborn child "salutary." U.S.Br.24. In the next, the United States says EMTALA provides the child no protection at all.

The United States raises a red herring when it says that Idaho's "dual stabilization" reading of EMTALA (i.e., stabilization of the mother *and* unborn child) makes no sense where a "pregnancy complication itself means the fetus would not have survived even absent immediate pregnancy termination." U.S.Br.25. That's not Idaho's argument. If a pregnancy complication makes it impossible to save the unborn child, then there is no possible stabilizing treatment to be provided to the child.

### C.    EMTALA does not displace state regulation of medical practice.

The United States presses a point on which the parties agree: EMTALA requires a Medicare-funded hospital to provide a stabilization treatment "consistent with accepted clinical standards." U.S.Br.14–15, 30–31, 35–36. That leaves a key question: who sets "accepted clinical standards?" It is not the federal government. After all, the federal circuits have unanimously held that EMTALA's stabilization requirement is not a national standard of care but merely a duty to treat, Idaho.Br.33–34 & n.1, including in this very context, *Texas*, 89 F.4th at 543 (rejecting the administration's attempt to construe EMTALA as an abortion mandate because "EMTALA does not impose a national standard of care").

Instead, each state sets those "accepted clinical standards" by exercising its traditional police power to regulate the practice of medicine. Idaho.Br.35–37; U.S.Br.31 (citing Idaho's Emergency Application for a Stay Pending Appeal at 17, *Idaho v. United States*, No. 23-727 (U.S. Nov. 20, 2023)). That is consistent with EMTALA's limitation of treatment options to those "available at the hospital." 42 U.S.C. § 1395dd(b)(1)(A). The federal government's own interpretation of that provision shows that "available" treatment options are limited by the "scope of [a hospital staff's] professional licenses," which are granted and limited by state law. Centers for Medicare & Medicaid Services, State Operations Manual, App. V, at 48. And it is consistent with the federal government's enforcement of EMTALA in conformity with state and local "norms of care." 42 U.S.C. § 1320c-3(a)(6). *Contra* U.S.Br.31, 33, 35.

The United States says that when a particular stabilizing treatment is consistent with accepted clinical standards, "EMTALA demands that specific treatment be offered." U.S.Br.15, 30–31. Again, Idaho doesn't disagree—the question is who sets the "accepted clinical standards." Each one of the treatments (epinephrine, blood transfusion, defibrillation, etc.) that CMS has held hospitals deficient for not providing, U.S.Br.15 n.3 (listing treatments), is one that state law allows. But after five decades of CMS enforcement involving countless hospitals and doctors, the United States cannot identify a single example where it declared a hospital in violation of EMTALA for failing to provide a treatment that state law prohibits (i.e., a "conflict," *see* U.S.Br.33–34 (citing 42 U.S.C. § 1395dd(f)). That silence speaks volumes about the federal government's novel theory.

The United States resorts to a savings provision in the Affordable Care Act, U.S.Br.17–18, a statute enacted decades after EMTALA. The government points to subsections (a) and (b), which limit subsidies for abortion and allow insurers to restrict coverage for it, then jumps to subsection (d), which states that nothing in the law "shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law," including EMTALA. 42 U.S.C. § 18023(a)-(b), (d). But just as Idaho predicted in its opening brief, the United States skips subsection (c), which contains an express savings clause stating that it is *not* to be construed to preempt state laws about abortion. Idaho.Br.40–41.

Likewise, Idaho predicted that the United States would, as it did before the Supreme Court, point to a couple of examples in an ocean of enforcement actions that the United States says support its abortion mandate. Idaho.Br.38; U.S.Br.18 &

n.4. But as Idaho explained, none of the United States' examples involved a hospital's failure to provide an abortion that state law disallowed. Idaho.Br.38–39. The same is true with the United States' invocation of various HHS rules that refer to EMTALA but never interpreted it to require abortions disallowed by state law. *Compare* U.S.Br.18–19, *with* Idaho.Br.39–40.

The United States also cites three cases that purportedly recognized, before *Dobbs*, "that EMTALA can require that pregnancy termination be offered." U.S. Br.20. But Idaho anticipated this argument, too, and preemptively distinguished each case. Idaho.Br.40. The United States provides no response. Equally inapposite is this Court's decision in *Planned Parenthood Arizona Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013). U.S.Br.32–33. That case merely held that when determining which providers are "qualified" for a state Medicaid program, the state is limited to considering "the provider's competency and professional standing." 727 F.3d at 969–70. It has no bearing here.

## D. The United States misconstrues EMTALA's purpose.

The United States accuses Idaho of arguing that EMTALA "requires nothing of hospitals beyond 'treat[ing] all patients on the same footing' and does not entitle patients to any particular care." U.S.Br.26. That's not what Idaho is saying. As Idaho has explained, EMTALA "impos[es] a legal duty 'to provide emergency care to all'" so long as the care is available at the hospital and consistent with state standards. Idaho.Br.34 (quoting *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792–93 (2d Cir. 1999)). Idaho cites EMTALA's narrow purpose to show the overreach in the government's reinterpretation of the statute as an abortion mandate.

The United States sets up and knocks down a strawman, asserting that Idaho is advancing a "nondiscrimination rule," a tactic the Supreme Court "rejected" in *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249 (1999) (per curiam). U.S.Br.26–27. There, the lower court held that "to recover in a suit alleging a violation of [42 U.S.C.] 1395dd(b), a plaintiff must prove that the hospital acted with an improper motive in failing to stabilize her," and the Supreme Court disagreed. 525 U.S. at 250. That is not Idaho's argument here, which is that EMTALA takes state standards of care as it finds them. If state law allows a facility to provide a particular treatment, and the treatment is necessary to stabilize a condition, then EMTALA requires the facility to provide the treatment. (No one disputes that EMTALA protects individuals "with and without insurance." U.S.Br.29 (quoting *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1040 (D.C. Cir. 1991))). But if state law prohibits a particular treatment, then the treatment is not available, and EMTALA does not require it.

The administration says EMTALA requires emergency care sufficient to stabilize. U.S.Br.27. Idaho does not disagree if the service is otherwise "available" at the medical center. *E.g. Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 582 (6th Cir. 2009); *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 893–96 (7th Cir. 2003); *Burditt v. HHS*, 934 F.2d 1362, 1368–69 (5th Cir. 1991). Nothing suggests that the hospitals in cases like *In re Baby K*, 16 F.3d 590, 595–96 (4th Cir. 1994), *Moses*, or *Thomas*, U.S.Br.27, could not provide the care requested, either as a matter of state law or due to the hospital's lack of capabilities. Here, the question is whether EMTALA requires hospitals to provide treatment that state law prohibits them from providing for anyone. It does not.

Curiously, the United States—which consistently runs from the statutory text—accuses *Idaho* of failing to grapple with that text by insisting that EMTALA does not interfere with state regulation of the practice of medicine. U.S.Br.28. But that limit is the most fundamental textual commitment and interpretive principle of the entire Medicare Act. 42 U.S.C. § 1395. And the implications of the United States' theory are vast. Consider a state that prohibits a risky, experimental drug. If the United States is correct, then a doctor who determines that the drug is a necessary stabilizing treatment could violate state law. No federal court has so held.

## IV. At minimum, the district court's injunction needs to be vacated or tailored based on subsequent developments.

### A. The United States has no irreparable harm.

#### 1. The administration's "airlift" claims are unsupported.

Since the filing of Idaho's opening brief, the United States' primary argument for irreparable harm has crumbled. Here and in the Supreme Court, the government claimed that when Idaho was allowed to enforce its law while the injunction was stayed, its largest hospital, St. Luke's, purportedly "'had to airlift pregnant women out of Idaho roughly every other week,' as of April 2024, 'compared to once in all of the prior year.'" U.S.Br.40 (quoting *Moyle*, 144 S. Ct. at 2017 (Kagan, J., concurring)). And in a new amicus brief filed here, St. Luke's repeats this charge, via unsworn assertions, that during that time, "six pregnant St. Luke's patients with medical emergencies were transferred out of state for termination of their pregnancy" due to preeclampsia and PPROM, a preterm premature rupture of membranes. Amicus Br. of St. Luke's at 14

(emphasis omitted). But litigation discovery has shown no reason to think this charge is true.

While defending its Defense of Life Act in state court, Idaho tested St. Luke's widely publicized claims. The State served a 30(b)(6) deposition notice on St. Luke's, requesting testimony related to transporting patients out of Idaho to have an abortion. Notice of Deposition of St. Luke's at 2, *Adkins v. State*, No. CV01-23-14744 (Idaho Dist. Ct., Ada County July 3, 2024) (filed with 9/23/2024 Declaration of St. Luke's to Preserve Confidential Information Designations). But when St. Luke's corporate representative was asked about the same six patients the hospital claims were transferred out of state for an abortion, she testified that she did not "know why they chose to be transported," and could only say that "*one of the options* would be ending the pregnancy to maintain the patient's health." Tr. of St. Luke's Dep. at 114:2-22, *Adkins v. State*, No. CV01-23-14744 (Idaho Dist. Ct., Ada County July 16, 2024) (emphasis added) (filed with 9/23/2024 Declaration of St. Luke's to Preserve Confidential Information Designations). And since St. Luke's did not know why these transfers were made, it certainly could not say the transfers were for abortions that could not be performed in Idaho.

Plus, rather than supporting the government's case, other facts about these transfers refute its argument that abortion is the only available treatment for certain conditions. Local Idaho media reported that for at least one of these airlifts—which was supposedly to treat a condition for which the United States insists abortion was the only option—an abortion did not happen. *'I think it could potentially ignite a collapse of our health care system': Abortion in Idaho*, KTVB (June 20, 2024), https://bit.ly/48kme7K.

Instead, the mother gave birth to twins, saving what was "very much a *wanted* pregnancy." *Id.* (emphasis added).

Thus, while St. Luke's has continued to claim publicly that all six of these women were transferred exclusively for abortions, it testified under oath that it does not know why women chose to be transferred. Not only that, but at the same time that St. Luke's has been making those public claims about these six women in filings with this Court, it sought to prevent public disclosure of its sworn testimony about them (purportedly on the ground that doing so would violate patient privacy). But of course, if St. Luke's amicus filings about these women do not violate patient privacy, then neither does its anonymized testimony about them. Now that St. Luke's has withdrawn those objections, that testimony is properly before this Court both as a legislative fact and as a judicially noticeable public record. *See* Fed. R. Evid. 201, Advisory Comm. Notes (discussing legislative facts); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). And it precludes the United States from citing vague reports about airlifts to prove irreparable harm.

**2. The United States suffers no irreparable harm from the enforcement of an Idaho law that does not conflict with EMTALA.**

The government suffers no irreparable harm related to non-enforcement of federal law here. Because EMTALA incorporates Idaho's state-law regulations regarding the practice of medicine, the Idaho Defense of Life Act does not conflict with EMTALA.

Moreover, the United States is unable to point to any true conflicts because the necessary stabilizing treatment is almost never an abortion. The United States relies on the district court's conclusion that supposed ambiguity in Idaho's law created a gap between what EMTALA requires and what Idaho's Defense of Life Act might prohibit. U.S.Br.37–43. But as a panel of this Court concluded in staying the district court's preliminary injunction, "almost all the examples in the district court's parade-of-horribles are no longer true, given the Idaho Legislature's recent amendment to the statute and clarification from the Supreme Court of Idaho." *United States v. Idaho*, 83 F.4th 1130, 1137 (9th Cir.), *reh'g en banc granted, vacated by* 82 F.4th 1296 (9th Cir. 2023). Following those changes, "the district court's reliance on declarations from certain doctors claiming that the law would undermine their medical judgment," which the United States relies on again here, U.S.Br.38–39, 41 "is no longer valid," *Idaho*, 83 F.4th at 1137. This is particularly true given the clarifications by the Idaho Supreme Court about state law: physician " 'certainty' is not the standard" for invoking the life-of-the-mother exception, that "standard has no imminency requirement," and a "medical consensus on what is necessary to prevent the death of the" mother is not required. *Id.* (cleaned up).

The United States intimates that Idaho's Defense of Life Act prevents women from receiving stabilizing treatment in the case of PPROM. U.S.Br.40. But numerous studies show that a significant number of pre-viability babies are safely delivered after a PPROM by carefully monitoring the mother's health for the risks the United States identifies until the baby reaches viability and can be safely delivered. *Moyle*, 144 S. Ct. at 2037 n.23 (Alito, J., dissenting) (cataloging studies showing infant survival rate from

one-third to as high as 90%). This type of care—protecting both mother and baby—is precisely what the Defense of Life Act was designed to accomplish. And if a doctor reasonably believes that a mother is facing a life-threatening condition like sepsis or critical organ failure, then Idaho's law allows termination of the pregnancy.

The United States also claims obstacle preemption. U.S.Br.42. But a panel of this Court rejected that argument, too. *Idaho*, 83 F.4th at 1138. That's because it is not EMTALA's purpose "to force hospitals to treat medical conditions using certain procedures." *Id.* "Instead, EMTALA seeks to prevent hospitals from neglecting poor or uninsured patients with the goal of protecting 'the health of the woman' and 'her unborn child.'" *Id.* (quoting 42 U.S.C. § 1395dd(e)(1)(A)). Idaho's Defense of Life Act's "limitations on abortion services do not pose an obstacle to EMTALA's purpose because they do not interfere with the provision of emergency medical services to indigent patients." *Id.* at 1138–39. So the United States cannot show irreparable harm by the Defense of Life Act's enforcement.

**B.    The United States offers no good reason to refrain from modifying the injunction to reflect its concessions.**

The United States asks this Court not to touch the injunction's scope because Idaho's "motion to modify the injunction remains pending in the district court" and "[t]he district court should be permitted to determine in the first instance whether to modify its injunction." U.S.Br.59. But the United States omits that it is arguing the opposite in the district court, which it says lacks jurisdiction to modify the injunction while this appeal "remains pending before the Ninth Circuit." U.S. Opp'n to Emergency Mot. to Modify Prelim. Inj. at 4, No. 1:22-cv-329 (D. Idaho Aug. 2, 2024), ECF

No. 171. This Court has jurisdiction over the injunction, as the government has acknowledged, *see id.*, and it should give effect to the United States' concessions.

The United States fares no better on the merits.

*First*, the United States is wrong that its position did not evolve between the district court and Supreme Court. As Justice Barrett explained, "the shape of these cases has substantially shifted since we granted certiorari." *Moyle*, 144 S. Ct. at 2019 (Barrett, J., concurring). That was because "[a]t the merits stage … the United States disclaimed [certain] interpretations of EMTALA" that had led to the Court's grant of review. *Id.* at 2021 (Barrett, J., concurring). Justice Barrett enumerated the United States' "important" and "critical" concessions, which are the same concessions that Idaho seeks to implement here. *See id.*; Idaho.Br.43–48.

*Second*, the injunction is inconsistent with those concessions. The federal rules mandate that every injunction "state its terms specifically." Fed. R. Civ. P. 65(d)(1)(B). This specificity matters not only to Idaho but also to the third-party physicians and hospitals who need to know what aspects of state law may be enforced despite the injunction. The injunction reflects none of the United States' concessions, which were critical to the Court's decision. *Moyle*, 144 S. Ct. at 2021 (Barrett, J., concurring).

Instead, the injunction describes its terms only at a high level of generality as forbidding enforcement of Idaho law "as applied to medical care required" by EMTALA and where necessary "to avoid" an emergency medical condition. 1-ER-051–52. That language provides no notice whatsoever of the exceptions the United States acknowledged in this litigation. And the government is wrong as a matter of law to characterize EMTALA's mandate as requiring hospitals "to avoid" emergency

medical conditions, *see id.*, rather than "to stabilize" them, a position the government did not defend in the Supreme Court. *See* 42 U.S.C. § 1395dd(b)(1)(A). So it cannot now be heard to deny the need to implement those limits.

## CONCLUSION

The Court should vacate the district court's injunction or, at minimum, narrow it consistent with the administration's concessions.

Respectfully submitted,

Dated: November 5, 2024

By:*/s/ Alan M. Hurst*

JAMES A. CAMPBELL
JOHN J. BURSCH
ERIN M. HAWLEY
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jcampbell@ADFlegal.org
jbursch@ADFlegal.org
ehawley@ADFlegal.org
lwilson@ADFlegal.org

RAUL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
SOLICITOR GENERAL
700 W Jefferson St #210
Boise, ID 83720
(208) 332-3548
alan.hurst@ag.idaho.gov

*Counsel for Appellant State of Idaho*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2024 I electronically filed the foregoing Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Alan M. Hurst*
Alan M. Hurst
Attorney for Appellant State of Idaho

November 5, 2024

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-35440, 23-35450

I am the attorney or self-represented party.

**This brief contains** 6,418 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Alan M. Hurst **Date** November 5, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*